# 22-728

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

FEDERAL TRADE COMMISSION, STATE OF NEW YORK, STATE OF CALIFORNIA,
STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF ILLINOIS,
STATE OF NORTH CAROLINA, COMMONWEALTH OF VIRGINIA,

—against—

*Plaintiffs-Appellees,*

MARTIN SHKRELI, individually, as an owner and former director of
Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendant-Appellant,*

VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, KEVIN MULLEADY,
individually, and as an owner and director of Phoenixus AG and as
a former executive of Vyera Pharmaceuticals, LLC,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME II OF VIII
### (Pages A-298 to A-594)

BRADLEY GROSSMAN
UNITED STATES FEDERAL
  TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-2424

*Attorneys for Plaintiff-Appellee
  Federal Trade Commission*

KIMO S. PELUSO
NOAM BIALE
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for Defendant-Appellant
  Martin Shkreli*

(*Counsel continued on inside cover*)

PHILIP LEVITZ
OFFICE OF THE NEW YORK STATE
    ATTORNEY GENERAL
28 Liberty Street, 15th Floor
New York, New York 10005
(212) 416-8000

*Attorneys for Plaintiffs-Appellees*
  *State of New York, State of*
  *California, Commonwealth of*
  *Pennsylvania, State of Illinois,*
  *Commonwealth of Virginia*

SHIRA HOFFMAN
ASSISTANT U.S. ATTORNEY
CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 269-6000

*Attorneys for Plaintiff-Appellee*
  *State of California*

DEREK MICHAEL WHIDDON
ASSISTANT ATTORNEY GENERAL
OHIO OFFICE OF THE
    ATTORNEY GENERAL
30 East Broad Street, 26th Floor
Columbus, Ohio 4321
(614) 466-2677

*Attorneys for Plaintiff-Appellee*
  *State of Ohio*

JOSEPH STEPHEN BETSKO, SR.
PENNSYLVANIA OFFICE OF
  THE ATTORNEY GENERAL
ANTITRUST SECTION
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-5393

*Attorneys for Plaintiff-Appellee*
  *Commonwealth of Pennsylvania*

SARAH A. HUNGER
DEPUTY SOLICITOR
ILLINOIS OFFICE OF THE
    ATTORNEY GENERAL
CIVIL APPEALS DIVISION
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5202

*Attorneys for Plaintiff-Appellee*
  *State of Illinois*

JESSICA VANCE SUTTON
NORTH CAROLINA DEPARTMENT
  OF JUSTICE
114 West Edenton Street
Raleigh, North Carolina 27603
(919) 716-0998

*Attorneys for Plaintiff-Appellee*
  *State of North Carolina*

SARAH OXENHAM ALLEN
LUCAS W.E. CROSLOW
MARTIN JORDAN MINOT
VIRGINIA OFFICE OF THE
    ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-6557

*Attorneys for Plaintiff-Appellee*
  *Commonwealth of Virginia*

# TABLE OF CONTENTS

PAGE

District Docket Court Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Amended Complaint, dated April 14, 2020 [Redacted] . . . . . . . . . . . . . . . . . A-136

Defendant Kevin Mulleady's Answer and Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-222

Defendant Martin Shkreli's Answer with Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-289

Defendant Vyera Pharmaceuticals' Answer with Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-351

Joint Stipulation and Order to Amend the Relief Requested
    in the Pleadings, dated March 30, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . A-409

FTC's Motion for Leave to Withdraw the FTC's Prayer
    for Equitable Monetary Relief, dated May 26, 2021 . . . . . . . . . . . . . . . . A-414

Order Dismissing the FTC's Claim for Disgorgement,
    dated June 2, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-419

Defendant Martin Shkreli's Pretrial Memorandum of Law [Redacted] . . . A-422

Plaintiff States' Supplemental Pretrial Memorandum of Law,
    dated October 20, 2021 [Redacted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-457

Joint Motion for Entry of Stipulated Order for Permanent Injunction,
    dated December 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-492

Stipulated Order for Permanent Injunction and Equitable
    Monetary Relief, dated December 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . A-541

ii

PAGE

Written Testimony of Nicholas Pelliccione, Ph. D.,
dated October 18, 2021 .......................................... A-581

Written Testimony of W. David Hardy, M.D., dated October 20, 2021 . . A-593

Written Testimony of Frank DellaFera, dated October 18, 2021
[Redacted] ..................................................... A-631

Written Testimony of James R. Bruno, dated October 20, 2021
[Redacted] ..................................................... A-649

Written Testimony of Edward V. Conroy, dated October 20, 2021 ...... A-687

Written Testimony of Susan McDougal, dated October 15, 2021
[Redacted] ..................................................... A-725

Written Testimony of Abhishek Mukhopadhyay,
dated October 19, 2021 [Redacted] .............................. A-739

Written Testimony of Nilesh Patel, dated October 15, 2021
[Redacted] ..................................................... A-751

Written Testimony of Manish S. Shah, dated October 20, 2021 ......... A-766

Written Testimony of Martin Shkreli, dated October 15, 2021
[Redacted] ..................................................... A-785

Written Testimony of Anne Kirby, dated October 20, 2021 [Redacted] . . A-803

Written Testimony of Kevin Mulleady, dated October 20, 2021 ......... A-831

Written Testimony of Professor C. Scott Hemphill,
dated October 19, 2021 [Redacted] .............................. A-864

Written Testimony of Dr. Anupam B. Jena, dated October 20, 2021
[Redacted], with Attachments ................................... A-924

iii

PAGE

Written Testimony of John S. Russell, dated October 20, 2021
    [Redacted], with Attachments .................................. A-1011

Consolidated (Full) Trial Transcripts,
    dated December 14 to 20, 2021 ................................ A-1068

Defendant Martin Shkreli's Notice of Appeal, dated April 5, 2022 .... A-2298

was elected to the board of directors of Phoenixus AG in June 2017.  Mr. Shkreli denies the remaining allegations in Paragraph 42 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 42 directed toward the Company and on that basis denies them.

43.     Certain allegations in Paragraph 43 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli admits that, in 2017, Phoenixus AG offered to buy back preferred shares from interested investors.  Mr. Shkreli denies the remaining allegations in Paragraph 43 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 43 directed toward the Company and therefore denies them.

44.     Certain allegations in Paragraph 44 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli admits that since his incarceration, he has communicated with many of his family and friends, including Mr. Mulleady and Mr. Mithani.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegation in Paragraph 44 regarding the number of his emails with Mr. Mulleady and Mr. Mithani between June and December 2019, and therefore denies that allegation. To the extent that the last sentence of paragraph 44, which is ambiguous, alleges that all of Mr. Shkreli's communications with Mr. Mulleady and Mr. Mithani relate to matters of Vyera business strategy, that allegation is specifically denied.  Mr. Shkreli denies the remaining allegations in Paragraph 44 directed toward Mr. Shkreli.

45.     The allegations in Paragraph 45 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents, and therefore, denies the characterizations alleged in Paragraph 45.

46.     Mr. Shkreli admits that he is reflected on the books and records of Phoenixus AG as a minority shareholder, owning approximately ███ of Phoenixus AG shares and controlling approximately ███ of shareholder votes.

### 2.     "Kevin Mulleady"

47.     Mr. Shkreli admits that Mr. Mulleady is the current chairman of the board of directors of Phoenixus AG and a former CEO of Vyera.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 47 directed toward Mr. Mulleady and therefore denies them.

48.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 48 directed toward Mr. Mulleady and therefore denies them.

49.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 49 directed toward Mr. Mulleady and therefore denies them.

50.     Mr. Shkreli admits that Mr. Mulleady took a position finding investors for Mr. Shkreli's hedge fund, and that Mr. Mulleady helped start Retrophin, Inc., and was an early employee of Turing Pharmaceuticals AG (the predecessor to Phoenixus AG) and Turing Pharmaceuticals, LLC (the predecessor to Vyera Pharmaceuticals, LLC).  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 50 directed toward Mr. Mulleady and therefore denies them.

51.     Mr. Shkreli admits that Mr. Mulleady held the position of Managing Director of Turing Pharmaceuticals AG from October 27, 2014 to June 3, 2016.  Mr. Shkreli denies the

11

remaining allegations in Paragraph 51 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 51 directed toward Mr. Mulleady and therefore denies them.

52.     Mr. Shkreli admits that Mr. Mulleady joined the board of directors of Phoenixus AG in 2017, that he is currently the Chairman of the board of directors of Phoenixus AG, and that he formerly held the position of CEO of Phoenixus AG and Vyera Pharmaceuticals, LLC.   Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 52 directed toward Mr. Mulleady and the Company, and therefore denies them.

53.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 52 directed toward Mr. Mulleady and the Company, and therefore denies them.

## IV.   "Background"

### A.     "Federal Law Encourages Generic Competition"

54.     Paragraph 54 purports to summarize various statutes.  The text of those statutes speaks for itself.  Mr. Shkreli refers to those statutes for a true and complete statement of their meaning.

55.     Mr. Shkreli admits that products based on an NDA are generally referred to as "brand-name drugs" or "branded drugs."  The remaining allegations in Paragraph 55 state legal conclusions to which no response is required.

56.     Mr. Shkreli admits that a company seeking to market a generic version of a branded drug may file an Abbreviated New Drug Application ("ANDA") with the FDA referencing the branded drug's NDA.  The remaining allegations in Paragraph 56 state legal conclusions to which no response is required.

57.     Paragraph 57 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 57.

58.     Paragraph 58 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 58.

59.     Paragraph 59 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 59.

60.     Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 60 and therefore denies them.

61.     Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 61 and therefore denies them.

62.     Paragraph 62 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 62.  Mr. Shkreli lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 62 and therefore denies them.

63.     Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 63 and therefore denies them.

64.     Paragraph 64 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 64.  Mr. Shkreli lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 64 and therefore denies them.

**B.     "Competition from Lower-Priced Generic Drugs Saves American Consumers Billions of Dollars Each Year"**

65.     Paragraph 65 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 65.  Mr. Shkreli lacks

knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 65 and therefore denies them.

66.    Paragraph 66 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 66.

67.    Certain allegations in Paragraph 67 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli otherwise lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 67 and therefore denies them.

68.    Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 68 and on that basis denies them.

C.    **"Daraprim Is the Gold-Standard Treatment for Toxoplasmosis"**

69.    Mr. Shkreli admits that toxoplasmosis is a parasitic infection caused by *Toxoplasma gondii* (*T. gondii*), which is typically transmitted through foodborne (eating contaminated meat), animal-to-human (contact with infected cat feces), or mother-to-child (congenital) routes.  Mr. Shkreli further admits that, in most infected humans, toxoplasmosis is contained by their immune systems and causes no symptoms.  Mr. Shkreli denies as stated the allegation that toxoplasmosis is "common."  Mr. Shkreli states that toxoplasmosis encephalitis, the illness that Daraprim treats, is extremely rare.

70.    Mr. Shkreli admits that, in some immunocompromised individuals—such as those with HIV/AIDS, cancer patients, or recipients of organ transplants— an active infection with *T. gondii* may cause severe symptoms, and can in some cases become a potentially fatal organ infection, most commonly in the brain, lungs, or heart.  Mr. Shkreli further admits that *T. gondii* can also infect the eyes.

71.     Mr. Shkreli admits that if an expectant mother becomes newly infected with *T. gondii* during or just before pregnancy, she can pass the infection to her unborn baby, and such an infection may cause congenital toxoplasmosis, which, if left untreated, may lead to blindness, severe intellectual disabilities, and other neurological problems.

72.     Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 72 and therefore denies them.

73.     Certain allegations in Paragraph 73 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 73 and therefore denies them.

74.     Certain allegations in Paragraph 74 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.

75.     Mr. Shkreli admits that Daraprim is a branded version of pyrimethamine, that Daraprim was first approved by the FDA in 1953, and that Daraprim is no longer subject to patent protection.  Mr. Shkreli denies the remaining allegations in Paragraph 75.

76.     Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 76 and therefore denies them.

77.     Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 77 and therefore denies them.

78.     Mr. Shkreli denies the allegations in Paragraph 78.

D.    **"Vyera's Acquisition of Daraprim"**

1.    **"Prior ownership of Daraprim"**

79.    Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 79 and therefore denies them.

80.    Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 80 and therefore denies them.

81.    Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 81 and therefore denies them.

82.    Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 82 and therefore denies them.

83.    Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 83 and therefore denies them.

84.    Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 84 and therefore denies them.

85.    Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 85 and therefore denies them.

2.    **"Vyera's acquisition of Daraprim"**

86.    Certain allegations in Paragraph 86 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those unidentified documents to the extent they exist for a true and complete statement of their contents.  Mr. Shkreli denies the remaining allegations in Paragraph 86.

87.    Mr. Shkreli admits that, in or around April 2015, Vyera contacted Impax with a bid to acquire the U.S. Daraprim rights for approximately ███████  Mr. Shkreli lacks knowledge

or information sufficient to form a belief about the remaining allegations in Paragraph 87 and therefore denies them.

88.     Mr. Shkreli admits that Vyera acquired the U.S. rights to Daraprim in August 2015 for the price of approximately $55 million.  Mr. Shkreli lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 88 and therefore denies them.

89.     Mr. Shkreli denies the allegations in Paragraph 89.

90.     Certain allegations in Paragraph 90 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli denies the remaining allegations in Paragraph 90 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 90 directed toward the Company and therefore denies them.

91.     The allegations in Paragraph 91 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 91 directed toward the Company and therefore denies them.

92.     The allegations in Paragraph 92 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 92 directed toward the Company and therefore denies them.

V.    **"Defendants' Anticompetitive Agreements to Maintain Vyera's Daraprim Monopoly"**

93.    Mr. Shkreli denies the allegations in Paragraph 93 directed toward Mr. Shkreli. Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 93 directed toward the Company and Mr. Mulleady and therefore denies them.

A.    **"Defendants Implement Agreements Restricting Resale and Limiting Purchases to Block Generic Entry"**

94.    Mr. Shkreli lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 94 and therefore denies them.

95.    Certain allegations in Paragraph 95 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves. Mr. Shkreli refers to those documents for a true and complete statement of their contents. Mr. Shkreli denies the remaining allegations in Paragraph 95.

96.    Mr. Shkreli admits that Retrophin acquired the rights to sell Thiola. Mr. Shkreli denies the remaining allegations in Paragraph 96.

97.    Certain allegations in Paragraph 97 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves. Mr. Shkreli refers to those documents for a true and complete statement of their contents. Mr. Shkreli denies the remaining allegations in Paragraph 97.

98.    Certain allegations in Paragraph 98 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves. Mr. Shkreli refers to those documents for a true and complete statement of their contents. Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 98 directed toward Mr. Mulleady and therefore denies them.

99.    Mr. Shkreli admits that a restricted distribution system for Daraprim had been put in place prior to Vyera's acquisition of Daraprim and that Vyera expanded the number of distributors that were distributing Daraprim.  Mr. Shkreli denies the remaining allegations in Paragraph 99 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 99 directed toward the Company and Mr. Mulleady and therefore denies them.

### 1.    "Vyera's contractual restrictions prevent distributors from selling Daraprim to generic companies"

100.    Certain allegations in Paragraph 100 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 100 directed toward the Company and therefore denies them.

101.    Certain allegations in Paragraph 101 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 101 directed toward the Company and therefore denies them.

102.    Mr. Shkreli admits that Vyera has a contractual relationship with ICS and that the terms of that relationship are embodied in their contract, which is a document that speaks for itself.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 102 directed toward the Company and therefore denies them.

103.    Certain allegations in Paragraph 103 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true

and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 103 directed toward the Company and therefore denies them.

104.    Certain allegations in Paragraph 104 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 104 directed toward the Company and therefore denies them.

105.    Certain allegations in Paragraph 105 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 105 directed toward the Company and therefore denies them.

106.    Certain allegations in Paragraph 106 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 106 directed toward the Company and therefore denies them.

107.    Certain allegations in Paragraph 107 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 107 directed toward the Company and therefore denies them.

108.    Certain allegations in Paragraph 108 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 108 directed toward the Company and therefore denies them.

109.    Certain allegations in Paragraph 109 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 109 directed toward the Company and therefore denies them.

110.    Certain allegations in Paragraph 110 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 110 directed toward the Company and therefore denies them.

111.    Certain allegations in Paragraph 111 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 111 directed toward the Company and therefore denies them.

112.    Certain allegations in Paragraph 112 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information

to form a belief as to the truth of the remaining allegations in Paragraph 112 directed toward the Company and therefore denies them.

113.    Certain allegations in Paragraph 113 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 113 directed toward the Company and therefore denies them.

> **2.    "Vyera's contractual restrictions prevent downstream purchasers from selling Daraprim to generic companies"**

114.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 114 directed toward the Company and therefore denies them.

115.    Certain allegations in Paragraph 115 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 115 directed toward the Company and therefore denies them.

116.    Certain allegations in Paragraph 116 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 116 directed toward the Company and therefore denies them.

117.    Certain allegations in Paragraph 117 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 117 directed toward the Company and therefore denies them.

118.    Certain allegations in Paragraph 118 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 118 directed toward the Company and therefore denies them.

119.    Certain allegations in Paragraph 119 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 119 directed toward the Company and therefore denies them.

120.    Certain allegations in Paragraph 120 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 120 directed toward the Company and therefore denies them.

121.    Certain allegations in Paragraph 121 purport to characterize or summarize from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli admits that Vyera entered into an agreement with Walgreens.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 121 directed toward the Company and therefore denies them.

122.    Certain allegations in Paragraph 122 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 122 directed toward the Company and therefore denies them.

### 3.    "Vyera limits and monitors approved sales of Daraprim to prevent generic companies from obtaining it"

123.    Mr. Shkreli denies the allegations in Paragraph 123.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 123 directed toward the Company and Mr. Mulleady, and therefore denies them.

124.    Mr. Shkreli denies the allegations in Paragraph 124.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 124 directed toward the Company and Mr. Mulleady, and therefore denies them.

125.    Certain allegations in Paragraph 125 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 125 directed toward the Company and therefore denies them.

126.    Certain allegations in Paragraph 126 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 126 directed toward the Company and therefore denies them.

127.     Certain allegations in Paragraph 127 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 127 directed toward the Company and therefore denies them.

128.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 128 directed toward the Company and therefore denies them.

129.     Certain allegations in Paragraph 129 purport to characterize, summarize, or quote from selected portions of one or more documents or recordings, which speak for themselves.  Mr. Shkreli refers to those documents or recordings for a true and complete statement of their contents.

130.     Certain allegations in Paragraph 130 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 130 directed toward Mr. Mulleady and Mr. Mithani, and therefore denies them.

131.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 130 and therefore denies them.

132.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 132, which are solely directed toward the Company and Mr. Mulleady, and therefore denies them.

133.     Certain allegations in Paragraph 133 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph
133 and therefore denies them.

    **4.**    **"Defendants' generic-blocking restrictions prevent generic competitors from purchasing Daraprim and have no legitimate rationale"**

134.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the
truth of the allegations in Paragraph 134, directed solely toward the Company, and therefore denies
them.

135.    Certain allegations in Paragraph 135 purport to characterize or summarize one or
more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true
and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information
to form a belief as to the truth of the allegations in Paragraph 135, directed solely toward the
Company, and therefore denies them.

136.    Paragraph 136 states legal conclusions to which no response is required.  To the
extent a response is required, Mr. Shkreli denies the allegations in Paragraph 136.  Mr. Shkreli
lacks sufficient knowledge or information to form a belief as to the truth of the remaining
allegations in Paragraph 135, directed solely toward the Company, and therefore denies them.

137.    Mr. Shkreli denies the allegations in Paragraph 137.

138.    Certain allegations in Paragraph 138 purport to characterize, summarize, or quote
from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers
to those documents for a true and complete statement of their contents.  Mr. Shkreli denies the
allegations in Paragraph 138 directed toward Mr. Shkreli.

139.    Certain allegations in Paragraph 139 purport to characterize, summarize, or quote
from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers
to those documents for a true and complete statement of their contents.  Mr. Shkreli admits that,

in 2015, the Senate Special Committee on Aging launched an investigation into price increases for certain drugs.  Mr. Shkreli denies the remaining allegations in Paragraph 139.

140.    Certain allegations in Paragraph 140 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli denies the allegations in Paragraph 140, except admits that certain Vyera employees testified before the Senate.

141.    Mr. Shkreli denies the allegations in Paragraph 141.

142.    Paragraph 142 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 142.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 142 and therefore denies them.

143.    Certain allegations in Paragraph 143 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 130 directed toward the Company, and therefore denies them.

B.      **"Defendants Enter Exclusive Agreements With API Manufacturers to Block Generic Companies' Access to Pyrimethamine API Supply"**

144.    Mr. Shkreli denies the allegations in Paragraph 144 directed toward Mr. Shkreli. Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 144 directed toward the Company and Mr. Mulleady, and therefore denies them.

145.   Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 145 and therefore denies them.

146.   To the extent that the allegations in Paragraph 146 purport to describe the FDA's API approval process, such allegations constitute legal conclusions to which no response is required.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 146 and therefore denies them.

147.   Certain allegations in Paragraph 147 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 147 and therefore denies them.

148.   Mr. Shkreli denies the allegations in Paragraph 148.

> **1.   "Vyera locks up the only manufacturer with an FDA-approved manufacturing process for pyrimethamine API"**

149.   Mr. Shkreli admits that, as of 2015, Fukuzyu and Ipca Laboratories Ltd. had filed Drug Master Files ("DMF") with the FDA.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 149, which are directed solely toward the Company, and therefore denies them.

150.   Certain allegations in Paragraph 150 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 150, which are directed solely toward the Company, and therefore denies them.

28

151.    Mr. Shkreli admits that Fukuzyu's pyrimethamine API is approved by the FDA.
Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the
remaining allegations in Paragraph 151, which are directed solely toward the Company, and
therefore denies them.

152.    Certain allegations in Paragraph 152 purport to characterize, summarize, or quote
from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers
to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient
knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph
152, which are directed solely toward the Company, and therefore denies them.

153.    The allegations in Paragraph 153 purport to characterize, summarize, or quote from
selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to
those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient
knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph
153, which are directed solely toward the Company, and therefore denies them.

154.    Certain allegations in Paragraph 154 purport to characterize or summarize one or
more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true
and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information
to form a belief as to the truth of the remaining allegations in Paragraph 154, which are directed
solely toward the Company, and therefore denies them.

155.    Certain allegations in Paragraph 155 purport to characterize, summarize, or quote
from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers
to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 155, which are directed solely toward the Company, and therefore denies them.

156.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 156, which are directed solely toward the Company, and therefore denies them.

157.    Certain allegations in Paragraph 157 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 157, which are directed solely toward the Company, and therefore denies them.

158.    Paragraph 158 purports to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli admits that the Company has an agreement with Fukuzyu that remains in effect.

> **2.    "Defendants poach a second API manufacturer from generic competitors"**

159.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 159, which are directed solely toward the Company, and therefore denies them.

160.    To the extent that Paragraph 160 makes allegations regarding RL Fine's plans, business or experience, manufacturing process, ability to obtain FDA approval, and ability to supply pyrimethamine API for sale in the United States, Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.  Mr. Shkreli denies the remaining allegations in Paragraph 160.

161.    Mr. Shkreli denies the allegations in Paragraph 161.

162.    Certain allegations in Paragraph 162 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 162 directed toward Mr. Mulleady and therefore denies them.

163.    Certain allegations in Paragraph 163 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 163, which are directed solely towards the Company and Mr. Mulleady, and therefore denies them.

164.    Certain allegations in Paragraph 164 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 164, which are directed solely toward the Company, and therefore denies them.

165.    Certain allegations in Paragraph 165 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 165, which are directed solely toward the Company, and therefore denies them.

166.    Certain allegations in Paragraph 166 purport to characterize or summarize one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true

and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 166, which are directed solely toward the Company, and therefore denies them.

167.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 167, which are directed solely toward the Company, and therefore denies them.

168.    To the extent that Paragraph 168 makes allegations regarding supply interruptions at Fukuzyu, Fukuzyu's capacity to produce pyrimethamine API, and Fukuzyu's supply of pyrimethamine API to other manufacturers, Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of these allegations.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 168, which are directed solely toward the Company, and therefore denies them.

169.    To the extent that Paragraph 169 alleges that RL Fine did not "take any further steps to conform its process to FDA requirements," Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of such allegation and on that basis denies it.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 169, which are directed solely toward the Company, and therefore denies them.

170.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 170, which are directed solely toward the Company, and therefore denies them.

171.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 171, which are directed solely toward the Company, and therefore denies them.

172.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 172, which are directed solely toward the Company, and therefore denies them.

173.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 173, which are directed solely toward the Company, and therefore denies them.

174.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 174, which are directed solely toward the Company, and therefore denies them.

175.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 175, which are directed solely toward the Company, and therefore denies them.

**C.    "Vyera Enters Data-Blocking Agreements to Mask the True Size of the Pyrimethamine Market"**

176.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 176, which are directed solely toward the Company, and therefore denies them.

177.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 177, and therefore denies them.

178.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 178, and therefore denies them.

179.    Mr. Shkreli denies the allegations in Paragraph 179.

180.    Mr. Shkreli admits that Vyera Pharmaceuticals, LLC and Phoenixus AG are privately-held companies.  Mr. Shkreli states that Vyera is required by law to report aspects of

Daraprim's distribution, including to government regulatory bodies.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 180 and therefore denies them.

181.   Mr. Shkreli denies the allegations in Paragraph 181.

182.   Mr. Shkreli denies the allegations in Paragraph 182.

183.   The allegations in Paragraph 183 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 183, which are directed solely toward the Company, and therefore denies them

184.   Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 184, which are directed solely toward the Company, and therefore denies them.

185.   Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 185, which are directed solely toward the Company, and therefore denies them.

186.   The allegations in Paragraph 186 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents. Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 186, which are directed solely toward the Company, and therefore denies them.

187.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 187, which are directed solely toward the Company, and therefore denies them.

188.     Certain allegations in Paragraph 188 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 188, which are directed solely toward the Company, and therefore denies them.

189.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 189 and therefore denies them.

190.     Mr. Shkreli admits that Vyera has no obligation to publicly report its Daraprim sales.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 173 and therefore denies them

VI.     **"Defendants' Anticompetitive Conduct Successfully Delayed and Excluded Numerous Potential Generic Competitors"**

191.     Mr. Shkreli denies the allegations in Paragraph 191.

A.     ████████████████

192.     To the extent that Paragraph 192 asserts allegations speculating about ████████ Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.  Mr. Shkreli denies the remaining allegations in Paragraph 192.

193.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 193 and therefore denies them.

194.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 194 and therefore denies them.

195.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 195 and therefore denies them.

196.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 196 and therefore denies them.

197.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 197 and therefore denies them.

198.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 198 and therefore denies them.

199.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 199 and therefore denies them.

200.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 200 and therefore denies them.

201.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 201 and therefore denies them.

202.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 202 and therefore denies them.

203.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 203 and therefore denies them.

204.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 204 and therefore denies them.

205.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 193 and therefore denies them.

206.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 206 and therefore denies them.

207.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 207 and therefore denies them.

208.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 208 and therefore denies them.

209.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 209 and therefore denies them.

210.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 210 and therefore denies them.

211.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 211 and therefore denies them.

212.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 212 and therefore denies them.

213.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 213 and therefore denies them.

214.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 214 and therefore denies them.

215.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 215 and therefore denies them.

216.    Mr. Shkreli admits the allegations in Paragraph 216.

217.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 217 and therefore denies them.

218.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 218 and therefore denies them.

219.    Mr. Shkreli denies the allegations in Paragraph 219 directed toward Mr. Shkreli. To the extent that Paragraph 219 asserts allegations speculating about █████, Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.

220.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 220 and therefore denies them.

**B.**    "████████████████████"

221.    Mr. Shkreli denies the allegations in Paragraph 221 directed toward Mr. Shkreli. To the extent that Paragraph 221 asserts allegations speculating about ██████ Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

222.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 222 and therefore denies them.

223.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 223 and therefore denies them, except admits that Daraprim has no patent protection.

224.    To the extent that the allegations in Paragraph 224 purport to describe the FDA's approval process, such allegations constitute legal conclusions to which no response is required.

Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 224 and therefore denies them.

225.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 225 and therefore denies them.

226.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 226 and therefore denies them.

227.    Mr. Shkreli admits that Ipca had a U.S. DMF for pyrimethamine.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 227 and therefore denies them.

228.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 228 and therefore denies them.

229.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 229 and therefore denies them.

230.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 230 and therefore denies them.

231.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 231 and therefore denies them.

232.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 232 and therefore denies them.

233.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 233 and therefore denies them.

234.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 234 and therefore denies them.

235.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 235 and therefore denies them.

236.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 236 and on that basis denies them.

237.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 237 and therefore denies them.

238.    Mr. Shkreli denies the allegations in Paragraph 238 directed toward Mr. Shkreli. To the extent that Paragraph 238 asserts allegations speculating about ███████ Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

C.    "████████████████"

239.    Mr. Shkreli denies the allegations in Paragraph 239 directed toward Mr. Shkreli. To the extent that Paragraph 239 asserts allegations speculating about ██, Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of such allegations and therefore denies them.

240.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 240 and therefore denies them.

241.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 241 and therefore denies them.

242.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 242 and therefore denies them.

243.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 243 and therefore denies them.

244.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 244 and therefore denies them.

245.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 245 and therefore denies them.

246.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 246 and therefore denies them.

247.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 247 and therefore denies them.

248.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 248 and therefore denies them.

249.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 249 and therefore denies them.

250.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 250 and therefore denies them.

251.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 251 and therefore denies them.

252.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 252, which are directed solely toward the Company, and therefore denies them.

253.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 253, which are directed solely toward the Company, and therefore denies them.

254.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 254, which are directed solely toward the Company and Mr. Mulleady, and therefore denies them.

255.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 255, which are directed solely toward the Company and Mr. Mulleady, and therefore denies them.

256.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 256, which are directed solely toward the Company and Mr. Mulleady, and therefore denies them.

257.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 257, which are directed solely toward the Company, and therefore denies them.

258.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 258 and therefore denies them.

259.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 259 and therefore denies them.

260.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 260 and therefore denies them.

261.    Mr. Shkreli denies the allegations in Paragraph 261 directed toward Mr. Shkreli. To the extent that Paragraph 261 asserts allegations speculating about ███, Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.

D.      **"Mylan N.V."**

262.    Mr. Shkreli admits that Mylan is one of the largest generic pharmaceutical companies in the world.  Mr. Shkreli denies the remaining allegations in Paragraph 262.

263.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 263 and therefore denies them.

264.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 264 and therefore denies them.

265.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 265 and therefore denies them.

266.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 266 and therefore denies them.

E.      **"Other generic companies"**

267.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 267 and therefore denies them.

268.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 268 and therefore denies them.

269.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 269 and therefore denies them.

270.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 270 and therefore denies them.

271.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 271 and therefore denies them.

272.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 272, which are directed solely toward the Company, and therefore denies them.

**VII.    "Defendants' Foreclosure of Generic Entry Caused Consumers to Pay Higher Prices"**

273.    Mr. Shkreli denies the allegations in Paragraph 273.

274.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 274 and therefore denies them.

275.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 275 and therefore denies them.

276.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 276 and therefore denies them.

277.    Mr. Shkreli denies the allegations in Paragraph 277.

278.    Mr. Shkreli denies the allegation in Paragraph 278 that "Defendants' anticompetitive conduct has delayed the introduction of . . . price competition to the detriment of consumers and other purchasers of Daraprim." Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 278 and therefore denies them.

279.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 279, which are directed solely toward the Company, and therefore denies them.

280.    Mr. Shkreli denies the allegations in Paragraph 280.

281.    Mr. Shkreli denies the allegations in Paragraph 281.

282.    Mr. Shkreli denies the allegations in Paragraph 282.

283.     Mr. Shkreli denies the allegations in Paragraph 283.

284.     Mr. Shkreli denies the allegations in Paragraph 284 directed toward Mr. Shkreli. Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 284 and therefore denies them.

285.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 285, and therefore denies them.

286.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 286 and therefore denies them.

287.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 286 and therefore denies them.

288.     Mr. Shkreli denies the allegations in Paragraph 288.

289.     Mr. Shkreli denies the allegations in Paragraph 289.

290.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 290, which are directed solely toward the Company, and therefore denies them.

291.     Mr. Shkreli denies the allegations in Paragraph 291.

292.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 292, which are directed solely toward the Company, and therefore denies them.

293.     Mr. Shkreli denies the allegations in Paragraph 293.

294.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 292, which are directed solely toward Mr. Mulleady, and therefore denies them.

**VIII.  "Vyera Has Monopoly Power in a Relevant Market for FDA-Approved Pyrimethamine Products"**

295.    Paragraph 295 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 295.

296.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 296, which are directed solely toward the Company, and therefore denies them.

297.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 297, which are directed solely toward the Company, and therefore denies them.

298.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 298, which are directed solely toward the Company, and therefore denies them.

299.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 299, which are directed solely toward the Company, and therefore denies them.

300.    Paragraph 300 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 300.

301.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 301, which are directed solely toward the Company, and therefore denies them.

302.    Mr. Shkreli denies the allegations in Paragraph 302.

303.    Certain allegations in Paragraph 303 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers

to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 303, which are directed solely toward the Company, and therefore denies them.

304.    Mr. Shkreli denies the allegations in Paragraph 304.

305.    Paragraph 305 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies those allegations.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 305 and therefore denies them.

306.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 306, which are directed solely toward the Company, and therefore denies them.

307.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 307, which are directed solely toward the Company, and therefore denies them.

308.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 308 and therefore denies them.

309.    The allegations in Paragraph 309 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Mr. Shkreli refers to those documents for a true and complete statement of their contents.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 309, which are directed solely toward the Company, and therefore denies them.

310.    Paragraph 310 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 310.

311.    Paragraph 311 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 311.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 311 and therefore denies them.

312.    Paragraph 312 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 312.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 312 and therefore denies them.

313.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 313, which are directed solely toward the Company, and therefore denies them.

**"COUNT I"**

**"Monopoly Maintenance Against All Defendants"**

314.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

315.    Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 315, which are directed solely toward the Company, and therefore denies them.

316.    Mr. Shkreli denies the allegations in Paragraph 316 that are directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 316 directed toward the Company and Mr. Mulleady and therefore denies them.

317.    Mr. Shkreli denies the allegations in Paragraph 317.

318.    Paragraph 318 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 318.

### "COUNT II"

### "Agreements in Restraint of Trade (Restrictions and Limitations on Resale of Daraprim) Against All Defendants"

319.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

320.    Paragraph 320 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 320 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 320 directed toward the Company and Mr. Mulleady and therefore denies them.

### "COUNT III"

### "Agreements in Restraint of Trade (API Supply Exclusivity Agreements) Against All Defendants"

321.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

322.    Paragraph 322 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 322 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 322 directed toward the Company and Mr. Mulleady and therefore denies them.

### "COUNT IV"

### "A.    Anticompetitive Contracts, Agreements and/or Arrangements in Violation of New York's Donnelly Act Against All Defendants"

323.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

324.    Paragraph 324 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 324 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 324 directed toward the Company and Mr. Mulleady and therefore denies them.

325.    Paragraph 325 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 325 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 325 directed toward the Company and Mr. Mulleady and therefore denies them.

326.    Paragraph 326 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 326.

 **"B.    Illegality in Violation of New York Executive Law § 63(12) Against All Defendants"**

327.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

328.    Paragraph 328 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 328.

### "COUNT V"

**"A.    Anticompetitive Contracts, Agreements and/or Arrangements
in Violation of California's Cartwright Act Against All Defendants"**

329.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

330.     Paragraph 330 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 330 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 330 directed toward the Company and Mr. Mulleady and therefore denies them.

331.     Paragraph 331 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 331 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 331 directed toward the Company and Mr. Mulleady and therefore denies them.

### "B.     Anticompetitive Contracts, Agreements and/or Arrangements in Violation of California's Unfair Competition Act Against All Defendants"

332.     Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

333.     Paragraph 333 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 333 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 333 directed toward the Company and Mr. Mulleady and therefore denies them.

334.     Paragraph 334 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 334 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 334 directed toward the Company and Mr. Mulleady and therefore denies them.

**"COUNT VI"**

**"Anticompetitive Contracts, Combinations and/or Conspiracies in
Violation of the Illinois Antitrust Act Against All Defendants"**

335.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

336.    Paragraph 336 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 336 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 336 directed toward the Company and Mr. Mulleady and therefore denies them.

337.    Paragraph 337 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 337.

**"COUNT VII"**

**"Unfair Methods of Competition and/or Unfair Acts or Practices in Violation of the
North Carolina Unfair or Deceptive Practices Act Against All Defendants"**

338.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

339.    Paragraph 339 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 339 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 339 directed toward the Company and Mr. Mulleady and therefore denies them.

340.    Paragraph 340 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 340 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth

of the allegations in Paragraph 340 directed toward the Company and Mr. Mulleady and therefore denies them.

341.    Paragraph 341 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 341.

342.    Paragraph 342 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 342.

343.    Paragraph 343 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 343.

## "COUNT VIII"

### "Violations of Ohio's Valentine Act Against All Defendants"

344.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

345.    Paragraph 345 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 345.

## "COUNT IX"

### "A.    Pennsylvania's Unfair Trade Practices and Consumer Protection Law"

346.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

347.    Paragraph 347 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 347.

348.    Paragraph 348 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 348.

349.    Paragraph 349 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 349.

350.    Paragraph 350 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 350.

351.    Paragraph 351 (including its subparts (a)-(e)) contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 351 (including its subparts (a)-(e)).

352.    Paragraph 352 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 352.

353.    Paragraph 353 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 353.

### "B.    Common Law Doctrine against Restraint of Trade"

354.    Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

355.    Paragraph 355 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 355.

356.    Paragraph 356 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 356.

**"COUNT X"**

**"A.     Anticompetitive Agreements in Violation of the
Virginia Antitrust Act Against All Defendants"**

357.     Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

358.     Paragraph 358 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 358 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 358 directed toward the Company and Mr. Mulleady and therefore denies them.

359.     Paragraph 359 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 359 directed toward Mr. Shkreli.  Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 359 directed toward the Company and Mr. Mulleady and therefore denies them.

**"B.     Monopoly Maintenance in Violation of the Virginia Antitrust Act"**

360.     Mr. Shkreli hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

361.     Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 361, which are directed solely toward the Company, and therefore denies them.

362.     Mr. Shkreli denies the allegations in Paragraph 362 directed toward Mr. Shkreli. Mr. Shkreli lacks sufficient knowledge or information to form a belief as to the truth of the

allegations in Paragraph 362 directed toward the Company and Mr. Mulleady and therefore denies them.

363.     Mr. Shkreli denies the allegations in Paragraph 363.

364.     Paragraph 364 states legal conclusions to which no response is required.  To the extent a response is required, Mr. Shkreli denies the allegations in Paragraph 364.

## GENERAL DENIAL

Mr. Shkreli denies each and every allegation in the Complaint not specifically admitted or otherwise addressed above.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Mr. Shkreli asserts the following separate and additional affirmative and other defenses, all of which are pleaded in the alternative:

### First Defense

The Complaint, and each and every claim stated therein, fails to state a claim against Mr. Shkreli upon which relief can be granted.

### Second Defense

Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations and/or the doctrine of laches.

### Third Defense

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli's alleged conduct has not harmed competition, the competitive process, or consumers, and was lawful, procompetitive, and based on legitimate business and economic justifications.

### Fourth Defense

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not alleged that Mr. Shkreli is presently engaged in ongoing or imminent violations of law, as required by, *inter alia*, Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), and New York Executive Law Section 63(12), N.Y. Exec. Law § 63(12).

### Fifth Defense

Plaintiffs' claims are barred, in whole or in part, insofar as the Federal Trade Commission purports to seek equitable monetary relief, since Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), does not authorize the Federal Trade Commission to seek such relief.

### Sixth Defense

Plaintiffs' claims are barred, in whole or in part, by the single entity doctrine, pursuant to which an antitrust conspiracy cannot be found among a corporation, its wholly-owned subsidiary and/or its officers and directors.

### Seventh Defense

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not properly alleged a relevant product market.

### Eighth Defense

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli's alleged conduct did not lead to the acquisition or maintenance of monopoly power in any properly defined relevant antitrust market, and was lawful, procompetitive, and based on legitimate business and economic justifications.

**Ninth Defense**

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli's alleged conduct did not unreasonably restrain trade and was lawful, procompetitive, and based on legitimate business and economic justifications.

**Tenth Defense**

Plaintiffs' claims are barred, in whole or in part, because any harm to competition complained of stems from the intricate multi-tiered regulatory regime that governs the production, sale, and manufacture of pharmaceutical products, including the Hatch-Waxman Act.

**Eleventh Defense**

Plaintiffs' claims are barred, in whole or in part, because the injury complained of and the relief sought by Plaintiffs are the result of the actions or inaction of third-party generic manufacturers and/or government regulatory bodies, including without limitation the FDA.

**Twelfth Defense**

The contemplated relief would not be in the public interest because it would, among other things, harm consumers.

**Thirteenth Defense**

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli did not enter into or sign any agreements with any distributors, hospitals, other downstream purchasers, or any API suppliers.

**Fourteenth Defense**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs are not direct purchasers of Daraprim, and have not suffered any antitrust injury.

**Fifteenth Defense**

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli, as an individual, does not possess any market power or monopoly power.

**Sixteenth Defense**

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli has no ability to control or direct the Company's business decisions, and therefore cannot be liable for any alleged illegal conduct by the Company under agency principles.

**Seventeenth Defense**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs seek injunctive relief that is unreasonable, unduly punitive, and not narrowly tailored to the necessary relief.

**Eighteenth Defense**

Plaintiffs' claims for damages are barred, in whole or in part, because their damages as alleged are speculative and because of the impossibility of the ascertainment and allocation of those alleged damages.

**Nineteenth Defense**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack standing to assert them.

**Twentieth Defense**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' injuries, if any, were caused, executed or approved in whole or in part by individuals or entities not under the control or direction of Mr. Shkreli.

**Twenty-First Defense**

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli's conduct was justified, privileged, and/or not improper.

**Twenty-Second Defense**

Plaintiffs' claims are barred, in whole or in part, because this is not a "proper case" for the FTC to seek, and for the Court to issue, a permanent injunction, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. 53(b).

**Twenty-Third Defense**

Plaintiff's claims are barred, in whole or in part, because Plaintiffs' theory of reverse agency liability is not recognized by law.

**Twenty-Fourth Defense**

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli has not received or benefitted from any ill-gotten gains as a result of the alleged conduct, and therefore any equitable monetary relief sought by Plaintiffs is an unlawful penalty.

**Twenty-Fifth Defense**

Plaintiffs' claims are barred, in whole or in part, because the underlying conduct did not concern or involve Mr. Shkreli, nor did he approve or ratify it.

**Twenty-Sixth Defense**

Plaintiffs' claims are barred, in whole or in part, because no consumers have been harmed by the conduct alleged.

**Twenty-Seventh Defense**

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli was not a director or officer of the Company during the conduct complained of from February 2016 through the present.

**Twenty-Eighth Defense**

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli had no knowledge of the conduct alleged.

**Twenty-Ninth Defense**

Plaintiffs' claims are barred, in whole or in part, because Mr. Shkreli did not consent to the conduct alleged.

**Thirtieth Defense**

Mr. Shkreli adopts and incorporates by reference any applicable defense pleaded by any other Defendant not otherwise expressly set forth herein.

**RESERVATION OF AFFIRMATIVE AND OTHER DEFENSES**

Mr. Shkreli reserves the right to assert and rely on additional affirmative and other defenses that may become available or apparent, and to amend his answer and/or defenses.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Shkreli prays as follows:

1. That the Complaint be dismissed with prejudice;

2. That the Court enter judgment in favor of Mr. Shkreli; and

3. That the Court award further relief as deemed just and proper.

**DEMAND FOR JURY TRIAL**

Mr. Shkreli demands a trial by jury on all issues so triable in this action.


Dated: September 15, 2020                    Respectfully submitted,

                                By:    */s/ Christopher H. Casey*
                                       Christopher H. Casey, Esq. (admitted *pro hac vice*)
                                       A.J. Rudowitz, Esq. (admitted *pro hac vice*)
                                       DUANE MORRIS LLP
                                       30 South 17th Street

Philadelphia, PA  19103-4196
Telephone: (215) 979-1155/1974

Edward T. Kang
Kandis L. Kovalsky
KANG, HAGGERTY & FETBROYT LLC
123 S. Broad St. #1670
Philadelphia, PA 19109
Tel: (215) 525-5852/1993

*Attorneys for Defendant Martin Shkreli*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION;
STATE OF NEW YORK; STATE OF
CALIFORNIA; STATE OF ILLINOIS;
STATE OF NORTH CAROLINA; STATE
OF OHIO; COMMONWEALTH OF
PENNSYLVANIA; and
COMMONWEALTH OF VIRGINIA,

*Plaintiffs*,

v.

VYERA PHARMACEUTICALS, LLC;
PHOENIXUS AG; MARTIN SHKRELI,
individually, as an owner and former officer
of Vyera Pharmaceuticals, LLC and
Phoenixus AG; and KEVIN MULLEADY,
individually, as an owner and director of
Phoenixus AG and a former executive of
Vyera Pharmaceuticals, LLC,

*Defendants*.

Case No. 1:20-cv-00706-DLC

ECF Case

# DEFENDANTS VYERA PHARMACEUTICALS, LLC AND PHOENIXUS AG'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF

**A-352**

Defendants Vyera Pharmaceuticals, LLC and Phoenixus AG (together, "Vyera"), by and through their attorneys, submit this Answer to Plaintiffs' Amended Complaint for Injunctive and Other Equitable Relief ("Complaint").  *See* ECF No. 87.

Pursuant to Federal Rule of Civil Procedure 8(b)(3), Vyera denies each and every one of the allegations except to the extent those allegations are specifically admitted below.[1]  Vyera further responds to the allegations in the Complaint as follows:

## I.    "Nature of the Case"[2]

1.      Vyera admits that Daraprim has been used to treat toxoplasmosis.  Vyera denies the allegations in Paragraph 1 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 1 directed toward Martin Shkreli and/or Kevin Mulleady (together, the "Individual Defendants") and on that basis denies them.

2.      Vyera admits that Daraprim has been sold for more than 60 years and that, in 2015, Vyera acquired the U.S. rights to Daraprim.  Vyera denies the remaining allegations in Paragraph 2.

3.      Vyera admits that, as of 2015, Daraprim had no patent protection.  Vyera denies the remaining allegations in Paragraph 3 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 3 directed toward the Individual Defendants and on that basis denies them.

4.      Insofar as Paragraph 4 alleges that the U.S. Food and Drug Administration ("FDA") requires any generic applicant to conduct bioequivalence testing comparing its product to samples of the branded drug, that allegation states a legal conclusion to which no response is required.

---

[1] The introductory paragraph spanning pages 1 to 2 of the Complaint contains assertions of Plaintiffs' intent to which no response is required.  To the extent a response is required, Vyera denies the allegations in said paragraph.

[2] The headings in quotation marks are copied from the Complaint for ease of reference.  They do not constitute part of Vyera's answer.  To the extent that responses to the headings are required, Vyera denies them.

Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 4 concerning generic companies, including whether they could secure enough branded Daraprim for bioequivalence testing and whether any generic company abandoned development plans, and on that basis denies them.  Vyera denies the remaining allegations in Paragraph 4.

5.      Vyera admits that, in January 2017, Turing Pharmaceuticals AG (the predecessor to Phoenixus AG) entered into a supply agreement for pyrimethamine with Fukuzyu Pharmaceutical Co, Ltd. ("Fukuzyu"), the contents of which speak for themselves.  Vyera refers to that document for a true and complete statement of its contents.  Vyera denies the remaining allegations in Paragraph 5.

6.      Vyera admits that it has not purchased active pharmaceutical ingredient ("API") from RL Fine Chem Pvt. Ltd. ("RL Fine").  Vyera denies the remaining allegations in Paragraph 6.

7.      Vyera admits that, in September 2017, it entered into agreements with two of its distributors pursuant to which the distributors were prevented from selling their Daraprim sales data to third-party data reporting companies.  The contents of those documents speak for themselves and Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 7 concerning the actions of third-party data reporting companies and the use of data by generic companies and on that basis denies them.  Vyera denies the remaining allegations in Paragraph 7.

8.      Vyera denies the allegations in Paragraph 8.

II.     "Jurisdiction and Venue"

9.      Paragraph 9 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 9.

10.     Paragraph 10 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 10 directed toward Vyera.

Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 10 directed toward the Individual Defendants and on that basis denies them.

11.     Paragraph 11 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 11 directed toward Vyera. Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 11 directed toward the Individual Defendants and on that basis denies them.

12.     Paragraph 12 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 12.

13.     Paragraph 13 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 13.

14.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 14, which are directed solely toward the Individual Defendants, and on that basis denies them.

**III.**     **"The Parties"**

    **A.**     **"Plaintiff Federal Trade Commission"**

15.     Paragraph 15 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 15.

16.     Paragraph 16 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 16.

    **B.**     **"Plaintiff State of New York"**

17.     Paragraph 17 states legal conclusions and assertions of intent to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 17.

**C.     "Plaintiff State of California"**

18.     Paragraph 18 states legal conclusions and assertions of intent to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 18.

**D.     "Plaintiff State of Illinois"**

19.     Paragraph 19 states legal conclusions and assertions of intent to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 19.

**E.     "Plaintiff State of North Carolina"**

20.     Paragraph 20 states legal conclusions and assertions of intent to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 20.

**F.     "Plaintiff State of Ohio"**

21.     Paragraph 21 states legal conclusions and assertions of intent to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 21.

**G.     "Plaintiff Commonwealth of Pennsylvania"**

22.     To the extent Paragraph 22 states allegations relating to Claim IX(A), that claim has been dismissed by the Court, and thus no response is required.  Paragraph 22 contains legal conclusions and assertions of intent to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 22.

**H.     "Plaintiff Commonwealth of Virginia"**

23.     Paragraph 23 states legal conclusions and assertions of intent to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 23.

**I.     "Corporate Defendants"**

24.     Vyera admits the allegations in Paragraph 24.

25.     Vyera admits that Phoenixus AG is engaged in the manufacture and distribution of Daraprim in the United States, that Phoenixus AG sells Daraprim to Vyera Pharmaceuticals, LLC

for distribution in the United States, and that Phoenixus AG is involved in the distribution, pricing, and commercial and marketing activities of Daraprim. Vyera denies the remaining allegations in Paragraph 25. Vyera states that Turing Pharmaceuticals AG (the predecessor to Phoenixus AG) acquired the rights to market and distribute Daraprim in the United States in August 2015, and that Turing Pharmaceuticals AG designated its wholly-owned subsidiary, Turing Pharmaceuticals, LLC (the predecessor to Vyera Pharmaceuticals, LLC), as the exclusive distributor of Daraprim in the United States.

26.     Vyera admits that Vyera Pharmaceuticals, LLC is a privately-held, for-profit limited liability corporation, is wholly owned by Phoenixus AG, is incorporated in Delaware with its principal place of business located in New York City, transacts business in the Southern District of New York and throughout the United States, and was previously named Turing Pharmaceuticals, LLC.

27.     Vyera admits that Vyera Pharmaceuticals, LLC is registered with the FDA as the owner of the Daraprim New Drug Application and that Vyera Pharmaceuticals, LLC purchases Daraprim from Phoenixus AG and then markets and distributes Daraprim throughout the United States.

28.     Vyera admits that Phoenixus AG has five direct employees, that Averill Powers is the Chief Executive Officer of Phoenixus AG and the Chief Strategy Officer and General Counsel of Vyera Pharmaceuticals, LLC, and that Vyera Pharmaceuticals, LLC has no board of directors. Vyera denies the remaining allegations in Paragraph 28.

29.     Vyera denies the allegations in Paragraph 29.

30.     Paragraph 30 does not contain any allegations of fact to which a response is required. To the extent a response is required, Vyera denies the allegations in Paragraph 30.

J.      "Individual Defendants"

1.      "Martin Shkreli"

31.     Vyera admits that Mr. Shkreli founded Turing Pharmaceuticals AG (the predecessor to Phoenixus AG) and Turing Pharmaceuticals, LLC (the predecessor to Vyera Pharmaceuticals, LLC), that Mr. Shkreli is a former chairman of the board of Phoenixus AG, that Mr. Shkreli is a former CEO of Vyera Pharmaceuticals, LLC, and that Mr. Shkreli is presently reflected as a shareholder on the books and records of Phoenixus AG.  Vyera denies the remaining allegations in Paragraph 31 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 31 directed toward Mr. Shkreli and on that basis denies them.  Insofar as Paragraph 31 alleges that Mr. Shkreli is the "largest shareholder" of Phoenixus AG, such allegation states a legal conclusion to which no response is required.

32.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 32 directed toward Mr. Shkreli and on that basis denies them.

33.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 33 directed toward Mr. Shkreli and on that basis denies them.

34.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 34 directed toward Mr. Shkreli and on that basis denies them.

35.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 35 directed toward Mr. Shkreli and on that basis denies them.

36.     Vyera denies the allegations in Paragraph 36 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 36 directed toward Mr. Shkreli and on that basis denies them.

37.     Vyera denies the allegations in Paragraph 37 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 37 directed toward Mr. Shkreli and on that basis denies them.

38.     Vyera admits that Mr. Shkreli remained CEO of Phoenixus AG and Vyera Pharmaceuticals, LLC until December 2015.  Vyera denies the remaining allegations in Paragraph 38 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 38 directed toward Mr. Shkreli and on that basis denies them.

39.     Vyera admits that Ron Tilles served as CEO of Turing Pharmaceuticals AG and Turing Pharmaceuticals, LLC from January 1, 2016 to April 11, 2017 and that Mr. Shkreli is presently reflected as a shareholder on the books and records of Phoenixus AG.  Certain allegations in Paragraph 39 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 39 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 39 directed toward Mr. Shkreli and on that basis denies them.  Insofar as Paragraph 39 alleges that Mr. Shkreli is the "largest shareholder" of Phoenixus AG, such allegation states a legal conclusion to which no response is required.

40.     Vyera admits that Dr. Eliseo Salinas formerly served as CEO of Turing Pharmaceuticals, LLC.  Vyera denies the remaining allegations in Paragraph 40 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 40 directed toward Mr. Shkreli and on that basis denies them.

41.     Vyera admits that Mr. Mulleady and Akeel Mithani joined the board of directors of Phoenixus AG in June 2017 and that Mr. Mulleady formerly served as CEO of Phoenixus AG and Vyera Pharmaceuticals, LLC from January 1, 2018 to February 19, 2019.  Certain allegations in Paragraph 41 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 41 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 41 directed toward the Individual Defendants and on that basis denies them.

42.     Certain allegations in Paragraph 42 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that Mr. Mithani was elected to the board of directors of Phoenixus AG in June 2017.  Vyera denies the remaining allegations in Paragraph 42 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 42 directed toward Mr. Shkreli and on that basis denies them.

43.     Certain allegations in Paragraph 43 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that, in 2017, Phoenixus AG offered to buy back preferred shares from interested investors.  Vyera denies the remaining allegations in Paragraph 43 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 43 directed toward Mr. Shkreli and on that basis denies them.

44.     Certain allegations in Paragraph 44 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 44 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 44 directed toward Mr. Shkreli and on that basis denies them.

45.     Certain allegations in Paragraph 45 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 45 to the extent they are directed toward Vyera.  Vyera otherwise lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 45 directed toward Mr. Shkreli and on that basis denies them.

46.     Vyera admits that Mr. Shkreli is reflected on the books and records of Phoenixus AG as owning approximately ██% of Phoenixus AG shares and controlling approximately ██% of shareholder votes.  Vyera states that the allegations in Paragraph 46 state legal conclusions to which no response is required.

### 2.     "Kevin Mulleady"

47.     Vyera admits that Mr. Mulleady is the current chairman of the board of directors of Phoenixus AG and formerly served as CEO of Phoenixus AG and Vyera Pharmaceuticals, LLC from January 1, 2018 to February 19, 2019.  Vyera denies all remaining allegations in Paragraph 47 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 47 directed toward Mr. Mulleady and on that basis denies them.

48.     Vyera denies the allegations in Paragraph 48 to the extent they are directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 48 directed toward Mr. Mulleady and on that basis denies them.

49.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 49 directed toward Mr. Mulleady and on that basis denies them.

50.     Vyera admits that Mr. Mulleady was an early employee of Turing Pharmaceuticals AG (the predecessor to Phoenixus AG) and Turing Pharmaceuticals, LLC (the predecessor to Vyera Pharmaceuticals, LLC).  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 50 directed toward Mr. Mulleady and on that basis denies them.

51.     Vyera admits that, prior to his termination in 2016, Mr. Mulleady held the position of Managing Director of Turing Pharmaceuticals AG from October 27, 2014 to June 3, 2016. Vyera denies the remaining allegations in Paragraph 51 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 51 directed toward Mr. Mulleady and on that basis denies them.

52.     Vyera admits that Mr. Mulleady joined the board of directors of Phoenixus AG in 2017, that he is currently the chairman of the board of directors of Phoenixus AG, and that he formerly held the position of CEO of Phoenixus AG and Vyera Pharmaceuticals, LLC.  Vyera denies the remaining allegations in Paragraph 52 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 52 directed toward Mr. Mulleady and on that basis denies them.

53.     Vyera admits the allegations in Paragraph 53.

IV.     "**Background**"

A.      "**Federal Law Encourages Generic Competition**"

54.     Paragraph 54 purports to summarize various statutes.  The text of those statutes speaks for itself.  Vyera refers to those statutes for a true and complete statement of their meaning.

55.     Vyera admits that products based on a New Drug Application are generally referred to as "brand-name drugs" or "branded drugs."  The remaining allegations in Paragraph 55 state legal conclusions to which no response is required.

56.     Vyera admits that a company seeking to market a generic version of a branded drug may file an Abbreviated New Drug Application with the FDA referencing the branded drug's NDA.  The remaining allegations in Paragraph 56 state legal conclusions to which no response is required.

57.     Paragraph 57 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 57.

58.     Paragraph 58 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 58.

59.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 59 and on that basis denies them.

60.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 60 and on that basis denies them.

61.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 61 and on that basis denies them.

62.     Paragraph 62 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 62.  Vyera lacks knowledge

or information sufficient to form a belief about the remaining allegations in Paragraph 62 and on that basis denies them.

63.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 63 and on that basis denies them.

64.     Paragraph 64 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 64.  Vyera lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 64 and on that basis denies them.

   **B.     "Competition from Lower-Priced Generic Drugs Saves American Consumers Billions of Dollars Each Year"**

65.     Paragraph 65 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 65.  Vyera lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 65 and on that basis denies them.

66.     Paragraph 66 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 66.

67.     Certain allegations in Paragraph 67 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera otherwise lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 67 and on that basis denies them.

68.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 68 and on that basis denies them.

**C.    "Daraprim Is the Gold-Standard Treatment for Toxoplasmosis"**

69.    Vyera admits that toxoplasmosis is a parasitic infection caused by *Toxoplasma gondii* (*T. gondii*), which is typically transmitted through foodborne (eating contaminated meat), animal-to-human (contact with infected cat feces), or mother-to-child (congenital) routes.  Vyera further admits that, in most infected humans, toxoplasmosis is contained by their immune systems and causes no symptoms.  Vyera denies the allegation that toxoplasmosis is "common."

70.    Vyera admits that, in some immunocompromised individuals—such as those with HIV/AIDS, cancer patients, or recipients of organ transplants—an active infection with *T. gondii* may cause severe symptoms, and can in some cases become a potentially fatal organ infection, most commonly in the brain, lungs, or heart.  Vyera further admits that *T. gondii* can also infect the eyes.

71.    Vyera admits that if an expectant mother becomes newly infected with *T. gondii* during or just before pregnancy, she can pass the infection to her unborn baby, and such an infection may cause congenital toxoplasmosis, which, if left untreated, may lead to blindness, severe intellectual disabilities, and other neurological problems.

72.    Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 72 and on that basis denies them.

73.    Certain allegations in Paragraph 73 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 73 and on that basis denies them.

74.     Certain allegations in Paragraph 74 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.

75.     Vyera admits that Daraprim is a branded version of pyrimethamine, that Daraprim was first approved by the FDA in 1953, and that Daraprim is no longer subject to patent protection. Vyera denies the remaining allegations in Paragraph 75.

76.     Vyera admits that Daraprim is currently available only as a 25-milligram tablet. Vyera lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 76 and on that basis denies them.

77.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 77 and on that basis denies them.

78.     Vyera denies the allegations in Paragraph 78.

**D.     "Vyera's Acquisition of Daraprim"**

     **1.     "Prior ownership of Daraprim"**

79.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 79 and on that basis denies them.

80.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 80 and on that basis denies them.

81.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 81 and on that basis denies them.

82.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 82 and on that basis denies them.

83.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 83 and on that basis denies them.

84.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 84 and on that basis denies them.

85.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 85 and on that basis denies them.

### 2.     "Vyera's acquisition of Daraprim"

86.     Certain allegations in Paragraph 86 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those unidentified documents to the extent they exist for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 86.

87.     Vyera admits that, in or around April 2015, it contacted Impax with a bid to acquire the U.S. Daraprim rights for approximately ███.  Vyera lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 87 and on that basis denies them.

88.     Vyera admits that it acquired the U.S. rights to Daraprim in August 2015 for the price of approximately $55 million.  Vyera lacks knowledge or information sufficient to form a belief about the remaining allegations in Paragraph 88 and on that basis denies them.

89.     Vyera denies the allegations in Paragraph 89.

90.     Certain allegations in Paragraph 90 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 90 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 90 directed toward Mr. Shkreli and on that basis denies them.

91.     The allegations in Paragraph 91 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 91 directed toward Vyera.

92.     The allegations in Paragraph 92 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.

## V.     "Defendants' Anticompetitive Agreements to Maintain Vyera's Daraprim Monopoly"

93.     Vyera denies the allegations in Paragraph 93 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 93 directed toward the Individual Defendants and on that basis denies them.

### A.     "Defendants Implement Agreements Restricting Resale and Limiting Purchases to Block Generic Entry"

94.     Vyera lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 94 and on that basis denies them.  Vyera states that the allegations in Paragraph 94 are directly contrary to other allegations in the Complaint that a restricted distribution system for Daraprim had been implemented prior to Vyera's acquisition of Daraprim in 2015.  *See, e.g.*, ¶¶ 83, 85.

95.     Certain allegations in Paragraph 95 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 95.

96.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 96 directed toward Mr. Shkreli and on that basis denies them.

97.     Certain allegations in Paragraph 97 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 97 directed toward Mr. Shkreli and on that basis denies them.

98.     Certain allegations in Paragraph 98 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 98 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 98 directed toward Mr. Mulleady and on that basis denies them.

99.     Vyera admits that a restricted distribution system for Daraprim had been put in place prior to Vyera's acquisition of Daraprim and that Vyera expanded the number of distributors that were distributing Daraprim.  Vyera denies the remaining allegations in Paragraph 99 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 99 directed toward Mr. Shkreli and on that basis denies them.

       **1.**     **"Vyera's contractual restrictions prevent distributors from selling Daraprim to generic companies"**

100.    Certain allegations in Paragraph 100 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 100.

101.    Certain allegations in Paragraph 101 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to

those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 101.

102.    Vyera admits that it has a contractual relationship with ICS and that the terms of that relationship are embodied in their contract, which is a document that speaks for itself.

103.    Certain allegations in Paragraph 103 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.

104.    Certain allegations in Paragraph 104 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.

105.    Certain allegations in Paragraph 105 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that it has a contractual relationship with ASD Healthcare.

106.    Certain allegations in Paragraph 106 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 106.

107.    Certain allegations in Paragraph 107 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that it has a contractual relationship with BioRidge Pharma.

108.    Certain allegations in Paragraph 108 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 108.

109.    Certain allegations in Paragraph 109 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that it has a contractual relationship with █████████.

110.    Certain allegations in Paragraph 110 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 110.

111.    Certain allegations in Paragraph 111 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that it has a contractual relationship with Optime Care, Inc.

112.    Certain allegations in Paragraph 112 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 112.

113.    Certain allegations in Paragraph 113 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 113.

  **2. "Vyera's contractual restrictions prevent downstream purchasers from selling Daraprim to generic companies"**

114.    Vyera denies the allegations in Paragraph 114.

115.     Certain allegations in Paragraph 115 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 115.

116.     Certain allegations in Paragraph 116 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 116.

117.     Certain allegations in Paragraph 117 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 117.

118.     Certain allegations in Paragraph 118 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 118.

119.     Certain allegations in Paragraph 119 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 119.

120.     Certain allegations in Paragraph 120 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that it has a contractual relationship with GPO Vizient.  Vyera denies the remaining allegations in Paragraph 120.

121.    Certain allegations in Paragraph 121 purport to characterize or summarize from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that it has a contractual relationship with Walgreens.  Vyera denies the remaining allegations in Paragraph 121.

122.    Certain allegations in Paragraph 122 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 122.

### 3.    "Vyera limits and monitors approved sales of Daraprim to prevent generic companies from obtaining it"

123.    Vyera denies the allegations in Paragraph 123.

124.    Vyera denies the allegations in Paragraph 124, except admits that it offers Daraprim in different package quantities, including in a 100 tablet-count bottle.

125.    Certain allegations in Paragraph 125 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 125.

126.    Certain allegations in Paragraph 126 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 126.

127.    Certain allegations in Paragraph 127 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 127.

128.    Vyera denies that it has a contractual relationship with Drug Mart and that Drug Mart is now (or was ever) limited to carrying one bottle of Daraprim in inventory at a time.  Vyera states that, in response to a patient need, Vyera authorized one of its distributors to sell a bottle of Daraprim to Drug Mart, even though Drug Mart is not part of Vyera's distribution network, in order to respond to the needs of the patient.

129.    Certain allegations in Paragraph 129 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 129 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 129 directed toward the Individual Defendants and on that basis denies them.

130.    Certain allegations in Paragraph 130 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 130 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 130 directed toward Mr. Mulleady and on that basis denies them.

131.    Vyera denies the allegations in Paragraph 131 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 131 and on that basis denies them.

132.    Vyera denies the allegations in Paragraph 132 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 132 directed toward Mr. Mulleady and on that basis denies them.

133.    Certain allegations in Paragraph 133 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 133.

**4.    "Defendants' generic-blocking restrictions prevent generic competitors from purchasing Daraprim and have no legitimate rationale"**

134.    Vyera denies the allegations in Paragraph 134.

135.    Certain allegations in Paragraph 135 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 135.

136.    Paragraph 136 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 136.  Vyera denies the remaining allegations in Paragraph 136 directed toward Vyera.

137.    Vyera denies the allegations in Paragraph 137.

138.    Certain allegations in Paragraph 138 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 138 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 138 directed toward Mr. Shkreli and on that basis denies them.

139.    Certain allegations in Paragraph 139 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that, in 2015,

the Senate Special Committee on Aging launched an investigation into price increases for certain drugs.  Vyera denies the remaining allegations in Paragraph 139.

140.    Vyera denies the allegations in Paragraph 140, except admits that certain Vyera employees testified before the Senate.

141.    Vyera denies the allegations in Paragraph 141.

142.    Vyera denies the allegation in Paragraph 142 that the "resale restrictions are not related to any safety concerns about Daraprim."  Vyera further denies the allegation that "[p]rior to 2015, Daraprim was sold in open distribution without incident for more than 60 years."  As noted, *supra*, that allegation is contrary to the allegations that Daraprim was placed in a restricted distribution system prior to Vyera's acquisition of Daraprim in 2015.  *See, e.g.*, ¶¶ 83, 85.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 142 and on that basis denies them.

143.    Certain allegations in Paragraph 143 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 143.

**B.    "Defendants Enter Exclusive Agreements With API Manufacturers to Block Generic Companies' Access to Pyrimethamine API Supply"**

144.    Vyera denies the allegations in Paragraph 144 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 144 directed toward the Individual Defendants and on that basis denies them.

145.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 145 and on that basis denies them.

146.     To the extent that the allegations in Paragraph 146 purport to describe the FDA's API approval process, such allegations constitute legal conclusions to which no response is required.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 146 and on that basis denies them.

147.     Certain allegations in Paragraph 147 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 147 and on that basis denies them.

148.     Vyera denies the allegations in Paragraph 148.

### 1.     "Vyera locks up the only manufacturer with an FDA-approved manufacturing process for pyrimethamine API"

149.     Vyera admits that, as of 2015, Fukuzyu and Ipca Laboratories Ltd. ("Ipca") had filed Drug Master Files ("DMF") with the FDA.  Vyera denies the remaining allegations in Paragraph 149.

150.     Certain allegations in Paragraph 150 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 150 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 150 and on that basis denies them.

151.     Vyera denies the allegations in Paragraph 151 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 151 and on that basis denies them, except admits that Fukuzyu's pyrimethamine API is approved by the FDA.

152.     Certain allegations in Paragraph 152 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 152.

153.     The allegations in Paragraph 153 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that Phoenixus AG has a contractual relationship with Fukuzyu.  Vyera denies the remaining allegations in Paragraph 153.

154.     Certain allegations in Paragraph 154 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 154.

155.     Certain allegations in Paragraph 155 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 155.

156.     To the extent that Paragraph 156 alleges that Fukuzyu has abided by the terms of its exclusive supply agreement and that two potential generic competitors sought and were denied API from Fukuzyu due to the exclusive contract, Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.  Vyera denies the remaining allegations in Paragraph 156.

157.    Certain allegations in Paragraph 157 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 157.

158.    Paragraph 158 purports to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that it has a supply agreement with Fukuzyu that is currently in effect.

## 2.    "Defendants poach a second API manufacturer from generic competitors"

159.    Vyera denies the allegations in Paragraph 159.

160.    To the extent that Paragraph 160 makes allegations regarding RL Fine's plans, business or experience, manufacturing process, ability to obtain FDA approval, and ability to supply pyrimethamine API for sale in the United States, Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.  Vyera denies the remaining allegations in Paragraph 160.

161.    Vyera denies the allegations in Paragraph 161 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 161 directed toward the Individual Defendants and on that basis denies them.

162.    Certain allegations in Paragraph 162 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 162 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 162 directed toward the Individual Defendants and on that basis denies them.

163.     Certain allegations in Paragraph 163 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that, in or around December 2017, it entered into contractual arrangements with RL Fine.  Vyera denies the remaining allegations in Paragraph 163 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 163 directed toward Mr. Mulleady and on that basis denies them.

164.     Certain allegations in Paragraph 164 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that it has made certain payments to RL Fine in connection with their contractual arrangements.  Vyera denies the remaining allegations in Paragraph 164.

165.     Certain allegations in Paragraph 165 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  To the extent that Paragraph 165 alleges that "[s]ince signing the agreement with Vyera, RL Fine has not supplied pyrimethamine to any company for use in the United States," Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegation and on that basis denies it.  Vyera denies the remaining allegations in Paragraph 165.

166.     Certain allegations in Paragraph 166 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera admits that it has made certain payments to RL Fine

in connection with their contractual arrangements and that Vyera has not received pyrimethamine API from RL Fine.  Vyera denies the remaining allegations in Paragraph 166.

167.    Vyera denies the allegations in Paragraph 167.

168.    To the extent that Paragraph 168 makes allegations regarding supply interruptions at Fukuzyu, Fukuzyu's capacity to produce pyrimethamine API, and Fukuzyu's supply of pyrimethamine API to other manufacturers, Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.  Vyera denies the remaining allegations in Paragraph 168.

169.    To the extent that Paragraph 169 alleges that RL Fine did not "take any further steps to conform its process to FDA requirements," Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegation and on that basis denies it.  Vyera denies the remaining allegations in Paragraph 169.

170.    Vyera admits that certain Vyera employees have traveled to Japan to meet with employees of Fukuzyu.  Vyera denies the remaining allegations in Paragraph 170.

171.    Certain allegations in Paragraph 171 appear to purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 171 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 171 directed toward Mr. Mulleady and on that basis denies them.

172.    Vyera admits that, in October 2019, it paid RL Fine $██████ to terminate the agreement with RL Fine.  Vyera denies the remaining allegations in Paragraph 172, including any implication of a connection between the termination and any Federal Trade Commission inquiries.

173.    Vyera denies the allegations in Paragraph 173 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 173 and on that basis denies them.

174.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 174 and on that basis denies them.

175.    Vyera denies the allegations in Paragraph 175 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 175 and on that basis denies them.

**C.    "Vyera Enters Data-Blocking Agreements to Mask the True Size of the Pyrimethamine Market"**

176.    Vyera denies the allegations in Paragraph 176.

177.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 177 and on that basis denies them.

178.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 178 and on that basis denies them.

179.    Vyera denies the allegations in Paragraph 179.

180.    Vyera admits that Vyera Pharmaceuticals, LLC and Phoenixus AG are privately-held companies.  Vyera states that it is required by law to report aspects of Daraprim's distribution, including to government regulatory bodies.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 180 and on that basis denies them.

181.    Vyera denies the allegations in Paragraph 181.

182.    Vyera denies the allegations in Paragraph 182.

183.    The allegations in Paragraph 183 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents, and otherwise denies any remaining allegations in Paragraph 183.

184.    The allegations in Paragraph 184 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents, and otherwise denies any remaining allegations in Paragraph 184.

185.    The allegations in Paragraph 185 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents, and otherwise denies any remaining allegations in Paragraph 185.

186.    The allegations in Paragraph 186 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents, and otherwise denies any remaining allegations in Paragraph 186.

187.    To the extent Paragraph 187 alleges that the "FDA noticed . . . IQVIA data," Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegation and on that basis denies it.  Vyera admits that the FDA contacted Vyera to ask if Daraprim was in shortage, but states that the FDA's contact occurred in February 2018.  Vyera states that it responded to the FDA's inquiry by explaining that Daraprim was not in shortage, that Vyera had sufficient existing supplies of Daraprim, and that the production of new, additional supplies of Daraprim was planned to occur imminently.  Certain allegations in Paragraph 187 purport to characterize, summarize, or

quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 187.

188.    Certain allegations in Paragraph 188 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the remaining allegations in Paragraph 188.

189.    To the extent that Paragraph 189 asserts allegations about a decision of an unnamed "generic company," Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegation and on that basis denies it.  Vyera denies the remaining allegations in Paragraph 189.

190.    To the extent that Paragraph 190 alleges that "[p]rior to the more lucrative offer from Defendants, ASD and ███████ were regularly selling their Daraprim sales data to IQVIA and others," Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegation and on that basis denies it.  Vyera denies the remaining allegations in Paragraph 190, except admits that it has no obligation to publicly report its Daraprim sales.

## VI.    "Defendants' Anticompetitive Conduct Successfully Delayed and Excluded Numerous Potential Generic Competitors"

191.    Vyera denies the allegations in Paragraph 191.

### A.    "███████████████"

192.    To the extent that Paragraph 192 asserts allegations speculating about ███████, Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.  Vyera denies the remaining allegations in Paragraph 192.

193.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 193 and on that basis denies them.

194.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 194 and on that basis denies them.

195.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 195 and on that basis denies them.

196.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 196 and on that basis denies them.

197.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 197 and on that basis denies them.

198.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 198 and on that basis denies them.

199.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 199 and on that basis denies them.

200.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 200 and on that basis denies them.

201.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 201 and on that basis denies them.

202.    Vyera denies the allegations in Paragraph 202 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 202 and on that basis denies them.

203.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 203 and on that basis denies them.

204.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 204 and on that basis denies them.

205.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 205 and on that basis denies them.

206.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 206 and on that basis denies them.

207.    Vyera denies the allegations in Paragraph 207 to the extent they are directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 207 and on that basis denies them.

208.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 208 and on that basis denies them.

209.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 209 and on that basis denies them.

210.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 210 and on that basis denies them.

211.    Certain allegations in Paragraph 211 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 211 and on that basis denies them.

212.    Certain allegations in Paragraph 212 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations

in Paragraph 212 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 212 and on that basis denies them.

213.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 213 and on that basis denies them.

214.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 214 and on that basis denies them.

215.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 215 and on that basis denies them.

216.    Vyera admits the allegations in Paragraph 216.

217.    Vyera denies the allegations in Paragraph 217 directed toward Vyera, except admits that, on March 11, 2020, Oakrum Pharma, LLC announced that it would launch an authorized generic version of Daraprim, that the authorized generic was chemically identical to Daraprim, and that the authorized generic would be sold as a generic product.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 217 and on that basis denies them.

218.    Certain allegations in Paragraph 218 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 218 and on that basis denies them.

219.    Vyera denies the allegations in Paragraph 219 directed toward Vyera.  To the extent that Paragraph 219 asserts allegations speculating about ██████, Vyera lacks sufficient

knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.

220.    Vyera denies the allegations in Paragraph 220 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 220 and on that basis denies them.

   **B.**    "███████████████████████"

221.    Vyera denies the allegations in Paragraph 221 directed toward Vyera.  To the extent that Paragraph 221 asserts allegations speculating about ███████████, Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.

222.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 222 and on that basis denies them.

223.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 223 and on that basis denies them, except admits that Daraprim has no patent protection.

224.    To the extent that the allegations in Paragraph 224 purport to describe the FDA's approval process, such allegations constitute legal conclusions to which no response is required. Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 224 and on that basis denies them.

225.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 225 and on that basis denies them.

226.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 226 and on that basis denies them.

227.     Vyera admits that Ipca had a U.S. DMF for pyrimethamine.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 227 and on that basis denies them.

228.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 228 and on that basis denies them.

229.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 229 and on that basis denies them.

230.     Certain allegations in Paragraph 230 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 230 and on that basis denies them.

231.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 231 and on that basis denies them.

232.     Vyera denies the allegations in Paragraph 232 to the extent they are directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 232 and on that basis denies them.

233.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 233 and on that basis denies them.

234.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 234 and on that basis denies them.

235.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 235 and on that basis denies them.

236.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 236 and on that basis denies them.

237.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 237 and on that basis denies them.

238.     Vyera denies the allegations in Paragraph 238 directed toward Vyera.  To the extent that Paragraph 238 asserts allegations speculating about ███████████, Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.

C.     "███████████████████"

239.     Vyera denies the allegations in Paragraph 239 directed toward Vyera.  To the extent that Paragraph 239 asserts allegations speculating about ████, Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.

240.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 240 and on that basis denies them.

241.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 241 and on that basis denies them.

242.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 242 and on that basis denies them, except admits that Fukuzyu's pyrimethamine API is approved by the FDA.

243.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 243 and on that basis denies them.

244.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 244 and on that basis denies them.

245.    Certain allegations in Paragraph 245 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 245 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 245 and on that basis denies them.

246.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 246 and on that basis denies them.

247.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 247 and on that basis denies them.

248.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 248 and on that basis denies them.

249.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 249 and on that basis denies them.

250.    Certain allegations in Paragraph 250 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 250 and on that basis denies them.

251.    Vyera denies the allegations in Paragraph 251 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 251 and on that basis denies them.

252.    Certain allegations in Paragraph 252 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to

those documents for a true and complete statement of their contents. Vyera denies the remaining allegations in Paragraph 252.

253.     Vyera denies the allegations in Paragraph 253 directed toward Vyera. Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 253 and on that basis denies them.

254.     Vyera denies the allegations in Paragraph 254 directed toward Vyera. Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 254, including the allegations directed toward Mr. Mulleady, and on that basis denies them.

255.     Vyera denies the allegations in Paragraph 255 directed toward Vyera. Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 255 directed toward Mr. Mulleady and on that basis denies them.

256.     Vyera denies the allegations in Paragraph 256 directed toward Vyera. Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 256 directed toward Mr. Mulleady and on that basis denies them.

257.     Vyera denies the allegations in Paragraph 257 directed toward Vyera. Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 257 and on that basis denies them.

258.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 258 and on that basis denies them.

259.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 259 and on that basis denies them.

260.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 260 and on that basis denies them.

261.    Vyera denies the allegations in Paragraph 261 directed toward Vyera.  To the extent that Paragraph 261 asserts allegations speculating about ██, Vyera lacks sufficient knowledge or information to form a belief as to the truth of such allegations and on that basis denies them.

**D.    "Mylan N.V."**

262.    Vyera denies the allegation in Paragraph 262 that "Defendants' exclusionary conduct caused Mylan to stop pursuing a generic version of Daraprim."  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 262 and on that basis denies them.

263.    Vyera denies the allegations in Paragraph 263 directed toward Vyera, except admits that it is not a publicly traded company that is required to file its financials publicly.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 263 and on that basis denies them.

264.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 264 and on that basis denies them.

265.    Certain allegations in Paragraph 265 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 265 and on that basis denies them.

266.    Certain allegations in Paragraph 266 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 266 and on that basis denies them.

**E.**     **"Other generic companies"**

267.     Vyera denies the allegation in Paragraph 267 that "Vyera's exclusionary conduct also likely impeded the ability of at least one other generic company to obtain Daraprim samples." Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 267 and on that basis denies them.

268.     Certain allegations in Paragraph 268 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 268 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 268 and on that basis denies them.

269.     Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 269 and on that basis denies them.

270.     Certain allegations in Paragraph 270 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 270 and on that basis denies them.

271.     Certain allegations in Paragraph 271 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 271 and on that basis denies them.

272.    Certain allegations in Paragraph 272 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 272 and on that basis denies them.

**VII.    "Defendants' Foreclosure of Generic Entry Caused Consumers to Pay Higher Prices"**

273.    Vyera denies the allegations in Paragraph 273.

274.    Vyera denies the allegations in Paragraph 274.

275.    Vyera denies the allegations in Paragraph 275.

276.    Vyera denies the allegations in Paragraph 276.

277.    Vyera denies the allegations in Paragraph 277.

278.    Vyera denies the allegation in Paragraph 278 that "Defendants' anticompetitive conduct has delayed the introduction of . . . price competition to the detriment of consumers and other purchasers of Daraprim."  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 278 and on that basis denies them.

279.    Certain allegations in Paragraph 279 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 279 and on that basis denies them.

280.    Vyera denies the allegations in Paragraph 280.

281.    Vyera denies the allegations in Paragraph 281.

282.    Vyera denies the allegations in Paragraph 282.

283.    Vyera denies the allegations in Paragraph 283.

284.    Vyera denies the allegations in Paragraph 284 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 284 and on that basis denies them.

285.    Vyera denies the allegations in Paragraph 285 to the extent they are directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 285 and on that basis denies them.

286.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 286 and on that basis denies them.

287.    Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 287 and on that basis denies them.

288.    Vyera denies the allegations in Paragraph 288.

289.    Vyera denies the allegations in Paragraph 289.

290.    Vyera denies the allegations in Paragraph 290 directed toward Vyera and states that it has been, and continues to be, immediately responsive to patient outreach.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 290 and on that basis denies them.

291.    Vyera denies the allegations in Paragraph 291.

292.    Vyera denies the allegations in Paragraph 292.

293.    Vyera denies the allegations in Paragraph 293 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 293 directed toward Mr. Shkreli and on that basis denies them.

294.     Vyera denies the allegations in Paragraph 294 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 294 directed toward Mr. Mulleady and on that basis denies them.

**VIII.   "Vyera Has Monopoly Power in a Relevant Market for FDA-Approved Pyrimethamine Products"**

295.     Paragraph 295 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 295.

296.     Vyera denies the allegations in Paragraph 296.

297.     Vyera denies the allegations in Paragraph 297.

298.     Vyera denies the allegations in Paragraph 298.

299.     Vyera denies the allegations in Paragraph 299.

300.     Paragraph 300 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 300.

301.     Vyera denies the allegations in Paragraph 301 to the extent they are directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 301 and on that basis denies them.

302.     Vyera denies the allegations in Paragraph 302.

303.     Certain allegations in Paragraph 303 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 303 and on that basis denies them.

304.     Vyera denies the allegations in Paragraph 304.

305.    Paragraph 305 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 305.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 305 and on that basis denies them.

306.    Paragraph 306 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 306.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 306 and on that basis denies them.

307.    Certain allegations in Paragraph 307 purport to characterize or summarize one or more documents, which speak for themselves.  Vyera denies the remaining allegations in Paragraph 307, except admits that generic Daraprim is a therapeutic substitute for Daraprim.

308.    Vyera denies the allegations in Paragraph 308 to the extent they are directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 308 and on that basis denies them.

309.    The allegations in Paragraph 309 purport to characterize, summarize, or quote from selected portions of one or more documents, which speak for themselves.  Vyera refers to those documents for a true and complete statement of their contents.  Vyera denies the allegations in Paragraph 309 to the extent they are directed toward Vyera.

310.    Paragraph 310 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 310.

311.    Paragraph 311 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 311.  Vyera denies the allegations in Paragraph 311 to the extent they are directed toward Vyera.  Vyera lacks sufficient

knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 311 and on that basis denies them.

312.    Paragraph 312 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 312.  Vyera denies the allegations in Paragraph 312 to the extent they are directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 312 and on that basis denies them.

313.    Vyera denies the allegations in Paragraph 313.

## "COUNT I"

### "Monopoly Maintenance Against All Defendants"

314.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

315.    Vyera denies the allegations in Paragraph 315.

316.    Vyera denies the allegations in Paragraph 316.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 316 directed toward the Individual Defendants and on that basis denies them.

317.    Vyera denies the allegations in Paragraph 317.

318.    Paragraph 318 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 318.

## "COUNT II"

### "Agreements in Restraint of Trade (Restrictions and Limitations on Resale of Daraprim) Against All Defendants"

319.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

320.    Paragraph 320 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 320.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 320 directed toward the Individual Defendants and on that basis denies them.

**"COUNT III"**

**"Agreements in Restraint of Trade
(API Supply Exclusivity Agreements) Against All Defendants"**

321.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

322.    Paragraph 322 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 322.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 322 directed toward the Individual Defendants and on that basis denies them.

**"COUNT IV"**

**"A.    Anticompetitive Contracts, Agreements and/or Arrangements
in Violation of New York's Donnelly Act Against All Defendants"**

323.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

324.    Paragraph 324 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 324.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 324 directed toward the Individual Defendants and on that basis denies them.

325.    Paragraph 325 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 325.  Vyera lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in Paragraph 325 directed toward the Individual Defendants and on that basis denies them.

326.    Paragraph 326 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 326.

**"B.    Illegality in Violation of New York Executive Law § 63(12) Against All Defendants"**

327.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

328.    Paragraph 328 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 328.

### "COUNT V"

**"A.    Anticompetitive Contracts, Agreements and/or Arrangements in Violation of California's Cartwright Act Against All Defendants"**

329.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

330.    Paragraph 330 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 330.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 330 directed toward the Individual Defendants and on that basis denies them.

331.    Paragraph 331 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 331.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 331 directed toward the Individual Defendants and on that basis denies them.

### "B.    Anticompetitive Contracts, Agreements and/or Arrangements in Violation of California's Unfair Competition Act Against All Defendants"

332.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

333.    Paragraph 333 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 333.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 333 directed toward the Individual Defendants and on that basis denies them.

334.    Paragraph 334 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 334.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 334 directed toward the Individual Defendants and on that basis denies them.

### "COUNT VI"

### "Anticompetitive Contracts, Combinations and/or Conspiracies in Violation of the Illinois Antitrust Act Against All Defendants"

335.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

336.    Paragraph 336 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 336.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 336 directed toward the Individual Defendants and on that basis denies them.

337.    Paragraph 337 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 337.

**"COUNT VII"**

**"Unfair Methods of Competition and/or Unfair Acts or Practices in Violation of the North Carolina Unfair or Deceptive Practices Act Against All Defendants"**

338.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

339.    Paragraph 339 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 339.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 339 directed toward the Individual Defendants and on that basis denies them.

340.    Paragraph 340 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 340.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 340 directed toward the Individual Defendants and on that basis denies them.

341.    Paragraph 341 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 341.

342.    Paragraph 342 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 342.

343.    Paragraph 343 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 343.

**"COUNT VIII"**

**"Violations of Ohio's Valentine Act Against All Defendants"**

344.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

345.    Paragraph 345 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 345.

## "COUNT IX"

### "A.    Pennsylvania's Unfair Trade Practices and Consumer Protection Law"

346.    Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

347.    Paragraph 347 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 347.

348.    Paragraph 348 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 348.

349.    Paragraph 349 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 349.

350.    Paragraph 350 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 350.

351.    Paragraph 351 (including its subparts (a)-(e)) contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 351 (including its subparts (a)-(e)).

352.   Paragraph 352 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 352.

353.   Paragraph 353 contains allegations relating to Count IX(A) of the Complaint, which has been dismissed by the Court, and thus no response to those allegations is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 353.

**"B.    Common Law Doctrine against Restraint of Trade"**

354.   Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

355.   Paragraph 355 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 355.

356.   Paragraph 356 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 356.

**"COUNT X"**

**"A.    Anticompetitive Agreements in Violation of the
Virginia Antitrust Act Against All Defendants"**

357.   Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

358.   Paragraph 358 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 358.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 358 directed toward the Individual Defendants and on that basis denies them.

359.   Paragraph 359 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 359.  Vyera lacks sufficient

knowledge or information to form a belief as to the truth of the allegations in Paragraph 359 directed toward the Individual Defendants and on that basis denies them.

**"B.     Monopoly Maintenance in Violation of the Virginia Antitrust Act"**

360.     Vyera hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

361.     Vyera denies the allegations in Paragraph 361.

362.     Vyera denies the allegations in Paragraph 362 directed toward Vyera.  Vyera lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 362 directed toward the Individual Defendants and on that basis denies them.

363.     Vyera denies the allegations in Paragraph 363.

364.     Paragraph 364 states legal conclusions to which no response is required.  To the extent a response is required, Vyera denies the allegations in Paragraph 364.

**GENERAL DENIAL**

Vyera denies each and every allegation in the Complaint not specifically admitted or otherwise addressed above.

**AFFIRMATIVE AND OTHER DEFENSES**

Without assuming any burden of proof that it would not otherwise bear, Vyera asserts the following separate and additional affirmative and other defenses, all of which are pleaded in the alternative:

**First Defense**

The Complaint, and each and every claim stated therein, fails to state a claim against Vyera upon which relief can be granted.

### Second Defense

Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations and/or the doctrine of laches.

### Third Defense

Plaintiffs' claims are barred, in whole or in part, because Vyera's alleged conduct has not harmed competition, the competitive process, or consumers, and was lawful, procompetitive, and based on legitimate business and economic justifications.

### Fourth Defense

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not alleged that Vyera is presently engaged in ongoing violations of law, as required by, *inter alia*, Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), and New York Executive Law Section 63(12), N.Y. Exec. Law § 63(12).

### Fifth Defense

Plaintiffs' claims are barred, in whole or in part, insofar as the Federal Trade Commission purports to seek equitable monetary relief, since Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), does not authorize the Federal Trade Commission to seek such relief.

### Sixth Defense

Plaintiffs' claims are barred, in whole or in part, by the single entity doctrine, pursuant to which an antitrust conspiracy cannot be found among a corporation, its wholly-owned subsidiary and/or its officers and directors.

### Seventh Defense

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not properly alleged a relevant product market.

**Eighth Defense**

Plaintiffs' claims are barred, in whole or in part, because Vyera's alleged conduct did not lead to the acquisition or maintenance of monopoly power in any properly defined relevant antitrust market, and was lawful, procompetitive, and based on legitimate business and economic justifications.

**Ninth Defense**

Plaintiffs' claims are barred, in whole or in part, because Vyera's alleged conduct did not unreasonably restrain trade and was lawful, procompetitive, and based on legitimate business and economic justifications.

**Tenth Defense**

Plaintiffs' claims are barred, in whole or in part, because any harm to competition complained of stems from the intricate multi-tiered regulatory regime that governs the production, sale, and manufacture of pharmaceutical products, including the Hatch-Waxman Act.

**Eleventh Defense**

Plaintiffs' claims are barred, in whole or in part, because the injury complained of and the relief sought by Plaintiffs are the result of the actions or inaction of third-party generic manufacturers and/or government regulatory bodies, including without limitation the FDA.

**Twelfth Defense**

The contemplated relief would not be in the public interest because it would, among other things, harm consumers.

**RESERVATION OF AFFIRMATIVE AND OTHER DEFENSES**

Vyera reserves the right to assert and rely on additional affirmative and other defenses that may become available or apparent, and to amend its answer and/or defenses.

**PRAYER FOR RELIEF**

WHEREFORE, Vyera prays as follows:

1. That the Complaint be dismissed with prejudice;

2. That the Court enter judgment in favor of Vyera Pharmaceuticals, LLC and Phoenixus AG; and

3. That the Court award further relief as deemed just and proper.

**DEMAND FOR JURY TRIAL**

Vyera demands a trial by jury on all issues so triable in this action.

Dated:  September 15, 2020        Respectfully submitted,

/s/ Steven A. Reed
Steven A. Reed (admitted *pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA  19103
Tel:  215.963.5000
steven.reed@morganlewis.com

Stacey Anne Mahoney
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Tel:  212.309.6000
stacey.mahoney@morganlewis.com

*Attorneys for Defendants Vyera Pharmaceuticals, LLC and Phoenixus AG*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL TRADE COMMISSION; STATE OF
NEW YORK; STATE OF CALIFORNIA;
STATE OF ILLINOIS; STATE OF NORTH
CAROLINA; STATE OF OHIO;
COMMONWEALTH OF PENNSYLVANIA;
and COMMONWEALTH OF VIRGINIA,

        *Plaintiffs*,

      v.

VYERA PHARMACEUTICALS, LLC;
PHOENIXUS AG; MARTIN SHKRELI,
individually, as an owner and former director of
Phoenixus AG and a former executive of Vyera
Pharmaceuticals, LLC; and KEVIN
MULLEADY, individually, as an owner and
director of Phoenixus AG and a former executive
of Vyera Pharmaceuticals, LLC,

        *Defendants*.

Case No. 20-cv-00706 (DLC)

ECF Case

---

**JOINT STIPULATION AND**             **ORDER**
**TO AMEND THE RELIEF REQUESTED IN THE PLEADINGS**

WHEREAS, the Federal Trade Commission ("FTC") and State of New York initiated the

above-captioned action ("Action") on January 27, 2020, and with State of California, State of

Illinois, State of North Carolina, State of Ohio, Commonwealth of Pennsylvania, and

Commonwealth of Virginia (collectively, "the States," and, together with the FTC, "Plaintiffs")

filed an Amended Complaint for Injunctive and Other Equitable Relief on April 14, 2020

("Amended Complaint", ECF No. 87);

WHEREAS, the Amended Complaint's Prayer for Relief seeks the following remedies under federal[1] and/or state law[2]:

A.  Declaratory relief (¶¶ 1-12);

B.  Injunctive relief (¶¶ 13-15);

C.  Equitable monetary relief (¶¶ 16-17);

D.  Reasonable attorneys' fees and costs for the States only (¶ 18); and

E.  Civil penalties/forfeitures for the States only (¶ 19);

WHEREAS, no Plaintiff seeks or will seek to recover monetary damages in this action (ECF No. 229 at 40 ("[P]laintiffs in this action do not seek damages; they seek equitable monetary relief."));

WHEREAS, in September and October 2020, Defendants Vyera Pharmaceuticals, LLC, Phoenixus AG, Martin Shkreli, and Kevin Mulleady ("Defendants") responded to the Amended Complaint with Answers containing jury demands (ECF Nos. 257, 292, 293);

WHEREAS, pursuant to Federal Rule of Civil Procedure 15(a)(2), the States wish to amend the Amended Complaint by deleting only Paragraph 19 in the Prayer for Relief containing the States' request for civil penalties/forfeitures under state law and to forgo any claim for civil penalties/forfeitures based on the alleged conduct in the Action in exchange for Defendants' agreement to withdraw their jury demands; and

---

[1]  The substantive federal claims are asserted under Sections 1 and 2 of the Sherman Act and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). The FTC seeks relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

[2]  The state law claims are asserted under New York's Donnelly Act and New York Executive Law § 63(12); California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*; California's Unfair Competition Act, Cal. Bus. & Prof. Code § 17200 *et seq.*; Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*; North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. § 75-1 *et seq.*; Ohio's Valentine Act, Ohio Rev. Code Chapter §§ 109.81 and 1331 *et seq.*; Pennsylvania Common Law Doctrine Against Restraints of Trade; and Virginia Antitrust Act, Virginia Code §§ 59.1-9.1 *et seq.* The claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law was previously dismissed by the Court. (ECF No. 229.)

WHEREAS, Defendants believe they are entitled to a jury trial on any claims for damages and civil penalties/forfeitures, but have agreed to withdraw their jury demands based on the Plaintiffs' representation that they are not requesting damages in the Action and subject to the States' withdrawal with prejudice of any claims for civil penalties/forfeitures based on the alleged conduct in the Action as set forth in Paragraph 19 in the Prayer for Relief.

NOW THEREFORE, the parties hereby stipulate and agree, subject to entry of this Stipulation by the Court, that:

1.     The States withdraw with prejudice any claims for civil penalties/forfeitures as set forth in Paragraph 19 in the Prayer for Relief based on the alleged conduct in the Action.

2.     Defendants withdraw their jury demands.

3.     Defendants will not seek to reinstate their jury demands absent further amendments to the operative complaint in the Action that seek to add parties, claims or remedies.

4.     Pursuant to Federal Rule of Civil Procedure 15(a)(2), the Amended Complaint (ECF No. 87) is AMENDED as follows: Paragraph 19 in the Prayer for Relief is STRICKEN.

5.     Pursuant to Federal Rule of Civil Procedure 15(a)(2), Defendants' Answers (ECF Nos. 257, 292, 293) are AMENDED as follows: the jury demands are STRICKEN.

DATED:  March 30, 2021

So
ordered.

_____
DENISE COTE
United States District Judge

Respectfully submitted,

| | |
|---|---|
| /s/ Markus H. Meier | /s/ Stacey Anne Mahoney |
| Markus H. Meier | Stacey Anne Mahoney |
| Federal Trade Commission | Sarah E. Hsu Wilbur |
| 600 Pennsylvania Avenue, NW | Nicholas Passaro |
| Washington, DC 20580 | MORGAN, LEWIS & BOCKIUS LLP |
| Tel: 202-326-3759 | 101 Park Avenue |
| mmeier@ftc.gov | New York, NY 10178 |
| *Counsel for Plaintiff Federal Trade* | Tel: 212-309-6000 |
| *Commission* | stacey.mahoney@morganlewis.com |
| | sarah.wilbur@morganlewis.com |
| /s/ Jeremy R. Kasha | nicholas.passaro@morganlewis.com |
| Jeremy R. Kasha | |
| Office of the New York Attorney General | Steven A. Reed (*pro hac vice*) |
| 28 Liberty Street | MORGAN, LEWIS & BOCKIUS LLP |
| New York, NY 10005 | 1701 Market Street |
| Tel: (212) 416-8277 | Philadelphia, PA 19103 |
| jeremy.kasha@ag.ny.gov | Tel: 215-963-5603 |
| *Counsel for Plaintiff State of New York* | steven.reed@morganlewis.com |
| | |
| /s/ Michael D. Battaglia | Scott A. Stempel (*pro hac vice*) |
| Michael D. Battaglia | William S. D. Cravens (*pro hac vice*) |
| Deputy Attorney General Office of the | MORGAN, LEWIS & BOCKIUS LLP |
| Attorney General of California | 1111 Pennsylvania Ave., NW |
| 455 Golden Gate Avenue, Suite 11000 | Washington, DC 20004-2541 |
| San Francisco, CA 94102 | Tel: 202-739-5211 |
| Tel: (415) 510-3769 | scott.stempel@morganlewis.com |
| michael.battaglia@doj.ca.gov | william.cravens@morganlewis.com |
| *Counsel for Plaintiff State of California* | |
| | Noah J. Kaufman (*pro hac vice*) |
| /s/ Richard S. Schultz | MORGAN, LEWIS & BOCKIUS LLP |
| Richard S. Schultz | One Federal Street |
| Assistant Attorney General Office of the | Boston, MA 02129 |
| Attorney General of Illinois | Tel: 617-341-7590 |
| 100 W. Randolph Street, 11th Floor | noah.kaufman@morganlewis.com |
| Chicago, IL 60601 | |
| Tel: (312) 814-3000 | *Counsel for Defendants* |
| rschultz@atg.state.il.us | *Vyera Pharmaceuticals, LLC and* |
| *Counsel for Plaintiff State of Illinois* | *Phoenixus AG* |

/s/ K.D. Sturgis
K.D. Sturgis
Special Deputy Attorney General
North Carolina Department of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603
Tel: (919) 716-6000
ksturgis@ncdoj.gov
*Counsel for Plaintiff State of North Carolina*

/s/ Elizebeth M. Maag
Elizebeth M. Maag
Associate Assistant Attorney General Office of the
Ohio Attorney General
Antitrust Section
150 E. Gay Street, 22nd Floor
Columbus, OH 43215
Tel: (614) 466-4328
liz.maag@ohioattorneygeneral.gov
*Counsel for Plaintiff State of Ohio*

/s/ Joseph S. Betsko
Joseph S. Betsko
Senior Deputy Attorney General Pennsylvania Office
of Attorney General Antitrust Section        Strawberry
Square, 14th Floor
Harrisburg, PA 17120
jbetsko@attorneygeneral.gov
*Counsel for Plaintiff Commonwealth of Pennsylvania*

/s/ Tyler T. Henry
Tyler T. Henry
Assistant Attorney General Office of the
Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
thenry@oag.state.va.us
*Counsel for Plaintiff Commonwealth of Virginia*

/s/ Kenneth R. David
Kevin J. Arquit
Albert Shemmy Mishaan
Kenneth R. David
Nicholas Rendino
Kasowitz Benson Torres LLP
1633 Broadway
New York, NY 10019
Tel: (212) 506-1700
KArquit@kasowitz.com
AMishaan@kasowitz.com
KDavid@kasowitz.com
NRendino@kasowitz.com

*Counsel for Defendant Kevin Mulleady*

*/s/ Christopher H. Casey*
*Christopher H. Casey*
*Jeffery S. Pollack*
*Sarah O'Laughlin Kulik*
*Brett Feldman*
*Andrew John Rudowitz*
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103 Tel: 215 979-1000
chcasey@duanemorris.com
jspollack@duanemorris.com
sckulik@duanemorris.com
bmfeldman@duanemorris.com
ajrudowitz@duanemorris.com

Edward Kang
Kandis L. Kovalsky
Kang Haggerty and Fetbroyt LLC
123 S. Broad Street Suite 1670
Philadelphia, PA 19109
ekang@kanghaggerty.com
kkovalsky@kanghaggerty.com

*Counsel for Defendant Martin Shkreli*

**SO ORDERED.**

_____

HON. DENISE L. COTE
UNITED STATES DISTRICT JUDGE

Date:    March __, 2021

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL TRADE COMMISSION; STATE
OF NEW YORK; STATE OF CALIFORNIA;
STATE OF ILLINOIS; STATE OF NORTH
CAROLINA; STATE OF OHIO;
COMMONWEALTH OF PENNSYLVANIA;
and COMMONWEALTH OF VIRGINIA,

                    Plaintiffs,

         v.

VYERA PHARMACEUTICALS, LLC;
PHOENIXUS AG; MARTIN SHKRELI,
individually, as an owner and former
director of Phoenixus AG and a former
executive of Vyera Pharmaceuticals, LLC;
and KEVIN MULLEADY, individually, as
an owner and former director of Phoenixus
AG and a former executive of Vyera
Pharmaceuticals, LLC,

                    Defendants.

---

Case No. 1:20-cv-00706-DLC

---

**FTC's Motion for Leave to Withdraw the
FTC's Prayer for Equitable Monetary Relief**

The FTC brought this case under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b),

seeking a permanent injunction and other equitable relief, including equitable monetary relief.

(ECF 91, Prayer for Relief ¶ 16). On April 22, 2021, the Supreme Court held in *AMG Capital

Management, LLC v. F.T.C.* that Section 13(b) does not "authorize the Commission to obtain

court-ordered monetary relief," including restitution or disgorgement. 141 S. Ct. 1341, 1347

(2021). Thus, the FTC now lacks statutory authority to request equitable monetary relief in this

case. The FTC therefore seeks leave under Federal Rule of Civil Procedure 15(a)(2) to withdraw

from the Amended Complaint its prayer for equitable monetary relief under Section 5 of the FTC

Act. (ECF 91, Prayer for Relief ¶ 16). Defendants refused to consent to the FTC's proposed

amendment.

   As the Supreme Court recognized in *AMG,* however, Congress can "grant [the FTC]

further remedial authority," thereby restoring the FTC's ability to obtain equitable monetary

relief. 141 S. Ct. at 1352.  Congress is currently considering such legislation. *See* Consumer

Protection and Recovery Act, H.R. 2688, 117th Cong. (2021).[1] The bill, as drafted, would apply

"to any action or proceeding that is pending on . . . the date of [its] enactment." *Id.* § 2(c). A

House of Representatives panel has held a hearing on the bill. *See* The Consumer Protection and

Recovery Act: Returning Money to Defrauded Consumers—Hearing on H.R. 2688 Before the

Subcomm. on Consumer Protection and Commerce of the H. Comm. on Energy and Commerce.

117th Cong. (2021).[2] Should Congress authorize the FTC to seek equitable monetary relief under

Section 13(b) of the FTC Act or any other provision of law while this action is pending, the FTC

reserves its right to reassert its claim for equitable monetary relief.


Dated:  May 26, 2021                         Respectfully submitted,

                                             /s/ Markus H. Meier
                                             Markus H. Meier (admitted *pro hac vice*)
                                             Federal Trade Commission
                                             600 Pennsylvania Avenue, NW
                                             Washington, DC 20580
                                             Tel: 202-326-3759
                                             mmeier@ftc.gov

                                             *Counsel for the Federal Trade Commission*

---

[1] *Available at* https://energycommerce.house.gov/sites/democrats.energycommerce.
house.gov/files/documents/BILLS-117hr2668ih%20Hearing%204.27.%20CPC.pdf.

[2] *Available at* https://energycommerce.house.gov/committee-activity/hearings/rescheduled-
hearing-on-the-consumer-protection-and-recovery-act.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 26th day of May, 2021, I have electronically filed a true and correct copy of the FTC's Motion for Leave to Withdraw the FTC's Prayer for Equitable Monetary Relief with the Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

Dated: May 26, 2021                    <u>/s/ Markus H. Meier</u>
                                       Markus H. Meier (admitted *pro hac vice*)
                                       Federal Trade Commission
                                       600 Pennsylvania Avenue, NW
                                       Washington, DC 20580
                                       Tel: 202-326-2018

                                       *Counsel for Plaintiff*
                                       *Federal Trade Commission*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA,<br><br>       Plaintiffs,<br><br> v.<br><br>VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC; and KEVIN MULLEADY, individually, as an owner and former director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC,<br><br>       Defendants. | Case No. 1:20-cv-00706-DLC |

---

**[Proposed] Order on FTC's Motion for Leave to Withdraw the
FTC's Prayer for Equitable Monetary Relief**

Having considered the FTC's Motion for Leave to Withdraw the FTC's Prayer for Equitable Monetary Relief, the Court hereby **GRANTS** the Motion.

**IT IS FURTHER ORDERED** that:

1.  The FTC's request for equitable monetary relief under Section 13(b) included in Paragraph 16 of Plaintiffs' Prayer for Relief (ECF 91) is withdrawn.

2.  Should Congress subsequently authorize the FTC to seek equitable monetary relief under Section 13(b) of the FTC Act or any other provision of law while this case is pending, the FTC may seek to reinstate such request for equitable monetary relief.

1

SO ORDERED.

Date: _____

_____
DENISE COTE
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
FEDERAL TRADE COMMISSION, STATE OF NEW :      20cv00706 (DLC)
YORK, STATE OF CALIFORNIA, STATE OF   :
OHIO, COMMONWEALTH OF PENNSYLVANIA,   :         ORDER
STATE OF ILLINOIS, STATE OF NORTH     :
CAROLINA, and COMMONWEALTH OF         :
VIRGINIA,                             :
                                      :
                    Plaintiffs,       :
                                      :
           -v-                        :
                                      :
VYERA PHARMACEUTICALS, LLC, AND       :
PHOENIXUS AG, MARTIN SHKRELI,         :
individually, as an owner and former  :
director of Phoenixus AG and a former :
executive of Vyera Pharmaceuticals,   :
LLC, and KEVIN MULLEADY, individually,:
as an owner and former director of    :
Phoenixus AG and a former executive of:
Vyera Pharmaceuticals, LLC,           :
                                      :
                    Defendants.       :
                                      :
------------------------------------- X

DENISE COTE, District Judge:

     In a decision of April 22, 2021, the Supreme Court held

that Section 13(b) of the Federal Trade Commission Act does not

authorize the Federal Trade Commission ("FTC") to seek equitable

monetary relief such as restitution or disgorgement. AMG Cap.

Mgmt., LLC v. Fed. Trade Comm'n, 141 S. Ct. 1341, 1352 (2021)

("AMG"). In a letter of May 19, the defendants requested leave

to file a motion for partial summary judgment with respect to

(1) the FTC's claim for equitable monetary relief; and (2) the

State plaintiffs' claims for disgorgement with respect to sales outside their borders.  The defendants submitted a proposed briefing schedule in a letter of May 25.

On May 26, the FTC conceded that the Supreme Court's decision eliminates its ability to obtain equitable monetary relief and filed a motion for leave to withdraw its prayer for equitable monetary relief.  The defendants opposed this motion on May 28.

Finally, in a letter of May 27, the State plaintiffs requested that the defendants' partial motion for summary judgment with respect to the State plaintiffs' claims for disgorgement be briefed after the close of expert discovery. Accordingly, it is hereby

ORDERED that, as a result of the Supreme Court's decision in AMG, the FTC's prayer for equitable monetary relief is dismissed.

IT IS FURTHER ORDERED that, in the event Congress passes legislation authorizing the FTC to seek equitable monetary relief, the FTC may request to reinstate its prayer for equitable monetary relief.  Should the defendants oppose the request, the parties shall submit a proposed briefing schedule.

IT IS FURTHER ORDERED that the State plaintiffs' proposed briefing schedule set out in their letter of May 27 is adopted. The defendants' partial motion for summary judgment relating to

the State plaintiffs' claims for disgorgement is due **August 13, 2021**.  Any opposition is due **August 27, 2021**, and any reply is due **September 3, 2021.**


Dated:     New York, New York
           June 2, 2021

                              _____
                                 DENISE COTE
                        United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA, <br><br> Plaintiffs, <br><br> v. <br><br> VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former officer of Vyera Pharmaceuticals, LLC and Phoenixus AG (formerly known as Turing Pharmaceuticals, LLC and Turing Pharmaceuticals AG); and KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC <br><br> Defendants. | Case No. 1:20-cv-00706-DLC |

**DEFENDANT MARTIN SHKRELI'S**
**PRETRIAL MEMORANDUM OF LAW**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................1

II.    FACTS ...............................................................................................................5

       A.     Founding of Vyera and Phoenixus..........................................................5

       B.     The Price Increase and R&D ...................................................................6

       C.     Vyera's Sourcing of API..........................................................................8

       D.     Vyera's Distribution of Daraprim .........................................................10

       E.     The Proxy Fight .....................................................................................10

       F.     Generic Competition..............................................................................10

       G.     Mr. Shkreli's Involvement in Vyera After February 2016 ...................12

III.   ARGUMENT....................................................................................................14

       A.     Plaintiffs Have Failed to Meet Their Burden of Proving that Mr. Shkreli
              Violated the Sherman Act or Analogous State Statutes.........................14

              1.     There Can Be No Section 2 Liability Against Mr. Shkreli.......14

              2.     There Can Be No Section 1 Liability Against Mr. Shkreli.......17

              3.     Mr. Shkreli Cannot Be Derivatively Liable for Vyera's Conduct............19

IV.    PLAINTIFFS' REQUESTED RELIEF IS BOTH UNAVAILABLE AND
       OVERBROAD...................................................................................................23

       A.     Mr. Shkreli Cannot Be Held Jointly & Severally Liable With The
              Company Defendants ..............................................................................23

       B.     Any Injunctive Relief Ordered Against Mr. Shkreli Must Be Narrowly
              Tailored; It May Not Unduly Harm Or Penalize Him ...........................25

V.     CONCLUSION.................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Appraisers Coal. v. Appraisal Inst.*, 845 F. Supp. 592 (N.D. Ill. 1994) .......................................16

*Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 256 F. Supp. 2d 249 (D.N.J. 2003) .....................16

*City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126 (1877) ..............................24

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ........................................22

*Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394 (S.D.N.Y. 2008)
    (Jones, J.) ............................................................................................................................ 14-15

*In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671 (S.D.N.Y. May 15, 2012)
    (Cote, J.) ...................................................................................................................................19

*ES Dev., Inc. v. RWM Enterprises, Inc.*, 939 F.2d 547 (8th Cir. 1991) ........................................16

*F.T.C. v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1296 (D. Minn. 1985)), *aff'd*, 743
    F.3d 886 (4th Cir. 2014) ...........................................................................................................27

*F.T.C. v. Ross*, 897 F. Supp. 2d 369 (D. Md. 2012) ............................................................... 27-28

*Federal Trade Comm'n v. Facebook, Inc.*, No. 20-3590, 2021 WL 2643627
    (D.D.C. June 28, 2021) .............................................................................................................26

*FTC v. Abbvie Inc.*, 976 F.3d 327 (3d Cir. 2020) .........................................................................25

*FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001)
    (Kaplan, J.) ...............................................................................................................................20

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ...........................................................25

*FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283 (S.D.N.Y. 2008)
    (Holwell, J.) ..............................................................................................................................20

*Gust, Inc. v. AlphaCap Ventures, LLC,* 15cv6192, 2016 WL 4098544 (S.D.N.Y.
    July 28, 2016) (Cote, J.) ...........................................................................................................14

*Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*, 408
    F. Supp. 1251 (S.D.N.Y. 1976) (Pierce, J.) .............................................................................20

*Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945)................................................. 21-23

*Liu v. Sec. & Exch. Comm'n*, ___ U.S. ___, 140 S. Ct. 1936 (2020) ..................................... 23-25

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951)........................................................ 21-23

*Mahmud v. Kaufmann*, 496 F. Supp. 2d 266 (S.D.N.Y. 2007) (Conner, J.).................................22

*In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209 (E.D.N.Y. 1996) .................................17

*Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239
    F.3d 172 (2d Cir. 2001)........................................................................................................27

*Murphy Tugboat Co. v. Shipowners Merchs. Towboat Co.,* 467 F. Supp. 841
    (N.D. Cal. 1979)..............................................................................................................19, 23

*Mylan Pharm. v. Celgene Corp.*, CV 14-2094 ES, 2014 WL 12810322 (D.N.J.
    Dec. 23, 2014)........................................................................................................................19

*Naso v. Park*, 850 F. Supp. 264 (S.D.N.Y. 1994) (Conner, J.)......................................................17

*Pascarella v. Sandals Resort Int'l, Ltd.*, No. 19-cv-2543, 2020 WL 1048943
    (S.D.N.Y. Mar. 4, 2020) (Torres, J.)......................................................................................20

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218 (E.D.N.Y. 2009) ....................15

*Sanders v. Air Line Pilots Ass'n., Int'l*, 473 F.2d 244 (2d Cir. 1972)............................................27

*Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 15 Civ. 211, 2021
    WL 1553926 (S.D.N.Y. Apr. 20, 2021) (Schofield, J.) ..................................................... 27-28

*United States v. W. T. Grant Co.,* 345 U.S. 629 (1953)..................................................................25

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-6480, 2019 WL
    130535 (E.D. Pa. Jan. 8, 2019) ........................................................................................ 15-16

*Yamaha Motor Co. v. Fed. Trade Com.*, 657 F.2d 971 (8th Cir. 1981).........................................28

**Statutes**

15 U.S.C. §1 ............................................................................................................................*Passim*

15 U.S.C. § 53(b) .........................................................................................................................25

FTC Act Section 5 .......................................................................................................................27

Sherman Act..................................................................................................................14, 17, 19, 21

Sherman Act Section 2........................................................................................................*Passim*

**Other Authorities**

Fed. R. Civ. P. 65 .......................................................................................................................27

Hopper, Allen T., et al., *Discovery of Selective Toxoplasma gondii Dihydrofolate Reductase Inhibitors for the Treatment of Toxoplasmosis*, J. Med. Chem. 2019, 62, 1562-1576 ............................................................................................7

Janetka, James W., et al., *Optimizing pyrazolopyrimidine inhibitors of calcium dependent protein kinase 1 for treatment of acute and chronic toxoplasmosis*, J. Med. Chem. 2020 June 11, 63(11), 6144-6163 ....................................................7

I.    **INTRODUCTION**

Plaintiffs, the Federal Trade Commission ("FTC") and seven state Attorneys General, have had over a year of discovery in this unprecedented action, and a five-year investigation before filing the action, to develop evidence that Martin Shkreli, along with Kevin Mulleady—the only individuals ever named in a federal government action alleging monopolization under Section 2 of the Sherman Act—violated federal and state antitrust laws.  The record is clear that they cannot do so.  The Court must hold plaintiffs to their burden of proof and reject plaintiffs' claims against Mr. Shkreli.

As one of the co-founders of Vyera, Mr. Shkreli believed that the company could find new cures for rare and neglected diseases while creating value for Vyera's shareholders.  With respect to Daraprim, he believed that the company could create a better version of the drug, and worked hard, along with a first-rate team of scientists that he personally recruited, to make this vision a reality.  He authorized the price increase of Daraprim—a drug that had been largely ignored by the pharmaceutical community for nearly 60 years—to align the price with other similar life-saving drugs and to use the proceeds for research and development to make a better version of Daraprim. He urged Vyera to focus on research and development, because he believed that the company had an obligation to the rare disease patient community to invest any profits in new and better drugs. The law is crystal clear that raising prices is not unlawful, and in fact is an important part of our free market system.  So, despite plaintiffs' attempts to make it so, this case is not about the Daraprim price increase, but rather, whether plaintiffs can sustain their burden of proving that Mr. Shkreli violated the antitrust laws.  The record shows that plaintiffs come up woefully short.

Mr. Shkreli's work with Vyera and Daraprim was cut short when he was arrested and resigned as CEO in December 2015.  During the four and a half months he was with Vyera, he was not involved in any of the distribution or supply agreements that form the basis of plaintiffs'

allegations.  Indeed, the record shows that almost all of those agreements were negotiated, entered and signed after Mr. Shkreli had left Vyera.  In addition, the record is devoid of any evidence that he was involved in those agreements after he left.

Nor does the record show conduct by Mr. Shkreli since he left Vyera that can sustain plaintiffs' antitrust claims.  The record is now clear that plaintiffs' reliance on a false newspaper allegation that Mr. Shkreli was "running" Vyera from prison (*see* Am. Compl. (ECF 87) ¶ 45), was misplaced.  No such evidence has been presented.  At most, the evidence shows that from the time he left Vyera to the current day, Mr. Shkreli has made suggestions to Vyera management— as any large shareholder would be expected to—regarding the business, most of which management ignored.  And Mr. Shkreli did not have the authority to, and did not, direct any of Vyera's corporate actions once he left the company, including any actions relating to Daraprim.

Plaintiffs bring no claims against Mr. Shkreli in his individual capacity; their theory of liability is a derivative one, *i.e.*, that as a former corporate officer and director, and current shareholder, Mr. Shkreli is liable for corporate conduct in which he allegedly "participated."  But putting aside whether this is the proper standard for the Court to apply, the record supports neither anticompetitive conduct by Vyera nor Mr. Shkreli's participation in such conduct.  For all the reasons set forth in Defendants' Pre-Trial Memorandum, there is no basis for the Court to find that Vyera violated the law.  The case against Mr. Shkreli should end right there.  But even assuming the Court were to find Vyera liable, which it should not, there is no basis for the Court to find liability against Mr. Shkreli, for several reasons.

First, there is no evidence that Mr. Shkreli, as an individual, possesses monopoly power, a necessary element of a Section 2 claim, and plaintiffs cannot point to a single case that holds that an individual acting on behalf of a corporation assumes the monopoly power of the company.  In

fact, as plaintiffs' own expert Scott Hemphill testified, the concept does not make any sense.  So the Section 2 claims against Mr. Shkreli cannot survive even if the Court were to find Vyera liable under Section 2.

Second, there is no basis for holding Mr. Shkreli liable under Section 1.  Mr. Shkreli had no involvement in any of the allegedly anticompetitive agreements Vyera entered into, most of which were entered after he had left the companies.  Nor can Mr. Shkreli be held liable through his status as a former officer and director, or current minority shareholder. Corporate officers and directors can be held liable only for conduct by the company that constitutes a *per se* antitrust violation, which is not alleged here, and despite being a large shareholder, Mr. Shkreli does not have the authority to control Vyera's decisions.  Plaintiffs' allegation that Mr. Shkreli's exercising his rights as a large shareholder was somehow improper goes nowhere, because there is no evidence that Mr. Shkreli ever influenced any decisions of the Phoenixus board relating to Daraprim.

Finally, because the state law claims against Mr. Shkreli filed by the state Attorneys General generally mirror the federal claims, they all fail for the same reasons.

Even if plaintiffs were able to present sufficient evidence that Mr. Shkreli violated the law, which they cannot, the record is also devoid of any evidence that Mr. Shkreli was unjustly enriched by the alleged scheme.  Thus, plaintiffs' unprecedented request for unspecified monetary relief and an injunction that would ban Mr. Shkreli from all aspects of the pharmaceutical industry for life is wholly without foundation.

Because he believed so deeply in Vyera's mission, Mr. Shkreli invested $18 million of his own money into the company and received no salary or compensation of any kind.  Indeed, far

from being "unjustly enriched," Mr. Shkreli has made *no profit* from Daraprim or any other drug that Vyera has sold.  So plaintiffs are not entitled to any monetary relief against Mr. Shkreli.

And plaintiffs' request for a lifetime industry ban is simply an overreach by the plaintiffs.

First, there is no factual foundation on which the Court could base a permanent injunction, because the record shows that as of the time the Complaint was filed, Mr. Shkreli was not "violating" or "about to violate" the law.   The Amended Complaint makes reference to communications Mr. Shkreli had—months before the Complaint was filed—with Vyera executives about the company, and contains a vague allegation that Mr. Shkreli was at that time "looking for" drugs other than Daraprim to hatch a similar scheme (Am. Compl. (ECF 87) ¶ 293), but no such evidence was developed in discovery.  Thus there is no evidentiary support for any type of injunction.

Second, even if there were support in the record for an injunction, a lifetime ban from the industry would be well beyond the bounds of any reasonable sanction for the Court to impose. Any sanction must be narrowly tailored to the proof in the case.  Even assuming plaintiffs proved every single allegation against Mr. Shkreli, which they cannot, a lifetime ban from the pharmaceutical industry would amount to unnecessary and unreasonable punishment, which is not the proper function of a court in equity and, in any event, inappropriate in a rule of reason antitrust case.

For all these reasons, the Court should reject all the claims against Mr. Shkreli.[1]

---

[1] Mr. Shkreli incorporates by reference in their entirety Defendants' Memorandum Addressing Questions of Law Expected To Arise at Trial ("Defendants' Pre-Trial Memorandum") and Defendant Kevin Mulleady's Pre-Trial Memorandum of Law ("Mulleady's Pre-Trial Memorandum").

II.   **FACTS**

A.       **Founding of Vyera and Phoenixus[2]**

Martin Shkeli has always had a passion for finding cures for rare diseases, and spent years after college studying drug trials, chemistry, and biopharmaceutical stocks.   Written Direct Testimony of Martin Shkreli ("Shkreli Decl.") ¶ 9.   In September 2014, after several years at Retrophin, a company he founded in 2010 that focused on rare diseases such as Duchenne Muscular Dystrophy (DMD) and pantothenate kinase-associated neurodegeneration (PKAN), Mr. Shkreli co-founded Vyera and Phoenixus.  *Id.* ¶ 10-16.  He personally invested approximately $18 million into Vyera.  *Id.* ¶ 15.  From the date of Vyera's and Phoenixus' founding until December of 2015, Mr. Shkreli was the CEO of Vyera and a Director and Chairman of the Board of Directors of Phoenixus.  *Id.* ¶ 17.  He never received a salary or any form of compensation from either company.  *Id.;* Tilles Dep. Tr., at  194:25-195:9*.*

Early on, Mr. Shkreli advised the Phoenixus Board of Directors that while he had been acting as Vyera's CEO, it was not a role that he planned or wanted to fill much longer, and urged the company to identify and hire a new CEO with greater pharmaceutical industry experience than he had.  Shkreli Decl. ¶ 18.  Mr. Shkreli recruited well-credentialed and experienced scientists at Vyera to conduct research and development ("R&D"), including Vyera's head of R&D, Eliseo Salinas, M.D, former head of global R&D for Shire Pharmaceuticals; Dr. Adam Brockman, a parasitologist with two decades of experience in the biopharmaceutical industry; Dr. Matthew Welsch, a medicinal chemist; Dr. Steven Thomas, also a medicinal chemist and currently Chief Scientific Officer for ValenzaBio; and Dr. Wendy Cousin, currently the lead scientist at Spring

---

[2] Turing Pharmaceuticals LLC and Vyera Pharmaceuticals LLC will be referred to in this brief as "Vyera." Turing Pharmaceuticals AG and Phoenixus AG will be referred to as "Phoenixus."

Discovery. *Id.* ¶ 19.  Mr. Shkreli and his co-founders envisioned that Vyera would, among other things, acquire established pharmaceuticals that treated rare diseases but were largely ignored by the larger pharmaceutical companies.  *Id.* ¶ 22.   One of these drugs was Daraprim, which Vyera acquired from Core Pharma in August of 2015.  *Id.* ¶ 32.  Mr. Shkreli believed that Vyera could develop a better version of Daraprim with less severe side effects, while at the same time providing shareholder value.  *Id.* ¶ 34.

### B.      The Price Increase and R&D

After Vyera purchased Daraprim, it increased its price from $17.50 to $750 per pill.  Mr. Shkreli authorized the price increase because he believed that Daraprim was significantly underpriced relative to other lifesaving medications such as drugs that treat hepatitis C (*e.g.*, Sovaldi and Harvoni), and HIV drugs.  Shkreli Decl. ¶ 33.  At $750 per pill, Daraprim compared very favorably to hepatitis C and HIV drugs when one considers the cost of a course of treatment. *Id.*  For example, a full course of treatment for hepatitis C costs approximately $80,000, whereas, at $750 per pill, a full course of treatment for toxoplasmosis costs approximately $40,000.  *Id.* And of those three diseases—hepatitis C, HIV, and toxoplasmosis—only one, toxoplasmosis, is rapidly fatal.  *Id.*

Mr. Shkreli also believed that the price increase would allow Vyera to invest in R&D to create a new and better version of Daraprim.  *Id.* ¶ 34.  On its own, Daraprim is highly toxic and must be taken in combination with another drug called leucovorin.  *Id.*  Adding a second drug to the treatment regimen can result in reduced adherence to the regimen.  *Id.*  Mr. Shkreli's vision was to make a combination pill containing both Daraprim and leucovorin.  *Id.*  Mr. Shkreli believed that if Vyera were going to increase the price of the drug, it had an obligation to the patient community to invest the revenues from the price increase into research and development.  *Id.*  ¶

35.  For this reason, he never took a salary or received any compensation from Vyera or Phoenixus. *Id.* ¶ 17.

Mr. Shkreli urged the company to invest revenues from the price increase into new drug development, including either a drug with an entirely new chemical composition, effective against toxoplasmosis, or a combination pill combining Daraprim and leucovorin.  *Id.* ¶ 36.  Led by a team of four to five doctors in the R&D department, Vyera focused its research and development efforts on making a better form of Daraprim.  *Id.*  Vyera was the first company to develop new toxoplasmosis drugs, including a new drug (TUR-006) that would obviate the need for sulfa drugs and thus remove the allergic complications that most HIV patients experience.  *Id.*  Vyera also had two papers published in the Journal of Medicinal Chemistry about these innovations.  *See* Hopper, Allen T., et al., *Discovery of Selective Toxoplasma gondii Dihydrofolate Reductase Inhibitors for the Treatment of Toxoplasmosis*, J. Med. Chem. 2019, 62, 1562-1576; Janetka, James W., et al., *Optimizing pyrazolopyrimidine inhibitors of calcium dependent protein kinase 1 for treatment of acute and chronic toxoplasmosis*, J. Med. Chem. 2020 June 11, 63(11), 6144-6163.  In addition, while Mr. Shkreli was at Vyera, the company developed the first ever toxoplasmosis-specific inhibitor of the enzyme DHFR, which reached Phase 1 clinical development, a stage that few research projects attain.  *Id.* ¶ 37.

Daraprim was just one of over a dozen drugs that Vyera acquired or developed. *Id.* ¶ 39. These include: leronlimab, an antibody used to treat HIV (licensed from CytoDyn Inc.); intranasal Ketamine, which treats acute suicidality; Stiripentol, used for Dravet Syndrome, a severe encephalapothy affecting children; oxytocin, which treats autism; Vecamyl, used for malignant hypertension and spinal cord injury; two new toxoplasmosis drugs; four new medicines and new nucleic acid therapies for various rare diseases; and new, cheaper generic drugs.  *Id.*

### C.    Vyera's Sourcing of API

After he left the company, Mr. Shkreli learned that Vyera signed a supply contract with a Japanese company called Fukuzyu.  Shkreli Decl. ¶ 43.  Mr. Shkreli did not negotiate or sign, and is not familiar with any of the terms of, Vyera's contract with Fukuzyu.  *Id.*  As a matter of good business practice, it is important for a pharmaceutical company to have a secondary or back-up API supplier available to meet its needs if its primary supplier becomes unable to do so.  *Id.* ¶ 45; Pellicione Written Testimony at ¶ 26; Written Direct Testimony of Kevin Mulleady ( "Mulleady Decl.") ¶ 42.  For Vyera, which depended on Daraprim sales to generate revenue, having a back-up supplier was important to ensure both that it could continue to offer and make sales of Daraprim and that there would be no interruption in the supply of Daraprim to the patients who depend upon it.  Shkreli Decl. ¶ 46; Salinas Dep. Tr. at 158:23-160:5.  For these reasons, while Mr. Shkreli served as CEO of Vyera, he asked the manufacturing team to look into contracting with not only a primary supplier, but also a secondary supplier.  *Id.* ¶ 47.  That process was not completed by the time he left the company in December 2015.  *Id.* ¶ 48.  Prior to that time, Vyera had had discussions with an Indian company, Neuland Laboratories, about supplying Vyera with pyrimethamine.  *Id.*  However, those discussions did not progress very far.  *Id.*  In addition, Vyera's head of manufacturing, Dr. Hasmukh Patel, approached a second company, Ipca Laboratories, about supplying API in the United States, during the time that Mr. Shkreli was CEO.  *Id.*  However, those efforts were ultimately unsuccessful, as Dr. Patel left the company in November or December of 2015.  *Id.*

Two years later, in 2017, when Mr. Shkreli was no longer an employee of Vyera or director of Phoenixus, he became aware of another potential API manufacturer of pyrimethamine, an Indian company named ███.  *Id.* ¶ 49.  A representative of ███ approached a former Vyera employee, Edwin Urrutia, and informed him that ███ was working towards manufacturing

pyrimethamine. *Id.* ¶ 50.  That information was passed on to Mr. Shkreli through his attorney. *Id.*
Around that same time, Mr. Shkreli fortuitously learned in conversations with either Mr. Mulleady
or Vyera employee Akeel Mithani that Vyera was already engaged in discussions with ████.
*Id.* ¶ 51.  Mr. Shkreli informed Mr. Mulleady of what he had learned from Mr. Urruita, namely
that ████ was working towards the manufacture of pyrimethamine. *Id.* ¶ 52.  Mr. Shkreli did
not know whether Mr. Mulleady and Mr. Mithani already knew that ████ was working towards
the manufacture of pyrimethamine, but thought it was important to inform Vyera management of
this fact because he thought that it could mean that entry of a generic alternative to Daraprim was
imminent, which would have a significant effect on his investment in the company *Id.* ¶ 53-54.

As a shareholder, Mr. Shkreli felt that his role was limited to conveying the information to
management so that they could project when that entry might occur and make whatever decisions
they thought appropriate to prepare for it—such as reducing the sales force—but that any decision
about what to do with the information was for Vyera management to make.  *Id.* ¶ 54.  Mr. Shkreli
also recognized that ████ represented a potential secondary or back-up source of
pyrimethamine for Vyera, and that ████ could be a potential partner with Vyera in creating a
combined drug containing pyrimethamine and leucovorin.  *Id.* ¶ 55.  Mr. Shkreli does not know
what, if anything, Mr. Mulleady did with the information he provided him about ████.  *Id.* ¶
56.  Mr. Shkreli later learned that Vyera approached ████ about purchasing pyrimethamine,
and he counseled Mr. Mithani, who was inexperienced in such matters, on how to approach ████
████ on this subject and the possible partnership for a combination pill.  *Id.*  Mr. Shkreli also
learned that Vyera entered into an API supply agreement with ████.  *Id.* ¶ 57.  However, Mr.
Shkreli did not negotiate that agreement, did not sign it, and has never seen it.  *Id.*

### D.    Vyera's Distribution of Daraprim

Mr. Shkreli has very little knowledge concerning the specifics of Vyera's distribution of Daraprim, other than the fact that it is offered through specialty distribution, just as it was under its previous owner, CorePharma.  Shkreli Decl. ¶ 58.  The distribution of Daraprim was handled by Vyera executives who understood specialty distribution, and not Mr. Shkreli.  *Id.* ¶ 59.  Mr. Shkreli did not negotiate, did not sign, and is not familiar with any of the terms of any of the distribution contracts that Vyera entered with distributors.  *Id.* ¶ 60.

### E.    The Proxy Fight

In 2016, Mr. Shkreli was not satisfied that Vyera was moving in the right direction, and became concerned about the future of the company, which at that time was his largest investment.  Shkreli Decl. ¶ 61.  He was particularly frustrated by the way that Ron Tilles, who had been named interim CEO, was managing Vyera.  *Id.*  As a result, Mr. Shkreli organized a proxy fight to remove members of the Board of Directors of Phoenixus that he did not think were doing a good job, including Mr. Tilles.  *Id.*  The proxy fight was successful, and Mr. Shkreli's slate of directors, which included Kevin Mulleady and Akeel Mithani, was elected.  *Id.*

The proxy fight was totally unrelated to Vyera's sale and distribution of Daraprim.  *Id.* ¶ 62.  Despite the fact that Mr. Shkreli's share ownership in Phoenixus allowed him to make changes to the Board of Phoenixus, he never used that power to affect in any way Vyera's distribution of Daraprim, its acquisition of pyrimethamine API for Daraprim, or its policies and practices related to reporting of data.  *Id.* ¶ 63.

### F.    Generic Competition

As a shareholder of Phoenixus, Mr. Shkreli from time to time makes suggestions to Vyera management regarding the company.  Shkreli Decl. ¶ 64.  Often these suggestions are ignored.  *Id.*; Mulleady Decl. ¶ 64; Mulleady Dep. Tr., at 122:14-123:10; Mithani Dep. Tr., at 259:10-18.

One significant example of Vyera management ignoring Mr. Shkreli's suggestions after he left the companies is their failure to follow his suggestion that Vyera develop an alternative to or a better form of Daraprim to treat toxoplasmosis.  Shkreli Decl. ¶ 64.

Ever since Vyera purchased Daraprim, Mr. Shkreli has anticipated the development of a generic competitor.  *Id.* ¶ 66.  Mr. Shkreli's view, as he expressed to his Vyera colleagues, is that the only way to mitigate the impact of generic competition is to develop a new or better drug.  *Id.* In a September 26, 2015 email to Vyera employee Ed Painter, who had asked Mr. Shkreli if an annual price reduction commitment might discourage generics from entering the market, Mr. Shkreli told Mr. Painter that he did not think there is much that can be done to prevent generics from entering the market other than to introduce a new drug.  *Id.* ¶ 67; Trial Ex. DX 126. As a result, when he was CEO of Vyera, Mr. Shkreli made sure that R&D was a core focus for the company.  Shkreli Decl. ¶ 68.  And Vyera employees spent a lot of time thinking about how to make a better version of Daraprim.  *Id.*

Mr. Shkreli explained his philosophy about R&D in a 2017 email to Tracy Seckler, the Chief Visionary Officer for Charley's Fund, a charity dedicated to developing life-saving treatments for DMD.  *Id.* ¶ 69.  Mr. Shkreli told Ms. Seckler that if a company increases the price of a pharmaceutical, as Vyera did, it needs to use the profits to fund lab research and develop a better drug.  *Id.*; Trial Exhibit DX 481.  After his resignation, Mr. Shkreli repeatedly advised and implored Vyera employees to continue this research.  Shkreli Decl. ¶ 70.  But for several years after he left the company, the management had very little interest in R&D.  *Id.*  As a result, Vyera has not developed a new or better drug to treat toxoplasmosis.  *Id.*  Mr. Shkreli is not aware of any plan by Vyera—which owned Daraprim for only four months before he resigned as CEO—to stop

or slow a generic pharmaceutical company from manufacturing and selling a generic version of Daraprim, which he does not believe is possible. *Id.* ¶ 71.

### G.    Mr. Shkreli's Involvement in Vyera After February 2016

Mr. Shkreli resigned as Vyera's CEO on December 18, 2015, and subsequently resigned from Vyera's Board on February 10, 2016. Shkreli Decl. ¶ 73. Since his departure, Mr. Shkreli's only role in Vyera has been as a shareholder. *See* Tilles Dep. Tr., at 147:23-148:2, 183:3-24; Retzlaff Dep. Tr., at 210:3-10; Shkreli Decl. ¶ 73. As a shareholder, Mr. Shkreli is entitled to vote his shares in Phoenixus and to contact company management about sales data like any other Vyera shareholder. Tilles Dep. Tr., at 183:17-22; Retzlaff Dep. Tr., at 181:9-10; Shkreli Decl. ¶ 75. But, Mr. Shkreli has not had any role in managing nor the authority to manage Vyera  since his departure—and the company's actions make this clear. After resigning from Vyera, Mr. Shkreli was not able to control or manage the business of Vyera, and was not able to control the decision-making of Vyera as it related to Daraprim. Costopoulos Dep. Tr., 141:20-142:20. More specifically, Mr. Shkreli did not negotiate any supply agreements on behalf of Vyera during this time period (or any other time period), nor was Mr. Shkreli able to control the decision-making as it related to Vyera's distribution agreements for Daraprim. Costopoulos Dep. Tr., 144:2-145:4.

After Mr. Shkreli left Vyera as CEO in December of 2015, it was the company's view that Mr. Shkreli should have no role in the management of the company. Costopoulos Dep. Tr., 145:18-146:9. Mr. Shkreli has not attended meetings of Vyera's Senior Leadership team since December 2015 and, as an example, was specifically barred from attending such meetings as early as February 2016 "because he was no longer a part of management" of Vyera. Costopoulos Dep. Tr., at 55:23-57:18, 141:20-142:12; Tilles Dep. Tr., at 161:25-162:22, 163:17-164:3; Retzlaff Dep. Tr., at 210:3-10. Mr. Shkreli sought a consulting agreement with Vyera after his departure, but the company refused to retain him as a consultant. Tilles Dep. Tr., at 165:4-6; Costopoulos Dep.

Tr., at 145:12-17; Shkreli Decl. ¶ 78.  And, while Mr. Shkreli has made suggestions to company management, these suggestions have often been ignored.  Tilles Dep. Tr., at 10-13; Shkreli Decl. ¶¶ 64, 81.  For example, when Mr. Shkreli requested a Vyera email address, company management told him that he could not have an email because he was "no longer part of the company . . . you're not part of this."  Tilles Dep. Tr., at 84:10-13; *see also* Tilles Dep. Tr., at 189:10-18.  Mr. Shkreli's communications with Vyera management since leaving the company have focused on sales data relevant to his status as a large shareholder, consistent with the company's view that "he's entitled to shareholder updates, but nothing beyond that."  Tilles Dep. Tr., at 183:9-24; *see id.*, at 165:24-166:17; Retzlaff Dep. Tr., at 181:9-10; Shkreli Decl. ¶ 75.  Finally, Mr. Shkreli has not been physically present at Vyera's offices since his departure.  Tilles Dep. Tr., at 173:14-174:2; Retzlaff Dep. Tr., at 211:8-11.

In sum, Mr. Shkreli's interactions with Vyera since his departure make it clear that Mr. Shkreli has had no subsequent role in the company's management  *See* Tilles Dep. Tr., at 184:17-22; Retzlaff Dep. Tr., at 210:3-10; Costopoulos Dep. Tr., at 141:20-142:12, 146:4-9.  Since leaving the companies, Mr. Shkreli has not had the authority to make, and has not made, any decisions for Vyera or Phoenixus in any way relating to Daraprim or any other drug. Shkreli Decl. ¶ 76.

Since leaving Vyera and Phoenixus in February 2016, Mr. Shkreli has been in contact with Mr. Mulleady and current employee Akeel Mithani and, more recently, with Vyera's current CEO and General Counsel, Averill Powers.  *Id.* ¶ 80.  Mr. Shkreli has known Mr. Mulleady and Mr. Mithani for years and has considered both of them friends.  *Id.*  Following his resignation from Vyera, he has had many discussions and communications with both of them on various topics ranging from pop culture to personal matters to matters affecting Vyera.  *Id.* ¶ 81.  From the time that Mr. Powers was promoted to interim CEO in December 2018, Mr. Shkreli has had a limited

number of conversations with him, beginning in 2020. *Id.* In the course of the many discussions Mr. Shkreli has had with Messrs. Mulleady, Mithani and Powers, he has made suggestions to each of them about Vyera, primarily relating to business development, in his role as a major shareholder in Phoenixus. *Id.* ¶ 81. But no Vyera employee, including Mr. Mulleady, Mr. Mithani, or Mr. Powers, is required or bound to follow Mr. Shkreli's suggestions. *Id.* In fact, more often than not they ignore, or at least do not follow, those suggestions, which has been a continuing source of frustration for Mr. Shkreli. *Id.*; Mulleady Dep. Tr., at 122:14-123:10; Mithani Dep. Tr., at 259:10-18.

III.   **ARGUMENT**

A.   **Plaintiffs Have Failed to Meet Their Burden of Proving that Mr. Shkreli Violated the Sherman Act or Analogous State Statutes**

Plaintiff have failed to meet their burden of proving that Mr. Shkreli violated either Section 1 or Section 2 of the Sherman Act, or state-level analogous statutes.

1.   **There Can Be No Section 2 Liability Against Mr. Shkreli**

The elements of a claim under Section 2 of the Sherman Act are (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident. *Gust, Inc. v. AlphaCap Ventures, LLC,* 15cv6192, 2016 WL 4098544, at *4 (S.D.N.Y. July 28, 2016) (Cote, J.) (quoting *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014)).

To succeed on a Section 2 claim, a plaintiff must prove that a defendant possesses monopoly power (a/k/a market power) in a relevant market. *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 404 (S.D.N.Y. 2008) (Jones, J.) (explaining that an element of a Section 2 claim is "the possession of monopoly power in the relevant market" (quoting *United States v.*

*Grinnell Corp.*, 384 U.S. 563, 570-71 (1966))); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 239 (E.D.N.Y. 2009) (same).

Plaintiffs' Section 2 claims against Mr. Shkreli fail because Mr. Shkreli does not possess monopoly power.[3]  To meet the monopoly power element, a plaintiff must show that the defendant possesses "the power to control prices or exclude competition." *Discover Fin. Servs.*, 598 F. Supp. 2d at 404 (quoting *Heerwagen v. Clear Channel Communications*, 435 F.3d 219, 226 (2d Cir. 2006)).  That analysis fails when applied to individuals.  Plaintiffs' own expert, Scott Hemphill, Ph.D., J.D., will offer no opinion that Mr. Shkreli possesses monopoly or market power.  In fact, Dr. Hemphill was flummoxed by the mere suggestion that Mr. Shkreli, or Mr. Mulleady, could possibly possess market power.  When asked, at his deposition, if he intended to testify whether "either of the individual defendants, meaning Mr. Shkreli or Mr. Mulleady, possessed market power," Dr. Hemphill responded, "I don't know what that would mean.  Market power and monopoly power would be evaluated by reference to the sellers of products."  Hemphill Dep. Tr., at 245:10-20.  Thus, because Mr. Shkreli and Mr. Mulleady are not "sellers of products," the only basis for liability Dr. Hemphill could articulate against them, at his deposition, is that "they are the same thing as Vyera for purposes of an economist." *Id.* at 245:10-23.  But under the law, that is not so.

Courts that have addressed the rare monopolization claims brought against individuals have held that an individual cannot be liable on a monopolization theory unless the individual possesses monopoly power.  In *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-6480, 2019

---

[3] The Court previously struck Mr. Shkreli's Fifteenth Affirmative Defense on this ground, holding that "to succeed at trial, the plaintiffs need not prove that Shkreli . . . personally possessed any market power."  Oct. 6, 2020 Opinion and Order (ECF 365), at 10.  However, that affirmative defense merely restates what is, in the first instance, plaintiffs' burden to prove.  Thus, Mr. Shkreli respectfully reasserts that the government must, but cannot, meet this burden.

WL 130535 (E.D. Pa. Jan. 8, 2019), the plaintiffs sued a cooperative, its members (including natural born individuals), and certain third-party distributors, alleging claims under, *inter alia*, Section 2 of the Sherman Act, alleging that the defendants violated Section 2 by "conspiring to acquire or maintain, acquiring or maintaining, and/or attempting to acquire or maintain monopoly power." *Id.* at *5. However, the claims against the individuals could not stand because "to sustain their claims of monopolization and attempted monopolization," the court held, plaintiffs must "prove the required elements against *each individual defendant*." *Id.* (quotations and citation omitted, emphasis added). The plaintiffs' claims against the individual defendants failed because just as in a related class action in which the plaintiffs failed to allege that "any of the individual member defendants had a dangerous probability of achieving monopoly power" themselves, the plaintiffs in *Winn-Dixie* alleged no facts that the individual defendants possessed monopoly power themselves. *Id*.

Other courts are in accord: individuals do not possess monopoly power by virtue of their association with corporate defendants. *See Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n*, 256 F. Supp. 2d 249, 284-85 (D.N.J. 2003) (granting summary judgment on Section 2 claim because plaintiffs failed to prove individual defendants possessed monopoly power, holding that plaintiffs do not even *"*contend that [the individual defendant,] separate from [the company,] possesses market power*"* and finding that "[the individual defendant] is not in the business of importing oriental rugs and therefore has no market share whatsoever … [the defendant] as an individual possesses no power to prevent newcomers from entering the market"); *Appraisers Coal. v. Appraisal Inst*., 845 F. Supp. 592, 602-03 (N.D. Ill. 1994) (dismissing Section 2 claim against individuals where the plaintiff made "no allegation with respect to the market power of any individual"); *see also ES Dev., Inc. v. RWM Enterprises, Inc*., 939 F.2d 547, 554 (8th Cir. 1991)

(holding in a Section 1 case that "the Sherman Act does not impart liability for actions by an individual, regardless of their anticompetitive motive or effect, unless the individual entity possesses monopoly power.").

Accordingly, because there is no evidence, and no expert will opine, that Mr. Shkreli possesses market power, Plaintiff's Section 2 claims—and all related state law claims—against him fail.

### 2.    There Can Be No Section 1 Liability Against Mr. Shkreli

Section 1 of the Sherman Act proscribes every "contract, combination . . . or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  To satisfy the elements of a Section 1 claim, Plaintiffs must prove "(1) a contract, conspiracy, or combination, (2) which restrains trade such that the anticompetitive effects outweigh the procompetitive effects, and (3) which proximately causes injury to plaintiff."  *Naso v. Park*, 850 F. Supp. 264, 272 n.6 (S.D.N.Y. 1994) (Conner, J.) (citing *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 687 F. Supp. 800, 806-07 (S.D.N.Y. 1988)); *see also In re Med. X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 215 (E.D.N.Y. 1996) (Section 1 claim requires "(1) concerted action, (2) by two or more persons, (3) which unreasonably restrains interstate or foreign trade or commerce.").  Plaintiffs allege that Vyera's distribution and supply agreements are unreasonable restraints of trade in violation of Section 1, and that Mr. Shkreli is vicariously liable because he was formerly a corporate officer and director, and is currently a shareholder.  Am. Compl. (ECF 87) ¶¶ 319-22.  But the evidence fails to support these claims.

First, plaintiffs cannot show a Section 1 violation by Vyera, for all the reasons articulated in Defendants' Pre-Trial Memorandum.  Because there is no liability for Vyera, there can be no liability for Mr. Shkreli.  But even if the Court disagrees and finds Vyera liable under Section 1, the record does not support liability for Mr. Shkreli under Section 1.

The record does not support a finding of liability based upon Mr. Shkreli's alleged participation in the contracts. During the four and a half months he was with Vyera, he was not involved in any of the supply or distribution agreements that are the basis of plaintiffs' allegations. And the record shows that almost all of those agreements were negotiated, entered and signed after Mr. Shkreli left Vyera. Additionally, the record is devoid of any evidence that he was involved in those agreements after he had left. Mr. Shkreli has very little knowledge concerning the specifics of Vyera's distribution of Daraprim, other than the fact that it is offered through specialty distribution, just as it was under its previous owner, Core Pharma. Shkreli Decl. ¶ 58. Mr. Shkreli did not negotiate, did not sign, and is not familiar with any of the terms of any of the distribution contracts that Vyera entered with distributors. *Id.* ¶ 60.

While CEO of Vyera, Mr. Shkreli asked Vyera's manufacturing team to investigate contracting with a primary and secondary supplier of pyrimethamine. *Id.* ¶ 47. Mr. Shkreli viewed it as important for Vyera to have a secondary supplier to ensure continuity of supply. *Id.* ¶¶ 45-46. During his tenure, Vyera engaged in discussions with two companies, Neuland Laboratories and Ipca Laboratories. *Id.* ¶ 48. However, discussions with these companies did not ultimately lead to an API supply agreement and concluded in late 2015 after Vyera's head of manufacturing, Dr. Hasmukh Patel, left the company in November or December of that year. *Id.* Not long after, Mr. Shkreli resigned from Vyera and the Phoenixus Board. And, while Mr. Shkreli became aware, after he left the company, that Vyera had signed an API supply agreement with Fukuzyu, he did not negotiate that agreement, did not sign it, and is not familiar with any of its terms. *Id.* ¶ 43. Vyera's agreement with ███████ was entered into during the term of Mr. Shkreli's incarceration. Mr. Shkreli did not negotiate that agreement, did not sign it, and has never seen it. *Id.* ¶ 57.

Moreover, the record contains no evidence that Mr. Shkreli had any contact at all with anyone at any of the counterparties to the allegedly illegal agreements.  Thus, there can be no "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" between Mr. Shkreli and any other person or entity, to support a Section 1 claim. *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. May 15, 2012) (Cote, J.) (internal quotation marks omitted); *see also Mylan Pharm. v. Celgene Corp.*, CV 14-2094 ES, 2014 WL 12810322, at *8 (D.N.J. Dec. 23, 2014).

In short, Plaintiffs have failed to carry their burden of proving that Mr. Shkreli participated in the challenged agreements such that he can be held liable for them. Therefore, plaintiffs have failed to prove their Section 1 claim—and all related state law claims—against Mr. Shkreli.

### 3.    Mr. Shkreli Cannot Be Derivatively Liable for Vyera's Conduct

Plaintiffs' theory of Mr. Shkreli's liability—*i.e.*, that under agency principles Mr. Shkreli can be held liable for Vyera's alleged anticompetitive conduct, is untenable.[4]

First, a director or officer cannot be liable for a company's allegedly anticompetitive conduct unless that conduct constitutes a *per se* violation of the antitrust laws.  *Murphy Tugboat Co. v. Shipowners Merchs. Towboat Co.,* 467 F. Supp. 841, 853-54 (N.D. Cal. 1979) (CEO's knowing approval or ratification of company's policy of refusing to deal with competitors did not impose liability under Sherman Act on CEO because the company's policy was not a *per se* violation or "inherently wrongful.")  Here, Plaintiffs are not alleging "inherently wrongful"

---

[4] Mr. Shkreli acknowledges that in its Opinion and Order denying Mr. Shkreli's Motion to Dismiss ("Motion to Dismiss Order") (ECF 365), the Court rejected Mr. Shkreli's argument that plaintiffs' "reverse agency" theory was the wrong standard, and ruled that it is enough that plaintiffs establish Mr. Shkreli's "participation" in Vyera's allegedly anticompetitive conduct.  Mr. Shkreli urges the Court to reconsider this conclusion on the proper standard to apply.  Nonetheless, as developed more fully herein, even under a "participation" standard Mr. Shkreli should not be held liable.

conduct or *per se* antitrust violations by Vyera, so Mr. Shkreli cannot be held liable based upon his former roles as an officer and director of Vyera.[5]

Second, Mr. Shkreli's status as a shareholder in Phoenixus does not confer liability. *See Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc*., 408 F. Supp. 1251, 1270 (S.D.N.Y. 1976) (Pierce, J.) (holding that the fact that a person is a shareholder "does not give him authority to act for the corporation"). There is no evidence that Mr. Shkreli's share ownership in Phoenixus (less than 50% of Phoenixus' stock, Shkreli Decl. ¶ 75), gave him the authority to control Vyera's decisions relating to Daraprim, so as to give rise to his liability for the company's acts. *See FTC v. Med. Billers Network, Inc*., 543 F. Supp. 2d 283, 321 (S.D.N.Y. 2008) (Holwell, J.); *FTC v. Crescent Publ'g Group, Inc.*, 129 F. Supp. 2d 311, 324 (S.D.N.Y. 2001) (Kaplan, J.). In fact, the record shows the opposite: Mr. Shkreli did *not* control Vyera's decision-making with regard to Daraprim after he left the company, and while he often made suggestions to management, more often than not those suggestions were either ignored or not followed. Mulleady Dep. Tr., at 122:14-123:10; Mulleady Decl. ¶ 64; Mithani Dep. Tr., at 259:10-18; Tilles Dep. Tr., at 10-13; Shkreli Decl. ¶¶ 64, 81. Thus, since leaving Vyera and Phoenixus, Mr. Shkreli has not had the authority to make, and has not made, any decisions for Vyera or Phoenixus in any way relating to Daraprim. Shkreli Decl. ¶ 76.[6]

---

[5] Nor can Mr. Shkreli be held liable for Vyera's acts by virtue of his status as the company's former agent. "It is a basic principle of agency law that '[o]nly an agent's own tortious conduct subjects the agent to liability . . . . An agent is not subject to liability for torts committed by the agent's principal that do not implicate the agent's own conduct; there is no principle of respondeat inferior.'" *Pascarella v. Sandals Resort Int'l, Ltd.*, No. 19-cv-2543, 2020 WL 1048943, at *6 (S.D.N.Y. Mar. 4, 2020) (Torres, J.) (alterations in original) (citation and internal quotation marks omitted).

[6] In addition, while Mr. Shkreli sometimes voiced his opinion as a major shareholder, the company was under no obligation to follow his advice. Shkreli Decl. ¶¶ 75, 78-81. In fact, after his resignation from Vyera and the Phoenixus Board of Directors, the companies shut him out of meetings. *Id.* ¶¶ 77-78; *see also* Costopoulos Dep. Tr., at 55:23-57:18, 141:20-142:12; Tilles Dep. Tr., at 161:25-162:22, 163:17-164:3; Retzlaff Dep. Tr., at 210:3-10.

Plaintiffs spent a lot of time in discovery focused on Mr. Shkreli's exercise of his share ownership in Phoenixus to suggest that he controlled the company, and thus, presumably, its decisions relating to Daraprim. They focused particular attention on a proxy fight in 2016, which resulted in Mr. Shkreli's slate of directors, including Kevin Mulleady and Akeel Mithani, being elected to the Board. But despite plaintiffs' insinuation that Mr. Mulleady and Mr. Mithani were controlled by Mr. Shkreli (*see* Am. Compl. (ECF 87) ¶ 41-42, 48), the record shows otherwise. *See* Shkreli Decl. ¶ 81 (Mr. Mulleady and Mr. Mithani "more often than not . . . ignore, or at lease do not follow" Mr. Shkreli's suggestions); Mulleady Dep. Tr., at 122:14-123:10 (stating that Mr. Mulleady has never followed up on "a very strong majority – high majority" of Mr. Shkreli's ideas); Mithani Dep. Tr., at 259:10-18 (stating that "[n]one of [Mr. Shkreli's] ideas were good" and that Mr. Mithani told Mr. Shkreli that). Nor were plaintiffs able to develop any evidence that Mr. Shkreli's lawful exercise of his rights as a shareholder had any effect on the company's decisions relating to Daraprim. Shkreli Decl. ¶ 62-63 ("The proxy fight was totally unrelated to Vyera's sale and distribution of Daraprim.").

Finally, there is also no basis to hold Mr. Shkreli liable on the theory that he "participated" in Vyera's alleged scheme to monopolize the market for Daraprim. In its Motion to Dismiss Order, the Court relies upon the Supreme Court's opinions in *Hartford-Empire Co. v. United States*, 323 U.S. 386 (1945) and *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), stating: "An individual may be held liable under the Sherman Act to the extent that individual has 'participated in violations of' the antitrust laws, such as by 'negotiating, voting for[,] or executing agreements which constituted steps in the progress of the conspiracy.'" ECF 229, at 35-36. However, neither *Hartford-Empire* nor *Lorain Journal* supports application of a "participation" theory of liability in

a Section 2 monopolization case.  And even if those cases do support application of such a theory,

Mr. Shkreli cannot be found liable based upon such a theory.

The Supreme Court's holding in *Hartford-Empire* does not establish grounds to hold Mr.

Shkreli liable.  The facts in that case are very different from the facts here.  *Hartford-Empire*

involved an industry-wide conspiracy involving various horizontal exclusionary agreements

amongst 12 competing corporations and 101 individuals associated with those corporations as

officers and directors to create and maintain a monopoly.  *Hartford-Empire*, 323 U.S. at 392.  The

allegations here are against a single corporate entity and two of its former officers and directors,

alleging monopoly maintenance and agreements in restraint of trade, analyzed under the rule of

reason.  The gravamen of the Amended Complaint, indeed the first count, is single-firm conduct—

monopoly maintenance in violation of Section 2 of the Sherman Act by Vyera.  Am. Compl. (ECF

87) ¶ 65-66.  And while the Amended Complaint alleges that the distribution and supply

agreements violated Section 1, plaintiffs do not allege the type of wide-ranging conspiracy that

existed in *Hartford-Empire.*  We are not aware of any case in the intervening 76 years since

*Hartford-Empire* was decided that has adopted a "participation" theory and applied it in the context

of a case alleging monopolization under Section 2 and agreements in restraint of trade under

Section 1.[7]

In addition, the Supreme Court's opinion in *Lorain Journal* did not examine, nor was the

Court asked to rule on, the grounds on which any individual defendants were found liable.  Instead,

---

[7] A corporation cannot conspire with its officers, employees or agents to violate the antitrust laws.  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984); *Mahmud v. Kaufmann*, 496 F. Supp. 2d 266, 275 (S.D.N.Y. 2007) (Conner, J.) ("It is well-established that the Sherman Antitrust Act does not apply to concerted action among officers or employees of the same enterprise acting as such.").  Thus, Mr. Shkreli cannot be found liable based on any theory that he "conspired" with Vyera.  The only "conspiracy" that could conceivably be found is one between Vyera and each of its distribution and supply partners.  But this theory fails because the record is devoid of the required "concerted action" by Vyera's counterparties, either with Vyera or among themselves.  *See* Vyera's Memorandum of Law, at 43-46; Mulleady's Memorandum of Law.

the Court merely noted, without critique or analysis, that certain individual defendants were alleged to have "participated in the conduct alleged to constitute the attempt to monopolize." *Lorain Journal*, 342 U.S. at 145 n.2. These *dicta* do not support the establishment of a rule that individuals may be liable for "participation" in an alleged monopolization scheme.[8]

But even if the *Hartford-Empire* "participation" standard is the correct rule to apply to this case, plaintiffs have failed to show that Mr. Shkreli can be held liable. As explained above in Section I.A.2, the record shows that Mr. Shkreli was not involved in the allegedly anticompetitive agreements, so he cannot be found to have "participated" in them. *See* Shkreli Decl. ¶¶ 43, 57, 60.

## IV. PLAINTIFFS' REQUESTED RELIEF IS BOTH UNAVAILABLE AND OVERBROAD

### A. Mr. Shkreli Cannot Be Held Jointly & Severally Liable With The Company Defendants

Plaintiffs seek equitable monetary relief in the form of disgorgement from the Defendants, and claim that Mr. Shkreli is jointly and severally liable for such a judgment. However, the Supreme Court's holding in *Liu v. Sec. & Exch. Comm'n*, ___ U.S. ___, 140 S. Ct. 1936, 1945 (2020) forecloses plaintiffs from pursuing disgorgement from Mr. Shkreli on a joint and several liability theory.

In assessing whether joint and several liability may be applied to the equitable remedy of disgorgement, the Supreme Court held that "[w]hile equity courts did not limit profits remedies to particular types of cases, they did circumscribe the award in multiple ways to avoid transforming it into a penalty outside their equitable powers." *Id.* at 1944. Thus, "[t]he rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding

---

[8] Indeed, the Northern District of California noted in *Murphy Tugboat* that "there is no discussion whatever in" either case (*Hartford-Empire* or *Lorain Journal*) "of liability of officers or directors." 467 F. Supp. at 851 n.6.

profits." *Id.* at 1945.  In other words, allowing joint and several liability "runs against the rule to not impose joint liability in favor of holding defendants liable to account for such profits only as have accrued to themselves . . . ." *Id.* at 1949 (citations omitted).

Still, the Supreme Court held, joint and several liability may be imposed against "partners engaged in concerted wrongdoing." *Id.* at 1949.  However, even that has limitations.  First and foremost, the cases cited approvingly by the Court show this exception to the rule to be quite limited.  For instance, it does not extend to a corporation's officers and directors.  Specifically, in *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126 (1877), the Supreme Court overturned a joint and several damages award against a company's employee in a patent infringement case.  *Id.* at 140.  Although the Court found that the individual employee entered into several of the contracts that led to the alleged infringement, the Court held that the contracts were made on behalf of his employer and the employee received no benefit therefrom.  *Id.*  He received only his usual salary.  *Id.*  Thus, it was not proper to impose joint and several liability on the employee for an accounting of the company's profits.

Taking this, and other precedent, into account, the Supreme Court, in *Liu*, remanded the case before it back to the District Court to consider whether joint and several liability was appropriate under the circumstances of that case.  140 S. Ct. at 1950.  Among the factors the Supreme Court instructed the District Court to consider included whether the individual defendants were mere passive recipients of their enterprise's profits, whether their finances – as husband and wife – were commingled, and whether they personally enjoyed "the fruits of the scheme." *Id.* at 1949.  None of those factors is at play in this case and therefore Mr. Shkreli cannot be subject to joint and several liability for Vyera's profits, to the extent that any can be shown.

Mr. Shkreli invested approximately $18 million dollars into Vyera when he founded it. Shkreli Decl. ¶ 15.  Since that date, he has not taken a salary or received any other form of compensation from Vyera or Phoenixus.  *Id.* ¶ 17.  And while Mr. Shkreli owns shares in Phoenixus, plaintiffs have not offered any evidence to show the extent of any "ill-gotten gains" that Mr. Shkreli enjoyed as a result of the alleged scheme.  In fact, plaintiffs' expert on monetary relief, Scott Hemphill, expressly stated that he was offering no opinion on the amount of the individual defendants' monetary gain.  Hemphill Dep. Tr., at 247:10-249:3.  In short, plaintiffs have failed to meet their burden that Mr. Shkreli has enjoyed any of "the fruits of the scheme" alleged in this case, and thus, under *Liu*, he cannot be held jointly and severally liable for Vyera's profits.

> **B.** **Any Injunctive Relief Ordered Against Mr. Shkreli Must Be Narrowly Tailored; It May Not Unduly Harm Or Penalize Him**

Under the FTC Act, the FTC may "in proper cases[,]"seek a permanent injunction.  15 U.S.C. § 53(b).  Such relief is forward looking.  *United States v. W. T. Grant Co.,* 345 U.S. 629, 633 (1953).  Its "purpose . . . is to prevent future violations."  *Id.*  Thus, injunctive relief is not punitive.  To be entitled to injunctive relief, plaintiffs must show that a permanent injunction is necessary—*i.e.*, because harm to competition is ongoing or is likely to recur, an injunction is needed to stop it.  *See id.* (a permanent injunction is appropriate where the moving party shows that "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive"); *see also FTC v. Abbvie Inc.*, 976 F.3d 327, 380 (3d Cir. 2020) (a plaintiff seeking an injunction must prove a "cognizable danger" of a recurrent violation; proof that a recurrent violation is "merely possible" is insufficient); *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) ("As a general rule, [p]ast wrongs are not enough for the grant of an injunction; an injunction will issue only if the wrongs are ongoing or likely to recur.");

*Federal Trade Comm'n v. Facebook, Inc.*, No. 20-3590, 2021 WL 2643627, at *18 (D.D.C. June 28, 2021) (declining to award the FTC injunctive relief where the only actionable conduct occurred years prior to the filing of the complaint and where "no actionable violation is either ongoing or about to occur").

There is no factual foundation on which the Court could base a permanent injunction, because the record shows that as of the time the Complaint was filed, Mr. Shkreli was not "violating" or "about to violate" the law.   The Amended Complaint makes reference to communications Mr. Shkreli had—months before the Complaint was filed—with Vyera executives about the company, and contains a vague allegation that Mr. Shkreli was "looking for" drugs other than Daraprim to carry out a similar scheme (Am. Compl. (ECF 87) ¶ 293), but no such evidence was developed in discovery.   Moreover, even if there had been ongoing anticompetitive conduct at the time the Complaint was filed, since that time three more generic companies have had their ANDAs for generic Daraprim approved, so there is no risk of any harm to competition by any acts of Vyera or the individual defendants.   Thus there is simply no evidentiary support for any ongoing or imminent violations of the law, and thus no basis for any type of injunction.

But even if there were such a basis for an injunction against Mr. Shkreli, the challenged conduct in this case—even though proper—has no likelihood of continuing into the future.   Shkreli Decl. ¶ 83.   Indeed, Mr. Shkreli recognizes that, after he is released from prison, his "employment opportunities going forward are [going to be] fairly limited."   *Id.* at 82; Shkreli Dep. Tr., at 353:6-23.   He testified that he is not interested in acquiring commercial assets and being involved in the "day-to-day affairs of commercializing medicine."   *Id.* at 354:7-355:17; Shkreli Decl. ¶ 83.   Instead, he would like to pursue experimental and research-based opportunities related to

26

discovery of new medicines and new uses for existing medicines, similar to the work that he did prior to Vyera's acquisition of Daraprim.  Shkreli Dep. Tr., at at 354-355:358:8; Shkreli Decl. ¶ 83.  None of that would involve him in pricing pharmaceuticals, sourcing API, or contracting with pharmaceutical distributors.  And, thus, an injunction is unnecessary as against him.

If the Court were to disagree, and find some injunctive relief appropriate in this case, the relief plaintiffs seek is grossly overbroad.  An injunction must not go any further than necessary to prevent future violations.  As such, "the injunction must not 'unduly harm the defendants . . . [by] put[ing] them out of business, but [must] simply ensure that they will conduct their business in a manner which does not violate Section 5 of the FTC Act.'"  *F.T.C. v. Ross*, 897 F. Supp. 2d 369, 387 (D. Md. 2012) (quoting *F.T.C. v. Kitco of Nev., Inc.*, 612 F. Supp. 1282, 1296 (D. Minn. 1985)), *aff'd*, 743 F.3d 886 (4th Cir. 2014).  In other words, the court must ensure— as required in all cases, under Federal Rule of Civil Procedure 65—that any injunctive relief is "narrowly tailored to fit specific legal violations' and avoid[s] unnecessary burdens on lawful commercial activity." *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 15 Civ. 211, 2021 WL 1553926, at *14 (S.D.N.Y. Apr. 20, 2021) (Schofield, J.) (quotation and citation omitted).

Plaintiffs do not precisely define the injunctive relief they seek in this case.  However, they do seek to penalize Mr. Shkreli by enjoining him from owing in part or whole or working for a company engaged in the pharmaceutical industry.[9]  As the District of Maryland held in *F.T.C. v. Ross,* seeking such broad relief is improper.

_____

[9] Plaintiffs' use of the vague and undefined term "pharmaceutical industry" is enough by itself to deny the relief sought.  The Second Circuit has vacated, and affirmed the denial of, injunctions that are impermissibly vague.  *See Metro. Opera Ass'n v. Local 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 178 (2d Cir. 2001) ("the vagueness of this injunction serves as sufficient reason to require that we vacate it"); *Sanders v. Air Line Pilots Ass'n., Int'l*, 473 F.2d 244, 249 (2d Cir. 1972) (affirming denial of injunction because of "the breadth and vagueness of [the injunctive relief] sought").  The relief requested could be interpreted to reach lawful conduct that is totally outside the bounds of the alleged conduct, such as owning stock in a pharmacy company like Walgreens or CVS or publishing an industry journal.  Equally vague are plaintiffs' requests to enjoin defendants' undefined "course of conduct" and from "engaging in similar and related conduct in the future."  Am. Compl. (ECF 87), at 76 ¶¶ 13-14.  Plaintiffs do not define

**A-454**

In that case, the FTC filed suit, seeking injunctive relief, against a group of corporate entities and an individual for alleged deceptive conduct in connection with the sale of computer software. *Ross*, 897 F. Supp. 2d at 374. The relief granted was an injunction restraining the individual defendant from "the marketing and sale of computer security software and software that interferes with consumers' computer use as well as from engaging in any form of deceptive marketing." *Id.* at 387. Notably, the Court did not enjoin the individual defendant from working in her chosen field of marketing and selling computer security software. As the court held, "[s]he may still utilize her marketing talents as long as they are used for legitimate products and ventures and do not contribute to deceiving the public." *Id.* Thus, to the extent any injunctive relief is entered in this case—which it should not be—such relief should be narrowly tailored and not so broad as to bar Mr. Shkreli from working in his chosen field of work. Such an injunction would simply constitute undue punishment, which is not the proper function of an equity court, particularly in a rule of reason antitrust case.[10]

## V.     **CONCLUSION.**

Martin Shkreli respectfully requests that the Court find him not liable and enter judgment in his favor and against Plaintiffs on all Counts asserted against him.

Respectfully submitted,

By:     */s/ Christopher H. Casey*
Christopher H. Casey, Esq. (admitted *pro hac vice*)
Jeffrey S. Pollack, Esq. (admitted *pro hac vice*)

---

the conduct at issue, nor do they state whether it may have other pro-competitive purposes. As the Eighth Circuit held in *Yamaha Motor Co. v. Fed. Trade Com.*, 657 F.2d 971, 984 (8th Cir. 1981) an injunction that makes otherwise lawful conduct a *per se* unlawful restraint "goes beyond any reasonable relationship to the [challenged conduct]." *See also Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.*, 15 Civ. 211, 2021 WL 1553926, at *14 (S.D.N.Y. Apr. 20, 2021) (Schofield, J.) (Rule 65 "requires that a permanent injunction be specific and 'describe in reasonable detail' what is restrained." (quoting Fed. R. Civ. P. 65(d))).

[10] The State Plaintiffs' claims for injunctive relief should be rejected as well, for all the reasons in Mulleady's Pre-Trial Memorandum. *See* Mulleady Pre-Trial Memorandum of Law.

A.J. Rudowitz, Esq. (admitted *pro hac vice*)
Sarah Fehm Stewart
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA  19103-4196
Telephone: (215) 979-1155/1299/1974

*Attorneys for Defendant Martin Shkreli*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on October 20, 2021, a copy of the foregoing Defendant Martin Shkreli's

Pretrial Memorandum of Law was served upon all counsel of record in matter by email.


<u>*/s/ Andrew J. Rudowitz*</u>
Andrew J. Rudowitz

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION, et al.,

Plaintiffs,

v.

VYERA PHARMACEUTICALS, LLC, et
al.,

Defendants.

Case No.: 1:20-cv-00706-DLC

Plaintiff States' Supplemental Pretrial Memorandum of Law

## Table of Contents

Preliminary Statement..................................................................................1
Argument ....................................................................................................3
   I.   Defendants' Anticompetitive Conduct Violates State Laws ...........................3
      A.  New York..........................................................................................4
      B.  California..........................................................................................6
      C.  Illinois .............................................................................................7
      D.  North Carolina .................................................................................8
      E.  Ohio................................................................................................9
      F.  Pennsylvania ..................................................................................11
      G.  Virginia .........................................................................................12
  II.  Equitable Remedies of an Injunction, Disgorgement, and a Ban Are
       Authorized by State Law and Are Necessary and Appropriate in This
       Matter............................................................................................14
      A.  Injunction ......................................................................................14
      B.  Disgorgement.................................................................................15
         1.  Disgorgement of the Totality of Defendants' Ill-Gotten
            Gains is Appropriate ...........................................................15
         2.  An Award of Equitable Monetary Relief of $64.6 Million
            is Warranted ........................................................................17
            a.  A reasonable approximation of Vyera's unjust gains is
               $64.6 million...........................................................17
            b.  Defendants have failed to show this figure is inaccurate..............21
         3.  The Imposition of Joint and Several Liability is Warranted Here .......23
      C.  Permanent Industry Ban...................................................................25
Conclusion ................................................................................................27

i

**Table of Authorities**

**Cases**                                                                                                          **Page(s)**

*A&A Disposal & Recycling, Inc. V. Browning-Ferris Indus. Of Ill., Inc.,*
    279 Ill. App. 3d 337 (2d Dist. 1996)...........................................................................8
*Acuity Optical Labs., LLC v. Davis Vision, Inc.,*
    2016 U.S. Dist. LEXIS 112423 (C.D. Ill. August 23, 2016) ...................................8
*Anheuser-Bush, Inc. v. Abrams,*
    71 N.Y.2d 327 (N.Y. 1988) .....................................................................................5
*Boffa Surgical Group LLC v. Managed Healthcare Assocs.,*
    2015 IL App (1st) 142984, ¶ 19 (2015)....................................................................8
*Carter-Jones Lumber Co. v. Dixie Distrib. Co.,*
    166 F.3d 840 (6th Cir. 1999) ..................................................................................10
*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163
    83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999).........................................................6, 7
*C. K. & J. K, Inc. v. Fairview Shopping Ctr. Corp.,*
    63 Ohio St. 2d 201, 407 N.E.2d 507 (Ohio 1980) ................................................10
*Classen v. Weller,*
    145 Cal.App.3d 27, 192 Cal. Rptr. 914 (1983).......................................................6
*Collins v. Main Line Board of Realtors,*
    304 A.2d 493 (Pa. 1973)........................................................................................11
*Columbia Gas Transmission, LLC v. Ott,*
    984 F. Supp. 2d 508 (E.D. Va. 2013) ...................................................................13
*Com. of Va. v. Winslow,*
    No. 20943, 1987 WL 92058 (Va. Cir. Ct. Feb. 20, 1987) ....................................12
*Drum v. San Fernando Valley Bar Ass'n,* 182 Cal. App. 4th 247
    106 Cal. Rptr. 3d 46 (2010) ....................................................................................7
*Epic Games, Inc. v. Apple Inc.,*
    2021 U.S. Dist. LEXIS 172303 (N.D. Cal. Sept. 10, 2021) ...................................7
*Fisherman's Wharf Bay Cruise Corp. v. Superior Court,*
    114 Cal. App. 4th 309, 7 Cal. Rptr. 3d 628 (Cal. Ct. App. 2003) ..........................6
*FTC v. Bronson Partners, LLC,*
    654 F.3d 359 (2d Cir. 2011)..................................................................................17
*FTC v. Mylan Labs.,*
    62 F. Supp. 2d 25, (D.D.C. 1999) ......................................................................9, 10
*Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.,*
    162 Ill. 2d 99 (1994) ...............................................................................................8
*Hester v. Martindale-Hubbell, Inc.,*
    493 F. Supp. 335 (E.D.N.C. 1980),
    *aff'd,* 659 F.2d 433 (4th Cir. 1981) .......................................................................9
*Hogan v. Cleveland Ave Rest., Inc.,*
    No. 2:15-CV-2883, 2018 U.S. Dist. LEXIS 49587 (S.D. Ohio Mar. 26, 2018)....10

**Cases (cont'd)**                                                    **Page(s)**

*Huberman v. Warminster Township*,
  1981 WL 820 (Pa. Com. Pl. Jan. 30, 1981) ..........................................11
*In re Cipro Cases I & II*, 61 Cal. 4th 116, 187 Cal. Rptr. 3d 632
  348 P.3d 845 (Cal. 2015) .................................................................6
*Integrity Auto Specialists, Inc. v. Meyer*,
  83 Va. Cir. 119 (2011) ...................................................................12
*Johnson v. Microsoft Corp.*,
  106 Ohio St. 3d 278, 2005-Ohio 4985, 834 N.E.2d 791 (Ohio 2005).................10
*List v. Burley Tobacco Growers' Co-op. Ass'n*,
  151 N.E. 471 (Ohio 1926) ...............................................................10
*Liu v. SEC*,
  140 S. Ct. 1936 (2020)............................................................. *passim*
*Nash County Bd. of Educ. v. Biltmore Co.*,
  464 F. Supp. 1027 (E.D.N.C. 1978), *cert. denied*, 454 U.S. 878,
  102 S. Ct. 359, 70 L. Ed. 2d 188, *rehearing denied*, 454 U. S. 1117,
  102 S. Ct. 692, 70 L. Ed. 2d 654 (1981), *aff'd*, 640 F.2d 484 (4th Cir. 1981)........9
*Net Realty Holding Trust v. Franconia Properties, Inc.*,
  544 F. Supp. 759 (E.D. Va. 1982) ....................................................12
*New York v. Actavis*,
  2014 WL 7015198, 2014 U.S. Dist. LEXIS 172918 (S.D.N.Y. Dec. 11, 2014)
  *aff'd on other grounds*, 787 F.3d 638 (2d Cir. 2015) ...............................5
*New York v. Feldman*,
  210 F. Supp. 2d 294 (S.D.N.Y. 2002).............................................5, 16
*North Carolina Steel, Inc. v. National Council on Comp. Ins.*,
  123 N.C. App. 163, 472 S.E.2d 578 (1996)
  *aff'd in part and rev'd in part*, 347 N.C. 627, 496 S.E.2d 369 (1998)...............8, 9
*Oksanen v. Page Mem'l Hosp.*,
  945 F.2d 696 (4th Cir. 1991) ..........................................................12
*Pecover v. Electronics Arts Inc.*,
  633 F.Supp.2d 976 (N.D. Cal. 2009) ...................................................6
*People v. Applied Card Sys., Inc.*,
  27 A.D.3d 104 (3d Dep't 2005),
  *aff'd on other grounds*, 11 N.Y.3d 105 (N.Y. 2008) ...............................5
*People v. Ernst & Young, LLP*,
  980 N.Y.S.2d 456 (1st Dep't 2014) ...................................................15
*People v. Fashion Place Associates*,
  638 N.Y.S.2d 26 (1st Dep't 1996) ....................................................25
*People v. Greenberg*,
  27 N.Y.3d 490 (N.Y. 2016) ...........................................................5, 16
*People ex rel. Cuomo v. H & R Block, Inc.*,
  870 N.Y.S.2d 315 (1st Dep't 2009) ...................................................16

**Cases (cont'd)**                                                    **Page(s)**

*People v. Rattenni,*
    81 N.Y.2d 166 (N.Y. 1993) ................................................................5

*People ex rel. Schneiderman v. Imported Quality Guard Dogs, Inc.,*
    930 N.Y.S.2d 906 (App. Div. 2d Dep't 2011)....................................5, 25

*People by Vacco v. Lipsitz,*
    663 N.Y.S.2d 468 (N.Y. Sup. Ct. 1997) ...........................................16

*People v. Northern Leasing Systems, Inc.,*
    133 N.Y.S.3d 389 (N.Y. Sup. Ct. 2020) ............................................25

*People ex rel. Spitzer v. Telehublink Corp.,*
    756 N.Y.S.2d 285 (3d Dep't 2003).....................................................16

*Piercing Pagoda, Inc. v. Hoffner,*
    465 Pa. 500, 351 A.2d 207 (1976) .....................................................12

*Princess Prestige Co.,*
    42 N.Y.2d 104 (N.Y. 1977) ................................................................5

*Purofied Down Products Corp. v. National Ass'n of Bedding Mfrs.,*
    201 Misc. 149 (N.Y. Sup. Ct. 1951) ..................................................4

*Root v. Railway Co.,*
    105 U.S. 189 (1882).............................................................................15

*Rose v. Vulcan Materials Co.,*
    282 N.C. 643, 194 S.E.2d 521 (1973)..................................................9

*Schwartz v. Laundry & Linen Supply Drivers' Union, Local 187,*
    14 A.2d 438 (Pa. 1940)................................................................11, 12

*SEC v. Commonwealth Chem. Secs., Inc.,*
    574 F.2d 90 (2d Cir. 1978)................................................................15

*S.E.C. v. Contorinis 's*
    743 F.3d 296 (2d Cir. 2014)..............................................................25

*SEC v. Credit Bancorp, Ltd.,*
    No. 99-cv-11395, 2011 WL 666158 (S.D.N.Y. Feb. 14, 2011) ...........22

*SEC v. First Jersey Sec., Inc.,*
    101 F.3d 1450 (2d Cir. 1996) ..............................................17, 23, 24

*SEC v. Haligiannis,*
    470 F. Supp. 2d 373 (S.D.N.Y. 2007)..........................................17, 23

*SEC v. Inorganic Recycling Corp.,* No 99-cv-10159
    2002 WL 1968341 (S.D.N.Y. Aug. 23, 2002)....................................23

*SEC v. Pentagon Capital Mgmt. PLC,*
    725 F.3d 279 (2d Cir. 2013) ........................................................23, 25

*SEC v. Wyly,*
    56 F. Supp. 3d 394 (S.D.N.Y. 2014)..................................................22

*Solomon v. Cedar Acres E., Inc.,*
    455 Pa. 496 (1974) .............................................................................12

*Spitzer v. Coventry First LLC,*
    No. 0404620/2006, 2007 WL 2905486 (N.Y. Sup. Ct. Sept. 25, 2007)
    *aff'd,* 861 N.Y.S.2d 9 (1st Dep't 2008) ..............................................16

**Cases (cont'd)**                                                          **Page(s)**

*State v. Apple Health and Sports Club*, Ltd.,
   80 N.Y.2d 803 (N.Y. 1992) ................................................................5
*State ex rel. Easley v. Rich Food Servs.*, Inc.,
   139 N.C. App. 691, 535 S.E.2d 84 (2000).........................................8, 9
*State ex rel. Edmisten v. Challenge, Inc.*,
   54 N.C. App. 513, 284 S.E.2d 333 (1981).............................................9
*State v. Frink Am.*, Inc.,
   770 N.Y.S.2d 225 (4th Dep't 2003).......................................................5
*State v. Midland Equities of New York, Inc.*,
   117 Misc. 2d 203 (N.Y. Sup.Ct. 1982) ................................................25
*State v. Mobil Oil*,
   38 N.Y.2d 640 (N.Y.1976) ...................................................................4
*212 Inv. Corp. v. Kaplan*,
   847 N.Y.S.2d 905 (N.Y. Sup. Ct. 2007) ..............................................23
*United States v. Keyspan Corp.*,
   763 F.Supp.2d 633 (S.D.N.Y. 2011).....................................................12
*WTAR Radio–TV Corp. v. City Council of Va. Beach*,
   223 S.E.2d 895 (Va. 1976)..................................................................13
*Yeager's Fuels v. Pennsylvania Power & Light*,
   953 F. Supp. 617 (E.D. Pa. 1997) .......................................................11

**Federal Statutes**

      15 U.S.C. § 2..............................................................................13
      15 U.S.C. §6103(a)  .....................................................................16

**State Statutes**

**New York**

N.Y. Exec. Law
      § 63(12)......................................................................... *passim*

N.Y. Gen. Bus. Law
      § 340 *et seq.* ...........................................................................3, 4
      § 340(1).......................................................................................4
      §§ 349, 350................................................................................16

**State Statutes (cont'd)**                                                              **Page(s)**

**California**

CA Bus. & Prof. Code
      § 16700 *et seq.* ................................................................................3, 6
      § 16720(a) ..........................................................................................6
      § 16754.5 ...........................................................................................6
      § 17200 *et seq.* ................................................................................3, 6

**Illinois**

Illinois Antitrust Act
      740 ILCS 10/1 *et seq* ......................................................................3, 8
      740 ILCS 10/7(1) ...............................................................................8
      740 ILCS 10/11 .................................................................................7

**North Carolina**

N.C.G. S.
      § 75-1 *et seq.* ..................................................................................3, 8
      § 75-9 ................................................................................................8

**Ohio**

The Ohio Valentine Act;
      O.R.C. § 1331.01, *et. seq* ...............................................................3,10
      O.R.C. § 109.81 ................................................................................10
      O.R.C § 1331.11 ...............................................................................10

**Pennsylvania**

Commonwealth Attorneys Act
      71 P.S. § 732-204 (c) .....................................................................3, 11

**Virginia**

Virginia Antitrust Act,
      Virginia Code § 59.1-9.1 *et seq.* ......................................................3
      § 59.1-9.5 .........................................................................................13
      § 59.1-9.6 .........................................................................................13
      § 59.1-9.8 .........................................................................................13
      § 59.1-9.15(a) ...................................................................................13
      § 59.1-9.17 .......................................................................................12

**PRELIMINARY STATEMENT**

Defendants' anticompetitive scheme is an egregious violation of state and federal law. The wrongdoing was clearly and intentionally anticompetitive, and had no legitimate pro-competitive, pro-consumer, or pro-patient benefit. Daraprim is not a dangerous, sensitive, fragile, or controlled substance that warrants the distribution restrictions and monitoring that Defendants employed. Similarly, Defendants' efforts to lock up all manufacturers of the active pharmaceutical ingredient ("API") for Daraprim were not justified by any *bona fide* supply concerns. And, Defendants' attempts to block generic competitors from accessing the data necessary to evaluate the market opportunity for generic Daraprim likewise lacked any legitimate motive. Rather, the purpose and effect of every facet of this illegal scheme was to restrain competition.

Defendants infamously bought the rights to an old, unpatented, life-saving drug and immediately increased its price by more than 4000%. While not in itself illegal, this type of dramatic price increase would normally attract fierce generic price competition. Defendants foresaw and forestalled this by engaging in numerous practices and agreements designed to prevent, impede, and delay potential generic competition. First, Defendants entered into numerous agreements restricting (or even prohibiting) resale of Daraprim by distributors, hospitals, and other downstream purchasers of Daraprim to hinder potential generic competitors' ability to obtain sufficient drug product to conduct the testing necessary to obtain FDA approval of a generic Daraprim. Second, Defendants expended substantial time and resources to obtain exclusive agreements with the most viable API sources to both dissuade potential generic competitors from attempting to enter the market and delay generic entry. Third, Defendants paid two of their primary distributors not to transfer their Daraprim sales data to third-party aggregators in order to obscure the size of the market opportunity in hopes that this would chill

1

generic entry (as potential generic competitors rely on such data in making launch decisions). Defendants even went so far as to buy back their own product, at even more elevated prices, in a surreptitious and dubious parking lot meet-up – just to keep it out of the hands of competitors. *See* Plaintiffs' Pretrial Proposed Findings of Fact ("FOF") ¶ 77.

These facts and circumstances stand out for their inequity and greed – and for Defendants' stunning and unrepentant disregard for state and federal law.  The State of New York, State of California, State of Illinois, State of North Carolina, State of Ohio, Commonwealth of Pennsylvania, and Commonwealth of Virginia (collectively, "Plaintiff States") brought this action to hold Defendants accountable, deter similar conduct and deprive the wrongdoers of their ill-gotten gains.  Accordingly, we are requesting that the Court denounce Defendants' anticompetitive business practices and grant the relief that the Plaintiffs have outlined in their Proposed Order, including an order enjoining this conduct with regard to Daraprim or any other pharmaceutical product, banning the individual defendants from participation in the pharmaceutical industry, and requiring the disgorgement of all ill-gotten gains as detailed below.

Moreover, since the misconduct is fully and inseparably attributable to all four corporate and individual Defendants, the Defendants can and should be held jointly and severally liable. This is a unitary scheme, and no Defendant is responsible for less than all of the harm.  Their conduct, individually and collectively, is egregious and warrants the imposition of joint and several liability for equitable monetary relief.  Doing so would be consistent with long-standing equitable principles set forth in case law, including the recent Supreme Court case *Liu v. SEC*, 140 S.Ct. 1936 (2020).

**ARGUMENT**

Defendants' conduct violates the laws of the various Plaintiff States, as well as federal law.  ECF No. 86 at 67- 74 (Am. Complaint Counts IV-X); *see also* Plaintiffs' Joint Pretrial Memorandum at 12-43 (discussing federal law).  Plaintiffs' Joint Pretrial Memorandum sets out the factual and legal bases for concluding that Defendants' conduct violated federal antitrust law and explains why an injunction against all Defendants and a ban against the individual defendants is necessary and appropriate.  *Id.*  For the same reasons that Defendants' anticompetitive scheme violates federal law, the conduct likewise violates each of the state laws asserted in the Amended Complaint.[1]

The Court has already ruled that the Plaintiff States, by their Attorneys General, have standing to bring these state (and federal) claims, and to seek equitable relief.  ECF No. 229; ECF No. 482; ECF 483.  This memorandum explicates Defendants' liability under the various state laws asserted in the Amended Complaint, ECF No. 86, and demonstrates that the equitable relief sought by Plaintiff States – namely, injunctive relief, the disgorgement of ill-gotten gains, and a ban on industry participation for the individual defendants – is legally authorized, necessary, and appropriate in this case.

## I.    Defendants' Anticompetitive Conduct Violates State Laws

Defendants' anticompetitive agreements and unlawful scheme to impede and delay generic competition violate each of the State laws asserted in the Amended Complaint for the same reasons they violate the federal antitrust laws.  *See* Plaintiffs' Joint Pretrial Memorandum,

---

[1] New York's Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq*.; N.Y. Exec. Law § 63(12); California's Cartwright Act, CA Bus & Prof Code § 16700 *et seq.*, California's Unfair Competition law, CA Bus & Prof Code § 17200 *et seq.*; Illinois Antitrust Act, 740 ILCS 10/1 *et seq*.; North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. § 75-1 *et seq*.; Ohio's Valentine Act; Ohio Revised Code §1331.01 *et seq.;* Pennsylvania's Common Law Doctrine against Restraints of Trade; and Virginia Antitrust Act, Virginia Code § 59.1-9.1 *et seq*.

3

incorporated by reference.  Plaintiff States here identify and discuss the relevant state laws

violated by Defendants' anticompetitive conduct in more detail.

### A.  New York

Defendants' anticompetitive practices, agreements and overall course of conduct to

maintain monopoly power over FDA-approved pyrimethamine products, as detailed in Plaintiffs'

Findings of Facts, violate New York's Donnelly Act, N.Y. Gen. Bus. Law §§ 340-347, as well as

New York Executive Law § 63(12).

The Donnelly Act is New York's antitrust statute, enacted more than a century ago

shortly after the enactment of the federal Sherman Act.  *State v. Mobil Oil*, 38 N.Y.2d 460, 463

(N.Y.1976) (Donnelly Act enacted in 1893, three years after the Sherman Act).  The Donnelly

Act declares illegal:

> Every contract, agreement, arrangement or combination whereby. . . [c]ompetition
> or the free exercise of any activity in the conduct of any business, trade or
> commerce or in the furnishing of any service in this state is or may be restrained
> or whereby. . . for the purpose of establishing or maintaining any such monopoly
> or unlawfully interfering with the free exercise of any activity in the conduct of
> any business, trade or commerce or in the furnishing of any service in this state
> any business, trade or commerce or the furnishing of any service is or may be
> restrained.

N.Y. Gen. Bus. Law §340(1).  "The purpose of the section is to prevent restraint of trade and the

creation of monopoly so as to protect the general public against enhanced prices of essential

commodities by suppression of competition."  *Purofied Down Products Corp. v. National Ass'n

of Bedding Mfrs.*, 201 Misc. 149, 156 (N.Y. Sup. Ct. 1951).

The "Donnelly Act has been considered to have been modeled after the [federal]

Sherman Act," *Mobil Oil*, 38 N.Y.2d 460 at 463, and New York's highest court has held that it

"should generally be construed in light of Federal precedent and given a different interpretation

only where State policy, differences in the statutory language or the legislative history justify

such a result." *People v. Rattenni*, 81 N.Y.2d 166, 171 (N.Y. 1993) (citing *Anheuser-Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335 (N.Y. 1988)).

The Executive Law authorizes the New York Attorney General to sue "'any person' who engages in 'repeated fraudulent or illegal acts or otherwise demonstrate[s] persistent fraud or illegality.'" *State v. Apple Health and Sports Club*, Ltd., 80 N.Y.2d 803, 807 (N.Y. 1992) (quoting N.Y. Exec. Law § 63(12)).  The "illegal acts" or "illegality" may be violations of state or federal laws.  *See, e.g., id.* (violations of health club licensing laws); *see also State v. Princess Prestige Co*., 42 N.Y.2d 104 (1977) (violations of the Home Solicitation Sales Act); *People v. Applied Card Sys., Inc*., 27 A.D.3d 104 (3d Dep't 2005), *aff'd on other grounds*, 11 N.Y.3d 105 (2008) (violations of debt collection laws); *State v. Frink Am*., Inc., 770 N.Y.S.2d 225 (App. Div. 4th Dep't 2003) (violations of labor laws).  Federal Sherman Act and New York Donnelly Act violations have been held to be a valid bases for an action and relief under the Executive Law. *New York v. Actavis*, 2014 WL 7015198, *43, 2014 U.S. Dist. LEXIS 172918 (S.D.N.Y. Dec. 11, 2014), *aff'd on other grounds*, 787 F.3d 638 (2d Cir. 2015); *New York v. Feldman*, 210 F. Supp. 2d 294, 300 (S.D.N.Y. 2002).

The Attorney General may seek an order enjoining the illegal acts and associated conduct, obtain equitable monetary relief (including disgorgement of ill-gotten gains), and may permanently ban individual violators from further involvement in the industry. *See, e.g., People ex rel. Schneiderman v. Greenberg*, 27 N.Y.3d 490, 497 (N.Y. 2016) (construing the Executive Law to include the remedy of disgorgement); *People ex rel. Schneiderman v. Imported Quality Guard Dogs, Inc.,* 930 N.Y.S.2d 906, 907-08 (App. Div. 2d Dep't 2011) (affirming order permanently enjoining defendant from engaging in the business of dog selling, breeding, or training).

5

## B.  California

Defendants' anticompetitive conduct, including their vertical arrangements and API exclusivity agreements, unreasonably restrained trade in violation of both California's antitrust statute, the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*., and its unfair competition law (the "UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*.  Under California law, "antitrust violations are torts" and "corporate officers are liable for their tortious acts committed on behalf of the corporation."  *Classen v. Weller*, 145 Cal. App. 3d 27, 48, 192 Cal. Rptr. 914 (Cal. Ct. App. 1983).  Though "broader in range and deeper in reach than the Sherman Act" (*In re Cipro Cases I & II,* 61 Cal. 4th 116, 160, 187 Cal. Rptr. 3d 632, 348 P.3d 845 (Cal. 2015) (internal quotations and citations omitted)), the Cartwright Act, like its federal counterpart, prohibits all combinations created for or carrying out unreasonable restrictions in trade or commerce.  *See* Cal. Bus. & Prof. Code § 16720(a); *see also In re Cipro Cases I & II,* 61 Cal. 4th at 136-137.  Such prohibited combinations under the Cartwright Act include exclusive dealing arrangements. *See Pecover v. Electronics Arts Inc.*, 633 F. Supp. 2d 976, 983 (N.D. Cal. 2009) (finding that, under California law, "[v]ertical restraints, including exclusive dealing arrangements, are proscribed when it is probable that performance of the arrangements will foreclose competition in a substantial share of the affected line of commerce.") (citing *Fisherman's Wharf Bay Cruise Corp. v. Superior Court*, 114 Cal. App. 4th 309, 334-35, 7 Cal. Rptr. 3d 628 (Cal. Ct. App. 2003)).  For actions brought by the Attorney General, courts may "grant such mandatory injunctions as may be reasonably necessary to restore and preserve fair competition in the trade or commerce affected by the violation."  Cal. Bus. & Prof. Code § 16754.5.

The UCL is broad by design and prohibits "acts or practices which are unlawful, or unfair, or fraudulent." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180-81, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (Cal. 1999). The unlawful prong "borrows violations of other laws and treats them as unlawful practices" under the UCL. *Id.* at 180 (citations omitted). Under the unfair prong, "a practice may be deemed unfair even if not specially proscribed by some other law" and even if not violating an antitrust statute. *Id.* at 180, 187. To determine whether a business practice is unfair, courts traditionally have applied a balancing test, weighing "the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257, 106 Cal. Rptr. 3d 46 (Cal. Ct. App. 2010) (internal quotations and citations omitted). In *Cel-Tech,* the California Supreme Court announced a test for "unfairness" in antitrust cases between competitors, requiring the plaintiff to show that the challenged conduct (1) "threatens an incipient violation of an antitrust law," (2) "violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law," or (3) "otherwise significantly threatens or harms competition." *Cel-Tech*, 20 Cal. 4th at 187. These findings must be "tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." *Id.* at 186-87. Although the Court limited its holding to competitor cases, it has been applied in non-competitor cases. *See Epic Games, Inc. v. Apple Inc.*, 2021 U.S. Dist. LEXIS 172303, at *289-98 (N.D. Cal. Sept. 10, 2021) (concluding the challenged conduct was unfair under both tests).

### C. Illinois

Defendants' anticompetitive activities, including their vertical arrangements and API exclusivity agreements, restrained trade and violated the Illinois Antitrust Act ("IAA") for the same reasons they violate the Sherman Act. The IAA instructs Illinois courts to use federal court

interpretations of the Sherman Act as a guide to interpret similar provisions of the IAA. 740

ILCS 10/11. Following this principle, Illinois courts have held that Sections 3(2) and 3(3) of the

IAA are comparable to Sections 1 and 2 of the Sherman Act and require the same elements of

liability. *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 162 Ill. 2d 99, 108 (1994); *Boffa*

*Surgical Group LLC v. Managed Healthcare Assocs.*, 2015 IL App (1st) 142984, ¶ 19 (2015)

(construing Section 3(2) of the IAA in accordance with Section 1 of the Sherman Act); *A&A*

*Disposal & Recycling, Inc. V. Browning-Ferris Indus. Of Ill., Inc.,* 279 Ill. App. 3d 337, 341 (2d

Dist. 1996) (construing Section 3(3) of the IAA as comparable to Section 2 of the Sherman Act);

*accord Acuity Optical Labs., LLC v. Davis Vision, Inc*., 2016 U.S. Dist. LEXIS 112423, *58

(C.D. Ill. August 23, 2016).

Section 10/7(1) of the IAA authorizes the Illinois Attorney General to bring actions to

prevent and restrain violations of Section 3 of the IAA, and courts are directed to enter such

judgment as they consider necessary to remove the effects of any such violations. 740 ILCS

10/7(1). Under the IAA, Courts are authorized to exercise all powers necessary for this purpose,

including, but not limited to, issuing injunctions and divesting property. *Id.*

### D.  North Carolina

The North Carolina Attorney General is authorized to investigate "all corporations or

persons doing business in this State…with the purpose of acquiring such information as may be

necessary to enable him to prosecute any such corporation, its agents, officers and employees for

crime, or prosecute civil actions against them if he discovers they are liable and should be

prosecuted." N.C. Gen. Stat. § 75-9; *State ex rel. Easley v. Rich Food Servs.*, Inc., 139 N.C. App.

691, 535 S.E.2d 84 (2000) (corporation's managing agent, even though not an officer or director,

may properly be sued for violations of this chapter committed under his management).

8

The body of law applying the Sherman Act, although not binding on state courts, is nonetheless instructive in determining the full reach of N.C. Gen. Stat. § 75-1. *North Carolina Steel, Inc. v. National Council on Comp. Ins.*, 123 N.C. App. 163, 472 S.E.2d 578 (1996), *aff'd in part and rev'd in part*, 347 N.C. 627, 496 S.E.2d 369 (1998); *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 194 S.E.2d 521 (1973); *Hester v. Martindale-Hubbell, Inc.*, 493 F. Supp. 335 (E.D.N.C. 1980), *aff'd*, 659 F.2d 433 (4th Cir. 1981). The North Carolina antitrust enforcement mechanism almost completely mirrors its federal counterpart. *Nash County Bd. of Educ. v. Biltmore Co.*, 464 F. Supp. 1027 (E.D.N.C. 1978), *cert. denied*, 454 U.S. 878, 102 S. Ct. 359, 70 L. Ed. 2d 188, *rehearing denied*, 454 U. S. 1117, 102 S. Ct. 692, 70 L. Ed. 2d 654 (1981), *aff'd*, 640 F.2d 484 (4th Cir. 1981).

Actual injury is not required in an action brought under this chapter by the Attorney General. Instead, the action must show that defendant's conduct adversely affects the public interest. *State ex rel. Edmisten v. Challenge, Inc.*, 54 N.C. App. 513, 284 S.E.2d 333 (1981).

The court is authorized to "order the restoration of any moneys or property and the cancellation of any contract obtained by *any defendant* as a result of such violation." N.C. Gen. Stat. § 75-15.1 (emphasis added); *State ex rel. Easley v. Rich Food Servs.*, Inc., 139 N.C. App. 691, 699, 535 S.E.2d 84, 90 (2000). This provision has been held to authorize disgorgement. *FTC v. Mylan Labs.*, 62 F. Supp. 2d 25, 61-62 (D.D.C.1999).  Further, "[t]he Attorney General may prosecute civil actions in the name of the State to obtain mandatory orders, including (but not limited to) permanent and temporary injunctions and temporary restraining orders, to carry out the provisions of [Chapter 75]." N.C. Gen. Stat. § 75-14; *State ex rel. Easley v. Rich Food Servs.*, Inc., 139 N.C. App. 691, 697, 535 S.E.2d 84, 88 (2000).

**E. Ohio**

Defendants' activities, including restrictions and limitations on the resale of Daraprim and API exclusivity agreements, restrain trade in violation of Ohio's Valentine Act. "The Ohio Valentine Act (R.C. § 1331.01, *et. seq.*) is patterned after the Sherman Act and Ohio courts consistently interpret the Valentine Act in accordance with federal judicial construction of the federal antitrust laws." *Hogan v. Cleveland Ave. Rest., Inc.*, 2018 U.S. Dist. LEXIS 49587, at *9 (S.D. Ohio Mar. 26, 2018). *See also Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 2005-Ohio 4985, 834 N.E.2d 791, 797 (Ohio 2005); *C. K. & J. K, Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 407 N.E.2d 507, 509 (Ohio 1980) ("These statutes, known as the Valentine Act, were patterned after the Sherman Antitrust Act, and as a consequence this court has interpreted the statutory language in light of federal judicial construction of the Sherman Act") (citations omitted). "The Valentine Law was passed April 19, 1898, and is generally conceded to have been patterned after the Sherman Anti-Trust Act of July 2, 1890…[a] comparison of the two enactments shows that the Ohio law is in much broader and stronger terms than the federal enactment*." List v. Burley Tobacco Growers' Co-op. Ass'n*, 151 N.E. 471, 474 (Ohio 1926).

The Ohio Attorney General has an affirmative duty to "do all things necessary" to enforce the antitrust laws, by bringing suits for "equitable relief," O.R.C. § 109.81, or "to restrain and enjoin" violations, or by seeking to have violations "enjoined or otherwise prohibited," or through "injunction or other proceedings," *id.* § 1331.11. There are no limitations on the kinds of equitable relief that Ohio may seek or that this Court can grant. *See generally* O.R.C. Chapter 1331; O.R.C. § 109.81. "Federal courts are courts in law and in equity, and a court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case." *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846

10

(6th Cir. 1999); *see also FTC v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1, 8 (D.D.C. 1999)
(confirming Ohio's right to seek an equitable remedy in an antitrust action).

### F. Pennsylvania

Defendants' conduct violates Pennsylvania's common law doctrine against unreasonable
restraint of trade. The Commonwealth of Pennsylvania, by and through its Attorney General, can
bring an antitrust action on behalf of the general economy of the Commonwealth for a violation
of state common law antitrust. Commonwealth Attorneys Act, 71 P.S. § 732-204 (c). In *Collins
v. Main Line Board of Realtors*, 304 A.2d 493, 496 (Pa. 1973), the Pennsylvania Supreme Court
applied federal court interpretation of the Sherman Act to decide a state common law antitrust
claim.  The Court held that, to establish a violation, the plaintiff may show that "the illegal
bargain tends to create or has for its purpose to create a monopoly in prices or products," or that
"competition has in fact been restricted by the monopolistic agreement." *Id*. at 496-97. *See also*,
*Schwartz v. Laundry & Linen Supply Drivers' Union, Local 187*, 14 A.2d 438, 441 (Pa. 1940)
(the Sherman Act is "merely the application of the common-law doctrine concerning restraint of
trade to the field of interstate commerce."). In *Huberman v. Warminster Township*, 1981 WL
820, at *2-*3 (Pa. Com. Pl. Jan. 30, 1981), the Court of Common Pleas recognized that the
Pennsylvania Supreme Court in *Collins* held that the federal Sherman Act embodied
Pennsylvania's common law doctrine concerning restraint of trade and applied federal case law
interpreting the Sherman Act to a Pennsylvania common law antitrust claim. The District Court
for the Eastern District of Pennsylvania also followed *Collins* in *Yeager's Fuels v. Pennsylvania
Power & Light*, 953 F. Supp. 617, 668 (E.D. Pa. 1997) by applying federal case law to state
common law claims. Accordingly, a violation of Section 1 of the Sherman Act should be deemed
a violation of Pennsylvania's common law doctrine against unreasonable restraint of trade.

The full panoply of equitable relief is available under Pennsylvania common law antitrust doctrine. Injunctive relief is available for persons who have been or will be injured by a restraint of trade or monopoly. *Schwartz*, 14 A.2d at 439-40. Additionally, the Commonwealth can seek monetary equitable relief for a common law antitrust violation. Order on Preliminary Objections, *Commonwealth v. Chesapeake Energy, Inc. et al.*, No. 2015IR0069 (Bradford County Ct. Com Pl., Dec. 14, 2017). "Where equity assumes jurisdiction for one or more purposes, it will retain jurisdiction for *all purposes* to give complete relief and to do complete justice between the parties." *Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207 (1976) (emphasis retained). Equity provides complete relief inclusive of a monetary award. *Solomon v. Cedar Acres E., Inc.*, 455 Pa. 496, 501 (1974). Federal courts are vested with the inherent equitable authority to award disgorgement. *United States v. Keyspan Corp.*, 763 F. Supp. 2d 633, 638–40 (S.D.N.Y. 2011). There is no Pennsylvania state antitrust statute that limits the equitable jurisdiction of any state or federal court to award monetary equitable relief, including disgorgement, for a violation of Pennsylvania's common law doctrine against unreasonable restraint of trade and monopolies.

### G.  Virginia

Defendant's conduct, including their vertical arrangements and API exclusivity agreements, restrained trade and violated the Virginia Antitrust Act (the VAA).  Section 59.1-9.17 of the VAA requires that the statute "shall be applied and construed to effectuate its general purposes in harmony with judicial interpretations of comparable federal statutory provisions." For the purposes of such analysis, Virginia courts have consistently held that the VAA is "comparable to the Sherman and Clayton Acts."  *Com. of Va. v. Winslow*, No. 20943, 1987 WL 92058, at *2 (Va. Cir. Ct. Feb. 20, 1987); *see also Integrity Auto Specialists, Inc. v. Meyer*, 83

12

Va. Cir. 119 (2011); *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 710 (4th Cir. 1991); *Net Realty Holding Trust v. Franconia Properties, Inc.*, 544 F. Supp. 759, 767 n.10 (E.D. Va. 1982). Virginia Code § 59.1-9.5, which provides that "[e]very contract, combination or conspiracy in restraint of trade or commerce of this Commonwealth is unlawful," parallels Section 1 of the Sherman Act, and Section § 59.1-9.6, which provides that "[e]very conspiracy, combination, or attempt to monopolize, or monopolization of, trade or commerce of this Commonwealth is unlawful" parallels Section 2 of the Sherman Act, 15 U.S.C. § 2.  Accordingly, claims under the VAA are governed by the same standard as claims under the Sherman Act, and the Court should deem violations of Section 1 and 2 of the Sherman Act to be violations of the parallel provisions of the VAA.

The Virginia Attorney General may seek "injunctive relief" for violations of the Act. Virginia Code § 59.1-9.15(a).  In Virginia, injunctive relief includes both prohibitory injunctions, which are designed to prevent a future wrong, and mandatory injunctions, which are designed to "undo an existing wrongful condition." *WTAR Radio–TV Corp. v. City Council of Va. Beach*, 223 S.E.2d 895, 898 (Va. 1976); *Columbia Gas Transmission, LLC v. Ott*, 984 F. Supp. 2d 508, 516 n.5 (E.D. Va. 2013).  The VAA specifically authorizes courts to "grant mandatory injunctions reasonably necessary to eliminate violations" of the Act.  Virginia Code § 59.1-9.8. This authority is explicitly granted in addition to the authority in this Section to grant other forms of relief including "temporary restraining orders and injunctions to prevent and restrain violations of this chapter," "damages," and "civil penalties," a distinction that confirms power of the equity court to provide complete relief, including equitable monetary relief.  *Id.*

**II.      Equitable Remedies of An Injunction, Disgorgement, and a Ban Are Authorized by State Law and Are Necessary and Appropriate in This Matter**.

Mindful that this Court has already held that the conduct here is New York-centric ("To the extent the defendants violated either the federal or state statutes at issue here, they did so from decisions made and contracts executed in New York"), ECF 482 at 11, and that Plaintiff State of New York "may obtain disgorgement of Vyera's net profits" upon proving a violation of its state laws, ECF 482 at 14, this Section evaluates the remedies sought pursuant to New York law.  Plaintiff States incorporate by reference the arguments in support of the requested relief under the laws of the other Plaintiff States, as set forth in the opposition to Defendants' unsuccessful Motion for Partial Summary Judgment.  ECF No. 475.

**A.  Injunction**

New York asserts two independent statutory bases to support its request for injunctive relief.  First, pursuant to the Donnelly Act, codified in the New York General Business Law, the Attorney General may seek and obtain an order on behalf of the State "to restrain and prevent the doing in this state of any act herein declared to be illegal, or any act in, toward or for the making or consummation of any contract, agreement, arrangement or combination herein prohibited." N.Y. Gen. Bus. Law § 342.  Second, pursuant to Section 63(12) of the New York Executive Law, New York may seek "an order enjoining the continuance of [illegal or fraudulent] business activity or of any fraudulent or illegal acts." N.Y. Exec. Law § 63(12).

These statutes, by their language, do not  limit the Attorney General's ability to seek injunctive relief to discrete illegal acts, but rather permit broad injunctions against business conduct associated with the illegality.  *See* N.Y. Gen. Bus. Law § 342 (injunction may prohibit "any act in, toward or for the making or consummation of" anticompetitive agreements or

14

arrangements); N.Y. Exec. Law § 63(12) (courts may issue an "order enjoining the continuance of such business activity", not just specific acts).

The misconduct here is egregious, consisting of clear and intentional efforts to impede and delay generic competition over several years, by constructing a web of restrictive distribution agreements, supply agreements and data-blocking agreements.   The result was not just an exorbitant and artificially high price for Daraprim (FOF ¶ 148), but also the creation of unnecessary risk to vulnerable patients. FOF ¶¶ 268, 270, 274, 276-77. To meet the needs of both specific and general deterrence, New York respectfully urges the Court to issue the broadest possible injunction – against all Defendants – to permanently enjoin such anticompetitive practices, in any form, including with respect to conduct concerning other pharmaceutical products, and to ban the individual Defendants from participation in the pharmaceutical industry permanently, or for at least 20 years.

### B. Disgorgement

### 1. Disgorgement of the Totality of Defendants' Ill-Gotten Gains is Appropriate

The Supreme Court has confirmed that disgorgement, a remedy that is "a mainstay of equity courts," is "tethered to a wrongdoer's net unlawful profits." *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020).  It is based on the "foundational principle" that "it would be inequitable that a wrongdoer should make a profit out of his own wrong." *Id.* (quoting *Root v. Railway Co.*, 105 U.S. 189, 207 (1882)); *see also SEC v. Commonwealth Chem. Secs., Inc.*, 574 F.2d 90, 102 (2d Cir. 1978) (disgorgement is "a method of forcing a defendant to give up the amount by which he was unjustly enriched"). Disgorgement focuses on the *gain* to the wrongdoer as opposed to the loss to the victim.  ECF 482 at 12-13 (quoting *People v. Ernst & Young, LLP*, 980 N.Y.S.2d 456, 456 (1st Dep't 2014)).  "Accordingly, the remedy of disgorgement does not require a showing or

15

allegation of direct losses to consumers or the public; the source of the ill-gotten gains is

immaterial." *Id.* (citing *Ernst & Young*).

This Court has already held that:

- Disgorgement is appropriate under the Executive Law for persistent or repeated violations of the Donnelly Act or other state or federal laws. ECF 482 at 11-12.[2]

- The New York Attorney General has the authority to seek disgorgement of Defendants' net profits.  ECF No. 482 at 11.[3]

- Because "the source of the ill-gotten gains is immaterial," disgorgement may include all of defendant's unjust gains attributable to the entirety of its U.S. sales. ECF No. 482 at 14.[4]

- In this case, the Defendants' conduct has a sufficient factual nexus with New York:

    "The locus of the defendants' alleged wrongful activity was New York State.  The headquarters of Vyera Pharmaceuticals, LLC were and are located in New York State.  The distribution agreements at issue were executed on defendants' behalf in New York, as were the exclusive supply agreements that the plaintiffs allege were integral to the scheme."  ECF 482 at 5-6.  *See also* FOF ¶ 2.

These rulings are now the law of the case.  See ECF No. 483 at 2.  Thus, upon a finding

of liability, the New York Attorney General may obtain disgorgement of Defendants' net profits

attributable to their ill-gotten gains for the entirety of its U.S. sales.  ECF No. 482 at 14.

---

[2] *See, e.g., New York v. Feldman*, 210 F. Supp. 2d 294, 300 (S.D.N.Y. 2002) (enforcing Donnelly Act violation); *Spitzer v. Coventry First LLC*, No. 0404620/2006, 2007 WL 2905486 (N.Y. Sup. Ct. Sept. 25, 2007), *aff'd*, 861 N.Y.S.2d 9, 10 (1st Dep't 2008) (enforcing the Donnelly Act and the Martin Act); *People ex rel. Spitzer v. Telehublink Corp.*, 756 N.Y.S.2d 285, 285 (3d Dep't 2003) (enforcing the federal Telemarketing Act, 15 U.S.C. §6103(a) and the New York Deceptive Practices Act); *State by Abrams v. Camera Warehouse, Inc.*, 496 N.Y.S.2d 659, 660 (N.Y. Sup. Ct. 1985) (enforcing N.Y. Gen. Bus. Law § 518); *People by Vacco v. Lipsitz*, 663 N.Y.S.2d 468, 474 (N.Y. Sup. Ct. 1997) (enforcing the New York Deceptive Practices and False Advertising Acts, N.Y. Gen. Bus. Law §§ 349, 350).

[3] *People ex. rel. Schneiderman v. Greenberg*, 27 N.Y.3d 490, 497 (N.Y. 2016)).  This authority stems from "New York's vital interest in securing an honest marketplace, which is threatened when a defendant uses a New York business to engage in its scheme." *Id*. at 13 (quoting *People ex rel. Cuomo v. H & R Block, Inc.*, 870 N.Y.S.2d 315, 316 (1st Dep't 2009) and *New York v. Feldman*, 210 F. Supp. 2d 294, 303 (S.D.N.Y. 2002)) (internal quote marks omitted).

[4] This authority stems from "New York's vital interest in securing an honest marketplace, which is threatened when a defendant uses a New York business to engage in its scheme."  ECF 482 at 13 (quoting *People ex rel. Cuomo v. H & R Block, Inc., 870 N.Y.S.2d 315, 316* (1st Dep't 2009) and *New York v. Feldman, 210 F. Supp. 2d 294, 303* (S.D.N.Y. 2002)) (internal quote marks omitted).

### 2.   An Award of Equitable Monetary Relief of $64.6 Million is Warranted

The amount to be disgorged will be "calculate[d] ... by taking the amount of profits Defendants made in the real wor[ld] and subtracting the estimated amount of profits they would have made if they had faced generic competition at an earlier date."  ECF No. 172 at 2 (internal quotes omitted); *see also* ECF No. 482 (disgorgement is "measured by the defendant's wrongful gain.") (quoting *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020)).  "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Secs.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996).

The methodology for calculating disgorgement is well-established. The Second Circuit applies a two-step burden-shifting framework to calculate disgorgement. First, the plaintiff must show "that its calculations reasonably approximated the amount of the defendant's unjust gains." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 368 (2d Cir. 2011) (internal quotation marks omitted). The burden then shifts to the defendants "to show that those figures were inaccurate." *Id.* (internal quotation marks omitted). "Any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created the uncertainty." *First Jersey*, 101 F.3d at 1475; *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007) ("The burden falls on defendants to dispel uncertainty as to the proper calculation of disgorgement and they have not done so.")

### a. A reasonable approximation of Vyera's unjust gains is $64.6 million

As Plaintiffs' economic expert Professor Scott Hemphill explains, Vyera's net profits flowing from Defendants' anticompetitive conduct are reasonably approximated at $64.6 million. FoF ¶ 319. Professor Hemphill arrived at this calculation by creating an excess profits model with four steps:

**First**, Professor Hemphill determined Vyera's Daraprim revenue in the real world. Relying on Vyera's internal data, he concluded that its net Daraprim revenue from October 2018 through December 2020 was $103.6 million. *Id.* at ¶ 321.

**Second**, Professor Hemphill estimated the revenues Vyera would have made in a counterfactual "but-for" world without Vyera's anticompetitive restrictions. *Id.* at ¶ 322. The most important input into this calculation is the projected date of generic entry absent Vyera's conduct. The timing of Vyera's authorized generic ("AG") entry is also a variable. *Id.*

**Third**, Professor Hemphill determined the incremental revenue attributable to Vyera's conduct, which is $67.6 million. This number is simply the difference between the real-world and but-for world revenue. *Id.* at ¶ 326.

**Finally**, Professor Hemphill calculated Vyera's excess profits by subtracting the incremental costs it would have saved by making fewer Daraprim sales. *Id.* at ¶ 327. Incremental costs are those costs that fluctuate with the volume of Daraprim sold. They include things such as the manufacturing cost of making additional tablets and the marketing expenses that Vyera reduced after generic entry. They do not, however, include fixed costs—those costs Vyera would have paid regardless of the Daraprim quantity it sold. After deducting incremental costs, Professor Hemphill determined that Vyera's excess profits attributable to its conduct were $64.6 million. *Id.*

In order to calculate the revenues Vyera would have made but for its anticompetitive conduct, Professor Hemphill determined potential counterfactual world generic entry dates by reviewing the record and identifying various points at which the generic applicants stated that they were delayed by obstacles attributable to Vyera's inequitable conduct. This record evidence is briefly summarized for convenience.

*Cerovene Entry*. The record shows that Cerovene's entry was delayed by two factors. First, Cerovene was delayed by 15 months by its inability to purchase Daraprim samples. Cerovene ███████████████████████████████████████████████████████ ██████████████████ FOF ¶ 174. ████████████████████ in November 2018, Cerovene finally was able to purchase three bottles.[5] FOF ¶ 176. ████████████████████████ ████████████████████████████████████████████ FOF ¶¶ 176-77. The FDA approved this request five months later in April 2019, and Cerovene promptly completed the required studies. FOF ¶ 178. Absent Vyera's distribution restrictions, Cerovene would have been able to purchase five bottles of Daraprim in January 2018, completed ███████ ████ 15 months earlier, and launched the generic equivalent in December 2018 instead of March 2020. FOF ¶ 180.

Cerovene was delayed an additional two months by its inability to obtain pyrimethamine API from ██████ Cerovene's CEO, Manish Shah, testified that he had an agreement with ██████ in September 2016 to supply pyrimethamine API. FOF ¶ 167. The next month, ██████—which was in active negotiations with Vyera for exclusivity—broke that deal and refused to supply. *Id.* Cerovene then sourced from ██████, but had to complete additional regulatory submissions because ██████ manufacturing process had not yet been approved by the FDA. FOF ¶ 168. Shah will testify that had Cerovene obtained ████████████ ████, it could have filed its major amendment with the FDA ██████████████ months earlier than it did in the real world. This in turn would have moved up Cerovene's development timeline by ████ months and it could have entered the market in October 2018. FOF ¶ 181.

---

[5] Cerovene was able to purchase one bottle of Daraprim in June 2018 from ██████ Because the FDA requires that bioequivalence testing be done on bottles from the same manufacturing lot, Cerovene could not combine this bottle with the three bottles it later acquired from ██████.

███ *Entry*. ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

*Authorized Generic Entry*. Vyera launched an AG version of Daraprim in March 2020, shortly after learning of Cerovene's approval. FOF ¶ 256. An AG is a generic product sold by the brand company to recapture a portion of sales that would otherwise be lost to a generic entrant. Brand companies generally launch an AG in response to generic entry. But the record shows that Vyera was not logistically ready to sell an AG until October 2019. FOF ¶ 325. Thus, if Cerovene had entered the market in October 2018, Vyera may not have been able to respond with an AG at that time and, thus, would not have made the AG sales it did in the real world. FOF ¶¶ 323, 325.

Based on the evidence concerning the timing of generic entry, it is reasonable to assume that absent Vyera's anticompetitive conduct: (1) Cerovene would have entered in October 2018;

(2) ▮▮ would have entered in October 2019; and (3) Vyera would have been unable to launch an AG until October 2019. In that scenario, Professor Hemphill calculates that Vyera's net revenues from October 2018 until December 2020 would have been only $36.1 million, and that Vyera's unjust gain is $64.6 million.

Professor Hemphill's model is well grounded in the evidence and provides a reasonable approximation of Vyera's unjust enrichment from its anticompetitive scheme. Moreover, the model may well understate the true amount of Vyera's excess profits because it does not take into account the fact that Vyera's restrictions caused other generic companies—like Mylan—to abandon development. It is possible that one or more of these companies would have entered even earlier than October 2018 and that Vyera's unjust gain is more than $64.6 million.

**b. Defendants have failed to show this figure is inaccurate**

Defendants have not criticized Professor Hemphill's model for calculating excess profits. Instead, they offer a variety of arguments about generic entry that are based on conjecture or a misreading of the factual record. For example, Defendants' experts:

- Speculate that even if the generic developers were able to obtain samples and API sooner, the FDA might have moved more slowly in approving them so the ultimate generic entry dates might have been the same—but offer no reason to believe the FDA would have behaved differently.

- Suggest that the delays Cerovene and ▮▮ faced are their own fault and not attributable to Vyera's actions. In particular, they claim that Cerovene could have obtained all of the Daraprim it needed in early 2018 had it sourced through ▮▮▮▮▮ rather than ▮▮▮▮ As explained in Plaintiff's Joint Pretrial Memorandum at 30, however, the record shows that ▮▮▮ was more likely than ▮▮▮▮▮ to provide samples—and would have done so had Vyera not intervened to buy them back. FOF ¶ 175.

- Assert that, in November 2018, Cerovene could have bought five bottles instead of three from ▮▮▮▮▮ obviating the need for an FDA waiver. But Cerovene's CEO will testify that ▮▮▮▮ could only source three bottles. FOF ¶ 176.

Dr. Jena also quibbles with Professor Hemphill's assumptions about Vyera's pricing in the but-for world and the overall size of the pyrimethamine market. As Professor Hemphill will

21

explain, these criticisms are inapt and, in any event, insignificant, making at most a minor difference to the total disgorgement amount. Dr. Jena makes no attempt to quantify that difference or propose an alternative figure.

Finally, Defendants have argued that, regardless of the amount of their unjust gains, Phoenixus AG and Vyera Pharmaceuticals, LLC cannot pay a judgment of $53.1 to $64.6 million at a single point in time and therefore should not be required to pay an award of that size at any time.  But courts in this district have consistently found that a "Defendant's current financial net-worth is irrelevant to the Court's consideration of the disgorgement award." *SEC v. Credit Bancorp, Ltd.*, No. 99-cv-11395, 2011 WL 666158, at *5 (S.D.N.Y. Feb. 14, 2011); *see also SEC v. Wyly*, 56 F. Supp. 3d 394, 406 (S.D.N.Y. 2014) ("For purposes of calculating disgorgement, financial hardship does not preclude the imposition of an order of disgorgement."). It would be inequitable to withhold disgorgement "simply because a swindler claims that she has already spent all the loot." *SEC v. Inorganic Recycling Corp.*, No 99-cv-10159, 2002 WL 1968341, *2-4 (S.D.N.Y. Aug. 23, 2002). Notwithstanding the irrelevance of a defendant's inability to pay to an award of disgorgement, Defendants have not even shown that Phoenixus AG and Vyera Pharmaceuticals, LLC are unable to pay a disgorgement award. Defendants offer only an expert opinion that these entities do not have enough liquid assets to pay a judgment between $53.1 and $64.6 million in the first quarter of 2022. As Plaintiffs' expert, Saul Solomon, will explain, Defendants' expert, Justin McLean, does not address how much the entities actually could pay or whether they could pay the full requested judgment over time.

### 3.  The Imposition of Joint and Several Liability is Warranted Here

Where appropriate, courts in equity can impose joint and several liability for disgorge-

ment awards.  *See, e.g., SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013)

(joint and several liability appropriate because defendants had "collaborat[ed]" on a common

scheme).  Joint and several liability has been upheld where, as here, the misconduct of the com-

pany and its top controlling officers are indistinguishable.  *SEC v. First Jersey Sec., Inc.*, 101

F.3d 1450 (2d Cir. 1996) ("as president, chief executive officer, and sole shareholder of First Jer-

sey, [co-defendant] Brennan possessed control over every aspect of First Jersey's operations").

*See also 212 Inv. Corp v. Kaplan*, 847 N.Y.S.2d 905, 910 (N.Y. Sup Ct. 2007) ("[T]there is a sig-

nificant body of authority holding that '[w]hen apportioning liability for disgorgement among

multiple defendants, courts have the discretion to find joint and several liability when two or

more individuals collaborate in the illegal conduct'"); *SEC v. Haligiannis*, 470 F. Supp. 2d 373,

385 (S.D.N.Y. 2007) ("[C]ourts have the discretion to find joint and several liability when two or

more individuals collaborate in the illegal conduct.")

Joint and several disgorgement orders are permissible so long as they are equitable and

do not act as a penalty. Whether an award of joint and several disgorgement is appropriate in a

particular case is a necessarily fact-specific inquiry. *Liu,* 140 S. Ct. at 1949 (remanding to the

Ninth Circuit for a factual finding as to whether petitioners should be held jointly liable as they

were married and may have shared finances.)

Under the particular facts presented here, all Defendants should be held jointly and

severally liable for the total amount of disgorgement.  To begin, the individual Defendants have

been top officers and/or directors (FOF ¶¶ 3-4) and have been integrally involved in the

wrongdoing – personally involved in critical acts. *See* FOF ¶¶ 279-285 (Shkreli), ¶¶311-317

(Mulleady)[6].   Both individuals are the two primary shareholders in the company and former CEOs.  FOF ¶ 279 (Shkreli); ¶ 312 (Mulleady).   Defendant Mulleady has been on the  board of directors for several years – even through the filing of this action – and Defendant Shkreli is not only the mastermind and implementor of the anticompetitive scheme, but took various acts to ensure that the anticompetitive conduct would continue after his termination in December 2015 (*e.g.,* by getting Vyera to terminate his successor CEO and selecting and getting elected new Board members in 2017, by his voting and influence on the board, and by continuing to help direct the company's conduct via his influence on officers/directors like Mulleady and Mithani. FOF ¶¶ 305-310.

None of the concerns expressed in *Liu* preclude joint and several liability for a company and its top officer (or officers), as in *First Jersey,* or others who collaborated in the wrongdoing. "The amount a court may order a wrongdoer to disgorge may not exceed the total amount of gain from the illegal action, but that does not entail that the gain must personally accrue to the wrongdoer". *S.E.C. v. Contorinis* 743 F.3d 296, 305–06 (2d Cir. 2014).

Moreover, the Plaintiff States would be prejudiced if we could not enforce the disgorgement order against each of the Defendants, in full.  Conceptually, there is no meaningful way to unscramble and separate the Defendants' wrongdoing, since this antitrust violation was effectuated by a large, centrally orchestrated scheme, not by individual transactions than can be somehow allocated.  *See Pentagon Capital,* 725 F.3d at 287.

---

[6] Mulleady ordered the audit of every pill in Fall 2017, negotiated and signed the RL Fine agreement, and bought back Daraprim from Reliant in a Starbucks parking lot.  Shkreli implemented the restricted distribution scheme, orchestrated a management coup in Summer 2017 that resulting in the firing of a CEO and appointing of new Board members, and has been involved in running the company from prison, in violation of the terms of his confinement. FOF ¶¶ 279-285 (Shkreli), ¶¶311-317 (Mulleady).

24

C.     **Permanent Industry Ban**

Upon finding of a violation under Executive Law § 63(12), the Court may exercise its

discretion to issue a permanent and plenary ban, *i.e.,* indefinitely excluding the individual

defendants from all aspects of the pharmaceutical industry.  *See, e.g., People ex rel.*

*Schneiderman v. Imported Quality Guard Dogs, Inc.,* 930 N.Y.S.2d 906, 907-08 (App. Div. 2d

Dep't 2011)  ("permanently enjoin[ing] the appellant from selling, breeding, or  training dogs, or

advertising or soliciting the sale, breeding, or training of dogs."); *People v. Fashion Place*

*Associates*, 638 N.Y.S.2d 26 (1st Dep't 1996) ("permanently restraining and enjoining

defendants ... from engaging in any and all acts directly or indirectly involving the offer of sale

of real estate securities to the public."); *People v. Northern Leasing Systems, Inc.*, 133 N.Y.S.3d

389, 412 (N.Y. Sup. Ct. 2020) ("permanently enjoin[ing] respondents from conducting the

business of equipment finance leasing or collection of debts under equipment finance leases and

from purchasing, financing, transferring, servicing, or enforcing equipment finance leases.");

*State v. Midland Equities of New York, Inc.*, 117 Misc. 2d 203, 208  (N.Y. Sup.Ct. 1982)

("judgment permanently enjoining [defendants] from engaging in the business of mortgage

foreclosure consultation, from offering legal advice to consumers and from soliciting business

for attorneys.")

Given their egregious misconduct, we seek an order imposing permanent industry bans

on the individual Defendants; at a minimum, a 20-year industry ban would be appropriate in this

case.  To begin, there are no meaningful mitigating factors.   On the contrary, there are

aggravating factors.  The Court has already found that Defendant Shkreli used cellphones from

prison (against prison rules and court orders) to further the scheme – during the pendency of the

action, no less.  ECF Nos. 451, 452 (spoliation ruling).  Moreover, call records and/or messages

were spoliated. *Id.* Defendant Mulleady also had his hands all over the scheme – tightening the distribution model after he rejoined Vyera in 2017 as Board member and eventually CEO (FOF ¶ 55); personally negotiating the RL fine agreement (FOF ¶¶ 121, 123), and personally traveling himself to buy back Daraprim pills at inflated prices under dubious circumstances in a parking lot. (FOF ¶ 77).  This was not for the benefit of patients, of course, but rather done to keep them out of the hands of generic companies seeking them for bioequivalency testing. (FOF ¶ 122); ECF Nos. 475, 476, Ex. 17.  Both individuals are poorly positioned in equity to argue for anything less than a permanent ban.

The ban should also be plenary, barring both individual defendants from the pharmaceutical industry altogether, without carve-outs.  It should extend to all aspects of the pharmaceutical industry, including without limitation: brand and generic drugs and devices, at any state or research, development or sales, as well as marketing, financing, valuation or risk assessment, or any kind of consulting within the pharmaceutical industry.  The order should also prohibit them from exercising share voting rights to control, influence the operation of, or vote for or against boards of directors or management of companies involved in any aspect of the pharmaceutical industry.

**CONCLUSION**

For the reasons set forth herein, Plaintiff States ask the Court to find that Defendants

violated the state laws identified in ECF No. 86 and grant a broad injunction and order of

disgorgement against the Defendants, as well as a permanent industry ban on Shkreli and

Mulleady.

Respectfully submitted,

*/s/ Elinor R. Hoffmann*
Elinor R. Hoffmann
Chief, Antitrust Bureau
Bryan Bloom
Jeremy R. Kasha
Amy McFarlane
Saami Zain
Office of the New York Attorney General
28 Liberty Street
New York, NY 10005
Tel: (212) 416-8269
elinor.hoffmann@ag.ny.gov
*Counsel for Plaintiff State of New York*

*/s/ Michael D. Battaglia*
Michael D. Battaglia
Deputy Attorney General
Office of the Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3769
michael.battaglia@doj.ca.gov
*Counsel for Plaintiff State of California*

*/s/ Richard S. Schultz*
Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Attorney General of Illinois
100 W. Randolph Street, 11th Floor
Chicago, IL 60601
Tel: (872) 272-0996
Richard.Schultz@ilag.gov
*Counsel for Plaintiff State of Illinois*

*/s/ Jessica V. Sutton*
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603
Tel: (919) 716-0998
jsutton2@ncdoj.gov
*Counsel for Plaintiff State of North Carolina*

*/s/ Beth A. Finnerty*
Beth A. Finnerty
Assistant Chief, Antitrust Section
Office of the Attorney General of Ohio
30 E. Broad Street, 26th Floor
Columbus, OH 43215
Tel: (614) 466-4328
Beth.Finnerty@OhioAGO.gov
*Counsel for Plaintiff State of Ohio*

*/s/ Joseph S. Betsko*
Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
Antitrust Section
Strawberry Square, 14th Floor
Harrisburg, PA 17120
jbetsko@attorneygeneral.gov
*Counsel for Plaintiff Commonwealth of Pennsylvania*

*/s/ Tyler T. Henry*
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, VA 23219
thenry@oag.state.va.us
*Counsel for Plaintiff Commonwealth of Virginia*

Dated:  October 20, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL TRADE COMMISSION; STATE
OF NEW YORK; STATE OF CALIFORNIA;
STATE OF ILLINOIS; STATE OF NORTH
CAROLINA; STATE OF OHIO;
COMMONWEALTH OF PENNSYLVANIA;
and COMMONWEALTH OF VIRGINIA

Plaintiffs,

v.

VYERA PHARMACEUTICALS, LLC;
PHOENIXUS AG; MARTIN SHKRELI,
individually, as an owner and former officer
of Vyera Pharmaceuticals, LLC and
Phoenixus AG (formerly known as Turing
Pharmaceuticals, LLC and Turing
Pharmaceuticals, AG); and KEVIN
MULLEADY, individually, as an owner and
director of Phoenixus AG and a former
executive of Vyera Pharmaceuticals, LLC,

Defendants.

Case No.: 1:20-cv-00706-DLC

---

**Joint Motion for Entry of Stipulated Order for Permanent Injunction**

Plaintiffs Federal Trade Commission ("FTC), by its designated attorneys, and the states

and commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and

Virginia (collectively the "Plaintiff States"), by and through their Attorneys General (collectively

"Plaintiffs") and Defendants Vyera Pharmaceuticals, LLC, Phoenixus AG,  and Kevin Mulleady

(collectively "Settling Defendants"), by their respective attorneys, respectfully move this Court

to enter the accompanying Stipulated Order for Permanent Injunction and Equitable Monetary

Relief ("Stipulated Order"). Entry of the Stipulated Order will end the litigation against the

Settling Defendants. The litigation will proceed against Defendant Martin Shkreli. A copy of the

Stipulated Order is attached as Exhibit A. As grounds for this request, the parties state as follows:

1.      On April 16, 2021, Plaintiffs filed an Amended Complaint against the Settling Defendants and Mr. Shkreli, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C § 26, Section 342 of the New York General Business Law, Section 63(12) of the New York Executive Law, Sections 16700 *et seq.*, 17200 *et seq.* of the California Business and Professions Code, Section 7 of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. §75-1 *et seq.*, Chapter 1331and Section 109.81 of the Ohio Revised Code, Pennsylvania, Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.* and Common Law Doctrine against Restraints of Trade proceeding under 71 P.S. § 732-204 (c) and the Virginia Antitrust Act, Virginia Code §59.1-9.1 *et seq.*, alleging unfair methods of competition, monopolization, and agreements in restraint of trade to prevent generic competition to Daraprim, an anti-parasitic used to treat toxoplasmosis.

2.      The Settling Defendants deny the allegations and claims against them in the Amended Complaint, and that Plaintiffs are entitled to any relief sought therein.

3.      In their Amended Complaint, Plaintiffs seek a permanent injunction to prevent the continuation of the conduct at issue and to prevent similar and related conduct in the future and to prevent Defendants Shkreli and Mulleady (the "Individual Defendants") from owning in part or whole, or working for, a pharmaceutical company. The State Plaintiffs also seek equitable monetary relief under Section 342 of the New York General Business Law, Section 63(12) of the New York Executive Law, Sections 16700 *et seq.*, 17200 *et seq.* of the California Business and Professions Code, Section 7 of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, North Carolina

Unfair or Deceptive Practices Act, N.C. Gen. Stat. §75-1 *et seq.*, Chapter 1331and Section

109.81 of the Ohio Revised Code, Pennsylvania, Unfair Trade Practices and Consumer

Protection Law, 73 P.S. § 201-1 *et seq.* and Common Law Doctrine against Restraints of Trade

proceeding under 71 P.S. § 732-204 (c) and the Virginia Antitrust Act, Virginia Code §59.1-9.1

*et seq.*

4.      The Settling Defendants have reached a settlement with Plaintiffs. In doing so, the

Settling Defendants admit only the facts necessary to establish the personal and subject matter

jurisdiction of the Court in this matter.

5.      The Settling Defendants agree to be bound by the terms of the Stipulated Order

upon its entry by the Court.

6.      The Stipulated Order applies for a period of 10 years and provides for the parties

to bear their respective costs in this action.

7.      The Stipulated Order includes injunctive relief in the form of conduct prohibitions

that prevent the Corporate Defendants from engaging in conduct similar to that challenged in the

Amended Complaint for a period of 10 years, as set forth in Section II.A.

8.      The Stipulated Order also includes (a) injunctive relief in the form of conduct

prohibitions  that prevent Mr. Mulleady (or any company owned or controlled by him) from

engaging in conduct similar to that challenged in the Amended Complaint for a period of 10

years, as set forth in Section II.F; and (b) injunctive relief that bans, restrains, and enjoins Mr.

Mulleady from participating in various activities relating to, exercising control over, and serving

as an officer or director of, any pharmaceutical company, and from acquiring, holding, or voting

more than 8% of any pharmaceutical company, with two exceptions, for a period of 7 years, as

set forth in Section II.C and D of the Stipulated Order.

3

9.      The Stipulated Order also provides for the following equitable monetary relief

payable to the Plaintiff States:

- The Corporate Defendants shall pay a guaranteed amount of $10 million upfront and up to $30 million more in contingent payments over 10 years as set forth in Paragraphs V.A-G of the Stipulated Order;

- A suspended judgment of $250,000 is entered against Mr. Mulleady that is payable only after a final, unappealable court ruling that he has violated the Order, as set forth in Paragraph V.H. of the Stipulated Order.

10.     By December 6, 2021, all Plaintiffs and the Settling Defendants had signed the

Stipulated Order. On December 7, 2021, the Commission voted 4-0 to accept the proposed

Stipulated Order. On December 6, 2021, the Attorneys General of all Plaintiff States accepted

the proposed Stipulated Order. All Plaintiffs and the Settling Defendants jointly request that the

Court enter the attached Stipulated Order and place it on the public record, thereby bringing this

litigation to an end as to the Settling Defendants, and retain jurisdiction for the purposes of

construction, modification, and enforcement of the Proposed Order.


Respectfully submitted,

*/s/ Markus H. Meier*
Markus H. Meier
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
Tel: (202) 326-3759
mmeier@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*

/s/ Elinor R. Hoffmann
Elinor R. Hoffmann
Chief, Antitrust Bureau
Office of the New York Attorney General
28 Liberty Street
New York, NY 10005
Tel: (212) 416-8269
elinor.hoffmann@ag.ny.gov

*Counsel for Plaintiff State of New York*

/s/ Michael D. Battaglia
Michael D. Battaglia
Deputy Attorney General
Office of the Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3769
michael.battaglia@doj.ca.gov

*Counsel for Plaintiff State of California*

/s/ Richard S. Schultz
Richard S. Schultz
Assistant Attorney General
Office of the Attorney General of Illinois
100 W. Randolph Street, 11th Floor
Chicago, IL 60601
Tel: (312) 814-3000
rschultz@ilag.gov

*Counsel for Plaintiff State of Illinois*

/s/ K.D. Sturgis
K.D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603
Tel: (919) 716-6000
ksturgis@ncdoj.gov

*Counsel for Plaintiff State of North Carolina*

*/s/ Beth A. Finnerty*
Beth A. Finnerty
Assistant Chief, Antitrust Section
Derek M. Whiddon
Assistant Attorney General
Ohio Attorney General
30 E. Broad Street, 26th Floor
Columbus, OH 43215
Tel: (614) 466-4328
beth.finnerty@ohioattorneygeneral.gov

*Counsel for Plaintiff State of Ohio*

*/s/ Joseph S. Betsko*
Joseph S. Betsko
Senior Deputy Attorney General
Stephen M. Scannell
Deputy Attorney General
Pennsylvania Office of Attorney General
Antitrust Section
Strawberry Square, 14th Floor
Harrisburg, PA 17120
jbetsko@attorneygeneral.gov

*Counsel for Plaintiff Commonwealth of Pennsylvania*

*/s/ Tyler T. Henry*
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219
thenry@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*

*/s/ Steven A. Reed*
Steven A. Reed
Morgan, Lewis & Bockius LLP
1701 Market St.
Philadelphia, PA 19103
Tel: (215) 963-5603
steven.reed@morganlewis.com

*Counsel for Defendants Phoenixus AG and Vyera Pharmaceuticals, LLC*

_/s/ Kenneth R. David_____
Kenneth R. David
1633 Broadway
New York, NY 10019
Tel: (212) 506-1893
kdavid@kasowitz.com
Kasowitz Benson Torres LLP

_Counsel for Defendant Kevin Mulleady_

**CERTIFICATE OF SERVICE**

I hereby certify that on December 7, 2021, I have electronically filed a true and correct

copy of the **Joint Motion for Entry of Stipulated Order for Permanent Injunction** with the

Clerk of the Court using the CM/ECF system, which will automatically send e-mail notification

of such filing to all counsel of record.

Dated: December 7, 2021                    */s/ Maren Haneberg*
                                           Maren Haneberg
                                           Federal Trade Commission
                                           600 Pennsylvania Avenue, NW
                                           Washington, DC 20580
                                           Work: (202) 326-3084
                                           Cell: (202) 657-9928
                                           mhaneberg@ftc.gov

                                           *Counsel for Plaintiff Federal Trade Commission*

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA<br><br>       Plaintiffs,<br><br>    v.<br><br>VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former officer of Vyera Pharmaceuticals, LLC and Phoenixus AG (formerly known as Turing Pharmaceuticals, LLC and Turing Pharmaceuticals, AG); and KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC,<br><br>       Defendants. | Case No.: 1:20-cv-00706-DLC<br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION AND EQUITABLE MONETARY RELIEF** |

Plaintiffs the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, and the states or commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia (collectively "Plaintiff States"), by and through their Attorneys General (collectively "Plaintiffs"), pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C § 26, Section 342 of the New York General Business Law, Section 63(12) of the New York Executive Law, Sections 16700 *et seq.*, 17200 *et seq.* of the California Business and Professions Code, Section 7 of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. §75-1 *et seq.*, Chapter 1331and Section 109.81 of the Ohio Revised Code, Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.* and Common Law Doctrine against Restraints of Trade proceeding under 71 P.S. § 732-204 (c) and the Virginia Antitrust Act, Virginia Code §59.1-9.1 *et seq.*, filed their Amended Complaint for Permanent Injunctive and Other Equitable Relief, against Defendants Vyera Pharmaceuticals, LLC, Phoenixus AG, Martin Shkreli, and Kevin Mulleady to remedy and prevent their alleged anticompetitive conduct and unfair methods of competition in or affecting commerce in violation

of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and state law.  The Plaintiffs and Defendants Vyera Pharmaceuticals, LLC, Phoenixus AG, and Kevin Mulleady (collectively "Settling Defendants") have agreed to resolve this case through settlement, without trial or final adjudication of any issue of law or fact, and stipulate to entry of this Stipulated Order for Permanent Injunction and Equitable Monetary Relief ("Order") to resolve all matters against the Settling Defendants in dispute in this action.

## FINDINGS

1.   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, as well as under the principles of supplemental jurisdiction codified in 28 U.S.C. § 1367(a).

2.   This Court has personal jurisdiction over the Settling Defendants because each has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b) and with the state of New York pursuant to N.Y. CPLR §§ 301, 302.

3.   Venue for this matter is proper in this Court under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), 15 U.S.C. § 22, and 15 U.S.C. § 1391(b) and (c).

4.   The Amended Complaint alleges that the Settling Defendants engaged in anticompetitive conduct and unfair methods of competition in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and state law.

5.   The Settling Defendants admit the facts necessary to establish the personal and subject matter jurisdiction of this Court in this matter.

6.   The Settling Defendants deny the allegations and claims in the Amended Complaint and dispute that Plaintiffs are entitled to obtain relief.

7.   The Settling Defendants waive any claim they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

8.   Entry of this Order satisfies the requests for relief made by the Plaintiffs in their Amended Complaint and is in the public interest.

## STIPULATIONS

1.   The Settling Defendants stipulate that venue for this matter is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c), and under Section 13(b) of the FTC Act, U.S.C. § 53(b).

2.      The Settling Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

3.      The Plaintiffs and the Settling Defendants have agreed that entry of this Order fully and finally resolves all claims and litigations between them arising from or based primarily on the allegations described in the Amended Complaint and precludes further litigation against Phoenixus, Vyera, and/or Mulleady, as defined herein, arising from or based primarily on the allegations except for purposes of enforcing or modifying this Order.

4.      The Plaintiffs and Settling Defendants stipulate that they will each bear their own costs in this matter and shall not make any claims against the other for attorneys' fees or costs.

## ORDER

**IT IS HEREBY ORDERED:**

## I. DEFINITIONS

As used in this Order, the following definitions apply:

A.      "Phoenixus" means Phoenixus AG, its directors, officers, employees, agents, attorneys, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Phoenixus AG, and the respective directors, officers, employees, agents, attorneys, representatives, successors, and assigns of each.

B.      "Vyera" means Vyera Pharmaceuticals, LLC, its directors, officers, employees, agents, attorneys, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Vyera Pharmaceuticals, LLC, and the respective directors, officers, employees, agents, attorneys, representatives, successors, and assigns of each.  Vyera Pharmaceuticals, LLC is a subsidiary of Phoenixus.

C.      "Kevin Mulleady" or "Mulleady" means Defendant Kevin Mulleady, an individual defendant.  Mulleady was Chairman of the Board of Directors of Phoenixus AG and Chief Executive Officer of Vyera Pharmaceuticals, LLC.  Mulleady is also the Executive Chairman and Chief Executive Officer of Prospero Pharmaceuticals, LLC.

D.      "Commission" means the United States Federal Trade Commission.

E.      "Plaintiff States" mean the states or commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia.

F.      "API" means any active pharmaceutical ingredient that is used in the manufacture of a Drug Product.

G.      "Biosimilar" means any biologic Drug Product that is highly similar to, and has no clinically meaningful difference from, an existing FDA-approved biologic Drug Product or that otherwise meets the FDA's criteria for classification as a biosimilar.

H.   "Corporate Asset" means any asset of a Corporate Named Defendant or any successor, assign, joint venture, subsidiary, partnership, division, group, or affiliate controlled by a Corporate Named Defendant. Corporate Asset expressly excludes any inventory, goods or products that are sold or to be sold in the ordinary course of business, including without limitation, any APIs, raw materials, or finished product. Corporate Asset also expressly excludes any unissued shares of equity interests, capital stock, partnership interest, membership or limited liability company interest or similar equity right in one or both of the Corporate Named Defendants or any successor, assign, joint venture, subsidiary, partnership, division, group, or affiliate controlled by any of them.

I.   "Corporate Defendants" means Phoenixus and Vyera.

J.   "Corporate Named Defendants" means Phoenixus AG and Vyera Pharmaceuticals, LLC.

K.   "Customer or Supplier" means a counter-party to a distribution, wholesale, resale, API supply, or Drug Product purchase agreement with a Corporate Defendant.

L.   "Daraprim" means any Drug Product authorized for marketing or sale in the United States pursuant to FDA Authorization NDA 008578, and any supplements, amendments, or revisions to this NDA.

M.   "Designated State Representatives" mean the following named individuals or another representative identified by each respective Plaintiff State:

1.   Elinor R. Hoffmann, Chief, Antitrust Bureau, Office of the New York State Attorney General, 28 Liberty Street, New York, NY 10005, elinor.hoffmann@ag.ny.gov;

2.   Michael D. Battaglia, Deputy Attorney General, California Department of Justice, 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102, michael.battaglia@doj.ca.gov;

3.   Richard S. Schultz, Assistant Attorney General, Antitrust Bureau, Office of the Illinois Attorney General, 100 West Randolph Street, Chicago, IL 60601, richard.schultz@ilag.gov;

4.   K. D. Sturgis, Special Deputy Attorney General, North Carolina Department of Justice, 114 West Edenton Street, Raleigh, NC 27603, ksturgis@ncdoj.gov;

5.   Beth A. Finnerty, Assistant Chief, Antitrust Section, Office of the Ohio Attorney General, 30 East Broad Street, 26th Floor, Columbus, OH 43215, Beth.Finnerty@ohioAGO.gov;

6.   Joseph S. Betsko, Senior Deputy Attorney General, Pennsylvania Office of Attorney General, Strawberry Square, Harrisburg, PA 17120, jbetsko@attorneygeneral.gov; and

7.   Tyler T. Henry, Assistant Attorney General, Office of the Attorney General of Virginia, 202 North Ninth Street, Richmond, VA 23219, thenry@oag.state.va.us.

N.   "Development" means all preclinical and clinical research and development activities related to a Drug Product, including discovery or identification of a new chemical entity, test method development, all studies for the safety or efficacy of a Drug Product, toxicology studies, bioequivalence and bioavailability studies, pharmaceutical

formulation, process development, manufacturing scale-up, development-stage manufacturing, quality assurance/quality control development, stability testing, statistical analysis and report writing, for the purpose of obtaining any and all FDA Authorizations necessary for the manufacture, use, storage, import, export, transport, promotion, marketing, labeling, distribution, and sale of a Drug Product, and regulatory affairs related to the foregoing.

O.   "Drug Product" means any product that is the subject of an FDA Authorization.

P.   "Exempted Company" means any Pharmaceutical Company owned or controlled by Mulleady (including Prospero) whose business is limited to a Therapeutic Equivalent of Thiola and/or the PKAN Product.

Q.   "FDA" means the United States Food and Drug Administration.

R.   "FDA Authorization" means any of the following applications:

1.   An application filed or to be filed with the FDA pursuant to 21 C.F.R. Part 314 *et seq.*, including "New Drug Application" ("NDA"), "Abbreviated New Drug Application" ("ANDA"), "Supplemental New Drug Application" ("SNDA"), or "Marketing Authorization Application" ("MAA"), and all supplements, amendments, and revisions thereto, any preparatory work, registration dossier, drafts and data necessary for the preparation thereof, and all correspondence between the holder and the FDA related thereto; or

2.   A "Biologic License Application" ("BLA") filed or to be filed with the FDA pursuant to 21 C.F.R. 601.2, *et seq.*, and Section 351 of the Public Health Service Act, and any NDA deemed to be a BLA by the FDA, and all supplements, amendments, revisions thereto, any preparatory work, drafts and data necessary for the preparation thereof, and all correspondence between the holder and the FDA related thereto.

S.   "GPO" means any group purchasing organization, an entity that negotiates prices of Drug Products on behalf of member healthcare providers, including hospitals, ambulatory care facilities, physician practices, nursing homes, and home health agencies.

T.   "Net Proceeds" means proceeds after deducting direct transaction costs paid to Third Parties (i.e., sales commissions, advisor fees, and other costs incurred solely due to the underlying transaction).

U.   "Ownership Interest" means any voting or non-voting stock, share capital, or equity in a Person (other than an individual). Ownership Interest shall not include any unexercised options or other unexercised instruments that are convertible into any voting or non-voting stock.

V.   "Person" means any individual, partnership, joint venture, firm, corporation, association, trust, unincorporated organization, or other business or government entity, and any subsidiaries, divisions, groups, or affiliates thereof.

W.   "Pharmaceutical Company" means any Person (other than an individual) that is engaged in the research, Development, manufacture, commercialization, or marketing of any Drug Product.

X.   "PKAN Product" means the chemical compound that, as of the date this Order is entered, Prospero is involved in the Development of as a potential treatment for pantothenate kinase-associated neurodegeneration ("PKAN").

Y.   "Priority Review Voucher" means a voucher issued by the FDA that entitles a Drug Product to receive expedited regulatory review.

Z.   "Prospero" means Prospero Pharmaceuticals, LLC, its directors, officers, employees, agents, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Prospero Pharmaceuticals, LLC, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

AA.   "Therapeutic Equivalent" means a Drug Product that is classified by the FDA as being therapeutically equivalent to another Drug Product because, among other criteria, both Drug Products contain identical amounts of an API in the identical dosage form and route of administration, meet compendial or other applicable standards of strength, quality, purity, and identity, and they are classified by the FDA as bioequivalent.

BB.   "Thiola" means the Drug Products authorized for marketing or sale in the United States pursuant to FDA Authorizations NDA 019569 or NDA 211843, and any supplements, amendments, or revisions to these NDAs.

CC.   "Third Party" means any Person that is not a Corporate Defendant or an entity under common management, direction, or control of a Corporate Defendant.

## II. PROHIBITED BUSINESS ACTIVITIES

**Corporate Defendants**

A.   The Corporate Defendants, directly or through any Person, are hereby restrained and enjoined from entering into or enforcing any contract, arrangement, mutual understanding, or agreement that prohibits, or in any manner interferes with or restricts the ability of:

1.   Any purchaser (including hospitals and pharmacies), reseller, wholesaler, or distributor of a Drug Product to provide that Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of that Drug Product by that Pharmaceutical Company,

*Provided, however,* this provision does not prohibit the Corporate Defendants from entering an agreement with a distributor that restricts that distributor to certain channels of sale so long as it permits the distributor to sell the Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of the Drug Product;

2.   Any manufacturer, seller, supplier, or distributor of an API to sell or provide that API to a Pharmaceutical Company,

*Provided, however*, this provision does not prohibit a Corporate Defendant from entering a contract to purchase all of its needs for a particular API from any Person so long as the contract does not require the Person to supply the API exclusively to the Corporate Defendant or restrict the Person's freedom to sell the API to any other Person, and

*Provided further,* if the Corporate Defendants have no other supply agreement for a particular API, this provision will not apply to any arrangement to obtain API from a Person who has not previously manufactured the API if the Corporate Defendants bear at least 50% of the direct costs of developing the API; or

3.   Any distributor, wholesaler, pharmacy, or GPO of a Drug Product to sell or otherwise provide data related to the sales or distribution of any Drug Product, such as sales numbers and volume, or other sales variables such as ordering trends, to a Person engaged in the business of purchasing, aggregating, and selling sales and distribution data on Drug Products.

B.   The Corporate Defendants shall not hire, appoint as an officer or director, or otherwise do business with Mulleady in any manner that violates Paragraph II.C of this Order and shall not hire, appoint as an officer or director, or otherwise do business with Defendant Martin Shkreli in any manner that violates any provision or restriction in an order issued by this Court.

### Defendant Kevin Mulleady

C.   For a period ending 7 years after this Order is entered, Mulleady is hereby banned, restrained, and enjoined from, directly, or through any other Person:

1.   Participating in the research, Development, manufacture, commercialization, distribution, marketing, importation, or sale of a Drug Product or API, including participating in the formulation, determination, or direction of any business decisions of any Pharmaceutical Company;

2.   Exercising control over the activities, conduct, board, or management of any Pharmaceutical Company;

3.   Serving as an officer or director of any Pharmaceutical Company;

4.   Entering into any agreements, whether oral or written, concerning how to vote his shares in any Pharmaceutical Company; and

5.   Calling an Extraordinary General Meeting at Phoenixus or Vyera either on his own or as part of a group doing so,

*Provided, however,* Mulleady may exercise all other rights to which he is entitled as a shareholder of an Exempted Company and/or any Pharmaceutical Company to the extent such shareholding is permitted by Paragraph II.D.  Nothing in this Paragraph II.C shall preclude Mr. Mulleady from expressing his own views on his own behalf as a shareholder concerning the business of any such Pharmaceutical Company,

7

*Provided, further,* it is not a violation of this Paragraph II.C for Mulleady to be employed by, consult with, or act as an officer or director of Phoenixus or Vyera, and in so doing take the actions set forth in Paragraphs II.C.1 to 3, so long as:

    a)    Mulleady does not own or control any Ownership Interest in Phoenixus or Vyera, either directly or through any other Person, and

    b)    Mulleady provides prior notification to the Commission and the Plaintiff States of any proposed involvement in or engagement with Phoenixus or Vyera pursuant to Paragraph VI.C, and

*Provided, finally*, that it is not a violation of this Paragraph II.C for Mulleady to be employed by, consult with, or act as an officer or director of an Exempted Company and/or take the actions set forth in Paragraphs II.C.1 to 4 at an Exempted Company, so long as:

    a)    The Exempted Company's business is limited to (i) a Therapeutic Equivalent of Thiola and/or (ii) the PKAN Product, and the Exempted Company does not have an interest or role in, and is not engaged in any activities related to, any other Drug Product;

    b)    The Exempted Company's financial interest in any Therapeutic Equivalent of Thiola is limited to a passive royalty right;

    c)    The Exempted Company does not have any authority, control, or other role in, or engage in any activities related to, the commercialization, marketing, sales, distribution, or pricing of any Therapeutic Equivalent of Thiola;

    d)    Prior to the filing of an FDA Authorization, the Exempted Company fully divests itself of any control or authority to commercialize, market, sell, distribute, or price any PKAN Product; and

    e)    Mulleady complies with the prior notification provisions set forth in Paragraphs VI.D and VIII.B.

D.    Mulleady is hereby restrained and enjoined from acquiring, holding, or voting more than 8% of the Ownership Interest (based on the latest information available to shareholders from the issuer) in any Pharmaceutical Company (other than an Exempted Company), either directly or through any other Person,

*Provided, however,* it shall not be a violation of this Paragraph II.D if Mulleady passively obtains more than 8% of the Ownership Interest in a Pharmaceutical Company through means other than exercising options or otherwise purchasing the Ownership Interest so long as Mulleady (i) reduces his Ownership Interest in such Pharmaceutical Company to 8% or lower within 10 months, and (ii) in the interim only votes up to 8% of the Ownership Interest in the Pharmaceutical Company,

*Provided, further,* this Paragraph II.D does not permit Mulleady to acquire, hold, or vote any Ownership Interest in Phoenixus or Vyera while Mulleady is employed by, consulting with, or acting as officer or director for Phoenixus or Vyera, and

*Provided, finally,* Mulleady may exercise the rights to which he is entitled as a shareholder of a Pharmaceutical Company (other than those prohibited by Paragraphs II.C.4 and 5) so long as his Ownership Interest in such company does not exceed the limits in this Paragraph II.D.

E.   If Phoenixus or Vyera is found in violation of Section II of this Order, it shall be presumed that Mulleady has also violated the terms of this Order, but only if he is employed by, consulting with, or acting as officer or director for Phoenixus or Vyera at the time the violation occurs.  Mulleady may rebut this presumption by proving to the Court by a preponderance of the evidence that he did not have any knowledge of, involvement in, or in any manner facilitate, the violation of this Order.

F.   Mulleady, any Exempted Company, and any other company Mulleady controls, is restrained and enjoined from proposing, negotiating, reviewing, entering into, being a party to, or enforcing, either directly or through any other Person, any contract, arrangement, mutual understanding, or agreement that prohibits, or in any manner interferes with or restricts the ability of:

1.   Any purchaser (including hospitals and pharmacies), reseller, wholesaler, or distributor of a Drug Product to provide that Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of that Drug Product by that Pharmaceutical Company,

*Provided, however,* this provision does not prohibit Mulleady, any Exempted Company, or any other company Mulleady controls from entering an agreement with a distributor that restricts that distributor to certain channels of sale so long as it permits the distributor to sell the Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of the Drug Product;

2.   Any manufacturer, seller, supplier, or distributor of any API to provide that API to a Pharmaceutical Company,

*Provided, however,* this provision does not prohibit Mulleady, any Exempted Company, or any other company Mulleady controls from entering a contract to purchase all of its needs for a particular API from any Person so long as the contract does not require the Person to supply the API exclusively to the company or restrict the Person's freedom to sell the API to any other Person, and

*Provided further,* if Mulleady, any Exempted Company, or any other company Mulleady controls has no other supply agreement for the particular API, this provision will not apply to any arrangement to obtain API from a Person who has not previously manufactured the API if Mulleady, the Exempted Company, or any company he owns or controls bears at least 50% of the direct costs of developing the API; or

3.   Any distributor, wholesaler, pharmacy, or GPO of a Drug Product to sell or otherwise provide data related to the sales or distribution of any Drug Product, such as sales numbers and volume, or other sales variables such as ordering

trends, to a Person engaged in the business of purchasing, aggregating, and selling sales and distribution data on Drug Products.

## III. NOTIFICATIONS TO AFFECTED PERSONS

**Corporate Defendants**

The Corporate Defendants shall provide, within 21 days of the entry of this Order, written notification in the form of Appendix A to this Order to all their Customers and Suppliers, and going forward shall provide such notification to any Customer or Supplier to whom the Corporate Defendants have not previously provided notification under this Section III,

*Provided, however,* the Corporate Defendants need not provide notice to Customers entering into an agreement to purchase generic prescription drugs so long as the agreement does not also include branded prescription drugs or an API.

## IV. SUPPLY OF DRUG PRODUCTS

**Corporate Defendants**

A.   So long as a Corporate Defendant markets a Drug Product, they shall, at the request of a Pharmaceutical Company, sell the Drug Product to that Pharmaceutical Company for use in Development of a Therapeutic Equivalent or Biosimilar of the Drug Product in accordance with the following:

    1.   The quantity sold shall be at least as much as the Pharmaceutical Company, in its reasonable judgment, needs to conduct its Development of a Therapeutic Equivalent or Biosimilar of the Drug Product;

    2.   The Drug Product is delivered no later than 30 days after the Corporate Defendant receives a purchase order; and

    3.   The Corporate Defendants shall charge the Pharmaceutical Company a price that is no greater than the wholesale acquisition cost of the Drug Product.

B.   The Corporate Defendants shall continue to market and sell Daraprim until the earliest to occur of the following:

    1.   At least three Pharmaceutical Companies that are Third Parties have obtained FDA Authorization to market and sell a Therapeutic Equivalent of Daraprim and each has made at least one commercial sale of the Therapeutic Equivalent;

    2.   At least two Pharmaceutical Companies that are Third Parties have obtained FDA Authorization to market and sell a Therapeutic Equivalent of Daraprim and each of these Pharmaceutical Companies has made uninterrupted commercial sales of the Therapeutic Equivalent for a period of at least 9 months;

    3.   The Corporate Defendants exhaust their supply of pyrimethamine API, the API is no longer available, or the API is only available at a cost or in quantities that

make it unprofitable to continue marketing and selling Daraprim, and the Corporate Defendants notify the Commission and the Designated State Representatives of their inability to secure a supply of pyrimethamine and the reasons therefore;

4. An independent auditor, selected by the Corporate Defendants and approved by the Plaintiffs, verifies that the operating expenses (including variable and fixed costs) for Daraprim exceeded net revenues generated through the sale of Daraprim for at least two consecutive quarters;

5. The Corporate Defendants lose FDA Authorization to continue marketing Daraprim;

6. Three years after this Order is entered; or

7. The Corporate Defendants (a) notify the Commission and the Plaintiff States of their intent to discontinue marketing Daraprim; (b) sell their Daraprim business to an acquirer ("Acquirer") and in a manner that is acceptable to the Commission and the Plaintiff States; (c) maintain the viability, marketability, and competitiveness of the Daraprim business until the sale of the Daraprim business is completed; and (d) provide the Acquirer with the assistance and information necessary to enable the Acquirer to obtain the necessary approvals to manufacture, market, and sell Daraprim in commercial quantities, and to supply the Acquirer with sufficient quantities of Daraprim to meet the Acquirer's commercial needs until the Acquirer is independently able to manufacture and market commercial quantities of Daraprim.

C. The Corporate Defendants shall provide notifications required under this Section IV to the Commission and the Plaintiff States by sending electronic copies to the Secretary of the Commission at ElectronicFilings@ftc.gov and to the Compliance Division at bccompliance@ftc.gov, and by sending electronic copies to each Designated State Representative.

## V. EQUITABLE MONETARY RELIEF

**Corporate Named Defendants**

A. The Corporate Named Defendants shall pay up to $40 million to the Settlement Fund (defined below), comprised of a guaranteed payment of $10 million, and contingent payments of up to $30 million pursuant to Paragraph V.C.

B. The Corporate Named Defendants shall pay $10 million as equitable monetary relief, which shall be used for a settlement fund in accordance with the terms of this Order ("Settlement Fund"). The Corporate Named Defendants will make this payment within 30 business days of the entry of this Order by electronic fund transfer into the Settlement Fund in accordance with instructions provided by the Plaintiff States. The money deposited into the Settlement Fund shall be held in escrow and distributed in the manner prescribed in Paragraph V.D herein.

C.   The Corporate Named Defendants are ordered to make additional payments of equitable monetary relief, not to exceed $30 million in the aggregate, to the Settlement Fund as described below:

    1.   For any Corporate Asset other than a Priority Review Voucher, Corporate Named Defendants will:

        a)   Pay 20% of the total Net Proceeds from the sale, license, transfer, or other monetization of an asset that results from a transaction that is executed within 5 years after this Order is entered; and

        b)   Pay 20% of the total Net Proceeds from a transaction monetizing the remaining royalty stream related to Ketamine assets that is executed prior to entry of this Order or within 5 years after this Order is entered.

    Corporate Named Defendants must transfer monies related to transaction into the Settlement Fund within 30 days of its receipt; for example, in a transaction with an upfront payment and royalty stream, the Corporate Named Defendants would pay 20% of the net upfront payment within 30 days of receiving the upfront payments and would pay 20% of any additional royalties within 30 days of when the royalties are received by either Corporate Named Defendant,

    *Provided, however,* the Corporate Named Defendants shall not be required to make payments under this Paragraph V.C.1 after (a) their total payments to the Settlement Fund under this Paragraph V.C.1 equal $15 million, or (b) their total combined payments to the Settlement Fund under Paragraphs V.C.1 and V.C.2 equal $30 million.

    2.   For any Priority Review Voucher that is a Corporate Asset, the Corporate Named Defendants will pay 20% of the Net Proceeds received from the the sale, license, transfer or other monetization of the Priority Review Voucher that results from a transaction executed during the term of this Order,

    *Provided, however,* the Corporate Named Defendants shall not be required to make payments under this Paragraph V.C.2 after their total payments to the Settlement Fund under Paragraphs V.C.1 and V.C.2 equal $30 million.

    3.   No later than 30 days after any transaction for which the Corporate Named Defendants are required to make additional payments under this Paragraph V.C, the Corporate Named Defendants shall provide notice to the Designated State Representatives of the transaction.  The notice shall include a description of the transaction and its financial terms, contact information for each party to the transaction (including the name, phone number and email address of a representative of the party with knowledge of the transaction), and a copy of all agreements regarding the transaction.

D.   All money deposited in the Settlement Fund pursuant to this Section V shall be used for equitable relief, including consumer redress and other equitable relief that the Plaintiff States determine to be related to the Corporate Named Defendants' alleged violative practices and injury, any attendant expenses for the administration of such fund, and repayment of out-of-pocket expenses, and to satisfy the amount of any settlement reached

in the related case, *BCBSM, Inc. v. Vyera Pharmaceuticals, LLC, et al.,* No. 21-cv-01884-DLC (SDNY) (the "Class Action").  Any money remaining in the fund after such distributions shall be deposited by the Plaintiff States as disgorgement to be used consistently with their respective state laws.  Any interest earned on amounts deposited into the fund will remain in the fund and become a part of the fund.

E.     Within 10 business days of entry of the Order, the Corporate Named Defendants shall submit their Taxpayer Identification Numbers (Employer Identification Numbers) to the Plaintiff States.

F.     The Corporate Named Defendants shall have no right to challenge any actions the Plaintiff States or their representatives may take pursuant to this Section V of this Order.

G.     In consideration for the settlement of this matter and Plaintiff States' agreement to receive equitable monetary relief over a period of 10 years, one or both Corporate Named Defendants, on behalf of themselves and their successors, and any subsidiaries, and affiliates controlled by them, whether private or publicly-traded, shall sign within 30 days of entry of this Order a collateral agreement (in the form contained in Appendix B or as otherwise agreed to by the Plaintiff States and the Corporate Named Defendants) to secure the contingent debt described in Paragraph V.C as follows: (1) the Corporate Named Defendants give and grant the Plaintiff States a secured interest in all of the assets that are Corporate Assets (other than as set forth in Appendix B and other than any right, title, or interest in any Priority Review Voucher) of the Corporate Named Defendants until the obligation in Paragraph V.C.1 has been fully satisfied or the prescribed period of time has expired; and (2) the Corporate Named Defendants give and grant the Plaintiff States a secured interest in the Priority Review Voucher that is a Corporate Asset until the obligations of Paragraph V.C.2 have been fully satisfied or the prescribed period of time has expired.  The Corporate Named Defendants shall promptly provide information requested by a Designated State Representative to facilitate the perfection or enforcement of the security interest granted under the collateral agreement. If Corporate Named Defendants file for bankruptcy protection, within this 10 year period, the Corporate Named Defendants shall not object to the Plaintiff States asserting the appropriate security interest as a Secured Creditor with the appropriate court.

**<u>Defendant Kevin Mulleady</u>**

H.     Judgment in the amount of two hundred and fifty thousand dollars ($250,000) is entered in favor of the Plaintiff States against Mulleady as equitable monetary relief in connection with a negotiated resolution of this action and not as part of any final adjudication of any issue of fact or law.  The judgment is suspended unless and until there is a final unappealable judgment of contempt against Mulleady (i.e., all parties have exhausted their rights to appeal the judgment of contempt or the time for all such appeals has lapsed).  A final unappealable judgment of contempt against Mulleady shall lift the suspension of the judgment and Mulleady shall be required to pay the judgment within 90 days of delivery of instructions by a Designated State Representative.  Neither party will contest the other party's right to appeal any order or judgment of contempt or other violation of this Order.

## VI. PRIOR NOTIFICATION REQUIREMENTS

### Corporate Defendants

A.      The Corporate Defendants shall not, directly or indirectly, through subsidiaries, partnerships, or otherwise, acquire from a Third Party:

    1.      Any Pharmaceutical Company;

    2.      Any rights or interest in any Pharmaceutical Company; or

    3.      Any exclusive rights to market, distribute, or sell any FDA-approved Drug Product;

without providing prior written notification to the Commission and each of the Designated State Representatives.

The prior notification required by this Section VI shall be given on the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended (hereinafter referred to as the "Notification"), and shall be prepared and transmitted in accordance with the requirements of that part, except that no filing fee will be required for any such Notification.  Notification shall be filed with the Secretary of the Commission at ElectronicFilings@ftc.gov, and copies provided to the Compliance Division of the Commission at bccompliance@ftc.gov, and each Designated State Representative.  Notification need not be made to the Department of Justice. Notification is required only of the Corporate Defendants and not of any other party to the transaction.  The Corporate Defendants shall provide Notification to the Commission and to each of the Designated State Representatives at least 30 days prior to consummating any such transaction (hereafter referred to as the "first waiting period"). If, within the first waiting period, representatives of the Commission make a written request for additional information or documentary material (within the meaning of 16 C.F.R. § 802.20), the Corporate Defendants shall not consummate the transaction until 30 days after substantially complying with such request.  Early termination of the waiting periods in this Paragraph VI.A may be requested by the Corporate Defendants and, where appropriate, granted by a letter from the Commission's Bureau of Competition,

*Provided, however,* that prior notification to the Commission shall not be required by this Order for a transaction for which notification is required to be made, and has been made, pursuant to Section 7A of the Clayton Act 15 U.S.C. § 18a; however, notification shall still be made to the Designated State Representatives, and

*Provided further,* that prior notification shall not be required by this Order for a transaction valued at less than $25 million, as adjusted annually on the anniversary of the date this Order is entered based on the yearly increase or decrease of the Producer Price Index for Pharmaceutical Preparation Manufacturing.

### Defendant Kevin Mulleady

B.      If Mulleady, directly or through any other Person, acquires more than 1% of Ownership Interest in a Pharmaceutical Company (other than indirectly through a mutual fund,

exchange-traded fund, or other diversified, investment vehicle that is not specifically focused on Pharmaceutical Companies), Mulleady shall provide written notification to the Commission and to each of the Designated State Representatives within 30 days of acquiring such interest,

*Provided, however,* Mulleady need not provide notice of his Ownership Interest in Phoenixus, Vyera, or Prospero as of the date this Order is entered.

As part of his notification, Mulleady shall describe, by number of shares and percentage of total ownership, based on the latest information available to shareholders from the issuer (which source Mulleady shall identify in the referenced notification), the size of his Ownership Interest in the relevant Pharmaceutical Company before the transaction, and the size of the Ownership Interest he acquired in the transaction.

C.     Mulleady shall not be employed by, consult with, or act as an officer or director for Phoenixus or Vyera pursuant to Paragraph II.C without providing 30 days' prior written notification to the Commission and each of the Designated State Representatives.  As part of his notification, Mulleady must identify and describe in detail his position and responsibilities, provide a copy of any employment or consulting agreement, identify and provide contact information for his immediate supervisor, and certify that he has provided a copy of the Order to his immediate supervisor.  If, in response to the notification required pursuant to this Paragraph VI.C, representatives of the Commission or the Plaintiff States make a written request for additional information or documentary material, Mulleady will not commence any such work for Phoenixus or Vyera until 30 days after substantially complying with the request.

D.     If Mulleady is employed by, consulting with, or acting as an officer or director of an Exempted Company, then the Exempted Company may not divest itself of control or authority to commercialize, market, sell, distribute, or price the PKAN Product without providing 30 days' advance written notice of the closing of any such transaction to the Commission and the Plaintiff States.  The written notification must identify the intended counterparty and value and date of the proposed transaction.  No filing fee shall be required for such notification.  If, in response to a notification required pursuant to this Paragraph VI.D, representatives of the Commission or the Plaintiff States make a written request for additional information or documentary material, the Exempted Company shall not consummate the transaction until 30 days after submitting such additional information or documentary material.  The Commission and Plaintiff States are collectively limited to a single such request for additional information.

## VII. COMPLIANCE REPORTING REQUIREMENTS

### All Settling Defendants

A.     Each Settling Defendant shall submit to the Commission and to each of the Designated State Representatives verified written reports ("Compliance Reports") setting forth in detail the manner and form in which each Settling Defendant intends to comply, has complied, and is complying with this Order, in accordance with the following:

     1.    Each Settling Defendant shall submit an initial Compliance Report within 60 days of the entry of this Order;

     2.    On the first anniversary of the entry of this Order, and annually thereafter for 9 years on the anniversary date of the entry of this Order, each Settling Defendant shall submit an annual Compliance Report; and

     3.    Each Settling Defendant shall submit additional Compliance Reports as the Commission or its staff or a Designated State Representative may request.

B.    Each Compliance Report shall contain sufficient information and documentation to enable the Commission and the Plaintiff States to determine whether the Settling Defendants are in compliance with the Order.  Conclusory statements that the Settling Defendant has complied with its or his obligations under this Order are insufficient.

C.    The Corporate Defendants shall include in their Compliance Reports, among other information or documentation that may be necessary to demonstrate compliance with this Order:

     1.    A full description of the measures the Corporate Defendants have implemented or plans to implement to ensure that they have complied, are complying, or will comply with each paragraph of this Order;

     2.    A certified accounting of all proceeds from the sale, license, transfer, or other monetization of any Corporate Asset (other than an asset related to a Priority Review Voucher) and the monetization of the remaining royalty stream related to Ketamine; and

     3.    A certified accounting of all proceeds from the sale, license, transfer, or other monetization of any Priority Review Voucher.

D.    Mulleady shall include in his Compliance Reports, among other information or documentation that may be necessary to demonstrate compliance with this Order:

     1.    A full description of the measures he has implemented or plans to implement to ensure that he has complied, is complying, or will comply with each paragraph of this Order, and

     2.    Information that identifies and describes all ballots cast by him, directly or indirectly, in the exercise of his voting interest in any Pharmaceutical Company. Upon request by the Commission or a Designated State Representative, Mulleady shall provide copies of such ballots.

E.    Each Settling Defendant shall retain all material written communications with each party identified in its or his Compliance Report and all internal memoranda, reports, and recommendations concerning fulfilling its or his obligations under this Order, and shall provide non-privileged copies of these documents to Commission staff and the Designated State Representatives upon request.

F.    Each Settling Defendant shall submit its or his Compliance Report to the Commission and the Plaintiff States by submitting the report electronically to the Secretary of the Commission at ElectronicFilings@ftc.gov, to the Compliance Division of the Commission at bccompliance@ftc.gov, and to each Designated State Representative.

## VIII. CHANGE OF CORPORATE CONTROL

**Corporate Defendants**

A.   The Corporate Defendants shall notify the Commission and each Designated State Representative at least 30 days prior to:

    1.   The dissolution of a Corporate Named Defendant;

    2.   Any proposed acquisition, merger, or consolidation of a Corporate Named Defendant; or

    3.   Any other change in a Corporate Named Defendant, including assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of this Order.

**Defendant Kevin Mulleady**

B.   If Mulleady is employed by, consulting with, or acting as an officer or director of an Exempted Company, then Mulleady shall notify the Commission and each Designated State Representative at least 30 days prior to:

    1.   The dissolution of the Exempted Company;

    2.   The closing of any proposed acquisition, merger, or consolidation of the Exempted Company;

    3.   The closing of any proposed change of ownership, control, or authority of the PKAN Product; or

    4.   Any other change in the Exempted Company, including assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of this Order.

## IX. ACCESS TO INFORMATION

**All Settling Defendants**

For purposes of determining or securing compliance with this Order, subject to any legally recognized privilege, upon written request, and upon 10 business days' notice to a Corporate Defendant (made to its principal United States offices, registered office of its United States subsidiary, or its headquarters address), or to Mulleady (if Mulleady is employed at, consulting with, or acting as officer or director of an Exempted Company in accordance with Paragraph II.C), the notified Corporate Defendant or Mulleady shall, without restraint or interference, permit any duly authorized representative of the Commission or of a Designated State Representative:

A.   Access, during business office hours of the Corporate Defendant or the Exempted Company, and in the presence of counsel, to all facilities and access to inspect and copy all non-privileged books, ledgers, accounts, correspondence, memoranda, and all other

records and documents ("Books and Records") in the possession or under the control of that Corporate Defendant or Mulleady related to compliance with this Order, which copying services shall be provided by the Corporate Defendant or Mulleady at the request of the authorized representative(s) of the Commission or of a Designated State Representative and at the expense of the Corporate Defendant or Mulleady,

*Provided*, *however*, that if the Exempted Company does not have dedicated facilities of its own (including rented office space in a multipurpose building), Mulleady may make such Books and Records available at an alternative location within the Southern District of New York; and

B.   To interview officers, directors, or employees of the Corporate Defendant or the Exempted Company, who may have counsel present, regarding such matters.

## X. COOPERATION

**Corporate Defendants**

A.   In connection with litigation in this matter against Defendant Martin Shkreli, the Corporate Defendants shall:

1.   Agree not to object or move to quash service of process of trial subpoenas to Anne Kirby and Nicholas Pelliccione issued by the Commission or the Plaintiff States under Rule 45 of the Federal Rules of Civil Procedure; and agree to seek their authorization to accept service on their behalf; and

2.   Negotiate in good faith with the Commission and a Designated State Representative to provide a declaration, affidavit or, if necessary, a sponsoring witness to establish the authenticity and admissibility of any documents or data that the Corporate Defendants produce or have produced to the Commssion or the Plaintiff States.

**Defendant Kevin Mulleady**

B.   In connection with litigation in this matter against Defendant Martin Shkreli, Mulleady shall:

1.   Agree to service of process of a trial subpoena to Mulleady issued by the Commission or the Plaintiff States under Rule 45 of the Federal Rules of Civil Procedure; and

2.   Negotiate in good faith with the Commission and a Designated State Representative to provide a declaration, affidavit or, if necessary, act as a sponsoring witness to establish the authenticity and admissibility of any documents or data as to which he has personal knowledge or can provide evidence as to its reliability.

## XI. RETENTION OF JURISDICTION

This Court shall retain jurisdiction of this matter for the purposes of construction, modification, and enforcement of this Order.

## XII. EXPIRATION OF ORDER

This Order shall expire 10 years after the date it is entered.

## XIII. DISMISSAL AND COSTS

This action is hereby dismissed with prejudice as to the Settling Defendants. Each party to bear its own costs.

SO ORDERED this_____ day of _____, _____.

_____
The Honorable Denise Cote

SO STIPULATED AND AGREED:


Date: 12/6/21

_____
Markus H. Meier
Assistant Director
Health Care Division
Bureau of Competition
Federal Trade Commission
FOR PLAINTIFF FEDERAL TRADE COMMISSION




Date: _____

_____
Elinor R. Hoffmann
Chief
Antitrust Bureau
Office of the New York State Attorney General
FOR PLAINTIFF STATE OF NEW YORK




Date: _____

_____
Michael D. Battaglia
Deputy Attorney General
California Department of Justice
FOR PLAINTIFF STATE OF CALIFORNIA




Date: _____

_____
Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Illinois Attorney General
FOR PLAINTIFF STATE OF ILLINOIS

SO STIPULATED AND AGREED:


_____                    Date:  _____
Markus H. Meier
Assistant Director
Health Care Division
Bureau of Competition
Federal Trade Commission
FOR PLAINTIFF FEDERAL TRADE COMMISSION


_____                    Date:  12/4/2021
Elinor R. Hoffmann
Chief
Antitrust Bureau
Office of the New York State Attorney General
FOR PLAINTIFF STATE OF NEW YORK


_____                    Date:  _____
Michael D. Battaglia
Deputy Attorney General
California Department of Justice
FOR PLAINTIFF STATE OF CALIFORNIA


_____                    Date:  _____
Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Illinois Attorney General
FOR PLAINTIFF STATE OF ILLINOIS

SO STIPULATED AND AGREED:


_____          Date: _____
Markus H. Meier
Assistant Director
Health Care Division
Bureau of Competition
Federal Trade Commission
FOR PLAINTIFF FEDERAL TRADE COMMISSION



_____          Date: _____
Elinor R. Hoffmann
Chief
Antitrust Bureau
Office of the New York State Attorney General
FOR PLAINTIFF STATE OF NEW YORK



_____          Date: 12/5/2021
Michael D. Battaglia
Deputy Attorney General
California Department of Justice
FOR PLAINTIFF STATE OF CALIFORNIA



_____          Date: _____
Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Illinois Attorney General
FOR PLAINTIFF STATE OF ILLINOIS

20

# A-523

Case 22-728, Document 95, 12/22/2022, 3442416, Page231 of 302

SO STIPULATED AND AGREED:


_____                    Date: _____
Markus H. Meier
Assistant Director
Health Care Division
Bureau of Competition
Federal Trade Commission
FOR PLAINTIFF FEDERAL TRADE COMMISSION



_____                    Date: _____
Elinor R. Hoffmann
Chief
Antitrust Bureau
Office of the New York State Attorney General
FOR PLAINTIFF STATE OF NEW YORK



_____                    Date: _____
Michael D. Battaglia
Deputy Attorney General
California Department of Justice
FOR PLAINTIFF STATE OF CALIFORNIA



_____                    Date: 12/6/21
Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Illinois Attorney General
FOR PLAINTIFF STATE OF ILLINOIS

20

_____          Date: 12/5/2021
K. D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
FOR PLAINTIFF STATE OF NORTH CAROLINA

_____          Date: _____
Beth A. Finnerty
Assistant Chief
Antitrust Section
Office of the Ohio Attorney General
FOR PLAINTIFF STATE OF OHIO

_____          Date: _____
Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

_____          Date: _____
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

21

Date: _____

_____
K. D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
FOR PLAINTIFF STATE OF NORTH CAROLINA

Date: 12-6-21

_____
Beth A. Finnerty
Assistant Chief
Antitrust Section
Office of the Ohio Attorney General
FOR PLAINTIFF STATE OF OHIO

Date: _____

_____
Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

Date: _____

_____
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

21

_____          Date: _____
K. D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
FOR PLAINTIFF STATE OF NORTH CAROLINA

_____          Date: _____
Beth A. Finnerty
Assistant Chief
Antitrust Section
Office of the Ohio Attorney General
FOR PLAINTIFF STATE OF OHIO

_____          Date: 12/6/21
Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

_____          Date: _____
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

_____   Date: _____
K. D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
FOR PLAINTIFF STATE OF NORTH CAROLINA

_____   Date: _____
Beth A. Finnerty
Assistant Chief
Antitrust Section
Office of the Ohio Attorney General
FOR PLAINTIFF STATE OF OHIO

_____   Date: _____
Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

_____   Date: 12/6/2021
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

21

_____                          Date: _____
Averill Powers
Chief Executive Officer of Phoenixus AG and General Counsel of Vyera Pharmaceuticals, LLC
FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC


_____                          Date: _____
Steven A. Reed
Morgan, Lewis & Bockius LLP
COUNSEL FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC


_____                          Date: _____
Kevin Mulleady
FOR KEVIN MULLEADY


_____                          Date: _____
Marc E. Kasowitz
Albert Shemmy Mishaan
Kenneth R. David
Kasowitz Benson Torres LLP
COUNSEL FOR KEVIN MULLEADY

_____     Date: _____
Averill Powers
Chief Executive Officer of Phoenixus AG and General Counsel of Vyera Pharmaceuticals, LLC
FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC


_____     Date: 12/4/21
Steven A. Reed
Morgan, Lewis & Bockius LLP
COUNSEL FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC


_____     Date: _____
Kevin Mulleady
FOR KEVIN MULLEADY


_____     Date: _____
Marc E. Kasowitz
Albert Shemmy Mishaan
Kenneth R. David
Kasowitz Benson Torres LLP
COUNSEL FOR KEVIN MULLEADY

_____          Date: _____
Averill Powers
Chief Executive Officer of Phoenixus AG and General Counsel of Vyera Pharmaceuticals, LLC
FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC


_____          Date: _____
Steven A. Reed
Morgan, Lewis & Bockius LLP
COUNSEL FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC


_____          Date:   12/5/21
Kevin Mulleady
FOR KEVIN MULLEADY

_____          Date:  12/5/21
Marc E. Kasowitz
Albert Shemmy Mishaan
Kenneth R. David
Kasowitz Benson Torres LLP
COUNSEL FOR KEVIN MULLEADY

22

APPENDIX A
NOTICE TO AFFECTED PERSONS

**Vyera/Phoenixus letterhead]**

**[Name and address of recipient]**

Dear **[Name of recipient**]:

This letter concerns an Order for Permanent Injunction and Equitable Monetary Relief ("the Order") entered against Vyera Pharmaceuticals, LLC, and Phoenixus AG in Federal Trade Commission, et al. v. Vyera Pharmaceuticals, LLC, et al. Case No. 1:20-cv-00706-DLC.  A copy of the Order is attached to this letter.  Please read the Order carefully.  **To the extent anything in this letter differs from the terms in the Order, the Order supersedes this letter.  Further, capitalized terms in this letter have the same meaning as those terms do in the Order.**

The Order bars Vyera and Phoenixus from taking certain actions that can impede the development, manufacture, sale, or marketing of competing Drug Products.  Among other things, and subject to certain enumerated exceptions, the Order prohibits and renders unenforceable any agreements where Vyera and Phoenixus interfere with any of the following: (1) providing a Drug Product to a Pharmaceutical Company for the Development of a Therapeutic Equivalent or Biosimilar of that Drug Product; (2) providing any API to a Pharmaceutical Company; and (3) providing data related to sales or distribution of a Drug Product to a data aggregator.

If you have concerns about whether Vyera or Phoenixus is complying with its obligations under the Order, you may contact us at **[contact information for Vyera and Phoenixus].**  You may also contact the Federal Trade Commission at bccompliance@ftc.gov or the State Plaintiffs at **[contact information for State Plaintiffs].**

Sincerely,

[name and title]

**APPENDIX B**
**COLLATERAL ASSIGNMENT AND SECURITY AGREEMENT**

This Collateral Assignment and Security Agreement ("Agreement") is made by the states or commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia (collectively "Secured Parties") and Phoenixus AG, Vyera Pharmaceuticals, LLC , successors, and assigns (collectively "Grantors") on the effective date of _____, 2021.

### PRELIMINARY STATEMENT

WHEREAS, the Grantors,  have entered into a settlement agreement with Secured Parties to resolve all claims against the Grantors entitled *Federal Trade Commission, et al. v. Vyera Pharmaceuticals, LLC, et al.,* Case No. 20-cv-00706 pending in the Federal Court of the Southern District of New York (the "Action"), the terms of which are set forth in the Stipulated Order for Permanent Injunction and Equitable Monetary Relief dated _____, 2021 in the Action ("Stipulated Order").

WHEREAS, the Grantors have agreed to make certain contingent payments in an aggregate amount not to exceed $30 million over a period of up to 10 years based on sales of certain assets of the Grantors, as set forth in the Stipulated Order and as further described herein; and

WHEREAS, subject to the terms set forth in this Agreement, the Grantors have agreed to grant a security interest in the Collateral (as defined below) to the Secured Parties, as security for the Secured Obligations (as defined below);

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt of which are hereby acknowledged, the parties hereto agree as follows:

### DEFINITIONS

1. **Terms Defined in Agreement**. All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Agreement.

2. **Terms Defined in New York UCC**. Terms defined in the New York UCC which are not otherwise defined in this Security Agreement are used herein as defined in the New York UCC.

3. **Definitions of Certain Terms Used Herein**. As used in this Agreement, in addition to the terms defined in the Preliminary Statement, the following terms shall have the following meanings:

"**Collateral**" means any and all Corporate Assets of Phoenixus AG and Vyera Pharmaceuticals, LLC, in which a security interest may be created under Article 9 of the New

B-1

York UCC, including but not limited to Priority Review Vouchers and any Corporate Asset not related to a Priority Review Voucher, in which the Grantors now have, or hereafter acquire any right or interest in, as well as any monetized royalty stream owed to Phoenixus related to any Corporate Assets regarding the treatment of intranasal racemic ketamine, even if such transactions was entered prior to the entry of this Agreement.  Collateral shall expressly exclude (a) any inventory, goods or products, including without limitation, any active pharmaceutical ingredients, raw materials or finished product sold or produced in the ordinary course of business, (b)  any unissued shares of equity interests, capital stock, partnership interest, membership or limited liability company interest or similar equity right  in one or both of the Corporate Named Defendants (as defined in the Stipulated Order) or any other Grantor or any successor, joint venture, subsidiary, partnership, division, group, or affiliate controlled by any of them, (c) any property to the extent that such grant is prohibited by any requirement of law of a governmental authority or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property, except to the extent that such requirement of law or the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under Section 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law or principles of equity; provided, however, that such security interest shall attach immediately at such time as such requirement of law is not effective or applicable, or such prohibition, breach, default or termination is no longer applicable or is waived or any required consent has been obtained, and to the extent severable, shall attach immediately to any portion of the Collateral that does not result in such consequences; or (d) United States intent-to-use trademark or service mark application to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark or service mark application under Federal United States  law; provided, however, after such period, each Grantor acknowledges that such interest in such trademark or service mark application shall be subject to a security interest in favor of the Secured Parties shall be included in the Collateral, or (e) leasehold interests in real property, or (f) motor vehicles and assets subject to certificates of title,  or (g) other assets to the extent the costs or burden of obtaining or perfecting a security interest therein is excessive in relation to the benefit of the collateral security provided to the Secured Parties, as reasonably determined by the Collateral Agent in consultation with the Grantors.

**"Corporate Asset"** has the meaning assigned to such term in the Stipulated Order.

**"Event of Default"** means that Grantors have:

a.    Failed to make payments in accordance with the requirements of Paragraph V.C of the Stipulated Order unless promptly cured; or

    b.    Commenced a case, proceeding or other action seeking to adjudicate it as bankrupt or insolvent or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts.

"**New York UCC**" means the New York Uniform Commercial Code as in effect in the State of New York as of the date of this Agreement.

"**Secured Parties**" Means the states or commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia.

## GRANT OF SECURITY INTEREST

1.   **Grantors' Pledge**. The Grantors hereby pledge, assign, and grant to Secured Parties, a security interest in all of such Grantors' rights title and interest, whether now owned or hereinafter acquired, in and to the Collateral to secure the prompt and complete payments and performance of the Secured Obligations. The Grantors agree to promptly file such documents and to enter into any such agreements in order to perfect the Secured Parties security interest in the Collateral which may not be considered located in the United States. The Grantors shall take any other actions reasonably requested by the Secured Parties from time to time to cause the attachment and perfection of, and the ability of the Secured Party to enforce, the security interest of the Secured Party in any and all of the Collateral.

## REPRESENTATIONS AND WARRANTIES

Grantors represent and warrant that:

1.   **Authority to Act**. The execution, delivery and performance of this Agreement are within its corporate or other organizational powers have been duly authorized by all required organizational action and do not and will not contravene its charter or other organizational documents or any law or any agreement or undertaking to which it is a party or by which it may in any way be bound..

2.   **Title, Validity and Enforceability**. The Grantors are the rightful legal owners of the Collateral, and have good and valid rights in or the power to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all liens. No other creditor has the right to ownership of the Collateral that may interfere with the Secured Parties' ability to take and profit from the sale of said assets in the event that the above-listed contingent equitable monetary relief is not paid.

3.      **Change of Office**. The Grantors shall not change their chief executive office or mailing addresses or organizational identification number unless the Secured Parties shall have received not less than 30 days' prior written notice from Grantors of such proposed change, which notice shall set forth such information with respect thereto as the Secured Parties may require.

4.      **Change of Name**. The Grantors shall not change their names unless each of the following conditions is satisfied: (i) the Secured Parties shall have received not less than 30 days prior written notice from the Grantors of such proposed change in  their names, which shall accurately set forth the proposed new name; and (ii) the Secured Parties shall receive a certified copy of the amendment to the charter documents providing for the name change as soon as it is available.

5.      **Change of Structure.** The Grantors shall not change their type of organization, jurisdiction of organization or other legal structure unless each of the following conditions is satisfied: (i) the Secured Parties shall have received not less than 30 days prior written notice from the Grantors of such proposed change in it their names, which shall accurately set forth the proposed new name; and (ii) the Secured Parties shall receive a certified copy of the amendment to the charter documents providing for the change of structure as soon as it is available.

## EVENT OF DEFAULT/REMEDIES

**Grantors' Obligations upon the Event of Default**., Upon the occurrence of an Event of Default, the Secured Parties shall have the right to exercise all rights and remedies available to them under applicable law.

## GOVERNING LAW

1.      **Governing Law**. This Agreement shall be construed in accordance with and governed by the law of the State of New York.

2.      **Submission to Jurisdiction**. The Grantors hereby irrevocably and unconditionally submit, for their selves and their property, to the nonexclusive jurisdiction of the United States District Court of the Southern District of New York, , and any appellate court from any appeal thereof, in any action or proceeding arising out of or related to this Agreement, or for recognition or enforcement of any judgment, and the Grantors, hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard and determined in such Federal Court. The Grantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

3.      **Waiver of Inconvenient Forum**. The Grantors hereby irrevocably and unconditionally waive, to the fullest extent they may legally and effectively do so, any objection

which they may now or hereinafter have to the laying of venue of any suit, action or proceeding to enforce this Agreement in any court referred to in Paragraph 2 above.

4. **Waiver of Jury Trial**. The Grantors hereby irrevocable and unconditionally waive, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement.

## GENERAL

1. **Successors and Assigns**. This Agreement shall be binding upon Grantors and each of their successors and assigns and inure to the benefit of and be enforceable by Secured Parties, for the purpose of protecting the Secured Parties' interest in the satisfaction of the Grantors' obligation to make certain payments to the Settlement Fund as set forth in Paragraph V.C of the Stipulated Order.

2. **Amendments.** Neither this Agreement nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement signed by the Secured Parties and the Grantors. The Secured Parties shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of their respective rights, power and/or remedies unless such waiver shall be in writing and signed by all Secured Parties. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Secured Party of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which the Secured Party would otherwise have on any future occasion, whether similar in kind or otherwise.

3. **Survivability**. If any provisions of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

4. **Signatures**. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall have the same force and counterpart of any such agreement by facsimile or other electronic method of transmission shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of this Agreement.

5. **Collateral Agent.** Each Secured Party, on behalf of itself [and any of its affiliates] hereby irrevocably appoints [_____] (in such capacity, the "Collateral Agent") to serve as collateral agent under this Agreement and with respect to the liens, encumbrances, pledges and security interests granted hereunder, for the purpose of

protecting the Secured Parties' interest in the satisfaction of the Grantors' obligation to make certain payments to the Settlement Fund as set forth in Paragraph V.C of the Stipulated Order.  Each Secured Party authorizes the Collateral Agent to take such actions as agent on its behalf and the Secured Parties and to exercise all powers under this Agreement related to the administration, validity, perfection and enforcement of the liens, encumbrances, pledges and security interests granted herein, including without limitation, the granting of any consent with respect to the Collateral and liens, encumbrances, pledges and security interests hereunder, and  to exercise such powers as are reasonably incidental thereto. In addition, to the extent required under the laws of any jurisdiction each Secured Party hereby grants to the Collateral Agent any required powers of attorney to execute and enforce this Agreement governed by the laws of such jurisdiction on such Secured Party's behalf.  Without limiting the foregoing, each Secured Party hereby authorizes the Collateral Agent to execute and deliver, and to perform its obligations under this Agreement and to exercise all rights, powers and remedies that the Collateral Agent may have under this Agreement. No Secured Party shall have any right individually to realize upon any of the Collateral, it being understood and agreed that all powers, rights and remedies under this Agreement may be exercised solely by the Collateral Agent on behalf of the Secured Parties in accordance with the terms thereof. In its capacity, the Collateral Agent is a "representative" of the Secured Parties within the meaning of the term "secured party" as defined in the New York UCC, as applicable. The Secured Parties irrevocably authorize the Collateral Agent, at its option and in its discretion, to subordinate any lien, encumbrance, pledge or security interest on any property granted to or held by the Collateral Agent under this Agreement. The Secured Parties hereby irrevocably authorize the Collateral Agent, at its option and in its sole discretion, to release any Liens granted to the Collateral Agent on any Collateral.

      6.    **Release.**

A. The Collateral, other than any right title and interest in any Priority Review Voucher (the "Non PRV Collateral") shall be automatically released from the liens, encumbrances and security interests in favor of the Secured Parties created hereby upon the earlier of  (i) the date the Grantors' aggregate payments to the Settlement Fund pursuant to Paragraph V.C.1. of the Stipulated Order equal $15 million (ii) the five  (5) year anniversary of the date the Stipulated Order is entered in the Action, or (iii) the date the Grantors' aggregate payments to the Settlement Fund pursuant to Paragraph V.C.1 and V.C.2 of the Stipulated Order equal $30 million. Concurrently with such release,  this Agreement shall terminate with respect to such Non PRV Collateral, and all obligations of each Grantor to the Secured Parties hereunder with respect to such Non PRV Collateral shall terminate, all without delivery of any instrument or performance of any act by any party. The Secured Parties shall promptly deliver such documents as such Grantor may reasonably request to evidence the termination of this Agreement and the related liens, encumbrances and security interest with respect to such Non PRV Collateral.

B. All Collateral constituting any Priority Review Voucher shall be automatically released from the liens, encumbrances and security interests in favor of the Secured Parties created hereby upon the earlier of (i) the date the Grantors' aggregate payments to

the Settlement Fund pursuant to Paragraphs V.C.1 and V.C.2 of the Stipulated Order equal $30 million or (ii) the ten (10) year anniversary of the date the Stipulated Order is entered in the Action. Concurrently with such release, this Agreement shall terminate, and all obligations of each Grantor to the Secured Parties hereunder shall terminate, all without delivery of any instrument or performance of any act by any party. The Secured Parties shall promptly deliver such documents as such Grantor may reasonably request to evidence such termination in full of the interests hereunder.

       7.    **Notices**

All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) business days after being deposited in the mail, postage prepaid, or, in the case of electronic mail notice, when received, addressed as follows in the case of the Grantors and each of the Secured Parties, or to such other address as may be hereafter notified by the respective parties hereto:

[Add notice information for each party below]

[_____]

[_____]

[Remainder of Page Intentionally Left Blank]

[Signature Pages to Follow]

IN WITNESS WHEREOF, the Grantors and Secured Parties have hereunto set their hands this _____ day of December, 2021.


_____          Date: _____
Elinor R. Hoffmann
Chief
Antitrust Bureau
Office of the New York State Attorney General
FOR PLAINTIFF STATE OF NEW YORK


_____          Date: _____
Michael D. Battaglia
Deputy Attorney General
California Department of Justice
FOR PLAINTIFF STATE OF CALIFORNIA


_____          Date: _____
Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Illinois Attorney General
FOR PLAINTIFF STATE OF ILLINOIS


_____          Date: _____
K. D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
FOR PLAINTIFF STATE OF NORTH CAROLINA


_____          Date: _____
Beth A. Finnerty
Assistant Chief
Antitrust Section
Office of the Ohio Attorney General
FOR PLAINTIFF STATE OF OHIO

_____                    Date: _____
Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA



_____                    Date: _____
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
FOR PLAINTIFF COMMONWEALTH OF VIRGINIA



_____                    Date: _____
Averill Powers
Chief Executive Officer of Phoenixus AG and General Counsel of Vyera Pharmaceuticals, LLC
FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC



_____                    Date: _____
Steven A. Reed
Morgan, Lewis & Bockius LLP
COUNSEL FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA<br><br>        Plaintiffs,<br><br>        v.<br><br>VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former officer of Vyera Pharmaceuticals, LLC and Phoenixus AG (formerly known as Turing Pharmaceuticals, LLC and Turing Pharmaceuticals, AG); and KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC,<br><br>        Defendants. | Case No.: 1:20-cv-00706-DLC<br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION AND EQUITABLE MONETARY RELIEF** |

Plaintiffs the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, and the states or commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia (collectively "Plaintiff States"), by and through their Attorneys General (collectively "Plaintiffs"), pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C § 26, Section 342 of the New York General Business Law, Section 63(12) of the New York Executive Law, Sections 16700 *et seq.*, 17200 *et seq.* of the California Business and Professions Code, Section 7 of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. §75-1 *et seq.*, Chapter 1331and Section 109.81 of the Ohio Revised Code, Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.* and Common Law Doctrine against Restraints of Trade proceeding under 71 P.S. § 732-204 (c) and the Virginia Antitrust Act, Virginia Code §59.1-9.1 *et seq.*, filed their Amended Complaint for Permanent Injunctive and Other Equitable Relief, against Defendants Vyera Pharmaceuticals, LLC, Phoenixus AG, Martin Shkreli, and Kevin Mulleady to remedy and prevent their alleged anticompetitive conduct and unfair methods of competition in or affecting commerce in violation

of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and state law. The Plaintiffs and Defendants Vyera Pharmaceuticals, LLC, Phoenixus AG, and Kevin Mulleady (collectively "Settling Defendants") have agreed to resolve this case through settlement, without trial or final adjudication of any issue of law or fact, and stipulate to entry of this Stipulated Order for Permanent Injunction and Equitable Monetary Relief ("Order") to resolve all matters against the Settling Defendants in dispute in this action.

## FINDINGS

1. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, as well as under the principles of supplemental jurisdiction codified in 28 U.S.C. § 1367(a).

2. This Court has personal jurisdiction over the Settling Defendants because each has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b) and with the state of New York pursuant to N.Y. CPLR §§ 301, 302.

3. Venue for this matter is proper in this Court under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), 15 U.S.C. § 22, and 15 U.S.C. § 1391(b) and (c).

4. The Amended Complaint alleges that the Settling Defendants engaged in anticompetitive conduct and unfair methods of competition in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and state law.

5. The Settling Defendants admit the facts necessary to establish the personal and subject matter jurisdiction of this Court in this matter.

6. The Settling Defendants deny the allegations and claims in the Amended Complaint and dispute that Plaintiffs are entitled to obtain relief.

7. The Settling Defendants waive any claim they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

8. Entry of this Order satisfies the requests for relief made by the Plaintiffs in their Amended Complaint and is in the public interest.

## STIPULATIONS

1. The Settling Defendants stipulate that venue for this matter is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c), and under Section 13(b) of the FTC Act, U.S.C. § 53(b).

2. The Settling Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

3. The Plaintiffs and the Settling Defendants have agreed that entry of this Order fully and finally resolves all claims and litigations between them arising from or based primarily on the allegations described in the Amended Complaint and precludes further litigation against Phoenixus, Vyera, and/or Mulleady, as defined herein, arising from or based primarily on the allegations except for purposes of enforcing or modifying this Order.

4. The Plaintiffs and Settling Defendants stipulate that they will each bear their own costs in this matter and shall not make any claims against the other for attorneys' fees or costs.

## ORDER

**IT IS HEREBY ORDERED:**

## I. DEFINITIONS

As used in this Order, the following definitions apply:

A. "Phoenixus" means Phoenixus AG, its directors, officers, employees, agents, attorneys, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Phoenixus AG, and the respective directors, officers, employees, agents, attorneys, representatives, successors, and assigns of each.

B. "Vyera" means Vyera Pharmaceuticals, LLC, its directors, officers, employees, agents, attorneys, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Vyera Pharmaceuticals, LLC, and the respective directors, officers, employees, agents, attorneys, representatives, successors, and assigns of each. Vyera Pharmaceuticals, LLC is a subsidiary of Phoenixus.

C. "Kevin Mulleady" or "Mulleady" means Defendant Kevin Mulleady, an individual defendant. Mulleady was Chairman of the Board of Directors of Phoenixus AG and Chief Executive Officer of Vyera Pharmaceuticals, LLC. Mulleady is also the Executive Chairman and Chief Executive Officer of Prospero Pharmaceuticals, LLC.

D. "Commission" means the United States Federal Trade Commission.

E. "Plaintiff States" mean the states or commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia.

F. "API" means any active pharmaceutical ingredient that is used in the manufacture of a Drug Product.

G. "Biosimilar" means any biologic Drug Product that is highly similar to, and has no clinically meaningful difference from, an existing FDA-approved biologic Drug Product or that otherwise meets the FDA's criteria for classification as a biosimilar.

3

H.  "Corporate Asset" means any asset of a Corporate Named Defendant or any successor, assign, joint venture, subsidiary, partnership, division, group, or affiliate controlled by a Corporate Named Defendant. Corporate Asset expressly excludes any inventory, goods or products that are sold or to be sold in the ordinary course of business, including without limitation, any APIs, raw materials, or finished product. Corporate Asset also expressly excludes any unissued shares of equity interests, capital stock, partnership interest, membership or limited liability company interest or similar equity right in one or both of the Corporate Named Defendants or any successor, assign, joint venture, subsidiary, partnership, division, group, or affiliate controlled by any of them.

I.  "Corporate Defendants" means Phoenixus and Vyera.

J.  "Corporate Named Defendants" means Phoenixus AG and Vyera Pharmaceuticals, LLC.

K.  "Customer or Supplier" means a counter-party to a distribution, wholesale, resale, API supply, or Drug Product purchase agreement with a Corporate Defendant.

L.  "Daraprim" means any Drug Product authorized for marketing or sale in the United States pursuant to FDA Authorization NDA 008578, and any supplements, amendments, or revisions to this NDA.

M.  "Designated State Representatives" mean the following named individuals or another representative identified by each respective Plaintiff State:

   1.  Elinor R. Hoffmann, Chief, Antitrust Bureau, Office of the New York State Attorney General, 28 Liberty Street, New York, NY 10005, elinor.hoffmann@ag.ny.gov;

   2.  Michael D. Battaglia, Deputy Attorney General, California Department of Justice, 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102, michael.battaglia@doj.ca.gov;

   3.  Richard S. Schultz, Assistant Attorney General, Antitrust Bureau, Office of the Illinois Attorney General, 100 West Randolph Street, Chicago, IL 60601, richard.schultz@ilag.gov;

   4.  K. D. Sturgis, Special Deputy Attorney General, North Carolina Department of Justice, 114 West Edenton Street, Raleigh, NC 27603, ksturgis@ncdoj.gov;

   5.  Beth A. Finnerty, Assistant Chief, Antitrust Section, Office of the Ohio Attorney General, 30 East Broad Street, 26th Floor, Columbus, OH 43215, Beth.Finnerty@ohioAGO.gov;

   6.  Joseph S. Betsko, Senior Deputy Attorney General, Pennsylvania Office of Attorney General, Strawberry Square, Harrisburg, PA 17120, jbetsko@attorneygeneral.gov; and

   7.  Tyler T. Henry, Assistant Attorney General, Office of the Attorney General of Virginia, 202 North Ninth Street, Richmond, VA 23219, thenry@oag.state.va.us.

N.  "Development" means all preclinical and clinical research and development activities related to a Drug Product, including discovery or identification of a new chemical entity, test method development, all studies for the safety or efficacy of a Drug Product, toxicology studies, bioequivalence and bioavailability studies, pharmaceutical

formulation, process development, manufacturing scale-up, development-stage manufacturing, quality assurance/quality control development, stability testing, statistical analysis and report writing, for the purpose of obtaining any and all FDA Authorizations necessary for the manufacture, use, storage, import, export, transport, promotion, marketing, labeling, distribution, and sale of a Drug Product, and regulatory affairs related to the foregoing.

O.    "Drug Product" means any product that is the subject of an FDA Authorization.

P.    "Exempted Company" means any Pharmaceutical Company owned or controlled by Mulleady (including Prospero) whose business is limited to a Therapeutic Equivalent of Thiola and/or the PKAN Product.

Q.    "FDA" means the United States Food and Drug Administration.

R.    "FDA Authorization" means any of the following applications:

1.    An application filed or to be filed with the FDA pursuant to 21 C.F.R. Part 314 *et seq.*, including "New Drug Application" ("NDA"), "Abbreviated New Drug Application" ("ANDA"), "Supplemental New Drug Application" ("SNDA"), or "Marketing Authorization Application" ("MAA"), and all supplements, amendments, and revisions thereto, any preparatory work, registration dossier, drafts and data necessary for the preparation thereof, and all correspondence between the holder and the FDA related thereto; or

2.    A "Biologic License Application" ("BLA") filed or to be filed with the FDA pursuant to 21 C.F.R. 601.2, *et seq.*, and Section 351 of the Public Health Service Act, and any NDA deemed to be a BLA by the FDA, and all supplements, amendments, revisions thereto, any preparatory work, drafts and data necessary for the preparation thereof, and all correspondence between the holder and the FDA related thereto.

S.    "GPO" means any group purchasing organization, an entity that negotiates prices of Drug Products on behalf of member healthcare providers, including hospitals, ambulatory care facilities, physician practices, nursing homes, and home health agencies.

T.    "Net Proceeds" means proceeds after deducting direct transaction costs paid to Third Parties (i.e., sales commissions, advisor fees, and other costs incurred solely due to the underlying transaction).

U.    "Ownership Interest" means any voting or non-voting stock, share capital, or equity in a Person (other than an individual). Ownership Interest shall not include any unexercised options or other unexercised instruments that are convertible into any voting or non-voting stock.

V.    "Person" means any individual, partnership, joint venture, firm, corporation, association, trust, unincorporated organization, or other business or government entity, and any subsidiaries, divisions, groups, or affiliates thereof.

W.    "Pharmaceutical Company" means any Person (other than an individual) that is engaged in the research, Development, manufacture, commercialization, or marketing of any Drug Product.

X.   "PKAN Product" means the chemical compound that, as of the date this Order is entered, Prospero is involved in the Development of as a potential treatment for pantothenate kinase-associated neurodegeneration ("PKAN").

Y.   "Priority Review Voucher" means a voucher issued by the FDA that entitles a Drug Product to receive expedited regulatory review.

Z.   "Prospero" means Prospero Pharmaceuticals, LLC, its directors, officers, employees, agents, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Prospero Pharmaceuticals, LLC, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

AA.   "Therapeutic Equivalent" means a Drug Product that is classified by the FDA as being therapeutically equivalent to another Drug Product because, among other criteria, both Drug Products contain identical amounts of an API in the identical dosage form and route of administration, meet compendial or other applicable standards of strength, quality, purity, and identity, and they are classified by the FDA as bioequivalent.

BB.   "Thiola" means the Drug Products authorized for marketing or sale in the United States pursuant to FDA Authorizations NDA 019569 or NDA 211843, and any supplements, amendments, or revisions to these NDAs.

CC.   "Third Party" means any Person that is not a Corporate Defendant or an entity under common management, direction, or control of a Corporate Defendant.

## II. PROHIBITED BUSINESS ACTIVITIES

**Corporate Defendants**

A.   The Corporate Defendants, directly or through any Person, are hereby restrained and enjoined from entering into or enforcing any contract, arrangement, mutual understanding, or agreement that prohibits, or in any manner interferes with or restricts the ability of:

1.   Any purchaser (including hospitals and pharmacies), reseller, wholesaler, or distributor of a Drug Product to provide that Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of that Drug Product by that Pharmaceutical Company,

*Provided, however,* this provision does not prohibit the Corporate Defendants from entering an agreement with a distributor that restricts that distributor to certain channels of sale so long as it permits the distributor to sell the Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of the Drug Product;

2.   Any manufacturer, seller, supplier, or distributor of an API to sell or provide that API to a Pharmaceutical Company,

*Provided, however*, this provision does not prohibit a Corporate Defendant from entering a contract to purchase all of its needs for a particular API from any Person so long as the contract does not require the Person to supply the API exclusively to the Corporate Defendant or restrict the Person's freedom to sell the API to any other Person, and

*Provided further,* if the Corporate Defendants have no other supply agreement for a particular API, this provision will not apply to any arrangement to obtain API from a Person who has not previously manufactured the API if the Corporate Defendants bear at least 50% of the direct costs of developing the API; or

3. Any distributor, wholesaler, pharmacy, or GPO of a Drug Product to sell or otherwise provide data related to the sales or distribution of any Drug Product, such as sales numbers and volume, or other sales variables such as ordering trends, to a Person engaged in the business of purchasing, aggregating, and selling sales and distribution data on Drug Products.

B. The Corporate Defendants shall not hire, appoint as an officer or director, or otherwise do business with Mulleady in any manner that violates Paragraph II.C of this Order and shall not hire, appoint as an officer or director, or otherwise do business with Defendant Martin Shkreli in any manner that violates any provision or restriction in an order issued by this Court.

### Defendant Kevin Mulleady

C. For a period ending 7 years after this Order is entered, Mulleady is hereby banned, restrained, and enjoined from, directly, or through any other Person:

1. Participating in the research, Development, manufacture, commercialization, distribution, marketing, importation, or sale of a Drug Product or API, including participating in the formulation, determination, or direction of any business decisions of any Pharmaceutical Company;

2. Exercising control over the activities, conduct, board, or management of any Pharmaceutical Company;

3. Serving as an officer or director of any Pharmaceutical Company;

4. Entering into any agreements, whether oral or written, concerning how to vote his shares in any Pharmaceutical Company; and

5. Calling an Extraordinary General Meeting at Phoenixus or Vyera either on his own or as part of a group doing so,

*Provided, however,* Mulleady may exercise all other rights to which he is entitled as a shareholder of an Exempted Company and/or any Pharmaceutical Company to the extent such shareholding is permitted by Paragraph II.D. Nothing in this Paragraph II.C shall preclude Mr. Mulleady from expressing his own views on his own behalf as a shareholder concerning the business of any such Pharmaceutical Company,

*Provided, further,* it is not a violation of this Paragraph II.C for Mulleady to be employed by, consult with, or act as an officer or director of Phoenixus or Vyera, and in so doing take the actions set forth in Paragraphs II.C.1 to 3, so long as:

    a)    Mulleady does not own or control any Ownership Interest in Phoenixus or Vyera, either directly or through any other Person, and

    b)    Mulleady provides prior notification to the Commission and the Plaintiff States of any proposed involvement in or engagement with Phoenixus or Vyera pursuant to Paragraph VI.C, and

*Provided, finally*, that it is not a violation of this Paragraph II.C for Mulleady to be employed by, consult with, or act as an officer or director of an Exempted Company and/or take the actions set forth in Paragraphs II.C.1 to 4 at an Exempted Company, so long as:

    a)    The Exempted Company's business is limited to (i) a Therapeutic Equivalent of Thiola and/or (ii) the PKAN Product, and the Exempted Company does not have an interest or role in, and is not engaged in any activities related to, any other Drug Product;

    b)    The Exempted Company's financial interest in any Therapeutic Equivalent of Thiola is limited to a passive royalty right;

    c)    The Exempted Company does not have any authority, control, or other role in, or engage in any activities related to, the commercialization, marketing, sales, distribution, or pricing of any Therapeutic Equivalent of Thiola;

    d)    Prior to the filing of an FDA Authorization, the Exempted Company fully divests itself of any control or authority to commercialize, market, sell, distribute, or price any PKAN Product; and

    e)    Mulleady complies with the prior notification provisions set forth in Paragraphs VI.D and VIII.B.

D.    Mulleady is hereby restrained and enjoined from acquiring, holding, or voting more than 8% of the Ownership Interest (based on the latest information available to shareholders from the issuer) in any Pharmaceutical Company (other than an Exempted Company), either directly or through any other Person,

*Provided, however,* it shall not be a violation of this Paragraph II.D if Mulleady passively obtains more than 8% of the Ownership Interest in a Pharmaceutical Company through means other than exercising options or otherwise purchasing the Ownership Interest so long as Mulleady (i) reduces his Ownership Interest in such Pharmaceutical Company to 8% or lower within 10 months, and (ii) in the interim only votes up to 8% of the Ownership Interest in the Pharmaceutical Company,

*Provided, further,* this Paragraph II.D does not permit Mulleady to acquire, hold, or vote any Ownership Interest in Phoenixus or Vyera while Mulleady is employed by, consulting with, or acting as officer or director for Phoenixus or Vyera, and

*Provided, finally,* Mulleady may exercise the rights to which he is entitled as a shareholder of a Pharmaceutical Company (other than those prohibited by Paragraphs II.C.4 and 5) so long as his Ownership Interest in such company does not exceed the limits in this Paragraph II.D.

E.   If Phoenixus or Vyera is found in violation of Section II of this Order, it shall be presumed that Mulleady has also violated the terms of this Order, but only if he is employed by, consulting with, or acting as officer or director for Phoenixus or Vyera at the time the violation occurs. Mulleady may rebut this presumption by proving to the Court by a preponderance of the evidence that he did not have any knowledge of, involvement in, or in any manner facilitate, the violation of this Order.

F.   Mulleady, any Exempted Company, and any other company Mulleady controls, is restrained and enjoined from proposing, negotiating, reviewing, entering into, being a party to, or enforcing, either directly or through any other Person, any contract, arrangement, mutual understanding, or agreement that prohibits, or in any manner interferes with or restricts the ability of:

1.   Any purchaser (including hospitals and pharmacies), reseller, wholesaler, or distributor of a Drug Product to provide that Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of that Drug Product by that Pharmaceutical Company,

*Provided, however,* this provision does not prohibit Mulleady, any Exempted Company, or any other company Mulleady controls from entering an agreement with a distributor that restricts that distributor to certain channels of sale so long as it permits the distributor to sell the Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of the Drug Product;

2.   Any manufacturer, seller, supplier, or distributor of any API to provide that API to a Pharmaceutical Company,

*Provided, however,* this provision does not prohibit Mulleady, any Exempted Company, or any other company Mulleady controls from entering a contract to purchase all of its needs for a particular API from any Person so long as the contract does not require the Person to supply the API exclusively to the company or restrict the Person's freedom to sell the API to any other Person, and

*Provided further,* if Mulleady, any Exempted Company, or any other company Mulleady controls has no other supply agreement for the particular API, this provision will not apply to any arrangement to obtain API from a Person who has not previously manufactured the API if Mulleady, the Exempted Company, or any company he owns or controls bears at least 50% of the direct costs of developing the API; or

3.   Any distributor, wholesaler, pharmacy, or GPO of a Drug Product to sell or otherwise provide data related to the sales or distribution of any Drug Product, such as sales numbers and volume, or other sales variables such as ordering

trends, to a Person engaged in the business of purchasing, aggregating, and selling sales and distribution data on Drug Products.

## III. NOTIFICATIONS TO AFFECTED PERSONS

**Corporate Defendants**

The Corporate Defendants shall provide, within 21 days of the entry of this Order, written notification in the form of Appendix A to this Order to all their Customers and Suppliers, and going forward shall provide such notification to any Customer or Supplier to whom the Corporate Defendants have not previously provided notification under this Section III,

*Provided, however,* the Corporate Defendants need not provide notice to Customers entering into an agreement to purchase generic prescription drugs so long as the agreement does not also include branded prescription drugs or an API.

## IV. SUPPLY OF DRUG PRODUCTS

**Corporate Defendants**

A.     So long as a Corporate Defendant markets a Drug Product, they shall, at the request of a Pharmaceutical Company, sell the Drug Product to that Pharmaceutical Company for use in Development of a Therapeutic Equivalent or Biosimilar of the Drug Product in accordance with the following:

   1.     The quantity sold shall be at least as much as the Pharmaceutical Company, in its reasonable judgment, needs to conduct its Development of a Therapeutic Equivalent or Biosimilar of the Drug Product;

   2.     The Drug Product is delivered no later than 30 days after the Corporate Defendant receives a purchase order; and

   3.     The Corporate Defendants shall charge the Pharmaceutical Company a price that is no greater than the wholesale acquisition cost of the Drug Product.

B.     The Corporate Defendants shall continue to market and sell Daraprim until the earliest to occur of the following:

   1.     At least three Pharmaceutical Companies that are Third Parties have obtained FDA Authorization to market and sell a Therapeutic Equivalent of Daraprim and each has made at least one commercial sale of the Therapeutic Equivalent;

   2.     At least two Pharmaceutical Companies that are Third Parties have obtained FDA Authorization to market and sell a Therapeutic Equivalent of Daraprim and each of these Pharmaceutical Companies has made uninterrupted commercial sales of the Therapeutic Equivalent for a period of at least 9 months;

   3.     The Corporate Defendants exhaust their supply of pyrimethamine API, the API is no longer available, or the API is only available at a cost or in quantities that

10

make it unprofitable to continue marketing and selling Daraprim, and the Corporate Defendants notify the Commission and the Designated State Representatives of their inability to secure a supply of pyrimethamine and the reasons therefore;

4. An independent auditor, selected by the Corporate Defendants and approved by the Plaintiffs, verifies that the operating expenses (including variable and fixed costs) for Daraprim exceeded net revenues generated through the sale of Daraprim for at least two consecutive quarters;

5. The Corporate Defendants lose FDA Authorization to continue marketing Daraprim;

6. Three years after this Order is entered; or

7. The Corporate Defendants (a) notify the Commission and the Plaintiff States of their intent to discontinue marketing Daraprim; (b) sell their Daraprim business to an acquirer ("Acquirer") and in a manner that is acceptable to the Commission and the Plaintiff States; (c) maintain the viability, marketability, and competitiveness of the Daraprim business until the sale of the Daraprim business is completed; and (d) provide the Acquirer with the assistance and information necessary to enable the Acquirer to obtain the necessary approvals to manufacture, market, and sell Daraprim in commercial quantities, and to supply the Acquirer with sufficient quantities of Daraprim to meet the Acquirer's commercial needs until the Acquirer is independently able to manufacture and market commercial quantities of Daraprim.

C. The Corporate Defendants shall provide notifications required under this Section IV to the Commission and the Plaintiff States by sending electronic copies to the Secretary of the Commission at ElectronicFilings@ftc.gov and to the Compliance Division at bccompliance@ftc.gov, and by sending electronic copies to each Designated State Representative.

## V. EQUITABLE MONETARY RELIEF

### Corporate Named Defendants

A. The Corporate Named Defendants shall pay up to $40 million to the Settlement Fund (defined below), comprised of a guaranteed payment of $10 million, and contingent payments of up to $30 million pursuant to Paragraph V.C.

B. The Corporate Named Defendants shall pay $10 million as equitable monetary relief, which shall be used for a settlement fund in accordance with the terms of this Order ("Settlement Fund"). The Corporate Named Defendants will make this payment within 30 business days of the entry of this Order by electronic fund transfer into the Settlement Fund in accordance with instructions provided by the Plaintiff States. The money deposited into the Settlement Fund shall be held in escrow and distributed in the manner prescribed in Paragraph V.D herein.

C.  The Corporate Named Defendants are ordered to make additional payments of equitable monetary relief, not to exceed $30 million in the aggregate, to the Settlement Fund as described below:

    1.  For any Corporate Asset other than a Priority Review Voucher, Corporate Named Defendants will:

        a)  Pay 20% of the total Net Proceeds from the sale, license, transfer, or other monetization of an asset that results from a transaction that is executed within 5 years after this Order is entered; and

        b)  Pay 20% of the total Net Proceeds from a transaction monetizing the remaining royalty stream related to Ketamine assets that is executed prior to entry of this Order or within 5 years after this Order is entered.

    Corporate Named Defendants must transfer monies related to transaction into the Settlement Fund within 30 days of its receipt; for example, in a transaction with an upfront payment and royalty stream, the Corporate Named Defendants would pay 20% of the net upfront payment within 30 days of receiving the upfront payments and would pay 20% of any additional royalties within 30 days of when the royalties are received by either Corporate Named Defendant,

    *Provided, however,* the Corporate Named Defendants shall not be required to make payments under this Paragraph V.C.1 after (a) their total payments to the Settlement Fund under this Paragraph V.C.1 equal $15 million, or (b) their total combined payments to the Settlement Fund under Paragraphs V.C.1 and V.C.2 equal $30 million.

    2.  For any Priority Review Voucher that is a Corporate Asset, the Corporate Named Defendants will pay 20% of the Net Proceeds received from the the sale, license, transfer or other monetization of the Priority Review Voucher that results from a transaction executed during the term of this Order,

    *Provided, however,* the Corporate Named Defendants shall not be required to make payments under this Paragraph V.C.2 after their total payments to the Settlement Fund under Paragraphs V.C.1 and V.C.2 equal $30 million.

    3.  No later than 30 days after any transaction for which the Corporate Named Defendants are required to make additional payments under this Paragraph V.C, the Corporate Named Defendants shall provide notice to the Designated State Representatives of the transaction.  The notice shall include a description of the transaction and its financial terms, contact information for each party to the transaction (including the name, phone number and email address of a representative of the party with knowledge of the transaction), and a copy of all agreements regarding the transaction.

D.  All money deposited in the Settlement Fund pursuant to this Section V shall be used for equitable relief, including consumer redress and other equitable relief that the Plaintiff States determine to be related to the Corporate Named Defendants' alleged violative practices and injury, any attendant expenses for the administration of such fund, and repayment of out-of-pocket expenses, and to satisfy the amount of any settlement reached

in the related case, *BCBSM, Inc. v. Vyera Pharmaceuticals, LLC, et al.,* No. 21-cv-01884-DLC (SDNY) (the "Class Action"). Any money remaining in the fund after such distributions shall be deposited by the Plaintiff States as disgorgement to be used consistently with their respective state laws. Any interest earned on amounts deposited into the fund will remain in the fund and become a part of the fund.

E. Within 10 business days of entry of the Order, the Corporate Named Defendants shall submit their Taxpayer Identification Numbers (Employer Identification Numbers) to the Plaintiff States.

F. The Corporate Named Defendants shall have no right to challenge any actions the Plaintiff States or their representatives may take pursuant to this Section V of this Order.

G. In consideration for the settlement of this matter and Plaintiff States' agreement to receive equitable monetary relief over a period of 10 years, one or both Corporate Named Defendants, on behalf of themselves and their successors, and any subsidiaries, and affiliates controlled by them, whether private or publicly-traded, shall sign within 30 days of entry of this Order a collateral agreement (in the form contained in Appendix B or as otherwise agreed to by the Plaintiff States and the Corporate Named Defendants) to secure the contingent debt described in Paragraph V.C as follows: (1) the Corporate Named Defendants give and grant the Plaintiff States a secured interest in all of the assets that are Corporate Assets (other than as set forth in Appendix B and other than any right, title, or interest in any Priority Review Voucher) of the Corporate Named Defendants until the obligation in Paragraph V.C.1 has been fully satisfied or the prescribed period of time has expired; and (2) the Corporate Named Defendants give and grant the Plaintiff States a secured interest in the Priority Review Voucher that is a Corporate Asset until the obligations of Paragraph V.C.2 have been fully satisfied or the prescribed period of time has expired. The Corporate Named Defendants shall promptly provide information requested by a Designated State Representative to facilitate the perfection or enforcement of the security interest granted under the collateral agreement. If Corporate Named Defendants file for bankruptcy protection, within this 10 year period, the Corporate Named Defendants shall not object to the Plaintiff States asserting the appropriate security interest as a Secured Creditor with the appropriate court.

**<ins>Defendant Kevin Mulleady</ins>**

H. Judgment in the amount of two hundred and fifty thousand dollars ($250,000) is entered in favor of the Plaintiff States against Mulleady as equitable monetary relief in connection with a negotiated resolution of this action and not as part of any final adjudication of any issue of fact or law. The judgment is suspended unless and until there is a final unappealable judgment of contempt against Mulleady (i.e., all parties have exhausted their rights to appeal the judgment of contempt or the time for all such appeals has lapsed). A final unappealable judgment of contempt against Mulleady shall lift the suspension of the judgment and Mulleady shall be required to pay the judgment within 90 days of delivery of instructions by a Designated State Representative. Neither party will contest the other party's right to appeal any order or judgment of contempt or other violation of this Order.

## VI. PRIOR NOTIFICATION REQUIREMENTS

**Corporate Defendants**

A.  The Corporate Defendants shall not, directly or indirectly, through subsidiaries, partnerships, or otherwise, acquire from a Third Party:

1.  Any Pharmaceutical Company;

2.  Any rights or interest in any Pharmaceutical Company; or

3.  Any exclusive rights to market, distribute, or sell any FDA-approved Drug Product;

without providing prior written notification to the Commission and each of the Designated State Representatives.

The prior notification required by this Section VI shall be given on the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended (hereinafter referred to as the "Notification"), and shall be prepared and transmitted in accordance with the requirements of that part, except that no filing fee will be required for any such Notification. Notification shall be filed with the Secretary of the Commission at ElectronicFilings@ftc.gov, and copies provided to the Compliance Division of the Commission at bccompliance@ftc.gov, and each Designated State Representative. Notification need not be made to the Department of Justice. Notification is required only of the Corporate Defendants and not of any other party to the transaction. The Corporate Defendants shall provide Notification to the Commission and to each of the Designated State Representatives at least 30 days prior to consummating any such transaction (hereafter referred to as the "first waiting period"). If, within the first waiting period, representatives of the Commission make a written request for additional information or documentary material (within the meaning of 16 C.F.R. § 802.20), the Corporate Defendants shall not consummate the transaction until 30 days after substantially complying with such request. Early termination of the waiting periods in this Paragraph VI.A may be requested by the Corporate Defendants and, where appropriate, granted by a letter from the Commission's Bureau of Competition,

*Provided, however,* that prior notification to the Commission shall not be required by this Order for a transaction for which notification is required to be made, and has been made, pursuant to Section 7A of the Clayton Act 15 U.S.C. § 18a; however, notification shall still be made to the Designated State Representatives, and

*Provided further,* that prior notification shall not be required by this Order for a transaction valued at less than $25 million, as adjusted annually on the anniversary of the date this Order is entered based on the yearly increase or decrease of the Producer Price Index for Pharmaceutical Preparation Manufacturing.

**Defendant Kevin Mulleady**

B.  If Mulleady, directly or through any other Person, acquires more than 1% of Ownership Interest in a Pharmaceutical Company (other than indirectly through a mutual fund,

exchange-traded fund, or other diversified, investment vehicle that is not specifically focused on Pharmaceutical Companies), Mulleady shall provide written notification to the Commission and to each of the Designated State Representatives within 30 days of acquiring such interest,

*Provided, however,* Mulleady need not provide notice of his Ownership Interest in Phoenixus, Vyera, or Prospero as of the date this Order is entered.

As part of his notification, Mulleady shall describe, by number of shares and percentage of total ownership, based on the latest information available to shareholders from the issuer (which source Mulleady shall identify in the referenced notification), the size of his Ownership Interest in the relevant Pharmaceutical Company before the transaction, and the size of the Ownership Interest he acquired in the transaction.

C.  Mulleady shall not be employed by, consult with, or act as an officer or director for Phoenixus or Vyera pursuant to Paragraph II.C without providing 30 days' prior written notification to the Commission and each of the Designated State Representatives.  As part of his notification, Mulleady must identify and describe in detail his position and responsibilities, provide a copy of any employment or consulting agreement, identify and provide contact information for his immediate supervisor, and certify that he has provided a copy of the Order to his immediate supervisor.  If, in response to the notification required pursuant to this Paragraph VI.C, representatives of the Commission or the Plaintiff States make a written request for additional information or documentary material, Mulleady will not commence any such work for Phoenixus or Vyera until 30 days after substantially complying with the request.

D.  If Mulleady is employed by, consulting with, or acting as an officer or director of an Exempted Company, then the Exempted Company may not divest itself of control or authority to commercialize, market, sell, distribute, or price the PKAN Product without providing 30 days' advance written notice of the closing of any such transaction to the Commission and the Plaintiff States.  The written notification must identify the intended counterparty and value and date of the proposed transaction.  No filing fee shall be required for such notification.  If, in response to a notification required pursuant to this Paragraph VI.D, representatives of the Commission or the Plaintiff States make a written request for additional information or documentary material, the Exempted Company shall not consummate the transaction until 30 days after submitting such additional information or documentary material.  The Commission and Plaintiff States are collectively limited to a single such request for additional information.

## VII. COMPLIANCE REPORTING REQUIREMENTS

### All Settling Defendants

A.  Each Settling Defendant shall submit to the Commission and to each of the Designated State Representatives verified written reports ("Compliance Reports") setting forth in detail the manner and form in which each Settling Defendant intends to comply, has complied, and is complying with this Order, in accordance with the following:

       1.     Each Settling Defendant shall submit an initial Compliance Report within 60 days of the entry of this Order;

       2.     On the first anniversary of the entry of this Order, and annually thereafter for 9 years on the anniversary date of the entry of this Order, each Settling Defendant shall submit an annual Compliance Report; and

       3.     Each Settling Defendant shall submit additional Compliance Reports as the Commission or its staff or a Designated State Representative may request.

B.    Each Compliance Report shall contain sufficient information and documentation to enable the Commission and the Plaintiff States to determine whether the Settling Defendants are in compliance with the Order. Conclusory statements that the Settling Defendant has complied with its or his obligations under this Order are insufficient.

C.    The Corporate Defendants shall include in their Compliance Reports, among other information or documentation that may be necessary to demonstrate compliance with this Order:

       1.     A full description of the measures the Corporate Defendants have implemented or plans to implement to ensure that they have complied, are complying, or will comply with each paragraph of this Order;

       2.     A certified accounting of all proceeds from the sale, license, transfer, or other monetization of any Corporate Asset (other than an asset related to a Priority Review Voucher) and the monetization of the remaining royalty stream related to Ketamine; and

       3.     A certified accounting of all proceeds from the sale, license, transfer, or other monetization of any Priority Review Voucher.

D.    Mulleady shall include in his Compliance Reports, among other information or documentation that may be necessary to demonstrate compliance with this Order:

       1.     A full description of the measures he has implemented or plans to implement to ensure that he has complied, is complying, or will comply with each paragraph of this Order, and

       2.     Information that identifies and describes all ballots cast by him, directly or indirectly, in the exercise of his voting interest in any Pharmaceutical Company. Upon request by the Commission or a Designated State Representative, Mulleady shall provide copies of such ballots.

E.    Each Settling Defendant shall retain all material written communications with each party identified in its or his Compliance Report and all internal memoranda, reports, and recommendations concerning fulfilling its or his obligations under this Order, and shall provide non-privileged copies of these documents to Commission staff and the Designated State Representatives upon request.

F.    Each Settling Defendant shall submit its or his Compliance Report to the Commission and the Plaintiff States by submitting the report electronically to the Secretary of the Commission at ElectronicFilings@ftc.gov, to the Compliance Division of the Commission at bccompliance@ftc.gov, and to each Designated State Representative.

## VIII. CHANGE OF CORPORATE CONTROL

**Corporate Defendants**

A.    The Corporate Defendants shall notify the Commission and each Designated State Representative at least 30 days prior to:

1.    The dissolution of a Corporate Named Defendant;

2.    Any proposed acquisition, merger, or consolidation of a Corporate Named Defendant; or

3.    Any other change in a Corporate Named Defendant, including assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of this Order.

**Defendant Kevin Mulleady**

B.    If Mulleady is employed by, consulting with, or acting as an officer or director of an Exempted Company, then Mulleady shall notify the Commission and each Designated State Representative at least 30 days prior to:

1.    The dissolution of the Exempted Company;

2.    The closing of any proposed acquisition, merger, or consolidation of the Exempted Company;

3.    The closing of any proposed change of ownership, control, or authority of the PKAN Product; or

4.    Any other change in the Exempted Company, including assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of this Order.

## IX. ACCESS TO INFORMATION

**All Settling Defendants**

For purposes of determining or securing compliance with this Order, subject to any legally recognized privilege, upon written request, and upon 10 business days' notice to a Corporate Defendant (made to its principal United States offices, registered office of its United States subsidiary, or its headquarters address), or to Mulleady (if Mulleady is employed at, consulting with, or acting as officer or director of an Exempted Company in accordance with Paragraph II.C), the notified Corporate Defendant or Mulleady shall, without restraint or interference, permit any duly authorized representative of the Commission or of a Designated State Representative:

A.    Access, during business office hours of the Corporate Defendant or the Exempted Company, and in the presence of counsel, to all facilities and access to inspect and copy all non-privileged books, ledgers, accounts, correspondence, memoranda, and all other

records and documents ("Books and Records") in the possession or under the control of that Corporate Defendant or Mulleady related to compliance with this Order, which copying services shall be provided by the Corporate Defendant or Mulleady at the request of the authorized representative(s) of the Commission or of a Designated State Representative and at the expense of the Corporate Defendant or Mulleady,

*Provided, however*, that if the Exempted Company does not have dedicated facilities of its own (including rented office space in a multipurpose building), Mulleady may make such Books and Records available at an alternative location within the Southern District of New York; and

B.  To interview officers, directors, or employees of the Corporate Defendant or the Exempted Company, who may have counsel present, regarding such matters.

## X. COOPERATION

### Corporate Defendants

A.  In connection with litigation in this matter against Defendant Martin Shkreli, the Corporate Defendants shall:

1.  Agree not to object or move to quash service of process of trial subpoenas to Anne Kirby and Nicholas Pelliccione issued by the Commission or the Plaintiff States under Rule 45 of the Federal Rules of Civil Procedure; and agree to seek their authorization to accept service on their behalf; and

2.  Negotiate in good faith with the Commission and a Designated State Representative to provide a declaration, affidavit or, if necessary, a sponsoring witness to establish the authenticity and admissibility of any documents or data that the Corporate Defendants produce or have produced to the Commssion or the Plaintiff States.

### Defendant Kevin Mulleady

B.  In connection with litigation in this matter against Defendant Martin Shkreli, Mulleady shall:

1.  Agree to service of process of a trial subpoena to Mulleady issued by the Commission or the Plaintiff States under Rule 45 of the Federal Rules of Civil Procedure; and

2.  Negotiate in good faith with the Commission and a Designated State Representative to provide a declaration, affidavit or, if necessary, act as a sponsoring witness to establish the authenticity and admissibility of any documents or data as to which he has personal knowledge or can provide evidence as to its reliability.

Case 22-728, Document 95, 12/28/2022, 3442416, Page267 of 302

A-559

Case 1:20-cv-00706-DLC   Document 754   Filed 12/07/21   Page 19 of 40
Case 1:20-cv-00706-DLC   Document 753-1   Filed 12/07/21   Page 20 of 41

## XI. RETENTION OF JURISDICTION

This Court shall retain jurisdiction of this matter for the purposes of construction, modification, and enforcement of this Order.

## XII. EXPIRATION OF ORDER

This Order shall expire 10 years after the date it is entered.

## XIII. DISMISSAL AND COSTS

This action is hereby dismissed with prejudice as to the Settling Defendants. Each party to bear its own costs.

SO ORDERED this _____7th_____ day of ____December____, 2021.

_____
The Honorable Denise Cote

19

SO STIPULATED AND AGREED:


_Markus H. Meier_                                    Date: 12/6/21

Markus H. Meier
Assistant Director
Health Care Division
Bureau of Competition
Federal Trade Commission
FOR PLAINTIFF FEDERAL TRADE COMMISSION




Date: _____

Elinor R. Hoffmann
Chief
Antitrust Bureau
Office of the New York State Attorney General
FOR PLAINTIFF STATE OF NEW YORK




Date: _____

Michael D. Battaglia
Deputy Attorney General
California Department of Justice
FOR PLAINTIFF STATE OF CALIFORNIA




Date: _____

Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Illinois Attorney General
FOR PLAINTIFF STATE OF ILLINOIS

SO STIPULATED AND AGREED:


_____          Date: _____
Markus H. Meier
Assistant Director
Health Care Division
Bureau of Competition
Federal Trade Commission
FOR PLAINTIFF FEDERAL TRADE COMMISSION



_____          Date: 12/4/2021
Elinor R. Hoffmann
Chief
Antitrust Bureau
Office of the New York State Attorney General
FOR PLAINTIFF STATE OF NEW YORK



_____          Date: _____
Michael D. Battaglia
Deputy Attorney General
California Department of Justice
FOR PLAINTIFF STATE OF CALIFORNIA



_____          Date: _____
Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Illinois Attorney General
FOR PLAINTIFF STATE OF ILLINOIS

SO STIPULATED AND AGREED:


_____                    Date: _____

Markus H. Meier
Assistant Director
Health Care Division
Bureau of Competition
Federal Trade Commission
FOR PLAINTIFF FEDERAL TRADE COMMISSION


_____                    Date: _____

Elinor R. Hoffmann
Chief
Antitrust Bureau
Office of the New York State Attorney General
FOR PLAINTIFF STATE OF NEW YORK


*Michael Battaglia*                                         Date: 12/5/2021

Michael D. Battaglia
Deputy Attorney General
California Department of Justice
FOR PLAINTIFF STATE OF CALIFORNIA


_____                    Date: _____

Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Illinois Attorney General
FOR PLAINTIFF STATE OF ILLINOIS

Case 22-728, Document 95, 12/22/2022, 3442416, Page271 of 302

SO STIPULATED AND AGREED:

---

Date: _____

Markus H. Meier
Assistant Director
Health Care Division
Bureau of Competition
Federal Trade Commission
FOR PLAINTIFF FEDERAL TRADE COMMISSION

---

Date: _____

Elinor R. Hoffmann
Chief
Antitrust Bureau
Office of the New York State Attorney General
FOR PLAINTIFF STATE OF NEW YORK

---

Date: _____

Michael D. Battaglia
Deputy Attorney General
California Department of Justice
FOR PLAINTIFF STATE OF CALIFORNIA

---

Date: 12/6/21

Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Illinois Attorney General
FOR PLAINTIFF STATE OF ILLINOIS

_____                    Date:  12/5/2021

K. D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
FOR PLAINTIFF STATE OF NORTH CAROLINA


_____                    Date:  _____

Beth A. Finnerty
Assistant Chief
Antitrust Section
Office of the Ohio Attorney General
FOR PLAINTIFF STATE OF OHIO


_____                    Date:  _____

Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA


_____                    Date:  _____

Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

Date: _____

_____
K. D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
FOR PLAINTIFF STATE OF NORTH CAROLINA

_____
Beth A. Finnerty
Assistant Chief
Antitrust Section
Office of the Ohio Attorney General
FOR PLAINTIFF STATE OF OHIO

Date: 12-6-21

_____
Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

Date: _____

_____
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

Date: ___  ___

21

Date: _____

_____
K. D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
FOR PLAINTIFF STATE OF NORTH CAROLINA

Date: _____

_____
Beth A. Finnerty
Assistant Chief
Antitrust Section
Office of the Ohio Attorney General
FOR PLAINTIFF STATE OF OHIO

Date: 12/6/21

_____
Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

Date: _____

_____
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

_____       Date: _____
K. D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
FOR PLAINTIFF STATE OF NORTH CAROLINA

_____       Date: _____
Beth A. Finnerty
Assistant Chief
Antitrust Section
Office of the Ohio Attorney General
FOR PLAINTIFF STATE OF OHIO

_____       Date: _____
Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

_____       Date: 12/6/2021
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

_____                    Date: _____

Averill Powers
Chief Executive Officer of Phoenixus AG and General Counsel of Vyera Pharmaceuticals, LLC
FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC


_____                    Date: _____

Steven A. Reed
Morgan, Lewis & Bockius LLP
COUNSEL FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC


_____                    Date: _____

Kevin Mulleady
FOR KEVIN MULLEADY


_____                    Date: _____

Marc E. Kasowitz
Albert Shemmy Mishaan
Kenneth R. David
Kasowitz Benson Torres LLP
COUNSEL FOR KEVIN MULLEADY

_____   Date: _____

Averill Powers
Chief Executive Officer of Phoenixus AG and General Counsel of Vyera Pharmaceuticals, LLC
FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC

_____   Date: 12/4/21

Steven A. Reed
Morgan, Lewis & Bockius LLP
COUNSEL FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC

_____   Date: _____

Kevin Mulleady
FOR KEVIN MULLEADY

_____   Date: _____

Marc E. Kasowitz
Albert Shemmy Mishaan
Kenneth R. David
Kasowitz Benson Torres LLP
COUNSEL FOR KEVIN MULLEADY

_____                    Date: _____
Averill Powers
Chief Executive Officer of Phoenixus AG and General Counsel of Vyera Pharmaceuticals, LLC
FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC


_____                    Date: _____
Steven A. Reed
Morgan, Lewis & Bockius LLP
COUNSEL FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC


_____                    Date:   12/5/21
Kevin Mulleady
FOR KEVIN MULLEADY


_____                    Date:  12/5/21
Marc E. Kasowitz
Albert Shemmy Mishaan
Kenneth R. David
Kasowitz Benson Torres LLP
COUNSEL FOR KEVIN MULLEADY


22

**APPENDIX A**
**NOTICE TO AFFECTED PERSONS**

**Vyera/Phoenixus letterhead]**

**[Name and address of recipient]**

Dear **[Name of recipient**]:

This letter concerns an Order for Permanent Injunction and Equitable Monetary Relief ("the Order") entered against Vyera Pharmaceuticals, LLC, and Phoenixus AG in Federal Trade Commission, et al. v. Vyera Pharmaceuticals, LLC, et al. Case No. 1:20-cv-00706-DLC.  A copy of the Order is attached to this letter.  Please read the Order carefully.  **To the extent anything in this letter differs from the terms in the Order, the Order supersedes this letter.  Further, capitalized terms in this letter have the same meaning as those terms do in the Order.**

The Order bars Vyera and Phoenixus from taking certain actions that can impede the development, manufacture, sale, or marketing of competing Drug Products.  Among other things, and subject to certain enumerated exceptions, the Order prohibits and renders unenforceable any agreements where Vyera and Phoenixus interfere with any of the following: (1) providing a Drug Product to a Pharmaceutical Company for the Development of a Therapeutic Equivalent or Biosimilar of that Drug Product; (2) providing any API to a Pharmaceutical Company; and (3) providing data related to sales or distribution of a Drug Product to a data aggregator.

If you have concerns about whether Vyera or Phoenixus is complying with its obligations under the Order, you may contact us at **[contact information for Vyera and Phoenixus].**  You may also contact the Federal Trade Commission at bccompliance@ftc.gov or the State Plaintiffs at **[contact information for State Plaintiffs].**


                         Sincerely,



                         [name and title]

**APPENDIX B**
**COLLATERAL ASSIGNMENT AND SECURITY AGREEMENT**

This Collateral Assignment and Security Agreement ("Agreement") is made by the states or commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia (collectively "Secured Parties") and Phoenixus AG, Vyera Pharmaceuticals, LLC , successors, and assigns (collectively "Grantors") on the effective date of _____, 2021.

**PRELIMINARY STATEMENT**

WHEREAS, the Grantors, have entered into a settlement agreement with Secured Parties to resolve all claims against the Grantors entitled *Federal Trade Commission, et al. v. Vyera Pharmaceuticals, LLC, et al.,* Case No. 20-cv-00706 pending in the Federal Court of the Southern District of New York (the "Action"), the terms of which are set forth in the Stipulated Order for Permanent Injunction and Equitable Monetary Relief dated _____, 2021 in the Action ("Stipulated Order").

WHEREAS, the Grantors have agreed to make certain contingent payments in an aggregate amount not to exceed $30 million over a period of up to 10 years based on sales of certain assets of the Grantors, as set forth in the Stipulated Order and as further described herein; and

WHEREAS, subject to the terms set forth in this Agreement, the Grantors have agreed to grant a security interest in the Collateral (as defined below) to the Secured Parties, as security for the Secured Obligations (as defined below);

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt of which are hereby acknowledged, the parties hereto agree as follows:

**DEFINITIONS**

1. **Terms Defined in Agreement**. All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Agreement.

2. **Terms Defined in New York UCC**. Terms defined in the New York UCC which are not otherwise defined in this Security Agreement are used herein as defined in the New York UCC.

3. **Definitions of Certain Terms Used Herein**. As used in this Agreement, in addition to the terms defined in the Preliminary Statement, the following terms shall have the following meanings:

**"Collateral"** means any and all Corporate Assets of Phoenixus AG and Vyera Pharmaceuticals, LLC, in which a security interest may be created under Article 9 of the New

York UCC, including but not limited to Priority Review Vouchers and any Corporate Asset not related to a Priority Review Voucher, in which the Grantors now have, or hereafter acquire any right or interest in, as well as any monetized royalty stream owed to Phoenixus related to any Corporate Assets regarding the treatment of intranasal racemic ketamine, even if such transactions was entered prior to the entry of this Agreement. Collateral shall expressly exclude (a) any inventory, goods or products, including without limitation, any active pharmaceutical ingredients, raw materials or finished product sold or produced in the ordinary course of business, (b) any unissued shares of equity interests, capital stock, partnership interest, membership or limited liability company interest or similar equity right in one or both of the Corporate Named Defendants (as defined in the Stipulated Order) or any other Grantor or any successor, joint venture, subsidiary, partnership, division, group, or affiliate controlled by any of them, (c) any property to the extent that such grant is prohibited by any requirement of law of a governmental authority or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property, except to the extent that such requirement of law or the term in such contract, license, agreement, instrument or other document providing for such prohibition, breach, default or termination or requiring such consent is ineffective under Section 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law or principles of equity; provided, however, that such security interest shall attach immediately at such time as such requirement of law is not effective or applicable, or such prohibition, breach, default or termination is no longer applicable or is waived or any required consent has been obtained, and to the extent severable, shall attach immediately to any portion of the Collateral that does not result in such consequences; or (d) United States intent-to-use trademark or service mark application to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark or service mark application under Federal United States law; provided, however, after such period, each Grantor acknowledges that such interest in such trademark or service mark application shall be subject to a security interest in favor of the Secured Parties shall be included in the Collateral, or (e) leasehold interests in real property, or (f) motor vehicles and assets subject to certificates of title, or (g) other assets to the extent the costs or burden of obtaining or perfecting a security interest therein is excessive in relation to the benefit of the collateral security provided to the Secured Parties, as reasonably determined by the Collateral Agent in consultation with the Grantors.

**"Corporate Asset"** has the meaning assigned to such term in the Stipulated Order.

**"Event of Default"** means that Grantors have:

     a.     Failed to make payments in accordance with the requirements of Paragraph V.C of the Stipulated Order unless promptly cured; or

    b.      Commenced a case, proceeding or other action seeking to adjudicate it as bankrupt or insolvent or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts.

"**New York UCC**" means the New York Uniform Commercial Code as in effect in the State of New York as of the date of this Agreement.

"**Secured Parties**" Means the states or commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia.

## GRANT OF SECURITY INTEREST

1.    **Grantors' Pledge**. The Grantors hereby pledge, assign, and grant to Secured Parties, a security interest in all of such Grantors' rights title and interest, whether now owned or hereinafter acquired, in and to the Collateral to secure the prompt and complete payments and performance of the Secured Obligations. The Grantors agree to promptly file such documents and to enter into any such agreements in order to perfect the Secured Parties security interest in the Collateral which may not be considered located in the United States. The Grantors shall take any other actions reasonably requested by the Secured Parties from time to time to cause the attachment and perfection of, and the ability of the Secured Party to enforce, the security interest of the Secured Party in any and all of the Collateral.

## REPRESENTATIONS AND WARRANTIES

Grantors represent and warrant that:

1.    **Authority to Act**. The execution, delivery and performance of this Agreement are within its corporate or other organizational powers have been duly authorized by all required organizational action and do not and will not contravene its charter or other organizational documents or any law or any agreement or undertaking to which it is a party or by which it may in any way be bound..

2.    **Title, Validity and Enforceability**. The Grantors are the rightful legal owners of the Collateral, and have good and valid rights in or the power to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all liens. No other creditor has the right to ownership of the Collateral that may interfere with the Secured Parties' ability to take and profit from the sale of said assets in the event that the above-listed contingent equitable monetary relief is not paid.

3.  **Change of Office**. The Grantors shall not change their chief executive office or mailing addresses or organizational identification number unless the Secured Parties shall have received not less than 30 days' prior written notice from Grantors of such proposed change, which notice shall set forth such information with respect thereto as the Secured Parties may require.

4.  **Change of Name**. The Grantors shall not change their names unless each of the following conditions is satisfied: (i) the Secured Parties shall have received not less than 30 days prior written notice from the Grantors of such proposed change in their names, which shall accurately set forth the proposed new name; and (ii) the Secured Parties shall receive a certified copy of the amendment to the charter documents providing for the name change as soon as it is available.

5.  **Change of Structure.** The Grantors shall not change their type of organization, jurisdiction of organization or other legal structure unless each of the following conditions is satisfied: (i) the Secured Parties shall have received not less than 30 days prior written notice from the Grantors of such proposed change in it their names, which shall accurately set forth the proposed new name; and (ii) the Secured Parties shall receive a certified copy of the amendment to the charter documents providing for the change of structure as soon as it is available.

## EVENT OF DEFAULT/REMEDIES

**Grantors' Obligations upon the Event of Default**., Upon the occurrence of an Event of Default, the Secured Parties shall have the right to exercise all rights and remedies available to them under applicable law.

## GOVERNING LAW

1.  **Governing Law**. This Agreement shall be construed in accordance with and governed by the law of the State of New York.

2.  **Submission to Jurisdiction**. The Grantors hereby irrevocably and unconditionally submit, for their selves and their property, to the nonexclusive jurisdiction of the United States District Court of the Southern District of New York, , and any appellate court from any appeal thereof, in any action or proceeding arising out of or related to this Agreement, or for recognition or enforcement of any judgment, and the Grantors, hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard and determined in such Federal Court. The Grantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

3.  **Waiver of Inconvenient Forum**. The Grantors hereby irrevocably and unconditionally waive, to the fullest extent they may legally and effectively do so, any objection

which they may now or hereinafter have to the laying of venue of any suit, action or proceeding to enforce this Agreement in any court referred to in Paragraph 2 above.

      4.    **Waiver of Jury Trial**. The Grantors hereby irrevocable and unconditionally waive, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement.

## GENERAL

      1.    **Successors and Assigns**. This Agreement shall be binding upon Grantors and each of their successors and assigns and inure to the benefit of and be enforceable by Secured Parties, for the purpose of protecting the Secured Parties' interest in the satisfaction of the Grantors' obligation to make certain payments to the Settlement Fund as set forth in Paragraph V.C of the Stipulated Order.

      2.    **Amendments.** Neither this Agreement nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement signed by the Secured Parties and the Grantors. The Secured Parties shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of their respective rights, power and/or remedies unless such waiver shall be in writing and signed by all Secured Parties. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Secured Party of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which the Secured Party would otherwise have on any future occasion, whether similar in kind or otherwise.

      3.    **Survivability**. If any provisions of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

      4.    **Signatures**. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall have the same force and counterpart of any such agreement by facsimile or other electronic method of transmission shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of this Agreement.

      5.    **Collateral Agent.** Each Secured Party, on behalf of itself [and any of its affiliates] hereby irrevocably appoints [_____] (in such capacity, the "Collateral Agent") to serve as collateral agent under this Agreement and with respect to the liens, encumbrances, pledges and security interests granted hereunder, for the purpose of

protecting the Secured Parties' interest in the satisfaction of the Grantors' obligation to make certain payments to the Settlement Fund as set forth in Paragraph V.C of the Stipulated Order. Each Secured Party authorizes the Collateral Agent to take such actions as agent on its behalf and the Secured Parties and to exercise all powers under this Agreement related to the administration, validity, perfection and enforcement of the liens, encumbrances, pledges and security interests granted herein, including without limitation, the granting of any consent with respect to the Collateral and liens, encumbrances, pledges and security interests hereunder, and to exercise such powers as are reasonably incidental thereto. In addition, to the extent required under the laws of any jurisdiction each Secured Party hereby grants to the Collateral Agent any required powers of attorney to execute and enforce this Agreement governed by the laws of such jurisdiction on such Secured Party's behalf. Without limiting the foregoing, each Secured Party hereby authorizes the Collateral Agent to execute and deliver, and to perform its obligations under this Agreement and to exercise all rights, powers and remedies that the Collateral Agent may have under this Agreement. No Secured Party shall have any right individually to realize upon any of the Collateral, it being understood and agreed that all powers, rights and remedies under this Agreement may be exercised solely by the Collateral Agent on behalf of the Secured Parties in accordance with the terms thereof. In its capacity, the Collateral Agent is a "representative" of the Secured Parties within the meaning of the term "secured party" as defined in the New York UCC, as applicable. The Secured Parties irrevocably authorize the Collateral Agent, at its option and in its discretion, to subordinate any lien, encumbrance, pledge or security interest on any property granted to or held by the Collateral Agent under this Agreement. The Secured Parties hereby irrevocably authorize the Collateral Agent, at its option and in its sole discretion, to release any Liens granted to the Collateral Agent on any Collateral.

      6.    **Release.**

A. The Collateral, other than any right title and interest in any Priority Review Voucher (the "Non PRV Collateral") shall be automatically released from the liens, encumbrances and security interests in favor of the Secured Parties created hereby upon the earlier of (i) the date the Grantors' aggregate payments to the Settlement Fund pursuant to Paragraph V.C.1. of the Stipulated Order equal $15 million (ii) the five (5) year anniversary of the date the Stipulated Order is entered in the Action, or (iii) the date the Grantors' aggregate payments to the Settlement Fund pursuant to Paragraph V.C.1 and V.C.2 of the Stipulated Order equal $30 million. Concurrently with such release, this Agreement shall terminate with respect to such Non PRV Collateral, and all obligations of each Grantor to the Secured Parties hereunder with respect to such Non PRV Collateral shall terminate, all without delivery of any instrument or performance of any act by any party. The Secured Parties shall promptly deliver such documents as such Grantor may reasonably request to evidence the termination of this Agreement and the related liens, encumbrances and security interest with respect to such Non PRV Collateral.

B. All Collateral constituting any Priority Review Voucher shall be automatically released from the liens, encumbrances and security interests in favor of the Secured Parties created hereby upon the earlier of (i) the date the Grantors' aggregate payments to

the Settlement Fund pursuant to Paragraphs V.C.1 and V.C.2 of the Stipulated Order equal $30 million or (ii) the ten (10) year anniversary of the date the Stipulated Order is entered in the Action. Concurrently with such release, this Agreement shall terminate, and all obligations of each Grantor to the Secured Parties hereunder shall terminate, all without delivery of any instrument or performance of any act by any party. The Secured Parties shall promptly deliver such documents as such Grantor may reasonably request to evidence such termination in full of the interests hereunder.

      7.    **Notices**

All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) business days after being deposited in the mail, postage prepaid, or, in the case of electronic mail notice, when received, addressed as follows in the case of the Grantors and each of the Secured Parties, or to such other address as may be hereafter notified by the respective parties hereto:

[Add notice information for each party below]

[_____]

[_____]

[Remainder of Page Intentionally Left Blank]

[Signature Pages to Follow]

IN WITNESS WHEREOF, the Grantors and Secured Parties have hereunto set their hands this
_____ day of December, 2021.


_____                Date: _____

Elinor R. Hoffmann
Chief
Antitrust Bureau
Office of the New York State Attorney General
FOR PLAINTIFF STATE OF NEW YORK


_____                Date: _____

Michael D. Battaglia
Deputy Attorney General
California Department of Justice
FOR PLAINTIFF STATE OF CALIFORNIA


_____                Date: _____

Richard S. Schultz
Assistant Attorney General
Antitrust Bureau
Office of the Illinois Attorney General
FOR PLAINTIFF STATE OF ILLINOIS


_____                Date: _____

K. D. Sturgis
Special Deputy Attorney General
Jessica V. Sutton
Special Deputy Attorney General
North Carolina Department of Justice
FOR PLAINTIFF STATE OF NORTH CAROLINA


_____                Date: _____

Beth A. Finnerty
Assistant Chief
Antitrust Section
Office of the Ohio Attorney General
FOR PLAINTIFF STATE OF OHIO

_____      Date: _____
Joseph S. Betsko
Senior Deputy Attorney General
Pennsylvania Office of Attorney General
FOR PLAINTIFF COMMONWEALTH OF PENNSYLVANIA

_____      Date: _____
Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

_____      Date: _____
Averill Powers
Chief Executive Officer of Phoenixus AG and General Counsel of Vyera Pharmaceuticals, LLC
FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC

_____      Date: _____
Steven A. Reed
Morgan, Lewis & Bockius LLP
COUNSEL FOR PHOENIXUS AG AND VYERA PHARMACEUTICALS, LLC

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA, | |
| *Plaintiffs,* | |
| v. | Case No. 20-cv-00706 (DLC) |
| VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC; and KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC, | ECF Case |
| *Defendants.* | |

**TRIAL TESTIMONY OF NICHOLAS PELLICCIONE, Ph.D.**

FTC v. Vyera, et al.,
20-cv-00706 (DLC)

**DX-539**

Pursuant to 28 U.S.C. § 1746, Nicholas Pelliccione, Ph.D., declares under penalty of perjury as follows:

1.      I am an adult resident of Brooklyn, New York and I am currently employed as the Senior Vice President and Head of Research and Development at Vyera Pharmaceuticals, LLC ("Vyera").

**BACKGROUND**

2.      I received a bachelor's of science degree in chemistry from Polytechnic University in 1975 and a Ph.D. in biochemistry from Mount Sinai School of Medicine, CUNY, in 1980.  I completed a National Institute of Health postdoctoral fellowship in the Department of Medicine at Memorial Sloan-Kettering Cancer Center in New York from 1980 to 1983.

3.      I have over 35 years of experience in the pharmaceutical industry and have devoted much of my career to assisting life sciences companies in navigating regulatory challenges as they bring important treatments to market.

4.      I began my career in the pharmaceutical industry in 1984 with Estee Lauder, Inc. ("Estee Lauder") in Melville, New York.  I initially held the title of Senior Scientist, Biological Research, and in 1987 I was promoted to Principal Scientist, Biological Research.  I held that position until 1988 when I was promoted to Manager, Scientific and Regulatory Affairs.

5.      I left Estee Lauder in 1990 and joined the Schering Plough Research Institute ("Schering Plough") in Kenilworth, New Jersey, where I spent the next approximately 15 years of my career.  I began at Schering Plough as a Manager of Regulatory Affairs in the oncology division, then worked my way up to serve as the Vice President of Worldwide Regulatory Affairs, Chemistry, Manufacturing and Controls—a role I held from 2000 until 2005.

6.      I left Schering Plough in 2005 to join Chugai Pharma USA, LLC ("Chugai USA") in Bedminster, New Jersey, where I served as the Senior Vice President of Regulatory and

Pharmaceutical Sciences from 2005 to 2007. Chugai USA's parent company, Chugai Pharmaceutical Co., Ltd., is a leading Japanese pharmaceutical developer and manufacturer. Among my other duties at Chugai USA, I was responsible for interfacing with the Food and Drug Administration ("FDA") regarding Chugai USA's pipeline drug products, and I also oversaw the company's Quality Assurance initiative, which worked to ensure that Chugai USA's active pharmaceutical ingredient ("API") suppliers met applicable manufacturing standards.

7.      I left Chugai USA in 2007 to become the Senior Vice President of Regulatory Affairs and Quality at Aeterna Zentaris, Inc. ("Aeterna Zentaris") in Basking Ridge, New Jersey. Aeterna Zentaris is a specialty biopharmaceutical company that specializes in developing treatments and diagnostics for neglected diseases. At Aeterna Zentaris, I was responsible for, among other things, developing the company's regulatory strategy with respect to a number of drug products at various stages of development.

8.      I remained with Aeterna Zentaris until 2014, when I joined Regado Biosciences, Inc. ("Regado"), which was also located in Basking Ridge, New Jersey. I served as the Senior Vice President for Regulatory Affairs and Quality at Regado, where I was responsible for completing a Phase 3 trial of a new anticoagulation medication. In August 2014, the study found a number of serious side effects with the treatment, which led to the suspension of the study and Regado's merger into Tobira Therapeutics. As a result, my tenure at Regado lasted only approximately six months.

9.      In approximately November of 2014, I was contacted by a recruiting company that made me aware of an opportunity at a new biopharmaceutical startup company called Turing Pharmaceuticals (now Vyera). Given the timing with my departure from Regado, I agreed to an interview.

10.     I was intrigued by Vyera's commitment to developing new innovative treatments for neglected diseases and, in January 2015, I accepted a position as Vyera's Senior Vice President for Regulatory Affairs.  Later, in 2017, I was promoted to Senior Vice President and Head of Research and Development—the role I currently hold.

11.     In August 2015, Vyera acquired a drug called Daraprim from Impax Pharmaceuticals, Inc. ("Impax").  Daraprim is used to treat toxoplasmosis—a potentially serious parasitic infection caused by the parasite *Toxoplasma gondii* ("*T. gondii*").  Daraprim's API is a chemical called pyrimethamine.

12.     During my tenure at Vyera, I have had numerous responsibilities related to Daraprim and toxoplasmosis.  My testimony today is not intended to address all of those responsibilities.  Rather, as explained more fully below, my testimony focuses on two aspects of my responsibilities that I understand are of relevance to this litigation: (1) my role in Vyera's engagement of Fukuzyu Pharmaceutical Co., Ltd. ("Fukuzyu") as Vyera's API supplier for pyrimethamine API and (2) Vyera's research and development efforts to develop new and improved treatments for toxoplasmosis.

**ENGAGEMENT OF FUKUZYU AS VYERA'S API SUPPLIER**

13.     By virtue of my role at Vyera, I am personally familiar with the facts and circumstances that led to Vyera's identification of Fukuzyu as a potential supplier of pyrimethamine API, the discussions and negotiations that transpired between Vyera and Fukuzyu, and the entry by Vyera and Fukuzyu into a Master Services Agreement in January 2017.

14.     As I described above, in August 2015 Vyera acquired Daraprim from Impax.  I recall that as part of the acquisition Vyera acquired a limited supply of pyrimethamine API from

Impax, which was in the possession of Impax's contract manufacturing organization, Patheon. Vyera inherited Impax's agreement with Patheon, and this supply of pyrimethamine API was used to manufacture Vyera's initial batches of Daraprim.

15.     I realized in approximately late 2015 or early 2016, however, that in order to manufacture additional quantities of Daraprim, Vyera needed to obtain a safe and reliable source of pyrimethamine API.  This was important because Vyera did not inherit any supply agreement with an API manufacturer as part of the acquisition.  If the existing supply of pyrimethamine API were to run out or expire, Vyera would have been unable to manufacture additional quantities of Daraprim.

16.     As part of the process of working with the FDA to transition the Daraprim New Drug Application from Impax to Vyera, I learned that Impax had obtained its pyrimethamine API from Fukuzyu.

17.     I initially reached out to Fukuzyu in April 2016.  I did not have a point of contact at Fukuzyu and tried contacting them by simply sending an email to a general email address that I found on Fukuzyu's website.

18.     Fukuzyu responded to my inquiry.  I quickly realized, however, that it would be necessary to enlist the help of someone who spoke Japanese and had experience with the pharmaceutical industry in Japan to help facilitate our discussion with Fukuzyu.  I reached out to a former colleague, Dr. Mikio Arisawa, whom I had met and developed a professional relationship with while working at Chugai USA.

19.     Dr. Arisawa helped negotiate with Fukuzyu.  In October 2016, I visited Fukuzyu's facility in Toyama, Japan along with Dr. Arisawa and two of my colleagues at Vyera,

Dr. Eliseo Salinas (the President and Head of Research and Development) and Gopal Krishna

(the Vice President of Chemistry, Manufacturing, and Control).

20.     The negotiations led to the entry into, on January 25, 2017, a Master Services

Agreement between Vyera and Fukuzyu.  The Master Services Agreement stated that Fukuzyu

"shall provide the API Bulk Drug Substance, pyrimethamine exclusively to Turing for the use,

sale and/or distribution in the Territory.  To be clear, the use, sale and/or distribution of

pyrimethamine described in this section refers to the use, sale and/or distribution of the API Bulk

Substance for humans only."  The "territory" was defined to mean the United States and its

territories.  *See* DX 440-9523-24.

21.     The Master Services Agreement further provided that "[t]he minimum order

quantity [of pyrimethamine API] will be 50 kg."  *See* DX 440-9524.

22.     Vyera did not conduct a full current good manufacturing practices ("cGMP")

audit of Fukuzyu prior to entering into the Master Services Agreement.  Doing so would have

been expensive and it did not make sense to undertake before an agreement was finalized.  Vyera

did have a cGMP audit of Fukuzyu conducted several months after entering into the Master

Services Agreement.

23.     Prior to Vyera's entry into the Master Services Agreement with Fukuzyu on

January 25, 2017, there was no agreement in principle or other agreement between Vyera and

Fukuzyu related to the supply of pyrimethamine API.  In fact, we were uncertain whether

Fukuzyu would decide to enter into the agreement with us at all.

24.     The company felt that it was important that the agreement with Fukuzyu provide

Vyera with the exclusive right to obtain pyrimethamine API from Fukuzyu.  Among other things,

obtaining exclusivity would permit Vyera to minimize the risk of supply disruption if, for

example, Fukuzyu had limited quantities of pyrimethamine available and opted to sell those

quantities to another manufacturer rather than Vyera.  At the time we entered into the supply

agreement, and now, I understood that it is common for companies to include exclusivity as a

standard term in an API supply agreement.  I did not believe Vyera's agreement with Fukuzyu

would prevent potential competitors from finding alternative sources of pyrimethamine API.

25.     Based on my knowledge of the discussions and negotiations that Vyera had with

Fukuzyu, Vyera did not coerce Fukuzyu to include an exclusivity provision in the Master

Services Agreement.  Again, I understand that such provisions are common in API supply

agreements, and the exclusivity provision was included in Vyera's Master Services Agreement

with Fukuzyu in the course of ordinary, bilateral, arm's-length commercial negotiations.

26.     As a general matter, it is prudent for pharmaceutical manufacturers to arrange for

a backup API supply in case the primary API supplier is no longer able to provide the API,

which could potentially lead to drug shortages or the need to pull the product from the market

completely—both of which could harm patients.  Moreover, for a small company like Vyera,

whose revenues are principally derived from one product, it is particularly important to have a

backup API supplier because an inability to manufacture and sell that product would have a

devastating financial effect on the company.

27.     In fact, the importance of having a backup API supplier was recently made clear

based on an experience that Vyera had with another one of its drug products, Vecamyl, which is

used to treat hypertension.  The API in Vecamyl is called mecamylamine.  Previously, the

commercial partner with which Vyera sells Vecamyl had sourced mecamylamine from an API

supplier called Albany Molecular Research, Inc. ("AMRI").  We learned in approximately 2019

that AMRI was ceasing production of mecamylamine.  As I understand, AMRI was having

issues with its manufacturing facility and was also having trouble obtaining one of the necessary

raw materials.  Vyera and its commercial partner did not have a backup supplier of

mecamylamine and, as a result, we have been forced to scramble to find a new API supplier.

**VYERA'S RESEARCH AND DEVELOPMENT ACTIVITIES**

28.     As noted above, I have had significant responsibility during my tenure at Vyera

related to Vyera's research and development efforts.  For example, in my current role as Senior

Vice President and Head of Research and Development, I am responsible for establishing

Vyera's strategic research and development roadmap and for providing scientific input into

research and development programs.  My responsibilities have also included overseeing all

aspects of Vyera's regulatory operations as they relate to pipeline products.  In short, I am

closely familiar with Vyera's research and development efforts that have occurred since I joined

the company in January 2015 to the present.

29.     Daraprim was first approved by the FDA in 1953 as a treatment for malaria.  In

1958, the FDA approved Daraprim to treat toxoplasmosis.

30.     Daraprim is a folic acid antagonist.  It works by selectively inhibiting the enzyme

dihydrofolate reductase, which has the effect of interfering with DNA and RNA synthesis in

many species, including the *T. gondii* parasite.

31.     Between the time of Daraprim's development in the 1950s and Vyera's

acquisition of Daraprim in 2015, to my knowledge there had been virtually no research and

development focused on finding new or improved treatments for toxoplasmosis.

32.     In my view, Daraprim has a number of limitations.  First, Daraprim has

significant toxicities.  Because Daraprim inhibits folic acid synthesis in not only the *T. gondii*

parasite but the patient as well, patients taking Daraprim may experience bone marrow

suppression, which can lead to potentially serious side effects, including leukopenia (low white blood cell count), particularly neutropenia, and thrombocytopenia (low blood platelet count). As a result, Daraprim must typically be prescribed concurrently with a drug called leucovorin, which reduces the extent and effects of bone marrow suppression.

33.     Second, Daraprim is typically not effective in treating toxoplasmosis on its own, as noted in the Daraprim Prescribing Information, and patients receiving Daraprim should also be treated simultaneously with a separate class of drugs called sulfonamides (most commonly a drug called Sulfadiazine). Sulfonamides work synergistically with Daraprim by blocking a separate enzyme needed for folic acid synthesis, dihydropteroate synthetase. Together, Daraprim and the sulfonamide work to block folic acid synthesis (and thus proliferation and survival) of the *T. gondii* parasite.

34.     Because Daraprim is typically prescribed with Sulfadiazine (to effectively target the *T. gondii* parasite) and leucovorin (to offset its toxicities), a course of treatment with Daraprim typically requires the patient to take multiple medications. This has proven to be problematic because the high pill burden associated with toxoplasmosis treatment has been shown to contribute to increased levels of patient noncompliance—meaning that patients do not follow or complete their prescribed course of medication, often leading to ineffective treatment and adverse outcomes. This problem is particularly pronounced in HIV and AIDS patients, who are most commonly affected by toxoplasmosis because of their weakened immune systems. Because HIV and AIDS patients typically already have to manage significant numbers of prescriptions, noncompliance with toxoplasmosis treatment is particularly pronounced in this group of patients.

35.     Daraprim is effective in treating active toxoplasmosis infections, but it cannot eradicate latent toxoplasmosis infections.  By way of background, there are two different stages of toxoplasmosis infection.  In the case of an active infection, the *T. gondii* parasite grows and reproduces quickly.  *T. gondii* parasites in this active phase are referred to as tachyzoites. Following the active phase, the *T. gondii* parasite may often enter a dormant or latent phase in which it grows and reproduces slowly.  *T. gondii* parasites in this latent phase are referred to as bradyzoites.  While Daraprim, when administered with a sulfonamide, is effective at treating active toxoplasmosis infections, Daraprim is incapable of targeting the *T. gondii* parasite when it is in its latent (bradyzoite) phase.  As a result, the parasite often remains alive in the host patient's tissue and may cause a recurrence of active (tachyzoite) toxoplasmosis infection.

36.     Beginning shortly after Vyera's acquisition of Daraprim in August 2015, Vyera launched an effort to develop new and improved treatments for toxoplasmosis that were aimed at addressing the shortcomings described above.  Although Vyera undertook a number of research and development projects, my testimony today is intended to focus on two of them in particular—a product that we referred to as VYR-006 and a separate product that we referred to as VYR-007.

37.     VYR-006 was a pipeline product that we began working on in late 2015 or early 2016 under the direction of Dr. Eliseo Salinas, our President and Head of Research and Development at the time.  VYR-006 would have been, in effect, the "next generation" of Daraprim.  It had the same mechanism of action as Daraprim in that it was a folic acid antagonist and was intended to inhibit dihydrofolate reductase, but it was designed to specifically target the metabolic pathway of the *T. gondii* parasite.  The theory was that by specifically targeting the parasite, we could avoid the toxicities associated with Daraprim, and thereby eliminate

Daraprim's harmful side effects and the need to take leucovorin to mitigate against bone marrow suppression.  In addition to improving Daraprim's efficacy, my colleagues and I believed that reducing the pill burden associated with toxoplasmosis treatment would result in improved patient compliance and better outcomes.

38.     Vyera invested heavily in VYR-006.  From inception to present, Vyera has spent approximately $3.3 million on the project.

39.     We successfully completed preclinical work and Phase 1 studies for VYR-006 and were able to develop a manufacturing process.  However, moving to Phase 2 studies would require a significant financial commitment.  Because Vyera has been struggling financially, the company has been unable to generate the funding needed to further advance the project.  As a result, the VYR-006 project has effectively been shelved since approximately 2018.  I am hopeful that this project will be restarted because I believe that VYR-006 is a promising treatment that could provide significant benefits to toxoplasmosis patients.

40.     Vyera began work in late 2015 or early 2016 on a separate pipeline toxoplasmosis treatment that we referred to as VYR-007.  In our work on VYR-007, we collaborated closely with scientists and researchers at Washington University in St. Louis.

41.     VYR-007 had a different mechanism of action than Daraprim.  It was designed as a calcium-dependent protein kinase 1 ("CDPK-1") inhibitor, meaning that it targeted and inhibited a different enzyme than the enzyme targeted by Daraprim, dihydrofolate reductase. CDPK-1 is present only in certain parasites, including *T. gondii*.  We hoped that, unlike Daraprim, VYR-007 could successfully eradicate the *T. gondii* parasite in its latent (bradyzoite) phase.  This would have been a benefit to immunocompromised toxoplasmosis patients, who currently often require lifelong prophylactic treatment to prevent their toxoplasmosis infection

from reentering an active (tachyzoite) phase.  If VYR-007 could have successfully eradicated the *T. gondii* parasite from the patient's body, it would have eliminated the need for prophylactic treatment.

42.    VYR-007 appeared to work well in preclinical modeling and Vyera successfully obtained a patent on the molecule.  Unfortunately, when we began testing in animal subjects, it became apparent that VYR-007 contained significant toxicities at the levels that would have been needed to administer VYR-007 to humans.  As a result, Vyera was forced to abandon the project in approximately 2019.

43.    Like VYR-006, Vyera invested heavily in VYR-007.  My understanding is that between project inception and 2019, Vyera invested approximately $1.2 million in VYR-007.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on October 18, 2021                    */s/ Nicholas Pelliccione*
                                                Nicholas Pelliccione, Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **FEDERAL TRADE COMMISSION, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**VYERA PHARMACEUTICALS, LLC, et al.,**<br><br>Defendants. | **Case No.: 1:20-cv-00706-DLC** |

**Direct Testimony of W. David Hardy, M.D.**

GX8003-001

## TABLE OF CONTENTS

I.     Background and Qualifications................................................................ 1

II.    Summary of Opinions .......................................................................... 4

III.   Definition of Toxoplasmosis................................................................ 5

IV.    The Diagnosis and Treatment of Toxoplasmosis...................................... 8

       A.    Toxoplasma Encephalitis .......................................................... 8

       B.    Congenital Toxoplasmosis...................................................... 17

       C.    Ocular toxoplasmosis ........................................................... 21

V.     An FDA-Approved Pyrimethamine-Based Regimen is the Preferred Treatment for
       Toxoplasmosis ................................................................................ 24

VI.    Trimethoprim-Sulfamethoxazole is Not Interchangeable with an FDA-Approved
       Pyrimethamine-Based Regimen........................................................... 28

       A.    Lack of Evidence of Safety and Efficacy ................................... 28

       B.    Limited Clinical Experience .................................................... 31

       C.    Reduced Potency................................................................... 32

       D.    Unsuitable for Empiric Therapy ............................................... 33

       E.    Not an Option for Patients with Sulfa Allergies ........................... 33

VII.   Compounded Pyrimethamine is Not Interchangeable with FDA-Approved
       Pyrimethamine ................................................................................ 34

GX8003-002