# 22-728

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

FEDERAL TRADE COMMISSION, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF ILLINOIS, STATE OF NORTH CAROLINA, COMMONWEALTH OF VIRGINIA,

—against—

*Plaintiffs-Appellees,*

MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendant-Appellant,*

VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, KEVIN MULLEADY, individually, and as an owner and director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME III OF VIII
### (Pages A-595 to A-891)

BRADLEY GROSSMAN
UNITED STATES FEDERAL
  TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-2424

*Attorneys for Plaintiff-Appellee
  Federal Trade Commission*

KIMO S. PELUSO
NOAM BIALE
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for Defendant-Appellant
  Martin Shkreli*

*(Counsel continued on inside cover)*

PHILIP LEVITZ
OFFICE OF THE NEW YORK STATE
  ATTORNEY GENERAL
28 Liberty Street, 15th Floor
New York, New York 10005
(212) 416-8000

*Attorneys for Plaintiffs-Appellees
  State of New York, State of
  California, Commonwealth of
  Pennsylvania, State of Illinois,
  Commonwealth of Virginia*

SHIRA HOFFMAN
ASSISTANT U.S. ATTORNEY
CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 269-6000

*Attorneys for Plaintiff-Appellee
  State of California*

DEREK MICHAEL WHIDDON
ASSISTANT ATTORNEY GENERAL
OHIO OFFICE OF THE
  ATTORNEY GENERAL
30 East Broad Street, 26th Floor
Columbus, Ohio 4321
(614) 466-2677

*Attorneys for Plaintiff-Appellee
  State of Ohio*

JOSEPH STEPHEN BETSKO, SR.
PENNSYLVANIA OFFICE OF
  THE ATTORNEY GENERAL
ANTITRUST SECTION
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-5393

*Attorneys for Plaintiff-Appellee
  Commonwealth of Pennsylvania*

SARAH A. HUNGER
DEPUTY SOLICITOR
ILLINOIS OFFICE OF THE
  ATTORNEY GENERAL
CIVIL APPEALS DIVISION
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5202

*Attorneys for Plaintiff-Appellee
  State of Illinois*

JESSICA VANCE SUTTON
NORTH CAROLINA DEPARTMENT
  OF JUSTICE
114 West Edenton Street
Raleigh, North Carolina 27603
(919) 716-0998

*Attorneys for Plaintiff-Appellee
  State of North Carolina*

SARAH OXENHAM ALLEN
LUCAS W.E. CROSLOW
MARTIN JORDAN MINOT
VIRGINIA OFFICE OF THE
  ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-6557

*Attorneys for Plaintiff-Appellee
  Commonwealth of Virginia*

# TABLE OF CONTENTS

PAGE

District Docket Court Entries ........................................... A-1

Amended Complaint, dated April 14, 2020 [Redacted] ................. A-136

Defendant Kevin Mulleady's Answer and Jury Demand,
        dated September 15, 2020 ........................................ A-222

Defendant Martin Shkreli's Answer with Jury Demand,
        dated September 15, 2020 ........................................ A-289

Defendant Vyera Pharmaceuticals' Answer with Jury Demand,
        dated September 15, 2020 ........................................ A-351

Joint Stipulation and Order to Amend the Relief Requested
        in the Pleadings, dated March 30, 2021 .......................... A-409

FTC's Motion for Leave to Withdraw the FTC's Prayer
        for Equitable Monetary Relief, dated May 26, 2021 ............... A-414

Order Dismissing the FTC's Claim for Disgorgement,
        dated June 2, 2021 ............................................... A-419

Defendant Martin Shkreli's Pretrial Memorandum of Law [Redacted] ... A-422

Plaintiff States' Supplemental Pretrial Memorandum of Law,
        dated October 20, 2021 [Redacted] ............................... A-457

Joint Motion for Entry of Stipulated Order for Permanent Injunction,
        dated December 7, 2021 .......................................... A-492

Stipulated Order for Permanent Injunction and Equitable
        Monetary Relief, dated December 7, 2021 ......................... A-541

ii

PAGE

Written Testimony of Nicholas Pelliccione, Ph. D.,
dated October 18, 2021 .......................................... A-581

Written Testimony of W. David Hardy, M.D., dated October 20, 2021 .. A-593

Written Testimony of Frank DellaFera, dated October 18, 2021
[Redacted] ..................................................... A-631

Written Testimony of James R. Bruno, dated October 20, 2021
[Redacted] ..................................................... A-649

Written Testimony of Edward V. Conroy, dated October 20, 2021 ...... A-687

Written Testimony of Susan McDougal, dated October 15, 2021
[Redacted] ..................................................... A-725

Written Testimony of Abhishek Mukhopadhyay,
dated October 19, 2021 [Redacted] ............................... A-739

Written Testimony of Nilesh Patel, dated October 15, 2021
[Redacted] ..................................................... A-751

Written Testimony of Manish S. Shah, dated October 20, 2021 ........ A-766

Written Testimony of Martin Shkreli, dated October 15, 2021
[Redacted] ..................................................... A-785

Written Testimony of Anne Kirby, dated October 20, 2021 [Redacted] .. A-803

Written Testimony of Kevin Mulleady, dated October 20, 2021 ........ A-831

Written Testimony of Professor C. Scott Hemphill,
dated October 19, 2021 [Redacted] ............................... A-864

Written Testimony of Dr. Anupam B. Jena, dated October 20, 2021
[Redacted], with Attachments ................................... A-924

iii

PAGE

Written Testimony of John S. Russell, dated October 20, 2021
    [Redacted], with Attachments ................................... A-1011

Consolidated (Full) Trial Transcripts,
    dated December 14 to 20, 2021 ................................. A-1068

Defendant Martin Shkreli's Notice of Appeal, dated April 5, 2022 .... A-2298

W. David Hardy, M.D., declares as follows:

1.      My name is Dr. W. David Hardy. I have been retained by the Federal Trade

Commission, New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia.

2.      In my testimony, I will:

     a.   Define toxoplasmosis, including the most common manifestations of the
disease;

     b.   Explain how toxoplasmosis is diagnosed, the goals in treating toxoplasmosis,
the treatments available, and the factors governing the choice of treatment;

     c.   Explain why Daraprim or other FDA-approved pyrimethamine, as part of a
regimen with a sulfonamide, is the preferred treatment for toxoplasmosis;

     d.   Explain why trimethoprim-sulfamethoxazole is not readily interchangeable
with FDA-approved pyrimethamine; and

     e.   Explain why compounded pyrimethamine is not readily interchangeable with
FDA-approved pyrimethamine.

## I.    Background and Qualifications

3.      I am a licensed physician with over 30 years of experience specializing in

infectious diseases and treatment of patients with HIV. Currently I work as a scientific and

medical consultant on clinical and laboratory research investigating infectious diseases, focusing

on HIV, other viral infections and AIDS-related opportunistic diseases. I also serve as an

Adjunct Clinical Professor of Medicine, Division of Infectious Diseases at the Keck School of

Medicine of USC and as a research consultant to the NIH-funded Clinical Translational Research

Center of Charles Drew University School of Medicine and Science.

4.      I graduated from Baylor College of Medicine with honors in 1981. I completed a

residency in internal medicine in 1984 at Harbor-UCLA Medical, and a clinical and research

fellowship in infectious diseases and immunology at UCLA School of Medicine from 1984 to

GX8003-003

1986. Later in my career, I completed a laboratory research fellowship at UCLA from 1998 to

2002.

     5.      I hold active medical licenses in California and DC, and an inactive license in

Texas. I have certifications from the American Board of Internal Medicine in internal medicine

and infectious diseases, as well as an HIV Specialist credential from the American Academy of

HIV Medicine.

     6.      I have practiced medicine as a licensed physician since 1981. I began my career in

infectious diseases during the early days of the AIDS epidemic, and have wide-ranging

experience as a clinician, educator, and researcher in this field, with a particular focus on HIV

and AIDS. This experience includes serving as Director of the HIV/AIDS Clinic at UCLA

School of Medicine from 1987 to 1996 where over the course of a decade, I directly or indirectly

(via teaching relationships) provided primary and specialty care for well over 1500 patients with

HIV and AIDS. Managing severe, life-threatening opportunistic infections, including

toxoplasmosis, was the mainstay of my clinical practice. I also focused my clinical research

during this time on the treatment and prevention of AIDS-related opportunistic infections,

including *Pneumocystis jiroveci* pneumonia and *Toxoplasma gondii* encephalitis, among others,

and I designed, conducted, and reported the results of over 30 clinical trials testing

investigational medications for treatment and prevention of AIDS-related opportunistic

infections.

     7.      From 2002 to 2013, I was Chief of the Division of Infectious Diseases at Cedars-

Sinai Medical Center, a UCLA-affiliated academic medical center. During those 12 years, I was

promoted to full Professor of Medicine at the David Geffen School of Medicine at UCLA, I ran

my own animal research laboratory, I oversaw a busy clinical research program studying 10 new

2

HIV medications in clinical trials, and I provided primary medical care for 250 persons living with HIV and other infectious diseases.

8.      During my 22 years of academic medicine work at UCLA, I roughly estimate that I have taught over 600 UCLA and other visiting medical students, over 525 internal medicine residents and over 100 infectious diseases fellows. In addition to these trainees, I have regularly spoken as an expert lecturer at over 150 local, regional, national and international conferences and educational meetings and have published over 175 peer-reviewed research articles, scientific/medical reviews, book chapters, case reports, editorials, and online continuing medical education (CME) publications.

9.      Beyond my experience at UCLA and Cedars Sinai, I was the Senior Director of Research of Whitman-Walker Health in Washington, DC from 2015 to 2018 where I helped build and directed a community-based, nonacademic research program. I also served as an Adjunct Professor of Medicine, Division of Infectious Diseases, at Johns Hopkins University School of Medicine from 2015 to 2020, and as a Clinical Professor of Medicine, Division of Infectious Diseases, at George Washington University during this time.

10.     I have also been invited to serve on panels and committees related to the treatment and research of AIDs-related opportunistic infections, including a panel of experts convened by the NIH and CDC to review and recommend best practices for the treatment and prophylaxis of AIDS-related opportunistic infections, including toxoplasmosis, and the NIH/NIAID-AIDS Clinical Trials Group Opportunistic Infection Committee and Protozoan Pathogen Study Group, which oversaw the development of NIH-supported research studies on AIDS-related opportunistic infections, including toxoplasmosis. I have served as a board member of both national professional HIV physician organizations, including the American Academy of HIV

3

GX8003-005

Medicine (AAHIVM) as Chair of the Education Committee and the HIV Medicine Association

(HIVMA)/Infectious Diseases Society of America (IDSA), for which I was Chair of the Board of

Directors of HIVMA from 2018 to 2019.

11.     My expertise in diagnosing, treating, and preventing toxoplasmosis derives from

my three-plus decades of providing care for patients with HIV. The number of patients I have

cared for who were diagnosed with and treated for Toxoplasma encephalitis has varied over the

course of my career, from approximately 16 patients per year early in my career, to a high of

approximately 36 patients per year between 1986 and 1991, followed by progressively declining

numbers from 20 patients per year from 1991 to 1996 to 3 to 6 patients per year following the

introduction of effective, combination antiretroviral therapy (ART) in 1996. I estimate that over

the course of my career, I have treated more than 200 patients for toxoplasmosis with FDA-

approved pyrimethamine plus sulfadiazine or clindamycin.

12.     My curriculum vitae is attached at Appendix A.

13.     I have prepared demonstratives to accompany my testimony. These

demonstratives are attached at Appendix B.[1]

## II.   Summary of Opinions

14.     Toxoplasmosis is a parasitic infection that, while asymptomatic in most

individuals, can cause severe disease and even death in certain populations, including children

infected *in utero* and immunocompromised individuals. Toxoplasmosis can cause disease in

many parts of the body, but three of the most common manifestations requiring treatment occur

in the brain (Toxoplasma encephalitis), in a fetus or child infected by the mother (congenital

toxoplasmosis), and in the eye (ocular toxoplasmosis). In its most severe forms, active

---

[1] GD001 (Hardy Demonstrative).

GX8003-006

toxoplasmosis has the potential to cause irreversible damage or death within a very short period

of time. Physicians, therefore, must rely on the most effective, time-tested treatments to quickly

arrest the disease and prevent further harm.

15.     The gold standard for treating toxoplasmosis is a two-drug regimen of Daraprim

or other FDA-approved pyrimethamine plus a sulfonamide. For patients who cannot tolerate a

sulfa drug, the preferred treatment is Daraprim or other FDA-approved pyrimethamine plus

clindamycin. These regimens are preferred because of their efficacy and safety, long history of

successful clinical use, their superior potency when compared to other treatments, and the role

they play in diagnosing toxoplasmosis where a biopsy is not feasible.

16.     Other available treatments are not readily interchangeable with FDA-approved

pyrimethamine. Trimethoprim-sulfamethoxazole (Bactrim or Septra) has more limited scientific

evidence of safety and efficacy than a pyrimethamine-based regimen, it lacks the long history of

successful clinical use, it is far less potent than pyrimethamine, it cannot be reliably used to

confirm the diagnosis of Toxoplasma encephalitis, and it is not a viable treatment option for

patients who cannot tolerate a sulfa drug. Compounded pyrimethamine is not subject to the same

standards of review to ensure safety and efficacy as FDA-approved pyrimethamine; as such, a

treating physician cannot know whether compounded pyrimethamine will effectively treat active

toxoplasmosis in the same way as FDA-approved pyrimethamine.

**III.  Definition of Toxoplasmosis**

17.     Toxoplasmosis is an infection caused by the parasite *Toxoplasma gondii* that is

found worldwide. It is one of the most common parasitic infections of humans and other warm-

blooded animals; nearly one-third of humanity has been exposed to and infected with this

parasite. Its prevalence varies widely in different parts of the world and among different

serologic surveys. It is estimated that between 10% and 30% of the populations of countries in

5

North America have been infected; in other parts of the world, as much as 30% to 50% of the population may be infected. Most infections in humans are asymptomatic, but the parasite can produce devastating disease in children infected congenitally (during pregnancy) as well as in immunocompromised persons.

18.     Humans primarily become infected with *T. gondii* by ingesting undercooked or uncooked meat from animals with tissue cysts or by ingesting food and water contaminated with oocysts – egg-like structures – from infected cat feces.

19.     The only ways in which toxoplasmosis is passed from person to person is by mother-to-child (congenital) transmission, where a woman becomes infected during or just prior to her pregnancy and transmits the infection to her child, and blood transfusion or organ transplantation, where an uninfected person receives an organ transplant or blood transfusion from an infected donor.

20.     Once an individual has been infected with *T. gondii*, the parasite remains in their body in an inactive state as a cyst-like structure called a bradyzoite. There is currently no treatment that can completely eradicate the parasite from an individual after infection has occurred.

21.     The majority of individuals infected with *Toxoplasma gondii* typically experience no symptoms or only mild "flu-like" symptoms. This is because a healthy immune system can suppress the infection, keeping it in a latent form. In its latent form, the parasite does not cause disease or inflammation.

22.     Toxoplasmosis is considered an opportunistic infection because it will take advantage of a compromised immune system to reactivate. The latent parasitic infection will remain in that state unless the person becomes immunosuppressed or immunocompromised. At

GX8003-008

that point, the immune system can no longer keep the infection in the latent form, and the inactive cyst will reactivate and begin replicating, causing inflammation and disease, in what is called the tachyzoite form.

23.     Immunocompromised individuals infected with *Toxoplasma gondii* or infected individuals with healthy immune systems who later become immunocompromised can experience serious, life-threatening disease. This includes individuals with advanced HIV disease (AIDS), persons receiving anti-cancer chemotherapy, solid organ and bone marrow/stem cell transplant recipients (due to immune suppressing, anti-rejection medications), and persons with severe congenital immunodeficiencies. Since the beginning of the AIDS pandemic in the early 1980s, toxoplasmosis has ranked high on the list of diseases that can lead to death in persons with AIDS.

24.     The prevalence of toxoplasmosis in the United States has generally decreased over time. The percentage of the population infected with *Toxoplasma gondii* has declined since the 1980s, from an estimated 16.0% of the population as measured in 1988 to 1994 to 10.4% of the population in 2011 to 2014.[2] This decline may be due to several factors, including better public awareness regarding handling cat feces and soil, and improvements in storing and preparing food. The incidence of active toxoplasmosis disease has also declined during this time, driven by improvements in the treatment of HIV and in the prevention of opportunistic infections in general.

---

[2] GX4124 at 003 (Jones et al., *Toxoplasma gondii* seroprevalence in the United States 2009-2010 and comparison with the past two decades. Am J Trop Med. Hyg. 2014; 90(6): 1135-1139). GX4123 at 001 (Jones et al., *Toxoplasma gondii* Infection in the United States, 2011-2014 [published correction appears in Am J Trop Med Hyg. 2018 Jul; 99(1): 241-242]. Am J Trop Med Hyg. 2018; 98(2): 551-557).

GX8003-009

## IV.   The Diagnosis and Treatment of Toxoplasmosis

25.   Toxoplasmosis in immunocompromised or immunosuppressed individuals can involve any organ, including the heart, testis, skin, and spinal cord, but three of the most common manifestations are Toxoplasma encephalitis (TE), congenital toxoplasmosis, and ocular toxoplasmosis.[3]

### A.   Toxoplasma Encephalitis

26.   Toxoplasma encephalitis — toxoplasmosis infection of the brain — is the most common manifestation of the disease among immunosuppressed patients. Toxoplasma encephalitis in immunocompromised patients, especially without prompt diagnosis and treatment, is immediately life threatening. An individual with Toxoplasma encephalitis typically presents to an emergency room or other acute care setting with obvious neurological symptoms often similar to those of a cerebrovascular accident or stroke. Depending on where in the brain the *T. gondii* parasites have reactivated, the patient could present with a range of symptoms, from mental confusion, inability to speak or find words, facial drooping, or inability to use their limbs on one side of their body, to headaches, reflex changes, or seizures, or they may be comatose or obtunded. If the active infection is advanced, a patient with Toxoplasma encephalitis could die within as little as 12 to 24 hours without treatment. Prompt gathering of clinical data, decision-making, and empiric therapy are essential for patient survival.

### 1.   Diagnosis

27.   Because the symptoms associated with Toxoplasma encephalitis are similar to symptoms associated with other conditions including stroke, the treating physician needs to take a number of steps immediately to diagnose the patient. I have outlined these steps below.[4]

---

[3] See GD001 at 001 (Hardy Demonstrative).

[4] See GD001 at 002 (Hardy Demonstrative).

GX8003-010

28.     The physician will first determine whether the patient is immunocompromised, by taking a patient history or possibly performing a rapid HIV test. The treating physician also will order brain imaging (either a CT or MRI scan) and draw blood for a variety of tests, including serology tests to determine if the patient has a past or current toxoplasmosis infection. The CT or MRI scan will be examined to identify the presence of any inflammatory lesions or abscesses. The physician will also review the results of the serological tests to detect IgG antibodies, which indicate a past – and now chronic – toxoplasmosis infection, and/or IgM antibodies, which indicate an acute or recent infection (within the last 30 to 60 days). A positive antibody result for either antibody confirms toxoplasmosis as a possible culprit.

29.     Armed with the results of these tests, the treating physician would make a presumptive diagnosis of Toxoplasma encephalitis based on: (1) a patient history indicating the patient is known or suspected to be immunocompromised; (2) the presence of the typical pattern and appearance of lesions on brain imaging; and (3) a positive serology test for anti-Toxoplasma antibodies. Because time is of the essence, the presumptive diagnosis may be initially based on the patient history and brain imaging alone while awaiting the results of the serologic studies, which may take 24 to 36 hours to become available.

30.     With the presumptive diagnosis, the treating physician would then empirically treat the patient with pyrimethamine plus sulfadiazine or clindamycin, both to treat the parasitic infection and to provide the fourth indirect confirmation that toxoplasmosis is the cause of the intracranial brain lesion(s). The patient is typically admitted to the hospital immediately and remains in the hospital for at least 7 to 10 days, at which point a repeat brain imaging study is performed to determine whether a clinical response to this empiric treatment can be confirmed. A decrease in the number, size, and inflammation of the lesions provides the final confirmation

GX8003-011

of the diagnosis of Toxoplasma encephalitis. If there is minimal or no change or even an increase in the size, inflammation, or number of lesions, it indicates that toxoplasmosis is not likely the cause of the brain disease, and a brain biopsy likely will be necessary to determine the cause. A brain biopsy of one of the lesions can definitively diagnose toxoplasmosis, but because the biopsy itself poses a high risk of causing additional neurological damage and possibly even death, physicians turn to empiric therapy first.

   **2.   Treating Toxoplasma Encephalitis**

   **a)   Treatment Goals**

31.   The focus in treating all forms of toxoplasmosis, including Toxoplasma encephalitis, is to suppress the active and destructive form of the disease. The three distinct goals for treating and preventing Toxoplasma encephalitis are: (1) treatment of the active toxoplasmosis disease; (2) primary prophylaxis (preventing the development of active disease); and (3) secondary prophylaxis (maintenance therapy to prevent recurrence of active disease).

32.   The goal in treating active toxoplasmosis disease is to suppress the actively replicating tachyzoites that are causing the disease and to return the toxoplasmosis to the latent bradyzoite phase, which does not cause disease. All currently available treatments for toxoplasmosis target only the actively replicating state of the parasite. As a result, even with successful treatment of active toxoplasmosis disease, the parasite will never be entirely eliminated and will remain in the patient's body in a latent state for life.

33.   Because patients with a suppressed or weakened immune system may not be able to keep the Toxoplasma in a latent state on their own, primary prophylaxis treatment is often required. Primary prophylaxis pharmacologically assists the compromised immune system in keeping the organism in the latent state to prevent active toxoplasmosis disease from developing. Individuals who may require primary prophylaxis are certain HIV positive patients, as well as

10

patients receiving chemotherapy for cancer and recipients of solid organ and bone marrow/stem cell transplants.

34.     Secondary prophylaxis, or maintenance therapy, is necessary for immunocompromised patients who have successfully completed initial therapy for active toxoplasmosis disease. Unless their immune system is significantly reconstituted (e.g., due to antiretroviral therapy for persons with HIV, completion or reduction in dose of anti-cancer chemotherapy for persons with cancer, or reduction in dose of immunosuppressive medications for transplant recipients) long-term pharmacologic suppression or secondary prophylaxis is necessary to keep successfully treated active toxoplasmosis from re-activating and causing disease again.

### b) Role of Treatment Guidelines

35.     The treatment options for Toxoplasma encephalitis, and the scientific and medical evidence supporting each option, are extensively reviewed, compared/contrasted, and discussed in the Guidelines for the Prevention and Treatment of Opportunistic Infections in Adults and Adolescents with HIV (the "Opportunistic Infections Guidelines").[5] The Opportunistic Infections Guidelines are published by the Centers for Disease Control and Prevention (CDC), the National Institutes of Health (NIH), and the HIV Medicine Association (HIVMA) of the Infectious Diseases Society of America (IDSA), and contain treatment guidelines generated by expert panels drawn from among the world's experts in laboratory and clinical research as well as the clinical practice of diagnosis and treatment of toxoplasmosis.

36.     It is important to understand how guidelines are developed and how clinicians use these guidelines in treating patients with toxoplasmosis. The Opportunistic Infections Guidelines

---

[5] GX4131.

GX8003-013

are regularly updated, based on a real-time review of newly published, peer-reviewed literature relevant to each opportunistic infection. Most importantly, these guidelines make recommendations according to a carefully considered and rigid grading system that conveys both the strength of the recommendations and the quality of the evidence supporting that recommendation, set forth in more detail in Figure 1.

| | |
|---|---|
| Strength of Recommendation | **Grade A** - strong recommendation for the statement |
| | **Grade B** - moderate recommendation for the statement |
| | **Grade C** - optional recommendation for the statement |
| Quality of evidence | **Level I** - One or more randomized trials with clinical outcomes and/or validated laboratory endpoints |
| | **Level II** – One or more well-designed, non-randomized trials or observational cohort studies with long-term clinical outcomes |
| | **Level III** – Expert opinion |

Source: GX4131 at 009 (Opportunistic Infections Guidelines)

*Figure 1: Opportunistic Infections Guidelines Grading System*

37.     Recommendations based on the strongest, best-quality evidence from randomized, controlled clinical trials (RCTs) are assigned an A-I grade. Other less well-studied treatments receive lower grades and can only be recommended with less confidence or certainty because of lack of sufficient scientific evidence from RCTs. This transparent grading system guides the expert panels to digest and categorize large amounts of both laboratory animal research and clinical trial/clinical experience data to provide clinicians caring for patients with opportunistic infections the highest quality guidance to diagnose and treat their patients. As a result, clinicians

GX8003-014

can feel confident that they are making clinically supportable treatment decisions when following these guidelines.

38.     The guidelines are particularly important for physicians treating patients who present for medical care with symptoms consistent with Toxoplasma encephalitis for two reasons. First, after the introduction of effective treatment for HIV in 1996, many opportunistic infections, including toxoplasmosis, occur much more rarely than they did at the height of the AIDS epidemic. As the incidence has declined, many physicians in the U.S. have had little opportunity to gain clinical experience with diagnosis and treatment of these diseases. Second, the scientific evidence-based nature of guideline-informed recommendations is particularly critical due to the irreversible neurologic and potentially life-threatening brain damage TE can cause in an affected patient within hours to days. Faced with these dire outcomes, treating physicians need the most well-researched, well-tested and trusted treatment to halt the progress of the active disease as quickly and as thoroughly as possible. The guideline recommendations provide physicians with the information necessary to confidently select the treatment that will best meet that goal.

### c)  Treatment Options

(1)  Pyrimethamine + Sulfonamide

39.     Pyrimethamine (Daraprim and its generic equivalents) is an antiparasitic medication that, in combination with a sulfonamide, was the first FDA-approved product indicated for the treatment of toxoplasmosis. Daraprim was first approved by the FDA in 1953 and is available as a 25 mg tablet.[6] The sulfonamide most commonly prescribed in conjunction with pyrimethamine is sulfadiazine. If the patient has a hypersensitivity reaction (severe allergy)

---

[6] GX4139 (U.S. Food and Drug Administration, Drugs@FDA, Label for NDA 008578 (Jan 23, 1953)).

13

GX8003-015

to a sulfonamide, clindamycin may be prescribed in place of sulfadiazine. Because pyrimethamine can cause dose-related suppression of the bone marrow causing decreased white and red blood cells, folinic acid (also known as leucovorin or vitamin B9) is administered concurrently to mitigate this effect. Leucovorin protects the bone marrow from the suppressive effects of pyrimethamine.

40.    The two-drug combination of FDA-approved pyrimethamine plus a sulfonamide attacks the Toxoplasma organism's ability to reproduce itself and thus cause disease. This is done by hitting the critical and organism-specific biosynthetic pathway (folic acid cycle) that the parasite uses to make its DNA and its proteins. Without successful functioning of this pathway, these microorganisms cannot sustain themselves.

41.    I have laid out the specific recommended dosing of pyrimethamine plus sulfadiazine for the treatment of TE below in Figure 2.

|  | Pyrimethamine | Sulfadiazine | Leucovorin |
|---|---|---|---|
| **Active disease** (at least 6 weeks) **for patients** *under* **60 kg** | Loading dose of 200 mg, 50 mg once daily | 1000 mg every 6 hours | 10 mg to 25 mg once daily |
| **Active disease** (at least 6 weeks) **for patients 60 kg** *and over* | Loading dose of 200 mg, 75 mg once daily | 1500 mg every 6 hours | 10 mg to 25 mg once daily |
| **Secondary prophylaxis** (continued until patient's immune system recovers) | 25 mg to 50 mg once daily | 2000 mg to 4000 mg daily in 2 to 4 doses | 10 mg to 25 mg once daily |

Source: GX4131 at 376 (Opportunistic Infections Guidelines)

*Figure 2: Toxoplasma Encephalitis Dosing Regimen for* Pyrimethamine Plus Sulfadiazine

42.    Pyrimethamine plus a sulfonamide is recommended by the Opportunistic Infections Guidelines as the preferred therapy for the treatment of active Toxoplasma

14

encephalitis and for secondary prophylaxis, with the highest possible grade of A-I.[7] For patients

who cannot tolerate sulfadiazine, the Opportunistic Infections Guidelines identify pyrimethamine

plus clindamycin as an alternative regimen, also with the highest possible grade of A-I for the

treatment of the active disease, and B-I for secondary prophylaxis.[8]

(2)   Trimethoprim-Sulfamethoxazole (TMP-SMX)

43.     Trimethoprim-sulfamethoxazole (TMP-SMX) (Bactrim, Septra, and their generic

equivalents) is approved by the FDA for certain infections caused by susceptible bacteria and

fungi such as *Pneumocystis jirovecii* pneumonia (PCP), shigellosis, and certain types of urinary

tract infections. It is used off label to treat a variety of other bacterial infections, including

traveler's diarrhea and bronchitis. TMP-SMX was originally approved by the FDA in 1973 and

is available in tablet form in two dosage strengths (80mg/400mg and 160mg/800mg), as an oral

suspension, and as a sterile liquid for intravenous infusion.[9] Similar to pyrimethamine plus

sulfadiazine, TMP-SMX is a fixed-dose combination of two inhibitors of the folic acid pathway.

44.     Although TMP-SMX is not FDA-approved to treat toxoplasmosis, it is prescribed

in certain circumstances. Patients who are at risk for Toxoplasma encephalitis are also at risk for

PCP, so they frequently are prescribed medications to prevent both infections. TMP-SMX is the

recommended medication for primary prophylaxis for PCP, and because it was found that TMP-

SMX also provides prophylaxis against toxoplasmosis, TMP-SMX may be prescribed as

prophylaxis for both opportunistic infections, reducing the pill burden for patients.

---

[7] GX4131 at 376 (Opportunistic Infections Guidelines).

[8] GX4131 at 376 (Opportunistic Infections Guidelines).

[9] GX4140 (U.S. Food and Drug Administration, Drugs@FDA, Original Approhval for NDA 017377 (July 30, 1973)).

GX8003-017

45.     TMP-SMX is recommended by the Opportunistic Infections Guidelines as the preferred medication for primary prophylaxis against Toxoplasma encephalitis, with a graded recommendation of A-II.[10] It is also identified as an alternative (to the preferred therapy of pyrimethamine plus sulfadiazine) for treatment of the active disease (B-I) and secondary prophylaxis (B-II).[11] I have laid out the specific recommended dosing of TMP-SMX for the treatment of TE below in Figure 3.

| | TMP-SMX |
|---|---|
| **Primary prophylaxis** (used for PCP and TE) | One double-strength-tablet (160mg/800mg) daily<br>Alternative: one double-strength tablet of TMP-SMX  three times weekly |
| **Active disease** rated at B-I by the guidelines | Two double-strength tablets (160mg/800mg) three times a day or 10 mg/kg TMP and 50 mg/kg SMX  intravenously in three divided doses daily |
| **Secondary prophylaxis** (continued until patient's immune system recovers) | One double-strength-tablet (160mg/800mg) daily |

Source: GX4131 at 324-325, 354, 376 (Opportunistic Infections Guidelines); GX4119 (Dunay et al. Treatment of toxoplasmosis: historical perspective, animal models, and current clinical practice. Clin Microbiol Rev 2018 31: e00057-17)

*Figure 3: Toxoplasma Encephalitis Dosing Regimen for TMP-SMX*

(3) Atovaquone

46.     Atovaquone, first approved in 1992 under the brand name Mepron, is a quinone antimicrobial drug approved by the FDA for the prevention and treatment of PCP in adults and adolescents aged 13 years and older who cannot tolerate TMP-SMX.[12]  It is available only as an oral suspension. Atovaquone can be used off-label as an alternative medication for primary prophylaxis, treatment of the active disease of toxoplasma encephalitis, and secondary

---

[10] GX4131 at 354 (Opportunistic Infections Guidelines).

[11] GX4131 at 376 (Opportunistic Infections Guidelines).

[12] GX4141 at 354 (Opportunistic Infections Guidelines).

16

prophylaxis, both as part of a multi-drug regimen with pyrimethamine or sulfadiazine and on its own.

47.      Atovaquone is identified by the Opportunistic Infections Guidelines as an alternative medication for primary prophylaxis, with a graded recommendation of C-III. Atovaquone (with meals or oral nutritional supplements) plus pyrimethamine plus leucovorin (B-II), atovaquone plus sulfadiazine (B-II), or, for patients intolerant of both pyrimethamine and sulfadiazine, atovaquone as a single agent (B-II) are also identified as alternative treatments for active Toxoplasma encephalitis disease and for secondary prophylaxis.

**B.  Congenital Toxoplasmosis**

48.      Babies born to mothers infected with Toxoplasma during or prior to pregnancy are at great risk for being born with congenital toxoplasmosis. Congenital infections acquired during the first trimester of pregnancy are more severe than those acquired in the second or third trimester. While the mother rarely has symptoms of toxoplasmosis, temporary parasitemia (parasites circulating in the blood) leads to the development of focal lesions in the placenta, and the fetus may become infected. A wide spectrum of clinical diseases occurs in congenitally infected children: mild disease may consist of slightly diminished vision, whereas severely affected infants may suffer blindness and mental retardation with the full tetrad of manifestations (retinochoroiditis, hydrocephalus, seizures, and intracerebral calcification). When infection occurs during the first trimester, the fetus may not survive the pregnancy.

**1.  Diagnosis**

49.      In diagnosing congenital toxoplasmosis, the primary goal is to screen and treat pregnant women or women seeking to become pregnant to prevent any potential in utero infection. Such screening is accompanied by detailed instruction on how to avoid exposure to toxoplasmosis (avoiding raw or undercooked meat and any contact with potential sources of cat

17

feces, including litter boxes and soil). Ideally, the screening is done as part of a pre-natal evaluation or very early in the pregnancy.

50.    The mother's blood is first tested for the presence of toxoplasma antibodies. If the patient is positive for IgM antibodies (indicator of a recent or active toxoplasmosis infection) or the result is equivocal in any way, the blood sample will need to be tested by a specialized laboratory dedicated to the laboratory diagnosis of *Toxoplasma gondii* infection, to provide a definitive diagnosis of an active toxoplasmosis infection. Additional testing may also be performed on the amniotic fluid at or after 14 gestation weeks to determine if an infant is infected.

51.    The confirmation of the diagnosis is important given the potential severity of a congenital toxoplasmosis infection, particularly when it occurs early in the pregnancy. If infected in the first 10 weeks of pregnancy, blindness and severe mental retardation are likely, and some may elect to terminate the pregnancy. If the pregnancy proceeds, immediate treatment is critical.

52.    Beyond routine screening, if a pregnant woman has a known exposure to toxoplasmosis in the first 18 weeks of pregnancy, the obstetrician will order new antibody tests but likely begin treating the mother empirically with spiramycin before the laboratory results are available; the risk of severe disease is too great and the antibiotic is relatively safe for both the mother and fetus.

**2.  Treating Congenital Toxoplasmosis**

**a)  Treatment Goals**

53.    The primary treatment goal is to prevent the transmission of toxoplasmosis from mother to fetus by treating the mother either prior to or during pregnancy to suppress the active form of the disease. If *in utero* transmission of toxoplasmosis is suspected or confirmed, the second treatment goal is to treat the fetus or child to suppress the active form of the disease.

18

GX8003-020

54.     In the case of congenital toxoplasmosis, a delay in accurately diagnosing or treating the pregnant mother can increase risk for transmission of the parasite to the fetus, resulting in blindness, mental retardation, or even death. The developing fetus does not have a fully formed immune system, and without timely, effective treatment, the toxoplasmosis can actively replicate unchecked, causing irreversible damage.

**b)  Treatment Options**

55.     Treatment of maternal or congenital toxoplasmosis infection is guided by several recommendations, including materials published by the American Academy of Pediatrics Committee on Infectious Diseases and the American College of Obstetricians and Gynecologists.[13] Unlike the Opportunistic Infections Guidelines, these sets of recommendations may or may not include an evaluation of the full body of scientific evidence, including regular reviews of new evidence and graded recommendations.

(1) Pyrimethamine + Sulfonamide

56.     Pyrimethamine plus a sulfonamide, typically sulfadiazine, is used in the treatment of certain maternal infections, and in the treatment of infected fetuses or congenitally infected newborns. The combination of pyrimethamine, sulfadiazine, and leucovorin is recommended for infections acquired by the mother at or after 18 weeks gestation or where infection in the fetus is documented or suspected. The specific recommended dosing of pyrimethamine plus sulfadiazine for the treatment of maternal infections and for congenitally infected infants is set forth in Figure 4 below.

---

[13] GX4129 (Maldonado & Read, AAP Committee on Infectious Diseases. Diagnosis, treatment, and prevention of congenital toxoplasmosis in the United States. Pediatrics. 2017; 139(2): e20163860). GX4130 (Montoya & Remington, Management of Toxoplasma gondii infection in pregnancy. Clin Infect Dis 2008; 47: 554-566). GX4115 (American College of Obstetricians and Gynecologists, Practice Bulletin on Cytomegalovirus, Parvovirus B19, Varicella Zoster, and Toxoplasmosis in Pregnancy. Obstet. Gynecol. 2015; 125(6): 1510–25).

GX8003-021

| | Pyrimethamine | Sulfadiazine | Leucovorin |
|---|---|---|---|
| **Active disease in mother** *detected after 18 weeks gestation* (treatment until delivery) | 100 mg once daily for the first two days, then 50 mg once daily | 75 mg/kg the first day, then 100 mg/kg daily divided into two doses | 10 mg to 20 mg daily until one week after pyrimethamine treatment ends |
| **Congenitally-infected newborns** (treatment for 12 months) | 2 mg/kg/day divided twice per day for the first 2 days, from day 3 to 2 months (6 months if symptomatic), 1 mg/kg/day 1 mg/kg 3 times per week after | 100 mg/kg/day divided twice per day | 10 mg 3 times per week |

Source: GX4130 (Montoya & Remington, Management of Toxoplasma gondii infection in pregnancy. Clin Infect Dis 2008; 47: 554-566)

*Figure 4: Congenital Toxoplasmosis Dosing Regimen*

(2) Spiramycin

57.     Spiramycin is a macrolide antibiotic, similar to erythromycin and azithromycin. Spiramycin is not approved by the FDA for marketing in the U.S., but it may be obtained from the FDA as an orphan drug through the Investigational New Drug process to treat pregnant patients whose toxoplasmosis infection is suspected or diagnosed before 18 weeks gestation and infection of the fetus is not documented.[14] Spiramycin is not recommended if there is documentation or suspicion that the fetus has been infected with toxoplasmosis. Unlike other treatments for toxoplasmosis, Spiramycin is not teratogenic (meaning it does not disturb the development of the fetus) and does not cross the blood-placental barrier, so it can be safely administered in early pregnancy. Spiramycin acts to reduce transmission to the fetus and is most effective if initiated within 8 weeks of the IgM antibody becoming detectable.

---

[14] GX4137 (CDC, Parasites - Toxoplasmosis (Toxoplasma Infection), Resources for Health Professionals).

GX8003-022

## C. Ocular toxoplasmosis

58.     Ocular toxoplasmosis occurs when toxoplasma parasites infect the eye, causing inflammation in the retina, choroid, or both. Upon initial infection, toxoplasma has a predilection to settle at the back of the eye or the retina, the highly specialized tissue responsible for creating vision.

59.     Eye disease (most frequently retinochoroiditis) caused by Toxoplasma infection can result from congenital infection or at any time after birth in a child or adult by any of the modes of transmission I explained above. Eye infection leads to an acute inflammatory lesion of the retina, which can leave retinochoroidal scarring even after the lesion has healed. Symptoms of ocular disease include eye pain, increased sensitivity to light (photophobia), tearing of the eyes and blurred vision. The eye disease can reactivate months or years later, each time causing more damage to the retina. If the central structures of the retina are involved, there will be a progressive loss of vision that can lead to blindness.

### 1. Diagnosis

60.     Ocular toxoplasmosis may be diagnosed when a patient seeks an eye exam specifically because of impaired or blurry vision or incidentally as part of a routine annual eye exam.  If the patient is infected with Toxoplasma parasites that are actively replicating, using an indirect ophthalmoscope, the treating physician will see a collection of white fluffy material causing necrosis of cells in the retina or the choroid, the vascular layer of the eye located below the retina. The vitreous, which is the clear gel-like fluid that fills the eye, may also be cloudy, giving the eye as a whole a cloudy appearance. To confirm the diagnosis, the treating physician will test the patient's blood for antibodies to determine whether the patient is seropositive for toxoplasma, and whether the infection is a new or old infection that has become reactivated.

21

### 2.   Treating Ocular Toxoplasmosis

#### a)   Treatment Goals

61.     The approach to treating ocular toxoplasmosis varies depending on whether the patient is or is not immunocompromised. For immunocompromised patients, ocular toxoplasmosis must be treated, as the eye is structurally and functionally directly connected to the brain. The goals of this treatment are to treat the active disease and to prevent recurrence. For patients with healthy immune systems, however, there is equipoise regarding whether to treat certain manifestations of ocular toxoplasmosis as the disease will often resolve without treatment owing to the competent immune system response. The decision to treat or not to treat ocular disease in these patients is dependent on numerous parameters including acuteness of the lesion(s), degree of inflammation, visual acuity, and lesion size, location, and persistence. The results of ocular toxoplasmosis treatment studies comparing treatment options are often uninterpretable or of little value due to the fact that many of the patients being treated are immunocompetent and thus the disease frequently resolves without treatment.

#### b)   Treatment Options

62.     There are several sources of recommendations for treatment of ocular toxoplasmosis. These recommendations are not necessarily comprehensive reviews of all available scientific evidence, but they do provide clinicians with guidance when treating ocular toxoplasmosis.[15]

---

[15] GX4118 (de-la-Torre, et al. Therapy for ocular toxoplasmosis. Ocul Immunol Inflamm. 2011; 19: 314-20). GX4126 (Kim, et al. Interventions for toxoplasma retinochoroiditis: a report by the American Academy of Ophthalmology. Ophthalmology. 2013; 120(2): 371-378).

GX8003-024

(1) Pyrimethamine + Sulfonamide

63.     For ocular toxoplasmosis that requires treatment, the classic therapy consists of

pyrimethamine plus sulfadiazine. The specific recommended dosing is set forth in Figure 5

below.

| | Pyrimethamine | Sulfadiazine | Leucovorin |
|---|---|---|---|
| **Active disease treatment** for adults (treatment for 4 to 6 weeks) | 100 mg to 200 mg as a loading dose, then 25 mg to 50 mg per day | 500 mg to 1 gram dosed 4 times per day | 15 mg per day |
| **Active disease treatment** for congenital infection in pediatric patients (treatment for 1 year) | 2 mg/kg for one day, then 1 mg/kg per day | 50 mg/kg 2 times per day | 7.5 mg per day |
| **Active disease initial treatment** for acquired infection in pediatric patients (treatment for 4 to 5 year) | 2 mg/kg for one day, then 1 mg/kg per day | 50 mg/kg 2 times per day | 7.5 mg per day |

Source: GX4118 at 003-004 (de-la-Torre, et al. Therapy for ocular toxoplasmosis. Ocul Immunol Inflamm. 2011; 19)

*Figure 5: Ocular Toxoplasmosis Dosing Regimen for* Pyrimethamine Plus Sulfadiazine

(2) Trimethoprim-Sulfamethoxazole (TMP-SMX)

64.     Trimethoprim-Sulfamethoxazole (TMP-SMX) may be used as an alternative,

second-line therapy to treat the active disease of ocular toxoplasmosis when the preferred

pyrimethamine-sulfadiazine regimen is not an option.[16] The specific recommended dosing is set

forth in Figure 6 below.

---

[16] Other alternative treatments that have been used to treat ocular toxoplasmosis include clindamycin/dexamethasone intravitreal injections (that is, injection of the medication directly into the globe of the eye) and azithromycin.

GX8003-025



|  | **TMP-SMX** | **Oral Prednisone** |
|---|---|---|
| **Active disease** (treatment for 6 weeks) | One double-strength tablets (160mg/800mg) twice a day | 1 mg/kg started after 3 days. |

Source: GX4118 (de-la-Torre, et al. Therapy for ocular toxoplasmosis. Ocul Immunol Inflamm. 2011; 19: 314-20)

*Figure 7: Ocular Toxoplasmosis Dosing Regimen for TMP-SMX*

## V. An FDA-Approved Pyrimethamine-Based Regimen is the Preferred Treatment for Toxoplasmosis

65.     Pyrimethamine plus a sulfonamide has long been considered the time-tested and proven gold standard medication to treat active toxoplasmosis disease and is the preferred treatment of all active forms of toxoplasmosis requiring treatment, with the narrow exception of suspected or proven maternal infection at less than 18 weeks of pregnancy.[17] Pyrimethamine plus a sulfonamide is also the preferred treatment for secondary prophylaxis to prevent the recurrence of active Toxoplasma encephalitis. Where the patient cannot tolerate a sulfonamide due to a hypersensitivity reaction or allergy or other intolerance to sulfa, pyrimethamine plus clindamycin is the preferred alternative. A pyrimethamine-based regimen is preferred over other available treatments because of its demonstrated efficacy and safety, its long history of successful clinical use, its superior potency demonstrated in *in vitro* and animal studies when compared to other treatments, and the unique and critical role it plays in diagnosing toxoplasmosis where a biopsy is not feasible.[18]

66.     The combination of pyrimethamine plus a sulfonamide has been the subject of randomized, controlled clinical trials (RCTs), which are the highest, most stringent scientific

---

[17] See GD001 at 003 (Hardy Demonstrative).
[18] See GD001 at 004 (Hardy Demonstrative).

24

GX8003-026

methods of evaluating a medication's safety and efficacy.[19] The outcomes of these RCTs have clearly established that pyrimethamine plus a sulfonamide has the greatest combined efficacy and acceptable tolerability when folinic acid is given concomitantly.[20] The medical and scientific evidence that makes the pyrimethamine-based regimens the preferred treatment is recognized in the Opportunistic Infections Guidelines, which give pyrimethamine plus sulfadiazine the strongest possible recommendation of A-I based on the highest quality evidence available.[21] Guidelines and recommendations for the treatment of congenital toxoplasmosis and ocular toxoplasmosis also identify the pyrimethamine-plus-sulfadiazine regimen as the first-line therapy for active toxoplasmosis disease.[22]

67.      There is a long history of successful clinical use of pyrimethamine plus a sulfonamide to treat toxoplasmosis. Despite the introduction of other treatments in the many decades since pyrimethamine was first approved, a pyrimethamine-based regimen has remained the gold standard regimen for all major manifestations of active toxoplasmosis disease. Clinicians have continued to use pyrimethamine plus a sulfonamide because they know—from scientific research, rigorous medical guidelines, and experience—that it treats toxoplasmosis the most effectively. Throughout the 1980s and 1990s, the treatment of choice for the numerous cases of life-threatening Toxoplasma encephalitis in persons with AIDS as well as other

---

[19] GX4131 at 322-336 (Opportunistic Infections Guidelines) *citing* GX4125 (Katlama, et al. Pyrimethamine-clindamycin vs. pyrimethamine-sulfadiazine as acute and long-term therapy for toxoplasmic encephalitis in patients with AIDS. Clin Infect Dis. 1996 Feb; 22(2): 268-275); GX4117 (Dannemann, et al Treatment of toxoplasmic encephalitis in patients with AIDS. A randomized trial comparing pyrimethamine plus clindamycin to pyrimethamine plus sulfadiazine. The California Collaborative Treatment Group. Ann Intern Med. 1992; 116(1): 33-43).

[20] GX4131 at 324-325 (Opportunistic Infections Guidelines).

[21] GX4131 at 324-325, 376 (Opportunistic Infections Guidelines).

[22] GX4129, GX4130, GX4115, GX4118, GX4126.

GX8003-027

immunocompromised patients without HIV was a pyrimethamine-based regimen, and it remains so today.

68.     Pyrimethamine also has superior potency compared to other drugs used in the treatment of toxoplasmosis. *In vitro* studies have demonstrated that pyrimethamine is 25 to 50 times more potent against *T. gondii* compared to trimethoprim, one of the key components of TMP-SMX, on its own; the combination of pyrimethamine plus sulfadiazine is 10 times more potent than the combination of trimethoprim and sulfamethoxazole found in TMP-SMX.[23] Superior potency is important in treating active toxoplasmosis, particularly in the case of Toxoplasma encephalitis and ocular toxoplasmosis. The blood-brain barrier is difficult to penetrate, so only a small amount of medication may reach the brain or the eye. Because it is highly potent, even that small amount of pyrimethamine that penetrates the blood-brain barrier can effectively treat the active infection. The same is not true of a relatively low-potency medication like TMP-SMX; if only a small amount of TMP-SMX manages to penetrate the blood-brain barrier, it may fail to adequately treat the active infection, allowing it to continue to replicate and cause irreversible damage in the brain or eye.

69.     Pyrimethamine also plays a unique and critical role in diagnosing Toxoplasma encephalitis. Once a presumptive diagnosis has been made, the patient is treated empirically with pyrimethamine plus sulfadiazine or clindamycin. The aim of this treatment is to both treat the parasitic infection and to provide confirmation that toxoplasmosis is the cause of the intracranial brain mass or masses. A significant decrease in the size, inflammation, or number of the lesions in the brain following at least a week of pyrimethamine therapy confirms the diagnosis of

---

[23] GX4134 (van der Ven, et al. Anti-toxoplasma effect of pyrimethamine, trimethoprim and sulphonamides alone and in combination: implications for therapy. J Antimicrob Chemother. 1996 Jul;38(1):75-80).

GX8003-028

Toxoplasma encephalitis, while a lack of change or increase in the size, inflammation, or number of lesions after at least a week of pyrimethamine therapy indicates that toxoplasmosis is likely not the cause of the brain disease. In this way, pyrimethamine serves as the gold standard not only for the primary treatment of the disease, but also as a critical factor in making the diagnosis of the disease.

70.     The reasons set forth above for preferring pyrimethamine for the treatment of toxoplasmosis apply equally to all FDA-approved pyrimethamine products. For more than 67 years, the only FDA-approved pyrimethamine product available was the branded form of Daraprim, until February 2020 when the FDA approved a generic form of pyrimethamine.

71.     Generic products are subject to a high standard for review and approval by the FDA. The generic applicant must establish that their product is effectively the same as its brand-name counterpart that has already been established to be safe and effective. To do so, the generic must provide sufficient data to demonstrate that its product delivers the same amount of active ingredient and behaves in the same way in patients as the branded drug.  The generic must also demonstrate that its manufacturing process will reliably and consistently produce a high-quality drug. By meeting the FDA's stringent standards for approval, any FDA-approved generic pyrimethamine product is assured to be as safe and effective as Daraprim and can be used interchangeably.

72.     I cannot overstate the importance of treating life-threatening disease with the gold standard treatment. When immunocompromised patients present for medical care with suspected Toxoplasma encephalitis, there is little room for error if the patient is to have a positive outcome. Failure to treat the patient properly and timely can lead to brain damage and even death in a short period of time. In these critical circumstances, physicians must use limited sources of data to

GX8003-029

quickly make diagnostic and treatment decisions. For these reasons, reliance upon treatments that have been extensively studied in *in vitro*, animal, and clinical studies and have consistently and reliably demonstrated positive characteristics and high levels of success are critical to patient survival. Using alternative treatments when the proven, scientifically-based treatment of FDA-approved pyrimethamine plus sulfadiazine is available, exposes the already seriously ill, immunocompromised patient to unnecessary risks.

## VI.   Trimethoprim-Sulfamethoxazole is Not Interchangeable with an FDA-Approved Pyrimethamine-Based Regimen

73.     Trimethoprim-sulfamethoxazole is not readily interchangeable with pyrimethamine plus a sulfonamide for the treatment of active toxoplasmosis disease or secondary prophylaxis for Toxoplasma encephalitis. TMP-SMX has more limited scientific evidence of safety and efficacy, it lacks the long history of successful clinical use, it has been demonstrated to be 25- to 50-times less potent than pyrimethamine (thus making it less likely to penetrate and treat the disease in the brain and eye), and it cannot be reliably used to confirm the diagnosis of Toxoplasma encephalitis through empiric treatment.[24] TMP-SMX is also not a viable treatment option for patients with a sulfa allergy.

### A.  Lack of Evidence of Safety and Efficacy

74.     The scientific evidence of the safety and efficacy of TMP-SMX in the treatment of active toxoplasmosis disease is limited. The Opportunistic Infections Guidelines reflect this lack of scientific evidence, giving TMP-SMX a B-I recommendation for the treatment of active Toxoplasma encephalitis, indicating that the evidence to support a recommendation for or against use is moderate.[25] While the Opportunistic Infections Guidelines note that if

---

[24] See GD001 at 005 (Hardy Demonstrative).

[25] GX4131 at 376 (Opportunistic Infections Guidelines).

28

pyrimethamine is unavailable or there is a delay in obtaining it, TMP-SMX may be utilized as a

second-line treatment in place of pyrimethamine-sulfadiazine or pyrimethamine-clindamycin, the

Guidelines acknowledge that this alternative treatment has much less scientific evidence to

support it. Treatment recommendations for congenital and ocular toxoplasmosis similarly

identify TMP-SMX as only an alternative to the first-line therapy of pyrimethamine plus a

sulfonamide.[26]

75.     Few head-to-head prospective clinical trials of treatments for Toxoplasma

encephalitis comparing TMP-SMX and a pyrimethamine-based regimen have ever been

conducted. Of those published, only two were RCTs and only one of those was conducted to

completion. That singular RCT was conducted in Italy and enrolled a total of only 77 total

patients (40 TMP-SMX vs 37 P-S) and did not show a statistically significant difference in

efficacy or survival between the two treatments.[27] The major problem in interpreting the results

from a trial of this small size is the lack of statistical confidence that the results are truly valid.

76.     I have two concerns about the validity of this study. First, in general, it is

preferable to have more, rather than fewer, study participants where at all possible. There is no

indication that the study was constrained in enrolling enough patients, because the incidence of

TE had not yet declined in Europe in the mid- to late-1990s when the study was conducted. I also

have concerns that this RCT may have reported results for participants who were not in fact

infected with *Toxoplasma gondii*. The authors of the study note that "[t]he presence of antibodies

to *T. gondii* was not required as an inclusion criterion,"[28] and in fact, when they later conducted

---

[26] GX4129, GX4126, GX4118.

[27] GX4132 (Torre, et al. Randomized trial of trimethoprim-sulfamethoxazole versus pyrimethamine-sulfadiazine for therapy of toxoplasmic encephalitis in patients with AIDS. Italian Collaborative Study Group. Antimicrob Agents Chemother. 1998 Jun;42(6):1346-9).

[28] GX4132 at 003 (Torre, et al.).

GX8003-031

blood tests on the study participants, nearly one quarter (17 of 77) of the participants did not have antibodies to *T. gondii*.[29] These participants were nevertheless kept in the study, and results were reported as to these participants' treatment outcomes despite equivocal diagnoses. The inclusion of these participants in the already-small population size of the study further undermines the statistical confidence that the results of the study are actually valid.

77.      I am aware that Dr. Jena cites to two meta-analyses concerning TE as finding there are therapies without pyrimethamine with similar efficacy to those with pyrimethamine. There are two problems with his assertion. First, meta-analyses are not a replacement for RCTs, which are the gold standard tool for assessing safety and efficacy in the clinical context. Meta-analyses are often conducted to compensate for the lack of definitive RCT evidence to conclusively resolve a clinical treatment question. But, combining multiple imprecise, non-definitive data sets frequently only further obfuscates the clinical treatment question at issue, rather than providing clear conclusions as to the best clinical treatment for a given condition. Moreover, meta-analyses are beset with statistical issues: they seek to combine smaller studies to produce a large enough data set to show statistical significance, but the smaller studies are not analogous to one another, with the result that meta-analyses typically do not produce statistically conclusive information unless they are based on RCTs that are already conclusive. For these reasons, expert panels typically do not take meta-analyses into account when fashioning treatment guidelines. Second, these specific meta-analyses ultimately did not produce definitive results, and each suggest that further RCTs are necessary to produce conclusive evidence.

---

[29] GX4132 at 002 (Torre, et al.).

GX8003-032

### B. Limited Clinical Experience

78.     Although TMP-SMX has been available since the 1970s, it has not been adopted as a first-line treatment for active toxoplasmosis disease. As a result, overall clinical experience using TMP-SMX to treat toxoplasmosis has been limited compared to pyrimethamine-based regimens. Clinicians who are not as familiar with using TMP-SMX to treat active toxoplasmosis may not be as comfortable with using it to treat a potentially life-threatening disease when the gold standard treatment is available.

79.     I am aware that Dr. Jena has cited to anecdotal evidence of doctors who use TMP-SMX and have expressed a preference for it. The personal clinical preference of individual doctors is not inconsistent with my opinion that a pyrimethamine-based regimen is the gold standard for treatment of active toxoplasmosis disease. The use of TMP-SMX for the treatment of active toxoplasmosis disease is not supported by the same level of scientific evidence supporting the use of pyrimethamine plus a sulfonamide and therefore is not recommended as first-line therapy by the guidelines. While physicians generally consult and make treatment decisions based on clinical guidelines and, to a lesser extent, medical literature, it is not unexpected that individual physicians may come to a different conclusion than those expressed in guidelines and medical literature based on their own clinical experience.

80.     Dr. Jena has also cited to evidence that the institution where he is a hospitalist, Massachusetts General Hospital, has steered physicians to select TMP-SMX to treat toxoplasmosis. Documents produced by Massachusetts General Hospital explain, however, that the decision to steer doctors to TMP-SMX was driven by the excessive price increase of Daraprim (estimating it would cost at least $150,000 to treat only nine patients) and concerns

GX8003-033

about disruptions to patient care—it was not done for medical reasons.[30] Despite this

recommendation, MGH made allowances for the use of Daraprim where the patient had a sulfa

allergy, and Daraprim was still available for patients transitioning from the hospital to outpatient

care.[31]

81.     Over the past approximately five years, I have also experienced disruptions to the

care of my own toxoplasmosis patients when the hospital pharmacies I work with have had

difficulty filling my prescriptions for Daraprim. As I have explained, if left untreated, TE causes

brain damage at a rapid pace and can cause death within days if not hours. Therefore, in

situations where the pharmacy was unable to obtain the gold standard treatment Daraprim for my

patient in a timely manner, I was forced to start the patient on the alternative treatment TMP-

SMX while I continued my efforts to obtain Daraprim. Throughout this period of time I have

continued to prescribe the gold standard of pyrimethamine plus sulfadiazine or pyrimethamine

plus clindamycin to my patients, but have only turned to TMP-SMX as a third choice when

pyrimethamine was unavailable.

**C.  Reduced Potency**

82.     As I explained earlier in my testimony, *in vitro* studies have demonstrated that

pyrimethamine is 25 to 50 times more potent against *T. gondii* compared to trimethoprim, the

first ingredient in TMP-SMX, and pyrimethamine plus a sulfonamide is 10 times more potent

than the combination of TMP-SMX.[32] The protective blood-brain barrier is difficult for drugs to

penetrate, meaning that very little TMP-SMX might actually make its way into the brain tissue.

---

[30] MGH000000043. *See also* GX3546 (MGH000000011) (recognizing pyrimethamine as the "mainstay treatment for severe toxoplasmosis infections.")
[31] MGH000000043.
[32] See ¶ 68.

GX8003-034

If so, its inferior potency decreases the chance that it will effectively treat Toxoplasma

encephalitis and thus makes TMP-SMX a less attractive choice for treatment. It has been

elevated as a potential option for treatment of toxoplasmosis almost entirely due to the increased

cost and limited availability of FDA-approved pyrimethamine.

### D. Unsuitable for Empiric Therapy

83.     Unlike pyrimethamine, empiric therapy with TMP-SMX cannot be used to

confirm a presumptive diagnosis of Toxoplasma encephalitis. Because TMP-SMX is a broad-

spectrum antibiotic – and not specifically an antiparasitic like pyrimethamine – achieving a

decrease in the size and inflammation of the brain lesions after two weeks of TMP-SMX

treatment does not necessarily confirm that toxoplasmosis is the cause of the brain disease.

Rather, such a result could indicate that the patient had one of many bacterial infections which

TMP-SMX can treat or possibly a parasitic infection. In this situation, the empiric treatment

would be inconclusive and would not serve to confirm the presumptive diagnosis, with

potentially disastrous consequences for patient survival.

### E.  Not an Option for Patients with Sulfa Allergies

84.     Finally, TMP-SMX cannot be used in patients with a history of hypersensitivity to

sulfonamide antibiotics, including anaphylaxis, Stevens-Johnson syndrome (a severe reaction of

the skin and mucous membranes that can cause lasting damage and suffering and even death) or

severe liver or kidney toxicity. These patients also cannot receive sulfadiazine. Approximately

3% to 8% of the general population have an allergy to sulfonamides, but among patients with

HIV, that number may be as high as 30%.[33] As both hypersensitivity to sulfonamides and severe

---

[33] GX4120 (Giles, et al. Sulfonamide Allergies. Pharmacy (Basel). 2019;7(3):132); (GX4116 (Brackett, et al. Likelihood and mechanisms of cross-allergenicity between sulfonamide antibiotics and other drugs containing a sulfonamide functional group. Pharmacotherapy. 2004; 24:856–870).

GX8003-035

liver or kidney toxicity are not always predictable and are increased with patients with HIV, the use of TMP-SMX poses increased risks to these patients.[34] The treatment of choice in these patients is the combination of pyrimethamine and clindamycin.

## VII. Compounded Pyrimethamine is Not Interchangeable with FDA-Approved Pyrimethamine

85.     Compounded pyrimethamine is not readily interchangeable with FDA-approved pyrimethamine. While the two products may theoretically contain the same active pharmaceutical ingredient, compounded pyrimethamine is not subject to the same rigorous standards of review as products approved by the FDA. As such, a treating physician would have no assurance of a compounded product's safety or efficacy. Specifically, compounded products are not required to: (1) demonstrate that they have the same effect on the body as the FDA-approved product; (2) be made in the same form as the FDA-approved product; (3) meet rigorous manufacturing standards; and (4) use suitable active pharmaceutical ingredients.[35] A treating physician therefore would have no way of knowing whether a compounded pyrimethamine product would work as an FDA-approved pyrimethamine product would. Due to these differences, the guidelines and recommendations that physicians rely upon do not apply to compounded pyrimethamine.

86.     Compounded or "home-grown" medications are products that are made by combining, mixing, or altering active and inactive pharmaceutical ingredients to create a medication in a non-FDA-approved facility. Compounding may be done by retail or hospital-based pharmacies, typically to meet the needs of a specific patient. Compounded medications are not typically prescribed when the patient can be treated with an available FDA-approved

---

[34] GX4121 (Ho & Juurlink. Considerations when prescribing trimethoprim-sulfamethoxazole. CMAJ. 2011 Nov 8;183(16):1851-8).

[35] See GD001 at 006 (Hardy Demonstrative).

34

medication. Unlike generic medications, which are automatically substituted by a pharmacist, compounded products must be expressly prescribed by the doctor.

87.     Unlike FDA-approved generic drugs, compounded medications are not required to demonstrate that they will deliver the right amount of the active ingredient to the place in the body where it has effect. Because of this lack of testing, a physician cannot be confident that the compounded pyrimethamine will have the same effect on toxoplasmosis as FDA-approved pyrimethamine. This poses a number of risks, including that treatment will be less effective or take longer to act on the infection. The risks are particularly dire in the case of Toxoplasma encephalitis, where a presumptive diagnosis is confirmed through empiric treatment with pyrimethamine. If a patient treated with compounded pyrimethamine fails to improve as expected, it may be unclear whether that means the patient does not have toxoplasmosis or that the compounded pyrimethamine did not work on the infection in the same way as the FDA-approved product would.

88.     It is common for compounders to prepare medications in capsule form, rather than tablet form. FDA-approved pyrimethamine is available only in tablet form but it is my understanding that Imprimis and Avella, two specialty pharmacies, created compounded versions of pyrimethamine in capsule form.[36] The absorption rate of any oral medication—meaning the rate at which the drug moves from the intestinal tract into systemic circulation—is often dependent on how the medication is delivered to the gastrointestinal tract via tablet or capsule. Physicians will not know how their absorption into the blood system compares to that of FDA-approved tablets, which may pose problems for critically ill patients with TE where their

---

[36] Saadeh (Imprimis) Dep. 27:3-12; GX3362 at 002 (OPT000001) (Avella press release referring to compounded pyrimethamine product as a "capsule").

35

response to treatment not only confirms the diagnosis of Toxoplasma encephalitis but also ensures their survival.

89.     The manufacturing processes used to make compounded medications as well as the active pharmaceutical ingredients in the compounded medications themselves are also not subject to the same standards as FDA-approved products. Because compounded medications do not need to comply with cGMP standards, there is a risk that errors in the compounding process will occur, resulting in products that have unpredictable amounts of active ingredient. Likewise, the lack of oversight over the active pharmaceutical ingredients themselves means the prescribing physician may not know whether it is of the same quality and suitability for human use as the FDA-approved medication.

90.     It is also important to point out that the treatment guidelines are made using the strong assertion that not only is the choice of the anti-*T. gondii* medication critical, but also that these medications be from FDA-reviewed, -approved, and -monitored sources. The potency, stability, absorption, metabolism, distribution, penetration, elimination, and durability of the pharmaceutical agents themselves must be held to the standards established and enforced by the FDA. Thus, while the various guidelines and recommendations for the treatment of toxoplasmosis apply equally to FDA-approved branded and generic versions of medications, the same is not true of compounded pyrimethamine products.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on October 20, 2021.

/s/ *W. David Hardy*
W. David Hardy, M.D.

GX8003-038

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**FEDERAL TRADE COMMISSION, et al.,**

      **Plaintiffs,**

      **v.**                                                    **Case No.: 1:20-cv-00706-DLC**

**VYERA PHARMACEUTICALS, LLC, et al.,**

      **Defendants.**

**Direct Testimony of Frank DellaFera,**
**Founder and President, Fera Pharmaceuticals, LLC**

GX8007-001

Frank DellaFera declares as follows:

1.    My name is Frank DellaFera. I am voluntarily submitting this declaration at the request of the plaintiffs in this case. I understand that this declaration will be submitted to the Court deciding this matter. The statements in this declaration are based on my personal knowledge. The exhibits referenced in this declaration are attached.

2.    I previously testified about the events discussed this declaration in an investigational hearing conducted by the FTC on December 10, 2019. I testified truthfully and accurately during that investigational hearing. I reviewed the transcript from the investigational hearing, GX5003, for accuracy. I also testified about the events discussed in this declaration at a deposition on January 19, 2021. I testified truthfully and accurately during that deposition.

I.    **Background**

3.    I am the founder and current president of Fera Pharmaceuticals, LLC, which is a pharmaceutical company based in Locust Valley, New York. I also reside in the State of New York. I have worked in the pharmaceutical industry since 1981, after graduating from the School of Pharmacy at St. John's University. After working for two years as a practicing community pharmacist, I joined Eli Lilly in sales. After several promotions, I joined another company called Lyphomed, which specializes in hospital injectables, again in a sales role. After leaving Lyphomed, I became vice president of sales and marketing at Benvenue Labs. In 1990, I joined Dura Pharmaceuticals, an allergy respiratory company, as a regional sales director. In 1996, I joined Eon Labs as the head of sales and marketing. In 2005, a large pharmaceutical company called Novartis acquired Eon Labs.

4.    Following the 2005 acquisition, I was made vice president of sales and marketing of Sandoz, Novartis's generic division. In that role, I was responsible for setting and managing Sandoz's commercial strategy for approximately 800 molecules (with over 1,500 different

GX8007-002

formulations). In 2008, I was promoted to president and CEO of Sandoz. Due to a change in global leadership, I left Sandoz in January 2009.

5.      After leaving Sandoz, I decided to start Fera Pharmaceuticals in 2009. I am Fera's current president and own the company along with my wife and a family trust. My vision for Fera was to start a company that developed niche products—generic or branded—that are overlooked by the larger pharmaceutical companies and/or that faced barriers to entry. This business model has been successful for Fera. As an example, Fera acquired nine generic ophthalmic ointments, which had a difficult delivery mechanism. I later sold these ointments for $93 million plus milestone payments.

6.      As president of Fera, I set the company's strategic vision and make the ultimate decision as to what pharmaceutical products to pursue. My team updates me on a daily basis about the status of our current projects and we frequently discuss commercial strategy. While I usually delegate managing our business partners to my vice president, Susan McDougal, an executive with nearly 20 years of pharmaceutical industry experience, I am involved with important decisions like contracting with a new business partner or signing off on major financial spending. Similarly, while Fera has a regulatory team headed by John D'Angelo, an executive with 40 years of FDA regulatory experience, I review important communications to the FDA before submitting them to the agency. Fera's regulatory team often prepares our FDA submissions in conjunction with reputable FDA consulting firms like Hyman, Phelps and Lachman Associates. Fera also has hired a consultant, Gary Conte, who has over 40 years of experience working with active pharmaceutical ingredient (API) suppliers. His experience is invaluable in helping to choose reputable API manufacturers with a solid track record complying with FDA regulations.

GX8007-003

II.   **Fera's business model for generic drugs**

7.      As I mentioned above, part of Fera's generic drug business model is to identify

and develop products with barriers to entry that would deter other competitors. Such barriers to

entry could include a complex formulation that is difficult to develop, an unusual dosage form

that is difficult to manufacture, or limited availability of suppliers of the drug's active

pharmaceutical ingredient. Another, though much rarer, barrier to entry occurs when a brand

drug's distribution system makes it difficult to acquire the samples needed for bioequivalence

testing. Because Fera is unencumbered with manufacturing facilities that often have lengthy

developmental lead times, we are able to move quickly to pursue new opportunities as they arise.

8.      To evaluate a new product opportunity, Fera uses a number of databases. Each

database provides different, useful information. For example, Fera's commercial team typically

reviews data sold by a company called IQVIA (formerly known as IMS). IQVIA data is the best

way to get information about the product's sales data and number of market participants—

particularly when a product is marketed by a privately held company that does not need to make

public SEC filings. We use another database, called Newport, to evaluate the number and

availability of API suppliers and whether the product is protected by patents.

9.      Fera seeks to partner with reputable API suppliers that have experience

complying with the FDA's rigorous manufacturing and quality regulations. These rules are

known as current Good Manufacturing Practices, or cGMPs. This is because the drug's API is its

most important ingredient. My commercial team works closely with our API consultant, Gary

Conte, to evaluate potential suppliers. It is ultimately my decision to select the API supplier, as

they play such an important role in drug development. When available, I prefer to use an API

supplier that has already filed a drug master file, or DMF, for the specific product. When the

supplier has already filed a DMF, I know they have compiled the information necessary for the

3

FDA to review. An even better option is to use a DMF-holding supplier whose API is already in use in another FDA-approved product because that means the FDA has already reviewed and approved that supplier's manufacturing process.

10.    If there are no DMF holders available, Fera tries to find a reputable API supplier that has already developed a manufacturing process for the particular API. Using an API supplier with a developed process means that the supplier does not need to develop the process from scratch. But the supplier must then ensure that its process complies with FDA regulations and compile the necessary documentation for filing the ANDA. This compliance process can be lengthy, even when the supplier already knows how to manufacture the product.

11.    If no other reputable suppliers with a manufacturing process are available, we have to pay a supplier to develop the API. This is a lengthy and costly process, and often raises additional questions from the FDA, which can delay approval. Because using a DMF holder can help Fera be the first generic to market and greatly reduce our costs, we strongly prefer to use an API supplier with an already filed and approved DMF.

12.    After finding a source of cGMP-compliant API—whether by purchasing from a DMF holder or by having the supplier develop the process—we send the API to a contract manufacturer to develop the finished dosage form of the product. To facilitate the research and development of the generic version of the drug, we typically seek to acquire small amounts of the brand version listed on the FDA's Orange Book, known as referenced listed drug or RLD. We then compare the API in the brand version of the drug to our supplier's API to verify that they are the same.

13.    Another reason that Fera needs samples of RLD for our generic product is to meet the FDA's bioequivalence requirement. To receive FDA approval for a generic drug, Fera needs

GX8007-005

to establish that its generic product is bioequivalent to the RLD. This usually involves providing both our generic product and the brand RLD to humans in both a fast and fed state and observing to ensure that the drug absorbs into the body at a similar rate. FDA regulations also require Fera to retain five times the amount of RLD as used in the bioequivalence testing. It is my understanding that the FDA requires us to retain this RLD to allow the agency to verify our testing if necessary.

14.     Normally, acquiring samples of RLD is a simple process. Fera's commercial team, Ms. McDougal or one of her reports, reaches out to a licensed pharmacy or distributor to acquire the drug. From the time of the request, we usually have the product in hand within a week, or at most a month.

## III.   **Fera's generic pyrimethamine project**

15.      In September 2015, my team and I identified Daraprim as a potential generic product opportunity following the headlines about the manufacturer's large price increase. At that point, my team and I reviewed IQVIA data and saw that Daraprim's sales volumes was about one million tablets per year. At that point, I e-mailed Ms. McDougal to check the Newport database to see if there were any API suppliers available with DMFs. Based on Ms. McDougal's response, I understood that there were only two suppliers with DMFs: Ipca and Fukuzyu. GX3246 is a copy of the September 21, 2015 e-mail I sent to Ms. McDougal and her response to me.

16.     We also understood that Daraprim was subject to a closed distribution system. A closed distribution system means that the drug is distributed through a specialty pharmacy, rather than using wholesale distributors. The fact that Daraprim was in closed distribution could mean that it would be more difficult to acquire RLD, which could deter other potential competitors.

GX8007-006

17.     Because the lack of API suppliers and the closed distribution system acted as barriers to entry to generic competitors, I concluded that a generic pyrimethamine product would be a good fit for Fera's business model.

18.     When deciding whether to pursue the generic pyrimethamine project, I did not consider price or sales volume of Bactrim or compounded pyrimethamine.

### IV.  Fera's generic pyrimethamine development was delayed by the lack of API manufacturers

19.     After evaluating the market opportunity, Fera's first step in drug development was to find a source of pyrimethamine API. We first reached out to Fukuzyu, which holds a DMF for pyrimethamine API, but they did not respond to our initial query.

20.     I then decided to meet with potential API suppliers at an industry conference called the Drug, Chemical, and Associated Technologies Week, usually referred to as DCAT. Before attending, my team had identified another potential API supplier, API-1 from the Newport database. Newport indicated that API-1 did not currently have a manufacturing process in place, though it might have had some previous experience. Gary Conte, Fera's API consultant, highly recommended API-1 based on feedback he had heard from his colleagues in the industry about that company's work for multinational pharmaceutical companies like Merck. He arranged for Ms. McDougal and me to speak with API-1 executives at DCAT 2016, which was held at the Waldorf Astoria in New York City.

21.     While the API-1 executives we met confirmed that API-1 did not currently have a pyrimethamine manufacturing process in place, one of the scientists appeared familiar with the molecule. Based on our conversations with these executives and Gary Conte's assessment, I decided to pursue a relationship with API-1 to develop pyrimethamine API for Fera's generic pyrimethamine project.

GX8007-007

22.     At DCAT, we also met with another API supplier called ███. Like API-1 ███ scientists appeared to have some familiarity with pyrimethamine API but did not have a manufacturing process in place. I chose API-1 instead of ███ because of API-1's well-established reputation and more favorable pricing.

23.     Following DCAT, Ms. McDougal negotiated a development agreement with API-1 in which Fera would pay API-1 for its labor and costs in developing the API, prepare the DMF, and take care of FDA filing fees. I reviewed API-1's proposal and signed off on the development agreement, which Ms. McDougal executed.

24.     API-1 was a good and responsive partner, but as often happens when developing a new manufacturing process, they made mistakes. For example, API-1 failed to perform a purge test that required them to redo a large amount of the development work, setting our process back significantly and costing about $200,000.

25.     In total, I estimate that Fera invested around $2 million in API-1's pyrimethamine API development. First, we paid all costs associated with API-1's pyrimethamine API development, which totaled close to $1 million. A list of these costs through May 2019 is contained in GX3106. Fera keeps documents like GX3106 in order to monitor project costs in the ordinary course of business. In addition to these costs, Fera's commercial and regulatory team devoted significant time and resources towards facilitating API-1's development, which I estimate totaled around $1 million.

26.     To ensure that we protected our significant investment in developing a pyrimethamine API manufacturing process, Fera entered into an exclusive supply contract with API-1. At Fera, we use exclusive supply agreements when we invest in an API supplier's development process because it wouldn't make business sense for us to pay for a supplier that

7

would supply our competitors. For this reason, without an exclusive contract, we would not be willing to outlay the resources required to pay for the development of a new API process. On the other hand, when the API supplier already has a DMF, Fera does not enter into exclusive supply contracts because there is no investment to protect.

27.     Because of the uncertainty that comes with developing a new API manufacturing process, and because submitting a new process to the FDA can also involve some regulatory risk, I would have preferred to switch to an API supplier whose process was already approved, despite the significant investment we had made into API-1's process. I believed that Fukuzyu, one of the two pyrimethamine API suppliers with a DMF, likely supplied the brand manufacturer of Daraprim given how long Fukuzyu was on the market. This meant that the FDA had likely already approved Fukuzyu's pyrimethamine API manufacturing process.

28.     For this reason, Fera tried again to initiate a relationship with Fukuzyu. In late 2017 and early 2018, our API consultant, Gary Conte, worked with a broker to try to acquire a sample of pyrimethamine API from Fukuzyu. I viewed this request as the first step in developing a deeper business relationship. Ms. McDougal led this process internally, but she kept me in the loop as the negotiations proceeded. My understanding is that Fukuzyu would not agree to sell Fera pyrimethamine API for human use in the United States and imposed other restrictions on any purchase. Because of these constraints on Fera's use of the API, it was evident to me that it made no sense to seek to purchase pyrimethamine API from Fukuzyu.

29.     Due to the difficulty sourcing RLD, explained in greater detail below, we did not begin work on the drug master file until the fall of 2018. On May 28, 2019, Fera filed a drug master file for pyrimethamine API based on the process that API-1 developed for Fera.

8

V.   **Fera sought, but failed, to acquire sufficient RLD for development and bioequivalence testing**

30.     In fall 2016, I directed the commercial team to begin to seek to procure samples of Daraprim RLD. Ms. McDougal informed me that Fera's usual suppliers were unable to obtain Daraprim RLD due to restrictions from the manufacturer. This information led Fera to seek alternate sources of Daraprim RLD.

31.     In December 2016, Ms. McDougal and I got in touch with a hospital pharmacist at ████████, ██████████. We asked ████████ whether he could procure Daraprim for our research and development and for use in bioequivalence testing. On December 15, 2016, ██ ████ informed Ms. McDougal by e-mail that "according to our hospital policy and distributor contract, I can only procure from what is defined as own use for hospital business, so purchasing it for Fera doesn't look viable." Ms. McDougal forwarded this e-mail to me. GX3258 is a copy of forwarded e-mail from ████████. Based on this e-mail, I concluded that a hospital pharmacy was not a feasible route to procure Daraprim samples.

32.     On December 22, 2016, Fera entered into an agreement with a contract research organization called Xcelience to both acquire Daraprim RLD and to develop a generic Daraprim prototype. This organization was appealing to me because it advertised to Fera that it could accomplish two of our goals at once: procure Daraprim RLD and use an intermediate batch of API-1 API to develop a model of generic Daraprim.

33.     But Xcelience's sources were also unable to procure Daraprim RLD. One of Xcelience's sources even reached out to Vyera to acquire 13 30-count bottles of Daraprim on our behalf. In response to that request, Vyera required that Fera identify itself and indemnify Vyera for any liability related to Daraprim, regardless of whether it related to the specific RLD that Fera purchased. I viewed this as an intentional effort to place onerous conditions on Fera in order

9

to prevent us from acquiring the samples we needed and to gain competitive intelligence about a potential generic competitor. Ms. McDougal struck the indemnification provision in a redline and sent it back to Xcelience, but my understanding is that we never heard back. Because Xcelience could not procure RLD, I made the decision to terminate our relationship in August 2017.

34.     The commercial team also entered into negotiations with another company called Tanner Pharma to procure Daraprim RLD. Fera had never worked with Tanner before. Tanner initially required that we pay upfront to acquire the Daraprim at a price far above WAC. Tanner refused to show us any proof that they actually had Daraprim in stock or that they were a financially sound company. Tanner also engaged in pressure tactics by continuously warning us that the price for Daraprim RLD would go up if we did not buy soon. Given that Xcelience had made a similar promise and turned out to be wrong, we were uncomfortable paying that sum of money to an unknown company that refused to provide us any evidence that they actually had the ability to get the product. For these reasons, I ended our negotiations with Tanner.

35.     In October 2017, my team was able to acquire small amounts of Daraprim RLD via a physician prescription and from a pharmacy called ███████. This RLD did not meet FDA requirements for bioequivalence testing because we could not determine the lot number or chain of custody. We also could not acquire a sufficient quantity via prescription to perform bioequivalence testing.

36.     Due to the difficulty Fera faced procuring Daraprim RLD, I directed Fera's regulatory team to submit a request for a pre-ANDA meeting with the FDA to suggest an alternate method of determining equivalence between Fera's generic pyrimethamine and Daraprim. Fera consulted with Kurt Karst, regulatory counsel from Hyman, Phelps, in preparing

10

this submission.  I approved the letter before John D'Angelo submitted it to the FDA on October 25, 2017. GX3179 is a copy of the letter Fera sent to the FDA.

37.     In GX3179, Fera noted that although pyrimethamine was not a traditionally complex product, the "unavailability due to the restricted access program created by the RLD has made the development of a generic version of the product largely impossible." We proposed performing a pharmacokinetic study, which would not require Daraprim RLD, instead of in-human dissolution testing to prove bioequivalence. The FDA denied this request without meeting with Fera.

38.     In January 2018, Ms. McDougal and I managed to procure two bottles of Daraprim RLD from a company called Reliant Specialty. We learned about Reliant through a pharmaceutical industry broker named Peter Skoutelas after we told him about our difficulty sourcing RLD. Mr. Skoutelas put us in touch with Satya Valiveti, a representative from Reliant Specialty. Mr. Valiveti originally wanted us to prepay for the RLD, but agreed to a 50% prepayment at our request. Because of Mr. Skoutelas's endorsement and Reliant's willingness to negotiate on the prepayment amount, I authorized Susan McDougal to place a purchase order with Reliant. At the end of January 2018, Reliant delivered us the two bottles of Daraprim RLD.

39.     I decided to limit Fera's purchase to two bottles because I was concerned that the RLD would expire before our generic pyrimethamine was ready for bioequivalence testing. In January 2018, Fera had just begun work with a new contract research organization, Latitude Pharmaceuticals, to replace Xcelience in researching and developing a tablet of generic pyrimethamine. Because Reliant's Daraprim RLD had an expiration date of June 2019, it was possible that Fera's generic pyrimethamine would not be finished before the RLD expired. I also felt reassured that we could get more from Reliant because we had acquired the two bottles

GX8007-012

quickly and because Mr. Valiveti informed us that he could acquire more RLD if necessary. For these reasons, I assumed that I would be able to procure additional Daraprim RLD from Reliant in the future and decided against purchasing additional bottles in January 2018.

40. In April 2018, with development of our generic pyrimethamine prototype progressing on schedule, I directed Ms. McDougal to contact Mr. Valiveti to discuss purchasing additional Daraprim. Ms. McDougal and I met Mr. Valiveti in person on May 9, 2018, at the Basil Leaf Café, an Italian restaurant located near Fera's office in Locust Valley. Mr. Valiveti informed us that Kevin Mulleady, the CEO of Vyera, had repurchased Mr. Valiveti's inventory of five bottles of Daraprim and entered into a contract that prevented Mr. Valiveti from acquiring additional Daraprim. Because of this conversation, I no longer viewed Reliant as a potential source of Daraprim RLD.

41. Much later, Susan McDougal informed me about a conversation she had with Mr. Valiveti in May 2019. Mr. Valiveti indicated that might be able to acquire Daraprim RLD through a new company he had founded called Specialty Pharmasource. I authorized Susan to continue these discussions in an effort to procure Daraprim RLD for bioequivalence testing. I never had proof that he had access to Daraprim RLD, and as I describe below, we learned shortly after her conversation that we would not need additional bottles.

VI. **Due to Fera's inability to procure Daraprim RLD, Fera renewed its efforts to seek FDA assistance**

42. On June 1, 2018, Fera requested competitive generic therapy (CGT) designation from the FDA. This designation would afford us expedited review of our application and interim communications with the relevant FDA officials to make sure our application was on track. On August 3, 2018, the FDA granted Fera's request for CGT designation. On August 24, 2018, Fera submitted a communication to the Office of Generic Drugs to request waivers of three FDA

GX8007-013

rules, including the number of bottles that we would need to conduct bioequivalence testing. I approved this letter before Fera submitted it. GX3177 is a copy of this letter. Fera requested this waiver because we had not been able to purchase enough RLD due to the manufacturer's distribution system. On January 25, 2019, the FDA denied Fera's request.

43.     On March 4, 2019, my team and I participated in a call with the FDA's Office of Generic Drugs. We prepared a statement to read to the FDA. GX3198 is a copy of these prepared remarks, which Susan McDougal drafted with help from John D'Angelo and me. (I had laryngitis, so I had Ms. McDougal read the section assigned to me). The purpose of the call was to explain again how Fera's difficulty acquiring Daraprim RLD was impeding our generic drug development. Because the two bottles of Daraprim RLD that Fera had procured would expire in July 2019, we would soon be left without any Daraprim RLD at all if FDA declined to grant a waiver. We also informed the FDA that Vyera's CEO, Kevin Mulleady, had repurchased the remaining bottles from the only reliable source that we had identified.

44.     On April 5, 2019, Fera requested that the FDA waive its retention requirement that obliges the applicant to retain five times the number of retained samples of RLD. I reviewed and approved this request letter before we submitted it to the FDA. GX3178 is a copy of this communication from Fera to the FDA.

45.     On June 4, 2019, the FDA informed Fera that our proposal to use two bottles was likely to be acceptable. GX3245 is a copy of this letter from the FDA to Fera. Based on advice from our regulatory team, who regularly help guide my analysis of FDA correspondence and decisions, I decided that the FDA's representation was sufficient to move forward with bioequivalence studies. We promptly began those studies and placed our product on a six-month

13

stability in accordance with FDA guidelines. Our generic pyrimethamine product met the bioequivalence requirements.

46.     Fera filed its pyrimethamine ANDA on December 19, 2019 following the conclusion of the stability studies. During our application's review period, the FDA asked us numerous questions, primarily related to the API manufacturing process. I participated in calls with the FDA, with API-1, and internally to try to promptly answer the FDA. One major, time-consuming inquiry from the FDA related to a potential small impurity in our product. To respond to this inquiry, we needed to synthesize our own reference standard to evaluate whether this impurity was present in the pyrimethamine API. Because of covid-19, however, API-1 was unable to address this query quickly, which was a decisive factor in preventing Fera from answering the FDA's questions within the review period. Because we could not answer the FDA's questions within the review period, we received a complete response letter from the FDA in August 2020. It is my view that if we had used Fukuzyu as our pyrimethamine API supplier, Fera would have been able to respond within the review period. We responded to that letter in December 2020. In the interim, we divested this product, which was approved on July 27, 2021.

VII. **Interactions with Kevin Mulleady**

47.     In April 2018, Peter Skoutelas, the same industry broker who introduced me to Reliant Pharmacy, informed me that the CEO of Vyera, Kevin Mulleady, wanted to meet. I was concerned that Mr. Skoutelas had told Mr. Mulleady the status of Fera's generic pyrimethamine project. Mr. Mulleady and I met in person a few times over lunch in April and May 2018.

48.     On April 30, 2018, Fera's director of business development, Scott Florentino, and I met with Kevin Mulleady and another Vyera executive, Akeel Mithani, at the Basil Leaf Café. Mr. Mithani and Mr. Mulleady proposed a joint venture in which Vyera would provide the rights to Vecamyl, several other projects, and support for a pyrimethamine ANDA to be based on

14

Vyera's NDA file. They estimated that Fera's royalties from the joint venture would be $72

million. The two warned me that in a scenario without the joint venture that the first generic

entrant to the pyrimethamine market would likely only make $16 million in 2019. I understood

Mr. Mulleady and Mr. Mithani to mean that it would be more profitable for Fera to pursue a

generic pyrimethamine ANDA in partnership with Vyera than on its own.

49.     On May 4, 2018, I met with Kevin Mulleady, again at the Basil Leaf Café. This

time, instead of a carrot, Mr. Mulleady brought a stick. The stick was an April 23, 2018

competitive intelligence Powerpoint presentation that contained sensitive information about

Fera's relationship with API-1 He gave me a copy, which is marked GX3195. Mr. Mulleady first

pointed me to page 9 of the slide deck, which mentions that an Indian API supplier called RL

Fine Chemicals was supplying pyrimethamine API to Mylan and Sandoz, two of the world's

largest generic pharmaceutical companies. Mr. Mulleady told me that he had flown to India and

met with RL Fine executives to enter into an exclusive contract that would eliminate Mylan and

Sandoz as potential generic competitors. He mentioned that Vyera was making a handsome

monthly payment to RL Fine in exchange for this agreement. Mr. Mulleady then pointed me to

page 12 of the presentation, which identified API-1 as Fera's pyrimethamine API supplier and

told me that he knew who was supplying pyrimethamine API to Fera. I took this conversation as

a threat by Mr. Mulleady to interfere with Fera's pyrimethamine API supply.

50.     During the same May 4, 2018 conversation, Mr. Mulleady informed me, while

grinning, that he bought the Daraprim RLD from Reliant. Mr. Mulleady also provided me with

information about current Daraprim sales, which were lower than we had seen in the 2014

IQVIA data. This information was useful to us because the sales data reported in the more recent

GX8007-016

IQVIA figures was strangely low and IQVIA was our only method of estimating the market size for Daraprim.

51.     My team and I had phone discussions with Vyera executives for the rest of May 2018. My goal was to learn more about Vyera's intent and plans and our negotiations never progressed beyond redlining term sheets. I ended these discussions in early June 2018. At that point, I directed Scott Florentino, the Director of Commercial Development, to memorialize the previous events as listed.  On June 27, 2018, Scott sent Susan and me a document containing his timeline of Vyera's and Fera's discussions regarding pyrimethamine, which I reviewed at the time and agreed was accurate. GX3286 is a copy of this document.

52.     Around the same time, I reached out to Fera's contact at API-1 ▮▮▮▮▮▮. I asked ▮▮▮▮▮ to verify that he and his team had not received any contact from Vyera because I was concerned that Mr. Mulleady would attempt to eliminate our supply of pyrimethamine API the same way that he claimed he had done to Mylan and Sandoz.

## VIII.  **Interaction with Martin Shkreli**

53.     I have briefly met Martin Shkreli. In fall 2014, a mutual acquaintance named Brian Smith invited me to an investors' meeting with Mr. Shkreli. Mr. Shkreli was seeking investors for his new company, Turing Pharmaceuticals. Along with a number of other individuals, I met with Mr. Shkreli for about two hours.

54.     Mr. Shkreli's plan was to purchase a drug called Biltricide. He wanted a $5 million investment from each of us to make this acquisition and claimed that he would bring in $1 billion in revenues during the first year. At the time, Biltricide was a low-revenue product without patent protection or generic competition. I was puzzled as to how he planned to turn this low revenue drug into a blockbuster product. I assumed that he knew of some new indication for Biltricide, but Mr. Shkreli never indicated that was his plan. Instead, he simply mentioned that he

16

planned to raise the price and put the drug into a closed distribution system to deter generic

entry. I warned Mr. Shkreli that he should temper his enthusiasm.

EXECUTED on October __ 2021

Frank DellaFera
President, Fera Pharmaceuticals

17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**FEDERAL TRADE COMMISSION, et al.,**

        **Plaintiffs,**

        **v.**                              **Case No. 1:20-cv-00706-DLC**

**VYERA PHARMACEUTICALS, LLC, et al.,**

        **Defendants.**

**Direct Testimony of James R. Bruno**

**TABLE OF CONTENTS**

I.  Summary of Qualifications ................................................................................ 2

II. Summary of Opinions ...................................................................................... 4

III. API Manufacturing Overview .......................................................................... 5

    A.  Importance of a drug's active pharmaceutical ingredient ........................ 5

    B.  API manufacturing: A primer .................................................................. 6

IV. Fukuzyu and RL Fine were the only pyrimethamine API suppliers available to supply the U.S. market from 2015 to 2019 ................................................... 12

    A.  Fukuzyu was the best source of pyrimethamine API from 2015 to 2019 ............ 12

    B.  RL Fine was the next best source of pyrimethamine API during this timeframe ........................................................................................ 14

    C.  Other suppliers were not viable pyrimethamine API suppliers from 2015 to 2019 ................................................................................. 16

V.  The exclusive supply provision in the Fukuzyu contract does not mitigate supply risk or protect an investment ........................................................... 19

    A.  The Fukuzyu supply contract does not contain any of the provisions that pharmaceutical companies typically include to mitigate against supply risk ....... 20

    B.  The exclusive supply provision in the Fukuzyu contract does not mitigate supply risk ................................................................................. 22

    C.  The exclusive supply provision in the Fukuzyu contract does not protect any investment ................................................................................. 23

VI. RL Fine's contract with Vyera was not a legitimate backup pyrimethamine API supply agreement ................................................................................. 25

    A.  Vyera's contract with RL Fine does not mitigate supply risk .................... 25

    B.  Vyera's failure to perform diligence also indicates that it was not intending to use RL Fine as a backup supplier ................................... 27

    C.  RL Fine contract does not protect any investment by Vyera; instead, it conditions huge payments for exclusivity ...................................... 28

VII. As a result of the RL Fine and Fukuzyu exclusive contracts, generic competitors had to use API suppliers that did not have a developed cGMP process ............ 31

    A.  Cerovene ................................................................................................. 32

    B.  Inva-Tech ............................................................................................... 34

    C.  Fera ........................................................................................................ 35

GX8001-002

James R. Bruno declares as follows:

1.   My name is James R. Bruno. I have been retained by the Federal Trade Commission, the State of New York, the State of California, the State of Illinois, the State of North Carolina, the State of Ohio, the Commonwealth of Pennsylvania, and the Commonwealth of Virginia as an expert in active pharmaceutical ingredient (API) sourcing, manufacturing, contracting, and associated regulatory requirements. I am voluntarily submitting this declaration at the request of the plaintiffs in this case. I understand that this declaration will be submitted to the Court deciding this matter.

**I.   Summary of Qualifications**

2.   I have over 40 years of experience in custom manufacturing and development of pharmaceutical intermediates and API. I have worked with a mix of pharmaceutical companies, including emerging pharmaceutical companies and large, established pharmaceutical companies.

3.   I am currently the managing director of Chemical and Pharmaceutical Solutions, Inc., a pharmaceutical consulting company that I founded in 2002. I am primarily responsible for offering executive-level consulting to brand and generic pharmaceutical companies and contract manufacturing organizations (CMOs) on matters of supply and development of APIs and finished drug products. I am involved in every aspect of the manufacturing contract process, including manufacturer selection, financial and technical diligence, contract negotiations and execution of long-term supply agreements or quality agreements, audits, and filing technical documents necessary to support a new drug application with the FDA.

4.   I began my career in 1973 as a Technical Service Manager at NL Industries, where I was responsible for developing new formulations for excipients used in pharmaceutical and cosmetic products.

GX8001-003

5.   From 1978 until 1982, I was a Project Manager at Ganes Chemical, which was a major supplier of DEA-controlled drugs. I was responsible for developing their custom API manufacturing business.

6.   From 1982 to 1994, I was a Director at Sipsy Chemical, a French manufacturer that supplied APIs to North American pharmaceutical companies. I was responsible for developing new API manufacturing business, which included working with branded pharmaceutical companies to execute long-term supply agreements. I also assisted in the development and licensing of new technologies and acted as the registered FDA agent for the company.

7.   From 1994 to 1996, I was a Director at Aerojet, a contract manufacturer that supplies APIs to pharmaceutical companies around the globe, specializing in long-term supply of custom API products. My responsibilities included negotiating supply agreements with pharmaceutical companies.

8.   In 1996, I took a position as Vice President of Sales and Marketing at Vinchem, a trading company that represents suppliers of pharmaceutical products located outside the United States. My role was to develop new markets for the member suppliers and broaden their reach into custom API manufacturing. As part of this role, I performed audits and technical assessments for contract manufacturers worldwide.

9.   In 1999, I became Global Business Manager at Honeywell, a contract manufacturer that develops raw materials and APIs for pharmaceutical companies around the world. I led a group focused on the development of new compounds and was responsible for all business aspects of that work, including negotiating and executing long-term supply agreements. I left Honeywell in 2002 to start CAP Solutions.

GX8001-004

10. I received a Bachelor of Science degree from Rider University in 1973, a Master of Science degree from St. Joseph's University in 1978, and a Master of Business Administration from Rider University in 1982.

11. I have also been actively involved with several professional organizations. I was previously the President of the Drug, Chemical & Associated Technologies Association, which is the largest and oldest pharmaceutical organization in the world. I have also been actively involved in the Society of Chemical Manufacturers & Affiliates and the American Chemical Society.

12. I have also been involved with chemical manufacturing trade publications, including PharmaChem, for which I am a member of the Editorial Committee, and Organic Process Research & Development, for which I am a reviewer. I have published numerous articles on pharmaceutical manufacturing and have given numerous trainings and seminars on pharmaceutical manufacturing over the last 15 years.

13. My curriculum vitae, including all publications I have authored in the previous 10 years, is attached as Appendix A.

## II. Summary of Opinions

14. As part of my work and analysis, I have reviewed documents and transcripts of investigational hearings and depositions. I have reached the following four conclusions through my review of these materials as well as my 40 years of experience in the pharmaceutical industry.

15. First, from 2015 until 2019, Fukuzyu and RL Fine were the only two API suppliers that had a pyrimethamine API manufacturing process ready for use in product development and manufacturing. Developing a new cGMP API manufacturing process typically takes 15-24 months.

4

16. Second, the exclusivity provision in Vyera's supply agreement with Fukuzyu is inconsistent with an effort to mitigate pyrimethamine API supply risk. Pharmaceutical companies typically use an exclusivity provision to protect their investment in the development of a supplier's API manufacturing process, not to mitigate supply risk. That rationale, though, is not applicable here as Vyera did not invest, or assist, in Fukuzyu's development of pyrimethamine API. The exclusivity provision in the Fukuzyu contract is particularly ill-suited to mitigating API supply risk because it does not prevent Fukuzyu from selling API to purchasers outside of the United States or for veterinary use. Further, the Fukuzyu contract lacks standard provisions used to guarantee a reliable supply of API.

17. Third, the RL Fine contract is inconsistent with an effort to form a backup API supply relationship. The contract does not obligate RL Fine to produce or guarantee API supply, and, in fact, Vyera never purchased any API from RL Fine. Nor did it take any steps to qualify RL Fine as an alternative supplier. The contract also includes a number of provisions that make little sense for a backup supply agreement. Further, the contract was negotiated by two Vyera executives with little to no technical experience in the pharmaceutical industry, while Vyera personnel responsible for API sourcing and quality were entirely left out of the process.

18. Finally, because Fukuzyu and RL Fine were unavailable, generic manufacturers had to use API suppliers without a developed manufacturing process. This required extensive investment and took each supplier between 15 to 24 months.

**III. API Manufacturing Overview**

   **A.  Importance of a drug's active pharmaceutical ingredient**

19. A drug's most important ingredient is its active pharmaceutical ingredient (API) because it provides the therapeutic effect. In this case, Daraprim's API is pyrimethamine API.

5

GX8001-006

20. A pharmaceutical company must source API early in the drug development process so that the company can use it to research and develop the finished dosage form of the product. For example, a generic company must have a source of pyrimethamine API before making a tablet of generic Daraprim. Securing access to API is therefore what is known in the industry as a rate-determining step, meaning that without a source of API, the pharmaceutical company cannot progress to the next phase in the development process.

21. A pharmaceutical company must ensure that its supplier manufactures API consistent with FDA standards, called current Good Manufacturing Practices (cGMPs). The FDA publishes the up-to-date version of cGMPs in the Federal Register and Code of Federal Regulations. Compliance with cGMPs is not just a "nice to have." A pharmaceutical company cannot receive FDA approval to bring a drug to market without meeting these strict requirements.

**B.   API manufacturing: A primer**

22. Developing a cGMP manufacturing process from scratch requires designing, implementing, and testing a method to ensure that the API meets FDA standards. This typically involves the following steps, which I have also summarized in the following flow-chart:

6



23. First, the API supplier must design the manufacturing process. This step includes a literature search to see if the manufacturing process for a specific API is protected by patent. The supplier will also look for a manufacturing process already in the public domain that it can use. At this initial stage, the API supplier will diagram different theoretical routes and models for manufacturing the API and what raw materials they require. Once it has reviewed the various possibilities, it will select its manufacturing route. Developing this blueprint for the manufacturing process typically takes around a month.

24. Second, the supplier must source and acquire the raw materials used in the selected manufacturing route. Some of these materials may need to be sourced from specialized manufacturers. Once the supplier receives the materials, it assays them—subjecting them to a standardized test—to confirm they are the right ingredients. This sourcing process typically takes seven to nine weeks.

7

GX8001-008

25. Third, the API supplier must conduct small lab trials to test its manufacturing process. These lab trials involve chemically processing the raw materials in operational steps until the supplier generates the final product. I've included API-3 's pyrimethamine API flow chart on the next page as an example of each stage of these operational steps:



GX8001-009

████████████████████████████████████████████████

████████████

27. The purpose of the lab trials is to optimize the manufacturing process. Optimization can include adjusting the process to minimize the amounts of solvents (█████████████████ ████████) and reagents (██████████████████████████████), and to reduce the presence of any impurities that result from the manufacturing process. Optimization is typically accomplished through a trial-and-error methodology that tests each step at various degrees of purity to achieve the optimal result with the minimal amount of waste and impurities, while trying to reduce unnecessary expense or delay.

28. While the lab trials of the manufacturing process are ongoing, the API supplier has to develop and implement analytical methods that will be used to evaluate the product generated at each step. This involves developing in-process controls to monitor and adjust the manufacturing process to ensure that each step is proceeding as prescribed. Developing these analytical tools can be time consuming. The supplier must also validate the analytical methods to ensure that they produce consistent results and can identify any impurities.

29. My rule of thumb estimate is that each step takes at least five weeks. Lab trials are iterative, meaning that the API supplier may need to run through each stage multiple times as it hones its process. For example, a problem may not surface until a later stage, which requires the supplier to revisit all the previous steps to determine the cause of the issue. Conducting lab trials can cost over $200,000 in total. This cost is based on the laboratory time and the cost of the chemicals and equipment typically needed to manufacture an API.

30. Fourth, the API supplier must identify, characterize, and produce any impurities that result from the manufacturing process. An impurity is any component of a drug substance that is

GX8001-010

not supposed to be present. To characterize an impurity, the API supplier must identify whether it is present, quantify it, and then evaluate whether it poses a toxicological issue. These impurities often exist only in small amounts and can be difficult to identify. Isolating, identifying, quantifying, and evaluating an impurity can take months or even years.

31. Fifth, the supplier must purchase or synthesize reference standards of the finished API and any impurities. The purpose of these reference standards is to be able to test future manufacturing batches for assurance of the identity, quality, potency, and purity of the product. While the supplier may be able to purchase some of these reference standards, it must synthesize any that are unavailable commercially, which involves manufacturing the finished API or impurity. This process can be lengthy, particularly if the impurities are unknown and must first be identified. These reference standards must be established to run the analytical methods before the product is given to humans, whether in human drug studies (including bioequivalence studies) or clinically.

32. Sixth, the API supplier must scale up the manufacturing process and begin stability testing. At each stage of the manufacturing process, the supplier must use its analytical methods to control the product and ensure that it conforms to the specifications. It may be necessary to optimize the process at the larger scale, requiring the supplier to go back and conduct lab trials. In addition, the supplier may identify additional impurities that it must test.

33. Seventh, the API supplier may undertake its manufacturing campaign to create API that can be used in the finished dosage form for human consumption. A manufacturing campaign involves running the manufacturing process at scale to make a large batch of API.

34. At this stage, the API is tested to understand whether it remains stable over time. Stability testing can often identify additional impurities that need to be characterized.

GX8001-011

35. Eighth, the API supplier compiles its data in a file to be submitted to the FDA, including characterization of all impurities. While some of these data are generated during the manufacturing process, much of the file can only be written after the scaled-up manufacturing campaign is complete. This file may be submitted separately to the FDA as a drug master file (DMF), or be included directly in the Chemistry, Manufacturing, and Controls (CMC) section of a drug application.

36. As explained above, the FDA's cGMP requirements are rigorous and require thorough documentation. The API supplier must identify the manufacturing process for the API and list the analytical methods used to control the API. This includes methods for the in-process controls as well as the final product.

37. Compiling and reviewing the data and information included in the DMF/CMC section can take several months. Because the pharmaceutical company must reference the DMF or include the same information in its application, this compilation constitutes another rate-determining step in the drug application process. In other words, without a completed DMF or access to the full process to be included in the CMC section, the manufacturer cannot file its application.

38. For the reasons discussed in this section, in my experience manufacturing a cGMP-compliant API from scratch at scale can take at least 15 months at a cost of $30,000 to $40,000 per month. Mr. Russell's point that pyrimethamine API is easy make is misplaced—the most time-consuming part of the process is ensuring that the laboratory can consistently manufacture the product in compliance with cGMPs.

11

## IV. Fukuzyu and RL Fine were the only pyrimethamine API suppliers available to supply the U.S. market from 2015 to 2019

39. Given the time and cost associated with developing a manufacturing process from scratch, pharmaceutical companies prefer to use a supplier that already has a cGMP-compliant process in place for manufacturing a given API. This is particularly important for a generic manufacturer that is seeking to make a generic version of a drug without any intellectual property protection because shortening the time to market can impact the product's revenue and financial success. In this case, Fukuzyu and RL Fine were the only suppliers who had developed a manufacturing process for pyrimethamine that was likely to be cGMP compliant.

### A.  Fukuzyu was the best source of pyrimethamine API from 2015 to 2019

40. The best API source is a supplier whose manufacturing process (1) was included or referenced in an FDA-approved drug application and (2) is being used in a product sold in the United States. If the API is already used in an FDA-approved product, the FDA must necessarily have reviewed the API manufacturing process to ensure cGMP compliance. The FDA also must inspect the API supplier's manufacturing facility before approving its use in a drug product.

41. In this case, between 2015 and 2019, the only DMF-holders for pyrimethamine were Fukuzyu and Ipca. Ipca was (and is) subject to an import ban and therefore is not available as a source of API for pyrimethamine.

42. For this reason, my opinion is that Fukuzyu was the best option for a pharmaceutical company seeking a supplier of pyrimethamine API. Fukuzyu has had a manufacturing process for pyrimethamine API in place since 1966.[1] In 1992, Fukuzyu submitted a DMF for pyrimethamine API to the FDA.[2] In 2007, GSK, the then-brand manufacturer of Daraprim in the

---

[1] Salinas Dep. 97:3-19.

[2] FDA, List of Drug Master Files (Apr. 6, 2021), https://www.fda.gov/media/129111/download.

GX8001-013

United States, supplemented its filing with the FDA to include Fukuzyu as its pyrimethamine

API supplier.[3] This indicates to me that Fukuzyu's process was cGMP compliant because it was

in use in an approved drug application. And, because its product is used in humans, the FDA

would also have already inspected Fukuzyu's manufacturing facility. Unlike a supplier that

would need to develop a process from scratch, Fukuzyu would have been readily available to

support a pharmaceutical company's product development.

43. Put simply, because Fukuzyu's manufacturing process was already developed and cGMP

compliant, using Fukuzyu as an API supplier would greatly reduce the likelihood of any API-

related issues and delays. For these reasons, if my client were seeking a pyrimethamine API

supplier, my first choice would be Fukuzyu.

44. The next best option for a pharmaceutical company seeking a source of API is a supplier

that has filed a DMF with the FDA for the specific API, but whose API has not yet been used in

an FDA-approved product. Filing a DMF indicates that the supplier has successfully developed a

manufacturing process designed to be compliant with U.S. cGMPs.

45. The FDA does not fully review DMFs, however, until they are referenced in a drug

application. In other words, listing a DMF does not mean the FDA has approved the API

supplier's process. But even if the supplier's DMF has not yet been reviewed, there are still three

significant benefits to sourcing API from a DMF-holder. First, the filing of a DMF confirms that

the supplier has successfully developed a manufacturing process for the API. Second, it is likely

that the DMF holder will be compliant with cGMPs if it undertook the effort to file its DMF with

---

[3] GX3505 (Letter from Hemant Goswami to Renata Albrecht re: NDA 008578; DARAPRIM® (pyrimethamine) Tablets Supplement: Prior Approval, CMC Registration of Fukuzyu Pharmaceutical Co., Ltd., Japan as an Alternate Manufacturing and Testing Site for Pyrimethamine).

13

**A-663**

the FDA. Third, a DMF holder likely has samples of API readily available, which the pharmaceutical company can use to develop a finished dosage form.

46. To check which suppliers hold DMFs for a particular API, a pharmaceutical company can search the FDA's publicly available database. For this reason, an API supplier that develops a cGMP-compliant manufacturing process will often choose to file its DMF to advertise that it has product available for sale. A pharmaceutical company can also use subscription databases, such as Newport (now known as Cortellis Generics Intelligence), to search for DMFs and research API suppliers.

47. During the 2015-2019 time period, there were no pyrimethamine API DMF holders that had filed a DMF but were not yet referenced in an application.

**B.  RL Fine was the next best source of pyrimethamine API during this timeframe**

48. If no DMF holder is available, then the next best option is to find a supplier that has a manufacturing process for the specific API and that is well-positioned to comply with cGMPs. To identify suppliers that manufacture a specific API, pharmaceutical companies can use Newport. They can also review API supplier websites.

49. One useful metric to evaluate whether a supplier with a manufacturing process for a given API is suitable is to check whether it has prior experience complying with the FDA's cGMPs for other products. This information, which is available on the FDA's website, suggests that the supplier has the expertise to meet the FDA's cGMP requirements for the relevant API. For example, it is standard practice to evaluate whether a supplier has any Form 483s, which the FDA uses to list observations of potential cGMP issues. It is also standard practice to check whether the FDA has issued the supplier a warning letter. It is also a particularly good idea to learn whether the FDA has recently inspected the supplier by checking the FDA's publicly

14

available databases.  If the supplier has been inspected, a standard next step is to request the results of the inspection from the supplier.

50. Another useful data point is whether the API supplier has successfully complied with the regulatory standards from a jurisdiction with rigorous approval requirements, such as the European Union, as this indicates that the supplier will likely be able to comply with cGMPs. The compilation of data and documents submitted to European regulatory bodies is known as an EDMF or EUDMF.

51. During the 2015 to 2019 timeframe, my opinion is that RL Fine was the only pyrimethamine API supplier that fit these criteria, so was therefore the next best option after Fukuzyu for a pharmaceutical company seeking a pyrimethamine API supplier. RL Fine marketed its product globally before it signed the 2017 agreement with Vyera.[4] RL Fine's pyrimethamine DMF was ready in October 2016,[5] and RL Fine planned to file the DMF in the fourth quarter of 2017.[6] RL Fine also manufactures four to five tons of pyrimethamine API each year.[7] This meant that RL Fine could readily provide quantities of pyrimethamine API to a pharmaceutical company seeking to make a finished dosage form of Daraprim or generic Daraprim.

---

[4] Ramachandra (RL Fine) Dep. 11.

[5] GX3293 at 002 (Email from Santosh Mahil to Greg Aucremanne, RL Fine Chem Pvt. Ltd. Enquiry, Zane Cartwright, et al. re: Re: Pyrimethamine).

[6] GX3297 at 001 (Email from Bill Cain to Greg Aucremanne, Jason Raff, Dwight Raff, et al. re: RE: Pyrimethamine/Impurities).

[7] Mathew (RL Fine) Dep. 7.

15

52. While RL Fine did not have a U.S. DMF filed with the FDA, it has filed DMFs with the FDA for other products[8] and its manufacturing facility had been recently FDA inspected.[9] RL Fine also exports pyrimethamine API to other countries.[10] Because of its experience seeking FDA approval for other products, and its success in achieving regulatory compliance with other foreign bodies, RL Fine was well positioned to compile a U.S. DMF for pyrimethamine API or support a drug application that would likely receive FDA approval. This lessens the risk that a pharmaceutical company would need to wait while RL Fine compiled and formatted its data to meet FDA requirements.

### C. Other suppliers were not viable pyrimethamine API suppliers from 2015 to 2019

53. If an API supplier has not developed a manufacturing process, the remaining option for a pharmaceutical company is to develop one from scratch. When selecting a supplier to develop a process, it is important to pay close attention to whether the supplier has experience complying with cGMPs, whether its facility is FDA-inspected, and whether it has any experience with similar molecules.

54. To analyze the pyrimethamine API market from 2015 to 2019, I have evaluated whether there were API suppliers other than Fukuzyu and RL Fine that (1) already had a manufacturing process in place and (2) were well-positioned to comply with cGMPs. Normally, my first step would be to pull up the Newport database, but it does not include historical information. As a substitute, I have reviewed a screenshot of the Newport list of pyrimethamine API suppliers as of

---

[8] FDA, List of Drug Master Files (DMFs), https://www.fda.gov/drugs/drug-master-files-dmfs/list-drug-master-files-dmfs (firm search for RL Fine showing multiple DMFs filed).

[9] FDA, Inspection Classification Database Search, https://www.accessdata.fda.gov/scripts/inspsearch/ (firm search for "R.L. Fine" showing FDA inspections of RL Fine's Bangalore facilities in March 2011, July 2013, July 2015, and February 2019).

[10] GX3297 at 001 (Email from Bill Cain to Greg Aucremanne, Jason Raff, Dwight Raff, et al. re: RE: Pyrimethamine/Impurities).

GX8001-017

February 2016 from the record as a best estimate of the state of the market between 2015 and 2019.[11] This screenshot is shown in Appendix B and is GX3298.

55. In the 2016 Newport database screenshot, there are two other pyrimethamine API suppliers that have a commercially available process in addition to Fukuzyu and RL Fine: Ipca Laboratories Ltd. and Guilin Pharmaceutical Co. Ltd. Neither one was a viable option.

56. First, Ipca was not viable because its cGMP issues resulted in an FDA import ban. Ipca voluntarily stopped shipping all API to the U.S. in July 2014 following FDA inspections of its facilities that resulted in negative observations.[12] The FDA placed the company on an import alert in early 2015.[13] The FDA issued a warning letter to Ipca in January 2016 for data manipulation and falsification[14] and then banned the import of any API manufactured by Ipca into the United States in June 2017.[15] This ban remains in place today.[16] I would quickly rule out Ipca as a potential supplier for this reason.

57. Second, both Mylan and Teva—two of the world's largest generic pharmaceutical companies—determined that Guilin was not a viable source of pyrimethamine API.[17] In my

---

[11] GX3298 at 003 (Email from Jennifer Xiao to Greg Aucremanne, Paula Raese, Zane Cartwright re: Re: Pyrimethamine).

[12] Ipca, Ipca letter to Bombay Stock Exchange (Feb. 1, 2016), https://www.ipca.com/wp-content/pdf/financials/notice-of-board-meeting/USFDA-Warning-Letter.pdf.

[13] FiercePharma, FDA bans import of Ipca Lab drugs (June 19, 2017), https://www.fiercepharma.com/manufacturing/fda-bans-imports-ipca-lab-drugs; FDA Import Alert 66-40: Detention Without Physical Examination of Drugs From Firms Which Have Not Met Drug GMPs (Mar. 29, 2021), https://www.accessdata.fda.gov/cms_ia/importalert_189.html (publishing the alerts placed on Ipca's three manufacturing facilities in January and March 2015).

[14] FiercePharma, FDA warning to Ipca Labs shines light on rampant data falsification (Feb. 9, 2016), https://www.fiercepharma.com/manufacturing/fda-warning-to-ipca-labs-shines-light-on-rampant-data-falsification.

[15] FiercePharma, FDA bans import of Ipca Lab drugs, (June 19, 2017), https://www.fiercepharma.com/manufacturing/fda-bans-imports-ipca-lab-drugs.

[16] FDA, Import Alert 66-40 (Mar. 29, 2021), https://www.accessdata.fda.gov/cms_ia/importalert_189.html.

[17] Raese (Mylan) Dep. 35:3-10; GX3517 at 004 (Email from Brian Savage to Patrick Huyett, Maren Schmidt, Rachel Turow).

GX8001-018

experience, these companies have highly specialized personnel whose main role is sourcing API.

If they determined that Guilin was not viable, I would give their evaluation serious weight when

providing a recommendation to any client seeking a pyrimethamine API source. Further, Guilin

is primarily a finished dosage manufacturer.[18] Guilin does not list pyrimethamine API for sale on

its website.[19]

58. In addition, the 2016 Newport database screenshot identifies three companies (Alcon,

Dy-Mach, and Hikal) that were "Not Manufacturing" pyrimethamine. To receive this designation

in Newport, a representative from Newport has typically called the company and inquired about

the API. In my experience, when Newport says that a supplier is not making an API, it's not

making it.

59. Finally, the 2016 Newport database screenshot identifies two companies, Shanghai

Zhongxi Sunve and Bio-gen as having an "unconfirmed" manufacturing status. It is my

understanding that Newport lists suppliers as "unconfirmed" when its representatives hear

secondhand that a supplier is making an API, but have not confirmed one way or the other. In my

experience, it is rare that manufacturers with an "unconfirmed" manufacturing status are actually

making the product. It seems very unlikely that either of these companies is manufacturing

pyrimethamine API today. Shanghai Zhongxi Sunve is not FDA-inspected. Both Mylan and

Teva contacted Shanghai Zhongxi Sunve and determined that it was not a viable source of

pyrimethamine API.[20]  Bio-Gen has no FDA experience, and its commercial products are

---

[18] Fosun Pharma, Group Overview, https://www fosunpharma.com/en/about/GroupOverview html ("Fosun Pharma takes pharmaceutical manufacturing as its core business . . . .").

[19] Fosun Pharma, Pharmaceutical API and Intermediate, https://www fosunpharma.com/en/product/pharmacylist. aspx?type=14.

[20] GX3517 at 004 (Email from Brian Savage to Patrick Huyett, Maren Schmidt, Rachel Turow); Raese (Mylan) Dep.77:11- 38:18.

18

extractions, not APIs.[21] An API importer, LGM Pharma, determined that Bio-Gen was not a viable source of pyrimethamine API.[22]

60. My review of additional record materials provided to me indicates that a third pyrimethamine API supplier, Anuh Pharma, developed a pyrimethamine API manufacturing process in December 2018.[23] Anuh Pharma does not have a U.S. DMF for pyrimethamine API. It is questionable whether Anuh Pharma could ever meet these requirements because in 2016 the French National Agency for Medicines and Health Products Safety requested the withdrawal of Anuh Pharma's GMP certificate,[24] which indicates that it has had technical issues in the past. Anuh was not FDA inspected until September 2019 and, even now, there is no indication that Anuh's pyrimethamine API process is compliant with U.S. cGMPs. For this reason, just as with Ipca, I would not recommend using Anuh Pharma as an API source in an FDA-regulated product.

61. As a result, other than Fukuzyu and RL Fine, my review of the market indicates that no other pyrimethamine API supplier was positioned to supply the United States until 2019.

## V. The exclusive supply provision in the Fukuzyu contract does not mitigate supply risk or protect an investment

62. In January 2017, Vyera entered an exclusive pyrimethamine API supply arrangement with Fukuzyu that prevented Fukuzyu from selling its API to anyone else for human use in the

---

[21] FDA, Inspection Classification Database Search, https://www.accessdata.fda.gov/scripts/inspsearch/ (firm search for "Bio-gen" has no results); FDA, List of Drug Master Files (DMFs), https://www.fda.gov/drugs/drug-master-files-dmfs/list-drug-master-files-dmfs. (firm search for "Bio-gen showing no results).

[22] DX 273 (Email from Gideon Schurder to Joe Kraatz, Mendel Schurder, Jessica Hinson re: RE: Pyrimethamine).

[23] Shah (Aadivighnesh) Dep. 12.

[24] Regulatory Focus, UK, French Regulators Call Out Two Noncompliant Indian Pharma Sites, (April 4, 2016) https://www.raps.org/news-articles/news-articles/2016/4/uk,-french-regulators-call-out-two-noncompliant-indian-pharma-sites.

19

United States. I understand that Mr. Russell and Vyera executives explain the exclusivity provision as a means to mitigate supply risk. However, this exclusivity provision does not mitigate supply risk, particularly because it allows Fukuzyu to sell to larger customers. Further, an exclusivity provision is typically used to protect a pharmaceutical company's investment in the development of a supplier's API manufacturing process but it does not seem like that was the purpose here, either. Vyera did not invest, or assist, in Fukuzyu's development of pyrimethamine API in this case.

**A. The Fukuzyu supply contract does not contain any of the provisions that pharmaceutical companies typically include to mitigate against supply risk**

63. Mitigating supply risk is a common concern for drug companies, such that contracting firms do not need to reinvent the wheel to create new terms. For this reason, Russell's argument that Vyera may have elected to make the novel use of an exclusive supply provision to mitigate supply risk is incorrect.

64. Instead, there are a number of ways that companies concerned with supply risk go about reducing that risk.

65. One of the most common and effective ways to mitigate supply risk is to include a provision requiring the drug manufacturer to provide forecasted amounts of API. This type of provision requires a pharmaceutical company to forecast its needs on an annual basis before placing an order. By using this type of provision, the supplier can budget for adequate production capacity to create the API, while the pharmaceutical company can be sure that it will receive sufficient API. For example, GSK's contract with Fukuzyu contains a requirements provision

20

requiring GSK to provide biannual forecasts, which Fukuzyu then must meet (at least for the first three months of each forecast).[25]

66. Other contractual agreements to reserve production line capacity or to otherwise prioritize or guarantee a specific pharmaceutical customer's needs can also help ensure that the pharmaceutical company will have sufficient API. For example, GSK's contract with Fukuzyu requires Fukuzyu to reserve manufacturing capacity for pyrimethamine API.[26] This ensures that Fukuzyu will not prioritize another project on its production line over its production of pyrimethamine API.

67. In this case, Vyera's contract with Fukuzyu does not require either Fukuzyu to reserve sufficient capacity to produce pyrimethamine API for Vyera or Vyera to estimate how much pyrimethamine API it will need.[27] This is despite the fact that Fukuzyu usually requires forecasts from its customers.[28] Instead, Vyera simply submits purchase orders to Fukuzyu. These purchase orders are not binding if Fukuzyu does not acknowledge them in writing within ten days, meaning that Fukuzyu may reject them without cause.[29] There is no penalty to Fukuzyu if it decides to not sell Vyera any pyrimethamine API after that ten-day period even if it accepts a purchase order.

68. In fact, I am not sure why Vyera needed a supply contract with Fukuzyu in the first place. Fukuzyu has produced pyrimethamine API for decades, including for the previous owners of

---

[25] GX3504 at 010-012 (Document: Supply Agreement between GlaxoSmithKline Services).

[26] GX3504 at 014 (Document: Supply Agreement between GlaxoSmithKline Services).

[27] GX1020 at 004-006 (Document: Fukuzyu Master Services Agreement).

[28] GX3515 at 001 (Email from Shinya Saegusa to Miyazaki Minako, Miura Tetsuo, Mai Suzuki et al. re: Re: Pyrimethamine).

[29] GX1020 at 004-006 (Document: Fukuzyu Master Services Agreement).

GX8001-022

Daraprim. Fukuzyu still appears to sell large quantities of pyrimethamine API to GSK.[30] All of this indicates to me that the supply line is sound because Fukuzyu would be able to accommodate Vyera's comparably small requirements and would be unlikely to stop supplying pyrimethamine API. Vyera's Senior Vice President of Research and Development, Nicholas Pelliccione, confirmed that he does not have any concern with Fukuzyu's ability to supply or maintain compliance with cGMPs.[31] And, a simple, non-contractual way to mitigate supply risk is to purchase extra API to hold in reserve. The benefit of purchasing extra API is that it not only mitigates against an API supplier's decision to no longer support a drug, but also any *force majeure* incidents like a facility fire.

69. For this reason, it was likely sufficient for Vyera to continue its predecessor's practice of purchasing pyrimethamine API from Fukuzyu's U.S.-based broker on an as-needed basis rather than enter into a supply agreement.[32]

### B. The exclusive supply provision in the Fukuzyu contract does not mitigate supply risk

70. Preventing Fukuzyu from selling its API to others does not ensure that the supplier will meet Vyera's supply needs in a timely manner. Nor does it prevent Fukuzyu from deciding to stop making the product or ensure that Fukuzyu will continue to make quality API. Instead, all it does is ensure that Fukuzyu will not sell to any other purchaser within the scope of the exclusivity provision.

71. Given the limited scope of the exclusivity provision in the Fukuzyu contract, it is particularly ill suited to mitigate supply risk because it does not prioritize Vyera's needs over the

---

[30] GX3503 (Spreadsheet: Daraprim Data).

[31] Pelliccione Dep. 94:5-20; Pelliccione IH 53:12-19.

[32] GX1321 at 002 (Email from Shkreli to David Ailinger, Michael Smith, Patrick Crutcher).

GX8001-023

requirements of Fukuzyu's other customers.[33] Outside of the U.S., GSK sells much more finished

product containing pyrimethamine API than Vyera does.[34] And unlike Vyera's contract, GSK's

contract with Fukuzyu includes a requirements provision and capacity reservation clause;

Fukuzyu is thus obligated to ensure that it meets GSK's requirements first.[35] And, in my

experience, an API supplier is more likely to supply its larger customer over a smaller one—

particularly a well-known company like GSK that could sponsor additional business on other

APIs.

72. Fukuzyu is also allowed to sell to a U.S.-based veterinary API customer called Pegasus.[36]

My review of the record indicates that veterinary customers for pyrimethamine API tend to

purchase large quantities, so again, Fukuzyu might choose to sell to its veterinary customer with

larger orders who are not included in the scope of the exclusivity provision.[37]

73. Notably, Russell never elaborates how the exclusivity provision actually mitigates risk.

C. **The exclusive supply provision in the Fukuzyu contract does not protect any
investment**

74. The exclusivity provision is also unusual because it does not protect any Vyera

investment, which again, is the typical reason a pharmaceutical company enters an exclusive

supply agreement. When an API supplier develops a process from scratch, the pharmaceutical

company will sometimes pay for the supplier's substantial API development costs and provide

additional technical assistance.

---

[33] Pelliccione Dep. 97:4-22; Pelliccione IH 102: 3-12.

[34] GX3503 (Spreadsheet: Daraprim Data).

[35] GX3504 at 010-012, 014 (Document: Supply Agreement between GlaxoSmithKline Services).

[36] GX1616 at 003-004 (Email from Arisawa to Mulleady); GX1674 (Email from Mulleady to Arisawa, Kirby, Mithani).

[37] GX3479 (Email from Selwyn Lustman to Joe Kraatz, Mendel Schurder, Jessica Hinson re: RE: Pyrimethamine).

23

75. In order to protect a pharmaceutical company's investment of time and resources into the supplier's API development process, the pharmaceutical company might require exclusivity for a period of time. Otherwise, the supplier could simply market the API to other customers despite the fact that the API was only developed as a result of the pharmaceutical company's investment. Absent the exclusivity, a drug company would be unlikely to invest in API development in the first place. For this reason, it makes sense to me that Fera would have insisted on an exclusive contract with API-1.

76.  Exclusivity provisions are uncommon, however, where the drug company does not invest in the API supplier's development process. This is because an API supplier that develops an API on its own initiative will likely seek to sell the API as widely as possible in order to maximize its return. Because API suppliers can usually make more revenue by selling higher volumes of their product to multiple, non-exclusive customers, they typically are unwilling to lock themselves into an exclusive supply arrangement. And absent an investment in the API supplier's process, the API supplier has no reason to forgo the additional sales it could make to other customers. In my experience, an API supplier is typically much more willing to guarantee forecasted requirements or set aside capacity than to enter into an exclusivity provision that would deprive it of revenue.

77. Vyera did not pay to develop Fukuzyu's manufacturing process or for any of its filing fees.[38] In fact, Vyera does not even know the details of Fukuzyu's manufacturing process.[39] In this type of situation, where the API supplier has already filed a DMF with the FDA, it is unusual for the supplier to agree to exclusivity since the drug manufacturing process has already been

---

[38] Pelliccione IH 102:22-103:3.

[39] Pelliccione IH 102:22-103:3.

24

finalized. Fukuzyu does not even have an exclusive supply relationship with GSK, its longstanding partner for pyrimethamine API.[40] Similarly, Impax did not have an exclusive supply relationship with Fukuzyu prior to the sale of the U.S. Daraprim rights to Vyera.[41]

## VI.  RL Fine's contract with Vyera was not a legitimate backup pyrimethamine API supply agreement

78. In fall 2017, Vyera executives negotiated and executed an exclusive pyrimethamine API agreement with RL Fine. The contract was, however, terminated by Vyera on October 25, 2019.[42] While I understand that Vyera executives described this agreement as a backup supply contract, the contract between Vyera and RL Fine was unlike any agreement between a pharmaceutical company and an API supplier I have ever seen.

### A.  Vyera's contract with RL Fine does not mitigate supply risk

79. A backup supply contract is a type of secondary supply contract. A secondary supply contract can be another method of guaranteeing a steady source of API. The benefit of using a secondary supplier is that it protects not only against *force majeure*-type incidents, but also against quality issues with the primary supplier's API. In order to mitigate the risk effectively, however, the pharmaceutical company must ensure that the secondary supplier is actually ready to supply API in the event of a disruption.

80. To that end, a secondary API supplier must meet the company's specifications and the FDA's requirements. Just as with a primary supplier, a secondary supplier must be FDA approved and included in the sponsor's filing or in a supplement to its filing (sNDA). This

---

[40] GX3504 (Document: Supply Agreement between GlaxoSmithKline Services).

[41] GX1321 at 002 (Email from Shkreli to David Ailinger, Michael Smith, Patrick Crutcher); Mulleady IH 54:1-12.

[42] Powers Dep. 106:5-108:3; GX1204 (Letter from Averill Powers, Phoenixus AG to RL Fine Chem Pvt. Ltd. re: Termination of Distribution and Supply Agreement between Phoenixus AG and RL Fine Chem Pvt. Ltd.).

GX8001-026

approval is necessary because the purchasing company must be able to depend on the secondary

supplier's ability to produce quality product quickly in case of an unexpected supply

interruption. If the drug manufacturer does not have FDA approval to use the secondary

supplier's API at the time of the supply disruption, it does not actually mitigate supply risk. For

this reason, it is imperative that the pharmaceutical company seek FDA approval for the alternate

supplier as soon as possible. Mr. Russell agrees. In his report, he says that it is "preferable for a

secondary supplier to react quickly in the event of supply problems with a primary supplier."

81. Throughout the entire term of Vyera's contract with RL Fine, RL Fine was unable to

serve as a backup supplier for Vyera because Vyera never sought FDA approval to use RL Fine's

API in Daraprim.[43] RL Fine also has not taken any steps toward filing a DMF.[44] Thus, if Vyera

had faced a supply disruption from Fukuzyu, Vyera would not have been able to use RL Fine as

an alternate pyrimethamine API supplier for Daraprim, and would have been forced to wait

potentially a significant length of time for FDA approval.

82. The fact that RL Fine was already producing pyrimethamine API for compounding

pharmacies does not remove the requirement for Vyera to obtain FDA approval to use RL Fine's

API in Daraprim. And because RL Fine's manufacturing process is presumably different from

Fukuzyu's, Vyera would need to undertake additional analysis and testing to demonstrate the

adequacy of its new finished dose with RL Fine's API. This requires at least an additional six

months of stability testing and other potential delays. Further, a pharmaceutical company using a

secondary supplier usually purchases a small percentage of its API needs from the supplier so the

pharmaceutical company can be sure that the secondary supplier is maintaining the equipment,

---

[43] Mithani Dep. 140:70142:9, 181:16-182:4; Pelliccione Dep. 94:21-95:14; Powers Dep. 78:12-80:8.

[44] Mathew (RL Fine) Dep. 6 ("As of now, we are not authorized to sell pyrimethamine in the US.").

GX8001-027

materials, and facility to manufacture the specific API. The FDA also prefers manufacturers to produce API on a regular basis. For this reason, it is rare that a drug company would retain a pure "backup" supplier that stands ready in the event of a supply interruption but does not actually produce the API.

### B. Vyera's failure to perform diligence also indicates that it was not intending to use RL Fine as a backup supplier

83. Vyera did not perform an appropriate level of diligence into RL Fine's manufacturing process, including whether it was likely to be cGMP-compliant. In order to manage time and cost constraints, pharmaceutical companies will often perform increased diligence into prospective suppliers. This can take the form of issuing requests for proposals (RFPs), auditing the supplier, or any other methods to ensure that the supplier has consistently maintained quality controls, is cost efficient, and is likely to comply with cGMPs.  If a company has a small number of products on which it is financially dependent, more diligence is due to ensure that its API supplier will be reliable.

84. I estimate that hiring an auditor outside of India would cost around $10,000, plus travel costs, although there are qualified auditors in India who could be hired for less. I would also advise a company to require a history of RL Fine's FDA approvals and other interactions. Considering the importance of Daraprim revenues to Vyera, these costs are a small fraction of just one of the monthly royalty payments Vyera made to RL Fine and are much more likely to mitigate supply risk.

85. By contrast, the RL Fine due diligence efforts were conducted by Mithani and Mulleady, neither of whom have any experience with API sourcing or any relevant scientific background.[45]

---

[45] Mithani IH 38:13-23, 159:1-21; Mithani Dep. 120:14-121:15, 134:8-135:2; Pelliccione Dep. 51:22-52:8; Mulleady IH 244:12-245:2; GX1490 at 003 (December 15, 2017 Minutes of the Meeting of the Board of Directors).

27

GX8001-028

Indeed, Vyera did not send technical personnel to examine RL Fine's manufacturing site, did not

review its interactions with the FDA, and did not speak with RL Fine technical personnel about

pyrimethamine API production.[46] Vyera did not enter a quality agreement with RL Fine.[47]

86. This approach differs from Vyera's own approach to negotiating its primary supply

contract with Fukuzyu. To negotiate the Fukuzyu contract, Vyera sent its President and Head of

Research and Development, Senior Vice President and Head of Regulatory Affairs and Quality,

and Vice President and Head of Chemistry, Manufacturing, and Controls to Japan to negotiate

terms and discuss quality with Fukuzyu.[48] Vyera followed a similar practice when sourcing an

API supplier for its only other marketed product, Vecamyl. For Vecamyl, Vyera issued an RFP

and its Head of Chemistry, Manufacturing and Controls evaluated six different suppliers'

detailed proposals before selecting its new API supplier.[49] This is despite the fact that Vecamyl

has far lower sales revenue relative to Daraprim.[50]

**C. RL Fine contract does not protect any investment by Vyera; instead, it conditions huge payments for exclusivity.**

87. The contract between Vyera and RL Fine is unlike any agreement between a

pharmaceutical company and an API supplier I have ever seen. Under the contract, Vyera had no

assurance that RL Fine would file a DMF with the FDA or produce any pyrimethamine API. Nor

is it even required to set aside capacity for pyrimethamine API manufacturing.

88. Rather than being structured as a backup supply agreement, Vyera's contract with RL

Fine seems to focus on preventing competitors from using RL Fine as a source of pyrimethamine

---

[46] Mithani IH 130:12-17; Mithani Dep. 117:6-121:7.

[47] Pelliccione Dep. 123:10-124:6; Pelliccione IH 49:12-50:6; Mulleady IH: 236:15-237:14.

[48] Pelliccione IH 44:15-45:4; GX1018 (Email from Pelliccione to Arisawa with Fukuzyu Meeting Agenda .docx).

[49] GX3225 (Document: Weekly Update CMC Topics).

[50] Pelliccione Dep. 89:14-90:9; Powers Dep. 47:18-21, 50:11-51:12, 69:10-70:9; Salinas Dep. 75:25-76:6.

28

API. As RL Fine's exclusive worldwide pyrimethamine API distributor (except for India), Vyera can block RL Fine from selling pyrimethamine API to other pharmaceutical manufacturers.[51] This provision is atypical in a backup supply agreement, particularly because the contract has no provisions governing how Vyera would distribute the drug. And Vyera does not appear to have any experience or interest in distributing APIs and never appeared to actually distribute any pyrimethamine API on behalf of RL Fine.[52] Instead, this provision appears to work as an exclusivity provision.

89. Again, unlike most other exclusive contracts, Vyera did not invest any resources towards RL Fine's development of a pyrimethamine API manufacturing process. RL Fine had already undertaken the investment necessary to develop its process on its own.[53] Although a stated purpose of one of the payments was to reimburse RL Fine's DMF filing fee, the scale of the payment—$1 million—far exceeded the actual filing fee of $57,795 and was payable upon execution of the contract, not the filing of the DMF.[54] RL Fine received the payment, but never filed the DMF.[55]

---

[51] GX1108 at 016 (Document: RL Fine Agreements).

[52] Pelliccione IH at 78:3-79:24; Mithani IH at 169:14-170:6; Mulleady IH 211:4-215:5, 233:20-234:25; Ramachandra (RL Fine) Dep. 13.

[53] Shah (Aadivignesh Chem) Dep. 8; Ramachandra (RL Fine) Dep. 10.

[54] GX1108 at 023-024 (Document: RL Fine Agreements);84 Fed. Reg. 36101, 36103 (Generic Drug User Fee Rates for Fiscal Year 2020) (July 26, 2019), https://www.federalregister.gov/documents/2019/07/26/2019-15906/generic-drug-user-fee-rates-for-fiscal-year-2020.

[55] Mithani Dep. 140:70142:9, 181:16-182:4; Mathew (RL Fine) Dep. 6 ("As of now, we are not authorized to sell pyrimethamine in the US."); Pelliccione Dep. 94:21-95:14; Powers Dep. 78:12-80:8; Mulleady IH 240:25-241:3; FDA, List of Drug Master Files (DMFs) (July 8, 2021), https://www.fda.gov/drugs/drug-master-files-dmfs/listdrug-master-files-dmfs.[56] GX1108 at 014, 023-024 (Document: RL Fine Agreements) ("Product' means any product directly or indirectly manufactured, sold or marketed by Company and/or any of its Affiliates that contain the API (whether or not the API was supplied by the Supplier)."), Powers Dep. 81:22-82:11; Mithani Dep. 146:11-`147:12, 150:8-151:6.

GX8001-030

90. Vyera's other substantial payments to RL Fine are also inconsistent with industry practice. Specifically, Vyera agreed to pay RL Fine a royalty of 7.5% of its net revenues, with a guaranteed minimum of $3 million dollars, from Daraprim sales regardless of whether its API was used to generate those sales.[56] This meant that each monthly royalty payment amounted to between $300,000 to $450,000 dollars.[57] As context, Vyera often spent more on a single monthly royalty payment than it has spent on *all* purchases of pyrimethamine API from Fukuzyu since entering into its 2017 supply agreement. And if Fukuzyu did experience a supply disruption, Vyera would still need to pay RL Fine for any API it purchased in addition to the substantial premiums it had already paid.[58] Instead, Vyera continued to pay RL Fine substantial royalties each and every month even though RL Fine was not even approved to supply pyrimethamine to Vyera in the event of a supply disruption.

91. These royalty payments were specifically tied to generic entry, terminating when a generic product was approved.[59] If Vyera ever sold the rights to Daraprim, RL Fine would receive 7% of the purchase price even if the agreement were terminated.[60] Vyera also paid RL Fine another $1,000,000 upon execution of a Product Collaboration Agreement.[61]  In this agreement, the parties agreed to collaborate on the development of APIs for six products, none of

---

[56] GX1108 at 014, 023-024 (Document: RL Fine Agreements) ("Product' means any product directly or indirectly manufactured, sold or marketed by Company and/or any of its Affiliates that contain the API (whether or not the API was supplied by the Supplier)."), Powers Dep. 81:22-82:11; Mithani Dep. 146:11-`147:12, 150:8-151:6.

[57] Powers Dep. 80:25-81:15.

[58] GX1108 at 022 (Document: RL Fine Agreements) ("The purchase price of the API sold to Company, under this Agreement shall be the fair market value of the API at the time that each such Purchase Order is delivered.").
[59] GX1108 at 023-024 (Document: RL Fine Agreements).

[60] GX1108 at 024 (Document: RL Fine Agreements).

[61] GX1108 at 022-023 (Document: RL Fine Agreements); Mithani Dep. 145:12-146:10.

GX8001-031

which Vyera developed.[62] All of these provisions are highly unusual for a backup supply contract. These payments make little sense because they do not incentivize RL Fine to actually do any work as a back-up supplier or collaboration partner. In fact, RL Fine was paid regardless of whether it did any development work or sold Vyera any pyrimethamine API. Vyera has never purchased pyrimethamine from RL Fine.[63] The payments only seem to compensate RL Fine for agreeing not to produce pyrimethamine for generic competitors. Indeed, it would have been far more cost effective for Vyera to buy extra API from Fukuzyu than to enter this "backup supply agreement" with RL Fine. This is particularly true given that the FDA permits manufacturers to retest API after its expiration date, which if successful, can extend an API's shelf life beyond the standard five years.

VII.   **As a result of the RL Fine and Fukuzyu exclusive contracts, generic competitors had to use API suppliers that did not have a developed cGMP process**

92. As explained in Section IV, from 2015 to 2019, Fukuzyu and RL Fine were the only two viable pyrimethamine API suppliers for generic manufacturers. In 2017, Vyera entered into exclusive contracts with both companies, preventing them from supplying pyrimethamine API to generic competitors in the United States. Cerovene, Fera, and Inva-Tech therefore all had to find an alternative pyrimethamine API supplier for their respective generic Daraprim projects. (A fourth, Mylan, abandoned its project because it could not reliably assess the market size and had trouble acquiring API and Daraprim samples.)[64] Because there were no other suppliers available,

---

[62] GX1108 at 011 (Document: RL Fine Agreements); Pelliccione Dep. 113:9-115:7, 207:5-9; Mithani Dep. 101:25-104:20, 179:9-180:13.

[63] Powers Dep. 79:12-80:3.

[64] Hatch (Mylan) Dep. 59:2-60:5.

GX8001-032

each generic company had to sponsor an API supplier's development of a pyrimethamine API manufacturing process.

93. As I opined above, developing an API manufacturing process can take anywhere from 15 to 24 months. Consistent with my experience, the generic companies had to spend a similar amount of time working with a new API supplier to develop the pyrimethamine API manufacturing process.

94. My review of the actions taken by the generic companies to develop pyrimethamine API are detailed below and in the timeline in Appendix C (GX7001), which summarizes the generic companies' efforts to develop sources of pyrimethamine API:

**A. Cerovene**

95. In my opinion, Cerovene took the preferred approach to sourcing pyrimethamine API. In 2014, Cerovene first used Ipca, which had a pyrimethamine API DMF.[65] After Ipca was banned from importing API, Cerovene approached and negotiated a verbal agreement with Fukuzyu.[66] When Fukuzyu backed out (right around when Fukuzyu began negotiating with Vyera),[67] Cerovene proceeded with RL Fine.[68] However, in late 2017, RL Fine refused to move forward in supporting Cerovene's efforts.[69] This occurred while Vyera finalized its exclusive contract with RL Fine.[70] In other words, Cerovene had serious negotiations with each of the suppliers best situated at the time to supply the market.

---

[65] Shah (Cerovene) Aff. ¶¶ 17-20; FDA, List of Drug Master Files (Jan. 12, 2021), https://www.fda.gov/drugs/drug-master-files-dmfs/list-drug-master-files-dmfs (Ipca submitted its pyrimethamine API DMF in 2009).

[66] Shah (Cerovene) Aff. ¶¶ 21-23.

[67] Shah (Cerovene) Aff. ¶ 27 (negotiations fell through in October 2016); Pelliccione IH 44:15-46:7 (Vyera executives flew to Japan in October 2016).

[68] GX3265 (Supply Agreement between RL Fine Chem Pvt. Ltd. and Cerovene, Inc. (Nov. 16, 2016).

[69] Shah (Cerovene) Aff. ¶ 39.

[70] GX1108 at 016 (Document: RL Fine Agreements).

32

96. After Fukuzyu and then RL Fine broke off their respective business relationships with Cerovene, Cerovene turned to Plan D. In April 2018, at Cerovene's request, API-4 executed a tech transfer to its subsidiary, API-3 .[71] A tech transfer involves one supplier transferring its manufacturing process, analytical methods, and related knowledge to another.[72] It is my opinion that pursuing a tech transfer from API-4 to API-3 was the next best alternative to using pyrimethamine API from RL Fine or Fukuzyu because the recipient of the transfer typically gets the benefit of using the original supplier's process and knowledge.[73]

97. After refining API-4 's process, API-3 started its first pyrimethamine API manufacturing campaign.[74] Due to an equipment failure, this was not completed until June 2019.[75] At that point, it is my opinion that a pharmaceutical company could use API-3 's pyrimethamine API to begin development of a finished dosage form of generic Daraprim.

98. However, API-4 did not update its DMF to include the API-3 manufacturing site until June 2020.[76] This means that a pharmaceutical company seeking to use API-3 's pyrimethamine API would need to wait until that date to submit a drug application.

99. API-3 's development timeline is consistent with my experience with tech transfers. While a tech transfer can greatly reduce development time, particularly with respect to

---

[71] Shah (Cerovene) Aff. ¶¶ 42-43; API-3      Dep. 23:25-24:6 (API-3  received the tech transfer in April or May 2018).

[72] The FDA guidelines for industry explains that the "goal of technology transfer activities is to transfer product and process knowledge between development and manufacturing, and within or between manufacturing sites to achieve product realization. This knowledge forms the basis for the manufacturing process, control strategy, process validation approach and ongoing continual improvement." FDA, Q10 Pharmaceutical Quality System: Guidance for Industry, at 8-9 (April 2009) (emphasis in original), available at https://www.fda.gov/media/71553/download.

[73] Because the recipient of the tech transfer receives the transferor's proprietary information, suppliers are often unwilling to transfer their process freely.

[74] API-3      Dep. 55:3-56:4.

[75] API-3      Dep. 47:18-48:9; GX3406 at 002 (Email from API-3      to API-3       re: Events list w/Attach: Pisgah Events 2019).

[76] GX3406 at 003 (Email from API-3      to API-4       re: Events list w/Attach: API-3  Events 2019).

33

developing analytical methods and the actual manufacturing process, differences in the facility and equipment can lead to different experiment outcomes, which require new testing and new methods. For example, API-3 had difficulty replicating API-4's process, so it had to make a number of adjustments to achieve a reliable and quality result.[77] In other words, even once API-3 already had API-4's process documentation, it still took 14 months for API-3 to finish its first manufacturing campaign.

### B. Inva-Tech

100.     Similar to Cerovene, Inva-Tech switched pyrimethamine API suppliers from Ipca to RL Fine due to the 2015 import ban on Ipca's products.[78] Inva-Tech entered into a supply agreement with RL Fine,[79] but RL Fine terminated the relationship in the fall of 2017.[80]

101.     At that point, Inva-Tech executive Nilesh Patel reached out to a business partner, API-2    , and asked it to manufacture pyrimethamine API on Inva-Tech's behalf.[81] Before then, API-2    did not have a pyrimethamine API manufacturing process in place.[82] But Inva-Tech, which had received RL Fine's process as part of its ANDA submission, was able to perform a tech transfer of that process to API-2    in early 2018.[83] This decision makes sense. Given that Inva-Tech already had a copy of RL Fine's manufacturing process, it would likely be faster to transfer the process to a trusted partner than to have a new supplier start from scratch.

[77] API-3    Dep. 47:18-48:9; GX3406 at 002 (Email from API-3    to API-4    re: Events list w/Attach: API-3 Events 2019).

[78] Patel (Inva-Tech) Aff. ¶¶ 22-35.

[79] GX3166 (Document: Preliminary Collaboration Agreement Between Inva-Tech Pharma Solutions, LLC. and RL Fine Chem Pvt. Ltd.).

[80] Patel (Inva-Tech) Aff. ¶¶ 36-48.

[81] Patel (Inva-Tech) Aff. ¶¶ 50-51.

[82] Patel (Inva-Tech) Aff. ¶ 52.

[83] Patel (Inva-Tech) Aff. ¶ 53. The relevant portions from the Patel depo are not designated.

34

102.      Like API-3  API-2      had to make a number of adjustments to RL Fine's

process and did not complete its pyrimethamine API manufacturing campaign until June 2019.[84]

In other words, it took API-2      around 16 months to manufacture pyrimethamine API despite

using a pre-existing process. In my opinion, it was not until June 2019 that API-2       's API

would be ready to manufacture a finished dose form of generic Daraprim.

103.      In July 2019, Inva-Tech updated its application to the FDA using API-2       's

data and manufacturing process.[85]

**C. Fera**

104.      Fera first began its efforts to create a generic Daraprim product in response to

Vyera raising the price in 2015.[86] After concluding that the DMF holders were not viable

options, Fera hired API-1 , a well-respected API supplier that has filed several U.S. DMFs and

owns an FDA-inspected facility,[87] to develop pyrimethamine API on Fera's behalf.[88] API-1  had

some knowledge of pyrimethamine API but did not have a manufacturing process or analytical

methods in place.[89] Selecting API-1  was a logical decision in this situation given its

understanding of pyrimethamine API and its reputation and experience working with U.S.

pharmaceutical companies.

---

[84] Patel (Inva-Tech) Aff. ¶ 54; GX3170 ( Email from S. Prasanna to Nilesh Patel, Kannan Govindarajan, Venkatesh, et al. re: Re: Declarations for Pyri).

[85] GX3168 at 003 (Document: Inva-Tech Pharma Solutions, LLC. Complete Response Amendment re: Complete Response to Pending ANDA for Pyrimethamine).

[86] DellaFera (Fera) Aff. ¶ 15.

[87] FDA, List of Drug Master Files (Jan. 12, 2021), https://www.fda.gov/drugs/drug-master-files-dmfs/list-drug-master-files-dmfs (listing dozens of API DMFs submitted by API-1 ); FDA, Inspection Classification Database Search, https://www.accessdata.fda.gov/scripts/inspsearch/ (firm search for "API-1" showing FDA inspections of API-1's Bangalore facilities in August 2011, September 2012, November 2016, and August 2019).

[88] DellaFera (Fera) Aff. ¶ 23.

[89] McDougal (Fera) Aff. ¶¶ 16-17.

GX8001-036

105.        API-1 concluded its lab trials in October 2016[90] but did not finish its cGMP

manufacturing campaign until October 2017.[91] Fera CEO's DellaFera estimated that this

development process took around 18 months.[92] This development timeline is consistent with the

15- to 24-month timeline I would expect given that API-1 developed the process from scratch. As

of October 2017, API-1's pyrimethamine API was ready to be used in a final dosage form—but

only for Fera, which executed an exclusive contract with API-1.[93]

106.        In fall 2017, Fera engaged with Fukuzyu to acquire a sample of pyrimethamine

API.[94] Fera's CEO testified that although Fera had already begun to work with another API

supplier at that point, he would have switched to Fukuzyu had it been an option to avoid further

expense and delay.[95]

107.        I agree that switching to Fukuzyu in 2017 would have been a logical and

appropriate course of action for Fera. Because Fukuzyu was already an FDA-approved supplier

of pyrimethamine API, Fera would have been better off abandoning its investment in API-1 and

using Fukuzyu, particularly because Fera had not yet developed a finished dosage form of its

generic Daraprim using API-1 API. Fera could have avoided the expense of compiling a DMF

and would have had more comfort knowing that the FDA had already reviewed Fukuzyu's

manufacturing process. This second point is particularly important given that the FDA ultimately

did have a number of questions about API-1's manufacturing process that Fera had to answer.[96]

---

[90] GX3251 at (Document: API-1    . Project Report).
[91] McDougal (Fera) Aff. ¶ 29.
[92] GX5003 [DellaFera (Fera) IH 40:4-41:1].
[93] DX 115 (Document: Supply Agreement for Pyrimethamine Active Pharmaceutical Ingredient by and between API-1    and Fera Pharmaceuticals LLC).
[94] DellaFera (Fera) Aff. ¶¶ 27-28.
[95] DellaFera (Fera) Aff. ¶¶ 27-28.
[96] McDougal (Fera) Aff. ¶¶ 41-42.

GX8001-037

108.     While talks between Fera and Fukuzyu did not progress, Fera made the right first step—reaching out to see if Fukuzyu would be willing to sell Fera a sample. When Fukuzyu explained to Fera that it would not sell its pyrimethamine API to companies making drugs for human use in the United States, it made sense that Fera did not pursue the issue any further and proceeded with API-1

109.     Fera filed its DMF in May 2019.[97] At that point, Fera could file an ANDA that referenced this DMF, assuming all its other requirements were met.

110.     In conclusion, until the generic companies' API manufacturing partners developed pyrimethamine API manufacturing processes and filed DMFs in 2019 and 2020, the only two pyrimethamine API suppliers able to supply the market, Fukuzyu and RL Fine, were in exclusive arrangements with Vyera.


I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on October 20, 2021.

*/s/ James R. Bruno*

---

[97] FDA, List of Drug Master Files (DMFs) (Jan. 12, 2021), https://www.fda.gov/drugs/drug-master-files-dmfs/list-drug-master-files-dmfs.

37

GX8001-038

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION, et al.,

Plaintiffs,

v.                                                    Case No.: 1:20-cv-00706-DLC

VYERA PHARMACEUTICALS, LLC, et al.,

Defendants.

Direct Testimony of Edward V. Conroy

GX8002-001

# TABLE OF CONTENTS

I. Introduction ........................................................................................................ 2

II. Qualifications .................................................................................................... 2

III. Assignment ....................................................................................................... 4

IV. Summary of opinions ........................................................................................ 4

V. Pharmaceutical distribution primer ................................................................. 6

    A. Full-line distribution ................................................................................. 6

    B. Specialty distribution ............................................................................... 7

VI. Vyera's use of a tightly controlled specialty distribution system is not consistent with industry norms or tied to patient benefits ................................................. 9

    A. Daraprim does not need to be in specialty distribution to increase drug access or provide patient benefits ......................................................... 9

    B. Vyera's restrictive distribution tools and practices are not consistent with industry norms or tied to patient benefits ...................................... 11

        1. Customer restrictions ........................................................................ 12

        2. Purchase limits ................................................................................. 13

        3. Monitoring of sales .......................................................................... 17

        4. Buyback at a premium ..................................................................... 19

        5. Removal of previously approved customer accounts ....................... 21

        6. Data blocking .................................................................................... 23

    C. Mr. Russell's attempts to normalize Vyera's restrictive distribution system and practices are misleading ...................................................... 29

        1. Industry trends toward specialty are irrelevant to whether Vyera's restrictions are consistent with industry norms or necessary for patient benefits ................................................................................. 29

        2. Mr. Russell's examples of purportedly analogous drugs are readily distinguishable and fail to explain Vyera's restrictions ................... 30

        3. Mr. Russell's conclusion that Vyera made the distribution system it "inherited" less restrictive is misleading and does not account for the restrictions Vyera added ................................................................. 33

VII. Vyera's distribution partners financially benefited from distribution restrictions and data blocking that impeded generic entry ................................................. 35

## I.  Introduction

1.      My name is Edward Vincent Conroy. I am the President and Chief Operating Officer at Ed Conroy & Associates, a consulting firm providing commercialization and distribution services to pharmaceutical companies.

2.      I was retained by Plaintiffs Federal Trade Commission, New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia to provide expert testimony about Vyera's Daraprim distribution system and distribution-related practices. I am voluntarily submitting this declaration at the request of Plaintiffs. I understand this declaration will be submitted to the Court deciding this matter.

3.      I submitted an opening expert report on April 12, 2021, a reply report on June 29, 2021, and a corrected reply report on July 6, 2021. I was deposed on the opinions expressed in my reports on July 14, 2021.

## II.  Qualifications

4.      I have over 45 years of experience in the pharmaceutical industry. I have spent most of my career negotiating contracts and managing relationships with major distributors and drug chains, such as AmerisourceBergen, Cardinal, McKesson, and Walgreens. I have also worked extensively with big and small pharmaceutical companies to design and implement distribution systems for a variety of drugs, including brand drugs, generics, and drugs with specialty needs.

5.      I began my career in 1975 at GlaxoSmithKline (GSK),[1] a major pharmaceutical manufacturer and Daraprim's owner from 1953 to 2010. Over my 26 years at GSK, I gained a broad exposure to the pharmaceutical industry: I served as a sales representative working with

---

[1] GSK had undergone several acquisitions and name changes during my tenure. I will refer to GSK and its predecessors Burroughs Wellcome and Glaxo Wellcome collectively as GSK.

drug distributors and hospitals; analyzed pharmaceutical data using a variety of data sources, including IMS (now IQVIA) and Medi-Span; and handled national accounts management and trade development with responsibility for drug distribution systems.

6.      While at GSK, I helped to design and execute drug launches, including of Flolan, Lotronex, and Retrovir. Flolan is a life-saving intravenous drug to treat primary pulmonary hypertension. It was high cost, difficult-to-use, and "cold chain," meaning that it required refrigeration throughout the distribution chain. We sold Flolan only through a closed system using Accredo specialty pharmacy. Lotronex is used to treat irritable bowel syndrome. It was initially launched in full-line distribution and later moved to specialty distribution controlled by a Risk Evaluation and Mitigation Strategies (REMS).[2] I helped to develop the REMS and implement them with distributors and pharmacies. Retrovir is the first antiviral drug for HIV and was one of the most expensive oral tablets on the market at the time. We distributed it openly and provided payment assistance in-house at GSK.

7.      I departed GSK in 2001 to start my consulting practice Ed Conroy & Associates. Since then, I have helped over 15 pharmaceutical start-ups to launch and commercialize their products. As part of this, I advise on the design and implementation of distribution systems. This includes drafting and negotiating contracts with drug distributors, pharmacy chains, hospitals, third-party logistics companies (3PLs), and managed care organizations to establish an optimal distribution system that meets the patients' needs and fits the characteristics of the product being launched. I apply my decades of experience with pharmaceutical contracts in my day-to-day work as a consultant.

---

[2] REMS "is a drug safety program that the U.S. Food and Drug Administration (FDA) can require for certain medications with serious safety concerns to help ensure the benefits of the medication outweigh its risks." FDA, Risk Evaluation and Mitigation Strategies | REMS (Aug. 8, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/risk-evaluation-and-mitigation-strategies-rems.

8.      By working extensively with big and small pharmaceutical companies, I have gained experience in all facets of drug sales and distribution. In my career, I have been involved in over 25 product launches, including over-the-counter, intravenous, specialty, REMS, brand drugs, and generics. At least five of the launches I worked on (Adasuve, Flolan, DaunoXome, Lotronex, and Wellcovorin) involved specialty needs, such as REMS and cold chain refrigeration requirements. In nearly all cases, I have written, designed, negotiated, and managed agreements with 3PLs, drug wholesalers, managed care organizations, specialty pharmacies, and drug chains. I have also set up tracking systems to monitor drug sale and distribution using various data sources, including IQVIA, Medi-Span, and distributor data.[3]

9.      My curriculum vitae is attached at Appendix A.

**III. Assignment**

10.      I was asked to address two questions relevant to this matter. First, whether Vyera's Daraprim distribution system and practices are consistent with industry norms or tied to patient benefits. Second, whether Vyera's distribution partners financially benefited from distribution restrictions and data blocking that impeded generic entry.

**IV. Summary of opinions**

11.      Based on my review of the evidence and my experience of over 45 years in the pharmaceutical industry, I conclude that Vyera's distribution systems and practices that I describe below are not consistent with industry norms or tied to patient benefits. I reach this conclusion for a variety of reasons detailed in Section VI of my written testimony. In brief, Daraprim is not a high touch, high complexity drug that needs to be in specialty distribution. If I were advising Vyera on the most appropriate distribution system for Daraprim, I would advise

---

[3] Distributor data includes an inventory report (known as EDI 852), a sales report (known as EDI 867), and a chargeback report (known as EDI 844).

that Daraprim should be distributed openly, as it had for over 60 years until 2015, and that Vyera should provide payment assistance to help patients navigate reimbursement issues after Vyera's price increase.

12.      Importantly, though, my conclusion that Daraprim is most appropriately distributed openly is not integral to my primary opinion in this case. Even if, contrary to my opinion, it were necessary to distribute Daraprim in a closed specialty system, Vyera has adopted numerous restrictive distribution tools and practices, which, individually and collectively, are not grounded in normal industry reasons or necessary to achieve patient benefits. These are (1) customer restrictions, (2) purchase limits, (3) intensive monitoring of sales, (4) buyback of Daraprim at a premium, (5) removal of previously approved accounts, and (6) data blocking. The standard in the pharmaceutical industry is to maximize drug access, usage, sales volume, and profits, while meeting patients' needs. But Vyera's restrictive distribution tools and practices limit the access to Daraprim without benefiting patients. It would have been unusual had Vyera used these restrictions individually, but simultaneously using all six of them for a drug like Daraprim is extraordinary in my experience.

13.      I further conclude that Vyera's distribution partners financially benefited from distribution restrictions and data blocking that impeded generic entry. The basis for my conclusion is detailed in Section VII of my written testimony. In brief, because Daraprim is more expensive than its generic version and distributors' compensation structure is largely similar across brand and generic contacts, distributors make more money distributing the sole-source brand drug that has no competition rather than the brand and its generic version. In addition, Daraprim distributors gained from data blocking fees that they received from Vyera.

14.     I have reviewed John Russell's expert report responding to the opinions I expressed in my opening report. Mr. Russell's report does not change my opinions in this case.

**V. Pharmaceutical distribution primer**

15.     Pharmaceutical distribution systems vary in their restrictiveness from the more open to the more closed. The more open systems have fewer restrictions on drug distribution, whereas the more closed systems have more restrictions. Distribution restrictions can take various forms, such as restrictions on who can buy the drug (customer restrictions) or how many bottles they can buy at a given time (purchase limits).

   **A. Full-line distribution**

16.     A traditional full-line distribution system is at the open end of the distribution spectrum with fewer restrictions. Under this system, pharmaceutical manufacturers partner with major full-line distributors—AmerisourceBergen, Cardinal, and McKesson—to deliver prescription drugs to entities that are licensed to dispense them, such as pharmacies, hospitals, clinics, and nursing homes.

17.     Almost 70% of pharmaceuticals in the United States by volume are distributed through the open distribution system because most drugs do not require special handling and traditional channels provide a quick and easy way for patients to access the drugs. The efficiency of the open system allows almost any patient to receive their prescription by the next day. Standard full-line distribution services usually include near 100% fill rate on orders, emergency shipments of drugs 24/7/365, contract and chargeback administration, returns processing, customer service support, adequate working inventories, and licensed, environmentally-controlled facilities. In addition, full-line distributors provide inventory and sales reports to the manufacturers. These reports are usually transmitted weekly or monthly, but more frequent reports are typically available with an additional fee.

**B.  Specialty distribution**

18.     About 30% of pharmaceuticals in the United States by volume are distributed

through specialty channels.[4] Specialty distribution systems tend to be at the more closed end of

the distribution spectrum. They usually restrict the distribution channels for a drug to a small

number of distributors, which is why some specialty systems may be called limited, restricted, or

closed.

19.     It is important to keep in mind that specialty is not a single uniform method of

distribution. Specialty systems vary in their restrictiveness. Defendants' expert Mr. Russell

acknowledges that some specialty channels are extremely restrictive, while others are more open.

The more restrictions on drug access, such as customer restrictions and purchase limits, the more

closed the system becomes. The more closed the system, the more control the manufacturer has

over the distribution of its product.

20.     When I advise my clients on the drug distribution design, I generally recommend

having as few restrictions as possible to maximize drug access, usage, sales, and profits. Indeed,

a drug can be distributed through specialty pharmacies but not have customer restrictions or

purchase limits, such as Wellcovorin sold by GSK and DaunoXome sold by Galen (one of my

consulting clients).

21.     But in certain circumstances, distribution restrictions are necessary to advance

patient needs and ensure a seamless distribution of the drug. The more restricted distribution

systems are typically reserved for high touch, high complexity, high cost drugs with special

shipping, handling, storage, black box warnings, or REMS. High touch drugs have complex

---

[4] Mr. Russell notes that specialty makes up 45% of total industry revenue. His use of revenue to measure a
percentage is misleading because specialty drugs are typically high cost, and thus account for a significantly higher
percentage of revenue than volume. Volume is a more accurate measure of prevalence.

administration, preparation, or treatment regimens that require ongoing clinical monitoring and patient education to assure safety, efficacy, and better patient outcomes.

22.     A large percentage of drugs that fit these characteristics tend to be new infusions, injectables, or biologics that are used to treat chronic, oncological, autoimmune/immune, or inflammatory diseases, including cystic fibrosis, ALS, leukemia, multiple sclerosis, and Crohn's disease. These types of novel, complex drugs often require the expertise of specialty pharmacies, which are well positioned to provide special shipping, handling, and high touch care. This includes monitoring and management of side effects, injection training, and access to a clinical staff 24 hours a day, 7 days a week. Similarly, products that require special handling (e.g., cold chain, REMS, DEA-controlled substances) may be better handled by specialty distributors, which have tailored distribution capabilities to address these special needs, rather than full-line distributors.

23.     On the other hand, strict restrictions on distribution and drug access are usually not necessary for oral drugs (such as tablets).[5] Oral drugs, unlike infusions for example, do not require complex administration. Moreover, oral drugs are usually stable at room temperature, which means that they do not require special shipping, handling, or storage.

24.     A drug's cost is a factor to consider in distribution design because high cost can create reimbursement challenges. But just because a drug is expensive does not mean that it must be subject to distribution restrictions or distributed through specialty. Irrespective of a drug's distribution channels, the manufacturer is free to set up a payment assistance program in-house or provide it through third parties such as PARx Solutions, AssistRx, or CoverMyMeds that help

---

[5] Of course, there are exceptions. For example, oral drugs used to treat multiple sclerosis need distribution restrictions and high touch services to help monitor side effects, efficacy, and changes in the course of the chronic disease.

patients to navigate the prior authorization process. Indeed, Retrovir sold by GSK was the first antiviral drug for HIV and was one of the most expensive oral tablets on the market at the time. Besides its high cost, Retrovir did not have other features of specialty drugs, so we distributed it openly without restrictions and provided payment assistance in-house at GSK.

**VI. Vyera's use of a tightly controlled specialty distribution system is not consistent with industry norms or tied to patient benefits**

25.     Based on my review of the record, I understand that previous owners of Daraprim transitioned the drug from full-line open distribution to specialty. Vyera kept Daraprim in specialty and added contractual restrictions on Daraprim's distribution.

26.     My primary opinion in this case outlined in VI.B is that Vyera's restrictive distribution tools and practices, individually and collectively, are not grounded in normal industry reasons or necessary to achieve patient benefits. I discuss six of Vyera's restrictive practices: (1) customer restrictions, (2) purchase limits, (3) intensive monitoring of sales, (4) buyback of Daraprim at a premium, (5) removal of previously approved accounts, and (6) data blocking. But before I address these restrictions, I will explain in VI.A why Daraprim does not require specialty distribution.

27.     My opinion in VI.B is not dependent on my conclusion that Daraprim does not need to be in specialty distribution. Even if one were to conclude that Daraprim must or should be distributed via specialty, Vyera's restrictive tools and practices for Daraprim are inconsistent with industry norms, individually and collectively.

**A.  Daraprim does not need to be in specialty distribution to increase drug access or provide patient benefits**

28.     Daraprim is not the type of drug that needs to be in specialty. Drugs distributed through specialty channels usually have at least two of the following characteristics: high complexity; high touch; high cost; special shipping, handling or storage; and REMS. Daraprim is

GX8002-010

an oral tablet that has been on the market since 1953. My own experience as well as Dr. Hardy's and Vyera's testimony confirm that Daraprim has time-tested safety and well-established medical guidelines. Daraprim is easy to administer and stable at room temperature, meaning that it lacks special shipping, handling, or storage requirements. Moreover, Daraprim has no REMS or FDA black box warnings. While I was at GSK, there were no storage or stability issues with Daraprim or any medical concerns from doctors or patients that required a transition to specialty. Had there been any problems with Daraprim that required a change in distribution, they would have been brought to my attention. Daraprim was always in GSK's price lists and available for any licensed wholesaler, hospital, or pharmacy to purchase and distribute without any restrictions. It is very unusual to move to specialty an oral drug that had been distributed openly for six decades. This is particularly true for a drug like Daraprim that lacks the usual features of specialty drugs identified above.

29.     At least one Vyera executive and a generic manufacturer agree with me that Daraprim does not need to be in specialty to increase patient access or provide other patient benefits. Vyera executive Marco Polizzi stated that there was "absolutely no[]" reason to distribute a high-cost authorized generic version of Daraprim through specialty instead of full-line distributors.[6] Moreover, I understand that the first generic entrant Dr. Reddy's chose to distribute pyrimethamine through open distribution channels to provide greater access to patients.

30.     Mr. Russell dismisses Dr. Reddy's decision to sell its generic version of Daraprim in open distribution based on generic manufacturers' "very different incentives." But generics can and do place drugs in specialty when it is necessary. Here, Dr. Reddy's testified that it did

---

[6] Polizzi Dep. 165:15-24.

not consider restricted distribution for its high-cost generic pyrimethamine because it saw no

reason for either branded or generic Daraprim to be placed in restricted distribution. This

testimony is consistent with my opinion.

31.     Mr. Russell goes on to argue that specialty distribution provided two potential

benefits to Daraprim patients: improving compliance with the treatment regimen and providing

payment assistance. But Mr. Russell has not identified any documents, and I am aware of none,

showing that patient compliance has improved since the transition to specialty. In fact, I have not

even seen any record of what steps Vyera has actually taken to improve patient compliance

through specialty.

32.     As to payment assistance, Mr. Russell is correct that Daraprim patients would

benefit from it because Vyera's price increase likely created reimbursement challenges. But

payment assistance programs have little to do with the mode of distribution or distribution

restrictions. For example, Vyera could have distributed Daraprim openly and provided payment

assistance in-house or through third parties such as PARx Solutions, AssistRx, or

CoverMyMeds. This is what we did with Retrovir at GSK. While Retrovir was a high cost HIV

tablet, we distributed openly because it did not fit other features of specialty drugs. Similarly, if I

were consulting Vyera regarding Daraprim distribution I would not recommend specialty

channels if the goal were to maximize access, usage, and sales volume.

**B.  Vyera's restrictive distribution tools and practices are not consistent with industry
     norms or tied to patient benefits**

33.     While I conclude that it is not necessary to distribute Daraprim through specialty,

the opinions that follow in VI.B do not depend on this conclusion. Regardless of whether it is

necessary to distribute Daraprim through specialty, the contractual restrictions and practices that

Vyera implemented and which I discuss below are not consistent with industry norms or tied to

patient benefits. It would have been unusual had Vyera used these restrictions individually, but simultaneously using all six of them for a drug like Daraprim is extraordinary in my experience.

**1.   Customer restrictions**

34.    Based on my review of the record, I understand that all of Vyera's distribution contracts have restrictions on authorized customers that can access Daraprim. Summary exhibit GX7003 details Vyera's customer restrictions with its specialty distribution partners—ASD, BioRidge, Cardinal Specialty, Optime, and Walgreens.[7] None of them can sell Daraprim to a retail pharmacy with a prescription or a generic without Vyera's approval.

35.    As I explained above, a drug can be in specialty but have no customer restrictions, such as Wellcovorin sold by GSK and DaunoXome sold by Galen (one of my consulting clients). Wellcovorin was a chemotherapy drug primarily purchased by oncology clinics and sold through both open and specialty channels. DaunoXome was an IV, cold chain drug primarily purchased by hospitals and sold exclusively through ICS. Neither Wellcovorin nor DaunoXome had any access restrictions. We let the customers self-select whether they wanted to buy these drugs and how much. The testimony in this case is consistent with my experience. For example, Vyera's specialty distributor Cardinal noted that "there are some [specialty] contracts that are open and don't have any restrictions to them."[8] Vyera's other specialty distributor BioRidge estimated "that maybe half of [its contracts] list the customers they want us to sell to, the other half it's open to anyone, anyone meaning a licensed pharmacy."[9]

36.    Mr. Russell argues that it is not uncommon for manufacturers to have limits on customer accounts, but he does not even attempt to explain why Daraprim or toxoplasmosis

---

[7] GX7003.

[8] Johnson (Cardinal) Dep. 129:13-20.

[9] Anderson (BioRidge) Dep. 26:11-15.

patients required or even benefited from customer restrictions. Indeed, I see no normal industry

reason why customer restrictions were necessary for Daraprim. In fact, I would advise my clients

against imposing restrictions on access, such as customer restriction, unless they are necessary to

improve patient outcomes.

37.     Instead of giving specific reasons for customer restrictions, Mr. Russell generally

notes that specialty distribution can be used to improve patients' compliance with the treatment

regimen and provide payment assistance. In addition to the problems with this claim that I

identified above,[10] there is no explanation why Daraprim needs to be subject to customer

restriction to achieve any of these benefits. But even assuming that patients somehow benefited

from customer restrictions, these benefits could have been achieved without restricting access to

generic companies. There is nothing inherent in the specialty distribution model or customer

restrictions that requires preventing generics from buying a drug for use in bioequivalence

studies. Vyera's own Chief Commercial Officer and specialty distributors agreed with me[11] and

Mr. Russell did not present any argument to the contrary.

38.     In sum, I conclude that Vyera's customer restrictions, individually and

collectively with other restrictions I discuss in VI.B, are not consistent with industry norms or

necessary to achieve patient benefits.

**2. Purchase limits**

39.     I understand that Vyera has agreements with its distributors that limit the number

of Daraprim bottles that a customer can purchase at a given time. Vyera had a five-bottle limit

with its former distributor ICS "to ensure that the [buyer] is legit and not a generics

---

[10] ¶¶ 31-32, 35.

[11] GX5013 at 205 (Retzlaff IH 205:9-13); Johnson (Cardinal) Dep. 132:3-10; Quill (Optime) Dep. 99:8-24;
Anderson (BioRidge) Dep. 71:9-21.

manufacturer."[12] In December 2015, Vyera also agreed with ASD to a five-bottle limit, which was reduced to four bottles in April 2018; orders exceeding the limit require Vyera's approval.[13] Similarly, Vyera agreed with Optime not to sell more than three bottles of Daraprim to any purchaser without Vyera's express approval.[14]

40.     Similar to customer restrictions, purchase limits tend to limit sales, impede drug access, and frustrate customers, providers, and patients. Consistent with this, ASD noted in an email to Anne Kirby that purchase limits (and removal of previously approved accounts discussed below) "is going to cause a lot of disruption to the existing customers" and "delay orders."[15]

41.     Because purchase limits tend to be disruptive, I advise my clients to use them only in a very narrow set of circumstances and only when necessary. In my experience, purchase limits are usually used to: (1) meet REMS requirement; (2) ensure safety of addictive drugs or drugs with black box warnings; (3) manage drug shortages; (4) control a high volume of returns; or (5) reduce arbitrage (customers buying the drug cheap and reselling it at a higher price). Mr. Russell opines that Vyera's purchase limits helped Vyera to avoid the potential for supply shortages, better manage inventory, and avoid potential financial risks arising from 340B sales. My personal experience with Daraprim, my review of the record, and Mr. Russell's report do not lend support to any of these reasons in this case.

42.     First, Daraprim is not subject to a REMS.[16]

43.     Second, Daraprim is a safe, time-tested drug with no black box warnings.[17]

---

[12] GX1215.
[13] GX1533; GX1577.
[14] GX1036.
[15] GX1577 at 001.
[16] GX3019 at 002.

44.     Third, Daraprim has never been in shortage.[18] We did not have them at GSK and neither Mr. Russell nor Vyera's executives identified an instance where Daraprim was in shortage or limited supply. Implementing strict purchase limits of three or five bottles to address a hypothetical concern for shortages is highly unusual in my experience.

45.     Fourth, I have not seen any evidence to suggest that Daraprim had a high return rate even before Vyera's purchase limits were put in place. In fact, the high carrying cost of Daraprim is likely to discourage unwanted purchases, thus increasing the accuracy of orders and reducing the likelihood of returns.

46.     Mr. Russell's statement that purchase limits helped with inventory management is unclear. To the extent this refers to avoiding shortages or managing product returns, these concerns appear to be hypothetical as I have not seen any concrete issues relating to inventory management in my review of the record (or my experience at GSK). I would advise my clients against using purchase limits absent specific reasons why they are necessary to address inventory problems.

47.     Fifth, while Vyera sells Daraprim at different prices to 340B and non-340B entities, Vyera has not presented any instances of 340Bs buying Daraprim at $1 and illegally reselling it at a higher price. It is not surprising because 340B entities are prohibited from reselling the covered drugs to anyone but the patient.[19] The consequences for violation can be severe, including the suspension from the 340B program (and its discounted pricing) and the loss of pharmacy license. Even setting this aside, if Vyera's purchase limits were in response to 340B

---

[17] Costopoulos Dep. 49:5-6, 12-13. Ghorban Dep. 47:9-11.
[18] Haas Dep. 35:8-13, 16-21; GX5001 at 091 (Pelliccione IH 91:18-22); Ghorban Dep. 122:22-25.
[19] 42 U.S.C. § 256b(a)(5)(B).

misuse, I would expect them to apply only to 340B entities so that Vyera could maximize all other sales. But Optime's purchase limits applied to all entities.[20] Also, in the case of ASD, 340B entities became exempt from the purchase limits around 2018, which is the opposite of what I would have expected if the purchase limits were in response to 340B concerns.[21]

48.     Mr. Russell's attempt to connect purchase limits to avoiding large unexpected chargeback liabilities from 340B sales is also unfounded. Mr. Russell provides no evidence whatsoever that sudden spikes in 340B sales ever happened or adversely impacted Vyera's cash flow. But even setting this aside, Mr. Russell appears to misunderstand the chargeback process. Distributors adjudicate chargebacks electronically and overnight. After an account orders from a contract providing special pricing and before it is shipped, the order is examined to make sure the customer is eligible for the discount. The distributor then creates a chargeback for the difference between the WAC price and contract price and submits this daily to the manufacturer to make itself whole. For example, Vyera's contract with Cardinal specifies that Cardinal "will transmit daily all chargeback billings" to Vyera.[22] The bottom line is that Mr. Russell's theoretical concern about large unexpected chargebacks is overblown: Vyera gets chargeback information daily and the accounts are verified to be eligible for discounts before the orders are shipped. Besides, if the purchase limits were designed to address 340B spikes, I would expect them to only apply to 340B sales. But as I mentioned earlier, 340B sales became exempt from ASD's purchase limits in 2018.

---

[20] Quill (Optime) Dep. 52:5-11 (orders from any customer greater than three bottles requires Vyera's approval).
[21] GX1577 at 003 ("ASD will place a PAR LEVEL Rule of only 4 Bottles per ORDER on all the approved facilities that are NON-340B. There will be no par level rule on 340B accounts."); Desai (ASD) Dep. 87:14-88:17.
[22] GX1045 at 043.

49.     Finally, Mr. Russell does not even attempt to explain how purchase limits are necessary to achieve patient benefits, and I see no connection between Vyera's purchase limits and improving patient outcomes.

50.     In short, I conclude that Vyera's purchase limits, individually and collectively with other restrictions I discuss in VI.B, are not consistent with industry norms or tied to patient benefits.

### 3.  Monitoring of sales

51.     I understand that Vyera receives daily or weekly sales reports from all of its distribution partners.[23] Vyera's top executives Kevin Mulleady, Anne Kirby, and Akeel Mithani closely monitor Daraprim sales to identify any "irregularities" in purchases.[24] I have seen numerous examples of Vyera leadership reviewing sales reports and following up on transactions they deemed suspicious, including orders placed by reputable institutions like Mayo Clinic.[25]

52.     I also understand that in September 2017, Vyera conducted a "full out audit of" Daraprim to "know where every bottle of Daraprim . . . went to" to avoid Daraprim "leakage."[26] Vyera established a system with ASD for immediate notification of any orders for five or more bottles.[27] Anne Kirby would monitor purchases exceeding five bottles,[28] flag them to the company leadership,[29] and contact the buyer to "inquire as to what their purpose is."[30]

---

[23] GX1460 at 001; GX1361; GX1355.

[24] Mulleady Dep. 247:21-248:5, 10-12.

[25] GX3332 (Kirby emailing Cardinal about Mayo Clinic purchase: "It is uncommon for a hospital to purchase 4 100 count bottles WAC for outpatient use. . . . Contact information would be helpful."); GX3337 (Kirby inquires about Illinois ADAP's purchase of 8 bottles and expresses "concern[] about taking the customer's word for the affiliation"); GX1165 (Kirby and Mulleady agree to establish a 1 bottle limit with Drug Mart); GX1032 (Kirby asks the team to "make sure we are flagging any purchases by the affiliated hospitals that are outside of historical trends" because Civica Rx is affiliated with a hospitals that might develop a generic).

[26] GX1358 at 001; GX1123 at 002; GX1357 at 002.

[27] GX1029; GX1459; Kirby Dep. 245:10-18, 25-246:25 (the idea for the reports came out of a conversation with Mulleady to know "who was ordering product before it happened instead of after").

53.     It is not unusual for manufacturers to monitor sales and it is often done for legitimate reasons. For example, I have experience with small companies where we carefully monitored product to make sure we had sufficient quantities on hand and to detect declining sales because of cash flow and budgetary needs. Our monitoring was centered on ensuring sufficient supply and managing costly inventory, API, and components. More broadly, manufacturers may monitor purchases to locate new customers, improve marketing efforts, or identify potential other uses for the drug for business development opportunities. Notably, these types of monitoring efforts normally focus on sales trends, not individual transactions.

54.     I have seen no evidence to suggest that Vyera's monitoring was done for any of these legitimate reasons. The monitoring efforts seem to be geared toward spotting orders of multiple bottles of Daraprim and orders by accounts not on the approved customer list. Vyera's monitoring practice has several unusual features. First of all, this is the first time I am seeing a company monitor Mayo Clinic for suspect purchases. Mayo Clinic is a highly respected institution with a world-class infectious disease practice. They are very unlikely to jeopardize their brand name and position by engaging in illegal transactions. Moreover, the degree of Vyera's monitoring is extraordinary in my experience. Consistent with my opinion, one pharmacy executive agreed that Vyera's involvement "in every bottle transaction . . . is very unusual."[31] Similarly, the ASD witness noted that the five-bottle reports are "very uncommon."[32]

---

[28] Mulleady Dep. 246:5-7, 11-12 (Ms. Kirby would monitor [a purchase of more than five bottles] and make a decision of how it was to be handled").

[29] GX1027; Mulleady Dep. 247:3-6 (GX1027 is an example of a report regarding an order for five or more bottles that Kirby sent to Mulleady).

[30] GX5009 at 237 (Kirby IH 237:2-10).

[31] Valiveti (Reliant) Dep. 133:22-134:10, 12, 14-15.

[32] GX1029; Desai (ASD) Dep. 128:11-16.

GX8002-019

It is astonishing that Vyera's senior executives such as Mulleady, Mithani, and Kirby would involve themselves in monitoring that does not help to grow sales and has nothing to do with patient access or successful use of Daraprim.

55.     As with purchase limits, Mr. Russell opines that monitoring could have helped Vyera to avoid the potential for supply shortages, better manage inventory, and avoid potential financial risks arising from 340B sales. This argument fails here for the same reason it failed with purchase limits: I am not aware of any documents or testimony showing that Vyera's intense monitoring was done for any of these reasons, and Mr. Russell does not point to any specific facts to support his conjecture. Mr. Russell also fails to explain how Vyera's intensive monitoring and full audit of Daraprim sales benefited patients in any way.

56.     Based on my experience with monitoring and my review of Mr. Russell's report and the facts of this case, I conclude that Vyera's intensive monitoring, individually and collectively with other restrictions I discuss in VI.B, is not consistent with industry norms or tied to patient benefits.

### 4.  Buyback at a premium

57.     I understand that as a result of intensive monitoring, in April 2018, Anne Kirby was able to identify an outlier purchase of five Daraprim bottles by CentraState.[33] Kirby notified Mulleady and Mithani of this purchase. According to testimony by Mithani and Kirby, Vyera was concerned about CentraState reselling Daraprim to a generic.[34] Using a middleman,

---

[33] GX1028; Kirby Dep. 250:14-20, 251:2-25.

[34] GX5011 at 202 (Mithani IH 202:20-24 ("Q Was Vyera concerned that CentraState would sell the Daraprim on to a generic's manufacturer? A Sure, that was one of the ideas that --one of the reasoning that someone might have bought five bottles.")); Kirby Dep. 255:22-25 (Mithani "could have been concerned about products being resold to another entity such as a generic company. Which seems reasonable.").

Mulleady contacted CentraState's owner, Satya Valiveti.[35] Mulleady told Valiveti to sell the bottles directly to Vyera rather than return them to ASD.[36] I understand that Valiveti offered to sell Daraprim to Vyera at around $130,000 per bottle, or almost twice the original purchase price.[37] Mulleady did not push back.[38] Valiveti met with Mulleady in a Starbucks parking lot to return the five bottles of Daraprim.[39] Following the repurchase, Vyera had ASD block CentraState's access to Daraprim.[40]

58.     This buyback is astounding in many ways. First of all, in my over 45 years in the pharmaceutical industry, this is the first time I have heard of a CEO of a pharmaceutical company repurchasing drugs in a Starbucks parking lot. Second, manufacturers normally seek to reduce their inventory rather than increase it. It is more common for a manufacturer to offer an incentive (such as longer dating or discount) to decrease their own inventory, not buy it back. Third, manufacturers normally do not want to lose prescriptions. By incentivizing its partners to take on more inventory, a manufacturer can reduce the chance of stock-outs, which would cause prescriptions to not be filled. Buying inventory back runs counter to that goal. Fourth, I have never heard of a buyback at a premium except during a drug recall, when a manufacturer might choose to incentivize returns for a recalled or suspect product. Even in those situations, I have never heard of a buyback at a 100% premium.

59.     In my experience, inventory repurchase may be necessary in a very narrow set of circumstances. One reason is to move volume from one distribution center that has too much

---

[35] Mulleady 258:9-23.

[36] Valiveti (Reliant) Dep. 109:11-19; 114:11-115:14, 17-20.

[37] Valiveti (Reliant) Dep. 115:21-116:23; GX5008 at 145, 126 (Mulleady IH 145:14-146:7, 126:13-23).

[38] Valiveti (Reliant) Dep. 115:21-116:23; Mulleady Dep. 262:12-23.

[39] Mulleady Dep. 269:15-270:19; Valiveti (Reliant) Dep. 120:3-9; GX3132.

[40] GX1023; Desai (ASD) Dep. 80:21-81:14, 82:7-17.

inventory to another distribution center that needs more inventory. Another reason for repurchasing is to help a customer avoid a restocking fee when they over-forecasted demand and over-stocked the drug. This could happen, for example, if a high-volume prescriber retired, reducing demand dramatically. Clearly, none of these circumstances were present here.

60.     Mr. Russell does not even attempt to justify Vyera's Daraprim buyback or explain why it was necessary to achieve any patient benefits.

61.     Needless to say, the buyback, individually and collectively with other restrictions I discuss in VI.B, is well beyond anything I have seen in my over 45 years in this industry and has nothing to do with advancing patient benefits.

### 5.  Removal of previously approved customer accounts

62.     I understand that right after the CentraState buyback, Vyera requested ASD and Cardinal to further tighten the list of approved accounts already subject to Vyera's customer restrictions.[41] At Vyera's request, ASD sent Vyera a list of all accounts that were eligible to buy Daraprim from ASD without Vyera's further approval.[42] The list included over 27,000 eligible accounts, which Vyera cut down to 555.[43] In May 2018, Kirby sent ASD the new "APPROVED account list and the UNAPPROVED account list."[44] ASD agreed to make Daraprim available

---

[41] GX1633 at 002 (April 6, 2018 text chain between Mulleady and Kirby about Mulleady's Starbucks "run" to repurchase five bottles of Daraprim from CentraState; Kirby notes that she "[t]alked to Cardinal Specialty and ASD, and told them they need to find a way we can approve or block orders."); GX1590 at 001; GX1581 at 001 ("This was the list we requested as a starting point for approved and non-approved accounts (since our own data didn't have class of trade for all accounts). I assume ASD ran a broader list of accounts that they considered eligible, rather than just the accounts that have purchased.").

[42] GX3490.

[43] GX1591.

[44] GX1591.

only to the newly-approved accounts; any customer that did not appear on the approved list would need to receive Vyera's authorization to purchase Daraprim.[45]

63.     As with ASD, in April 2018, Vyera reached out to Cardinal to modify the account approval process.[46] At Vyera's request, Cardinal provided Vyera with a list of accounts eligible to buy Daraprim from Cardinal without Vyera's further approval.[47] That list included over 14,700 eligible accounts,[48] which Vyera cut down to 146 accounts.[49] Cardinal then removed access to all accounts not on the newly approved list and requested Vyera's "approval if they make another purchase."[50]

64.     Removing approved accounts is similar to customer restrictions, purchase limits, and inventory buyback: it tends to reduce the points of sale and usually makes it harder to access the drug. As I have previously explained, this is typically counterproductive for manufacturers, which normally seek to have the drug readily available for patients and prescribers to increase sales. Moreover, in my experience, removal of accounts creates disruption and frustration among the customers that used to have access to the drug. This is illustrated by an email from ASD to Kirby noting that the removal of accounts "is going to cause a lot of disruption to the existing customers. Especially since they were allowed to purchase before and now they [can]not purchase the product."[51]

65.     When a company removes accounts, it is usually done for regulatory reasons, such as a change in REMS or other FDA requirements. Some REMS require accounts to be

---

[45] GX1591.

[46] GX3328 at 001.

[47] Johnson (Cardinal) Dep. 61:5-7.

[48] GX3328.

[49] GX3329.

[50] GX3342 at 001.

[51] GX1577 at 001.

certified in the drug's REMS program to purchase and dispense the drug. The certification is valid for a limited time and needs to be periodically updated. I have removed accounts that failed to recertify their compliance with REMS requirements. In addition, managing old non-productive REMS accounts can be costly, which is another reason to remove them. Finally, manufacturers might choose to eliminate accounts that pose a credit risk, are slow payers, violate a REMS agreement, or resell products at a higher price after accepting a discount. I am not aware of any evidence suggesting that Vyera removed the accounts for these reasons.

66.     Mr. Russell's opinion that removing accounts had the potential to provide cost savings is theoretical and ignores the circumstances leading up to the removal of the accounts. Specifically, Vyera ordered the removal of thousands of previously-approved accounts immediately after its extraordinary buyback, which is consistent with Shkreli's directive to "tighten the supply chain" to limit generics' access to Daraprim.[52] Mr. Russell does not document how removing accounts resulted in any cost savings to Vyera. The REMS example that I provided above simply does not apply to Daraprim, which is not a REMS drug. Finally, Mr. Russell does not argue that the removal of accounts benefited patients, and I see no reason why it would.

67.     In sum, I conclude that Vyera's removal of previously approved accounts, individually and collectively with other restrictions I discuss in VI.B, is not based on normal industry reasons or tied to patient benefits.

### 6.  Data blocking

68.     The pharmaceutical industry runs on data. IQVIA (former IMS) and Wolters Kluwer's Medi-Span are the leading third-party data aggregators. They buy "sales and inventory

---

[52] GX3089 at 005.

data from multiple wholesalers or distributors" and combine the distributors' data to provide a "holistic view for manufacturers on inventory and sales activities."[53]

69.      I understand that in August 2017, Akeel Mithani directed Vyera to implement data blocking "ASAP"[54] and inquire "if previous data can be taken down."[55] A month later, Vyera amended its distribution contracts with ASD and Cardinal to add data blocking provisions that prohibited ASD and Cardinal from selling their Daraprim sales data to third party data aggregators, including IQVIA and Wolters Kluwer.[56] But Mithani's "unprecedented" request for retroactive data blocking did not materialize.[57]

70.      I also understand that BioRidge and Walgreens have never reported Daraprim sales data. BioRidge does not report pharmaceutical sales data to data aggregating companies.[58] And Vyera took steps to make sure that Walgreens did not report data either. For example, on the day of Vyera's acquisition of Daraprim, Vyera's senior director of business development Michael Smith asked Vyera's executives in charge of distribution—Nancy Retzlaff and Tina Ghorban—to "tell [W]algreens/ICS we don't want them reporting to IMS or any other databases."[59] That same day, Ghorban "[c]onfirmed that [Walgreens] do[es] NOT disclose Daraprim sales/Rxs to any data reporting company."[60] Retzlaff later explained that "Walgreens

---

[53] Johnson (Cardinal) Dep. 90:8-17.

[54] GX1101; GX3333 at 001 (Cardinal email noting that Vyera "is very interested in blocking data ASAP and knowing what those fees would be."), 003 ("Turing Pharma reached out urgently this morning to discuss fees that might be incurred to block their data."); Johnson (Cardinal) Dep. 103:18-24, 104:2-7, 10-12, 14-25, 105:10-19.

[55] GX1375; GX3331 at 003 (Cardinal email noting that "it's important for" Vyera to "retroactively blinding the data"); GX1377 (Kirby reporting to Mithani on discussions with Cardinal about retroactive data blocking).

[56] GX1045 at 029 (ASD) & 049-50 (Cardinal).

[57] GX3333 at 001.

[58] Anderson (BioRidge) Dep. 34:25-35:4.

[59] GX1556; Retzlaff Dep. 139:16-140:12, 19-23 (recalling that Vyera notified Walgreens and ICS that it did not want Daraprim data reported to IMS).

agreed that they would not report sales data to IMS" because Vyera's business development team did not want its "sales levels to be visible to anyone else."[61]

71.     The combined result of Vyera's arrangements with ASD, Cardinal, BioRidge, and Walgreens is that Daraprim data has not been fully reported since Vyera's acquisition of the product in August 2015.

72.     In my over 45 years in the pharmaceutical industry, I have neither recommended nor been asked to implement data blocking. ASD and Cardinal agreed that data blocking "[i]sn't common" and is "rarely done."[62] The reason is that IQVIA data is extremely valuable for market analysis. The industry relies on IQVIA data in at least two key ways: (1) to identify new business development opportunities; and (2) to form a market basket consisting of competitors. Most companies use these baskets to measure potential market size, growth, market share, marketing return on investment, and sales staff performance.[63] In fact, like the rest of the industry, Vyera executives regularly use IQVIA data to identify business development opportunities and assess the market landscape because IQVIA provides "the most comprehensive database of information" for "sizing of a marketplace."[64] As a Vyera executive put it, IQVIA data is "the

---

[60] GX1289; Ghorban Dep. 201:4-11 ("Q. Did you talk to Walgreens about the data reporting of Daraprim? A. Yeah. Q. And what did they tell you, what did Walgreens tell you? A. They said -- they said they didn't disclose Daraprim sales or data to -- to the data reporting companies."), 199:21-200:13 (Ghorban recalled confirming with Walgreens that they did not disclose Daraprim sales data to any data reporting companies).

[61] GX5013 at 156 (Retzlaff IH 156:14-23).

[62] Desai (ASD) Dep. 130:12-18; Johnson (Cardinal) Dep. 95:22-24, 96:2-11, 14-19, 21.

[63] Johnson (Cardinal) Dep. 93:8-11, 14-17 (having a drug's sales data accurately reported "can show the market size . . . of a product or the therapeutic class").

[64] Retzlaff Dep. 133:2-134:4, 6-9. See also GX5009 at 068 (Kirby IH 68:14-21) ("We utilize IMS data for competitive purposes. . . . to see what the marketplace looks like"); Mithani Dep. 206:16-107:16 (Mithani uses IMS data for business development; it is "one of the resources to see what the potential market looks like"); (IQVIA "provided the most comprehensive database of information" for "sizing of a marketplace"); Ghorban Dep. 194:24-195:13 (IQVIA data is "a standard data source for the industry . . . that companies and analysts will look at to understand the dynamics of markets and products"), 198:3-18 (IQVIA data is "always part of the assessment").

foundation all pharmaceutical companies use to identify and select products based on size or other factors."[65]

73.      Based on my work with Alaven and Galen to help them increase their generic presence, I know that having accurate data is particularly valuable for generic companies. When a generic is looking for a business opportunity, it evaluates a variety of factors, including whether the brand has any patent protection or regulatory exclusivities. But, as Mulleady put it, "the litmus tests for generic companies, [is] how much of that market they could capture."[66] So generics are primarily concerned with the market size, market growth, and the number of potential competitors.[67] Thus, a potential generic competitor's first step is analyzing the sales data reported by IQVIA to evaluate the market landscape.[68] Having an accurate estimate of the market size is critical for any generic because generic development comes with significant costs and risks. Overestimating the market size can adversely impact a generic's return on investment.

74.      Data blocking necessarily reduces the accuracy of IQVIA data. Daraprim is no exception. A Vyera executive Scott Breakstone noted that as a result of Vyera's data blocking, IQVIA data for Daraprim is "extremely incomplete and not very useful."[69] Another top Vyera executive Nancy Retzlaff noted that Shkreli and Vyera's business development team "believed that . . . limiting data to generic manufacturers . . .  would limit or impede their ability to assess

---

[65] Polizzi Dep. 37:11-14.

[66] Mulleady Dep. 285:5-7.

[67] Polizzi Dep. 37:15-38:4 (Generics "evaluate the relative sales level for a particular product, what form it's sold within, how many competitors are in that market, what the average selling price of the product is, and they evaluate whether or not they can bring value to the market by adding another generic product and, again, lowering the price to the patient and still be able to make profit after investment in a development program, and they make that full assessment ROI.").

[68] Hatch (Mylan) Dep. 57:6-10 ("when the portfolio team creates a forecast, one of the foundational pieces of information is the IMS value"), 21:8-11 ("When we're evaluating the creation of a or the development of a generic product, we initially rely on the IMS . . . value."); GX3511 at 011 (slides circulated by Shkreli state that "[g]eneric drug companies rely on IMS and other channel audit to forecast their potential revenue for launching drugs").

[69] GX1177.

the size of the market opportunity."[70] A third Vyera executive Tina Ghorban agreed that Vyera's

business development team "believed that if the volume went down or if the sales looked like

they were going down, that there would be less interest from . . . generic companies."[71]

75.     Data blocking creates havoc and is a counterproductive, no-win game. Therefore,

the industry norm is to have an open flow of data.

76.     Ignoring the importance of IQVIA data and generic testimony, Mr. Russell claims

that IQVIA data is not valuable for smaller volume drugs like Daraprim. But this is contradicted

by Vyera's own use of IQVIA data to assess the Daraprim market size before acquiring it.[72]

Moreover, to the extent that a drug's small volume may make each month's data report less

accurate because the sample size from which IQVIA collects data is smaller, the trend over time

still provides a valuable metric of the market size. In other words, absent data blocking, sales

trends over time are generally accurate for small volume drugs, even if not all individual sales

have been captured.

77.     Mr. Russell also argues that data blocking had no effect on generics' ability to

estimate market size. But his conclusion is flawed on several counts. Historical IQVIA data

before Vyera's price increase in August 2015 would not be that useful for estimating Vyera's

revenues. Indeed, Mr. Russell agrees that historical data required making projections to account

for the decline in Daraprim volume after the price increase. I understand from the testimony of

representatives of Mylan, Dr. Reddy's, and Fera that they knew that Daraprim data was

---

[70] Retzlaff Dep. 137:11-25, 138:3-8, 10-13. See also GX1177 ("I believe that this decision was initiated by BD at Turing to prevent external visibility into our corporate performance."); GX3512 at 069 (slides circulated by Shkreli state that if a distributor "does not release prescriptions or sales to IMS" then "generics and other parties will not be aware of our level of prescriptions and sales").

[71] Ghorban Dep. 203:7-9, 13-204:8, 12-18. GX1298 at 059 ("the less sales that you see in IMS, which is an industry standard, . . . the less attractive it made be for other companies to enter the market").

[72] Smith Dep. 209:11-18, 20-22, 212:22-213:4 (before acquiring Daraprim, Vyera reviewed IMS sales data to estimate Daraprim volume and revenue).

underreported, but not by how much,[73] making IQVIA data less valuable and the generics' task of estimating the market size harder. To be sure, generics were not fully prevented from gauging the market and were able to piece information together from other sources, including Vyera's press releases and customer interviews. But as Dr. Reddy's and Mylan representatives testified, they had difficulty assessing the market opportunity for pyrimethamine even after spending significant effort to estimate it through publicly available documents. A Dr. Reddy's witness noted that, because IQVIA data was unreliable, "it was very hard for us to actually figure out what the size of the market was" and that its "assessment of the market size would have been more accurate if [it] had accurate IQVIA data."[74] And a witness for Mylan—one of the largest generic pharmaceutical companies in the world—agreed that the absence of accurate IQVIA data "makes it extremely difficult to produce an accurate forecast."[75] This contradicts Mr. Russell's opinion that generics did not have issues assessing Daraprim's market size.

78.     The bottom line is that data blocking is rarely done. There are no normal industry reasons to employ this strategy, and it certainly does not benefit the patients. Mr. Russell does not even attempt to explain what purpose data blocking serves; he just argues that it had no effect on the generics' ability to estimate market size. But if data blocking did not matter, then why did Vyera pay the distributors to block the data? I conclude that Vyera's data blocking, individually and collectively with other restrictions I discuss in VI.B, is not based on industry norms or tied to patient benefits.

---

[73] Hatch (Mylan) Dep. 56:8-25 ("the data appeared to be underreported from IMS"); Mukhopadhyay (Dr. Reddy's) Dep. 25:17-27:12; DellaFera (Fera) Dep. 164:11-19.

[74] Mukhopadhyay (Dr. Reddy's) Dep. 26:24-27:12, 41:19-42:3.

[75] Hatch (Mylan) Dep. 57:20-23, 58:6-8, 10-23.

C. **Mr. Russell's attempts to normalize Vyera's restrictive distribution system and practices are misleading**

1. **Industry trends toward specialty are irrelevant to whether Vyera's restrictions are consistent with industry norms or necessary for patient benefits**

79.     Mr. Russell suggests that Vyera's restricted specialty distribution of Daraprim is consistent with industry norms because of recent industry trends toward specialty distribution driven by innovative new drugs[76] (which Daraprim is not). Mr. Russell's reliance on the increasing use of specialty is a red herring. It does not help to answer the primary question: whether Vyera's restrictive distribution tools and practices (detailed in Section VI.B.1-6) are based on normal industry reasons or necessary to achieve patient benefits. To answer that question you need to understand the normal reasons for using customer restrictions, purchase limits, etc. and then see if those reasons apply given what we know about Daraprim, its patients, and prescribers. Increasing use of specialty fails to shed any light on this.

80.     Moreover, the trend toward specialty does not help to answer the secondary question: whether Daraprim needs to be in specialty (addressed in Section VI.A). As Mr. Russell appears to admit, the rise of specialty is driven by new, complex therapies (for cystic fibrosis, ALS, and leukemia to name a few)—in stark contrast to Daraprim. These novel therapies usually fit at least two of the parameters for specialty distribution that I identified earlier: high cost; high touch; special shipping, handling, or storage; and REMS. Daraprim—a tablet available since 1953—is only high cost, and only because Vyera dramatically raised its price. As I previously explained, high cost does not by itself require specialty distribution.

81.     Moreover, Mr. Russell ignores another significant difference between, on the one hand, new and complex drugs that physicians are not familiar with and, on the other hand, old

---

[76] The trend is driven by drugs used to treat chronic, oncological, autoimmune/immune, or inflammatory diseases, including cystic fibrosis, ALS, leukemia, multiple sclerosis, and Crohn's disease.

and established drugs like Daraprim that have been on the market for decades. New, complex drugs often fail treatment because doctors do not know how to optimally use them; placing such drugs into specialty may make sense because a manufacturer can enlist specialty pharmacies to provide doctors and patients education about the drug. This is not the case with Daraprim, which, as I explained earlier, has time-tested safety and well-established medical guidelines that prescribers can rely on.

82.     All in all, Mr. Russell's analysis of industry trends simply ignores crucial facts about Vyera's tightly controlled distribution system for Daraprim and has little bearing on whether Vyera's system is consistent with industry norms.

### 2.  Mr. Russell's examples of purportedly analogous drugs are readily distinguishable and fail to explain Vyera's restrictions

83.     Mr. Russell gives three examples of high-cost tablets distributed through specialty (Vitrakvi, Ayvakit, and Orladeyo) to demonstrate that there is nothing unusual about Vyera's tightly controlled specialty distribution system for Daraprim. While Mr. Russell agrees with me that specialty distribution systems vary substantially in restrictiveness, he does not provide any details about the distribution restrictions placed on these three drugs, beyond the fact that they are distributed through specialty pharmacies. I have no information, and Mr. Russell does not provide any, whether these drugs have customer restrictions, purchase limits, exceptionally close monitoring of sales, buyback, removal of accounts, and data blocking similar to Daraprim. Without knowing this or anything else about the design, purpose, and patient benefits of these drugs' distribution systems and restrictions, Mr. Russell's comparisons on the basis of alleged similar characteristics with Daraprim are worthless. They do not shed light on my primary question: whether Vyera's tight restrictions (detailed in Section VI.B.1-6) are based on normal industry reasons or necessary to achieve patient benefits.

84.     Nor do these examples help answer the secondary question: whether Daraprim need to be in specialty. Each of the examples Mr. Russell provides is on its face distinguishable from Daraprim. Vitrakvi is an innovative cancer treatment that was granted accelerated approval in 2018 (with further clinical trials required).[77] The FDA noted that Vitrakvi's "approval marks a new paradigm in the development of cancer drugs."[78] Ayvakit treats a rare form of cancer called gastrointestinal stromal tumor and was approved in 2020.[79] Orladeyo was also approved in 2020 and is used to prevent attacks of hereditary angioedema, a rare hereditary disease.[80] Orladeyo is the first and only oral drug approved to treat it.[81]

85.     In contrast to these cutting-edge drugs that have been approved within the last three years and require further clinical trials and close supervision, Daraprim has been around for almost seven decades and has time-tested safety and well-established medical guidelines. Daraprim was transitioned to a tightly controlled specialty distribution system only after decades of unrestricted open distribution. Mr. Russell has neither explained why Daraprim needs to be in specialty nor provided any example of a drug that fits Daraprim's pattern.

---

[77] FDA, FDA approves an oncology drug that targets a key genetic driver of cancer, rather than a specific type of tumor (Nov. 26, 2018), https://www.fda.gov/news-events/press-announcements/fda-approves-oncology-drug-targets-key-genetic-driver-cancer-rather-specific-type-tumor.

[78] FDA, FDA approves an oncology drug that targets a key genetic driver of cancer, rather than a specific type of tumor (Nov. 26, 2018), https://www.fda.gov/news-events/press-announcements/fda-approves-oncology-drug-targets-key-genetic-driver-cancer-rather-specific-type-tumor.

[79] Reuters, FDA approves Blueprint's stomach cancer therapy priced at $32,000 per month (Jan. 9, 2020), https://www.reuters.com/article/us-blueprint-fda-idUSKBN1Z82LP.

[80] GlobeNewswire, BioCryst Announces U.S. Availability of ORLADEYO (berotralstat) for the Treatment of Hereditary Angioedema (Dec. 16, 2020), https://www.globenewswire.com/news-release/2020/12/16/2146051/0/en/BioCryst-Announces-U-S-Availability-of-ORLADEYO-berotralstat-for-the-Treatment-of-Hereditary-Angioedema.html.

[81] GlobeNewswire, BioCryst Announces U.S. Availability of ORLADEYO (berotralstat) for the Treatment of Hereditary Angioedema (Dec. 16, 2020), https://www.globenewswire.com/news-release/2020/12/16/2146051/0/en/BioCryst-Announces-U-S-Availability-of-ORLADEYO-berotralstat-for-the-Treatment-of-Hereditary-Angioedema.html.

86.     In addition to these three examples, Mr. Russell also points to FDA's list of drugs for which the agency received access inquiries from generic developers to suggest that Vyera's distribution system was normal for the pharmaceutical industry.[82] Mr. Russell's comparison is ironic because FDA used that list—which includes Daraprim—to name and shame companies for restricting access to samples for bioequivalence studies.[83] This list was intended to disparage outlier behavior deviating from industry norms and harming patients by hindering generic entry. In FDA's own words, the agency published the "list of companies that have potentially been blocking access to the samples of their branded products" to deter brand companies from "creat[ing] obstacles for generic developers in purchasing samples of their brand drugs."[84] In announcing this list, FDA noted that in some cases "brand companies have placed restrictions in their commercial contracts or agreements with prescription drug distributors, wholesalers or specialty pharmacies that limit the ability of these intermediaries in the drug supply chain to sell samples to generic drug developers for testing," even though, in FDA's view, "a path to securing samples of brand drugs for the purpose of generic drug development should always be available."[85]

---

[82] FDA, Reference Listed Drug (RLD) Access Inquiries (Sept. 24, 2019), https://wayback.archive-it.org/7993/20191213015730/https:/www.fda.gov/node/377335.

[83] New York Times, F.D.A. Names and Shames Drug Makers to Encourage Generic Competition (May 17, 2018), https://www.nytimes.com/2018/05/17/health/drug-prices-generics-fda.html.

[84] FDA, Statement from FDA Commissioner Scott Gottlieb, M.D., on new agency efforts to shine light on situations where drug makers may be pursuing gaming tactics to delay generic competition (May 17, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-agency-efforts-shine-light-situations-where-drug.

[85] FDA, Statement from FDA Commissioner Scott Gottlieb, M.D., on new agency efforts to shine light on situations where drug makers may be pursuing gaming tactics to delay generic competition (May 17, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-new-agency-efforts-shine-light-situations-where-drug.

### 3. Mr. Russell's conclusion that Vyera made the distribution system it "inherited" less restrictive is misleading and does not account for the restrictions Vyera added

87.     Mr. Russell tries to justify Vyera's restrictions by arguing that Vyera expanded the system that it "inherited" from Impax by adding more distributors and specialty pharmacies for Daraprim. He then misleadingly concludes on this basis that the actions of increasing the number of distributors and specialty pharmacies would have allowed for greater access to Daraprim.

88.     First, any suggestion that Vyera had no involvement in moving Daraprim to a specialty distribution system because Vyera merely "inherited" such a system is contradicted by the evidence. Vyera independently planned to move Daraprim to a restrictive specialty distribution model and took numerous steps to do so—including searching for and selecting a distribution vendor (which Vyera ultimately decided to forgo after learning that Impax chose a different vendor).[86] For example, on June 1, 2015 (about two months before acquiring Daraprim), Kevin Mulleady directed Vyera's General Counsel to work with a prospective specialty distributor to turn around the contracts "as quickly as humanly possible." Mulleady emphasized, "This is currently the #1 priority of Turing and exceptionally time sensitive."[87] Moreover, each specialty distribution agreement Vyera "inherited" from Amedra allowed the

---

[86] GX5013 at 120, 122 (Retzlaff IH 120:4-7 ("specialty distribution was, you know, thought of from the very beginning because that's the model Martin had used previously at Retrophin"), 120:16-25, 122:7-14 (Vyera was "assessing alternative specialty . . . distributors" in spring 2015 while negotiating the Daraprim acquisition with Impax)); GX5005 at 039 (Smith IH 150:18-22 ("Q. So in the spring of 2015 Turing sought out a vendor for moving Daraprim to specialty distribution; is that correct? A. Yes."), 151:24-152:25 (Discussing steps taken by Vyera in spring 2015 to set up a specialty distribution system for Daraprim and noting that "while we were moving that process forward that's when we found out about Impax. So Martin was just like do Impax or do Walgreens, it's already there.")).

[87] GX1218 at 004. See also GX1634 (summary of Vyera's June 11, 2015 meeting with Accredo, a prospective specialty vendor for Daraprim); GX1635 (July 9, 2015 email between Michael Smith and Nancy Retzlaff on whether to continue discussions with Accredo or go with Walgreens, Impax's Daraprim distributor); GX1636 (Smith and Retzlaff agreeing to "cut [Accredo] loose").

manufacturer to terminate the agreement with 90 days' notice.[88] Indeed, Vyera terminated the contract with ICS in February 2016.[89] So any suggestion that it would have been challenging for Vyera to terminate its specialty contracts and move Daraprim back to open distribution is completely unfounded. It is much easier to open up a closed system than close an open system. In my career, I have personally modified "inherited" distribution systems without any issues.

89.    Second, Vyera's system is more restrictive when compared against past owners'. While Vyera added distributors and specialty pharmacies, all of its distribution partners have had customer restrictions throughout the entire period of Vyera's ownership of Daraprim.[90] This is clearly more restrictive when compared to the open system previously used to distribute Daraprim for over 60 years. More importantly, Vyera has been "doing everything [it] can" to "tighten the supply chain,"[91] including through customer restrictions, purchase limits, intensive monitoring of sales, buyback of Daraprim at a premium, removal of thousands of previously approved customer accounts, and data blocking.[92] Mr. Russell fails to mention most of these restrictions when comparing Vyera's specialty system to Amedra's or Impax's. But, once again, these steps made Vyera's system more restrictive than those of past owners and created additional hurdles for generics trying to obtain Daraprim for bioequivalence studies. For example, CentraState had five bottles of Daraprim in its possession, the quantity necessary for bioequivalence testing, at a time when generics were searching for Daraprim RLD. Because of

---

[88] GX0109 at 006; GX1299 at 006, § 8(a) (Vyera could have terminated the agreement with ICS "by providing three months' prior written notice."); GX1042 at 009, § 6.2 ("Amedra Pharmaceuticals may terminate this Agreement without cause upon ninety (90) days' advance written notice to Walgreens.").

[89] GX1579.

[90] GX7003.

[91] GX3089 at 005 (telephone conversation between Martin Shkreli and Akeel Mithani).

[92] Section VI.B.1-6.

Vyera's buyback, generic companies could not buy five bottles of Daraprim from CentraState—a fact that Mr. Russell fails to acknowledge.

**VII.   Vyera's distribution partners financially benefited from distribution restrictions and data blocking that impeded generic entry**

90.    Without opining on whether generics were in fact delayed by Vyera's restrictions, I conclude that distribution partners stand to gain from restrictions and data blocking that impede generic entry. The reason is that distribution partners usually make more money selling a sole-source product because brand drugs are generally priced higher than generics and therefore distributors make more based on the same percentage markup. When generics come in, distributors will usually distribute the brand and the cheapest generic. The generic eats into the higher-priced brand sales that deliver a higher prompt pay discount and fee to the distributor. As a result, a distributor usually makes more money distributing the sole-source brand that has no competition rather than the brand and its generic alternative. Indeed, the buyer at McKesson once told me that if all pharmaceuticals became generic McKesson would not have enough revenue to stay open: 2% of $20,000 is $400 vs 2% of $40 is only 80 cents. Which one would they want to sell? The higher profit item.

91.    Daraprim and its generic pyrimethamine are no exception. Summary exhibit GX7002 details the compensation structure of Vyera's distribution partners from the start of Vyera's contractual relationship to present. Optime receives a fixed fee based on volume sold and benefits from selling more volume of Daraprim.[93] Optime does not have a distribution agreement with any of the generics. Accordingly, when Daraprim sales volume declined after generic entry, Optime's sales and profits were also likely to decline.

---

[93] Quill (Optime) Dep. 39:15-42:22, 71:10-78:5.

92.     Vyera's remaining distribution partners (BioRidge, ASD, Cardinal Specialty, and

Walgreens) receive a certain percentage of Daraprim's WAC and benefit from selling more

volume of Daraprim at a higher price.[94] For example, ASD receives a 2.75% distribution fee of

Daraprim's WAC, comprised of a 0.75% service fee and 2% prompt pay discount.[95] Given

Daraprim's $75,000 WAC for a 100-count bottle, ASD receives $2,062.50 for each bottle. In

comparison, the first generic entrant Dr. Reddy's priced a 100-count bottle of pyrimethamine at

$29,250 WAC. Dr. Reddy's offered ASD's parent company, AmerisourceBergen, a 3%

distribution services fee of WAC, which comes to only $877.50 for each 100-count bottle.[96]

Compare $877.50 with $2,062.50 and it is easy to see why Vyera's distribution partners

benefited from Daraprim remaining a sole source product.

93.     In addition to the distribution fees, ASD and Cardinal also benefited from the data

blocking fees. As Cardinal explained, "[d]ata blocking is a provision in our agreement with

manufacturers that states that we will not sell the data for that particular manufacturer to . . . third

parties, and typically . . . it's an exchange for an additional revenue in the contract for Cardinal to

make up for the lost revenue that would occur."[97] Distributors consider the data they sell to

aggregators "to be their data that they own" and for which they "receive revenue" from the

aggregators.[98] But on a manufacturer's request and for a fee, ASD and Cardinal could agree to

not report the sales data that they generate.[99] So Vyera had to compensate ASD and Cardinal in

exchange for their agreement to stop reporting their data to IQVIA, Wolters Kluwer, and other

---

[94] Anderson (BioRidge) Dep. 52:5-54:20, 23-66:23; Desai (ASD) Dep. 51:2-53:25, 57:2-65:3; Johnson (Cardinal) Dep. 49:19-50:12.

[95] GX1045 at 027 & 007; GX1457 at 001.

[96] GX3498.

[97] Johnson (Cardinal) Dep. 93:24-94:7.

[98] Johnson (Cardinal) Dep. 90:24-91:7; Desai (ASD) Dep. 93:5-7.

[99] Desai (ASD) Dep. 93:21-94:15; Johnson (Cardinal) Dep. 93:24-94:7.

third-party data aggregators. Vyera paid $3,000 monthly data blocking fee to ASD and a 0.25%

fee of Daraprim's WAC to Cardinal.[100] Cardinal explained that "the quoted 25 basis points is

more than acceptable" to compensate Cardinal for lost revenue.[101]


I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on October 20, 2021.

*/s/ Edward V. Conroy*

---

[100] GX1045 at 029 & 050.
[101] GX3333 at 001.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Case No.: 1:20-cv-00706-DLC** |
| **VYERA PHARMACEUTICALS, LLC, et al.,** | |
| **Defendants.** | |

**Direct Testimony of Susan McDougal
Vice President, Fera Pharmaceuticals, LLC**

GX8008-001

Susan McDougal declares as follows:

1.      My name is Susan McDougal. I am the vice president of Fera Pharmaceuticals, LLC, which is a pharmaceutical company based in Locust Valley, New York. I also reside in the State of New York. I am voluntarily submitting this declaration at the request of plaintiffs in this case. I understand that this declaration will be submitted to the Court deciding this matter. The statements in this declaration are based on my personal knowledge. The exhibits referenced in this declaration are attached. Also attached to this declaration is an exhibit labeled GX7015, which I have reviewed and which is based upon and fairly represents the underlying documents it cites.

2.      I previously testified about the events discussed this declaration in an investigational hearing conducted by the FTC on December 11, 2019. I testified truthfully and accurately during that investigational hearing. I also testified about the events discussed in this declaration at a deposition on February 25, 2021. I testified truthfully and accurately during that deposition.

**I.   Background**

3.      I have worked in the pharmaceutical industry since 2003, when I joined Eon Labs as a marketing manager. In 2005, Novartis acquired Eon Labs, and I joined Novartis's generic division, Sandoz, as a senior marketing manager. At both Eon Labs and Sandoz, I reported to Frank DellaFera. At the end of Mr. DellaFera's tenure at Sandoz, he started Fera Pharmaceuticals, which seemed like an exciting new venture. I have a lot of respect for Mr. DellaFera and thought that he would be successful, so when he asked me to join, I accepted and started at Fera in April 2009.

4.      When I first joined Fera, my title was vice president of marketing. A few years ago, I became vice president of the whole company. In that role, I view myself as Mr.

1

DellaFera's right hand. One of my core responsibilities is project management, which involves identifying new opportunities and managing the development process, both internally and with our external manufacturing partners. I also assist our regulatory team with FDA correspondence and filings.

5.      Fera's business model is intentionally nimble, which allows us to pursue a wide range of drug development opportunities, including generic versions of existing drugs and new chemical entities. As a virtual company, Fera can easily pivot to pursuing a new opportunity by contracting with third-party manufacturers with different capabilities as necessary. Since I joined Fera, the company has pursued both generic opportunities and new chemical entities with a great deal of success.

6.      Mr. DellaFera normally asks me to look into new generic opportunities based on his knowledge of the industry. Fera has access to a number of databases that provide useful information about different aspects of the industry. In particular, I always check the sales data from IQVIA (formerly known as IMS) to evaluate the potential market size for a drug and whether it has any existing generics. When a brand company is nonpublic, and does not file reports with the SEC, IQVIA data is usually the only way to evaluate the market size for the drug. I also use a database called Newport to evaluate the active pharmaceutical ingredient (API) market for a drug, in particular whether there are any suppliers that have drug master files (DMFs). Once I've reviewed this information, I present it to Mr. DellaFera, we discuss the opportunity, and then Mr. DellaFera makes the final call whether to pursue it.

7.      As part of the generic drug development process, Fera has to purchase samples of the brand drug, known in the industry as reference listed drug or RLD. Fera first needs RLD to research its ingredients to make sure our generic product's API is similar to the brand drug's

GX8008-003

API. Then, after our generic product is manufactured, the FDA requires us to test our generic product in humans to ensure that it is bioequivalent to the brand. This usually involves providing both our generic product and the brand RLD to humans to ensure that the drug absorbs into the body at a similar rate. The FDA also requires Fera to retain five times the amount of RLD used in the bioequivalence testing—these additional bottles are typically known as retains. It is my understanding that the FDA requires us to keep retains to verify our testing if necessary.

8.      Procuring RLD is one of my responsibilities. Normally, acquiring samples of RLD is a simple process. I reach out to a licensed pharmacy or distributor to acquire the drug. From start to finish, Fera usually receives the product in hand within a week, at most a month.

**II.     Fera's initial Daraprim development process**

9.      In September 2015, Mr. DellaFera and I discussed a recent price hike on a drug called Daraprim. I pulled sales data from IQVIA, which indicated that the market size for Daraprim was around one million tablets annually. At that time, there was no generic version of Daraprim approved by the FDA. After discussing with Mr. DellaFera, we concluded that a market that size could support at least one generic entrant, and likely more.

10.      Mr. DellaFera e-mailed me to check whether there were any API suppliers with DMFs available for pyrimethamine API, the API in Daraprim. I looked at Newport and found only two DMF holders: a Japanese company called Fukuzyu and an Indian company called Ipca. GX3246 is a copy of the September 21, 2015 e-mail exchange between Mr. DellaFera and me. We also knew that Daraprim was distributed in a closed system, which could make it difficult for other generic competitors to procure the RLD necessary for bioequivalence testing. A closed distribution system means the drug is only sold by select wholesalers and/or pharmacies, rather than being available to the open market. The lack of API suppliers and potential difficulty acquiring RLD presented barriers to entry that could deter other generics, meaning that there was

3

unlikely to be much generic competition in the short term. Mr. DellaFera made the decision to greenlight the generic pyrimethamine project.

11.     With any new project, the first major developmental step is finding a reliable API supplier. This is because we need API before we design and manufacture the finished dosage form of the drug, which for Daraprim is a tablet. In evaluating potential suppliers, I work closely with our API consultant, Gary Conte, to find a supplier with experience complying with the FDA's rigorous manufacturing standards and quality requirements. Mr. Conte has 40 years of experience in the API industry and his advice is very valuable.

12.     When available, I prefer to use an API supplier that has already filed a DMF for a given API. While the FDA does not review or approve DMFs until they are referenced in a drug application, I know that a DMF holder has at least taken the time to compile the information the FDA requires. Even better is when a DMF-holder's API is used in an FDA-approved product because that provides additional assurance that the API supplier is reliable and likely to pass FDA muster. This is because the FDA must have necessarily reviewed the DMF as part of its approval of the overall drug application.

13.     When there are no DMF holders available, my next choice is to find a reputable API supplier that already has a manufacturing process for the drug. Fera then pays for that supplier to compile the information required by the FDA for the drug application. But if Fera cannot find a reputable supplier with a manufacturing process, our last resort is to pay a supplier to develop the API. Developing an API from scratch takes a long time and involves a lot of trial and error, which can lengthen the approval timeline significantly, and the FDA often has questions about a new manufacturing process. API development is also expensive. For these

GX8008-005

reasons, when possible, I prefer to use a DMF holder over sourcing API from a supplier that has to develop a manufacturing process from scratch.

14.     While I work closely with Mr. Conte to search for and recommend an API supplier, Mr. DellaFera usually signs off on any new API relationship and any important contractual arrangement with Fera's suppliers.

15.     In February 2016, I directed a member of my team, Genevieve DellaFera, to contact Fukuzyu, one of the DMF holders of pyrimethamine API. My review of the Newport database indicated that Fukuzyu likely supported the brand product, Daraprim, which meant that the FDA had already reviewed and approved the API manufacturing process. For this reason, Fukuzyu was my top choice for a pyrimethamine API supplier. But Fukuzyu did not respond to our initial query.

16.     Mr. DellaFera and I then met with Fera's API consultant, Gary Conte, to discuss other potential pyrimethamine API suppliers. Mr. Conte recommended a supplier called API-1, which I had identified in the Newport database as a company that potentially had some familiarity with the molecule, but did not currently have a manufacturing process in place. Mr. Conte informed me that he had received positive feedback about API-1 from his colleagues in the industry. Based on this recommendation, Mr. DellaFera and I met with API-1 at an industry conference called Drug, Chemical, and Associated Technologies Week, more commonly known as DCAT.

17.     At DCAT, which was held in March 2016, Mr. DellaFera and I met with executives and scientists from API-1 While API-1 did not have a pyrimethamine API manufacturing process developed (or in development), one of the scientists seemed familiar with the molecule. Mr. DellaFera and I also met with an API supplier called ▆▆▆▆. ▆▆▆▆

5

GX8008-006

also did not have an API manufacturing process in place. Mr. DellaFera decided to use API-1 as the API supplier for our pyrimethamine API project. Due to Mr. Conte's recommendation and API-1's lower cost, I agreed with Mr. DellaFera's decision.

18.     Following Mr. DellaFera's instruction, I continued discussions with API-1. After DCAT, API-1 agreed to research the manufacturing process and outline a proposed development project for Fera. In May and June 2016, API-1 executives and I discussed their proposal. After some back and forth about the scope of the project, we entered a confidentiality and exclusivity agreement, which I executed on June 13, 2016. DX 113 is a copy of that agreement. This contract was exclusive because Fera agreed to pay for all of the pyrimethamine API development costs, which included reimbursing API-1 for labor and expenses, paying for lab work, and paying to compile the submission to the FDA. Without an exclusive arrangement, it would not have made sense for Fera to make this significant investment in API-1's manufacturing process.

**III.   Fera's attempts to procure samples of Daraprim RLD**

19.     While API-1 worked to develop an API manufacturing process that complied with FDA regulations, I began efforts to acquire samples of Daraprim RLD. Fera would use these samples to test any initial product that API-1 was able to send as it progressed in its efforts. On November 7, 2016, I reached out to my usual supplier of brand samples, a company called Pharmaceutical Buyers Inc., or PBI. One of my contacts at PBI, Harris Herman, responded the same day and told me that he could not procure Daraprim for us because it was "only available to hospitals and government facilities at this time." GX3238 is a copy of this email correspondence. Normally, PBI is able to provide Fera with samples within a couple weeks, or at most, a month. This communication indicated to me, however, that PBI was not going to be able to source Daraprim for us. At that point, I explained to Mr. DellaFera that it looked like it would be difficult to acquire samples of Daraprim RLD from our customary partners.

6

20.     We then contacted one of Mr. DellaFera's acquaintances, a hospital pharmacist at ███████ named ████████, who agreed to look into buying Daraprim RLD on Fera's behalf. But on December 15, 2016, ████████ informed me by e-mail that "according to our hospital policy and distributor contract, I can only procure from what is defined as own use for hospital business, so purchasing it for Fera doesn't look viable." GX3258 is a copy of the e-mail from ████████, which I forwarded to Mr. DellaFera. Based on my experience with ████████, I concluded that I would not be able to buy Daraprim RLD from a hospital, either.

21.     On December 22, 2016, Fera entered into an agreement with a contract research organization called Xcelience to both acquire Daraprim RLD and to develop a generic Daraprim prototype. I discussed this opportunity with Mr. DellaFera, and we agreed at the time that Xcelience seemed like a great fit because it claimed it could both acquire Daraprim RLD and continue our generic product development.

22.     However, Xcelience informed us that it quickly ran into the same roadblocks that our other suppliers faced. On January 4, 2017, Xcelience vice president Ben Sahacic told me that the manufacturer of Daraprim "is now limiting distribution of Daraprim only to hospitals and government agencies directly." GX3234 is a copy of this communication. Shortly after that, it is my understanding that Xcelience's source contacted Vyera directly to purchase Daraprim RLD. I authorized Xcelience to buy up to four 30-count bottles for research and development, and directed Xcelience to include in its agreement a provision that allowed us to buy eleven more bottles for bioequivalence testing.

23.     After months of negotiation, on June 23, 2017, Xcelience informed Fera for the first time that Vyera required Fera to sign an indemnification agreement. At the same time, I learned that Xcelience's sourcing vendor was a company called AdiraMedica. GX3469 is this e-

7

mail correspondence, including the indemnity agreement. I had never been required to sign an indemnification agreement previously when purchasing samples of RLD, so I reviewed the proposed agreement with Mr. DellaFera. My view was that the indemnity provision was intended to place an obstacle in the path of product development because it made Fera liable for "any liability or other claim (including without limitation injury or death) arising from the use of Daraprim." This would mean that Fera would be liable for any claim related to Daraprim—even if unrelated to our use of the samples in testing.

24.     With Mr. DellaFera's approval, I struck the entire indemnification provision from the agreement in redline and sent it back to Xcelience. As far as I'm aware, Xcelience never received a response to Fera's counterproposal. Because Xcelience was unable to acquire samples of Daraprim, Mr. DellaFera directed me to end our relationship with Xcelience in August 2017.

25.     I also continued to check in with PBI to see if they ever had any success acquiring samples of Daraprim RLD. On February 23, 2017, I asked PBI whether Daraprim was available, but they were unable to provide it. GX3561 is a copy of that e-mail correspondence. On May 11, 2017, I again asked PBI about Daraprim, but they responded their supplier "only can distribute Daraprim to hospitals and government facilities." GX3239 is a copy of that e-mail correspondence.

26.     In October 2017, my team was able to acquire small amounts of Daraprim RLD from a physician prescription and a pharmacy called ███████. This RLD did not meet FDA requirements for bioequivalence testing because we could not determine the lot number before purchasing the RLD and because it was provided in unsealed orange pharmacist vials. It was also far too small of a quantity to use in bioequivalence testing.

8

27.    During late 2016 and into 2017, one of my direct reports, Genevieve DellaFera, also communicated with a company called Tanner Pharma about purchasing Daraprim RLD. Ms. DellaFera kept me apprised of her communications. I had never done business with Tanner before, and neither had Mr. DellaFera. Tanner initially told us that it would sell us a 100-count bottle for $101,433, or $25,000 over WAC, but that we'd have to prepay the entire sum while Tanner sourced the product. By September 2017, Tanner had raised its price to $132,200 for a 30-count bottle. Mr. DellaFera informed me that he was cautious about giving an unknown company the large sum of money that they demanded upfront. While Tanner eventually agreed to an escrow agreement, they declined to provide us any proof that they actually had access to Daraprim. Instead, they repeatedly warned us that if we did not buy the product soon, they would be forced to raise the price again. Given our experience with PBI and Xcelience, we were skeptical that they actually had access to the product based on their say-so alone. We also found the pressure tactics to be troubling. Mr. DellaFera ultimately decided to end negotiations with Tanner.

28.    In my experience, when an RLD procurement company provides a quote, that does not mean they are actually able to provide the product. Instead, the quote is simply how much the company would charge *if* it can actually acquire it.

**IV.   Fera's development of a finished dosage form was delayed by the lack of available samples**

29.    While Fera sought to acquire samples of Daraprim, API-1 continued to work to complete development of its manufacturing process. By October 2017, I understood that API-1 had finished its validation batches, meaning its product was compliant with FDA regulations and ready to be placed in tablets to be tested for bioequivalence against the brand. But Fera was unable to proceed with this plan because Xcelience had not developed a prototype of generic

9

pyrimethamine. As explained above, this was due to Xcelience's and Fera's, inability to procure the RLD necessary for product development.

30.     In November 2017, Fera signed a development contract with a company called Latitude Pharmaceuticals. Latitude, using the small amount of Daraprim RLD that Fera had acquired a month earlier and <sup>API-1</sup>'s API, began development of a generic pyrimethamine prototype. At that point, we still did not have any RLD usable for BE testing.

31.     Given the delays in development, we held off on compiling and filing information for Fera's pyrimethamine API DMF until fall 2018. This allowed us to focus on procuring Daraprim RLD and to delay paying the expensive costs around filing a DMF, which ultimately amounted to around $30,000 in consultant costs and approximately $55,000 for a filing fee. Based on past experience, I expected that we could compile the DMF at the same time as we prepared to conduct bioequivalence testing. This proved correct, as we finished compiling and submitted the DMF in May 2019, well before we completed bioequivalence testing.

32.     While Latitude developed the generic pyrimethamine prototype, Fera's API consultant, Gary Conte, reached out to Fukuzyu via an agent to try to acquire a sample of pyrimethamine API. While Fera initially sought to use this sample as a reference to test against <sup>API-1</sup>'s API, I also hoped that this purchase would be the start of a business relationship with Fukuzyu. In January 2018, Mr. Conte forwarded me an e-mail chain that included several months of back and forth correspondence between Mr. Conte's agent, Charkit, and various brokers, and attached a "confidentiality proclamation." I understood the confidentiality proclamation to come from Fukuzyu. GX3192 is a copy of this e-mail chain and attached document.

10

33.     After reading GX3192, I understood that Fukuzyu was unwilling to partner with Fera. In an e-mail from the API broker on page 3 of GX3192, sent on December 1, 2017, Fukuzyu requested that Fera guarantee that "The API sold to the US company will not be used to make pyrimethamine drug product, for human use, that will find its way back to the US for commercial purposes, either via normal prescription drug distribution or via 'compounded drug products' or 'compounding pharmacies'. The API will ONLY be used for drug products sold and used in South America." I understood this requirement to preclude Fera from using Fukuzyu API commercially in our generic pyrimethamine product, which we intended to sell in the United States, not South America.

34.     In addition, the second clause of the attached confidentiality proclamation in GX3192 prohibited Fera from sharing any confidential information from Fukuzyu with Fera's contract manufacturers without Fukuzyu's permission. I understood this clause to effectively prevent Fera from using the API in our research and development, as I did not think it likely that Fukuzyu would allow Fera's manufacturing partners to use Fukuzyu's information to perform research and development for our product intended for the U.S. market.

**V.     Fera acquires two bottles of Daraprim**

35.     On January 22, 2018, a pharmaceutical industry dealmaker that we knew, Peter Skoutelas, introduced Fera to another RLD source, a company called Reliant Specialty. Reliant's representative, Satya Valiveti, informed us that he could acquire bottles of Daraprim. While he initially required a full prepayment, he then agreed to limit it to 50% upfront. With Mr. Skoutelas's endorsement and Mr. Valiveti's willingness to compromise, we felt comfortable moving forward with purchasing two 100-count bottles from Reliant. Mr. DellaFera greenlighted my purchase of two bottles, which we received shortly afterwards.

11

36.     At that point, I did not recommend purchasing additional RLD from Reliant for bioequivalence testing. Our generic product development was still in the early stages, due to our inability to procure the Daraprim RLD that Xcelience needed for research, and the bottles that Reliant sold Fera would expire in July 2019. I was concerned that the costly product would expire before our product was ready for bioequivalence testing. Mr. DellaFera agreed, and we decided to wait to purchase additional bottles.

37.     On April 24, 2018, I reached out to Mr. Valiveti to confirm that he still had additional bottles of Daraprim for sale. On May 9, 2018, Mr. DellaFera and I met with Mr. Valiveti in person at the Basil Leaf Café, an Italian restaurant located near Fera's offices in Locust Valley, New York. Mr. Valiveti informed us that he no longer had any Daraprim to sell us because Vyera's CEO, Kevin Mulleady, had repurchased his remaining inventory. He also informed us that Reliant was unable to acquire additional inventory because he had entered an agreement with Vyera that prevented him from distributing or selling Daraprim. Based on these discussions, I did not view Reliant as a source for any additional Daraprim.

38.     Given our extensive unsuccessful efforts to acquire Daraprim from November 2016 to May 2018, I was skeptical that we would be able to buy additional Daraprim RLD.

**VI.   The FDA allows Fera to proceed with bioequivalence testing with two bottles**

39.     On October 25, 2018, Latitude executed a tech transfer agreement that transferred the tablet manufacturing process they had developed to our contract manufacturer, Rivopharm. Rivopharm completed Fera's first generic pyrimethamine manufacturing campaign in March 2019. At that point, Fera was unable to conduct bioequivalence testing because it did not have sufficient samples of Daraprim to meet FDA requirements.

40.     Starting in October 2017, Fera had sought waivers or exceptions from the FDA to prove bioequivalence using fewer bottles than the regulations required. While the FDA denied

12

Fera's first two requests, on June 4, 2019, the FDA approved Fera's third request. Fera

conducted the bioequivalence testing immediately using the two bottles that we purchased from

Reliant, and on December 20, 2019, Fera submitted its ANDA to the FDA.

**VII. Fera was unable to respond to the FDA's questions about the API before the conclusion of the review period**

41.    The FDA raised a number of questions about Fera's generic pyrimethamine

application in the first half of the eight-month review period. The most difficult and time-

consuming query to answer related to Fera's pyrimethamine API manufacturing process.

Because of the covid-19 pandemic, API-1 was short-staffed in its facility and had trouble

answering the FDA's requests, which involved synthesizing a reference standard for an impurity

and then testing the API to confirm whether the impurity was present at a problematic level. If

we had used Fukuzyu as our API supplier, I find it very unlikely that the FDA would raise this

issue given that it was already familiar with Fukuzyu's manufacturing process. Ultimately,

despite working diligently internally and with API-1, Fera could not respond to the FDA within

the review period and we received a complete response from the FDA on August 17, 2020.

42.    A complete response is an FDA determination that it has identified deficiencies

that Fera was unable to address during the review period. If Fera had been able to respond to the

FDA's inquiries and avoid the complete response letter, it would mean that we had adequately

addressed the issues the FDA raised and it would have most likely approved our application.

43.    In December 2020, we replied to the FDA and it approved the application on July

28, 2021.

EXECUTED on October 16, 2021

Susan McDougal
Vice President

13

DocuSign Envelope ID: 8E34535A-C7AC-4EF4-873D-A5FBA0806D58

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **FEDERAL TRADE COMMISSION, et al.,** | |
| Plaintiffs, | |
| v. | **Case No. 1:20-cv-00706-DLC** |
| **VYERA PHARMACEUTICALS, LLC, et al.,** | |
| Defendants. | |

**Direct Testimony of Abhishek Mukhopadhyay**
**Head of Business Development, Dr. Reddy's Laboratories**

Abhishek Mukhopadhyay declares as follows:

1.  My name is Abhishek Mukhopadhyay, and I reside in the State of New Jersey. I am head of business development at Dr. Reddy's Laboratories ("Dr. Reddy's"). I am voluntarily submitting this declaration at the request of the plaintiffs in this case. I understand that this declaration will be submitted to the Court deciding this matter. The statements in this declaration are based on my personal knowledge. The exhibits referenced in this declaration are attached.

2.  I previously testified about the matters discussed in this declaration during a deposition in this matter on February 12, 2021. I was deposed in both my individual capacity as well as serving as the corporate designee for Dr. Reddy's. I testified truthfully and accurately during this deposition.

I.  **Background**

3.  I have worked in Business Development for Dr. Reddy's for seven years and have been the head of the group for the past three years. I have a Ph.D. in neuroscience from the Northwestern University Feinberg School of Medicine. I have worked in the pharmaceutical industry for nine years.

4.  Dr. Reddy's is a large multinational pharmaceutical firm selling around 150-160 products. It primarily sells generic versions of innovator drugs. My business development team is responsible for managing business development transactions such as licensing agreements, mergers and acquisitions, co-development, and divestitures. One way that Dr. Reddy's brings generic products to market is by licensing a product developed by a third-party or by partnering with a third-party to develop a product for Dr. Reddy's. I have been involved in the licensing of around 15-20 drug products.

**A-741**

DocuSign Envelope ID: 8F34535A-C7AC-4EF4-873D-A5FBA0806D58

5. Relevant here, Dr. Reddy's entered into a licensing agreement to market a generic Daraprim product which was developed by Cerovene. I led this project on behalf of Dr. Reddy's. I negotiated the deal structure, term sheet, and agreement, led the due diligence process, and provided support until the product launched in the United States.

## II. Dr. Reddy's in-licensing deal with Cerovene for generic Daraprim

### A. Dr. Reddy's initially explored a potential generic Daraprim project, but found IQVIA data unreliable

6. Following the significant price increase in Daraprim, Dr. Reddy's began to explore developing its own more affordable generic version of Daraprim. As part of this process, Dr. Reddy's R&D team reached out to potential suppliers of the active pharmaceutical ingredient (API) and the portfolio team began conducting a preliminary assessment of the pyrimethamine market. In my experience selecting a generic product for development or for in-licensing, we rely on IQVIA data as a primary source for market data. The IQVIA data provides an estimate of the drug market in both revenues and sales volume. This data allows us to estimate the size of the market opportunity. If, for some reason, the IQVIA data is not reliable, we turn to other secondary sources of information, such as corporate financial reports and public disclosures, if available.

7. With respect to pyrimethamine, the IQVIA data did not appear to be reliable or accurate. Specifically, the Daraprim sales reported in IQVIA dropped dramatically after Vyera acquired the product, and this data did not match the sales reported previously or the sales that Vyera had publicly reported in that year. ████████████████████████████████

████████████████████████████████████████████████████

████████

GX8009-003

**A-742**

**B.  Dr. Reddy's due diligence of a potential relationship with Cerovene**

8.  In March 2016, while evaluating a potential API source for pyrimethamine, Dr. Reddy's team learned of Cerovene's efforts to develop a generic Daraprim product, and I learned that Cerovene had already filed an ANDA for a generic form of Daraprim.

9.  Rather than develop our own generic Daraprim product, we decided to begin discussions with Cerovene. I led these discussions for Dr. Reddy's. On January 3, 2017, I signed a pre-deal memorandum recommending that Dr. Reddy's enter into a development and supply agreement with Cerovene to in-license generic Daraprim. GX3380 is a copy of my memorandum. The purpose of this memo was to explain the rationale for in-licensing the product and to detail the diligence performed by the various teams involved in the deal's assessment. We prepare such a memo prior to signing any business development deal.

10.  As the pre-deal memorandum (GX3380) reflects, I evaluated the generic Daraprim project as a "near term opportunity to be the first generic for an oral solid product[.]" There were no generic products currently on the market, and Cerovene was ahead in filing its ANDA and developing its product. We believed at that time that Cerovene could potentially launch its product within 12 months, i.e., by early 2018.

11.  I prepared the commercial assessment of a generic Daraprim product opportunity. My assessment was based on a number of factors. First, I estimated the market to be between $███████████ dollars although this estimate was less precise due to the unreliability of IQVIA data. Because the IQVIA data was not reliable, we examined Vyera's press releases and contacted its customers to attempt to triangulate the size of the market.

12.  Second, I viewed the market opportunity for Dr. Reddy's generic Daraprim product to be commercial purchasers rather than lower-priced federal and state purchasers.

A-743

DocuSign Envelope ID: 8F34535A-C7AC-4EF4-873D-45FBA0806D58

13. Third, in assessing the market opportunity, I did not consider the availability of Bactrim on the market, or its pricing. I did not consider Bactrim to be relevant to my assessment because Bactrim is not AB-rated to Daraprim, and thus cannot be automatically substituted by a pharmacist for Daraprim. I did not consider the price of Bactrim in my analysis.

14. Similarly, I did not consider the availability of compounded pyrimethamine, or its price, on my pricing projections for generic Daraprim. Compounded pyrimethamine is not automatically substitutable for Daraprim by a pharmacy. Moreover, because compounded drug products are not FDA approved, safety concerns could arise.

15. Instead, I projected the price of Dr. Reddy's generic drug based on a discount off the price of branded Daraprim. Depending on the number of generic competitors in the market, I projected the price of Cerovene's generic Daraprim to range from a ▮▮▮▮▮ percent discount to the brand's wholesale acquisition cost ("WAC"). In turn, I expected the generic to take significant fraction of the brand's sales.

16. Dr. Reddy's also performed extensive due diligence to ensure that Cerovene's ANDA was in order. I summarized these efforts in my pre-deal memorandum. This diligence included review by various functional teams, including Technical, Regulatory Affairs, Quality Assurance, and Intellectual Property. Specifically, Dr. Reddy's examined Cerovene's ANDA filing, its communications with the FDA, and performed a quality compliance audit of Cerovene's facility. Based on this extensive due diligence, and my conversations with Cerovene, I was confident that Cerovene could manufacture this product and get approval of its ANDA.

DocuSign Envelope ID: 8F34535A-C7AC-4EF4-873D-A5FBA0806D58

**C. Cerovene's search for a new API supplier**

17. The business development team's main concern was Cerovene's search for an alternative API supplier. A generic company needs to locate an API supplier with an active U.S. DMF to make an FDA-approved drug product. Alternatively, generic companies like Dr. Reddy's could develop their own API in house, although the process of doing so can take years.

18. Cerovene had submitted its ANDA to the FDA using API from Ipca. Before I began discussions with Cerovene, the FDA had placed Ipca on import alert, which meant that Cerovene would not be able to use Ipca's API. Cerovene had received a complete response letter from the FDA that indicated that its ANDA was ready for approval, except for the compliance status of its API supplier.

19. It was important to me that Cerovene find a new pyrimethamine API supplier before I would be comfortable recommending that Dr. Reddy's enter into this in-licensing deal. Thus, although Dr. Reddy's was not responsible for or directly involved in finding a replacement API supplier, Cerovene, primarily through its CEO, Manish Shah, kept me apprised of its attempts to find an alternative API supplier.

20. Through these interactions with Cerovene, I learned that Cerovene first attempted to source API from Fukuzyu. Based on my knowledge of generic drug product development, Fukuzyu would have been the best option after Ipca because it had an active U.S. DMF. After significant delays, though, Fukuzyu eventually refused to supply Cerovene.

21. Later, Cerovene informed me that it identified RL Fine as an alternative API supplier. Based on my knowledge of generic drug product development, RL Fine was the second-best API supply option after Fukuzyu because it had developed a pyrimethamine

DocuSign Envelope ID: 8E34535A-C7AC-4EF4-873D-A5EBA0806D58

manufacturing process and only needed to file a U.S. DMF. I relied on the identification

of RL Fine as an alternative supplier in my pre-deal memorandum.

22. GX3388 includes a presentation created for the pyrimethamine committee at Dr. Reddy's

which is charged with overseeing the progress of the generic Daraprim project. The

presentation summarizes the challenges Cerovene faced in securing an alternate source of

API. GX3388 was prepared primarily by Christine Walton, Dr. Reddy's product manager

for generic Daraprim. Christine Walton and I discussed the content of the presentation

and I also reviewed the document and provided comments.

23. After Cerovene secured a new source of API from RL Fine, Dr. Reddy's agreed to move

forward with a supply and development agreement with Cerovene. GX3387 is a copy of

the supply and development agreement between Cerovene and Dr. Reddy's, dated

January 3, 2017.

24. Under this agreement, Cerovene was responsible for developing and filing the generic

Daraprim product application with the FDA and manufacturing the product for

commercial distribution. Dr. Reddy's agreed to make milestone payments to Cerovene

during the product's development. After FDA approval of the product, Dr. Reddy's was

responsible for marketing, distributing, and pricing the product. Dr. Reddy's and

Cerovene agreed to ███████████████ .

### III. Difficulties obtaining reference listed drug (RLD) required for additional bioequivalence testing delayed the generic Daraprim project.

25. In December 2017, the FDA notified Cerovene that it needed to perform additional

bioequivalence studies using RL Fine's API. To perform these studies, I understood that

Cerovene would be required to obtain brand-name Daraprim, also referred to as the

reference listed drug ("RLD"). I expected that it would take only a few weeks to obtain

A-746

Daraprim RLD. Based on my knowledge of generic drug product development, I anticipated that completing the biostudies would take three to four months.

26. As Dr. Reddy's business point of contact for this in-licensing relationship, Cerovene kept me up to date regarding its ANDA and its need to obtain RLD.  Through those interactions, I learned that Cerovene had difficulty sourcing RLD. Due to these difficulties, Dr. Reddy's decided to support its efforts. This was unusual for an in-licensing project; Dr. Reddy's generally does not need to help its partners procure RLD. As Cerovene's point of contact at Dr. Reddy's, I was included on emails related to RLD sourcing and I connected Cerovene with members of Dr. Reddy's sourcing team, who had relationships with RLD suppliers that might have helped Cerovene. In April 2018, I documented Cerovene's efforts to procure RLD. GX3397 is a copy of that correspondence. It includes materials that Dr. Reddy's compiled and submitted to the New York Attorney General's office in response to its request for information in this matter.

27. Initially, Cerovene had tried to obtain RLD from Espee. I was copied on email communications concerning these sourcing efforts. Cerovene had approved an order to purchase RLD from Espee on December 30, 2017. GX3397 includes a copy of that purchase order.

28. By February 2018, Cerovene had been trying to obtain RLD from Espee for over a month. On February 20, 2018, in an e-mail to Cerovene's CEO, I raised concerns about Espee's failure to deliver the RLD and suggested cancelling the purchase order with Espee to work with a different RLD sourcing company. GX3395 is a copy of these communications. I initially proposed working with ProSupplier. However, I learned from

DocuSign Envelope ID: 8E34535A-C7AC-4EF4-873D-A5EBA0806D58

discussions with Dr. Reddy's sourcing team that Reliant Specialty could potentially assist in sourcing Daraprim RLD faster than ProSupplier. I was familiar with Reliant at this time and believed it was a reliable supplier of RLD.

29. Both ProSupplier and Reliant required advance payment. In my experience, this requirement was unusual, as payments for RLD are usually made after the product is delivered. At the time, I believed it would have been an unreasonable risk to pay both suppliers at the same time due to the amount of money involved and the uncertainty that either company could actually source the RLD.

30. I ultimately suggested to Manish Shah that Dr. Reddy's place an order with Reliant. Reliant is a U.S.-based company and indicated that it could provide RLD within two weeks of payment. By contrast, ProSupplier is based in Switzerland and had initially indicated a four to six-week lead time. On March 28, 2018, Dr. Reddy's released to Reliant a prepayment amount of $550,000 for five bottles, the total amount of the order. GX3397 includes the purchase order and invoice for RLD from Reliant.

31. I participated in later email communications concerning sourcing from Reliant. GX3394 is a copy of these communications. On April 19, 2018, Reliant expressed its concern that the "product is highly restricted and [it] may not be feasible to get it." Based on this information, Dr. Reddy's decided to cancel the purchase order from Reliant and sought a refund of the prepayment funds.

32. With the Reliant purchase order cancelled, Dr. Reddy's intended to issue a new purchase order for Daraprim RLD with ProSupplier. By that time, ProSupplier had indicated that it was confident that it could deliver the RLD within two to three weeks.

GX8009-009

DocuSign Envelope ID: 8534535A-C7AC-4FF4-972D-155BA6806BE8

33. However, I learned from Manish Shah, CEO of Cerovene, that he believed ProSupplier was trying to source the Daraprim RLD from Reliant, the same company that so far had been unable to obtain it. As a result, on May 4, 2018, I advised Dr. Reddy's personnel to hold off on issuing a purchase order and releasing payment to ProSupplier. I was concerned that ProSupplier did not have access to the RLD as it claimed. Instead of engaging ProSupplier, my team and I decided to continue working with Reliant at this time.

34. On July 22, 2018, I notified Dr. Reddy's personnel that Reliant was able to provide one bottle of Daraprim RLD. GX3392 is a copy of this and other email communications relating to renewed efforts to source RLD from Reliant. Dr. Reddy's placed another order with Reliant and prepaid again for two additional bottles that Reliant indicated it could procure.

35. By August 23, 2018, I updated Dr. Reddy's management on continuing issues procuring Daraprim RLD from Reliant and a new plan to order additional bottles of RLD from ProSupplier. I then monitored and participated in later emails relating to efforts to source RLD through ProSupplier. GX3390 is a copy of this correspondence.

36. By September 28, 2018, Cerovene and Dr. Reddy's agreed to place an order with ProSupplier for three bottles while also keeping its existing order with Reliant open. Due to the significant delays in sourcing RLD, Dr. Reddy's executives, in conjunction with Manish Shah at Cerovene, then concluded that we needed to accept the risk of prepaying in advance with two different RLD suppliers. Dr. Reddy's paid 50% of $375,000 in advance for this order, with the remaining balance to be paid after delivery.

37. On November 19, 2018, I informed Dr. Reddy' executives and other personnel working

on the generic Daraprim project that Cerovene had obtained three bottles from

ProSupplier. After receiving the three bottles from ProSupplier, the Reliant order was

cancelled. Because the ProSupplier bottles were from a different manufacturing lot than

the bottle previously sourced by Reliant, Cerovene could not combine the ProSupplier

bottles and the Reliant bottle for bioequivalence testing.

38. Despite significant efforts, Cerovene and Dr. Reddy's were unable to obtain the five

bottles of Daraprim RLD that generally would be needed to complete the biostudies and

constitute sufficient samples in reserve per FDA regulations. Cerovene, however,

successfully sought a waiver from the FDA which allowed it to use the three ProSupplier

bottles of Daraprim for bioequivalence studies and to meet regulatory requirements.

**IV. In March 2020, Dr. Reddy's launched its generic product in open distribution channels and captured a significant portion of the branded drug's sales.**

39. Cerovene's generic Daraprim product received FDA approval in late February 2020. Dr.

Reddy's began selling the product shortly thereafter in March 2020. I was not responsible

for commercialization of the generic Daraprim product but in my role as business lead for

the generic Daraprim project, I was involved in discussions concerning those issues

including pricing, distribution, and launch strategy. Dr. Reddy' chose to sell generic

Daraprim in an open distribution model, which includes using large drug wholesalers

such as Cardinal and McKesson as well as various specialty pharmacies. The distribution

strategy for generic Daraprim was designed to encourage and enable broader access to

patients, who could purchase the drug in various pharmacies rather than one specific

store. Hospitals and group purchasing organizations could also obtain generic Daraprim

directly from a wholesaler or the manufacturer.

40. I am not aware of any discussions concerning restricting the distribution of pyrimethamine. I am not aware of discussions concerning potential risks associated with product safety, product liability, or product quality that would indicate that open distribution would not be appropriate for generic Daraprim.

41.  At launch, Dr. Reddy's priced Daraprim product launched at a ▮▮% discount off the brand product. Since its introduction, the product's WAC price has been $292.50 per pill, which is shown in Column V of GX3385. In my role as project lead of the generic Daraprim project, I reviewed and discussed these documents with Dr. Reddy's personnel.

42. Since launch, Dr. Reddy's WAC price has not changed, but because of additional generic competitors, the net price of Dr. Reddy's generic Daraprim product (taking into account rebates, chargebacks, etc.) has decreased.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on October 19, 2021

DocuSigned by:

*Abhishek Mukhopadhyay*

0EB3D9E4526A408...

Abhishek Mukhopadhyay
Head of Business Development
Dr. Reddy's Laboratories

GX8009-012

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION, et al.,

      Plaintiffs,

      v.

VYERA PHARMACEUTICALS, LLC, et al.,

      Defendants.

Case No.: 1:20-cv-00706-DLC

**Direct Testimony of Nilesh Patel**
**Co-Founder and Compliance and Regulatory Officer of InvaTech Pharmaceuticals LLC**

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Nilesh Patel declares as follows:

1.      My name is Nilesh Patel, and I reside in the State of New Jersey. I am Co-Founder and Compliance and Regulatory Officer for InvaTech Pharmaceuticals.

2.      I am voluntarily submitting this declaration. The information in this declaration is based on my personal knowledge. I understand that this declaration will be submitted to the Court deciding this matter.

3.      The exhibits referenced in this declaration are attached.

4.      I previously testified about the matters discussed in this declaration during an investigational hearing before the FTC on November 20, 2019 and at a deposition in this matter on December 8, 2020.

## I. Background

### A. InvaTech

5.      InvaTech is a pharmaceutical research and development firm founded in 2009 that started operating in 2013. InvaTech is located in New Jersey and employs approximately 50 people. InvaTech manufactures finished drug product and submits Abbreviated New Drug Applications ("ANDAs") to the U.S. Food and Drug Administration ("FDA") for approval.

6.      InvaTech has developed around fifty products, of which approximately twenty products are marketed currently. InvaTech does not market the products it develops.

### B. Personal background

7.      I am co-founder and Compliance and Regulatory Officer for InvaTech.

8.      My responsibilities at InvaTech include: sourcing API for InvaTech products; sourcing reference listed drug (RLD) for bioequivalence (BE) testing for InvaTech; and I have primary responsibility at InvaTech for securing FDA approval of InvaTech drug products. I also am responsible for identifying molecules for development, identifying marketing partners, and

1

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

developing the growth strategy for InvaTech, as well as managing InvaTech's day-to-day operations.

9.    I was the sole decision-maker at InvaTech responsible for deciding to develop a generic Daraprim product.

10.    I reviewed and supervised InvaTech's correspondence with the FDA regarding InvaTech's ANDA for generic Daraprim.

11.    Before joining InvaTech, I worked at various other pharmaceutical companies. For example, at Sandoz, a large manufacturer of generic drug products, I worked in Sandoz's U.S. offices to ensure that products met quality requirements.

**II. InvaTech decided to develop generic Daraprim in 2014**

12.    In 2014, I decided that InvaTech should develop a generic Daraprim product primarily for two reasons. First, Daraprim was off patent. It is always easier to develop a generic product when the brand-name drug has no patent protection. This is because there are no patents that can be enforced to prevent InvaTech from entering the market and competing. Second, there were no generic versions of Daraprim approved for sale in the United States. The lack of generic entrants meant less competition for InvaTech's product, which accordingly would be more profitable.

13.    In considering whether to develop generic Daraprim, I researched Daraprim's sales volume, revenues, and pricing using IMS data and also considered API supply issues.

14.    I expected that a generic version of Daraprim would be profitable based on the then-prevailing brand-name price of approximately $400 to $500 per 100-tablet bottle. The increasing price of Daraprim in 2013 and later years continued to make developing a generic an attractive investment.

GX8010-003

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

15.     InvaTech needs FDA approval to lawfully market a generic Daraprim product in the United States. It was my goal to have FDA approval for our generic Daraprim product as soon as possible.

**III. InvaTech's generic Daraprim product**

   **A.  InvaTech's efforts to source API for its generic Daraprim product**

16.     The active pharmaceutical ingredient ("API") is the actual drug in a pharmaceutical product that is intended to have a physiological or therapeutic effect on the body. Pyrimethamine is the API in Daraprim. InvaTech cannot make generic Daraprim without pyrimethamine.

17.     InvaTech does not manufacture API and instead sources API from an API manufacturer. It is not uncommon in the pharmaceutical industry for a pharmaceutical company to partner with a different company for manufacture of API.

18.     Companies that manufacture API may submit a Drug Master File to the FDA. The DMF relates to the manufacture of a specific API. An ANDA filer can reference a company's DMF in its ANDA. The FDA must approve the DMF before FDA will approve the ANDA that references the DMF. Of the approximately forty-eight products that InvaTech has developed, I would estimate that more than forty of those products involved API suppliers with DMFs already on file with FDA when InvaTech began developing the products. The remaining API suppliers were in the process of filing their DMFs.

19.     Instead of referencing a DMF, a company filing an ANDA also has the option to put all of the information about the API directly into its ANDA.

20.     When I was selecting a partner to manufacture pyrimethamine API for InvaTech, I preferred a partner that already had a DMF on file with the FDA because the ANDA approval process will take longer if InvaTech cannot reference a DMF that FDA has already reviewed.

3

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Referencing a DMF is also a faster and less complex undertaking than including all of the information in the ANDA. If a company does not already have a DMF on file with FDA, then (in my experience) it can take up a year to prepare a DMF filing, which then requires an initial clearance from FDA before it can even be referenced. I believed then (and still believe) that working with an API supplier with an approved pyrimethamine DMF would lead to faster approval of InvaTech's ANDA.

21.     If I could not partner with a company with a DMF on file or ready to file, I would prefer to partner with a company with the know-how to make pyrimethamine who knows generally about how to file DMFs with FDA.

**1.  Ipca**

22.     In 2014, I chose Ipca as the source of pyrimethamine API for InvaTech to reference in its ANDA. Ipca already had a U.S. DMF for pyrimethamine on file with FDA.

23.     Ipca was initially able to supply pyrimethamine API samples to InvaTech, but was unable to continue supporting InvaTech after the FDA imposed an import ban on Ipca in 2015. I understood that the FDA's import ban prevented Ipca from selling certain API, including pyrimethamine, into the United States, that it would take Ipca a long time to clear the ban, and, as a result, that Ipca would not be able to further support InvaTech's generic Daraprim project.

24.     After FDA imposed an import ban on Ipca in 2015, I began searching for a new pyrimethamine API supplier. I spent three to six months researching potential partners but I was not successful in finding a partner until I contacted RL Fine.

**2.  RL Fine**

25.     I reached out to RL Fine because I had learned from its website that RL Fine was supplying pyrimethamine API for use outside of the United States. Because RL Fine appeared to have the know-how to make pyrimethamine API and was supplying in other countries, I chose

4

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

RL Fine as InvaTech's new API supplier. RL Fine also had obtained FDA approval for DMFs for other APIs.

26.     I initially reached out to Mr. Rajan Roy, the owner of RL Fine. From that conversation, I understood that pyrimethamine API was available. Around the same time, in summer of 2015, RL Fine representatives were at an industry conference for API suppliers in New York City. At the conference, I approached RL Fine about supplying pyrimethamine API, and the reaction of the RL Fine representatives was positive. I believed that we had reached an understanding that RL Fine would supply pyrimethamine API to InvaTech.

27.     As part of my due diligence, I visited RL Fine's manufacturing facility in India in 2015 or 2016. During that visit, I reviewed their facility and met with personnel about the RL Fine pyrimethamine process.

28.     In February 2017, InvaTech and RL Fine executed a preliminary collaboration agreement. GX3166 is a copy of this agreement, which I executed on behalf of InvaTech. Our agreement covered three different APIs, including pyrimethamine, which RL Fine would provide to InvaTech for the U.S. market. GX3166-002. We agreed that RL Fine would provide a DMF for pyrimethamine API for filing with the FDA; under our agreement, RL Fine would be free to supply pyrimethamine API to other companies too, but InvaTech would have preferential pricing..

29.     The agreement specified that InvaTech would pay ████████ of pyrimethamine API, ███████████████████████████████. GX3166-002.

30.     InvaTech estimated that it would need approximately ██████ of pyrimethamine API from RL Fine each year to support its product.

5

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

31.     Our agreement specified a target submission date for InvaTech's ANDAs of 2017 to 2018. GX3166-002. When I executed the agreement, I expected to file InvaTech's ANDA for generic Daraprim in 2017 or 2018. The agreement also explains, consistent with my expectations at the time, that InvaTech intended to launch its generic Daraprim product in 2018. GX3166-002.

32.     Under our partnership, InvaTech split responsibilities with RL Fine. InvaTech was responsible for formulating the drug product and conducting bioequivalence testing. RL Fine was responsible for providing the specified APIs for initial R&D activities in support of the ANDA filing. GX3166-002. In addition, RL Fine was responsible for providing complete access and support to InvaTech's research and development team for any queries related to the API's purity and other technical specifications; assisting in the preparation of documents necessary to file the DMF with the FDA; and providing a complete set of DMF documents for filing with FDA. GX3166-001. RL Fine also agreed to address any deficiencies the FDA identified and do so in a timely manner. GX3166-001. It was my understanding that RL Fine would help InvaTech address any deficiencies that the FDA cited with respect to pyrimethamine API in InvaTech's ANDA.

33.     Per our agreement, RL Fine supplied InvaTech with an initial ██ and then another ██ of pyrimethamine API for InvaTech to use in preparing its ANDA. InvaTech used the API that RL Fine supplied to conduct required testing, including bioequivalence testing, in support of its ANDA.

34.     Although it was my plan that RL Fine would file a DMF, which InvaTech would then reference in its ANDA, RL Fine was taking too long to complete the filing between January and summer of 2017. InvaTech pushed RL Fine to file a DMF, but RL Fine never did. Therefore, around June 2017, InvaTech requested that RL Fine provide all of the DMF-related material, so

GX8010-007

A-758

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that InvaTech could include the information in its ANDA. InvaTech did this to speed up the process, avoid waste of time, and complete its ANDA filing faster.

35.     On July 28, 2017, InvaTech filed its generic Daraprim ANDA, including information on RL Fine's process for manufacturing pyrimethamine API, with FDA. The FDA assigned the ANDA number A210216. InvaTech's ANDA included the results of bioequivalence testing that InvaTech had done using RL Fine's pyrimethamine API.

36.     On September 11, 2017, FDA sent an initial response to InvaTech regarding its ANDA. The initial response included questions from FDA about the ANDA. Some of the FDA's questions related to RL Fine's pyrimethamine API. The deadline to respond to the FDA's questions was September 18, 2017.

37.     I emailed the FDA's questions about the pyrimethamine API to my contact at RL Fine, Dr. A.R. Ramesha, on September 11, 2017. GX3042 is a copy of InvaTech's correspondence with RL Fine. I asked for RL Fine's help "ASAP" with answering the FDA's questions. GX3042-003.

38.     The next day, September 12, my colleague Jinesh Patel pasted another comment from the FDA's September 11, 2017 letter in an email to RL Fine and asked for RL Fine's assistance responding to that comment. GX3042-002. I reviewed and supervised all of Ms. Patel's communications with FDA and RL Fine regarding InvaTech's ANDA for generic Daraprim.

39.     RL Fine responded that they were busy with an audit. GX3042-002. In response, I explained that the FDA wanted the answers by Friday and asked RL Fine to expedite their response. GX3042-001. Dr. Ramesha of RL Fine then emailed that he would respond on September 13. GX3042-001. RL Fine did not respond on September 13.

7

**A-759**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

40.     After receiving no response from RL Fine for five days, Ms. Patel wrote to RL

Fine on Sunday, September 17, that we still had not received any answer and asked again for a

response ASAP so InvaTech could respond to FDA by Monday. GX3042-0001. Ms. Patel sent

that email at my direction. Dr. Ramesha responded that the audit was still continuing. GX3042-

0001. I responded that same day that the information was time sensitive and that we needed to

respond to the FDA on Monday, September 18. GX3042-0001.

41.     RL Fine did not respond with answers to the FDA's questions by the deadline of

September 18, 2017. I continued following up with RL Fine to try to get answers. RL Fine never

provided the information that InvaTech had requested in GX3042.

42.     Toward the end of September, I had a phone call with Dr. Ramesha. Based on that

phone call, it was my understanding that RL Fine's management had decided that RL Fine would

no longer be supporting InvaTech's ANDA for generic Daraprim. Based on that information, I

thought that InvaTech's development of generic Daraprim was dead unless and until InvaTech

could find a new supplier of pyrimethamine API.

43.     After I understood that RL Fine would no longer be supporting InvaTEch's

development of generic Daraprim, I flew to India to discuss the issue face to face with RL Fine.

The issue was so critical that I believed I had to go to India to discuss it in person. After an 18-

hour flight to India, I checked into my hotel and went to a meeting at RL Fine's headquarters in

Bangalore, India.

44.     The meeting included me and four people from RL Fine, including Dr. Ramesha,

an attorney for RL Fine, and a senior executive from RL Fine named Jacob Mathew. The

meeting lasted around two hours. I asked the RL Fine executives to please continue supporting

InvaTech's Daraprim ANDA until FDA approves InvaTech's ANDA. After that, RL Fine could

8

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

stop supporting InvaTech, and in the interim I would be able to find another API supplier. Mr. Mathew declined my request and said RL Fine was no longer supporting InvaTech's Daraprim ANDA effective immediately. I understood based on our conversation that RL Fine was no longer supporting InvaTech's Daraprim ANDA. Although RL Fine explained that it was stopping support on pyrimethamine because it was a small volume product, I did not find that reason credible because the volumes we needed were clear at the initial stages of our discussions, and RL Fine could have raised any such issue before signing the preliminary collaboration agreement. When I left my meeting with RL Fine, I had no hope that RL Fine would continue helping InvaTech with its Daraprim ANDA.

45.    I asked at the meeting whether RL Fine intended to stop supporting the other two APIs that also were the subject of our agreement. Based on what the RL Fine people told me, I understood that RL Fine would continue supporting InvaTech on those other products. RL Fine has continued supporting InvaTech's development of those other products. Pyrimethamine was the only product that RL Fine stopped supporting.

46.    On May 22, 2018, FDA issued a complete response letter to InvaTech regarding InvaTech's generic Daraprim ANDA. GX3173 is a copy of this FDA letter to InvaTech. I reviewed this letter when it was received at InvaTech. A complete response letter means that FDA has reviewed the entire ANDA and has identified the deficiencies with the ANDA. The FDA letter was a major deficiency response. A major deficiency response in my experience means that FDA will need approximately six months to review InvaTech's responses to the complete response letter. The FDA's May 2018 complete response letter cited deficiencies with InvaTech's pyrimethamine API.

GX8010-010

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

47.     On May 23, 2018, I emailed RL Fine to ask for help responding to the deficiencies relating to the pyrimethamine API. GX3048 is a copy of my correspondence with RL Fine. I copied and pasted the FDA's questions about RL Fine's pyrimethamine API into an email to Dr. Ramesha. GX3048-001-03. I believed that RL Fine would be able to answer the FDA's API questions because I view RL Fine as a capable chemical company that is scientifically and technically proficient.

48.     Dr. Ramesha responded that he would check with Mr. Mathew and get back to me. GX3048-001. RL Fine never responded again and never helped InvaTech respond to these FDA questions.

49.     Although FDA identified some deficiencies that were not related to API, these deficiencies were not difficult to answer, and InvaTech responded to those on its own. If RL Fine had not stopped supporting InvaTech, I believe it would have taken InvaTech six to nine months to respond to the FDA's May 2018 complete response letter. My estimate is based on my experience responding to other FDA major deficiency letters for other InvaTech products FDA ultimately approved.

**3.  API-2**

50.     In late 2017 or early 2018, I started looking for another API supplier to replace RL Fine; I was interested in transferring the pyrimethamine process that we had included in the ANDA to another manufacturing facility.

51.     I identified API-2        as a replacement API supplier. I chose API-2        as our new partner because I had been API-2        's ▮▮▮▮▮▮ and had a good knowledge of the company and its capabilities. InvaTech started working with API-2        on pyrimethamine in late 2017 or early 2018. InvaTech agreed to pay ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of pyrimethamine API.

10

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

52.     When I was first choosing a replacement for Ipca back in 2015, I did not consider API-2 because API-2 did not have a DMF for pyrimethamine on file with FDA, had never made pyrimethamine before and did not have a process or know-how for making pyrimethamine. Therefore, I believed that it would have taken too long to source API from API-2

. After RL Fine stopped working with InvaTech, though, I considered API-2 to be the next best option.

53.     Before InvaTech could respond to the May 2018 FDA complete response letter, we had to replicate the pyrimethamine manufacturing process with API-2, replicate stability testing using new API from API-2, and work with API-2 to address the API deficiencies in the complete response letter. Fortunately, InvaTech had access to RL Fine's manufacturing process because InvaTech had included all of the relevant information in its original ANDA filing. InvaTech transferred the technical know-how for manufacturing pyrimethamine API to API-2, which sped up API-2's API development.

54.     It took API-2 approximately six months to develop a process for manufacturing pyrimethamine. API-2 had to validate that process per FDA requirements. API-2 also had to redo work other work that RL Fine had done, including for example, preparing its own certificates of analysis so that API-2 could respond to FDA's questions about the certificates of analysis for the pyrimethamine API. In June 2019, API-2 supplied information InvaTech needed to respond to the May 2018 complete response letter. GX3170 is a copy of this correspondence between InvaTech and API-2.

55.     On July 31, 2019, InvaTech submitted its response to the FDA's May 2018 complete response letter. GX3168 is a copy of InvaTech's response. Ms. Patel signed the submission on behalf of InvaTech, and I supervised the preparation of this package of materials

11

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

for submission to the FDA. InvaTech's response included an amendment shifting the site of API

manufacture from RL Fine to API-2 . GX3168-003.

**B. Bioequivalence testing and sourcing reference listed drug**

**1. ANDA applicants must demonstrate bioequivalence to the brand-name drug**

56.     While a New Drug Application includes safety and efficacy studies, generic drug

companies submitting an ANDA do not need to repeat all that testing and instead need to show

only bioequivalence to the brand-name product (called the "reference listed drug" or "RLD").

ANDA sponsors are required to keep additional RLD, typically five times the amount of RLD

used in the bioequivalence testing, in inventory in case there is an FDA audit.

57.     InvaTech needed Daraprim RLD to conduct FDA-required bioequivalence

testing. In bioequivalence studies, human subjects are given dosages of the proposed generic and

the RLD. Bioequivalence studies are typically done by a third-party clinical research

organization. Once the study is successful, meaning it meets all of the criteria for demonstrating

bioequivalence between the RLD and the test product, then that data can be submitted to FDA in

ANDA. This is the process InvaTech followed for its generic Daraprim product.

**2. InvaTech had no difficulty purchasing Daraprim RLD in 2014**

58.     On October 23, 2014, InvaTech purchased six 100-tablet bottles of Daraprim

RLD from a local pharmacy for $8,132.50. GX3175 is the receipt from the local pharmacy for

the Daraprim RLD purchase. InvaTech had no difficulty acquiring Daraprim RLD at that time

and did not have to sign any waivers or liability agreements.

59.     InvaTech used this Daraprim RLD for BE testing in the summer of 2016. After

BE testing, InvaTech had some Daraprim RLD left, but that RLD has since expired.

12

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**IV. Expected launch of InvaTech's generic Daraprim product**

60.     In January 2020, FDA issued a minor deficiency letter to InvaTech for its

Daraprim ANDA. GX3174 is a copy of that FDA letter.

61.     InvaTech is working on responding to that minor deficiency letter. InvaTech's

response has been delayed as a result of API-2 ████ coming to a standstill due to the COVID

emergency in India. The head of research and development for API-2 ████████, and we

have had to begin working a new person at API-2 ████ on the API project. InvaTech hopes to

respond to the minor deficiency letter within the next 30 to 60 days

62.     InvaTech intends to launch its generic Daraprim product within 60-90 days of

FDA approval.

63.     Based on my experience in the generic pharmaceutical industry, it is my

understanding that entry of the first generic competitor will result in a price erosion of

approximately 30% to 40% from the prevailing brand-name price. The brand name drug's sales

volume also experiences significant decline of approximately 60% to 70% when the first generic

enters the market. In my experience, six months after generic entry, the brand name drug's sales

volumes will have dropped by 80%. The brand drug's sales volume will continue to decline as

additional generic products enter the market. Prices for the drug product also continue to decline

as more generics enter the market.

64.     Consistent with this general understanding, I expect that InvaTech's generic

Daraprim will launch at a significant price discount to the brand-name Daraprim price. I expect

launch of generic Daraprim will continue to reduce brand-name Daraprim sales.

65.     When I refer to the market share for a generic Daraprim product, I consider

InvaTech's share relative to the total of the brand-name Daraprim sales and any other generic

GX8010-014

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Daraprim products. I do not include any other products when I think about "share" of the market into which InvaTech intends to launch its generic Daraprim product.

## V. InvaTech used IMS data to evaluate the Daraprim market opportunity

66.     I typically look at IMS data for a drug when considering whether to develop a generic version of that drug. For example, in 2014, I considered IMS data for Daraprim as part of deciding whether to develop a generic Daraprim product. The Daraprim IMS data I reviewed was for the years around 2011-2013. I also recall that the data showed Daraprim volumes of approximately 1 million tablets per year. In addition, I used IMS data to analyze the other two products that were included in InvaTech's agreement with RL Fine.

67.     I do not remember reviewing any other data sources regarding Daraprim sales and volumes before making a decision about whether to develop a generic Daraprim product. I did not consult data from Walters Kluwer or Truven Health, which I had never heard of prior to testifying in this case.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on October 15, 2021.

_____  oct·19, 2021
Nilesh Patel

14

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION, et al.,** | |
| Plaintiffs, | |
| v. | Case No.: 1:20-cv-00706-DLC |
| **VYERA PHARMACEUTICALS, LLC, et al.,** | |
| Defendants. | |

**Direct Testimony of Manish S. Shah
Co-Founder and President of Cerovene Inc.**

**HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Manish S. Shah declares as follows:

1.      My name is Manish S. Shah, and I reside in the State of New Jersey. I am co-founder and President of Cerovene Inc. I am voluntarily submitting this declaration at the request of the plaintiffs in this case. I understand that this declaration will be submitted to the Court deciding this matter. The statements in this declaration are based on my personal knowledge. The exhibits referenced in this declaration are attached. Also attached to this declaration is an exhibit labeled GX7016, which I have reviewed and which is based upon and fairly represents the underlying documents it cites.

2.      I previously testified about the matters discussed in this declaration during an investigational hearing before the Federal Trade Commission on November 19, 2019 and at a deposition in this case on November 19, 2019.

## I. Background

### A. Cerovene Inc.

3.      Cerovene is a pharmaceutical research and development firm founded in 2006. Cerovene does not manufacture the active pharmaceutical ingredient ("API") in its products. API refers to the ingredient in the drug product that is intended to produce a pharmacological effect. Cerovene does manufacture the finished drug product. Cerovene develops the product, creates the documents necessary to submit the Abbreviated New Drug Application ("ANDA") to the FDA, submits the ANDA, works with the FDA to gain approval, and makes a finished product for distribution after FDA approval.

4.      Cerovene and its partners have submitted 50 to 60 ANDAs. The FDA has approved 70% of those ANDAs. Cerovene also has submitted 10 to 15 ANDAs on its own. Of those, the FDA has approved 7 to 8. Altogether, Cerovene has at least 20 FDA-approved products on the market.

A-768

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**B.  Personal background**

5.      I am co-founder and President of Cerovene. As the President, I have overall

responsibility for managing and running the company. My responsibilities relate to all aspects of

the drug development process, including identifying the products to develop, purchasing and

sourcing API for use in Cerovene pharmaceutical products, sourcing reference listed drug

("RLD") for bioequivalence testing, and compiling and submitting ANDAs to the FDA.

6.      Prior to co-founding Cerovene, I spent approximately fourteen years working at

various pharmaceutical companies as a scientist and product development manager. My work

experience included formulating and developing various generic products, including drafting

sections of ANDAs.

7.      I have a master's degree in industrial pharmacy and am a registered pharmacist in

New York and New Jersey.

**II.  Cerovene decided to develop generic Daraprim in 2013**

8.      In 2013, I decided that Cerovene should develop a generic Daraprim product. In

my view, developing a generic version of Daraprim was attractive for several reasons. First,

Daraprim did not have any patent protection in 2013. It is always easier to develop a generic

product when the brand product has no patent protection. This is because you need to develop a

formulation of the product that will not infringe the brand company's patents, and the brand

company may sue to enforce patents that prevent launch of a generic competitor. Second, there

were no generic versions of Daraprim on the market in the U.S. in 2013. This was attractive

because less competition meant that launching a generic Daraprim product would be more

profitable. Third, we expected to be able to procure pyrimethamine API from Ipca

Pharmaceuticals. Pyrimethamine is the active pharmaceutical ingredient in Daraprim. Securing a

reliable source of API is a critical component of any drug development process. Ipca had

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

developed and submitted to the FDA a Drug Master File (DMF) for pyrimethamine API. A DMF is a compilation of documents that detail a supplier's particular process for manufacturing a specific API. Cerovene planned to refer to Ipca's DMF in its ANDA.

9.      I expected that a generic version of Daraprim would be profitable based on the then-prevailing brand-name price of approximately $12 per pill.

10.      Dr. Reddy's Laboratories ("DRL") is Cerovene's marketing partner for generic Daraprim. Cerovene is responsible for supplying a finished generic Daraprim product to DRL, and DRL is responsible for marketing, sales, and distributing the generic Daraprim product.

**III. Cerovene's generic Daraprim product**

11.      Cerovene submitted its generic Daraprim ANDA to FDA on May 8, 2014. GX3020 is the ANDA submission cover letter that I signed as President of Cerovene. FDA assigned Cerovene's ANDA number 207127.

12.      I expended significant time and effort working with FDA throughout the approval process to gain FDA approval of Cerovene's pyrimethamine ANDA as quickly as possible.

**A.  Cerovene's efforts to source API for its generic Daraprim product**

13.      Cerovene does not manufacture API; it sources API from an API manufacturer. In my experience, it is not uncommon in the pharmaceutical industry for a pharmaceutical company to partner with a different company to manufacture the API.

14.      There are two major components to the ANDA: finished drug product (the pill or capsule that the patient takes) and drug substance (the part of the drug that affects the body, i.e., the API). Cerovene prefers to handle the development and manufacture of the drug product and then rely on another manufacturer's DMF to cover the drug substance, i.e., the API.

15.      Being able to refer to a DMF saved a lot of work for Cerovene in submitting its Daraprim ANDA. For a company like Cerovene that does not manufacture API, it is best to refer

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

to a DMF from a company with experience manufacturing API. If Cerovene does not partner

with a DMF-holder, Cerovene has to expend much more time and money developing the

information about the API, working with the API manufacturer, and incorporating the

information into the ANDA.

16.     All else equal, I would certainly prefer to partner with a company with a DMF on

file or ready to file versus a company that does not have a DMF on file or ready to file.

Partnering with a company that knows how to make pyrimethamine but does not have a DMF on

file will entail significant additional time and effort for Cerovene to put together the drug

substance section of the ANDA.

**1. Ipca**

17.     Cerovene planned to refer to Ipca's DMF for pyrimethamine in its ANDA filing.

18.     In 2015, FDA issued an import ban against Ipca, meaning that drug products

marketed in the U.S. could not use API manufactured at various Ipca facilities in India.

19.     Although FDA exempted several Ipca API products from the ban, pyrimethamine

was not exempted. In October 2015, I wrote a letter to FDA seeking an exemption to the Ipca

import ban for pyrimethamine. GX3014 is a copy of the letter I sent to FDA requesting the

exemption. Cerovene and Ipca also wrote jointly to FDA making the same request. GX3015 is a

copy of the joint letter, which I signed on behalf of Cerovene. FDA denied those requests, and

Cerovene had to find a new pyrimethamine API supplier.

20.     I was responsible for finding a new pyrimethamine API supplier to replace Ipca.

My preference was to find an alternate supplier with a DMF for pyrimethamine already on file

with FDA. Filing a DMF indicates that the supplier has successfully developed a manufacturing

process designed to be compliant with U.S. regulatory requirements. If I could not find a

company with a DMF in the U.S., then I would prefer a company with experience manufacturing

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

pyrimethamine API and with a history of securing FDA approval to manufacture API for use in a human pharmaceutical product.

### 2. Fukuzyu

21.     In 2015, Cerovene contacted Fukuzyu Pharmaceutical Company. Fukuzyu had a DMF for pyrimethamine on file with FDA. It was my understanding that Fukuzyu supplied the brand manufacturer of Daraprim, which meant that FDA had already approved its pyrimethamine API manufacturing process. Because Fukuzyu's process was already approved, I viewed Fukuzyu as the best option for sourcing pyrimethamine API.

22.     Over the course of 2015 and 2016, working through a broker firm in New York called Sumitomo, I attempted to reach a deal with Fukuzyu to supply pyrimethamine API to Cerovene.

23.     It was my understanding that Fukuzyu wanted Cerovene to buy ███ of pyrimethamine as a condition of agreeing to supply API to Cerovene. That is more than Cerovene needed, but we agreed to make that purchase because Cerovene very much wanted to partner with Fukuzyu to supply pyrimethamine API. In September 2016, I emphasized to Sumitomo that Cerovene was ready to purchase the API. Based on my conversations with Sumitomo, I understood that Fukuzyu would supply the API.

24.     In the meantime, Fukuzyu supplied a small amount of their pyrimethamine API for Cerovene to test for suitability for our ANDA.

25.     On September 13, 2016, I emailed the FDA project manager for our pyrimethamine ANDA to provide an update on Cerovene's actions to procure a new source of pyrimethamine API. I informed her that Cerovene was able to procure API samples from Fukuzyu, the only company besides Ipca that held an active pyrimethamine DMF.  I also

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

informed the FDA project manager that Fukuzyu wanted a substantial purchase of API as a condition of supplying Cerovene.

26.      I had several communications with Sumitomo about when Fukuzyu would ship the pyrimethamine API that Cerovene had ordered.

27.      Contrary to my expectations that Fukuzyu would supply API to Cerovene, I came to understand that Fukuzyu would not supply any pyrimethamine API to Cerovene. On October 5, 2016, I received an email from Sumitomo with a letter from Fukuzyu. Because the letter from Fukuzyu was written in Japanese, Sumitomo translated the content into English. GX3260 is an email chain that includes that correspondence. After reviewing the correspondence, I understood that Fukuzyu was not going to supply pyrimethamine to anyone because pyrimethamine was an older substance with limited growth potential. This was the first time I learned that Fukuzyu had these concerns. I did not receive any other explanation from Fukuzyu. Fukuzyu never supplied any pyrimethamine API to Cerovene other than the initial sample amount.

28.      I was extremely disappointed that Fukuzyu had decided not to supply pyrimethamine. Based on my experience, it would have been much easier and faster for Cerovene to amend our ANDA to reference Fukuzyu's DMF for pyrimethamine than to work with a company that did not have a DMF on file for pyrimethamine or that needed to develop a pyrimethamine manufacturing process from scratch. Based on my experience, if Cerovene had secured API from Fukuzyu, I expect that Cerovene would have been able to submit its major amendment to the FDA to reference Fukuzyu's DMF four months later.

**3.  RL Fine**

29.      While negotiating with Fukuzyu, I continued to look for alternative API suppliers. Finding a company with a pyrimethamine DMF already on file was still my first choice, and

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

finding a company that knew how to make pyrimethamine and was likely to get FDA approval to do so was my second choice.

30.     In 2016, through friends and colleagues, I learned of a company called RL Fine that had a process in place for making pyrimethamine and was supplying pyrimethamine to markets outside the United States. This was encouraging because it meant RL Fine knew how to make pyrimethamine for use in pharmaceutical products. RL Fine also had DMFs for other drug substances on file with FDA and had supplied other API for use in pharmaceutical products marketed in the United States. This indicated to me that RL Fine was able to manufacture drug substances to the standards necessary for FDA approval.

31.     Cerovene and RL Fine executed a supply agreement for pyrimethamine dated November 16, 2016. GX3265 is a copy of the executed supply agreement, which I signed on behalf of Cerovene. The agreement specified the pricing and minimal order requirements, and Cerovene agreed to make two upfront payments to RL Fine—a ▮▮▮▮ payment upon execution of the agreement and a second ▮▮▮▮ payment upon approval of the ANDA. GX3265-012-13. The agreement was set to last for ▮▮▮▮▮▮▮▮▮ with automatic one-year renewals thereafter. GX3265-007 (§ 12.1).

32.     Cerovene's agreement with RL Fine had an ▮▮▮▮▮▮, meaning that RL Fine would exclusively supply Cerovene, with a four-year term. GX3265-013. Given the time, effort, and money that Cerovene would be investing in getting RL Fine qualified as an API supplier for the U.S. market, an exclusivity provision made economic sense to keep other companies from free riding on Cerovene's investment in getting RL Fine qualified to supply pyrimethamine in the United States.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

33.     In early 2017, a senior executive from RL Fine named Mr. Jacob Mathew, visited

Cerovene's headquarters in the United States. I confirmed during that meeting that RL Fine

would not have any problem supplying pyrimethamine API to Cerovene.

34.     RL Fine did not file a DMF for pyrimethamine. Instead, Cerovene included the

RL Fine manufacturing information as an amendment to Cerovene's ANDA. We went that route

because it appeared to be the fastest way to get approval and would let Cerovene control the

process and ensure prompt replies to any FDA questions rather than relying on RL Fine to handle

the DMF process.

35.     Cerovene invested a great deal of time, effort, and money compiling the necessary

data from RL Fine and formatting it correctly for submission to the FDA. We ensured that RL

Fine's process was compliant with current good manufacturing practices and that the section of

the ANDA related to API manufacturing had all required information. We also performed a

number of studies on RL Fine's API samples to provide this information. We also worked with

RL Fine to incorporate all of the required information into the ANDA amendment, including all

of the necessary paperwork and certifications to demonstrate that RL Fine would be an

acceptable API manufacturer and all of the technical information regarding the API itself and RL

Fine's manufacturing process.

36.     On April 2, 2017, Cerovene submitted a major amendment to its ANDA changing

its API supplier to RL Fine. GX3024 is a copy of that amendment, which I signed on behalf of

Cerovene. In that amendment, Cerovene informed FDA that (a) we had qualified RL Fine as a

new supplier of pyrimethamine API; (b) RL Fine had been manufacturing pyrimethamine on a

commercial basis for the European and Asian markets; (c) RL had been inspected by FDA in

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

June 2015; and (d) because RL Fine did not have a pyrimethamine DMF, Cerovene was

amending its ANDA to include a new drug substance section for the RL Fine API.

37.     If Cerovene had been able to partner with Fukuzyu, which already had a

pyrimethamine DMF on file with FDA, the steps to filing a major amendment would have been

much simpler. Fukuzyu would have supplied a small batch of API for stability testing, and then

Cerovene would have been able to submit the amendment referencing the Fukuzyu DMF. I

would not have expected any follow-up questions from FDA because Fukuzyu's DMF was

already referenced in the Daraprim NDA. I estimate that it would have taken approximately four

months from the date Fukuzyu supplied API to then submit a major amendment naming Fukuzyu

as our supplier.

38.     In 2016 and 2017, RL Fine delivered a total of ██████████ of pyrimethamine

API to Cerovene. This amount was sufficient for Cerovene to conduct testing for its ANDA and

launch in the marketplace upon FDA approval of Cerovene's ANDA.

39.     On or around November 30, 2017, I travelled to India and meet with RL Fine

executives to finalize the commercial supply of pyrimethamine that Cerovene was expecting

from RL Fine. Mr. Mathew, the same senior executive at RL Fine with whom I met at

Cerovene's offices earlier in 2017, told me that RL Fine would no longer supply API to

Cerovene. I was surprised by this decision. Cerovene had a contract with RL Fine to supply

pyrimethamine API, and, before my visit to India, I had no reason to suspect that RL Fine would

not abide by its commitment. It was my understanding from that conversation that RL Fine had

decided not to supply pyrimethamine to anyone in the U.S. market.

40.     Losing RL Fine as a supplier introduced significant costs and risks to Cerovene.

Although RL Fine had already delivered enough pyrimethamine API (assuming approval came

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

before expiration of the API) to support launching Cerovene's generic Daraprim product, Cerovene was in a very difficult position because I now had to find another new API supplier. RL Fine became "radio silent" and provided no further support with respect to Cerovene's ANDA.

41.     The next time I spoke with RL Fine was in Bangalore, India, on or around February 25, 2020. I was visiting India again and wanted to see if RL Fine would change its mind about supplying pyrimethamine API to Cerovene. I met again with Mr. Mathew, and, surprisingly, I was told that RL Fine had no more problem supplying Cerovene with pyrimethamine API. Mr. Jacob did not provide any reason for this change. In April 2020, RL Fine supplied approximately ███ of pyrimethamine to Cerovene. That transaction occurred pursuant to the original pyrimethamine supply agreement that we had executed in 2016. Cerovene used some of the additional API that RL Fine delivered in April 2020 to manufacture more commercial batches of generic Daraprim product for sale in 2021. ███████

███████████████████████████

**4.  API-3**

42.     During 2018 and 2019, after RL Fine went radio silent, Cerovene continued to try to find an API supplier. █████████ API-4 ████████████ API-3 ███

██████████ In or around February 2019, █████████ API-4 ████

████████ API-3 ███████████████

███ API-3 ████████████████ API-4 ██████

█ API-4 ██████████

43.     On February 19, 2019, Cerovene executed a supply agreement for API-3 to supply pyrimethamine API if Cerovene received FDA approval to use API-3 as its API supplier. GX3266 is a copy of Cerovene's supply agreement with API-3 which I executed on behalf of

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Cerovene. ███████████ API-3 ███ API-3 ███████████ ███████████████ GX3266-003 (§ 2.4). Cerovene has worked with API-3 to validate its API manufacturing process, manufacture an exhibit batch per FDA requirements, and complete necessary stability studies. The FDA inspection process of API-3 is ongoing, and Cerovene is continuing to work towards qualifying API-3 as its pyrimethamine API supplier. ██ ███████████ Cerovene is using the API that RL Fine delivered in April 2020 to manufacture commercial lots of its generic product for sale in the marketplace in 2021 and 2022.

**B. Bioequivalence testing and sample procurement**

**1. ANDA applicants must demonstrate bioequivalence to the brand-name drug**

44.    To obtain approval for a new drug application for a brand-name drug, the applicant must include studies that show that the drug is safe and effective. An applicant submitting an ANDA does not need to repeat these studies. Instead, the applicant needs to demonstrate that the ANDA product is bioequivalent to the reference listed drug.

45.    Demonstrating bioequivalence ("BE") requires what are commonly known as bioequivalence studies ("BE studies"). In these BE studies, human subjects are given dosages of the proposed generic and the reference listed drug (RLD). Bioequivalence studies are typically done at a third-party clinical research organization. Once the study is successful, meaning it meets all of the criteria for demonstrating bioequivalence between the RLD and the test product, then that data can be submitted to FDA in the ANDA. This is the process Cerovene followed for its generic Daraprim product.

46.    For Cerovene's generic Daraprim ANDA, we estimated that five bottles of Daraprim RLD would be necessary for BE testing and associated regulatory requirements.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**2. In 2013, Cerovene easily acquired Daraprim RLD to conduct bioequivalence testing**

47.       In 2013, Cerovene purchased 9 bottles (100 tablets per bottle) of Daraprim RLD from ███████████, a mom and pop pharmacy ██████████████. Cerovene paid $10,350 for all nine bottles of Daraprim. GX3013 is the receipt from ██████████.

48.       Cerovene had no difficulties in acquiring Daraprim RLD in 2013. Cerovene has purchased RLD from ██████████ at various times. In general, it takes about one day for ███████ to provide RLD after Cerovene orders it. To the best of my recollection, it took approximately one day for ██████ to acquire the Daraprim RLD for Cerovene in 2013.

49.       Cerovene used the RLD that it acquired from ████████████ to conduct BE testing for its generic Daraprim product. For BE testing, the RLD has to be from the same batch. The nine bottles Cerovene acquired in 2013 were from the same batch. The results of the BE testing showed that Cerovene's generic product met the FDA's bioequivalence requirements. Cerovene's May 2014 ANDA submission included the results of this BE testing.

**3. In 2017, FDA required Cerovene to conduct new bioequivalence testing using RL Fine API**

50.       On December 26, 2017, FDA responded to Cerovene's major amendment naming RL Fine as its API supplier with a complete response letter. GX3270 includes a copy of the FDA complete response letter at pages 006 to 011. The complete response letter informed us that FDA was requiring new BE testing using the RL Fine API and an unexpired lot of the RLD. GX3270-008. This was the first time that FDA had told Cerovene that new BE testing would be required.

51.       Cerovene still had some bottles of Daraprim that it had bought from ███████ ██████ in 2013, but we could not use them for the new BE testing because they had expired.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

52.     The FDA's requirement that Cerovene conduct new BE testing using RL Fine's

API presented the only substantial issue with FDA approval of Cerovene's ANDA; it is my

understanding that Cerovene's ANDA was otherwise ready for approval.

**4. Unlike in 2013, Cerovene was unable to acquire five bottles of Daraprim RLD to
conduct new bioequivalence testing**

53.     I led Cerovene's efforts to acquire new Daraprim RLD. Cerovene believed it

would need a minimum of 5 bottles (100 tablets per bottle) of RLD to conduct new BE testing.

In contrast to my experience acquiring Daraprim RLD in 2013, it was extremely difficult to

acquire Daraprim RLD, and it was impossible to acquire the entire amount we believed we

needed for BE testing. I was very surprised at how difficult it was to acquire Daraprim RLD at

this time, given how easily I had acquired it from ███████████ in 2013. I spent 12 months,

basically the entirety of 2018, leading Cerovene's efforts to obtain 5 bottles of Daraprim RLD

for BE testing as requested by FDA.

54.     I wanted to acquire sufficient Daraprim RLD to conduct the required testing and

gain FDA approval as soon as possible. I reached out to a variety of different sources, including

individual pharmacists and procurement companies that specialize in sourcing RLD for BE

testing. RLD procurement companies provide price quotes for acquiring a specific amount of

RLD. In my experience, RLD procurement companies may promise that they can source RLD

even if they ultimately cannot. Other than reputation and prior experience working with an RLD

supplier, it is difficult to evaluate whether to believe any particular RLD procurement company's

promises to deliver RLD that is difficult to obtain. After promising that they can procure the

RLD, the companies often request a deposit (e.g., 50% or even 100% of the total cost) in

advance. In this case, several RLD procurement companies quoted prices far above the

wholesale cost of Daraprim and wanted significant deposits in advance. It is not economical for

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Cerovene to place deposits totaling hundreds of thousands of dollars with every RLD sourcing company that claims it can acquire a product.

55.     In general, and in this case in particular, I made decisions (often in conjunction with our marketing partner DRL) about which companies to work with and for how long based on my best understanding of whether they could actually deliver the requested Daraprim RLD.

56.     Cerovene first called ████████████████ on or about December 29, 2017. ████████████████ had provided the Daraprim RLD in 2013, but was not able to supply Cerovene with any Daraprim RLD in 2017.

57.     On December 30, 2017, Cerovene issued a purchase order to Espee BioPharma & FineChem LLC for five bottles of Daraprim at a price of $112,000 each. Espee never procured any Daraprim RLD for Cerovene, and Cerovene cancelled the purchase order on February 20, 2018. In January 2018, I tried to acquire Daraprim RLD from a company called Pharmaceutical Buyers Inc., but they too were unable to procure sufficient Daraprim RLD for my purposes. I even reached out to pharmacists I knew both in the United States and in Bangladesh, and they could not procure Daraprim RLD either.

58.     In February 2018, Cerovene and DRL engaged a company called Reliant Specialty to acquire five bottles of Daraprim RLD. Reliant represented that it could procure five bottles, and quoted a price of $110,000 per bottle. GX3562 includes a copy of the pro forma invoice Reliant sent to DRL and Cerovene on March 6, 2018. Cerovene prepaid $550,000 to Reliant for five bottles. Reliant's representations led us to rely on Reliant, as opposed to other RLD sourcing companies such as ProSupplier. We had evaluated ProSupplier as a source of Daraprim RLD, but decided to remain with Reliant because of Reliant's representations that it could get five bottles of Daraprim RLD.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

59.     On or about June 4, 2018, Reliant delivered one bottle of Daraprim RLD for $110,000. GX3099 is a copy from Cerovene's files of the invoice from Reliant. One bottle was not sufficient to conduct the BE testing that FDA was requiring. Cerovene and DRL continued to work with Reliant to attempt to acquire more Daraprim RLD, including RLD from the same lot as the one bottle that Reliant had delivered. In November 2018, Cerovene and DRL cancelled the order with Reliant for the remaining four bottles because Reliant kept promising but failing to deliver more Daraprim bottles.

60.     Cerovene and DRL worked diligently to acquire more Daraprim RLD to conduct the new BE testing FDA was requiring. Although the prices being quoted for Daraprim RLD were extremely high, cost was not the deciding factor in how we tried to source Daraprim RLD. To the contrary, I worked with various possible suppliers at the same time in an effort to source Daraprim RLD, and my primary criteria in continuing to work with a potential supplier was whether I believed that supplier could in fact supply Daraprim RLD in the quantity Cerovene needed.

61.     Because Reliant proved unable to acquire Daraprim RLD in sufficient quantities, we engaged a company called ProSupplier to source Daraprim RLD. DRL had worked with ProSupplier in the past. I decided that Cerovene would take on the financial burden of prepaying with both Reliant and ProSupplier. Cerovene and DRL ordered three bottles from ProSupplier. It is my understanding that ProSupplier could source only three bottles of Daraprim RLD. In or around September 2018, Cerovene transferred a prepayment of $375,000 for these three bottles to DRL, which in turn prepaid ProSupplier. In mid-November 2018, ProSupplier delivered three bottles of Daraprim RLD to Cerovene for a total price of $375,000. GX3259 is a copy of the ProSupplier invoice, which I kept in Cerovene's files.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

62.     The three Daraprim bottles from ProSupplier could not be combined for purposes

of BE testing with the one bottle that Reliant had supplied because Reliant's bottle was from a

different lot of Daraprim RLD. BE testing typically requires using RLD from the same lot. While

I would have preferred to purchase more, it was my understanding that ProSupplier could

acquire only three bottles.

**C.  Cerovene repeatedly tried to work with FDA regarding the new bioequivalence
      testing requirement in light of Cerovene's difficulties acquiring Daraprim RLD**

63.     On January 22, 2018, Cerovene asked the FDA to reconsider its requirement of

new BE testing. GX3016 is a copy of that correspondence, which I signed on behalf of

Cerovene. Based on my understanding at the time, I wrote that Daraprim RLD was difficult to

acquire because it was subject to a restricted distribution program. I asked FDA for permission to

use foreign RLD or expired RLD that Cerovene had in its possession from ███████████.

FDA denied those requests. GX3019 is a copy of that FDA denial. FDA also informed me that

Daraprim was not subject to a restricted distribution program for safety reasons and that the

restrictions on supply that I had described were not required by the FDA. GX3019-002.

64.     I wrote again to the FDA in July 2018 about our inability to acquire Daraprim

RLD. GX3017 is a copy of this letter to the FDA. I wrote, based on my understanding at the

time, that Daraprim appeared to be subject to a restricted distribution program. GX3017-003. I

further told the FDA that Daraprim RLD was inaccessible and unavailable in the United States.

GX3017-003. I accordingly requested a reduction in the amount of Daraprim RLD that the FDA

would require for the BE testing.  GX3017. I reiterated my request in a second letter to FDA in

August 2018. GX3018 is a copy of that letter from me to the FDA.

65.     The FDA eventually agreed in April 2019 that Cerovene could use less than five

bottles of Daraprim RLD to conduct BE testing and meet FDA requirements. GX3264 is a copy

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of the letter from FDA to Cerovene allowing Cerovene to use less than five bottles for BE testing and sample retention.

66.     Cerovene conducted BE testing between May and June 2019 using a finished dose product containing RL Fine API and the Daraprim RLD that ProSupplier had sourced. Cerovene's product passed the BE testing, and Cerovene submitted those results to FDA in September 2019. GX3269 is a copy of Cerovene's amendment to its ANDA including those results. I signed the amendment on behalf of Cerovene.

**D.  Cerovene's generic Daraprim product launched in 2020**

67.     FDA approved Cerovene's ANDA on February 28, 2020. GX3263 is a copy of the FDA letter to Cerovene approving the ANDA. FDA assigned Cerovene's product an AB rating with respect to Daraprim.

68.     DRL launched Cerovene's generic Daraprim (pyrimethamine) product in the United States in March 2020.

**IV. Cerovene did not consider the availability of compounded pyrimethamine or Bactrim when deciding to develop a generic Daraprim product**

69.     I am aware of the existence of compounded pyrimethamine. The existence of compounded pyrimethamine was not a factor in my decision to develop a generic Daraprim product. I am also aware of a product called Bactrim. The existence of Bactrim was not a factor in my decision to develop a generic Daraprim product.

70.     I expected launch of generic Daraprim would significantly reduce brand-name Daraprim sales. When a generic version of a brand name drug launches, brand-name sales will drop significantly over time. Within one to six months, the brand name product may lose 50 to 80% of its sales. Generics typically enter at a discount to the brand-name drug price. This same general understanding also applied to my understanding of Daraprim. That is, it was my

GX8011-018

**A-784**

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

understanding and expectation that entry of a generic Daraprim product would enter at a significant discount to the price of Daraprim and result in a sharp decline in the volume sold of Daraprim.

**V.  Cerovene uses IQVIA data in assessing market opportunities**

71.      I understand that IQVIA is the new name for a company formerly known as IMS, which provides data about brand-name drug sales. I have used IMS/IQVIA data in my work at Cerovene. I use IMS/IQVIA sales figures for a brand name product as part of deciding whether to invest time and money in developing a generic version of that product.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on October 20, 2021

/s/ Manish S. Shah_____
Manish S. Shah

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL TRADE COMMISSION; STATE OF
NEW YORK; STATE OF CALIFORNIA;
STATE OF ILLINOIS; STATE OF NORTH
CAROLINA; STATE OF OHIO;
COMMONWEALTH OF PENNSYLVANIA;
and COMMONWEALTH OF VIRGINIA,

*Plaintiffs*,

v.

VYERA PHARMACEUTICALS, LLC;
PHOENIXUS AG; MARTIN SHKRELI,
individually, as an owner and former director of
Phoenixus AG and a former executive of Vyera
Pharmaceuticals, LLC; and KEVIN
MULLEADY, individually, as an owner and
director of Phoenixus AG and a former executive
of Vyera Pharmaceuticals, LLC,

*Defendants*.

Case No. 20-cv-00706 (DLC)

ECF Case

---

**Direct Testimony of Martin Shkreli**

Due to a transcription error, the citation in Paragraph 67 should reference Trial Exhibit

DX497, rather than DX126.  Plaintiffs do not object to this revision.

DX546

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA, *Plaintiffs*, <br><br> v. <br><br> VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former officer of Vyera Pharmaceuticals, LLC and Phoenixus AG (formerly known as Turing Pharmaceuticals, LLC and Turing Pharmaceuticals AG); and KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC, *Defendants*. | Case No. 1:20-cv-00706-DLC |

## <u>DECLARATION OF MARTIN SHKRELI</u>

I, Martin Shkreli, declare that I have personal knowledge of the facts set forth herein and state as follows:

**I.**    <u>Background</u>

1.    My name is Martin Shkreli. I am 38 years old.

2.    I am a first generation American citizen. I am the second of four children of Pashko and Katrina Shkreli, who immigrated to the United States from Albania and settled in the Midwood section of Brooklyn, New York, where I was raised.

3.    From a young age, and throughout my high school years, I was fascinated by science and the financial industry, and in particular, biotech companies. While still in high school, at the age of 17, I was hired as an intern by the investment fund Cramer, Berkowitz & Co., founded

DX 546

by famed investor Jim Cramer, the host of "Mad Money" on CNBC. I continued working there through my college years, until April 2004.

4.　　　I attended Baruch College, where I continued to pursue my interest in finance and biotech. I graduated from Baruch in 2004 with a Bachelor's Degree in Business Administration.

5.　　　From 2004-2006, I worked as a healthcare and technology analyst for an established hedge fund, Intrepid Capital Management.

6.　　　In 2006, I left Intrepid Capital Management to found my own firm, Elea Capital Management LLC.

7.　　　In 2009, along with a friend and colleague, Marek Biestek, I founded a hedge fund called MSMB Capital Management.

8.　　　MSMB Capital Management's business focused on managing client assets, primarily in the healthcare investment field, including in the areas of drug discovery and development. As President and Chief Investment Officer, I was responsible for stock selection, portfolio management, investor communications, trading analysis, and other management-related matters.

9.　　　I have always had a passion for finding cures for rare diseases, and spent years after college studying drug trials, chemistry, and biopharmaceutical stocks. In late 2010, I began creating a start-up biopharmaceutical company aimed at developing pharmaceutical drugs to treat and cure rare diseases often ignored by large pharmaceutical companies.

10.　　　Around this time, I learned about a young boy who died from a form of muscular dystrophy. I began to focus on Duchene Muscular Dystrophy (DMD). DMD is a rare genetic disease that causes significant progressive muscle degeneration and weakness. It is caused by the absence of dystrophin, the protein that keeps muscle cells intact. Inspired by this story, I decided

to call the new biopharmaceutical company "Retrophin," combining the words recombinant and dystrophin.

11.      Despite having little formal training in biology, after reading volumes of academic publications and having discussions with leading experts in neurology and pharmacology, I wrote the genetic sequence for a new fusion protein incorporating recombinant dystrophin, hoping that it could one day be used to help people suffering from muscular dystrophy.  Based on my work, Retrophin worked to develop a new treatment for DMD.

12.      While at Retrophin, I served as CEO.  I was also a co-inventor of a pharmaceutical candidate to treat a disease called pantothenate kinase-associated neurodegeneration, or "PKAN."  PKAN is a rare neurological disorder characterized by the progressive degeneration of specific regions of the central nervous system.  It is normally diagnosed in early childhood and can lead to death. Along with two other colleagues, Dr. Andrew Vaino and Marek Biestek, I was awarded several issued patents for this treatment.   Retrophin conducted a Phase III trial for this candidate.  Our effort was the first-ever drug candidate discovered and developed for PKAN.

13.      During my tenure as CEO, Retrophin acquired the pharmaceutical Chenodal, a drug used to treat gallstones, and licensed the rights to Thiola, a drug used to prevent kidney stones in patients suffering from cystinuria, an inherited condition characterized by a buildup of the amino acid, cystine, in the kidneys and bladder.

14.      Retrophin raised the prices of both Chenodal and Thiola to bring them in line with other pharmaceuticals that offered comparable benefits, and to generate revenue for new drug development and discovery, including the potential treatment for PKAN.

3

II.    Turing/Vyera

A.    Founding of Turing

15.    I resigned from Retrophin in September of 2014, and, along with several other former Retrophin employees, founded a new pharmaceutical company, which we named Turing Pharmaceuticals LLC.  I personally invested approximately $18 million into Turing.  At around the same time, we also formed Turing Pharmaceuticals AG, which was Turing Pharmaceuticals LLC's parent company.

16.    Turing Pharmaceuticals LLC has since been renamed Vyera Pharmaceuticals LLC, and Turing Pharmaceuticals AG has been renamed Phoenixus AG.  I will refer to these companies as Vyera and Phoenixus throughout this declaration.

17.    From the date of Vyera's and Phoenixus' founding until December of 2015, I was the CEO of Vyera and a Director and Chairman of the Board of Phoenixus AG.  I never received a salary or any form of compensation from either company.

18.    Early on, I advised the Phoenixus Board of Directors that while I had been acting as Vyera's CEO, it was not a role that I planned or wanted to fill much longer, and urged the company to identify and hire a new CEO with greater pharmaceutical industry experience than I had.

19.    I recruited well-credentialed and experienced scientists at Vyera to conduct research and development ("R&D").  I personally recruited and hired Vyera's head of R&D, Eliseo Salinas, M.D.  Prior to coming to Vyera, Dr. Salinas had had 22 years of experience in the pharmaceutical industry, including as head of global R&D for Shire Pharmaceuticals, Chief Medical Officer at Adolor, and Chief Medical Officer-Head of Development at Elan Pharmaceuticals.  Dr. Salinas was assisted by approximately 8-9 scientists with Ph.Ds, including, to name just a few, Dr. Adam Brockman, a parasitologist with two decades of experience in the biopharmaceutical industry; Dr.

4

Matthew Welsch, a medicinal chemist; Dr. Steven Thomas, also a medicinal chemist and currently Chief Scientific Officer for ValenzaBio; and Dr. Wendy Cousin, who holds a Ph.D in life sciences and molecular and cellular aspects of biology, and is currently the lead scientist at Spring Discovery.

20.     Vyera also worked with WuXi AppTec, a global leader in contract research used by large and small biopharmaceutical companies. WuXi assisted Vyera with research and development related to toxoplasmosis, and WuXi and Vyera researchers worked to create the first x-ray crystallography images for pyrimethamine and toxoplasma gondii dihydrofolate and reductase (DHFR). Achieving this milestone was a fundamental step that had never been undertaken before, and was instrumental in creating a superior medicine to pyrimethamine.

21.     My co-founders and I envisioned that Vyera would engage in drug discovery, from the very basics of inventing new drugs to developing drugs that had been licensed from universities but had not yet reached human stage or developing drugs that pharmaceutical companies had put in human stage and then had abandoned.

22.     We also envisioned that Vyera would acquire pharmaceuticals that were established and older, or manufacture generic versions of established pharmaceuticals.

23.     In short, we believed that Vyera had the capability to do virtually anything in the pharmaceutical space that would benefit patients and create shareholder value.

24.     We observed that medium and large-sized pharmaceutical manufacturers often neglect older drugs. We saw opportunities to add shareholder value through licensing or purchasing these drugs and then improving distribution networks, focusing on patient outreach and education, and investing in R&D to improve these drugs or devise new and better treatments for the diseases they treat.

25.    Vyera's business development group focused on identifying lifesaving drugs in which Vyera should invest. This group, which consisted of between 10 and 15 people, was tasked with finding under-valued drugs that provided significant patient benefits for neglected disease states. The business development group cast a wide net, and was not focused on any one disease or pharmaceutical.

26.    Vyera's business development group was led by Patrick Crutcher and Michael Smith.

27.    Mr. Crutcher and Mr. Smith reported to me, but I was not involved in the day-to-day activities of the group.

**B.    Acquisition of Daraprim**

28.    In March of 2015, Patrick Crutcher reported that in his research he had discovered a drug called Daraprim that was prescribed to treat a rare disease known as toxoplasmosis encephalitis. Mr. Crutcher suggested that Vyera consider acquiring the rights to the drug. At the time, I had never heard of Daraprim.

29.    Toxoplasmosis encephalitis (which, for purposes of this declaration, I will refer to simply as "toxoplasmosis") is an infection caused by the Toxoplasma gondii parasite. Many people are infected with this parasite, and never know it. That is because, in healthy individuals, the immune system keeps the parasite in an inactive state and prevents it from causing illness. But in immunocompromised individuals, toxoplasmosis can cause serious illness and even death.

30.    I agreed with Mr. Crutcher's suggestion that we seek to acquire Daraprim, because I believed that Vyera could develop a better version of Daraprim with less severe side effects, while at the same time providing shareholder value. It was clear to me that Daraprim was

significantly undervalued, and that if Vyera could acquire the drug at the right price, the acquisition made sense.

31.     Vyera proceeded to engage in negotiations with the owner of Daraprim, Core Pharma, a subsidiary of Impax Laboratories.

32.     In August of 2015, Vyera bought Daraprim for $55 million from Core Pharma. Through that transaction, Vyera obtained the exclusive rights to manufacture and sell Daraprim in the United States.

### C.     The Price Increase and R&D

33.     After Vyera purchased Daraprim, it increased its price from $17.50 to $750 per pill. I authorized the price increase because I believed that Daraprim was significantly underpriced relative to other lifesaving medications such as drugs that treat hepatitis C (*e.g.*, Sovaldi and Harvoni), and HIV drugs. Much of the media attention following the price increase focused on the price of one pill. But when comparing drug prices, it is more instructive to compare the cost of an entire course of treatment. At $750 per pill, Daraprim compared very favorably to hepatitis C and HIV drugs when one considers the cost of a course of treatment. For example, a full course of treatment for hepatitis C costs approximately $80,000, whereas, at $750 per pill, a full course of treatment for toxoplasmosis costs approximately $40,000. And of those three diseases—hepatitis C, HIV, and toxoplasmosis—only one, toxoplasmosis, is rapidly fatal.

34.     I also believed that the price increase would allow Vyera to invest in R&D to create a new and better version of Daraprim. At that time, Daraprim had been commercially available for over 60 years. And, as far as I am aware, no research had been conducted to improve upon the drug or its delivery mechanism during those 60-plus years. This is significant because Daraprim, on its own, is highly toxic and must be taken in combination with another drug called leucovorin.

7

Adding a second drug to the treatment regimen can result in reduced adherence to the regimen. My vision was to make a combination pill containing both Daraprim and leucovorin.

35.     I believed that if Vyera were going to increase the price of the drug, it had an obligation to the patient community to invest the revenues from the price increase into research and development. This is why I never took a salary from Vyera or Phoenixus.

36.     I urged the company to invest revenues from the price increase into new drug development, including either a drug with an entirely new chemical composition, effective against toxoplasmosis, or a combination pill combining Daraprim and leucovorin. Led by a team of four-five doctors in the R&D department, Vyera focused its research and development efforts on making a better form of Daraprim. We were the first company to develop new toxoplasmosis drugs, including a new drug (TUR-006) that would obviate the need for sulfa drugs and thus remove the allergic complications that most HIV patients experience. We also had two papers published in the Journal of Medicinal Chemistry about these innovations.   *See* Hopper, Allen T., et al., *Discovery of Selective Toxoplasma gondii Dihydrofolate Reductase Inhibitors for the Treatment of Toxoplasmosis*, J. Med. Chem. 2019, 62, 1562-1576; Janetka, James W., et al., *Optimizing pyrazolopyrimidine inhibitors of calcium dependent protein kinase 1 for treatment of acute and chronic toxoplasmosis*, J. Med. Chem. 2020 June 11, 63(11), 6144-6163.

37.     I am proud of the fact that while I was at Vyera, the company developed the first ever toxoplasmosis-specific inhibitor of the enzyme DHFR. In fact, Vyera began work on this project even before the company acquired Daraprim. The drug even entered Phase 1 clinical development, a stage that few research projects attain.

38.     But I must accept the blame for the media firestorm that ensued following the price increase. Many people criticized Vyera, and me personally, for raising the price so dramatically.

In the course of defending the price increase, I gave interviews and made statements that reflected poorly on Vyera and its mission of curing rare diseases.  During my time in prison, I have had a lot of time to reflect upon my decisions and conduct during this time period, and regret many of my actions and statements.  I accept full responsibility for the price increase—which I still believe was the right decision for the company and the patient community—and also for the unfortunate negative publicity that Vyera received as a result.

39.    Daraprim was just one of over a dozen drugs that Vyera acquired or developed. These include: leronlimab, an antibody used to treat HIV (licensed from CytoDyn Inc.); intranasal Ketamine, which treats acute suicidality; Stiripentol, used for Dravet Syndrome, a severe encephalapothy affecting children; oxytocin, which treats autism; Vecamyl, used for malignant hypertension and spinal cord injury; two new toxoplasmosis drugs; four new medicines and new nucleic acid therapies for various rare diseases; and new, cheaper generic drugs.

**D.    Vyera's Sourcing of API**

40.    The active pharmaceutical ingredient (API) in Daraprim is a substance known as pyrimethamine.

41.    In order to manufacture Daraprim, it was necessary for Vyera to contract with an API supplier to manufacture and sell it pyrimethamine.

42.    I do not recall Vyera entering into any supply agreements while I was CEO of Vyera.

43.    After I left the company, I learned that Vyera signed a supply contract with a Japanese company called Fukuzyu.  I did not negotiate or sign, and am not familiar with any of the terms of, Vyera's contract with Fukuzyu.

46.     API supply is an area where I and the other founders of Vyera believed that Vyera could outperform Daraprim's prior owners. A company such as Core Pharma, and its parent company Impax Laboratories, have hundreds of drugs. Our view was that the larger pharmaceutical companies such as Core Pharma tend not to pay attention to details for certain of their drugs, such as ensuring API supply through a secondary supplier. For Vyera, which depended on Daraprim sales to generate revenue, having a back-up supplier was important to ensure both that it could continue to offer and make sales of Daraprim and that there would be no interruption in the supply of Daraprim to the patients who depend upon it.

47.     For these reasons, while I served as CEO of Vyera, I asked the manufacturing team to look into contracting with not only a primary supplier, but also a secondary supplier.

48.     That process was not completed by the time I left the company. Prior to my resignation, there had been discussions with an Indian company, Neuland Laboratories, about supplying Vyera with pyrimethamine. However, those discussions did not progress very far. In addition, Vyera's head of manufacturing, Dr. Hasmukh Patel, approached a second company, Ipca Laboratories, about supplying API in the United States, during the time that I was CEO. However, those efforts were ultimately unsuccessful, as Dr. Patel left the company in November or December of 2015.

49.     Two years later, in 2017, when I was no longer an employee of Vyera or director of Phoenixus, I became aware of another potential API manufacturer of pyrimethamine, an Indian

10

company named RL Fine.

50.    A representative of RL Fine approached a former Vyera employee, Edwin Urrutia, and informed him that RL Fine was working towards manufacturing pyrimethamine. That information was passed on to me through my attorney.

51.    Around that same time, I fortuitously learned in conversations with either Mr. Mulleady or Mr. Mithani—I cannot recall which one—that Vyera was already engaged in discussions with RL Fine.

52.    I informed Mr. Mulleady of what I had learned from Mr. Urruita, namely that RL Fine was working towards the manufacture of pyrimethamine.

53.    It was unknown to me then, and remains unknown to me now, whether Mr. Mulleady and Mr. Mithani already knew that RL Fine was working towards the manufacture of pyrimethamine.

54.    Regardless, I believed that it was important to inform Vyera management of this fact because I thought that it could mean that entry of a generic alternative to Daraprim was imminent, which would have a significant effect on my investment in the company. As a shareholder, I felt that my role was limited to conveying the information to management so that they could project when that entry might occur and make whatever decisions they thought appropriate to prepare for it--such as reducing the sales force. But any decision about what to do with the information was for Vyera management, not me, to make.

55.    RL Fine represented a potential secondary or back-up source of pyrimethamine for Vyera. I also thought that RL Fine could be a potential partner with Vyera in creating a combined drug containing pyrimethamine and leucovorin.

11

56.     I do not know what, if anything, Mr. Mulleady did with the information I provided him about RL Fine.  I later learned that Vyera approached RL Fine about purchasing pyrimethamine, and I counseled Mr. Mithani, who was inexperienced in such matters, on how to approach RL Fine on this subject and the possible partnership for a combination pill.

57.     I also know that at some point Vyera entered into an API supply agreement with RL Fine.  However, I did not negotiate that agreement, did not sign it, and have never seen it.

**E.     Vyera's Distribution of Daraprim**

58.     I also have very little knowledge concerning the specifics of Vyera's distribution of Daraprim, other than the fact that it is offered through specialty distribution, just as it was under its previous owner, Core Pharma.

59.     The distribution of Daraprim was handled by other Vyera executives who understood specialty distribution.

60.     I did not negotiate, did not sign, and am not familiar with any of the terms of any of the distribution contracts that Vyera entered into with distributors.

**F.     The Proxy Fight**

61.     In 2016, I was not satisfied that Vyera was moving in the right direction, and became concerned about the future of the company, which at that time was my largest investment. I was particularly frustrated by the way that Ron Tilles, who had been named interim CEO, was managing Vyera.  As a result, I organized a proxy fight to remove members of the Board of Directors of Phoenixus that I did not think were doing a good job, including Mr. Tilles.  The proxy fight was successful, and my slate of directors, which included Kevin Mulleady and Akeel Mithani, was elected.

62.     The proxy fight was totally unrelated to Vyera's sale and distribution of Daraprim.

12

63.     Despite the fact that my share ownership in Vyera allowed me to make changes to the Board of Phoenixus, I never used that power to affect in any way Vyera's distribution of Daraprim, its acquisition of pyrimethamine API for Daraprim, or its policies and practices related to reporting of data.

### G.     Generic Competition

64.     As a shareholder of Phoenixus, I viewed, and continue to view, my role as being limited to making suggestions to the company's management, and I understand that my suggestions need not be followed. Indeed, my suggestions to Vyera management often go ignored.

65.     One significant example of Vyera management ignoring my suggestions after I left the companies is their failure to follow my suggestion that Vyera develop an alternative to or a better form of Daraprim to treat toxoplasmosis.

66.     Ever since Vyera purchased Daraprim, I have anticipated the development of a generic competitor. My view, as I expressed to my Vyera colleagues, is that the only way to mitigate the impact of generic competition is to develop a new or better drug.

67.     In fact, I stated as much in a September 26, 2015 email to Vyera employee Ed Painter, who had asked me if an annual price reduction commitment might discourage generics from entering the market. As I told Mr. Painter, I do not think there is much that can be done to prevent generics from entering the market other than to introduce a new drug. Trial Ex. DX 126.

68.     As a result, when I was CEO of Vyera, I made sure that R&D was a core focus for the company. And Vyera employees spent a lot of time thinking about how to make a better version of Daraprim, which would block the DHFR enzyme. Specifically, a "new Daraprim" would block toxoplasma's DHFR enzyme but not the patient's DHFR enzyme, which is necessary for life. Daraprim does not do this now. Vyera successfully created such a molecule under my

watch, and this discovery was published in the prestigious peer-reviewed journal for discovery research, the Journal of Medicinal Chemistry.

69.     I explained my philosophy about R&D in a 2017 email to Tracy Seckler, the Chief Visionary Officer for Charley's Fund, a charity dedicated to developing life-saving treatments for DMD.  As I told Ms. Seckler, if a company increases the price of a pharmaceutical, as Vyera did, it needs to use the profits to fund lab research and develop a better drug.  Trial Exhibit DX 481. No company had ever focused on new drugs for toxoplasmosis before Vyera.  I envisioned using Daraprim as a platform to create drugs for a variety of neglected infectious diseases, including schistosomiasis, Chagas and viral diseases.

70.     After my resignation, I repeatedly advised and implored Vyera employees to continue this research.  But unfortunately, my advice went unheeded.  For several years after I left the company, the management had very little interest in R&D.  As a result, Vyera has not developed a new or better drug to treat toxoplasmosis.

71.     I am not aware of any plan by Vyera – which owned Daraprim for only four months before I resigned as CEO – to stop or slow a generic pharmaceutical company from manufacturing and selling a generic version of Daraprim, which I do not believe is possible.

**H.      Involvement in Vyera After February 2016**

72.     I only served as CEO of Vyera for approximately four months following Vyera's purchase of Daraprim.  I resigned as CEO of Vyera on December 17, 2015, following my arrest. I resigned as Chairman of the Board of Vyera on January 20, 2016, and as director on February 10, 2016.

73.     Since February 10, 2016, the only role I have had in Vyera or Phoenixus is Phoenixus shareholder.

14

74.     I am currently the largest shareholder in Phoenixus. I own approximately 32% of Phoenixus' outstanding shares, and have approximately a 43% voting interest.    As a large shareholder in Phoenixus, I am an active investor, and regularly ask questions of Vyera management and make suggestions to management on the direction of the company.

75.     Since leaving the companies, I have had very little knowledge of Vyera's manufacture, distribution, and sale of Daraprim, other than information I have received in my role as a large shareholder.  For example, I would often ask Vyera executives such as Nancy Retzlaff and Ron Tilles about sales figures for Daraprim, which were and are critical to my investment. But I have received only the type of information that any other large shareholder would be expected to receive.

76.     Since leaving the companies, I have not had the authority to make, and have not made, any decisions for Vyera or Phoenixus in any way relating to Daraprim (or for that matter, any other drug).

77.     As an active investor, I initially sought to have a continuing role in the direction of Vyera and Phoenixus after I had left the Board.  But Vyera's management made it clear that it did not want me to have any such role.

78.     In early 2016, Vyera management did not allow me to participate in meetings of Vyera's Senior Leadership Team (SLT).  Later that year, management denied my request for a consulting contract with Vyera, and completely shut me out of any role in the day-to-day operations of Vyera.

79.     Since leaving Vyera and Phoenixus in February 2016, I have been in contact with former Vyera employee Kevin Mulleady and current employee Akeel Mithani and, more recently, with Vyera's current CEO and General Counsel, Averill Powers.

80.    I have known Mr. Mulleady and Mr. Mithani for years and have considered both of them friends.  Following my resignation from Vyera, I have had many discussions and communications with both of them on various topics ranging from pop culture to personal matters to matters affecting Vyera.  From the time that Mr. Powers was promoted to interim CEO in December 2018, I have had a limited number of conversations with him, beginning in 2020.

81.    In the course of the many discussions I have had with Messrs. Mulleady, Mithani and Powers, I have made suggestions to each of them about Vyera, primarily relating to business development, in my role as a major shareholder in Phoenixus.  But no Vyera employee, including Mr. Mulleady, Mr. Mithani, and Mr. Powers, is required or bound to follow my suggestions.  In fact, more often than not they ignore, or at least do not follow, those suggestions.  This has been a continuing source of frustration for me.

## III.    The Future

82.    I do not know what the future holds for me after I am released from prison.  However, I expect that my conviction will significantly limit my future employment options.  I have considered pursuing opportunities both within and outside of the pharmaceutical industry.

83.    I am aware that I will need to work to rehabilitate my public image, so if I do pursue employment within the pharmaceutical industry, I am not interested in acquiring commercial assets or the day-to-day affairs of commercializing medicine.  Instead, I hope to continue playing a role in the discovery of cures and treatments for rare and life-threatening diseases.  I would like to return to the type of work I did when working on cures for DMD and PKAN, and focus on experimental and research-based opportunities related to discovery of new medicines and new uses for existing medicines.

I declare under penalty of perjury that the foregoing is true and correct.

16

Executed on October 5th, 2021

_____
Martin Shkreli

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL TRADE COMMISSION; STATE OF
NEW YORK; STATE OF CALIFORNIA;
STATE OF ILLINOIS; STATE OF NORTH
CAROLINA; STATE OF OHIO;
COMMONWEALTH OF PENNSYLVANIA;
and COMMONWEALTH OF VIRGINIA,

           *Plaintiffs*,

    v.

VYERA PHARMACEUTICALS, LLC;
PHOENIXUS AG; MARTIN SHKRELI,
individually, as an owner and former director of
Phoenixus AG and a former executive of Vyera
Pharmaceuticals, LLC; and KEVIN
MULLEADY, individually, as an owner and
director of Phoenixus AG and a former executive
of Vyera Pharmaceuticals, LLC,

           *Defendants*.

Case No. 20-cv-00706 (DLC)

ECF Case

---

**TRIAL TESTIMONY OF ANNE KIRBY**

FTC v. Vyera, et al.,
20-cv-00706 (DLC)

**DX-538**

Pursuant to 28 U.S.C. § 1746, Anne Kirby declares under penalty of perjury as follows:

1.      I am an adult resident of St. Petersburg, Florida, and I currently hold the role of Executive Vice President of Commercial and Operations for Vyera Pharmaceuticals, LLC ("Vyera").

**BACKGROUND**

2.      I received a bachelor's degree in business administration from the University of Akron in Akron, Ohio in 2003, and a master's degree in business administration ("MBA") with a concentration in strategic marketing management from the University of Akron in May 2004.

3.      After I received my MBA in 2004, I worked as a sales representative for Pfizer in Cleveland, Ohio, until August 2009.  At Pfizer I was responsible for sales of Norvasc (a calcium channel blocker used to treat hypertension and angina), Lipitor (a statin used to treat hyperlipidemia), Caduet (a combination of Norvasc and Lipitor), and Zithromax (a macrolide antibiotic used to treat a broad range of respiratory infections, skin infections, ear infections, and sexually transmitted diseases).  As a sales representative, I was responsible for calling on internal medicine and cardiology physicians in the Cleveland market to educate them about the use of and indications for those products.

4.      In August 2009 I left Pfizer to join Amgen, also in Cleveland, as a biopharmaceutical sales representative for approximately four years.  There, I was primarily responsible for educating physicians in the Cleveland area about Prolia, an injectable drug used to treat post-menopausal osteoporosis.

5.      I left Amgen in March 2013 to join CNS Therapeutics as a sales representative responsible for educating physical medicine and rehabilitation physicians in Ohio and western Pennsylvania concerning intrathecal Baclofen, a muscle relaxant administered by a fully

implantable pump and used to treat cerebral palsy, spasticity after stroke, and other muscle-related complications.

6.      In July 2014 I left CNS Therapeutics to join Innerspace Neuro Solutions, a medical device company, where I was responsible for educating physicians in Ohio, Michigan, and parts of Pennsylvania concerning a parenchymal intracranial pressure-monitoring system used to diagnose and monitor patients with traumatic brain injury.

7.      In the spring of 2015, Innerspace Neuro Solutions stopped commercializing its intracranial pressure-monitoring system and I began looking for other sales opportunities in the pharmaceutical industry. I learned that Vyera (then known as Turing Pharmaceuticals, LLC) was recruiting sales representatives to work through a third-party vendor, Alamo Pharmaceuticals ("Alamo"), to promote Vecamyl (mecamylamine HCI tablets), a prescription drug used to treat a rare form of hypertension called malignant hypertension, to spinal cord injury specialists. I did my own investigation of the drug and its indications, determined that it was a promising opportunity that would suit my background and experience, and applied for one of the sales representative positions through Alamo.

8.      I was hired by Alamo in June 2015 and began working as a sales representative on behalf of Vyera to call on physicians in Ohio, western Pennsylvania, and parts of Kentucky and Indiana in order to educate them concerning the indications for and use of Vecamyl.

9.      In the fall of 2015 I transitioned to become a full-time employee of Vyera. My first position as a Vyera employee was as a Key Account Manager for Vecamyl. In that role I continued to be responsible for calling on physicians in Ohio, western Pennsylvania, and parts of Kentucky and Indiana and educating them concerning the indications for and use of Vecamyl.

-2-

**Experience with specialty distribution of Vecamyl**

10.     Since Vyera acquired it, and continuing through the present, Vecamyl has been distributed through specialty distribution. Specialty distribution consists of distribution through specialty distributors and/or specialty pharmacies that carry medications that require special handling, address small patient populations, or are available at a higher cost. A specialty pharmacy, unlike traditional retail pharmacies, provides patients with higher levels of individualized service and care.

11.     I had experience with specialty distribution in the pharmaceutical industry before I joined Vyera. At Amgen, for example, my responsibilities including educating prescribers and their staff concerning the specialty distribution of Amgen's Prolia injectable drug product.

12.     In my experience (including my experience at Amgen with Prolia and my experience at Vyera with Vecamyl and Daraprim), specialty distribution offers significant benefits to manufacturers, prescribers, and patients, including contract management and price eligibility, more efficient inventory management, and better and more individualized services for prescribers and patients.

13.     Specialty distribution is particularly well suited, in my experience, for drugs that are used to treat a relatively small patient population that struggles with compliance or otherwise has difficulties taking the drug as prescribed, and for drugs that are higher cost.

14.     Vecamyl is an appropriate drug for specialty distribution, based on my experience, because it: a) is used to treat a very small patient population; b) involves complex dosing for patients that need significant assistance managing and taking their medications; and c) is relatively high-cost.

15.     When I began promoting Vecamyl on behalf of Vyera, it was distributed by Dohmen Life Science Services (now known as Eversana); Vyera subsequently transitioned specialty distribution of Vecamyl to Optime Care ("Optime"), which is also one of the distributors for Daraprim.

16.     When promoting Vecamyl to spinal cord injury specialists in 2015 and 2016, I explained to them the benefits of specialty pharmacy distribution and how they could use the Vecamyl specialty pharmacy to access insurance support and fulfill prescriptions of Vecamyl for their patients.

**Experience promoting Daraprim to hospital customers**

17.     In January 2016, my title was changed to National Account Manager to reflect the fact that my responsibilities with respect to Daraprim included working with hospital customers outside the Ohio and Pennsylvania areas, and I gained responsibilities for the product Daraprim, although I maintained some continuing responsibilities for Vecamyl as well.  With respect to Daraprim specifically, I worked with Vyera's Key Account Managers to promote Daraprim to hospital customers, including by meeting with hospital pharmacists and hospital pharmacy buyers to educate them concerning the indications for use, specialty distribution, and pricing of Daraprim.

18.     When I assumed the National Account Manager responsibilities for Daraprim in January 2016, I learned that it is a drug used to treat toxoplasmosis, caused by a very common parasite, *Toxoplasma gondii*, that typically causes no symptoms in patients with healthy immune systems but can cause life-threatening symptoms in immunocompromised patients such as those with HIV and AIDS, transplant recipients on immunosuppressant medication, and patients undergoing treatments for cancer.  I further learned that Daraprim (pyrimethamine) – used in

conjunction with a class of drugs known as sulfonamides (typically sulfadiazine) – is used to treat active toxoplasmosis infections, although it does not eradicate the infection in its latent form.

19.     I am aware that shortly after acquiring the United States rights to Daraprim from Impax in August 2015, Vyera increased the wholesale acquisition cost ("WAC") price of Daraprim from approximately $17.60 to $750 per tablet. This was consistent with my understanding of Vyera's business model at that time, which was to acquire drugs (like Vecamyl and Daraprim) that are used to treat serious but rare and neglected medical conditions and to use revenues from sales of those drugs to develop next-generation therapies for neglected diseases – including toxoplasmosis – that have limited treatment options and high unmet needs.

20.     I also learned in January 2016 that Daraprim, like Vecamyl, was in specialty distribution because it is also used to treat a small patient population and is relatively high-cost. In addition, because immunocompromised toxoplasmosis patients have historically struggled with compliance (meaning that they are less likely to take medication as prescribed), specialty distribution for Daraprim promotes patient compliance by offering a higher level of service and follow-up.

21.     ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████  ██  █████

██████████████████████  █  ████████████

██████████████████████████████

██████████████████████████████

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮

22.     Many of the discussions that I had with hospital customers during that period concerned pricing of Daraprim.  Although the WAC price of Daraprim was $750 per pill, this does not reflect the price paid by patients.

23.     More than half of Daraprim sales are to entities and organizations, including qualified AIDS Drugs Assistance Programs ("ADAPs"), that are covered by the Public Health Service Section 340B program and state Medicaid programs.  The price of Daraprim sold through the 340B program is only $0.01 per tablet.

24.     Other government customers (purchasing for the Department of Veterans Affairs and the Department of Defense) have access to Daraprim at Federal Supply Schedule pricing.  Presently, government customers can purchase 100-count bottles of Daraprim at $38,204.77 and thirty-count bottles of Daraprim at $2,978.21.

25.     For uninsured patients who do not qualify for the 340B program but who meet certain financial need criteria, Vyera provides Daraprim with no out-of-pocket expense under its Patient Assistance Program.

26.     Vyera also offers a Co-Pay Assistance Program that ensures that patients who have commercial (private) insurance are not obligated to pay anything out of pocket for their prescriptions of Daraprim.  Vyera also offers a Bridge Program that provides patients with Daraprim at no cost until any insurance benefits investigation has been completed.  The Bridge Program also serves patients who have been denied coverage for Daraprim through their

commercial insurance provider while an appeal is being presented on the patients' behalf to that insurer.

27.     Finally, prices paid by commercial payors are subject to negotiation and may be reduced by payor rebates, co-pay, and other applicable discounts.  As a result, the average net price paid per Daraprim tablet is less than 50% of the WAC price – and the average net price paid has declined steadily since the price increase in 2015, falling from an average net price of $305 per tablet in 2016 to $228 per tablet in 2019, and falling further still to $145 per tablet in 2020.

### Responsibilities as Director of Trade and Distribution

28.     In October 2016 I was promoted to Director of Trade and Distribution at Vyera. In that role I was responsible for maintaining the relationship with Vyera's distribution partners, as well as other trade partners, including Vyera's co-pay card vendor, sample management vendors, and returns processing vendor.  This included overall responsibility for maintaining Vyera's business relationships with its distribution partners and service providers, and for optimizing their ability to serve both the patients using Vyera's products and the healthcare professionals prescribing those products.

### Responsibilities as Chief Operations Officer and Chief Executive Officer

29.     In the spring of 2018 I was promoted to Chief Operations Officer of Vyera.  In that position I maintained my responsibility for managing the relationship with Vyera's distribution and other trade partners, and added responsibility for commercial analytics and operations.

30.     In the fall of 2018 I was promoted to Chief Executive Officer of Vyera, a position I held for approximately six months in anticipation of a corporate restructuring that Vyera was

contemplating at that time.  While I was Chief Executive Officer, I added oversight
responsibilities for human resources, sales and marketing, and IT.

### Responsibilities as Executive Vice President of Commercial and Operations

31.     When Vyera decided not to pursue the contemplated restructuring, I transitioned
in the spring of 2019 to my current role as Executive Vice President of Commercial and
Operations.  In that position I am responsible for managing the relationships with Vyera's
distribution and other trade partners, and for commercial analytics and operations at Vyera.

### SPECIALTY DISTRIBUTION OF DARAPRIM

32.     In October 2016, when I was promoted to Director of Trade and Distribution at
Vyera, I gained an understanding of Vyera's distribution practices for Daraprim, and of the
distribution practices that were already in place for Daraprim when Vyera acquired the product
in August 2015.

### Amedra's Placement of Daraprim in Specialty Distribution

33.     It is my understanding that in 2010 GSK sold the rights to sell and distribute
Daraprim in the United States to CorePharma LLC ("CorePharma"), and that CorePharma
subsequently transferred marketing responsibilities for the product to one of its affiliates,
Amedra Pharmaceuticals, LLC ("Amedra"), in 2012.  I further understand that between 2012 and
2014, Amedra increased the price of Daraprim to approximately $13.50 per tablet.

34.     It is also my understanding that in or around June 2014, Amedra decided to
transition Daraprim to specialty distribution.

35.     As discussed above, I already had significant experience with specialty
distribution when I became Director of Trade and Distribution in October 2016, including
through my experience detailing Prolia for Amgen and my experience detailing Vecamyl and

Daraprim for Vyera.  Based on that experience, I recognized that specialty distribution is

particularly well suited for drugs that are used to treat a relatively small patient population that

struggles with compliance, and for drugs that are higher-cost.  For those types of products,

specialty distribution offers significant benefits for manufacturers (including contract

management and more efficient inventory management) and for prescribers and patients

(including more individualized services and follow-up).

36.     In order to implement specialty distribution for Daraprim, Amedra contracted

with two specialty pharmacies, Walgreens Specialty Pharmacy ("Walgreens") and Integrated

Commercialization Solutions ("ICS") in February and March 2015, respectively.

37.     The agreements that Amedra negotiated with Walgreens and ICS permitted those

two distributors to sell Daraprim only to certain classes of authorized customers.  These

limitations are often referred to as "class of trade" provisions, and I understand that they are

frequently included in specialty distribution agreements in the pharmaceutical industry.

38.     Specifically, based on my review of records maintained by Vyera, I am aware

that Amedra entered into a Specialty Pharmacy Provider Distribution Agreement with Walgreens

on February 23, 2015.  Under the terms of that agreement, Walgreens was appointed as the

exclusive specialty pharmacy and was authorized to dispense Daraprim only to patients (defined

as "the person who will be treated with the Product") within the United States.  GX1042 at 003-

004.

39.     Based on my review of records maintained by Vyera, I am aware that Amedra

entered into a Distribution Services Agreement with ICS on March 2, 2015.

40.    In March 2015, Impax Laboratories, Inc. ("Impax") acquired Amedra's parent company, and, as part of the acquisition, Impax also acquired the right to distribute Daraprim in the United States.

41.    It is my understanding, based on conversations that I recall having with colleagues and distributors in my capacity as Director of Trade and Distribution, that Impax assessed whether to keep Daraprim in specialty distribution in March 2015 and decided to do so after concluding that traditional open distribution was not feasible for Daraprim because the extremely small patient population made traditional distribution inefficient and expensive.

42.    In other words, Impax inherited and implemented the specialty distribution system that Amedra had begun to put in place through its agreements with Walgreens and ICS. Under that system, Walgreens continued to have the exclusive right to distribute Daraprim directly to patients, and ICS had the exclusive right to distribute Daraprim to hospitals and government entities.  DX 418 at FTC-PROD-00013555.

43.    After Impax had completed the transition of Daraprim to specialty distribution, Impax sold the rights to market and distribute Daraprim in the United States to Vyera on August 7, 2015.  As part of the acquisition, Impax assigned to Vyera its rights and obligations under the Specialty Pharmacy Provider Distribution Agreement with Walgreens and the Distribution Services Agreement with ICS that Amedra had originally entered into on February 23, 2015 and March 2, 2015, respectively.  DX 351 (AMNEAL-CID-003164-3242).

44.    In addition, on August 5, 2015, Vyera, ICS, and Amedra entered into a letter of understanding, pursuant to which ICS consented to the assignment of the Distribution Services Agreement from Amedra to Vyera.  DX 350 (AMNEAL-CID-003033-034).

-10-

45.     Although Vyera inherited the specialty distribution system for Daraprim that

Amedra had implemented through the agreements with Walgreens and ICS, I would have

recommended Daraprim for specialty distribution even if I had been setting up the distribution

system from scratch.  Not only does specialty distribution help ensure patient compliance (and

therefore effective treatment), but due to the high cost of Daraprim, specialty distribution offers

important benefits for the manufacturer, patients, and prescribers, including contract

management, more efficient inventory management, assistance in obtaining insurance approvals,

and assistance for patients with respect to co-pay management.

46.     Although Vyera kept Daraprim in specialty distribution after acquiring it from

Impax, Vyera expanded that specialty distribution network significantly to include four

additional specialty distributors:  ASD Healthcare ("ASD") in September 2015, BioRidge

Pharma LLC ("BioRidge") in November 2015, Cardinal Specialty ("Cardinal Specialty") in

April 2017, and Optime in August 2018.  GX1563 (Distribution Services Agreement between

Vyera and ASD, dated Sept. 30, 2015); GX1031-003-009 (Distribution Agreement between

Vyera and BioRidge, dated Oct. 5, 2015); GX1045-030-048 (Specialty Pharmaceutical

Distribution Wholesale Purchase and Distribution Services Agreement between Vyera and

Cardinal, dated Apr. 1, 2017); GX1034 (Master Services Agreement between Vyera and Optime,

dated Aug. 6, 2018).  Vyera also added significant patient support services to its distribution

system for Daraprim by contracting first with Asembia, LLC (formerly known as Armada Health

Care LLC) ("Asembia"), and then with Optime to provide specialized patient support services, as

I describe in more detail below.

47.     Vyera also terminated the aspect of Amedra's contract with Walgreens that made

Walgreens the exclusive specialty pharmacy authorized to sell Daraprim to patients.  This action

-11-

resulted in a significant increase in the number of specialty pharmacies that could sell Daraprim to patients. GX 1448 at FTC-Vyera00267516.

48.    Vyera made the decision to expand the existing specialty distribution system that Vyera inherited from Amedra and Impax in order to ensure that patients were able to access Daraprim when they needed it.

49.    Like the agreements that Amedra had entered into with Walgreens and ICS, Vyera's agreements with ASD, BioRidge, Cardinal Specialty, and Optime include class of trade provisions typically found in specialty distribution agreements that permit each distributor to ship or sell Daraprim only to authorized customers. Each of these agreements, including the class of trade provisions included in each agreement, are described in more detail below.

50.    I am not aware of any instance in which Vyera coerced one of its distributors to include a class of trade provision in its agreement. I am also not aware of any instance in which one of Vyera's distributors requested (or received) assurances about class of trade provisions in Vyera's distribution agreements with other distributors. Again, class of trade provisions are common in specialty pharmaceutical distribution agreements, and they were included in Vyera's agreements with its distributors in the course of ordinary, bilateral, arm's-length commercial negotiations.

51.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
██████████████████████

52.    ████████████████████████████████████
████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████████

███████████

53.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████

### **Walgreens**

54.    As indicated above, Impax assigned to Vyera its rights and obligations under the
Specialty Pharmacy Provider Distribution Agreement with Walgreens that Amedra had entered
into on February 23, 2015.

55.    The original agreement that Amedra had entered into with Walgreens was
exclusive to Walgreens specialty pharmacies.  Walgreens was authorized to dispense Daraprim
from its specialty pharmacy locations (identified in Exhibit B to the agreement) only to patients

(defined as "the person who will be treated with the Product") within the United States. GX
1042 at 002-004; Exhibit B.

56.     Vyera entered into an amendment to the agreement with Walgreens effective
March 30, 2016 that removed the exclusivity provision such that Vyera could distribute
Daraprim through other specialty pharmacies in addition to Walgreens. The amendment also
amended the list of Walgreens community specialty pharmacy locations identified in Exhibit B
that were authorized to dispense Daraprim under the agreement. GX 1042 at 028; Exhibit B.

57.     Under the amended agreement with Walgreens, patients could fill prescriptions
for Daraprim through an authorized Walgreens community specialty pharmacy, or by bringing
the prescription to one of Walgreens' retail pharmacies where it would be triaged to one of
Walgreens' central fill distribution centers for home delivery.

58.     I am not aware of Walgreens ever requesting (or Vyera providing to Walgreens)
assurances about Vyera's distribution agreements with other distributors – including class of
trade provisions included in such agreements.

59.     I am also not aware of Walgreens ever requesting permission from Vyera to sell
Daraprim to an entity seeking to develop a generic version of Daraprim.

**ICS**

60.     As explained above, on August 5, 2015, Vyera, ICS, and Amedra entered into a
letter of understanding, pursuant to which ICS consented to the assignment of the Distribution
Services Agreement from Amedra to Vyera. DX 350 (AMNEAL-CID-003033-034).

61.     The class of trade provisions in the Distribution Services Agreement were not
amended by the parties after the Agreement was assigned to Vyera.

-14-

62.    ICS distributed Daraprim pursuant to the terms of the Distribution Services Agreement entered by Amedra and assigned to Vyera until that Agreement was terminated in February 2016 after Vyera began using BioRidge for 3PL and distribution services.

**Asembia and BioRidge**

63.    On October 2, 2015, Vyera entered into a Master Services Agreement with Asembia, and subsequently entered into a separate Distribution Agreement with Asembia's subsidiary, BioRidge, with an effective date of December 1, 2015.  DX 553 (Vyera_00464115-128); GX1448.

64.    I was not involved in the negotiation of these two agreements, but I am familiar with their terms because I became responsible for managing the agreements and the relationships with Asembia and BioRidge when I became Director of Trade and Distribution.

65.    Under the Master Services Agreement and two consecutive Statements of Work dated December 11, 2015 and February 1, 2017, Asembia contracted to provide specialty hub services and patient support program services to Vyera with respect to Daraprim, including Daraprim being distributed by BioRidge.  DX 554 (Vyera_00464133-155); DX 551 (Vyera_00395341-344).  The patient support program was designed to provide live patient support at critical times throughout patients' therapy and to simplify and streamline the referral process for prescribers.  DX 551 (Vyera_00395341-344).  As part of the hub services and patient support program, Asembia worked together with Vyera on an ongoing basis to build a network of specialty pharmacies (in addition to and including Walgreens specialty pharmacies) authorized to dispense Daraprim.  Asembia agreed to then oversee the distribution of Daraprim to those specialty pharmacies through BioRidge.  Asembia created a streamlined process for

-15-

prescribers to submit e-prescriptions or hard-copy prescriptions for Daraprim to Asembia and set up a dedicated toll-free number for patients and prescribers to call for questions and support.

66.     Upon receipt of a prescription for Daraprim, Asembia verified patient benefits, completed any missing insurance information, coordinated with the prescribers and their staff to obtain prior authorization approvals and triaged prescriptions to the most appropriate specialty pharmacy within the network established through the program.  Asembia also agreed to assist the prescriber in the appeal process in the event that a prior authorization request is denied.

67.     Asembia also helped patients enroll in Vyera's support programs when appropriate, including the Co-Pay Assistance Program, the Patient Assistance Program, and the Bridge Program.

68.     The Master Services Agreement with Asembia was terminated in April 2019 after Vyera transitioned the patient services program for Daraprim to Optime.

69.     Under the Distribution Agreement, BioRidge contracted to provide 3PL services (warehousing and shipping – the same services previously provided by ICS) and distribution services to Vyera with respect to Daraprim.  Specifically, BioRidge agreed to distribute Daraprim to the authorized pharmacies, clinics, and hospitals, including those identified in Exhibit A1 (which was updated on an ongoing basis) to the Agreement.  The list in Exhibit A1 to the original Agreement significantly expanded the number of specialty pharmacies to include not only the Walgreens specialty pharmacy network, but also eight other specialty pharmacies that had not been authorized to dispense Daraprim before Vyera acquired the drug and expanded the distribution network.  GX1448 at Exhibit A1.

70.     The Distribution Agreement with BioRidge was amended on March 15, 2016 to authorize BioRidge to also distribute Daraprim to ASD and to designated wholesalers and

-16-

specialty pharmacies that represent ADAPs eligible to purchase Daraprim through the 340B program. GX1292 at Ex. A2. The same amendment also provided that the parties would establish "a mutually agreed upon Network of entities qualified" to receive shipments of Daraprim from BioRidge, to be listed in Exhibit A1. GX1292 at 001.

71.     This is consistent with my experience that the list of specialty pharmacies to which BioRidge was authorized to ship Daraprim was updated on an ongoing basis on the advice of BioRidge (and of Asembia after it began providing hub services). We felt that BioRidge and Asembia had a good feel for the specialty pharmacies best suited to service patients in a given geographical area, so we typically followed their advice.

72.     The Distribution Agreement with BioRidge was amended on April 1, 2019, and the list of specialty pharmacies to which BioRidge was authorized to ship Daraprim was again amended to include only Walgreens specialty pharmacies, which was the only specialty pharmacy network that BioRidge was shipping to at that time because the patient services program had by then been transitioned to Optime. GX 1039 at 006.

73.     In at least one instance I recall, BioRidge shipped Daraprim to a specialty pharmacy that had not previously been identified by Vyera as an authorized pharmacy, and, on the advice of BioRidge, Vyera subsequently added that pharmacy – ReCept Pharmacy in Texas – to the list of authorized pharmacies to which BioRidge could ship Daraprim. GX 1031 at 028.

74.     Other than that one instance, I am not aware of BioRidge ever requesting permission from Vyera to ship Daraprim to any entity other than an authorized distributor designated by Vyera, and I am not aware of BioRidge ever requesting permission from Vyera to ship Daraprim to an entity seeking to develop a generic version of Daraprim.

-17-

75.     I am also not aware of BioRidge ever requesting (or Vyera providing to
BioRidge) assurances about Vyera's distribution agreements with other distributors – including
class of trade provisions included in such agreements.

**Smith Medical Partners**

76.     As described above, BioRidge contracted to provide 3PL (warehousing and
shipping) services for Daraprim in addition to distribution services under its December 1, 2015
Distribution Agreement with Vyera.  BioRidge then sub-contracted the Daraprim 3PL services to
a third-party vendor – Smith Medical Partners LLC ("Smith Medical").  Rather than continuing
to use BioRidge as a middleman with respect to 3PL services provided by Smith Medical, Vyera
decided to enter a direct contractual relationship with Smith Medical in order to have better
accountability and visibility in the Daraprim supply chain.  As a result, Vyera entered a Supply
Chain Services Agreement with Smith Medical, with an effective date of March 15, 2017.  GX
1038.  BioRidge's contractual obligations with respect to the distribution of Daraprim remained
as set forth in the December 1, 2015 Distribution Agreement, as amended.

77.     Pursuant to the Supply Chain Services Agreement with Smith Medical, including
the referenced Statement of Work, Smith Medical provided 3PL services to Vyera with respect
to Daraprim.  More specifically, Smith Medical agreed to provide warehousing for Daraprim and
to ship it to the next party within the supply chain – limited to "designated distributors, unless
directed otherwise by [Vyera]."  GX 1037-007.

78.     I was involved in the negotiation of this Supply Chain Services Agreement and
managed the Agreement after it was entered, including after ICS assumed Smith Medical's
obligations under the Agreement in October 2018.

79.     I am not aware of Smith Medical or ICS ever requesting permission from Vyera to ship Daraprim to any entity other than an authorized distributor designated by Vyera.

**ASD**

80.     Vyera entered a Distribution and Services Agreement with ASD, a division of ASD Specialty Healthcare, Inc., with an effective date of September 30, 2015.  GX 1045.

81.     I was not involved in the negotiation of this Agreement, but I am familiar with its terms and I became responsible for managing the agreement and the relationship with ASD when I became Director of Trade and Distribution.

82.     The Agreement authorized ASD to distribute and sell Daraprim only to Government Customers (defined to include the Department of Veterans Affairs and the Department of Defense) and hospitals.  GX 1045 at 006.

83.     There is nothing in the agreement with ASD that seeks to control or restrict what ASD's authorized Daraprim customers – including hospitals – do with the Daraprim they purchase from ASD.

84.     The Agreement with ASD was amended March 18, 2016 to authorize ASD also to sell Daraprim to any licensed wholesalers and specialty pharmacies that support certain state ADAPs (subject to prior written approval by Vyera).  GX 1045 at 025.

85.     The Agreement with ASD was amended again, effective December 4, 2018, to add "covered entities," as defined by Section 340B of the Public Health Services Act, as authorized customers to which ASD could distribute Daraprim under the Agreement.  GX 1033 at 001.

86.     It was then amended again, with an effective date of March 9, 2020, to ensure that all account types of 340B entities were included within the scope of authorized customers.  That

amendment also provided that new customers could be approved by Vyera by email. GX 1456 at 003.

87.     To the extent that requests were made by ASD to sell Daraprim to non-commercial customers not included on the list of authorized purchasers in the Agreement, those requests would not have been addressed by the commercial department but would have instead been routed to the medical or legal department for them to address, depending on the nature of the request.

88.     I am not aware of ASD ever requesting (or Vyera providing to ASD) assurances about Vyera's distribution agreements with other distributors – including class of trade provisions included in such agreements.

### Cardinal Health

89.     Vyera entered a wholesale drop-ship agreement with Cardinal Health dated April 13, 2016. Vyera entered the drop-ship agreement with Cardinal Health because Vyera received customer feedback from hospitals and ADAPs that Cardinal Health was their preferred distributor. The agreement authorized Cardinal Health to provide drop shipments of Daraprim to state ADAP agencies listed in Attachment A to the agreement, or to entities subsequently authorized by Vyera. GX 1026 at 003, 008.

90.     I was not involved in negotiating the drop-ship agreement with Cardinal Health, but I am familiar with its terms because I had responsibility for managing the agreement after I became Director of Trade and Distribution.

91.     Although the drop-ship agreement with Cardinal Health is technically still in place, most of Cardinal Health's Daraprim customers began accessing Daraprim through the

-20-

Cardinal Specialty agreement when that agreement was entered in April 2017. GX 1045 at 030, 048.

92.    I was involved in the negotiation of the agreement with Cardinal Specialty and with the management of the agreement after it was entered.

93.    The agreement authorized Cardinal Specialty to sell Daraprim to authorized classes of customers, including hospitals, ADAPs, and 340B entities. A complete list of approved classes of trade was included in Exhibit F, and sales to any other classes of trade require Vyera's prior approval. GX 1045 at 030, 048.

94.    There is nothing in the agreement with Cardinal Specialty that seeks to control or restrict what Cardinal Specialty's authorized Daraprim customers – including hospitals – do with the Daraprim that they purchase from Cardinal Specialty.

95.    The agreement with Cardinal Specialty expressly lists retail pharmacies (defined to include "any licensed pharmacy that is not a mail-order pharmacy from which a patient could purchase a drug without being required to receive medical services from a provider or institution affiliated with that pharmacy") as a nonapproved class of trade. This is intended to ensure that toxoplasmosis patients receive the higher level of service and follow-up that is provided by specialty pharmacies. GX 1045 at 048. Specialty pharmacies are able to help with compliance issues, and they can also help patients sign up for assistance programs such as a co-pay card if they cannot afford their medication. They can also help prescribers overcome insurance issues that they may face with a higher-cost product like Daraprim. Retail pharmacies typically do not offer comparable services for patients and prescribers.

96.    I am not aware of Cardinal Specialty ever requesting permission from Vyera to sell Daraprim to an entity seeking to develop a generic version of Daraprim.

-21-

97.     I am also not aware of Cardinal Specialty ever requesting (or Vyera providing to Cardinal Specialty) assurances about Vyera's distribution agreements with other distributors – including class of trade provisions included in such agreements.

**Optime**

98.     Vyera entered into a Master Services Agreement with Optime, effective August 6, 2018. GX 1034.

99.     I was involved in identifying Optime as a potential distribution partner, and I was actively involved in the negotiation and management of the Agreement with Optime.

100.    The "Account Management Business Rules" incorporated in the Master Services Agreement authorize Optime to distribute Daraprim to approved account types, including hospitals (for in-patient use or 340B-eligible out-patient use with a valid 340B identification), and ADAPs and health departments with a valid 340B identification, hospital distributors that supply a single hospital system, and corrections facilities. GX 1036 at 001. The Agreement does not authorize Optime to sell Daraprim to retail pharmacies for the same reason that Vyera does not authorize its other distributors to sell to retail pharmacies – retail pharmacies do not offer the level of patient and prescriber support that Vyera believes is appropriate for Daraprim. For the same reason, sales by Optime to specialty pharmacies are limited to specialty pharmacies approved in writing by Vyera as part of the authorized specialty pharmacy network. GX 1036 at 001.

101.    The Agreement with Optime also requires prior approval by Vyera for orders of more than three 100-count bottles of Daraprim, as well as approval if the account does not provide prescription-level information. GX 1036 at 001. I am not aware of any quantity limits incorporated in any of Vyera's agreements with distributors other than Optime. The reasons we

-22-

implemented quantity limits in the Agreement with Optime included concerns about whether Vyera and its distributors would have enough supply to meet patients' needs, and cash-flow concerns that would result from chargebacks incurred from the purchase of large quantities of Daraprim by 340B customers paying just \$.01 per pill. As a general matter, however, it was in Vyera's interests to monitor all of its Daraprim sales closely in order to avoid errors in ordering, pricing, and distribution, and in order to enhance patient and provider services by allowing sales representatives to follow up with prescribing physicians, and to avoid the resale of Daraprim within the wrong distribution channels (i.e., Daraprim sold at 340B prices resold to non-340B customers).

102.    As just one example, if a hospital orders a large quantity of Daraprim for its outpatient pharmacy to keep as stock, we would want to know about that for several reasons so that we could contact the hospital and confirm that the order was not an error. First, stocking large amounts of a high-cost and rarely used product like Daraprim exposes Vyera to a risk of future liability for returns. Second, and more importantly, hospital outpatient pharmacies do not have access to the same patient support services and programs provided by specialty pharmacies within the approved network and by the patient service providers that support them, so it is in the patients' best interests for them to obtain Daraprim from authorized specialty pharmacies that can provide the highest level of support.

103.    I recall one situation, for example, where we identified an ADAP contract pharmacy that was purchasing a significant quantity of Daraprim at WAC, despite the fact that it was eligible for 340B pricing. After reaching out to the pharmacy, Vyera was able to work with the pharmacy and one of Vyera's distributors, Cardinal Specialty, to arrange for the pharmacy to receive Daraprim at the appropriate 340B price.

-23-

104.    The separate Statement of Work for specialty pharmacy services incorporated in

the Master Services Agreement with Optime authorizes Optime to dispense Daraprim to patients

with a valid prescription.  GX 1048 at 001.  This is a standard provision in specialty pharmacy

service agreements to ensure that drug products are dispensed and used pursuant to a prescription

written by a prescribing physician.

105.    I am not aware of Optime ever requesting permission from Vyera to sell Daraprim

to an entity seeking to develop a generic version of Daraprim, either as part of its distribution

services or its specialty pharmacy services.

106.    I am also not aware of Optime ever requesting (or Vyera providing to Optime)

assurances about Vyera's distribution agreements with other distributors – including class of

trade provisions included in such agreements.

**Restrictions on Sales of Data to Third Parties**

107.    Based on my experience in the pharmaceutical industry, I am aware that there are

some firms, including IQVIA, Inc. (formerly known as IMS Health) ("IQVIA"), that make

pharmaceutical sales data available for purchase.  My understanding is that these firms operate

by purchasing sales data from pharmaceutical distributors, aggregating the data, then making it

available for purchase.

108.    In September 2017, Vyera amended its specialty distribution contracts with ASD

and Cardinal Specialty to add provisions that prohibited ASD and Cardinal Specialty from

selling Daraprim sales data to firms like IQVIA.  In exchange, Vyera agreed to make monthly

payments to ASD and Cardinal Specialty.  GX 1045-029 (Third Amendment to Distribution

Services Agreement between Vyera and ASD, dated Sept. 12, 2017); GX 1045-049 (Amendment

No. 1 to Specialty Pharmaceutical Distribution Wholesale Purchase and Distribution Agreement between Vyera and Cardinal Specialty, dated Sept. 30, 2017).

109.    I am not aware of any provisions restricting Vyera's distributors from selling sales data to third parties before these two amendments to the agreements with Cardinal Specialty and ASD were executed in September 2017.

110.    The primary reason that Vyera entered into these agreements was a concern that because Daraprim accounted for nearly all of Vyera's revenues, Daraprim sales data was effectively a proxy for Vyera's overall performance.  Members of Vyera's management team were concerned about too much information about the company's finances becoming public.

111.    In addition, a significant percentage (half or more) of Vyera's sales are to 340B customers and state Medicaid programs at a net price of just $.01 per pill, but the data transmitted to data aggregators is typically based on WAC pricing.  As a result, there was an additional concern that any data transmitted to data aggregators would be inaccurate with respect to price and total sales volume, potentially disadvantaging Vyera in negotiations with prospective commercial partners.

112.    Vyera amended its agreement with ASD in February 2020 to remove the data provision from the distribution agreement with ASD.  GX 1457.  This was done to reduce costs by eliminating the service fee owed to ASD under the terms of the amendment.

113.    For the same reason, in November 2020, Vyera amended its agreement with Cardinal Specialty to remove the data provision.  GX1458.

114.    Vyera's specialty distribution agreements with BioRidge and Optime never contained provisions restricting the sale of data to third-party data aggregators.

-25-

115.     BioRidge alone has accounted for the substantial majority of Vyera's sales of
Daraprim by volume during the relevant period.  Sales data regarding these transactions were
never subject to any agreements restricting sales to third-party data aggregators.

116.     Based on my experience in the pharmaceutical industry, IQVIA data and other
third-party pharmaceutical sales data for rare-disease drugs (and other drugs with small patient
populations), and for drugs distributed through specialty pharmacies, have always been
inherently unreliable and inaccurate.

**SALES OF DARAPRIM**

117.     In my role as Executive Vice President of Commercial and Operations, I regularly
receive and review reports of Daraprim sales from various sources.  I also had access to
historical sales data for Daraprim that Vyera obtained at the time of its acquisition of the product.

118.     That data shows a sharp drop in the amount of tablets sold on an annual basis after
the price increase was instituted in August 2015.

119.     After the initial sharp drop, annual tablet sales then remained relatively flat at
approximately 250,000 tablets per year from 2016 through 2019 before falling again to
approximately 165,000 in 2020 following generic entry.

120.     Although sales volume in units remained relatively flat between 2016 and 2019,
net sales revenue from Daraprim decreased during the same period from more than $77 million
in 2016 to just over $58 million in 2019.  This decrease was due to a decline in the net price per
tablet, resulting from the mix of customers purchasing the product and the discounts and rebates
they obtained.

**CERTIFICATION OF CERTAIN BUSINESS RECORDS**

121.     I make this declaration based on my personal knowledge and information

contained in the business records of Vyera, or confirmation with other responsible Vyera

personnel with such knowledge.  I personally reviewed the documents that have been labeled DX

265, DX 350, DX 351, DX 418, DX 419, DX 420, DX 421, DX 422, DX 423, DX 427, DX 428,

DX 429, DX 430, DX 432, DX 433, DX 434, DX 435, DX 436, DX 439, DX 440, DX 441, DX

442, DX 443, DX 444, DX 474, DX 475, DX 494, DX 495, DX 496, DX 497, DX 498, DX 499,

DX 500, DX 501, DX 502, DX 503, DX 504, DX 505, DX 506, DX 507, DX 508, DX 509, DX

510, DX 511, DX 512, DX 513, DX 514, DX 515, DX 516, DX 517, DX 518, DX 519, DX 520,

DX 521, DX 522, DX 523, DX 528, DX 551, DX 553, DX 554, GX 125, GX 1383, GX 3204,

and GX 3434 for purposes of this litigation (the "Vyera Business Records").  I certify, in

accordance with the requirements of Federal Rule of Evidence 902, that the Vyera Business

Records constitute records of regularly conducted business activity that were: (A) made at or

near the time of the occurrence of the matters set forth by, or from information transmitted by, a

person with knowledge of those matters; (B) kept in the course of the regularly conducted

activity; and (C) made by the regularly conducted activity as a regular practice.  Based on a

search of Vyera's records, I have determined that Vyera maintained a copy of the Vyera

Business Records in the ordinary course of its regularly conducted activities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 20, 2021                            */s/ Anne Kirby*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA, | |
| Plaintiffs, | |
| v. | Case No. 20-cv-00706 (DLC) |
| VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC; and KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC, | ECF Case |
| Defendants. | |

**TRIAL TESTIMONY OF KEVIN MULLEADY**

I, KEVIN MULLEADY, affirm the following to be true under penalties of perjury and provide this witness statement, based on my own personal knowledge, as my direct testimony in this action:

I.   **Background**

1.   My name is Kevin P. Mulleady, and I am 39 years old.

1

DX 545

2.      I am an Irish citizen who immigrated to the United States with my family when I was five years old.  My parents moved me and my two siblings to the United States in search of a better life, and we settled in Bayonne, New Jersey, where I grew up.

3.      In Ireland, my parents did not have much in the way of a formal education, and neither of them attended university.  Upon arriving in America, my father took a job as the superintendent at our apartment building in Bayonne, and my mother raised me and my siblings. Years later, my mother took a job bagging groceries at a local ShopRite, and at night took classes and studied to become a radiology transcriptionist.  Eventually, she took a job at a local hospital in New Jersey doing patient intake, where she still works to this day.

4.      Growing up, my family lived in a basement apartment in the building at which my father was the Superintendent.  During that time, I also worked in the building to help support myself and my family.  Typically, I would perform manual tasks to help my father, such as taking out the garbage three times a week for the 40 apartments in the building, sweeping, and helping address day-to-day tenant problems.

5.      I excelled academically in high school and was fortunate enough to be accepted to Rutgers University.  When I was accepted, my parents' combined income was insufficient to afford the tuition at Rutgers.  I was able to attend only because of an academic scholarship and generous financial aid that I received.  I also had to work multiple jobs to help support myself through college.  I was proud to have received my bachelor's degree in mechanical and aerospace engineering in 2005, as a first-generation college graduate.

6.      Throughout my life, I have always been interested in the entrepreneurial side of business. After graduating college in 2005, I decided to pursue that interest and seek out a career in finance while hopefully being able to use my engineering degree to set me apart from other

candidates.  As a first step in my pursuit, I took an entry-level position as an intern on the equity

trading floor at an international bank in London.  In that position, I learned the basics of equity

trading and rotated through various trading desks.

7.      While my experience at the bank was a good one, it was not as fulfilling as I had

hoped, and I left that position later in 2005.  Thereafter, I took a break from finance and accepted

an opportunity to be a real estate broker in London.  I worked in in real estate in London until

approximately 2007.  My experience in real estate was exciting, but it ultimately confirmed for

me that I wanted to get back into something more finance-related.

8.      In 2007, I accepted a position as a financial advisor at Worldwide Wealth

Management in New York.  As a financial advisor, I worked on financial planning, primarily for

physicians, which included setting up defined benefit plans and other financial products for

clients.  In 2008, I left Worldwide Wealth Management for a better opportunity.

9.      In 2008, I began working as a financial advisor to individuals and companies at

Citi Smith Barney in New York.  I started developing my client list while there, and was able to

continue to expand my client relationships when the company was acquired and became Morgan

Stanley Smith Barney ("Morgan Stanley").  I was very successful as a financial advisor at

Morgan Stanley and was one of Morgan Stanley's top performers in the country, as measured

against others with my length of service, and spoke at training programs for new advisors.  I was

also awarded bonuses for being a "Level 1" advisor.  I worked at Morgan Stanley until I left in

2011 to begin what I thought would be a better opportunity for me at a hedge fund.

## II.     MSMB Capital and Retrophin

10.      I was introduced to Martin Shkreli by a mutual acquaintance while l was working

at Morgan Stanley.  In 2011, Mr. Shkreli offered me a job at a hedge fund he had founded,

MSMB Capital Management ("MSMB"). In or around March 2011, I was hired as Chief Operating Officer at MSMB. My primary responsibility at MSMB was raising capital; specifically, locating potential investors for the fund. In that position, I reported to Mr. Shkreli, who was the general partner of MSMB.

11.     While I was at MSMB, Mr. Shkreli started a separate company called Retrophin, Inc. ("Retrophin"), which was focused on treatments for rare diseases. At Mr. Shkreli's request, I performed some limited tasks at Retrophin, and he provided me with so-called "founder" shares in the company. However, I did not have an official title or formal role at Retrophin. Nor did I have any responsibility for the business or operations at Retrophin, and was not involved in any way with Retrophin's efforts to market any pharmaceutical products. In or around February 2013, I left MSMB in order to pursue other opportunities, and ceased doing any work related to Retrophin.

## III.   Initial Employment at Vyera

12.     After leaving MSMB, I explored a number of different opportunities, including forming my own wealth management firm. In late 2014, however, Mr. Shkreli asked me to join a new pharmaceutical company he had started called Turing Pharmaceuticals LLC ("Turing"). At around the same time, Mr. Shkreli also formed Turing Pharmaceuticals AG, which was Turing's parent company.[1] I decided to join Turing, now Vyera, in late 2014, even though I did not have a pharmaceutical background because I saw it as an exciting opportunity at a new company that would benefit many patients and it appealed to my entrepreneurial business interests.

---

[1]     Turing Pharmaceuticals LLC has since been renamed Vyera Pharmaceuticals LLC ("Vyera"), and Turing Pharmaceuticals AG has been renamed Phoenixus AG ("Phoenixus"). I will refer to these companies as Vyera and Phoenixus throughout this affidavit.

4

13.     During my initial period of employment at Vyera, I was a Managing Director.  I was not considered a member of the Senior Leadership team at the company and did not have a leadership position at that time.

14.     During the 2014 to 2015 time period, I worked on a variety of largely administrative tasks as requested, but did not have much, if any, input on the business side of the company, including anything to do with the acquisition of pharmaceutical products.  Rather, during that time, I was primarily trying to learn a business and industry with which I was not familiar and help wherever I could in the company.  My responsibilities at that time included operations such as finding office space, performing various administrative tasks, and assisting in whatever ways I could.

15.     I was a Vyera employee at the time that it acquired Daraprim, but was not involved with or responsible for the decisions to acquire Daraprim, raise its price, or the company's decision to keep it in specialty distribution.  I did not participate in, negotiate, execute, or authorize the August 7, 2015 Asset Purchase Agreement between Impax and Vyera by which Vyera acquired the rights to Daraprim.

16.     Near the outset of my employment at Vyera in late 2014, I had the opportunity to invest personally in the company.  I took advantage of that opportunity and invested $1.5 million of my own personal funds into Turing Pharmaceuticals AG, as Vyera's parent company was then known.  As a result of that investment, I became an equity shareholder in what is now Phoenixus. I continue to hold those shares today.

17.     I was terminated from Vyera in or around June 2016, as part of the company's cost-cutting efforts.

5

IV.    **Prospero**

18.    In May 2015, during my initial tenure at Vyera, I was inspired to start my own

pharmaceutical company, Prospero Pharmaceuticals, LLC ("Prospero").  Prospero is a small

biotechnology company developing therapies for unmet medical needs in orphan diseases, which

are usually defined as conditions that affect fewer than 200,000 people nationwide.  Prospero has

no employees or facilities.  Nearly all, if not all, of the work at Prospero is handled by myself.  I

am also the majority shareholder and CEO of the company.  Mr. Shkreli has a small interest in

Prospero.  He loaned approximately $150,000 to the company in exchange for a convertible note

that, contingent on certain future events, could be converted into a very small equity position in

the company.

19.    Currently, Prospero is working on two potential drugs.  First, Prospero licensed

the rights to develop a generic version of Thiola to another pharmaceutical company.  Thiola is a

drug that helps prevent the formation of one type (cystine) of kidney stones.  Prospero has no

rights concerning how that drug -- should it successfully come to market -- is marketed, priced,

supplied, or distributed.  In exchange for licensing its rights to a generic version of Thiola,

Prospero received an up-front payment and a royalty of future sales for up to six years from the

first sale of the product.  Neither Prospero nor I have any decision-making authority in the

development, marketing, or distribution of any generic version of Thiola that the company

Prospero partnered with may bring to market.  Neither I nor Prospero have ever had, nor

currently have, any plans, or ability, to place a potential generic version of Thiola into specialty

distribution.  As of now, there is one generic version of Thiola that has successfully entered the

market.  Teva Pharmaceuticals launched a generic version of Thiola on May 17, 2021.  Although

I remain optimistic, it is neither certain nor clear when the generic version of Thiola will enter the market, or that it will, in fact, ever successfully enter the market.

20.     The second potential drug that Prospero will seek to develop concerns a potential treatment for Pantothenate Kinase-Associated Neurodegeneration ("PKAN"). Prospero owns the patent for a new chemical entity that can potentially treat PKAN. To date, Prospero has not undertaken the necessary steps to file a New Drug Application ("NDA") for this chemical compound. I believe that it will take Prospero at least three or four years of clinical trials and other testing before it will be in a position to know if this chemical compound is safe and successfully treats PKAN, and whether an NDA can be filed. Thereafter, of course, there are a number of regulatory steps before Prospero could bring the product to market. Thus, at best, Prospero is years away from bringing this product to market. At no point have I or Prospero had -- nor do we currently have -- any plans to place this potential treatment for PKAN into specialty distribution.

21.     Prospero is not currently working on any other drugs or chemical compounds. Nor does it have any plans to develop any other drugs or chemical compounds at this time. Other than my limited role in connection with Daraprim, I have never had any plans to put any drugs (or chemical compounds), or searched for any drugs (or chemical compounds) to place, into specialty distribution through Prospero or any other company.

**V.     Second Employment at Turing/Vyera**

22.     After I was terminated from Vyera in June 2016, I did not have any role or position with the company other than as a small minority shareholder until June 2017. At that time, I was elected to the Board of Directors of Phoenixus (the "Phoenixus Board"). Mr. Shkreli asked me to join a slate of candidates for the Phoenixus Board that he was going to propose for

election.  Given that I had invested a large amount of my own money in Vyera, I agreed to be on

the slate of candidates for the Phoenixus Board.  I did so because I thought that I could add value

as a Phoenixus Board member, and because it would allow me to be involved with what was a

large personal investment.  Our slate of directors won election to the Phoenixus Board in June

2017.

23.     After I was elected to the Board, the Phoenixus Board, voted to remove the then-

current CEO, Dr. Eliseo Salinas.  Thereafter, Mr. Mithani and I were named to an Executive

Committee of the Phoenixus Board (the "Executive Committee").  Given the lack of a CEO at

the time, the Phoenixus Board determined that the Executive Committee would perform various

senior management day-to-day functions for Vyera.

24.     The Phoenixus Board elected me as its Chairman in November 2017.  Around that

same time, I also volunteered to take on the role of CEO of Vyera on an interim basis, and the

Phoenixus Board appointed me to that role.  I was subsequently made Vyera's CEO on a

permanent basis in January 2018.

25.     I served as Vyera's CEO from January 2018 through February 2019, at which

point I left the role, though the Phoenixus Board did subsequently vote to terminate me as CEO.

Although I was no longer CEO, I continued as Chairman of the Phoenixus Board.  Thereafter I

was a consultant to Vyera from March 2019 to March 2020, but my consulting agreement was

not renewed after its term ended.  I have not held any employment or consulting position with

either Vyera or Phoenixus since March 2020, though I remained in the position of Chairman of

the Phoenixus Board until later that year.

26.     At a meeting of the Phoenixus Board on November 17, 2020, the other members

of the Phoenixus Board voted to remove me as the Chairman.  Prior to that meeting, I had

circulated an agenda for that meeting to the Phoenixus Board that included an item for discussion concerning Mr. Shkreli's continued involvement with Vyera and Phoenixus. However, at the meeting, none of the items on the agenda I circulated were discussed because before I could raise any of the items on the agenda, another board member called for a vote to remove me as Chairman. I was thereafter removed from that position.

27.     At that same November 17, 2020 meeting, the other members of the Phoenixus Board informed me that Mr. Shkreli had called for an Extraordinary General Meeting of the Phoenixus shareholders ("EGM") at which a vote would be taken to remove me and Edwin Thomas from the Phoenixus Board entirely. On December 11, 2020, an EGM was held, and Mr. Thomas and I were removed from the Phoenixus Board. Since December 11, 2020, I have not had any involvement with Vyera or Phoenixus other than as a shareholder of Phoenixus.

## VI.     Current Employment

28.     I am currently unemployed and transitioning between jobs. The burdens of, and time devoted to, defending this litigation, as well as the unfortunate negative publicity that has been associated with the litigation, has hindered my career progression.

## VII.     Vyera's Decision to Acquire Daraprim, Increase its Price, and Keep it in Specialty Distribution

### A.     Decision to Acquire Daraprim

29.     I understand that in or around August 2015, Vyera purchased the rights to market and distribute Daraprim in the United States from Impax Laboratories, LLC ("Impax").

30.     I was not involved in the decision to acquire Daraprim, nor was I involved in the discussions or negotiations about acquiring the rights to Daraprim, and I do not recall the specifics of Vyera's acquisition of those rights.

31.     Although I was not involved with its acquisition, I do recall learning at some point that Daraprim was a drug that treated a rare disease known as toxoplasmosis, which primarily affected immunocompromised individuals and pregnant women.

**B.    Decision to Raise Price of Daraprim**

32.     I understand that shortly after acquiring the rights to market Daraprim in the United States from Impax in August 2015, Vyera increased Daraprim's list price from approximately $17.60 to $750 per tablet.

33.     I was not involved in the decision to raise the price of Daraprim. From my recollection and understanding, Mr. Shkreli was responsible for the decision to raise the price of Daraprim.

**C.    Decision to Maintain Daraprim in Specialty Distribution**

34.     I also understand that Vyera sold Daraprim through what is commonly called a specialty distribution system. My general understanding of a specialty distribution system is a system that confines the distribution channel for a pharmaceutical drug to a single or small number of distributors.

35.     My recollection and understanding is that when Vyera purchased the rights to Daraprim in 2015, the drug was already being sold by Impax through a specialty distribution system, which Vyera then inherited. Given my limited role at Vyera at the time, I was not involved in the process of the decision to maintain the specialty distribution system for Daraprim that Vyera inherited, or in setting up Vyera's specialty distribution system for Daraprim. However, I understood at that time that it was a priority for the company to ensure that a distribution system was established for Daraprim and Vecamyl -- which was a drug that treated hypertension that Vyera also sold. My recollection and understanding is that Michael Smith and

10

Nancy Retzlaff were primarily responsible for establishing Vyera's distribution system for Daraprim.

36.     The only very limited involvement that I can recall having in setting up a distribution system for Daraprim is that I exchanged some e-mails concerning preliminary discussions in 2015 about draft agreements with a potential distributor for Daraprim, but none of those agreements were ever executed by Vyera.  Specifically, I recall a series of emails in June 2015 with Vyera employees Nancy Retzlaff, Michael Smith, and Howard Dorfman, and Rob Osborne, an executive at Express Scripts, Inc. ("Express Scripts"), concerning certain draft "boilerplate" distribution agreements Mr. Osborne sent for Vyera's review.  [GX 1218.]  These draft agreements were potential agreements with Express Scripts for the distribution of Vyera's products.  My understanding is that these boilerplate agreements were standard in the industry and were not specific to Daraprim.  It did not occur to me that anyone might question Vyera maintaining a specialty distribution system for its products or the boilerplate agreements Mr. Osborne sent because the pharmaceutical industry veterans at the company, including Ms. Retzlaff, who had decades of pharmaceutical experience, were leading the efforts relating to the specialty distribution system at the time.

37.     I was not responsible for negotiations or discussions with Express Scripts concerning these agreements or any aspect of the contemplated distribution systems.  Rather, I recall being copied on these e-mails as part of my efforts at the time to assist in ensuring that the team at Vyera executed on the plans that others at the company had decided to follow.  It was in that context that I responded to Mr. Osborne's email by asking our legal counsel, Howard Dorfman, to "take the contracts lead," and stating that reviewing and commenting on the contracts was the "#1 priority of Turing and exceptionally time sensitive."  [GX 1218.]

38.     I do not recall why I referred to the contracts as the "#1 priority" of Vyera.  I was still relatively new to Vyera at the time, and was trying to add value by being a "squeaky wheel" to help move the process along.  Having Vyera's legal counsel take the contracts lead in setting up Vyera's distribution system seemed to me to be the reasonable next step in the process.  I do not recall having any further involvement wither either the potential distribution agreements with Express Scripts, or any other distribution agreements at Vyera.  I do recall, however, that nothing ever came of the proposed relationship with Express Scripts -- Vyera never entered into any of the agreements Mr. Osborne sent to us and which I asked Mr. Dorfman to review, or any distribution arrangements with Express Scripts.

## VIII.    API Supply Agreements

39.     I understand that Plaintiffs in this litigation contend that Vyera entered into supply agreements for pyrimethamine -- the active pharmaceutical ingredient ("API") in Daraprim -- that were unlawful, specifically, Vyera's supply agreements with Fukuzyu Pharmaceutical Company, Ltd. ("Fukuzyu") and RL Fine Chem, Pvt. Ltd.("RL Fine").  I did not negotiate, execute, or authorize the supply agreement with Fukuzyu, and though I was involved in the RL Fine negotiations, that agreement was entered into to ensure Vyera had a back-up API supplier and to help diversify its product mix.

### A.    Fukuzyu Agreement

40.     Although I was not employed at Vyera at the time, I understand that Vyera entered into an agreement with Fukuzyu to procure pyrimethamine in January 2017.  To my knowledge, this agreement was signed by Vyera's CEO at that time, Ron Tilles.  I was not employed by Vyera when the agreement with Fukuzyu was executed.  As a result, I was not involved in the negotiation, execution, or approval of the supply agreement between Vyera and Fukuzyu.

12

**B.     RL Fine Agreements**

41.     When I took over as interim CEO and Chairman of the Board in 2017, Fukuzyu was the only entity that Vyera had a supply agreement with for the supply of pyrimethamine. Daraprim sales were the primary source of revenue for Vyera during the time I was at the company.  Therefore, a disruption to the supply of the API that Fukuzyu provided to Vyera to manufacture Daraprim posed a tremendous risk to the company and its viability.

42.     The risk of a disruption to the supply of pyrimethamine was not hypothetical. The United States Food and Drug Association had previously banned imports of other pyrimethamine suppliers, such as Ipca Laboratories, Ltd. ("Ipca"), due to manufacturing deficiencies.  The January 2015 Ipca import ban demonstrated to me and others at the company that Vyera could not rely solely on Fukuzyu for its supply of the API needed to manufacture Daraprim.  I was concerned that if Fukuzyu had suffered any type of catastrophe at its plant, any supply chain disruptions, or an import ban, then Vyera's ability to produce and sell Daraprim would be threatened or entirely disrupted.  Given these realities, and Daraprim's importance to Vyera, I and others at the company thought it was prudent to secure a backup supplier for pyrimethamine.

43.     I do not recall when I was first involved in discussions about the need or desire for a backup API supplier, or who first raised the idea.  I do recall, however, that even prior to my return to the company in 2017, Vyera considered entering into a backup or secondary API supply agreement, including, I believe, with RL Fine.  Indeed, as I understand it, it is common practice in the pharmaceutical industry to have a backup API supplier.

44.     When I was interim CEO of Vyera, Mr. Mithani and the business development team lead the search for a potential backup API supplier.  My general recollection is that I first learned of RL Fine and its efforts to manufacture pyrimethamine at some point in 2017, when I

13

learned that several former Vyera employees attended a Drug, Chemical & Associated Technologies Association ("DCAT") networking event that RL Fine also attended. My recollection is that I learned that RL Fine informed Ron Tilles and others that pyrimethamine was on its list of products coming to market. I do not recall exactly how or from whom I learned about RL Fine and its interest in manufacturing pyrimethamine, but I do generally recall that Mr. Shkreli passed along this information to someone at Vyera.

45.     At some point after I first learned about RL Fine and its efforts to manufacture pyrimethamine, Mr. Mithani reached out to RL Fine to determine how far along it was in its development process concerning pyrimethamine. As a result of that outreach, I understood that RL Fine was close to filing a Drug Master File ("DMF") for the sale of pyrimethamine in the United States. Therefore, Vyera decided to pursue RL Fine as a potential backup supplier.

46.     Mr. Mithani and I were the primary individuals involved in the negotiations with RL Fine. Our negotiations included trips to India to meet with the executives at RL Fine, as well as the private equity firm -- the Mape Group -- that had recently purchased all or a majority interest in RL Fine. I personally traveled to India and while there negotiated with RL Fine, executives at the Mape Group, and took a physical tour of RL Fine's manufacturing facility. While my tour of the manufacturing facility was not intended to substitute for all of the due diligence that Vyera might want to conduct of RL Fine in the future, my tour was an important step to ensure that RL Fine was a legitimate operation with actual manufacturing facilities.

47.     In addition to our efforts to secure RL Fine as a potential backup API supplier for Vyera, we also sought a robust relationship with RL Fine that went beyond the supply of pyrimethamine. We discussed the potential for collaborating on future products, which I thought could be useful as part of Vyera's efforts to diversify the products that the company would

market and from which it would generate revenue in anticipation of the inevitable entry of a generic version of Daraprim.

48.     Ultimately, we agreed to a general framework for a business deal between RL Fine and Vyera that addressed Vyera's need for a backup supplier, as well as set up a collaboration between the two companies concerning the development of future drugs.  After we agreed to the business framework for the deal, Vyera's legal counsel, including outside counsel, worked to draft and finalize the agreements and the specific terms.  As I understand it, the business deal between Vyera and RL Fine was broken up into two different legal agreements -- one focused on the supply of pyrimethamine, and the other addressing the collaborations efforts between the two companies.  I do not recall why the business deal with RL Fine was broken into two separate agreements, or whether I ever had an understanding of why that was done.

49.     On December 15, 2017, I attended a board meeting at which the Phoenixus Board considered, and voted to approve, the two agreements with RL Fine:  a Product Collaboration Agreement and a Distribution and Supply Agreement with RL Fine.  The Board of Directors also authorized me to execute the agreements.  None of the other individuals who participated are named as Defendants in this suit.

50.     After the Phoenixus Board meeting, on December 27, 2017, Vyera and RL Fine executed the Product Collaboration Agreement, and the Distribution and Supply Agreement.  In general, my recollection of the agreements is that RL Fine agreed under the Distribution and Supply Agreement to supply pyrimethamine API to Vyera on an exclusive worldwide basis for use in all territories outside of India.  In exchange, Vyera agreed to pay RL Fine a fixed lump sum payment and a royalty on Vyera's Daraprim sales in the United States.  And, at the same

time, the parties established a collaborative relationship to identify, develop, manage, and commercialize future pharmaceutical products for FDA approval and launch in the United States.

51.     Consistent with industry practice and Vyera's own past practice with Fukuzyu, we did not conduct extensive due diligence on RL Fine during the negotiations, as diligence is costly and not something that should be done until the supplier's product is required for use.  Because Vyera had sufficient supply of pyrimethamine on hand to meet its near-term production needs for Daraprim, I did not feel it necessary during the negotiations to order a costly audit for a company like RL Fine that we believed was close to filing a DMF.

52.     After signing the agreements with RL Fine, I was comforted that Vyera had secured a backup supplier of API for its Daraprim manufacturing process.  I was also optimistic that the future product collaborations with RL Fine could be very beneficial to Vyera to potentially allow it to market new drugs.  As head of business development, Mr. Mithani was the point person at Vyera for the RL Fine relationship, in particular for the other product collaborations.  I eventually grew very frustrated with Mr. Mithani and the lack of progress between Vyera and RL Fine concerning collaborations on other pharmaceutical products.  I pressed him several times for status updates and for signs of material progress in Vyera's efforts to collaborate with RL Fine.  Much to my disappointment, Vyera did not ultimately collaborate on any other products with RL Fine.

53.     Although we entered into the RL Fine agreements with optimism, after some time it became apparent that Vyera was not receiving enough value to justify the costs of the royalty it was paying to RL Fine.  In October 2019, Vyera reached an agreement with RL Fine to terminate the API supply agreement in exchange for a lump sum payment.

IX.     **Distribution Agreements**

54.     I understand that Plaintiffs contend that Vyera entered into distribution agreements with the following entities, each of which was unlawful: Integrated Commercialization Solutions ("ICS"), ASD Healthcare ("ASD"), Cardinal Specialty ("Cardinal"), BioRidge Pharma, LLC ("BioRidge") and Optime Care Inc. ("Optime"), and Walgreens Specialty Pharmacy ("Walgreens"). I had no involvement in the negotiation or execution of any of those distribution agreements with the exception of a very limited role in the Optime relationship. Each of the specialty distribution agreements with ICS, ASD Healthcare, Cardinal Health, BioRidge Pharma, LLC, and Walgreens was negotiated, executed or directly authorized by others, and I did not participate in those agreements.

55.     Indeed, many of the agreements about which Plaintiffs complain were negotiated and executed when I was not even employed at Vyera, and I am not familiar with, nor do I recall, the specific terms of each of those agreements. Even while CEO at Vyera, I did not have specific knowledge of the terms of each of the agreements. Indeed, I was continuing to learn more and more about Vyera's distribution systems, and its nuances and provisions, throughout my tenure as CEO.

56.     I also was not involved in the negotiation or execution of the specialty distribution agreement with Optime, with the exception of very limited preliminary discussions concerning a potential agreement. Specifically, my involvement with Optime entailed initial, high-level discussions both with Optime and internally at Vyera, each of which was consistent with my role as CEO at the time. As best as I can recall, none of the specific terms or deal points of any potential agreement with Optime were ever discussed with me or in my presence. I was not principally involved in negotiating or executing the Optime agreement.

57.     I do recall, however, that Vyera considered partnering with Optime for the
distribution of Daraprim because of Optime's "high-touch" specialty distribution services.
Optime's "high-touch" services provided patients with education, support, and individualized
care plans that were designed to boost patient compliance and retention, all of which was
attractive, and greatly beneficial, to Vyera.  Although I am not familiar with the specific terms of
the agreement Vyera ultimately reached with Optime, my understanding is that the terms of that
agreement were standard in the industry, and nothing in the agreement prohibited Optime from
selling Daraprim to a manufacturer of a generic version of Daraprim or an unauthorized
customer if Vyera provided its written approval.  To my knowledge, Vyera never even received,
and certainly never denied, a request for a potential generic manufacturer to obtain product
through Optime, and never received or denied a request for Optime to sell product to an
unauthorized customer type.

**X.     Data Sharing Agreements with ASD and Cardinal**

58.     I understand that Plaintiffs contend that Vyera intended to block the entry of
potential generic competitors by including provisions in its agreements with two of its four
distributors in which Vyera agreed to pay a fee to those distributors in exchange for their
agreement to maintain the confidentiality of and to not disclose Daraprim sales data.

59.     As I understand it, the restrictions on sharing Daraprim sales data that Plaintiffs
reference relate to Vyera's agreements with ASD and Cardinal.  In 2017, Vyera amended its
distribution agreements with ASD and Cardinal for the purpose of adding provisions that
prohibited ASD and Cardinal from selling Daraprim sales data in exchange for monthly
payments from Vyera.  I signed the amendment to the agreement with Cardinal on September 8,
2017, on behalf of Vyera, though I was not directly involved in the negotiations for the

agreement. That amendment predominantly concerned the updated data sharing restrictions.
Scott Emmens signed the amendment to the agreement with ASD on September 11, 2017, on
Vyera's behalf. At the time that the ASD amendment was executed, I was a member of the
Executive Committee, but was not involved in either the negotiation or execution of the
amendment.

60.     From my perspective, there were multiple business reasons for entering into both
of these amendments to Vyera's distribution agreements. As a private company, Vyera was
interested in maintaining its privacy and keeping its business and commercially-sensitive sales
information from being disclosed to the public. Because Daraprim was Vyera's primary source
of revenue at that time, the company was concerned that the release of Daraprim sales data could
serve as a proxy for the company's overall financial condition and performance. In addition,
Vyera was concerned about public opinion. Mr. Shkreli was regularly in the news around this
time, both concerning the price increase of Daraprim, and his unrelated criminal trial and
ultimate conviction on securities fraud. Indeed, Mr. Shkreli generated overwhelmingly negative
media attention and public outrage. Given this reality and Mr. Shkreli's connection to Vyera, I
and many others at the company did not want to draw additional unwanted public attention to
Vyera by disclosing its sales data. We believed that any public disclosures about the company,
in particular about its Daraprim sales, would lead to negative press articles and social media
mentions, none of which would be helpful to Vyera's business. In fact, the company was already
receiving significant negative attention and consequences as a result of Mr. Shkreli's connection
with the company. We did not want to create another news cycle by disclosing confidential sales
data.

61.    While we understood that precluding Vyera's distributors from being able to sell Vyera's Daraprim sales data would mean that potential generic competitors did not have access to that data, we also believed that implementing data sharing restrictions would not prevent generic competition.  As a pharmaceutical company with an off-patent drug like Daraprim, we understood that generic competition was inevitable given the price increase.  It was only a matter of time before a generic version of Daraprim entered the market.  We did not believe that such potential generic entry was contingent on knowing or understanding Vyera's sales data.  Indeed, we believed that not disclosing such data could have the opposite effect and leave the market with an overly rosy picture of Daraprim sales.  Specifically, Vyera's volume of Daraprim sales dropped precipitously, by approximately 60-70%, following the price increase, as customers switched to alternative products such as Bactrim and compounded pyrimethamine.  Thus, the restrictions that Vyera had in place that precluded its distributors from selling and publicly disclosing Daraprim sales were likely to leave the market with an overly bullish sense of the volume of Daraprim sales because the publicly available data would have reflected the higher, pre-price-increase volume of sales.  If anything, we believed that the data sharing restrictions would have overinflated the market's sense of the value of the opportunity for generic entry.

XI.    **My Actions as Vyera CEO and Chairman**

62.    I understand that Plaintiffs also have selectively focused on a handful of other isolated business interactions I had while I was at Vyera and have tried to use those to paint an inaccurate narrative that I engaged in rampant intentional anticompetitive activity.  I address each of these cherry-picked instances below.

A.    **Bottle Monitoring and Limits**

63.    As I understand it, Plaintiffs contend that certain conversations or communications I had with Mr. Shkreli, and certain Vyera employees, while I was Vyera's CEO

20

and/or Chairman, concerning actual or potential limits Vyera placed on the number of bottles that could be sold at any one time, or monitoring within Vyera to understand who was purchasing Daraprim and for what purpose, were anticompetitive.  I address each of the incidents below that I understand Plaintiffs have raised.

(a)      Discussions with Mr. Shkreli

64.      While I was Vyera CEO, and after that time when I was Chairman of the Phoenixus Board, I had numerous phone calls with Mr. Shkreli, including while he has been incarcerated.  Mr. Shkreli was Phoenixus's largest shareholder and I believed that it was part of my job as CEO and Chairman to communicate with the company's shareholders.  Mr. Shkreli was the shareholder who most often communicated with me, and I believed it was important to listen to his views on the company and its operations.  Mr. Shkreli said many things and provided many suggestions during our calls, some of which I agreed with and many of which I did not.  Ultimately, as the CEO and Chairman of the Phoenixus Board, I made my own decisions concerning what I thought was best for the company and its shareholders.

65.      I understand that Plaintiffs specifically take issue with an August 5, 2019 telephone call that I had with Mr. Shkreli during which he suggested the company "screen every doctor" and ensure that no one could "sell more than one bottle at a time."  As of that date, August 5, 2019, I was no longer CEO of Vyera, and therefore was not responsible for day-to-day management of the company.  Moreover, although I was still Chairman of the Phoenixus Board at the time, I do not recall taking any action in response to Mr. Shkreli's suggestions during that call.  Indeed, I am not aware that Vyera ever, and certainly not after the referenced call, "screened every doctor" or limited the sales of Daraprim to one bottle at a time.

(b)      Discussions with Ms. Kirby and Mr. Lau

66.      As I understand it, Plaintiffs contend that certain emails I had in September 2017 with Anne Kirby, who at the time was Director of Trade and Distribution at Vyera, and with Chris Lau, who at the time was the Manager of Business Analytics and Intelligence, in which I requested information on Vyera's distribution system, suggest anticompetitive conduct on my part. Plaintiffs take these e-mails out of context and misinterpret my intentions.

67.      By way of background, in September 2017, I was less than three months into my return to Vyera, and was beginning my tenure as part of the Executive Committee. As part of my efforts to better educate myself concerning the details of Vyera's business and operations, I sought out the advice and guidance of the experienced team of Vyera employees in most, if not all, of the departments at the company.

68.      One of the key areas that I did not understand at the time, and that I still do not fully understand, is the company's distribution system. In order to familiarize myself with the company's distribution, on September 8, 2017, I wrote an e-mail to Mr. Lau in which I stated: "We want to do a full out audit of daraprim. Where would be a good place to start if we wanted to know where every bottle of daraprim we sold went to, etc? I want access to all our data." [GX 1358.]

69.      The following day, September 9, 2017, before I received a response from Mr. Lau, I sent a similar request to Anne Kirby: "I'd like to really start working with you on understanding our distribution. A good beginning point would be just knowing where every bottle we have ever sent out went. Do you know where I could find that information and any prior analysis (i.e. I saw a heat map of it at NSM)? Do we have a shared drive?" [GX 1123.] In addition to understanding the overall distribution system, I also specifically requested that Ms. Kirby provide a heat map identifying where Daraprim was being sold because our sales force

22

represented a significant cost center to Vyera, and I wanted to understand whether our sales force

was a good investment or not, and whether there was a potential substantial cost-saving

opportunity in that area. Indeed, Vyera was constantly evaluating whether the company's sales

force was needed, and this analysis was a topic of frequent discussion.

70.      After my email exchange with Ms. Kirby, Mr. Lau asked for "more clarity on

what [I was] looking for," and I let him know that I "saw a heat map at the NSM showing where

bottles were sold/prescribed geographically." [GX 1358.] Again, as was the case in my email

with Ms. Kirby, I told Mr. Lau that I was seeking a heat map to understand whether our sales

force represented a good use of the company's financial resources.

71.      I recall that in response to my e-mails to Ms. Kirby and Mr. Lau, Ms. Kirby

provided me with a Trade & Distribution presentation that provided a high-level summary of

Vyera's distribution system, and Mr. Lau provided me with a map showing the geographic areas

where Daraprim was being sold. I also recall that I engaged in discussions with them and others

throughout the time period to better understand Vyera's sales and distribution system, including

who Vyera was selling Daraprim to, and where it was doing so. These discussions were all part

of my effort to put me in the best position possible to do my job as a member of the Executive

Committee and the Phoenixus Board.

72.      While I generally recall discussions about seeking information about sales and the

distribution system, I do not recall the subsequent email between myself and Mr. Lau on October

11, 2017, in which I wrote: "who are the wholesalers and what function do they have? i worry

that someone added more complexity (and leakage) to the channel while we were gone. who can

the wholesalers sell to?" [GX 1357.] However, this is consistent with my recollection that in

October 2017, I was still working to understand the company's distribution system. I was, and

remain, concerned with unauthorized purchasers obtaining Vyera product because I understood that misuse of Daraprim could result in liability to the company. My understanding was, and remains, that it was essential that the appropriate legal procedures were established and complied with before Vyera approved the sale of Daraprim to a third party, whether that entity was a potential generic competitor or not. I do not recall what, if any, information Mr. Lau provided in response to my October 11, 2017 e-mail.

(c)    Monitoring of Sales

73.    I also understand that Plaintiffs contend that certain so-called bottle monitoring systems and purchase limits that Vyera had with some of its distributors are anticompetitive and potentially unlawful, though it is not clear to me what exactly Plaintiffs contend I did that was unlawful. I generally recall that Vyera implemented a system whereby it was notified of all orders at ASD for five or more bottles of Daraprim, and that Vyera has had certain limits in place for the number of bottles of Daraprim that could be sold by particular distributors to any one purchaser at a time.

74.    I did not implement the system with ASD where Vyera was notified of orders of five or more bottles, though I was aware that it was being instituted. Likewise, I was not involved in implementing any limits on the amount of bottles any one distributor could sell at one time. I believe that most, if not all, of those so-called bottle limits were implemented before I came back to Vyera in 2017, though I recall being aware of those limits when I did come back to the company. My general recollection and understanding is that bottle limits were standard in Vyera's contracts with distributors and were common in the industry. I recall that Vyera had bottle limits and notification systems in place that were intended to identify outlier purchases of Daraprim for a variety of reasons. For example, I understood those systems were designed to prevent so-called "fat-finger" orders where an entity inadvertently places an order for more

24

bottles than they intended.  My understanding is that those systems were also intended to ensure that the entity ordering large amounts of product were aware that they did not need to handle patient care themselves and that such care could be handled through our specialty providers.

75.     We also monitored sales to understand our customers and, again, to evaluate whether our sales force was proving to be an effective and efficient use of the company's resources to generate sales.  I, of course, understood that these notification systems could alert Vyera to a sale to a company that was buying the bottles to manufacture a generic version of Daraprim, and that Vyera's distribution agreements would not permit such sales without Vyera's consent.  However, that was not what I understood to be the intended purpose of monitoring Vyera's sales, and such monitoring did not mean that Vyera refused to sell Daraprim to a potential generic competitor.  I am not aware of any instances while I was either a member of the Phoenixus Board or the Executive Committee, or CEO of the company, in which Vyera denied a request from a disclosed potential generic competitor (or someone acting on its behalf) that had agreed to the legal protections necessary to protect Vyera for non-patient use to purchase Daraprim.

76.     During my time at Vyera, I understood that the entry of a generic version of Daraprim was all but certain to occur.  This eventuality was no secret, and it was part of my job as CEO (and a Phoenixus Board member) to plan for that inevitability and how best to position Vyera for it.  As a result, I was also interested to know whether generic entities were procuring Daraprim to assess whether generic entry was imminent, and to assess the competitive landscape, as any company would assess the competitive market for its products.  Moreover, I did not understand bottle monitoring to be something that would prevent generic companies from obtaining the product because the notification of a large order would only be received by Vyera

after the order was placed and shipped.  In short, bottle limits and monitoring were something that I understood to be common in the industry; it was not something that I understood or intended to be a tool to prevent generic competition.

### B.    Centrastate Repurchase

77.    I also understand that Plaintiffs take issue with Vyera's repurchase of five bottles of Daraprim from an unauthorized purchaser with which I was involved.  As a general matter, Vyera did not contact buyers to inquire about the purpose for their purchase of Daraprim.  The one exception that I recall is when Vyera -- either directly or through a third party, I cannot recall which -- contacted Centrastate Specialty Script ("Centrastate") concerning the Daraprim it improperly obtained for non-patient use in clear violation of Vyera's policies.  In or around April 2018, Vyera, repurchased five bottles of Daraprim from Centrastate, which had improperly purchased the product.  The Centrastate purchase demonstrates why bottle monitoring and notification for large orders is a useful and important part of Vyera's legitimate business practices.

78.    Centrastate purchased the five bottles of Daraprim, but it was not authorized to make that purchase under our agreements with the distributor, and thus it should not have been sold the bottles.  As I understand it, Ms. Kirby at Vyera initially flagged this sale as improper in April 2018 because Centrastate was not an approved account for that purchase, and she was concerned that the ultimate patients could be subject to high out of pocket costs as a result.  [GX 1383.]  Upon learning of the sale, I understand that Ms. Kirby reached out to ASD for additional information about Centrastate, but was advised that Centrastate had already received the bottles, and was provided its contact information.  [GX 1383.]  Ms. Kirby, thereafter, updated me and Mr. Mithani about Centrastate's improper purchase.  [GX 1383.]

79.     Given that Centrastate was an unapproved account and an entity with which
Vyera was unfamiliar, I and others at Vyera were concerned about how it might use the product
it purchased and the potential liability that could cause the company.  I understood -- as I believe
others did as well at Vyera -- that the company could be held liable for potential misuse of
Daraprim by a purchaser, such as Centrastate, or to whomever it in turn dispensed that product.

80.     As a result of these concerns, we decided to further investigate the Centrastate
purchase and learned that a gentleman named Satya Valiveti might be the purchaser.  Mr.
Valiveti was the owner of Reliant Specialty, LLC ("Reliant"), which I learned was affiliated with
Centrastate.  When Mr. Valiveti was contacted -- I do not recall whether these communications
were by me or an industry source with whom I was working -- he initially denied that he was the
purchaser of the five bottles.  This information concerned me given that the information we had
indicated that Mr. Valiveti was the buyer and that he operated a pharmacy out of a strip mall.
This information raised red flags to us about Mr. Valiveti's purchase.

81.     Our research into Mr. Valiveti, Reliant, and Centrastate, raised additional red
flags for us.  In particular, we learned that Mr. Valiveti conducted a lot of research into
intraocular injections of small molecule drugs similar to Daraprim.  We were concerned that he
might be seeking to conduct similar research by injecting Daraprim into somebody's eyes given
that toxoplasmosis can affect a person's eyes.  Daraprim is not approved to be administered in
that manner.  As a result, among other things, we were concerned that if the Daraprim purchased
by Centrastate was improperly provided to patients, then Vyera could potentially be liable if they
were harmed from its misuse.

82.     We also learned through our outreach to Mr. Valiveti that the bottles of Daraprim
were not obtained for patient use, but were instead procured for a third party whose identity he

refused to disclose.  Mr. Valiveti also refused to disclose the purpose for which, or how, the third party planned on using the pills he obtained.  As it turns out, Mr. Valiveti was eager to return the bottles to the company from which he acquired them, and may have volunteered that he had already made the decision to do so, but noted that the company he acquired the bottles from was going to charge a restocking fee to return them.  Given Mr. Valiveti's intention to return the bottles, Vyera offered to repurchase the bottles directly instead.

83.    I thought it was a prudent business decision to repurchase the bottles from Mr. Valiveti rather than risk that he may not return the bottles, and therefore continue to risk patient harm or liability to Vyera from any misuse.  Mr. Valiveti offered to sell the bottles to Vyera for twice the amount he paid, and we agreed to that price.  I recall that I was comfortable with Mr. Valiveti's price because we had already received the amount of the initial purchase price -- which I believe would have been $375,000 -- from the company selling the product to him, and I thought that an additional outlay -- which I believe would have been an additional $375,000 -- was a worthwhile investment to eliminate the risk of potential liability to Vyera and ensure the bottles were returned promptly.

84.    I met Mr. Valiveti a few days later at a Starbucks located outside of New York City to reacquire the pills.  When I met Mr. Valiveti, I presented him with a repurchase contract that was drafted by Vyera's lawyers for the repurchase of the five bottles of Daraprim, and he provided me with the bottles.  I did not provide Mr. Valiveti with any money or a check for the bottles.  I believe Mr. Valiveti was subsequently paid by Vyera, but I do not have a specific recollection of the details or of being involved.

C.    **Vyera's Potential Partnership with Fera Pharmaceuticals LLC**

85.    I understand that Plaintiffs also contend that Vyera's negotiations, including my participation therein, with Fera Pharmaceuticals LLC ("Fera") was somehow unlawful. I address those negotiations with Fera below.

86.    Frank DellaFera is the founder and CEO of Fera, which is a pharmaceutical company involved in various aspects of the drug business, including development, marketing and distribution of generic drugs through the filing of Abbreviated New Drug Applications ("ANDA"). Mr. DellaFera is the former CEO and President of Sandoz, US, a successful generic drug company. I reached out to Mr. DellaFera in April 2018 after an industry contact recommended that I reach out to him as a potential partner for Vyera in its own efforts to market a generic version of Vyera.

87.    I recall that my contact had indicated that Fera may be interested in developing a generic version of Daraprim. At the same time, as part of its ongoing preparation for the inevitable entry of a generic version of Daraprim to the market, Vyera was also working on the potential launch of its own generic version of Daraprim. Among other things, Vyera was considering an Authorized Generic version of Daraprim, which is a generic version of a drug that is marketed by the company that owns the rights to the branded drug. However, I was concerned that Vyera's association with Mr. Shkreli would have a negative impact on sales of such an Authorized Generic product. At the time, Vyera was dealing with the fallout from being associated with Mr. Shkreli and his high profile and overwhelmingly negative public reputation.

88.    One potential solution I considered to mitigate the risk that customers may not want to purchase a generic form of Daraprim from what was perceived as Mr. Shkreli's company was to partner with another company to create a generic version of Daraprim that could be marketed by that partner while also benefitting Vyera. I thought at the time that Vyera could

29

provide its expertise and data to such an enterprise, while the partner could provide the

marketing and branding, as well as expertise in successfully bringing a generic to market. I

believed that such a partnership could be beneficial to both parties and lead to increased sales

that would gain some market share back from Bactrim and compounding pharmacies.

89.     As I understood it, a company seeking to market a generic version of a brand-

name drug must file an ANDA with the FDA. Given Fera's interests and track record, and

Vyera's ongoing consideration of a generic Daraprim, I thought that Fera seemed like an ideal

partner to develop an ANDA version of Daraprim. Therefore, I reached out to Mr. DellaFera to

explore that possibility. As a result of my outreach, Vyera and Fera spent a number of weeks in

Spring 2018 negotiating the terms of a potential joint venture or partnership between the

companies.

90.     These discussions were not preliminary, nor hypothetical: lawyers for both

parties were involved and eventually exchanged a number of draft proposals. Ultimately,

however, no deal was reached because we could not come to an agreement on terms, and Vyera

never entered into any agreements with Fera. I generally recall that we could not reach an

agreement on terms. Also, I recall that I became frustrated with the state of the negotiations and

believed that Fera, and specifically Mr. DellaFera, continually sought to change the terms of the

potential transaction that we were discussing. At a certain point, I determined that the Vyera

group's collective efforts were no longer worth continuing down the path of a transaction with

Fera given Fera's negotiating style.

91.     I understand that Plaintiffs contend that I, on behalf of Vyera, discouraged Fera

from competing with Vyera. I do not recall ever having done so, and do not believe I did.

Rather, I recall that throughout the failed negotiation process both sides discussed how both

Vyera and Fera could benefit from a joint venture or partnership. In fact, during negotiations I repeatedly assured Mr. DellaFera that Fera could continue its own ANDA development going forward. Before negotiations between us ended, the latest proposal was that the two companies would work together on a generic version of Daraprim, and at the same time, Fera could continue its other efforts to launch its own generic version of Daraprim. That was not a deal point that I took lightly, since it would lead to Vyera's partner competing directly with Vyera and the partnership, but I believed that it was one that was necessary to get the deal done. Ultimately, however, even that concession by Vyera was not enough to reach an agreement with Fera.

92.    I understand that Plaintiffs contend that I told Mr. DellaFera that Vyera's agreement with RL Fine eliminated two potential generic competitors, and that I somehow threatened Fera's relationship with its API supplier, API-1. I do not recall making either statement, and do not believe that I did. Indeed, my understanding at that time was that there were a number of API manufacturers -- beyond those with whom Vyera was working -- who had the ability to produce pyrimethamine in 2018. And history has borne that out. I understand that Dr. Reddy's Laboratories and Cerovene were both able to secure an API supplier for their generic Daraprim, which is currently on the market.

## XII.   Plans for the Future in the Pharmaceutical Industry

93.    I understand Plaintiffs are seeking an industry ban based on their contention that I may engage in the conduct they contend is unlawful in the future either at Vyera or some other company. Accordingly, I wanted to briefly explain my plans for my future in the pharmaceutical industry.

94.    I sit here today facing a potential lifetime ban from the pharmaceutical industry and potential financial ruin. If anything, my experience from being drawn into this litigation has

solidified my resolve to avoid any potential problems concerning drug distribution or pricing in the future, and has made me hyperaware of avoiding any practice or activity that could be misconstrued as anticompetitive. To be clear, I have no plans to acquire any drug for placement into specialty distribution whether or not in conjunction with a price increase. Nor have I ever had other plans to replicate the marketing, sale, and distribution system that was used at Vyera for Daraprim with any other drugs or at any other company.

95.     Rather, my plan is to do exactly the opposite. Although I am currently unemployed and not on the Phoenixus Board, I remain a shareholder of the company. As I have explained to Vyera's shareholders, should I ever be in a leadership position at Vyera again, my plan would be to take action to promptly lower the price of Daraprim to its pre-price-increase level. Although I put myself forward as a candidate for the Phoenixus Board earlier this year, I ultimately withdrew my candidacy as I believed that was best for the company, particularly given the overhang of this litigation.

96.     I do not wish to be known for the conduct that Plaintiffs contend is anticompetitive, or associated with the Daraprim price increase in which I had no part, but rather wish to continue an ethical career in the pharmaceutical industry helping patients and bringing life-saving treatments to market. I can say confidently and definitively that I will never implement plans to replicate or participate in the conduct concerning Daraprim that Plaintiffs contend is unlawful -- even though I understand that the conduct Plaintiffs have targeted is not, in fact, unlawful. Additionally, I will take steps to ensure that I avoid any conduct that could be construed as potentially violating the law.

*        *        *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: *10/20/21*

Kevin Mulleady

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION, et al.,

Plaintiffs,

v.                                                    Case No.: 1:20-cv-00706-DLC

VYERA PHARMACEUTICALS, LLC, et al.,

Defendants.

Direct Testimony of Professor C. Scott Hemphill, Ph.D., J.D.

GX8004-001

# TABLE OF CONTENTS

I.    Introduction and Assignment ........................................................................... 1

    A.    Qualifications ............................................................................................ 1

    B.    Allegations ................................................................................................ 1

    C.    Assignment ............................................................................................... 2

    D.    Materials relied upon ............................................................................... 3

    E.    Summary of opinions ............................................................................... 3

II.   Industry Background ....................................................................................... 4

    A.    Toxoplasmosis and its treatment .............................................................. 4

    B.    The sale and distribution of Daraprim ..................................................... 6

    C.    Generic competition .................................................................................. 8

III.  Market Power and Monopoly Power ............................................................. 15

    A.    The relevant antitrust market is FDA-approved pyrimethamine products ........... 18

    B.    Vyera had market power and monopoly power in the relevant market ............... 37

    C.    Direct evidence demonstrates Vyera's market power and monopoly power ....... 38

IV.   Competitive Effects ....................................................................................... 40

    A.    Impeded entry .......................................................................................... 41

    B.    Lack of procompetitive justification ........................................................ 44

    C.    Conclusion ............................................................................................... 46

V.    Excess Profits ................................................................................................ 47

    A.    Revenue in the actual world .................................................................... 48

    B.    Timing and extent of generic entry in the but-for world ........................ 48

    C.    Revenue in the but-for world .................................................................. 54

    D.    Excess revenue and excess profits .......................................................... 57

GX8004-002

C. Scott Hemphill, Ph.D., J.D., declares as follows:

## I.   Introduction and Assignment

### A.  Qualifications

1.      I am the Moses H. Grossman Professor of Law at New York University, where my research focuses on the law and economics of competition and innovation. I hold a Ph.D. in economics and a J.D. from Stanford University. Prior to Stanford, I earned an M.Sc. in economics from the London School of Economics, where I studied as a Fulbright Scholar.

2.      My academic research has focused, in substantial part, on the economics of competition in the pharmaceutical industry. This scholarship has been published in peer-reviewed journals including the *Journal of Health Economics*, the *Journal of Empirical Legal Studies*, and *Science*, as well as leading law reviews. This work has been cited by the U.S. Supreme Court, the California Supreme Court, and numerous federal trial and intermediate appellate courts. My research has also formed the basis for testimony before Congress on questions of pharmaceutical economics and regulation.

3.      In addition to my academic research, I have experience teaching courses about the law and economics of antitrust to both law students and federal judges. I have also served as an economics expert in other antitrust litigation. My relevant experience, including a list of recent testimony, is attached as Appendix A.

4.      I am offering opinions in my capacity as an economist. I have been assisted by staff of the FTC's Bureau of Economics and Cornerstone Research.

### B.  Allegations

5.      I have been asked to opine on specific economic questions arising out of the challenged conduct in this case. The FTC and seven states (together, Plaintiffs) allege that Vyera Pharmaceuticals entered restrictive contracts with distributors and suppliers that restrained trade

1

and allowed Vyera to maintain a monopoly over FDA-approved pyrimethamine, which it sells under the brand name Daraprim.

6.      Upon acquiring the U.S. rights to Daraprim in August 2015, Vyera raised its list price (commonly referred to as the wholesale acquisition cost, or WAC) to $750 per tablet. According to Plaintiffs, Vyera engaged in conduct that impeded generic drug makers' access to necessary inputs in three ways, resulting in delayed arrival of low-priced generic competition and higher prices for consumers.

7.      First, Plaintiffs allege that Vyera entered into contracts with distributors that impaired access to necessary Daraprim samples by limiting Daraprim sales to a subset of Vyera-approved customers, imposing resale restrictions on hospitals and pharmacy customers, and capping the quantity that a customer could purchase.

8.      Plaintiffs further allege that Vyera limited access to a critical input by entering exclusive supply contracts with Fukuzyu Pharmaceutical Co. and RL Fine Chem Pvt., two manufacturers of pyrimethamine, the active pharmaceutical ingredient (API) used to make Daraprim.

9.      Finally, Plaintiffs allege that Vyera impaired generic drug makers' ability to assess the market opportunity for developing a generic version of Daraprim by entering agreements that prevented distributors from furnishing Daraprim sales data to data-aggregation companies that assemble commercial databases used by industry participants.

**C. Assignment**

10.     Plaintiffs asked me to conduct an economic analysis addressed to three questions:

- ▪ First, did Vyera possess market power and monopoly power with respect to Daraprim between August 2015 and March 20, 2020?

2

  ▪ Second, what are the competitive effects (if any) arising from the challenged conduct?

  ▪ Third, what are Vyera's excess profits, defined as the difference between Vyera's actual profits and its profits in a but-for world in which generic entry was not impeded by the conduct?

**D. Materials relied upon**

11. In forming my opinions, I have relied on my professional training in economics, academic research, teaching, and my prior government and consulting experience. I have also examined and analyzed documents, data, and testimony relevant to this matter. In addition, I have relied on the reports and testimony of Dr. David Hardy, Mr. James Bruno, and Mr. Edward Conroy.

**E. Summary of opinions**

12. Based on my review of the evidence and my economic analysis, I have reached the following conclusions.

13. *First*, during the relevant time period, Vyera possessed market power and monopoly power with respect to Daraprim. This conclusion is supported by Vyera's 100% market share in a relevant antitrust market of FDA-approved pyrimethamine products. This conclusion is also supported by the profitable imposition of large and sustained price increases in the price of Daraprim prior to 2020, and the large and negative effect on Vyera's sales volume and profits, and on the price paid by consumers, when a competing FDA-approved pyrimethamine product entered in March 2020.

14. *Second*, Vyera's exclusive supply agreements and distribution restrictions, to the extent that they made it more difficult for generic manufacturers to access the resources they need to develop competing products, harmed the competitive process. The expected effect of

3

impeding competition from lower-priced generics was to preserve Vyera's market power and maintain a higher price for FDA-approved pyrimethamine. This anticompetitive effect is not offset by any procompetitive justification.

15.     *Third*, Vyera's challenged conduct resulted in excess profits between $53.1 million and $64.6 million. I have calculated Vyera's excess profits by comparing Vyera's actual profits to an estimate of the profits it would have earned but for the conduct. Absent Vyera's conduct, the likely outcome would have been initial generic entry between October and December 2018, and possibly additional generic entry thereafter, which in turn would have resulted in lower Daraprim profits.

16.     As part of my analysis, I have reviewed the report of Defendants' medical and economics expert, Dr. Anupam Jena, who responded to my opinions. Dr. Jena's opinions do not change my conclusions.

## II.  Industry Background

### A.  Toxoplasmosis and its treatment

17.     Daraprim, a 25-milligram tablet containing pyrimethamine, has been FDA-approved since 1953 for the treatment of toxoplasmosis. Daraprim, and generic versions of Daraprim, are the only FDA-approved products indicated to treat this condition.

18.     I understand from Plaintiffs' medical expert, Dr. Hardy, that toxoplasmosis is a serious disease caused by a common parasitic infection. While the infection typically causes few or no symptoms in healthy adults with normal immune responses, it can cause active disease requiring treatment in individuals with compromised immune systems, including those with HIV/AIDS. Disease symptoms vary, but include damage to the brain, eyes, or other organs. If left untreated, the damage can be permanent or fatal. The most recent available estimate suggests

4

there are slightly less than 10,000 cases of toxoplasmosis per year in the United States. Incidence has declined over time due to improvements in the treatment of HIV/AIDS and the increased use of prophylaxis treatment in immunocompromised individuals to prevent the infection from causing active disease.

19.     The most common serious forms of toxoplasmosis affect the brain (a condition called toxoplasma encephalitis), the eye (ocular toxoplasmosis), or infants in utero (congenital toxoplasmosis). Although the manifestations have varied treatment courses, pyrimethamine is considered the standard of care for all of them.

20.     For varied reasons, some patients receive a treatment for toxoplasmosis other than FDA-approved pyrimethamine. Some patients receive trimethoprim-sulfamethoxazole (TMP-SMX), an antibiotic sold under the brand name Bactrim and available in generic formulations for about ten cents per tablet.[1] TMP-SMX is widely prescribed to treat conditions other than toxoplasmosis. In the treatment of toxoplasmosis, it is used primarily for prophylaxis. While TMP-SMX is sometimes used to treat active disease, it is generally considered a second-line treatment.

21.     In addition, some patients receive a compounded version of pyrimethamine that is not FDA-approved. Compounded drugs are intended to meet the needs of specific patients who cannot take a commercially available version—for example, due to an allergy to an inactive ingredient. After Vyera raised the price of Daraprim in 2015, more hospitals and outpatient compounding pharmacies, such as Imprimis and Avella Specialty Pharmacy, began compounding pyrimethamine treatments, which cost about $1 to $5 per dose.[2] Compounded

---

[1] From Q4 2008 through Q3 2020, the price of TMP-SMX was between $0.05 and $0.10 per tablet. GX3555 (IQVIA National Sales Perspectives).
[2] *See* Saadeh (Harrow) Dep. 35-36, 37-38; Sredzinski (Avella) Dep. 32-33 (Avella's price to cash-paying customers was $1 per capsule).

GX8004-007

pyrimethamine does not undergo the safety and effectiveness studies required for FDA approval and is not required to be manufactured according to the FDA's current good manufacturing practice (CGMP) regulations.

### B.  The sale and distribution of Daraprim

22.      In August 2015, Vyera acquired the rights to Daraprim from Impax for $55 million. Before that, Daraprim had changed hands several times: from GlaxoSmithKline to CorePharma in 2010 and from CorePharma to Impax in March 2015. Over time, both the distribution and price of Daraprim changed significantly.

#### 1.  Distribution of Daraprim

23.      Vyera uses different distributors to sell to different types of customers. Vyera's contracts with its distributors contain restrictions that limit the sale of Daraprim to certain approved purchasers and limit the amount of Daraprim a purchaser can buy.

24.      Some of Vyera's distribution contracts also include data-blocking agreements providing compensation to the distributor in exchange for its agreement not to sell its Daraprim sales data to IQVIA or similar third party data aggregators.

#### 2.  Price of Daraprim

25.      The price of Daraprim has increased over time. We can observe this in the drug's list price, also known as the wholesale acquisition cost (WAC), which is set by the manufacturer. Between 2011 and 2014, the WAC for Daraprim gradually increased from about $8 to $14, and in June 2015, increased further to about $18. In August 2015, Vyera raised the WAC for Daraprim to $750, a more than 40-fold increase.

26.      We can also observe this result by looking at net prices, which are more pertinent for assessing market responses to changes in price. In contrast to WAC, net prices reflect the price a drug maker actually receives on transactions after subtracting various rebates,

GX8004-008

chargebacks, and discounts. In 2010, the net price of Daraprim was less than $1. This increased

gradually until Vyera's acquisition in 2015, which resulted in a much higher net price of $305 in

2016. Figure 1 shows the net price of Daraprim from 2010 to 2016.[3]



**Figure 1 (GX7021)**
**Average Net Price of Daraprim**
**2010–2016**

Source: GX3555 (IQVIA National Sales Perspectives), GX1618 (Vyera_01560868), GX1619 (Vyera_01560869)

27.     Different entities pay different prices for Daraprim. For example, commercial

payers or their pharmacy benefit managers (PBMs) negotiate rebates with Vyera, and hospital

buying groups negotiate discounts off WAC. Other customers qualify for special prices that are

set by regulation. For example, hospitals that qualify for the federal 340B drug pricing program

are eligible to purchase Daraprim for outpatient use for only a penny per tablet. In 2019, the year

---

[3] Available sales data for 2010 through Q2 2015 takes account of discounts and chargebacks, but not rebates, and is
therefore an upper bound of the net price.

7

before generic entry, 340B purchases accounted for approximately 30% of Daraprim sales by volume. Excluding 340B sales, the net price of Daraprim in 2019 was approximately $330 per tablet.

### C. Generic competition

28.     Generic entry is a unique and powerful catalyst for price competition in pharmaceutical markets. Generic drugs are essentially identical to the brand version and typically enter the market at a much lower price. The regulatory context of generic entry is important to understand competition in pharmaceutical markets. The FDA approval process for generics can take years to complete and creates barriers to new entry, but also ensures that approved generic drugs meet the same rigorous manufacturing standards as and are bioequivalent to the brand.

29.     Many states have laws that facilitate competition between brands and virtually identical generic versions by allowing pharmacists to substitute the lower priced generic.[4] Economists have studied the competition between brands and generics and observed that generics typically lead to lower prices and capture substantial share from the brand.[5] As a result of lower prices and the high degree of substitution, generic entry is an important source of consumer savings. One estimate suggests that generic drugs saved U.S. drug purchasers approximately $313 billion in 2019.[6]

---

[4] National Association of Boards of Pharmacy, *2021 Survey of Pharmacy Law* (2020), pp. 97-101; Vivian, Jesse. 2008. "Generic Drug Substitution Laws." *U.S. Pharm.* 33 (6): 30-34, at Table 2, available at https://www.uspharmacist.com/article/generic-substitution-laws.
[5] *E.g.* Conrad, Ryan and Randall Lutter. 2019. "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," FDA Report: 1-9; Grabowski, Henry, Genia Long, Richard Mortimer, and Ani Boyo. 2016. "Updated Trends in US Brand-Name and Generic Drug Competition." *Journal of Medical Economics*, 5.
[6] Association for Accessible Medicines, *Generic Drug and Biosimilars Access and Savings in the U.S.* (2020 Report), available at https://accessiblemeds.org/2020-Access-Savings-Report.

GX8004-010

### 1. Requirements for FDA approval of generic drugs

30.     The economic effects of generic entry are promoted by the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-Waxman Act. Prior to Hatch-Waxman, a generic applicant had to undertake clinical testing to establish a drug's safety and efficacy. Hatch-Waxman set up an alternative approval pathway, allowing a drug maker to submit an Abbreviated New Drug Application (ANDA) demonstrating that its generic product is bioequivalent to the brand and uses a suitable source of active pharmaceutical ingredient (API). This section describes these requirements at a high level and provides specific background about how Vyera's conduct may have affected generic firms' ability to meet them.

#### a. Bioequivalence

31.     The FDA approval process requires a generic applicant to demonstrate that its proposed product is bioequivalent to an already-approved brand-name product. Bioequivalence means that the generic product uses the same active ingredient and will be absorbed by the body at the same rate and to the same extent as the brand-name drug.

32.     In order to establish bioequivalence, the generic drug maker needs to perform testing that compares its generic product to the brand-name version. The generic drug maker therefore needs samples of the branded product (also called the reference listed drug or RLD). I understand that, for Daraprim, generic companies needed at least 500 Daraprim tablets from the same manufacturing lot.

33.     I also understand, based on the reports and testimony of Plaintiffs' distribution expert, Mr. Conroy, that generic drug makers typically purchase these samples through a distributor or specialized middleman, but that Vyera's distribution restrictions made accessing these samples more difficult.

9

34.     In addition to supporting FDA approval, bioequivalence is also necessary for the FDA's determination of therapeutic equivalence. A generic drug is therapeutically equivalent to the brand if, in addition to having the same active ingredient and dosage form (among other requirements), it is bioequivalent. The FDA assigns an "AB" rating to therapeutic equivalents. Therapeutic equivalence is generally required for substitution under state law and by private payers, as discussed in more detail below.

b.  **API**

35.     Generic drug products must use API that meets the same demanding standards as approved brand-name drugs. My understanding of these standards generally and with respect to the development of pyrimethamine API specifically is based on the reports and testimony of Plaintiffs' API expert, Mr. James Bruno.

36.     To be used in an FDA-approved product, the API must be tested for impurities and demonstrate stability over time. An API supplier must also comply with the rigorous standards set out in the FDA's CGMP regulations. The required studies and documentation can be submitted to the FDA as part of a drug application or separately as a so-called drug master file (DMF).

37.     Starting from scratch, the investment required to develop the process to make an API, perform the required studies, and collect the documentation required by the FDA can take at least 15 months and cost up to $30,000 to $40,000 per month.

38.     ANDA applicants that are able to use API from manufacturers with a DMF already on file save both time and money because they do not need to redo the required testing or re-submit the relevant documentation. Pyrimethamine had only one DMF available for reference between 2015 and 2019. Fukuzyu, a Japanese manufacturer of pyrimethamine API, held that DMF and supplied API for Daraprim both before and after Vyera's acquisition. This, according

10

**A-876**

to Mr. Bruno, made Fukuzyu the best available API supplier. Vyera signed an exclusive supply agreement with Fukuzyu in January 2017.

39.     If a drug maker does not or cannot source its API from a manufacturer with a DMF, the next best option is one that already supplies API to jurisdictions with regulatory standards similar to the United States, such as the European Union. According to Mr. Bruno, the only pyrimethamine API manufacturer in this position was RL Fine. Vyera entered an exclusive supply agreement with RL Fine in December 2017.

### 2.   Substitution of therapeutically equivalent generics

40.     Competition in the pharmaceutical industry, like many other industries, is shaped by industry-specific laws, regulations, and market practices. An appropriate economic analysis takes these industry-specific features into account. One important feature of competition in the pharmaceutical industry is the process of generic substitution for AB-rated generic drugs.

41.     Generic substitution is the result of a cluster of statutes, regulations, and private decision making. Forty-nine states and the District of Columbia have laws that either require or permit a pharmacist to fill a prescription written for a brand with a lower-priced AB-rated generic substitute, if available, unless the physician or patient directs otherwise.[7] In addition, private payers, Medicare, and Medicaid all encourage substitution of lower-priced generics through preferred placement on formularies, which result in lower copays for patients.

42.     In most states, substitution is permitted, not required.[8] Substitution of a generic occurs because it is cheaper and hence in a private decision maker's own economic interest. In other words, these laws work in conjunction with private decision making to promote price competition.

---

[7] National Association of Boards of Pharmacy, *2021 Survey of Pharmacy Law* (2020), pp. 97-101.
[8] *Id.*

11

43.     In the minority of states where substitution is required, the relevant law conditions the substitution on the generic being the least expensive option.[9] Here, once again, the law facilitates price competition by rewarding lower-priced generic drugs.

### 3.  Economics of generic competition

44.     Most branded drugs eventually face competition from one or more generics. Competition from lower-priced, virtually identical generic products results in substantially lower prices for consumers. For example, an analysis of certain drugs with a novel active ingredient— so-called new molecular entities—facing first generic entry between 2013 and 2014 found that brands retained, on average, just 12% of volume after one year.[10] The rate of generic penetration routinely reaches 95% for drugs with generic competition.[11] Studies also show that generic entry results in lower prices. For example, an analysis of all drugs facing first generic entry between 2015 and 2017 reported that, for products with a single generic producer, the median generic price discount was 39% off the brand price prior to generic entry.[12] The discount is even larger when there are multiple generics competing on price.[13]

---

[9] *Id.*

[10] Grabowski, Henry, Genia Long, Richard Mortimer, and Ani Boyo. 2016. "Updated Trends in US Brand-Name and Generic Drug Competition." *Journal of Medical Economics*, 5.

[11] Buttorff, Christine, Yifan Xu, and Geoffrey Joyce. 2020. "Variation in Generic Dispensing Rates in Medicare Part D." *American Journal of Managed Care*, 26 (11), available at https://www.ajmc.com/view/variation-in-generic-dispensing-rates-in-medicare-part-d (noting that "the generic substitution rate . . . is typically 95% or higher"); IMS Institute for Healthcare Informatics, "Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013," April 2014, p. 51 ("Generics are now dispensed 95% of the time when a generic form is available.").

[12] Conrad, Ryan and Randall Lutter. 2019. "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices," FDA Report: 1-9 (39% is the median price discount on an AMP basis; on an invoice price basis (relying on IMS National Sales Perspective data), the median price discount is 31%).

[13] Conrad and Lutter, "Generic Competition and Drug Prices," 1-9 (when there are two competing generic products, 54% is the median price discount on an AMP basis; on an invoice price basis, the median discount is 44%); *see also* Olson, Luke M. and Brett W. Wendling. 2018. "Estimating the Causal Effect of Entry on Generic Drug Prices Using H-W Exclusivity." *Review of Industrial Organization* 53:139–172, 159 (finding "[t]he effects of three competitors range from decreasing generic prices from 24.0 to 39.7%, relative to a single competitor").

GX8004-014

45.     To compete with a new generic entrant, a branded firm may launch an authorized generic (AG) product. An AG is a brand name drug, authorized under the drug maker's existing FDA approval, that is marketed without the brand name by the brand or by a third-party generic firm. A 2011 FTC report found that the presence of an AG also results in lower generic prices.[14]

### 4. Generic FDA-approved pyrimethamine

46.     These empirical findings are consistent with the observed effects of entry by generic versions of Daraprim.

47.     The FDA approved the first generic version of Daraprim in February 2020, which was launched by Dr. Reddy's Laboratories (DRL) in March 2020. By the end of that year, DRL captured 41% of the sales volume for FDA-approved pyrimethamine. Around the time DRL entered, Vyera launched an AG product that captured 16% of the market by the end of 2020. Figure 2 shows the shift in volume from Daraprim to other FDA-approved pyrimethamine products.

---

[14] FTC. 2011. "Authorized Generic Drugs: Short-Term Effects and Long-Term Impact: A Report of the Federal Trade Commission."

13



**Figure 2 (GX7013)**
**Quantity of FDA-Approved Pyrimethamine by Product**
**2019–2020**

Source: GX1618 (Vyera_01560868), GX1619 (Vyera_01560869), GX3386 (DRL0000146b)

48.   Consistent with the economic literature, generic entry led to lower net prices for FDA-approved pyrimethamine. As Figure 3 shows, the average net price fell by ▮ between 2019 and 2020.

14



Figure 3 (GX7004)
Average Net Price of FDA-Approved Pyrimethamine
2016–2020

Source: GX1618 (Vyera_01560868), GX1619 (Vyera_01560869), GX3386 (DRL0000146b)

49.     As discussed below, these observations about the impact of generic competition play an important role in the assessment of whether Vyera exercised market power and monopoly power.

### III. Market Power and Monopoly Power

50.     The economic evaluation of market power is undertaken in two complementary ways. One approach is to assess Daraprim's position in a properly defined antitrust market with significant barriers to entry. This evaluation usefully focuses attention on the relative competitive roles played by drugs other than Daraprim, and the extent to which these drugs constrain

15

Daraprim's exercise of market power. Possession of a large share of a relevant market, combined with other evidence about the market, demonstrates market power and monopoly power.

51.     The second route is to assess Vyera's historical conduct in setting the price of Daraprim and the response of consumers. This route is sometimes called the "direct" approach. A showing that Vyera profitably charged a price substantially above the competitive level—that is, the price that would prevail under competitive conditions—suffices to establish market power and monopoly power as an economic matter.

52.     These approaches overlap to a significant degree. For example, a firm's imposition of a price above the competitive level provides direct evidence of market power and is also an important input in the identification of a relevant antitrust market.

53.     Here we can observe that Vyera was able to impose a price of Daraprim above the competitive level. In the four years prior to generic entry, Vyera maintained an average net price between $228 and $305 per tablet, as shown in Figure 3.[15] These prices are above any measure of the competitive level. With the available data, we can determine the upper bound of the competitive level by observing the price that prevailed after DRL's entry in March 2020. The average net price of FDA-approved pyrimethamine, in the nine-month period following generic entry, was ███

---

[15] App'x B (GX7004 (Fig. 3)).

16



**Figure 4 (GD002-001)**
**Average Net Price of FDA-Approved Pyrimethamine**
**Before and After Generic Entry**

Source:  GX1619 (Vyera_01560869), GX1618 (Vyera_01560868), GX3386 (DRL0000146b)

54.     Because we can observe that this price prevailed when two producers of FDA-approved pyrimethamine were competing, we know that the competitive price cannot be higher than this level.[16] The competitive level is likely much lower. Prices will likely continue to fall as additional generics enter and price competition becomes more intense.

55.     Applied here, both the market definition and direct approaches support the conclusion that Vyera exercised market power and monopoly power with respect to Daraprim between August 2015 and March 2020. The market definition inquiry yields the conclusion that FDA-approved pyrimethamine is a relevant antitrust market. During the time period under

---

[16] The post-entry price of ▮▮▮ is lower than the average price for 2020 (▮▮▮) because the latter figure includes high-price Daraprim sales made prior to generic entry.

17

scrutiny, Vyera possessed a 100% share in that market. As to direct evidence, when Vyera owned the only available FDA-approved pyrimethamine product, it was able to profitably set and maintain a price significantly higher than the competitive level. I discuss these analyses in turn.

### A. The relevant antitrust market is FDA-approved pyrimethamine products

56.    Market definition is a routinely-employed analytical tool that supports the evaluation of competitive effects in two ways. First, it helps to establish whether a firm has market power. Second, it identifies the products that impose a competitive constraint on the exercise of market power, such that impeding competition from those products can be expected to have an anticompetitive effect.

57.    Market definition has two components, a geographic market and a product market. In this case the geographic market is straightforward. All of the pharmaceutical products that I considered in my analysis are sold on a nationwide basis in the United States and, to the extent they require FDA approval, are approved for use on a nationwide basis. The relevant geographic market is therefore the United States. Accordingly, my analysis focused on the product market.

58.    The relevant antitrust market contains the products associated with the conduct in question and those additional products that are close enough substitutes to constrain the exercise of market power. Here, the conduct in question involves Vyera's strategies to impede entry of generic pyrimethamine competitors. Accordingly, my market definition analysis examined whether FDA-approved pyrimethamine, which encompasses both Daraprim and FDA-approved generics, is a relevant antitrust market.

59.    Using FDA-approved pyrimethamine products as the candidate market, I have performed quantitative and qualitative analyses to evaluate whether generic pyrimethamine constrained the exercise of market power of Daraprim within an overall FDA-approved

18

pyrimethamine market and whether other therapies were close enough substitutes so as to warrant inclusion in the market.

    **1. Quantitative evidence from DRL's entry in 2020 demonstrates that FDA-approved pyrimethamine products are a relevant market**

60.    The goal of the market definition inquiry is to determine whether delaying or otherwise impeding entry of other sellers within the candidate market would harm consumers by allowing Vyera to profitably charge a higher price and/or reduce output.

61.    Here we have an opportunity to observe the effects of new entry by DRL, a competing producer of FDA-approved pyrimethamine. Before DRL launched its lower-priced generic version of Daraprim in March 2020, Vyera was the only FDA-approved pyrimethamine available. After DRL's launch, both DRL and Vyera's AG product began making sales.

62.    By observing that DRL's entry caused many customers to switch from Daraprim and led to lower prices and higher volumes of FDA-approved pyrimethamine, I conclude that generic pyrimethamine products constrained Vyera's exercise of market power. Accordingly, there is a relevant market consisting of brand and generic FDA-approved pyrimethamine products.

63.    As a corollary, products outside the FDA-approved pyrimethamine product market did not constrain the exercise of market power to the same extent as the DRL generic and thus do not belong in the relevant market.

19

      **a.  The consumer response to DRL's entry demonstrates that FDA-approved pyrimethamine products are a relevant market**

64.      DRL's generic product launched in March 2020 at a significant discount to Daraprim. In 2019, the year before DRL entered, Daraprim sold at an average net price of $228 per tablet.[17] After its launch, DRL's product sold for an average of ███ per tablet.[18]

65.      In response, a large portion of Daraprim customers readily switched. Daraprim sales dropped 49% in the nine-month period after generic entry, compared to the same period prior to entry. By the end of 2020, Dr. Reddy's had a 41% share of FDA-approved pyrimethamine sales by volume; Vyera's AG had 16%.[19] As shown in Figure 5, Daraprim's net revenue and gross profits each declined 59% between 2019 and 2020.[20]

---

[17] App'x. B (GX7004 (Fig. 3)).

[18] Over the period between March 2020 and December 2020, DRL sold 91,500 tablets and had net sales of ██████████ implying a net price of ██████ per tablet. GX3386 (DRL sales data).

[19] *See* App'x. B (GX7013 (Fig. 2)).

[20] Net revenue decreased from $58.1 million to $24.0 million, and gross profits decreased from $55.0 million to $22.4 million.

GX8004-022



**Figure 5 (GX7012)**
**Daraprim Net Revenue and Gross Profit**
**2010–2020**

Source: GX3555 (IQVIA National Sales Perspectives), GX1618 (Vyera_01560868), GX1619 (Vyera_01560869)

     66.     Competition from DRL's generic product resulted in a lower price and higher

sales volume for FDA-approved pyrimethamine.[21] We can observe that generic entry

corresponds with a steeper decline in price than the pre-entry period. As shown in Figure 6, the

average net price fell to ▮▮▮ in the nine-month period after entry, compared to $209 in the same

period prior to entry, a decrease of ▮▮▮.[22] Prior to generic entry, the comparable average price

decline was approximately 6%.[23] Moreover, sales volume increased by 5% in the nine-month

period after generic entry, compared to the same period prior to entry.

---

[21] App'x B (GX7006, GX7011).
[22] The price decreased from $209.11 to ▮▮▮.
[23] 6.2% is the average price decline for all complete nine-month before-and-after windows from January 2016 to
February 2020. *See* App'x B (GX7006) (6.2%).

21

**Figure 6 (GD002-001)**
**Average Net Price of FDA-Approved Pyrimethamine**
**Before and After Generic Entry**

Price Per
Tablet



67.     These observations support the conclusion that, absent generic entry, the price of FDA-approved pyrimethamine was significantly higher and the sales volume of FDA-approved pyrimethamine was lower. This demonstrates that competition from the DRL product constrained Vyera's ability to exercise market power.

68.     A corollary observation is that other products on the market, including TMP-SMX and compounded pyrimethamine, were less effective in constraining the exercise of market power. The ability of generic Daraprim to better constrain Vyera's exercise of market power in the FDA-approved pyrimethamine market, compared to other therapies, demonstrates that it is a closer economic substitute. Dr. Jena agrees that generics are the closest economic substitutes for the branded product.

22

**b. Application of the hypothetical monopolist test confirms that FDA-approved pyrimethamine products are a relevant market**

69.      My conclusion that FDA-approved pyrimethamine products are a relevant market is confirmed by application of the hypothetical monopolist test. This test, described in the Horizontal Merger Guidelines used by federal antitrust enforcement agencies, identifies a relevant market by asking whether elimination of competition within the group of products would significantly harm consumers. The starting point, as an initial candidate market, is typically the narrowest market consistent with an evaluation of the conduct. The test then asks whether a profit-maximizing hypothetical monopolist, producing all products in the candidate market, likely would impose a price increase—in particular, a "small but significant and non-transitory increase in price," or SSNIP—on at least one of the products. The typical threshold for a SSNIP is 5% or 10%.

70.      If the analysis shows that the hypothetical monopolist would impose such a SSNIP, the inquiry is complete and the candidate market is the relevant market. If competition from products outside the market would prevent a price increase of this magnitude, it follows that one or more of those products might be a close economic substitute. The next step is then to broaden the candidate market and conduct the test again until it is satisfied.

71.      This iterative process ordinarily identifies the narrowest relevant market pertinent to the challenged conduct. To be sure, a broader market may also satisfy the test because, if a hypothetical monopolist could impose a SSNIP in a given market, it could necessarily impose a SSNIP if it owned additional products. But adding additional substitutes yields a misleadingly broad market, within which the firm whose conduct is under investigation will have a misleadingly small share.

23

72.     Here we can apply observations about the effects of DRL's entry to answer the question posed by the hypothetical monopolist test. We can observe that Vyera, the sole producer of FDA-approved pyrimethamine products prior to DRL's entry, was able to charge prices ███ higher in the absence of competition between Daraprim and generic pyrimethamine.[24] This demonstrates that a hypothetical monopolist owning both Daraprim and DRL's product would charge a price significantly more than 5% above the competitive level obtained when these drugs competed against each other. Therefore the candidate market of branded Daraprim and generic pyrimethamine satisfies the hypothetical monopolist test.

### c. The observed consumer response reflects brand-generic price competition

73.     The consumer response to generic entry provides powerful support for the conclusion that FDA-approved pyrimethamine is the relevant market. Defendants' expert Dr. Jena, however, suggests that the observed effects of DRL's entry were not the result of competition. First, Dr. Jena suggests that the observed decrease in FDA-approved pyrimethamine price is the result of state "automatic substitution" laws, which he characterizes as a mechanical process that shifts share without regard to the price of the generic product. This is incorrect.

74.     As discussed in Section 2, state substitution laws facilitate price competition. Most state laws permit pharmacists to substitute a lower-cost, virtually identical generic product when a patient is prescribed a brand. Whether substitution actually occurs depends on another actor preferring the generic because it is cheaper. A minority of states require substitution, but here too, only if the generic is cheaper. This facilitates price competition by rewarding lower-priced generics.

---

[24] $209.11/███ is approximately ███. *See* App'x B (GX7006).

24

75.     Second, Dr. Jena suggests that some or all of the price decrease observed after generic entry would have occurred even absent generic entry due to a pre-existing downward price trend. Dr. Jena does not articulate a reason for this trend or why he expects it to continue, but even if it does, my analysis already takes account of a possible downward trend. The price of FDA-approved pyrimethamine and Daraprim decreased by ▮ and 40%, respectively, during the nine-month period after entry, compared to the same period prior to entry. As discussed above, the comparable price decrease prior to generic entry is just 6%.[25]

76.     It is thus clear that generic competition had a significant constraining effect beyond any such pre-entry trend. Without addressing or criticizing this approach, Dr. Jena makes an arbitrary comparison—the first and last quarters of 2019—that yields the highest rate of pre-entry decline, and uses this comparison to calculate a downward trend in the price of Daraprim. Choosing any other quarter as a start date would have resulted in higher predicted prices, and thus a larger gap between his predicted prices and the lower actual prices observed after generic entry.

77.     But even Dr. Jena's calculations show that generic competition constrained Vyera's ability to exercise market power. The observed net Daraprim price in 2020 is 14% lower than the price implied by his approach.[26] Thus, Dr. Jena's analysis is consistent with my conclusion that, absent generic competition, Vyera was able to maintain a higher price for Daraprim.

---

[25] App'x B (GX7006) (showing ▮ decline in the price of FDA-approved pyrimethamine after generic entry, compared to a 6.2% decline before generic entry); App'x C (GD0002-002); GX1619 (Vyera sales data used to calculate Daraprim prices during the nine-month period before and after generic entry, yielding a 39.7% decline); *see also* App'x C (GX7014) (showing the net price of Daraprim from 2015 to 2020).
[26] The average actual world price of Daraprim in 2020 was $145.41. *See* App'x B (GX7014). Dr. Jena's average predicted price, taking account of the declining volume of Daraprim over four quarters, is $169.38. $145.41/$169.38 is approximately 86%.

GX8004-027

78.     Evidence from the record further supports the conclusion that Vyera competed on price with DRL's generic. For example, Vyera offered payers large rebates that would make Daraprim cheaper than DRL's generic. In exchange, the payer would place Daraprim (instead of the generic) on a preferred tier of its formulary, with a lower copay for patients.[27] Vyera documents also indicate that it offered hospital customers lower prices in order to compete with DRL.[28] Moreover, Vyera's internal forecasts predicted that generic competition would cause Daraprim's price to fall significantly. For example, in a forecast from March 2020, Vyera projected a Daraprim price drop from $278 to $126 immediately after generic entry.[29]

79.     The fact that Vyera lowered Daraprim prices to various customers in order to compete with DRL is further evidence that DRL was a close economic substitute for Daraprim and supports my conclusion that FDA-approved pyrimethamine products are the relevant market. By contrast, other therapies were not sufficiently close substitutes for Daraprim, as further confirmed by my analysis below.

### 2. The consumer response to past Daraprim price increases confirms that the relevant market does not include other toxoplasmosis treatments

80.     Other evidence supports my conclusion that FDA-approved pyrimethamine is the relevant market by demonstrating that other therapies are not sufficiently close economic substitutes. If enough customers would switch to another therapy, in response to a price increase significantly above the competitive level, so as to render the increase unprofitable, then the therapy is a close economic substitute that should be included in the relevant market.

---

[27] GX3431 (Vyera offered CVS 63% off WAC to be placed on Tier 1 and "block[] generics"); GX3552 (Vyera expressed it was "very motivated" to enter brand-for-generic agreement and offered Optum a 65% rebate); GX 1644 (Vyera tracker indicating that Vyera executed brand-for-generic rebates of 65% with certain payers).
[28] GX1645 at 002 ("We are sweetening the deal with Vizient GPO as per their recommendation. Vizient is the largest GMP for hospitals. We understand our pricing was not as good as our generic competition.").
[29] GX1638 (Tab "Forecast," Row 124).

26