# 22-728

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

FEDERAL TRADE COMMISSION, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF ILLINOIS, STATE OF NORTH CAROLINA, COMMONWEALTH OF VIRGINIA,

—against—

*Plaintiffs-Appellees,*

MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendant-Appellant,*

VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, KEVIN MULLEADY, individually, and as an owner and director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME IV OF VIII
### (Pages A-892 to A-1188)

BRADLEY GROSSMAN
UNITED STATES FEDERAL
  TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-2424

*Attorneys for Plaintiff-Appellee
  Federal Trade Commission*

KIMO S. PELUSO
NOAM BIALE
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for Defendant-Appellant
  Martin Shkreli*

(*Counsel continued on inside cover*)

PHILIP LEVITZ
OFFICE OF THE NEW YORK STATE
    ATTORNEY GENERAL
28 Liberty Street, 15th Floor
New York, New York 10005
(212) 416-8000

*Attorneys for Plaintiffs-Appellees
    State of New York, State of
    California, Commonwealth of
    Pennsylvania, State of Illinois,
    Commonwealth of Virginia*

SHIRA HOFFMAN
ASSISTANT U.S. ATTORNEY
CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 269-6000

*Attorneys for Plaintiff-Appellee
    State of California*

DEREK MICHAEL WHIDDON
ASSISTANT ATTORNEY GENERAL
OHIO OFFICE OF THE
    ATTORNEY GENERAL
30 East Broad Street, 26th Floor
Columbus, Ohio 4321
(614) 466-2677

*Attorneys for Plaintiff-Appellee
    State of Ohio*

JOSEPH STEPHEN BETSKO, SR.
PENNSYLVANIA OFFICE OF
    THE ATTORNEY GENERAL
ANTITRUST SECTION
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-5393

*Attorneys for Plaintiff-Appellee
    Commonwealth of Pennsylvania*

SARAH A. HUNGER
DEPUTY SOLICITOR
ILLINOIS OFFICE OF THE
    ATTORNEY GENERAL
CIVIL APPEALS DIVISION
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5202

*Attorneys for Plaintiff-Appellee
    State of Illinois*

JESSICA VANCE SUTTON
NORTH CAROLINA DEPARTMENT
    OF JUSTICE
114 West Edenton Street
Raleigh, North Carolina 27603
(919) 716-0998

*Attorneys for Plaintiff-Appellee
    State of North Carolina*

SARAH OXENHAM ALLEN
LUCAS W.E. CROSLOW
MARTIN JORDAN MINOT
VIRGINIA OFFICE OF THE
    ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-6557

*Attorneys for Plaintiff-Appellee
    Commonwealth of Virginia*

# TABLE OF CONTENTS

PAGE

District Docket Court Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Amended Complaint, dated April 14, 2020 [Redacted] . . . . . . . . . . . . . . . . A-136

Defendant Kevin Mulleady's Answer and Jury Demand,
        dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-222

Defendant Martin Shkreli's Answer with Jury Demand,
        dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-289

Defendant Vyera Pharmaceuticals' Answer with Jury Demand,
        dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-351

Joint Stipulation and Order to Amend the Relief Requested
        in the Pleadings, dated March 30, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . A-409

FTC's Motion for Leave to Withdraw the FTC's Prayer
        for Equitable Monetary Relief, dated May 26, 2021 . . . . . . . . . . . . . . . A-414

Order Dismissing the FTC's Claim for Disgorgement,
        dated June 2, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-419

Defendant Martin Shkreli's Pretrial Memorandum of Law [Redacted] . . . A-422

Plaintiff States' Supplemental Pretrial Memorandum of Law,
        dated October 20, 2021 [Redacted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-457

Joint Motion for Entry of Stipulated Order for Permanent Injunction,
        dated December 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-492

Stipulated Order for Permanent Injunction and Equitable
        Monetary Relief, dated December 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . A-541

ii

PAGE

Written Testimony of Nicholas Pelliccione, Ph. D.,
      dated October 18, 2021 .......................................... A-581

Written Testimony of W. David Hardy, M.D., dated October 20, 2021 .. A-593

Written Testimony of Frank DellaFera, dated October 18, 2021
      [Redacted] ..................................................... A-631

Written Testimony of James R. Bruno, dated October 20, 2021
      [Redacted] ..................................................... A-649

Written Testimony of Edward V. Conroy, dated October 20, 2021 ...... A-687

Written Testimony of Susan McDougal, dated October 15, 2021
      [Redacted] ..................................................... A-725

Written Testimony of Abhishek Mukhopadhyay,
      dated October 19, 2021 [Redacted] .............................. A-739

Written Testimony of Nilesh Patel, dated October 15, 2021
      [Redacted] ..................................................... A-751

Written Testimony of Manish S. Shah, dated October 20, 2021 ........ A-766

Written Testimony of Martin Shkreli, dated October 15, 2021
      [Redacted] ..................................................... A-785

Written Testimony of Anne Kirby, dated October 20, 2021 [Redacted].. A-803

Written Testimony of Kevin Mulleady, dated October 20, 2021......... A-831

Written Testimony of Professor C. Scott Hemphill,
      dated October 19, 2021 [Redacted] .............................. A-864

Written Testimony of Dr. Anupam B. Jena, dated October 20, 2021
      [Redacted], with Attachments ................................... A-924

iii

PAGE

Written Testimony of John S. Russell, dated October 20, 2021
    [Redacted], with Attachments .................................. A-1011

Consolidated (Full) Trial Transcripts,
    dated December 14 to 20, 2021 ................................. A-1068

Defendant Martin Shkreli's Notice of Appeal, dated April 5, 2022 .... A-2298

81.     The degree of substitution between products is often expressed in economic terms as the cross-price elasticity of demand. Cross-price elasticity, or cross-elasticity, refers to the degree to which an increase (or decrease) in the price of one product results in a change in quantity demanded of another product. For two products with positive cross-elasticity, the higher the cross-elasticity between products, the closer substitutes they are.

82.     My analysis of DRL's entry shows that generic versions of Daraprim significantly constrained Vyera's exercise of market power, beyond any constraint imposed by other therapies. This supports the conclusion that generics are significantly closer substitutes for Daraprim than other therapies. This conclusion is also supported by an analysis of consumer responses to past increases in the price of Daraprim, which confirms that there is not sufficient cross-elasticity between FDA-approved pyrimethamine and other therapies to constrain the exercise of market power in the FDA-approved pyrimethamine market.

**a.  Between 2010 and 2014, there was little substitution to other therapies despite a large increase in the price of Daraprim**

83.     We can observe that substantial increases in the price of Daraprim, the only form of FDA-approved pyrimethamine available at the time, did not lead to substantial substitution to other therapies. This is consistent with the conclusion that there is low cross-elasticity between FDA-approved pyrimethamine and other therapies.

84.     Between 2010 and 2014, CorePharma (a previous owner of Daraprim) increased the price of Daraprim repeatedly. Prior to November 2010, the price of Daraprim was $0.45 per tablet.[30] Over the next four years, the price increased 26-fold to $11.77.[31]

---

[30] App'x C (GD002-003).
[31] App'x B (GX7007).

GX8004-029

85.    The quantity loss associated with these price increases is small. For example, in the nine months preceding the November 2010 price increase, CorePharma sold 1,020,500 tablets of Daraprim at an average price of $0.45 per tablet. In the nine months following, CorePharma sold 910,600 tablets at an average price of $4.38.[32] Bringing these two observations together, an 881% increase in the price of Daraprim corresponded to an 11% decrease in the quantity sold.[33]

86.    This evidence is consistent with low price elasticity of demand for Daraprim. Economists use the concept of price elasticity of demand to express the change in quantity demanded by consumers that is associated with a particular price increase. Here, an 881% increase in the price of Daraprim was associated with an 11% decrease in quantity, indicating highly inelastic demand at this price level.

87.    As a corollary, this data also shows that, at most, there was a small amount of substitution (no more than 11%) to other therapies, in response to a substantial (881%) increase in the price of Daraprim. Indeed, the change in quantity due to the price increase is likely even smaller than 11% because some of the quantity change may be the result of a declining incidence of toxoplasmosis over time in response to improved treatments for HIV/AIDS, rather than switching to other therapies.[34]

88.    This evidence is consistent with low cross-elasticity between Daraprim and other therapies. Even if all of the observed quantity decrease were attributed to switching to other therapies, such as TMP-SMX or compounded pyrimethamine, that amount of switching is still much lower than would be expected from such a large price increase if the product had high

---

[32] App'x C (GD0002-003).
[33] App'x C (GD0002-003) (showing similar results if other windows are used).
[34] See App'x C (GD002-003).

GX8004-030

cross-elasticity with other therapies. This supports my conclusion that the relevant market is no

broader than FDA-approved pyrimethamine products.

> **b. Vyera's large and profitable price increase in 2015 demonstrates that other products did not constrain the price of Daraprim to the competitive level**

89.     Vyera's ability to profitably impose a large price increase in 2015 is further

evidence that other therapies are not close substitutes and should not be included in the relevant

market. As with the earlier period of Daraprim price increases, we again observe Daraprim price

increases that are very large relative to the decrease in quantity.

90.     Specifically, Daraprim's average net price increased from $12 in the nine-month

period preceding the 2015 price increase to $274 in the nine-month period thereafter, an increase

of 2,283%.[35] During this same period, quantity declined 66%.[36] Beyond this nine-month

window, in subsequent years Vyera's prices remained well above ███, the upper bound

estimate for the competitive level.[37]

91.     One would expect that a 24-fold price increase would drive virtually all

purchasers to a close economic substitute if one were available. But that is not what happened

here. Notwithstanding the observed decrease in quantity, Vyera was able to sell hundreds of

thousands of Daraprim tablets at the much higher, supracompetitive price level.[38] Defendants'

expert, Dr. Jena, agrees that the decline in quantity sold was not large enough to make the price

increase unprofitable.

92.     Vyera's price increase resulted in substantial profits. From 2016 through 2019,

Vyera's annual gross profits on Daraprim ranged between $55 million and $74 million. In

---

[35] *See* App'x C (GD0002-004) ($11.51 to $274.32).
[36] App'x C (GD0002-004) reports this calculation as well as alternative calculations with three-month and six-month windows, all yielding consistent results.
[37] App'x B (GX7004, GX7011).
[38] During the nine-month period after the August 2015 price increase, Vyera sold 216,138 tablets. Between 2016 and 2019, Vyera sold between 254,188 and 256,517 tablets of Daraprim per year.

GX8004-031

comparison, from 2010 through 2014, annual revenue for Daraprim—an upper bound of possible profits—was no greater than $10 million.[39] These increases were not the result of increased demand during this period. Nor did the perceived efficacy of pyrimethamine change in a significant way.[40]

93.     Some customers, specifically hospitals that had stocked Daraprim in case a rare patient presented with toxoplasmosis, appear to have reduced their precautionary purchases as a result of this large price increase.[41] Other customers likely switched to other therapies. None of these other therapies, however, constrained the price of FDA-approved pyrimethamine to the competitive level. Thus they are not properly included in the relevant market.

94.     It is not possible (or, as explained below, necessary) to determine the precise quantity of Daraprim lost to other therapies. There is not a reliable means, using available data, to calculate the amount of switching from Daraprim to TMP-SMX, a widely used antibiotic. As for compounded pyrimethamine, comprehensive sales data do not exist. While we do not have a comprehensive picture of compounded pyrimethamine usage, we do know that two large compounding pharmacies, Imprimis and Avella Specialty Pharmacy, sold only small volumes of compounded pyrimethamine capsules. Imprimis sold fewer than 22,000 compounded pyrimethamine capsules in 2016 and its sales declined thereafter.[42] Avella sold a total of 1,280 compounded pyrimethamine capsules, with no sales after 2018 due to a lack of customers.[43]

95.     Although cross-elasticity cannot be reliably calculated using the available data, we can conclude that the cross-elasticity between FDA-approved pyrimethamine and other

---

[39] *See* App'x B (GX7012 (Fig. 5)).
[40] *See* Shkreli (Day 1) Dep. 127.
[41] *E.g.* GX1585 (email describing Shkreli's concern that "hospitals that don't want to pay $75K to stock a bottle in the event of an emergency").
[42] GX3355 (Imprimis data).
[43] GX3363 (Avella data); *see also* Sredzinski (Avella) Dep. 98.

30

therapies was not high enough to warrant inclusion of these other therapies in the relevant market. Other therapies did not constrain Vyera's ability to raise the price of Daraprim above the competitive level. And as with the earlier price increase, one would expect than an increase of this magnitude would cause virtually all purchasers to switch to another product with high cross-elasticity, if one were available. This means that other therapies, including TMP-SMX and compounded pyrimethamine, are not sufficiently close economic substitutes for FDA-approved pyrimethamine to constrain the exercise of market power within that market and, thus, are properly excluded from the market.

**c. Dr. Jena's analysis of claims data is flawed and uninformative**

96.     Although Dr. Jena agrees that Vyera's 2015 price increase on Daraprim did not result in enough quantity loss to render it unprofitable, he has analyzed a dataset of insurance claims in an effort to show that there was some substitution to other therapies. He purports to identify a set of toxoplasmosis patients whose drug claims show a decreased use of Daraprim and an increased use of TMP-SMX beginning in 2010. He concludes that this change indicates substitution from Daraprim to TMP-SMX.

97.     Dr. Jena's analysis of claims data is uninformative about the scope of the relevant market. As I discussed above, there was some degree of substitution to other therapies in response to price increases beginning in 2010. But that observation alone is not helpful in assessing whether other therapies are properly included in the relevant market.

98.     My analysis has shown that substitution to other therapies did not constrain the price of FDA-approved pyrimethamine to the competitive level and thus they are not included in the relevant market. Dr. Jena does not offer an alternative assessment of the degree of substitution between FDA-approved pyrimethamine and other products. Nor does he offer an

31

alternative threshold for the appropriate degree of substitution to warrant inclusion in the relevant market.

99.     In fact, Dr. Jena has not offered an opinion that any other therapy should be included in the relevant market. His analysis, even if accurate and reliable, does not address the relevant economic question: whether Vyera, during the period under examination, was able to profitably raise Daraprim's price above the competitive level.

100.     Dr. Jena's claims data analysis also suffers from multiple flaws. First, it draws conclusions about a selected subset of patients that do not generalize to the market as a whole. The data are likely drawn from a single network and limited to outpatient treatment. His sample includes only 633 patients, or 14 patients per quarter in the period covered by his data. This small, unrepresentative shows clear inconsistencies with national sales data. For example, Dr. Jena's data set shows no Daraprim use after the third quarter of 2015. In fact, Vyera sold more than 200,000 tablets per year between 2016 and 2019.[44]

101.     Dr. Jena's analysis is flawed in a further respect. He claims to have identified patients using TMP-SMX for the treatment of toxoplasmosis by assuming that every TMP-SMX claim following a diagnosis of toxoplasmosis is being used as a treatment for toxoplasmosis. Dr. Jena classifies any prescription of TMP-SMX as a treatment for toxoplasmosis, even if that prescription occurs many months or years later than the diagnosis. Given that TMP-SMX is a widely-prescribed antibiotic used to treat other conditions, if it was administered months or years after a toxoplasmosis diagnosis it may well have been used to treat a different condition. Dr. Jena's method thus likely overstates the use of TMP-SMX for toxoplasmosis.

---

[44] *see* n. 38, above.

32

102.    One simple way to investigate this issue, using the limited data on which Dr. Jena bases his conclusions, is to examine the timing of drug claims compared to the most recent observed toxoplasmosis diagnosis. As shown in Figure 7, the majority (57%) of the TMP-SMX claims in Dr. Jena's dataset were filed more than a year after a toxoplasmosis diagnosis, compared to 10% of Daraprim claims.



**Figure 7 (GX7010)**
**Months Since Most Recent Toxoplasmosis Diagnosis for Drug Claims Included in Dr. Jena's Claims Analysis**

Source: OptumHealth Employer Claims data; Expert Report of Dr. Anupam B. Jena, filed June 4, 2021

103.    This discrepancy suggests that many of the TMP-SMX prescriptions may have been used to treat other infections.

### 3.   Other evidence confirms a relevant market limited to FDA-approved pyrimethamine

#### a.   Medical evidence

104.    I have reviewed the reports and testimony of Plaintiffs' medical expert, Dr. Hardy, as well as record evidence bearing on the functional substitutability of other therapies for

33

FDA-approved pyrimethamine products. This evidence is consistent with and explains the observed economic outcome that the availability of other therapies, including TMP-SMX and compounded pyrimethamine, did not constrain the price of FDA-approved pyrimethamine to the competitive level.

105.    Based on my review of Dr. Hardy's report, FDA-approved pyrimethamine is the gold standard therapy for virtually all types of active toxoplasmosis and plays a unique and critical in diagnosing toxoplasma encephalitis.

106.    TMP-SMX, an antibiotic that is used on an off-label basis to treat toxoplasmosis, is not considered to be a close functional substitute for FDA-approved pyrimethamine. The safety and efficacy of TMP-SMX for the treatment of active toxoplasmosis is less established than Daraprim and many physicians consider TMP-SMX to be inferior to FDA-approved pyrimethamine.

107.    Compounded versions of pyrimethamine are also not considered a close functional substitute. Because they are not subject to the same regulatory scrutiny as FDA-approved products, compounded products are understood to pose higher risks to patients. For example, the process for making a compounded drug product is not reviewed by the FDA or required to meet the manufacturing standards applicable to FDA-approved drugs. This increases the risk of incorrect dosing. In light of these risks, compounded products are intended to serve individual patients with specialized needs and are subject to regulatory restrictions on distribution and large-scale manufacturing.

### b.    Payer formulary policies

108.    After Vyera raised the price of Daraprim in 2015, there is no indication that Daraprim was widely excluded from formularies or insurance coverage. Formulary exclusion is an important payer tool to steer patients to more cost-effective treatments. When there is a good

34

enough alternative available at a lower price, payers may deny coverage for the more expensive drug. Despite the fact that a single tablet of Daraprim cost hundreds of dollars compared to $5 or less for a unit of TMP-SMX[45] or compounded pyrimethamine, payers continued to cover it.[46]

109.    In contrast to Vyera's 2015 price increase, it appears that the availability of a generic version did prompt payers to exclude Daraprim from coverage. For example, CVS's three largest commercial formularies all covered Daraprim following Vyera's 2015 price increase. But after DRL's entry, two of them excluded brand Daraprim in favor of the generic.[47] This illustrates that generics impose a potent competitive constraint beyond that offered by other therapies.

110.    Formulary exclusion is not the only tool payers use to steer patients to cost-effective treatments. Payers sometimes require patients to try other, cheaper therapies or meet other prior authorization criteria before covering the prescribed drug. Evidence from Vyera documents and PBM employee testimony suggest that despite Daraprim's high price, many health plans did not impose such requirements.[48] The largest PBMs did create optional prior authorization criteria that their client health plans could choose to adopt, but these criteria did not require patients being treated for toxoplasmosis to try any other therapies before covering Daraprim.[49] The fact that many health plans chose not to impose such requirements is consistent with the conclusion that other therapies were not reasonable substitutes.

---

[45] As discussed in Paragraph 20, the net price of TMP-SMX is less than $0.10, while the price of compounded pyrimethamine produced by Imprimis and Avella is approximately $1 to $5.
[46] *See, e.g.,* Wessels (CVS) Dep. 28-29, 32, 37, 55-58, 63 (CVS representative testified that Daraprim continued to be covered by CVS's three largest commercial formularies after the 2015 price increase); *see also* GX3551 at 002 (Optum's pharmacy and therapeutics committee assigned Daraprim the "designation of an essential drug").
[47] Wessels (CVS) Dep. 63-64 (CVS's Standard Control and Advanced Control formularies excluded Daraprim from coverage when generics entered and generics were placed on the lowest copay tier).
[48] For example, of CVS's commercial clients, only about 20% to 25% chose to impose a prior authorization requirement. Wessels (CVS) Dep. 54-55.
[49] GX3427 (CVS); GX3549 (Optum); GX3526 (Express Scripts).

GX8004-037

111.     Of course, payer practices are not uniform. There are likely exceptions to these general observations. Dr. Jena identifies two individual health plans that imposed prior authorization criteria on Daraprim that required patients to first try and fail other therapies. But the existence of these exceptions does not demonstrate that other therapies were close substitutes for Daraprim. Indeed, we can observe that even though some payers imposed formulary controls, such tools did not result in enough purchasers switching to other products to constrain Vyera's ability to profitably maintain the price of Daraprim above the competitive level.

### c. Vyera's expectations for Daraprim

112.     I have reviewed numerous documents and deposition transcripts from Vyera and other market participants. Based on that review, Vyera's expectations about Daraprim pricing and consumer behavior are consistent with my conclusion that the relevant market is limited to FDA-approved pyrimethamine products.

113.     Vyera's willingness to purchase the rights of Daraprim for $55 million was premised on a plan to raise its price and the expectation that other treatments would not be able to constrain the profitability of this plan.[50] The expectation of Vyera personnel is reflected, among other places, in an email between employees written in connection with the firm's inquiry to purchase the rights to Daraprim, in which the drug was described as "the GOLD standard" and "essentially unsubstitutable."[51]

114.     When deciding whether to acquire Daraprim, Vyera commissioned a study to analyze whether physicians were likely to switch to alternatives in response to a price increase.

---

[50] *See, e.g.*, GX1320 at 018 (June 2015 Vyera presentation projecting "[p]otential revenues of over $500mm with greater than 80% EBITDA margins").
[51] GX1213 at 001 (May 2015 email chain from Crutcher to Smith).

GX8004-038

The results of the study, which were circulated to executives including Mr. Shkreli, show that physicians did not generally consider other therapies to be reasonable substitutes for Daraprim.[52]

115.    The study reported that physicians view pyrimethamine as the standard of care for toxoplasmosis and are "at a loss to think of an appropriate alternative."[53] It added that infectious disease doctors are "highly focused on therapeutic benefit" and "not particularly cost- or price-sensitive."[54] The report further noted that most physicians "would complete prior authorizations or pursue financial support in the interest of securing 'gold standard' treatment for patients," rather than substitute another drug on cost grounds.[55]

**B. Vyera had market power and monopoly power in the relevant market**

116.    Having determined that the relevant market in which to assess the anticompetitive effects of Vyera's conduct is FDA-approved pyrimethamine products, the next step in the analysis is to address whether Vyera had market power and monopoly power in that market.

117.    During the period between August 2015 and March 2020, Vyera had a 100% share in the relevant market. When the relevant market is protected by significant barriers to entry, a share this high is sufficient to establish market power and monopoly power.

118.    Monopoly power is enabled by significant barriers to entry, without which the monopolist would be unable to charge a supracompetitive price for a sustained period. In the pharmaceutical industry, there are numerous barriers to launching a competing product. Any competing FDA-approved product must go through the FDA's regulatory process. For a generic drug, this involves significant development work, bioequivalence testing, and FDA scrutiny, and typically takes several years.

---

[52] GX1167; Retzlaff Dep. 184-86.
[53] GX1167 at 001.
[54] GX1167 at 016.
[55] GX1167 at 028.

GX8004-039

119.    Generic entrants to the FDA-approved pyrimethamine market may have faced additional barriers, to the extent that Vyera's distribution restrictions and exclusive supply agreements restricted access to Daraprim samples and pyrimethamine API, both of which are required to secure approval of an ANDA.

120.    Based on the foregoing analysis, I conclude the Vyera had market power and monopoly power in the relevant market for FDA-approved pyrimethamine from the time it acquired Daraprim in 2015 until generic entry in 2020.

**C. Direct evidence demonstrates Vyera's market power and monopoly power**

121.    I reach the same conclusion by directly analyzing Vyera's ability to exercise market power and monopoly power. Direct analysis to assess market power and monopoly power is a standard tool used by economists.[56] By definition, a firm has market power if it can charge a price greater than the competitive level for a sustained period. Here the evidence shows that Vyera was able to do just that.

122.    When Vyera owned the only available FDA-approved pyrimethamine product, it was able to profitably set and maintain a price significantly higher than the competitive level. As discussed above, in the four years prior to generic entry, Vyera maintained an average net price between $228 and $305.[57] This price is well above any measure of the competitive price, which is no greater than the ████ price of FDA-approved pyrimethamine observed following DRL's competitive entry.

123.    The conclusion that Vyera possessed a high degree of market power is reinforced by evidence that the competitive price is likely substantially less than ████. The observed ████

---

[56] Kaplow, Louis, and Carl Shapiro. 2007. "Antitrust." In *Handbook of Law and Economics*, Vol. 2, edited by A. Mitchell Polinsky and Steven Shavell, 1087-90.
[57] App'x B (GX7004 (Fig. 3)). Measured on a quarterly basis, Vyera maintained an average net price between $202 and $330 from Q4 2015 through Q4 2019. App'x B (GX7011).

GX8004-040

price level is a conservative upper bound based on the first few months after generic entry. We

have not had the opportunity to see the competitive process fully play out. As additional generics

enter and competition intensifies, prices will likely continue to fall. Moreover, there is evidence

supporting a much lower level, $12, as a reasonable estimate of the competitive price level. This

is the price that prevailed in 2013 and 2014, prior to Vyera's price increase.[58] During this period,

two generic drug makers decided to begin developing their product.[59] Under the reasonable

assumption that those generic entrants planned to compete on price, a market with generic

competition likely would feature a price at or below the $12 level. This suggests that Vyera was

able to set a price for Daraprim hundreds of dollars above the competitive level for nearly five

years, which in turn demonstrates a high degree of market power.

124.     Vyera's supracompetitive prices corresponded to a reduction in the quantity sold.

As discussed in Paragraph 90, Vyera's 2015 price increase resulted in a reduction in the quantity

of Daraprim—at the time, the only FDA-approved pyrimethamine product available. By contrast,

when DRL's generic pyrimethamine entered the market in March 2020, the total output of FDA-

approved pyrimethamine expanded. FDA-approved pyrimethamine volume in 2020 increased by

9% over its 2019 level, from approximately 255,000 tablets to 278,000 tablets.[60]

125.     While Vyera's supracompetitive price of Daraprim caused a reduction in the

quantity sold, this change was very profitable for Vyera. As discussed in Paragraph 92, Vyera's

supracompetitive pricing resulted in annual gross profits that were tens of millions of dollars

---

[58] See App'x B (GX7007).
[59] Based on testimony from executives at the two generic drug makers, Cerovene and Inva-Tech, these companies
began developing generic products in 2013 and 2014, respectively.
[60] See App'x B (GX7011).

GX8004-041

greater than the profits earned by the drug's previous owners.[61] The associated gross profit margins ranged between 89% and 98%.[62]

126.    For these reasons, we can directly observe that Vyera exercised market power and monopoly power with respect to Daraprim between August 2015 and March 2020.

## IV. Competitive Effects

127.    From the conclusion that Vyera possessed monopoly power in the market for FDA-approved pyrimethamine products, it immediately follows that impeding entry by other firms within the market—here, prospective producers of an FDA-approved generic pyrimethamine drug—would have the anticompetitive effect of artificially sustaining Vyera's monopoly power.

128.    When branded drug makers face generic competition, drug prices typically fall. As discussed in Section III, real-world evidence in this case confirms that result. Drug purchasers benefit from this competition. It follows directly that when contracts are entered into that impede or delay generic competition, as is alleged here, purchasers are likely to be made substantially worse off, compared to letting competition take its course. Conduct that impedes competition from taking its course harms the competitive process and has anticompetitive effects. Here, the relevant question is whether Vyera's challenged conduct impeded generics' opportunities to constrain the exercise of market power, thereby disrupting the expected consequences of competition, including lower prices and increased output.

---

[61] *See* App'x B (GX7012 (Fig. 5)).
[62] Gross margins are calculated using Vyera's reported production costs, which ranged between $6 and $32 per tablet between 2015 and 2020.

GX8004-042

129.   Such harms arise when three conditions are met. The first condition is that the drug maker is able to exercise market power and charge a supracompetitive price in the absence of competition. The second condition is that the exclusion is sufficiently effective as to make a difference to competition. The third condition is that the conduct does not have demonstrated procompetitive effects that offset the harm to purchasers. I have already concluded that between August 2015 and March 2020, Vyera exercised monopoly power and market power in the market for FDA-approved pyrimethamine drugs. The rest of this section therefore focuses on the second and third conditions.

## A.   Impeded entry

130.   The second condition is that the conduct at issue was sufficiently effective as to make a difference to competition. Exclusion of a rival need not be permanent to have an anticompetitive effect. Even short delays can have a large effect on profits. Nor must foreclosure of a rival's competitive opportunities be completely airtight to have an adverse effect. Sometimes, of course, exclusionary conduct raises the cost of entry to a point that entry is not attempted at all. But complete abandonment is not necessary. Exclusionary conduct can still have an anticompetitive effect if it raises rivals' expenses and thereby impedes or delays competition.[63]

131.   From an economic perspective, the issue is whether the exclusionary conduct meaningfully reduces the effectiveness of rivals, or probability of entry, as a constraint on the incumbent's exercise of market power. A common example reflected in the academic literature is a dominant firm using exclusive contracts with one or more suppliers of a key input, thereby

---

[63] Krattenmaker, Thomas G., and Steven C. Salop. 1986. "Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price." *Yale Law Journal* 96 (2): 209-93, 234, 236 (describing various strategies to raise rivals' costs by means of contracts with suppliers, including "obtaining exclusionary rights from . . . the lowest-cost suppliers" and "acquir[ing] an exclusionary right" over part of the supply).

41

GX8004-043

making it more difficult for competing firms to obtain the input on terms that would enable them to compete effectively with the dominant firm.[64] Such contracts can be expected to impede competitive entry.

132.    By contrast, if a dominant firm entered an exclusive contract with one of several equally promising suppliers, that contract would be unlikely to make a difference to competition because potential competitors could equally source the input from the other suppliers. This literature is relevant to an economic evaluation of Vyera's distribution restrictions and exclusive supply agreements.

133.    *Distribution restrictions*. Testimony and documents from generic drug makers indicate that Vyera's challenged agreements restricting access to samples impeded the approval efforts of generic drug makers that needed to obtain Daraprim for FDA-mandated bioequivalence studies. This evidence indicates that at least two companies, Cerovene and Fera, were unable to obtain a sufficient quantity of Daraprim for more than a year. This record further indicates that another generic drug maker, Mylan, ultimately decided to abandon its efforts to develop a generic version of Daraprim after failing to secure adequate samples. This evidence of delayed and deterred entry supports the conclusion that Vyera's conduct impaired the opportunities of its rivals to a degree that made a difference to competition.

---

[64] *See, e.g.*, Comanor, William S., and Patrick Rey. 2000. "Vertical Restraints and the Market Power of Large Distributors."*Review of Industrial Organization* 17(2):135–153, 136 (model in which "dominant" distributor excludes its "price-cutting rivals" by entering exclusive supply arrangement with supplier, thereby harming consumer welfare); Marx, Leslie M., and Greg Shaffer. 2007. "Upfront Payments and Exclusion in Downstream Markets." *RAND Journal of Economics* 38(3): 823-43 (dominant retailer reaches contract with manufacturer that excludes retailer's rivals); Lafontaine, Francine, and Margaret Slade. 2008. "Exclusive Contracts and Vertical Restraints: Empirical Evidence and Public Policy." In *Handbook of Antitrust Economics*, edited by Paolo Buccirossi, MIT Press: 391–414, 392 n. 3 (slotting allowances imposed by retailers on manufacturers); Oki, Ryoko, and Noriyuki Yanagawa. 2011. "Exclusive Dealing and the Market Power of Buyers," *Asian Journal of Law and Economics* 2(1): 1-23 (incumbent downstream firm signs exclusive contract with manufacturer, excluding the downstream firm's more efficient rival, with anticompetitive effect).

GX8004-044

134.    *Exclusive supply agreements*. Testimony from generic drug makers and the opinion of Dr. Bruno indicate that Vyera's challenged exclusive supply agreements with Fukuzyu and RL Fine—as I understand from Mr. Bruno, the two most viable pyrimethamine API suppliers—raised its rivals' costs and impeded their entry. This evidence indicates that the contracts increased the expense of procuring API supply and entailed additional investment to assemble the extensive data required for FDA approval. Multiple generic drug makers have stated that they faced more than a year of delay, increased costs, or both because of Vyera's agreements. As with the distribution restrictions, this amount of impairment would establish that the API exclusivity agreements made a difference to competition.

135.    In response to my opinion, Dr. Jena has argued that Vyera's contractual restrictions did not have an adverse effect on competition because, based on his interpretation of documents and testimony (as well as the opinions of other defense experts), he believes that no generic competitors would have entered the market earlier absent Vyera's conduct. This contention suffers from three fundamental flaws.

136.    First, Dr. Jena asserts that Vyera's contractual restrictions were not anticompetitive because, in his view, the generic drug makers could have overcome them if they had made different decisions. For example, he suggests that generic manufacturers failed to take certain "rational" measures to procure Daraprim in a timely manner, such as contracting with multiple drug procurement services simultaneously. Dr. Jena acknowledges that doing so would likely have cost the generic firm millions of dollars in additional expenses, but he dismisses the relevance of the additional expense on the ground that the generic would still make a profit (albeit a smaller one) when it eventually entered the market.

43

137. Dr. Jena's opinion ignores the fundamental point that a rational firm can be expected to engage in profit maximization, which entails a comparison of incremental cost and incremental benefit. A rational profit maximizing firm is unlikely to take a costly action that has an incremental benefit smaller than its cost. Moreover, Dr. Jena cannot determine whether investing additional resources in sample procurement was economically rational without evaluating the ex ante expectations of success and the opportunity cost of the investment. He has made no such inquiry.

138. Second, Dr. Jena suggests that restrictions on competition are anticompetitive only if they entirely prevent competition or make generic entry completely unprofitable. As explained earlier, however, contractual restrictions do not need to completely foreclose competition in order to be anticompetitive. Conduct that impedes or delays a competitor or increases that competitor's costs can also be anticompetitive.

139. Third, Dr. Jena claims that competitive harm is absent if subsequent FDA decisions would have delayed entry in any event. He offers no economic analysis to support this view. Contrary to Dr. Jena's opinion, however, harm to the competitive process is not dispelled by the happenstance of a subsequent action by a regulator. If Vyera's conduct impeded entry by competitors, that harm to the competitive process is not nullified if some separate event would independently and coincidentally have prevented them from entering. Thus, even if Dr. Jena were right that subsequent regulatory action by the FDA independently would have delayed generic entry, that would not alter the conclusion that Vyera's conduct was anticompetitive.

## B. Lack of procompetitive justification

140. In addition to market power and ability to make a difference to competition, the third condition necessary for a finding of net anticompetitive effects is that the conduct does not have demonstrated procompetitive benefits that offset the harm to purchasers. Conduct that

44

impedes competition in some respect sometimes is nevertheless beneficial overall because that conduct generates other more-than-offsetting procompetitive benefits that could not be achieved absent the conduct. However, Vyera's agreements lack any such procompetitive effect.

141.     One such procompetitive effect, associated with some exclusive agreements between a firm and its upstream suppliers, is the avoidance of free riding. The idea is that a firm makes a socially valuable investment for the benefit of its supplier that the firm's competitor can then take advantage of. By limiting a supplier's freedom of action to deal with the competitor, the firm preserves the incentive to make an investment.

142.     Whether such a justification is present depends on the facts. For a free-riding explanation to bear any weight, there must first be a substantial investment or expenditure by the firm that is subject to free riding by its rivals. Moreover, to attribute a procompetitive benefit to the restraint, it is important that the firm is not already being compensated for its investment by another party, such as the supplier that benefits from the investment.

143.     Vyera's API exclusivity agreements here lack any such procompetitive effect. Vyera did not invest in developing Fukuzyu or RL Fine's manufacturing process. Fukuzyu had already filed its DMF in 2008, well before Vyera acquired the rights to Daraprim, and supplied Vyera's predecessor. As for RL Fine, that supplier already had a process for manufacturing pyrimethamine API in place, and Vyera never took the necessary steps to get regulatory approval to use RL Fine's API in Daraprim. I am not aware of any basis to believe the exclusive arrangements protected any procompetitive investment made by Vyera.

144.     A second possible justification for a vertical contract is to avoid the risk of supply disruption. However, such a concern does not provide an economic justification for the supply arrangement at issue here. First, and most obviously, the agreements do not in fact guarantee

45

supply, but merely oblige the supplier not to supply any competitor. For Fukuzyu, the agreement allowed them to continue selling pyrimethamine in other markets. And without a DMF, or an incentive to file one, RL Fine cannot, and has never been able to, supply pyrimethamine API to Vyera. The absence of a supply-protective effect here is consistent with the economic literature about upstream supply limitations, which does not indicate the likelihood of such a procompetitive effect.

145.    Additionally, if supply assurance were needed, Vyera had other contractual tools at its disposal to accomplish that goal. For example, it could have arranged for a guaranteed quantity, or for the provision of all of its requirements. However, its supply contracts contained no such provision. The lack of such a provision is not surprising given that Vyera's requirements were relatively small, in accordance with the small volume of the drug.

146.    I have not been presented with any claimed economic procompetitive justifications for Vyera's contractual restrictions that limited the purchase of Daraprim. Dr. Jena has alluded to circumstances in which exclusive supply and distribution contracts might have procompetitive effects. He does not, however, claim that any of those circumstances apply here.

**C. Conclusion**

147.    Vyera possessed market power and monopoly power in the market for FDA-approved pyrimethamine drugs. Its contractual restrictions on Daraprim samples and pyrimethamine API, to the extent that they impeded potential generic competitors from obtaining these necessary inputs, were sufficient to make a difference to competition. There are no apparent procompetitive effects of these restrictions that offset their harm to competition. In light of this analysis, it follows directly that the restrictions are anticompetitive.

GX8004-048

**V.  Excess Profits**

148.    My final assignment was to calculate the excess profits associated with Vyera's exclusionary contracts with API suppliers and distributors. This is the difference between Vyera's actual profits and its profits in a but-for world in which competitive entry was not impeded by its conduct.

149.    If Vyera's conduct did in fact impede the entry of competing generics, the major likely consequence was to delay the date of generic entry. Because there is no way to know for certain exactly when generic pyrimethamine would have launched absent Vyera's conduct, calculating excess profits necessarily involves making reasonable assumptions about what would have happened. I have constructed a model that calculates the amount of excess profits under a variety of counterfactual scenarios that reflect the likely timing and extent of entry absent Vyera's conduct. These scenarios are based on testimony and documents from the generic drug makers. My estimates of excess profits, summarized in Appendix C-5, range between $53.1 million and $64.6 million.[65]

150.    The scenarios vary along three dimensions. First, the date of entry—December 2018 or October 2018—for DRL's generic product. Second, whether, at a later date, a second generic entrant would have entered. And third, whether Vyera would have been able to launch its AG product in a timely fashion in response to earlier generic entry. These alternative assumptions result in eight scenarios.

151.    The calculation of excess profits proceeded in four steps. First, I calculated Vyera's revenue in the actual world over the relevant period. Second, I calculated Vyera's revenue in the but-for world associated with each scenario described above. Third, I calculated

---

[65] App'x C (GD002-005).

47

excess revenue, which is the difference between Vyera's actual revenue and its counterfactual revenue. Fourth, I subtracted the incremental costs associated with Vyera's extra sales in the actual world compared to the but-for world. The result of this final calculation is excess profits. I now describe each of these steps in greater detail.

### A. Revenue in the actual world

152.    The first step was to calculate Vyera's revenue in the actual world over the relevant period. The appropriate measure of revenue in this context is net revenue, which subtracts rebates, discounts, and chargebacks that Vyera paid back to distributors, purchasers, and payers. I calculated net revenue based on Vyera's actual data documenting its revenues, costs, and profits. The relevant period over which I calculated Vyera's net revenue is October 2018, the earliest generic entry date in the but-for world, through December 2020, the last month of available data.

153.    Based on this data, net revenue over the relevant period was $103.6 million. This calculation includes Vyera's net revenue from selling both branded Daraprim and its AG version. It is appropriate to include the AG product in my calculation given that the decision to launch an AG was a consequence of generic entry and, as discussed in more detail below, may have occurred at an earlier date in the but-for world.

### B. Timing and extent of generic entry in the but-for world

154.    Next, I constructed a counterfactual world describing the likely timing and extent of entry absent Vyera's exclusionary contracts. I have reviewed testimony and documents from four generic drug makers—DRL (together with Cerovene, which developed the generic product), Fera, Inva-Tech, and Mylan—explaining the extent to which they were delayed or deterred by Vyera's restrictive contracts. I also reviewed Vyera documents about its preparations to launch

GX8004-050

an AG product. Based on this information, I built alternative scenarios in which generic pyrimethamine products enter the market earlier than in the actual world.

155.     I now summarize the alternative assumptions I made and explain my basis for using them as reasonable projections about generic entry in the but-for world.

### 1. DRL

156.     DRL's partner Cerovene began product development in 2013 and filed an ANDA the following year. While the ANDA was pending, the FDA banned Cerovene's API supplier from importing API into the United States. As a result, Cerovene needed to find a new API supplier and re-do its bioequivalence testing. Cerovene entered an agreement with RL Fine to supply API and incorporated that API into its generic product. However, Cerovene could not proceed to bioequivalence testing without the required samples of Daraprim.

157.     Cerovene and DRL approached numerous parties to purchase Daraprim. After more than a year of trying, neither firm had been able to purchase an adequate amount. Instead, Cerovene sought FDA approval to proceed with bioequivalence testing using a smaller quantity. Upon receiving the FDA's permission, Cerovene began its bioequivalence testing. After submitting successful results to the FDA, Cerovene received approval in February 2020. DRL launched its generic product about a month later.

158.     If the Court concludes that Vyera's conduct impeded Cerovene's access to necessary inputs, it is reasonable to assume that DRL's product could have launched sooner. Holding constant the real-world timing of unaffected events, I have made reasonable assumptions about how the absence of Vyera's conduct would have altered certain key dates. I have modeled two different possible entry dates for DRL's product: October 2018 and December 2018.

GX8004-051

### a.   December 2018 Entry

159.    The FDA informed Cerovene that it needed to perform new bioequivalence testing in December 2017. But Cerovene was unable begin testing until May 2019, because it could not obtain adequate samples and thus had to wait for the FDA's permission to proceed with a smaller quantity.

160.    I have assumed that, absent Vyera's distribution restrictions, Cerovene could have purchased the required quantity of Daraprim within two weeks of the FDA response—that is, by mid-January 2018. This is a reasonable assumption because in 2013, Cerovene was able to purchase samples quickly from the first source it approached.

161.    At that point, Cerovene could have begun bioequivalence testing. Assuming that subsequent steps—testing, ANDA filing and evaluation, and post-approval launch preparations—proceeded at the same pace as in the actual world, DRL would have launched its generic product about 11 months later, by mid-December 2018. Compared to actual entry in March 2020, this is a difference of approximately 15 months.

### b.   October 2018 Entry

162.    As an alternative, I also modeled DRL entry in October 2018. This earlier entry date rests on the further assumption that, absent Vyera's efforts to secure an exclusive supply agreement with Fukuzyu, Cerovene could have used Fukuzyu as its API supplier instead of using RL Fine.

163.    The basis for this assumption is testimony from Cerovene's president that Fukuzyu agreed to supply API but never followed through. Shortly after Cerovene initiated a purchase order in September 2016, Vyera executives met with Fukuzyu in Japan to discuss an exclusive supply agreement, following several months of communication via an agent. The purchase order went unfilled, and Vyera and Fukuzyu subsequently formalized their agreement.

50

164.    If Fukuzyu's refusal to supply Cerovene is attributable to Vyera's negotiations, then Vyera's conduct could reasonably be assumed to result in an additional period of delay. In the actual world, in April 2017, Cerovene amended its ANDA to name RL Fine as its new API supplier. Evidence indicates that, had Fukuzyu supplied the API, Cerovene could have amended its ANDA (naming Fukuzyu) in February 2017.[66] Combining this two-month shift with the fifteen-month shift discussed above, and once again assuming that subsequent steps proceeded at the same pace as in the actual world, DRL would have launched by mid-October 2018. Appendix C-6 illustrates this timeline.[67]

### 2.  Fera

165.    I have constructed several scenarios in which Fera, the second generic producer to receive FDA approval, enters earlier absent Vyera's conduct. Fera began product development in 2016 and partnered with an API supplier to develop an API manufacturing process. By November 2017, Fera received API to use in its final product. At this point, Fera was not yet ready to manufacture a final product because it had been unable to source samples needed to make a prototype.

166.    In October 2017, after nearly a year of trying, Fera sourced a few tablets and finished its prototype about a year later.

167.    In March 2019, six months after completing its prototype, Fera had a final product and could have begun bioequivalence testing if it had adequate samples. However, its efforts to secure samples came up short. In January 2018, Fera purchased two bottles of Daraprim (compared to the required five bottles) and twice asked the FDA to allow it to proceed with a

---

[66] Testimony from Cerovene's president indicates that if Fukuzyu had promptly fulfilled Cerovene's purchase order in October 2016, Cerovene could have filed its major amendment four months later.
[67] App'x C (GD002-006).

51

GX8004-053

smaller amount. The FDA granted this request in June 2019. At that point, Fera was able to complete its bioequivalence testing and submitted its ANDA in December 2019. In August 2020, the FDA issued a so-called "complete response" to the ANDA that included several questions about the API. Fera replied to the FDA approximately four months later and received FDA approval in July 2021.

168.    If the Court concludes that Vyera's conduct impeded Fera's access to necessary inputs, it is reasonable to assume that Fera's product could have launched sooner. I have modeled entry in the last quarter of 2019.

169.    This entry date is based on two main assumptions. The first assumption is that, absent Vyera's distribution restrictions, Fera would have been able to purchase samples (for both prototype development and bioequivalence testing) soon after it began its search in November 2016. Thus, in November 2017, Fera would be ready to manufacture a final product, rather than being held up by prototype development.

170.    If development of the finished product proceeded at the same pace as in the actual world, Fera would have had a final product ready for bioequivalence testing six months later, in May 2018. Fera would been able to purchase adequate samples for this purpose (not just two bottles) without delay. Assuming that subsequent steps—testing, ANDA filing, and FDA evaluation—proceeded at the same pace as in the actual world, Fera would have filed its ANDA in November 2018 received a response from the FDA in July 2019.

171.    The second assumption is that, absent Vyera's conduct, the FDA would have approved the ANDA in July 2019 rather than issuing a complete response. There are two alternative bases for this assumption. First, according to the testimony of a Fera executive, the FDA might have approved the ANDA rather than issuing a complete response if its API supplier,

52

API-1, had answered an earlier, preliminary set of FDA questions in a timely manner. In the actual world, according to this testimony, the Covid-19 pandemic prevented API-1 from doing so. If Fera had filed its ANDA in November 2018—the but-for date discussed above—rather than December 2019, this impediment would not have arisen.

172.    Alternatively, Fera might have avoided a complete response because, absent Vyera's exclusive supply agreement with Fukuzyu, Fera could have used Fukuzyu as its API supplier instead of API-1. According to the testimony of a Fera executive, Fera sought API samples and would have switched suppliers if Fukuzyu had agreed, but Fukuzyu refused due to the Vyera agreement. Because Fukuzyu (unlike API-1) already had an approved DMF, the FDA would likely have raised fewer concerns about API, according to this testimony. Thus, if Fera had submitted its ANDA in November 2018 relying on Fukuzyu API, the FDA might have granted approval in July 2019 instead of issuing a complete response.

173.    Either way, if ANDA approval occurred in July 2019, it is reasonable to expect that Fera would have launched within three months, by the last quarter of 2019. Appendix C-7 illustrates this timeline.[68] I have also modeled excess profits under the alternative assumption that Fera would not have received FDA approval by the end of 2020.

### 3.  Other generics

174.    I have reviewed evidence that two additional generic drug makers, Inva-Tech and Mylan, were delayed or deterred from entering by Vyera's conduct. Inva-Tech had to find a new API supplier after RL Fine decided to stop supporting its ANDA, around the same time that Vyera entered an exclusive supply arrangement with RL Fine. Mylan considered developing a generic product following Vyera's price increase in 2015, but abandoned the plan given its

---

[68] App'x C (GD002-007).

53

inability to procure samples, difficulty in finding a reliable API source, and uncertainty about the market opportunity due to a lack of accurate data.

175.    There is not sufficient information to determine when, absent Vyera's conduct, these companies might have entered the market. Accordingly, I did not include them in any entry scenario. That said, evidence of possible delayed or deterred entry, as to these two firms, adds an element of conservatism to my calculations.

### 4.   Vyera's authorized generic

176.    In the actual world, Vyera launched its AG product a little more than one week before DRL's launch in March 2020, and made its first sales the following month. I have modeled two alternative approaches to AG entry in the but-for world. The first approach assumes that, similar to the actual world, the AG product would launch shortly before DRL's entry and make its first sales in the month after DRL's entry.

177.    The second approach assumes an AG launch in October 2019. The basis for this assumption is documents and testimony from an executive in Vyera's AG subsidiary indicating that, before October 2019, Vyera was still working to resolve logistical and quality issues necessary to commence distribution of the AG. If it took Vyera the same amount of time to complete these preparations, regardless of DRL's entry, then it would not have been ready to launch the AG until October 2019 in the but-for world.

### C.   Revenue in the but-for world

178.    After identifying reasonable assumptions for dates of generic entry in the but-for world, the next step in calculating excess profits was to assess the effect that generic entry would have had on Vyera's net revenue. This calculation was based on three main inputs: (1) the volume of FDA-approved pyrimethamine in the overall market, which increased after generic

54

entry; (2) Vyera's share of that volume, which declined after generic entry; and (3) Vyera's net price, which also declined after generic entry.

179.    To the extent possible, I have relied on real-world evidence about the actual effect of DRL's entry. DRL entered in March 2020, and data on FDA-approved pyrimethamine volume, Vyera's share, and Vyera's net price is available through December 2020. Because there are more months of entry in the but-for world, compared to the actual world, I needed to supplement this real-world evidence. To make reasonable assumptions about what would have occurred, I have relied on Vyera's own forecasting assumptions about the effects of generic competition.[69]

180.    I reviewed numerous Vyera forecasts, but selected a June forecast titled "Phoenixus Model 6.3.2020" for three reasons. First, it is one of the most recent forecasts available to me and was used as recently as June 2020, several months after generic entry occurred. Second, it has significant indicia of reliability: it was sent to the Phoenixus Board of Directors for use in evaluating a possible business deal. Third, of the forecasts I reviewed, this forecast most accurately projected the actual world between June and December 2020.

181.    I combined real-world data and Vyera's forecast to make the following assumptions.

### 1. Volume of FDA-approved pyrimethamine

182.    In the actual world, the overall quantity of FDA-approved pyrimethamine increased by 9.1% in 2020 compared to 2019. I therefore used this growth rate in the but-for world for the first four quarters of generic competition. After the fourth quarter of generic

---

[69] GX1608 at 020-29 ("Phoenixus Model 6.2.2020," Tab "Detailed Revenue").

55

competition, I assumed further growth of 2.0% per year, reflecting Vyera's growth forecast for 2021 of 0.5% per quarter.

183.    In scenarios that include a second generic entrant, I assumed a growth rate of 3.0% per year, adopting Vyera's growth forecast for 2022 (a period when Vyera projected a second generic).

### 2.   Vyera's market share

184.    After determining the volume of FDA-approved pyrimethamine, I calculated the share of Daraprim and Vyera's AG product. In the first four quarters of generic competition, I assumed Daraprim and the AG have the same market shares as in the actual world.

185.    For the fifth through eighth quarters of generic competition, I adopted the same assumption that Vyera's forecast makes for 2021: that Daraprim's market share would decrease by approximately 10% each quarter.

186.    In scenarios that model a second entrant, I adopted Vyera's forecast assumption. Vyera projected that a second entrant in 2022 would cause Daraprim's share to decline by about 37% compared to 2021. I made the analogous assumption that, for the first four quarters after the second generic enters, Daraprim's share would decline 11% per quarter.[70] Because Vyera projects no further share decline after 2022, I adopted the same assumption and assumed no change in share beyond the eighth quarter after generic entry. The market share of the AG is calculated in the same way.

### 3.   Daraprim price

187.    Finally, I determined the effect of generic entry on the net price of Daraprim. For the first four quarters of generic competition, I assumed that Daraprim's net price is the same as

---

[70] $(1 - 0.11)^4 = 0.63$ which represents a 37% decline from 1 over the four quarters.

GX8004-058

it was in the first four quarters after entry in the actual world. For quarters five through eight, I used Vyera's forecast prices for 2021. I then kept the price static until, when applicable, a second generic entered. At that point, I used Vyera's forecast for the price in 2022, when it assumed the second generic would enter. The AG's price is determined the same way.

188.     Based on these assumptions, I calculated Vyera's net revenue in various scenarios by multiplying the net Daraprim (and AG) price by the quantity of Daraprim (and AG) sold. Depending on the entry date assumptions, Vyera's net revenue in the but-for world ranges from $36.1 million to $45.4 million.

### D. Excess revenue and excess profits

189.     Vyera's excess revenue attributable to Vyera's conduct is the difference between its actual net revenue over the relevant period and its but-for revenue. Depending on the generic entry assumptions, Vyera's excess revenue ranges from $56.0 million to $67.6 million.

190.     To calculate Vyera's excess profits, one final adjustment is needed. In the actual world compared to the but-for world, Vyera's net revenue is larger, but its costs are larger too. I therefore subtracted, from excess revenue, those incremental costs expended as a result of making more sales. These are costs that increase or decrease along with the volume of Daraprim (and the AG product) sold. It is not appropriate to deduct fixed costs, such as Vyera's employee overhead, facilities, or research and development costs, because those costs are not directly dependent on the volume of Daraprim sold, and thus would have been incurred regardless of the volume sold.

191.     Here I identified two categories of incremental costs: variable manufacturing costs and sales force costs. First, to reasonably estimate variable manufacturing costs, I relied on Vyera's reported cost of goods sold for Daraprim, which ranged from approximately $6 to $20 per tablet in 2019 and 2020, and for its AG product, which was approximately $1 or less. From

GX8004-059

this, I deducted a fixed maintenance fee of $1.5 million, paid to a contract manufacturer, which Vyera was obliged to make regardless of the volume sold.

192.    Second, I observed that Vyera reduced its sales force after generic entry. I relied on Vyera documents to estimate the cost savings associated with this reduction.

193.    I also considered whether Vyera's marketing costs declined in response to generic entry, and concluded based on the available data that they did not.

194.    After subtracting these incremental costs, Vyera's excess profits from October 2018 through December 2020 range from $53.1 million to $64.6 million, depending on the assumptions. The results of this final calculation represent the excess profits attributable to Vyera's conduct.


I declare under penalty of perjury that the foregoing is true and correct.
EXECUTED on October 19, 2021.

*/s/ C. Scott Hemphill*
C. Scott Hemphill, Ph.D., J.D.


Revision Executed on December 17, 2021
*/s/ C. Scott Hemphill*

GX8004-060

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA, | |
| *Plaintiffs*, | |
| v. | Case No. 20-cv-00706 (DLC) |
| | ECF Case |
| VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC; and KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC, | |
| *Defendants*. | |

## TRIAL TESTIMONY OF DR. ANUPAM B. JENA, MD, PHD



FTC v. Vyera, et al.,
20-cv-00706 (DLC)

**DX-541**

**Introduction**

Pursuant to 28 U.S.C. § 1746, Dr. Anupam B. Jena, M.D., Ph.D. declares under penalty of perjury as follows:

1.  I am an adult resident of Wellesley, Massachusetts, and I am the Ruth L. Newhouse Associate Professor of Health Care Policy and Medicine at Harvard Medical School and a physician in the Department of Medicine at Massachusetts General Hospital, the largest affiliated teaching hospital of Harvard Medical School.

*Qualifications*

2.  As a physician, I work as an Internal Medicine Specialist treating patients in the hospital with a wide variety of acute and chronic general medical conditions, including patients with infectious complications arising from HIV/AIDS. I have been involved in the care of patients with toxoplasmosis and though I am not an infectious disease specialist, I am familiar with the complications of this disease. I earned my M.D. and Ph.D. in Economics from the University of Chicago and my Bachelors in Biology and Economics from the Massachusetts Institute of Technology.

3.  As an economist, I specialize in the economics of physician behavior, the economics of health care productivity, and the economics of medical innovation. I am also a faculty research fellow at the National Bureau of Economic Research, the nation's leading nonprofit economic research organization. I have published approximately 150 peer-reviewed articles in leading medical and economics journals.

*Allegations and Assignments*

4.  I understand that Plaintiffs allege that Vyera Pharmaceuticals, LLC (hereafter, "Vyera"), and its parent company Phoenixus AG (hereafter, "Phoenixus"), along with Martin Shkreli and Kevin Mulleady (collectively, "Defendants") engaged in anticompetitive business practices to maintain a monopoly on Daraprim. Specifically, Plaintiffs allege that after Defendants acquired the U.S. rights to Daraprim and subsequently raised the price of the product from $17.60 to $750 per tablet, they then executed a multi-part strategy to delay generic competition. Specifically, Defendants are alleged to have:

     i.   Limited generic manufacturers' ability to obtain Daraprim samples to be used as part of the FDA approval process by prohibiting distributors and purchasers from reselling Daraprim to generic companies or their agents;

    ii.   Limited access to pyrimethamine — the active pharmaceutical ingredient ("API") necessary for manufacturing Daraprim — by signing exclusivity contracts with Fukuzyu Pharmaceutical Co., Ltd. (hereafter, "Fukuzyu") and RL Fine Chem (hereafter, "RL Fine"); and

   iii.  Signed "data-blocking" agreements with some distributors to prevent them from selling Daraprim sales information to third-party data reporting companies, such as IQVIA.

5.     Counsel for Vyera and Phoenixus retained me to review the expert reports submitted by Dr. W. David Hardy and Professor C. Scott Hemphill and to:

- Evaluate Professor Hemphill's assessment of Defendants' challenged conduct, and from an economic perspective, analyze the competitive impact (if any) arising from this conduct;

- Evaluate Dr. Hardy's assessment that neither trimethoprim-sulfamethoxazole ("TMP-SMX") nor compounded pyrimethamine is readily interchangeable with FDA-approved pyrimethamine;

- Evaluate Professor Hemphill's assessment of the relevant antitrust market in which Daraprim was sold; and

- Evaluate whether Professor Hemphill's proposed method for calculating excess profits is reliable and accurate.

6.     After reviewing the evidence, including data, documents, and testimony, I reached the following conclusions:

     i.   Professor Hemphill fails to demonstrate any harm to competition arising from Vyera's distribution system practices, exclusive API agreements, or "data-blocking" agreements.

    ii.   Dr. Hardy's conclusion that neither TMP-SMX nor compounded pyrimethamine is readily interchangeable with FDA-approved pyrimethamine is inconsistent with the clinical guidelines, medical literature, and actual world experience.

   iii.  Professor Hemphill's conclusions that the relevant antitrust market is pyrimethamine products approved by the FDA and that "Vyera exercised market power and monopoly power over the sale of Daraprim between August 2015 and March 2020" suffer from fundamental errors and shortcomings.

   iv.  Professor Hemphill's proposed method to calculate Vyera's excess profits is based on numerous flawed assumptions, so I find his model to be highly speculative and

unreliable in accurately estimating excess profits under the unsupported theory that Vyera's alleged conduct delayed generic entry.

7.    These opinions, and the supporting analyses, are detailed in my June 4, 2021 expert report, and they remain unchanged based on my review of the reply reports and deposition testimony of Professor Hemphill and Dr. Hardy.  An appendix of selected materials on which I have relied and that I have discussed in my written direct testimony is being submitted herewith in accordance with Fed. R. Evid. 703.

## Case and Industry Background

### *Summary of Toxoplasmosis*

8.    Toxoplasmosis is a potentially life-threatening infection caused by the parasite *Toxoplasma gondii* (*T. gondii*).  It is one of the most common parasitic infections in humans.

9.    Common manifestations of toxoplasmosis include toxoplasma encephalitis ("TE" also known as cerebral toxoplasmosis), congenital toxoplasmosis, and ocular toxoplasmosis.  The severity of the disease varies across different manifestations but also within manifestations.

10.    TE is the most common manifestation of toxoplasmosis in immunocompromised patients including patients with HIV.  TE is a severe manifestation of toxoplasmosis and is immediately life-threatening without treatment for patients who are immunocompromised.

11.    Congenital toxoplasmosis ("CT") typically occurs after primary infection of a pregnant person and can be transmitted to the fetus.

12.    Ocular toxoplasmosis ("OT") can be transmitted congenitally or acquired by eating contaminated foods or undercooked meats.

### *Toxoplasmosis Treatments*

13.    Common treatments for toxoplasmosis include Daraprim (pyrimethamine), TMP-SMX, compounded pyrimethamine, atovaquone, clindamycin and dexamethasone, and azithromycin.  Only pyrimethamine is FDA-approved to treat toxoplasmosis.

**Daraprim**

14. Daraprim, the branded version of pyrimethamine, is administered orally and is indicated for the treatment of toxoplasmosis when used with a sulfonamide (typically sulfadiazine).

15. Daraprim was approved by the FDA in January 1953. A generic version of Daraprim produced by Cerovene was approved on February 28, 2020 and launched by its marketing partner, Dr. Reddy's Laboratories ("DRL"), on March 20, 2020. Fera's and Teva's generic versions of Daraprim were approved on July 27, 2021 and August 13, 2021, respectively. Phoenixus's subsidiary, Oakrum Pharma LLC, launched an authorized generic on March 11, 2020.

**TMP-SMX**

16. TMP-SMX is a combination of sulfamethoxazole, a sulfonamide, and dihydropteroate synthase inhibitor, and trimethoprim.

17. TMP-SMX was approved by the FDA in 1973 (marketed as Bactrim) and is taken orally. It is commonly used off-label to treat toxoplasmosis.

**Compounded Pyrimethamine**

18. Drug compounding is a practice of combining, mixing, or altering ingredients of a drug to create a medication tailored to the needs of an individual patient. Compounded drugs are not FDA approved; however, the FDA has a compounding program to increase the effectiveness and quality of compounded drugs. [Expert Report of Shelton T. Bradshaw, June 4, 2021, ¶¶ 32-36].

19. In the U.S., the volume of API for compounded pyrimethamine is much greater than the volume of API used by prescription drug makers for FDA-approved Daraprim.

20. In October 2015, the specialty pharmacy Imprimis Pharmaceuticals started offering a customizable compounded version of pyrimethamine and leucovorin in one capsule.

21. In December 2015, another specialty pharmacy, Avella, started producing a compounded formulation of pyrimethamine.

22.  As of January 2016, all inpatient pyrimethamine usage at my own hospital, Massachusetts General Hospital ("MGH"), was the compounded suspension produced by our own compounding pharmacy.  [DX 468].

**Atovaquone**

23.  Atovaquone is a quinone antimicrobial medication that was approved by the FDA in 1992 (marketed as Mepron) and taken orally.  Atovaquone is used off-label to treat toxoplasmosis.

**Clindamycin and Dexamethasone**

24.  A treatment option for OT involves the combination of clindamycin, an antibiotic used to treat bacterial infections, and dexamethasone, a corticosteroid that relieves inflammation. Intravitreal injection of clindamycin-dexamethasone is an off-label treatment alternative for OT.   It is considered advantageous over a pyrimethamine-based regimen, since the intravitreal injection bypasses ocular barriers, which likely reduces systemic complications.

**Azithromycin**

25.  Azithromycin is an oral antibiotic used to treat many types of infections.  Azithromycin is an alternative, off-label treatment for OT.

***Daraprim Sales and Distribution***

**History of Daraprim**

26.  Daraprim received FDA approval in January 1953 and was marketed worldwide by GlaxoSmithKline plc (hereafter, "GSK") and its affiliated predecessors until 2010.  [DX 347]. As seen in **Exhibit D.1**, data reported by IQVIA based on sales to wholesalers and other distributors show that by 2010, the price charged per Daraprim tablet was approximately $1.



**Exhibit D.1**
**Quantity and Price of Daraprim**
**Q1 2006 - Q2 2015**

**Note:**
[1] Price is calculated as quarterly gross sales divided by quarterly units.  IQVIA National Sales Perspectives data do not account for rebates, and as a result are only approximate prices.

**Source**:
[A] IQVIA National Sales Perspectives Data (DX 425, DX 438, DX 437, DX 426).

27.  In October 2010, CorePharma LLC (hereafter, "CorePharma") acquired the rights to sell and distribute Daraprim in the U.S. and Canada.  [DX 347].  Marketing responsibilities for Daraprim were transferred from CorePharma to Amedra Pharmaceuticals LLC (hereafter, "Amedra") in 2012.  [DX 347].  Amedra steadily increased the price of Daraprim from $7.75 per tablet in January 2011 to approximately $13.50 per tablet by January 2014.  [DX 355].

28.  In March 2015, Impax Laboratories, Inc. (hereafter, "Impax") acquired Amedra's parent company, Tower Holdings, Inc.  [DX 418].  Impax acquired the marketing rights to Daraprim and subsequently increased the list price of Daraprim from approximately $13.50 per tablet

to $17.60 per tablet in June 2015.  [DX 355].  As seen in **Exhibit D.1,** the prices based on sales to wholesalers and other distributors also increased during that time period.

29. On August 7, 2015, Impax sold its U.S. rights to market and distribute Daraprim to Vyera (known as Turing at the time).  On August 11, 2015, Vyera increased the list price of Daraprim from approximately $17.60 per tablet to $750 per tablet.  [DX 355].  **Exhibit D.1** shows the number of Daraprim tablets sold on a quarterly basis from Q1 2006 through Q2 2015, the last full quarter prior to Vyera's acquisition of Daraprim.

**Daraprim's Specialty Distribution System**

30. Daraprim was first marketed in a "specialty distribution system" by Amedra in 2015.  [Expert Report of John Russell, June 4, 2021 (hereafter, "Russell Report"), ¶¶ 42-43].  Amedra contracted with two specialty distributors: Walgreens Specialty Pharmacy (hereafter, "Walgreens") and Integrated Commercialization Solutions (hereafter, "ICS").  [DX 349, DX 348, DX 418].  Upon acquiring Daraprim from Amedra in 2015, Impax kept Daraprim in this system.  [DX 418].

31. After the acquisition from Impax in August 2015, Vyera expanded the distribution system to include four specialty distributors: ASD Healthcare, BioRidge Pharma LLC, Cardinal Specialty, and Optime Care Inc.  [GX1045, GX1033, GX1031, GX1448, GX1045, GX1034].  Vyera continued to sell Daraprim direct to patients though Walgreens, as inherited from Amedra's contract in 2015, and added Optime as an additional provider of specialty pharmacy services in February 2019.  [GX1042, GX1048].

**Daraprim API Supply**

32. In January 2017, Vyera signed a supply agreement for API with Fukuzyu.  [DX 440].  Under the agreement, Fukuzyu agreed to sell pyrimethamine API for human use exclusively to Vyera in the United States.  [DX 440].

33. In December 2017, Vyera agreed to become RL Fine's exclusive pyrimethamine API distributor worldwide.  [DX 442].  Vyera agreed to pay RL Fine a fixed lump sum payment and a percentage of Vyera's Daraprim sales in the United States.  [DX 442].

*Generic Pharmaceuticals*

### The FDA Approval Process

34. Generic drugs are medications that are created to be the same as an existing approved brand-name drug in dosage form, safety, strength, route of administration, quality, and performance characteristics.

35. Generic drugs are typically less expensive and less time consuming to develop and approve than brand drugs and are therefore priced lower than the brand drugs. However, the generic drug manufacturer must submit an abbreviated new drug application (hereafter, "ANDA") and the FDA takes a significant amount of time to review the information required to establish that a generic drug is bioequivalent to its brand counterpart.

### ANDAs for Pyrimethamine

36. **Table 1** below summarizes information for each manufacturer regarding its ANDA process.

**Table 1**
**Summary of Generic Manufacturers' ANDAs**

| Manufacturer | Approximate Start Date | Submission Date(s) | Status |
|---|---|---|---|
| Cerovene | 2013 | May 8, 2014 | • Approved: Feb. 28, 2020<br>• Launched: March 20, 2020 |
| Inva-Tech | 2014 | • First submission: July 28, 2017<br>• Amended submission: July 31, 2019 | Awaiting approval |
| Mylan | 2015 | Project removed from work plan in 2017 | N/A |
| Fera | 2015 | December 19, 2019 | • Approved: July 27, 2021 |
| Teva | 2019 | January 27, 2021 | • Approved: Aug. 13, 2021 |

*Summary of Alleged Exclusionary Conduct*

37. Plaintiffs allege that Vyera's distribution contracts made it difficult for generic companies to obtain Daraprim to conduct FDA-required tests for bioequivalence. Professor Hemphill opines that two generic companies were delayed and one generic manufacturer decided not to pursue a generic product "after failing to secure adequate samples." [Expert Report of C. Scott Hemphill, Ph.D., J.D., April 12, 2021 (hereafter, "Hemphill Report"), ¶ 194].

38. Plaintiffs further allege that Vyera's exclusivity provisions in its agreements with two API suppliers resulted in delays and/or increased costs for multiple generic manufacturers. [Hemphill Report, ¶ 195].

39. In his opening report, Professor Hemphill claimed that "the challenged contracts [with distributors and API suppliers] impeded competition from lower-priced competing therapies, thereby preserving Vyera's market power." [Hemphill Report, ¶ 16]. However, I understand that in his reply report, Professor Hemphill restated his opinion on whether the alleged actions impeded the generic manufacturers: "I am not offering an opinion on whether, as a factual matter, Vyera's restrictions made it more difficult for generics to obtain necessary inputs such as Daraprim samples and API." [Reply Report of C. Scott Hemphill, Ph.D., J.D., June 29, 2021 (hereafter, "Hemphill Reply Report"), ¶ 99]. I further understand that Professor Hemphill testified that he is not offering an opinion as to whether the restrictions made it more difficult for the generic manufacturers to obtain inputs. [Deposition of Scott Hemphill, Ph.D., J.D., July 22, 2021, pp. 118, 121-123, 190-192].

40. Further, Plaintiffs allege that Vyera signed "data-blocking" agreements with its distributors to prevent them from selling Daraprim sales data to third-party companies, such as IQVIA. According to Plaintiffs, this prevented generic companies from properly assessing Daraprim's market and deterred them from pursuing development of a generic product. Professor Hemphill notes that he was not asked to opine on the anticompetitive effects from these agreements, so he does not claim that these agreements delayed generic manufacturers.

## Evaluation of Defendants' Alleged Anticompetitive Conduct

### Vyera's Distribution System Practices and Exclusive API Agreements Did Not Harm Competition

#### Vyera's Distribution System Practices

41. ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████.

42. In 2015, Vyera inherited its restricted distribution system from Impax, and subsequently *increased* the number of distributors from only two to four. [DX 351, Expert Report of

Edward V. Conroy, April 12, 2021, ¶¶ 41, 43]. In a but-for world, Vyera would be operating under the inherited distribution system, and still only be partnered with two specialty distributors, Walgreens Specialty Pharmacy and ICS.

43. I further understand that the inherited distribution system from Impax contractually authorized Walgreens Specialty Pharmacy and ICS to sell and dispense Daraprim exclusively to persons who will be treated with Daraprim. [DX 349]. As a result, in a but-for world Vyera would be operating under the inherited distribution system, which would restrict generic manufacturers' ability to purchase Daraprim from these distributors.

44. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████.

45. Further, reference listed drug ("RLD") samples could be obtained in a timely fashion, albeit at a cost that some manufacturers were not interested in paying due in part to the high price of Daraprim that would have been the same in the but-for world.

46. According to Plaintiffs, Vyera's distribution system practices made it difficult for generic manufacturers to obtain Daraprim samples, which are required to develop a prototype and to perform bioequivalence testing. [*Federal Trade Commission et al v. Vyera Pharmaceuticals, LLC et al* (1:20-cv-00706-DLC), Amended Complaint, April 14, 2020, ¶ 4, Hemphill Report, ¶¶ 235-237]. In his opening report, Professor Hemphill attributed a fifteen-month delay in Cerovene's generic entry to this alleged anticompetitive conduct. [Hemphill Report, ¶ 225]. However, in his reply report Professor Hemphill clarified that "I am not offering an opinion on whether, as a factual matter, Vyera's restrictions made it more difficult for generics to obtain necessary inputs such as Daraprim samples." [Hemphill Reply Report, ¶ 99].

**Vyera's Exclusive API Agreements**

47. ███████████████████████████████████████████
████████████████████████████.

48. Vyera had exclusive provisions in its supply agreements with two API manufacturers, Fukuzyu and RL Fine, that Plaintiffs allege delayed generic competition.

49. *RL Fine* entered into an exclusive API supply agreement with *Cerovene* in November 2016, a year prior to its agreement with Vyera. [GX3265].

50. Similar to the distribution practices, Professor Hemphill fails to demonstrate that Vyera's restrictions caused delays in generic manufacturers' ability to source API. In his opening report, Professor Hemphill concluded that the inability to source API delayed Cerovene's FDA approval. [Hemphill Report, ¶ 225]. However, in his reply report, he clarified that he was not offering an opinion on whether it was in fact Vyera's actions that made it more difficult for the generic manufacturer to source this input. [Hemphill Reply Report, ¶ 99].

51. In addition, Professor Hemphill explicitly states that there was *no delay* to Fera's generic as a result of any failed attempts at API sourcing, only claiming that Fera *may* have been asked fewer questions by the FDA if it sourced API from Fukuzyu instead of [API-1]. [Hemphill Report, ¶¶ 240, 242, 247, Deposition of Frank DellaFera, President of Fera Pharmaceuticals, January 19, 2021 (hereafter, "DellaFera Deposition"), pp. 45-47]. He implicitly states that there was *no delay* for the other three potential generic manufacturers by not proposing an earlier entry date for any of them in his but-for world.

52. Finally, generic manufacturers sought and identified alternative API manufacturers independent of the Defendants' exclusive supply contracts.

**Vyera's "Data-Blocking" Agreements**

53. Vyera's "data-blocking" agreements would not have impacted competition. [Russell Report, Section IV.B]. If anything, Mylan and Inva-Tech over-estimated the market opportunity, forecasting larger pyrimethamine volumes than actually occurred. [Exhibit D.5, DX 094, Deposition of Nilesh Patel, Co-Founder of Inva-Tech, December 8, 2020 (hereafter, "Nilesh Patel Deposition"), pp. 159-160, DX 3]. Further, as seen in **Table 1** above, Cerovene, Inva-Tech, Mylan, and Fera began the ANDA process between 2013 and 2015, so they clearly assessed the market opportunity years prior to the 2017 "data-blocking" agreements.

54. Although Plaintiffs allege that these agreements prevented generic companies from properly assessing the market for Daraprim and ultimately deterred them from pursing development

of a generic product, Professor Hemphill demonstrates no harm from these actions, and, in
fact, was not even asked to opine on them.  [Hemphill Report, footnote 221].

55.

56.

57.

58.







68.

69.

70.

71.

72.

73.

74. ████████████████████████████████████████████████

75. ████████████████████████████████████████████████

76. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████

77. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

78. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

79. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

80. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



81.

82.

## Evaluation of the Alleged Relevant Antitrust Market

### *Framework for Assessing Market Power*

83. For purposes of assessing market power, economists may consider indirect evidence as well as direct evidence.

84. Critical to the indirect approach of assessing market power is evaluating the degree of therapeutic substitutability (whether two products perform similarly for a particular purpose,

regardless of price) and economic substitutability (whether an increase in the price of one product causes consumers to switch to another product) between products.

85. Assessing market power using direct evidence requires actual proof that a firm charges supra-competitive prices (which requires comparing actual prices to a competitive benchmark price), restricts output, and/or reduces quality.

***Daraprim is Therapeutically Substitutable with Other Products***

86. 

**Clinical Guidelines**

87. Clinical guidelines show that TMP-SMX is the preferred prophylactic treatment for toxoplasma encephalitis ("TE"), with pyrimethamine (plus dapsone or atovaquone) as one alternative treatment. Even for the treatment of active disease and for secondary prophylaxis of TE, TMP-SMX or atovaquone are recommended alternative therapies, demonstrating that there are other effective treatments for TE.

88. In addition, there are other disease indications where pyrimethamine is *not* the preferred therapy relative to TMP-SMX, but an alternative therapy. [Expert Report of W. David Hardy, M.D., April 12, 2021 (hereafter, "Hardy Report"), ¶¶ 55-56]. Regarding treatments for ocular toxoplasmosis, Dr. Hardy alleges that "[p]yrimethamine plus sulfadiazine is the expert consensus first-line therapy to treat active ocular toxoplasmosis disease." [Hardy Report, ¶ 78]. However, the guidelines also suggest that there are alternative effective treatments. The Johns Hopkins ABX Guide, for example, suggests that an intravitreous injection of clindamycin and dexamethasone is an equally effective treatment.

**Medical Literature**

89.  Practitioners often rely on medical literature when evaluating different treatment options, which may report newer findings than clinical guidelines.  Randomized controlled trials ("RCTs") and systematic literature confirm that pyrimethamine is therapeutically substitutable with TMP-SMX in treating TE and with an intravitreal injection of clindamycin and dexamethasone in treating ocular toxoplasmosis.

90.  RCTs are considered the "gold standard" for assessing cause and effect.  One RCT, Torre, et al. (1998), compared the effectiveness of TMP-SMX to a pyrimethamine-based regimen for the treatment of TE and found no "difference in efficacy or survival between the two treatments."   [GX4132, Torre, Donato, et al., "Randomized Trial of Trimethoprim-Sulfamethoxazole versus Pyrimethamine-Sulfadiazine for Therapy of Toxoplasmic Encephalitis in Patients with AIDS," *Antimicrobial Agents and Chemotherapy*, Vol. 42. No. 6, June 1998, pp. 1346-1349 (hereafter, "Torre, et al. (1998)")].  The study further found that patients who are treated with TMP-SMX "appeared more likely to achieve a complete radiologic response after acute therapy" for TE, compared to patients treated with pyrimethamine and that "adverse reactions were significantly more frequent in patients" treated with pyrimethamine. [GX4132, Torre, et al. (1998)].

91.  Regarding ocular toxoplasmosis, one RCT compared the effect of an intravitreal injection of clindamycin and dexamethasone to an oral pyrimethamine-based regimen, finding no difference in lesion size or visual acuity after treatment between the two groups.  The authors also suggested that it might be a *superior* treatment to pyrimethamine since this treatment "may offer the patient more convenience, a safer systemic side effect profile, greater availability and fewer follow-up visits and hematologic evaluations." [Soheilian, Masoud, et al., "Randomized Trial of Intravitreal Clindamycin and Dexamethasone versus Pyrimethamine, Sulfadiazine, and Prednisolone in Treatment of Ocular Toxoplasmosis," *Ophthalmology*, Vol. 118, No. 1, 2011, pp. 134-141, at p. 134].

92.  Similarly, meta-analyses of the literature of TE treatments show that there are therapies without pyrimethamine with similar efficacy to those with pyrimethamine.  [*See, e.g.*, Hernandez, A.V., et al., "A systematic review and meta-analysis of the relative efficacy and safety of treatment regimens for HIV-associated cerebral toxoplasmosis: is trimethoprim-

sulfamethoxazole a real option?," *HIV Medicine*, Vol. 18, 2017, pp. 115-124, Rajapakse, Senaka, et al., "Antibiotics for human toxoplasmosis: A systematic review of randomized trials," *Pathogens and Global Health*, Vol. 107, No. 4, 2013, pp. 162-169 (hereafter, "Rajapakse, et al. (2013)")]. One "systematic review comparing pyrimethamine plus sulfadiazine with TMP-SMX for the treatment of Toxoplasma encephalitis *demonstrated similar efficacy, radiologic response, and adverse events between the two treatments*" (emphasis added). [Hardy Report, ¶ 95].

93. Another meta-analysis found that for TE, a pyrimethamine plus sulfadiazine regimen was found to have a similar efficacy to TMP-SMX, with adverse effects appearing less commonly with TMP-SMX. [Rajapakse, et al. (2013), at p. 164]. For ocular toxoplasmosis, the same meta-analysis found that intravitreal clindamycin plus dexamethasone had similar efficacy to pyrimethamine plus sulfadiazine. [Rajapakse, et al. (2013), at p. 164]. An Express Scripts "Drug Evaluation" report for Daraprim summarized this same meta-analysis, noting that TMP-SMX was a potential alternative to Daraprim plus sulfadiazine. [DX 374].

94. In his critiques, Dr. Hardy attempts to dismiss systematic reviews and meta-analyses entirely, stating these publications "are often done because there are no published definitive RCTs to confidently answer a clinical treatment question." [Hardy Report, ¶ 95]. Dr. Hardy also dismisses the results of the TE RCT discussed above due to the small sample size. [Hardy Report, ¶ 83]. Dr. Hardy himself published a study assessing PCP therapies with only 30 patients (less than half the number of patients in the RCT that Dr. Hardy dismisses) and another with only 60 patients, drawing meaningful conclusions from the results.

95. Professor Hemphill also incorrectly attempts to dismiss the results in the medical literature. First, Professor Hemphill acknowledges that studies that conducted direct comparisons of TMP-SMX and pyrimethamine show inconclusive results. [Hemphill Report, ¶ 150]. The fact that researchers in the medical community conducted "head-to-head prospective clinical trials of treatments of Toxoplasma encephalitis comparing TMP-SMX and a pyrimethamine-based regimen," suggests that clinicians and other practitioners consider both products as viable treatment options for toxoplasmosis. [Hemphill Report, footnote 174]. Furthermore, some of these studies were conducted prior to Vyera's acquisition of Daraprim, suggesting that the comparison was not conducted as a result of the increase in price.

96. Second, Professor Hemphill suggests that "some patients cannot safely take TMP-SMX. Because TMP-SMX contains a sulfonamide, it cannot be used with patients who have a sulfa allergy or intolerance." [Hemphill Report, ¶ 151]. With pharmaceuticals, it is typical that some patients may have an allergy or intolerance. This does not preclude TMP-SMX from being in the same antitrust market as Daraprim. Rather, products should be evaluated as potentially in the same market as long as a large enough group of consumers consider them interchangeable. Regardless of whether Daraprim is a better fitting treatment for some patients, treatments do not need to be perfect substitutes to be considered in the same market.

97. Third, Professor Hemphill asserts that "unlike pyrimethamine, TMP-SMX cannot be used to confirm a diagnosis of toxoplasma encephalitis." [Hemphill Report, ¶ 152]. Pharmaceutical products often compete through non-price features and attributes that differentiate the products. [Pharmaceutical Industry Antitrust Handbook, *ABA Section of Antitrust Law*, Second Edition, 2018, pp. 235-236]. The fact that Daraprim can be used to confirm a diagnosis of TE may explain why it is priced at a premium relative to other treatments, but it is insufficient to suggest that Daraprim is not substitutable with other toxoplasmosis treatments.

98. Finally, Professor Hemphill asserts that "FDA-approved pyrimethamine is widely regarded as the 'gold standard' treatment for active toxoplasmosis." [Hemphill Report, ¶ 146]. As discussed above, Daraprim is not the preferred treatment for *all* indications of toxoplasmosis.

99. Evidence from clinicians, as well as an analysis of actual world patient use of the different treatment options, is consistent with Daraprim being therapeutically substitutable with other treatment options.

### Evidence from Medical Professionals

100. Emails exchanged by Dr. Hardy and the Chief of the Division of Infectious Diseases at Icahn School of Medicine at Mount Sinai, ████████████, are consistent with the evidence suggesting TMP-SMX is substitutable for Daraprim. ████████ described to Dr. Hardy that she "never really [was] able to identify poor [patient] outcomes" after Vyera's price increase and that "I think what we have learned is that there are better tolerated and less toxic alternatives. We either use Bactrim or the combination of clinda[mycin]/atovaquone which

22

ironically is what ophthalmologists have been using for ocular toxo for years! I am unaware of any poor outcomes in transplant or HIV from not having pyrimethamine." [DX 452]. Dr. Hardy even responds and says "the scant research seems to find (although not conclusively) that TMP-SMX is a well-tolerated alternative to Pyr-Sulfa or Pyr-Clinda for CNS toxo and atovaquone-clinda regimen is used successfully in ocular toxo." ████ expands in a later email that "In my opinion, I think Bactrim is as good, better tolerated, less toxicity and cheaper. I held that stance years before Martin [Shkreli]. The necessary placebo controlled trials were never done and unlikely to ever be done. Pyrimethamine is not available in many parts of the world and toxo is treated with SMX/TMP. I have not seen data that mortality is higher. As far as clinda[mycin]/atovaquone, all I have seen are a few cases and all recovered." [DX 453].

101. At my own hospital, MGH, as part of the hospital's electronic medical record system, practitioners evaluating treatment options for toxoplasmosis are prompted with a message stating: "The Infectious Diseases Division and the Antimicrobial Stewardship Program at MGH recommend the use of Trimethoprim-Sulfamethoxazole (TMP/SMX) for the treatment of toxoplasmosis." [DX 467].

102. Dr. Lucy Young, an ophthalmologist at MGH who specializes in ocular toxoplasmosis, emailed in March 2016 that she had "switched to Bactrim a long time ago for compliance and affordability reasons. I have not had any situation with pyrimethamine in the past year." [DX 470]. Similarly, Dr. Lucas Schulz, Clinical Coordinator for Infectious Diseases for the Department of Pharmacy at UW Health, testified that Daraprim and Bactrim are both first-line agents for toxoplasmosis that can be considered equal for treating active toxoplasmosis infections. [Deposition of Lucas Schulz, Clinical Coordinator for Infectious Diseases for the Department of Pharmacy at UW Health, February 25, 2021, p. 46].

103. Compounded pyrimethamine has also been found to be a viable substitute for Daraprim. Some hospitals, including MGH, produce their own compounded formulation of pyrimethamine, which further confirms that it is a safe, viable substitute to FDA-approved Daraprim.

104. Professor Hemphill describes a 2015 report authored by an independent research firm commissioned by Vyera that he suggests supports his conclusion that other toxoplasmosis

treatments are not reasonably interchangeable with FDA-approved pyrimethamine products. [DX 512]. Professor Hemphill's characterization of the study's findings is misleading. First, the report contains mixed evidence on how the 17 interviewed physicians perceive the different treatment options. Second, the study only focuses on one stakeholder involved in determining treatment options (physicians), but fails to describe the perceptions of other stakeholders, including insurance providers, healthcare systems, and patients. Third, this study was from 2015, *prior* to Vyera's acquisition of Daraprim. Vyera underestimated TMP-SMX, and after acquiring Daraprim, saw more patients switching to TMP-SMX and compounded pyrimethamine than anticipated. [Deposition of Michael Smith, Turing Co-Founder, January 7, 2021, pp. 220-221].





107.



108.



109. ███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████

*Formulary Evidence*

110. Prior authorization/step therapy is a common way that health insurers encourage prioritization of cost-effective medications. For example, BCBS of Arizona requires toxoplasmosis patients to have failure, contraindication, intolerance, or resistance to atovaquone, TMP-SMX, *and* compounded pyrimethamine before it will cover brand or generic Daraprim, thus acknowledging that atovaquone, TMP-SMX, and compounded pyrimethamine are therapeutic alternatives to Daraprim for the treatment of toxoplasmosis.

111. The available evidence also supports the fact that compounded pyrimethamine is clinically substitutable with FDA-approved pyrimethamine. Some hospitals, including my own, compound their own pyrimethamine, as acknowledged by Dr. Hardy and Professor Hemphill. [Hardy Report, ¶ 101, Hemphill Report, ¶ 139]. A presentation from OptumRx noted how compounded versions of pyrimethamine were being offered as a low-cost alternative to Daraprim, and that there were no clinical concerns with using the compounded pyrimethamine in place of Daraprim. [DX 478, DX 476, DX 477].

112. Thus, as indicated by the available medical guidelines, literature, actual world evidence from
     medical professionals, ███████████████, and formularies, there are therapeutic
     alternatives to Daraprim, including TMP-SMX and compounded pyrimethamine.

### *Daraprim is Economically Substitutable with Other Products*

113. Economic evidence suggests that some degree of economic substitutability exists between
     Daraprim and other therapeutic alternatives.

114. **Exhibit D.5** shows that after the price increase for Daraprim occurred in August 2015, the
     volume of Daraprim tablets dropped substantially to approximately 65,000 tablets per month.
     Data depicting Illinois' Medicaid utilization of Daraprim also shows a drop in units after
     2015. [DX 458]. This sizeable decline in quantity suggests some degree of price competition
     and product substitution was occurring. The fact that there is not 100 percent substitution to
     the low-priced alternative therapies (e.g., compounded pyrimethamine and TMP-SMX)
     following Vyera's price increase does not mean that the products are not substitutes. This
     simply shows that the products are not *perfect* substitutes (i.e., that the products are not
     identical). Taking into account contraindications, intolerances, comorbidities,
     patient/prescriber preferences, etc., a large increase in the price of a drug will likely not
     reduce the volume to zero.

28

**Exhibit D.5**
**Quantity of Daraprim Tablets Sold**
**Q1 2006 - Q4 2020**



**Note:**
[1] The number of tablets from January 2006 to July 2015 is calculated using the National Sales Perspectives data reports from IQVIA. The number of tablets from August 2015 to December 2020 is calculated using Vyera sales data.
**Sources**:
[A] IQVIA National Sales Perspectives Data (DX 425, DX 438, DX 437, DX 426).
[B] Vyera Sales Data (DX 521).

115. Professor Hemphill discounts the observed switching from Daraprim to other therapeutic alternatives by invoking the "Cellophane Fallacy," which is the theoretical possibility that if a monopolist opts to set its price above the competitive level, the supra-competitive price leads consumers to seek out less expensive alternatives that they otherwise would not consider to be substitutes if the monopolist charged a lower price. [Hemphill Report, ¶ 142]. This criticism applies when it is established that the product in question is being sold at a supra-competitive price.

116. 

117. Despite the evidence of switching at lower price levels, Professor Hemphill asserts that there was not substantial substitution to other toxoplasmosis therapies during the large Daraprim price increases between 2010 and 2014. [Hemphill Report, ¶¶ 123-129]. His assertion is misleading.

118. Professor Hemphill fails to accurately measure the prices of Daraprim by relying on IQVIA National Sales Perspective ("NSP") price data, which do not account for all discounts and rebates drug manufacturers offer that reduce net price paid for drug products.

119. Rebates and other discounts can make a significant difference in the actual price that patients and payers face for Daraprim. **Exhibit D.6** shows that the average price per tablet for Daraprim from October 2015 to December 2020 drops from $656 to $246 (approximately 62.5 percent) when accounting for rebates, chargebacks, and other discounts that Vyera provided. Vyera paid out rebates equaling about 22 percent of Daraprim's gross sales during this period.

**Exhibit D.6**
**Daraprim Gross and Net Prices per Tablet**
**Q4 2015 - Q4 2020**



**Note:**
[1] Gross price is calculated as quarterly gross sales divided by quarterly units. Net price is calculated as quarterly gross sales minus relevant chargebacks, rebates, and other deductions, divided by quarterly units.
**Source:**
[A] Vyera Sales Data (DX 521).

120. Even if Professor Hemphill's reported prices are accepted as accurate, he noted that a modest increase in the price of Daraprim (less than $4) is associated with an 11 percent decline in tablet sales, so an increase in the price of Daraprim led to substitution to other therapies.

121. Professor Hemphill's additional economic evidence is that Vyera raised the price of Daraprim in 2015, which he claims was significantly above the competitive level for multiple years. [Hemphill Report, ¶¶ 130-131].

122. Professor Hemphill asserts that the profitability of this price change is confirmed by the fact that Vyera "did not meaningfully roll [the price increase] back." [Hemphill Report, ¶ 133].

31

However, after reaching an average net price per tablet of $330 in Q1 2016, over the following 15 quarters the net price of Daraprim decreased relative to the previous quarter 10 times (67%). Daraprim's net price ultimately decreased to approximately the same price at which Cerovene's generic launched. [Deposition of Anupam Jena, MD, PhD, July 30, 2021, p. 29].

123. Thus, economic evidence showing a sizeable decline in Daraprim's volume following Vyera's price increase and evidence implying switching at much lower price levels suggests that some degree of economic substitutability exists between Daraprim and other therapeutic alternatives.

**Professor Hemphill's Application of the Indirect Approach to Establish Market Power is Flawed**

124. Professor Hemphill compares consumers' purchasing behavior before DRL's generic entry in March 2020 to that after generic entry, suggesting that the decline in Daraprim volume after generic entry, the decrease in prices of pyrimethamine drugs, and the decline in Vyera's net profits show that the market should be limited to FDA-approved pyrimethamine drugs. [Hemphill Report, ¶¶ 78-80].

125. ██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████.

126. ██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████.

127. Further, many states have regulations allowing pharmacists to automatically switch patients' prescriptions to generic versions without the need for consent from the prescriber or the patient, allowing generics to capture large shares of sales quickly once entering into the marketplace.

128. Data presented by Professor Hemphill suggests that the regulation is, in part, driving patient conversion to the generic pyrimethamine. In Exhibit 5 of his report, Professor Hemphill presents a comparable downward sloping trend in Daraprim tablets for patients who are insured through commercial payors and patients who receive their medication from 340B hospitals and their contracted pharmacies. [Hemphill Report, Exhibit 5].

129. The 340B Drug Pricing Program is intended to allow low-income patients to obtain medications at low costs. As such, if the decline in Daraprim volumes after generic entry was purely driven by patients switching to generic pyrimethamine due to its lower price, we would expect to see a sharper decline in Daraprim's volume among commercially-insured patients (who face larger differences between brand and generic prices) than for 340B patients.

130. Additionally, a decline in the average price of FDA-approved pyrimethamine observed by Professor Hemphill after generic entry is in part a function of automatic substitution to the lower-priced generic product, since this weighted average price incorporates a growing share of generic sales over time. Further, an observed decline in Vyera's net profits is expected given the shift in volume to generic pyrimethamine resulting from generic substitution laws and regulations.

131. Relatedly, Professor Hemphill purports to apply the Hypothetical Monopolist Test, which aims to define the relevant antitrust product market by asking whether a profit-maximizing hypothetical monopolist controlling all products in a proposed market likely would impose a small but significant, nontransitory increase in price for at least one product in the market. Professor Hemphill asserts that, because the price of pyrimethamine fell after generic entry, a hypothetical monopolist controlling both Daraprim and generic pyrimethamine would charge a price significantly more than 5 percent above the "competitive level, so the market consists only of branded Daraprim and generic pyrimethamine. [Hemphill Report, ¶ 116].

33

132. This analysis fails to account for regulation, including automatic substitution, and ignores the steep downward trend in Daraprim's price *prior* to generic entry. Applying Professor Hemphill's approach to nearly any other U.S. pharmaceutical product where there is a bioequivalent generic would lead to a similar conclusion: that the relevant market always includes only the brand and its bioequivalent generics. This is implausible.

### Professor Hemphill's Application of the Direct Approach to Establish Market Power is Flawed

133. Direct evidence of market power is typically unavailable, particularly in the pharmaceutical industry. Professor Hemphill asserts that "Vyera profitably set [the Daraprim] price greatly in excess of the competitive level," suggesting that this constitutes *direct* evidence of Vyera's market and monopoly power. [Hemphill Report, ¶¶ 178-188]. Professor Hemphill relies on flawed analyses and a highly subjective definition of the competitive price level for Daraprim as outlined below.

#### *Professor Hemphill's definition of the competitive price level for Daraprim is flawed*

134. Professor Hemphill's definition of the competitive pricing level for Daraprim is unsubstantiated. While he acknowledges that there exists "some uncertainty" about the competitive price level, he asserts that the competitive pricing was at most $160 and as low as $12 per tablet (or even lower). [Hemphill Report, ¶¶ 99, 100, 182]. This wide range demonstrates how arbitrary his definition is.

135. Furthermore, Professor Hemphill's approach would suggest that DRL has market power, despite it being a generic manufacturer that offered "potent competition" to the branded product in the marketplace. [Hemphill Report, ¶ 93]. For example, Professor Hemphill suggested that a competitive price for Daraprim could be $12. Based on this competitive price, DRL would have entered the market at a supra-competitive price and would have earned supra-competitive profits for nearly a year. Even if the costs per unit for DRL were twice the amount that Professor Hemphill reported for Vyera ($3.93 x 2 = $7.86), DRL still would have made a gross profit exceeding $18.3 million over the period March 2020 to January 2021.

*Vyera's profit margins are not indicative of market power*

136. Professor Hemphill also suggests that "Vyera's exercise of market power can also be observed in its price-cost margins." [Hemphill Report, ¶ 184]. He estimates Vyera's gross profit margins to be 89 to 98 percent between 2015 and 2020, and asserts that this is direct evidence of market power, but these margins are uninformative when assessing market power. First, the gross margins are based on tablet production costs only, a measure of short-run costs and do not incorporate initial investments, uncertainty about the success of the investment, or other investment costs that Vyera is undertaking. Second, these margins remained at a similar level for Vyera both *before* and *after* DRL's entry, implying that even in the presence of generic entry from DRL, Vyera has continued to possess market power. Finally, the fact that FDA-approved pyrimethamine rose once DRL entered with a generic in 2020 could also be explained by patients switching back to pyrimethamine from TMP-SMX or other therapeutic alternatives in response to the lower generic price. This would be consistent with a broader relevant market than the one defined by Professor Hemphill.

**Evaluation of Professor Hemphill's Proposed Method for Calculating Excess Profits**

137. Professor Hemphill presents a flawed model of excess profits, which calculates the difference between Vyera's actual profits and profits in a but-for world without Vyera's challenged contracts. [Hemphill Report, Section 5].

138. First, Professor Hemphill fails to provide a sound basis for determining the date of generic entry in the but-for world and his model is highly sensitive to his generic entry dates. In his reply report Professor Hemphill clarifies that he was not offering an opinion as to whether, in fact, Vyera's restrictions made it more difficult for generics to obtain these necessary inputs, yet his model presents earlier but-for generic entry dates. [Hemphill Reply Report, ¶ 99].

139. Second, Professor Hemphill attributes a decrease in the price of brand Daraprim to generic entry, ignoring the fact that Daraprim's price began steadily decreasing much earlier, with an observable decrease in price beginning in Q1 2019, an entire year before generic entry. [Hemphill Report, Exhibit 12].

140. Third, Professor Hemphill assumes that the total volume of brand and generic pyrimethamine grows for years following earlier generic entry. [Hemphill Report, ¶¶ 267-278]. This is contrary to the fact that the incidence of toxoplasmosis has been declining since the 1980s. [Hardy Report, ¶ 31].

141. In sum, Professor Hemphill presents an excess profits model that is based off of a number of flawed assumptions. As a result, I find his model to be highly speculative and unreliable in accurately estimating excess profits under the unsupported theory, which Professor Hemphill himself declines to endorse in his reply report, that Vyera's alleged conduct delayed generic entry. [Hemphill Reply Report, ¶ 99].

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 20, 2021                    *Dr. Anupam B. Jena*
                                           Dr. Anupam B. Jena, M.D., Ph.D.

*Federal Trade Commission et al.*

v.

*Vyera Pharmaceuticals, LLC et al.*

———————

Case No. 20-cv-00706 (DLC)

———————

### Trial Testimony of Dr. Anupam B. Jena, MD, PHD
### Federal Rule of Evidence 703 Appendix of Materials

| Document | Tab |
|---|---|
| Hernandez, A.V., et al., "A systematic review and meta-analysis of the relative efficacy and safety of treatment regimens for HIV-associated cerebral toxoplasmosis: is trimethoprim-sulfamethoxazole a real option?," *HIV Medicine*, Vol. 18, 2017, pp. 115-124 | 1 |
| Lykins, Joseph, et al., "Understanding Toxoplasmosis in the United States Through 'Large Data' Analyses," *Clinical Infectious Diseases*, Vol. 63, No. 4, 2016, pp. 468-475 | 2 |
| Pharmaceutical Industry Antitrust Handbook, *ABA Section of Antitrust Law*, Second Edition, 2018 | 3 |
| Rajapakse, Senaka, et al., "Antibiotics for human toxoplasmosis: A systematic review of randomized trials," *Pathogens and Global Health*, Vol. 107, No. 4, 2013, pp. 162-169 | 4 |
| Soheilian, Masoud, et al., "Randomized Trial of Intravitreal Clindamycin and Dexamethasone versus Pyrimethamine, Sulfadiazine, and Prednisolone in Treatment of Ocular Toxoplasmosis," *Ophthalmology*, Vol. 118, No. 1, 2011, pp. 134-141 | 5 |
| Torre, Donato, et al., "Randomized Trial of Trimethoprim-Sulfamethoxazole versus Pyrimethamine-Sulfadiazine for Therapy of Toxoplasmic Encephalitis in Patients with AIDS," *Antimicrobial Agents and Chemotherapy*, Vol. 42. No. 6, June 1998, pp. 1346-1349 | 6 |

**Tab 1**

Hernandez, A.V., et al., "A systematic review and meta-analysis of the relative efficacy and safety of treatment regimens for HIV-associated cerebral toxoplasmosis: is trimethoprim-sulfamethoxazole a real option?," *HIV Medicine*, Vol. 18, 2017, pp. 115-124

DOI: 10.1111/hiv.12402
© 2016 British HIV Association
HIV Medicine (2017), 18, 115—124

## ORIGINAL RESEARCH

# A systematic review and meta-analysis of the relative efficacy and safety of treatment regimens for HIV-associated cerebral toxoplasmosis: is trimethoprim-sulfamethoxazole a real option?

AV Hernandez,[1,2,*] P Thota,[1*] D Pellegrino,[4] V Pasupuleti,[5] VA Benites-Zapata,[5] A Deshpande,[6,7] AC Penalva de Oliveira[8] and JE Vidal[8,9,10]

[1] School of Medicine, Universidad Peruana de Ciencias Aplicadas (UPC), Lima, Peru, [2] Health Outcomes and Clinical Epidemiology Section, Department of Quantitative Health Sciences, Lerner Research Institute, Cleveland Clinic, Cleveland, OH, USA, [3] Department of Medicine, Case Western Reserve University, Cleveland, OH, USA, [4] Department of Infectious Diseases, Instituto de Infectologia Emilio Ribas, Sao Paulo, Brazil, [5] Center for Public Health Research, Research Institute, Faculty of Medicine, Universidad de San Martin de Porres, Lima, Peru, [6] Medicine Institute Center for Value Based Care Research, Cleveland Clinic, Cleveland, OH, USA, [7] Department of Infectious Diseases, Medicine Institute, Cleveland Clinic, Cleveland, OH, USA, [8] Department of Neurology, Instituto de Infectologia Emilio Ribas, Sao Paulo, Brazil, [9] Divisão de Clínica de Moléstias Infecciosas e Parasitárias, Hospital das Clínicas, Faculdade de Medicina da Universidade de Sao Paulo, Sao Paulo, Brazil and [10] Laboratorio de Protozoologia, Instituto de Medicina Tropical de São Paulo, Faculdade de Medicina da Universidade de São Paulo, São Paulo, Brazil

**Objectives**

The objective of this study was to perform a systematic review and meta-analysis of the literature to evaluate the efficacy and safety of therapies for cerebral toxoplasmosis in HIV-infected adults. The pyrimethamine plus sulfadiazine (P-S) combination is considered the mainstay therapy for cerebral toxoplasmosis and pyrimethamine plus clindamycin (P-C) is the most common alternative treatment. Although trimethoprim-sulfamethoxazole (TMP-SMX) has potential advantages, its use is infrequent.

**Methods**

We searched PubMed and four other databases to identify randomized controlled trials (RCTs) and cohort studies. Two independent reviewers searched the databases, identified studies and extracted data. Risk ratios (RRs) were pooled across studies using random-effects models.

**Results**

Nine studies were included (five RCTs, three retrospective cohort studies and one prospective cohort study). In comparison to P-S, treatment with P-C or TMP-SMX was associated with similar rates of partial or complete clinical response [P-C: RR 0.87; 95% confidence interval (CI) 0.70–1.08; TMP-SMX: RR 0.97; 95% CI 0.78–1.21], radiological response (P-C: RR 0.92; 95% CI 0.82–1.03), skin rash (P-C: RR 0.81; 95% CI 0.56–1.17; TMP-SMX: RR 0.17; 95% CI 0.02–1.29), gastrointestinal impairment (P-C: RR 5.16; 95% CI 0.66–40.11), and drug discontinuation because of adverse events (P-C: RR 0.32; 95% CI 0.07–1.47). Liver impairment was more frequent with P-S than P-C (P-C vs. P-S: RR 0.48; 95% CI 0.24–0.97).

**Conclusions**

The current evidence fails to identify a superior regimen in terms of relative efficacy or safety for the treatment of HIV-associated cerebral toxoplasmosis. Use of TMP-SMX as preferred treatment may be consistent with the available evidence and other real-world considerations. Larger comparative studies are needed.

**Keywords:** cerebral toxoplasmosis, HIV infection, toxoplasmic encephalitis

*Accepted 23 February 2016*

Correspondence: Dr José E. Vidal, Department of Neurology, Instituto de Infectologia Emilio Ribas, Av. Doutor Arnaldo 165, Cerqueira César, Sao Paulo 01246-900, Brazil. Tel: +5511 38961200; e-mail: josevibe@gmail.com
*These authors contributed equally to the study.

## Introduction

Highly active antiretroviral therapy (HAART) has significantly reduced the incidence, prevalence, and case-

116   AV Hernandez *et al.*

fatality rates of cerebral toxoplasmosis in HIV-infected patients from both developed and developing countries [1,2]. Treatment of cerebral toxoplasmosis has been relatively successful in comparison to other opportunistic infections; however, cerebral toxoplasmosis still represents a poor prognostic determinant in patients with advanced disease and severe immunodeficiency [1,3,4].

Although the first case of HIV-associated cerebral toxoplasmosis was described in 1980 [5], there have been only a few randomized controlled trials and cohort studies comparing different regimens for the treatment of AIDS-associated cerebral toxoplasmosis [6,7]. Thus, although HIV-associated cerebral toxoplasmosis is quite a common world-wide problem, there is a scarcity of evidence regarding optimal therapy. The preferred initial therapy for cerebral toxoplasmosis in Department of Health and Human Services of the USA (DHHS), European AIDS Clinical Society (EACS), and British HIV Association (BHIVA) guidelines is the combination of pyrimethamine plus sulfadiazine (P-S), and pyrimethamine plus clindamycin (P-C) is the preferred alternative regimen [8-10]. Trimethoprim-sulfamethoxazole (TMP-SMX) usually appears as an additional alternative in these three guidelines, but other recommendations [11] indicate this combination and P-S as first-line therapies. In clinical practice, however, TMP-SMX use is infrequent when P-C and P-S are available. In contrast, TMP-SMX is the first choice in Africa and in other developing regions, particularly where other regimens are not available or where there is experience with TMP-SMX. TMP-SMX has potential advantages (i.e. tolerability, posology, parenteral formulation and accessibility) and remains an attractive option. Pyrimethamine is a standard use drug approved by the Food and Drug Administration (FDA) in 1953 but its price has increased worryingly, with a negative impact on both public health and individual patient care. In addition, regimens including pyrimethamine require the use of folinic acid, a medication usually unavailable in most resource-limited settings. The DHHS guidelines mention that pyrimethamine will soon no longer be available in retail pharmacies in the USA (http://aidsinfo.nih.gov/guidelines/html/4/adult-and-adolescent-oi-prevention-and-treatment-guidelines/0) and recommends it for patients with suspected or documented toxoplasmosis who do not have a history of sulfa allergy; TMP-SMX should be used as a substitute if pyrimethamine is not readily available. In this scenario, the optimal management of cerebral toxoplasmosis continues to be controversial, and evidence-based, clear alternatives to pyrimethamine are needed.

The purpose of this systematic review and meta-analysis was to evaluate the most effective and safest therapy for HIV-associated cerebral toxoplasmosis.

## Methods

### Data sources and searches

We performed a systematic search for publications using PubMed-Medline, CINAHL, Scopus, Web of Science and the Cochrane Library from database inception to 30 October 2014. Search strategies used subject headings and keywords with no language restrictions. The database searches were performed independently by two authors (PT and DP). The PubMed search strategy is available as supplementary data (Appendix S1). A manual search of references from recent reviews and relevant published original studies was also performed to identify relevant studies.

The following predetermined inclusion criteria were used: (1) studies evaluating the efficacy and safety of acute therapeutic regimens in HIV-infected patients with cerebral toxoplasmosis; (2) study population of patients > 18 years old. Our exclusion criteria were: (1) single drug regimen observational studies; (2) case series; (3) studies in which safety and efficacy data were not available or could not be extracted for each of the study groups. Efficacy outcomes of interest were clinical and radiological response. All adverse event data provided in the included studies were recorded for safety outcomes.

### Study selection and data extraction

A list of retrieved articles was reviewed independently by two investigators (PT and DP) to choose potentially relevant articles, and any disagreements were discussed and resolved by consensus with one other author (AVH). Two reviewers (PT and DP) independently extracted and recorded data from included studies. The following information was extracted: age, gender, time since AIDS diagnosis, treatment regimens, duration of treatment, follow-up time, clinical and radiological responses, and adverse events. One other author (AVH) reviewed the extractions for discrepancies, and the three authors (PT, DP and AVH) reached a consensus.

### Evaluation of study quality

The quality of all included cohort studies was assessed independently by two authors (PT and VP) using the

© 2016 British HIV Association

*HIV Medicine* (2017), 18, 115--124

Case 22-728, Document 97-1, 1202/2022, 3442420, Page79 of 164

A-965

Case 1:20-cv-00706-DLC   Document 842-2   Filed 12/20/21   Page 2 of 28

Newcastle–Ottawa scale (NOS) [12]. The NOS uses two different tools for case–control and cohort studies and consists of three parameters of quality: selection, comparability and exposure/outcome assessment. The NOS assigns a maximum of four points for selection, two points for comparability and three points for exposure or outcome. NOS scores of ≥ 7 were considered to represent high-quality studies and NOS scores of 5–6 were considered to represent moderate quality.

The quality of all included randomized controlled trials (RCTs) was assessed independently by two authors (PT and VP) using The Cochrane Collaboration tool for assessing risk of bias [13]. The following items were evaluated: generation of the allocation sequence (selection bias); concealment of the allocation sequence (selection bias); blinding (detection and performance bias); blinding of participants and personnel to outcome assessment; incomplete outcome data (attrition bias); selective outcome reporting (reporting bias); and other biases. For each RCT, each item was described as having either a low risk of bias, a high risk of bias, or an unclear risk of bias. All discrepancies were addressed by a re-evaluation of the original article as a group (PT, VP and AVH).

Data synthesis and analysis

Our systematic review followed the recommendations of the Preferred Reporting Items for Systematic Reviews



Fig. 1 Preferred Reporting Items for Systematic Reviews and Meta-Analyses (PRISMA) flow chart for the selected studies.

© 2016 British HIV Association

HIV Medicine (2017), 18, 115–124

118   AV Hernandez et al.

and Meta-Analyses (PRISMA) collaboration [14]. DerSimonian and Laird random-effects models and the inverse variance method were used for all meta-analyses [15] to calculate pooled risk ratios and 95% confidence intervals (CIs). $I^2$ values of 30–60% represented a moderate level of heterogeneity. A P-value of < 0.1 for $\chi^2$ was defined as indicating the presence of heterogeneity. Publication bias was illustrated using funnel plots and formally tested using Egger's test [16]. We used REVIEW MANAGER for all statistical analyses (REVMAN 5.0; The Cochrane Collaboration, Oxford, UK; http://tech.cochrane.org/revman/about-revman-5).

## Results

### Eligible studies

Of the 504 unique articles retrieved and screened by study title, 30 potentially relevant articles were selected based on relevance to the study topic. After screening the abstracts, 16 articles were found to fulfil the inclusion criteria and were selected for full-text review (Fig. 1). Nine articles (n = 692) assessing the efficacy and/or safety of acute therapeutic regimens in HIV-infected patients with cerebral toxoplasmosis were included in our systematic review and meta-analysis. Seven articles were excluded after full-text review (reasons for exclusion are listed in Fig. 1).

### Study characteristics

Table 1 summarizes the main characteristics of the included studies. Of the nine included studies, five were RCTs [17–21], three were retrospective cohort studies [1,22,23] and one was a prospective cohort study [24]. Sample size ranged from 29 to 299 patients. The most commonly evaluated treatment regimen was P-S, which was one of the treatment arms in seven studies. Duration of treatment varied from 3 weeks to 6–8 weeks.

### Quality assessment and publication bias

NOS quality scores for cohort studies ranged from 6 to 8 (Supporting Information Table S1a). The majority of the included RCTs were assessed as having a high risk of bias using the Cochrane tool, with no blinding of participants, personnel and outcome assessment as the main issues (Table S1b). The low number of studies in the pooled analyses (< 10) precluded us from evaluating for publication bias by funnel plot analysis. However, publication bias was minimized by a comprehensive

**Table 1** Overview of the included studies

| Authors, year published | Study location | Type of study | Sample size | Age (mean (SD)) | Male (%) | Treatment groups; dosage | Duration of treatment |
|---|---|---|---|---|---|---|---|
| Anthony et al., 1992 [1] | Italy | RC | 29 | 34.4 (7.4) | 74.4 | Pyrimethamine i.v. plus clindamycin; 50–75 mg/day, 2.4–3.6 g/day | 6–8 weeks |
| Arens et al., 2007 [21] | South Africa | RC | 43 | 32.6 | 41.9 | Pyrimethamine plus sulfadiazine; NR Trimethoprim plus sulfamethoxazole; NR | NR |
| Cuanes et al., 1995 [22] | France | RC | 55 | 33.0 | 31.8 | Pyrimethamine plus clindamycin; 100 mg loading dose, then 50 mg/day, 4 g/day Atovaquone plus pyrimethamine; 3 g/day, 4–6 g/day loading dose then 75 mg/day | 6–8 weeks |
| Chirgwin et al., 2002 [18] | France, USA | RCT | 49 | 35.6 | 65.3 | | 6 weeks |
| Dannemann et al., 1992 [17] | USA, Europe | RCT | 59 | 36.0 (8.4) | 84.8 | Pyrimethamine plus clindamycin; 200 mg loading dose, then 75 mg/day 4.8 g/day i.v. 3 weeks and then 1.2–1.35 g/day orally 3 weeks | 6 weeks |
| Katlama et al., 1996 [19] | Europe | RCT | 299 | 33.5 (8.5) | 87.6 | Pyrimethamine plus clindamycin; 50 mg/day, 2.4 g/day | 6 weeks |
| Kongsaengdao et al., 2008 [20] | Thailand | RCT | 30 | 37.3 (9.8) | 63.3 | Trimethoprim plus sulfamethoxazole; 50–100 mg/d/o, 4 g/day | 6 weeks |
| Ref.G Poele, 1991 [23] | Germany | PC | 51 | NR | NR | Pyrimethamine plus rhodamacin plus spiramycin; 1.5 mg/kg/day, 2.4 g/day, 3x10⁶ IU | 3 weeks |
| Torre et al., 1998 [20] | Italy | RCT | 77 | 33.2 (5.8) | 74.0 | Pyrimethamine plus sulfadiazine; 50 mg/day, 60 mg/kg/day Trimethoprim plus sulfamethoxazole; 10 mg/kg/day, 50 mg/kg/day | 30 days* |

i.v., intravenous; IU, international units; RC, retrospective cohort; PC, prospective cohort; RCT, randomized controlled trial; NR, not reported; SD, standard deviation.
*Followed by 50% maintenance dose for 3 months.



Fig. 2 Partial or complete clinical response. (a) Pyrimethamine plus clindamycin (P-C) vs. pyrimethamine plus sulfadiazine (P-S). (b) Trimethoprim-sulfamethoxazole (TMP-SMX) vs. P-S. CI, confidence interval; RCT, randomized controlled trial; IV, inverse variance.

search of databases without language and publication date restrictions.

## Meta-analyses

### Clinical and radiological efficacy

Treatment with P-S had a similar clinical efficacy when compared with P-C or TMP-SMX, with similar rates of partial or complete clinical response [P-C vs. P-S: risk ratio (RR) 0.87; 95% confidence interval (CI) 0.70–1.08; $I^2 = 28\%$; TMP-SMX vs. P-S: RR 0.97; 95% CI 0.78–1.21;

$I^2 = 0\%$] (Fig. 2) and radiological response [P-C vs. P-S: RR 0.92; 95% CI 0.82–1.03; $I^2 = 0\%$] (Fig. 3).

### Safety

The rates of skin rash (P-C vs. P-S: RR 0.81; 95% CI 0.56–1.17; $I^2 = 53\%$; TMP-SMX vs. P-S: RR 0.17; 95% CI 0.02–1.29; $I^2 = 0\%$) (Figure S1), gastrointestinal impairment (P-C vs. P-S: RR 5.16; 95% CI 0.66–40.11; $I^2 = 56\%$) (Figure S2), and drug discontinuation because of adverse events (P-C vs. P-S: RR 0.32; 95% CI 0.07–1.47; $I^2 = 42\%$) (Figure S3) were similar for P-S vs. P-C or TMP-SMX. Liver

© 2016 British HIV Association

Fig. 3 Partial or complete radiological response for the comparison of pyrimethamine plus clindamycin (P-C) vs. pyrimethamine plus sulfadiazine (P-S). CI, confidence interval; RCT, randomized controlled trial.

impairment was more frequent for P-S vs. P-C (P-C vs. P-S: RR 0.48; 95% CI 0.24–0.97) (Figure S4).

## Discussion

In this systematic review and meta-analysis, we found that treatment with P-S had similar relative clinical and radiological efficacy and similar safety when compared with P-C or TMP-SMX. Among adverse events, only liver impairment was more frequent with P-S when compared with the P-C regimen.

The main objective of this study was to compare and evaluate the current evidence on various treatment regimens for cerebral toxoplasmosis and to explore the availability of alternative, better treatment regimens. Table 2 presents an overview of two previous reviews and the present study. The first study was a systematic review by The Cochrane Collaboration [6]. This review included only randomized double-blind trials. On evaluating three studies, two comparing P-S with P-C [18,19] and one comparing P-S with TMP-SMX [21], the authors found similar rates of complete or partial clinical response between the regimens. The second study was a systematic review and meta-analysis [7], which included randomized and quasi-randomized controlled studies. On analysing five studies, three comparing P-S with P-C [1,18,19] and two comparing P-S with TMP-SMX [20,21], the authors found similar rates of complete or partial clinical response and mortality outcomes between the regimens.

Interestingly, P-S showed substantial toxicity and intolerance when compared with P-C.

As only a limited number of randomized trials have been performed on this topic, we aimed to evaluate the treatment regimens for HIV-associated cerebral toxoplasmosis in a larger population by including comparative cohort studies. Our results are in congruence with those of the two previous reviews, confirming that treatment with P-S had similar efficacy and safety to P-C or TMP-SMX. We found that only liver impairment was more frequent with P-S when compared with P-C. Thus, the available evidence fails to identify any one superior regimen for the treatment of cerebral toxoplasmosis.

Cerebral toxoplasmosis has been the most common central nervous system disease in patients with AIDS from both developed and developing countries [25–27]. In the HAART era, the burden of cerebral toxoplasmosis was reduced particularly in developed countries and to a lesser extent in developing countries. The situation is more serious in scenarios with nonavailability of HAART. However, globally, cerebral toxoplasmosis continues to afflict patients for several reasons: [1] late HIV diagnosis; [2] noncompliance with HAART or preventive antimicrobial drugs; and [3] virological and immunological HAART failure [28]. For these reasons, cerebral toxoplasmosis poses a serious challenge in the management of HIV-infected patients.

Early recognition and prompt treatment of acute symptoms during the initial phase of cerebral toxoplasmosis reduces the risk of neurological sequelae and mortality.

© 2016 British HIV Association

*HIV Medicine* (2017), 18, 115--124

TMP–SMX for HIV–associated cerebral toxoplasmosis   121

Table 2 Comparison of published systematic reviews on treatment of AIDS-associated cerebral toxoplasmosis

| | Dedicoat et al. [6] | Yan et al. [7] | Our study |
|---|---|---|---|
| Year of publication | 2006 | 2013 | — |
| Aim | To determine the most effective therapy for TE in HIV-infected adults | To determine the therapy that is most effective for primary prophylaxis of TE or for treating HIV-infected patients presenting with the first episode TE | To evaluate the most effective and safe therapy for cerebral toxoplasmosis in HIV-infected adults |
| Type of studies included | Randomized double-blinded trials | Randomized and quasi-randomized controlled trials | RCTs and cohort studies |
| Search databases | PubMed, EMBASE, AIDSearch and The Cochrane Library | PubMed, Google Scholar, EMBASE and CENTRAL | PubMed, CINAHL, Scopus, Web of Science and The Cochrane Library |
| Search cut-off date | November 2005 | September 2012 | October 2014 |
| Number of studies included | Three trials | 11 trials (including five studies evaluating treatment of TE) | Five RCTs, three retrospective cohort studies and one prospective cohort study |
| Total number of patients | 435 | 1472 (n = 494 in studies evaluating treatment of TE) | 692 |
| Study quality assessment | The assessment was based on the quality of allocation concealment, blinding, baseline characteristics of patients, use of intention-to-treat analysis and completeness of follow-up | Jadad scale | Cochrane risk of bias tool for RCTs; Newcastle–Ottawa scale for cohort studies |
| Primary outcome | Mortality, clinical response to treatment, neurological outcome and serious adverse events | TE (when prophylactics used), mortality and drug-limiting toxicity | Clinical and radiological efficacy of treatment and adverse effects |
| Results | Mortality (P-C vs. P-S: RR 1.41; 95% CI 0.88–2.28; P-S vs. IMP-SMX: RR 0.0; 95% CI 0.0–0.0); partial or complete clinical response (P-C vs. P-S: RR 0.95; 95% CI 0.55–1.64; P-S vs. IMP-SMX: RR 1.00; 95% CI 0.74–1.33); adverse events (P-C vs. P-S: RR 0.95; 95% CI 0.81–1.11; P-S vs. IMP-SMX: RR 0.58; 95% CI 0.21–1.61); radiological response (P-C vs. P-S: RR 0.95; 95% CI 0.84–1.07; P-S vs. IMP-SMX: RR 1.09; 95% CI 0.78–1.51) | Episodes of TE (IMP-SMX vs. D-P: OR 0.98; 95% CI 0.48–2.00); mortality (TMP-SMX vs. D-P: OR 0.75; 95% CI 0.53–1.06; P-S vs. P- C: OR 0.66; 95% CI 0.37–1.17; P-S vs. TMP-SMX: OR 0.12; 95% CI 0.01–1.39); toxicity and intolerance (TMP-SMX vs. D-P: OR 1.47; 95% CI 0.91–2.38; P-S vs. P-C: OR 3.08; 95% CI 1.82–5.24; P-S vs. TMP-SMX: OR 2.91; 95% CI 0.99–8.55); clinical response (P-S vs P-C: OR 1.63; 95% CI 1.05–2.51; P-S vs. TMP-SMX: OR 0.90; 95% CI 0.39–2.06) | Partial or complete clinical response (P-C vs. P-S: RR 0.87; 95% CI 0.70–1.08; TMP-SMX vs. P-S: RR 0.97; 95% CI 0.78–1.21); radiological response (P-C vs. P-S: RR 0.92; 95% CI 0.82–1.00); skin rash (P-C vs. P-S: RR 0.81; 95% CI 0.56–1.17; TMP-SMX vs. P-S: RR 0.17; 95% CI 0.02–1.29); GI impairment (P-C vs. P-S: RR 5.16; 95% CI 0.66–40.11; I² = 56%); drug discontinuation because of adverse events (P-C vs. P-S: RR 0.32; 95% CI 0.07–1.47); liver impairment (P-C vs. P-S: RR 0.48; 95% CI 0.24–0.97) |
| Conclusions | The available evidence fails to identify any one superior regimen for the treatment of TE. TMP-SMX appears to be an effective alternative therapy for TE in resource-poor settings where pyrimethamine and sulfadiazine are not available. | The available evidence fails to identify any one superior regimen for the primary prophylaxis and treatment of TE. Administration of TMP-SMX for primary prophylaxis and treatment of TE in patients with HIV infection is consistent with the available data. | Current evidence fails to identify one superior regimen in terms of relative efficacy or safety for the treatment of HIV-associated cerebral toxoplasmosis. Use of TMP-SMX as preferred treatment is consistent with the available evidence and other real-world considerations. |

CI, confidence interval; RR, risk ratio; TE, toxoplasmic encephalitis; RCT, randomized controlled trial; IMP-SMX, trimethoprim plus sulfamethoxazole; P-S, pyrimethamine plus sulfadiazine; P-C, pyrimethamine plus clindamycin; D-P, dapsone plus pyrimethamine; GI, gastrointestinal.

Historically, the regimen containing P-S has been preferred, and for patients who have contraindications for sulfadiazine use, the common alternative was P-C [9,29]. Approximately 70–90% of patients treated with these regimens demonstrate clinical and/or radiological improvement [30]. In clinical practice, however, treatment with P-S or P-C is beset with several problems, including adverse events, poor tolerability, complex posology, and the absence of parenteral formulations (a major problem in patients with alteration of mental status). In this context, evaluation of alternative treatments continues to be

a challenge. In patients with no allergies to sulfa drugs, TMP-SMX has been considered as a potential alternative [9,10]. One of the limitations to more widespread use of TMP-SMX is the lack of clinician expertise with this regimen in settings wherein P-S and P-C are available. Although diverging from classical and "paradigmatic" therapeutic management choices is not easy, a critical review of evidence can be useful in this scenario. TMP-SMX is routinely used in several settings, particularly in developing countries when P-S or P-C is not available. Evidence from these settings is scarce, as demonstrated in

our review, where eight of nine included studies were conducted in developed countries.

The ideal RCT to identify the optimal treatment of cerebral toxoplasmosis should compare TMP-SMX with P-S using a noninferior design, be multicentre and double-blinded, and have a robust sample size. Using clinical response (i.e. complete plus partial response) as the primary outcome, the results from Torre *et al.*'s 1998 trial [21] (clinical response: TMP-SMX arm = 78% and P-S arm = 81%), an alpha of 5% and a power of 90%, then 690 patients are required to be 90% sure that the upper limit of a one-sided 95% CI (or equivalently a 90% two-sided CI) will exclude a difference in favour of the P-S arm of more than 12% (i.e. the noninferiority limit). Major international efforts are necessary to conduct this study, particularly in developing countries.

Currently, potential advantages of TMP-SMX over P-S or P-C include: [1] the convenience of the lower pill burden and dosing frequency and the availability of intravenous formulations; current guidelines suggest an option of parenteral TMP-SMX usage as initial treatment in severely ill patients [9]; [2] the availability of several generic TMP-SMX formulations with the consequent impact on cost-effectiveness and increased accessibility; [3] prevention of *Pneumocystis jirovecii* pneumonia, other bacterial infections, and malaria [9,31]; and [4] the convenience of use simplifying the early initiation of HAART, which is associated with increased survival of HIV-infected patients with most opportunistic diseases.

Our study has some limitations. First, the quality of included studies was moderate to good. Most of the RCTs did not use blinding of treatments, which is essential to reduce information bias. We also included cohort studies, which have a higher probability of bias than RCTs; however, cohort studies were analysed independently from RCTs. Secondly, the number of studies and the total sample size were low. This may have reduced the probability of finding significant results for both efficacy and safety outcomes. Also, we were not able to run separate analyses by complete or partial clinical and radiological responses. Finally, specific doses of antimicrobials and duration of treatments were heterogeneous across studies. However, the direction of effects across different treatments, designs, doses and durations of treatment were similar across studies.

Previous reviews indicated that the choice of therapy will often be directed by available therapy [6,7]. In our systematic review, the available evidence fails to identify a superior regimen in terms of relative efficacy or safety for the treatment of cerebral toxoplasmosis. Although current evidence does not allow for a definitive recommendation, use of TMP-SMX as a preferred treatment

option in HIV-associated cerebral toxoplasmosis is consistent with the available data and associated practical issues. Larger comparative studies are needed, particularly in developing countries.

## Acknowledgements

*Conflicts of interest:* None of the authors has a conflict of interest to disclose. PT is currently an employee of Avery Dennison Corporation.

*Financial disclosure:* No funding was obtained for this study.

## References

1  Antinori A, Larussa D, Cingolani A *et al.* Prevalence, associated factors, and prognostic determinants of AIDS-related toxoplasmic encephalitis in the era of advanced highly active antiretroviral therapy. *Clin Infect Dis* 2004; 39: 1681–1691.

2  Vidal JE, Oliveira AC. AIDS-related cerebral toxoplasmosis in Sao Paulo State, Brazil: marked improvements in the highly active antiretroviral therapy-era but the challenges continue. *Braz J Infect Dis* 2013; 17: 379–380.

3  Riveiro-Barciela M, Falco V, Burgos J *et al.* Neurological opportunistic infections and neurological immune reconstitution syndrome: impact of one decade of highly active antiretroviral treatment in a tertiary hospital. *HIV Med* 2013; 14: 21–30.

4  Vidal JE, Hernandez AV, de Oliveira AC, Dauar RF, Barbosa SP Jr, Focaccia R. Cerebral toxoplasmosis in HIV-positive patients in Brazil: clinical features and predictors of treatment response in the HAART era. *AIDS Patient Care STDS* 2005; 19: 626–634.

5  Rutsaert J, Melot C, Ectors MP, Cornil A, De Prez C, Flament Durand J. Complications infectieuses pulmonaires et neurologiques d'un sarcome de Kaposi. Corrélation anatomo-clinique avec étude ultrastructurale. *Ann Anat Pathol,* 1980;25:125–138.

6  Dedicoat M, Livesley N. Management of toxoplasmic encephalitis in HIV-infected adults (with an emphasis on resource-poor settings). *Cochrane Database Syst Rev,* 2006. doi: 10.1002/14651858.CD005420.pub2

7  Yan J, Huang B, Liu G *et al.* Meta-analysis of prevention and treatment of toxoplasmic encephalitis in HIV-infected patients. *Acta Trop* 2013; 127: 236–244.

8  European AIDS Clinical Society Guidelines Clinical Management and Treatment of HIV Infected Adults in Europe. 7.1 ed. Vol 2015. 2014.

9  Panel on Antiretroviral Guidelines for Adults and Adolescents. Guidelines for the use of antiretroviral agents in

HIV-1-infected adults and adolescents. *Department of Health and Human Services* 2015; 2015: 1–161.

10 Nelson M, Dockrell D, Edwards S *et al.* British HIV Association and British Infection Association guidelines for the treatment of opportunistic infection in HIV-seropositive individuals 2011. *HIV Med* 2011;12:(Suppl 2): 1–140.

11 Gilbert DN, Chambers HF, Eliopoulos GM, Saag MS. The Sanford guide to antimicrobial therapy. 45th ed. Antimicrobial Therapy, Inc. Sperryville, VA, USA; 2015.

12 Wells GA, Shea B, O'Connell D *et al.* The Newcastle–Ottawa Scale (NOS) for assessing the quality of nonrandomised studies in meta-analyses. Available at: http://www.ohri.ca/programs/clinical_epidemiology/oxford.asp. Vol 2014. (accessed 30 January 2016).

13 Higgins JP, Altman DG, Gotzsche PC *et al.* The Cochrane Collaboration's tool for assessing risk of bias in randomised trials. *BMJ* 2011; 343: d5928.

14 Moher D, Liberati A, Tetzlaff J, Altman DG, Group P. Preferred reporting items for systematic reviews and meta-analyses: the PRISMA statement. *PLoS Med* 2009;6:e1000097.

15 DerSimonian R, Laird N. Meta-analysis in clinical trials. *Control Clin Trials* 1986; 7: 177–188.

16 Egger M, Davey Smith G, Schneider M, Minder C. Bias in meta-analysis detected by a simple, graphical test. *BMJ* 1997;315:629–634.

17 Chirgwin K, Hafner R, Leport C *et al.* Randomized phase II trial of atovaquone with pyrimethamine or sulfadiazine for treatment of toxoplasmic encephalitis in patients with acquired immunodeficiency syndrome: ACTG 237/ANRS 039 Study. AIDS Clinical Trials Group 237/Agence Nationale de Recherche sur le SIDA, Essai 039.. *Clin Infect Dis* 2002; 34: 1243–1250.

18 Dannemann B, McCutchan JA, Israelski D *et al.* Treatment of toxoplasmic encephalitis in patients with AIDS. A randomized trial comparing pyrimethamine plus clindamycin to pyrimethamine plus sulfadiazine. The California Collaborative Treatment Group. *Ann Intern Med* 1992; 116: 33–43.

19 Katlama C, De Wit S, O'Doherty E, Van Glabeke M, Clumeck N. Pyrimethamine-clindamycin vs. pyrimethamine-sulfadiazine as acute and long-term therapy for toxoplasmic encephalitis in patients with AIDS. *Clin Infect Dis* 1996; 22: 268–275.

20 Kongsaengdao S, Samintarapanya K, Oranratnachai K, Prapakarn W, Apichartpiyakul C. Randomized controlled trial of pyrimethamine plus sulfadiazine versus trimethoprim plus sulfamethoxazole for treatment of toxoplasmic encephalitis in AIDS patients. *J Int Assoc Physicians AIDS Care* 2008; 7: 11–16.

21 Torre D, Casari S, Speranza F *et al.* Randomized trial of trimethoprim-sulfamethoxazole versus pyrimethamine-sulfadiazine for therapy of toxoplasmic encephalitis in patients with AIDS. Italian Collaborative Study Group. *Antimicrob Agents Chemother* 1998; 42: 1346–1349.

22 Arens J, Barnes K, Crowley N, Maartens G. Treating AIDS-associated cerebral toxoplasmosis - pyrimethamine plus sulfadiazine compared with cotrimoxazole, and outcome with adjunctive glucocorticoids. South African medical journal =. *Suid-Afrikaanse tydskrif vir geneeskunde* 2007; 97: 956–958.

23 Caumes E, Bocquet H, Guermonprez G *et al.* Adverse cutaneous reactions to pyrimethamine/sulfadiazine and pyrimethamine/clindamycin in patients with AIDS and toxoplasmic encephalitis. *Clin Infect Dis* 1995; 21: 656–658.

24 Ruf B, Pohle HD. Role of clindamycin in the treatment of acute toxoplasmosis of the central nervous system. *Eur J Clin Microbiol Infect Dis* 1991; 10: 183–186.

25 Navia BA, Petito CK, Gold JW, Cho ES, Jordan BD, Price RW. Cerebral toxoplasmosis complicating the acquired immune deficiency syndrome: clinical and neuropathological findings in 27 patients. *Ann Neurol* 1986; 19: 224–238.

26 Renold C, Sugar A, Chave JP *et al.* Toxoplasma encephalitis in patients with the acquired immunodeficiency syndrome. *Medicine (Baltimore)* 1992; 71: 224–239.

27 San-Andres FJ, Rubio R, Castilla J *et al.* Incidence of acquired immunodeficiency syndrome-associated opportunistic diseases and the effect of treatment on a cohort of 1115 patients infected with human immunodeficiency virus, 1989-1997. *Clin Infect Dis* 2003; 36: 1177–1185.

28 Manzardo C, Del Mar Ortega M, Sued O. Garcia F, Moreno A, Miro JM. Central nervous system opportunistic infections in developed countries in the highly active antiretroviral therapy era. *J Neurovirol* 2005;11:(Suppl 3):72–82.

29 Levy RM, Bredesen DE. Central nervous system dysfunction in acquired immunodeficiency syndrome. *J Acquir Immune Defic Syndr* 1988; 1: 41–64.

30 Luft BJ, Hafner R, Korzun AH *et al.* Toxoplasmic encephalitis in patients with the acquired immunodeficiency syndrome. Members of the ACTG 077p/ANRS 009 Study Team. *N Engl J Med* 1993; 329: 995–1000.

31 Saadani Hassani A, Marston BJ. Impact of cotrimoxazole and insecticide-treated nets for malaria prevention on key outcomes among HIV-infected adults in low- and middle-income countries: a systematic review. *J Acquir Immune Defic Syndr* 2015;68(Suppl 3):S306–S317.

## Supporting Information

Additional Supporting Information may be found in the online version of this article at the publisher's web-site:
Figure S1. (A) Skin rash P-C vs P-S. (B) Skin rash TMP-SMX vs P-S.
Figure S2. Gastrointestinal impairment P-C vs P-S.

*HIV Medicine* (2017), 18, 115–124

124   AV Hernandez *et al.*

Figure S3. Drug discontinuation due to adverse events P-C vs P-S.

Figure S4. Liver impairment P-C vs P-S.

Data S1. PubMed search strategy.

Table S1. (A) Study Quality assessment using Newcastle-Ottawa scale for cohort studies. (B) Study Quality assessment using Cochrane risk of bias tool for RCTs.

© 2016 British HIV Association

**Tab 2**

Lykins, Joseph, et al., "Understanding Toxoplasmosis in the United States Through 'Large Data' Analyses," *Clinical Infectious Diseases*, Vol. 63, No. 4, 2016, pp. 468-475

*Clinical Infectious Diseases*



**MAJOR ARTICLE**

# Understanding Toxoplasmosis in the United States Through "Large Data" Analyses

Joseph Lykins,[1] Kanix Wang,[2] Kelsey Wheeler,[3] Fatima Clouser,[3] Ashtyn Dixon,[3] Kamal El Bissati,[3] Ying Zhou,[3] Christopher Lyttle,[4] Andrey Rzhetsky,[5,6,7] and Rima McLeod[3,8]

[1]Pritzker School of Medicine, [2]Committee on Genetics, Genomics, and Systems Biology, [3]Department of Ophthalmology and Visual Sciences, [4]Center for Health and Social Sciences (CHeSS), [5]Department of Medicine, [6]Department of Human Genetics, [7]Computation Institute, and [8]Department of Pediatrics (Infectious Diseases), Institute of Genomics, Genetics, and Systems Biology, Global Health Center, Toxoplasmosis Center, CHeSS, The College, University of Chicago, Illinois

*Background.* *Toxoplasma gondii* infection causes substantial morbidity and mortality in the United States, and infects approximately one third of persons globally. Clinical manifestations vary. Seropositivity is associated with neurologic diseases and malignancies. There are few objective data concerning US incidence and distribution of toxoplasmosis.

*Methods.* Truven Health MarketScan Database and *International Classification of Diseases, Ninth Revision* (*ICD 9*) codes, including treatment specific to toxoplasmosis, identified patients with this disease. Spatiotemporal distribution and patterns of disease manifestation were analyzed. Comorbidities between patients and matched controls were compared.

*Results.* Between 2003 and 2012, 9260 patients had *ICD 9* codes for toxoplasmosis. This database of patients with *ICD 9* codes includes 15% of those in the United States, excluding patients with no or public insurance. Thus, assuming that demographics do not change incidence, the calculated total is 61 700 or 6856 patients per year. Disease was more prevalent in the South. Mean age at diagnosis was 37.5 ± 15.5 years; 2.4% were children aged 0–2 years, likely congenitally infected. Forty one percent were male, and 73% of women were of reproductive age. Of identified patients, 38% had eye disease and 12% presented with other serious manifestations, including central nervous system and visceral organ damage. Toxoplasmosis was statistically associated with substantial comorbidities, including human immunodeficiency virus, autoimmune diseases, and neurologic diseases.

*Conclusions.* Toxoplasmosis causes morbidity and mortality in the United States. Our analysis of private insurance records missed certain at risk populations and revealed fewer cases of retinal disease than previously estimated, suggesting undercoding, underreporting, undertreating, or differing demographics of those with eye disease. Mandatory reporting of infection to health departments and gestational screening could improve care and facilitate detection of epidemics and, thereby, public health interventions.

*Keywords.* *Toxoplasma gondii*; toxoplasmosis; "large data"; Truven Health MarketScan Database; *ICD 9* code.

Toxoplasmosis, a disease caused by infection with the Apicomplexan parasite, *Toxoplasma gondii*, is a major source of morbidity and mortality in the United States and globally [1]. Disease presentation is highly variable, though severe eye disease resulting in loss of sight is not uncommon, and immunocompromised patients can present with serious infections of the central nervous system (CNS) [2–7]. Acquisition of infection during pregnancy can result in vertical transmission, leading to profound disability due to untreated congenital infection; consequences for the infected, untreated infant include cognitive impairment, hydrocephalus, and disability due to loss of sight [8]. Additionally, previous studies posit a role for *T. gondii* infection in a variety of comorbid conditions, including epilepsy and neurologic diseases [9–13]. In these ways, toxoplasmosis

continues to represent a major public health threat, as yet incompletely characterized in the United States. Thorough quantitation and characterization would facilitate targeted intervention strategies.

To our knowledge, there are no accurate, empiric data defining incidence of toxoplasmosis in the United States. According to the Centers for Disease Control and Prevention, toxoplasmosis remains one of the leading single causes of death related to foodborne illness in the United States, although numerically it is a minority. It is a neglected infection [14]. Estimates of infection prevalence are limited in scope. Seroprevalence in the United States is estimated at approximately 11% for women of childbearing age [15]. Additionally, one recent study estimates 4839 cases of symptomatic ocular toxoplasmosis per year nationally [16]. Estimates for other manifestations, including infection of the CNS and visceral organs, are lacking. Most studies of prevalence of toxoplasmic meningoencephalitis in the United States were from the 1990s, in the context of the human immunodeficiency virus (HIV)/AIDS epidemic, prior to advent of highly active antiretroviral therapy (HAART) [17, 18]. The most recent estimate, in 2003, indicated an annual

Received 11 January 2016; accepted 16 April 2016.

Correspondence: R. McLeod, University of Chicago, 5841 S Maryland Ave, MC 2114, Rm N 310A, Chicago, IL 60637 (rmcleod@uchicago.edu).

**Clinical Infectious Diseases®**

© The Author 2016. Published by Oxford University Press for the Infectious Diseases Society of America. All rights reserved. For permissions, e mail journals.permissions@oup.com.

DOI: 10.1093/cid/ciw356

risk reduction of 18% for cerebral toxoplasmosis, although these data were derived from a cohort of individuals being treated with HAART [19]. There is a paucity of estimates of noneye manifestations for the last decade.

Active infection with *T. gondii* is treated successfully with pyrimethamine and sulfadiazine [6 8,20]. These are the most effective medicines for treating toxoplasmosis, including ocular and CNS manifestations, and are not indicated in other clinical contexts. Additionally, there has been some use of trimethoprim sulfamethoxazole (TMP SMX) to treat ocular toxoplasmosis, with some authors suggesting similar clinical outcomes [21, 22], although TMP SMX is 10 fold less active, with suboptimal ratios of constituent medications with similar risks of hypersensitivity.

Given gaps in knowledge of incidence in the United States and uncertainties about frequency of different disease manifestations and other potential comorbid conditions, we use a novel approach to understand epidemiology of toxoplasmosis, namely, use of large insurance based datasets. The Truven Health MarketScan Commercial Claims and Encounter Database was queried to answer questions related to epidemiology of this infection. This database contains insurance claims from privately insured patients, not including individuals with access only to Medicare or Medicaid or without any health insurance. This database represents approximately 15% of the total US population. The MarketScan Databases have been used many times in the context of infectious diseases epidemiology and cost related studies, although we did not find such reports for toxoplasmosis [23 27].

Use of large datasets to characterize epidemiology of infectious disease presents a unique opportunity to assess prevalence and incidence of infection with minimal cost, while allowing for characterization of occurrence across time and space. Additionally, this approach facilitates identification of patterns of infection with respect to patient age, gender, and common comorbidities. Herein, we present a novel approach to understanding epidemiology of toxoplasmosis through use of "large data."

## METHODS

### Database Information
The Truven Health MarketScan Commercial Claims and Encounter Database includes privately insured patients, and was used to identify individuals with toxoplasmosis from 2003 to 2012 (see Supplementary Data).

### Identification of Patients and Assessment of Demographic Information
The 130.x series of *International Classification of Diseases, Ninth Revision* (*ICD 9*) codes (Supplementary Table 1) are used to specifically indicate infection with *T. gondii*, including diverse manifestations, such as CNS infection and eye disease.

To identify cases of toxoplasmosis not specifically coded for by *ICD 9* codes, numbers of claims for medicines specific to treatment of toxoplasmosis also were assessed.

The database identified patients who received these medicines, even in absence of an *ICD 9* code indicating presence of this specific infection. Claims were considered to represent toxoplasmosis if they included a relevant *ICD 9* code and a medicine use claim within 7 days of each other.

Once patients with disease due to *T. gondii* were identified, patients were evaluated for age at first diagnosis, gender, and US census region.

### Estimates of Annual Rates of Toxoplasmosis
Making an assumption that rates of infection are identical between our study population and the general population regardless of type of insurance, which might not be accurate, and recognizing that the database represents 15% of the total population, and only those with indemnity insurance, the number of cases for the entire population from 2003 to 2012 was calculated. Then, we subdivided by 10 years studied to give a predicted/estimated annual incidence of infection.

### Comorbidity in *T. gondii* Infection
Patients who have 130.x toxoplasmosis specific *ICD 9* codes were compared to controls matched for age, geography, and health, with fewer years in the database indicating improved health. After matching cases and controls, we constructed contingency tables for all possible toxoplasmosis by all disease pairs. Using these contingency tables, we then computed the following statistics for each pair: odds ratio (OR) of disease comorbidity (Supplementary Table 2) with toxoplasmosis codes of interest, conditional maximum likelihood estimate of disease OR (with 95% confidence interval), and *P* value for a null model in which 2 diseases occur independent of one another. We considered an association significant if it passed Benjamin Hochberg correction with a very conservative false discovery rate (FDR) threshold of 0.1%:

$$\text{FDR}_r = \min_{i \ge r} \frac{p_i N}{i} \le 0.1\%,$$

where *r* is rank of a disease ordered by increasing *P* values, $P_i$ is *P* value for disease with rank *i*, and *N* is total number of diseases tested [28].

## RESULTS

### Study Population
*ICD 9* codes specifically indicating infection with *T. gondii* identified 9260 unique patients from 2003 to 2012, out of a total of 151 million patients.

Use of medicine codes for pyrimethamine or sulfadiazine, and TMP SMX in context of *T. gondii* infection or eye disease, identified 2305 and 7690 cases, respectively. There was an overlap of 225 cases between those with toxoplasmosis specific drugs and cases where TMP SMX was used.





Map based on Longitude (generated) and Latitude (generated). Color shows prevalence. Details are shown for County. The data are filtered on count of Number of Records and sum of head counts (county_counts). The count of Number of Records filter ranges from 1 to 237. The sum of head counts (county_counts) filter includes values >500.

**Figure 1.** Demographic statistics of cohort, 2003 2012. *A*, Age at first diagnosis with toxoplasmosis. Increasing numbers of patients were diagnosed with toxoplasmosis as a function of age, indicating that there is an increasing disease burden among older individuals, who are potentially more capable of moving through the environment and engaging in risky behaviors, including the consumption of undercooked food, which pose the threat of exposure to infectious oocysts and ingestion of contaminated materials. More females than males were identified with toxoplasmosis in this cohort (approximately 59% vs 41% of the total number of cases). The ratio of male to female was most similar early on in the patient's lifetime, whereas there was an increasing disparity skewing toward increased incidence in females. This could be explained by screening of women of reproductive age, or could potentially indicate a difference in risk of exposure to the pathogen. *B*, Map of toxoplasmosis prevalence by county in the United States. Darker regions indicate increased prevalence of the infection. States with highest prevalence include Texas, California, New York, Illinois, Georgia, Florida, Maryland, and South Carolina. All these states had >400 patients with toxoplasmosis over the study period. There are pockets of increased prevalence across the southern United States. This is consistent with previous studies indicating increased prevalence among rural populations, with increased risk of environmental exposure.

### Disease Manifestations

Toxoplasmic chorioretinitis accounted for 3492 (37.7%) identified patients. Meningoencephalitis occurred in 472 (5.1%) patients. Less common manifestations of infection include myocarditis (113), pneumonitis (113), and hepatitis (188). These conditions comprised 1.2% of total cases each for myocarditis and pneumonitis, and 2.0% of total cases for hepatitis. Disseminated toxoplasmosis occurred in 120 patients. Codes indicating unspecified toxoplasmosis were assigned to 4194 (45.3%) patients.

### Demographics

Patients ranged in age from 0 to 70 years. Two hundred eighteen cases (2.4%) occurred in children 2 years of age and younger, indicating likely congenital infection (Figure 1*A*). Mean age at diagnosis was $37.5 \pm 15.5$ years. Approximately 41% (3776) of

cases occurred in males, while the remaining 5484 occurred in females. One demographic of particular interest is women of re productive age, here defined as aged 13 51 years, who have po tential for vertical transmission to a fetus. In this cohort, 73% (4022) were of reproductive age.

### Geographic Distribution of Toxoplasmosis Cases

A total of 9260 identified cases were divided up based on US census region. South, including South Atlantic and East and West South Central census regions, encompassed most identi fied cases, with 4614 of 9260, or almost 50% of cases. West, in cluding the Mountain and Pacific regions, contained only 1205 of 9260 cases (13%). A $\chi^2$ analysis revealed that distribution of cases was not consistent with distribution based on population ($P < .001$). See Figure 1B and Supplementary Figure 1 for distri bution of cases across census regions and a map of disease prev alence across the country.

### Estimated Annual Case Burden by Disease Manifestation in the United States

This study identified 9260 cases of toxoplasmosis over the pe riod from 2003 to 2012, corresponding to 61 373 cases over the study period, or a rate of 6137 cases per year for the whole pop ulation of the United States. Estimated annual incidence by dis ease manifestation is listed in Table 1 and Figure 2.

### Comorbidity in *T. gondii* Infection Based on Specific Toxoplasma *ICD-9* Code

ORs for statistically significant comorbidities of interest in pa tients with codes indicating toxoplasmosis, compared with matched controls without these codes, can be found in Table 2.

**Table 1.   Number of Cases of Toxoplasmosis in the United States, by Disease Manifestation, and Estimated Annual Incidence**

| Disease Manifestation | No. of Cases Identified by MarketScan Database, 2003 2012 | Estimated No. of Cases in United States, 2003 2012 | Estimated Annual Incidence |
|---|---|---|---|
| Meningoencephalitis | 610 | 4067 | 407 |
| Conjunctivitis[a] | 472 | 3147 | 315 |
| Chorioretinitis | 3492 | 23 280 | 2328 |
| Myocarditis | 113 | 753 | 75 |
| Pneumonitis | 113 | 753 | 75 |
| Hepatitis | 188 | 1253 | 125 |
| Toxoplasmosis of other specified sites | 1114 | 7427 | 743 |
| Multisystemic disseminated toxoplasmosis | 120 | 800 | 80 |
| Unspecified toxoplasmosis | 4194 | 27 960 | 2796 |
| Total No. of cases | 9206 | 61 373 | 6137 |

[a] It is important to note that toxoplasmic conjunctivitis is not a known clinical condition, and it is likely that this was simply coded for toxoplasmic eye disease, more generally.



**Figure 2.**  Clinical manifestations of toxoplasmosis, 2003 2012. Expected annual incidence of toxoplasmosis by disease manifestation in the United States. Using the number of identified cases of toxoplasmosis over the 10 year study period, recogniz ing that a previous estimate indicated the database accounted for 15% of the total population of the United States, and dividing this by the total number of years of the study, an estimated annual incidence of toxoplasmosis was found as a function of disease manifestation. These values represent the first quantitation of some of these manifestations for the United States in more than a decade.

### National Drug Code Use in the Identification of Toxoplasmosis Cases

In addition to patients with a diagnosis of toxoplasmosis coded, analyzed as above, patients were identified with National Drug Codes (NDCs), considered separately because diagnosis was less certain (Figure 3). Pyrimethamine and sulfadiazine are specific to treatment of infection with this parasite, indicating potential util ity in identifying patients with active toxoplasmosis. However, treatment could have been presumptive and then discontinued when another disease was diagnosed. TMP SMX sometimes has been used for treating retinal disease due to *Toxoplasma*, al though it is a suboptimal treatment. Therefore, presence of eye disease and TMP SMX treatment might suggest, but not con firm, this diagnosis. Other illnesses causing eye disease, and even different diseases requiring treatment with TMP SMX, could confound this surrogate marker for active toxoplasmosis. As shown in Figure 3, there were 2080 patients with only pyri methamine and/or sulfadiazine (2305     parts b [152] + d [73]); 7465 patients with only TMP SMX plus chorioretinitis (7690 parts b [152] + d [73]). In addition, 225 patients took both, not necessarily simultaneously (Figure 3; parts b [152] + d [73]). Of the total 9260 patients with a toxoplasmosis diagnostic code, 339 also had a pyrimethamine and/or sulfadiazine code; 690 also had a TMP SMX code; and 152 had both. NDC cohort demographics (Supplementary Table 3) and a comparison between the 2 med icine treatment groups were similar to the toxoplasmosis *ICD 9* code group, except age was younger ($\bar{x} = 38$ years [*ICD 9* toxoplasmosis] vs 51 years [NDC]; Supplementary Table 4 and Figure 2). Also, there were more patients in middle and south Atlantic states in the toxoplasmosis code group. ORs for comor bidities comparing treatment with pyrimethamine sulfadiazine vs TMP SMX  chorioretinitis group are shown in Table 2 and are sim ilar to those with *ICD 9* codes for toxoplasmosis.

**Table 2.   Comorbidity Odds Ratios**

| Comorbidity | OR Mean (95% CI) | |
|---|---|---|
| **Comorbidity odds ratios with toxoplasmosis *ICD 9* codes** | | |
| HIV | 17.57 (14.61 21.13) | |
| Malignant brain neoplasm | 8.69 (4.60 16.41) | |
| Unspecified encephalopathy (hydrocephalus) | 5.55 (4.75 6.48) | |
| Epilepsy | 3.51 (3.00 4.12) | |
| Thrombocytopenia | 3.17 (2.64 3.80) | |
| Benign brain neoplasm | 2.80 (2.08 3.74) | |
| Visual loss (acquired visual disturbances) | 2.55 (2.39 2.73) | |
| Systemic lupus erythematosus | 2.37 (1.88 2.99) | |
| Schizophrenia | 2.21 (1.80 2.72) | |
| Multiple sclerosis | 2.05 (1.64 2.58) | |
| Gestational and pregnancy related disorder | 1.92 (1.80 2.05) | |
| IBS and Crohn disease (regional enteritis, Crohn disease) | 1.49 (1.33 1.67) | |
| Bipolar disorder | 1.38 (1.17 1.62) | |
| Substance abuse | 1.24 (1.14 1.36) | |
| Anxiety | 1.24 (1.16 1.33) | |
| | **OR Mean (95% CI), TMP SMX** | **OR Mean (95% CI), Sulfadiazine Pyrimethamine** |
| **Comorbidity odds ratios with NDC** | | |
| HIV | 27.97 (22.35 35.00) | 62.78 (44.64 88.28) |
| Malignant brain neoplasm | 4.04 (3.05 5.34) | 15.9 (9.81 25.78) |
| Unspecified encephalopathy (hydrocephalus) | 2.77 (2.48 3.09) | 10.02 (8.14 12.34) |
| Epilepsy | 2.35 (2.02 2.72) | 6.27 (4.88 8.08) |
| Thrombocytopenia | 2.94 (2.61 3.32) | 4.37 (3.44 5.55) |
| Benign brain neoplasm | 1.62 (1.28 2.06) | 4.25 (2.65 6.83) |
| Visual loss (acquired visual disturbances) | 2.91 (2.74 3.07) | 2.14 (1.88 2.43) |
| Systemic lupus erythematosus | 2.37 (1.88 2.99) | 4.64 (3.16 6.79) |
| Schizophrenia | 2.03 (1.78 2.31) | 2.77 (2.09 3.69) |
| Multiple sclerosis | 3.10 (2.54 3.78) | 3.73 (2.55 5.45) |
| IBS and Crohn disease (regional enteritis, Crohn disease) | 1.58 (1.44 1.74) | 3.26 (2.75 3.87) |
| Bipolar disorder | 1.48 (1.27 1.73) | NS |
| Substance abuse | 1.29 (1.20 1.40) | NS |
| Anxiety | 1.52 (1.43 1.62) | NS |

Abbreviations: CI, confidence interval; HIV, human immunodeficiency virus; IBS, irritable bowel syndrome; *ICD-9, International Classification of Diseases, Ninth Revision*; NDC, National Drug Code; NS, not significant; OR, odds ratio; TMP-SMX, trimethoprim-sulfamethoxazole.

## DISCUSSION

Use of the Truven Health MarketScan Commercial Claims and Encounter Database presented a novel opportunity to assess prevalence of medical diagnosis of toxoplasmosis in the US population with indemnity insurance, confirmed some trends highlighted in earlier literature, and yielded some unexpected results.

Almost half of identified patients had codes indicating "unspecified toxoplasmosis," making it impossible to accurately quantitate disease manifestations. Of cases of toxoplasmosis with specified clinical manifestation, toxoplasmic chorioretinitis represented the highest proportion. This indicates a comparatively high frequency of eye disease relative to other manifestations, that eye disease due to *T. gondii* is more often diagnosed, or that it drives patients to seek care more than occurs for patients with other clinical manifestations. Our data do not provide support for other explanations for this observation.

Almost 500 patients presented with one of the most lethal complications of toxoplasmosis, meningoencephalitis. This emphasizes that immunocompromised patients remain at risk for life threatening manifestations. Our estimate indicates an annual disease burden of 488 cases of CNS disease due to *T. gondii*. Other, less common, manifestations of toxoplasmosis, including myocarditis, pneumonitis, and hepatitis, cause morbidity and mortality in the United States. It is critical that the index of suspicion for these rarer manifestations remain high, especially in immunocompromised patients, and that appropriate therapy is initiated when toxoplasmosis is suspected.

Numbers of cases of toxoplasmosis, identified by *ICD 9* code, were higher in the southern United States than would be expected based on population. The environment is more conducive to extended viability of the environmentally resistant, highly infective oocyst stage in this region [29]. Further, behavioral factors such as agricultural activity may represent an additional



a = Coded Toxoplasmosis and received Pyrimethamine &
Sulfadiazine treatment only, n = 339

b = Coded Toxoplasmosis and received Pyrimethamine & Sulfadiazine
and TMP/SMX treatment, n = 152

c = Coded Toxoplasmosis and received TMP/SMX treatment only, n = 690

d = Not coded Toxoplasmosis but received Pyrimethamine & Sulfadiazine
and TMP/SMX treatment, n = 73

**Figure 3.**  Venn diagram showing numbers of patients who were diagnosed by
*International Classification of Diseases, Ninth Revision (ICD 9)* codes for toxoplas
mosis with and without codes for medicines. Abbreviation: TMP SMX, trimethoprim
sulfamethoxazole.

---

explanation for this comparatively high prevalence. Moreover,
the Western census region demonstrated fewer cases than ex
pected. An environment that is dryer and more hostile to oo
cysts, or differences in parasite or vector distribution or in
recognition and reporting, could explain this.

Prevalence of comorbidities associated with toxoplasmosis
also was assessed; affording insight into how commonly indi
viduals with this infection suffer from other conditions. Com
pared to controls matched for age, geography, and health,
patients with codes for toxoplasmosis had greater odds of suf
fering from conditions including HIV, benign and malignant
brain neoplasm, epilepsy, autoimmune diseases including lupus
and multiple sclerosis, and psychiatric conditions including
substance abuse, anxiety, bipolar disorder, and schizophrenia.
Directionality and causality of these relationships is not clear.
However, immunosuppression with HIV infection, lupus or ma
lignancy, or immunosuppressive therapies predisposes to severe
infection. Chronic inflammation produced by presence of organ
isms in the brain may promote neoplastic transformation and ep
ilepsy, as could focal lesions or changes in neurotransmitters as
occurs in animal models [30]. Associations between seropreva
lence of *T. gondii* and neuropsychiatric illness are demonstrated
in the literature without directionality or causality. Ascertainment

bias could contribute to ORs, with neurologic signs and symp
toms precipitating testing for toxoplasmosis. There are certainly
billions of infected persons without neurobehavioral disease, so if
there is a real association, other factors such as host or parasite
genetics or timing of infection must be at play. Furthermore, as
this cohort is predominantly <65 years of age and without public
insurance, it remains of interest to study the effect of this possible
source of chronic inflammation in the brain on neurodegenera
tive diseases in geriatric populations.

While this analysis has offered potentially valuable insight
into toxoplasmosis in the United States, use of insurance data
bases for epidemiology has obvious limitations that must be ad
dressed. Disease is complicated, with many factors influencing
its prevalence and distribution. Host behavior can influence
rates of parasite transmission and risk of acquisition. This data
base has privately insured patients, and does not include Medic
aid or Medicare patients, or those without insurance. This
introduces sampling bias. While *T. gondii* is an equal opportunity
parasite, capable of infecting people irrespective of socioeconomic
status, there are risk factors that make infection more likely in
certain populations. This is especially among agricultural la
borers in the South, where a lack of private health insurance
is not uncommon. In calculations presented, we assume that
the population in the database is reflective of the population as
a whole. It is likely this is not the case, and thus our analysis
underestimates actual rates of infection and disease due to
*T. gondii*. Anecdotally, of 8 patients seen by our group in a pri
vate hospital setting with toxoplasmosis in the last month, 6
did not have private insurance, and therefore would not have
been identified by this approach. If this is reflective of the ge
neral population, as current payer mix for pyrimethamine
prescriptions suggests, with only 23% having private insur
ance (approximate N = 1026, 3 August 2015 to 27 November
2015; J. Casoy, N. Retzlaff, E. Salinas, personal communica
tion, 2016), there is substantial underestimation using this
private insurance  only approach. The corrected annual rate
would be considerably higher. Thus, true incidence estimates
would require a more aggressive public health approach to re
porting toxoplasmosis or another method for estimating
prevalence.

Additionally, ways in which physicians use *ICD 9* codes in
contexts of toxoplasmosis present a limitation to assessment.
Most patients whose claims contain references directly to toxo
plasmosis have codes indicating "unspecified toxoplasmosis,"
which offers no information about symptoms. As such, this ap
proach to characterizing toxoplasmosis on a population level is
unlikely to be reflective of true diversity of disease manifesta
tions, which can range from lymphadenopathy, which is less
likely to drive a patient to seek care when self limited, to menin
goencephalitis, a potentially fatal form of infection. Of note,
more individuals had codes indicating treatment for infection
with *T. gondii* than had claims indicating infection. A

substantial number of patients did not have *ICD 9* codes for in
fection, even though they received medication used to treat this
infection. There is the possibility that a considerable number of
patients are not being coded appropriately when symptomatic.
Thus, more people are receiving medications than would be de
tected by *ICD 9* codes, indicating a limitation of using *ICD 9*
codes for epidemiological studies.

If previous estimates of disease burden are correct, this meth
od underestimates prevalence. Annual burden of symptomatic
eye disease due to infection with *T. gondii* has been estimated at
4839 cases annually [16]. Our analysis conservatively estimates
2643 cases per year. Thus, this analysis underestimates cases by
almost half, if previous reports are accurate. Other manifestations
of toxoplasmosis, including meningoencephalitis, have not been
estimated in the years since development of HAART, limiting
comparative analyses with the MarketScan Database for CNS
infection.

Congenital infection remains a substantial cause of signifi
cant human suffering in association with vertical transmission
from mother to fetus. Of the identified patients, 218 were be
tween the ages of 0 and 2 at diagnosis. Detection of this disease
at birth identifies significantly symptomatic patients, which
would be expected to represent only a small proportion of
these infections. Most would be mild and not come to medical
attention in absence of systematic screening. Forty four percent
of patients were women of reproductive age, indicating that this
infection likely poses considerable medical burden during fetal
life. A number of countries, including France, have implement
ed mandatory screening during gestation for infection with
*T. gondii*. This approach has been demonstrated to be efficacious
in reducing the frequency and severity of congenital infection
by facilitating early diagnosis and treatment, and to be cost
beneficial [31 34]. Screening would facilitate appropriate treat
ment of acutely infected mothers, which has been demonstrated
to reduce disease severity in and frequency of infected infants.

Our observations of inability of analyses of large databases
such as the Truven MarketScan Commercial Claims and En
counter Database [23 27, 35] to identify all cases of toxoplas
mosis in the United States presents a different type of
opportunity for intervention. The fact that physicians are not
coding for toxoplasmosis, due to an inability to recognize it, a
lack of time to properly code, or some other barrier, in addition
to the fact that this parasite presents a health threat to the
American population and globally, suggests that it may be use
ful to make reporting of the disease to health departments man
datory. This would facilitate more accurate assessment of
prevalence and severity of toxoplasmosis in the United States.
This then could enable public health interventions that will ul
timately reduce human suffering and mortality. Toxoplasmosis
is a treatable condition, but an inability to appreciate the mag
nitude of the problem in this country presents a barrier to ap
propriate management of disease due to this parasite.

## Supplementary Data

Supplementary materials are available at http://cid.oxfordjournals.org.
Consisting of data provided by the author to benefit the reader, the posted
materials are not copyedited and are the sole responsibility of the author, so
questions or comments should be addressed to the author.

## Notes

*Acknowledgments.* We thank Sarah Dovgin for her help and work dur
ing the initial phase of this research. We thank J. Casoy, N. Retzlaff, and
E. Salinas for data and information concerning payer mix associated with
recent pyrimethamine prescriptions.

*Financial support.* This work was supported by the Division of Micro
biology and Infectious Diseases, National Institute of Allergy and Infectious
Diseases (grant number R01 AI27530); the Conte Center; and the National
Institutes of Health (grant numbers 1P50MH094267 and U01HL108634
01). We thank the Mann Cornwell family, Engel family (and "Taking Out
Toxo"), Morel family, and Rooney family for their support of this work.

*Potential conflicts of interest.* All authors: No reported conflicts. All
authors have submitted the ICMJE Form for Disclosure of Potential Con
flicts of Interest. Conflicts that the editors consider relevant to the content
of the manuscript have been disclosed.

## References

1. Furtado JM, Smith JR, Belfort R, Gattey D, Winthrop KL. Toxoplasmosis: a global threat. J Glob Infect Dis 2011; 3:281–4.
2. Latkany P. Ocular disease due to *Toxoplasma gondii*. In: Weiss LM, Kim K, eds. Toxoplasma gondii. London: Academic Press, 2007:101–5. Available at: http://www.sciencedirect.com/science/article/pii/B9780123695420500076. Accessed 19 June 2014.
3. Arevalo JF, Belfort R, Muccioli C, Espinoza JV. Ocular toxoplasmosis in the developing world. Int Ophthalmol Clin 2010; 50:57–69.
4. Wong B, Gold JWM, Brown AE, et al. Central-nervous-system toxoplasmosis in homosexual men and parenteral drug abusers. Ann Intern Med 1984; 100:36–42.
5. Grant IH, Gold JW, Rosenblum M, Niedzwiecki D, Armstrong D. *Toxoplasma gondii* serology in HIV-infected patients: the development of central nervous system toxoplasmosis in AIDS. AIDS 1990; 4:519–21.
6. Dedicoat M, Livesley N. Management of toxoplasmic encephalitis in HIV-infected adults (with an emphasis on resource-poor settings). Cochrane Database Syst Rev 2006; 3:CD005420.
7. Yan J, Huang B, Liu G, et al. Meta-analysis of prevention and treatment of toxoplasmic encephalitis in HIV-infected patients. Acta Trop 2013; 127:236–44.
8. McLeod R, Lykins J, Noble AG, et al. Management of congenital toxoplasmosis. Curr Pediatr Rep 2014; 2:166–94.
9. Akyol A, Bicerol B, Ertug S, Ertabaklar H, Kiylioglu N. Epilepsy and seropositivity rates of *Toxocara canis* and *Toxoplasma gondii*. Seizure 2007; 16:233–7.
10. Brown AS, Schaefer CA, Quesenberry J, et al. Maternal exposure to toxoplasmosis and risk of schizophrenia in adult offspring. Am J Psychiatry 2005; 162:767–73.
11. Torrey EF, Bartko JJ, Lun Z-R, Yolken RH. Antibodies to *Toxoplasma gondii* in patients with schizophrenia: a meta-analysis. Schizophr Bull 2007; 33:729–36.
12. Hurley RA, Taber KH. Latent *Toxoplasmosis gondii*: emerging evidence for influences on neuropsychiatric disorders. J Neuropsychiatry Clin Neurosci 2012; 24:376–83.
13. Miman O, Kusbeci OY, Aktepe OC, Cetinkaya Z. The probable relation between *Toxoplasma gondii* and Parkinson's disease. Neurosci Lett 2010; 475:129–31.
14. Centers for Disease Control and Prevention. Toxoplasmosis. Available at: http://www.cdc.gov/parasites/toxoplasmosis/. Accessed 22 August 2014.
15. Jones JL, Kruszon-Moran D, Rivera HN, Price C, Wilkins PP. *Toxoplasma gondii* seroprevalence in the United States 2009–2010 and comparison with the past two decades. Am J Trop Med Hyg 2014; 90:1135–9.
16. Jones JL, Holland GN. Annual burden of ocular toxoplasmosis in the United States. Am J Trop Med Hyg 2010; 82:464–5.
17. Porter SB, Sande MA. Toxoplasmosis of the central nervous system in the acquired immunodeficiency syndrome. N Engl J Med 1992; 327:1643–8.
18. Jones JL, Hanson DL, Chu SY, et al. Toxoplasmic encephalitis in HIV-infected persons: risk factors and trends. The Adult/Adolescent Spectrum of Disease Group. AIDS 1996; 10:1393–9.
19. San-Andrés F-J, Rubio R, Castilla J, et al. Incidence of acquired immunodeficiency syndrome-associated opportunistic diseases and the effect of treatment on a cohort of 1115 patients infected with human immunodeficiency virus, 1989–1997. Clin Infect Dis 2003; 36:1177–85.

20. Hotop A, Hlobil H, Groß U. Efficacy of rapid treatment initiation following primary *Toxoplasma gondii* infection during pregnancy. Clin Infect Dis 2012; 54:1545–52.

21. Torre D, Casari S, Speranza F, et al. Randomized trial of trimethoprim-sulfamethoxazole versus pyrimethamine-sulfadiazine for therapy of toxoplasmic encephalitis in patients with AIDS. Antimicrob Agents Chemother 1998; 42:1346–9.

22. Soheilian M, Sadoughi M-M, Ghajarnia M, et al. Prospective randomized trial of trimethoprim/sulfamethoxazole versus pyrimethamine and sulfadiazine in the treatment of ocular toxoplasmosis. Ophthalmology 2005; 112:1876–82.

23. Owusu-Edusei K, Chesson HW, Gift TL. The economic burden of pediculosis pubis and scabies infections treated on an outpatient basis in the United States: evidence from private insurance claims data, 2001–2005. Sex Transm Dis 2009; 36:297–9.

24. Cortese MM, Tate JE, Simonsen L, Edelman L, Parashar UD. Reduction in gastroenteritis in United States children and correlation with early rotavirus vaccine uptake from national medical claims databases. Pediatr Infect Dis J 2010; 29:489–94.

25. Owusu-Edusei K, Gift TL, Chesson HW. Treatment cost of acute gonococcal infections: estimates from employer-sponsored private insurance claims data in the United States, 2003–2007. Sex Transm Dis 2010; 37:316–8.

26. Hellinger DFJ, Encinosa WE. The cost and incidence of prescribing errors among privately insured HIV patients. PharmacoEconomics 2012; 28:23–34.

27. Flagg EW, Schwartz R, Weinstock H. Prevalence of anogenital warts among participants in private health plans in the United States, 2003–2010: potential impact of human papillomavirus vaccination. Am J Public Health 2013; 103:1428–35.

28. Benjamini Y, Hochberg Y. Controlling the false discovery rate: a practical and powerful approach to multiple testing. J R Stat Soc Ser A 1995; 57:289–300.

29. Lélu M, Villena I, Dardé M-L, et al. Quantitative estimation of the viability of *Toxoplasma gondii* oocysts in soil. Appl Environ Microbiol 2012; 78:5127–32.

30. Goldszmid RS, Dzutsev A, Trinchieri G. Host immune response to infection and cancer: unexpected commonalities. Cell Host Microbe 2014; 15:295–305.

31. Roos T, Martius J, Gross U, Schrod L. Systematic serologic screening for toxoplasmosis in pregnancy. Obstet Gynecol 1993; 81:243–50.

32. Stillwaggon E, Carrier CS, Sautter M, McLeod R. Maternal serologic screening to prevent congenital toxoplasmosis: a decision-analytic economic model. PLoS Negl Trop Dis 2011; 5:e1333.

33. Sagel U, Krämer A, Mikolajczyk RT. "Blind periods" in screening for toxoplasmosis in pregnancy in Austria—a debate. BMC Infect Dis 2012; 12:118.

34. Wallon M, Peyron F, Cornu C, et al. Congenital toxoplasma infection: monthly prenatal screening decreases transmission rate and improves clinical outcome at age 3 years. Clin Infect Dis 2013; 56:1223–31.

35. Gastañaduy PA, Hall AJ, Curns AT, Parashar UD, Lopman BA. Burden of norovirus gastroenteritis in the ambulatory setting—United States, 2001–2009. J Infect Dis 2013; 207:1058–65.

**A-982**

**Tab 3**

Pharmaceutical Industry Antitrust Handbook, *ABA Section of Antitrust Law*,
Second Edition, 2018



# Pharmaceutical Industry Antitrust Handbook

**Second Edition**



# Pharmaceutical Industry Antitrust Handbook

## Second Edition



The materials contained herein represent the opinions of the authors and/or the editors, and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Antitrust Law unless adopted pursuant to the bylaws of the Association.

Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2018 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission contact the ABA Copyrights & Contracts Department, copyright@americanbar.org, or complete the online form at http://www.americanbar.org/utility/reprint.html.

22 21 20 19 18      5 4 3 2 1

E-ISBN: 978-1-64105-214-6

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other barrelated organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

www.shopABA.org

interchangeability from economic substitutability.[30]

### a. Competition Among Branded Products

When the issue is conduct that allegedly affects competition between branded pharmaceutical products, the distinctive characteristics of competition between branded drugs becomes important to the issue of market definition and market power. Competition between branded drugs tends to focus *not* on price, but rather on innovation (research and development of new indications and uses for the branded product), marketing and promotion to doctors and patients.[31] Such competition affects the brand name drug's perceived value without significantly affecting the price.[32] Prescribing physicians are also generally insensitive to drug prices[33] because they select medicines based on other criteria, namely the effect the drug will have on the health and well-being of their patients. Thus, functional or therapeutic substitutability does not necessarily suggest price constraint among branded products.[34]

This is not to say that price competition never exists between branded products or that physicians never take price into account when choosing among brands within a particular therapeutic class. Prior to generic entry, the presence of other brand name products (as well as non-AB-rated generic drugs, i.e., generics corresponding to other brands) in the same therapeutic class can restrain brand pricing. Intense public concern with, and scrutiny of, medical costs, particularly prescription pharmaceutical costs, can also create a variety of pressures on prices.[35] Moreover, as the FTC's merger enforcement decisions signify, non-price competition is

235

an important dimension of rivalry which can also affect product market definition. All of these factors can influence a market definition analysis in a case involving a marketplace consisting solely of branded drugs.

### b.  Competition from Generic Products

Where conduct involves actual or potential competition between branded and generic drugs, pricing dynamics change. The entry of an AB-rated generic equivalent to the branded drug typically has a powerful effect on the market price for the drug molecule.[36] According to an FTC study, the generic market typically matures within one year of the introduction of the first entrant.[37] In a mature generic market, generics might replace 90 percent of branded sales at 85 percent lower cost, resulting in average consumer savings of 77 percent when both branded and generic sales are considered.[38] The magnitude of this effect varies depending on how many generic manufacturers enter the market.[39] At the same time, because the branded firm's efforts to build and maintain prescription volume ceases, and because generics typically do little advertising or promotion, generic entry generally correlates with a plateau of growth, or sometimes even a unit sales volume decline in the specific drug molecule, despite the substantially lower average price.[40] This distinctive pricing dynamic complicates the analysis of market power and definition of the relevant market.

### 2.  *Direct Evidence of Market Power*

Although courts predominantly rely upon the relevant market analysis to determine market share and the

**A-988**

**Tab 4**

Rajapakse, Senaka, et al., "Antibiotics for human toxoplasmosis: A systematic review of randomized trials," *Pathogens and Global Health*, Vol. 107, No. 4, 2013, pp. 162-169

Review

# Antibiotics for human toxoplasmosis: a systematic review of randomized trials

**Senaka Rajapakse[1], Mitrakrishnan Chrishan Shivanthan[2], Nilakshi Samaranayake[3], Chaturaka Rodrigo[1], Sumadhya Deepika Fernando[3]**

[1]Department of Clinical Medicine, Faculty of Medicine, University of Colombo, Sri Lanka, [2]University Medical Unit, National Hospital, Colombo, Sri Lanka, [3]Department of Parasitology, Faculty of Medicine, University of Colombo, Sri Lanka

The efficacy of different treatment regimens in clinical syndromes of toxoplasmosis were assessed by conducting a systematic review of published randomized clinical trials through extensive searches in MEDLINE, EMBASE, and SCOPUS with no date limits, as well as manual review of journals. Outcome measures varied depending on the clinical entity of toxoplasmosis. Risk of bias was evaluated and quality of evidence was graded. Fourteen randomized trials were included of which one was a non-comparative study. One well-designed trial showed that trimethoprim-sulphamethoxazole was more effective than placebo for clinical recovery of toxoplasmic lymphadenopathy in immunocompetent hosts. For toxoplasmic encephalopathy, efficacy of pyrimethamine + sulphadiazine and trimethoprim + sulphamethoxazole were similar, whereas pyrimethamine + sulphadiazine versus pyrimethamine + clindamycin showed no difference, irrespective of the outcome. Intravitreal clindamycin + dexamethasone and conventional treatment with oral pyrimethamine + sulphadiazine had similar efficacy with regard to all outcome measures in ocular toxoplasmosis, and intravitreal therapy was found to be safe. Adverse effects seemed more common with pyrimethamine + sulphadiazine. Most trials for encephalitis and ocular manifestations had a high risk of bias and were of poor methodological quality. There were no trials evaluating drugs for toxoplasmosis in pregnancy, or for congenital toxoplasmosis. Pyrimethamine + sulphadiazine is an effective therapy for treatment of toxoplasmic encephalitis; trimethoprim + sulphamethoxazole and pyrimethamine + clindamycin are possible alternatives. Treatment with either oral or intravitreal antibiotics seems reasonable for ocular toxoplasmosis. Overall, trial evidence for the efficacy of these drugs for toxoplasmosis is poor, and further well-designed trials are needed.

Keywords: Toxoplasmosis, Toxoplasma, Toxoplasmic encephalitis, Ocular, Systematic review, Treatment, Antibiotics

## Background

Toxoplasmosis is a cosmopolitan disease caused by infection with the Apicomplexan coccidian protozoan *Toxoplasma gondii*, an obligate intracellular parasite that forms cysts in mammalian tissues throughout the body.[1] It is an important public health problem, with high socio-economic impact in terms of human suffering including the cost of caring for sick, mentally handicapped, and blind children,[2] and is the commonest opportunistic infection causing focal brain disease in patients with acquired immune deficiency syndrome (AIDS).[3] The parasite is an extremely successful pathogen, responsible for significant morbidity and mortality, especially in congenitally infected and immunocompromised individuals.[3,4] The most important channels for transmission to humans are by ingestion of food or water contaminated with oocysts shed by cats, by eating undercooked or raw meat containing infective tissue cysts, and via transplacental transfer, notably when the mother becomes infected for the first time during pregnancy.[5]

Toxoplasmosis in those with normal immunity is usually a self-limiting disease. If symptomatic, the most commonly recognized feature is painless cervical lymphadenopathy, sometimes accompanied by low-grade fever.[6] Drug treatment is usually not required unless there is clinically severe or persistent disease, or other symptoms such as pneumonitis, myocarditis, meningoencephalitis, or polymyositis. Current practice is to treat such patients with pyrimethamine and sulfadiazine for 2–4 weeks.[7]

If infection occurs during pregnancy, the parasite can be transmitted to the fetus, resulting in congenital toxoplasmosis in the baby. The risk of congenital infection depends on gestational age at the time of

Correspondence to: Senaka Rajapakse, Department of Clinical Medicine, Faculty of Medicine, University of Colombo, 25 Kynsey Road, Colombo 08, Sri Lanka. Email: senaka.ucfm@gmail.com

© W. S. Maney & Son Ltd 2013
DOI 10.1179/2047773213Y.0000000094

maternal parasitemia. The aim of treatment is to prevent fetal infection.[8,9] Depending on the trimester of pregnancy and whether or not the fetus is infected, drugs used include spiramycin and pyrimethamine + sulfadiazine. Nonetheless, current evidence is unclear as to whether congenital transmission can be prevented with antenatal treatment.[10] Children with congenital toxoplasmosis usually receive treatment for 1 year with a practical dosage regimen of pyrimethamine + sulfonamides.

Toxoplasmic retinochoroiditis can occur at any age, and results in an acute intraocular inflammation, with sudden onset visual loss and pain. The condition often resolves without treatment within 6–8 weeks, leaving a healed scar.[11] Recurrences are known to occur.[12] Retinochoroiditis is treated for variable periods, ranging from 4 weeks to several months, with both anti-toxoplasma drugs and corticosteroids to reduce inflammation.[13]

Toxoplasmosis is a life-threatening disease for persons with impaired cellular immunity, in particular those with HIV infection and persons receiving immunosuppressive or cancer therapy.[3,14] In this group, the most common reason for occurrence of disease is reactivation of chronic infection, rather than newly acquired infection.[15,16] The predominant manifestation of toxoplasmosis in immunocompromised individuals is multifocal necrotizing encephalitis.[3,15] Immunocompromised patients require therapy to control progressive disease, and therapy needs to be continued for the period of cell-mediated immunosuppression to prevent relapse.[3,14]

Several drugs are used in the treatment of toxoplasmosis. These drugs act primarily against tachyzoites, and do not eradicate encysted forms. The most commonly used drugs target the folate pathway of the parasite. The best established regimen is a combination of pyrimethamine and sulfadiazine which inhibit parasite folate metabolism. Alternatively spiramycin, a macrolide, which has not been shown to be teratogenic, is used to treat infection in pregnant women.[17] Other macrolides, notably azithromycin, have also been shown to be effective.[18] Clindamycin, a lincomycin, inhibits *T.gondii* by an unknown mechanism that involves the parasite organelle apicoplast.[19] Other drugs against *T.gondii* include dapsone, azithromycin, minocycline, and rifabutin.[20] Combinations of drugs are thought to be more effective.

Many of the current treatment regimens are based on case series and case studies. There are no large-scale trials on drugs used to treat toxoplasmosis. Thus there is a need to evaluate the available trial evidence with regard to efficacy and safety of drugs used to treat symptomatic toxoplasmosis in immunocompetent and immunocompromised hosts, pregnant women, and also patients with ocular toxoplasmosis.

## Methods

We searched MEDLINE, EMBASE, and SCOPUS for publications, using the keywords 'toxoplasma' OR 'toxoplasmic' OR 'toxoplasmosis' OR 'toxoplasm*' AND 'randomized' OR 'randomised' OR 'random*' OR 'trial' in title, abstract, and keywords with no date limits. The search was performed in January 2013. The reference lists were imported into ENDNOTE X5®, and duplicates were removed. There were 949 hits in the combined search of MEDLINE, EMBASE, and SCOPUS. Three investigators (SR, NS, and MCS) independently went through the abstracts to identify relevant papers detailing the results of randomized trials of any drug or combination of drugs compared with placebo or other drug or combination of drugs given for treatment of toxoplasmic encephalitis, ocular toxoplasmosis, toxoplasmosis during pregnancy, or congenital toxoplasmosis. We excluded trials of drugs given for prophylaxis of toxoplasma infections. We also searched related publications and papers referenced in review articles on toxoplasmosis. Full papers of relevant studies were read through by two investigators (SR and SDF) who performed risk of bias analysis, and extracted the data into Revman 5® for analysis of pooled data. Duplicate publications of the same data were excluded. Where more than one trial was available with comparable outcomes, meta-analysis was performed. Results are presented as risk ratios with 95% confidence intervals for dichotomous data, and mean differences for continuous data. Risk of bias analysis and grading of methodological quality was performed by two authors independently (SR and SDF). Inter-rater agreement was 100%. (Fig. 1). The quality of studies was graded based upon the principles developed by the GRADE working group.[21]

## Results

Fourteen randomized trials were eligible for inclusion. One trial was on treatment of toxoplasmic lymphadenitis, five trials were related to treatment of toxoplasmic encephalitis in AIDS patients, and the remaining were on treatment of ocular toxoplasmosis. No randomized comparative trials were identified on treatment for other manifestations of toxoplasmosis. One study was a non-comparative study, and was therefore not included in the quantitative analysis.[22] Our results are summarized in Table 1.

### Toxoplasmic lymphadenopathy

One study compared treatment with trimethoprim sulphamethoxazole (TS) for toxoplasmic lymphadenopathy in immunocompetent individuals attending an infectious diseases clinic in Iran, in a randomized double blind trial.[23] Clinical response was the main outcome measure, and was defined by the following: impalpable lymph nodes and toxoplasma IgM titre <6 IU. Clinical response was measured at 1 month

and 6 months. At both reference time points, TS was superior to placebo. The trial was well designed and methodologically sound with a low risk of bias, although numbers were relatively small.

### Toxoplasmic encephalitis

We considered randomized controlled trials (RCTs) incorporating pyrimethamine in one or both arms for the treatment of toxoplasmic encephalitis (TE). There were no RCTs comparing pyrimethamine versus placebo.

Two RCTs compared pyrimethamine + sulfadiazine (PS) with TS.[24,25] Both studies included AIDS patients with clinical and radiological evidence of TE. In the study by Kongsaengdao et al.[24] patients had, in addition, positive CSF serology for T.gondii. Baseline characteristics were similar in the different treatment arms of both studies. Kongsaengdao et al.[24] treated patients with the same dose for 6 weeks, while Torre et al.[25] treated patients with a 30-day full dose course followed by a half dose maintenance course for 3 months. The randomization process was not detailed in Kongsaengdao's study, while Torres used a computer generated random sequence. Procedures for allocation concealment were unclear, and both trials appeared largely un-blinded, although interpretation of radiological findings was blinded in Torres' study. Outcome measures in both studies were similar; complete recovery (or treatment failure), death, and adverse effects of medications. The pooled total number of participants was 112. One study compared two dosage regimens of pyrimethamine (50 mg and 100 mg) with TS,[24] while the other study used 50 mg pyrimethamine.[25] A total of 55 patients received PS, and 47 patients received TS. No statistically significant difference was seen with regard to the outcomes of complete recovery or death between the two groups, at any dosage of pyrimethamine. Adverse effects appeared less common with TS; however numbers were small. The total number of deaths was six in these studies.

Two trials compared PS and pyrimethamine + clindamycin (PC)[26,27] Both studies were multicentre randomized studies, and were open labelled, recruiting AIDS patients with TE based on clinical signs and radiology. The pooled total number of participants was 358 (PS=180, PC=178). The study by Katlama et al.[27] was an intention-to-treat study, but had significant cross-overs. In this study, 37 patients in the PC group crossed over to PS, the majority (20) because of lack of response to treatment. However, only six of them improved with PS. Forty-five patients crossed over from PS to PC, and most of them (44) crossed over due to side effects from sulphonamides. No significant difference was observed with regard to the outcomes of complete recovery, death, or adverse effects.

There was one published non-comparative randomized trial of pyrimethamine + atovaquone versus atovaquone + sulphadiazine for toxoplasmic encephalitis.[22] Response rates were similar in the two groups, with regards to complete recovery and adverse effects.

### Ocular toxoplasmosis

There is a controversy regarding the necessity or efficacy of treatment of ocular toxoplasmosis. We found three RCTs comparing the effect of antibiotic treatment (together with steroids) for ocular toxoplasmosis compared with placebo.[28–30] One study compared pyrimethamine + trisulphapyrimidines (PS) versus placebo,[28] a second compared TS versus placebo,[29] and the other compared pyrimethamine versus placebo.[30] These studies were small and were of poor methodological quality and had high heterogeneity, rendering the results difficult to interpret. Effects on visual acuity were not reported in any of these trials. The studies failed to show significant benefit with any treatment regimen. The study by Silveira et al.[29] showed that recurrences of ocular toxoplasmosis were commoner in those untreated. This study heavily influenced the pooled data; patients were treated for 14 months in this study, which did not include any patients with acute ocular toxoplasmosis. Adverse events were more frequent with treatment in all three studies.

We considered randomized trials comparing PS versus other drugs in the treatment of ocular toxoplasmosis. Two trials compared PS with intravitreal clindamycin and dexamethasone (IVCD).[31,32] One study showed IVCD to be superior in terms of improvement in visual acuity, but pooled data showed no difference. There were also no differences between the two treatment regimens with regard to reduction in retinal lesion size, improvement in vitreous inflammation, adverse effects, or recurrence rates. Importantly, intravitreal injection of drugs appeared to be safe; subconjunctival hemorrhage and transient raised intraocular pressure were observed in four patients in the study by Soheilian et al.[32]

Three trials compared different oral regimens against PS.[33–35] Trials comparing PS with either TS[33] or the combination of pyrimethamine and azithromycin (PA)[34] showed no difference in improvement in visual acuity, reduction in vitreous inflammation, reduction in lesion size, or recurrence rates. In one study however, adverse effects appeared more common with PS compared with PA, although the results just failed to reach statistical significance. Another pilot randomized study compared azithromycin alone with PS[35] and showed equivalence with regard to the outcomes of time to sharpening of retinal lesions and time to disease inactivity. Visual acuity was not evaluated in this study. Comparison with other

Case 22-728, Document 97-1, 12/22/2022, 3442420, Page106 of 164

Case 1:20-cv-00706-DLC   Document 842-3   Filed 12/20/21   Page 1 of 19

**Table 1  Summary of findings of all trials**

| Comparison | Outcome | Studies | N | Relative effect | 95% CI | Grade |
|---|---|---|---|---|---|---|
| **Toxoplasmic lymphadenopathy** | | | | | | |
| TS vs placebo | Clinical response at 1 month | Alav 2010 | 46 | RR 5.00 | 1.67–14.97* | Moderate |
| | Clinical response at 6 months | Alav 2010 | 46 | RR 2.00 | 1.23–3.27* | Moderate |
| **Toxoplasmic encephalitis** | | | | | | |
| PS–50 vs TS | Complete recovery | Kongsaengdao 2008 Torre 1998 | 92 | RR 1.04 | 0.77–1.40 | Low |
| | Death | Kongsaengdao 2008 Torre 1998 | 97 | RR 0.14 | 0.01–2.45 | Low |
| | Adverse effects | Kongsaengdao 2008 Torre 1998 | 97 | RR 2.03 | 0.77–5.32 | Low |
| PS–100 vs TS | Complete recovery | Kongsaengdao 2008 | 20 | RR 1.00 | 0.56–1.78 | Low |
| | Death | Kongsaengdao 2008 | 20 | RR 0.33 | 0.04–2.69 | Low |
| | Adverse effects | Kongsaengdao 2008 | 20 | RR 9.00 | 0.55–147.95 | Low |
| PS vs PC | Complete recovery | Dannemann 1992 Katlama 1996 | 358 | RR 0.68 | 0.19–2.47 | Low |
| | Death | Dannemann 1992 Katlama 1996 | 358 | RR 0.71 | 0.44–1.14 | Low |
| | Adverse effects | Dannemann 1992 Katlama 1996 | 358 | RR 1.12 | 0.96–1.31 | Low |
| **Ocular toxoplasmosis** | | | | | | |
| Any drug vs placebo | Recurrence | Acers 1963 Silveira 2002 | 144 | RR 0.33 | 0.12–0.87** | Low |
| VCD vs PS | Improvement in visual acuity | Baharivand 2013 Soheilian 2011 | 134 | MD 0.10† | −0.01–0.22 | Low |
| | Reduction in retina lesion size | Baharivand 2013 | 66 | RR 1.06 | 0.54–2.10 | Low |
| | Improvement in inflammation | Baharivand 2013 Soheilian 2011 | 168 | RR 1.03 | 0.7–1.53 | Low |
| | Adverse effects | Baharivand 2013 Soheilian 2011 | 136 | RR 1.45 | 0.34–6.20 | Low |
| | Recurrence | Baharivand 2013 Soheilian 2011 | 136 | RR 0.74 | 0.08–7.13 | Low |
| PS vs TS | Improvement in visual acuity | Soheilian 2005 | 59 | RR 1.72 | 0.45–6.57 | Low |
| | Improvement in inflammation | Soheilian 2005 | 58 | RR 1.26 | 0.85–1.86 | Low |
| | Adverse reactions | Soheilian 2005 | 58 | RR 1.07 | 0.07–16.32 | Low |
| | Recurrence | Soheilian 2005 | 59 | RR 1.03 | 0.23–4.71 | Low |
| PS vs PA | Improvement in visual acuity | Bosch-Driessen 2002 | 42 | RR 1.10 | 0.77–1.56 | Low |
| | Improvement in inflammation | Bosch-Driessen 2002 | 34 | RR 1.02 | 0.66–1.58 | Low |
| | Adverse reactions | Bosch-Driessen 2002 | 46 | RR 1.91 | 1.00–3.65 | Low |
| | Recurrence | Bosch-Driessen 2002 | 24 | RR 1.67 | 0.66–4.2 | Low |

PS=Pyrimethamine+sulphadiazine  TS=trimethoprim+sulphamethoxazole  PC=Pyrimethamine+clindamycin  PA=Pyrimethamine+azithromycin  VCD=intravitreal clindamycin and dexamethasone
OR=Odds Ratio  MD=mean difference
\* TS was more effective than placebo
\*\* Drug treatment was associated with more side effects than placebo
$ Comparisons with high heterogeneity ($I^2$>70%)
GRADE Working Group grades of evidence
1 High quality: Further research is very unlikely to change our confidence in the estimate of effect
2 Moderate quality: Further research is likely to have an important impact on our confidence in the estimate of effect and may change the estimate
3 Low quality: Further research is very likely to have an important impact on our confidence in the estimate of effect and is likely to change the estimate
4 Very low quality: We are very uncertain about the estimate

*Rajapakse et al.* Antibiotics for human toxoplasmosis



Figure 1   PRISMA diagram for selected studies.

regimens was not possible as the measures used to determine response were different.

*Other manifestations*

No trials were found investigating the efficacy of any other drugs in the treatment of toxoplasmic encephalitis, ocular toxoplasmosis, congenital toxoplasmosis or toxoplasmosis in pregnancy, or for the drugs spiramycin, minocycline, rifabutin, or dapsone, although these have been used in case reports and case series.

*Risk of bias, heterogeneity, and quality of trials*

The risk of bias for most studies was high or unclear, the main risks being deficiencies in blinding of participants and evaluators (Fig. 2). Where pooled comparisons were performed, heterogeneity was low in all instances except one (Table 1, footnote). Most of the evidence was of poor quality, and studies had significant methodological flaws (Table 1).

**Discussion**

Overall, trial evidence on treatments for toxoplasmosis is limited, and the grade of recommendations which can be made based on the evidence is low.



Figure 2   Summary of risk of bias analysis. Key: Green '+': low risk of bias; Red '-': high risk of bias; Yellow '?': unclear risk of bias.

Trials were of poor methodological quality with high risk of bias (Fig. 2).

There is reasonable evidence of benefit for treatment of toxoplasmic lymphadenopathy in immunocompetent individuals; TS would be the preferred drug based on current evidence, although no other drugs have been evaluated in a RCT.

For TE, the most widely recommended drug is PS. Pyrimethamine + sulfadiazine has been used for many years, based on initial case series showing benefit. However there are no trials comparing PS with placebo for toxoplasmic encephalitis, and non-comparative data shows response rates for recovery varying from 51 70%. Mortality rates among patients treated with PS for TE in AIDS also vary from 1.7 14.1%.

*Rajapakse et al.*   Antibiotics for human toxoplasmosis

However, many other factors contribute to mortality as well as recovery from clinical disease in patients with TE in AIDS; thus in the absence of placebo controlled trials it is difficult to determine the efficacy of PS in TE. What our analysis does show is that, in TE in AIDS patients, TS and PA appear to be as effective in terms of mortality and complete recovery when compared with PS, and their adverse effect profiles are similar. Thus TS and PA are potential alternatives to treatment with PS. Trimethoprim+sulphamethoxazole in particular is more widely available, especially in resource poor settings, and thus would be an appropriate treatment choice where pyrimethamine is difficult to procure. Nonetheless, further studies are required to evaluate the efficacy of TS. Evidence for the use of azithromycin alone is lacking. Atovoquone could potentially be an alternative to PS, but comparative data does not exist, and in the presence of evidence of efficacy of other drugs, albeit of low quality, it is difficult to justify its routine use; in any case it is not widely available in resource-limited settings.

Assessment of improvement in ocular toxoplasmosis is difficult, due to difficulties in quantifying improvement, and is further confounded by the fact that some studies show no effect on clinical improvement with drug treatment compared to placebo. However these latter studies are small and methodologically poor. As would be expected, side effects were more common with treatment. Improvement with regard to visual acuity, regression in retinal lesion size, sharpening of margins of retinal lesions, and reduction in inflammation has been shown with treatment in comparative studies, and thus, most clinicians would treat ocular toxoplasmosis. The options for treatment are PS, IVCD, TMP-SMX, and PA. Although evidence is of poor quality, all these treatment options appear to be effective. Importantly, IVCD is as safe and effective as oral therapy. There is evidence that treatment helps prevent recurrences, but this finding was heavily influenced by one study where treatment was given for a prolonged period, and the study cohort included patients with a form of toxoplasmosis known to be associated with a high incidence of recurrence.[36]

We found no RCTs demonstrating the effects of treatment in pregnancy, in terms of preventing mother to child transmission of the disease. Meta-analysis of uncontrolled studies has shown no effect of such treatment. There is no good quality evidence regarding the benefits of treatment for congenital toxoplasmosis.

Although many other drugs are used for treating toxoplasmosis, i.e., spiramycin, dapsone, minocycline, etc, none of these have been evaluated in controlled trials, and current evidence for their use is based on case reports and case series. In the presence of several therapeutic options which have trial evidence, albeit of poor quality, we cannot recommend their use except in patients who cannot tolerate PS, IVCD, or PA.

Trial evidence for the efficacy of antibiotics for toxoplasmosis is poor, and further well-designed trials are needed. Despite there not being any comparative trials of drugs against placebo in TE, it would be unethical to conduct placebo controlled trials for TE given the serious nature of the disease. Thus, future trials should evaluate the efficacy of other drugs compared with PS. One of the difficulties in determining efficacy in this situation is in differentiating whether mortality is due to TE or other complications of AIDS; thus trials should be adequately powered, and confounding factors carefully controlled for. Whether ocular toxoplasmosis should be treated at all is controversial; hence there is a place for adequately powered trials comparing the different treatment regimens such as PS, TS, and IVCD versus placebo. Importantly, the outcome measures should be standardized in such trials. We suggest the following outcome measures: improvement in visual acuity assessed using a standardized scale; reduction in retinal lesions size, reduction in the degree of inflammation assessed using standardized methods; recurrence rates; and adverse effects. The assessment points should be clearly defined; we suggest assessment of these outcome measures at 1 month and 6 months for recovery, and follow-up for up to 2 years for recurrence. Since there is no clear evidence of benefit for drug treatment of toxoplasmosis in pregnancy, adequately powered trials comparing drugs which are safe in pregnancy against placebo are ethically justifiable, and are recommended. The main outcome measure in these trials would be reduction in the risk of developing congenital toxoplasmosis. While PS is currently used to treat congenital toxoplasmosis, future trials should compare other drugs with PS, with clinical recovery as the main outcome measure.

## Limitations
We searched the bibliographies of selected studies to identify any unpublished studies or published studies that might not have been included in the databases; none were found. Nonetheless, we acknowledge that non-indexed studies and unpublished studies may have been missed. We screened all studies which had at least an English abstract; two non-English studies were excluded from the final analysis, as all attempts to obtain the full text failed.

## Conclusions
Pyrimethamine+sulfadiazine remains an important drug in the treatment of ocular toxoplasmosis and TE, although precise efficacy is not known. There is little doubt that TE should be treated actively, however the evidence for treating ocular toxoplasmosis is less clear.

In patients who cannot tolerate PS, or where PS is not available, TS appears a reasonable alternative. Patients allergic to sulphonamides could be treated with PA. It seems reasonable to treat patients with active ocular toxoplasmosis, and PS, TS, and IVCD seem appropriate options. For immunocompetent individuals with toxoplasmic lymphadenopathy, TS is an appropriate treatment. Further high quality randomized trials are clearly needed to determine comparative benefits of drugs in patients with toxoplasmosis, especially TE, which has significant mortality. There is a need for rigid methodological quality and identification of clear outcome measures in such trials, as current controversies are a result of the poor quality of previous studies.

## Author Contributions:

SR, SDF, NS, and MCS conceptualized the review. SR, MCS, and CR developed the search strategy. MCS, NS, and SR independently read through the abstracts and identified suitable studies. The full papers were read through by SR and SDF. SR extracted and analyzed the data. SDF and SR wrote the first draft. SR, MCS, and CR revised the manuscript, and all authors reviewed and approved the final manuscript.

## Acknowledgements:

None.

## Conflict of Interest:

The authors declare no conflict of interest.

## Sources of Funding:

None.

## References

1 Dumètre A, Dardé ML. How to detect *Toxoplasma gondii* oocysts in environmental samples? FEMS Microbiol Rev. 2003;27:651 61.

2 Roberts T, Murrell KD, Marks S. Economic losses caused by foodborne parasitic diseases. Parasitol Today. 1994;10:419 23.

3 Luft BJ, Remington JS. Toxoplasmic encephalitis in AIDS. Clin Infect Dis. 1992;15:211 22.

4 Elsheikha HM. Congenital toxoplasmosis: priorities for further health promotion action. Public Health. 2008;122:335 53.

5 Saadatnia G, Golkar M. A review on human toxoplasmosis. Scand J Infect Dis. 2012;44:805 14.

6 McCabe RE, Brooks RG, Dorfman RF, Remington JS. Clinical spectrum in 107 cases of toxoplasmic lymphadeno pathy. Rev Infect Dis. 1987;9:754 74.

7 Georgiev VS. Management of toxoplasmosis. Drugs. 1994;48: 179 88.

8 Remington JS, McLeod R. Toxoplasmosis. In: Remington JS, Klein JO, (eds.) Infectious diseases of the fetus and newborn infant. 4th ed. Philadelphia: WB Saunders; 1995. p. 140.

9 Wong SY, Remington JS. Toxoplasmosis in pregnancy. Clin Infect Dis. 1994;18:853 61; quiz 862.

10 Wallon M, Liou C, Garner P, Peyron F. Congenital toxoplas mosis: systematic review of evidence of efficacy of treatment in pregnancy. BMJ. 1999;318:1511 4.

11 Holland GN. Ocular toxoplasmosis: a global reassessment. Part II: disease manifestations and management. Am J Ophthalmol. 2004;137:1 17.

12 Holland GN, Crespi CM, ten Dam van Loon N, Charonis AC, Yu F, Bosch Driessen LH, *et al.* Analysis of recurrence patterns associated with toxoplasmic retinochoroiditis. Am J Ophthalmol. 2008;145:1007 13.

13 Tabbara KF. Ocular toxoplasmosis: toxoplasmic retinochor oiditis. Int Ophthalmol Clin. 1995;35:15 29.

14 Ruskin J, Remington JS. Toxoplasmosis in the compromised host. Ann Intern Med. 1976;84:193 9.

15 Bertoli F, Espino M, Arosemena 5th, Fishback JR JL, Frenkel JK. A spectrum in the pathology of toxoplasmosis in patients with acquired immunodeficiency syndrome. Arch Pathol Lab Med. 1995;119:214 24.

16 Hunter CA, Remington JS. Immunopathogenesis of toxoplas mic encephalitis. J Infect Dis. 1994;170:1057 67.

17 Foulon W, Villena I, Stray Pedersen B, Decoster A, Lappalainen M, Pinon JM, *et al.* Treatment of toxoplasmosis during pregnancy: a multicenter study of impact on fetal transmission and children's sequelae at age 1 year. Am J Obstet Gynecol. 1999;180:410 5.

18 Araujo FG, Shepard RM, Remington JS. In vivo activity of the macrolide antibiotics azithromycin, roxithromycin and spira mycin against *Toxoplasma gondii*. Eur J Clin Microbiol Infect Dis. 1991;10:519 24.

19 Fichera ME, Bhopale MK, Roos DS. In vitro assays elucidate peculiar kinetics of clindamycin action against *Toxoplasma gondii*. Antimicrob Agents Chemother. 1995;39:1530 7.

20 Montoya JG, Remington JS. *Toxoplasma gondii*. In: Mandell GL, Benntt JE, Dolin R, (eds.) Principles and practice of infectious disease. 5th ed. Philadelphia: Churchill Livingstone; 2000. p. 2858 88.

21 Atkins D, Best D, Briss PA, Eccles M, Falck Ytter Y, Flottorp S, *et al.* Grading quality of evidence and strength of recommendations. BMJ. 2004;328:1490.

22 Chirgwin K, Hafner R, Leport C, Remington J, Andersen J, Bosler EM, *et al.* Randomized phase II trial of atovaquone with pyrimethamine or sulfadiazine for treatment of toxoplasmic encephalitis in patients with acquired immunodeficiency syn drome: ACTG 237/ANRS 039 study. Clin Infect Dis. 2002;34:1243 50.

23 Alavi SM, Alavi L. Treatment of toxoplasmic lymphadenitis with co trimoxazole: double blind, randomized clinical trial. Int J Infect Dis. 2010;14Suppl 3:e67 9.

24 Kongsaengdao S, Samintarapanya K, Oranratnachai K, Prapakarn W, Apichartpiyakul C. Randomized controlled trial of pyrimethamine plus sulfadiazine versus trimethoprim plus sulfamethoxazole for treatment of toxoplasmic encephalitis in AIDS patients. J Int Assoc Physicians AIDS Care (Chic). 2008;7:11 6.

25 Torre D, Casari S, Speranza F, Donisi A, Gregis G, Poggio A, *et al.* Randomized trial of trimethoprim sulfamethoxazole versus pyrimethamine sulfadiazine for therapy of toxoplasmic encephalitis in patients with AIDS. Italian Collaborative Study Group. Antimicrob Agents Chemother. 1998;42: 1346 9.

26 Dannemann B, McCutchan JA, Israelski D, Antoniskis D, Leport C, Luft B, *et al.* Treatment of toxoplasmic encephalitis in patients with AIDS. A randomized trial comparing pyrimethamine plus clindamycin to pyrimethamine plus sulfa diazine. The California Collaborative Treatment Group. Ann Intern Med. 1992;116:33 43.

27 Katlama C, De Wit S, O'Doherty E, Van Glabeke M, Clumeck N. Pyrimethamine clindamycin vs. pyrimethamine sulfadiazine as acute and long term therapy for toxoplasmic encephalitis in patients with AIDS. Clin Infect Dis. 1996;22:268 75.

28 Acers TE. Toxoplasmic retinochoroiditis: a double blind therapeutic study. Arch Ophthalmol. 1964;71:58 62.

29 Silveira C, Belfort R, Jr, Muccioli C, Holland GN, Victora CG, Horta BL, *et al.* The effect of long term intermittent trimethoprim/sulfamethoxazole treatment on recurrences of toxoplasmic retinochoroiditis. Am J Ophthalmol. 2002;134: 41 6.

30 Perkins ES, Schofield PB, Smith CH. Treatment of uveitis with pyrimethamine (daraprim). Br J Ophthalmol. 1956;40:577 86.

31 Baharivand N, Mahdavifard A, Fouladi RF. Intravitreal clindamycin plus dexamethasone versus classic oral therapy in toxoplasmic retinochoroiditis: a prospective randomized clin ical trial. Int Ophthalmol. 2013;33:39 46.

32 Soheilian M, Ramezani A, Azimzadeh A, Sadoughi MM, Dehghan MH, Shahghadami R, *et al.* Randomized trial of intravitreal clindamycin and dexamethasone versus pyretha mine, sulfadiazine, and prednisolone in treatment of ocular toxoplasmosis. Ophthalmology. 2011;118:134 41.

33 Soheilian M, Sadoughi MM, Ghajarnia M, Dehghan MH, Yazdani S, Behboodi H, *et al.* Prospective randomized trial of

*Rajapakse et al.*   **Antibiotics for human toxoplasmosis**

trimethoprim/sulfamethoxazole versus pyrimethamine and sul
fadiazine in the treatment of ocular toxoplasmosis. Oph
thalmology. 2005;112:1876 82.

34 Bosch Driessen LH, Verbraak FD, Suttorp Schulten MS,
van Ruyven RL, Klok AM, Hoyng CB, *et al.* A prospective,
randomized trial of pyrimethamine and azithromycin vs.
pyrimethamine and sulfadiazine for the treatment of ocular
toxoplasmosis. Am J Ophthalmol. 2002;134:34 40.

35 Balaskas K, Vaudaux J, Boillat Blanco N, Guex Crosier Y.
Azithromycin versus Sulfadiazine and Pyrimethamine for non
vision threatening toxoplasmic retinochoroiditis: a pilot study.
Med Sci Monit. 2012;18:CR296 302.

36 Gilbert RE, Freeman K, Lago EG, Bahia Oliveira LM, Tan
HK, Wallon M, *et al.* Ocular sequelae of congenital toxoplas
mosis in Brazil compared with Europe. PLoS Negl Trop Dis.
2008;2:e277.

**Tab 5**

Soheilian, Masoud, et al., "Randomized Trial of Intravitreal Clindamycin and Dexamethasone versus Pyrimethamine, Sulfadiazine, and Prednisolone in Treatment of Ocular Toxoplasmosis," *Ophthalmology*, Vol. 118, No. 1, 2011, pp. 134-141

# Randomized Trial of Intravitreal Clindamycin and Dexamethasone versus Pyrimethamine, Sulfadiazine, and Prednisolone in Treatment of Ocular Toxoplasmosis

Masoud Soheilian, MD,[1,2] Alireza Ramezani, MD,[1,2,3] Ahmad Azimzadeh, MD,[1,2]
Mohammad Mehdi Sadoughi, MD,[1,2] Mohammad H. Dehghan, MD,[1,2] Reza Shahghadami, MS,[1]
Mehdi Yaseri, PhD,[1] Gholam A. Peyman, MD[4]

**Purpose:**  To compare the efficacy of intravitreal injection of clindamycin and dexamethasone with classic treatment for ocular toxoplasmosis.

**Design:**  Prospective, randomized single-masked clinical trial.

**Participants:**  A total of 68 patients with active ocular toxoplasmosis were assigned randomly to 2 treatment groups: 34 in the intravitreal clindamycin plus dexamethasone (IVCD) group and 34 in the classic treatment (CT) group.

**Intervention:**  The IVCD group received 1 to 3 injection(s) of 1 mg intravitreal clindamycin and 400 $\mu$g dexamethasone, and the CT group received 6 weeks of treatment with pyrimethamine and sulfadiazine plus prednisolone. Antitoxoplasmosis antibodies (immunoglobulin [Ig] M and IgG) were measured using an enzyme-linked immunosorbent assay.

**Main Outcome Measures:**  Changes in retinochoroidal lesion size, measured by a computer program written in the MATLAB environment, 6 weeks after initiation of treatment. Visual acuity (VA) changes, vitreous inflammatory response, adverse drug reactions, and rate of recurrence were secondary outcome measures.

**Results:**  The mean number of injections in the IVCD group was 1.6. The lesion size reduction was statistically significant after treatment in both IVCD and CT groups ($P<0.001$ and $P = 0.009$, respectively). However, the difference in mean percentage of reduction at 6 weeks was not significant: 57.0±27.8% in the IVCD group versus 58.4±29.3% in the CT group ($P = 0.569$). In relation to the baseline, VA increased by 0.44±0.24 and 0.29±0.19 logarithm of the minimum angle of resolution units in the IVCD and CT groups, respectively ($P<0.001$); however, the difference of VA improvement between the groups was not significant. The interaction effect of IgM and treatment group on lesion size reduction was significant ($P = 0.002$); this indicated that IgM-positive cases responded better to CT and IgM-negative cases responded better to IVCD treatment. Vitreous inflammation reduction was insignificant between the groups. Within 2 years, 4 eyes (2 in each group) had 1 episode of recurrence. Adverse drug reactions occurred in 2 patients in the CT group. No major injection-related complication was encountered in the IVCD group.

**Conclusions:**  Intravitreal injection of clindamycin and dexamethasone may be an acceptable alternative to the classic treatment in ocular toxoplasmosis. It may offer the patient more convenience, a safer systemic side effect profile, greater availability, and fewer follow-up visits and hematologic evaluations.

**Financial Disclosure(s):**  The author(s) have no proprietary or commercial interest in any materials discussed in this article. Ophthalmology 2011;118:134–141 © 2011 by the American Academy of Ophthalmology.

*Toxoplasma gondii* is an intracellular parasite that has been considered the leading cause of posterior uveitis in the world.[1] Ocular toxoplasmosis was found to be the most common cause of posterior uveitis at the authors' institution, accounting for 54.5% of cases.[2] Despite being a usually self-limited disease, it may cause decreased vision secondary to optic nerve or macular involvement and severe vitreous inflammation. The goal of treatment is to arrest the multiplication of the parasite during the active period of retinochoroiditis.[3]

The classic treatment of toxoplasmosis retinochoroiditis consists of pyrimethamine, sulfadiazine, and systemic corticosteroid. However, this regimen may cause significant adverse systemic side effects. Pyrimethamine administration requires weekly monitoring of blood cell counts and platelets and coadministration of folinic acid to guard against leukopenia and thrombocytopenia. Moreover, sulfadiazine may cause a severe allergic reaction that can be life threatening in some cases. The cost of these drugs is high and they are not readily available in some areas. The use of

ISSN 0161-6420/11/$–see front matter
doi:10.1016/j.ophtha.2010.04.020

*Soheilian et al* · Clindamycin and Dexamethasone in Ocular Toxoplasmosis

these drugs in pregnant women is not known to be safe, nor is there a liquid formula of such drugs for pediatric patients. Compliance also is difficult, considering that the patient needs to receive up to 10 pills daily.[1,2,4,5]

Other alternative treatments for ocular toxoplasmosis are quadruple drug therapy (classic regimen plus clindamycin), clindamycin, trimethoprim and sulfamethoxazole, spiramycin, minocycline, azithromycin, atovaquone, and clarithromycin.[1,5–13] Given that most of the current treatments are not free of toxicities, safer and simpler therapies for ocular toxoplasmosis are desirable.

Intravitreal drug administration, through bypassing ocular barriers, can deliver a high concentration of drug to the intraocular tissues; meanwhile, it likely reduces untoward systemic complications. In addition, this approach is being used as a routine practice in the management of many ocular disorders.

Treatment of toxoplasmosis retinochoroiditis with intravitreal injection of clindamycin and dexamethasone has shown some promising effects in a few case reports.[14–22] Having a good intracellular penetration, clindamycin provides a high intracellular concentration against *T. gondii*, which is an intracellular parasite.

This randomized clinical trial compared a surrogate outcome, lesion size, to assess the efficacy of an off-label intravitreal injection of clindamycin and dexamethasone in relation to the classic treatment in toxoplasmosis retinochoroiditis.

## Patients and Methods

This study was conducted as a controlled, randomized, single-blind clinical trial. It was approved by the review board/ethics committee of the ophthalmic research center of Labbafinejad Medical Center, Tehran, Iran. The study protocol and its probable safety and efficacy were explained to all patients before recruitment. Informed consent was obtained from each patient.

### Participants

Patients were recruited from the uveitis clinic of Labbafinejad Medical Center in Tehran from January 2004 through the end of September 2006. The inclusion criteria were diagnosis of ocular toxoplasmosis made by clinical observation of the focal necrotizing chorioretinitis as well as at least 1 of the following characteristics: (1) optic nerve or macular involvement or threat thereof by an adjacent lesion, (2) a lesion adjacent to large retinal vessels, and (3) severe vitreous inflammation (>2+).

The exclusion criteria were: (1) visual acuity (VA) of worse than 20/200 in the fellow eye, (2) location of the lesion within the center (500 $\mu$m) of the macula, (3) VA better than 20/30 in the involved eye, (4) peripheral lesions causing ≤2+ vitreous inflammation, and (5) severe media opacity precluding clear photography.

### Intervention

Complete ocular evaluation, including measurement of best-corrected VA and fundus photography (nonmydriatic retinal camera TRC NW 200; Topcon, Tokyo, Japan) was performed at baseline. Best-corrected VA was expressed in logarithm of the minimum angle of resolution (logMAR) scale for statistical analysis. The degree of cell and flare in the anterior chamber and vitreous was determined according to Kanski[23] and Kimura et al[24]

scores on a scale from 0 to 4. A decrease of vitreous cells to the level of 0 or trace at 6 weeks after treatment was considered to be resolution of vitreous inflammation. Fundus examination at slit lamp with a 90-diopter lens and indirect ophthalmoscopy were undertaken in every patient. At presentation for all patients a limited laboratory work-up, including complete blood cell and platelet counts, purified protein derivative, Venereal Disease Research Laboratories analysis, and chest radiography, as well as serum measurement of immunoglobulin G (IgG) and IgM antitoxoplasmosis antibodies (by enzyme-linked immunosorbent assay), were performed.

Eligible cases were assigned randomly to 1 of the 2 treatment groups. The intravitreal clindamycin plus dexamethasone (IVCD) group received an intravitreal injection of 1 mg clindamycin plus 400 $\mu$g dexamethasone. The classic treatment (CT) group received pyrimethamine 25 mg daily (initial dose of 75 mg daily for 2 days), sulfadiazine 500 mg every 6 hours (initial dose of 4 g daily for 2 days), and 5 mg folinic acid daily for 6 weeks, as well as oral prednisolone 1 mg/kg daily for 3 weeks starting from the third day of therapy. Treatments in both groups started immediately after randomization on the day of presentation.

All patients were examined weekly thereafter for up to 6 weeks. Weekly complete blood cell and platelet counts were performed in patients in the CT group. Fundus photography was repeated at week 6 with the same adjustments in terms of camera zoom and picture resolution. On digital fundus photos taken before and after treatments, the margin of the main lesion was determined and outlined by a cursor based on clinical judgment (Fig 1). Then, using a program written in the MATLAB (matrix laboratory) environment, which is a numerical computing environment system, the corresponding area (size) was measured. Satellite lesions, defined as any retinal cloudiness outside the main lesion, were disregarded. The program calculated the sizes in pixels. The following proportion was used to describe the percentage of lesion size reduction: (post treatment lesion size–pretreatment lesion size)/pretreatment lesion size. Patients were observed after completion of treatment for at least 24 months.

Retreatment was performed every 2 weeks up to 3 injections in the intravitreally injected group based on the response to treatment. The response was judged clinically by 1 examiner (MS) using clues such as sharpening of the lesion border with or without hyperpigmentation or resolution of vitreous inflammation. To assess any possible retinal toxicity of clindamycin, electroretinography was performed in the first 7 cases before and 4 weeks after intervention.

### Surgical Technique

Intravitreal injection was performed under sterile conditions with topical anesthesia and insertion of a lid speculum. Through the supertemporal quadrant, 1 mg clindamycin in 0.1 ml plus 400 $\mu$g dexamethasone in 0.1 ml were injected intravitreally 3.75 mm posterior to the limbus with a 27-gauge needle separately. Anterior chamber paracentesis was performed as required.

### Main Outcome Measures

The primary outcome measure was lesion size reduction, and the secondary outcome measures were visual acuity, vitreous inflammation, adverse drug reaction, and recurrence rate.

### Sample Size

To detect a 25% difference in lesion size reduction between groups with the assumption of a standard deviation of 30% and an $\alpha$ equal to 0.05, 32 samples in each group were required to achieve 90%

*Ophthalmology*   *Volume 118, Number 1, January 2011*



**Figure 1.** Measurement of active toxoplasmosis lesion using MATLAB software (**A**) before and (**B**) after treatment with intravitreal clindamycin and dexamethasone.

power. Thirty-four cases in each group were included to compensate for 5% case loss.

## Randomization

Randomization was performed using the random block permutation method according to a computer-generated randomized list, with the length varied by 4 and 6. Random allocation sequence was performed by a biostatistician, putting the group sequence (written on the card) in appropriate envelopes labeled by ordered number. For every new eligible case, the next envelope was opened, revealing the group. Details of the series were unknown by the study investigators.

## Masking Procedure

This study was a single-masked clinical trial. At baseline and at each follow-up examination, an unmasked ophthalmologist (AA) completed the physical examination, including slit-lamp examination, tonometry, funduscopy, and evaluation of laboratory tests. Then the patient consulted with a masked retina specialist (MS) to address the response to treatment. Best-corrected VA at baseline and at each follow-up was performed by a masked certified optometrist. Fundus photographs were evaluated by 2 masked retina specialists.

## Statistical Methods

The mean±standard deviation and Wald 95% confidence interval (95% CI) were used to describe quantitative data, and percentage with its corresponding mid-P exact 95% CI for qualitative data. The *t* test, Mann–Whitney *U* test, and chi-square test were used to compare baseline differences in the groups. To compare the changes in each group, the paired *t* test and Wilcoxon signed-rank test were used. The difference in lesion size reduction between the groups was compared by *t* test. The difference in final best-corrected VA (adjusted for the baseline best-corrected VA and inflammation) between 2 groups was assessed statistically by an analysis of covariance (ANCOVA). A 2-way analysis of variance was used to evaluate the cross-product (interaction) effect of the treatment group and the presence of IgM on lesion size reduction. In the last step, an ordinal regression model was used for describ-

ing the relationship between vitreous inflammation (as the response variable) and the type of treatment (as the explanatory variable), adjusting for baseline inflammation.

## Results

Initially, 81 patients were recruited into the study. Six patients in the IVCD group and 5 patients in the CT group were lost to follow-up. Additionally, in the CT group, a severe skin rash developed in 1 case and thrombocytopenia developed in 1 case during the treatment course. In these 2 cases, medications were discontinued and the patients were excluded from the study. Finally, the data of 68 eyes of 68 patients (34 in each group) were analyzed.

Initial characteristics of cases in each group are presented in Table 1. There was no difference between the 2 groups regarding age, gender, initial VA, initial degree of inflammation, presence of previous retinochoroidal scar, baseline retinal lesion size, positive IgG and IgM titers, and mean follow-up. All patients with positive IgM titers did not have previous retinal scar, except 1 case in the IVCD group.

The mean number of injections in the IVCD group was 1.6. Eighteen (52.9%) cases received 1 injection, 11 (32.4%) cases received 2 injections, and 5 (14.7%) cases received 3 injections.

Retinal lesion size was not measurable in 9 cases in the IVCD group and in 8 cases in the CT group because of unacceptable quality of fundus photography either at the initial or at the 6-week visit. Overall, the lesion size could be measured before and after treatment in 51 cases (25 in the IVCD group and 26 in the CT group). The groups were comparable ($P = 0.426$) in terms of initial retinal lesion size (Table 1). Mean initial and final retinal lesion sizes as well as their reductions are shown separately for each group in Table 2. Mean lesion size reduction after treatment was statistically significant in both the IVCD and CT groups ($P<0.001$ and $P = 0.009$, respectively). However, the difference in mean percentage reduction at 6 weeks was not significant between the 2 groups; 57.0±27.8% (range, −8.2% to 100%; median, 64.2%) in the IVCD group versus 58.4±29.3% (range, 4.8%–100%; median, 56.7%) in the CT group ($P = 0.861$).

Comparing retinal lesion size reduction in cases with positive antitoxoplasmosis IgM results (63.7±33.7%) and those with negative antitoxoplasmosis IgM results (56.2±26.9%) disclosed no

*Soheilian et al* · Clindamycin and Dexamethasone in Ocular Toxoplasmosis

Table 1. Baseline Characteristic of Participants

| | Intravitreal Clindamycin Plus Dexamethasone Group (n = 34) | Classic Treatment Group (n = 34) | P Value |
|---|---|---|---|
| Mean age ± SD (yrs) | 24.5±6.0 | 23.3±6.1 | 0.426* |
| Male (%) | 16 (47.1) | 18 (52.9) | 0.628† |
| Female (%) | 18 (52.9) | 16 (47.1) | |
| Mean BCVA ± SD (logMAR) | 0.59±0.36 | 0.50±0.30 | 0.279* |
| Inflammation (%) | | | |
| 1+ | 4 (11.8) | 2 (5.9) | 0.794‡ |
| 2+ | 13 (38.2) | 17 (50.0) | |
| 3+ | 15 (44.1) | 14 (41.2) | |
| 4+ | 2 (5.9) | 1 (2.9) | |
| Retinochoroidal scar | 16 (47.1) | 18 (52.9) | 0.628† |
| Retinal lesion size (pixels) | 206 769±207 123 | 155 968±224 466 | 0.426* |
| Positive IgG (%) | 34 (100) | 34 (100) | 1.0 |
| Positive IgM (%) | 4 (11.8) | 7 (20.6) | 0.323† |
| Mean follow-up (mos) | 24.2±4.0 | 24.7±3.2 | 0.450* |

BCVA = best-corrected visual acuity; Ig = immunoglobulin; logMAR = logarithm of minimum angle of resolution; SD = standard deviation.
*t test.
†Chi-square test.
‡Mann–Whitney *U* test.

significant difference. In antitoxoplasmosis IgM-negative cases, lesion size reduction was greater in the IVCD group, although it was not statistically significant. However, in the antitoxoplasmosis IgM-positive cases, this reduction was significant in the cases of the CT group. Within-group analysis revealed that in the IVCD group, the difference in lesion size reduction between IgM-positive and IgM-negative cases was borderline. Nonetheless, this difference in the CT group reached a significant level in favor of cases with positive IgM results (Table 3). A 2-way analysis of variance showed that the cross-product (interaction) effect of IgM and treatment group on lesion size reduction was statistically significant ($P = 0.002$). It showed that the effect of group reversed based on IgM results being a positive or negative. This indicated that IgM-positive cases responded better to classic treatment and IgM-negative cases responded better to IVCD treatment.

The difference between the distributions of various levels of Snellen VA in the treatment groups was not statistically significant either before or after the interventions (Table 4). Visual acuity improved in all eyes of both groups after treatment. Initial mean VA was 0.59±0.36 logMAR (range, 0.0–1.52 logMAR) and 0.50±0.30 logMAR (range, 0.10–1.22 logMAR) in the IVCD and CT groups, respectively. Within each group, there was significant improvement in VA after treatment; VA increased by 0.44±0.24 logMAR (4.5 lines) in the IVCD group ($P<0.001$) and by 0.29±0.19 logMAR (3 lines)

in the CT group ($P<0.001$). However, the difference between the groups did not reach a significant level (Table 5).

Significant improvement of vitreous inflammation was observed in both groups after 6 weeks of treatment ($P<0.001$ for both groups). Resolution of vitreous inflammation occurred in 51.7% and 55.5% of the eyes in the IVCD and CT groups, respectively. Nevertheless, the reduction of vitreous inflammation was not significant between the groups ($P = 0.563$; Table 5). Before treatment, all the eyes showed 1+ to 4+ vitreous cells. At the end of the treatment, however, 15 eyes in each group (44.1%) had either trace or no vitreous cells.

During the follow-up period of up to at least 2 years, a total of 4 eyes (5.9%; 95% CI, 1.9%–13.6%; 2 in each group: 95% CI, 1%–18.1%) had 1 episode of recurrence. They occurred at 11 and 12 months in the IVCD and at 8 and 13 months in the CT groups after the initial treatments. All recurrences were treated again by the initial allocated regimens.

Adverse drug reactions were limited to 2 of 36 patients in the CT group (5.6%; 95% CI, 0.9%–17.2%): skin rash in one and thrombocytopenia in the other (2.8%; 95% CI, 0.1%–12.9%). Both patients were discontinued from their medication regimens and were excluded from the study. In the IVCD group, subconjunctival hemorrhage developed in 3 (8.8%) of 34 patients (95% CI, 2.3%–22.2%) and 1 patients (2.9%; 95% CI, 0.1%–13.7%) had transient

Table 2. Retinal Lesion Size Parameters in Each Group before and after Treatment in Pixels

| | Intravitreal Clindamycin Plus Dexamethasone Group (n = 25) | Classic Treatment Group (n = 26) | Difference (95% Confidence Interval) | P Value among Groups* |
|---|---|---|---|---|
| Mean initial lesion size† | 206769±207123 | 155968±224466 | 50801 (−70867 to 172469) | 0.744 |
| Lesion size at 6 wks† | 58259±73643 | 66362±96906 | 8103 (−40475 to 56681) | 0.734 |
| Mean lesion size changes† | 116994±143997 | 89606±651573 | 27388 (−240662 to 295438) | 0.517 |
| Mean percentage of changes (%) | 58.4±29.3 | 57.0 ±27.6 | 1.4 (−14.6 to 17.4) | 0.861 |
| P value within group‡ | <0.001 | 0.009 | | |

*t test.
†Calculates in pixels using program written in MATLAB environment.
‡Paired *t* test.

Ophthalmology   Volume 118, Number 1, January 2011

Table 3. Percentage of Lesion Size Reduction

| | Intravitreal Clindamycin Plus Dexamethasone Group | Classic Treatment Group | Difference (95% Confidence Interval) | P Value among Groups* | P Value for Interaction† |
|---|---|---|---|---|---|
| IgM negative | 61.4±25.8 | 49.0±26.8 | 12.5 (−4.4 to 29.3) | 0.144 | 0.002 |
| IgM positive | 28.7±38.6 | 81.2±10.9 | −52.5 (−90.3 to −14.8) | 0.013 | |
| Total | 58.4±29.3 | 57.0±27.6 | 1.4 (−14.6 to 17.4) | 0.861 | |
| P value within group* | 0.056 | 0.010 | | | |

Ig = immunoglobulin.
*$t$ test.
†Two-way analysis of variance.

raised intraocular pressure that responded to medical therapy. No major injection-related complication such as vitreous hemorrhage, endophthalmitis, retinal detachment, and cataract was encountered during the period of follow-up.

For the first 7 cases in the IVCD group, electroretinography was performed before and 1 week after injection. No prominent changes in A- or B-wave amplitude and implicit time were observed.

## Retrospective Power Calculation

To have a power of 90% to detect an intergroup difference of 25% in lesion size reduction with the α set at 0.05, 32 samples in each group were required. Considering 51 cases with good-quality fundus photographs for analysis and the measured standard deviations of the present study, post hoc power analysis calculated the power of this study to be 87%. To detect a difference of 10% and the observed difference of 1.4% in this study with a power of 90%, the required sample sizes are 344 and 17386, respectively.

## Discussion

This clinical trial demonstrated that IVCD overall was almost equally as effective as CT (pyrimethamine and sulfadiazine) in toxoplasmosis retinochoroiditis in terms of lesion size reduction. However, this response varied in favor of classic treatment or intravitreal injection, respectively, based on IgM-positive or IgM-negative results.

Clindamycin has been shown to be effective against ocular toxoplasma infections in both animal models and humans. It has been used with success both as monotherapy and in combination with other agents. It also has been shown to reduce the toxoplasma cyst count in the rabbit eye after administration of sub-Tenon's injection.[14–17] How-

ever, T. gondii is an obligate intracellular parasite; therefore, an antimicrobial agent with a good intracellular penetration is needed to be effective against this organism. Clindamycin is one of the agents that fulfill this purpose. It can cause an intracellular-to-extracellular ratio of 43 compared with some other antibiotics, such as erythromycin or levofloxacin, with ratios of 14 and 6, respectively.[25,26] However, systemic administration of this drug may be associated with some serious complications, such as pseudomembranous colitis from Clostridium difficile.[27–30] Considering these characteristics as well as being nontoxic to the retina, as demonstrated in some studies, and to avoid systemic side effects, intravitreal clindamycin was selected as the sole antibiotic for treatment of toxoplasmosis retinochoroiditis to compare with the classic treatment.

The pharmacokinetics of intravitreal clindamycin have been studied in detail. Intravitreal injection of 1.5 mg was found to be nontoxic to the retina. After a 1-mg intravitreal injection of clindamycin, its concentration remained 1.6 μg/ml or more for approximately 40 hours, which is higher than the 50% inhibitory concentration for T. gondii.[21,22] This dose has been used by other authors and has been demonstrated to be effective and safe in the treatment of toxoplasmosis retinochoroiditis.[14–17]

To the best of the authors' knowledge, there are only 3 case series available in the literature regarding the use of IVCD for the treatment of toxoplasmosis retinochoroiditis. Primarily, intraocular clindamycin and dexamethasone plus systemic sulfadiazine were used successfully for 1 case of reactivated ocular toxoplasmosis threatening a woman's vision during her first trimester of pregnancy.[15] In another report, 4 patients were treated with 2 to 4 intravitreal injections of 1 mg clindamycin plus 1 mg dexamethasone. A

Table 4. Distribution of Various Visual Acuities Based on Snellen Chart before and after Interventions (%)

| | Before | | After | |
|---|---|---|---|---|
| | Intravitreal Clindamycin Plus Dexamethasone Group | Classic Treatment Group | Intravitreal Clindamycin Plus Dexamethasone Group | Classic Treatment Group |
| 20/20–20/40 | 10 (29.4) | 12 (35.3) | 29 (85.3) | 28 (82.4) |
| 20/50–20/200 | 21 (61.8) | 20 (58.8) | 5 (14.7) | 6 (17.6) |
| <20/200 | 3 (8.8) | 2 (5.9) | 0 (0.0) | 0 (0.0) |
| P value | 0.867* | | 0.742† | |

*Fisher exact test.
†Chi-square test.

*Soheilian et al* · Clindamycin and Dexamethasone in Ocular Toxoplasmosis

Table 5. Visual Acuity and Vitreous Inflammation Changes after Treatment in Each Group

| | Intravitreal Clindamycin Plus Dexamethasone Group (n = 34) | Classic Treatment Group (n = 34) | P between Group |
|---|---|---|---|
| **BCVA (logMAR)** | | | |
| Before | 0.59±0.36 (20/80) | 0.50±0.30 (20/60) | 0.174* |
| After | 0.17±0.26 (20/30) | 0.21±0.33 (20/30) | |
| Change (% improvement) | 0.44±0.24 (78.2) | 0.29±0.19 (74.4) | |
| P value within group† | <0.001 | <0.001 | |
| **Vitreous inflammation (%)** | | | |
| Before | | | |
| 1+ | 4 (11.8) | 2 (5.9) | |
| 2+ | 13 (38.2) | 17 (50.0) | |
| 3+ | 15 (44.1) | 14 (41.2) | |
| 4+ | 2 (5.9) | 1 (2.9) | |
| After | | | 0.563‡ |
| 0 | 5 (17.2) | 10 (37.0) | |
| Trace | 10 (34.5) | 5 (18.5) | |
| 1+ | 14 (48.2) | 10 (37.0) | |
| 2+ | 0 (0.0) | 2 (7.4) | |
| 3+ | 0 (0.0) | 0 (0.0) | |
| 4+ | 0 (0.0) | 0 (0.0) | |
| P value within group§ | <0.001 | <0.001 | |

BCVA = best-corrected visual acuity; logMAR = logarithm of minimum angle of resolution.
*Analysis of covariance adjusted for baseline BCVA and inflammation.
†Paired $t$ test.
‡Based on ordinal regression adjusted for baseline inflammation.
§Wilcoxon signed-rank test.

favorable response was reported in all cases.[14] Recently, in 6 patients with toxoplasmosis retinochoroiditis who had either drug intolerance or disease progression despite oral microbial treatment, intravitreal clindamycin alone or in conjunction with vitrectomy was used and was reported to be effective.[16] In that series, intravitreal steroid treatment was not used and it was suggested that clindamycin alone was sufficient for treatment.

To assess the response of a focal retinitis to a specific treatment objectively, a direct measure of lesion size is required. For this purpose, a program written in the MATLAB environment was applied to compare the lesion sizes before and after treatment quantitatively in the digitized fundus photographs. This program enabled us to determine the margin of the retinitis as well as to measure the area of interest in pixels. In some previous published studies, this comparison was made by other techniques, such as using disc diameter or percentage of decrease in greater linear dimension of the lesion. However, each method has its own limitations and is highly examiner dependent. Rothova et al[3] reported at least half of 1-disc diameter reduction of lesions in 49% of patients receiving classic therapy and in 11% of patients receiving a 4-week treatment with trimethoprim and sulfamethoxazole. A clinical trial previously showed that the mean reduction in the size of retinal lesions was 61% and 59% in the cases receiving CT and the 6-week trimethoprim and sulfamethoxazole regimen, respectively.[10] The current study demonstrated comparable results regarding the response of lesion size to the treatments: 57.0% lesion size reduction by intravitreal clindamycin plus dexamethasone and 58.4% by the classic regimen.

All earlier mentioned case series reported a beneficial effect of intravitreal clindamycin on VA improvement in the eyes with active toxoplasmosis retinochoroiditis. In this study, VA increased in most eyes of both treatment groups. Mean VA improvement was 0.44 logMAR (4.5 lines) in the IVCD group and 0.35 logMAR (3.5 lines) in the CT group. In a previous report, VA increase was 0.56 logMAR (5.5 lines) in the cases receiving classic treatment and 0.52 logMAR (5 lines) in the cases receiving trimethoprim and sulfamethoxazole. Measuring the effect of treatment on VA is difficult to assess, given the importance of lesion location and the severity of inflammation in the active phase of toxoplasmosis. Similar to the formerly comparative studies,[3,10] no significant difference was found between the 2 treatment regimens in terms of VA improvement.

In this study, vitreous inflammation decrease was significant in almost all eyes of both treatment groups, although it was comparable between the 2 treatments. Resolution of vitreous inflammation occurred in more than half of the eyes of both groups: 51.7% and 55.5% in the IVCD and CT groups, respectively. This rate was 56.7% with trimethoprim and sulfamethoxazole treatment and 69% and 71% with the CT in a previous study.[10]

Use of steroids can reduce damage to ocular tissues from inflammation and scarring in ocular toxoplasmosis. The survey of members of the American Uveitis Society showed that 82% of respondents used systemic steroids in the management of ocular toxoplasmosis. Nonetheless, intravitreal steroids were not used concomitantly with intravitreal clindamycin in the management of toxoplasmosis retinochoroiditis by some authors, with the rationale that coadministration of steroids may interfere with the effectiveness of

Case 22-728, Document 97-1, 12/26/2022, 3442420, Page118 of 164

Case 1:20-cv-00706-DLC   Document 842-3   Filed 12/20/21   Page 13 of 19

clindamycin.[14–17] Intravitreal dexamethasone was used because of its well-documented anti-inflammatory role in the management of endophthalmitis. However, no worsening of retinochoroiditis or vitreous inflammation was observed. All intravitreally injected cases showed a significant diminution of inflammation.

Recurrence within 2 years of follow-up happened in 5.9% in each group of the current study, with no difference between the treatment groups. In the previous reports, 1 of 4 and 1 of 6 cases with toxoplasmosis retinochoroiditis who were treated by intravitreal clindamycin also had recurrence during follow-up.[14,16] The recurrence rate in a study undertaken at the authors' institution was 10.3% in patients receiving CT and 10% in those receiving trimethoprim and sulfamethoxazole, with an average follow-up of 32.3 months.[10] Reported rates of recurrence by other investigators vary greatly.[2,11] The recurrence rate correlates positively with the period of follow-up. Other factors that may play a major role in recurrence include host factors as well as pathogenicity of the organism.

Repeated intravitreal injection was required in 47.1% of the current cases who did not show sharpening of the retinal lesion. It was also needed in some patients of other published studies using intravitreal clindamycin for toxoplasmosis retinochoroiditis.[14,16] Considering the reported half-life for intravitreal clindamycin (5.6 days), the predetermined 2-week interval between injections in this study seems to be reasonable.[14,16]

In this study, 16.2% of patients had positive IgM titers. These cases may be indicative of an acquired form of toxoplasmosis. The only case with a positive IgM titer had retinal scar that might have been a new systemic infection, making the IgM titer positive, and a recurrence of retinitis adjacent to an old scar. Subgroup analysis showed a meaningful interaction of the treatment type and presence of IgM. Interestingly, a better response in terms of lesion size reduction to CT was observed in IgM-positive cases and to intravitreal injection of clindamycin plus dexamethasone in IgM-negative patients. One may conclude that cases with acquired toxoplasmosis retinochoroiditis respond better to CT. This can be justified by the logic that a patient with acquired toxoplasmosis confronts a systemic infection that rationally is treated better with systemic therapy. However, this finding deserves further investigation and should be interpreted with caution because of the small number of IgM-positive cases in this study, and therefore inadequate power to detect this effect.

Intraocular clindamycin has not shown any retinal toxicity in different studies. However, pretreatment and posttreatment electroretinography was performed for the first 7 eyes receiving IVCD that did not show any prominent changes. Other intravitreal injection-related side effects, such as vitreous hemorrhage, endophthalmitis, retinal detachment, and cataract, were not observed in the intravitreally injected eyes, noting that this study was not powered sufficiently to detect rare local safety risks. In 2 cases (5.6%) receiving classic treatment, however, adverse drug reactions (thrombocytopenia or skin rash) developed that necessitated drug withdrawal. An adverse drug reaction rate with trimethoprim and sulfamethoxazole treatment in ocular toxoplasmosis was reported to be 4%.[10] Dissimilar rates of

adverse drug reactions after CT have been reported with different doses (3.4%, 26%, and 64%[9]); therefore, its true incidence is unclear.[3,10,28–30] Considering the possibility of occurrence of such events that may even be fatal in some cases, a safer regimen is desirable. Given the similar efficacy without systemic side effects, IVCD may be a better alternative therapy.

The current findings are strengthened by the randomized and controlled nature of the study and by the adequate number of cases with an acceptable power. Potential weaknesses include the inability to mask the patients or to obtain fundus photographs in all cases. In addition, the use of a surrogate outcome as a track for VA was another limitation of this study. The sample size of this study was powered adequately ($\alpha = 0.05$ and $\beta = 0.2$) to determine a clinically acceptable difference in retinal lesion size reduction as small as 25%. However, to demonstrate a difference as small as 1.4%, which was observed in this study, a sample size of 13 406 would be required in each group.

An evidence-based systematic review disclosed that there is a lack of evidence to support routine antibiotic treatment for acute toxoplasmosis retinochoroiditis.[9] However, considering suggestive evidences that treatment can reduce the size of retinal scar and may inhibit irreversible visual loss, it would seem reasonable to treat active toxoplasmosis retinochoroiditis despite its self-limited course, when the side effects of the treatment are limited. Regarding the popularity of the classic regimen and assuming that it is effective in the resolution of toxoplasmosis retinochoroiditis, this therapy was used in the study as a control. However, it should be emphasized that none of the treatment regimens have been compared with the natural course of the disease.

This clinical trial demonstrated a comparable effect of intravitreal injection of clindamycin plus dexamethasone with the CT for the management of toxoplasmosis retinochoroiditis in terms of the ability to reduce lesion size and vitreous inflammation as well as improve visual acuity. Compared with the classic treatment, intravitreal injection of clindamycin plus dexamethasone may offer the patient more convenience, a safer systemic side effects profile, greater availability, and fewer follow-up visits and hematologic evaluations. It also may be a better alternative for pregnant and pediatric patients. However, one should be cautious about the possibility of the need for reinjections, with their potential complications, as well as the cases with acquired toxoplasmosis that may need a systemic therapy. Furthermore, the results of this study cannot be generalized to immunocompromised patients, monocular cases, and eyes with lesions inside the fovea ($<$500 $\mu$m).

## References

1. Dodds EM. Ocular toxoplasmosis: clinical presentations, diagnosis and therapy. Focal Points: Clinical Modules for Ophthalmologists. San Francisco, CA: American Academy of Ophthalmology; 1999:1–14.
2. Soheilian M, Heidari K, Yazdani S, et al. Patterns of uveitis in a tertiary eye care center in Iran. Ocul Immunol Inflamm 2004;12:297–310.

*Soheilian et al* · Clindamycin and Dexamethasone in Ocular Toxoplasmosis

3. Rothova A, Meenken C, Buitenhuis HJ, et al. Therapy for ocular toxoplasmosis. Am J Ophthalmol 1993;115:517–23.
4. Holland GN. Reconsidering the pathogenesis of ocular toxoplasmosis. Am J Ophthalmol 1999;128:502–5.
5. Tabbara K. Toxoplasmosis. In: Tasman W, Jaeger E, eds. Duane's Clinical Ophthalmology. Vol 4. Philadelphia: Lippincott-Raven; 1995:1–21.
6. Perkins ES. Ocular toxoplasmosis. Br J Ophthalmol 1973;57:1–17.
7. Martin WG, Brown GC, Parrish RK, et al. Ocular toxoplasmosis and visual field defects. Am J Ophthalmol 1980;90:25–9.
8. Hovakimyan A, Cunningham ET Jr. Ocular toxoplasmosis. Ophthalmol Clin North Am 2002;15:327–32.
9. Stanford MR, See SE, Jones LV, Gilbert RE. Antibiotics for toxoplasmic retinochoroiditis: an evidence-based systematic review. Ophthalmology 2003;110:926–31; quiz 31–2.
10. Soheilian M, Sadoughi MM, Ghajarnia M, et al. Prospective randomized trial of trimethoprim/sulfamethoxazole versus pyrimethamine and sulfadiazine in the treatment of ocular toxoplasmosis. Ophthalmology 2005;112:1876–82.
11. Rothova A, Bosch-Driessen LE, van Loon NH, Treffers WF. Azithromycin for ocular toxoplasmosis. Br J Ophthalmol 1998;82:1306–8.
12. Lopez JS, de Smet MD, Masur H, et al. Orally administered 566C80 for treatment of ocular toxoplasmosis in a patient with the acquired immunodeficiency syndrome. Am J Ophthalmol 1992;113:331–3.
13. Holland GN, O'Conner GR, Belfort R Jr, Remington JS. Toxoplasmosis. In: Pepose JS, Holland GN, Wilhelmuis KR, eds. Ocular Infection and Immunity, St. Louis: Mosby; 1996:1183–223.
14. Kishore K, Conway MD, Peyman GA. Intravitreal clindamycin and dexamethasone for toxoplasmic retinochoroiditis. Ophthalmic Surg Lasers 2001;32:183–92.
15. Martinez CE, Zhang D, Conway MD, Peyman GA. Successful management of ocular toxoplasmosis during pregnancy using combined intraocular clindamycin and dexamethasone with systemic sulfadiazine. Int Ophthalmol 1998;22:85–8.
16. Sobrin L, Kump LI, Foster CS. Intravitreal clindamycin for toxoplasmic retinochoroiditis. Retina 2007;27:952–7.
17. Nozik RA. Results of treatment of ocular toxoplasmosis with injectable corticosteroids. Trans Sect Ophthalmol Am Acad Ophthalmol Otolaryngol 1977;83:811–8.
18. O'Connor GR. Manifestations and management of ocular toxoplasmosis. Bull N Y Acad Med 1974;50:192–210.
19. Elkins BS, Holland GN, Opremcak EM, et al. Ocular toxoplasmosis misdiagnosed as cytomegalovirus retinopathy in immunocompromised patients. Ophthalmology 1994;101:499–507.
20. Ferguson JG Jr. Clindamycin therapy for toxoplasmosis. Ann Ophthalmol 1981;13:95–100.
21. Paquejt JT, Peyman GA. Intravitreal clindamycin phosphate in the treatment of vitreous infection. Ophthalmic Surg 1974;5:34–9.
22. Peyman GA, Charles HC, Liu KR, et al. Intravitreal liposome-encapsulated drugs: a preliminary human report. Int Ophthalmol 1988;12:175–82.
23. Kanski JJ. Clinical ophthalmology. 4th ed. Oxford: Butterworth-Heinemann Ltd; 1999:263–319.
24. Kimura SJ, Thygeson P, Hogan MJ. Signs and symptoms of uveitis. II. Classification of the posterior manifestations of uveitis. Am J Ophthalmol 1959;47:171–6.
25. Mandell GL, Coleman E. Uptake, transport, and delivery of antimicrobial agents by human polymorphonuclear neutrophils. Antimicrob Agents Chemother 2001;45:1794–8.
26. Peyman GA, Lee PJ, Seal D. Endophthalmitis Diagnosis and Management: Taylor & Francis; 2004:81–100.
27. O'Connor GR, Frenkel JK. Dangers of steroid treatment in toxoplasmosis. Periocular injections and systemic therapy [editorial]. Arch Ophthalmol 1976;94:213.
28. Soto J. Clindamycin and pseudomembranous colitis. Lancet 1995;346:249.
29. Thamlikitkul V, Danpakdi K, Chokloikaew S. Incidence of diarrhea and *Clostridium difficile* toxin in stools from hospitalized patients receiving clindamycin, beta-lactams, or non-antibiotic medications. J Clin Gastroenterol 1996;22:161–3.
30. Morgan BS, Larson B, Peyman GA. West CS. Toxicity of antibiotic combinations for vitrectomy infusion fluid. Ophthalmic Surg 1979;10:74–7.

## Footnotes and Financial Disclosures

Originally received: October 3, 2009.
Final revision: April 12, 2010.
Accepted: April 13, 2010.
Available online: August 12, 2010.                Manuscript no. 2009-1377.

[1] Department of Ophthalmology and Ophthalmic Research Center, Labbafinejad Medical Center, Shahid Beheshti Medical University, Tehran, Iran.

[2] Negah Eye Hospital, Tehran, Iran.

[3] Imam Hossein Medical Center, Shahid Beheshti Medical University, Tehran, Iran.

[4] Department of Ophthalmology, University of Arizona Health Science Center, Tucson, Arizona.

Presented at: American Academy of Ophthalmology Annual Meeting, October 2009, San Francisco, California.

Financial Disclosure(s):
The author(s) have no proprietary or commercial interest in any materials discussed in this article.

Supported by Ophthalmic Research Center of Shahid Beheshti Medical University, Tehran, Iran.

Correspondence:
Masoud Soheilian, MD, Ophthalmic Research Center, Labbafinejad Medical Center, Pasdaran Ave. Boostan 9 St., Tehran 16666, Iran. E-mail: masoud_soheilian@yahoo.com.

**Tab 6**

Torre, Donato, et al., "Randomized Trial of Trimethoprim-Sulfamethoxazole versus Pyrimethamine-Sulfadiazine for Therapy of Toxoplasmic Encephalitis in Patients with AIDS," *Antimicrobial Agents and Chemotherapy*, Vol. 42. No. 6, June 1998, pp. 1346-1349

ANTIMICROBIAL AGENTS AND CHEMOTHERAPY, June 1998, p. 1346–1349
0066-4804/98/$04.00+0
Copyright © 1998, American Society for Microbiology

Vol. 42, No. 6

# Randomized Trial of Trimethoprim-Sulfamethoxazole versus Pyrimethamine-Sulfadiazine for Therapy of Toxoplasmic Encephalitis in Patients with AIDS

DONATO TORRE,[1]* SALVATORE CASARI,[2] FILIPPO SPERANZA,[1] ALESSANDRA DONISI,[2]
GIAMPIETRO GREGIS,[2] ANTONIO POGGIO,[3] SERGIO RANIERI,[4] ANNA ORANI,[5]
GIOACCHINO ANGARANO,[6] FRANCESCO CHIODO,[7] GIANPAOLO FIORI,[1]
GIAMPIERO CAROSI,[2] AND THE ITALIAN COLLABORATIVE STUDY GROUP†

Department of Infectious Diseases, Regional Hospital, Varese,[1] Department of Infectious Diseases, University of Brescia,[2]
Department of Infectious Diseases. Regional Hospital, Verbania-Pallanza,[3] Department of Infectious Diseases,
Regional Hospital, Ravenna,[4] Department of Infectious Diseases, Regional Hospital. Lecco,[5]
Department of Infectious Diseases, University of Bari,[6] and Department of
Infectious Diseases, University of Bologna,[7] Italy

Received 14 October 1997/Returned for modification 18 December 1997/Accepted 10 March 1998

The aim of the present pilot study was to compare the efficacy and safety of trimethoprim (TMP) and sulfamethoxazole (SMX) with those of the standard therapy pyrimethamine (P)-sulfadiazine (S) for the treatment of toxoplasmic encephalitis in patients with AIDS. This was a pilot, multicenter, randomized, and prospective study. Patients were randomly assigned to receive TMP (10 mg/kg of body weight/day) and SMX (50 mg/kg/day) or P (50 mg daily) and S (60 mg/kg/day) as acute therapy (for 4 weeks) and then as maintenance therapy for 3 months at half of the original dosage. Seventy-seven patients were enrolled and randomized to the study: 40 patients were treated with TMP-SMX and 37 were treated with P-S. There was no statistically significant difference in clinical efficacy during acute therapy. In contrast, patients randomized to TMP-SMX appeared more likely to achieve a complete radiologic response after acute therapy. Adverse reactions were significantly more frequent in patients treated with P-S, and skin rash was the most common adverse event noted in these patients. In conclusion, the results of the study suggest that TMP-SMX appears to be a valuable alternative to P-S, in particular in patients with opportunistic bacterial infections.

Encephalitis caused by *Toxoplasma gondii* (toxoplasmic encephalitis [TE]) is the most common opportunistic infection causing focal brain disease in patients with AIDS (15, 16). More than 95% of cases of TE are strictly related to reactivation of a chronic (latent) infection, usually when the CD4-positive T-lymphocyte count falls below 100 cells/mm³ (17). The incidence of TE depends on the prevalence of *T. gondii* infection in the general population; in the United States 5 to 10% of the AIDS patients who are anti-*T. gondii* immunoglobulin G positive will develop TE (17), whereas in Europe, it is estimated that TE will develop in 10 to 40% of AIDS patients (20). The current recommended therapy for TE is the synergistic combination of pyrimethamine (P) and sulfadiazine (S) (14, 17). Unfortunately, successful treatment of patients with a severely impaired immune system, such as AIDS patients, with P-S is associated with adverse reactions, particularly to the sulfonamide component, that may preclude their use in up to 40 to 50% of patients (6, 12). New antitoxoplasma drugs are needed because of the frequency of adverse reactions with the current drugs and the low level of activity of the current drugs against the cyst form of *T. gondii* and because drugs with improved pharmacokinetic properties, including greater bioavailability and higher and more persistent levels in serum and/or in the cell, are needed. Several studies have shown that trimethoprim (TMP)-sulfamethoxazole (SMX) is effective for

the primary prophylaxis of TE in patients with CD4 cell counts of less than 100 cells/mm³ and positive serology (2, 18). In addition, the Centers for Disease Control and Prevention (3) recommended TMP-SMX for the primary prophylaxis of TE in AIDS patients with CD4 cell counts of less than 100 cells/mm³. However, the efficacy of TMP-SMX in the therapy of AIDS patients with TE has not yet been established. On the other hand, TMP-SMX has been shown to be effective against *T. gondii* in a variety of animal models (8, 10, 11), and several small nonrandomized studies have shown the beneficial effect of TMP-SMX in AIDS patients with TE (1, 13, 22). These promising in vitro and in vivo results from the use of TMP-SMX for the treatment of TE prompted us to undertake a prospective, multicenter, randomized, pilot trial to evaluate the effectiveness and safety of TMP-SMX as an alternative therapy for TE in patients with AIDS.

## MATERIALS AND METHODS

**Study design.** A prospective, multicenter, randomized, pilot study was designed to compare standard therapy for TE (P-S) to TMP-SMX therapy. The protocol was approved by the investigational ethics committee at each center before the study started, and informed consent was obtained from each patient.

**Recruitment and eligibility of patients.** AIDS patients, infected with human immunodeficiency virus type 1 with signs, symptoms, and computed tomography or magnetic resonance imaging scans judged compatible with the diagnosis of TE, were randomized to receive either P-S or TMP-SMX. Patients were eligible to enter the study if they were >18 years of age, had no known or suspected allergy to the study drugs, were not pregnant, and did not have *Pneumocystis carinii* pneumonia or a concomitant infection of the central nervous system. Patients were excluded from the study for a previous episode of TE, previous treatment or prophylaxis with TMP-SMX, or a poor hematological profile defined as a neutrophil count of <0.75 × 10⁹/liter, a hemoglobin level of <8 g/dliter, and/or a platelet count of <50 × 10⁹/liter.

---

* Corresponding author. Mailing address: Department of Infectious Diseases, Regional Hospital, Viale Borri 57, 21100 Varese, Italy. Phone: 0332 278446. Fax: 39332 265586.

† Members of the Italian Collaborative Study Group are listed in the appendix.

TABLE 1. Demographic and clinical baseline characteristics of patients with TE

| Characteristics | P-S (n = 37) | TMP-SMX (n = 40) | P value |
|---|---|---|---|
| Mean age (yr) | 32.4 ± 4.5 | 34.0 ± 6.4 | 0.21 |
| Male (no. [%] of patients) | 29 (78.4) | 28 (70.0) | 0.44 |
| Female (no. [%] of patients) | 8 (21.6) | 12 (30.0) | 0.44 |
| Risk factors for AIDS (no. [%] of patients) | | | |
| Intravenous drug abuse | 30 (81.0) | 30 (77.0) | 0.58 |
| Homosexual contacts | 3 (10.1) | 3 (7.7) | 1.0 |
| Heterosexual contacts | 4 (11.0) | 6 (15.2) | 0.73 |
| Blood transfusion | 0 | 1 (2.5) | <0.0001 |
| No. (%) of patient with the following: | | | |
| Fever | 21 (58.3) | 21 (51.2) | 0.81 |
| Headache | 26 (72.2) | 21 (51.2) | 0.16 |
| Seizures | 8 (22.2) | 14 (34.1) | 0.21 |
| Lethargy-coma | 1 (2.7) | 5 (12.1) | 0.20 |
| Hemiplegia or hemiparesis | 17 (47.2) | 22 (53.6) | 0.49 |
| Brain imaging findings (no. [%] of patients) | | | |
| Single lesion | 11 (30.6) | 18 (43.9) | 0.23 |
| Multiple lesions | 25 (69.4) | 23 (56.1) | 0.48 |

TABLE 2. Clinical response at the end of acute therapy for TE[a]

| Treatment response | No. (%) of patients | |
|---|---|---|
| | P-S (n = 35) | TMP-SMX (n = 37) |
| Complete | 23 (65.7) | 23 (62.1) |
| Partial | 7 (20.0) | 8 (21.6) |
| No change or progression | 5 (14.2) | 6 (16.2) |

[a] Data are not statistically significant.

compared by Fisher's exact test. P values of <0.05 were considered statistically significant.

## RESULTS

Seventy-seven patients were enrolled and randomized for examination of the efficacy and tolerability of the study medications (37 patients were assigned to the P-S arm and 40 were assigned to the TMP-SMX arm). Table 1 presents the demographic and clinical characteristics of patients with TE at the time of study entry. Most of the patients were men (75%), and the mean age was 33.2 ± 5.6 years. The CD4 T-cell count was not available at the time of entry into the study. Thirty-one of 40 (75.6%) patients treated with TMP-SMX had antibodies (immunoglobulin G) to T. gondii, whereas 29 of 37 (80.5%) patients treated with P-S had a positive serology. Six patients were comatose at the time of entry into the study. One patient was treated with P-S via a nasogastric tube, whereas five patients were treated with TMP-SMX by the intravenous route. In addition, seven patients were also treated intravenously with TMP-SMX, inasmuch as their clinical conditions did not allow oral administration of the drug. Thirty-five of 40 patients in the group treated with TMP-SMX and 33 patients of 37 patients in the group treated with P-S were also treated with dexamethasone, inasmuch as they showed at computed tomography brain lesions surrounded by edema. However, the clinical and radiologic improvements in patients given P-S or TMP-SMX intravenously were similar. The clinical response to therapy with P-S or TMP-SMX was evaluated at the end of the acute therapy (after 30 days). Three patients treated with TMP-SMX and four patients treated with P-S crossed over to the other treatment arm of the study because they did not respond to treatment. All patients treated with TMP-SMX or with P-S who crossed over showed a complete or partial response according to clinical and radiologic signs at the end of the acute therapy. As shown in Table 2, a complete clinical response was observed in 23 (65.7%) patients treated with P-S and in 23 (62.1%) patients treated with TMP-SMX; there was a lack of response or progression of the disease in 5 (14.2%) patients in the P-S group and in 6 (16.2%) patients in the TMP-SMX group. Seventy of 77 patients had a radiologic evaluation at the end of acute therapy (Table 3). A complete resolution of radiologic lesions was noted in 13 (39.3%) patients randomized to P-S

Treatment arms. By means of a computer-generated sequence, each patient was randomly assigned to receive either of the two regimens. The first regimen consisted of P-S given orally or via a nasogastric tube (in comatose patients) for 30 days. The dosage of P was 50 mg daily, and that of S was 60 mg/kg of body weight/day. In addition, folinic acid was given in a single dosage of 10 mg/day for the whole course of therapy. The second regimen consisted of TMP-SMX given orally or given intravenously if the patient was comatose, critically ill, or unable to take the drugs by oral administration. The dosages were the same for both routes of administration: 10 mg of TMP per kg/day plus 50 mg of SMX per kg/day every 12 h for 30 days.

After a 30-day course of acute therapy, the patients were continued on maintenance therapy at a reduced dosage (50%) for a further 3 months. Supportive treatment included use of steroids in those patients treated with TMP-SMX or P-S who showed at computed tomography evidence of perilesional edema and/or lesions that cause a mass effect. In addition, during the study patients treated with TMP-SMX or P-S did not receive any antiretroviral therapy. Patients were classified as having completed therapy if they received 80% of the total dose of P-S or TMP-SMX. Patients were crossed over to the other arm of treatment if they either had not responded within 15 days or had serious adverse reactions.

Monitoring, diagnosis, and evaluation of response. During acute therapy patients underwent complete clinical and neurologic examinations and laboratory evaluation at the time of study entry and at weeks 1, 2, 3, and 4. Laboratory evaluation including blood cell count, serum chemistry analysis, and liver and renal tests were performed at the same times at the clinical evaluation. Computed tomography or magnetic resonance imaging were performed blindly by the radiologist at the time of study entry and at the end of acute therapy (after 30 days). Adverse reactions were scored by means of the World Health Organization scale for toxic effects. Mild-to-moderate adverse events (grades 1 and 2) were treated symptomatically. For patients with severe toxic effects (grades 3 and 4) the drug treatment was stopped. During the maintenance therapy patients underwent clinical, neurologic, and laboratory evaluations every month. A diagnosis of TE was based on signs and symptoms of central nervous system dysfunction and typical lesions on computed tomography or magnetic resonance imaging (24). Clinical efficacy was defined as follows: complete response, resolution of neurologic signs and symptoms related to TE; partial response, decrease of active signs or symptoms of TE; no change or progression, lack of any improvement or increasing severity of neurologic and clinical signs. The same criteria were used for the radiologic evaluation of efficacy, as follows: complete response, a normal result or complete resolution of all initial lesions and absence of any new lesions; partial response, more than 50% decrease in the number of lesions and the absence of any new lesions; no change or progression, no decrease in the number and/or size of the brain lesions or an increase in the number of lesions and/or the size of any initial lesions. Neuroradiographic scans were performed at 4 weeks or sooner if the patient discontinued therapy because of clinical progression of disease or toxicity.

Statistical analysis. Data are expressed as means and standard deviations. The overall incidence and severity of adverse reactions and therapeutic outcome were

TABLE 3. Radiologic response at the end of acute therapy for TE

| Treatment response | No. (%) of patients | |
|---|---|---|
| | P-S (n = 33) | TMP-SMX (n = 37) |
| Complete | 13 (39.3) | 23 (62.1) |
| Partial | 10 (30.3) | 4 (10.8) |
| No change or progression | 10 (30.3) | 10 (27.0) |

[a] P = 0.0478.

TABLE 4. Adverse reactions in AIDS patients with TE during the acute and the maintenance therapy

| Adverse reaction | No. (%) of patients | | P value |
| | TMP-SMX ($n = 40$) | P-S ($n = 37$) | |
|---|---|---|---|
| Any of at least one adverse reaction | 5 (12.5) | 8 (21.6) | 0.36 |
| Fever | 0 | 1 | 0.48 |
| Skin rash | 0 | 6 | 0.0098 |
| Diarrhea | 1 | 0 | 1.00 |
| Gastric disturbances | 0 | 2 | 0.22 |
| Vomiting | 0 | 1 | 0.48 |
| Toxic effect on liver | 1 | 1 | 1.00 |
| Toxic effect on kidneys | 0 | 1 | 0.48 |
| Leukopenia | 1 | 0 | 1.00 |
| Neutropenia | 1 | 1 | 1.00 |
| Thrombocytopenia | 0 | 1 | 0.48 |
| Pancytopenia | 1 | 0 | 1.00 |
| Total | 5 (12.5) | 14 (37.8) | 0.00162 |

and in 23 (62.1%) patients randomized to TMP-SMX ($P = 0.0478$). In addition, a partial resolution of radiologic lesions was observed in 10 (30.3%) patients randomized to P-S and in 4 (10.8%) patients randomized to TMP-SMX. A lack of resolution of brain lesions or progression was observed in 10 (30.3%) patients randomized to P-S and in 10 (27%) patients randomized to TMP-SMX. It should be noted that we lost 5 patients and 7 patients for clinical and radiologic evaluations, respectively, at day 30.

The rate of relapse (worsening of clinical and/or radiologic signs) was evaluated during the maintenance therapy period. During the 3-month period, one relapse was observed in the 37 patients treated with TMP-SMX, but no relapses were observed in the 35 patients treated with P-S. Survival did not significantly differ between the two groups. No patient in either treatment arm died during the acute therapy period. Two patients died during the maintenance therapy: one patient randomized to the P-S group died of sepsis due to *Staphylococcus aureus* after 2 months of maintenance therapy, and one patient randomized to the TMP-SMX group died of decompensated posthepatic cirrhosis after 3 months of maintenance therapy. Adverse reactions occurred more frequently in the group of patients treated with P-S (Table 4): 14 (37.8%) in the P-S group and 5 (12.5%) in TMP-SMX group ($P = 0.0162$). Skin rashes were observed only in the P-S group.

## DISCUSSION

This randomized, pilot trial provides the first prospective data on the efficacy and toxicity of therapy with TMP-SMX for TE in AIDS patients. Our results have shown that TMP-SMX is effective for the treatment of TE. The presence of antibodies to *T. gondii* was not required as an inclusion criterion, given the high prevalence of positivity found in Europe and the fact that TE was not unequivocally associated with positive toxoplasma serology at the time that the study was designed. In our study we observed a substantially lower rate of response of radiologic lesions in comparison with that for clinical signs. The radiologic response to therapy lags behind the clinical response. In particular, especially during the first 2 to 3 weeks, a disparity between the radiologic and clinical responses may be observed, when there is clinical improvement, despite the progression found in neuroradiologic studies. Adverse reactions were sig-

nificantly frequent in the group of patients treated with P-S. Several studies have shown that in AIDS patients, treatment of TE must consist of both primary and maintenance therapy because of the 30 to 50% rate of relapse (12, 19, 24). It has been demonstrated that there is a wide range of doses of P-S which are effective for acute therapy of TE: 25 to 100 mg of P and 2 to 8 g of S (5–7). In addition, three small nonrandomized studies evaluated the efficacy of TMP-SMX in AIDS patients with TE (1, 13, 22). The dosage of TMP varied from 6.6 to 20 mg/kg/day, with the rate of efficacy ranging from 41.6 to 100%. In one of the three studies, Canessa et al. (1) showed clinical and radiologic responses in 9 of 12 patients (75%) treated with two different dosages of TMP-SMX (6.6 or 20 mg/kg/day). Recently, Winstanley et al. (25) have observed marked variations in the bioavailability of P in AIDS patients treated for TE, and the investigators suggest that a parenteral formulation of P would overcome variations in bioavailability. On the other hand, Chin et al. (4) have demonstrated that TMP-SMX, when given orally, is well absorbed in critically ill patients with AIDS, and no significant difference in the area under curve was observed between the intravenous and oral doses. Sattler et al. (21) reported that for AIDS patients a mean daily intravenous dose of $12 \pm 3.4$ mg of TMP per kg produced levels in serum of between 5 and 8 µg/ml, which resulted in decreased toxicity, without a decrease in efficacy. In addition, several studies have shown that TMP-SMX had good penetration in cerebrospinal fluid in individuals with either infected or healthy meninges (9, 23). In our study the adverse reaction rate observed in patients treated with TMP-SMX was significantly lower than that observed in patients treated with P-S. In particular, skin rash was not observed in any patients treated with TMP-SMX. The absence of rash among TMP-SMX-treated patients could be related to the low dosage used to treat our patients. Therefore, the use of TMP-SMX could represent a good therapeutic alternative for TE therapy in AIDS patients. Moreover, although this study was not designed for this aim, maintenance therapy with TMP-SMX in AIDS patients with TE may also prevent opportunistic infections susceptible to these drugs (16), including pneumonia due to *P. carinii*, and bacterial infections caused by *Salmonella* spp., *Listeria monocytogenes*, *Legionella* spp., and some unusual infections caused by *Nocardia* spp., *Pseudomonas cepacia*, and *Pseudomonas maltophilia* (26). In conclusion, this study showed that TMP-SMX is a reliable alternative to P-S therapy, and it may represent an effective drug for the therapy of bacterial opportunistic infections.

## APPENDIX

Members of the Italian Collaborative Study Group are as follows. Coordinators: G. P. Fiori (Varese), G. Carosi (Brescia). Members: D. Torre and F. Speranza (Division of Infectious Diseases, Varese); S. Casari, G. Gregis, and A. Donisi (Institute of Infectious Diseases, Brescia); A. Orani and M. Nigro (Division of Infectious Diseases, Lecco); F. Suter and F. Maggiolo (Division of Infectious Diseases, Busto Arsizio); G. P. Cadeo and B. Morandini (Division of Infectious Diseases, Mantova); A. Poggio (Division of Infectious Diseases, Verbania-Pallanza); G. Scalise and F. Ancarani (Institute of Infectious Diseases, Ancona); G. Angarano and P. Maggi (Institute of Infectious Diseases, Bari); G. Chiodo and G. Marinacci (Institute of Infectious Diseases, S. Orsola Hospital, Bologna); F. Gritti and M. G. Catalini (Division of Infectious Diseases, Maggiore Hospital, Bologna); A. Scalzini and R. Stellini (Division of Infectious Diseases, Brescia); F. Ghinelli (Division of Infectious Diseases, Ferrara); S. Pauluzzi and F. Menichetti (Institute of Infectious Diseases, Perugia); F. Al-

berici and P. Viale (Division of Infectious Diseases, Piacenza); S. Ranieri and P. Bassi (Division of Infectious Diseases, Ravenna); R. Ciammarughi (Division of Infectious Diseases, Rimini); F. Milazzo (Division of Infectious Diseases, Milan); and L. Cremoni and A. De Micheli (Division of Infectious Diseases, Monza).

## REFERENCES

1. Canessa, A., V. Del Bono, P. De Leo, N. Piersantelli, and A. Terragna. 1992. Cotrimoxazole therapy of Toxoplasma gondii encephalitis in AIDS patients. Eur. J. Clin. Microbiol. Infect. 11:125–130.
2. Carr, A., B. Tindall, B. J. Brew, D. J. Marriott, J. L. Harkness, R. Penny, and D. A. Cooper. 1992. Low-dose trimethoprim-sulphamethoxazole prophylaxis for toxoplasmic encephalitis in patients with AIDS. Ann. Intern. Med. 117: 106–111.
3. Centers for Disease Control and Prevention. 1995. Guidelines for the prevention of opportunistic infections in persons infected with human immunodeficiency virus: a summary. Morbid. Mortal. Weekly Rep. 44:1–34.
4. Chin, T. W. F., A. Vandenbroucke, and I. W. Fong. 1995. Pharmacokinetics of trimethoprim-sulfamethoxazole in critically ill and non-critically ill AIDS patients. Antimicrob. Agents Chemother. 39:28–33.
5. Cohn, J. A., A. McMeeking, W. Cohen, J. Jacobs, and R. S. Holzman. 1989. Evaluation of the policy of empiric treatment of suspected toxoplasmic encephalitis in patients with the acquired immunodeficiency syndrome. Am. J. Med. 86:521–527.
6. Dannemann, B., J. A. McCutchan, D. Israelski, D. Antoniskis, C. Leport, B. Luft, J. Nussbaum, N. Clumeck, P. Morlat, and J. Chiu. 1992. Treatment of toxoplasmic encephalitis in patients with AIDS. A randomized trial comparing pyrimethamine plus clindamycin plus sulfadiazine. Ann. Intern. Med. 116:33–43.
7. Dannemann, B. R., D. M. Israelski, and J. S. Remington. 1988. Treatment of toxoplasmic encephalitis with intravenous clindamycin. Arch. Intern. Med. 148:2477–2482.
8. Derouin, F., and C. Chastany. 1989. In vitro effects of folate inhibitors on Toxoplasma gondii. Antimicrob. Agents Chemother. 33:1753–1759.
9. Dudley, M. N., R. E. Levitz, R. Quintiliani, J. M. Hickingbotham, and L. H. Nightgale. 1984. Pharmacokinetics of trimethoprim and sulfamethoxazole in serum and cerebrospinal fluid of adult patients with normal meninges. Antimicrob. Agents Chemother. 26:811–814.
10. Grossman, P. L., and J. S. Remington. 1979. The effect of trimethoprim and sulphamethoxazole on Toxoplasma gondii in vitro and in vivo. Am. J. Trop. Med. Hyg. 28:445–455.
11. Harper, J. S., W. T. London, and J. L. Sever. 1985. Five drug regimens for treatment of acute toxoplasmosis in squirrel monkeys. Am. J. Trop. Med. Hyg. 34:55–57.
12. Haverkos, H. W. 1987. Assessment of therapy of toxoplasma encephalitis. The TE study group. Am. J. Med. 82:907–914.
13. Herrera, G., O. Villalta, and K. Visona. 1991. Trimethoprim-sulphamethoxazole treatment encephalitis in AIDS patients, abstr. WB-2321. In Abstracts of the Seventh International Conference on AIDS.
14. Leport, C., F. Raffi, S. Matheron, C. Katlama, B. Regnier, A. G. Saimot, C. Marche, C. Vedrenne, and J. L. Vilde. 1988. Treatment of central nervous system toxoplasmosis with pyrimethamine-sulfadiazine combination in 35 patients with the acquired immunodeficiency syndrome. Efficacy of long-term continuous treatment. Am. J. Med. 84:94–100.
15. Levy, R. M., D. E. Bredesen, and M. L. Rosenblum. 1985. Neurological manifestation of the acquired immunodeficiency syndrome (AIDS): experience at UCSF and review of literature. J. Neurosurg. 62:475–495.
16. Luft, B. J., and J. S. Remington. 1988. Toxoplasmic encephalitis. J. Infect. Dis. 157:1–6.
17. Luft, B. J., and J. S. Remington. 1992. Toxoplasmic encephalitis in AIDS. Clin. Infect. Dis. 15:211–222.
18. Michelet, C., F. Raffi, J. M. Besnier, J. M. Chennebault, F. Moulicton, B. Milpied, J. P. Breux, and F. Cartier. 1992. Cotrimoxazole (CMX) versus aerosolized pentamidine (AP) for primary prophylaxis of Pneumocystis carinii (PCP), abstr. B:139. In Abstracts of the Eight International Conference on AIDS.
19. Pedrol, E., J. M. Gonzalez-Clemente, J. M. Gatell, J. Mallolas, J. M. Miro, F. Graus, R. Alvarez, J. M. Mercader, J. Berenguer, and M. T. Jimenez de Anta. 1990. Central nervous system toxoplasmosis in AIDS patients: efficacy of an intermittent maintenance therapy. AIDS 4:511–517.
20. Renold, C., A. Sugar, J. P. Chave, L. Perrin, J. Delavelle, G. Pizzolato, P. Burkhard, V. Gabriel, and B. Hirschel. 1992. Toxoplasma encephalitis. Medicine (Baltimore) 71:224–238.
21. Sattler, F. R., R. Cowan, D. M. Nielsen, and J. Ruskin. 1988. Trimethoprim-sulphamethoxazole compared with pentamidine for treatment of Pneumocystis carinii pneumonia in the acquired immunodeficiency syndrome: a prospective, non-crossover study. Ann. Intern. Med. 109:280–287.
22. Solbreux, P., J. Sonnet, and F. Zech. 1990. A retrospective study about the use of cotrimoxazole as diagnostic support and treatment of suspected cerebral toxoplasmosis in AIDS. Acta Clin. Belg. 45:85–96.
23. Svedhem, A., and S. Iwarson. 1979. Cerebrospinal fluid concentrations of trimethoprim during oral and parenteral treatment. J. Antimicrob. Chemother. 5:717–720.
24. Wanke, C., C. U. Tuazon, A. Kovacs, T. Dina, D. O. Davis, N. Barton, D. Katz, M. Lunde, C. Levy, and F. K. Conley. 1987. Toxoplasma encephalitis in patients with acquired immunodeficiency syndrome: diagnosis and response to therapy. Am. J. Trop. Med. Hyg. 36:509–516.
25. Winstanley, P., S. Khoo, S. Szwandt, G. Edwards, E. Wilkins, J. Tjia, R. Coker, W. McKane, N. Beeching, and S. Watkin. 1995. Marked variation in pyrimethamine disposition in AIDS patients treated for cerebral toxoplasmosis. J. Antimicrob. Chemother. 36:435–439.
26. Young, L. S., and J. Hindler. 1987. Use of trimethoprim-sulphamethoxazole singly and in combination with other antibiotics in immunocompromised patients. Rev. Infect. Dis. 9(Suppl. 2):S177–S183.

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION; STATE OF
NEW YORK; STATE OF CALIFORNIA;
STATE OF ILLINOIS; STATE OF NORTH
CAROLINA; STATE OF OHIO;
COMMONWEALTH OF PENNSYLVANIA;
and COMMONWEALTH OF VIRGINIA,

Plaintiffs,

v.

VYERA PHARMACEUTICALS, LLC;
PHOENIXUS AG; MARTIN SHKRELI,
individually, as an owner and former director of
Phoenixus AG and a former executive of Vyera
Pharmaceuticals, LLC; and KEVIN
MULLEADY, individually, as an owner and
director of Phoenixus AG and a former executive
of Vyera Pharmaceuticals, LLC,

Defendants.

Case No. 20-cv-00706 (DLC)

ECF Case

## TRIAL TESTIMONY OF JOHN S. RUSSELL

FTC v. Vyera, et al.,
20-cv-00706 (DLC)

DX-542

**Introduction**

Pursuant to 28 U.S.C. § 1746, John S. Russell declares under penalty of perjury as follows:

1.  I am an adult resident of Middletown, Delaware, and I am currently employed as the Managing Partner for ASDO Consulting Group (ASDO), a firm providing consulting and advisory services to early stage and midsize life science companies, institutional investors, and healthcare data providers.

*Qualifications*

2.  I received my Bachelor of Science in Biological Sciences, Chemistry in 1969, and my Master of Science in Microbiology, magna cum laude, in 1974, from Fairleigh Dickinson University. I have also completed executive education programs at UCLA Anderson School of Management and Kellogg-Northwestern.

3.  Prior to joining ASDO, I held senior management positions in marketing and sales at Otsuka America Pharmaceutical Inc. (OAPI), the American subsidiary of a leading Japanese drug manufacturer, from 1996 to 2002. From 1985 to 1995, I held senior management marketing and sales positions at the IVAC Corporation, formerly a subsidiary of Eli Lilly & Co. (Eli Lilly), a leading supplier of medication infusion systems to hospitals. I began my career with Eli Lilly in 1973 and worked there until 1985, holding positions in sales, marketing, and pricing.

4.  My industry experience includes, but is not limited to, analyzing the commercial viability of introducing pharmaceutical products in the U.S., Japan, and E.U. markets, evaluating API supplier capabilities and researching alternative API suppliers, assisting generic pharmaceutical companies with portfolio management, and consulting on full-line and specialty distribution strategies.

*Allegations & Assignment*

5.  I understand that Plaintiffs allege that Defendants Vyera Pharmaceuticals, LLC (hereafter, "Vyera"), Phoenixus AG (hereafter, "Phoenixus"), Martin Shkreli, and Kevin Mulleady

1

engaged in anticompetitive business practices to maintain a monopoly on Daraprim. Specifically, Plaintiffs allege that Vyera utilized three strategies to limit generic competition.

6. First, Vyera's specialty distribution agreements had the alleged effect of preventing distributors and purchasers from reselling Daraprim to generic companies, thereby depriving generic manufacturers from being able to acquire Daraprim samples required for bioequivalence testing under the FDA approval process.

7. Second, Vyera signed exclusive supply contracts with Fukuzyu Pharmaceutical Co., Ltd. (hereafter, "Fukuzyu") and RL Fine Chem Pvt. Ltd. (hereafter, "RL Fine") for the active pharmaceutical ingredient in Daraprim, pyrimethamine, thereby allegedly limiting generic manufacturers' access to that input.

8. Third, Vyera allegedly restricted two distributors from selling sales information regarding Daraprim to third-party data aggregators in the pharmaceutical industry (e.g., IQVIA), thereby obscuring the market opportunity for prospective generic competitors.

9. Plaintiffs' counsel has retained Mr. Edward V. Conroy to offer expert testimony in relation to these claims. Mr. Conroy opines that some aspects of Vyera's Daraprim distribution system and practices are not consistent with industry norms and are explained by Vyera's alleged desire to prevent generics from obtaining Daraprim for bioequivalence studies.

10. Plaintiffs' counsel has also retained Mr. James Bruno to offer expert testimony in relation to these claims. Mr. Bruno opines that the exclusivity provision in Vyera's supply agreement with Fukuzyu is inconsistent with an effort to mitigate pyrimethamine API supply risk, that Vyera's contract with RL Fine was inconsistent with an effort to form a backup API supply relationship, and that Fukuzyu and RL Fine were the only two API suppliers that had a pyrimethamine manufacturing process ready for use in product development and manufacturing from 2015 until 2019.

11. I was retained by counsel for Vyera and Phoenixus to review the opinions offered by Mr. Conroy and Mr. Bruno. Based on my review of the record evidence, I reached the following opinions:

2

    i. *Vyera's use of a specialty distribution system was consistent with industry practice.* Specialty distribution systems are widely used in the industry, and Vyera had compelling reasons to distribute Daraprim through a specialty distribution system. Vyera's practice of monitoring sales and customer accounts is common in the pharmaceutical industry.

    ii. *Mr. Conroy's assessment of Vyera's distribution system and practices is flawed.* Mr. Conroy's assessment appears to be based on historical practice that does not consider the current structure and evolving trends in the industry.

    iii. 

    iv. *Agreements limiting distributor data sharing did not prevent manufacturers from estimating the size of the market opportunity.* Evidence in this matter demonstrates that none of the generic manufacturers considering ANDAs for pyrimethamine had issues creating estimates of the market opportunity.

    v. *Vyera's supply agreements with Fukuzyu and RL Fine were consistent with industry practice.* An exclusive contract with a large, dependable supplier such as Fukuzyu, and an exclusive contract with RL Fine as a backup supplier, would have reduced Vyera's API-related risks. Specific to API supply, exclusive agreements are common in the pharmaceutical industry and are used to maintain high quality, avoid drug shortages, and protect revenues.

    vi. 

    vii. *Mr. Bruno's assessment of Vyera's API supply agreements is flawed.* Mr. Bruno bases much of his opinions on the premise that Vyera's agreements with Fukuzyu and RL Fine are not "typical," "standard," or aligned with "industry norms." However, Mr. Bruno fails to establish that his industry experience is an appropriate benchmark for comparison, and he further ignores the degree of variation that can occur in API supply agreements based on the needs of the parties involved.

12. I previously submitted an expert report in connection with this matter. That report contains additional information regarding my analyses and opinions. An appendix of selected materials on which I have relied and that I have discussed in my written direct testimony is being submitted herewith in accordance with Fed. R. Evid. 703.

## Background

### *Overview of Vyera and Phoenixus*

13. Vyera is a privately-held, for-profit limited liability corporation that is wholly owned by Phoenixus AG. Vyera, formerly known as Turing Pharmaceuticals, LLC, is incorporated in Delaware and is headquartered in New York, New York.

14. Phoenixus is a privately-held, for-profit Swiss corporation that is based in Baar, Switzerland. Phoenixus, formerly known as Turing Pharmaceuticals AG, wholly owns the subsidiary known as Vyera Pharmaceuticals, LLC. In August 2015, Phoenixus acquired the rights to market and distribute Daraprim in the United States and has since sold the product exclusively to Vyera for distribution in the United States.

15. I understand that the individual defendant, Martin Shkreli, founded Phoenixus and Vyera and is the former chairman of the board of Phoenixus as well as the former CEO of Vyera. I understand that the individual defendant, Kevin Mulleady, is a former chairman of the Phoenixus board of directors and is the former CEO of Vyera.

### *Overview of Distribution Systems in the Pharmaceutical Industry*

16. Pharmaceutical companies decide how they want to distribute a manufactured drug product as part of their marketing strategy. In the U.S., historically, pharmaceutical companies have used drug wholesalers to distribute their products to customers. However, with the development of specialty drugs that may have unique requirements, other distribution models have evolved. These models include using a limited number of specialty distributors or selling a specialty drug direct to a limited number of specialty pharmacies or some combination thereof.

17. Depending on the characteristics and circumstances for a given drug product, a pharmaceutical company may opt for a more open distribution system or a more restricted distribution system. Distribution systems can fall anywhere on a continuum from more open to more restricted, but these systems can also be more simply categorized as full-line distribution (*i.e.*, open and less restrictive) or specialty distribution (more restrictive).

4

### 1. Full-Line Distribution

18. In a full-line distribution model, a pharmaceutical company sells the whole line of its drug products through the wholesaler, which in turn supplies these drug products to pharmacies and other institutions such as hospitals and long-term care facilities. Generally, a therapy with a large addressable market and a broad base of potential prescribers will be sold through a full-line distribution system.

19. The disadvantages to full-line distribution include manufacturers losing control of the channel strategy for the drug product and not having close control over the quality of the product after it is sold to full-line distributors. Full-line distributors may also be insufficient for distributing more specialized drug products that may target smaller patient populations and may require special handling to ensure quality and appropriate administration.

### 2. Specialty Distribution

20. Pharmaceutical companies establish and use specialty distribution systems, where a drug product is distributed through a single or small number of distributors, for different reasons such as inventory control, predicting manufacturing needs, ensuring consistent data reporting, tracking utilization, disease management, and benefits to patients. Patient benefits from these specialty distribution systems include better managed supply ensuring patient access and reducing waste, advanced standards for handling drug products ensuring quality is maintained, and highly trained pharmacy staff for treatment of chronic diseases that stay in touch with patients throughout their treatment and deliver superior services to ensure optimal patient outcomes.

21. Specialty drugs that are "high touch" and require special handling or storage can benefit from features included in specialty distribution systems. However, drugs that do not require special handling and storage may have other "high touch" features that can also benefit from specialty distribution systems. For example, drugs with known patient compliance issues can benefit from specialty distribution. Further, the inventory of high-cost drugs typically needs to be tightly controlled. Specialty distribution makes controlling and managing inventory easier.

22.  Specialty distribution can also be a way to help patients with their insurance claims submissions, appealing denials, and assuring insurance coverage for the treatment. These service offerings are one of the reasons why high-priced treatments are commonly sold through specialty pharmacies.

### *Overview of Active Pharmaceutical Ingredient Supply in the Pharmaceutical Industry*

23.  Pharmaceutical drugs are combinations of both active and inactive ingredients. The active pharmaceutical ingredient (hereafter, "API") is any substance or mixture of substances that, when used in the production of a drug, becomes the active ingredient and furnishes some pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease or to affect the structure and function of the body.

24.  I understand that the API for Daraprim is pyrimethamine, which acts as an antiparasitic. The primary use of pyrimethamine is to treat the *Toxoplasma gondii* parasite by inhibition of dihydrofolate reductase, a key biochemical pathway for the parasite.

### *1.  API Supplier Approval in the United States*

25.  Pharmaceutical companies source API either by manufacturing it themselves, or by purchasing API from a third party. API manufacturing must conform to FDA standards, known as current Good Manufacturing Practices (hereafter, "cGMPs"), which set minimum standards for the methods, facilities, and controls used in manufacturing, processing, and packing of a drug product. [*See, e.g.*, "Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients - Guidance for Industry," *United States Food and Drug Administration*, September 2016].

26.  Upon compliance with cGMP standards for a given API manufacturing process, an API manufacturer may submit a Drug Master File (hereafter, "DMF") with the FDA. Generic manufacturers can then reference these DMFs to support applications for FDA drug approval.

27.  It is not necessary, however, for a generic manufacturer to use an API supplier with a DMF. Instead of referencing a DMF, generic manufacturers can also include the details and

technical information that would typically be found in a DMF in their ANDA filing. [*See* Expert Report of Sheldon T. Bradshaw, June 4, 2021, p. 3].

### 2.  *API Supply Agreements and Related Business Practices*

28.  Pharmaceutical companies sourcing APIs from external API manufacturers are exposed to risks that may include quality lapses and supply disruptions. Therefore, U.S. pharmaceutical manufacturers have increasingly required API suppliers to sign agreements and have leveraged various contract mechanisms to mitigate these risks.

29.  However, there is no one-size-fits all approach to API supply agreement. While some pharmaceutical companies do not enter into formal API supply agreements, other companies may choose to enter into several different types of agreements with an API supplier, such as quality agreements, supply agreements, and master services agreements. [*See, e.g.*, Deposition of Manish Shah, December 17, 2020 (hereafter, "Shah Deposition"), p. 219; Deposition of Nilesh Patel, December 8, 2020 (hereafter, "Patel Deposition"), p. 92].

30.  While there may be structural characteristics to API supply agreements that share certain basic commonalities, the terms and conditions included in API supply agreements are unique to each agreement. These agreements result from negotiations reflecting the specific circumstances of a given opportunity and the parties' needs and wants at the time.

### *Overview of Daraprim (Pyrimethamine) Development and Distribution*

### 1.  *Brand Daraprim and History of Ownership Prior to Vyera*

31.  Daraprim is the branded version of pyrimethamine, which is used to treat toxoplasmosis, a parasitic infection. Following FDA approval in 1953, GlaxoSmithKline plc (hereafter, "GSK") and its predecessor entities owned the worldwide rights to Daraprim until 2010. [Expert Report of Edward V. Conroy, April 12, 2021 (hereafter, "Conroy Report"), ¶ 39; Expert Report of James Bruno, April 12, 2021 (hereafter, "Bruno Report"), ¶ 21; Defendants' Exhibit ("DX") 347].

32.  In October 2010, GSK sold the rights to market and distribute Daraprim in the U.S. and Canada to CorePharma LLC (hereafter, "CorePharma"). [Conroy Report, ¶ 40; DX 347].

CorePharma then transferred the product to its affiliate, Amedra Pharmaceuticals LLC (hereafter, "Amedra"), in late 2012. [DX 347].

33. In 2014, Amedra developed a plan to begin selling Daraprim through a specialty pharmacy distribution system. [DX 347]. Amedra held meetings with industry experts and concluded that "Daraprim would initially benefit from an exclusive specialty model." [DX 347].

34. Amedra entered into contracts with two distributors in 2015: Walgreens Specialty Pharmacy (hereafter, "Walgreens") and Integrated Commercialization Solutions (hereafter, "ICS"). [DX 349 (Walgreen Specialty Pharmacy Provider Distribution Agreement, February 23, 2015); DX 348 (ICS Distribution Services Agreement, March 2, 2015); DX 418].

35. Under the terms of the specialty distribution services agreement between Walgreens and Amedra, Walgreens had the exclusive right to distribute Daraprim to patients (*i.e.*, persons being treated with the product), and was the only authorized specialty pharmacy. [DX 349 (Walgreen Specialty Pharmacy Provider Distribution Agreement, February 23, 2015)].

36. Under the terms of the specialty distribution services agreement between ICS and Amedra, ICS had the exclusive right to distribute Daraprim to a defined set of "Customer(s)" that included "(i) governmental customers, including hospitals and other sites eligible for the Department of Veterans Affairs ('VA') and Department of Defense ('DoD') Federal Supply Schedule program ('FSS') pricing, (ii) customers eligible for 340B pricing under the Public Health Service Section 340B Drug Pricing Program ('PHS'), and (iii) other customers approved by Manufacturer." [DX 348 (ICS Distribution Services Agreement, March 2, 2015)]. ICS was to certify that all Daraprim being sold was for customers' "own use." [DX 348 (ICS Distribution Services Agreement, March 2, 2015)]. The agreement defined "Own Use" as "for the exclusive use of those defined as Customers herein and not for resale or distribution to persons or entities not defined as Customers herein." [DX 348 (ICS Distribution Services Agreement, March 2, 2015)].

37. In March 2015, Impax Laboratories, Inc. (hereafter, "Impax") acquired the rights to Daraprim as part of Impax's acquisition of Amedra's parent company, Tower Holdings, Inc. [*See* DX 418]. Impax completed Amedra's plan to distribute Daraprim through a specialty distribution system. [DX 418; DX 353].

### 2. *Vyera's Activities Following Acquisition of U.S. Rights to Daraprim*

38. On August 10, 2015, Vyera (known at the time as Turing) announced that it had acquired the rights to market and distribute Daraprim in the U.S. from Impax. On August 11, 2015, Vyera increased the list price of Daraprim from approximately $17.50 per tablet to $750 per tablet.

### a. *Specialty Distribution*

39. As part of the acquisition, Vyera inherited the specialty distribution agreements with Walgreens and ICS. Once Vyera inherited the Daraprim distribution system from Impax, the company *expanded* the number of distributors and specialty pharmacies for Daraprim beyond ICS and Walgreens. Vyera uses a third-party logistics provider (3PL) to receive Daraprim from its contract manufacturer, and contracts with four distributors and two specialty pharmacies. Since acquiring Daraprim, Vyera has used a few different 3PLs, initially using BioRidge, switching to Smith Medical Partners, and ultimately using ICS after AmerisourceBergen merged Smith Medical Partners with ICS. [Governments' Exhibit ("GX") 1452; GX1449; GX1448; GX5009]. ICS provides warehousing and distribution services to Vycra's four distributors.

40. Vyera established contractual agreements with all four of these distributors, ASD Healthcare, BioRidge Pharma LLC, Cardinal Specialty, and Optime Care Inc. [GX1045; GX1033; GX1031; GX1448; GX1034]. Like Amedra's original agreements with Walgreens and ICS, these agreements require each distributor to sell Daraprim to only certain types of purchasers and, in some instances, limit the quantity of Daraprim that any one approved purchaser can obtain. [GX1164; GX1544; GX1541; GX1036; GX1165].

41. Vyera also sells Daraprim directly to patients through its contracts with two specialty pharmacies. Vyera inherited its relationship with Walgreens from the contract established by Amedra in 2015. [GX1042 (Walgreens Specialty agreement with Amedra, February 23, 2015)]. In February 2019, Vyera expanded its contractual relationship with Optime, adding in specialty pharmacy services. [GX1048 (Specialty Pharmacy Services between Vyera and Optime, February 27, 2019)].

9

### b. API Supply Agreements

42. Upon acquiring Daraprim in August 2015, Vyera obtained a stock of pyrimethamine API that was in the possession of Impax's contract manufacturing organization. [GX5001].

43. In early 2016, Vyera identified Fukuzyu, a Japanese API supplier, as a potential supplier for pyrimethamine API. Fukuzyu was the supplier of pyrimethamine API for the previous owners of Daraprim, including GSK. [*See* DX 445].  On January 25, 2017, Fukuzyu signed an agreement to sell pyrimethamine API exclusively to Vyera for human use in the United States. [DX 513].

44. On December 27, 2017, Vyera signed an exclusive contract with RL Fine, an Indian API supplier. [GX1108]. I understand that Vyera executives describe this agreement as a backup supply contract. [*See, e.g.*, GX3216]. The agreement established Vyera as RL Fine's exclusive pyrimethamine API distributor worldwide and RL Fine agreed to supply pyrimethamine API to Vyera. [GX1108].

### 3. Generic Daraprim

45. The FDA has approved three ANDAs for generic Daraprim.  The FDA approved Cerovene's generic version of Daraprim on February 28, 2020 and Cerovene launched its generic on March 20, 2020.  On July 27, 2021, Fera received FDA approval for its generic version of Daraprim.  On August 13, 2021, Teva received FDA approval for its generic version of Daraprim.

46. On March 11, 2020, before the launch of Cerovene's generic, Phoenixus's subsidiary Oakrum Pharma LLC launched an authorized generic.

47. I understand that one other generic manufacturer, Inva-Tech, submitted an ANDA to the FDA. [GX3168]. One additional generic manufacturer, Mylan, considered developing a generic version of Daraprim beginning in 2015. [GX3111]. I understand that Mylan identified this project as a "Low ROI" project and recommended abandoning it in 2017, and later recommended to "Kill" the project in 2018. [Deposition of Michael Hatch, January 14, 2021 (hereafter, "Hatch Deposition"), p. 60; DX 106; DX 108; DX 472; DX 473; DX 112].

## Assessment of Vyera's Distribution System and Practices

48.  In what follows, I consider the evidence relating to Mr. Conroy's assessment of Vyera's distribution system and practices. I explain how Mr. Conroy's assessment is flawed and appears to be based on historical practice that does not consider the current structure and evolving trends in the industry.

### Vyera's Use of a Specialty Distribution System Was Consistent with Industry Practice

49.  The notion of using a specialty distribution system for a high-priced product such as Daraprim is not uncommon in the pharmaceutical industry. Daraprim's target population generally takes multiple therapies with complex dosing regimens, and as Amedra and Impax recognized when placing Daraprim into specialty distribution, the support of a limited distribution system and specialty pharmacies would offer several benefits to toxoplasmosis patients.

#### 1.  Specialty Distribution Systems Are Widely Used by Pharmaceutical Companies

50.  Specialty distribution systems are widely used by pharmaceutical companies and are increasingly common.  As of 2019, 83% of manufacturers were reported to have at least one drug in specialty distribution.

#### 2.  Vyera Inherited a Specialty Distribution System

51.  Vyera did not originate the idea of using a specialty distribution system for Daraprim. Rather, Vyera inherited the specialty distribution system from the previous owners of the product, Amedra and Impax.

52.  Once Vyera inherited the Daraprim distribution system from Impax, the company *expanded* the number of distributors and specialty pharmacies. [GX1045 (ASD Agreement); GX1448 (BioRidge Agreement); GX1045 (Cardinal Agreement); GX1034 (Optime Agreement)].

53.  These actions of increasing the number of distributors and specialty pharmacies would have generally allowed for greater access to Daraprim, contrary to Mr. Conroy's claim that all of Vyera's actions made it harder to obtain Daraprim. [Conroy Report, ¶ 19]. At his deposition,

11

Mr. Conroy acknowledged that Vyera added distributors to make it easier for customers to buy the product. [Deposition of Edward V. Conroy, July 14, 2021 (hereafter, "Conroy Deposition"), pp. 178-179].

3.   *Vyera Had Compelling Reasons to Distribute Daraprim Through a Specialty Distribution System*

54.   Vyera and preceding rights holders to Daraprim identified compelling reasons to market Daraprim through specialty distribution. These reasons include, but are not limited to, the cost of the product, the small patient population, and the difficulties associated with ensuring patient compliance.

55.   Daraprim's small patient population, which consists largely of HIV patients, is susceptible to compliance issues and Vyera identified this as one of the most important reasons to continue marketing Daraprim through a specialty distribution system. [*See* GX0108].

56.   Vyera identified specialty distribution as a way to help patients with their insurance claims submissions, appealing denials, and assuring coverage for the treatment. [*See* GX0108]. With the increased price of Daraprim, Vyera recognized the value that specialty pharmacies' services would provide with respect to assisting patients with insurance coverage issues.

57.   Vyera further identified inventory management as an added benefit of the specialty distribution system, which would give Vyera the opportunity to better manage financial risks associated with chargebacks. [*See* GX0108].

4.   *Pharmaceutical Companies Commonly Monitor Customer Accounts and Use Class of Trade Restrictions for Drugs in Specialty Distribution*

58.   It is not uncommon for manufacturers to place limits on the types of customers to which its distributors may sell their products. For example, BioRidge estimates that "maybe half [of its specialty contracts] list the customers they want us to sell to." [Deposition of Robert Anderson, February 24, 2021, p. 26]. A witness for Cardinal Health testified that class of trade restrictions "are very common in specialty distribution contracts" and that "over 90 percent" of the specialty drugs that she was involved with are subject to contractual restrictions regarding distribution. [Deposition of Courtney Johnson, February 3, 2021

(hereafter, "Johnson Deposition"), pp. 51, 135-136]. Mr. Valiveti, an owner of a drug procurement company, Reliant Specialty, testified that there was an "endless list" of companies that have their own class of trade restrictions. [Deposition of Satya Valiveti, December 1, 2020 (hereafter, "Valiveti Deposition"), p. 290].

> 5.   *Mr. Conroy's Assessment of Vyera's Distribution System and Practices Is Flawed and Incorrect*

59.   It is incorrect for Mr. Conroy to conclude that Vyera's use of a specialty distribution system was intended to impede generic competition based solely on his opinion that "some" aspects of the specialty distribution system are not standard or are inconsistent with "industry norms." There is no universally agreed upon set of industry norms. Mr. Conroy's conclusions as to Vyera's distribution system are flawed for the following reasons.

60.   First, Mr. Conroy fails to consider the rapidly evolving methods of distribution for specialty drugs. Indeed, Daraprim has the characteristics of a specialty drug and was treated as such by Amedra and Impax prior to Vyera's acquisition of the product.

61.   Second, Mr. Conroy admits that high cost is a legitimate reason for specialty distribution. [Conroy Report, ¶¶ 27-28]. While Mr. Conroy points out that high-cost drugs do not *need* to be sold through specialty pharmacies, it is still the case that high-cost drugs can and do benefit from being sold through these more limited distribution channels.

62.   Third, in reaching his conclusion that Vyera's distribution practices were based on a desire to prevent generic competitors from obtaining Daraprim for their ANDAs, Mr. Conroy claims that the "standard in the pharmaceutical industry is to increase sales volume." [Conroy Report, ¶ 19]. This is an oversimplification and is incorrect. The goal is to sell the volume that is most profitable while effectively meeting the needs of patients and other stakeholders.

63.   Consistent with this goal, Amedra conducted analyses evaluating potential net revenues to be earned through the specialty distribution model versus the retail pharmacy distribution model. [DX 347]. The results of the company's analysis showed that over the 2015 to 2017 time period, Amedra expected to earn *greater* net revenues each year through the specialty

distribution model, even though the specialty model was expected to have *lower* total unit sales each year. [DX 347].

64.  Fourth, Mr. Conroy states that Vyera's monitoring of sales by distributors and specialty pharmacies "does not appear to be explained by any legitimate business concern." [Conroy Report, ¶ 66]. However, Mr. Conroy agrees that "it is not unusual for manufacturers to monitor sales." [Conroy Report, ¶ 65]. In fact, Mr. Conroy cites his own experience with "small companies where we carefully monitored product to make sure we had sufficient quantities on hand and to detect declining sales because of cash flow and budgetary needs." [Conroy Report, ¶ 65].

65.  Finally, Mr. Conroy suggests that Vyera's periodic removal of certain previously approved customer accounts is indicative of anticompetitive intent. [Conroy Report ¶ 77]. To the contrary, Vyera's practices are not uncommon. Mr. Conroy would seemingly agree that removing previously approved customer accounts could be done for business reasons such as reducing costs associated with managing old, non-productive accounts. [Conroy Report, ¶ 76]. These actions are consistent with manufacturers looking to distribute their products in a highly controlled environment to protect product integrity (i.e., to prevent misuse and reduce inappropriate utilization).

66.

67.





72.

73.

74.











v. ███████████████████████████████████

92.    ████████████████████████████████████████████████
       ████████████████████████████████████████████████
       ████████████████████████████████████████████████
       ████████████████████████████████████████████████
       ██████████████████████████████

***Agreements Limiting Distributor Data Sharing Did Not Prevent Manufacturers from
Estimating the Size of the Market Opportunity***

93.  Mr. Conroy's opinion that the main reason for Vyera's data agreements was to "conceal the
     market size from the competitors" and thus to reduce generic manufacturers' incentives to
     enter is severely flawed. [Conroy Report, ¶ 84]. Moreover, at his deposition, Mr. Conroy
     acknowledged that he is not offering any opinion on whether Vyera's data agreements caused
     a delay in entry for any specific manufacturer. [Conroy Deposition, pp. 94-95].

94.  First, the value of IQVIA data in measuring low volume specialty drugs like Daraprim is
     diminished, as data aggregators are less able to accurately survey specialty distributors and
     make market-wide projections. Mr. Conroy would seemingly agree that the IQVIA data for
     Daraprim was less accurate even prior to Vyera's contracts with ASD and Cardinal because
     BioRidge and Walgreens did not report sales data. [Reply Expert Report of Edward V.
     Conroy, June 29, 2021, ¶ 39; Conroy Deposition, pp. 262-263].

95.  Second, the amendments to the ASD and Cardinal contracts did not occur until September
     2017, approximately two years after Vyera acquired Daraprim. [Conroy Report, ¶¶ 81-82;
     DX 424; DX 441]. During this two-year period, it is not evident that Vyera took any actions
     to limit the distributors from reporting sales data to the third-party data aggregators and
     neither BioRidge nor Walgreens were reporting sales data despite not being subject to any
     contractual restrictions on their ability to do so. Of the four generic manufacturers submitting
     ANDAs, three of them (Cerovene/Dr. Reddy's, Inva-Tech, and Fera) had all started their
     generic development projects before the data reporting amendments were even put in place.
     Further, Mylan had already recommended abandoning its pyrimethamine project in August

22

2017, *before* Vyera's amendments to the ASD and Cardinal contracts took effect in September 2017. [DX 106].

96. Third, the data reporting agreements between Vyera and two of its distributors did not have implications for Daraprim sales data historically. These data could easily have been used by manufacturers to make estimates of the market opportunity for Daraprim.

97. Fourth, data from third party aggregators are not the only source of information that generic manufacturers can rely upon to estimate the size of a market opportunity. Other information, including academic publications, industry research reports, or even actual usage data is publicly available.

98. In sum, generic manufacturers would have been able to estimate the potential market size for generic pyrimethamine, even if the distributors were not reporting data to IQVIA and other data aggregators. In fact, evidence in this matter demonstrates that the generic manufacturers did not have issues creating estimates of the market opportunity:

- **Mylan**: Mylan was able to utilize data from prior years, starting in 2012, to develop an estimate of the sales potential in 2015. [DX 094].

- **Teva**: In an email exchange with the FTC from October 2019, Teva described how one of the reasons it had decided to pursue a generic Daraprim product was because Teva had a "sophisticated market research team" that was able to discern information about the size of the market and pricing data, despite that information not being available through public disclosures or IQVIA. [DX 482].

- **Fera**: Testimony from Frank DellaFera indicated that based off of IQVIA data from 2014 on tablet sales and publicly available information about the pricing of the product, "it doesn't take a rocket scientist to figure out that if you take a product with that kind of price increase, this product, probably sales will be well beyond 500 million dollars." [DellaFera Deposition, p. 34]. In fact, the company was able to develop estimates for sales and potential profits for a generic Daraprim product for the period 2019 to 2021. [DX 280].

- **Inva-Tech**: Nilesh Patel, a co-founder of the company, testified that he was able to assess the market size of Daraprim as being roughly one million tablets per year in the U.S. based off of 2014 IMS data. [Patel Deposition, pp. 122-123].

- **Cerovene**: Manish Shah, co-founder and president of the company, described how in 2013 he was able to assess the size of the market and make a decision to pursue a generic product based off of data available at that time. [Shah Deposition, pp. 202-204].

23

<u>**Assessment of Vyera's Agreements with API Suppliers**</u>

99.   In what follows, I consider the evidence relating to Mr. Bruno's assessment of Vyera's agreements with API suppliers. I find that there are legitimate reasons to seek exclusivity provisions that are not related to competition, and that Mr. Bruno's assessment of Vyera's agreements with API suppliers is flawed.

*Vyera's Supply Agreement with Fukuzyu Was Consistent with Industry Practice*

*1.   Vyera Had Legitimate Business Reasons for Seeking Exclusivity with Fukuzyu*

100.   Upon acquiring Daraprim in August 2015, Vyera obtained a stock of pyrimethamine API that was stored at the drug product manufacturing site. [GX5001]. Given that this initial supply was limited, deposition testimony suggests Vyera employees were concerned that the company was going to run out of API to manufacture Daraprim. [Deposition of Eliseo Oreste Salinas, January 29, 2021 (hereafter, "Salinas Deposition"), pp. 95-97].

101.   These risks were accentuated in this case, particularly for Vyera as the API purchaser as it was a firm with only one major product, [Conroy Report, ¶ 88], and because of Fukuzyu's initial unwillingness to provide API directly to Vyera, exclusively or otherwise. [GX1324]. The subsequent risk stemming from this could lead to drug shortages, lost revenue, and existential risk for Vyera.

102.   Vyera identified Fukuzyu as a potential supplier for pyrimethamine API. [Salinas Deposition, pp. 95-97]. Fukuzyu was a large, dependable supplier. [Bruno Report, ¶¶ 90-91]. Fukuzyu has 55 years of experience manufacturing pyrimethamine API for firms including Impax and GSK. [Bruno Report, ¶ 87]. Fukuzyu's minimum manufacturing lot size was 250 kg of pyrimethamine, which was greater than Vyera's requirement of 55 kg. [GX1324]. An exclusive contract with a large, dependable supplier would have reduced Vyera's API-related risks.

103.   Firms may also choose to enter exclusivity agreements for other reasons, such as investing in a relationship with a manufacturer for purposes of future product development. Deposition testimony suggests Vyera was interested in developing a long-term partnership for future

toxoplasmosis products. [Salinas Deposition, pp. 107-115]. The company was contemplating additional ways it could develop improved versions of the product, including once-a-day pills, combination pills, and next generation analogue therapies with lower side-effect profiles. [DX 439]. Absent an adequate API supply, these research initiatives would be at risk.

2.  *Exclusivity Agreements Are Common in the Pharmaceutical Industry*

104. Specific to API supply, exclusive agreements are common in the pharmaceutical industry and are used to maintain high quality, avoid drug shortages, and protect revenues.

105. In fact, other generic manufacturers in this matter recognized the value of securing exclusive API supply agreements for pyrimethamine, despite these companies not investing in the API supplier's development process. For example, Mr. Mukhopadhyay, a member of Dr. Reddy's Business Development for North America Generics team, testified that a manufacturer filing an ANDA would be interested in obtaining exclusivity from its API supplier to ensure consistent supply and to ensure that the API source is not diverted to another competitor. [Mukhopadhyay Deposition, pp. 245-246]. In fact, after Ipca's import ban, Cerovene entered into a three-year exclusive pyrimethamine API supply arrangement with RL Fine, despite not investing in its API manufacturing process. [GX3265 (Supply Agreement between RL Fine and Cerovene, dated November 16, 2016)]. Mr. Shah, Cerovene's co-founder and President, testified as to how the company negotiated exclusivity specifically with RL Fine, and how there are other scenarios where Cerovene has asked API suppliers for exclusivity terms because "in an ideal world, if I am going to spend time, money, and take that whole information into my ANDA, I want to make sure we get the preferential treatment." [Shah Deposition, pp. 237-238]. Similarly, Fera entered into a ten-year exclusive pyrimethamine API supply agreement with [API-1] in April 2018. [DellaFera Deposition, pp. 200-202; DX 115; DX 113].

3.  *Mr. Bruno's Assessment of Vyera's Agreement with Fukuzyu Is Flawed*

106. It is incorrect for Mr. Bruno to conclude that Vyera's API supply agreements with Fukuzyu and RL Fine impaired generic competition based solely on the opinion that certain aspects of the agreements are not "typical," "standard," or aligned with "industry norms." [*See, e.g.*,

25

Bruno Report, ¶¶ 24, 32, 83, 96, 143]. In fact, Mr. Bruno testified at his deposition that he is not giving an opinion on whether there was any delay attributable to Vyera's agreements with Fukuzyu and RL Fine. [Deposition of James R. Bruno, July 29, 2021 (hereafter "Bruno Deposition"), pp. 115-116].

107. While there may be structural characteristics to API supply agreements that have some basic commonalities, the ultimate terms and conditions included in API supply agreements are unique to each agreement. These agreements result from negotiations reflecting the specific circumstances of a given opportunity and the parties' needs and wants at the time.

108. Further, Mr. Bruno fails to establish that his experience is an appropriate benchmark to assess whether the provisions in Vyera's supply agreements were "typical" or "standard." Even if there was one universally agreed upon set of industry norms, which there is not, it is still not evident that applying these norms would make sense in every instance, or in particular for Vyera or any of its agreement partners given their circumstances.

109. Mr. Bruno states that he does "not recommend using an exclusivity provision to mitigate supply risk." [Bruno Report, ¶ 82]. However, perceptions and preferences held by industry participants suggest that exclusive contracts can be used to mitigate supply risk.

110. Mr. Bruno also argues that exclusivity terms are uncommon if the drug company does not invest in the API supplier's development process. [Bruno Report, ¶ 24]. However, this is not a requirement for exclusivity agreements, and as discussed above, other generic manufacturers in this matter recognized the value of securing exclusive API supply agreements for pyrimethamine despite these companies not investing in the API supplier's development process.

111. Mr. Bruno's argument that Vyera's supply contract with Fukuzyu does not mitigate supply risk because it does not specify quantities or reserves is also inconsistent with his admission that Fukuzyu was a large, dependable supplier. [Bruno Report, ¶¶ 90-91].

112. Mr. Bruno further asserts that Vyera's exclusivity provision with Fukuzyu is unusual because neither Impax nor GSK had an exclusive supply relationship with Fukuzyu. [Bruno Report, ¶ 93]. But the fact that neither GSK nor Impax had exclusivity with Fukuzyu is also

26

unsurprising given that both firms have multiple product offerings. Indeed, Impax did not consider Daraprim to be a "core asset" for the company. [DX 418]. The importance of Daraprim to Vyera and the consequences of being unable to secure pyrimethamine API needed to produce it were markedly greater.

***Vyera's API Supply Agreement with RL Fine Was Consistent with Industry Practice***

> *1. RL Fine Was Valuable to Vyera as a Secondary Supplier*

113. Seeking exclusivity from RL Fine as a backup supplier is unsurprising given Vyera's position as a firm with few products and whose revenues depend on access to pyrimethamine API. In the event that Fukuzyu was unable to supply pyrimethamine, Vyera would need a reliable backup supplier after their existing inventory of pyrimethamine API was used.

114. Furthermore, it is not uncommon to seek backup suppliers in the industry. A 2017 Pew/ISPE (International Society for Pharmaceutical Engineering) report noted that drug quality issues were common drivers of supply shortages, with many companies enlisting backup or second-source manufacturers to limit their exposure to quality or compliance risk. ["Drug Shortages," *The Pew Charitable Trusts and the International Society for Pharmaceutical Engineering*, January 2017, pp. 8, 14].

115. This is consistent with deposition testimony from Vyera employees in this matter. One employee described the importance for drug manufacturers to have backup suppliers to avoid potential drug shortages, and noted that it had been an issue for Vyera's other commercial product, Vecamyl. [Deposition of Dr. Nicholas Pelliccione, December 10, 2020, pp. 212, 219-220]. Another Vyera employee testified that Vyera's decision to utilize RL Fine as a backup supplier was a business decision that was discussed in case Fukuzyu was hit by a catastrophe, such as a tsunami in Japan. [Salinas Deposition, pp. 145-147; 158-160]. By entering into a backup agreement with RL Fine, Vyera reduced its risk.

> *2. Compensating RL Fine for Exclusivity is Reasonable and In Line with Industry Practice*

116. Compensating RL Fine for exclusivity is to be expected. In agreeing to act as Vyera's exclusive backup supplier for pyrimethamine API, RL Fine would not have been able to sell

27

pyrimethamine to other API buyers. It is reasonable to expect that RL Fine would seek compensation in exchange for forgoing sales. In fact, Mr. Bruno himself admits that "it is unusual for an API supplier to agree to restrict its customer base without any compensation for lost sales." [Bruno Report, ¶ 95].

117. Additionally, the fact that Vyera's contract with RL Fine tied royalty payments to generic entry is, again, to be expected. [Bruno Report, ¶ 109]. If generic entry were to occur, the substantial resulting loss of branded Daraprim sales volume could effectively remove the need to have a backup supplier for pyrimethamine API; Vyera would no longer require the same quantities of pyrimethamine.

118. Compensating a party in exchange for a reduction of risk is, in its essence, an insurance policy. Through the mitigation of risk in exchange for a premium, insurance provides value to firms or individuals regardless of whether or not the policy ever pays out. This is analogous to the value that Vyera gained from a supply agreement with RL Fine, regardless of whether or not Vyera actually called on RL Fine to produce API.

### 3.  *Mr. Bruno's Assessment of Vyera's Agreement with RL Fine Is Flawed*

119. Mr. Bruno claims that secondary suppliers "must be ready to scale up production quickly" in order to be considered viable secondary suppliers. [Bruno Report, ¶ 78]. This is incorrect. Vyera maintained a substantial amount of pyrimethamine API on hand, precluding the need to have RL Fine in a "ready to produce" state at all times as a backup manufacturer. In January 2016, Vyera had 75 kg of pyrimethamine API on hand, which was enough to produce approximately 2.6 million tablets of Daraprim. [*See* DX 511]. Therefore, RL Fine still provided value as a backup supplier even it wasn't prepared to manufacture API at scale immediately.

120. Mr. Bruno claims that RL Fine was unsuitable as a backup supplier because they did not have a U.S. DMF. This claim is inconsistent with Mr. Bruno's commentary that RL Fine was one of only two manufacturers with a process ready. [*See* Bruno Report, ¶¶ 26, 116]. Further, RL Fine had a manufacturing process for pyrimethamine and a European DMF, was already exporting large volumes of pyrimethamine powder to the U.S. for compounding, and

ultimately served as Cerovene's primary pyrimethamine supplier for its ANDA and launch, and as Inva-Tech's primary pyrimethamine supplier for its ANDA. [Salinas Deposition, p. 151; DX 270; DX 346; Shah Deposition, pp. 107; Patel Deposition, pp. 40-41]. RL Fine also supplied Mylan with samples of pyrimethamine API. [Deposition of Paula Raese, January 22, 2021 (hereafter, "Raese Deposition"), p. 59].

121. Mr. Bruno also claims that the fact that Vyera did not perform due diligence on RL Fine's manufacturing process is evidence that Vyera never intended to use RL Fine as a backup supplier. [Bruno Report, ¶¶ 98-101]. There are several reasons that this claim is flawed.

122. First, due diligence is similar to pharmaceutical alliances in that it is not one-size-fits-all. The activities conducted and the amount of due diligence vary from agreement to agreement, and are largely dependent on the circumstances of the opportunity and the needs of the parties.

123. Second, by Mr. Bruno's account, "Fukuzyu and RL Fine were the only two viable pyrimethamine API suppliers for generic manufacturers" from 2015 to 2019. [Bruno Report, ¶ 126]. If that were true, it is not evident that Vyera needed to conduct any additional due diligence.

124. Third, other pharmaceutical companies interested in manufacturing a generic version of Daraprim varied in their due diligence practices, and sometimes conducted little to no due diligence on their API suppliers. Manish Shah, Founder, President, and Director of Cerovene, testified that they only performed a "document-based audit" of Ipca and did not conduct an on-site visit or inspection before sourcing pyrimethamine from Ipca. [Shah Deposition, pp. 218-219]. Nilesh Patel, Co-Founder of Inva-Tech, testified that he visited RL Fine before selecting them as their pyrimethamine API supplier in 2015, but that he did not conduct any additional due diligence on [API-2] in 2017, other than what he knew from acting as a U.S. agent for [API-2] [Patel Deposition, pp. 87, 187-188, 222]. Frank DellaFera, Co-Founder of Fera, testified that Fera did not conduct any due diligence on [API-1] before their June 2016 agreement to have [API-1] develop pyrimethamine API for Fera. [DellaFera Deposition, pp. 185-188]. Mr. Bruno states that Vyera's approach to due diligence "differs from industry practice," yet it is not clear what his definition of "industry practice" would be

29

given Cerovene, Inva-Tech, and Fera's varying approaches to due diligence. [Bruno Report, ¶ 98].



125.

126.

127.

128.

129.







139.

140.

141.

142.

143.



144.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 20, 2021                    _/s/ John S. Russell_____

*Federal Trade Commission et al.*

v.

*Vyera Pharmaceuticals, LLC et al.*

———————

Case No. 20-cv-00706 (DLC)

———————

**Trial Testimony of John S. Russell**
**Federal Rule of Evidence 703 Appendix of Materials**

| Document | Tab |
|---|---|
| "Drug Shortages," *The Pew Charitable Trusts and the International Society for Pharmaceutical Engineering*, January 2017 (excerpted) | 1 |
| "Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients - Guidance for Industry," *United States Food and Drug Administration*, September 2016 (excerpted) | 2 |

**Tab 1**

"Drug Shortages," *The Pew Charitable Trusts and the International Society for Pharmaceutical Engineering*, January 2017

A report from The Pew Charitable Trusts and the International Society for Pharmaceutical Engineering   |   Jan 2017



 

# Drug Shortages

An exploration of the relationship between U.S. market forces and sterile injectable pharmaceutical products: Interviews with 10 pharmaceutical companies

## 2. Quality issues continue to be a driving force behind shortages

For the purposes of this report, "quality issues" are a combination of cGMP compliance violations and matters related to product development or manufacturing that led to lower-than-expected product yields. These issues remained a primary contributor to shortages; of the 29 reference products reviewed for this report, 13 (45 percent) experienced shortages due to quality issues.

Examples of quality issues that contributed to shortages include:

- A company experienced delays in getting regulatory approvals for a drug because of quality issues identified during an FDA inspection of the manufacturing site.

- A product's active pharmaceutical ingredient (API) manufacturing site was subject to quality gaps that caused a delay in production.

- There were FDA violations as a result of the company's final product contract manufacturing site not following certain cGMP regulations.

- Issues arose in the transfer of the product from development to commercial manufacturing, reducing the product yields.

- Delays occurred in developing and transferring the analytical methods needed to support the transfer of a legacy product (a drug typically developed 10 to 20 years ago) to a new manufacturing site.

Participating companies said these quality issues created vulnerabilities across a product's supply chains, from manufacturers of active pharmaceutical ingredients, components, and final products. This included both internal and contracted manufacturing units. All the companies said they had curtailed the manufacturing of a product at some point in order to address a quality issue, resulting in a shortage.

In addition, participating companies said they had withdrawn a product from the market at some point in order to deal with a quality issue.

Seven of the 10 companies said they were discouraged from upgrading the facilities and equipment needed to meet cGMP requirements by the high costs of doing so—which, in turn, led to quality problems. This was especially true, they said, for low-margin, low-volume products and legacy products developed 10 to 20 years ago.

When asked to comment on opportunities to reduce quality issues, nine companies said they had systems in place to communicate risks to quality across the manufacturing facilities. However, these systems were reactive in nature, reporting only issues that had already occurred. They proposed improving systems to proactively identify issues before they lead to shortages, and offered the following examples of such proactive systems or processes:

- **Periodic risk assessment reviews.** Reports that identify the potential compliance risks across a company's manufacturing supply chain.

- **Trending reports.** Studies that review past supply chain data trends to forecast potential issues and trigger additional risk assessments.

- **Issue management communication system.** A method that communicates the potential compliance risks across an organization's functional groups and external partners.



Companies also commented on the need to improve their process and analytical methods development programs in order to ensure more robust technology transfers to commercial facilities, which improves the opportunity to consistently demonstrate conformance to the established product specifications.