## 3. Multiple factors outside of quality contributed to drug shortages

The interviews indicated that no single predictor identified whether a product was at risk of a shortage. Companies identified a set of issues outside of quality that contributed to drug shortages, including the inability to ramp up production when a competitor leaves the market. Other factors cited were lack of purchaser-manufacturer incentives that would benefit manufacturers when they could produce the product needed to meet demand and prevent a shortage.

Finally, companies also cited operational-related elements such as their ability to design predictable, flexible, and redundant supply chains that react quickly to changing demands and/or problems with specific manufacturing sites; predict future demands by improving market insights; and navigate regulatory expectations.

Companies' responses are summarized in Figure 1 and further discussed in sections 3.1 to 3.5.

Figure 1

### Factors Cited by Companies That Contributed to Drug Shortages, Other Than Quality



Additional factors outside of quality that companies identified as contributing to drug shortages

Note: Results derived from responses by 10 companies that participated in the survey. Companies answered the question, "What were other factors, besides quality, that led to drug shortages?" The respondents identified multiple elements; therefore, there are more than 10 responses.

© 2017 The Pew Charitable Trusts

## 3.1 Market withdrawals

Companies were asked for factors that could lead to a reduction in production or withdrawal from the market. The reasons identified, other than quality, are illustrated in Figure 2.

Figure 2

## Factors Other Than Quality That Companies Said Contributed to Whether a Product Would Be Withdrawn From the Market



Reasons for reducing production or market withdrawal

Note: Results derived from responses by 10 companies that participated in the survey. Companies answered the question, "What factors contributed to a manufacturer's decision to reduce production or withdraw a product from the market?" Respondents identified multiple elements; therefore, there are more than 10 responses.

© 2017 The Pew Charitable Trusts

Nine companies said patient impact (influenced by the number of replacements on the market) was a major factor they considered before exiting a market or deciding not to invest in additional facilities and/or equipment. The companies said that investments made to prevent drug shortages were not exclusive to high-margin products and that they would evaluate investments to help protect low-margin products from shortages, especially for drugs that had only limited replacements on the market. But they said that if a product had multiple replacements, meaning that patients' needs could be met by other manufacturers, they would limit investments and potentially withdraw a product from the market. All the companies noted that they prioritize the production of legacy products that have no replacements on the market, even when products had low margins and low sales volumes, since continuing to produce the legacy product would limit the potential impact on patients and also protect the company's brand.

The companies noted, however, that even the existence of multiple suppliers does not negate the potential of a shortage, since each manufacturer could experience difficulties in ramping up operations when a competitor withdrew from the market.

Four of the companies indicated that their emphasis had shifted from dual sourcing and backup manufacturing options for products to a network with limited sourcing and fewer manufacturing options when products went off patent.

And four of the companies said that they adjusted their portfolios by looking for higher-margin options should the market differentiation and associated margins for their products be reduced. This finding is consistent with the July 2016 GAO report finding that prices and profit margins declined for generic drugs as the number of suppliers increased, leading suppliers to exit the market.[10]

### 3.1.1 Reference product examples of drug shortages of sterile injectable products: Influence of replacement products

During the interviews, companies said they were less likely to invest in a backup manufacturing facility and/or a dual-source supplier when replacement products were available (Figure 3).

Figure 3

## Comparison of Whether Reference Products Had Dual Sourcing and/or Backup Manufacturing Based on the Availability of Replacements



Note: Results derived from 29 reference products for which shortages occurred. Figure 3 may suggest the effect of the availability of replacements in the market on manufacturers' decisions to invest in redundant systems (dual sourcing and/or backup manufacturing) for their products; that is, those with multiple replacements were less likely to have redundant systems.

© 2017 The Pew Charitable Trusts

The analysis also indicated that the ability of another firm to replace a product that goes into a shortage may be a more significant factor than sales volume as a predictor of a company's investment in redundant systems.

- Sixteen of the 20 reference products with dual-source or backup manufacturing had limited replacements, suggesting that companies prioritized their risk-mitigation strategies and applied them to products that would have larger impacts on patients if shortages occurred. Five of these products had limited replacements and sales of less than $10 million, suggesting that companies were willing to invest in adding the redundancies needed to protect patients from shortages.

- Eight of the 9 products that did not have dual-source or backup manufacturing had multiple replacements, indicating that these manufacturers did not invest in dual-source or backup manufacturing because the impact to the patient would be low if these companies had a supply issue.

 We would invest in a low-margin product that had no alternatives to protect unmet patient need in the market."

**Supply chain team,** *small pharmaceutical company*

## 3.2 Supply chain design

Companies said they reviewed and identified gaps across the supply chain management processes and in turn identified areas for prevention of future shortages. These companies identified the following business continuity elements involved in protecting against a sudden and unexpected demand for a product. Each company had in place at least one type of business continuity plan for reducing the risk of a supply interruption (Figure 4).

Figure 4

## Business Continuity Elements Identified by Companies for Protecting Against Shortages



Business continuity elements in place at companies

Note: Results derived from responses by 10 companies that participated in the survey. Companies answered the question, "What elements make up the business continuity plans?" Respondents identified multiple elements; therefore, there are more than 10 responses.

© 2017 The Pew Charitable Trusts

The companies said they did not implement these elements in a standardized and consistent manner across various products; instead, they select the appropriate business continuity element for products in their portfolios based on the product characteristics, the investment required, the impact on patients, the length of time needed to ramp up operations, or the technical complexity of the manufacturing process.



> We must structure our business continuity plans in a way that best meets the market characteristics of each product. Revenue is just one dimension we consider in identifying, developing, and applying business continuity plans for each product."
>
> Vice president, *global supply chain, large pharmaceutical company*

Companies described the elements of their business continuity plans as follows:

- **Safety stock of raw materials.** All companies said they maintain buffer or extra stocks of raw materials, such as excipients (inactive ingredients) and vials needed to meet rapid and unexpected increases in product demand.

- **Safety stock of intermediates and finished goods.** All companies said they store backup inventory of finished products at their packaging sites to protect against unexpected product demand. Eight companies said they also maintain backup inventory of key drug intermediates. All companies said that calculating these safety stocks is an area that could be improved.

- **Backup internal and external manufacturing facilities.** Nine companies each had two or more facilities in place to manufacture final products. The remaining company did not invest in backup manufacturing for products that required dedicated facilities, a decision that the company made based on the expected rate of return and limited sales volume anticipated for the products.

- **Dual-source suppliers.** Eight of the companies had second-source suppliers in place to provide the components, vials, stoppers, and raw materials needed to manufacture final drug products. But the companies highlighted that despite having this safeguard in place, they still experienced supply interruptions due to their suppliers' quality issues.

- **Ability to add a shift to an existing manufacturing line.** Six companies had processes in place to swap the manufacturing of one product with one at risk of a shortage. The companies noted that this strategy risked creating a shortage for the product that was replaced.

- **Warm starts**[†] Five of the companies applied warm-start strategies to one or more of their products to protect against future shortages. Such warm starts enabled a company to ramp up operations at a contract manufacturer to help meet unexpected and sudden surges in demand. When asked why more companies did not take that approach, all, including the ones that practiced warm starts, said the resources needed required significant investment. As a result, companies found they had to limit this approach to drugs that had annual sales of more than $10 million or more than 50 percent market share. This was confirmed when looking at the 29 reference products. Of the 29 reference products that experienced a shortage, only eight had warm-start agreements in place. And those eight had either annual sales of more than $10 million or market share of more than 50 percent.

Some product classes, such as antibiotics, hormones, and/or cytotoxic drugs, may require dedicated manufacturing facilities, an added challenge for these products. Six of the companies said manufacturing facilities requiring segregated, self-contained, or specialized lines prevented the establishment of redundant capacity due to the investments that would be required for products where demand might not be stable on an annual basis and

---

[†]   Warm start is used typically with contract manufacturing organizations (CMOs) to initiate manufacture of the finished dosage form of a product in a short amount of time. Companies said that to accomplish it, they had established (i) contracts in advance and (ii) qualified lines, along with trained staff for the products to be manufactured. Warm starts require that companies commit volumes to a CMO so that it keeps in place the processes for manufacturing a drug on short notice as well as trained staff to run the operations.

might have low margins. When companies were asked what additional steps they took to protect against supply interruptions when dealing with these dedicated manufacturing facilities, all said they invested in improving the equipment and/or expanding the manufacturing lines.

Given that all 10 companies had business continuity plans in place, they were asked why shortages were still an issue. Example responses cited include:

- The company's backup supplier experienced quality issues, suggesting that manufacturers need to do a better job of measuring and monitoring the quality systems that they and their suppliers use to guard against such failures.

- While the manufacturer had backup systems in place, it was challenged with ramping up backup lines quickly enough to avoid interruptions due to the inability to get information that more supply would be needed.

- The manufacturer built the backup capabilities after it faced a shortage. And even after these were in place, the ability to prevent shortages was challenging due to issues with forecasting demand.

- The risk of a shortage might be calculated incorrectly because of ineffective processes used to predict demand, and, as a result, the appropriate business continuity plan might not be applied to a specific product. *Refer to section 3.4 for details.*

### 3.2.1 Supply-chain-related cost reduction strategies.

Manufacturers of low-margin or end-of-market-life-cycle products were asked what supply chain strategies they used to achieve lower costs and stay competitive. When a branded product nears the end of its life cycle, it is nearing the end of its patent. For a generic, the end of the life cycle is when the product starts to compete with an increasing number of products, which drives down the price of that generic. Such manufacturers provided the following responses:

- Seven of the companies said they either relied on a single-source strategy or purchased products from a single vendor. The lack of a backup supplier put the products at risk of shortage.

- The same seven companies also said they sourced raw materials and components from low-cost countries, adding that they had experienced product shortages as a consequence of this supply strategy.

- All the companies said they used contract manufacturers. Of the 29 reference products, shortages in six cases were caused by quality issues that led to a supply interruption at the contract manufacturing sites.

- All the companies said they shifted the manufacturing of at least one low-margin product to a low-cost country in order to lower costs for the U.S. market and open up domestic capacity for the manufacture of higher-margin products. They said they experienced shortages of the low-margin products because of issues at the manufacturing facilities in the low-cost countries.

Eight companies said they typically applied these strategies to products with multiple replacements, since the potential impact of an interruption would have a limited impact on patients.

**Tab 2**

"Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients -
Guidance for Industry," *United States Food and Drug Administration*, September 2016

# Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients

# Guidance for Industry

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**
**September 2016**
**ICH**

**Revision 1**

# Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients

# Guidance for Industry

*Additional copies are available from:*

*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353*
*Email: druginfo@fda.hhs.gov*
*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*
*or*
*Office of Communication, Outreach and Development*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave., Bldg. 71, Room 3128*
*Silver Spring, MD 20993-0002*
*Phone: 800-835-4709 or 240-402-8010*
*Email: ocod@fda.hhs.gov*
*http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**
**September 2016**
**ICH**

**Revision 1**

*Contains Nonbinding Recommendations*

### Table Of Contents

I.    INTRODUCTION (1) ................................................................................................ 1
    A.    Objective (1.1) ............................................................................................... 1
    B.    Regulatory Applicability (1.2) ...................................................................... 2
    C.    Scope (1.3) ..................................................................................................... 2

II.    QUALITY MANAGEMENT (2) ............................................................................. 5
    A.    Principles (2.1) .............................................................................................. 5
    B.    Responsibilities of the Quality Unit(s) (2.2) ................................................ 5
    C.    Responsibility for Production Activities (2.3) .............................................. 6
    D.    Internal Audits (Self Inspection) (2.4) ......................................................... 7
    E.    Product Quality Review (2.5) ....................................................................... 7

III.    PERSONNEL (3) ...................................................................................................... 8
    A.    Personnel Qualifications (3.1) ....................................................................... 8
    B.    Personnel Hygiene (3.2) ................................................................................ 8
    C.    Consultants (3.3) ........................................................................................... 9

IV.    BUILDINGS AND FACILITIES (4) ...................................................................... 9
    A.    Design and Construction (4.1) ...................................................................... 9
    B.    Utilities (4.2) ............................................................................................... 10
    C.    Water (4.3) .................................................................................................. 10
    D.    Containment  (4.4) ...................................................................................... 11
    E.    Lighting (4.5) .............................................................................................. 11
    F.    Sewage and Refuse (4.6) ............................................................................ 11
    G.    Sanitation and Maintenance (4.7) ............................................................... 11

V.    PROCESS EQUIPMENT (5) ................................................................................. 12
    A.    Design and Construction (5.1) .................................................................... 12
    B.    Equipment Maintenance and Cleaning (5.2) ............................................... 13
    C.    Calibration (5.3) .......................................................................................... 13
    D.    Computerized Systems (5.4) ....................................................................... 14

VI.    DOCUMENTATION AND RECORDS (6) ........................................................... 15
    A.    Documentation System and Specifications (6.1) ........................................ 15
    B.    Equipment Cleaning and Use Record (6.2) ................................................ 16

*Contains Nonbinding Recommendations*

C.  Records of Raw Materials, Intermediates, API Labeling and Packaging Materials (6.3) ... 16

D.  Master Production Instructions (Master Production and Control Records) (6.4) ............... 16

E.  Batch Production Records (Batch Production and Control Records) (6.5) ........................... 17

F.  Laboratory Control Records (6.6) ........................................................................................... 18

G.  Batch Production Record Review (6.7) ................................................................................... 19

VII.  MATERIALS MANAGEMENT (7) ............................................................................... 19

A.  General Controls (7.1) .............................................................................................................. 19

B.  Receipt and Quarantine (7.2) .................................................................................................. 20

C.  Sampling and Testing of Incoming Production Materials (7.3) ............................................ 20

D.  Storage (7.4) ............................................................................................................................... 21

E.  Re-evaluation (7.5) .................................................................................................................... 21

VIII.  PRODUCTION AND IN-PROCESS CONTROLS (8) ............................................... 21

A.  Production Operations (8.1) ..................................................................................................... 22

B.  Time Limits (8.2) ....................................................................................................................... 22

C.  In-process Sampling and Controls (8.3) ................................................................................. 23

D.  Blending Batches of Intermediates or APIs (8.4) .................................................................. 23

E.  Contamination Control (8.5) .................................................................................................... 24

IX.  PACKAGING AND IDENTIFICATION LABELING OF APIs AND
INTERMEDIATES (9) .............................................................................................................. 24

A.  General    (9.1) ........................................................................................................................ 25

B.  Packaging Materials (9.2) ........................................................................................................ 25

C.  Label Issuance and Control (9.3) ............................................................................................ 25

D.  Packaging and Labeling Operations (9.4) .............................................................................. 26

X.  STORAGE AND DISTRIBUTION (10) ........................................................................ 26

A.  Warehousing Procedures (10.1) .............................................................................................. 26

B.  Distribution Procedures (10.2) ................................................................................................ 27

XI.  LABORATORY CONTROLS (11) ................................................................................. 27

A.  General Controls (11.1) ............................................................................................................ 27

B.  Testing of Intermediates and APIs (11.2) ............................................................................... 28

C.  Validation of Analytical Procedures - See Section 12. (11.3) ............................................... 29

D.  Certificates of Analysis (11.4) ................................................................................................. 29

E.  Stability Monitoring of APIs (11.5) ........................................................................................ 30

F.  Expiry and Retest Dating (11.6) .............................................................................................. 30

*Contains Nonbinding Recommendations*

G.    Reserve/Retention Samples (11.7) ............................................................................. 31

XII.    **VALIDATION (12)** ............................................................................................ **31**

A.    **Validation Policy (12.1)** ....................................................................................... **31**

B.    Validation Documentation (12.2) ............................................................................. 32

C.    Qualification (12.3) .................................................................................................... 32

D.    Approaches to Process Validation (12.4) ................................................................ 32

E.    Process Validation Program (12.5) .......................................................................... 33

F.    Periodic Review of Validated Systems (12.6) ......................................................... 34

G.    Cleaning Validation (12.7) ....................................................................................... 34

H.    Validation of Analytical Methods (12.8) ................................................................. 35

XIII.    **CHANGE CONTROL (13)** ............................................................................... **35**

XIV.    **REJECTION AND RE-USE OF MATERIALS (14)** .................................... **36**

A.    Rejection (14.1) .......................................................................................................... 36

B.    Reprocessing (14.2) ................................................................................................... 36

C.    Reworking (14.3) ........................................................................................................ 37

D.    Recovery of Materials and Solvents (14.4) ............................................................. 37

E.    Returns (14.5) ............................................................................................................. 37

XV.    **COMPLAINTS AND RECALLS (15)** ............................................................. **38**

XVI.    **CONTRACT MANUFACTURERS (INCLUDING LABORATORIES) (16)** .......... **39**

XVII.    **AGENTS, BROKERS, TRADERS, DISTRIBUTORS, REPACKERS, AND RELABELLERS (17)** ........................................................................................... **39**

A.    Applicability (17.1) .................................................................................................... 39

B.    Traceability of Distributed APIs and Intermediates (17.2) .................................. 39

C.    Quality Management (17.3) ....................................................................................... 40

D.    Repackaging, Relabeling, and Holding of APIs and Intermediates (17.4)............ 40

E.    Stability (17.5) ............................................................................................................ 40

F.    Transfer of Information (17.6) .................................................................................. 40

G.    Handling of Complaints and Recalls (17.7) ............................................................ 41

H.    Handling of Returns (17.8) ....................................................................................... 41

XVIII. **SPECIFIC GUIDANCE FOR APIs MANUFACTURED BY CELL CULTURE/FERMENTATION (18)** ..................................................................... **41**

A.    General (18.1) ............................................................................................................. 41

B.    Cell Bank Maintenance and Record Keeping (18.2) ............................................. 43

*Contains Nonbinding Recommendations*

| | | |
|---|---|---|
| C. | Cell Culture/Fermentation (18.3) | 43 |
| D. | Harvesting, Isolation and Purification (18.4) | 44 |
| E. | Viral Removal/Inactivation steps (18.5) | 44 |
| **XIX.** | **APIs FOR USE IN CLINICAL TRIALS (19)** | **45** |
| A. | General (19.1) | 45 |
| B. | Quality (19.2) | 45 |
| C. | Equipment and Facilities (19.3) | 46 |
| D. | Control of Raw Materials (19.4) | 46 |
| E. | Production (19.5) | 46 |
| F. | Validation (19.6) | 46 |
| G. | Changes (19.7) | 46 |
| H. | Laboratory Controls (19.8) | 47 |
| I. | Documentation (19.9) | 47 |
| **GLOSSARY (20)** | | **48** |

*Contains Nonbinding Recommendations*

# Q7 Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients Guidance for Industry[1]

> This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page.

## I. INTRODUCTION (1)

### A. Objective (1.1)

This document is intended to provide guidance regarding good manufacturing practice (GMP) for the manufacturing of active pharmaceutical ingredients (APIs) under an appropriate system for managing quality. It is also intended to help ensure that APIs meet the quality and purity characteristics that they purport, or are represented, to possess.

In this guidance, the term *manufacturing* is defined to include all operations of receipt of materials, production, packaging, repackaging, labeling, relabeling, quality control, release, storage and distribution of APIs and the related controls. In this guidance, the term *should* identifies recommendations that, when followed, will ensure compliance with CGMPs. An alternative approach may be used if such approach satisfies the requirements of the applicable statutes. For the purposes of this guidance, the terms *current good manufacturing practices* and *good manufacturing practices* are equivalent.

The guidance as a whole does not cover safety aspects for the personnel engaged in manufacturing, nor aspects related to protecting the environment. These controls are inherent responsibilities of the manufacturer and are governed by national laws.

---

[1] This guidance was developed within the Expert Working Group (Q7A) of the International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH) and has been subject to consultation by the regulatory parties, in accordance with the ICH process. This document has been endorsed by the ICH Steering Committee at *Step 4* of the ICH process, November 2000. At *Step 4* of the process, the final draft is recommended for adoption to the regulatory bodies of the European Union, Japan, and the United States.

Arabic numbers in subheadings reflect the organizational breakdown in the document endorsed by the ICH Steering Committee at Step 4 of the ICH process, November 2000.

*Contains Nonbinding Recommendations*

This guidance is not intended to define registration and/or filing requirements or modify pharmacopoeial requirements. This guidance does not affect the ability of the responsible regulatory agency to establish specific registration/filing requirements regarding APIs within the context of marketing/manufacturing authorizations or drug applications. All commitments in registration/filing documents should be met.

This guidance revises and replaces the guidance *Q7A Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients.* This revision changes the ICH codification from Q7A to Q7. This revision also adds the ICH section numbers in parentheses at the end of each paragraph in Sections II (2) through XIX (19) of the guidance.

### B.    Regulatory Applicability (1.2)

Within the world community, materials may vary as to their legal classification as an API. When a material is classified as an API in the region or country in which it is manufactured or used in a drug product, it should be manufactured according to this guidance.

### C.    Scope (1.3)

This guidance applies to the manufacture of APIs for use in human drug (medicinal) products. It applies to the manufacture of sterile APIs only up to the point immediately prior to the APIs being rendered sterile. The sterilization and aseptic processing of sterile APIs are not covered by this guidance, but should be performed in accordance with GMP guidances for drug (medicinal) products as defined by local authorities.

This guidance covers APIs that are manufactured by chemical synthesis, extraction, cell culture/fermentation, recovery from natural sources, or any combination of these processes. Specific guidance for APIs manufactured by cell culture/fermentation is described in Section XVIII (18).

This guidance excludes all vaccines, whole cells, whole blood and plasma, blood and plasma derivatives (plasma fractionation), and gene therapy APIs. However, it does include APIs that are produced using blood or plasma as raw materials. Note that cell substrates (mammalian, plant, insect or microbial cells, tissue or animal sources including transgenic animals) and early process steps may be subject to GMP but are not covered by this guidance. In addition, the guidance does not apply to medical gases, bulk-packaged drug (medicinal) products (e.g., tablets or capsules in bulk containers), or radiopharmaceuticals.

Section XIX (19) contains guidance that only applies to the manufacture of APIs used in the production of drug (medicinal) products specifically for clinical trials (investigational medicinal products).

An *API starting material* is a raw material, an intermediate, or an API that is used in the production of an API and that is incorporated as a significant structural fragment into the structure of the API. An API starting material can be an article of commerce, a material

2

*Contains Nonbinding Recommendations*

purchased from one or more suppliers under contract or commercial agreement, or produced in-house.  API starting materials normally have defined chemical properties and structure.

The company should designate and document the rationale for the point at which production of the API begins.  For synthetic processes, this is known as the point at which API starting materials are entered into the process.  For other processes (e.g., fermentation, extraction, purification), this rationale should be established on a case-by-case basis. Table 1 gives guidance on the point at which the API starting material is normally introduced into the process.

> From this point on, appropriate GMP as defined in this guidance should be applied to these intermediate and/or API manufacturing steps. This would include the validation of critical process steps determined to impact the quality of the API.  However, it should be noted that the fact that a company chooses to validate a process step does not necessarily define that step as critical.

The guidance in this document would normally be applied to the steps shown in gray in Table 1.  However, all steps shown may not need to be completed.   The stringency of GMP in API manufacturing should increase as the process proceeds from early API steps to final steps, purification, and packaging.  Physical processing of APIs, such as granulation, coating or physical manipulation of particle size (e.g., milling, micronizing) should be conducted according to this guidance.

This GMP guidance does not apply to steps prior to the introduction of the defined API starting material.

*Contains Nonbinding Recommendations*

**Table 1:  Application of this Guidance to API Manufacturing**

| Type of Manufacturing | Application of this guidance to steps (shown in gray) used in this type of manufacturing | | | | |
|---|---|---|---|---|---|
| Chemical Manufacturing | Production of the API starting material | Introduction of the API starting material into process | Production of Intermediate(s) | Isolation and purification | Physical processing, and packaging |
| API derived from animal sources | Collection of organ, fluid, or tissue | Cutting, mixing, and/or initial processing | Introduction of the API starting material into process | Isolation and purification | Physical processing, and packaging |
| API extracted from plant sources | Collection of plant | Cutting and initial extraction(s) | Introduction of the API starting material into process | Isolation and purification | Physical processing, and packaging |
| Herbal extracts used as API | Collection of plants | Cutting and initial extraction | | Further extraction | Physical processing, and packaging |
| API consisting of comminuted or powdered herbs | Collection of plants and/or cultivation and harvesting | Cutting/ comminuting | | | Physical processing, and packaging |
| Biotechnology: fermentation/ cell culture | Establish-ment of master cell bank and working cell bank | Maintenance of working cell bank | Cell culture and/or fermentation | Isolation and purification | Physical processing, and packaging |
| "Classical" Fermentation to produce an API | Establish-ment of cell bank | Maintenance of the cell bank | Introduction of the cells into fermentation | Isolation and purification | Physical processing, and packaging |

**Increasing GMP requirements**

LC3MFTC1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   FEDERAL TRADE COMMISSION,
3  STATE OF NEW YORK, STATE OF
   CALIFORNIA, STATE OF OHIO,
4  COMMONWEALTH OF PENNSYLVANIA,
   STATE OF ILLINOIS, STATE OF
5  NORTH CAROLINA, and
   COMMONWEALTH OF VIRGINIA,
6
                    Plaintiffs,
7         v.                          20 CV 706 (DLC)

8  MARTIN SHKRELI, et al.,

9                    Defendants.
   ------------------------------x
10                                   New York, N.Y.
                                     December 14, 2021
11                                   9:30 a.m.
   Before:
12                   HON. DENISE COTE,
                                     District Judge
13                        APPEARANCES

14 FEDERAL TRADE COMMISSION
   BY:  MARKUS H. MEIER
15      MARIN HANEBERG
        BRADLEY S. ALBERT
16      LAUREN PEAY
        NEAL PERLMAN
17      LEAH HUBINGER

18 NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
   BY:  ELINOR R. HOFFMANN
19      JEREMY R. KASHA
        AMY E. McFARLANE
20
   DUANE MORRIS LLP
21      Attorneys for Shkreli
   BY:  CHRISTOPHER H. CASEY
22      JEFFREY S. POLLACK
        ANDREW J. RUDOWITZ
23      SARAH FEHM STEWART
        SEAN McCONNELL
24      J. MANLY PARKS

25

LC3MFTC1

1

2          (Case called)

3          MR. MEIER:  I am Markus Meier on behalf of the Federal

4    Trade Commission.

5          MS. HOFFMAN:  Elinor Hoffman on behalf of New York

6    State and the state plaintiffs.

7          MR. ALBERT:  Brad Albert on behalf of the Federal

8    Trade Commission.

9          MR. PERLMAN:  Neal Perlman on behalf of the Federal

10   Trade Commission.  With me is our paralegal, Stephanie Guy.

11         MR. CASEY:  Good morning, your Honor, Christopher

12   Casey with the law firm of Duane Morris on behalf of the

13   defendant, Martin Shkreli.

14         MR. POLLACK:  Good morning, your Honor, Jeff Pollack,

15   the law firm of Duane Morris, on behalf of the defendant,

16   Martin Shkreli.

17         MR. RUDOWITZ:  Good morning, your Honor, A.J. Rudowitz

18   from the law firm of Duane Morris on behalf of Martin Shkreli.

19         MS. STEWART:  Good morning, your Honor, Sarah Fehm

20   Stewart from the law firm of Duane Morris for the defendant

21   Martin Shkreli.

22         MR. PARKS:  Good morning, Manley Parks on behalf of

23   the defendant Martin Shkreli.

24         MR. FIELDS:  Good morning, your Honor, Justin Fields

25   on behalf of defendant Martin Shkreli.

LC3MFTC1

1        THE COURT:  Mr. Fields, are you with Duane Morris as

2    well?

3        MR. FIELDS:  I am.

4        THE COURT:  Thank you so much.

5        Welcome, everyone.  Excuse me just one second.

6        MR. POLLACK:  Your Honor.

7        THE COURT:  Excuse me just one second.

8        Sorry, counsel.  This is Mr. Pollack?

9        MR. POLLACK:  That's right, your Honor.  Just a point

10   of clarification so there is no confusion.  Mr. Fields is our

11   trial technician.  He's not an attorney.  But he is with our

12   firm.

13        THE COURT:  Thank you so much.  I appreciate that.

14        Let me just welcome everyone as we begin this trial,

15   which is obviously very important to the government plaintiffs

16   and very important to the defendant and, of course, to the

17   public because it involves the enforcement of our antitrust

18   laws.  I want to thank everyone for working so hard to be well

19   prepared for today's trial.

20        I want to remind everyone of our protocol because of

21   the COVID pandemic.  This courtroom has been tested.  Its

22   ventilation systems have been tested.  There is a complete air

23   exchange every ten minutes, if not more frequently.

24        Everyone must wear a mask at all times with the

25   following exceptions:  When I'm speaking I do not need to wear

LC3MFTC1

1    a mask.  When an attorney is examining from the podium, the

2    attorney does not need to wear a mask.  When the witness is

3    seated in the witness seat, they do not need to wear a mask.

4          I am going to ask everyone in the well of the

5    courtroom to make sure that my law clerks or Mr. Whertvine are

6    notified of your vaccination status.  I won't be putting that

7    on the public record, but we want to know whether anyone in the

8    well of the courtroom is not fully vaccinated.

9          Those seated either in the jury box or outside in the

10   gallery of the courtroom must be seated six feet apart if you

11   are not fully vaccinated, and three feet apart from another

12   person if you are.

13         So those are the rules we will follow.

14         We are keeping time at this trial.  I'm keeping time

15   unless the parties have agreed on a different neutral

16   timekeeper.

17         Mr. Meier, have the parties agreed on a different

18   neutral timekeeper?

19         MR. MEIER:  No, your Honor.  We are fine with your

20   Honor taking on that task.  Thank you very much.

21         THE COURT:  Thank you.

22         I am going to ask my law clerks to back me up, so you

23   will have more protective hands on this task than just mine.

24   At the end of each day I will try to give you notice of where

25   we stand.

LC3MFTC1

1    I was going to begin today by dealing with the

2    remaining two requests for sealing of documents or the

3    courtroom by third parties.  Let me turn first to RL Fine.  I

4    don't have a direct application from RL Fine.  Instead, I had a

5    notification from defense counsel of December 6, which attached

6    an e-mail, and that e-mail from RL Fine refers to extreme

7    confidentiality.  That's not sufficient for me to understand

8    what its risks are here.

9    I made a number of findings yesterday that declined to

10   seal or redact documents in which various parties were

11   communicating with RL Fine.  So unless the parties have some

12   particular issue to bring to my attention with respect to RL

13   Fine, I do not have a basis from which to order the sealing of

14   any exhibit, in whole or in part, or the closure of any

15   courtroom in connection with RL Fine testimony.

16   Not hearing anything from counsel, I turn to the last

17   remaining application.  It is from a third party, Medisca, and

18   counsel for Medisca provided me a written description of its

19   request on December 6.

20   It is a company, as I understand it, that supplied

21   compounding pharmacies with the API of interest here and also

22   was the source of the pyrimethamine that was used in a clinical

23   trial conducted by a physician.  Counsel did not appear

24   yesterday to further explain this request and the principal

25   point of the request is, as I understand it, that Medisca does

LC3MFTC1

1    not want its source for the API to be publicly disclosed.

2    Depending on what that source is and to be consistent with the

3    rulings I made yesterday, the source will not be publicly

4    disclosed unless it was one of two companies.

5            So, Mr. Meier, was the source one of two companies

6    that will be publicly disclosed on this record, as far as you

7    know?

8            MR. MEIER:  I actually do not know that, your Honor.

9            THE COURT:  I'll let counsel figure this out during a

10   break and further advise me.

11           I take it this morning there will be no evidence

12   offered with respect to the Medisca issues.  Am I right,

13   Mr. Meier?

14           MR. MEIER:  I do not believe that the Medisca issues

15   will come up today, your Honor.

16           THE COURT:  Am I right, Mr. Casey?

17           MR. CASEY:  That's my understanding, your Honor.

18           THE COURT:  Thank you.

19           Mr. Meier, do the plaintiffs wish to offer an opening

20   statement?

21           MR. MEIER:  Your Honor, if I may, we do have a couple

22   of administrative matters that we would like to take up, if

23   that's possible.

24           THE COURT:  Certainly.

25           MR. MEIER:  We will not be doing an opening statement.

LC3MFTC1

1          THE COURT:  Yes.

2          MR. MEIER:  Your Honor, we have an agreement with

3    defendants on a first list of exhibits to be admitted.  We had

4    exchanged these back and forth with the defendants over the

5    last weekend, last couple of days.  I'd like to move in what we

6    labeled as Government Exhibit 9001, which is a first tranche of

7    exhibits to be admitted.

8          THE COURT:  Do you have a copy of that document?

9          MR. MEIER:  Yes, I do, your Honor.

10         THE COURT:  If you could hand it to my law clerk,

11   please.

12         MR. MEIER:  Thank you, your Honor.

13         THE COURT:  Counsel, where it's convenient, and this

14   wouldn't be true for bulky exhibits, but where it's convenient,

15   if you could hand up at least two copies of the document, one

16   for me and, if possible, even three copies.  I have two law

17   clerks with me at this trial.  Thank you so much.

18         Is there any objection to the admission of Government

19   Exhibit 9001 and the documents listed on it?

20         MR. RUDOWITZ:  Your Honor, we have no objection

21   pursuant to the Court's guidance on the admission of GX-9001

22   and the exhibits therein.

23         THE COURT:  9001 and the exhibits listed therein are

24   received.

25         (Government Exhibit 9001 received in evidence)

LC3MFTC1

1              THE COURT:  Next.

2              MR. MEIER:  The next item, your Honor, is we have the

3     deposition designations of a witness named Courtney Johnson

4     from Cardinal.  It's marked as Government Exhibit 9051.  I have

5     two copies to hand up and one for the defendants.  Again, we

6     have discussed this over the course of the last few days, and I

7     believe this comes in without objection.  I'll let the

8     defendants speak for themselves.

9              We will bring three copies in the future for the

10    Court.  Sorry, your Honor.

11             THE COURT:  Thank you so much.

12             This is a document describing actually the deposition

13    of Patel.

14             MR. MEIER:  I'm sorry.  My file got mixed up.  I

15    apologize, your Honor.  Let me start that over again.

16             THE COURT:  I now have another document, GX-9051,

17    which describes the deposition offer for Courtney Johnson of

18    Cardinal.

19             How does 9051 relate to what was given to me in the

20    white binders?

21             MR. MEIER:  Your Honor, what we did is, with respect

22    to Ms. Johnson, there are no changes, as I understand it.  When

23    I give you the one for Mr. Patel, we will tell you exactly

24    what's the difference on the first page.  So with Ms. Johnson

25    there are no differences.

LC3MFTC1

1          Your Honor, by the way, this is also the designations

2    from both defendants and plaintiffs.

3          THE COURT:  The agreement between the parties is one

4    party's designations are in yellow and another in blue.  Who is

5    in yellow?

6          MR. MEIER:  There is a key, a legend at the top of

7    each page.  The yellow is the FTC's designations, the orangish

8    color is the FTC's counter designations, the bluish and the

9    greenish colors are defendant's designations, and defendant's

10   counters, and there is a legend at the bottom of each page.

11         THE COURT:  Very helpful.  So well organized.  Thank

12   you very much.  Great assistance to the Court.

13         Of course, with the original offer of deposition

14   excerpts, I had the summary pages, one for the plaintiffs and

15   one for the defendant, and those same pages apply.

16         MR. MEIER:  Yes, your Honor.  Going forward, should we

17   submit those also?

18         THE COURT:  No need.  If I have them, I know where

19   they are.  Thank you.

20         Any objection to the receipt of Exhibit 9051?

21         MR. POLLACK:  No, your Honor.  We consent to the

22   admission of both parties' designations.

23         THE COURT:  That's Mr. Pollack?

24         MR. POLLACK:  I apologize, your Honor.  Yes.  Jeff

25   Pollack.

LC3MFTC1

1          THE COURT:  9051 is received.

2          (Government Exhibit 9051 received in evidence)

3          MR. MEIER:  The next one we have, your Honor, I'm

4    sorry I got them out of order, is 9050, Government Exhibit.  It

5    is the deposition designations revised for witness named Ravi

6    Patel from a company called Espee.  This one does have some

7    changes from the original and it is described on the cover.  I

8    can come up.

9          THE COURT:  Any objection to the receipt of Exhibit

10   9050?

11         MR. POLLACK:  No objection to both sides' designations

12   coming in as highlighted, your Honor.

13         THE COURT:  That's Mr. Pollack speaking?

14         MR. POLLACK:  Yes.  I will get that right eventually,

15   your Honor.

16         THE COURT:  Again, this is very clearly explained on

17   the front page, the difference with the original offer and what

18   is now being actually offered at trial, and Exhibit 9050 is

19   received.

20         (Government Exhibit 9050 received in evidence)

21         MR. MEIER:  The last one, your Honor, is also

22   deposition designations that have been revised.  It's the

23   deposition of Jacob Mathew.  Mr. Mathew is with the company RL

24   Fine.  The exhibit number is Government Exhibit 9052.

25         With this one, your Honor, we do have a dispute with

LC3MFTC1

1  the defendants, and we were hoping that we could get guidance

2  from the Court this morning.

3       That will be handled by my colleague, Mr. Perlman.

4  Mr. Perlman has additional copies of the exhibit.

5       MR. PERLMAN:  Good morning, your Honor.  May I

6  approach to pass up these copies of the exhibit?

7       THE COURT:  Yes.

8       I am going to interrupt.  Mr. Meier, you weren't here

9  yesterday afternoon for the entirety.  I wanted to tell you

10  your colleague handled the issues admirably.

11       MR. MEIER:  Thank you very much.  Appreciate that.

12       MR. PERLMAN:  Your Honor, I have tabbed he these three

13  copies of the transcripts where the disputes lie.

14       THE COURT:  You can move to the podium.  That's an

15  option for counsel, all counsel.  Feel free if it's more

16  convenient for you.  Either that, or really keep your voice up.

17       Mr. Perlman.

18       MR. PERLMAN:  Good morning, your Honor.  Again, this

19  is Neal Perlman for the FTC.  Both plaintiffs and defendants

20  are seeking to admit portions of the deposition transcript of

21  Mr. Mathew.

22       As my colleague, Mr. Meier, said, Mr. Mathew is the

23  chairman of RL Fine, which is, as your Honor knows, one of the

24  API suppliers at issue in this case.  The plaintiffs and

25  defendants took this deposition pursuant to the Hague

LC3MFTC1

1    Convention.

2         The plaintiffs at this point maintain objections to

3    two different passages of the transcript, which I have tabbed.

4    The first one is on page 8 at the very top.  It's question 13.

5    And the next, which is related, is at the top of page 12.

6         The issue here, your Honor, is that defendants are

7    seeking to admit Mr. Matthews' testimony, that it is easy to

8    make pyrimethamine API and for that reason there must be 20,

9    15, 10 other API suppliers in India that can make pyrimethamine

10   API.

11        But in his answers to those questions, he disclaims

12   any foundation for being able to provide that information.  For

13   example, if we turn to the question on the top of page 8,

14   that's, again, question 13.  The local commissioner in India

15   asks whether there are any other companies that have the

16   ability to make pyrimethamine API and Mr. Mathew says that he

17   thinks it's seventh grade chemistry, but says he's not a

18   technical person.

19        And there is a similar exchange at the top of page 12

20   between plaintiff's local counsel, Nishant Joshi and

21   Mr. Mathew.  Mr. Joshi asked what the basis was for

22   Mr. Matthews' assertion that it was an easy product to make and

23   there were many companies that could make pyrimethamine API.

24   Again, Mr. Matthews says, I'm not a chemical industry person.

25   I'm a financial services person.  There must be ten or 15

LC3MFTC1

1       different companies.

2              We respectfully submit that Mr. Matthews doesn't have

3       the foundation to provide these answers, and there is nowhere

4       else in this transcript where he does mention any foundation

5       for these statements.

6              THE COURT:  Mr. Casey.

7              I'm sorry, Mr. Pollack.

8              MR. POLLACK:  No problem.  You didn't know that I

9       would be the one speaking, your Honor.

10             Your Honor, to begin, this is the first time

11      plaintiffs are raising an issue with number 13 on page 8.  In

12      my correspondence with plaintiff's counsel from the last

13      several days, the only issue raised had to do with page 12.

14      But I'll address page 8 as well since it's being raised today.

15             The question was, are there other companies that have

16      the ability or --

17             THE COURT:  Sir, whenever -- counsel, this applies to

18      everyone.  When anyone is reading from a document, they must

19      slow down and speak up if they would like the court reporter to

20      be able to capture what you are saying.

21             MR. POLLACK:  Thank you for that good advice, your

22      Honor.

23             THE COURT:  Thank you.

24             MR. POLLACK:  Number 13.  Are there other companies

25      that have the ability or you believe have the potential to

LC3MFTC1

1    develop ability to manufacture pyrimethamine API.  The

2    objection lodged is that of speculation.  The question is

3    asking, what does the witness know?  He provides a response.

4            My argument would be the same thing for the testimony

5    at page 12.  Any idea what was the source of that information.

6    In other words, what do you know.  And he gives a response.

7            So the form of the question is proper and the response

8    is given.  There should be no objection to that testimony.

9            THE COURT:  The objection is sustained.  The testimony

10   is stricken.

11           Next.

12           MR. MEIER:  That is all the administrative matters

13   that the FTC has, your Honor.  We would be prepared to call the

14   first witness, unless the defendants have anything they need to

15   raise.

16           THE COURT:  You may call your first witness.

17           MR. MEIER:  Thank you, your Honor.

18           The government calls as its first witness

19   Dr. Pelliccione.  I will be doing the examination, your Honor.

20           THE COURT:  Dr. Pelliccione, if you could please come

21   up here and take the witness stand.  If you would remain

22   standing, please.

23   NICHOLAS PELLICCIONE,

24       called as a witness by the Plaintiffs,

25       having been duly sworn, testified as follows:

LC3MFTC1

1          THE COURT:  Counsel.

2          MR. MEIER:  Thank you, your Honor.

3          Just a quick administrative question.  When a counsel

4     is up here at the lectern, am I permitted to go back to the

5     counsel table if I need to without always asking for

6     permission?  I hope not to have it happen very often.

7          THE COURT:  You don't need to ask permission to move

8     around the courtroom, including to show a document to the

9     witness.  We are going to try to keep the record as spare as

10    possible.  I am afraid you are going to have to put your mask

11    back on.

12         MR. MEIER:  Correct.  Thank you, your Honor.

13         Dr. Pelliccione is a witness for whom defendants have

14    submitted an affidavit or a declaration, so I think Mr. Casey

15    has copies?

16         MR. CASEY:  Yes, your Honor.  May I approach the

17    witness?

18         THE COURT:  Certainly.

19         If you could, Mr. Casey, identify the exhibit number

20    that you are giving the witness so the record is clear.

21         MR. CASEY:  Yes, your Honor.  The exhibit number is

22    DX539.

23         THE COURT:  Thank you.

24         MR. CASEY:  Dr. Pelliccione, I'm showing you what's

25    been marked as DX539.  Did you have a chance to look at DX-539,

LC3MFTC1

1    Dr. Pelliccione?

2            THE WITNESS:  I have looked at it previously, yes.

3            MR. CASEY:  You recognize it?

4            THE WITNESS:  Yes, I do.

5            MR. CASEY:  What is DX-539?

6            THE WITNESS:  It's the trial testimony that I

7    provided.

8            MR. CASEY:  Your Honor, pursuant to the Court's

9    procedures, I understood that the Court would like to ask

10   questions of the witness at this time.

11           THE COURT:  Thank you very much.

12           Dr. Pelliccione, if we go to the last page of the

13   document, page 11, did you authorize the attachment of your

14   signature at that page?

15           THE WITNESS:  Yes, I did, your Honor.

16           THE COURT:  Did you do that after you had read the

17   entire exhibit with care?

18           THE WITNESS:  Yes, I did.

19           THE COURT:  Do you swear to the truth of its contents?

20           THE WITNESS:  Yes, I do.

21           THE COURT:  Thank you.

22           Any objection to the receipt of DX-539?

23           MR. MEIER:  Yes, your Honor.  The government has two

24   objections to DX-539 that we had raised previously with the

25   defendants.

LC3MFTC1

1          The first one, your Honor, would be paragraph 24 at

2     page 6.  If I may read, for the record, the part that we object

3     to, your Honor.  This is paragraph 24 which starts on page 5.

4     But the portion we object to carries over into page 6.  It

5     begins with the sentence, at the time we entered into the

6     supply.  It's the second line at the top of page 6, your Honor.

7     It says:  At the time we entered into the supply agreement and

8     now, I understood that it is common for companies to include

9     exclusivity as a standard term in an API supply agreement.

10          I want to read the next paragraph that we also have an

11    objection to because the objection is the same for both

12    paragraphs.

13          The next one is paragraph 25, the very next paragraph,

14    your Honor.  It's also on page 6.  It's the clause that starts

15    in the middle of that paragraph that begins with:  Again, I

16    understand.  So it says, your Honor:  Again, I understand that

17    such provisions are common in API supply agreements.

18          We believe the sentence that I read in paragraph 24

19    and the clause that I read in paragraph 25 should be stricken.

20          The reason, your Honor, is both are examples of

21    improper lay opinion testimony in violation of Federal Rule of

22    Evidence 701.  There is no foundation that Mr. Pelliccione

23    knows what is common for companies in the pharmaceutical

24    industry.  He hasn't conducted a survey, nor does he cite to

25    any authoritative source.  And we believe this testimony is

LC3MFTC1

1    precisely of the type of technical or other specialized

2    knowledge within the scope of Rule 702 and thus requires expert

3    testimony, not lay opinion testimony, your Honor.

4              THE COURT:  Mr. Casey.

5              MR. CASEY:  Yes, your Honor.  Thank you.  Christopher

6    Casey on behalf of Mr. Shkreli.

7              Your Honor, these statements that the plaintiffs have

8    objected to simply reflect the witness' understanding based on

9    his long experience in the pharmaceutical industry.  As his

10   affidavit indicates, he spent 35 years in this industry.

11             And the Court I'm sure is well familiar with the

12   standards under Rule 701.  The standards are that the opinion

13   be rationally based on the witness' perception.  These

14   statements are indeed rationally based on Dr. Pelliccione's

15   perception based on his knowledge in the industry.

16             Second, helpful clearly understanding the witness'

17   testimony or determining a fact at issue.  This is, we would

18   submit, very helpful to the Court in determining whether these

19   types of provisions are common in the industry.

20             Third, that it is not based on scientific technical or

21   other specialized knowledge within the scope of Rule 702.

22             I would commend to the Court on that part of the test

23   several cases from the Second Circuit.  The first is *United*

24   *States v. Dawkins*.  That's at 999 F.3d 767 (2d Cir. 2021), at

25   page 793 of that opinion.  The Second Circuit affirmed the

LC3MFTC1                    Pelliccione - Direct

1    district court's decision to allow witnesses who are part of a

2    conversation regarding the industry of college basketball to

3    testify about their understanding of jargon used during a

4    conversation, and the Court pointed to the witness' long

5    experience in the industry as being a significant factor.

6            I'd also point the Court to two other Second Circuit

7    cases:  *United States v. Rigas*, 490 F.3d 208 at page 224 (2d

8    Cir. 2007); *United States v. Yannotti*, 541 F.3d 112, 125-126

9    (2d Cir. 2008).  This kind of a statement, his understanding of

10   what is common in the industry, does not depend on his

11   knowledge of any specialized scientific training.  It is rather

12   a product of his long experience in the industry.  We submit,

13   your Honor, that this is proper lay testimony.

14           THE COURT:  Objection is overruled.  The testimony

15   will be received.

16           Examination.

17           MR. MEIER:  Thank you, your Honor.

18   DIRECT EXAMINATION

19   BY MR. MEIER:

20   Q.  Good morning.  Dr. Pelliccione.

21   A.  Good morning.

22   Q.  I believe you have already introduced yourself, but could

23   you go ahead and state your full name.

24   A.  Nicholas Pelliccione.

25   Q.  I believe we have already spelled that for the court

LC3MFTC1                    Pelliccione - Direct

1    reporter.

2              Dr. Pelliccione --

3              THE COURT:  Doctor, if you could move that mic, move

4    it up.  It moves.  Put it under your chin.  Keep your voice up.

5    Thanks.

6    Q.  Dr. Pelliccione, we have never met before, but you have met

7    some of my FTC colleagues at your investigational hearing in

8    September of 2019 and your deposition about a year ago.

9              My name is Markus Meier.  I work at the Federal Trade

10   Commission.  Is there anything that might affect your ability

11   to give truthful complete testimony today?

12   A.  No.

13             MR. MEIER:  Your Honor, at this time I'd like to just

14   introduce Stephanie Guy, who is sitting at counsel table.

15   Ms. Guy will be assisting me.  Hopefully, the Trial Director

16   technology is working properly, and we will be able to put up

17   exhibits that you will be able to see at that screen,

18   Dr. Pelliccione.

19   Q.  Dr. Pelliccione, you currently work at Vyera

20   Pharmaceuticals LLC, correct?

21   A.  That's correct.

22   Q.  You are Vyera's senior vice-president and head of research

23   and development?

24   A.  That's correct.

25   Q.  As senior vice-president you're a member of Vyera's senior

LC3MFTC1                           Pelliccione - Direct

1   leadership team?

2   A.  Yes, I am.

3   Q.  You report to Averill Powers?

4   A.  Correct.

5   Q.  Mr. Powers is the chief executive officer of Phoenixus?

6   A.  Yes.

7   Q.  He's also Vyera's general counsel and chief strategy

8   officer?

9   A.  That's correct.

10          MR. MEIER:  Just for the record, Phoenixus is spelled

11  P-h-o-e-n-i-x-u-s.

12  A.  Yes.

13  Q.  Your role at Vyera involves regulatory affairs and quality

14  assurance?

15  A.  Among other things, yes.

16  Q.  You have worked at Vyera since January 2015?

17  A.  Yes.

18  Q.  So you were working at Vyera when Vyera acquired the rights

19  to Daraprim in August 2015?

20  A.  Yes, I was.

21  Q.  As best I can tell, are you one of the few Vyera employees

22  who was at the company when it first acquired Daraprim is still

23  at Vyera today?

24  A.  I'm the only one.

25  Q.  Great.  That's what I thought.

LC3MFTC1                    Pelliccione – Direct

1          Dr. Pelliccione, you have a Ph.D. in biochemistry from

2     the Mt. Sinai School of Medicine?

3     A.   Yes.

4     Q.   You have, as Mr. Casey said, over 35 years of experience in

5     the pharmaceutical industry?

6     A.   Yes.

7     Q.   And you've devoted much of your career to assisting life

8     science companies navigating regulatory challenges?

9     A.   Yes, that's correct.

10    Q.   When we say regulatory challenges, you're talking about

11    meeting Food and Drug Administration rules and regulations?

12    A.   Primarily, yes.

13    Q.   And the Food and Drug Administration is often abbreviated

14    as capital FDA?

15    A.   Yes.

16    Q.   When you first started working at Vyera, you reported to

17    Dr. Eliseo Salinas?

18    A.   Actually, when I first started working, I reported to

19    Martin Shkreli.

20    Q.   But when Dr. Salinas was hired, you began to report to

21    Dr. Salinas?

22    A.   That is correct.

23    Q.   Speaking of Mr. Shkreli, when you first started working at

24    Vyera, Martin Shkreli was Vyera's CEO?

25    A.   I believe that's correct, yes.

LC3MFTC1                    Pelliccione - Direct

1   Q.  Did you meet Mr. Shkreli as part of the interview process

2   when you were considering taking the job with Vyera?

3   A.  Yes, I did.

4   Q.  Did Mr. Shkreli interview you?

5   A.  Yes, he did.

6   Q.  While working at Vyera, you would meet with Martin Shkreli,

7   is that correct?

8   A.  On occasion, yes.

9   Q.  About how many times do you estimate that you have met

10  about Martin Shkreli while working at Vyera?

11  A.  I don't know that I could hazard to guess.  There were some

12  regular meetings and then there were chance meetings.

13  Q.  Are we talking about more than a hundred times?

14  A.  I really couldn't answer that.

15  Q.  While working at Vyera, you spoke with Mr. Shkreli many

16  times?

17  A.  I spoke with Mr. Shkreli on a number of occasions.  I don't

18  know how you would define many.

19  Q.  Again, more than a hundred times?

20  A.  Maybe not.

21  Q.  While working at Vyera, you sent and received e-mails from

22  Mr. Shkreli?

23  A.  More than likely.

24  Q.  Let's move away from talking about your professional

25  background and talk briefly about a drug product called

24

LC3MFTC1                    Pelliccione - Direct

1   Daraprim.

2            During your time at Vyera, you've had numerous

3   responsibilities related to Daraprim, correct?

4   A.  Well, anything related on a regulatory quality and R&D

5   perspective, so, yes.

6   Q.  Those types of responsibilities with respect to Daraprim

7   came up on a number of different occasions during the time you

8   have worked at Vyera?

9   A.  Yes.

10  Q.  Daraprim was first approved by the FDA in 1953?

11  A.  That was the initial approval, yes.

12  Q.  Daraprim is used today to treat toxoplasmosis?

13  A.  That's correct.

14  Q.  And the FDA approved Daraprim to treat toxoplasmosis in

15  1958?

16  A.  That is correct.

17  Q.  Toxoplasmosis is a potentially serious parasitic infection?

18  A.  It's potentially serious.  Potentially life threatening.

19  Q.  Daraprim's active pharmaceutical ingredient is a chemical

20  called pyrimethamine?

21  A.  That's correct.

22  Q.  The term active pharmaceutical ingredient is often

23  abbreviated with capital API, is that correct?

24  A.  Yes, that's correct.

25  Q.  We are probably going to say that acronym a lot today,

LC3MFTC1                          Pelliccione - Direct

1    right?

2    A.   Yes.

3    Q.   Daraprim is the gold standard treatment for toxoplasmosis,

4    correct?

5    A.   Daraprim is the only FDA-approved treatment for

6    toxoplasmosis.

7    Q.   Did you ever hear Mr. Shkreli say that Daraprim is the

8    "gold standard" treatment for toxoplasmosis?

9    A.   I can't say that I specifically heard Mr. Shkreli say that.

10   Q.   Have you ever heard anyone at Vyera say that Daraprim is

11   the gold standard treatment for toxoplasmosis?

12   A.   I don't know that I could specifically state that I have

13   heard anyone say that at Vyera.

14   Q.   Have you ever said that?

15   A.   I may have.  I don't know.  It's the only treatment.

16   Q.   Fair to say that Vyera's revenues have principally been

17   derived from the sales of Daraprim?

18   A.   That's my understanding.

19   Q.   Vyera only sells two products commercially, correct?

20   A.   That is correct.

21   Q.   One is Daraprim and the other is a product called Vecamyl?

22   A.   Yes.

23   Q.   Just to be sure, Vecamyl V-e-c-a-m-y-l?

24   A.   That's correct.

25   Q.   And Daraprim is a much larger product for Vyera than

LC3MFTC1                    Pelliccione - Direct

1  Vecamyl, correct?

2  A.  I believe from a revenue perspective, yes.

3  Q.  You've been working at Vyera for almost seven years?

4  A.  Yes.

5  Q.  So during your time you've been working at Vyera, most of

6  the company's profits have come from the sales of Daraprim?

7  A.  I assume so.  I'm not part of the finance area.

8            THE COURT:  Doctor, let's be frank here.  Do you have

9  any reason to believe it's not principally from Daraprim?

10            THE WITNESS:  No.  I don't have any reason not to

11  believe that.

12            MR. MEIER:  Thank you, your Honor.

13  Q.  Would it be fair to say that your salary at Vyera has

14  mostly come from the sales of Daraprim?

15  A.  I assume so.

16  Q.  What is your current salary at Vyera?

17  A.  $360,000.

18  Q.  You've typically received an annual bonus while working at

19  Vyera?

20            MR. CASEY:  Your Honor, I am not sure what the

21  relevance is to these questions.

22            THE COURT:  Overruled.

23  Q.  Let me ask that again.  You've typically received an annual

24  bonus while working at Vyera?

25  A.  We did not always receive annual bonuses, but, yes, I have

LC3MFTC1                              Pelliccione – Direct

1    received annual bonuses.

2    Q.  What's the largest annual bonus you ever got at Vyera?

3    A.  Probably this past year.  I believe it was 25 percent of my

4    salary.

5    Q.  So 25 percent of your salary is about $90,000?

6    A.  I believe that's correct.

7    Q.  So your bonus at Vyera, that's mostly come from the sales

8    of Daraprim, correct?

9    A.  I assume so.

10   Q.  You worked at Vyera when Mr. Shkreli raised the price of

11   Daraprim by 4,000 percent?

12   A.  Yes.

13   Q.  Did you ever hear Mr. Shkreli say words to the effect that

14   he should have raised the price of Daraprim even higher?

15   A.  I did not hear him say that, but I have read that.

16   Q.  Did you ever hear Mr. Shkreli say words to the effect that

17   I could have raised the price of Daraprim even higher and made

18   more profits for our shareholders?

19   A.  Again, I don't recall that I heard him say that, but I have

20   read that.

21   Q.  And you are a shareholder of Vyera's parent company,

22   Phoenixus, correct?

23   A.  Yes, I am.

24   Q.  As part of your compensation for working at Vyera, you've

25   been given shares in Phoenixus?

LC3MFTC1                         Pelliccione - Direct

1    A.  Yes, I have.

2    Q.  As of December 2020, you own more than 17,000 shares of

3    Phoenixus, correct?

4    A.  I think honestly -- I don't remember how many shares.

5    Q.  But you do hold shares?

6    A.  I do.

7    Q.  And you hold the voting rights for some of those shares,

8    correct?

9    A.  Correct.

10   Q.  And Mr. Shkreli holds the voting rights to some of your

11   shares in Phoenixus, correct?

12   A.  I believe that's correct.

13   Q.  Let's talk about your role in Vyera's efforts to enter into

14   an exclusive supply contract with a Japanese API supplier

15   called Fukuzyu.  Are you with me?

16   A.  Yes.

17            MR. MEIER:  For the record Fukuzyu --

18            THE COURT:  I think it's on the glossary.

19            MR. MEIER:  Your Honor, would it be better if I

20   stopped spelling things?

21            THE COURT:  I think I have gotten counsel into the

22   good/bad habit of spelling for the court reporters.  I think

23   it's whenever I think that it might not be on the glossary.

24            MR. MEIER:  Thank you, your Honor.

25   Q.  You're familiar with a Japanese company called Fukuzyu?

LC3MFTC1                        Pelliccione - Direct

1    A.   Yes, I am.

2    Q.   And Fukuzyu is at times abbreviated in documents as capital

3    FKZ?

4    A.   Correct.

5    Q.   As part of the process of working with the FDA when you

6    were transitioning the Daraprim new drug application from

7    impacts to Vyera, you learned that Impax had been obtaining its

8    pyrimethamine API from Fukuzyu, correct?

9    A.   Yes, it's part of the NDA.

10   Q.   And it is you that had noticed that in the NDA?

11   A.   That is correct.

12   Q.   NDA is an abbreviation for new drug application?

13   A.   Yes.

14   Q.   A new drug application that's used to describe the

15   collection of regulatory filings that a pharmaceutical company

16   has to make to get FDA approval to market a new drug?

17   A.   Pretty much, yes.

18   Q.   And you were actually the first person from Vyera who

19   contacted Fukuzyu, correct?

20   A.   That is correct.

21   Q.   And you contacted Fukuzyu because Vyera needed to establish

22   contact with them as the listed API supplier in the NDA?

23   A.   Yes, that's correct.

24   Q.   And you personally initially reached out to Fukuzyu in

25   April of 2016?

LC3MFTC1                    Pelliccione – Direct

1   A.   I believe that's correct.

2   Q.   And Fukuzyu is Vyera's supplier of pyrimethamine API today?

3   A.   Yes, it is.

4   Q.   And Fukuzyu is an important partner for Vyera?

5   A.   Yes.

6   Q.   Is it correct that no one from Vyera's business development

7   team was involved in reaching out to Fukuzyu in April 2016?

8   A.   As far as I know, yes.

9   Q.   Now, in October of 2016, you personally visited Fukuzyu's

10  facility in Japan, correct?

11  A.   With two of my colleagues, yes.

12  Q.   You were joined on the trip to Japan by your boss at the

13  time, Dr. Salinas, and by a person named Gopal Krishna?

14  A.   Yes, that's correct.

15  Q.   That one I am not sure if you have the spelling.  G-o-p-a-l

16  K-r-i-s-h-n-a.

17       Dr. Salinas was Vyera's president and head of research

18  and development at the time?

19  A.   Yes.

20  Q.   You now have his job?

21  A.   I don't have the president job.

22  Q.   Thank you.

23       In effect, Dr. Salinas was Vyera's senior most

24  scientist at the time, correct?

25  A.   Yes, that's correct.

LC3MFTC1                         Pelliccione - Direct

1   Q.  Mr. Krishna was Vyera's vice-president of chemistry,

2   manufacturing, and control?

3   A.  Yes, that's correct.

4   Q.  And the term chemistry, manufacturing, and control is often

5   abbreviated as capital CMC, correct?

6   A.  Yes.

7   Q.  And you were Vyera's senior vice-president for regulatory

8   affairs at the time of the visit to Japan?

9   A.  That's correct.

10  Q.  So the three people Vyera sent to meet with Fukuzyu were

11  the company's most senior people responsible for science,

12  manufacturing, and regulatory affairs?

13  A.  Yes.

14  Q.  And no one from Vyera's business development team visited

15  Fukuzyu in Japan with you in 2016, correct?

16  A.  That is correct.

17  Q.  As part of your visit to Japan you toured the plant where

18  Fukuzyu makes pyrimethamine API?

19  A.  Yes, we did.

20  Q.  You took the plant tour because it's important for a

21  manufacturer who is having a product manufactured by someone

22  else to assure themselves that it is being made in a so-called

23  GMP facility and under good conditions?

24  A.  Well, I'd like to.

25          THE COURT:  Is that a yes or a no?  If you can answer

LC3MFTC1                    Pelliccione - Direct

1   yes or no, you should do so.  If you need to explain your

2   answer, you'll have an opportunity to do so on

3   cross-examination.  If you can't answer it yes or no, of

4   course, you may give a brief instruction or explanation.

5   A.   Can I hear the question again, please?

6   Q.   Yes.  You took the plant tour because it's important for

7   any manufacturer who is having a product manufactured by

8   someone else to assure themselves that it is being made in a

9   so-called GMP facility and under good conditions?

10  A.   Technically, yes.

11  Q.   Thank you.

12        You actually said that in your investigational

13  hearing.  Do you remember that?

14  A.   No.

15        THE COURT:  I don't think we have an answer to that

16  for the record.

17        THE WITNESS:  Off the top of my head, I don't

18  remember.

19  Q.   GMP stands for good manufacturing practices, correct?

20  A.   Yes, it does.

21  Q.   And the term good manufacturing practices is often

22  abbreviated as capital G, M, and P?

23  A.   Yes.

24  Q.   And good manufacturing practices are regulations enforced

25  by the FDA to assure the proper design monitoring and control

LC3MFTC1                    Pelliccione - Direct

1   of pharmaceutical manufacturing processes and facilities?

2   A.   That is correct.

3   Q.   Sometimes the acronym GMP is preceded by the letter C,

4   correct?

5   A.   Yes.

6   Q.   And the C stands for current, correct?

7   A.   That is correct.

8   Q.   So when you see CGMP, it means the most current good

9   manufacturing practices that the FDA requires?

10  A.   That's correct.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCEKFTC2                          Pelliccione - Direct

1   BY MR. MEIER:

2   Q.  You thought it was important that the specific team of

3   people from Vyera who attended the meetings with Fukuzyu go on

4   the plant tour?

5   A.  Yes.

6   Q.  And you wanted to be there specifically because you were

7   responsible for regulatory affairs and quality assurance?

8   A.  Yes.

9   Q.  And Gopal Krishna wanted to be there because he was the

10  head of CMC and you were touring a manufacturing plant?

11  A.  Yes.

12  Q.  And Dr. Salinas wanted to be there because he was the head

13  of R&D and he actually oversees the whole operations for Vyera?

14          MR. CASEY:  Your Honor, I object to the question.

15  He's asking about what Mr. Salinas wanted to do.  It's not

16  within the knowledge of the witness.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes.

19  BY MR. MEIER:

20  Q.  Thank you.

21          And no one from Vyera's business development team took

22  the Fukuzyu plant tour with you?

23  A.  That's correct.

24  Q.  As part of your visit to Japan, you also met with Fukuzyu's

25  technical personnel responsible for making pyrimethamine API?

1  A.  I believe we did some of them anyway.

2  Q.  And, again, no one from Vyera's business development team

3  met with Fukuzyu's technical personnel responsible for making

4  API?

5  A.  That's correct.

6  Q.  Let's now talk about the master services agreement between

7  Vyera and Fukuzyu.

8          You were part of Vyera's team responsible for getting

9  the agreement with Fukuzyu to supply Vyera with pyrimethamine

10  API, correct?

11  A.  Yes.

12  Q.  And this role included reading the documents related to the

13  master services agreement?

14  A.  Yes.

15  Q.  And your role included making sure that the agreement made

16  sense?

17  A.  Part of it, yes.

18  Q.  And your role included making sure that certain things were

19  included in the agreement, like the quality agreement?

20  A.  The quality agreement is referred to in the service

21  agreement, yes.

22  Q.  So your role included making sure that certain things were

23  included in the agreement, like the quality agreement?

24  A.  Yes.

25  Q.  And Vyera entered into the master services agreement with

LCEKFTC2                          Pelliccione - Direct

1   Fukuzyu in January of 2017?

2   A.   That's correct.

3   Q.   And Vyera's agreement with Fukuzyu includes an exclusivity

4   provision?

5   A.   Yes.

6   Q.   And Vyera didn't coerce Fukuzyu to include the exclusivity

7   provision in the master services agreement, correct?

8   A.   That's correct.

9   Q.   Instead, Vyera made it financially attractive for Fukuzyu

10  to enter the exclusivity agreement, correct?

11  A.   I can't answer that.

12  Q.   Well, let me ask you this:  As part of the agreement, did

13  Vyera offer Fukuzyu the prospect of supplying Vyera with

14  additional pyrimethamine API -- I'm sorry, let me start that

15  over.

16           As part of the agreement, Vyera offered Fukuzyu the

17  prospect of supplying additional pyrimethamine API for future

18  drug products Vyera was hoping to develop?

19  A.   I don't believe that's part of the actual agreement.

20  Q.   But that was part of the discussions with Fukuzyu, wasn't

21  it?

22  A.   That was part of -- we discussed the potential that Fukuzyu

23  could do API development for us.

24  Q.   In fact, that was discussed by you and Dr. Salinas with the

25  people at Fukuzyu, correct?

LCEKFTC2                    Pelliccione - Direct

1    A.  Yes.

2    Q.  And Fukuzyu had an understanding that there may have been

3    future developed products that would require pyrimethamine and

4    that Vyera would buy that pyrimethamine from Fukuzyu?

5            MR. CASEY:  Objection, your Honor.  I don't know that

6    the witness can testify to Fukuzyu's understanding.  A proper

7    foundation hasn't been laid.

8            THE COURT:  Sustained.

9    BY MR. MEIER:

10   Q.  As part of the agreement, Vyera offered Fukuzyu a better

11   price for pyrimethamine API than potential generic Daraprim

12   manufacturers would, correct?

13   A.  I don't know that.

14   Q.  Okay.

15           MR. MEIER:  Ms. Guy, would you please put Government

16   Exhibit 1020 on the screen.  Hopefully, the technology is

17   working.

18   Q.  If you could take a moment to just look at that first page?

19           THE COURT:  So do you have the ability to enlarge the

20   text?

21           Thank you.

22           MS. GUY:  You're welcome.

23   BY MR. MEIER:

24   Q.  Let me ask you this first Dr. Pelliccione.

25   A.  Excuse me.  Is it up?  Because there's no -- it flashes up,

LCEKFTC2                          Pelliccione - Direct

1    and then it goes away.

2    Q.  Okay.

3         MR. MEIER:  I don't know about courtroom technology.

4    Do we need to bring somebody in to help with that, your Honor?

5         THE COURT:  So I ask counsel to test the equipment in

6    advance of each day's session.  We'll ask my deputy to come and

7    try to assist and, if necessary, courtroom support.  So why

8    don't you continue, counsel.

9    BY MR. MEIER:

10   Q.  Do you see it up there now?

11   A.  No.

12        MR. MEIER:  Unfortunately, your Honor, when we got

13   ready for this trial, the rule was we had to put everything up,

14   so I didn't have time to put together binders, and I do not

15   have a backup other my own personal copy that's been

16   highlighted.  I'm happy to give the witness my personal

17   highlighted copy.

18        THE COURT:  I don't think that's necessary for this

19   document.  I think you can go ahead.

20        MR. MEIER:  Okay.

21   BY MR. MEIER:

22   Q.  Well, Dr. Pelliccione, do you know whether you have seen

23   the document marked as Government Exhibit 1020 before?

24   A.  I do not know.

25        MR. MEIER:  Okay.  I'm not sure if I can continue with

LCEKFTC2                          Pelliccione - Direct

1    this, then.  We'll have to put that one aside, and I will come

2    back to that.  Apologies, your Honor.  We'll do better

3    tomorrow, I hope.

4    BY MR. MEIER:

5    Q.  As part of your role at Vyera, you were responsible for

6    helping make sure that Fukuzyu was compliant with the master

7    services agreement, correct?

8              THE COURT:  Put the document back up again, please.

9              MS. GUY:  Yes.  I was just seeing if it would --

10             (Pause)

11             THE COURT:  Okay, counsel, why don't you continue.

12   We're going to be assisted in a moment with technical -- oh,

13   maybe they're here.

14             So we're having trouble -- counsel is having trouble

15   displaying the image on the witness' screen.  It's on my scene,

16   and it's on counsel's screens.

17             MR. MEIER:  It appears to be working everywhere except

18   for the witness, your Honor.

19             (Pause)

20             THE COURT:  So, Mr. Whertvine, if you would watch what

21   technical changes are being done, that would be of assistance.

22             You'll be happy to know this isn't coming off your

23   time.

24             MR. MEIER:  Okay.  Thank you, your Honor.  It's a huge

25   relief.  I was about to ask Mr. Albert to rearrange our

LCEKFTC2                    Pelliccione - Direct

1    schedules.

2           (Pause)

3           THE COURT:  We're going to take a midmorning recess.

4    A cable needs to be replaced.  Let's make it ten minutes, I

5    think.

6           Okay, good.  Have a nice break.

7           (Recess)

8           MR. MEIER:  Thank you, your Honor.  Again, Markus

9    Meier, for the Federal Trade Commission.

10          We have put up on the screen Government's

11   Exhibit 1020.

12   BY MR. MEIER:

13   Q.  Do you see that now, Mr. Pelliccione -- Dr. Pelliccione?

14   A.  Yes, I do.

15          MR. MEIER:  If we could briefly put the cover email

16   up.

17          MS. GUY:  Working on it.

18          Now, the technical difficulties have --

19          (Pause)

20          MR. MEIER:  Again, your Honor, I appreciate the

21   Court's indulgence, and, hopefully, we'll work through these

22   kinks and not have this happen a whole lot more.

23   BY MR. MEIER:

24   Q.  Dr. Pelliccione, do you see the cover email here?

25   A.  Yes, I do.

LCEKFTC2                    Pelliccione - Direct

1   Q.   And the emails from Gopal Krishna, correct?

2   A.   Yes.

3   Q.   And it's to you and Adam Bloom, correct?

4   A.   Yes.

5   Q.   And the subject is master services agreement?

6   A.   Correct.

7   Q.   And it attaches the Fukuzyu-Turing master services

8   agreement executed.  Do you see that?

9   A.   Yes.

10  Q.   Have you seen Government Exhibit 1020 before?

11  A.   That's the MSA?

12  Q.   Yes.  And this email.

13  A.   I've probably seen the email, but, yes, I've seen the MSA.

14  Q.   So what is Government Exhibit 1020?

15          THE COURT:  Is that the email or the MSA?

16          MR. MEIER:  Well, the email -- the MSA is attached to

17  the email, your Honor.

18          THE COURT:  Okay.  But on the screen, I don't think

19  you see an exhibit number.  So the witness may not know what

20  you're referring to when you use the exhibit number.

21  BY MR. MEIER:

22  Q.   So the exhibit --

23  A.   I see it.

24  Q.   -- Dr. Pelliccione, is both the email with the MSA

25  attached.

LCEKFTC2                        Pelliccione - Direct

1   A.  You're asking have I seen this?

2   Q.  Yes, I've asked you have you seen it, and then I'm asking

3   you what it is.

4   A.  Okay.  So, yes, I've seen it, and it is the service

5   agreement between Turing and Fukuzyu for pyrimethamine API.

6   Q.  Thank you.

7           MR. MEIER:  Your Honor, I move to admit Government

8   Exhibit 1020 in evidence.

9           THE COURT:  Received.

10          (Government's Exhibit 1020 received in evidence)

11  BY MR. MEIER:

12  Q.  Let's -- now, hopefully, this will work.  Let's look at the

13  first page of Government Exhibit 1020, the actual agreement

14  now.

15          Do you see that?

16  A.  Yes.  It's a little blurry and small.

17  Q.  Okay.  We'll work on that.

18          MR. MEIER:  Now I'd like to move to the upper half of

19  the second page, if that can work.

20          I missed my own cue.  Let's, actually, look at the

21  upper half of page 14.  Sorry.

22          I'm sorry, page 14 of the master services agreement,

23  which is page 15 of the exhibit.

24          Again, apologies as we work through this.

25  Q.  Do you see that page?

43

LCEKFTC2                          Pelliccione - Direct

1    A.  Yes, I do.

2    Q.  So this is the executed version of the master services

3    agreement?

4    A.  Yes, it is.

5    Q.  And Mr. Tilles was the chief executive officer of Turing at

6    the time?

7    A.  Yes.

8    Q.  And Mr. Kosugi was the president of Fukuzyu at the time?

9    A.  Yes.

10   Q.  Is it correct that Mr. Tilles actually went to Japan to

11   sign the master services agreement with Mr. Kosugi on

12   January 25, 2017?

13   A.  I'm not sure about that.

14   Q.  Okay, all right.

15              MR. MEIER:  You can take that down, Ms. Guy.

16              Your Honor, I apologize.  I asked to have this

17   admitted.  I don't remember if I got a ruling on that.

18              THE COURT:  Yes, it was received.

19              MR. MEIER:  Thank you, your Honor.

20   BY MR. MEIER:

21   Q.  As part of your role at Vyera, you were responsible for

22   helping Fukuzyu make sure that it remained compliant with the

23   agreement, correct?

24   A.  I'm not entirely sure what you mean.

25   Q.  Well, from time to time, Fukuzyu would check with you to

LCEKFTC2                    Pelliccione - Direct

1   make sure that it was still abiding by certain terms in the

2   master services agreement, correct?

3   A.  Yes.

4          MR. MEIER:  So, actually, I'd like to pull it up again

5   and look at the very top of page 4 of the master services

6   agreement.  If we could blow up paragraph (b) there.

7   BY MR. MEIER:

8   Q.  Do you recognize what paragraph (b) is on page 4 of

9   Government Exhibit 1020?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's the provision for exclusivity for Fukuzyu to provide

13  the pyrimethamine to Turing.

14  Q.  And you understood the term "territory" to mean United

15  States?

16  A.  Yes.

17  Q.  And you understood that the exclusivity only applied to the

18  use of pyrimethamine API for humans only?

19  A.  Yes.

20  Q.  So Fukuzyu could still sell API in the United States for

21  animal use?

22  A.  If they chose to, yes.

23  Q.  And one of your roles at Vyera was to make sure Fukuzyu

24  remained compliant with this exclusivity provision, correct?

25  A.  It wasn't really my role.

LCEKFTC2                        Pelliccione - Direct

1   Q.  But Fukuzyu would check with you through a person named

2   Mr. Arisawa, correct?

3   A.  Mr. Arisawa would basically send everything through me.

4   Q.  Right.

5   A.  He was the liaison with us.

6   Q.  So Mr. Arisawa was Vyera's representative in Japan,

7   correct?

8   A.  Yes, that's correct.

9   Q.  And Mr. Arisawa would assist Vyera in its negotiations and

10  relations with Fukuzyu.

11  A.  In the sense that we would provide him with information to

12  bring back to Fukuzyu.

13  Q.  Right.

14          And Mr. Arisawa speaks Japanese?

15  A.  Yes.

16  Q.  And he's somebody you knew from a position you had before

17  you came to Vyera?

18  A.  That is correct.

19  Q.  And it was you who had reached out to Mr. Arisawa to

20  develop a relationship for him to act as Vyera's representative

21  in Japan, correct?

22  A.  That's correct.

23  Q.  And, from time to time, Mr. Arisawa would send you

24  questions from Fukuzyu about the interpretation of this

25  exclusivity provision, correct?

LCEKFTC2                          Pelliccione - Direct

1    A.   That was done, yes.

2    Q.   And one of the outcomes of this exclusivity provision was

3    to prevent generic manufacturers in the United States from

4    acquiring pyrimethamine API from Fukuzyu for human use,

5    correct?

6    A.   That would have been an outcome, it would have prevented

7    any manufacturer that wanted the API.

8    Q.   To use the API for human use in the United States?

9    A.   In the United States.

10   Q.   This outcome was beneficial for Vyera in the sense that

11   Vyera would have less competition?

12   A.   In essence, I guess, yes.

13   Q.   I don't want you to guess.  Could you just say whether

14   that's correct or not?

15   A.   That would be correct.

16   Q.   Thank you.

17        MR. MEIER:  We can take that exhibit down, and I would

18   ask Ms. Guy to pull up Government Exhibit 1019.

19        Actually, I'm going to --

20   BY MR. MEIER:

21   Q.   Can you see this, Dr. Pelliccione --

22   A.   Yes.

23   Q.   -- or do we need to blow it up?

24        If you could take just a quick moment and familiarize

25   yourself with it before I ask a couple of questions.

LCEKFTC2                          Pelliccione - Direct

1          Again, I'm not asking you about -- I'll ask you about

2   some specific sentences, but I just want you to get a sense of

3   what this actually is.

4          Here's my question, Dr. Pelliccione --

5   A.  Yes.

6   Q.  -- have you seen the email chain that's marked as

7   Government Exhibit 1019 before?

8   A.  Yes.

9   Q.  And what is Government Exhibit 1019?

10  A.  It's a series of emails covering a couple of different

11  things related to Daraprim.

12  Q.  I don't know how to pronounce the name.  It says it's

13  from -- what's the name of the person?

14  A.  Senajda.

15  Q.  Senajda?

16  A.  Celaj.

17  Q.  That's spelled S-e-n-a-j-d-a and the last name -- Celaj,

18  you said?

19  A.  Yes.

20  Q.  -- is C-e-l-a-j.

21          Is Senajda Celaj a man or a woman?

22  A.  A woman.

23  Q.  Did Ms. Celaj send an email to you, Dr. Pelliccione?

24  A.  Yes, she did.

25          MR. MEIER:  Your Honor, I would move to admit

LCEKFTC2                          Pelliccione - Direct

1   Government Exhibit 1019 in evidence.

2              THE COURT:  Received.

3              (Government's Exhibit 1019 received in evidence)

4              MR. MEIER:  Let's turn to page 2 of Government Exhibit

5   1019.

6   BY MR. MEIER:

7   Q.  I'm going to ask you about the fifth line down, where it

8   says, "On November 22, 2016, at 7:31 a.m."

9              Do you see that?

10  A.  Yes, I do.

11  Q.  Let me read the entire line there.  "On November 22, 2016,

12  at 7:31 a.m., Nick Pelliccione," and it has your email address,

13  "wrote the following."  After the greeting, where it says,

14  "Morning Senajda," you write, "We got good news from Mikio in

15  Japan overnight — Fukuzyu has accepted our agreement to provide

16  pyrimethamine exclusively for us for human drugs and will not

17  sell to generic manufacturers.  That is a big sigh of relief

18  for us!"

19             Do you see that?

20  A.  Yes.

21  Q.  And you wrote that email, correct?

22  A.  Yes.

23  Q.  When it says Mikio, M-i-k-i-o, that's Mikio Arisawa?

24  A.  Correct.

25  Q.  Again, Mr. Arisawa was your representative in Japan?

LCEKFTC2                    Pelliccione - Direct

1   A.   Yes.

2   Q.   And Mr. Arisawa helped you negotiate the exclusivity

3   agreement with Fukuzyu?

4   A.   Yes.  He served as our liaison.

5   Q.   Still looking at Government Exhibit 1019, "Our agreement"

6   in that sentence refers to the master services agreement?

7   A.   Yes.

8   Q.   And that's the agreement for Fukuzyu to supply

9   pyrimethamine API to Vyera for use in making Daraprim?

10  A.   Yes.  Vyera in the sense that at the time, it was Turing,

11  but, yes.

12  Q.   When it says "will not sell to generic," when you wrote

13  that, that means that under the agreement between Fukuzyu and

14  Vyera, Vyera -- I'm sorry, let me start that over.

15       Where it says "will not sell to generics," that means

16  that under the agreement between Fukuzyu and Vyera, Fukuzyu

17  agreed not to sell pyrimethamine API to any generic companies

18  in the United States that might compete with Vyera, correct?

19  A.   It's correct in that generic manufacturers are among

20  pharmaceutical manufacturers in the United States, but it would

21  have excluded any pharmaceutical manufacturer in the United

22  States.

23  Q.   I appreciate that.

24       So not just the generic manufacturers were excluded,

25  but anybody who might want to make pyrimethamine in competition

50

LCEKFTC2                    Pelliccione – Direct

1   with Vyera?

2   A.  Only to use Fukuzyu's pyrimethamine.

3   Q.  Right.  Got it.  Thank you.

4        And then you say, "That is a big sigh of relief for

5   us!"

6        And by that, you were relieved that Fukuzyu had agreed

7   not to sell pyrimethamine to any of Vyera's competitors in the

8   United States, correct?

9   A.  I don't know that that's specifically what I meant.  We

10  were very relieved that we had finally gotten to an agreement

11  that was going to be signed.

12  Q.  All right.

13       MR. MEIER:  Let's turn to page 1 of Government

14  Exhibit 1019 and the middle of the page, and let's see if

15  Ms. Guy can call that up.

16  BY MR. MEIER:

17  Q.  Do you see that on your screen?

18  A.  Yes.

19  Q.  This is later in the day, around 8:18 a.m., still on

20  November the 22nd, correct?

21  A.  Yes.

22  Q.  Do you see where you wrote, "The Fukuzyu thing is great for

23  us!"  It's actually the third paragraph down.

24  A.  Yes.

25  Q.  You write, "The Fukuzyu thing is great for us!"

LCEKFTC2                        Pelliccione - Direct

1              "The Fukuzyu thing" means the exclusive API agreement

2     between Vyera and Fukuzyu, correct?

3     A.   It means the supply agreement.

4     Q.   Right.

5              With the exclusivity provision?

6     A.   That's part of it, yes.

7     Q.   Thank you.

8              MR. MEIER:  Ms. Guy, you can take Government

9     Exhibit 1019 down.  Thank you.

10    Q.   As Part of the contract, or the agreement, with Fukuzyu,

11    Vyera didn't make any investment in developing Fukuzyu's

12    manufacturing process for API, did it?

13    A.   No.

14    Q.   And Vyera didn't discover Daraprim?

15    A.   No.

16    Q.   And Vyera doesn't actually make or manufacture Daraprim,

17    correct?

18    A.   You mean as an actual manufacturer?

19    Q.   That's right.

20    A.   No, we don't manufacture anything.

21    Q.   Vyera uses a third-party contracted manufacturing

22    organization to make Daraprim, correct?

23    A.   Correct.

24    Q.   Vyera doesn't actually manufacture the active

25    pharmaceutical ingredient in Daraprim, correct?

52

LCEKFTC2                          Pelliccione - Direct

1    A.   That's correct.

2    Q.   Fukuzyu does?

3    A.   Yes.

4    Q.   And Vyera doesn't distribute pyrimethamine API in the

5    United States or anywhere else in the world, does it?

6    A.   No.

7    Q.   Vyera uses a third party to distribute Daraprim for it?

8    A.   Daraprim, the product?

9    Q.   The product.

10   A.   Yes.

11   Q.   The pill, Daraprim, is distributed for Vyera by another

12   company?

13   A.   Correct.

14   Q.   But Vyera does set the price of Daraprim, correct?

15   A.   Apparently, yes.

16   Q.   I'm sorry, what?

17   A.   Apparently, yes.

18   Q.   Okay.   Thank you.

19            Your responsibilities for working with Fukuzyu didn't

20   end after the two companies signed the exclusive agreement,

21   correct?

22   A.   That's correct.

23   Q.   You continued to be involved primarily for issues of

24   regulatory and quality issues?

25   A.   That's correct.

LCEKFTC2                          Pelliccione – Direct

1   Q.  And, again, you would work sometimes with your

2   representative in Japan, Mr. Arisawa, correct?

3   A.  Correct.

4   Q.  He continued to assist you with those types of issues as a

5   go-between from Vyera to Fukuzyu?

6   A.  Yes.

7   Q.  So, under the exclusivity provision of the contract, Vyera

8   gets to decide which, if any, companies in the United States

9   may buy pyrimethamine API from Fukuzyu?

10  A.  If Vyera were going to agree to have another company

11  purchase the API, that would be correct.

12  Q.  Right.

13        MR. MEIER:  Ms. Guy, would you please put Government

14  Exhibit 1003 on the screen.  Thank you.

15  Q.  Would you take a moment to just get a general sense of it.

16  I'm going to ask you some specific questions, but the first

17  thing I'm going to ask you, as I always will, is:  Have you

18  seen this before and what is it?

19  A.  Well, yes, I have seen it before.  It's a fairly old email.

20        Could you make it a little bigger or darker.

21        MR. MEIER:  Let's just make the top part a little

22  bigger.

23        THE WITNESS:  Thank you.

24        It's regarding supplying pyrimethamine to another

25  company.

54

LCEKFTC2                    Pelliccione - Direct

1   BY MR. MEIER:

2   Q.  And it's an email chain between you and your representative

3   in Japan, Mr. Arisawa, correct?

4   A.  That's correct.

5           MR. MEIER:  Your Honor, I move to admit Government

6   Exhibit 1003 in evidence.

7           THE COURT:  Received.

8           MR. CASEY:  Your Honor, on that point, if I may, the

9   emails that are coming from Mr. Arisawa, we would submit, are

10  hearsay.  We object to the admission on that basis.

11          MR. MEIER:  Your Honor, I think it's been well

12  established that Mr. Arisawa was an agent for Vyera in Japan

13  and continued to work with Vyera as Vyera's agent in

14  negotiations and then in the further efforts to make sure that

15  Fukuzyu complied with the agreements.

16          THE COURT:  Overruled.

17          MR. MEIER:  Thank you, your Honor.

18          THE COURT:  Received.

19          (Government's Exhibit 1003 received in evidence)

20          MR. MEIER:  Thank you, your Honor.

21  BY MR. MEIER:

22  Q.  I'm going to start with the earliest email, which actually

23  is the one at the back, because as often is the case, you go in

24  sort of reverse chronological order, and I want to do it in

25  chronological order.  So we're going to start with the earliest

LCEKFTC2                    Pelliccione - Direct

1   one in the chain, the one at the bottom of page 1, which is

2   from Mr. Arisawa to you.  And I see Ms. Guy has pulled that up.

3          Do you see where it says, "Hi Nick"?

4   A.  Yes.

5   Q.  And, again, "FKZ" is Fukuzyu?

6   A.  Yes.

7   Q.  So Mr. Arisawa writes, "Hi Nick.  Fukuzyu was approached by

8   an American pharmaceutical company called APTRICA for the

9   supply of pyrimethamine API for generic use."

10         Do you see that?

11  A.  Yes, I do.

12  Q.  "For generic use" meant that APTRICA wanted to buy

13  pyrimethamine API from Fukuzyu to make a generic Daraprim in

14  competition with Vyera, correct?

15  A.  Apparently, yes.

16  Q.  And moving up to page 1 of Government Exhibit 1003, do you

17  see your email in response?  And Ms. Guy is going to blow that

18  up for you?

19  A.  Yes.

20         MR. MEIER:  Let's get that centered.  There we go.

21  Q.  Do you see that?

22  A.  Yes, I do.

23  Q.  And you wrote, "Dear Mikio, I can confirm that the company

24  you mention below, APTRICA, is not affiliated with Vyera in any

25  way."

56

LCEKFTC2                          Pelliccione - Direct

1     Do you see that?

2     A.   Yes.

3     Q.   You didn't want a generic competitor to get access to

4     pyrimethamine API, correct?

5     A.   That was not the question I was asked.  It was whether or

6     not APTRICA was affiliated with Vyera, and they were not.

7              THE COURT:  So can you answer the question that was

8     asked by counsel?

9              THE WITNESS:  Can you repeat the question?

10    BY MR. MEIER:

11    Q.   My question was:  You didn't want a generic competitor to

12    get access to the API to make Daraprim, correct?

13    A.   We didn't want another American pharmaceutical company as

14    part of the exclusivity agreement.  That was basically the

15    fact.

16    Q.   Right.

17             So, actually, we'll take a look at the top of page 1

18    of Government Exhibit 1003.

19             Mr. Arisawa writes back to you, "I passed your message

20    to Fukuzyu and asked not to supply pyrimethamine to APTRICA."

21             Do you see that?

22    A.   Yes.

23    Q.   So Mr. Arisawa understood that you didn't want Fukuzyu to

24    sell pyrimethamine API to a generic competitor in the United

25    States, correct?

LCEKFTC2                    Pelliccione - Direct

1          MR. CASEY:  Objection.  Your Honor --

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes, that's correct.

4   BY MR. MEIER:

5   Q.  Okay.

6          MR. MEIER:  Ms. Guy, you can take Government

7   Exhibit 1003 down.  Thank you.

8          Ms. Guy, would you please put Government Exhibit 1005

9   on the screen.  Thank you.

10  Q.  Again, just take a moment, to the extent you can read this,

11  to just get familiar with it, and I'm going to start by asking

12  you:  Have you seen it before?  And what is it?

13  A.  Yes, I've seen it before.

14         And it is a series of emails between Dr. Arisawa and

15  myself regarding pyrimethamine sale -- pyrimethamine API sale

16  to a company called Sanyo.

17         MR. MEIER:  Okay.  Your Honor, I move to admit

18  Government Exhibit 1005 in evidence.

19         THE COURT:  Received.

20         (Government's Exhibit 1005 received in evidence)

21  BY MR. MEIER:

22  Q.  Again, let's start with the earliest email in the chain,

23  which is the bottom of page 2, and it appears to be from

24  Mr. Arisawa to you.

25         Do you see that, Dr. Pelliccione?

LCEKFTC2                          Pelliccione - Direct

1    A.  Yes, I do.

2    Q.  I'm sorry.  A moment ago, I think I heard you say

3    Dr. Arisawa?

4    A.  Yes.

5    Q.  Is that actually his correct title?

6    A.  That is correct.

7    Q.  Okay.  I'll try to remember that.

8         Do you see where it says, "Hi Nick"?

9    A.  Yes.

10   Q.  Then it says, "Fukuzyu informed me that they are selling

11   PYR to a Japanese trading company called Sanyo."

12        Do you see that?

13   A.  Yes.

14   Q.  And PYR would be pyrimethamine?

15   A.  Yes.

16   Q.  Reading the rest of it, "which, in turn, planned to sell it

17   to an American pharma that intends to develop it for South

18   America."

19        Do you see that?

20   A.  I do.

21   Q.  And it says, "Fukuzyu judged that this contract would not

22   interfere with the exclusivity term in the SA with you because

23   the exclusivity is confined to the U.S. market."

24        Do you see that?

25   A.  I do.

LCEKFTC2                    Pelliccione - Direct

1  Q.  And "SA," that's an abbreviation for the master services

2  agreement?

3  A.  Yes.

4  Q.  Then it says, "Fukuzyu does not know where the American

5  company plans to conduct clinical trials for development.  In

6  other words, it might conduct clinical trials in the U.S.  No

7  information," correct?

8  A.  That's correct.

9  Q.  So what I'd like to do is continue to look at this

10  Government Exhibit 1005, but I'd like to move to the middle of

11  the page of page 1, where you write back.

12          Do you see that blown up?

13  A.  Yep.

14  Q.  And you're following up on that email from Mr. Arisawa that

15  informs you that a Japanese trading company called Sanyo wants

16  to acquire pyrimethamine for a company in the United States,

17  correct?

18  A.  That's correct.

19  Q.  So you write back -- do you see where it says, "in order

20  for us"?

21  A.  Yes.

22  Q.  Okay.  Sorry, but this is going to be a little bit long,

23  but it says, "In order for us to be sure there is no breach of

24  contract here, we would need assurances in the form of

25  representations and warrants in their contract with Sanyo that

LCEKFTC2                        Pelliccione - Direct

1   the API sold to the U.S. company will not be used to make

2   pyrimethamine drug product for human use that will find its way

3   back to the U.S. for commercial purposes, either via normal

4   prescription drug distribution or via 'compounded drug

5   products' or 'compounding pharmacies.'"

6           Do you see that?

7   A.  Yes, I do.

8   Q.  Do you recall how Mr. Arisawa responded back to you on

9   this?

10  A.  I believe -- no, I don't recall exactly, no.

11  Q.  All right.  Then let's take a look at the top of Government

12  Exhibit 1005, the third paragraph.

13          Mr. Arisawa writes, "She replied" -- I'm sorry, let me

14  give you -- do you see where it says, "she replied"?

15  A.  Yes.

16  Q.  "She replied saying Fukuzyu understand to put such words in

17  the contract," correct?

18  A.  That's what it says, yes.

19  Q.  So you were instructing Mr. Arisawa to instruct Fukuzyu

20  that before it could sell API to a Japanese company called

21  Sanyo, Vyera needed assurances that the API it was selling to

22  Sanyo, that Sanyo was going to send to an American company,

23  would not find its way back into the United States, correct?

24  A.  That is correct, yes.

25  Q.  You wanted to make sure that if Fukuzyu sells pyrimethamine

LCEKFTC2                     Pelliccione - Direct

1    API to another American pharmaceutical company, that none of

2    that ends up in the United States?

3    A.  We wanted to make sure they were adhering to the

4    exclusivity agreement, yes.

5    Q.  And you wanted to make sure that none of the pyrimethamine

6    ends up competing in some way with Vyera's Daraprim?

7    A.  Ultimately, that would be the case.

8            MR. MEIER:  We can take that down, please.

9    Q.  Have you ever heard of a person named Akeel in a then?

10   A.  Yes.

11           MR. MEIER:  Akeel is spelled A-k-e-e-l.

12   Q.  Who is Mr. Mithani?

13   A.  Right now?

14   Q.  Sure.

15   A.  He is business development -- he is in the business

16   development group — actually, the head of business development

17   now — at Vyera.

18   Q.  And Mr. Mithani is not a chemist, correct?

19   A.  I do not believe he is, no.

20   Q.  And as far as you know, Mr. Mithani doesn't have any

21   background in pharmaceutical chemistry, manufacturing, or

22   controls, correct?

23   A.  As far as I know.

24   Q.  And as far as you know, Mr. Mithani doesn't have any

25   background in pharmaceutical regulatory affairs?

LCEKFTC2                         Pelliccione – Direct

1   A.  Correct.

2   Q.  In fact, you don't know what Mr. Mithani's background is

3   other than business development?

4   A.  That's correct.

5   Q.  And as you said, Mr. Mithani is part of Vyera's business

6   development team, and today, is actually the head?

7   A.  Correct.

8   Q.  Do you know the circumstances of how Mr. Mithani was hired

9   by Vyera?

10  A.  No, I do not.

11  Q.  Do you know whether it was Mr. Shkreli who had any role in

12  getting Vyera to hire Mr. Mithani?

13  A.  I don't know for sure, no.

14  Q.  But you do know that Mr. Mithani eventually became one of

15  the directors of the board of directors for Phoenixus?

16  A.  Yes.

17  Q.  Did you vote your shares in Phoenixus to put Mr. Mithani on

18  the board?

19  A.  I don't recall.

20  Q.  Do you know whether Mr. Shkreli voted his shares in

21  Phoenixus to put Mr. Mithani on the board?

22  A.  I do not.

23  Q.  Have you ever heard of a person named Kevin Mulleady?

24  A.  Yes.

25  Q.  Who is Kevin Mulleady?

LCEKFTC2                          Pelliccione – Direct

1    A.   I do not know what he does now, but back several years ago,

2    he was an employee of Vyera.

3    Q.   He was actually, at one point, Vyera's CEO?

4    A.   Yes.

5    Q.   And when Mr. Mulleady was Vyera's CEO, you reported to him?

6    A.   Yes.

7    Q.   And Mr. Mulleady is not a chemist, is he?

8    A.   I don't believe he is, no.

9    Q.   And Mr. Mulleady doesn't have any background in

10   pharmaceutical chemistry, manufacturing, and controls?

11   A.   I don't believe so.

12   Q.   And Mr. Mulleady doesn't have any background in

13   pharmaceutical regulatory affairs?

14   A.   I don't believe so.

15   Q.   In fact, you don't know what Mr. Mulleady's background is

16   other than business development, do you?

17   A.   I don't know that -- I don't know that Mr. Mulleady's

18   background is business development.  I do know he has a degree

19   in aerospace engineering, but, other than that, I don't know

20   what his actual role is.

21   Q.   Do you know whether Mr. Mulleady was ever part of Vyera's

22   business development team?

23   A.   I don't recall that.

24   Q.   Do you know the circumstances of how Mr. Mulleady was hired

25   by Vyera?

LCEKFTC2                        Pelliccione - Direct

1   A.  No, I don't.

2   Q.  Do you know whether Mr. Shkreli had any role in getting

3   Vyera to hire Mr. Mulleady?

4   A.  No, I do not.

5   Q.  Do you know how Mr. Mulleady came to be your boss at Vyera?

6   A.  He was made executive director of the company and then

7   ultimately CEO, so, by default, I reported to him.

8   Q.  When you say he was made executive director of the company,

9   you mean he was put onto the board of directors?

10  A.  No, no.  He was -- both Kevin Mulleady and Akeel Mithani

11  were brought in as executive directors, and they were actually

12  running the company together while there was no official CEO,

13  to the best of my recollection.

14  Q.  I understand.  Okay, thank you.

15          And Mr. Mulleady also eventually became a member of

16  the Phoenixus board of directors, correct?

17  A.  I actually don't know that.

18  Q.  You don't know?  Okay.

19          I'm going to shift topics now.  Based on your more

20  than 35 years of experience working in the pharmaceutical

21  industry, would you agree that APIs take time to develop?

22  A.  Yes.

23  Q.  And based on your experience, it could take two-plus years

24  to develop an API from scratch?

25  A.  It depends on the API.

LCEKFTC2                    Pelliccione - Direct

1    Q.  Sure.

2            Well, what about Daraprim API, if you were developing

3    it from scratch, do you have a sense of how long that would

4    take?

5    A.  You mean to be able to use it in a pharmaceutical product?

6    Q.  Right.

7            From the time you start the project to the time you

8    can put it into a pharmaceutical product, do you have any idea

9    how long that might take?

10   A.  I mean, my best estimation would be that it would take

11   somewhere between 12 and 18 months, at the earliest -- at the

12   low end, and possibly more.

13   Q.  Okay.

14   A.  It's hard to tell.

15   Q.  Sure.  Understood.

16           But if you can find somebody with a drug master file

17   on file with the FDA, the process could go quicker, correct?

18   A.  If you were to -- yes.

19   Q.  Just so we're clear, a drug master file, that's a

20   submission to the FDA used to provide detailed information

21   about facilities, processes, and other articles used in the

22   manufacturing of human drugs?

23   A.  Yes.

24   Q.  And the term "drug master file" is often abbreviated as

25   capital DMF, correct?

LCEKFTC2                           Pelliccione - Direct

1    A.   That's correct.

2    Q.   Now, there are a number of steps a company needs to take to

3    develop an API, correct?

4    A.   Yes.

5    Q.   And you've had experience trying to do so, correct?

6    A.   Well, I'm not a manufacturing chemist myself, but I've been

7    involved in the development and the things that go into

8    manufacturing an API, yes.

9    Q.   Right.

10          I understand you're not a chemist; you're a regulatory

11   affairs person?

12   A.   At this point, yes.

13   Q.   And you have been involved in that capacity in the

14   development of an API, correct?

15   A.   Correct.

16   Q.   So the first step, you'd have to procure the raw materials

17   that would be required for the synthetic or the chemical

18   process, correct?

19   A.   That would be among the first.  First, you'd have to

20   establish the -- you'd have to figure out how to make it, and

21   that would tell you what your starting materials are.

22   Q.   Okay.

23          And you have to establish the process and make sure

24   you have the right equipment?

25   A.   Correct.

LCEKFTC2                          Pelliccione - Direct

1   Q.  And you have to be able to do analytical work that's

2   required to develop the specifications and test the product

3   along the way?

4   A.  Correct.

5   Q.  Until you're able to develop the final product?

6   A.  Yes.

7   Q.  Are there any other sort of key steps in the process that I

8   missed?

9   A.  Those are the major categories.

10  Q.  If you wanted to obtain pyrimethamine as an active

11  pharmaceutical ingredient, if somebody wanted to, it would help

12  to reach out to a company that already knows how to make it,

13  correct?

14  A.  Yes.

15  Q.  And it would help to reach out to a company that has a U.S.

16  DMF?

17  A.  That would help, yes.

18  Q.  And if you could reach out to a company that already had a

19  U.S. DMF, that would shorten the process to getting approval to

20  make a generic version, correct?

21  A.  Yes.

22  Q.  So would it be fair, to sort of summarize, that if you were

23  looking for API, your preferences, in order, would be, number

24  one, find an API supplier with a U.S. DMF for the drug product

25  you want to make?

68

LCEKFTC2                          Pelliccione - Direct

1    A.   Yes.

2    Q.   Number two would be to find an API supplier with a European

3    DMF for the drug product you want to make?

4    A.   I would not necessarily go look for a European DMF

5    supplier.

6    Q.   I understand.

7         I'm trying to -- I'm actually trying to get more sort

8    of an hierarchy of if you were looking for an API supplier, and

9    you couldn't find one with a U.S. DMF, would a European DMF be

10   the next best substitute?

11   A.   I don't know that that would be the case.

12   Q.   Okay.

13        Well, what would be the next best?  What would you

14   do -- if you were looking for an API supplier and can't find

15   anyone with a U.S. DMF, what would you do next to look for it?

16   A.   I would go look at other API manufacturers and see if they

17   can manufacture the API.

18   Q.   Well, how would you do that?

19   A.   You would send out proposals with information and ask them

20   to reply whether or not they can do this, and then there's

21   other steps after that.

22   Q.   So you'd establish some kind of an RFP process?

23   A.   More or less, yes.

24   Q.   Request for proposal?

25   A.   Correct.

LCEKFTC2                              Pelliccione - Direct

1    Q.   Have you ever heard of the Indian company called RL Fine?

2    A.   I've heard of them.

3    Q.   And RL Fine is a chemical manufacturer?

4    A.   I believe that's correct, yes.

5    Q.   And as far as you know, RL Fine makes APIs?

6    A.   I believe they do.

7    Q.   To the best of your knowledge, did RL Fine ever supply API

8    to Vyera for Daraprim?

9    A.   No.

10   Q.   Were you involved in any negotiations with RL Fine about a

11   pyrimethamine API agreement?

12   A.   No.

13   Q.   Is it correct that none of Vyera's senior-most people

14   responsible for science, manufacturing, or regulatory affairs

15   were involved in negotiations with RL Fine about a

16   pyrimethamine API agreement?

17   A.   I was not aware of any negotiations with RL Fine about an

18   agreement for pyrimethamine API until, in preparing for this

19   trial, it came up in discussions with my lawyers.

20   Q.   Okay.  Well, I'm not going to ask you about your

21   discussions with lawyers.

22   A.   Right.

23   Q.   So it wasn't until preparing for this trial, that you have

24   actually learned that Vyera has a contract with RL Fine or had

25   a contract with RL Fine?

LCEKFTC2                    Pelliccione - Direct

1    A.  That's correct.

2    Q.  All right.  I'll move on.

3           Is it fair to say that it's standard procedure for

4    Vyera that you typically have quality agreements with your API

5    suppliers?

6    A.  Yes.

7    Q.  To the best of your knowledge, did Vyera ever have a

8    quality agreement with RL Fine?

9    A.  Not to my knowledge.

10   Q.  And Vyera has a standard operating procedure which calls

11   for the audit, roughly, every two to three years of your

12   principal suppliers?

13   A.  That's correct.

14   Q.  Do you know whether Vyera ever conducted an audit of

15   RL Fine?

16   A.  I am not aware of that, no.

17   Q.  Do you know whether Vyera's ever hired a third party to

18   conduct a quality audit of RL Fine?

19   A.  I am not aware of that, no.

20   Q.  And you've never been involved in a quality audit of

21   RL Fine, have you?

22   A.  No.

23   Q.  Shifting back to Fukuzyu:

24          Fukuzyu has been manufacturing API for Daraprim for a

25   long time, correct?

LCEKFTC2                    Pelliccione - Direct

1   A.  I believe so.

2   Q.  Do you have any idea of how long?

3   A.  No.

4   Q.  You don't recall that discussion coming up when you visited

5   Japan?

6   A.  It may have, but I don't recall.

7   Q.  But it's correct, though, that Fukuzyu manufactures API not

8   just for Vyera, but for many other companies around the world?

9   A.  API in general or pyrimethamine?

10  Q.  Pyrimethamine API.  Sorry.  Thank you.

11  A.  I know they manufacture pyrimethamine API for other

12  companies.  I don't know how many.

13  Q.  But you do know that they do that for companies all around

14  the world, correct?

15  A.  Yes.

16  Q.  And Fukuzyu has consistently delivered quality API for

17  Vyera?

18  A.  Yes, they have.

19  Q.  And you don't have any concerns about Fukuzyu's ability to

20  comply with FDA regulations, do you?

21  A.  At this point, no.

22  Q.  And Fukuzyu has always provided sufficient pyrimethamine

23  API to meet Vyera's needs?

24  A.  Yes.

25  Q.  And there's never been a time when Fukuzyu wasn't able to

LCEKFTC2                        Pelliccione - Direct

1    provide Vyera with sufficient pyrimethamine, correct?

2    A.  That's correct.

3    Q.  In fact, Vyera hasn't had any issues with Fukuzyu in terms

4    of supplying Vyera with all the Daraprim it needs, correct?

5    A.  With all the API?

6    Q.  I'm sorry, with all the Daraprim -- let me start that over.

7         Vyera hasn't had any issues with Fukuzyu in terms of

8    supplying Vyera with all the Daraprim API it needs?

9    A.  To this point, that's correct.

10   Q.  You personally have never been involved in looking for a

11   second supplier for pyrimethamine API, correct?

12   A.  That's correct.

13   Q.  And you haven't been involved in looking for a backup

14   supplier for pyrimethamine API, correct?

15   A.  That's correct.

16   Q.  Why is that?  Why haven't you ever been involved in looking

17   for a backup supplier for pyrimethamine API?

18   A.  It never crossed my thinking process that we would need a

19   backup supplier for --

20   Q.  You didn't think it was necessary?

21   A.  -- pyrimethamine API.

22        It's just something that never was discussed, at least

23   with me.

24   Q.  Right.

25        So it never occurred to you that it might be necessary

LCEKFTC2                    Pelliccione - Direct

1    to get a backup supplier for pyrimethamine API?

2    A.   Right.  I mean, typically, it's never really necessary to

3    have a backup supplier.

4    Q.   Okay.  Let's talk a bit about some of your personal

5    interactions with the FDA concerning Daraprim.

6            To the best of your knowledge, has there ever been a

7    shortage of Daraprim in the United States?

8    A.   To the best of my knowledge, no, there has not.

9            Well, you mean while with Vyera?

10   Q.   Thank you for that clarification.  Yes.

11           So let me ask it again, then.

12           To the best of your knowledge, there has never been a

13   shortage of Daraprim in the United States during the time that

14   Vyera has owned Daraprim; is that correct?

15   A.   That's correct.

16   Q.   Vyera was, however, contacted a couple of times by the FDA

17   about a possible Daraprim shortage, correct?

18   A.   That's correct.

19           (Continued on next page)

20

21

22

23

24

25

LCEMFTC3                    Pelliccione - Direct

1    Q.  When the FTC reached out to Vyera, they actually reached

2    out to you?

3    A.  Yes.

4    Q.  Let me finish the question.

5            When the FDA reached out to Vyera about a possible

6    shortage of Daraprim, they reached out to you because you were

7    the senior regulatory person, correct?

8    A.  If I may clarify, they reach out to me because I'm the

9    official correspondent for the NDA.

10   Q.  It happened on at least two separate occasions, correct?

11   A.  I believe so, yes.

12   Q.  One of them was early on after Vyera acquired the rights to

13   Daraprim from Impax?

14   A.  To the best of my recollection, yeah.

15   Q.  Again, it might have happened a little more than a year or

16   two ago?

17   A.  I believe that's correct.

18   Q.  I believe you were contacted by someone from the FDA drug

19   shortages staff?

20   A.  That's correct.

21   Q.  And the FDA drug shortages staff, they monitor the nation's

22   drug supply to prevent supply shortages or mediate in the event

23   of a shortage, correct?

24   A.  Yes.

25           MR. MEIER:  Ms. Guy, would you please put up

LCEMFTC3                    Pelliccione - Direct

1   Government Exhibit 1002 on the screen.

2   Q.  Again, we will go through the same routine.  If you could,

3   to the best of your ability, take a look at that and figure out

4   whether you have seen it before and what it is.  Then I am

5   going to ask you some specific questions.

6   A.  Yes.  I'm familiar with it.  It's a series of e-mails

7   between myself and Robert Kosko from the FDA about the Daraprim

8   supply.

9           MR. MEIER:  Your Honor, I move to admit Government

10  Exhibit 1002 in evidence.

11          THE COURT:  Received.

12          (Government Exhibit 1002 received in evidence)

13  Q.  So this is several e-mails between you and Robert Kosko at

14  FDA regarding a potential supply issue with Daraprim, correct?

15  A.  Yes.

16  Q.  And the FDA is asking you about a possible Daraprim

17  shortage or supply issue because IQVIA data showed that the

18  monthly supply for January to March of 2018 had decreased to

19  single digits, correct?

20  A.  That was his question, yeah.

21  Q.  And IQVIA is spelled capital IQVIA, correct?

22  A.  Yes.

23  Q.  IQVIA is a data source often used by people in the

24  pharmaceutical industry in the commercial and marketing areas,

25  correct?

76

LCEMFTC3                        Pelliccione - Direct

1    A.  Primarily, yes.

2    Q.  Did you ever learn why the IQVIA data underreported the

3    sales data for Daraprim causing the FDA to reach out to you?

4    A.  Not really.

5           MR. MEIER:  Ms. Guy, you can take 1002 down and please

6    put up 1013.

7    Q.  Again, if you could take a moment to look at it.

8    A.  OK.

9    Q.  Does this refresh your recollection?

10   A.  Yes.

11   Q.  Before I ask you anything substantively about it, have you

12   seen the document marked as Government Exhibit 1013 before?

13   A.  Yes, I have.

14   Q.  What is Government Exhibit 1013?

15   A.  It's an e-mail exchange between me and Anne Kirby

16   regarding, again, further information about the FDA's request

17   about the supply.

18          MR. MEIER:  Your Honor, I move to admit Government

19   Exhibit 1013 in evidence.

20          THE COURT:  Received.

21          (Government Exhibit 1013 received in evidence)

22   Q.  Look at page 1 near the top, the sentencing start with:

23   The inquiry is likely related.  Do you see that?

24   A.  Yes.

25   Q.  This is an e-mail that Anne Kirby is sending to you,

LCEMFTC3                          Pelliccione - Direct

1    correct?

2    A.  Yes.

3    Q.  Anne Kirby at the time, maybe even today, I am not sure, is

4    the head of commercial operations for Vyera?

5    A.  I believe that was the case.

6    Q.  When we say commercial operations, what does commercial

7    mean?

8    A.  Sales.

9    Q.  Sales.  OK.  Sales of the product.

10        So Ms. Kirby writes:  The inquiry is likely related to

11   the business decision we made to block dispense/sales data

12   reported by our distribution partners, not an actual shortage

13   in availability or distribution.  Do you see that?

14   A.  I do.

15   Q.  Does that refresh your recollection as to what the reason

16   was why the FDA was reaching out to you about a possible

17   shortage?

18   A.  It recollects, looking at the e-mail now, yes.

19   Q.  What do you remember now?

20   A.  Just that she told me this.  I had really no part in that.

21   Q.  I understand.

22        She is telling you that Vyera made a business decision

23   to block Daraprim's sales data that was reported by its

24   distribution partners to IQVIA, correct?

25   A.  That is what it says, yes.

LCEMFTC3                          Pelliccione - Direct

1   Q.  And it was the Vyera business decision to block the

2   Daraprim sales data that was the cause of the FDA's concerns?

3   A.  That seems to be the case.

4   Q.  Vyera made the business decision to block the data because

5   it wanted to discourage generic competition to Daraprim?

6   A.  I don't know why they made the business decision.

7   Q.  You never discussed that with Ms. Kirby?

8   A.  I don't believe I did, no.

9   Q.  Or anybody else?

10  A.  Nope.

11  Q.  All right.  Thank you.

12          MR. MEIER:  We can take that down, please.

13  Q.  Have you ever heard of a company called Imprimis?

14  A.  Yes.

15  Q.  What is Imprimis?

16  A.  Imprimis is a drug compounding company.

17  Q.  What is compounding in the context of the pharmaceutical

18  business?

19  A.  Drug compounding is when a company like Imprimis, or even a

20  local pharmacy, takes a drug and makes a dosage form for a

21  particular patient that is not an approved dosage form.

22  Q.  Would an example be somebody who has difficulty swallowing

23  a capsule, the pharmacist could turn that into a liquid

24  suspension?

25  A.  Yes.

LCEMFTC3                           Pelliccione - Direct

1    Q.  This would usually done on a patient-by-patient basis?

2    A.  It is supposed to be done on a patient-by-patient basis.

3    Q.  Are compounders subject to the same GMP quality regulations

4    that a pharmaceutical company like Vyera is?

5    A.  No, they are not.

6    Q.  So they don't have to meet the same quality standards that

7    Vyera would have to meet?

8    A.  That's correct.

9    Q.  Do compounding pharmacies have to make application to the

10   FDA for review to get approval?

11   A.  No, they do not.

12   Q.  In your mind, does that create safety concerns with

13   compounding pharmaceuticals?

14   A.  In my mind, it's a potential to create a safety concern.

15   Q.  Because you don't know whether the product has impurities

16   in it or could otherwise have been compromised?

17   A.  That's correct.

18   Q.  You also don't know whether the compounded drug has the

19   right dose of the active pharmaceutical ingredient?

20   A.  That's correct.

21          MR. MEIER:  Ms. Guy, would you please put Government

22   Exhibit 3208 on the screen.

23   Q.  Take a moment to look at that.  I am going to actually have

24   Ms. Guy show you the first page too of the letter that's

25   attached.  Take a moment.

LCEMFTC3                         Pelliccione - Direct

1   A.   Yup.

2         MR. MEIER:   Ms. Guy, can you show a little bit more of

3   the next -- that's fine.   We will show the letter.   Put the

4   letter up too.

5   Q.   Do you see that?

6   A.   I do.

7   Q.   Have you seen Government Exhibit 3208 before?

8   A.   Yes, I have.

9   Q.   What is it?

10  A.   It's a letter that Turing wrote to the FDA office of

11  compliance about Imprimis and their practices.

12  Q.   Did you write part of this letter?

13  A.   Yes, I did.

14  Q.   You actually signed this letter, right?

15  A.   That's correct.

16        MR. MEIER:   Your Honor, I'd like to move to admit

17  Government Exhibit 3208 into evidence.

18        THE COURT:   Received.

19        (Government Exhibit 3208 received in evidence)

20  Q.   Let's look at the first page of your letter to the FDA,

21  which is actually the third page of the exhibit, the page we

22  are on right now.

23        This is a letter that you sent to the FDA's office of

24  compliance on behalf of Vyera, correct?

25  A.   That's correct.

LCEMFTC3                           Pelliccione - Direct

1   Q.   In it you're basically talking about compounding that was

2   being done by Imprimis, correct?

3   A.   Yes.

4   Q.   And you have included various information about concerns

5   that Vyera has with compounded pyrimethamine.

6   A.   I'm sorry.  Say that again.

7   Q.   Let me see what I said.

8            You have included various information about concerns

9   about Vyera has with compounded pyrimethamine.

10  A.   That's correct.

11  Q.   Did you write the entire letter?

12  A.   I did not.

13  Q.   So some parts of it were written by others?

14  A.   Correct.

15  Q.   Including by a law firm?

16  A.   That's correct.

17  Q.   Again, I am not going to go into those details.

18           Did you review the letter before you signed it?

19  A.   Yes.

20  Q.   Do you agree with the letter's contents?

21  A.   I do.

22  Q.   Still looking at Government Exhibit 3208 and still looking

23  at the first page, let's go to the statement where it says:

24  Compounded drugs can pose serious health risks for patients.

25  You see that?

LCEMFTC3                          Pelliccione - Direct

1   A.   I do.

2   Q.   Do you believe that to be true?

3   A.   Yes.

4   Q.   The next sentence you say:  Compounded drugs are not FDA

5   approved.  Do you see that?

6   A.   Yes.

7   Q.   What's the relevance of this?

8   A.   A compounded drug is not an approved drug product.  So it

9   is not under the same strict regulatory oversight as an

10  approved drug.

11  Q.   Let's look at the last sentence of this same paragraph, the

12  one that starts with:  As a result.  Are you with me?

13  A.   Yes.

14  Q.   It says:  As a result, it is not appropriate to use a

15  compounded product in lieu of an FDA-approved, commercially

16  available product unless the compounded drug provides a

17  medically necessary and unavailable drug for a specific

18  patient.  Do you see that?

19  A.   I do.

20  Q.   What's the concern that you are trying to convey to the FDA

21  there?

22  A.   Again, this is -- these are products that are not approved.

23  They don't have the same oversight.  You cannot necessarily

24  guarantee the quality, the purity, and the fact as to whether

25  or not it has got the right dose, as you mentioned before.

LCEMFTC3                    Pelliccione - Direct

1    Q.  Let's turn to page 10 of your letter to the FDA, which is

2    actually page 12 of Government Exhibit 3208.  There is a

3    paragraph there in the middle where it says compounding drugs.

4    Do you see that?

5    A.  Yes.

6    Q.  It says:  Compounding drugs in the absence of CGMP

7    compliance increased the potential for preparation errors.  In

8    addition, the shelf life of compounded drugs is not verified by

9    stability testing, which is required under CGMP, and therefore

10   such products cannot be assumed to retain their strength and

11   purity over time.  Do you see that?

12   A.  Yes.

13   Q.  What's the concern if a product can't retain its strength

14   in purity over time?

15   A.  The concern is twofold.  It loses its strength.  You are

16   not giving the patient the correct dose.  So you would

17   underdose if it's losing strength.  If the purity isn't

18   maintained, you could be treating the patient with a drug

19   product that has potentially toxic impurities.

20   Q.  Dr. Pelliccione, when you communicate with the FDA in your

21   capacity as Vyera's head of regulatory affairs, you always try

22   to be accurate, correct?

23   A.  Yes.

24   Q.  You don't purposely write anything to the FDA that you know

25   is incorrect or untrue, correct?

LCEMFTC3                          Pelliccione - Cross

1    A.  To the best of my ability.

2    Q.  You have a duty of candor when communicating with the FDA,

3    correct?

4    A.  I don't know what you mean by that.

5    Q.  I'll move on.

6            When you communicate with the FDA, Dr. Pelliccione,

7    you always try to be honest, correct?

8    A.  Yes.

9    Q.  Thank you, Dr. Pelliccione.

10           MR. MEIER:  Your Honor I pass the witness.

11   CROSS-EXAMINATION

12   BY MR. CASEY:

13   Q.  Dr. Pelliccione, I just have some questions to ask you

14   based on your testimony this morning.

15           First of all, you testified about being hired at

16   Vyera.  Who hired you to work at Vyera?

17   A.  Martin Shkreli.

18   Q.  Was Martin Shkreli a participant in the Vyera's

19   relationship with Fukuzyu?

20   A.  No.

21   Q.  I want to go back to the testimony about the meeting in

22   Japan at Fukuzyu.  I believe you said it was September of 2016.

23   Do you recall that?

24   A.  October.

25   Q.  October of 2016.

1          What was the purpose of that meeting?

2     A.   We went to Fukuzyu to talk with them about supplying

3     pyrimethamine API for us.  We had had a number of

4     communications by e-mail and there seemed to be some hesitancy

5     on the part of Fukuzyu to agree to have us -- to supply API for

6     us.  Specifically, actually, the concerns were over Martin's

7     problems that he was having as of, I guess, September 2015.

8          So we thought, and it's always good business practice,

9     to visit your partners.  And in Japan it's definitely a good

10    thing to do, to visit your partner and establish a relationship

11    with them.  So we really went there to present to them what the

12    overall function and strategy of the company was.  We were not

13    only selling Daraprim, but that we were looking into other

14    programs on an R&D basis.  That was one of the main reasons we

15    went there.

16    Q.   Just so I have the timeline correct, this was in October of

17    2016, correct?

18    A.   That's when we went, yes.

19    Q.   And the MSA, the agreement between Vyera and Fukuzyu that

20    you were shown this morning, that MSA occurred a couple of

21    months after that, in January of 2017?

22    A.   I believe that's correct, yes.

23    Q.   Was the purpose of the meeting in Japan in October of 2016

24    to determine whether Fukuzyu was CGMP compliant?

25    A.   No, that wasn't the purpose.

LCEMFTC3                        Pelliccione - Cross

1   Q.  You were asked about a tour that you took of the Fukuzyu

2   facilities.  Do you remember that testimony?

3   A.  I do.

4   Q.  Can you tell the Court a little bit more about that tour

5   and what the purpose of that was?

6   A.  Yes.  Part of the agenda of the meeting was that we were

7   asked to take a tour.  I don't know if we asked specifically,

8   but it was part of the agenda.  But the idea was just to see

9   what the plant looked like, to show us their facilities, to get

10  an overall view of what Fukuzyu was all about, because no one

11  from Vyera or Turing at the time had ever been there.  It was

12  definitely not a GMP audit.

13  Q.  How long did the tour last?

14  A.  Less than an hour.

15  Q.  Did you consider this tour to be an inspection of the

16  Fukuzyu facility?

17  A.  No, we did not.

18  Q.  Now, after the MSA was entered in January of 2017, did you

19  have an audit performed of Fukuzyu?

20  A.  We did.

21  Q.  Did Vyera conduct that audit?

22  A.  We had a third party auditor do it for us.

23  Q.  Do you remember approximately when that audit took place?

24  A.  Off the top of my head, no.

25  Q.  Do you know if the audit took place after the MSA was

87

1   entered in January of 2017?

2   A.  I believe it was.

3   Q.  Now, you were also asked about a QA agreement, quality

4   agreement?

5   A.  A quality agreement, yes.

6           MR. CASEY:  Can we have DX-444 put up, Justin.

7   Q.  Dr. Pelliccione, I am showing you, you can see on the

8   screen there Exhibit DX-444.  Do you recognize that?

9   A.  Yes.

10  Q.  Is that the quality agreement that Vyera and Fukuzyu agreed

11  to on January 27 of 2017?

12  A.  Yes.

13  Q.  The quality agreement was a separate agreement from the

14  MSA, correct?

15  A.  That's correct.

16  Q.  There were two agreements entered at roughly the same time

17  in January of 2017, correct?

18  A.  Yes.

19  Q.  Is it required that the quality agreement be entered or

20  agreed upon on the same day or around the same time as the MSA?

21  A.  I don't believe so, no.

22  Q.  You were asked about another product that Vyera makes

23  called Vecamyl.  Do you remember that testimony?

24  A.  Yes.

25  Q.  Who provides the API for Vecamyl?

LCEMFTC3                          Pelliccione – Cross

1   A.  Currently, no one.  But in the past it was a company called

2   AMRI.

3   Q.  Does Vyera have a contract with AMRI to provide API?

4   A.  No.  Vyera actually does not own that ANDA.  It's owned by

5   another company.

6   Q.  You were asked about the exclusivity provision in the

7   contract between Vyera and Fukuzyu.  Do you remember that?

8   A.  Yes.

9   Q.  Was the fact that generic manufacturers could not buy

10  pyrimethamine the reason that Vyera requested exclusivity from

11  Fukuzyu?

12  A.  I don't believe that that was the sole reason, no.

13  Q.  I'm sorry?

14  A.  I don't believe that that was the main reason, no.

15  Q.  I want to go back to two exhibits you were shown this

16  morning.  The first is GX-1003.

17         MR. CASEY:  Can we get that.

18  Q.  Mr. Meier asked you questions about this document.

19         MR. CASEY:  Could you go to the bottom of the

20  document, the first in time e-mail.

21  Q.  This is an e-mail from Mikio Arisawa to you on May 15,

22  2018.  The subject is:  Need your quick response.  Correct?

23  A.  That's correct.

24  Q.  It was Mr. Arisawa that initiated this question to you, not

25  Vyera initiating the question, correct?

LCEMFTC3                    Pelliccione - Cross

1    A.  That's correct.

2    Q.  What did you understand the reason was for Mr. Arisawa to

3    ask you this question?

4    A.  He wanted to know whether or not this company was a

5    Vyera-related company.

6    Q.  What was your understanding as to why he wanted to know

7    whether the company was a Vyera-related company?

8    A.  I am not sure I know what the specific reason was at that

9    point.

10   Q.  Was it Vyera that was concerned about compliance with the

11   contract or was it Fukuzyu that was approaching Vyera having

12   concerns about compliance with the contract?

13   A.  It was Fukuzyu approaching us to find out whether or not

14   they were in compliance.

15        MR. CASEY:  Could we go to 1005, please.  Again, if

16   you could go to the bottom.  Yes.  Thank you.

17   Q.  The first e-mail in time there is Tuesday, November 28,

18   2017 to you.  That's from Mr. Arisawa, correct?

19   A.  Yes.

20   Q.  I think it's on the next page where it's from.

21   A.  Yes.

22   Q.  Again, this was another circumstance where Fukuzyu was

23   initiating the question to Vyera about compliance with the

24   contract, not the other way around, correct?

25   A.  That is correct.

LCEMFTC3                    Pelliccione - Cross

1          MR. CASEY:  You can take that down, Justin.  Thank

2    you.

3    Q.  You were asked this morning about DMFs, drug master file.

4    Do you remember that testimony?

5    A.  Yes, I do.

6    Q.  Does a pharmaceutical manufacturer need to partner with an

7    API supplier with a DMF like Fukuzyu?

8    A.  No.

9    Q.  What are the other options if the supplier does not have a

10   DMF?

11   A.  The other option is to manufacture or have the manufacturer

12   of the API and the whole process included in what's known as

13   module 3 of the NDA, where all the CMC information is provided.

14   Q.  Now, you were asked also about a second or backup supplier.

15   Do you remember that testimony?

16   A.  Yes.

17   Q.  Do you consider a contract with a backup supplier something

18   that is good to have?

19   A.  It's a good to have.

20   Q.  Can you explain why.

21   A.  In the event that you have no supply, such as we currently

22   have in the case of Vecamyl, if you have a backup supplier, you

23   can bring them along and continue -- and keep your supply chain

24   constant.

25   Q.  Can you explain for the Court just what you are speaking

LCEMFTC3                    Pelliccione - Cross

1  about with the Vecamyl situation in a little bit more detail.

2  A.  Before you asked me who the API supplier was, and AMRI was

3  the API supplier for mecamylamine, which is the API for

4  Vecamyl.  They stopped making the API and we are distributing

5  that product.  It's a very small distribution, very small

6  patient population.  But it's a pretty critical drug for the

7  patients that use it, so we want to keep that drug on the

8  market.

9      So we talked about LGM, who is now the owner of the

10  ANDA for Vecamyl and asked if they were going to pursue -- or

11  if we could pursue finding a new API supplier, and they agreed.

12  So we went out and found a company that will manufacture the

13  API for Vecamyl.

14  Q.  What company is that?

15  A.  That's Piramal.

16  Q.  I think you testified you do not currently have a contract

17  to produce API with Piramal, correct?

18  A.  We do have a contract with Piramal.  We don't have a

19  contract with AMRI.

20  Q.  At the time of the contract with Piramal, did Vyera also

21  have a quality agreement with Piramal?

22  A.  We have not finalized the quality agreement.

23  Q.  Thank you.

24      In terms of why a backup supplier is helpful, what

25  would be the result if you ran out of API or if your supplier

LCEMFTC3                    Pelliccione - Cross

1    couldn't supply it, as in the case of Vecamyl?  What's the

2    result of that?

3    A.  You would wind up not being able to manufacture any more

4    drug product, and ultimately you would have a drug shortage.

5    Q.  When Mr. Meier was asking questions about your negotiations

6    with Fukuzyu, I believe you testified that you had offered to

7    Fukuzyu to buy other API other than the pyrimethamine API, is

8    that correct?

9    A.  Actually, we offered that we would want to work with them

10   to manufacture API for new products that we were working on; in

11   other words, new compounds that we were working on in the

12   company through R&D.  We didn't have manufacturers specifically

13   for them.  So we wanted -- we asked Fukuzyu if they might be

14   interested in manufacturing API.

15   Q.  Can you explain for the Court some of those projects that

16   you were seeking or offering API for.

17   A.  The one I remember best is what we now refer to as VYR006.

18   That is a compound developed for the treatment of

19   toxoplasmosis.  It was developed by Vyera.  It's the same

20   mechanism of action as Daraprim, but has different properties,

21   much more specificity.  So we were looking to take that product

22   forward as a new treatment for toxoplasmosis.

23   Q.  Are there any other projects that you were working on at

24   the time you were negotiating with Fukuzyu?

25   A.  They are not jumping into my mind right now.  We were

LCEMFTC3                         Pelliccione - Redirect

1   working on Stiripentol, which was another investigational agent

2   we were working on.  I don't recall if that was one of the

3   products that we asked them about.

4          MR. CASEY:  Your Honor, I neglected to move into

5   evidence document DX-444.  Defendant would move into evidence

6   DX-444.

7          THE COURT:  Received.

8          (Defendant's Exhibit 444 received in evidence)

9          MR. CASEY:  I have no further questions for the

10  witness, your Honor.  Thank you.

11         THE COURT:  Anything further?

12         MR. MEIER:  Very briefly, your Honor.

13  REDIRECT EXAMINATION

14  BY MR. MEIER:

15  Q.  Dr. Pelliccione, a moment ago you mentioned a project that

16  Vyera had been working on that was labeled VYR006.  Do you

17  recall that?

18  A.  Yes.

19  Q.  That project has effectively been shelved since

20  approximately October of 2018, correct?

21  A.  More or less, yes.

22  Q.  In the seven years or so that you've been at Vyera, has

23  Vyera ever successfully launched any new product?

24  A.  No.

25         MR. MEIER:  No further questions, your Honor.

LCEMFTC3                         Pelliccione – Redirect

1          THE COURT:  Just give me one second, sir.  Thank you.

2          This new treatment for toxoplasmosis that you referred

3    to, that was going to use the same API pyrimethamine or a

4    different API?

5          THE WITNESS:  No.  It's a completely new chemical

6    entity.

7          THE COURT:  So when you were in discussions with

8    Fukuzyu, you were discussing working with them to be the

9    manufacturer of a new API for a new product?

10         THE WITNESS:  That was what we were discussing, yes.

11         THE COURT:  That was part of the October 2016

12   discussions in Japan?

13         THE WITNESS:  That was part of the presentation, yes.

14         THE COURT:  Was it your impression that that

15   opportunity had some significance in Fukuzyu's decision making

16   about the contract or MSA that you entered into with them?  Did

17   they seem interested in that?

18         THE WITNESS:  They were interested, yes.

19         THE COURT:  That's the only additional question I

20   have.

21         Did my question suggest any additional questions for

22   you, Mr. Meier?

23         MR. MEIER:  No, your Honor.  Thank you.

24         THE COURT:  Mr. Casey.

25         MR. CASEY:  No, your Honor.

LCEMFTC3                          Salinas - Direct

 1              THE COURT:  You may step down.  Thank you.

 2              THE WITNESS:  Thank you.

 3              (Witness excused)

 4              THE COURT:  Give me one second, counsel.

 5              Next witness.

 6              MR. MEIER:  Thank you, your Honor.

 7              Unfortunately, as chance would have it, you have would

 8   hear from me again.  I promise the Court that after today you

 9   will be hearing from a lot of my colleagues here.

10              The government calls as its next witness Dr. Eliseo

11   Salinas.

12              THE COURT:  Is someone getting Dr. Salinas?

13              Dr. Salinas, thank you.

14              Please take the witness stand.  Remain standing.

15   ELISEO ORESTE SALINAS,

16        called as a witness by the Plaintiffs,

17        having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. MEIER:

20   Q.  Good afternoon, Dr. Salinas.

21   A.  Good afternoon.

22   Q.  We have never met before, but you have met some of my FTC

23   colleagues at your investigational hearing in September of 2019

24   and at your deposition earlier this year.

25              Just so you know, my name is Markus Meier, and I'm

LCEMFTC3                          Salinas - Direct

1   with the Federal Trade Commission.

2   A.   Nice to meet you.

3   Q.   Is there anything that might affect your ability to give

4   truthful, complete testimony today?

5   A.   No.

6   Q.   Just so you know, Dr. Salinas, you may hear from time to

7   time I'll make reference to Ms. Guy, and that's the paralegal

8   that's assisting me, and hopefully the courtroom technology

9   will work and we will be able to pull up some exhibits for you

10  to look at.

11         Dr. Salinas, I'd like to start by talking briefly

12  about your background and experience in the pharmaceutical

13  industry.

14         You joined Turing in June of 2015 as the president and

15  head of research and development, correct?

16  A.   Correct.

17  Q.   Turing is now called Vyera.

18  A.   Yes.

19  Q.   In fact, the name changed from Turing to Vyera while you

20  were still at the company, correct?

21  A.   I believe so.

22  Q.   And the company changed its name in the hope of distancing

23  itself in the public eye from Martin Shkreli, correct?

24  A.   Correct.

25  Q.   For the purposes of remainder of my examination, when I

LCEMFTC3                    Salinas - Direct

1    refer to Vyera, I also mean the company formerly known as

2    Turing.  Do you understand that?

3    A.  I do.

4    Q.  As president and head of research and development, you were

5    part of Vyera's senior leadership team?

6    A.  Yes.

7    Q.  And you were also Vyera's interim chief executive officer

8    between April 2017 and July 2017?

9    A.  Yes.

10   Q.  So you worked for Vyera a little more than two years?

11   A.  Yes.

12   Q.  Just to bookend those dates, you worked at Vyera before it

13   purchased the rights to Daraprim, and you left shortly before a

14   jury found Mr. Shkreli guilty of securities fraud, correct?

15   A.  Correct.

16   Q.  Do you have a medical degree?

17   A.  I do.

18   Q.  You specialize in psychiatry and pharmacology?

19   A.  Correct.

20   Q.  Pharmacology is the study of how drugs work in the body?

21   A.  Yes.

22   Q.  You are still a practicing physician?

23   A.  No.

24   Q.  You're mostly a research scientist?

25   A.  Yes.

LCEMFTC3                      Salinas - Direct

1   Q.  And you have worked in the pharmaceutical industry for

2   about 30 years?

3   A.  Over 30 years.

4   Q.  Over.  Thank you.

5         You've primarily worked in the areas of pharmaceutical

6   research and development, correct?

7   A.  Correct.

8   Q.  When you first started working at Vyera, you reported to

9   Martin Shkreli?

10  A.  Yes.

11  Q.  And Mr. Shkreli was the chief executive officer at the

12  time?

13  A.  Yes.

14  Q.  And is it correct that Mr. Shkreli personally recruited and

15  hired you?

16  A.  Yes.

17  Q.  And you met with Mr. Shkreli as part of the interview

18  process when you were considering taking the job?

19  A.  I did.

20  Q.  And Mr. Shkreli interviewed you.

21  A.  He did.

22  Q.  When you and Mr. Shkreli both worked at Vyera, you would

23  meet periodically with Mr. Shkreli?

24  A.  Very often.

25  Q.  Could give me approximately how frequently?  Are we talking

99

LCEMFTC3                          Salinas - Direct

1     about daily, weekly?

2     A.   At least weekly.

3     Q.   When you and Mr. Shkreli both worked at Vyera, you would

4     speak with him periodically, even if you didn't meet with him,

5     correct?

6     A.   Yes.

7     Q.   Can you give us approximately how frequently did you speak

8     with Mr. Shkreli?

9     A.   It was weekly.  Most of our interactions were one on one,

10    person to person, weekly.

11    Q.   You said most of the time when you had your weekly

12    meetings, it would just be you and Mr. Shkreli?

13    A.   Correct.  There were also meetings with the rest of the

14    executive team and other people in the company.  But because of

15    my position, I had weekly interactions, one on one with him.

16    Q.   Weekly interaction one on one was in addition to senior

17    leadership team meetings?

18    A.   Yes.

19    Q.   When you and Mr. Shkreli both worked at Vyera, you

20    exchanged e-mails with each other?

21    A.   Yes.  Not many.  My recollection is that most of our

22    contacts were those weekly one-on-one interactions.

23    Q.   Did you ever hear Mr. Shkreli talk about the business model

24    he used at a pharmaceutical company called Retrophin before he

25    started Vyera?

LCEMFTC3                    Salinas - Direct

1   A.  Not specifically.  He had -- I knew he was in conflict with

2   his previous company and the topic of his previous company did

3   not come up often in my discussion with him.

4   Q.  In any of your meetings leading up to you joining Vyera or

5   after Vyera, did Mr. Shkreli ever explain to you Vyera's

6   business model?

7   A.  Yes.

8   Q.  Do you recall hearing Mr. Shkreli describe the business

9   model in the following way?  First, you try to identify drugs

10  that are the gold standard of care, that you like to look for

11  drugs that are the gold standard of care.  Is that something

12  that Mr. Shkreli discussed with you?

13  A.  No.

14  Q.  Did he ever talk to you about looking for drugs that have a

15  small patient population?

16  A.  No.

17  Q.  Do you ever recall Mr. Shkreli saying that you try to

18  acquire the drug that only has one manufacturer?

19  A.  No.

20  Q.  Or that has no immediate generic competition?

21  A.  No.

22  Q.  Did you ever hear Mr. Shkreli talk about the business model

23  that you tried to control access to the drug through a closed

24  distribution system?

25  A.  No.

LCEMFTC3                    Salinas - Direct

1   Q.  Even if you never heard Mr. Shkreli say anything about a

2   closed distribution system, did you see him do this with

3   Daraprim?

4   A.  Yes.

5   Q.  Even though you never heard Mr. Shkreli describe the

6   business model that you look for drugs that serve a small

7   patient population, did you see Mr. Shkreli actually do that?

8   A.  Not uniquely.

9   Q.  What do you mean by that?

10  A.  We had -- Turing had a number of research programs, some of

11  them in very large indications, like depression, for example,

12  which is a very large indication.  Others were aware.  But the

13  business model was not presented with focusing on rare

14  diseases.  I have worked in other companies that do focus on

15  rare diseases, but it was not presented to me as such.

16  Q.  Thank you.

17        Do you ever recall hearing Mr. Shkreli describe the

18  business model with words to the effect that you raise the

19  price of the drug significantly to maximize profits?

20  A.  Only after the acquisition of Daraprim explaining his

21  decision.

22  Q.  Even if you never heard Mr. Shkreli say that this was part

23  of the business model, you actually saw them do this with

24  Daraprim, correct?

25  A.  I saw him doing this with Daraprim, yes.

LCEMFTC3                    Salinas - Direct

1   Q.  During the time you worked at Vyera, almost all of the

2   companies' revenues came from the sales of Daraprim, correct?

3   A.  No, not exactly.

4   Q.  Where did they come from?

5   A.  There were two periods in the company, before and after

6   Daraprim.  I joined the company before the acquisition of

7   Daraprim, when the company had raised almost like 60 or $70

8   million in investor funds.  That was the business model then,

9   raising money from investors.  He did present the acquisition

10  of marketed products at the end of their commercial life as a

11  way of getting additional revenue so we wouldn't have to go too

12  often and raise money from investors.  He had done that with

13  Vecamyl, who was an acquisition with a very small patient

14  population that would bring additional revenues to the company.

15  But when I was hired, the main source of income of the company

16  was the money from investors.

17  Q.  Thank you for that clarification.

18          I want to focus on just the period after Daraprim was

19  acquired.  Do you follow that?

20  A.  I do.

21  Q.  In the period after Daraprim was acquired by Vyera, would

22  it be fair to say that almost all the companies' revenues came

23  from the sales of Daraprim?

24  A.  Yes.

25  Q.  In that same period after acquisition of Daraprim, almost

LCEMFTC3                    Salinas - Direct

1   all the company's profits came from the sales of Daraprim?

2   A.   Yes.

3   Q.   After that period your salary at Vyera came mostly from the

4   sales of Daraprim?

5   A.   Presumably, yes.

6   Q.   What was your highest annual salary when you worked at

7   Vyera?

8   A.   I believe it was $600,000.

9   Q.   That was back in 2017 or 2016?

10  A.   No.  That would have been when I was hired.  I was hired

11  with that salary.

12  Q.   In addition to your salary, you typically received a bonus?

13  A.   Yes.  Well, I did not.  But the idea was that I would.

14  Q.   So did you ever receive a bonus?

15  A.   I don't think so, no.  I am not sure about that.  I don't

16  think so, but I'm not positively sure.

17  Q.   Would it be fair to say that as the chief scientist and

18  being familiar with the research and development pipeline of

19  the company in 2017, that you believe that Vyera would need to

20  continue to rely almost exclusively on Daraprim revenue for at

21  least two to four more years?

22  A.   It was my hope that would not be the case.

23  Q.   You thought that it might be, depending on how well the

24  research and development projects went?

25  A.   And how well we could attract additional investors or the

104

LCEMFTC3                      Salinas - Direct

1    regional investors to continue supporting the company.
2    Q.   Again, putting yourself back into 2017, during that time
3    period, you believed, though, that it was possible that in
4    order for Vyera to continue it would need to rely on revenues
5    from Daraprim sales for anywhere from two to four years?
6    A.   Yes.
7    Q.   You worked at Vyera when Mr. Shkreli raised price of
8    Daraprim by 4,000 percent?
9    A.   I don't recall if it was exactly 4,000 percent, but it was
10   an enormous increase, yes.
11   Q.   Did you ever hear Mr. Shkreli say words to the effect that
12   he should have raised the price of Daraprim even higher?
13   A.   I don't recall that.  But I would have not been surprised
14   by him saying that.
15   Q.   Did you ever hear Mr. Shkreli say words to the effect that,
16   I could have raised the price of Daraprim even higher and made
17   more profits for our shareholders?
18   A.   I don't recall exactly, no.
19   Q.   While working at Vyera, you were a shareholder in the
20   parent company Phoenixus, correct?
21   A.   I received shares as part of my compensation, so, yes,
22   technically, yeah, I was a shareholder.
23   Q.   In March of 2017, you owned about 20,000 shares of
24   Phoenixus?
25   A.   It sounds right, but I don't recall the details.

LCEMFTC3                    Salinas - Direct

1   Q.  Did you hold the voting rights to those shares?

2   A.  Yes, I did.

3   Q.  Did Mr. Shkreli hold the voting rights to any of your

4   shares?

5   A.  No.

6   Q.  It was Mr. Shkreli that made the decision to increase the

7   list price of Daraprim to $750 a tablet, right?

8   A.  Yes.

9   Q.  And you've called that Daraprim price increase "excessive."

10  A.  I did.

11  Q.  You have called that Daraprim price increase "crazy."

12  A.  I did.

13  Q.  And you have called that Daraprim price increase

14  "irresponsible."

15  A.  I did.

16  Q.  And you have called that Daraprim price increase

17  "careless"?

18  A.  I did.

19  Q.  And you have called that price increase the poster child of

20  everything that is considered wrong about the pharmaceutical

21  industry, correct?

22  A.  Correct.

23  Q.  Let's shift gears and talk a little bit about Daraprim, the

24  product.  It was first approved by the FDA in 1953?

25  A.  Correct.

LCEMFTC3                    Salinas - Direct

1   Q.  It's used to treat toxoplasmosis?

2   A.  It is.

3   Q.  And toxoplasmosis is a potentially serious parasitic

4   infection?

5   A.  Yes.

6   Q.  Is Daraprim considered the gold standard treatment for

7   toxoplasmosis?

8   A.  Not everywhere, but some people do consider it the gold

9   standard.

10  Q.  Do you consider it to be the gold standard treatment for

11  toxoplasmosis?

12  A.  I do.

13  Q.  Did you ever hear Mr. Shkreli refer to Daraprim as the gold

14  standard treatment for toxoplasmosis?

15  A.  I don't recall.

16  Q.  Have you ever heard of a product called Bactrim?

17  A.  I did.

18  Q.  What is Bactrim?

19  A.  Bactrim is another antibiotic.  It's a combination product

20  that acts on a number of infections, including toxoplasmosis.

21  Q.  Do you believe that Bactrim is medically inferior to

22  Daraprim for the treatment of toxoplasmosis?

23  A.  I do.

24  Q.  You believe Bactrim is medically inferior to Daraprim

25  because not enough of the drug reaches the brain or the retina,

LCEMFTC3                          Salinas - Direct

1    which are key areas of active toxoplasmosis infection?

2    A.  I do.

3    Q.  The generic version of Bactrim is also known as TMP-SMX?

4    A.  Correct.  That's the two drugs, abbreviation of the two

5    drugs that made the combination called Bactrim.

6    Q.  I can't pronounce those, so I am not going to try.

7         You believe that TMP-SMX also is medically inferior to

8    Daraprim for the treatment of toxoplasmosis?

9    A.  I do.

10   Q.  Do you believe that compounded pyrimethamine products can

11   pose safety concerns for patients?

12   A.  It depends how they are compounded.

13   Q.  Do you also believe that compounded pyrimethamine is

14   medically inferior to Daraprim for the treatment of

15   toxoplasmosis?

16   A.  No, I don't.

17   Q.  Thank you.

18        MR. MEIER:  Ms. Guy, would you please put Government

19   Exhibit 1075 on the screen.

20   Q.  The way this is going to work, we will put the document on

21   the screen, have you just take a look to see whether you are

22   familiar with it.  I am going to ask you, have you seen it

23   before and what is it?  Then we will go through it.

24   A.  OK.

25   Q.  Let me first ask, have you seen Government Exhibit 1075

LCEMFTC3                          Salinas - Direct

1   before?

2   A.  Yes, I have.  Can I move the screen a little bit?

3   Q.  Hopefully without a plug falling out.  If you need to see

4   it better.

5   A.  That's OK.  Thank you.

6   Q.  Perfect.

7        Have you seen the e-mail that's been marked as

8   Government Exhibit 1075 before?

9   A.  I have.

10       MR. MEIER:  Could we quickly look at the second page

11  of the exhibit, which is the first page of a letter.

12  Q.  Do you see that letter there?

13  A.  I do.

14  Q.  Have you seen that before?

15  A.  I have.

16  Q.  What is the letter?

17  A.  It's a letter I wrote to the directory of two medical

18  associations alerting them about what a compounding group was

19  doing.

20       MR. MEIER:  So at this point, your Honor, I would move

21  to have Government Exhibit 1075 admitted.

22       THE COURT:  Received.

23       (Government Exhibit 1075 received in evidence)

24  Q.  So we are looking at the letter now, which starts on the

25  second page of the exhibit.  And, again, you wrote this letter,

LCEMFTC3                    Salinas - Direct

1    correct?

2    A.  I did.

3    Q.  Looking at the top of the first page of the letter, you

4    sent this letter to actually three different doctors, correct?

5    A.  Correct.

6    Q.  One of the doctors is a Dr. Bakken, correct?

7    A.  Yes.

8    Q.  That was to Dr. Bakken in his capacity as the president of

9    an organization known as IDSA.

10   A.  Correct.

11   Q.  IDSA stands for the Infectious Disease Society of America.

12   A.  Yes.

13   Q.  The next recipient is Carlos Del Rio, who is the chair of

14   HIVMA, correct?

15   A.  Correct.

16   Q.  And HIVMA is the HIV Medical Association.

17   A.  Yes.

18   Q.  The third person is Janet Gilsdorf, Dr. Gilsdorf, who is

19   the president of FPIDS and PIDS, correct?

20   A.  Correct.

21   Q.  And PIDS stands for Pediatric Infectious Disease Society?

22   A.  Yes.

23   Q.  Would it be fair to say that these three organizations

24   represent the physicians most likely to treat patients with

25   toxoplasmosis?

LCEMFTC3                        Salinas - Direct

1    A.  The one left out would be the ophthalmologist that is in

2    fact the most common form.  But these would represent the ones

3    that treat toxoplasmosis encephalitis associated with the HIV

4    infection.

5    Q.  Toxoplasmosis encephalitis is the toxoplasmosis in your

6    brain?

7    A.  Correct.

8    Q.  As opposed to ocular, which is in your eye?

9    A.  Yes.

10   Q.  These three organizations are the ones that represent the

11   physicians most likely to treat patients with toxoplasmosis

12   encephalitis?

13   A.  In general, yes.

14   Q.  These three organizations represent the physicians most

15   likely to prescribe Daraprim for toxoplasmosis encephalitis?

16   A.  Yes.

17   Q.  If we could just turn very quickly to page 4 of the letter.

18   I just want to ask you if that is your signature.

19   A.  It is.

20        MR. MEIER:  We are going to go back to the first page

21   and the first sentence.  Ms. Guy is going to blow that up so we

22   can see this a little bit better.

23   Q.  Do you see where it says I am writing?

24   A.  I do.

25   Q.  It says:  I am writing to you today to call to your

LCEMFTC3                    Salinas - Direct

1    attention our concerns regarding your endorsement of the

2    partnership between Imprimis Pharmaceuticals and Express

3    Scripts to make available a new unapproved drug combination for

4    the treatment of toxoplasmosis.  Do you see that?

5    A.  I do.

6    Q.  In this letter you're letting the heads of the nation's

7    leading infectious disease organizations know that Vyera

8    doesn't believe that Imprimis' compounded pyrimethamine product

9    is an acceptable substitute for Daraprim, correct?

10   A.  No.  I didn't believe that.  I don't know if Vyera believed

11   or not.  I didn't believe that.  Yeah.  I know that they were

12   in agreement with me, but that was my belief.

13   Q.  But you're sending this on behalf of Turing, correct?

14   A.  Correct.

15   Q.  You sent this on Turing letterhead?

16   A.  Yes.

17   Q.  You sent it in your capacity as the top science person at

18   Turing?

19   A.  Correct.

20   Q.  This was not a personal letter you were sending?

21   A.  No.  I meant to say that these represent my views.  Someone

22   in the company asked me to write a letter, and I wrote a

23   letter.

24   Q.  You had the authority to send this letter?

25   A.  Correct.

112

LCEMFTC3                    Salinas - Direct

1   Q.  Let's turn to page 2 and there is a bolded heading there

2   that says "promoting an unapproved drug."  Do you see that?

3   A.  I do.

4   Q.  Let me see it myself here.

5   A.  Can I make a clarification?

6   Q.  If you need to.

7   A.  You asked me before if I thought that a compounded product

8   was inferior, and I said no.  But these refer to a type of

9   compounding that is not the typical compounding.  This is the

10  first to the compounding that is done before a patient comes

11  with a medical need.  The compounding that is done, a priority.

12  That was the essence of my letter.

13  Q.  So if I understand that clarification, you're drawing a

14  distinction between the type of compounding Imprimis is doing

15  and the kind of compounding a doctor might request for a

16  specific patient who needs a specific compounded drug because

17  of some specific condition they had, like difficulty

18  swallowing?

19  A.  Correct.  That would not be, in my opinion, inferior.  This

20  was, in my opinion.

21  Q.  Sort of mask compounding, if you will, sort of mask

22  producing compounded product, correct?

23  A.  Yes.

24  Q.  I appreciate that distinction.

25          What are you trying to convey to the three heads of

LCEMFTC3                    Salinas - Direct

1   the largest infectious disease organizations in America in this

2   paragraph here where you're talking about promoting an

3   unapproved drug?

4   A.  My belief was that they underestimate the negative

5   consequences of what Imprimis was doing.  I believe that they

6   were honestly concerned about patient safety and access to

7   drugs.  But because probably they were not familiar with the

8   details of compounding, they underestimated certain aspects

9   that, in my opinion, were important to consider.

10  Q.  What would some of those aspects be that you thought were

11  important to be considered?

12  A.  One is the fact that compounding done this way is not

13  regulated by the FDA.  That's one.

14       The second was that that is a fixed dose compounded in

15  many cases because they were compounding Daraprim with

16  Leucovorin, which is another medication you could take with

17  Daraprim.  And because it was, to use your term, it was mask

18  compounding.  They were using a fixed combination.

19       My recollection is, there were at least two risks.

20  One was the fact that the combination, flexible dosing of one

21  and the other component were not contemplated and, two, that a

22  drug for a life-threatening disorder would be manufactured

23  outside the regulatory purview of the FDA.

24  Q.  If I understood correctly, to put it in my nontechnical

25  terms, you were concerned that Imprimis was sort of making a

LCEMFTC3                    Salinas - Direct

1  one-size-fits-all form of Daraprim and Leucovorin and

2  individual patients actually need different balances of that?

3  A.   Yes.

4  Q.   That could create medical issues for the patient?

5  A.   Yes.

6  Q.   And safety issues?

7  A.   Yes.

8  Q.   That's what you are trying to convey here to these heads of

9  these various infectious disease organizations?

10 A.   Yes.  Along with the regulatory aspect that is not an

11 approved drug.  My recollection is I was focusing on the

12 medical aspects of the problem beyond the legal one.

13 Q.   Understood.  In fact, to pick up on that point, the FDA has

14 made no finding that Imprimis' compounded product as safe or

15 effective in treating toxoplasmosis, correct?

16 A.   Correct.

17 Q.   Let's move to another part of page 2 of your letter.  There

18 is a bolded heading that says unsafe manufacture.  Do you see

19 that?

20 A.   I do.

21 Q.   Would it be fair to say that in the part about unsafe

22 manufacturing you're pointing out that Imprimis' manufacturing

23 facilities have been cited by the FDA for violations of current

24 good manufacturing practices?

25 A.   Yes.

LCEMFTC3                    Salinas - Direct

1   Q.  Let's go to page 3, the third paragraph, which is still

2   talking about unsafe manufacturing.  You write:  Compounding

3   drugs in the absence of CGMP compliance increases the potential

4   for errors in manufacturing the product.  In addition, the

5   shelf life of compounded products is not verified by stability

6   testing, which is required under CGMP, and therefore such

7   products cannot be assumed to retain their strength and purity

8   over time.  Do you see that?

9   A.  I do.

10  Q.  Why is that?

11  A.  Excuse me.  Why is what?

12  Q.  Why is this true?  What are you trying to convey here?

13  A.  The pharmaceutical business is the most heavily regulated

14  business, and it should be that way with life-saving

15  medications or medications that can put patients at risk if

16  they are not appropriately controlled.  In my 30 years in

17  industry I have seen an increase, a tightening of the

18  regulations.  As a consumer and a patient, I think that's a

19  good thing.  That's a good thing.

20        The lack of oversight in the manufacturing of a

21  life-saving medication struck me as something that was not

22  right.

23  Q.  Is there a risk to patients' health from compounded

24  pyrimethamine, potentially?

25  A.  Well, for example, if the doze of Leucovorin is

LCEMFTC3                    Salinas - Direct

1   inappropriate, yes, there are serious consequences that can

2   arise from that.

3   Q.  What's the risk to a patient's health if a product such as

4   compounded pyrimethamine doesn't retrain its strength and

5   purity?

6   A.   Two.  Number one, but might not be as effective, treat the

7   underlying condition and, number two, is that it can pose

8   safety risks.  The mechanism of action of Daraprim is to

9   inhibit, to block the activity of an enzyme called DGHR, which

10  is necessary for the parasite, but also for the patient.

11  That's why Leucovorin is given, so that the blocking of that

12  enzyme kills the parasite, but not the patient.  So having an

13  inadequate dose of Leucovorin could represent serial risks for

14  the patient.

15  Q.  Thank you.

16          MR. MEIER:  Ms. Guy, you can take Government Exhibit

17  1075 down.

18  Q.  Let's talk about your role in Vyera's efforts to enter into

19  an exclusive supply agreement with the Japanese API supplier

20  called Fukuzyu.

21          My first question is, you were involved in Vyera's

22  efforts to enter into an exclusive API supply agreement with

23  Fukuzyu, correct?

24  A.  Yes.

25  Q.  And Fukuzyu is a Japanese API supplier that had been

LCEMFTC3                          Salinas - Direct

1    producing pyrimethamine since around 1966.

2    A.  I believe so.  I don't mean to correct you, but I call it

3    Fukuzyu because that is the way I know it always.  I will refer

4    to them that way.

5    Q.  I appreciate that.  You've been to Japan.  I haven't.  But

6    I'm so locked in on Fukuzyu, I am going to keep saying it that

7    way and I apologize.

8            Fukuzyu held a U.S. drug master file for pyrimethamine

9    API, correct?

10   A.  Correct.

11   Q.  And what is a drug master file or DMF?

12   A.  It's a document that is filed with regulatory authorities

13   that describe the processes and procedures of the manufacturer

14   of API that allowed the regulator to conduct audits.

15   Q.  You personally went on the trip to Japan in 2016 to meet

16   with Fukuzyu?

17   A.  I did.

18   Q.  And you went with two other people from Vyera who worked

19   with you on science, regulatory, and manufacturing issues for

20   Vyera?

21   A.  I did.

22   Q.  And no one from Vyera's business development team visited

23   Fukuzyu in Japan with you in 2016, correct?

24   A.  Correct.

25   Q.  As part of your visit to Japan you toured the plant where

LCEMFTC3                        Salinas - Direct

1   Fukuzyu makes the API?

2   A.  Yes.

3   Q.  And you were part of the team at Vyera that was responsible

4   for getting the agreement with Fukuzyu to supply Vyera with

5   pyrimethamine API, correct?

6   A.  Yes.

7   Q.  It was Vyera that first raised the issue of including an

8   exclusivity provision in the supply agreement with Fukuzyu?

9   A.  I am not sure what you mean by first.

10  Q.  I mean, Fukuzyu didn't say to you:  We want that in the

11  contract.  You said to them:  We want it in the contract?

12  A.  Correct.  It was our demand, yes.

13  Q.  It was Vyera that first raised the issue of including

14  exclusivity?

15  A.  Yes.

16  Q.  To the best of your knowledge, would Fukuzyu have been

17  willing to supply Vyera with API for Daraprim even without the

18  exclusivity provision?

19  A.  Yes.

20        MR. MEIER:  Ms. Guy, would you please put up

21  Government Exhibit 1056 on the screen.

22  Q.  Again, Dr. Salinas, I am just going to ask you to take a

23  moment to look at it, get yourself familiar with it.

24  A.  I don't remember this e-mail.

25  Q.  You remember it?

LCEMFTC3                    Salinas - Direct

1    A.  Yes.

2    Q.  Let me just ask you, have you seen the e-mail chain marked

3    as Government Exhibit 1056 before?

4    A.  Yeah.  I can see the number.  The e-mail in the screen,

5    yes, I have seen it.

6    Q.  What is it?

7    A.  It's an exchange between Mikio Arisawa and myself, copied

8    to Nick Pelliccione, where Mikio Arisawa was asking me -- he

9    was preparing for a meeting with Mr. Kosugi, the CEO of

10   Fukuzyu, and Mikio Arisawa was asking me whether the ideas --

11   he was going to mention were OK or not.

12          MR. MEIER:  Your Honor, at this time I move to admit

13   Government Exhibit 1056 in evidence.

14          THE COURT:  Yes.  Received.

15          (Government Exhibit 1056 received in evidence)

16          THE COURT:  We are going to break for lunch.  We will

17   resume at 2:00.  Thank you.

18          (Luncheon recess)

19

20

21

22

23

24

25

LCEMFTC3                          Salinas - Direct

1                              AFTERNOON SESSION

2                                  2:05 p.m.

3              THE COURT:  I'm sorry that I am a little late.

4              Is the witness ready to retake the stand?

5              MR. MEIER:  Yes, your Honor.

6              THE COURT:  Thank you.

7              Counsel, you may resume.

8              MR. MEIER:  Thank you, your Honor.  When we took the

9     lunch recess we were just starting to look at Government

10    Exhibit 1056.

11             And Ms. Guy has pulled that back up for us.  I believe

12    it had just been admitted.

13    Q.  Let me pick up there and ask you, again, Dr. Salinas, just

14    to refresh your recollection by taking a quick look at what's

15    on the screen, and then I'll direct you to some specific

16    passages.

17    A.  I remember this e-mail.

18    Q.  In this time frame, 2016, in this e-mail chain, would it be

19    fair to say that you were advising Mr. Arisawa on negotiation

20    strategy to get Fukuzyu to agree with the agreement that you

21    all eventually entered with Fukuzyu?

22    A.  In broad terms, yes.

23    Q.  In broad terms this includes the discussion about getting

24    the exclusivity provision?

25    A.  Yes.

LCEMFTC3                        Salinas - Direct

1    Q.  One of the things you advised Mr. Arisawa to emphasize was

2    that Vyera sought to establish a long-term relationship with

3    Fukuzyu and work together on multiple development projects,

4    correct?

5    A.  It's not in this part of the e-mail which is on the screen,

6    but I remember something along those lines, yes.

7    Q.  Let's take a look at page 2 of Government Exhibit 1056.  I

8    am going to point you to bullet point number 4, the one that's

9    got --

10   A.  I'm seeing it now.

11   Q.  Do you see that now?

12   A.  I did a second ago.  Now it disappeared again.

13   Q.  Point number 4 says in all caps:  Our plans are only

14   possible if we have exclusivity for Fukuzyu's API.  Do you see

15   that?

16   A.  No.  I see an error message that said input signal not

17   found.  Check the video cable and video source.  Now black

18   screen.

19          Now, it's back.  I am seeing now the exhibit on the

20   screen.

21   Q.  Let's hope that it will participate and cooperate the rest

22   of the afternoon.

23          It says in all caps:  Our plans are only possible if

24   we have exclusivity for Fukuzyu's API.  Do you see that?

25   A.  I do.