# 22-728

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

FEDERAL TRADE COMMISSION, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF ILLINOIS, STATE OF NORTH CAROLINA, COMMONWEALTH OF VIRGINIA,

—against—

*Plaintiffs-Appellees,*

MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendant-Appellant,*

VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, KEVIN MULLEADY, individually, and as an owner and director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME V OF VIII
## (Pages A-1189 to A-1485)

BRADLEY GROSSMAN
UNITED STATES FEDERAL
  TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-2424

*Attorneys for Plaintiff-Appellee*
  *Federal Trade Commission*

KIMO S. PELUSO
NOAM BIALE
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for Defendant-Appellant*
  *Martin Shkreli*

(*Counsel continued on inside cover*)

PHILIP LEVITZ
OFFICE OF THE NEW YORK STATE
    ATTORNEY GENERAL
28 Liberty Street, 15th Floor
New York, New York 10005
(212) 416-8000

*Attorneys for Plaintiffs-Appellees*
    *State of New York, State of*
    *California, Commonwealth of*
    *Pennsylvania, State of Illinois,*
    *Commonwealth of Virginia*

SHIRA HOFFMAN
ASSISTANT U.S. ATTORNEY
CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 269-6000

*Attorneys for Plaintiff-Appellee*
    *State of California*

DEREK MICHAEL WHIDDON
ASSISTANT ATTORNEY GENERAL
OHIO OFFICE OF THE
    ATTORNEY GENERAL
30 East Broad Street, 26th Floor
Columbus, Ohio 4321
(614) 466-2677

*Attorneys for Plaintiff-Appellee*
    *State of Ohio*

JOSEPH STEPHEN BETSKO, SR.
PENNSYLVANIA OFFICE OF
    THE ATTORNEY GENERAL
ANTITRUST SECTION
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-5393

*Attorneys for Plaintiff-Appellee*
    *Commonwealth of Pennsylvania*

SARAH A. HUNGER
DEPUTY SOLICITOR
ILLINOIS OFFICE OF THE
    ATTORNEY GENERAL
CIVIL APPEALS DIVISION
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5202

*Attorneys for Plaintiff-Appellee*
    *State of Illinois*

JESSICA VANCE SUTTON
NORTH CAROLINA DEPARTMENT
    OF JUSTICE
114 West Edenton Street
Raleigh, North Carolina 27603
(919) 716-0998

*Attorneys for Plaintiff-Appellee*
    *State of North Carolina*

SARAH OXENHAM ALLEN
LUCAS W.E. CROSLOW
MARTIN JORDAN MINOT
VIRGINIA OFFICE OF THE
    ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-6557

*Attorneys for Plaintiff-Appellee*
    *Commonwealth of Virginia*

# TABLE OF CONTENTS

PAGE

District Docket Court Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Amended Complaint, dated April 14, 2020 [Redacted] . . . . . . . . . . . . . . . . A-136

Defendant Kevin Mulleady's Answer and Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-222

Defendant Martin Shkreli's Answer with Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-289

Defendant Vyera Pharmaceuticals' Answer with Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-351

Joint Stipulation and Order to Amend the Relief Requested
    in the Pleadings, dated March 30, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . A-409

FTC's Motion for Leave to Withdraw the FTC's Prayer
    for Equitable Monetary Relief, dated May 26, 2021 . . . . . . . . . . . . . . . . A-414

Order Dismissing the FTC's Claim for Disgorgement,
    dated June 2, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-419

Defendant Martin Shkreli's Pretrial Memorandum of Law [Redacted] . . . A-422

Plaintiff States' Supplemental Pretrial Memorandum of Law,
    dated October 20, 2021 [Redacted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-457

Joint Motion for Entry of Stipulated Order for Permanent Injunction,
    dated December 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-492

Stipulated Order for Permanent Injunction and Equitable
    Monetary Relief, dated December 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . A-541

ii

PAGE

Written Testimony of Nicholas Pelliccione, Ph. D.,
dated October 18, 2021 .......................................... A-581

Written Testimony of W. David Hardy, M.D., dated October 20, 2021 .. A-593

Written Testimony of Frank DellaFera, dated October 18, 2021
[Redacted] ..................................................... A-631

Written Testimony of James R. Bruno, dated October 20, 2021
[Redacted] ..................................................... A-649

Written Testimony of Edward V. Conroy, dated October 20, 2021 ...... A-687

Written Testimony of Susan McDougal, dated October 15, 2021
[Redacted] ..................................................... A-725

Written Testimony of Abhishek Mukhopadhyay,
dated October 19, 2021 [Redacted] .............................. A-739

Written Testimony of Nilesh Patel, dated October 15, 2021
[Redacted] ..................................................... A-751

Written Testimony of Manish S. Shah, dated October 20, 2021 ........ A-766

Written Testimony of Martin Shkreli, dated October 15, 2021
[Redacted] ..................................................... A-785

Written Testimony of Anne Kirby, dated October 20, 2021 [Redacted].. A-803

Written Testimony of Kevin Mulleady, dated October 20, 2021......... A-831

Written Testimony of Professor C. Scott Hemphill,
dated October 19, 2021 [Redacted] .............................. A-864

Written Testimony of Dr. Anupam B. Jena, dated October 20, 2021
[Redacted], with Attachments ................................... A-924

iii

PAGE

Written Testimony of John S. Russell, dated October 20, 2021
[Redacted], with Attachments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1011

Consolidated (Full) Trial Transcripts,
dated December 14 to 20, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1068

Defendant Martin Shkreli's Notice of Appeal, dated April 5, 2022 . . . . A-2298

LCEMFTC3                      Salinas - Direct

1   Q.  Do you recall that this is actually a sentence that you

2   wrote?

3   A.  Yes.  I believe in the first part of the e-mail I said -- I

4   added my comments in capital letters.  This is in all capitals.

5   I remember the concept.

6   Q.  Just to reset the situation, the situation at this point

7   is, Vyera and Fukuzyu have not entered the master services

8   agreement yet but are in negotiations of that agreement.

9   A.  Yes.  My group discovered in early 2016 that there was no

10  supply agreement with anybody, and we were very concerned about

11  that because our plans, our research plans and our commercial

12  plans for Daraprim --

13              THE COURT:  Excuse me one second.

14              Mr. Zach, is that you back there?

15              MR. ZACH:  It is, your Honor.

16              THE COURT:  I will ask my law clerk to get

17  Mr. Whertvine.

18              So sorry to interrupt.  I have a 30-second piece of

19  business I need to do.

20              (Recess)

21              THE COURT:  Resuming.

22  Q.  Dr. Salinas, we were just starting to look at the content

23  of Government Exhibit 1056, and we were looking at this

24  provision number 4 which says:  Our plans are only possible if

25  we have exclusivity for Fukuzyu's API.

LCEMFTC3                    Salinas - Direct

1          I believe you testified that that is a sentence you

2    wrote because you wrote the sentences in all caps, correct?

3    A.  Correct.

4    Q.  Other parts of this page that we are looking at, they were

5    actually written by Mr. Arisawa?

6    A.  Yes, I believe -- yes.

7    Q.  In some places Mr. Arisawa puts something in parenthesis in

8    order to indicate that he wasn't a hundred percent sure whether

9    you wanted him to make that point or not when he spoke with

10   Fukuzyu, correct?

11   A.  Correct.

12   Q.  Number 6 is one of these provisions in parenthesis and it

13   says:  If generic products are put on the U.S. market, Turing

14   will face a serious problem, and may eventually terminate the

15   marketing of Daraprim, as well as R&D in toxoplasmosis.  Do you

16   see that?

17   A.  I do.

18   Q.  Mr. Arisawa was looking for your guidance on whether he

19   should raise this point with Fukuzyu, correct?

20   A.  Correct.

21   Q.  Do you remember whether you told him he should or he

22   shouldn't?

23   A.  I don't remember.  But in the first part of the e-mail I

24   indicate which were the bullet points that, in my opinion, he

25   should retain.

LCEMFTC3                    Salinas - Direct

1    Q.  That he should in fact say, meaning he should say that to

2    Fukuzyu?

3    A.  Yes.

4    Q.  Number 6 is one of those points, correct?

5    A.  I don't recall if the brand -- I don't recall if I retained

6    6 or not in the first part of the e-mail.

7           MR. MEIER:  What we will do is, we will go back to

8    page 1 and take a quick look at that, Ms. Guy.  Upper half of

9    the e-mail.

10   A.  I see here.  You can retain 6, 9, and 11.  So -- I thought

11   6 was pertinent.

12   Q.  You're telling Mr. Arisawa, regarding your questions, I

13   think you can mention points 6, 9, 10, and 11, correct?

14   A.  Correct.

15          MR. MEIER:  Let's go back and look at 6 on page 2.

16   Sorry for the jumping around.

17   Q.  Number 6 is one you said:  Yes, Mr. Arisawa.  You can make

18   this point with Fukuzyu.

19   A.  Correct.

20   Q.  You wanted to make this point with Fukuzyu because you

21   wanted to make clear that Vyera didn't want generic competition

22   to Daraprim, correct?

23   A.  No.

24   Q.  That's not correct?

25   A.  That's not correct.

LCEMFTC3                    Salinas - Direct

1   Q.  Let's look at the top of page 2.  Do you see where it says,

2   in summary, we propose a long-term relationship covering all

3   products in our existing pipeline?  Do you see that?

4   A.  It's not showing on the screen.  It's showing development

5   in early 2018 --

6   Q.  I'm sorry.  I was reading the second sentence, the one that

7   starts at the very end of the first line where it states, with

8   in.

9   A.  Yes.

10  Q.  Let me try that again.  In summary, we propose a long-term

11  relationship covering all products in our existing pipeline.

12  Do you see that?

13  A.  I do, yes.

14  Q.  That, again, all caps, indicating that you had typed this

15  in?

16  A.  Correct.

17  Q.  This is the proposal you were having Mr. Arisawa raise with

18  Fukuzyu?

19  A.  Correct.

20  Q.  You wanted Mr. Arisawa to tell Fukuzyu that you wanted to

21  have a long-term relationship with them?

22  A.  Yes.

23  Q.  That was in order to make it interesting for Fukuzyu to

24  contract with you, correct?

25  A.  Not only that.  I knew, because of my work in Japan, that

LCEMFTC3                    Salinas - Direct

1   Japanese companies are interested in very long-term

2   relationships and they don't like to engage for short term.  On

3   the one hand, it was good for us because it was secure access

4   to the product and other products in our research pipeline, and

5   I knew it would be interesting for them.

6           THE COURT:  Dr. Salinas, I think the answer to the

7   last question could have been the word yes.

8           If you can answer a question fairly with a yes or a

9   no, you should do that.  Only when you can't answer fairly with

10  a yes or a no should you add.  Thank you.

11          MR. MEIER:  Thank you, your Honor.

12  Q.  Let me go back to the question then the way I asked it

13  because you said not only that was the first part of your

14  answer.  I'll ask the question again.  By proposing a long-term

15  relationship, Vyera hoped that Fukuzyu would see -- I'm reading

16  from the wrong place.  Now I have lost my place.  I apologize.

17          You intended for Vyera's promise of a long-term

18  relationship on other products to be an appealing offer to

19  Fukuzyu?

20  A.  Yes.

21  Q.  By proposing a long-term relationship Vyera hoped that

22  Fukuzyu would see the benefit of entering into an exclusive

23  agreement with Vyera?

24  A.  An agreement that would include exclusivity.

25  Q.  Thank you.

LCEMFTC3                    Salinas - Direct

1           MR. MEIER:  Ms. Guy, we can take that down.

2           Ms. Guy, would you please put up Government Exhibit

3    1223.

4    Q.  Again, Dr. Salinas, if you could just try to take a look at

5    this.  I'm actually going to focus you on the next page.

6           MR. MEIER:  Let's actually turn to the next page

7    first.  Turn to page 2.  And about a third of the way down.

8    Thank you.

9    Q.  Do you see that?

10   A.  I do.

11   Q.  So this is part of an e-mail exchange between you and Mr.

12   Arisawa, correct?

13   A.  Yes.

14   Q.  Cc'g Dr. Pelliccione.

15   A.  Yes.

16   Q.  And the subject is exclusivity right was obtained.

17   A.  Yes.

18   Q.  Have you seen this e-mail before?

19   A.  Yes.  I remember seeing that e-mail.

20          MR. MEIER:  Your Honor, I would move to admit

21   Government Exhibit 1223 in evidence.

22          THE COURT:  Received.

23          (Government Exhibit 1223 received in evidence)

24   Q.  Let's actually start by looking at the earliest e-mail in

25   the chain, which starts at the bottom of page 2, and it's from

128

LCEMFTC3                          Salinas - Direct

1    Mr. Arisawa to you on November 2, 2016 at 4:10 a.m.  Are you

2    with me?  Are you there, Doctor?

3    A.   Yes.

4    Q.   It's a big paragraph, so I'll try to read it slowly.

5              In the first sentence Mr. Arisawa writes to you:  I

6    have just finished the discussion with Mr. Kosugi.  He agreed

7    to give us the exclusivity, in quotation marks, of

8    pyrimethamine for the U.S.  The reason why he did not accept

9    our exclusivity request was based on the fact that Fukuzyu is

10   currently selling pyrimethamine to Pegasus, a company that

11   produces drugs for horses.  So theoretically he thinks he

12   cannot use the word exclusivity.  I asked if he is willing to

13   sell pyrimethamine to generic companies.  The answer is no.  I

14   stressed that Turing plans to develop four more new compounds

15   and would like Fukuzyu to work together.  Also said was the

16   regular purchase of 50 kilogram every year.  He appreciated the

17   comments and looked happy.  Do you see that?

18   A.   I do.

19   Q.   Again, Mr. Kosugi, he was the top person at Fukuzyu at the

20   time?

21   A.   Yes.

22   Q.   Then at the very end Mr. Arisawa writes:  In conclusion,

23   you will get the exclusivity right of pyrimethamine for your

24   territories.  Do you see that?

25   A.   I do.

LCEMFTC3                    Salinas - Direct

1   Q.  You were happy that Fukuzyu agreed to give Vyera an

2   exclusive API supply agreement, correct?

3   A.  I was happy they could give us a supply, and I was happy it

4   was exclusive, yes.

5   Q.  Thank you.

6           MR. MEIER:  We can pull that down, please.

7           At this time I would like you to put up Government

8   Exhibit 1484 on the screen.  If we could blow that up.  Thank

9   you.  Include Dr. Salinas' signature block.  Not signature

10  block, but his identification.  Thank you.

11  Q.  Can you read that, Dr. Salinas, or is it a little bit cut

12  off on the left side?

13  A.  I can.  Are you asking me to read it out loud.

14  Q.  No.  Just like I've been doing, I'm going to ask, have you

15  seen this before, and what is it?

16          First, have you seen the e-mail marked as Government

17  Exhibit 1484 before?

18  A.  I vaguely remember it, yes.

19  Q.  What is it?

20  A.  It's me informing the then CEO, Ron Tilles, that Fukuzyu

21  was OK signing an agreement and that we were going to do that

22  imminently.

23          MR. MEIER:  Your Honor, at this time I would move to

24  admit Government Exhibit 1484 in evidence.

25          THE COURT:  Received.

LCEMFTC3                          Salinas - Direct

1              (Government Exhibit 1484 received in evidence)

2     Q.  In the top of the first part of it, after you say hi, you

3     write to Vyera's then CEO, Mr. Tilles:  "Just got a call from

4     Mikio that Kosugi-SAN is very happy with the agreement.  In

5     particular, the possibility to provide API for our pipeline."

6     Do you see that.

7     A.  I do.

8     Q.  You're reporting to Mr. Tilles, who was the CEO at the

9     time?

10    A.  Yes.

11    Q.  And agreement in that sentence means the master services

12    agreement that includes the provision for Fukuzyu to provide

13    pyrimethamine API exclusively to Vyera for human use in the

14    United States?

15    A.  Including that and other sections.

16    Q.  Understood.

17             So the possibility to provide API for our pipeline,

18    that's a reference to the fact that as part of the negotiations

19    with Fukuzyu, Vyera offered the possibility of ordering other

20    APIs from Fukuzyu in return for the exclusivity provision,

21    correct?

22    A.  Not exactly.  I think it was --

23             THE COURT:  That's fine then.  You have answered not

24    exactly.

25             THE WITNESS:  Sorry.  I'm confused.

LCEMFTC3                    Salinas - Direct

1          THE COURT:  You said not exactly.  That's an answer.

2     Thank you.

3          MR. MEIER:  We can take that exhibit down, Ms. Guy.

4     Q.  As part of the negotiations and agreement between Vyera and

5     Fukuzyu, Vyera did not invest any capital in Fukuzyu's

6     manufacturing process for pyrimethamine API, correct?

7     A.  To my knowledge at the time I was there, no.

8     Q.  And Vyera did not pay for Fukuzyu to expand its capacity to

9     make pyrimethamine, correct?

10    A.  I don't know what Fukuzyu did with the monies that were

11    paid, but there was no request, a specific request for

12    expanding capacity.

13    Q.  And Vyera didn't provide Fukuzyu with any technical knowhow

14    to develop the manufacturing process for pyrimethamine,

15    correct?

16    A.  Correct.

17    Q.  Because Fukuzyu already knew how to make it, correct?

18    A.  Correct.

19    Q.  And Vyera didn't share any intellectual property with

20    Fukuzyu as part of the contract, correct?

21    A.  Not about pyrimethamine.

22    Q.  Are you familiar with the Indian company called RL Fine?

23    A.  Yes.

24    Q.  What do you remember about RL Fine?

25    A.  What I remember is that when we were looking for a supplier

LCEMFTC3                         Salinas - Direct

1    of API, RL Fine was one of the potential suppliers if we were

2    not able to establish a relationship with Fukuzyu.

3    Q.  Other than Fukuzyu and RL Fine, do you remember any other

4    API suppliers of pyrimethamine that you were considering back

5    in 2016, 2017?

6    A.  We were looking at all the possible suppliers in the world.

7    So I remember there were others, but I don't recall their

8    names.

9    Q.  That's what I'm asking as to whether you recall any other

10   names.

11   A.  I recall Ipca, but I don't recall exactly the details about

12   Ipca.

13   Q.  Do you recall discussions when you were there at Vyera

14   about whether the company should contract with an API supplier

15   to be the backup supplier for Fukuzyu?

16   A.  Very briefly.

17   Q.  Did you consider it necessary to secure a backup supplier

18   after you signed the supply agreement with Fukuzyu?

19   A.  Not at that time, no.

20   Q.  The contract was signed in 2017?

21   A.  Correct.

22   Q.  And you left the company sometime in mid 2017?

23   A.  Correct.

24   Q.  Was there any time from the time the company signed the

25   contract with Fukuzyu in 2017, and you left that you considered

LCEMFTC3                        Salinas - Direct

1   getting a backup supplier?

2   A.  No.  That's what I meant.  During those six months I was

3   with the company, after signing the agreement, I did not think

4   it was important at that time for that.

5   Q.  Thank you.

6        MR. MEIER:  Ms. Guy, would you please put Government

7   Exhibit 1479 on the screen.

8   Q.  If you could just take a moment, like you're doing, to

9   familiarize yourself with the cover.  Again, I am going ask you

10  to whether you have seen this before and whether you know what

11  it is?

12  A.  Yes, I have seen it before and I know what it is.

13  Q.  What is it?

14  A.  It was a call for an extraordinary general meeting of

15  shareholders to be held in June 2017.

16  Q.  As I think you just explained, extraordinary general

17  meeting is a shareholder meeting as opposed to a board meeting,

18  correct?

19  A.  Correct.

20  Q.  At this time, 21 June 2017, you were Vyera's interim chief

21  executive officer, correct?

22  A.  Yes.

23  Q.  And you were nominated by the then Phoenixus board to

24  become a board member, correct?

25  A.  Yes.

LCEMFTC3                          Salinas - Direct

1   Q.  By the time of this board meeting Mr. Shkreli was no longer

2   with Vyera or Phoenixus, correct?

3   A.  Yeah.  There was no Phoenixus at this time.  Yes.  Turing

4   or what it became after.

5   Q.  I think we talked about that at the very beginning.  I was

6   just going to use the term Vyera and Phoenixus, but I

7   understand what you mean.  By the time of the extraordinary

8   general meeting, Mr. Shkreli had been arrested for securities

9   fraud and he had resigned as the CEO and he had resigned from

10  the board, correct?

11  A.  Correct.

12  Q.  Is it correct that the parent company for Vyera, which was

13  then called Turing, is a Swiss corporation?

14  A.  Yes.

15  Q.  That's why it says Baar Switzerland.  That was the Swiss

16  headquarters for Turing Pharmaceuticals AG?

17  A.  Yes.

18  Q.  AG means essentially a corporation in German?

19  A.  I believe so.

20  Q.  Under Swiss corporate law, any shareholder with enough

21  shares in Phoenixus can call an extraordinary general meeting,

22  correct?

23  A.  I think so, but I don't remember the bylaws.

24  Q.  You recall that Mr. Shkreli actually is the person who

25  called for this particular extraordinary general meeting,

LCEMFTC3                    Salinas – Direct

1   correct?

2   A.  I believe so.

3   Q.  Do you recall that Mr. Shkreli had enough shares in the

4   parent company at the time to call this meeting by himself?

5   A.  As I said, I don't remember in detail the bylaws, but I

6   remember that he had the right to call for those meetings.

7   Q.  And he called for this particular meeting.

8   A.  I believe so.  There were several meetings during my tenure

9   that would call and would cancel.  I am not sure which one in

10  particular by whom.

11          MR. MEIER:  Let's turn to page 2, Roman numeral II.

12  It's down at the bottom of the page.  Thank you, Ms. Guy.

13          THE COURT:  Is this exhibit in evidence?

14          MR. MEIER:  I apologize, your Honor.  My apologies.  I

15  meant to request that this be moved in evidence.  Thank you for

16  the reminder.

17          THE COURT:  Received.

18          (Government Exhibit 1479 received in evidence)

19  Q.  Looking at agenda item number II it says:  Agenda items

20  requested by the Turing Pharmaceuticals, AG board of directors,

21  election of Eliseo O. Salinas, etc.

22          One of the agenda items at this extraordinary general

23  meeting was to nominate a slate of members to the board of

24  directors, correct?

25  A.  Correct.

LCEMFTC3                        Salinas - Direct

1    Q.  At this meeting do you recall that there were actually two

2    competing slates of nominees for the board?

3    A.  I do.

4    Q.  The current board at the time had proposed a slate of

5    directors, including you, and Mr. Shkreli had proposed a very

6    different slate of directors, is that correct?

7    A.  Correct.

8              MR. MEIER:  If we could scroll down a little bit,

9    Ms. Guy.  I'm sorry.  Turn to page 3 and then where it says

10   proposals, an explanation of the board of directors.  Up near

11   the top there is, in italics, proposals and explanations of the

12   board of directors.

13   Q.  It says the board of directors proposes that the

14   shareholders fully elect you and the other members that the

15   board had put forward, correct?

16   A.  Correct.

17   Q.  It also explains in that same paragraph that the board of

18   directors overwhelmingly supports these candidates, as do many

19   of the companies' large investors, due to the vast business

20   experience each has had in the pharmaceutical industry.  Do you

21   see that?

22   A.  I do.

23   Q.  That's a reference to you, Mr. Lavotha and Mr. Berman.

24   A.  Yes.

25   Q.  Then it actually explains the qualifications, your

1   qualifications, Mr. Lavotha's and Mr. Berman, correct?

2   A.  Correct.

3   Q.  I am not going to go and read all of those.  We will just

4   leave it at that.

5           MR. MEIER:  Let's turn to page 5 of Government Exhibit

6   1479.  If we could highlight the top agenda, item number I.

7   Q.  That says:  Agenda items requested by Martin Shkreli,

8   election of Akeel Mithani, Kevin Mulleady to the board of

9   directors.  Do you see that?

10  A.  Yes.

11  Q.  We talked about Mr. Mithani and Mr. Mulleady earlier this

12  afternoon, correct?

13  A.  Not with me.

14  Q.  That's right.  You are right.  That was with

15  Mr. Pelliccione.  Thank you.

16          Mr. Shkreli, was he proposing a slate of directors to

17  replace the current board?

18  A.  Yes.

19  Q.  One of the reasons he gave is, he had informed the board

20  that he was not satisfied with the current board, nor with how

21  the company was being run, correct?

22  A.  Correct.

23  Q.  And you also thought that Mr. Shkreli wasn't happy with you

24  and what you were doing as the interim CEO, correct?

25  A.  Yes.

LCEMFTC3                    Salinas - Direct

1    Q.  And, in fact, Mr. Shkreli had been very quote hostile and

2    negative towards you, correct?

3    A.  Yes.

4    Q.  And he had sent you threatening e-mails, correct?  I'm

5    sorry.  Threatening mail.

6    A.  I remember only one e-mail that was threatening.

7    Q.  Mr. Shkreli's threatening mail said you were "a cockroach

8    that needed to be stomped or crushed."  Do you remember that?

9    A.  I do remember that, yes.

10   Q.  And you thought Mr. Shkreli was hostile to you because you

11   did not want him to remain associated with Vyera after he had

12   stepped down, correct?

13   A.  That was my belief.

14   Q.  Right.  That's all I'm asking.  You thought Mr. Shkreli was

15   hostile to you because you did not want him to remain

16   associated with Vyera after he stepped down?

17   A.  Yes.

18   Q.  And you didn't want Mr. Shkreli to have an active role in

19   the company after he stepped down?

20   A.  Yes.

21   Q.  And it was your impression that Mr. Shkreli wanted to

22   continue to have an active role in the company, even after he

23   stepped down?

24   A.  Yes.

25   Q.  In fact, Mr. Shkreli wanted to participate in a meeting of

LCEMFTC3                    Salinas - Direct

1   the executive committee after stepping down.

2   A.   Yes.

3   Q.   And you thought that Mr. Shkreli's proposed slate of

4   directors lacked experience and competence, correct?

5   A.   Correct.

6   Q.   And the existing board recommended against Mr. Shkreli's

7   proposed slate of board of directors.

8   A.   Yes.

9            MR. MEIER:  If we could turn to page 6 of Government

10  Exhibit 1479.  We are still looking at the extraordinary

11  general meeting notes.  If you actually do the very top part,

12  include the very top.  Thank you.

13  Q.   This is where the board of directors proposes that the

14  proposal of Martin Shkreli be fully rejected, right?

15  A.   Right.

16  Q.   Then the board gives a number of reasons, correct?

17  A.   Correct.

18  Q.   Again, I am going to stay away from reading all of it.  But

19  one bullet point is a lack of transparency, correct?

20  A.   Yes.

21  Q.   Do you remember what that was generally about?

22  A.   In general terms, that Martin Shkreli was not forthcoming

23  with his reasons for doing what he was doing, and his business

24  relationships with the candidates he was appointing, trying to

25  appoint.

LCEMFTC3                          Salinas - Direct

1          MR. MEIER:  If we could go to the second bullet point,

2    Ms. Guy.

3    Q.  The second reason the board gave for rejecting

4    Mr. Shkreli's slate was because of what it perceived as undue

5    involvement of Martin Shkreli in the company, correct?

6    A.  Correct.

7    Q.  We talked a little bit about that a moment ago, at least

8    your perceptions of that a moment ago.

9    A.  Yes.

10   Q.  Let's look at the second bullet, undue involvement of

11   Martin Shkreli, and go to the fourth line down.  I think it's

12   the fourth one.  There it is.  Thank you.

13          One of the concerns the board had was that Mr. Shkreli

14   publicly holds himself out as speaking for the company when in

15   fact he has no operational or business responsibilities.  You

16   see that?

17   A.  I do.

18          MR. MEIER:  Let's go three lines down.  Thank you.

19   Q.  There the board explains that as a result of their distinct

20   lack of qualifications, and that's a reference to Mr. Shkreli's

21   slate, correct?

22   A.  Yes.

23          MR. RUDOWITZ:  Objection, your Honor.  This is all

24   hearsay within hearsay.

25          THE COURT:  Overruled.

LCEMFTC3                          Salinas - Direct

1    Q.  It says:  As a result of their distinct lack of

2    qualifications and the fact that they were nominated by

3    Mr. Shkreli and have apparent conflicts of interest further

4    described below, the board believes that in the case of their

5    election, many third parties, including regulatory authorities,

6    will likely deem the newly elected board members to be serving

7    merely as straw men acting on Mr. Shkreli's behalf, and could

8    further deem Mr. Shkreli to be in a position of influence,

9    direct, or control the board and thus the company as well.  You

10   see that?

11   A.  I do.

12   Q.  When it says the company, it's talking about what we have

13   been calling Vyera all day today, right?

14   A.  Right.

15   Q.  The operating company, the company that owns Daraprim,

16   correct?

17   A.  Yes.

18   Q.  And the company that you were doing the research and

19   development for, correct?

20   A.  Yes.

21   Q.  And the company that Mr. Pelliccione works for.

22   A.  Yes.

23   Q.  As it indicates there, one of the concerns the board had

24   was the lack of qualifications and conflicts of interest.

25            MR. MEIER:  If we could go down to the third bullet

142

LCEMFTC3                          Salinas - Direct

1   point right below where we have been highlighting, Unhighlight

2   and move down.  We will talk a little bit about that.

3   Q.  If I understand this correctly, a third reason the board

4   gave for opposing the slate Mr. Shkreli had put forward is that

5   the people he had put forward lacked qualifications and they

6   have conflicts of interest, correct?

7   A.  Correct.

8   Q.  And, apparently, Mr. Shkreli had provided CVs on some of

9   these different individuals, correct?

10  A.  Yes.

11          MR. MEIER:  Let's go to the next page, please.  If I

12  could just focus on Akeel Mithani on the top first.

13  Q.  This board meeting is held in 2017, correct?

14  A.  Yes.

15  Q.  According to the board minutes here or the minutes from the

16  extraordinary general meeting, Mr. Mithani had just graduated

17  three years earlier from college, correct?

18  A.  Correct.

19  Q.  Do you recall whether he had any background in the

20  pharmaceutical industry?

21  A.  My recollection is that he didn't.

22  Q.  Do you recall whether he had any experience of holding any

23  kind of a position of responsibility in any kind of company?

24  A.  He got some association with the company held by Martin

25  Shkreli, but that's all I knew.

LCEMFTC3                    Salinas - Direct

1   Q.  Do you see the last part of the entry there where it says

2   the board believes?  Do you see that?

3   A.  I do.

4   Q.  The board believes that Mr. Mithani's current association

5   with Mr. Shkreli constitute a direct conflict of interest with

6   the company and leaves Mr. Mithani unable to act as an

7   independent board member.

8           Do you have any recollection sitting here today what

9   that conflict of interest was?

10          MR. RUDOWITZ:  Objection, your Honor.  That statement

11  lacks foundation, personal knowledge.

12          THE COURT:  Overruled.

13  A.  I believe that Akeel Mithani had some participation in some

14  company that Martin Shkreli had created, a small endeavor, but

15  I don't recall the details.

16          MR. MEIER:  I am going to go ahead and move next to

17  the one for Mr. Mulleady.  It's sort of in the middle of the

18  page, Kevin Mulleady.

19  Q.  Do you see where it says Kevin Mulleady is a former Turing

20  employee and has been associated with Mr. Shkreli for many

21  years.  You see that?

22  A.  I do.

23  Q.  Do you remember what Mr. Mulleady did when he was a Turing

24  employee?

25  A.  I remember not knowing what he was doing.  He was present

LCEMFTC3                    Salinas – Direct

1    in the office, but nobody knew exactly what his role was.

2    Q.  Do you recall whether he was part of what was known as the

3    business development group at the time?

4    A.  Not exactly, no.  He was not part of that group, for as

5    much as I knew.

6    Q.  And do you recall that the board had concerns also that

7    Mr. Mulleady had conflicts of interest with Mr. Shkreli?

8    A.  Yes.

9    Q.  That was because of other business ventures that they were

10   involved in?  Is that correct?

11   A.  Correct.

12   Q.  Do you see where at the end of that block where it says the

13   board believes that Mr. Mulleady is not suitable to serve as an

14   independent member of the board.  Do you see that?

15   A.  I do.

16   Q.  Did you agree with that?

17   A.  Yes.

18          MR. MEIER:  Let's turn to page 8, please.  There is an

19   underlined portion right there.  Yes.  Perfect.

20   Q.  The board wrote this underlined portion:  The board is of

21   the opinion that, in light of all of the above-mentioned

22   negative implications for the company, the election of the

23   slate of candidates put forward by Martin Shkreli would be

24   disproportionately risky and outright unreasonable.  You see

25   that?

145

LCEMFTC3                         Salinas - Direct

1   A.  I did, yes.  I'm seeing that.

2   Q.  All of this board meeting and this discussion was occurring

3   after Mr. Shkreli had already left the company, correct?

4   A.  Yes.

5           MR. MEIER:  You can take down Government Exhibit 1479.

6   Q.  Let me summarize then.  The examining board put forward a

7   slate of what you believe to be competent and experienced

8   people, correct?

9   A.  Yes.

10  Q.  Mr. Shkreli put forward a slate of directors that lacked

11  experience?

12  A.  Yes.

13  Q.  And the board strongly recommended against Mr. Shkreli's

14  state of inexperienced directors?

15  A.  Yes.

16  Q.  But what actually ended up happening?

17  A.  The opposite.

18  Q.  Which is?

19  A.  The majority of the shareholders elected the slate proposed

20  by Martin Shkreli.

21  Q.  That's because Mr. Shkreli owned the largest portion of the

22  company?

23  A.  I don't know that for a fact.  He owned, he was the largest

24  investor, but he needed other investors to vote with them.

25           (Continued on next page)

LCEKFTC4                    Salinas - Cross

1   Q.  So Mr. Shkreli was successful getting his slate of

2   directors elected even though the existing board viewed them as

3   unqualified?

4   A.  Yes.

5   Q.  In doing so, Mr. Shkreli demonstrated that if he wasn't

6   happy with the current board of directors, he could change the

7   makeup of the board, correct?

8   A.  Yes.

9   Q.  And shortly after the meeting in June of 2017, you left the

10  company?

11  A.  Yes.

12  Q.  And you were replaced by Mr. Mulleady as the chief

13  executive officer?

14  A.  Yes.

15  Q.  So, in the end, you were out and Mr. Shkreli's people were

16  in?

17  A.  Yes.

18          MR. MEIER:  Thank you, Dr. Salinas.

19          No further questions, your Honor.

20  CROSS-EXAMINATION

21  BY MR. RUDOWITZ:

22  Q.  Good afternoon, Dr. Salinas.

23  A.  Good afternoon.

24  Q.  My name is AJ Rudowitz.  I'm an attorney representing

25  Mr. Shkreli in this action.

LCEKFTC4                    Salinas - Cross

1          I believe that you testified earlier that you've

2     worked in the pharmaceutical industry for approximately

3     30 years; is that right?

4     A.   A little bit over 30 years.

5     Q.   And you've worked for a number of medium and large size

6     pharmaceutical companies, including Wyeth, Shire, and Elan?

7     A.   Yes.

8     Q.   I believe you also testified that your primary experience

9     has been in the areas of research and development, right?

10    A.   Yes.

11    Q.   Dr. Salinas, you joined Vyera — I understand it was

12    formerly called Turing, but we'll refer to it as Vyera today —

13    back in June of 2015; is that right?

14    A.   Yes.

15    Q.   And you were hired as president and head of research and

16    development, correct?

17    A.   Correct.

18    Q.   I believe you testified earlier that Mr. Shkreli hired and

19    interviewed you for that position?

20    A.   Yes.

21    Q.   What was it that made you decide to join Vyera?

22    A.   The fact that they had the ambition to become an important

23    research company in central nervous system, or CNS, and/or the

24    research and development CNS company, and that they were well

25    funded, they have the means to accomplish that objective, and

LCEKFTC4                    Salinas - Cross

1   they have complicated research programs that required, in my

2   opinion, someone with a lot of experience, and that attracted

3   me.

4   Q.  I believe you also discussed earlier that you had

5   conversations with Mr. Shkreli concerning Vyera's business

6   model; is that right?

7   A.  That's right.

8   Q.  What did you understand the role to be of research and

9   development in Vyera's business model?

10  A.  The engine that R&D would be the most important thing that

11  we would be doing, that the acquisition of some products at the

12  end of their marketing life would be a supplement of the

13  funding necessary to develop those research programs.

14  Q.  As the engine of Vyera, when you were working at Vyera in

15  2015, what types of research and development projects and

16  programs were you working on?

17  A.  There were seven or eight.  Do you want me to give you a

18  brief summary of each of them?

19  Q.  A brief summary would be great.

20  A.  There were three, what is called, late stage programs,

21  programs that were likely to become marketed products in a

22  short period of time, two or three years.

23          One was a ketamine program, an intranasal form of

24  ketamine for the treatment of depression and suicide.

25          Another was oxytocin, which was originally a drug

LCEKFTC4                    Salinas - Cross

1    intended for lactation, to stimulate lactation in mothers, but

2    we thought about developing oxytocin for CNS conditions like

3    autism and disorders of that nature.

4          Another one was an antiepileptic drug which exist in

5    Europe, but did not at that time in the U.S., called

6    Stiripentol.

7          Those were the three most advanced, and behind those,

8    there were a number of programs for rare CNS disorders in

9    collaboration with different several academic institutions.

10         And then when Turing acquired Daraprim, as a condition

11   of that acquisition, I requested that we did research in

12   toxoplasmosis, and we started doing research in toxoplasmosis,

13   also.

14   Q.  Mr. Shkreli left his position as CEO just about six months

15   after you joined the company, in December 2015, right?

16   A.  Yes.

17   Q.  I know you just mentioned Daraprim.  So Vyera acquired

18   Daraprim in August of 2015?

19   A.  Yeah, it was the summer, I believe August.

20   Q.  I believe you testified earlier that you disagreed with the

21   price increase of Daraprim once Vyera acquired it; is that

22   right?

23   A.  Yes.

24   Q.  In your experience in the industry, it's true that drugs

25   that affect a rare condition are extremely expensive and can be

LCEKFTC4                    Salinas – Cross

1   priced at 300,000, 400,000, or 500,000 dollars per patient per

2   year; is that right?

3   A.   Yes.

4   Q.   Dr. Salinas, are you familiar with the potential side

5   effects of Daraprim?

6   A.   Yes.

7   Q.   If a toxoplasmosis patient takes too much Daraprim, what

8   are the side effects?

9   A.   Daraprim inhibits the action of an enzyme that is necessary

10  for the cells of the patient to regenerate, so it affect our

11  bone marrow, which produces the blood cells, which is one of

12  the most active tissues regenerating constantly.  So Daraprim

13  could have a very negative effect on the production of blood

14  cells, and that's one example.

15          It has very toxic effects in the embryo during the

16  first trimester of the pregnancy, which is the time which you

17  would like a drug against toxoplasmosis effective because it's

18  the time when the baby is most susceptible if the mother

19  contracts the parasite at the time.

20          And there are other side effects.

21  Q.   Conversely, if a toxoplasmosis patient takes too little

22  Daraprim, what are the side effects?

23  A.   I wouldn't call them side effects, but the parasite

24  infection will not be treated, and the patient could die of the

25  parasitic infection.

LCEKFTC4                    Salinas - Cross

1   Q.  Is it correct that taking the correct dosage of Daraprim is

2   important for treatment and for safety?

3   A.  Yes, it's critical.

4   Q.  And specialty pharmacies can help ensure that patients take

5   the correct dosage of Daraprim, right?

6           MR. MEIER:  Your Honor, I am going to object.  There's

7   been no foundation laid for Dr. Salinas knowing anything about

8   what specialty pharmacies do.

9           THE COURT:  I thought your objection was beyond the

10  scope.

11          Wait a minute.  Have you both subpoenaed this witness?

12          MR. MEIER:  Yes.

13          MR. RUDOWITZ:  Yes, your Honor.

14          THE COURT:  Okay.  So get beyond the scope.  You may

15  lay a foundation.

16  BY MR. RUDOWITZ:

17  Q.  Mr. Salinas, are you familiar with specialty pharmacies?

18  A.  Peripherally familiar, yes.

19  Q.  What's the difference between -- what benefits, if any,

20  does a specialty pharmacy offer that a retail pharmacy does

21  not?

22  A.  Typically, it affect drugs that are difficult to take,

23  require more explanation to the patient, or simply very

24  expensive.

25  Q.  Dr. Salinas what, if anything, can be done to help ensure

LCEKFTC4                    Salinas - Cross

1   patients take the correct amount of Daraprim?

2   A.   Well, first, education, of course, medical education, the

3   appropriate promotion from the sponsor explaining how the drug

4   should be taken, and to a certain extent, the specialty

5   distribution adds another layer of information and protection.

6   Q.   What other pharmaceutical must be taken with Daraprim to

7   treat toxoplasmosis, if any?

8   A.   Leucovorin.

9   Q.   Are there instances where a toxoplasmosis patient cannot

10  take Daraprim for treatment?

11  A.   Yes.  If the patient had a previous intolerance to

12  pyrimethamine, that will be an example.

13  Q.   I believe you discussed earlier issues with embryos.  Is

14  Daraprim the preferred treatment for toxoplasmosis patients who

15  are pregnant?

16  A.   Not in the first trimester.  It's contraindicated in the

17  first trimester.  Later on, it could be used, but not in the

18  first trimester.

19  Q.   And Daraprim -- based on your experience, can Daraprim be

20  administered to treat toxoplasmosis patients with a sulfa

21  allergy?

22  A.   Pyrimethamine can be given to patients that has a sulfa

23  allergy.  Not Bactrim, but pyrimethamine can be given to

24  patients that had a sulfa allergy.

25  Q.   With Daraprim -- is Daraprim often treated in combination

LCEKFTC4                    Salinas - Cross

1   with a sulfa?

2   A.   Yes.

3   Q.   Based on your experience, in general, what pharmaceutical

4   is most commonly used for the treatment of toxoplasmosis?

5   A.   In the U.S., it would be Daraprim -- sorry, excuse me, I

6   take that back.  The most commonly used is Bactrim, which is

7   trimethoprim and sulfamethoxazole.  That's the most commonly

8   used, although it is not approved for that indication.

9        The most knowledgeable experts on toxoplasmosis regret

10  that fact because they think that pyrimethamine is better, but

11  I believe, in volume, the most commonly used is Bactrim.

12  Q.   You testified earlier about a company called Fukuzyu,

13  correct?

14  A.   Correct.

15  Q.   And you were involved in identifying Fukuzyu as a potential

16  supplier for pyrimethamine API, correct?

17  A.   Yes.

18  Q.   It's correct that you did not identify Fukuzyu as a

19  potential supplier until 2016?

20  A.   Yes.

21  Q.   In 2016, you became concerned that Vyera might run out of

22  pyrimethamine API supply and, thus, would not be able to

23  continue manufacturing Daraprim; is that correct?

24  A.   Yes.

25  Q.   Up until that point, when you began searching for an API

LCEKFTC4                    Salinas – Cross

1    supplier, Vyera had been using the existing pyrimethamine API

2    inventory that was acquired from the previous owner of

3    Daraprim, right?

4    A.   Right.

5    Q.   So you began your search for an API supplier because you

6    were concerned with supply of pyrimethamine API, correct?

7    A.   Yes, very concerned.

8    Q.   And you didn't have any discussions with Mr. Shkreli about

9    the Fukuzyu API supply agreement; is that right?

10   A.   Right.  He wasn't there anymore.

11   Q.   And Vyera entered into the supply agreement with Fukuzyu in

12   approximately January of 2017; is that right?

13   A.   Right.

14   Q.   So Vyera went approximately one and a half years after

15   acquiring Daraprim before entering into a supply agreement; is

16   that right?

17   A.   That's right.

18   Q.   And you were involved in the negotiations of the supply

19   agreement between Vyera and Fukuzyu?

20   A.   Yes, I was.

21   Q.   You had primary oversight of the negotiations?

22   A.   Yes.

23   Q.   I believe that you testified earlier that in the

24   negotiations, getting an exclusive supply provision was a goal

25   for Vyera, correct?

LCEKFTC4                    Salinas - Cross

1   A.  Was a goal, yes.

2   Q.  It was a goal, but it was not the most important goal,

3   right?

4   A.  Correct.

5   Q.  What was the most important goal?

6   A.  Getting the supplier.

7   Q.  Now, Vyera and Fukuzyu did agree to an exclusivity

8   provision, right?

9   A.  Right.

10  Q.  Why did Vyera include an exclusivity provision in the

11  supply agreement with Fukuzyu?

12  A.  Because we were unable to anticipate the volume we would

13  need.  Our plans were very aggressive, and we had reasons to

14  believe that we could be successful in increasing the use of

15  Daraprim in the approved indication, and we had research

16  programs in extending that if we were successful in both areas

17  that were needed, it could be ten or fifteen times higher than

18  what would have been without those programs.

19  Q.  So you were concerned for API supply both for Daraprim, as

20  well as the anticipated or hopeful products that were in

21  development in the R&D pipeline; is that correct?

22  A.  Yes.  In particular, we're thinking about an intraocular

23  form of pyrimethamine.  We didn't talk about that.  That's why

24  I mentioned it.

25  Q.  Dr. Salinas, did you try to negotiate any other terms that

LCEKFTC4                    Salinas - Cross

1   would help ensure supply of pyrimethamine API, such as a

2   minimum volume requirement?

3   A.   That was part of the discussion.  I remember, also, the

4   quality agreement that was very important for us.

5   Q.   And you had discussions with Fukuzyu about prioritizing

6   sales of pyrimethamine API to Vyera over sales to its other

7   customers outside of the United States, right?

8   A.   That was our concern, that we would be able to get all the

9   pyrimethamine we would need, yes.

10  Q.   So you contemplated numerous types of provisions in the

11  supply agreement that would help ensure API supply, including

12  the exclusivity provision; is that correct?

13  A.   That's correct.

14  Q.   And in your experience in the industry, are exclusive

15  supply agreements common?

16  A.   Very common.

17  Q.   With all of the companies that you worked for previous to

18  Vyera, did they all have exclusive supply agreements?

19  A.   I've been with many companies.  I cannot guarantee all of

20  them had, but the important products for each of the companies

21  I worked for had -- or we intended to have exclusive supply

22  agreements.

23  Q.   I believe plaintiffs' counsel asked you earlier about a

24  concern of generic entry.

25          Do you remember that --

LCEKFTC4                    Salinas - Cross

1   A.  I do.

2   Q.  -- in general.

3          But, in fact, at the time you were negotiating the

4   supply agreement with Fukuzyu, generic competition was not a

5   concern of yours; is that right?

6   A.  That's right.

7   Q.  After Vyera signed --

8          THE COURT:  So, counsel, I do not understand the

9   distinction you're making.  If this is important to you, you

10  need to explain the difference.

11         MR. RUDOWITZ:  Okay, your Honor.

12  BY MR. RUDOWITZ:

13  Q.  Earlier today, plaintiffs' counsel was asking you, in

14  general, about whether you were concerned of generic

15  competition, and I believe that you did not testify that

16  generic competition was a concern of yours; is that right?

17  A.  That is right.

18  Q.  Now, generic entry was discussed earlier as well, and I

19  believe that you have testified, generally, that generic entry

20  would have been a concern specifically with respect to Fukuzyu

21  because it would impact supply?

22         THE COURT:  So, I'm sorry, I misled you, counsel.  I

23  didn't really want you to explain it; I wanted the witness to

24  explain it.  To the extent you can engage in nonleading

25  questions of the witness, that would be helpful.  I'm sorry if

LCEKFTC4                    Salinas - Cross

1    I misled you.

2         MR. RUDOWITZ:  Understood, your Honor.  I apologize.

3    BY MR. RUDOWITZ:

4    Q.  Dr. Salinas, can you explain why -- strike that.  I'm

5    sorry.

6         Can you explain why generic competition was not a

7    concern of yours, but generic entry may have been?

8    A.  Because of the business model.  Generic companies are based

9    on large volumes and low prices.  Large volumes, Advil,

10   ibuprofen, those kind of drugs — that's the business of generic

11   companies.  Large volumes, small prices, small cost.  That's

12   why generic companies do not invest in research and

13   development.  That's not their objective.  It's to make cheap

14   large volumes of medication.

15        And pyrimethamine and Daraprim was the opposite, a

16   very small volume, very small number of patients, and that's

17   why, for me personally, but that was my personal opinion, while

18   the entry of generic could be a theoretical concern, I thought

19   that that was unlikely to happen because if it were to happen,

20   one, two, three, five, ten generic companies would enter the

21   market, the market would collapse, and it would be the end of

22   the market for those generic companies because there wasn't

23   enough volume for them.

24        So I thought -- and some of my colleagues disagreed,

25   but I was of the opinion that that was not a major concern.

LCEKFTC4                    Salinas – Cross

1   Q.  Conversely, why were you concerned with generic companies

2   acquiring API from Fukuzyu?

3   A.  I was concerned about us, Turing, or Vyera having enough

4   API to do all our ambitious projects.  To give you an idea, if

5   we were successful -- let me step back.

6        Encephalitis toxoplasmosis is recognized by every

7   physician.  There's no undertreatment of toxoplasmosis

8   encephalitis.  There's a huge undertreatment of retinal

9   toxoplasmosis, which is the most common form.

10  Ophthalmologists, in the U.S. in particular, but also outside

11  of the U.S., have this misconception that the infection should

12  only be treated if it affects the center of the eye, the

13  macula, and if the parasite is detected outside of the macula,

14  in the periphery, they don't treat it, and that's not good

15  medicine, but that's the way it is done.

16        If ophthalmologists, the general ophthalmologists,

17  were to treat all the cases of toxoplasmosis that exist in this

18  country, the volume of Daraprim needed could be about ten times

19  higher, because those are the numbers.  So even if our research

20  projects were not successful, just merely by putting ocular

21  toxoplasmosis in the radar screen of the primary care

22  ophthalmologists would have generated an increase in our need

23  of pyrimethamine, and, therefore, I was afraid of any

24  competition, not generic.  I was afraid of any other competitor

25  that could require additional pyrimethamine.

LCEKFTC4                    Salinas - Cross

1          Fukuzyu was the only available supplier at the time,
2    but they were selling a number of generics — I don't know, ten,
3    twenty — and they have a small percentage of their capacity
4    allocated to pyrimethamine.  If our needs increase by ten
5    times, I was concerned that they would not be able to support
6    our needs.
7    Q.  And to try to summarize, because I think I may have done an
8    earlier poor job of asking the question, to summarize, generic
9    competition was not a concern of yours because the generic
10   business model did not fit Daraprim, and, thus, you did not see
11   it as a threat, but generics obtaining API from Fukuzyu was a
12   concern because of your high aspirations requiring high volume?
13          MR. MEIER:  Your Honor, I object; this is
14   argumentative.
15          THE COURT:  Sustained.
16   BY MR. RUDOWITZ:
17   Q.  Dr. Salinas, after signing the supply agreement with
18   Fukuzyu, you considered the need for a backup or additional API
19   supplier for pyrimethamine API?
20   A.  I was asked the question at that time, if we should or
21   should not look for a backup supplier.
22   Q.  Based on your experience, it's normal business practice in
23   pharmaceuticals to have a backup supplier for important
24   products, correct?
25   A.  Yes.

LCEKFTC4                    Salinas - Cross

1    Q.  And in your work at previous companies, the important

2    products at those companies had backup suppliers, correct?

3    A.  Typically, yes.

4    Q.  Dr. Salinas, I believe you have discussed a company called

5    RL Fine earlier.

6            Do you remember that?

7    A.  I do.

8            MR. RUDOWITZ:  Justin, can you bring up GX 1058.

9    Q.  Dr. Salinas, have you seen this email before?

10   A.  I hate to say that, but it's, again, a black screen.

11           THE COURT:  What is the document number again?  I'm

12   sorry.

13           MR. RUDOWITZ:  GX 1058, your Honor.

14           THE COURT:  Thank you.

15           THE WITNESS:  It's still a black screen.  I'm sorry.

16           Now it's back.  Okay, I'm seeing an email here.

17   BY MR. RUDOWITZ:

18   Q.  Dr. Salinas, have you seen this email before?

19   A.  Yes, I remember this email.

20   Q.  And this is an email chain with the original email sent by

21   Patrick Crutcher to you, copying Nick Pelliccione and Gopal

22   Krishna --

23   A.  Yes.

24   Q.  -- on November 17, 2016; is that right?

25   A.  Yes.

LCEKFTC4                    Salinas - Cross

1          MR. RUDOWITZ:  Your Honor, we move to admit GX 1058.

2          THE COURT:  Received.

3          (Government's Exhibit 1058 received in evidence)

4   BY MR. RUDOWITZ:

5   Q.  Dr. Salinas, what is the subject line of the email?

6   A.  RL Fine Chemicals.

7   Q.  Do you see in Mr. Crutcher's email to you, first paragraph,

8   third sentence, he writes, "It may make sense for us to get in

9   touch with them to discuss this as a backup supplier."

10          Do you see that?

11  A.  I do.

12  Q.  In the first bullet point, Mr. Crutcher writes, "RL Fine

13  Chemicals was contacted to determine if they have taken any

14  steps to file a U.S. DMF and make the API available to USA

15  generic companies."

16          Do you see that?

17  A.  I do.

18  Q.  And then on the following sub-bullet point, under that,

19  Mr. Crutcher writes, "RL has validated the process, and the

20  product is ready, as is a DMF, for submission to the FDA."

21          Do you see that?

22  A.  I do.

23  Q.  Do you know what product Mr. Crutcher is referring to in

24  that sub-bullet?

25  A.  Yes.  He's referring to pyrimethamine.

LCEKFTC4                        Salinas - Cross

1   Q.  Was this the first time that you had heard of RL Fine being

2   a potential backup supplier for pyrimethamine API for Vyera?

3   A.  I believe so, but I don't know.  But this was before we had

4   the agreement signed with Fukuzyu.

5   Q.  And above that, you email in response, and you write, "Good

6   idea.  Gopal, Nick:  Let's discuss."

7          Do you see that?

8   A.  I do.

9          Can I make a clarification?

10  Q.  Yes.

11  A.  So when I said I did not think it was necessary to have a

12  backup supplier at that time, I meant after signing the

13  agreement with Fukuzyu.  Before signing the agreement with

14  Fukuzyu, the backup is that for me, if Fukuzyu doesn't work, if

15  Fukuzyu doesn't want to do business with us, what do we do, we

16  need a backup that give us.  So the word backup has two

17  meanings in this context.

18  Q.  Okay.  So Vyera was aware of RL Fine's ability to

19  manufacture pyrimethamine API in 2016, right?

20  A.  Right.

21  Q.  Based on your experience, some generic pharmaceutical

22  companies do not need to rely on a DMF from outside API

23  manufacturers because they have their own manufacturing

24  processes; is that right?

25  A.  That's right.

LCEKFTC4                    Salinas - Cross

1   Q.  And those generic companies would just create their own DMF

2   internally and file that with the FDA; is that right?

3   A.  That is right.

4   Q.  So a generic company, like Perrigo or Mallinckordt, could

5   start and generate their own DMF?

6   A.  Yes, a large company could start the process without the

7   need of an outside DMF.  Any large generic company could have

8   manufactured pyrimethamine at any time.

9   Q.  Based on your experience, that process could be done in a

10  matter of a few months?

11          MR. MEIER:  Your Honor, I am going to object again.

12  There's no foundation for --

13          THE COURT:  Sustained.

14  BY MR. RUDOWITZ:

15  Q.  Dr. Salinas, are you aware of any generic pharmaceutical

16  companies creating their own DMFs internally?

17  A.  Yes.

18  Q.  How quickly can a DMF be created internally?

19          MR. MEIER:  Objection, your Honor.

20          THE COURT:  Sustained.

21  Q.  In your experience, and based on your knowledge, what's the

22  quickest that you know a generic pharmaceutical company to

23  create a DMF internally?

24          MR. MEIER:  Objection, your Honor.

25          THE COURT:  Sustained.

LCEKFTC4                           Salinas - Cross

1        I'll let you lay a foundation, counsel, but you have

2    to lay a foundation.

3        MR. RUDOWITZ:  Understood, your Honor.

4    BY MR. RUDOWITZ:

5    Q.  Dr. Salinas, do you know --

6        THE COURT:  Have you ever worked at a company -- have

7    you ever worked at a large generic manufacturing company?

8        THE WITNESS:  No.

9        THE COURT:  Have you ever worked at a large

10   pharmaceutical manufacturing company that's created its own API

11   for the first time?

12       THE WITNESS:  I believe, yes.  Wyeth, at the beginning

13   of my career.

14   BY MR. RUDOWITZ:

15   Q.  Dr. Salinas, how long did it take --

16       THE COURT:  Well, no, I got you started, counsel.

17   You're going to have to lay a foundation.

18       MR. RUDOWITZ:  Okay.

19   BY MR. RUDOWITZ:

20   Q.  Dr. Salinas, what company was that at?

21   A.  Wyeth.

22   Q.  And, Dr. Salinas, what drug was that?

23   A.  I don't recall.  There were many drugs manufactured by

24   Wyeth, and in discussions with the CMC, that topic would come

25   up and -- but I cannot pinpoint to a specific drug.

LCEKFTC4                    Salinas - Cross

1   Q.  Do you recall how long it would take -- how long it took?

2            THE COURT:  That's not a foundation, counsel.  Let's

3   move on.

4            MR. RUDOWITZ:  All right.

5   BY MR. RUDOWITZ:

6   Q.  Based on your experience, whether to have a backup supplier

7   is a business decision, right?

8   A.  It is.

9   Q.  Moving forward, you eventually became interim CEO of Vyera

10  in April 2017?

11  A.  Yes.

12  Q.  When you were CEO of Vyera, you were the one making the

13  day-to-day decisions for the company?

14  A.  Yes.

15  Q.  While you were CEO, did you often speak with Mr. Shkreli?

16  A.  Not often.  Once, I believe.  Or twice.

17  Q.  After Mr. Shkreli stepped down as CEO, he did not

18  participate in any executive committee meetings?

19  A.  He did not participate.

20  Q.  And you would agree with me that after Mr. Shkreli stepped

21  down as CEO, that he did not retain significant influence on

22  the company?

23  A.  Yes, I agree.

24            MR. RUDOWITZ:  Justin, can you pull up GX 1479 on

25  page 6.

LCEKFTC4                    Salinas – Cross

1   Q.  Dr. Salinas, I believe you had looked at this document

2   earlier today.

3           Do you remember that?

4   A.  Yes.

5   Q.  The second bullet point, fourth line down, I think you had

6   also looked at that, that starts with the word "there."

7   A.  Yes.

8   Q.  "There are times when Mr. Shkreli publicly holds himself

9   out as speaking for the company when, in fact, he has no

10  operational or business responsibilities."

11          Do you agree that Mr. Shkreli had no operational or

12  business responsibilities for Vyera at that time?

13  A.  I do.

14  Q.  And it was after --

15          MR. RUDOWITZ:  You can get rid of that, Justin.

16  Q.  It was after Mr. Shkreli stepped down as CEO that Vyera

17  began negotiating with Fukuzyu, right?

18  A.  Right.

19  Q.  And it was after Mr. Shkreli stepped down as CEO that Vyera

20  entered into the agreement with Fukuzyu, correct?

21  A.  Correct.

22  Q.  And it was after Mr. Shkreli stepped down as CEO that Vyera

23  identified RL Fine as a potential backup supplier, correct?

24  A.  Correct.

25          MR. RUDOWITZ:  No further questions, your Honor.

LCEKFTC4                    Salinas - Redirect

1          MR. MEIER:  Yes, your Honor.  Thank you.

2     REDIRECT EXAMINATION

3     BY MR. MEIER:

4     Q.  I have some follow-up questions, Dr. Salinas.

5          Do you recall the discussion with Mr. Rudowitz where

6     Mr. Rudowitz was drawing a distinction between concerns about

7     generic competition and generic entry?

8     A.  I do.

9          MR. MEIER:  Could we pull up Government Exhibit 1056,

10    which has already been admitted in evidence and we looked at

11    earlier today.  And if we could go to page 2, item number 6,

12    which we also talked about earlier today.

13    Q.  The contemporaneous records of your time at the company

14    show that you were concerned about generic competition,

15    correct?

16    A.  As a challenge to the volume we needed, yes.

17    Q.  If you look at number 3, it says, "Generic pyrimethamine

18    will hamper these activities and may leave toxoplasmosis a

19    forgotten disease with insufficient therapeutic effects."

20         So, again, you were concerned about generic

21    competition, weren't you?

22    A.  My main concern was the volume.  My main -- if Fukuzyu had

23    given a supply agreement without an exclusivity clause, that

24    would have been good enough.  I would have had half the loaf of

25    bread I needed.  The exclusivity gave more comfort.  That's the

LCEKFTC4                    Salinas - Redirect

1    distinction.

2    Q.  My question was:  You were concerned about generic

3    competition at the time, correct?

4    A.  To a certain extent, yes.

5    Q.  If you look at number 8, it says, "Generic companies sell

6    the drug at significantly lower prices, which is not a benefit

7    to Fukuzyu either on the sales."

8           Do you see that?

9    A.  I do.

10   Q.  So the contemporaneous records show that when you were

11   working at Vyera, you were concerned about generic competition,

12   correct?

13   A.  I was concerned about the generics or branded products

14   taking away the volume we would need.  So, yes, that includes

15   generics.

16   Q.  Okay.  Thank you.

17          MR. MEIER:  We can take that down.

18   Q.  You had talked about backup suppliers with Mr. Rudowitz.

19          Now, during the time you were at Vyera, Vyera never

20   got a backup supplier for Vecamyl, correct?

21   A.  I believe it was the case yes.

22   Q.  And you never got a backup supplier for Daraprim while you

23   were at Vyera?

24   A.  Correct.

25   Q.  When Mr. Rudowitz showed you Government Exhibit 1058, that

LCEKFTC4                    Salinas - Redirect

1    talked about RL Fine, you drew a distinction between two

2    different types of backup suppliers, correct?

3    A.  Correct.

4    Q.  One type of backup supplier was if you didn't get the

5    contract with Fukuzyu, your plan B would go to RL Fine,

6    correct?

7    A.  Correct.

8    Q.  But you were not talking about RL Fine at that time as a

9    second supplier to Fukuzyu, were you?

10   A.  Correct.

11   Q.  Now, Mr. Rudowitz also asked you about specialty

12   distribution, correct?

13   A.  Yes.

14   Q.  And during the time you worked at Vyera, Vyera had Daraprim

15   specialty distribution, correct?

16   A.  Yes.

17   Q.  But, as we also talked earlier today, Daraprim is a

18   68-year-old product, correct?

19   A.  Yes.

20   Q.  Do you know for how many years Daraprim was in specialty

21   distribution?

22   A.  Very little time before Vyera acquired it.

23   Q.  It was only shortly before Vyera acquired it that it was

24   put into specialty distribution in the first place, correct?

25   A.  Correct.

LCEKFTC4                    Salinas - Redirect

1    Q.  So for most of the history of the product, it was not in

2    specialty distribution, correct?

3    A.  Correct.

4    Q.  You testified earlier, when Mr. Rudowitz was talking to

5    you, about how you were attracted to come to Vyera because you

6    thought it might become an important research company, correct?

7    A.  Correct.

8    Q.  And you were hopeful that research and development would be

9    the most important thing the company does, correct?

10   A.  Correct.

11   Q.  In the time that you were at Vyera, you actually never

12   successfully developed and launched a product, did you?

13   A.  Not a commercial product, but we filed for INDs.

14   Q.  Yes, investigative new drug applications.

15   A.  Correct.

16   Q.  That's something you do pretty early in the process with

17   the FDA, right?

18   A.  It depends what you call "early."

19   Q.  Well, with the FDA, it's one of the first --

20   A.  Oh, we did, yes.  The FDA does not regulate research done

21   in animals.

22   Q.  You might do research before you file an IND, but an IND is

23   still early in the FDA regulatory process?

24   A.  Correct.

25   Q.  And it means that there could still be years and years

172

LCEKFTC4                          Salinas - Redirect

1    before you actually have a product ready to commercialize,

2    correct?

3    A.   Yes.

4    Q.   And in the time you were at Vyera, you didn't actually

5    commercialize any products?

6    A.   Correct.

7    Q.   To the best of your knowledge, do you know whether Vyera

8    has ever gotten FDA approval to market a new product?

9    A.   To the best of my knowledge, no, they haven't.

10   Q.   Now, during the six months or so that you were interim CEO,

11   you indicated that Mr. Shkreli didn't have significant

12   influence on the company, correct?

13   A.   In the operation of the company, yes.

14   Q.   But that was, of course, until he managed to replace the

15   board and to replace you, correct?

16   A.   Correct.

17              MR. MEIER:  No further questions, your Honor.

18              THE COURT:  Any further questions, counsel?

19              MR. RUDOWITZ:  No further questions, your Honor.

20              THE COURT:  Thank you.

21              So, you joined the company, you're very unhappy with

22   the price of Daraprim, you become interim CEO.

23              Did you take steps to reduce the price of Daraprim?

24              THE WITNESS:  We had discussions --

25              THE COURT:  Did you or didn't you?

LCEKFTC4                    Salinas - Redirect

1          THE WITNESS:  Oh, no.  Well, sorry, yes.  When I

2     came --

3          THE COURT:  What steps did you take to reduce the

4     price?

5          THE WITNESS:  Went on a case-by-case with certain

6     providers.  Certain hospitals were given some discounts and --

7     but not an across-the-board discount.

8          THE COURT:  So the ocular toxoplasmosis that you hoped

9     to develop another product to treat, that would be more widely

10    distributed and used by medical practitioners, did I understand

11    that correctly, that was your hope?

12         THE WITNESS:  No.  There were two aspects.  One is to

13    educate about the use of the existing product.  The existing

14    Daraprim could be used to treat the peripheral toxoplasmosis,

15    that's number one.

16         The second was to generate a new product that will be

17    an intraocular formulation that will be injected inside the

18    eye.  That's the research program.  But we had two research

19    activities, and with FDA, we had agreed that if we were -- the

20    problem, because it was such an old drug, there was not enough

21    research performed in 1953, but since then, many people have

22    conducted research with Daraprim in ocular toxoplasmosis.  We

23    were collecting data from France and Brazil to show that the

24    use of Daraprim in its existing form for ocular toxoplasmosis

25    was a good thing for patients, and, in addition, we had this

LCEKFTC4                    Salinas - Redirect

1    intraocular plan.  So there were two ways to tackle that

2    problem.

3              THE COURT:  Okay.

4              So you hoped to educate the medical profession to more

5    widely use Daraprim, you hoped to develop a new product for

6    injection into the eye.

7              Would that use the same API?

8              THE WITNESS:  Yes.

9              THE COURT:  Pyrimethamine?

10             THE WITNESS:  Yes.

11             THE COURT:  So when you went to Fukuzyu to obtain a

12   supply of pyrimethamine, you were running out of the supply

13   that came to you when Daraprim was purchased, you needed the

14   API?

15             THE WITNESS:  Yes.  Not immediately, but the

16   manufacturing person reporting to me came to alert me, saying

17   if we continue on the trend, and if things go well, we're going

18   to run out of product earlier than we think in the next year or

19   so.

20             THE COURT:  Counsel, do you have any questions for

21   this witness based on the questions I put to him?

22             MR. MEIER:  Not for the government, your Honor.

23   Markus Meier.

24             MR. RUDOWITZ:  Not for Mr. Shkreli, your Honor.

25             THE COURT:  You may step down.

LCEKFTC4

1          (Witness excused)

2          THE COURT:  Counsel, why don't we take a five-minute

3     recess, and then we'll resume with the next witness.

4          (Recess)

5          THE COURT:  Counsel, you may call your next witness.

6          MR. MEIER:  Thank you, your Honor.  Markus Meier, FTC.

7          We called our next witness an expert witness, James

8     Bruno.  And my colleague, Neal Perlman, will do the

9     examination, but Mr. Perlman also has an administrative matter

10    that we didn't complete this morning, if that's possible to

11    just do that very quickly, your Honor.

12         THE COURT:  So, Mr. Bruno, is that you standing?  Why

13    don't you come up here, and we'll get you seated while counsel

14    address me, not leave you standing like that.

15         THE WITNESS:  Thank you.

16         THE COURT:  Just take a seat for a moment.

17         Counsel.

18         MR. PERLMAN:  Good afternoon, your Honor.  In our

19    earlier discussion about the transcript of Jacob Matthew, I

20    realize I neglected to formally move that transcript into

21    evidence.  That was GX 9052.

22         THE COURT:  Received.

23         (Government's Exhibit 9052 received in evidence)

24         THE COURT:  So, Mr. Bruno, if you could please stand

25    and raise your right hand.

LCEKFTC4

1    JAMES BRUNO,

2         called as a witness by the Plaintiffs,

3         having been duly sworn, testified as follows:

4              THE COURT:  Please state your full name.

5              THE WITNESS:  James Bruno.

6              THE COURT:  And spell your last name.

7              THE WITNESS:  B-r-u-n-o.

8              THE COURT:  And you're about to be handed a document,

9    which I believe is your affidavit.  I'm going to ask you to

10   look at that.

11             And what's the exhibit number, counsel?

12             MR. PERLMAN:  It's 8001.

13             THE COURT:  Excuse me one second.

14             And if you could turn to the last page, which I

15   believe is page 37.

16             Mr. Bruno, did you authorize the placement of your

17   signature on that last page?

18             THE WITNESS:  Yes, I did, your Honor.

19             THE COURT:  And before you did that, did you read this

20   document with care?

21             THE WITNESS:  Yes, I did, your Honor.

22             THE COURT:  Do you swear to the truth of its contents?

23             THE WITNESS:  Yes, I do.

24             THE COURT:  Is there an offer of this exhibit, which I

25   believe is Government Exhibit 8001?

LCEKFTC4

1          MR. PERLMAN:  Yes, your Honor.  We move to admit

2   Government Exhibit 8001 into evidence.

3          THE COURT:  Other than the objections, which I may

4   already have ruled on, is there any further objection to

5   receipt of this document?

6          MR. PARKS:  Your Honor, Manly Parks, for Mr. Shkreli.

7          There is not.

8          THE COURT:  Thank you.

9          GX 8001 is received.

10          (Government's Exhibit 8001 received in evidence)

11          THE COURT:  Cross-examination?

12          MR. PERLMAN:  Your Honor, if I may quickly, there is

13   an appendix to GX 8001, which is a summary exhibit that

14   plaintiffs' counsel prepared at the direction of Mr. Bruno.

15   It's an API timeline.  We would like to move that into evidence

16   as well at this point.

17          THE COURT:  Does it have a number?

18          MR. PERLMAN:  Yes.  It should be Appendix C in the

19   binder.  It's labeled GX 7001.  It's the last tab in the

20   binder.

21          THE COURT:  So you're offering GX 7001?

22          MR. PERLMAN:  Yes, your Honor.

23          THE COURT:  Any objection?

24          MR. PARKS:  Your Honor, Manly Parks again.

25          Not at this time, although we would reserve the right

LCEKFTC4                    Bruno - Cross

 1   to raise an objection during cross-examination.

 2              THE COURT:  Certainly.

 3              MR. PARKS:  Thank you.

 4              THE COURT:  Received.  GX 7001 is received.

 5              (Government's Exhibit 7001 received in evidence)

 6              THE COURT:  Cross-examination?

 7   CROSS-EXAMINATION

 8   BY MR. CASEY:

 9   Q.  Good afternoon, Mr. Bruno.

10   A.  Good afternoon.

11   Q.  My name is Manly Parks.  I'm part of the team representing

12   Mr. Shkreli in this matter.  I'd like to start with your

13   background, if I might.

14              You began your career as a technical service manager

15   at NL Industries in 1973, correct?

16   A.  That's correct.

17   Q.  In that position, you were not responsible for contracts

18   regarding APIs; is that correct?

19   A.  That's correct.

20   Q.  You also did not do any work with pyrimethamine while you

21   were in that position at NL Industries, right?

22   A.  That's correct.

23   Q.  In your next position, as a project manager at Ganes

24   Chemicals, you did not do any work with pyrimethamine, did you?

25   A.  That's correct.

179

LCEKFTC4                    Bruno - Cross

1   Q.  In your position as a director of Sipsy Chemical, you did

2   not do any work on supply agreements for pyrimethamine,

3   correct?

4   A.  That's correct.

5   Q.  Sipsy Chemical did not have any supply agreements for

6   pyrimethamine at that time, did it?

7   A.  That's correct.

8   Q.  Sipsy Chemical was in the business of manufacturing APIs,

9   wasn't it?

10  A.  Both APIs and intermediate pharmaceuticals.

11  Q.  While you were at Sipsy Chemical, you were responsible for

12  negotiating API supply agreements with various drug

13  manufacturers, correct?

14  A.  When you say "drug manufacturers," you're talking

15  pharmaceutical companies?

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

LCEMFTC5                    Bruno - Cross

1   Q.  Yes?

2   A.  Yes.

3   Q.  When you were at Sipsy Chemical, approximately 25 percent

4   of the API contracts you negotiated had an exclusivity

5   provision in them, isn't that right?

6   A.  That's correct.

7   Q.  During your time at Aerojet, none of the API supply

8   agreements you worked on were for pyrimethamine, correct?

9   A.  That's correct.

10  Q.  About 15 to 20 percent of the API contracts you worked on

11  at Aerojet had an exclusivity provision in them, correct?

12  A.  That's correct.

13  Q.  Would you agree that in the 1990s, exclusivity terms

14  started to become increasingly common in API supply agreements?

15  A.  I don't agree with that.

16  Q.  Were you deposed in this matter on July 29, 2021?

17  A.  It sounds like the right dates.

18          MR. PARKS:  Can we take a look at page 42 of your

19  deposition, lines 2 through 23.

20  Q.  Actually, beginning at line 2 there is a question on this

21  page presented to you.  Did the nature of the business change

22  at some point as it was relevant to exclusivity terms being in

23  API's supply agreements?  Your answer here in your deposition

24  was:  I think it changed more because, as you got into more of

25  the '90s, we had more of the small emerging companies who were

LCEMFTC5                    Bruno - Cross

1   developing products.  So because they had less, I would say,

2   chemistry, the company that was manufacturing it, there was a

3   lot more work that we had to do.  So the costs were higher.  To

4   the point, we needed to cover those costs when we were

5   developing a product.  They took longer to do it.  SO we would

6   try to get at least either a short-term supply or we would

7   negotiate something to the effect of, we would get 70 percent

8   of the business for some of the years, stuff like that.  And

9   that's what I referred to as the short-term supply agreement

10  exclusivity agreement.

11          That was your testimony at your deposition, correct?

12  A.  That's correct.

13  Q.  Now, during your time at Vinchem, you did not have any role

14  with regard to pyrimethamine supply, correct?

15  A.  That's correct.

16  Q.  During your time at Honeywell, that company did not look at

17  becoming a supplier of pyrimethamine, did it?

18  A.  That's correct.

19  Q.  While you were at Honeywell, 30 to 40 percent of

20  Honeywell's supply arrangements with branded drug companies

21  contained exclusivity terms, correct?

22  A.  That's correct.

23  Q.  After Honeywell you formed CAP Consulting, correct?

24  A.  It's Chemical and Pharmaceutical Solution.

25  Q.  Can we call that CAP Consulting?

LCEMFTC5                    Bruno - Cross

1    A.   That's fine.

2    Q.   During your time at CAP Consulting, none of the API supply

3    agreements you assisted clients with negotiating pertained to

4    pyrimethamine, correct?

5    A.   That's correct.

6    Q.   None of those clients of CAP Consulting were involved with

7    pyrimethamine in any way, were they?

8    A.   That's correct.

9    Q.   Did you answer?

10   A.   I'm sorry.  That's correct.

11   Q.   So it would be correct, wouldn't it, to say that in the

12   course of your career you have not been professionally involved

13   with anything to do with pyrimethamine, correct?

14   A.   I have not worked on the pyrimethamine API.

15   Q.   As part of your work on this engagement, you didn't do any

16   formal survey regarding the frequency that different deal terms

17   appear in API supply agreements, did you?

18   A.   What you are calling a formal survey, I did not contact

19   companies and do, I would say, a study.

20   Q.   At your deposition you were asked whether you did any

21   normal survey and you said you didn't, isn't that right?

22   A.   I thought I just answered that.

23   Q.   You agree you did not do any formal survey of the frequency

24   of the different deal terms that appear in API supply

25   agreements?

LCEMFTC5                    Bruno - Cross

1    A.   That's correct.

2    Q.   In connection with this engagement you did not review any

3    formal survey analyzing the frequency with which different

4    terms or conditions appear in API supply agreements, did you?

5    A.   That's correct.

6    Q.   You were not aware of any such surveys, are you?

7    A.   Not that I'm aware of.

8    Q.   When you offer opinions about things being typical or

9    unusual in the industry in this case, you are basing that on

10   your personal experience and not in any kind of formal study or

11   analysis or industry data, isn't that correct?

12   A.   I'm basing my opinion on my 40 years in the industry, and

13   also that I worked in negotiating contracts on both sides, both

14   the CMO and the pharmaceutical company, and also in the

15   meetings we will discuss various terms and conditions that the

16   various CMOs and the various pharmaceutical companies are

17   working with.

18   Q.   So the answer to my question was, yes, isn't that right?

19   You are not basing your opinion of things being typical or

20   unusual on any kind of formal study or analysis or industry

21   data.  That's based on your personal experience only, isn't

22   that right?

23   A.   That's correct.

24   Q.   Thank you.

25            Would you agree that from the API perspective there

LCEMFTC5                    Bruno - Cross

1    are somewhere in the realm of 5,000 to 6,000 approved drugs in

2    the United States?

3    A.  That's correct.

4    Q.  Over the course of your career you have worked on about 100

5    different API supply agreements, right?

6    A.  That's correct.

7    Q.  And of those 100 you were only closely involved with about

8    40 of them, correct?

9    A.  That's not exactly what I was saying.  When I said that I

10   was the primary person on approximately 40, which meant I led

11   the entire group.  On the other contracts I'm just responsible

12   for what I would refer to as the CMC section.

13   Q.  Sir, at your deposition didn't you testify that you were

14   only closely involved with about 40 of the 100 different API

15   supply agreements you worked on in the course of your career?

16   A.  And what I was discussing, who was the lead person, and I

17   was the one in charge of doing it.  So everything had to come

18   to me, as opposed to me being part of the team.

19   Q.  Sir, my question is, didn't you testify to the phrase

20   closely involved with respect to only 40 of the 100?

21   A.  I would have to see that again to make sure it was the

22   exact word.

23           And I've lost the screen.

24   Q.  If we can get the screen back in the meantime, perhaps we

25   can take a look at your deposition of July 29, 2021 on page 51,

LCEMFTC5                    Bruno - Cross

1   line 25 through page 52, line 10.

2              THE COURT:  Is it up on your screen, sir?

3              THE WITNESS:  No, it's not.

4   Q.  Do you have it up there, sir?

5   A.  No, I don't.

6              THE COURT:  You can just read where you asked this

7   question.  Did you give this answer, counsel, if this is

8   important to you.

9              MR. PARKS:  It is.  I would like to just go ahead and,

10  if your Honor approves, I can walk up the page of the

11  transcript so the witness can follow along.

12  A.  Sure.  I'm getting it back.

13  Q.  Because I have the screen to read from.

14  A.  You're on page 52?

15  Q.  51 to 52.

16  A.  I see 52 in front of me right now.

17  Q.  The question at the last line of page 51 to page 52:  So in

18  the course of this experience, you indicated that you have

19  worked with approximately 100 pharmaceutical manufacturing

20  contracts.

21             THE COURT:  Slow down.

22  Q.  And you've been closely involved with approximately 40, is

23  that correct?

24  "A.  That's correct."

25  Q.  That was your testimony during your deposition, wasn't it?

LCEMFTC5                        Bruno - Cross

1   A.   That's my testimony.

2   Q.   Of the 40 API supply agreements that you testified you were

3   closely involved in, how many of them were backup supply

4   agreements?

5   A.   When you talk about a backup supplier, are you defining it

6   as somebody who is ready to produce, or what I would refer to

7   as a secondary supplier, somebody who has already made it, but

8   they make it part of the market, so to speak.

9   Q.   Either one of those.  Broadly encompassing of those, how

10  many of the 40 were in either of those situations?

11  A.   Of the ones where you had a true secondary supplier, I

12  would be negotiating either the primary or secondary supplier

13  position.

14  Q.   I'm asking for a number, sir.  How many of the 40 that you

15  were closely involved in were backup supply agreements under

16  either definition you have just provided?

17  A.   Under the definition that it was a secondary supplier in

18  which somebody was already manufacturing, I would say at least

19  20 of those where I was the secondary supplier.  I have to go

20  back -- I would have to look at it again to count it, but I

21  would say approximately.

22  Q.   Are there any of the 40 that were in the other category you

23  mentioned of a potential definition of backup supply agreement?

24  A.   No, there were not.

25  Q.   So 20 of the 40.

LCEMFTC5                    Bruno - Cross

1    A.  I was the secondary supplier.

2    Q.  Now, let's turn to your substantive opinions in the case.

3    Specifically let's talk about timing of market entry by

4    Cerovene, InvaTech, and Fera.

5          Now, your opinion here does not address whether market

6    entry by any of those firms with a generic competitor to

7    Daraprim was delayed by some factor other than the availability

8    of those firms to get API, does it?

9    A.  I would say that that was correct.

10   Q.  In your direct testimony there is a heading that states,

11   and I'll read it:  As a result of the RL Fine and Fukuzyu

12   exclusive contracts, generic competitors had to use API

13   suppliers that did not have a developed CGMP process.  I want

14   to examine the factual basis for that statement.

15         Would you agree that Cerovene's initial source for

16   pyrimethamine was a company called Ipca?

17   A.  That's correct.

18   Q.  The Federal Government banned Ipca from importing API,

19   didn't it?

20   A.  That's correct.

21   Q.  When did that happen?

22   A.  Around 2015.

23   Q.  That was well before Vyera supply agreements with Fukuzyu

24   and RL Fine, wasn't it?

25   A.  Vyera or Cerovene and InvaTech?

LCEMFTC5                    Bruno - Cross

1   Q.  Vyera supply agreements with Fukuzyu and RL Fine came well

2   after the 2015 ban of Ipca by the government, correct?

3   A.  If it was in 2016, yes.

4   Q.  Well, was it in 2016?

5   A.  When -- the work that I was looking at it was more Cerovene

6   and InvaTech was looking at Fukuzyu and RL Fine.  Vyera had

7   taken an option more of what I was looking at of going in a

8   different direction in the beginning.

9   Q.  I am not sure I understood what you said there, but I am

10  going to move on because we are going to get to the specific

11  dates of those agreements.

12          Would you acknowledge that Vyera's supply agreements

13  with Fukuzyu and RL Fine had nothing to do with Cerovene losing

14  its initial source of pyrimethamine API?

15  A.  My understanding with Vyera, they were looking at a totally

16  independent once they realized that they thought they could not

17  get the material from Fukuzyu or RL Fine.

18  Q.  I am going to try my question again.  Would you acknowledge

19  that Vyera's supply agreements with Fukuzyu and RL Fine had

20  nothing to do with Cerovene losing its initial source of

21  pyrimethamine API in 2015 as a result of the Federal Government

22  banning Ipca from importing API?

23  A.  You're asking when Ipca was the initial supplier?

24  Q.  Ipca wasn't their initial supplier, weren't they?

25  A.  I just wanted to confirm that because I was a little

LCEMFTC5                    Bruno - Cross

1   confused with the way the question was.  But, yes, I would

2   agree to that.

3   Q.  Would you also agree that if the government had not banned

4   Ipca from importing pyrimethamine API, Cerovene would not have

5   had to look for a replacement source of API to replace Ipca?

6   A.  For Cerovene, that's correct.

7   Q.  Isn't it also true that if the government had not banned

8   Ipca from importing pyrimethamine and Cerovene had continued to

9   use Ipca as its pyrimethamine API supplier, the contracts that

10  Vyera later entered into with Fukuzyu and RL Fine would not

11  have caused any negative impact on Cerovene's primary

12  pyrimethamine supply because Ipca would have still been around

13  to source it.

14  A.  If Ipca could still produce but they couldn't sell, then

15  they would be able to still use Ipca's material for their

16  formulation and for their approval in their submission.

17  Q.  After the government banned Ipca from importing

18  pyrimethamine, Cerovene next turned to Fukuzyu as a source of

19  pyrimethamine API, correct?

20  A.  That's correct.

21  Q.  Cerovene never entered into a written supply agreement with

22  Fukuzyu for pyrimethamine API, correct?

23  A.  That's correct.

24  Q.  Fukuzyu e-mailed Cerovene on October 5, 2016 to say that it

25  has decided against supplying pyrimethamine, correct?

LCEMFTC5                    Bruno - Cross

1   A.  That's correct.

2   Q.  And that is in GX-8011-007.  I'm sorry.  That's GX-3260.

3   Let's take a look at that.

4        Sir, was this a document you reviewed in connection

5   with developing your opinions in this case?

6   A.  I just lost the screen again.

7        MR. PARKS:  Your Honor, I have a hard copy to bring up

8   until we get the screen back, just to keep it moving.

9        THE COURT:  Thank you so much, counsel.

10  Q.  I have handed you the first page of that exhibit.  Do you

11  recognize that as a document you reviewed in connection with

12  the preparation of your opinions in this case?

13  A.  Give me a second to finish reading it, please.  Yes.

14  Q.  In this document there is an e-mail to Manish at

15  Cerovene.com forwarding a message from the president of Fukuzyu

16  Pharmaceutical, correct?

17  A.  That's correct.

18  Q.  In that message from the president of Fukuzyu

19  Pharmaceutical it states:  On October 4, 2016, we, Fukuzyu

20  Pharmaceutical, officially determined not to accept your

21  request for pyrimethamine supply.

22        Pyrimethamine is a very old drug substance and the

23  demand is not expected to grow substantially since its usage is

24  limited.  Therefore, after thorough consideration, we concluded

25  not to supply this item to anyone because of low business

LCEMFTC5                    Bruno - Cross

1    potential and high risk associated with the business.  Thank

2    you for understanding.  Correct?

3    A.  Correct.

4    Q.  Then that is received, according to this e-mail, by Manish

5    at Cerovene.com on October 5, 2016, right?

6    A.  I don't have the -- there it is.  Yes.

7    Q.  Thank you.

8         We have Fukuzyu saying we are not going to supply

9    pyrimethamine on October 4 and that's received on October 5,

10   2016.

11        The pyrimethamine supply agreement between Fukuzyu and

12   Vyera is dated January 25, 2017, correct?

13   A.  That's correct.

14   Q.  So that supply agreement was not signed until nearly four

15   months after Fukuzyu notified Cerovene that it was not going to

16   supply Cerovene with product, isn't that correct?

17   A.  That's correct.

18   Q.  Now, Fukuzyu first agreed with Vyera to exclusivity with

19   respect to pyrimethamine for human use in the United States on

20   November 22, 2016, correct?

21   A.  Sounds about the right time.

22   Q.  Let's take a look at GX-1019, page 2, which we looked at

23   earlier today, not with you, but with other witnesses.

24   A.  I had it for a second.  OK.

25   Q.  The original e-mail in this chain is --

A-1259

LCEMFTC5                        Bruno - Cross

1    A.  I don't have it again.  Sorry.  Now I got it.

2    Q.  The original e-mail in this chain states:  We got good news

3    from Mikio in Japan overnight.  Fukuzyu has accepted our

4    agreement to provide pyrimethamine exclusively for us for human

5    drugs.  You see that?

6    A.  It keeps blacking in and out and it's only up for a second

7    and then it goes back out again.  It's blinking on and off.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCEKFTC6                    Bruno - Cross

1    BY MR. PARKS:

2    Q.   Okay.

3    A.   And it's blanking on and off.

4         THE COURT:  I've asked for an entire new computer

5    setup for the witness table, the witness box, and we're

6    supposedly going to get it tomorrow morning.  I apologize, on

7    behalf of the court, for this technological failure.

8         (Pause)

9         MR. PARKS:  I was just asking counsel for the FTC if

10   they had any objection to me using a copy that had some

11   highlighting on it.  I think the answer was no objection.

12        MR. PERLMAN:  The answer is no objection.

13        MR. PARKS:  Thank you.

14   BY MR. PARKS:

15   Q.   So, sir, my question for you is:  Does this email refresh

16   your recollection that the date that Fukuzyu first agreed with

17   Vyera to exclusivity for pyrimethamine API was November 22nd,

18   2016?

19   A.   Yes.

20   Q.   Thank you.

21        MR. PARKS:  Your Honor, I just realized, I've been

22   traversing around the court without my mask.  I apologize.  I

23   will try to remember, if I leave my station, to put it back on.

24        I'm going to hold off here.  It's probably not fair to

25   the witness to ask questions while someone is digging around

LCEKFTC6                    Bruno - Cross

1   under the desk where he's seated.

2          THE COURT:  Well, I'm going to ask Mr. Bruno, please,

3   to just stand up and let our tech team get access to this space

4   and see if they can deal with the problem.  And then I'm going

5   to ask our tech team to stay around for a couple of minutes

6   while we use some more exhibits and see if this is cured.

7          COURT STAFF:  Yes, your Honor.

8          THE COURT:  Thanks so much.

9          (Pause)

10         THE COURT:  I've taken some time off the clock here.

11  And I apologize again, counsel, for I know how hard everyone's

12  prepared, and to have this interference is frustrating.

13         There appears to be a whole setup, underneath the

14  table where the witness stand is, that needs to be replaced.

15  So it's not just the matter of a cable, it's not just the

16  matter of a monitor; it's the matter of a whole system, and

17  they're going to try to replace it really quickly, and, as I

18  said, we'll replace it completely, everything, hopefully,

19  before court tomorrow.

20         I see that the screen is flickering still, so right

21  now we have to assume the monitor does not work other than in a

22  way that will frustrate everyone.

23         COURT STAFF:  Apologies, your Honor.  My colleague is

24  running to get a replacement.

25         THE COURT:  Good, good.  Thank you so much.

LCEKFTC6                    Bruno - Cross

1              MR. MEIER:  Your Honor --

2              THE COURT:  Yes, counsel.  What do you --

3              MR. MEIER:  I had one matter I was going to ask the

4    Court about for some guidance at the end, so we could at least

5    ask about that now, if it works for, your Honor?

6              THE COURT:  Sure.

7              MR. MEIER:  As your Honor knows, the parties have been

8    working very hard to work out objections, and your Honor has

9    given us a lot of guidance along the way to help us understand

10   the objections on documents and the objections on designations,

11   and this is really an administrative matter to ask your Honor's

12   preference.

13             Going forward, in light of all of the rulings and all

14   of the work we've already done, do you have a preference as to

15   whether we raise any remaining objections?  Should we submit

16   them in writing or address them, as we did this morning, with

17   Mr. Perlman before we start for the day?  Is there a preference

18   for the future?  I think we've worked out an awful lot, but

19   we're trying to figure out whether we should continue to submit

20   writings to your Honor with objections about deposition

21   designations and objections to exhibits, or whether we just

22   take it case by case --

23             THE COURT:  I think we take it case by case during the

24   trial day.

25             MR. MEIER:  All right.  Thank you.

LCEKFTC6                    Bruno - Cross

1           THE COURT:  Mr. Bruno, I hate to keep you standing.

2           Did you want to take a seat back there?

3           THE WITNESS:  If you don't mind.

4           (Pause)

5           MR. POLLACK:  Your Honor, may I be briefly excused?

6           THE COURT:  Sure, sure, yes, counsel, whenever you

7    need to take a break.  Obviously, if examining counsel or

8    principal counsel for a witness needs a break, I'll take a

9    break for everyone, but, otherwise, feel free go in and out.

10          MR. PARKS:  Thank you, your Honor.

11          (Pause)

12          THE COURT:  With my great thanks to our technical team

13   here, I think we've reached the conclusion that there is no

14   quick fix this afternoon, it's going to require an overhaul;

15   and so, counsel, can you manage an examination of the witness

16   without the screen?

17          MR. PARKS:  I believe I can, your Honor.  I think I

18   have hard copies, to the extent I need to use any, and I can

19   bring them up.  And if I am wrong about that, I will stand

20   corrected as we go and I will have to skip over that portion, I

21   suppose, but I do believe I have hard copies of anything I

22   need.

23          THE COURT:  Good.  They might have just fixed it, but

24   there are no guarantees, is the point.  We're in unknown

25   territory.

LCEKFTC6                          Bruno – Cross

1          We start at 9:30 in the morning, so you will be able

2     to replace it before then?

3          COURT STAFF:  Yes, your Honor.

4          THE COURT:  Good.  Thank you, thank you.

5          Mr. Bruno, if you could come on up here, and perhaps

6     the screen will work and perhaps it won't.

7          I'm going to ask you, Mr. Bruno, to move that mic back

8     into place so you'll be speaking into it, sort of under your

9     chin, not too close.  Great.

10          Counsel, thank you, again, for your patience.  You may

11     resume.

12          MR. PARKS:  Thank you, your Honor.

13     BY MR. PARKS:

14     Q.  Mr. Bruno, you understand you're still under oath, correct?

15     A.  That's correct.

16     Q.  Let's just recap a moment since we've had this little

17     break.

18          We can agree that Vyera had nothing to do with

19     Cerovene losing its original API source, Ipca, right?

20     A.  That's correct.

21     Q.  That happened as a result of the federal government, right?

22     A.  Correct.

23     Q.  The supply agreement between Vyera and Fukuzyu was dated

24     almost four months after Fukuzyu declined to supply Cerovene

25     with pyrimethamine API, correct?

LCEKFTC6                    Bruno - Cross

1   A.  Correct.

2   Q.  Fukuzyu first agreed to exclusivity on November 22nd, 2016,

3   which was nearly two months after Fukuzyu declined to supply

4   API to Cerovene, correct?

5   A.  Correct.

6   Q.  We can agree, can't we, that an agreement dated January of

7   2017 could not possibly have been the reason that Fukuzyu

8   declined to supply a pyrimethamine API to Cerovene in October

9   of 2016, right?

10  A.  I'm not sure I can agree with you completely.  Agreements

11  like this take time to negotiate, so I don't -- you'd have to

12  go back and look at what was going on internally, and were they

13  taking a longer period of time in that respect.  It could have

14  been coincidental.  It also could have been that they were

15  under-the-gun negotiations and that's where they were when they

16  made the decision.

17  Q.  You don't have any evidence to suggest that -- withdrawn.

18          You didn't identify any evidence in your expert

19  reports or your direct testimony in this case that Vyera

20  insisted that Fukuzyu decline to supply Cerovene with API on

21  October 4th, 5th, 2016, do you?

22  A.  I didn't see that.

23  Q.  Thank you.

24          Now, the next API supplier that Cerovene turned to

25  after Fukuzyu was RL Fine, correct?

LCEKFTC6                          Bruno - Cross

1   A.   Correct.

2   Q.   Cerovene entered into an exclusive supply agreement with

3   RL Fine on November 16, 2016, correct?

4   A.   That's correct.

5   Q.   And that was actually before Fukuzyu and Vyera first

6   reached agreement on exclusivity on November 22nd, 2016, wasn't

7   it?

8   A.   Would you repeat that?

9   Q.   Sure.

10       The date that RL Fine and Cerovene entered into an

11  exclusive supply agreement, November 16, 2016, was actually

12  before Fukuzyu and Vyera first reached agreement on

13  exclusivity, which was November 22nd, 2016, we saw from an

14  email a few moments ago, right?

15  A.   Okay, yes.

16  Q.   Now, Cerovene has taken the position that its exclusive

17  supply agreement with RL Fine helped it to maintain high

18  quality and avoid drug shortages and protect revenues, hasn't

19  it?

20  A.   That's correct.

21  Q.   And you recognize that those are, in fact, benefits that

22  can come from an exclusive supply agreement, don't you?

23  A.   Those would be benefits, yes.

24  Q.   In any event, we can agree that -- withdrawn.

25       Turning back to the exclusive supply agreement between

LCEKFTC6                    Bruno - Cross

1    Cerovene and RL Fine, RL Fine ended that supply relationship

2    with Cerovene on November 30, 2017, correct?

3    A.  Correct.

4    Q.  And we know that because if we look at the affidavit of

5    Mr. Sha, which is GX 8011 --

6          MR. PARKS:  And I believe this has already been

7    entered into evidence today.  Am I right about that?  8001?

8    Q.  Sir, are you familiar with the direct testimony of Mr. Sha?

9    A.  I remember reviewing it earlier on.

10   Q.  And you cite that affidavit in your direct testimony in

11   this case, don't you?

12   A.  Yes.

13   Q.  So you reviewed it, right?

14   A.  Yes.

15   Q.  And if we look at paragraph 39 of Mr. Sha's affidavit --

16          MR. PARKS:  I'm going to walk this up.

17   A.  I have it in front of me now.

18   Q.  Oh, you have it in front of you?  Great.

19          Mr. Sha testified under oath that:  On or around

20   November 30, 2017, he traveled to India and met with RL Fine

21   executives to finalize the commercial supply of pyrimethamine

22   that Cerovene was expecting from RL Fine.  Mr. Mathew, the same

23   senior executive at RL Fine with whom I met at Cerovene's

24   offices earlier in 2017, told me that RL Fine would no longer

25   supply API to Cerovene, right?

LCEKFTC6                      Bruno - Cross

1  A.  Correct.

2  Q.  So we know that RL Fine communicated that message on

3  November 30, 2017, from Mr. Sha's affidavit.  We also know that

4  the supply agreement between RL Fine and Vyera was dated

5  December 27th, 2017, correct?

6  A.  Correct.

7  Q.  So RL Fine ended its supply relationship with Cerovene a

8  full month before RL Fine entered into the supply agreement

9  with Vyera, correct?

10  A.  Correct.

11  Q.  We can agree, can't we, based on the simple linear time

12  principles, that an exclusivity provision in an agreement that

13  did not come into existence until December 27, 2017, could not

14  possibly have prevented RL Fine from supplying Cerovene with

15  pyrimethamine in November of 2017?  Correct?

16  A.  Again, I have no evidence to it, but because it's a month

17  apart, I didn't read a document that said that, so I

18  couldn't -- I can't necessarily agree with you.  I didn't see

19  anything, I can agree to that, but, again, there could have

20  been negotiations going on, and they could have been close to

21  the end and that would have had the two dates coincide like

22  that.

23  Q.  But even in that scenario, the agreement wouldn't have been

24  the preventative factor, right, because the agreement didn't

25  exist yet, correct?

LCEKFTC6                    Bruno - Cross

1   A.  But, again, if the agreement was under -- if they thought

2   they were close to an agreement, is what I'm trying to say,

3   then that could have triggered the two events.

4   Q.  You have just told us you saw no evidence indicating that,

5   right?

6   A.  That's my point.

7   Q.  Thank you.

8          Speaking of this timing issue, I would like to ask you

9   about Appendix C to your affidavit that was submitted as part

10  of your direct testimony in this case.  Let's take a look at

11  that.  That's GX 7001.  And we have the redacted public version

12  up on the screen here, I believe.

13         MR. PARKS:  Now, this has been moved into evidence,

14  and, your Honor, you'll recall that I reserved objections on

15  this and I want to now look into this document a bit with this

16  witness.

17  Q.  What, generally speaking, are we looking at here on the

18  screen?

19  A.  You're looking at an API development timeline for, I would

20  say, the three main companies, other than Vyera.

21  Q.  Now, who prepared this document?  Or this exhibit?

22  A.  It was prepared by the FTC.  I gave them the information,

23  and they actually did the document.  They're more attuned to be

24  able do these things than I am.  And I just lost the screen.

25         I got it back.

LCEKFTC6                          Bruno - Cross

1    Q.  Now, if we go to the bottom of page 2 of this document, in

2    the very bottom of that page, there is an italicized sentence

3    that states:  The timeline was prepared by attorneys and

4    paralegals at the FTC, subject to my review and approval?

5    A.  Correct.

6    Q.  My question for you, sir, is:  Did you review it, and did

7    you approve it?

8    A.  Yes, I did.

9    Q.  And this was created for use as a visual aid, right?

10   A.  That's correct.

11   Q.  Now, if we look back to the timeline itself — I want to

12   focus on the bar that says "Cerovene" at the left — there is an

13   entry in that bar that says:  Item 5 RL Fine ends relationship

14   December 2017.

15           Do you see that?

16   A.  Yes, I do.

17   Q.  Do you see directly above that there is an entry that says:

18   RL Fine December 2017?  Do you see that?

19   A.  That's correct.

20   Q.  And that's to indicate when Vyera's exclusive contract with

21   RL Fine happened, right?

22   A.  That's correct.

23   Q.  Now, this document we're looking at here, your

24   demonstrative, indicates that RL Fine's entry into an exclusive

25   agreement with Vyera was simultaneous with when RL Fine ended

LCEKFTC6                    Bruno - Cross

1    its supplier relationship with Cerovene, doesn't it?

2    A.   That's correct.

3    Q.   But the fact is, those events were not simultaneous, were

4    they?

5    A.   The RL Fine agreement was December 2017 and the ending the

6    relationship was December 2017.

7    Q.   Sir, we just looked at an email from Mr. Sha, I believe,

8    indicating that he traveled to RL Fine in India and had the

9    discussion with them on November 30th, 2017.  That was

10   paragraph 39 of the Sha affidavit.

11        Do you remember that from a few moments ago?

12   A.   Yes, I do.

13   Q.   So December 2017, on your exhibit, is wrong, isn't it?

14   A.   They had the visit on November 30th.  I wouldn't consider

15   this to be necessarily wrong, because the agreement was signed

16   on or about, or it was preparing to be signed, but it was

17   effective in December, and November 30th is the end of

18   November, it's the end of the month going into December.

19   Q.   So November 30th is actually December; is that your

20   testimony?

21   A.   No, that is not my testimony.  All I'm saying is that it's

22   very possible -- as I'm trying to say, the dates almost

23   coincide exactly, and to be notified they could have been

24   prepared to sign the agreement, and from that point on, it

25   would have been, one event triggered the other event.

LCEKFTC6                    Bruno - Cross

1   Q.  You have no information, you've already told us, that one

2   event triggered the other event, right?

3   A.  Yes.

4   Q.  Okay.

5        But this exhibit makes it look like these two things

6   were simultaneous when, in fact, there was a month between

7   them, right?

8   A.  You're assuming that December is the last day of the month

9   and November was the last day of the month.

10  Q.  Sir, I'm not assuming anything.  We've already gone through

11  these documents, and you've testified that the date of the

12  RL Fine-Vyera agreement was December 27th, 2017, and we know

13  from Mr. Sha's affidavit that the date that RL Fine declined to

14  supply pyrimethamine was November 30th, 2017, and, by my count,

15  November 30th is almost a month from December 27th, right?

16  A.  Correct.

17  Q.  So your document, that makes these events look

18  simultaneous, is inaccurate, isn't it?

19  A.  Again, I'm saying that while these documents -- and I

20  consider them to be accurate in the sense that it ended on --

21  if you want to say the November 30th should have been the date

22  instead of December, ending the relationship, I will give you

23  that.  But I would also -- based on looking at the timelines

24  and the approximation of the timelines, one event preceded the

25  other, where normally I would have said it would have been the

LCEKFTC6                    Bruno - Cross

1    other way around.

2    Q.  Okay.

3         MR. PARKS:  I'm going to move to strike "the normally

4    I would have said it would be the other way around" because

5    that's not an expert opinion that's been in any of his reports

6    or in his direct exam, and I don't know that he has any basis

7    to talk about how frequently or infrequently these events occur

8    and how they coincide with one another, your Honor.

9         THE COURT:  Overruled.

10        MR. PARKS:  Your Honor, I would also raise an

11   objection to this demonstrative as inaccurate and move that it

12   be stricken.

13        THE COURT:  That's denied.  But I get your point, that

14   the December 2017 should have said November, and that the

15   contract with Vyera wasn't executed until December 27th.

16        So I get that point, counsel, so I thank you.

17        MR. PARKS:  Okay.  We will move on.  Thank you, your

18   Honor.

19   BY MR. PARKS:

20   Q.  Let's take a look at -- let's discuss Vyera's negotiating

21   leverage and your testimony about missing risk management terms

22   in that agreement between Vyera and RL Fine.

23        Your opinion is that the Fukuzyu contract -- I'm

24   sorry, let's talk about the Fukuzyu contract first.

25        Your opinion is that the Fukuzyu contract — that is,

LCEKFTC6                    Bruno - Cross

1   Fukuzyu and Vyera — did not mitigate supply risk, correct?

2   A.   That's correct.

3   Q.   And in your direct testimony, you identified various

4   provisions that you said would have reduced supply risk for

5   Vyera, right?

6   A.   That's correct.

7   Q.   You discussed the concept of a requirements provision,

8   right?

9   A.   That's correct.

10  Q.   And you discussed the concept of a capacity reservation

11  clause, right?

12  A.   That's correct.

13  Q.   Sir, Fukuzyu would have had to agree to the inclusion of

14  those provisions in the agreement with Vyera before they could

15  go into the agreement, right?

16  A.   If it's not written in the agreement, then it's not part of

17  the agreement.

18  Q.   But in order for the parties to reach agreement, both

19  parties have to agree to put those terms in the agreement,

20  don't they?

21  A.   They need to have those terms in the agreement, yes.

22  Q.   You don't identify any evidence in your reports or in your

23  direct testimony, that Fukuzyu actually was willing to agree to

24  either of those types of provisions in this agreement with

25  Vyera, do you?

LCEKFTC6                    Bruno - Cross

1   A.   Unless it's written in the agreement -- and, again, these

2   are just several points, so they might have covered one, but I

3   was just trying to give examples of different ways of which

4   this is handled.

5   Q.   Sir, my question was:  You don't have any evidence that

6   Fukuzyu actually offered to agree to those provisions you said

7   should have been in this agreement?  You don't have any such

8   evidence, do you?

9   A.   Again, unless they're in the agreement, then it's not part

10  of the agreement.

11  Q.   I'm not asking what's in the agreement.  I'm asking whether

12  Fukuzyu offered to put them in the agreement.

13  A.   I saw no evidence that they either agreed to or didn't

14  agree to.

15  Q.   You don't know whether Fukuzyu offered to put in those

16  terms that you say should have been in there to mitigate supply

17  risk or not, do you?

18  A.   I do not.

19  Q.   And if Fukuzyu said no to a request to add those types of

20  supply terms, you certainly can't fault Vyera for that, can

21  you?

22  A.   Again, if Vyera is negotiating the contract, and if I'm

23  negotiating the contract and these are my, I would say,

24  important points, then it's up to you to get them in the

25  contract.

LCEKFTC6                    Bruno - Cross

1  Q.  To quote the great philosopher Mick Jagger, you can't

2  always get what you want, right?

3  A.  But this is part of negotiation, and if this is your number

4  one product that's your greatest part of your revenues, you

5  need to pick the ones that are most important, and one of the

6  most important ones for Vyera is to have a constant and

7  continuous supply of API, and that's mitigating the risk, and

8  what did you do to mitigate the risk?

9  Q.  But we can agree, either way, that Vyera couldn't just

10 dictate to Fukuzyu what Fukuzyu was going to agree to, could

11 it?

12 A.  It's part of the negotiations of the contract.

13 Q.  So the answer is, they couldn't just dictate to Fukuzyu,

14 could they?

15 A.  But they could have put their terms in place that they

16 wanted and found ways to control their supply.

17 Q.  I take it we're in agreement that Vyera could not dictate

18 to Fukuzyu what would go in the contract?

19 A.  I don't agree with you completely.  If I'm the one

20 purchasing it, then it's up to you to negotiate it, and, in

21 that respect, you should be able to dictate some of the terms

22 or come to a compromise between the terms.

23 Q.  As between Fukuzyu and Vyera, Fukuzyu had more bargaining

24 power in the negotiation over the terms of the API supply

25 agreement, didn't it?

LCEKFTC6                    Bruno - Cross

A.  I don't agree that either side has greater bargaining

powers.  At least in my experience of contracts, we don't

approach the contract from a "who's got the upper hand," so to

speak.  This is supposed to be a mutually agreeable event that

you've worked on in order to do it.  So each side is going to

have to give a little.

Q.  So bargaining power doesn't matter in pharmaceutical API

supply agreements; is that your testimony?

A.  I didn't say that.

Q.  Okay.

A.  I said it's part of the negotiations.

Q.  Now, sir, you stated in your direct testimony that Vyera's

pyrimethamine purchases from Fukuzyu were small when compared

to the amount of pyrimethamine purchased by GSK from Fukuzyu,

right?

A.  That's correct.

Q.  In your direct testimony, you pointed out that Vyera faced

a risk that Fukuzyu might supply its larger customer, GSK,

first before Vyera, and that presented a risk to Vyera that its

supply of pyrimethamine might be interrupted, correct?

A.  That's why I needed to have some kind of control over being

able to continue my supply and guarantee I could get it.

Q.  You would acknowledge, as a result of the relatively small

amount of API being purchased by Vyera, that it was not in a

particularly strong bargaining position with respect to

LCEKFTC6                    Bruno - Cross

1    Fukuzyu, wouldn't you?

2    A.   When you're talking about the bargaining power, yes, they

3    were a small potential client of Fukuzyu -- of Fukuzyu, so they

4    didn't have the buying power, for sure, that the GSK would have

5    had.

6    Q.   In your direct testimony affidavit, you discuss GSK's API

7    supply agreement with Fukuzyu, don't you?

8    A.   Yes, I do.

9    Q.   And you note that GSK's supply agreement with Fukuzyu

10   contains both a requirements provision and a capacity

11   reservation clause, right?

12   A.   That's correct.

13   Q.   Would you agree that GSK purchases large quantities of

14   pyrimethamine from Fukuzyu?

15   A.   That's correct.

16   Q.   Would you agree that a larger, more well-known company,

17   like GSK, is able to use its size as leverage to secure better

18   treatment from an API supplier as compared to a small buyer,

19   like Vyera?

20   A.   I would expect that.

21   Q.   In fact, in your direct testimony, you wrote, "In my

22   experience, an API supplier is more likely to supply its larger

23   customer over a smaller one, particularly a well-known company

24   like GSK, that could sponsor additional business on other

25   APIs," right?

LCEKFTC6                    Bruno - Cross

1    A.  This is why I emphasized in the need for risk mitigation

2    for the supply of the API.

3    Q.  And in your critique of Vyera for failing to get deal terms

4    from Fukuzyu like those GSK was able to secure, you don't

5    mention the massive difference in negotiating leverage between

6    Vyera and GSK, do you?

7    A.  I was looking at the point that Vyera needed to have in

8    place some kind of mechanism to guarantee that it would not

9    have an interrupted supply of API; it had, in effect, no part

10   with regards to the bargaining, it should have been up to

11   Vyera, who's -- again, it's their primary product.  They should

12   have been responsible for developing some mechanism that both

13   Fukuzyu and they could agree to.

14   Q.  Back to my question:  In your critique of Vyera for failing

15   to get deal terms from Fukuzyu like those GSK received, you

16   don't mention the massive difference in negotiating leverage

17   between Vyera and GSK, do you?

18   A.  I had already mentioned it into the document, so I already

19   documented this was one of the issues that were there.  Again,

20   Vyera has to find a way — and I listed other ways — to mitigate

21   the risk of supply.

22   Q.  In your direct testimony, you note that the requirements in

23   capacity reservation provisions in GSK's supply agreement with

24   Fukuzyu require Fukuzyu — and I'm quoting now — to ensure that

25   it meets GSK's requirements first, unquote, direct testimony

LCEKFTC6                    Bruno - Cross

1    paragraph 23.

2          Can we agree that it would not have been possible for

3    Fukuzyu to also make such a commitment to Vyera because that

4    commitment to Vyera would be inconsistent with its preexisting

5    commitment to GSK?

6    A.  I think two things, when I look at it:

7          For one, if that is the question, because GSK was

8    supplying them with forecasts, they knew how much they needed

9    to supply for GSK, so in their production planning, they could

10   have just equally had -- made sure that there was enough issue

11   there for that, or, again, Vyera could have used another method

12   to secure the supply of the raw material, like buying extra

13   material and some of the other techniques that I also mentioned

14   in my report.

15   Q.  Sir, if Fukuzyu has promised GSK that GSK will be first, as

16   you've told us in your direct testimony, Fukuzyu can't also

17   promise Vyera that Vyera will be first, can it?

18   A.  I'm not saying that one would be first and one would be

19   second.  I think the point is, if you know I need a hundred

20   kilos for one and I've guaranteed them that 100, I should be

21   able to, again, go into my planning -- and that's what a CMO

22   will do, and they'll probably make additional quantity.

23         And I worked for a number of CMOs.  This is what we

24   did all the time.  We negotiated -- or we planned for those

25   upswings; could be 20, 30, 40 percent.  So I could have in my

LCEKFTC6                    Bruno - Cross

1    planning made sure that I had it.

2           So I don't consider it to be inconsistent because they

3    were guaranteeing one versus the other.  It's a question of

4    planning, and it's a question of finding ways to mitigate the

5    risk.

6    Q.  Sir, there can only be one first, right?

7    A.  I'm not disagreeing, first versus second.  What I'm saying

8    is, with your planning, if I need a hundred, I make 120; if I

9    need 200, I make 250.  There's nothing unusual about that in

10   the CMO.  We never make the exact amount of material.

11   Q.  As you've told us, under the agreement between GSK and

12   Fukuzyu, GSK was first, right?

13          MR. PERLMAN:  Objection, your Honor.  I'm not sure

14   that this is in Mr. Bruno's report.  It's certainly not in

15   paragraph 23.

16          So would you direct us to the right paragraph?

17          MR. PARKS:  Sure.  I will freely admit my own notes

18   might be wrong, but that is what my notes tell me is in

19   paragraph 23.

20          THE COURT:  Yes, I think paragraph 23 may be a

21   miscite, if you mean paragraph 23 of the direct testimony.

22          MR. PARKS:  Yes, it appears to be a miscite.  And I

23   will see if I can correct the record on that at my first

24   opportunity.

25          THE COURT:  Okay.

LCEKFTC6                    Bruno - Cross

1         MR. PARKS:  But I have it in quotes in my notes, which

2    helps me believe I didn't invent it out of thin air.

3         THE COURT:  Okay, good.

4         You know, we have perhaps two minutes to go until

5    5:00 o'clock, but shall we say this is a good time for a break,

6    for the day?  Or, counsel, did you have a question or two you

7    wanted to follow through on this topic?

8         MR. PARKS:  I have a pretty limited amount.  We can

9    resume tomorrow morning, but I probably have no more than ten

10   minutes, possibly even only five, to complete my exam of this

11   witness.  So it's the Court's preference.  I'm happy to stop,

12   here, or go for a couple questions, or happy to go for five or

13   ten more minutes and finish.

14        THE COURT:  No, we're going to stop promptly at 5:00.

15   So the question was a minute or two more.

16        MR. PARKS:  Okay, this is a good stopping point.  I'm

17   actually at the end of a section and ready to move into

18   another.

19        THE COURT:  Okay, good.

20        Mr. Bruno, you can step down.  Thank you.

21        (Witness temporarily excused)

22        (Pause)

23        THE COURT:  Counsel, I'm going to confirm this in the

24   morning because I have some backup record keepers here, but it

25   looks to me like the plaintiff has used three hours and

**A-1283**

216

LCEKFTC6                         Bruno - Cross

1   fourteen minutes and the defendant one hour and forty-seven

2   minutes, so it should be roughly that amount, and I'll confirm

3   in the morning.

4          We're going to start again at 9:30.  I think we're a

5   little bit behind where we expected to be today, if I remember

6   our witness list.

7          Expectations?

8          MR. MEIER:  That's correct, your Honor.

9          THE COURT:  Okay, good.

10         So thank you for sending an email last night with your

11  expectations for tomorrow, but I am assuming that we're going

12  to complete the witnesses you plan for today first and then go

13  for the witnesses you would plan to do tomorrow; is that right?

14         MR. MEIER:  That is correct, your Honor.

15         THE COURT:  Okay.

16         If you change your minds, that's just fine, too.  I

17  know you have a lot to juggle in terms of witness plans, and

18  you'll accommodate each other's needs and your witnesses'

19  needs, but just shoot us an email — again, that's very kind —

20  to let us know what you expect.

21         I think that's it.  Have a good night, everyone.  And

22  I'll see you at 9:30, hopefully, with new equipment at the

23  witness stand.

24         (Adjourned to December 15, 2021 at 9:30 a.m.)

25                              * * *

1        INDEX OF EXAMINATION

2    Examination of:                              Page

3    NICHOLAS PELLICCIONE

4    Direct By Mr. Meier  . . . . . . . . . . . . .19

5    Cross By Mr. Casey . . . . . . . . . . . . . .84

6    Redirect By Mr. Meier  . . . . . . . . . . . .93

7    ELISEO ORESTE SALINAS

8    Direct By Mr. Meier  . . . . . . . . . . . . .95

9    Cross By Mr. Rudowitz  . . . . . . . . . . . 146

10   Redirect By Mr. Meier  . . . . . . . . . . . 168

11    JAMES BRUNO

12   Cross By Mr. Casey . . . . . . . . . . . . . 178

13                 GOVERNMENT EXHIBITS

14   Exhibit No.                              Received

15    9001     . . . . . . . . . . . . . . . . . . 7

16    9051     . . . . . . . . . . . . . . . . . .10

17    9050     . . . . . . . . . . . . . . . . . .10

18    1020     . . . . . . . . . . . . . . . . . .42

19    1019     . . . . . . . . . . . . . . . . . .48

20    1003     . . . . . . . . . . . . . . . . . .54

21    1005     . . . . . . . . . . . . . . . . . .57

22    1002     . . . . . . . . . . . . . . . . . .75

23    1013     . . . . . . . . . . . . . . . . . .76

24    3208     . . . . . . . . . . . . . . . . . .80

25    1075     . . . . . . . . . . . . . . . . . 108

1    1056    . . . . . . . . . . . . . . . . . . 119

2    1223    . . . . . . . . . . . . . . . . . . 127

3    1484    . . . . . . . . . . . . . . . . . . 130

4    1479    . . . . . . . . . . . . . . . . . . 135

5    1058    . . . . . . . . . . . . . . . . . . 162

6    9052    . . . . . . . . . . . . . . . . . . 175

7    8001    . . . . . . . . . . . . . . . . . . 177

8    7001    . . . . . . . . . . . . . . . . . . 178

9                        DEFENDANT EXHIBITS

10   Exhibit No.                              Received

11    444    . . . . . . . . . . . . . . . . . . .93

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCFKFTC1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      FEDERAL TRADE COMMISSION,
 3    STATE OF NEW YORK, STATE OF
      CALIFORNIA, STATE OF OHIO,
 4    COMMONWEALTH OF PENNSYLVANIA,
      STATE OF ILLINOIS, STATE OF
 5    NORTH CAROLINA, and
      COMMONWEALTH OF VIRGINIA,
 6
                  Plaintiffs,
 7         v.                          20 CV 706 (DLC)

 8    MARTIN SHKRELI, et al.,

 9                Defendants.
      ------------------------------x
10                                    New York, N.Y.
                                      December 15, 2021
11                                    9:30 a.m.
      Before:
12                       HON. DENISE COTE,

                                       District Judge
13                       APPEARANCES

14    FEDERAL TRADE COMMISSION
      BY:  MARKUS H. MEIER
15         MARIN HANEBERG
           BRADLEY S. ALBERT
16         LAUREN PEAY
           NEAL PERLMAN
17         LEAH HUBINGER

18    NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
      BY:  ELINOR R. HOFFMANN
19         JEREMY R. KASHA
           AMY E. McFARLANE
20
      DUANE MORRIS LLP
21         Attorneys for Shkreli
      BY:  CHRISTOPHER H. CASEY
22         JEFFREY S. POLLACK
           ANDREW J. RUDOWITZ
23         SARAH FEHM STEWART
           SEAN McCONNELL
24         J. MANLY PARKS

25
```

LCFKFTC1

1          (Trial resumed; in open court)

2          MR. MEIER:  Markus Meier, on behalf of the Federal

3   Trade Commission.

4          THE DEPUTY CLERK:  Please state your names for the

5   record.

6          THE COURT:  No, that's just fine.  We did that the

7   first day of trial.  Thank you very much, Mr. Whertvine.

8          Excuse me one second.

9          (Pause)

10         THE COURT:  I received a letter from counsel for

11  CareMark dated December 14, and I believe counsel have had an

12  opportunity to discuss this with each other.  It makes a

13  request for redaction of passages from the deposition that

14  appear at pages 103 to 105.

15         Can someone give me a report from the parties?

16         MS. STEWART:  Good morning, your Honor.  Sarah

17  Stewart, on behalf of the defendant.

18         We're agreeable to the proposed redactions.

19         MR. MEIER:  Your Honor, on behalf of the FTC, I think

20  we were already okay with it, so I think it's okay.

21         THE COURT:  I've reviewed it.  It's limited in

22  request.  Most of the requests made by CareMark were denied at

23  a conference on Tuesday.  The limited nature here, I don't

24  think, is terribly critical to the issues before me and has

25  some concern about competitive advantages, and, therefore, I

LCFKFTC1

1    approve the request to redact.

2            With that, I think we're ready to resume examination

3    of the witness.  Am I right, or, counsel, do you have other

4    issues?

5            MR. MEIER:  Yes, your Honor, if I may.  Markus Meier,

6    on behalf of the Federal Trade Commission.

7            We do have just a couple of administrative matters, if

8    we can take those up first, your Honor?

9            THE COURT:  Sure.

10           MR. MEIER:  First, I'd like to introduce the paralegal

11   that will be working with us today and operating the

12   technology — hopefully, we will have more success with the

13   technology — that is Phoebe Flint, your Honor.

14           And next, I wanted to introduce a number of exhibits

15   that we've already discussed with the defendants.  It's my

16   understanding that there should be no objections to any of

17   these, but I did want to take them one by one.

18           The first one is Government Exhibit 9053.

19           Your Honor, Government Exhibit 9053 is the revised

20   designations of the transcript of a witness named Desai from

21   ASD, and, again, we've indicated on the front cover the changes

22   from the original that we submitted back in October, and as

23   with the other designations, they are color-coded in the same

24   manner as we've been submitting to date.

25           THE COURT:  Any objections to receipt of 9053 other

LCFKFTC1

1    than objections on which I've already ruled?

2              MR. POLLACK:  No, your Honor.

3              THE COURT:  Thank you.

4              9053 is received.

5              (Government's Exhibit 9053 received in evidence)

6              MR. MEIER:  The next one, your Honor, is Government

7    Exhibit 9054.  These are the designations of the transcript of

8    Mr. Shah from an Indian company called Aadivignesh — I'm sorry,

9    I don't know how to pronounce that properly, but it's spelled

10   A-a-d-i-v-i-g-n-e-s-h.  In this particular one, there are no

11   changes from the version that was submitted as part of the

12   pretrial package in October.

13             THE COURT:  Any objections other than those I've

14   already ruled on?

15             MR. POLLACK:  No, your Honor.

16             THE COURT:  9054 is received.

17             (Government's Exhibit 9054 received in evidence)

18             MR. MEIER:  The next one, your Honor, is Government

19   Exhibit 9055.  It's the deposition --

20             THE COURT:  Excuse me.

21             If you could be seated, sir, at the back.  Thank you.

22             MR. MEIER:  Your Honor, Government Exhibit 9055, it's

23   the designations of Marco Polizzi from a company called Oakrum

24   and there are no changes from the designations submitted back

25   in October.

LCFKFTC1

1          THE COURT:  Any objections other than those I've

2    already ruled on to 9055?

3          MR. POLLACK:  No, your Honor.

4          THE COURT:  9055 is received.

5          (Government's Exhibit 9055 received in evidence)

6          MR. MEIER:  The next one, your Honor, is Government

7    Exhibit 9056 -- let me put my reading glasses on just to

8    confirm -- yes, 9056, and this is the designations of the

9    deposition of Paula Raese, R-a-e-s-e, from Mylan, M-y-l-a-n,

10   and there are no changes from what we submitted back in

11   October.

12         THE COURT:  Any objection to the receipt of 9056 other

13   than objections on which I've already ruled?

14         MR. POLLACK:  No, your Honor.

15         THE COURT:  Thank you.

16         Received.

17         (Government's Exhibit 9056 received in evidence)

18         MR. MEIER:  The last one for this morning, your Honor,

19   is Government Exhibit 9057.  It's the deposition designations

20   of John Vande Waa, capital V-a-n-d-e, separate word W-A-A, from

21   a company called USA Health, and there are no changes from the

22   versions submitted pretrial in October.

23         THE COURT:  Any objections to the receipt of 9057

24   other than what objections may have been made and on which I've

25   already ruled?

LCFKFTC1

1        MR. POLLACK:  No, your Honor.

2        THE COURT:  9057 is received.

3        (Government's Exhibit 9057 received in evidence)

4        MR. MEIER:  Thank you, your Honor.

5    My colleague from New York A.G.'s Office, Ms. Hoffman,

6    also has an administrative matter she'd like to raise, and then

7    we'll call the next witness.

8        MS. HOFFMAN:  Good morning, your Honor.  Eleanor

9    Hoffman, from New York.

10    Your Honor may recall last Friday, I indicated that we

11    may need briefing on the impact of the defendant's new

12    affirmative defense.  I since discussed with the defendant, and

13    I think we're in agreement, that no briefing is necessary now,

14    and may not be.  So we are not going to be submitting briefs,

15    if that's acceptable to your Honor, before the 21st.

16        THE COURT:  It's what?

17        MS. HOFFMAN:  We will not be submitting briefs, if

18    that's acceptable to your Honor, before the 21st.

19        THE COURT:  Great.  Good.

20    Let me just ask plaintiffs' counsel, Mr. Meier:  I

21    noticed you made a limited offer of exhibits yesterday, some

22    individual exhibits with a witness, but others with a document

23    that listed various exhibit numbers.

24    What is the procedure that you're following?  Are you

25    planning to withdraw most of your exhibits, or are you planning

LCFKFTC1

1   to offer most of them, but in tranches?

2           MR. MEIER:  We are planning to offer most of them, but

3   in tranches, and we're working through those details every

4   night and over the weekend and making sure -- our hope is to

5   initially put in the ones where we don't have any objections,

6   where we can get agreement.  And I probably will be actually

7   doing one of those this afternoon before the day is over, and

8   we're working through -- I think we probably have two or three

9   or four already that are going back and forth.  So that would

10  be the plan, your Honor, we will move them in through -- those

11  that aren't used with a witness in the moment here in Court, we

12  will seek to move in as many of those as possible that we can

13  get agreement on, and those we can't, we'll have to have some

14  discussion with your Honor about.

15          THE COURT:  Great.  Thanks for giving me that

16  heads-up.

17              Is this the time for the witness to retake the stand?

18          MR. MEIER:  Yes, your Honor.  We would recall

19  Mr. Bruno, and, again, my colleague, Neal Perlman, for the FTC,

20  will handle this witness, but I think the defendants want to

21  finish their examination.

22          THE COURT:  Mr. Bruno, if you could take the stand.

23          Mr. Bruno, I remind you, you're still under oath.

24          Counsel.

25          MR. PARKS:  Thank you, your Honor.

LCFKFTC1                         Bruno - Cross

1          And good morning, Mr. Bruno.

2          THE WITNESS:  Good morning.

3          MR. PARKS:  As a first matter, your Honor, yesterday,

4    at the end of the day, I had asked the witness a question, and

5    I had referred to his direct testimony.  I indicated at

6    paragraph 23, this is a question regarding the requirements and

7    capacity reservation provisions in GSK's supply agreement with

8    Fukuzyu and whether they require Fukuzyu to ensure that it

9    meets GSK's requirements first.  We determined, from a quick

10   look yesterday, that my citation to paragraph 23 of that direct

11   testimony was incorrect, and I discovered shortly after the

12   session yesterday, that it was page 23, not paragraph 23.

13          Perhaps we can put that up, Justin.

14          It is paragraph 71, it begins on page 22, but the

15   relevant language can be found at the top of page 23 of the

16   direct testimony.  So I just wanted to correct that reference

17   for the record.

18          With that, your Honor, I will proceed.

19    JAMES BRUNO,

20   CROSS-EXAMINATION CONTINUED

21   BY MR. PARKS:

22   Q.  Sir, in your direct testimony, you state that, "Where the

23   API supplier has already filed a DMF with the FDA, it is

24   unusual for the supplier to agree to exclusivity," and that's

25   in your direct testimony at paragraph 77.  I would like to

**A-1294**

LCFKFTC1                    Bruno - Cross

1    focus, sir, on the word "unusual" there.

2            You were saying that based on your personal

3    experience, that would be unusual, correct?

4    A.  That's correct.

5    Q.  Earlier, you said that over your career — and earlier, I

6    mean yesterday in your testimony — you said that over your

7    career, you've been involved in some capacity with 100 --

8    approximately 100 pharmaceutical manufacturing contracts,

9    correct?

10   A.  Correct.

11   Q.  And of those 100 contracts, you said you were closely

12   involved in approximately 40, correct?

13   A.  Correct.

14   Q.  Not one of those 100 pharmaceutical manufacturing

15   agreements that you were involved in some capacity with over

16   your career related to pyrimethamine, correct?

17   A.  That's correct.

18   Q.  And you told us that you did not do any formal study

19   regarding the frequency that different deal terms appear in API

20   supply agreements, correct?

21   A.  That's correct.

22   Q.  You also told us that you did not review, and are not aware

23   of, formal -- any formal survey analyzing the frequency with

24   which different terms or conditions appear in API supply

25   agreements, correct?

LCFKFTC1                    Bruno - Cross

1    A.  That's correct.

2    Q.  So because you did not conduct any industrywide analysis,

3    you really can't say if an agreement to exclusivity under these

4    circumstances is actually unusual in the industry, can you?

5    A.  My comment was that based on my experience with the

6    contracts that I've worked on, and that I've been involved

7    with, also, with my contacts with other companies, discussing

8    with CMOs and pharmaceutical companies, that it's unusual.

9    Q.  So to my question, you can't say whether that's actually

10   unusual in the industry because you didn't study the industry

11   for your analysis, did you?

12   A.  I did not do a formal study.  I did it with companies that

13   I had been working with over the 40-some years.

14   Q.  Now, I'd like to turn to Vyera's contract with RL Fine.

15           In your direct testimony affidavit, you stated that

16   the contract Vyera entered into with RL Fine was "not a

17   legitimate backup API supply agreement," and that's direct

18   testimony, that's the heading immediately before paragraph 78.

19           A core basis for that conclusion was that RL Fine was

20   not actually able to serve as a backup supplier for

21   pyrimethamine to Vyera at the time of the agreement, correct?

22   A.  That's correct.

23   Q.  Even though RL Fine had not taken steps toward filing a DMF

24   for pyrimethamine API, it was still the next best supply option

25   for pyrimethamine API after Fukuzyu at that time, wasn't it?

LCFKFTC1                    Bruno - Cross

1    A.  That's correct.

2    Q.  You don't have an issue, sir, do you, with the fact that

3    Vyera identified RL Fine as a possible alternate supplier of

4    pyrimethamine, do you?

5    A.  As I said in my statement, they were the second best option

6    at the time.

7    Q.  So you don't have an issue with Vyera having identified

8    RL Fine as a potential API supplier, right?

9    A.  That's correct.

10   Q.  And that was the actual conclusion that you reach in your

11   direct testimony, that after Fukuzyu, the next best

12   pyrimethamine API supply option was RL Fine, right?

13   A.  That's correct.

14   Q.  You also take issue with the amount of due diligence done

15   by Vyera before identifying RL Fine.

16          My question for you is this, sir:  Regardless of the

17   amount of due diligence Vyera did, it ended up identifying the

18   exact same next best option for pyrimethamine API supply that

19   you identified in your analysis, didn't it?

20   A.  In the initial phase of it, yes.

21   Q.  Now, you said in your direct testimony affidavit that

22   various aspects of the supply agreement between RL Fine and

23   Vyera were, to use your word, atypical of backup supply API

24   supply agreements and, again, using your language, inconsistent

25   with industry practice regarding such agreements, and that's in

LCFKFTC1                    Bruno - Cross

1    your direct testimony at paragraphs 88 and 90.

2            You are basing those conclusions, again, on your own

3    personal experience and not any study or analysis of the

4    pharmaceutical industry; isn't that right?

5    A.  I did not do a formal study of the industry, as you said.

6    Q.  And so your conclusions about this agreement being atypical

7    and inconsistent with industry practices are actually limited

8    to your own personal observation in your experience and not any

9    study of the industry, correct?

10   A.  It is not based on a formal study.

11   Q.  And they are limited to your personal experience, right?

12   A.  Yes, which is 40 years in the industry.

13   Q.  Well, we'll talk about that.

14           The reference point, over 40 years, is 100 agreements

15   with which you have had some agreement -- I'm sorry, some

16   involvement and 40 agreements with which you were closely

17   involved, right?

18   A.  You have to define when I said the 40, as I said yesterday,

19   40 of them, I was the lead person.  The other ones, I took care

20   of just a portion of it, which would have been the CMC section.

21   Q.  But your reference point for these opinions is those 100

22   agreements and those 40 agreements on which you were the lead

23   of the 100, correct?

24   A.  Not exactly.

25           And, again, I work with a lot of CMOs, and I work with

LCFKFTC1                    Bruno - Cross

1    a lot of pharmaceutical companies.  Discussing what the terms

2    and conditions of a contract is part of our discussions, and

3    even before we get to a supply agreement, we are discussing

4    those type of things.  We may not have gotten to the supply

5    agreement, but they're not done in a vacuum, and we're not

6    waiting to the very end to do it.

7            So my conclusions are based on that experience and my

8    discussions with hundreds of CMOs and multiple numbers of

9    pharmaceutical groups.

10   Q.  Yesterday, sir, you told us that of the 40 agreements that

11   you were closely involved in, approximately 20 were backup

12   supply agreements, correct?

13   A.  No, that's not what I said.

14   Q.  You didn't say that?

15   A.  I said 20 were second suppliers.

16   Q.  Secondary supply agreements?

17   A.  Correct.

18   Q.  Were any backup supply agreements?

19   A.  There were no backup suppliers in there.

20   Q.  So you have had no experience with backup supply

21   agreements?

22   A.  Not on -- I have not done a formal backup supply agreement.

23   Q.  Okay.

24           Speaking of backup agreements, generally, you were

25   retained by the FTC as an expert witness in a matter prior to

LCFKFTC1                    Bruno - Cross

1   this case, weren't you?

2   A.   Correct.

3   Q.   That was the AndroGel case, wasn't it?

4   A.   Yes.

5   Q.   In that case, your opinions related, in part, to a backup

6   manufacturing agreement, didn't it?

7   A.   Yes.

8   Q.   And the court in that case granted a motion to preclude you

9   from testifying about part of your opinion, didn't it?

10  A.   I'm not aware of an official judgment on that, on what they

11  precluded.

12  Q.   You're aware that a judge ruled that you couldn't testify

13  to part of your statement in that case, aren't you?

14  A.   I don't recall being advised that I couldn't testify in

15  court.  I gave my deposition, and that's as far as the case

16  went.

17  Q.   Sir, yesterday, you testified that you were deposed in this

18  case on July 29, 2021, and I'd like to take a look at your

19  deposition from July 29, 2021, on page 81, lines 15 through 25.

20        THE COURT:  Have you laid a foundation for this

21  testimony, counsel?

22        MR. PARKS:  I'm sorry?

23        THE COURT:  Have you laid a foundation for examining

24  with respect to this testimony?

25        MR. PARKS:  This testimony -- this is his deposition

LCFKFTC1                    Bruno – Cross

1    in this case.

2              THE COURT:  So has he testified inconsistently with

3    his deposition?

4              MR. PARKS:  I believe he has, yes.

5              THE COURT:  Oh, okay.  Thank you.

6              MR. PARKS:  Yes.

7    BY MR. PARKS:

8    Q.  And if we look on page 81, at lines 15 through 25, you were

9    asked a question at line 15:  "In any of these five cases that

10   you identify in paragraph 19, were you retained by any of the

11   plaintiffs, who are, in this case, the governmental entities,

12   or the plaintiffs in this case?"

13             And your answer, at line 20, was:  "I was retained by

14   the FTC."

15             And then the question to you was:  "Which one was

16   that?"

17             And your answer was:  "I think that was AndroGel."

18             And the question to you was:  "That was the one where

19   part of your testimony was excluded?"

20             And your answer was:  "I think so.  I would have to

21   check."

22             Right?

23             MR. PERLMAN:  Objection, your Honor.  Counsel is just

24   reading this deposition into the record.  I don't think this is

25   proper impeachment.  Mr. Bruno testified that he was retained

LCFKFTC1                    Bruno - Cross

1    by the FTC in AndroGel, so I don't see an inconsistency.

2           THE COURT:  Overruled.

3    BY MR. PARKS:

4    Q.  Sir, you testified in your deposition that you recognized

5    that part of your opinion was excluded in AndroGel, didn't you?

6    A.  If that's what I said, then I forgot that that was the

7    case, and as I said in that, I think that was the one that I

8    didn't recall at this point.

9    Q.  Thank you.

10          You recall -- has that testimony from your testimony

11   refreshed your recollection on that point?

12   A.  I would have to read more of it to see what the discussion

13   was about, to why I was talking about that, but, to be honest

14   with you, that was done a very long time ago, and I don't

15   remember the exact details.  I haven't reviewed that case in

16   years.

17   Q.  Sir, the court in the AndroGel case ruled that because you

18   failed to engage in any quantitative valuation of the backup

19   manufacturing agreement at issue in that case, you were not

20   permitted to offer testimony about a specific monetary

21   valuation for that agreement; isn't that right?

22   A.  I think I understand where you're going, and I think I'm --

23   I think this is what I will recall.  I don't recall all the

24   exact details, but I think I know what this is about.

25   Q.  Is that consistent with your general recollection of the

LCFKFTC1                          Bruno - Redirect

1    court's ruling in that case?

2              MR. PERLMAN:  Objection; relevance, your Honor.

3              THE COURT:  Sustained.

4    BY MR. PARKS:

5    Q.  Sir, just like in AndroGel, where you offered an opinion

6    without doing any substantive valuation analysis that the

7    backup manufacturing agreement there had no value, here, you

8    are offering the opinion that certain provisions in the supply

9    agreements to which Vyera was a party were atypical and

10   inconsistent with industry practice without any substantive

11   industry analysis either, aren't you?

12             MR. PERLMAN:  Objection; relevance and argumentative.

13             THE COURT:  Argumentative, form.  Sustained.

14             MR. PARKS:  I have no further questions for the

15   witness at this time.  Thank you.

16             THE COURT:  Thank you.

17   REDIRECT EXAMINATION

18   BY MR. PERLMAN:

19   Q.  Good afternoon, Mr. Bruno.

20   A.  Good morning.

21   Q.  Again, this is Neal Perlman, and I represent the Federal

22   Trade Commission.

23             Mr. Bruno, I'd like to just start with the second to

24   last topic that Mr. Parks discussed with you.

25             Do you recall discussing, just now, the backup supply

LCFKFTC1                      Bruno - Redirect

1    agreement between RL Fine and Vyera?

2    A.  Yes, I do.

3    Q.  In your professional experience, is Vyera's contract with

4    RL Fine consistent with a typical backup supply agreement?

5    A.  I do not consider it to be consistent with a typical backup

6    supply agreement.

7    Q.  Why not?

8    A.  I think the main point is that RL Fine was not listed in

9    any of the FDA documents.  Since it wasn't added to the AND or

10   the NDA for Daraprim, that from a regulatory point of view,

11   they could not use that API in their formulation in their

12   process.  So inside the contract, there was no relevance to

13   getting that approval, and whether it's a backup supplier or a

14   second supplier or a primary supplier, most of the contracts --

15   almost all of the contracts that I work on, there's some

16   trigger in there that says that you have to be approved, you

17   have to be able to submit your documents.

18          All that has to be done, and RL Fine did not, and was

19   never approved, as a supplier.  So as a backup supplier, as a

20   second supplier, even a primary supplier, their material could

21   not be used in any of the Daraprim that was sold in the U.S.

22   market.

23   Q.  Why does it matter whether a supplier is approved for use

24   by the FDA if it's a backup supplier?

25   A.  The whole premise of a backup supplier, as it's been

LCFKFTC1                    Bruno - Redirect

1    defined, is that their job is to be available in case there is

2    a problem and there's some interruption in the delivery of the

3    materials.  If you're not approved, then if there is an

4    interruption, that material has to be put into a process, which

5    gathers information, both on the API and the dosage, tests have

6    to be done, it has to be submitted to the FDA, and the FDA has

7    to review that information.

8            The FDA review alone could take 18 to 24 months.  So

9    if there is a supply interruption, then I could be without

10   product for 18 to 24 months.  Considering, in Vyera's case,

11   this was their number one product, it's economically what they

12   lived and died on.  So, if they're not getting that income,

13   that company could be out of business in that time period, on

14   just the FDA, not even on the part at the beginning where it

15   takes to get all that information and the work required.

16   Q.  In your view, does Vyera's contract with RL Fine mitigate

17   supply risk?

18   A.  I don't think it mitigates supply risk at all.

19   Q.  Why not?

20   A.  Again, because of the issues associated with the FDA.

21   Also, there are better ways to mitigate the risk, which would

22   have been less expensive for them.  Again, they could have

23   bought inventory.  Also, if you look at the contract, there was

24   no, again, part of the trigger.  They were getting fees even

25   though they weren't supplying, even though they couldn't

LCFKFTC1                    Bruno - Redirect

1   supply.  That's not usual in a contract.  The contracts that

2   I've worked on and I've been involved with, as I said, we have

3   milestones.  When the product is approved, you get a milestone

4   payment; when you get a submission, you get a milestone

5   payment.  This gives an incentive to the manufacturer to

6   actually get these things done.

7          RL Fine didn't do that.  Vyera never purchased

8   products to do that.  There was no interaction between the two

9   to move this thing forward, and, therefore, it didn't mitigate

10  the risk of a supply interruption.

11  Q.  I'd like to switch gears a little bit here and turn us to

12  the discussion that you had with Mr. Parks about bargaining

13  leverage.

14         Let me just ask:  Do you recall that discussion with

15  Mr. Parks yesterday?

16  A.  Yes.

17  Q.  In your experience, do API suppliers prefer to include

18  forecasting provisions in their supply contracts with

19  pharmaceutical companies?

20  A.  Yes, they do.

21  Q.  Why is that?

22  A.  It gives them an opportunity for planning.  You have to

23  look at the facility.  Most CMOs that are there, they look at

24  capacity, and when their capacity reaches a certain amount,

25  then they'll invest.  So forecasting allows them to do their

LCFKFTC1                    Bruno - Redirect

1    planning, it gives them an opportunity to see what products

2    they can do, they can't do, and, also, it gives them an

3    opportunity to look at when they're going to implement the

4    investments.

5         Often these investments take two years to get all the

6    permits, to bring in the equipment, to qualify, to certify, and

7    get things ready, so it's not something that you just do

8    overnight.  Forecasting is very important for all of that type

9    of thing.

10   Q.  Now, in your experience, do API suppliers prefer to have

11   exclusive provisions in their contracts with pharmaceutical

12   companies?

13   A.  The exclusive parts of the contract are a different sense.

14   It's used often in the very beginning of the project, when it's

15   in its clinical development.  For one, you don't know if the

16   project is going to succeed, and, also, there's a cost of

17   bringing on a second supplier, there's a cost of bringing on a

18   backup supplier.

19        The smaller companies, they don't have that

20   wherewithal, both financially or by the people themselves, so

21   they may look to get an exclusive arrangement that will get

22   them through all of their development period, that will get

23   them potentially into launch, and once they get there, they'll

24   start looking at second suppliers.  Once they get the product

25   launched, you know you have a product, you know you have an

240

LCFKFTC1                    Bruno - Redirect

1    income, you can afford to bring on all those costs.  And some

2    of those costs could run a million dollars.

3              THE COURT:  So I think the question you were asked was

4    from the perspective of the supplier, not the buyer.

5              Can you just answer from the perspective of the buyer?

6              THE WITNESS:  No.  I thought I was talking about the

7    supplier because of that, but I did bring in the buyer because

8    the two are related.

9              MR. PERLMAN:  Your Honor, I can try to ask a

10   clarifying question.

11   BY MR. PERLMAN:

12   Q.  When an API supplier agrees to exclusively sell to one

13   pharmaceutical company -- let me rephrase that.

14             When there's an exclusive contract between -- let me

15   rephrase that again.

16             Does an API supplier prefer to sell to one

17   pharmaceutical company or multiple pharmaceutical companies?

18   A.  A CMO for a product that they develop, they would prefer to

19   supply as many companies as they could.  It gives them more

20   volume and, therefore, better economics.

21   Q.  Okay.

22             So, again, turning to the discussion with Mr. Parks

23   about bargaining leverage, in your understanding and your

24   knowledge of the industry, does an API -- do API suppliers

25   prefer to have a forecasting provision or an exclusivity

LCFKFTC1                        Bruno - Redirect

1    provision in their contracts?

2    A.  The forecasting provision would be much more important

3    because it goes back to planning.

4    Q.  From the perspective of -- shifting gears, and from the

5    perspective of a pharmaceutical company, does it require more

6    leverage for a pharmaceutical company to secure a forecasting

7    provision from a CMO or an exclusivity provision?

8    A.  I think the forecasting would be more important, because,

9    again, you can --

10              THE COURT:  More important to whom?

11              THE WITNESS:  To the pharmaceutical company — thank

12   you — because it allows both parties to understand what they're

13   going to need for capacity in the future.  So the forecasting

14   becomes extremely important in that respect.

15   BY MR. PERLMAN:

16   Q.  Understood.  I'm asking just a slightly different question,

17   Mr. Bruno.

18              So, thinking about the pharmaceutical company's

19   perspective, and you're thinking about the bargaining dynamics

20   between a pharmaceutical company and an API supplier, would it

21   require more bargaining leverage from the pharmaceutical

22   company to secure an exclusivity provision or a forecasting

23   provision from the API supplier?

24   A.  Based on my experience, it would still be -- the

25   forecasting would be -- would give them more bargaining power

LCFKFTC1                    Bruno - Redirect

1   because it would give the CMO an understanding of when they

2   would have to make -- when their income would be generated, so

3   they would have more of a leverage in order to talk in that

4   respect.

5   Q.  I'd like to turn to paragraph 71 of your affidavit.  We

6   don't need to put it up on the screen, but we spent a lot of

7   time talking about the relationship yesterday between GSK's

8   contract with Fukuzyu and Vyera's contract with Fukuzyu.

9           Do you recall that testimony?

10  A.  Yes.

11  Q.  Mr. Bruno, could you remind the Court what the scope of the

12  exclusivity provision in Vyera's contract with Fukuzyu is?

13  A.  Basically, they were going to control the U.S. market for

14  human health in their exclusivity.  So, Vyera would be

15  restricted from selling any product into the United States for

16  human health.  That was the primary part of, I would say, their

17  contract in that regards.

18  Q.  You just said "Vyera."  Did you mean Fukuzyu?

19  A.  I'm sorry.  Fukuzyu.

20  Q.  Just to be clear, under the exclusivity provision, could

21  Fukuzyu sell pyrimethamine API outside of North America?

22  A.  That's correct.

23  Q.  To customers other than Vyera?

24  A.  And outside of the human health, as well.

25  Q.  Inside the United States?

LCFKFTC1                         Bruno - Redirect

1    A.  Correct.

2    Q.  I'd like to pose a hypothetical to you, Mr. Bruno.  If

3    demand for pyrimethamine API outside the United States rose, is

4    there anything in the Fukuzyu supply contract with Vyera that

5    would ensure that Fukuzyu would continue to supply Vyera?

6            MR. PARKS:  I am going to object.  It's not in the

7    report, it's not in his direct testimony, there's no expert

8    opinion on this, and so I don't think it's proper.

9            THE COURT:  Overruled.

10           THE WITNESS:  Would you repeat it again, please?

11   BY MR. PERLMAN:

12   Q.  Sure.

13           If demand for pyrimethamine API outside the United

14   States rose, is there anything in Vyera's supply contract with

15   Fukuzyu that would ensure that Fukuzyu would continue to supply

16   Vyera?

17   A.  I saw nothing in the contract that would guarantee that as

18   the volumes rose, that Vyera would be guaranteed deliveries of

19   the material.

20   Q.  Mr. Bruno, in your review of the contract, what happens

21   when Vyera sends a purchase order to Fukuzyu?

22   A.  According to the contract, Fukuzyu has ten days to respond

23   to the contract.

24   Q.  To the purchase order?

25   A.  To the purchase order.

LCFKFTC1                        Bruno - Redirect

1   Q.   Can Fukuzyu reject the purchase order?

2   A.   I saw nothing in the contract that said that Fukuzyu had to

3   accept the contract -- accept the purchase order, and if they

4   didn't do it within the ten-day period, they could, in effect,

5   reject it.

6   Q.   Okay.  Here's my last set of questions.  We're going to

7   shift gears slightly.

8        I think at the beginning of your testimony yesterday,

9   you discussed with Mr. Parks a number of companies that you had

10  worked for before and whether those companies had exclusive

11  contracts.  So I'd like to ask you a few questions about that.

12       Just to start, Mr. Bruno, why do pharmaceutical

13  companies typically seek exclusive API supply contracts?

14  A.   We're talking about the pharmaceutical companies?

15  Q.   That's right.

16  A.   So what happens when you're a company, and you're trying to

17  get an exclusivity, you're looking at your market, and so the

18  limit -- the more you can limit that API going to other people,

19  the longer you can delay the potential of the product going

20  into the marketplace and, in effect, competing with you.

21  Q.   Are there any other reasons?

22  A.   You are also looking to assure that you get supply

23  materials so you can maintain your market share.  So these are

24  the kinds of things that you're trying to do.  Once you've

25  launched a product, you don't want to be without.  As you go

LCFKFTC1                    Bruno - Redirect

1    forward, you want to make sure that you can get all of your

2    regulatory parts.

3         So all those aspects can get tied in, and you're also

4    making investments, so you're spending money, and you want to

5    make sure that you can get a return on all the money you spent

6    in order to get that product launched on the market.

7    Q.  So I'd like to just make sure we're clear about something.

8         When you said that companies prefer to have exclusive

9    supply contracts, are you drawing a distinction between the

10   supply contract and the exclusivity provision itself?

11   A.  I --

12        THE COURT:  Counsel, I'm a little confused by the

13   reference to company.  If you could identify if you're talking

14   about the purchaser, the pharmaceutical company purchasing the

15   API, or the manufacturer supplying it, I could better

16   understand your question.

17        MR. PERLMAN:  Sure.  And I will try to rephrase it, as

18   well.

19   BY MR. PERLMAN:

20   Q.  Let me ask you this question, Mr. Bruno:  Why do

21   pharmaceutical companies typically seek exclusivity provisions

22   in their supply contracts?

23   A.  The exclusivity will guarantee them a supply of material,

24   it will limit the amount of API that is available in the

25   marketplace, so it will allow them to maintain market share,

LCFKFTC1                    Bruno - Redirect

1    and because they're covering an investment, they need to make

2    sure that they can maintain that income in order to cover the

3    investment, which has occurred -- which could be several years.

4    Q.   How does an exclusivity provision guarantee supply?

5    A.   It doesn't guarantee supply from a manufacturing point of

6    view because unless you put something in the contract, and it's

7    not just an exclusive provision that says that I will make the

8    material, I will have either inventory available, I will have

9    capacity available, so those are other provisions within the

10   contract that give you that guarantee of the supply.  The

11   exclusivity, I don't see that in the contracts I've done, have

12   not limited the ability for you not to get material — excuse

13   the double negative — but you need other stipulations within

14   the terms of the contracts.  The exclusivity provision does not

15   do it.

16   Q.   Do exclusivity provisions — and I want to stay focused on

17   the exclusivity provision itself — in API supply contracts

18   ensure high quality for the pharmaceutical company?

19   A.   Again, the exclusivity doesn't do that.  You're -- within

20   the context of the contracts, there's normally a provision that

21   says something about you'll maintain GMP standards, you'll have

22   specifications.  Those are what dictates your quality and also

23   your quality agreement, not the exclusive provision.

24   Q.   Okay.

25         So I'd like to just wrap up with this question:  Do

LCFKFTC1                    Bruno - Redirect

1  you recall discussing the exclusivity provision in the Fukuzyu

2  supply agreement with Mr. Parks?

3  A.   Yes.

4  Q.   Does the exclusivity provision in Vyera's contract with

5  Fukuzyu mitigate supply risk?

6  A.   As I said in my report, it does not mitigate the supply

7  risk because the exclusivity is one piece of it.  Also inside

8  that contract, there's nothing that guarantees that they will

9  get their material and that Fukuzyu guarantees the supply of

10  material.  There's no provisions for the forecasting, there's

11  no provisions for saying that I'll give you the capacity.

12         In the Glaxo, the GSK one, those things exist, and

13  it's clear that you know that you're going to be able to get

14  the material, but, again, those are provisions outside of this,

15  I would say, exclusive provision.

16         MR. PERLMAN:  Your Honor, I have no further questions

17  for the witness at this time.

18         THE COURT:  Thank you.

19         Any recross?

20         MR. PARKS:  Manly Parks, for the defendants.

21         No, your Honor.

22         THE COURT:  Thank you.

23         So, there was a line of questions that I found

24  confusing about leverage.

25         THE WITNESS:  Okay.

LCFKFTC1                    Bruno - Redirect

1          THE COURT:  So let me just see if I can summarize what

2     I thought I understood you to be saying.

3          Forecasting provisions, suppliers of API like them

4     because they permit them to plan?

5          THE WITNESS:  Correct.

6          THE COURT:  And so if you were a pharmaceutical

7     company seeking to buy, it would be easier for you probably to

8     convince the manufacturer to include, as part of the contract

9     provisions, forecasting?

10         THE WITNESS:  Correct.

11         THE COURT:  But that's linked, from the buyer's point

12    of view, probably, to other provisions that would make sure

13    that orders you placed connected to the forecasting would be

14    fulfilled.  And what are those provisions?

15         THE WITNESS:  So what happens on a -- first of all,

16    you can talk about what we refer to as rolling forecasts.  And

17    so just -- I'll make up some time frames.  So if your contract

18    begins, essentially, say, January 1st, so in the third or

19    fourth quarter of the year before, you would put in what we

20    refer to as rolling forecasts.  So we call it rolling because

21    throughout the course of the year, it could be changing, so

22    it's not a fixed number.

23         So what the supplier will do is they'll talk to the

24    pharmaceutical company.  The pharmaceutical company will say,

25    well, we think we're going to need this much material on this

LCFKFTC1                    Bruno - Redirect

1   date, and they're planning it around the dosage as well as the

2   API.

3          So then what will happen is you'll get the forecast,

4   and then you'll order purchase orders against the forecast and

5   say I'll give you a purchase order on January 1st of something,

6   and then that becomes a binding -- and that's the binding

7   piece.

8          THE COURT:  So what is the contract provision linked

9   to that that indicates -- that links the forecast to the

10  binding nature of fulfilling the purchase order?

11         THE WITNESS:  Well, you'll have a forecasting piece,

12  and you'll have a purchasing order piece.  And you'll define

13  the purchasing order that the first purchasing order would be

14  put on a certain day and, that will be binding, and then you'll

15  talk about additional purchasing orders throughout the course

16  of the year.

17         But, also, what you will put in the contract, the

18  forecasting piece, is -- and, again, just to make up a number,

19  I may say I'm going to make 100 kilos, and that's what my

20  forecast is.

21         (Continued on next page)

22

23

24

25

LCFMFTC2                    Bruno

1          THE COURT:  Who are you referring to?

2          THE WITNESS:  I'm sorry.  The contract manufacturer

3    will be told by the pharmaceutical company that they are going

4    to need a hundred kilos.  The contract manufacturer, the CMO,

5    will then put into their budget that they are going to make a

6    hundred kilos.  But inside the forecasting piece of the

7    contracts they normally have a provision for going above that

8    number.  So as an example --

9          THE COURT:  So it's a minimum order requirement?

10          THE WITNESS:  Not an order.  It's a forecast at this

11    point still.  They have planned to make 100 kilos, but in their

12    plan --

13          THE COURT:  Who is planning to make a hundred kilos?

14          THE WITNESS:  The contract manufacturer.  I'm sorry.

15    I'll try to be more exact.  The contract manufacturer has the

16    hundred kilo number.  They, the contract manufacturer, will

17    turn around and in their gross planning for the year for all of

18    their products the contract manufacturer will put 100 kilos.

19    But most likely they will put 120 kilos.  When I worked for a

20    CMO and I was in charge, we put about a 20 percent because you

21    want to be able to cover that number.

22          Then once that number is in place, you have your

23    planning.  Then the next provision will be the purchase order.

24    Purchase orders will be the binding orders.  Normally, in the

25    forecasting piece the company, the pharmaceutical company and

LCFMFTC2                    Bruno

1    the CMO will be talking throughout the year and they will be

2    discussing their needs and the demand, how they go up and how

3    they go down.  They will make adjustments in the forecast.  And

4    then the purchase orders will be issued according to that and

5    purchase order is normally the binding piece of it in that

6    respect.  It's a constant and continuous conversation between

7    the two parties.  Neither one of them is doing this in a

8    vacuum.

9              THE COURT:  But the contract doesn't commit to the

10   state you have described it to us yet that that purchase order

11   must be filled.

12             THE WITNESS:  Normally, in the contract, the first

13   part of the contract talks about a purchase order that must be

14   filled.  They guarantee that they will supply the minimum

15   amount, which would be the hundred kilos.  They, the CMO,

16   guarantees that they will supply that much based on the

17   forecast.

18             THE COURT:  What's the time lag, or does it depend on

19   the product and the manufacturer, between receipt of the

20   forecast from the customer, the buyer of the API, and the

21   receipt of the purchase order which defines the precise

22   quantity desired at that moment?

23             THE WITNESS:  Normally, you do the forecast the

24   quarter before the contract year starts.  So, again, just say

25   you would do it in November if the contract starts January 1.

LCFMFTC2                          Bruno

1   That's the first piece.

2            Inside the contract, the first purchase order, there

3   will be a date and that has to be submitted.  You may say you

4   must do that in January, February, or March or some time frame.

5            And that purchase order, depending on what the two

6   have either agreed to or what the discussions are, will either

7   be the orders for the year or it will be the order for the next

8   quarter.  If it's an existing product, pyrimethamine was an

9   existing product.  I could envision getting a contract that

10  gave me a rolling forecast of, again, a hundred kilos and then

11  getting an order in the first quarter which could have been, I

12  want 50 kilos in January and I want 50 kilos in June, that type

13  of thing.  That would be, again, the purchase order and that

14  would be defined in the purchase order in that regards.

15           THE COURT:  What contract provisions protect the buyer

16  of the API that it will actually get from the supplier the API

17  that it needs?

18           THE WITNESS:  In the contract, I normally see it in

19  the purchase order, that that hundred kilos will now be defined

20  as the minimum amount of material that they must buy for that

21  year.

22           THE COURT:  If I provide, pursuant to contract terms,

23  a forecast in the fourth quarter and then I submit a purchase

24  order to you the following year on a schedule we have agreed

25  to, you are required, seller of the API, to provide that amount

LCFMFTC2                    Bruno

1  of API that I defined in my forecast at a minimum.

2          THE WITNESS:  At a minimum, yes.

3          THE COURT:  Or there is a financial penalty if you do

4  not.

5          THE WITNESS:  There is normally some kind of financial

6  penalty.

7          What I often see in the contracts, especially if you

8  have a second supplier, because the first supplier normally

9  supplies a larger amount, they normally get a better price.

10  There is a second supplier, smaller amount, they normally have

11  a higher price.  The contracts that I have worked on will often

12  define that difference in price.  If I don't supply you, then I

13  have to pay -- I, the CMO.  I have to pay that or pay some

14  penalty in that respect.

15          THE COURT:  So you testified earlier this morning that

16  once a DMF is filed for a particular API, it's unusual for the

17  manufacturer of the API and the buyer of the API to have an

18  exclusivity provision in their contract.

19          THE WITNESS:  If that API -- if that DMF --

20          THE COURT:  Did I understand your testimony correctly?

21          THE WITNESS:  I think so.  But I think there was more

22  to it that may not be correct.

23          THE COURT:  Please explain.

24          THE WITNESS:  So if I have what I refer to as a

25  multioutlet product, what I would say is, those kinds of

LCFMFTC2                    Bruno

1    products, you want to sell as much as you can.  So I, the CMO,

2    would submit a DMF.  The DMF would go into a file and the whole

3    world would know that I'm making that product.

4         THE COURT:  Are you saying that the knowledge that you

5    have filed, that you the manufacturer have filed in the DMF is

6    public information.

7         THE WITNESS:  Once you filed, you will get a number

8    from the FDA and that is in a database and it is another

9    database.  When I looked at who could do pyrimethamine, I went

10   into two databases.  One was the FDA DMF list and the other was

11   a pay service that I support.

12        THE COURT:  A subscription service.

13        THE WITNESS:  A subscription service.  That was the

14   Newport.  A lot of companies will actually use that almost as

15   an advertisement, so I can show the world I'm making it.  If

16   you're a generic house, you are going to call me up and say, I

17   see you're making this.  Therefore, can you supply me.

18        THE COURT:  Now the details of the DMF, the

19   manufacturing process, the quality controls, perhaps the

20   ingredients even, those are not public when you file the DMF.

21        THE WITNESS:  That's correct.  The whole concept of

22   the DMF was instituted when they wanted to have this generic

23   model, if you will.  So the CMO company argued that we didn't

24   want to give that information to a pharmaceutical company who

25   could either misuse it, who could give it to somebody else.  So

LCFMFTC2                    Bruno

1    they created this DMF.  So everything within the context of the

2    DMF is confidential.

3              THE COURT:  Therefore, tying it together, once an API

4    supplier has filed a DMF, they are less likely to be interested

5    in entering into a contract with an exclusivity provision

6    because?  Could you explain.

7              THE WITNESS:  The main reason is, you want to make

8    volume, even if it's a smaller volume product.  It doesn't

9    matter the scope of the project.  The more customers you have,

10   the more likely you are going to be able to sell your material.

11             Also, it will be an advantage because then you will

12   start to develop a relationship with a company, so the company

13   being the pharmaceutical company.

14             So, as I said, it's not a good example, but it's

15   almost it's like an advertisement.  I'm making this.  I can

16   make this.  I have a DMF.  I am going to be able to support

17   you.  The more I make, the lower my costs are.  The better my

18   economics are, the more profit I'll make.

19             The other side of it is, you reduce your risk, you

20   from the CMF point of view.  If I only offer it to you, again,

21   using Vyera as an example, what if they have a bad year?  What

22   if they don't do well in the marketplace?  What if somebody

23   else comes in, like a generic, another generic, and does a

24   better job?  There are things that they can do to do that.

25             One, I lose market share as the CMO.  But, more

LCFMFTC2                    Bruno

1     important, as it goes down, my costs go up.  Not just for the

2     product.  Because keep in mind that a CMO, when they look at

3     their overhead cost, it's based on how much they make, how much

4     material, not necessarily one product.  So the more products I

5     make, the lower my overheads are and the more profit I have.  I

6     have reduced my risk as the CMO so I could support that

7     production.  I reduced my cost because I continue to make more.

8     It's their advantage to have that type of thing.  For these

9     kinds of products, that's the case.

10         THE COURT:  In a bargaining situation, if you, the

11    manufacturer, have filed the DMF so the world knows that I have

12    a manufacturing process for this API and I'm available to the

13    world for contracts to supply you with this API, the DMF is

14    filed.  That news is out there.

15         THE WITNESS:  Correct.

16         THE COURT:  Now I'm, from the point of view of the

17    pharmaceutical company, coming to the manufacturer and saying,

18    yes, I know.  The world is aware that you are a producer of

19    this API.

20         THE WITNESS:  Correct.

21         THE COURT:  But I want to be your only purchaser in

22    America.  I want an exclusivity provision.  Even though

23    everyone else, every other pharmaceutical company in America

24    knows you have produced this API, I want you only to sell to

25    me.

LCFMFTC2                    Bruno

1          I have to provide you in this hypothetical with

2     incentives because you are depriving yourself, you, the

3     manufacturer, are depriving yourself of alternative outlets for

4     your API.

5               THE WITNESS:  Correct.

6               THE COURT:  And those incentives could be promises and

7     forecasts of a growth in the pharmaceutical company's business

8     for not just only supplying that API, but maybe other products

9     that the manufacturer produces.

10              THE WITNESS:  Correct.

11              THE COURT:  We won't go to your competing

12    manufacturers.  We will instead come to you and purchase other

13    products from you.

14              THE WITNESS:  Correct.  I think the other part of it

15    also is, once you start to build that relationship, it costs

16    money to develop a product because you have to audit plans, you

17    have to have that relationship.  And, in my experience, when

18    you put a face to the project, things tend to go a lot

19    smoother.

20              As a consultant, when I'm working with a

21    pharmaceutical company, and that's where a lot of my business

22    is interfacing with the contract manufacturer, the first thing

23    I do is try to get the two parties in the room so you can start

24    to develop that relationship.  Because I can assure you in this

25    these types of projects something is going to go wrong.  Those

LCFMFTC2                    Bruno

1   are relationships that help.

2          But also when you talk about the DMF, again, these

3   aren't being done in a vacuum.  You have people talking

4   constantly.  If I'm making pyrimethamine for you, my business

5   development guy is going to go in there and say, I am making

6   this.  What else are you looking at?

7          And Vyera may be a little different because it only

8   has the one product essentially at this time.  It has a few

9   that they are thinking about.  Some of them were, as I heard

10  yesterday, were more line extensions, which just means more

11  volume of that product, not of everything else.  There is a

12  dynamic going on between both parties throughout the whole

13  course of the time.

14         In many of the generics, especially on the market

15  today, the contract manufacturer will actually start working on

16  those products very early on.  I have worked on generics that

17  the generic product is made and the ANDA is submitted almost

18  the day that it gets approved by the innovator.  This could be

19  seven or eight years in advance you're starting to work on the

20  development of it so that you are ready when it becomes a

21  generic three or four years later.

22         THE COURT:  Let me make sure I understand what you

23  just said.

24         You are saying that the manufacturer of the API and a

25  generic not infrequently will work hand in hand so that they

LCFMFTC2                      Bruno

1    are both developing their processes at the same time.

2              THE WITNESS:  Not exactly.  You have the right idea.

3              But what I'm saying is, the generic company will say,

4    look, they go to Fukuzyu and they say, you know what, we are

5    making this product.  We have been working with you.  We are

6    looking to develop these two products and maybe they are five

7    or six or seven years out.

8              So then Fukuzyu will say, OK, let me look at it.  They

9    will go into their lab.  They look at research.  If you go on

10   the Internet for a lot of the major CMOs, you will not only see

11   a product line, you will see a development line.

12             Again, this is an indication, these are things, we

13   don't have them.  We don't have a DMF.  We don't even have a

14   process.  These are the things we are looking at.  Again, this

15   interaction is going on.  It's not a vacuum, is all I was

16   trying to say.

17             There is a lot of discussions and all of that.  When I

18   was doing more of this as a BD person, business development

19   person, as you move up the proverbial chain, when I was the

20   person calling on the generic house, one of the first things

21   you did is, you talked about what was next.  If you are doing a

22   good job on one, you get the next one.

23             In the case of Fukuzyu, for Vyera, in principle, when

24   Vyera bought the product, Fukuzyu was the only supplier for the

25   product because he was the only one that was approved.

LCFMFTC2                    Bruno

1          THE COURT:  By the FDA.

2          THE WITNESS:  By the FDA, yes.

3          Since no one else was in the submission that was sent

4    to the FDA by the original GSK, then Impax and then eventually

5    Vyera, Vyera had no choice.  It's not like they could say,

6    well, I'll use RL Fine.  They had to go through this whole

7    process of getting the approval.  That could take some time.

8          THE COURT:  That is, if they went to RL Fine, as

9    opposed to Fukuzyu, they would have to go through an entire

10   process to get RL Fine approved?

11         THE WITNESS:  Exactly.  My point that I was trying to

12   make earlier is that without that approval, in principal you

13   can't make the material.  Yes, you can make it.  But then you

14   better go through that long period of getting the approval.

15         I don't know the exact number today, but in my

16   business we review with the FDA, because they print some of

17   this, how many applications are in the submissions, how many

18   submissions -- how many applications for an approval.

19         The FDA has been backlogged at times with over 5,000

20   submissions that are being reviewed.  That could take several

21   years.  I had a client once that wanted to amend their

22   submission and in this case this would be an amendment to a

23   submission.

24         Because it was going to take so long and the

25   amendments go on the bottom of the pile, the new submissions go

261

LCFMFTC2                    Bruno

1    on the top.  They really just resubmitted a whole new thing, so

2    they were higher on the list.  Because it takes long and it's

3    an uncertainty in the time.

4           In the case of Fukuzyu, this is why I said I don't

5    think RL Fine mitigates the risk, is because I can't make the

6    product and no one is doing anything to get me approved in a

7    reasonable amount of time because in one respect I don't know

8    the time.  The estimate is two years, approximately, for just

9    the review part of it.  What I do I do for two years?

10           THE COURT:  Thank you.

11           Do counsel have questions for the witness based on the

12   questions I have placed to him?

13           MR. PERLMAN:  Nothing for plaintiffs, your Honor.

14           MR. PARKS:  Nothing for defendants, your Honor.

15           THE COURT:  Thank you.  You may step down.

16           THE WITNESS:  Thank you.

17           (Witness excused)

18           THE COURT:  Next witness.

19           MR. MEIER:  Your Honor, my colleague, Lauren Peay will

20   handle the next witness for the government.  We call Dr. W.

21   David Hardy, M.D. to the stand.

22           THE COURT:  Dr. Hardy, if you would come up here,

23   please, and take the witness stand.

24           Excuse me, Mr. Bruno.  If you could just stay one

25   minute.

LCFMFTC2                    Bruno

1           Thank you and thank you for your patience.  I just

2    wanted to confirm that I had no other questions.  Thank you.

3    WILLIAM DAVID HARDY,

4         called as a witness by the Plaintiffs,

5         having been duly sworn, testified as follows:

6           THE COURT:  Dr. Hardy, you are about to be handed a

7    document which I believe is your direct testimony.

8           MS. PEAY:  Your Honor, may I approach the bench and

9    the witness with copies?

10           THE COURT:  Thank you.  What's the exhibit number for

11    Dr. Hardy's affidavit?

12           MS. PEAY:  It is Government Exhibit 8003.

13           THE COURT:  Dr. Hardy, if you could turn to page 36 of

14    your exhibit, I believe you authorized someone to

15    electronically sign your name on page 36, is that right?

16           THE WITNESS:  That is correct, your Honor.

17           THE COURT:  Before you gave that authorization, did

18    you read this document with care?

19           THE WITNESS:  Yes, I did.

20           THE COURT:  Do you swear to the truth of its contents?

21           THE WITNESS:  Yes, I do.

22           THE COURT:  Any objection other than those already --

23    I don't think I have any already made.  Any objection to

24    receipt of 8003.

25           MR. McCONNELL:  No objection.

LCFMFTC2                        Hardy - Cross

1              THE COURT:  8003 is received.

2              (Government Exhibit 8003 received in evidence)

3              THE COURT:  Cross-examination.

4    CROSS-EXAMINATION

5    BY MR. McCONNELL:

6    Q.  Good morning, Dr. Hardy.  How are you?

7    A.  Good morning.  I'm fine.  Thank you.

8    Q.  In describing your expertise in this matter you point out

9    that you have treated well over 1500 HIV AIDS patients over

10   your 30-year plus career, is that correct?

11   A.  That is correct.

12   Q.  Are you familiar, Dr. Hardy, with the direct testimony that

13   Professor Hemphill intends to offer in this case?

14   A.  No, I'm not.

15   Q.  Professor Hemphill intends to testify that the most recent

16   available estimate suggests that there are slightly less than

17   10,000 cases of toxoplasmosis per year in the United States.

18   Do you agree with that estimate from Professor Hemphill?

19   A.  Not ever really counting the cases, I'm not really an

20   expert in terms of how many cases there are or in terms of the

21   diagnosis, treatment, prevention.

22   Q.  In your clinical experience do you believe the number to be

23   more or less than 10,000 per year?

24              MS. PEAY:  Objection, your Honor.  This is a question

25   that's outside the Scope of the witness' direct testimony.

LCFMFTC2                           Hardy - Cross

1              THE COURT:  Overruled.

2              You may answer.

3   A.  I would have no good basis to make a good judgment whether

4   that number is correct or not.

5   Q.  According to your direct testimony in this case, Dr. Hardy,

6   you have treated roughly 400 patients for toxoplasmosis over

7   the course of your entire career, is that right?

8   A.  My estimate is somewhere between 200 and probably 350, is

9   best I can say.

10  Q.  According to your testimony in this case, about 200 of

11  those 200 to 350 toxoplasmosis patients you treated with FDA

12  approved pyrimethamine, is that correct?

13  A.  That is correct.

14  Q.  So for the few cases to the 150 cases, based on your total

15  estimation of patients that you have treated, those patients

16  received a treatment other than FDA-approved pyrimethamine,

17  correct?

18  A.  To my best estimate, that would be true.

19  Q.  Dr. Hardy, I'd like to discuss a little bit your clinical

20  background with respect to treatment for toxoplasmosis.  OK?

21  You began your clinical experience with toxoplasmosis as a

22  resident physician from the period 1982 to 1986, correct?

23  A.  My residency was actually '82 to '84, but, yes, that would

24  be close to correct.

25  Q.  During that period of time of 1982 to 1986, you would

LCFMFTC2                    Hardy - Cross

1   prescribe pyrimethamine and sulfadiazine for a toxoplasmosis
2   patient unless he or she had an allergy to a sulfonamide
3   antibiotic, correct?
4   A.   That is correct.  In terms of the treatment of active
5   toxoplasmosis disease usually in the brain.
6   Q.   At some point between 1982 and 1986, the FDA approved
7   pyrimethamine for toxoplasmosis, correct?
8   A.   I don't know the exact date, but I do know that
9   pyrimethamine has been approved by the FDA for the treatment of
10  toxoplasmosis, yes.
11  Q.   Do you remember being deposed in this case on July 27,
12  2021, Dr. Hardy?
13  A.   Yes.
14  Q.   At your deposition you testified that you believed that
15  some point between 1982 and 1986, the FDA approved
16  pyrimethamine for use for patients with toxoplasmosis.  Do you
17  agree with that testimony?
18  A.   I do remember my deposition, and I faintly remember that
19  date.  It may have been actually earlier, but I know it has
20  been approved by the FDA.  It may have been done earlier than
21  that, but I am not exactly sure of the date.
22  Q.   Would it be fair to say that by 1986 the FDA had approved
23  pyrimethamine for treatment for patients with toxoplasmosis?
24  A.   That is my best understanding and recollection, yes.
25  Q.   So during that period of 1982 to 1986, you did not rely on

LCFMFTC2                    Hardy - Cross

1    any published guidelines in order to select that course of

2    treatment for toxoplasmosis patients because no published

3    guidelines existed at that time yet, correct?

4    A.   That is true.

5    Q.   During this period of 1982 to 1986, the approximate failure

6    rate for the pyrimethamine treatment regimen for acute active

7    toxoplasmic encephalitis was about one-third, right?

8    A.   I don't have good data to support that, but, to my best

9    recollection, in the early days of the AIDS epidemic, that was

10   a pretty good estimate, yes.

11   Q.   Now I'd like to move to the late 1980s, to the period 1986

12   to 1991.  Is that OK?

13   A.   '86 to '91.  OK.

14   Q.   Between 1986 and 1991, the number of toxoplasmosis patients

15   that you were treating each year increased to about 36 patients

16   per year, correct?

17   A.   Yes, approximately 36 per year.

18   Q.   And the only treatment regimen that you used during this

19   time to treat active toxoplasmosis was a pyrimethamine-based

20   regimen, correct?

21   A.   To the best of my recollection, that was my primary -- that

22   was my primary regimen for treatment, yes.

23   Q.   The failure rate of the pyrimethamine-based regimen

24   remained the same for the period 1986 to 1991 for active

25   toxoplasmosis patients, correct?

LCFMFTC2                    Hardy - Cross

1    A.   Again, I have no data to prove that, but I would estimate

2    that knowing what was happening, AIDS epidemic during those

3    years, that that high failure rate would continue, yes.

4    Q.   Now I am going to move into the early 1990s.  I am going to

5    discuss a drug -- I am going to try my best -- trimethoprim

6    sulfamethoxazole.  Are you familiar with that drug?

7    A.   Yes, I am.

8    Q.   Would it be OK if I referred to that drug today as either

9    TMP-SMX or Bactrim?

10   A.   That's fine with me.

11   Q.   Those can be used interchangeably, sir?

12   A.   Trimethoprim sulfamethoxazole is a generic name, TMP-SMX is

13   an acronym for that name, and Bactrim is actually a brand name

14   for that product.

15   Q.   Sometime around 1991, physicians treating toxoplasmosis got

16   lucky in that it was discovered that TMP-SMX not only prevented

17   pneumocystis carinii pneumonia, but was also fairly good at

18   preventing toxoplasmic encephalitis, correct?

19   A.   I don't remember the exact year that that was recognized,

20   but I do remember that, from large pneumocystis prevention

21   studies, there was also a decrease not only in the occurrence

22   of pneumocystis, but also, secondarily, decrease in occurrence

23   of toxoplasmic encephalitis, yes.

24   Q.   Within one year of that discovery, by 1992, TMP-SMX studies

25   began to demonstrate decreases in the occurrence of active

LCFMFTC2                          Hardy - Cross

1    toxoplasmosis, correct?

2    A.   Again, the dates to me are not entirely definitive.  I do

3    know that as more TMP-SMX was being used for the prevention

4    primarily of pneumocystis pneumonia that there was some

5    decrease in the occurrence of toxoplasmosis plastic

6    encephalitis as well.

7    Q.   With TMP-SMX you get the benefit of treating two

8    opportunistic infections with one drug, isn't that right?

9    A.   To be more specific, you get the benefit of preventing two

10   opportunistic infections.  It's a complicated situation.  But

11   the primary reason that TMP-SMX is used for prophylaxis of

12   toxoplasmic encephalitis is because commonly the patient is

13   already taking it to prevent pneumocystis pneumonia.  It is

14   simply continued.

15   Q.   And studies showed that TMP-SMX was effective as a

16   prophylactic for toxoplasmosis, correct?

17   A.   Correct.  Studies have shown that.

18   Q.   In fact, around this time you wrote a couple of textbook

19   chapters documenting the use of TMP-SMX to prevent both

20   pneumocystis pneumonia and toxoplasmosis around that time,

21   right?

22   A.   Sometime in the early '90s, yes.  I wrote chapters

23   reporting that, yes.

24   Q.   Eventually, TMP-SMX became the recommended medication for

25   primary prevention of toxoplasmosis, correct?

LCFMFTC2                    Hardy - Cross

1   A.   Yes.   That is what our guidelines say.

2   Q.   According to your expert testimony in this case, Dr. Hardy,

3   the three distinct goals for treating and preventing toxoplasma

4   encephalitis are treatment of the active toxoplasmosis disease,

5   primary prophylaxis, which is preventing the development of

6   active disease, and secondary prophylaxis, which is maintenance

7   therapy to prevent recurrence of the active disease.   Is that

8   correct?

9   A.   Yes, that is correct.

10  Q.   Today you consider TMP-SMX to be the gold standard for

11  primary prophylaxis for toxoplasmic encephalitis, correct?

12  A.   Yes, I consider it to be the most highly recommended agent

13  for the primary prevention of toxoplasmic encephalitis.

14  Q.   Do you remember testifying at your deposition, Dr. Hardy,

15  that you considered TMP-SMX to in fact be the gold standard for

16  primary prophylaxis for toxoplasmic encephalitis?

17  A.   I don't remember that exact term gold standard, but I

18  cannot equivocate with it.   It is the number one recommended

19  option, yes.

20  Q.   So you would agree with me that TMP-SMX is the gold

21  standard for primary prophylaxis for toxoplasmic encephalitis?

22  A.   Yes.

23  Q.   Now, another benefit of TMP-SMX is that it can be

24  administered in intravenous form, correct?

25  A.   Yes, that is correct.

270

LCFMFTC2                          Hardy - Cross

1   Q.  And a pyrimethamine-based regimen, on the other hand,

2   requires that the patient take several pills per day, correct?

3   A.  A total pyrimethamine regimen, yes, does require that.  The

4   number of pyrimethamine pills is low.  The number of pills that

5   go along with the other medication, sulphadiazine, is very

6   high.  But the regimen itself does contain many pills, yes.

7   Q.  I remember reading in your deposition that a

8   pyrimethamine-based regimen patient would be taking

9   approximately nine tablets per day.  Is that right?

10  A.  That is correct.

11  Q.  And the pyrimethamine-based pill regimen is sometimes a

12  limiting factor when a patient cannot swallow a pill reliably,

13  correct?

14  A.  Yes.  In the situation where the patient is obtunded or

15  comatose and cannot reliably survive pills, an intravenous form

16  of treatment is sought.

17          THE COURT:  Obtunded meaning?

18          THE WITNESS:  Unable to -- have a decreased mental

19  alertness.

20          THE COURT:  Thank you.

21  Q.  For that type of patient, Dr. Hardy, that you just

22  described, intravenous high dose TMP-SMX can be useful to

23  assure adequate drug delivery, correct?

24  A.  That is correct.

25  Q.  I'd like to turn our discussion to another drug,

271

LCFMFTC2                    Hardy - Cross

1   atovaquone.  Are you familiar with that?

2   A.   Atovaquone is a drug I'm familiar with.

3   Q.   Atovaquone is an alternative treatment for treating

4   toxoplasmosis, correct?

5   A.   Yes, that is true.

6   Q.   And you started to use atovaquone to treat active

7   toxoplasmosis sometime after 1991, correct?

8   A.   No, I don't believe that is correct.  Until pyrimethamine

9   became difficult to obtain, my number one choice, as per

10  guideline recommendations, to treat active disease from

11  toxoplasmosis in the brain was pyrimethamine plus sulphadiazine

12  or pyrimethamine plus clindamycin.  Atovaquone has always been

13  an alternative, second or third choice regimen.

14  Q.   Dr. Hardy, that was not responsive to my question.  My

15  question was simply that you did not start using atovaquone at

16  all in any respect to treat active toxoplasmosis until sometime

17  after 1991, correct?

18  A.   Sometime after 1991, yes.  It wasn't available at the time

19  until after that date I'm sure.

20  Q.   Between 1991 and 1996, you participated in at least two

21  studies using atovaquone for both active toxoplasmosis and for

22  pneumocystis carinii pneumonia that were fairly successful,

23  correct?

24  A.   I do remember participating in some studies investigating

25  the use of atovaquone in those diseases, yes.

LCFMFTC2                    Hardy - Cross

1   Q.  Those studies showed that it was effective, correct?

2   A.  I would have to review the studies to really understand and

3   make a decision whether -- what the term effective means.  But

4   I remember participating in them as a clinical research site.

5   Q.  Fair enough with the term effective.

6        Do you remember at your deposition testifying that

7   those studies were fairly successful, Dr. Hardy?

8   A.  I think the term fairly successful is one I would agree

9   with.  Again, it's put into the context of a high-mortality

10  disease that was untreatable in many ways, and fairly

11  successful could be taken in many different ways because of

12  that.

13  Q.  But you agree with it, correct?

14  A.  Yes.

15  Q.  So before 1991, in the 1980s, when you were seeing many

16  patients a year during the HIV AIDS epidemic, TMP-SMX and

17  atovaquone were not used to treat patients with toxoplasmosis,

18  correct?

19  A.  That is correct.

20  Q.  From 1991 to 1996, according to your direct testimony in

21  this case, the number of patients you saw fortunately went down

22  a bit to about 20 patients with toxoplasmosis per year,

23  correct?

24  A.  Yes, that is correct.

25  Q.  Your primary prescription choice for those patients that

LCFMFTC2                        Hardy - Cross

1    presented with active toxoplasmosis was a pyrimethamine-based

2    regimen during that time, correct?

3    A.  Yes, that is correct.

4    Q.  In that 1991 to 1996 time frame, you also had an

5    alternative to pyrimethamine-based regimen and had the ability

6    to prescribe TMP-SMX for active toxoplasmosis, correct?

7    A.  TMP-SMX is, again, an alternative second or line choice.

8    It was available, and I did not use it frequently, no.

9    Q.  But it is possible that you did prescribe TMP-SMX for

10   toxoplasmosis patients during that time, correct?

11   A.  It is possible that I may have prescribed it in the case

12   where an intravenous form of medication was necessary because

13   of a lack of oral route of administration in a patient who

14   could not swallow pills.

15   Q.  In that same time frame, as an alternative to a

16   pyrimethamine-based regimen, it is also possible that you

17   prescribed atovaquone for active toxoplasmosis patients,

18   correct?

19   A.  Yes, it is possible.  I would -- I do not remember doing it

20   frequently, however.

21   Q.  So since the introduction of TMP-SMX and atovaquone in the

22   early 1990s, there are now three to four alternative treatments

23   for treating active toxoplasmosis, correct?

24   A.  Yes.  Although I would correct the descriptive term from

25   alternative to secondary or tertiary recommended regimens.

LCFMFTC2                    Hardy - Cross

1    Q.  Do you remember at your deposition, Dr. Hardy,

2    characterizing TMP-SMX and atovaquone as alternatives for

3    treating active toxoplasmosis?

4    A.  Yes, I do.

5    Q.  You testified truthfully at your deposition, correct?

6    A.  Yes, I did.

7    Q.  And the survival rate for your patients with active

8    toxoplasmosis encephalitis was no different whether you treated

9    them with Daraprim or TMP-SMX, correct?

10   A.  That's a complicated question because of the time periods

11   in which I was treating patients with different medications and

12   the availability of antiretroviral therapy, which became

13   available after 1996.

14          MR. McCONNELL:  Justin, could you please pull up

15   Dr. Hardy's deposition for me, please, page 44.

16   Q.  You were asked at your deposition Dr. Hardy:  So do you

17   have an estimate of approximately what percentage of

18   toxoplasmic encephalitis you treated during that time period

19   with treatment regimens other than pyrimethamine sulphadiazine

20   or pyrimethamine clindamycin, correct?

21          THE COURT:  What time period is that question

22   referring to?

23          MR. McCONNELL:  The middle 1990s, your Honor.

24   A.  From '91 to '96?

25          THE COURT:  Is that the time period, counsel?

LCFMFTC2                        Hardy - Cross

1          MR. McCONNELL:  I believe so, your Honor, yes.

2     Q.  Do you see the question, Dr. Hardy?

3     A.  Yes.

4          MS. PEAY:  Objection, your Honor.  This is improper

5     impeachment or improper refreshing of the witness'

6     recollection.

7          THE COURT:  We don't have the question yet.  We have

8     the question asked at the deposition but not the question asked

9     at the trial.

10         Wait until the question is finished.

11         We now know what the question asked at the deposition

12    is referring to, a period of time between 1991 and 1996.  The

13    answer?

14         MR. McCONNELL:  Yes, it's between 1991 and 1996.  I

15    apologize, your Honor.  I can continue.

16         The opposing counsel at the deposition asked for

17    clarification of whether the question referred to active toxo

18    or just generally, and then the examining attorney clarified

19    toxoplasmic encephalitis and then the witness asked if he could

20    clarify that.  And then the witness answered:  OK.  I would

21    have to say the survival rate of the patient was no different.

22    Q.  Do you agree with that testimony, Doctor?

23    A.  Yes, I do agree with it based on my deposition.

24         THE COURT:  Before antiviral therapy for AIDS patients

25    became available in 1996, the survival rate for those treated

LCFMFTC2                    Hardy - Cross

1    with the two alternative therapies was no different, as you

2    recollect?

3              THE WITNESS:  As I recollect, in that pretherapy --

4    antiviral therapy period, they were about the same.

5              THE COURT:  Thank you.

6    Q.  Dr. Hardy, moving past 1996, you have continued to

7    prescribe primarily TMP-SMX for primary prophylaxis of

8    toxoplasmosis, correct?

9    A.  Yes, that is correct.

10   Q.  But from 2000 to 2015, you do not know what percentage of

11   toxoplasmosis cases in the United States were treated with

12   FDA-approved pyrimethamine tablets, correct?

13   A.  I do not have data to support an answer for that.  I can

14   tell you that the number of toxoplasmosis cases decreased

15   sharply after 1996.  And to know exactly how and what they were

16   treated with would be a difficult -- it would be a guess on my

17   part.

18   Q.  So the treatment choices of your colleagues in the medical

19   field between 2000 and 2015, you don't have data to support

20   whether they were prescribing FDA approved pyrimethamine

21   tablets or some other treatment for toxoplasmosis during this

22   time, right?

23   A.  I can say that the CDC, NIH, IDSA, HIVMA sponsored

24   guidelines continue to recommend a pyrimethamine-based regimen.

25   I do not have data to prove how patients were actually treated.

LCFMFTC2                    Hardy - Cross

1    Q.  Thank you.  That was my question regarding the data.

2         Those guidelines were developed in response to the

3    AIDS and HIV epidemic in the 1980s, correct?

4    A.  I believe they were first put together in the late 1980s,

5    early '90s, in order to be able to give physicians direction of

6    how to treat what were previously very rare infections.

7    Q.  Unfortunately for those patients, at that time, in the late

8    1980s, there were many more toxoplasmosis patients than there

9    are today to be able to do more effective studies on effective

10   treatment, correct?

11   A.  That is correct.

12   Q.  But by the time TMP-SMX and atovaquone were introduced in

13   the 1990s, there were few toxoplasmosis patients to run similar

14   studies, correct?

15   A.  It would really depend upon the time period.  Prior to

16   1996, the number of toxoplasmosis cases was about the same as

17   they were in the 1980s, maybe even greater, because there were

18   more patients that being were treated.  After 1996, with the

19   advent of antiviral therapy, the number of all opportunistic

20   infections, including toxoplasmosis, markedly decreased.

21   Q.  Just to be clear, the guidelines recommending FDA-approved

22   pyrimethamine came out in the late 1980s, before TMP-SMX or

23   atovaquone were used to treat toxoplasmosis, correct?

24   A.  I can say that with definition for atovaquone because it

25   was not available.  TMP-SMX has been available since the 1970s,

LCFMFTC2                    Hardy – Cross

1    so I can't really give an estimate, whether it was ever used to

2    treat toxoplasmosis encephalitis.  It may have been.  I don't

3    know.  I have no data to support it one way or the other.  But

4    it was not seriously tested in clinical trials until the early

5    1990s.

6    Q.  Thank you.

7         I want to move, Dr. Hardy, to the post 2015 to present

8    time frame.  Is that OK?

9    A.  Of course.

10   Q.  In 2015, you encountered some difficulties obtaining

11   pyrimethamine for your patients due to price, correct?

12   A.  Correct.

13   Q.  After a price increase on pyrimethamine, about 85 to 90

14   percent of the time that you tried to obtain pyrimethamine

15   sulphadiazine it was unsuccessful, correct?

16   A.  That is correct.

17   Q.  When you could not obtain a pyrimethamine-based regimen,

18   you prescribed TMP-SMX as an alternative in a majority of those

19   cases that you just described, correct?

20   A.  Yes, I did.

21   Q.  When infectious disease experts could not obtain a

22   pyrimethamine-based regimen during this time, some started

23   prescribing compounded pyrimethamine as an alternative as well,

24   correct?

25   A.  Yes.  I have heard of that and have seen some limited

279

LCFMFTC2                    Hardy - Cross

1   research articles published.

2   Q.  Albeit based on, as you said, very limited data, TMP-SMX

3   may be the most commonly used medication for active

4   toxoplasmosis since 2015 in the United States, correct?

5   A.  I cannot give an opinion about what is most commonly used.

6   That's not part of my expertise.  So I really can't give you a

7   good answer on that.

8   Q.  At conferences that you have attended for your industry you

9   have learned that the unavailability due to the price of

10  pyrimethamine over the past few years has made TMP-SMX the most

11  commonly used medication for toxoplasmosis outside of the

12  United States, correct?

13  A.  Again, I have no data.  I cannot remember whether or not I

14  heard that at a conference or not.  I do know that the lack of

15  availability of pyrimethamine has greatly affected the choice

16  for treatment of this life-or-death disease in which therapy

17  must be started within a very short period of time after

18  diagnosis.

19  Q.  Since the price increase of pyrimethamine after 2015, you

20  are not aware of any published data establishing a negative

21  impact on patient care, correct?

22  A.  No, I'm not aware of any published data.

23  Q.  You do not know what percentage of pyrimethamine

24  prescriptions in the United States are prescribed to treat

25  active toxoplasmosis, correct?

LCFMFTC2                    Hardy - Cross

1  A.  Again, that's not part of my expertise.  In looking at the

2  marketing or use of pyrimethamine.

3  Q.  So you don't know, correct?

4  A.  I do not know.

5  Q.  You do not know what percentage of active toxoplasmosis

6  cases in the United States are treated with FDA approved

7  pyrimethamine tablets, correct?

8  A.  Again, I have done no survey.  I have seen no research.  I

9  have no data to confirm that number in any way.

10  Q.  You do not know what percentage of active toxoplasmosis

11  cases in the United States are treated with compound

12  pyrimethamine either, correct?

13  A.  Again, I have no data to be able to make a reliable answer

14  to that question.

15  Q.  For your expert work on this case you did not make any

16  attempt to determine those percentages, did you?

17  A.  No, I did not.

18  Q.  Now, you have testified on direct that you have designed,

19  conducted, and reported the results of over 30 clinical trials

20  testing investigational medications for treatment and

21  prevention of AIDS-related opportunistic infections, correct?

22  A.  That is correct.

23  Q.  But you are not aware of any peer-reviewed studies that

24  have looked at the frequency of use of different treatment

25  regimens for toxoplasmosis during any of the time periods

LCFMFTC2                    Hardy - Cross

1   between 2000 and the present, correct, Dr. Hardy?

2   A.  Frequency of use is not usually a topic published in

3   medical journals, as opposed to toxicity and efficacy, but I

4   have not seen or am I aware of any articles that look at that

5   question, no.

6   Q.  In your clinical experience, is one of the reasons why

7   there are no such peer-reviewed studies is because there are an

8   insufficient number of toxoplasmosis patients to run such a

9   rigorous study?

10  A.  That is correct.  The number of cases of toxoplasmosis has

11  decreased markedly.  Among HIV-positive persons it has remained

12  somewhat consistent, among other immunocompromised patients,

13  such as those receiving stem cell or bone marrow transplants,

14  but that number is still pretty low.

15  Q.  Again, unfortunately, you would agree with me that none of

16  the treatment regimens, pyrimethamine-based regimens, TMP-SMX

17  or atovaquone, would be capable of actually eradicating latent

18  toxoplasmosis in patients, correct?

19  A.  Yes, that is correct.

20  Q.  As far as you are aware, Dr. Hardy, there has not been a

21  new medication approved to treat toxoplasmosis since

22  atovaquone, which, as we discussed, came out in about the mid

23  1990s, is that correct?

24  A.  That is correct.

25  Q.  You testified at your deposition that the development of

LCFMFTC2                    Hardy - Cross

1    new medications for toxoplasmosis has not been a high priority

2    for the biopharmaceutical industry whatsoever and that is

3    primarily because the diseases, while life threatening and

4    several and always needing treatment, does not occur at a

5    high-enough prevalence to make development of a drug for this

6    disease profitable, correct?

7    A.   I would have to see the exact words from my either direct

8    testimony or deposition that you just read.  But, in general,

9    yes, that is a belief of mine, yes.

10   Q.   If you agree with that testimony I don't think we have to

11   go back and show you, if that's OK with you, Dr. Hardy.

12           You went on to note at your deposition that clinical

13   trials comparing the efficacy of pyrimethamine to TMP-SMX are

14   not feasible any longer because so few patients are developing

15   toxoplasmosis these days, correct?

16   A.   That is correct.

17   Q.   For your engagement on this case, you have not personally

18   done a statistical survey of infectious disease practitioners

19   preferences for treating toxoplasmosis, correct?

20   A.   I have not and am not aware of any either.

21   Q.   In your direct testimony, Dr. Hardy, you testified that the

22   opportunistic infections guidelines contain treatment

23   guidelines for the treatment of toxoplasmosis, correct?

24   A.   Yes, they do.  That is correct.

25   Q.   But you would agree with me, though, that whether a single

LCFMFTC2                         Hardy - Cross

1    physician in his or her own personal practice follows those

2    guidelines is a matter of personal physician choice, correct?

3    A.   What a physician does in terms of treatment is always their

4    choice.  What kind of guidelines they follow is always their

5    choice.  Whether they endeavor to practice evidence-based

6    medicine or not is always their choice.

7    Q.   According to Professor Hemphill's direct testimony that he

8    intends to give to this Court, pyrimethamine is considered the

9    standard of care for all manifestations of toxoplasmosis.  Do

10   you agree with that opinion of Professor Hemphill?

11   A.   In large part, that is very true.  There are –- there is

12   one specific type of toxoplasmosis that is treated with a

13   different drug called spiramycin in a very specific clinical

14   situation.  But in all other situations in which toxoplasmosis

15   is being treated, yes, that is true.

16   Q.   If one of your infectious disease colleagues treated a

17   toxoplasmosis patient with TMP-SMX instead of pyrimethamine,

18   would you consider that to be a breach of that physician's

19   standard of care?

20   A.   To judge a physician's standard of care is not my job or am

21   I an expert in judging physician's care.  Again, it is a

22   personal choice based upon teaching, experience, etc.

23   Q.   Are you able to think of situations where a physician would

24   not prescribe FDA-based pyrimethamine and for a toxoplasmosis

25   patient and still be within the proper standard of care?

LCFMFTC2                     Hardy – Cross

1   A.   Certainly in a situation where a patient cannot take oral

2   medication, the use of intravenous TMP-SMX is in fact

3   recommended by the guidelines as a route of administration and

4   really the only medication that is available to treat such a

5   patient.  So in that situation, yes, I would say that is a

6   proper and recommended form of treatment.

7   Q.   That's just one example, correct, Dr. Hardy?  There are

8   other situations besides intravenous indication for a

9   toxoplasmosis patient where a colleague of yours could

10  prescribe TMP-SMX and be within the proper standard of care for

11  that patient, correct?

12  A.   Again, each physician practices medicine by their own style

13  and methodology.  How they do that is up to them.

14  Q.   Is that answer yes?

15  A.   That answer is, yes, I'm aware of that happening.

16  Q.   When you have heard of that happening, you haven't thought

17  that your colleague was breaching a standard of care to his

18  patient, his or her patient, correct?

19  A.   Again, I cannot judge my colleagues' standard of care and

20  how they treat their patients.

21  Q.   If one of your infectious disease colleagues treated a

22  toxoplasmosis patient with TMP-SMX instead of pyrimethamine,

23  only because of the price of pyrimethamine, would you consider

24  that to be a breach of that physician's standard of care?

25  A.   Having done that myself, because of the price and the

LCFMFTC2                    Hardy - Cross

1    availability of pyrimethamine and by necessity of needing to

2    start a medication in a very short period of time, the

3    immediate availability of TMP-SMX is what I have done myself,

4    so I would not judge a physician for doing that. It's a

5    necessity of the current marketplace.

6    Q. As part of your engagement for this case, Dr. Hardy, you

7    had a conversation with some members of the Federal Trade

8    Commission in April or May of 2019 regarding the general issue

9    of drug access to pyrimethamine in the form of Daraprim for the

10   treatment of toxoplasmosis, your personal experience, and what

11   you knew as the leader of HIVMA, correct?

12   A. I do remember having a telephone conversation with someone

13   from the FTC about this topic, and I was the chair of the board

14   of HIVMA at that time.

15   Q. Is it fair to say that that conversation happened sometime

16   in April 2019?

17   A. I believe that was about the day, yes.

18   Q. Now, do you remember sending an e-mail on April 3, 2019 to

19   over 30 of your fellow infectious disease colleagues regarding

20   this issue?

21   A. Yes, I do.

22   Q. In that e-mail you stated to your 30-plus infectious

23   disease colleagues that the Federal Trade Commission has asked

24   you to testify, has asked you, Dr. Hardy, to testify regarding

25   whether this enormous price hike of pyrimethamine has limited

LCFMFTC2                    Hardy - Cross

1    patients' access to this life-saving drug.  Do you remember

2    sending that e-mail?

3    A.  Yes, I do.

4    Q.  And your intent in sending that initial e-mail from April 3

5    of 2019 was to look to your fellow infectious disease

6    colleagues working in urban areas that have historically cared

7    for many HIV-positive persons to look for cases of problems

8    with access to pyrimethamine, correct?

9    A.  My intent was to simply, as you alluded to before, do a

10   very informal survey of colleagues who I know worked in areas

11   where HIV-AIDS had been and still was prevalent to better

12   understand what their experience had been in terms of treating

13   toxoplasmosis.

14   Q.  At your deposition you could only remember receiving two

15   responses from your colleagues to that e-mail, correct?

16   A.  I believe there were overall three, as I look at the

17   records more carefully, but yes at least -- I believe there

18   were three responses that I can remember.

19   Q.  So you e-mailed 30 plus colleagues and you got three

20   responses, correct?

21   A.  Correct.

22   Q.  And one of those responses to your inquiry regarding the

23   FTC's questions was an April 4, 2019 e-mail that you received

24   from Dr. Rajesh Gandhi, correct?

25   A.  I believe I did receive something from Rajesh Gandhi.  I

LCFMFTC2                    Hardy - Cross

1    can say for sure that was him.  But go ahead.

2    Q.  Would it refresh your recollection, sir, to see the e-mail?

3    A.  That would refresh me.  Yes.  Please do.

4         MR. McCONNELL:  Justin, could you please bring up

5    DX-456 to help refresh Dr. Hardy's memory.

6    Q.  Dr. Hardy, please take a moment to review the e-mail and

7    let me know when you have completed your review.

8    A.  Yes, I do remember this e-mail.

9    Q.  Does the e-mail from April 4, 2019 reflected in DX-456

10   refresh your recollection, Dr. Hardy?

11   A.  Yes, it does.

12   Q.  Dr. Gandhi responded to your e-mail to provide you with an

13   update regarding Massachusetts General Hospital's issues with

14   pyrimethamine access, correct?

15   A.  Correct.

16   Q.  The MGH there in the e-mail stands for Massachusetts

17   General Hospital, correct?

18   A.  That is correct.

19   Q.  Dr. Gandhi told you that we at Massachusetts General

20   Hospital have been able to access pyrimethamine through a

21   noncommercial source but that that will no longer be the case

22   as of September 2019.  As a result, our patients will either

23   need to use the commercial product, 400 to $900 per

24   25-milligram tablet, or we'll be forced to switch to

25   trimethoprim sulfamethoxazole instead?

LCFMFTC2                          Hardy - Cross

1    A.   That is correct.

2    Q.   And trimethoprim sulfamethoxazole is the TMP-SMX that we

3    have discussed today?

4    A.   That is true.

5    Q.   Is it possible, Dr. Hardy, that the noncommercial source

6    referenced by Dr. Gandhi was a reference to compound

7    pyrimethamine?

8         THE COURT:   Sustained.

9    Q.   Dr. Gandhi also noted that the Massachusetts General's

10   toxoplasmosis patients will either need to use the commercial

11   product or be forced to switch, correct?

12   A.   That is the reading of his e-mail, yes.

13        MR. McCONNELL:   You can take that down, please,

14   Justin.

15   Q.   You did not rely on that e-mail from Dr. Gandhi in offering

16   your expert report or testimony in this case, correct,

17   Dr. Hardy?

18   A.   No, I did not.

19   Q.   Dr. Hardy, you will agree with me that the research finds,

20   although not conclusively, that TMP-SMX is a well-tolerated

21   alternative to pyrimethamine-based treatment regimens for

22   toxoplasmosis patients, correct?

23   A.   It is true that there have been two studies, randomized

24   trials.  One was never finished.  One was problematic.  And the

25   results -- the conclusions from those studies were exactly as

LCFMFTC2                              Hardy – Cross

1  you said, yes.

2  Q.  You in fact cited to at least one of those studies in book

3  chapters and articles that you have written over the course of

4  your career, correct?

5  A.  Yes, I probably have.  I don't remember the exact citation,

6  but having written many book chapters and articles on this

7  topic, I probably did use those because they were the only ones

8  available.

9  Q.  We talked a little bit earlier, as part of your engagement

10 on this case you sent out an e-mail to your colleagues and you

11 got three responses.  We just checked one.  I'd like to discuss

12 another one with one of your colleagues, but the identity of

13 that person has to remain confidential.  Do you understand

14 that, Dr. Hardy?

15 A.  I understand that.  I am aware.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

LCFKFTC3                    Hardy – Cross

1    Q.  Do you remember the contents of that email back and forth

2    that you engaged in with that colleague of yours that responded

3    to your inquiry?

4    A.  Yes, I do.

5    Q.  So that colleague of yours responded to your request and

6    informed you that:  "I think what we have learned is that there

7    are better tolerated and less toxic alternatives.  We either

8    use Bactrim or the combination of clinda/atovaquone, which

9    ironically is what ophthalmologists have been using for ocular

10   toxo for years, and I am unaware of any poor outcomes in

11   transplants or HIV from not having pyrimethamine," correct?

12   A.  I do remember that email, yes.

13   Q.  And you responded to your colleague that:  "The scant

14   research seems to find, although not conclusively, that TMP/SMX

15   is a well-tolerated alternative to Pyr-Sulfa or Pyr-Clinda for

16   CNS toxo and atovaquone clinda regimen is used successfully in

17   ocular toxo," correct?

18   A.  I do remember writing that, yes.

19   Q.  And just for clarity of the record, Pyr-Sulfa is

20   pyrimethamine -- I'm sorry, I shouldn't have even tried.

21       Dr. Hardy, can you please clarify what Pyr-Sulfa was

22   in your email?

23   A.  By Pyr-Sulfa, I was referring to pyrimethamine and

24   sulfadiazine.

25   Q.  The reference to Pyr-Clinda, what were you referring to

LCFKFTC3                    Hardy – Cross

1    there?

2    A.  Pyrimethamine plus clindamycin.

3    Q.  And CNS, the reference there to CNS toxo, that's central

4    nervous system, correct?

5    A.  Correct.

6    Q.  The atovaquone/clinda regimen that's referred to in that

7    email is an alternative treatment that has been used in ocular

8    toxoplasmosis patients, correct?

9    A.  There are case reports that that has been used, yes.

10   Q.  And then you followed up with that colleague in a

11   subsequent email and asked:  "Do you feel that TMP/SMX or

12   atovaquone/clinda is as effective as pyrimethamine

13   sufadiazine," correct?

14   A.  Can you show me the rest of that email?

15   Q.  I can.

16          MR. McCONNELL:  Justin, if you bring it up.

17          Your Honor, I believe it has been properly redacted.

18          Justin, if you could bring it up to refresh the

19   witness' recollection.  Sorry, it's DX 453.

20          THE COURT:  Don't publicly display it.  Display it

21   just to counsel and the witness and me.

22   BY MR. McCONNELL:

23   Q.  Dr. Hardy, please let me know after you have had a chance

24   to review the email.

25          (Pause)

LCFKFTC3                         Hardy - Cross

1    A.  Yes, I've read that -- reread that.

2    BY MR. McCONNELL:

3    Q.  Dr. Hardy, does the email reflected at DX 453 refresh your

4    recollection?

5    A.  Yes, it does.

6    Q.  And at the very bottom of the first page of DX 453 is the

7    question I just referenced where you addressed your colleague

8    with the question, "Do you feel that TMP/SMX or

9    atovaquone/clinda is as effective as pyrimethamine

10   sulfadiazine," correct?

11   A.  Yes, I did ask that question.

12   Q.  And the colleague that you posed that question to

13   responded:  "In my opinion, I think Bactrim is as good, better

14   tolerated, less toxicity, and cheaper.  I held that stance for

15   years before Martin.  The necessary placebo-controlled trials

16   were never done and unlikely to be ever done," correct?

17   A.  Correct.

18   Q.  And she also responded to your question that:

19   "Pyrimethamine is not available in many parts of the world, and

20   toxo is treated with SMX/TMP.  I have not seen data that

21   mortality is higher," correct?

22   A.  That is correct.

23   Q.  Do you have any reason to disagree with that opinion?

24   A.  I accept my colleague's opinion and how this doctor has

25   recommended treatment, which I do not agree with in my own

LCFKFTC3                    Hardy - Cross

1   practice, in my own teaching, in my own training, and primarily

2   because it's not consistent with our treatment guidelines for

3   this disease.  But her opinion is her opinion.

4   Q.  You don't think that this physician is breaching a standard

5   of care to her patients, correct?

6   A.  No, I do not.

7   Q.  And then with the other part of your question, regarding

8   clinda/atovaquone, your colleague responded, "As far as

9   clinda/atovaquone, all I have seen are a few cases, and all

10  recovered," correct?

11  A.  Correct.

12          MR. McCONNELL:  You can take that down, Justin.  Thank

13  you.

14  Q.  And you did not, Dr. Hardy, rely on that email

15  correspondence with that infectious disease colleague of yours

16  in rendering your opinion in this case, correct?

17  A.  No, I did not.

18  Q.  So you did not do a statistical survey of what your

19  infectious disease colleagues were doing as far as treatment of

20  toxoplasmosis for this case, correct?

21  A.  No.  My opinion is based upon a much larger body of

22  evidence called the treatment guidelines, not upon the opinions

23  of two colleagues.

24  Q.  Well, that's actually not -- that's a separate question.

25  I'm just asking -- my first question is just simply:  You did

LCFKFTC3                     Hardy - Cross

 1    not do a statistical survey of what other physicians were doing

 2    as far as treatment for toxoplasmosis for your expert opinion

 3    in this case, correct?

 4    A.  Not a formal survey, no.

 5    Q.  But what you did do is you emailed, roughly, 38 of your

 6    infectious disease colleagues for their input to help answer

 7    this question posed to you by the Federal Trade Commission,

 8    correct?

 9    A.  I was curious as to what my colleagues' experience with

10    treating toxoplasmosis in the current era was all about, yes.

11    Q.  Correct.  Because the FTC wanted to know whether there were

12    patient access issues because of the high price of

13    pyrimethamine, correct?

14    A.  It was not so much the FTC wanting to know; it was the fact

15    that I was curious myself and wanted to be better informed

16    about if there were issues, that I would understand them

17    better.

18    Q.  And that email to 38 of your colleagues received three

19    responses, two of which we've discussed today, correct?

20    A.  Correct.

21    Q.  The third, I don't believe has been produced in this

22    litigation; is that correct?

23    A.  It is part of the witness packet -- I mean the evidence

24    packet.  Yes, I've seen it.

25    Q.  Well, I haven't had the opportunity to see it, but,

LCFKFTC3                          Hardy – Redirect

1    regardless, you only received three responses to your inquiry

2    to your 38 infectious disease colleagues, correct?

3    A.   Correct.

4    Q.   And two of those physicians endorsed using Bactrim as an

5    alternative treatment for toxoplasmosis to pyrimethamine-based

6    regimens, correct?

7    A.   Yes.  One endorsed it as her recommended regimen, one

8    endorsed it as a have to using the word forced to use TMS/SMX.

9            MR. McCONNELL:  Thank you very much, Dr. Hardy.

10           THE COURT:  We're going to take our midmorning recess.

11   Thank you.

12           (Recess)

13           THE COURT:  The witness can retake the stand.

14           Is somebody getting other defense counsel?

15           COUNSEL:  Yes, your Honor.

16           THE COURT:  Thank you.

17           (Pause)

18           THE COURT:  So any redirect?

19           MS. PEAY:  Yes, your Honor.  Lauren Peay, from the

20   Federal Trade Commission.  We'll have some redirect.

21   REDIRECT EXAMINATION

22   BY MS. PEAY:

23   Q.   Good morning, Dr. Hardy.

24   A.   Good morning.

25           MS. PEAY:  My name is Lauren Peay, your Honor, on

LCFKFTC3                          Hardy - Redirect

1    behalf of the Federal Trade Commission, for the government

2    plaintiffs.

3    Q.   And, Dr. Hardy, I'll have a few questions for you in

4    redirect now.

5    A.   Yes.

6    Q.   Dr. Hardy, during your testimony in response to questions

7    from defense counsel just now, you mentioned the guidelines

8    several times.

9         Do you recall that?

10   A.   Yes, I do.

11   Q.   And, Dr. Hardy, can you explain what the guidelines are

12   that you're referring to?

13   A.   Yes, I can.  The guidelines are a compilation of as much

14   available scientific and medical evidence that there is extant

15   to be able to create some very clear and graded recommendations

16   for how to diagnose, treat, and prevent opportunistic

17   infections that were associated with HIV/AIDS.

18   Q.   Who publishes the guidelines?

19   A.   The guidelines are published by the CDC, the National

20   Institutes of Health, the Infectious Disease Society of

21   America, and also the HIV Medical Association.

22   Q.   How are you familiar with the guidelines?

23   A.   I'm familiar with the guidelines because I was trained to

24   refer to them, to use them, to follow them in situations where

25   I ever had questions in terms of diagnosis, treatment, or

LCFKFTC3                    Hardy - Redirect

1   prevention of one of the opportunistic infections.  I helped

2   create data for them and was part of a group that was

3   specifically involved in the guidelines around pneumocystis and

4   toxoplasmosis, and I use them not only in my own training, but

5   in teaching my trainees and clinical practice, of course.

6   Q.  To make it clear on the record, these guidelines, the

7   opportunistic infections guidelines, they provide guidance for

8   a number of different opportunistic infections, correct?

9   A.  Correct.

10  Q.  Dr. Hardy, do you have an understanding of how these

11  guidelines are developed?

12  A.  Yes, I do.

13       The guidelines really seek to take into account all

14  laboratory, animal-based models, and clinical research, and

15  even clinical experience where clinical research may be

16  lacking, in order to be able to come up with a consensus of

17  opinion as to how to best diagnose, treat, and prevent these

18  opportunistic infections.

19  Q.  Do you have an understanding of whether the guidelines are

20  ever updated?

21  A.  Yes, they are.  The panel is pulled together to review new

22  data when it becomes available in order to see whether that new

23  data will, in fact, impact the current guidelines.

24  Q.  Do you have an understanding of what types of data the

25  guidelines drafters consider in evaluating their guidelines in

LCFKFTC3                    Hardy - Redirect

1  deciding whether to update them?

2  A.  The guidelines drafters consider a wide range of data.

3  They prefer it always to be peer reviewed and published.  They

4  rarely take into account nonpeer-reviewed data, but they put as

5  a highest priority randomized controlled clinical trials of

6  diagnostic treatment or prophylactic modalities, but accept

7  cohort studies, which are uncontrolled and not randomized, as

8  well as meta-analyses, as well, when randomized controlled

9  trials are not available.

10 Q.  And, Dr. Hardy, do you recall defense counsel asking you

11 about prophylaxis for toxoplasmosis?

12 A.  Yes, I do.

13 Q.  Do you recall also testifying about the treatment of the

14 active disease of toxoplasmosis?

15 A.  Yes, I do.

16 Q.  Are there different treatment goals for toxoplasmosis?

17 A.  Yes, there are.

18 Q.  What are those different treatment goals?

19 A.  The goal for prophylaxis is what I would always consider to

20 be a lower bar to meet in terms of trying to prevent the

21 occurrence of an opportunistic infection in a patient at risk

22 for that infection because of their degree of immune

23 deficiency.  The higher bar, in my mind, is always treatment.

24 Once the organism has become active in the person's body, then

25 bringing -- treating that active infection is oftentimes more

LCFKFTC3                    Hardy - Redirect

1   difficult, requires longer treatment, and oftentimes more

2   potent treatment, especially combination treatments, in order

3   to be able to bring that infection back under control.

4   Q.  What is the ultimate goal of treating the active infection?

5   A.  The ultimate goal of treating toxoplasmosis in the brain or

6   CNS toxoplasmosis is to put the organism that has become active

7   back into a latent state.

8           As I said earlier, none of our antibiotics that we use

9   to treat or prevent toxo will eradicate the cystic state of the

10  organism, but the medications are used to keep it in its

11  cystic, inactive state, just like a competent immune system

12  would.

13  Q.  Do you recall earlier defense counsel mentioning another

14  treatment goal for toxoplasmosis, the secondary prophylactic

15  treatment goal?

16  A.  Yes.  Sorry.  Secondary prophylaxis was commonly used, and

17  still sometimes is used, in order to keep a successfully

18  treated active infection -- keeping it inactive.  In the case

19  of toxoplasmosis, before the advent of anti-retroviral therapy,

20  the immune deficiency persisted despite successful treatment of

21  the opportunistic infection.  If treatment would have been

22  abruptly stopped, it would only be a matter of time for the

23  organism that was inactive to become active again.

24          In order to prevent that, we learned that a continuous

25  dose of oftentimes the same medication used to treat the

LCFKFTC3                    Hardy - Redirect

1    infection, but at a lower dosage, would be necessary to keep

2    the organism suppressed and in a latent state and not causing

3    harm to the patient.

4    Q.  Returning to the guidelines, do the guidelines provide

5    different recommendations for the three different treatment

6    goals you just testified about?

7    A.  Yes, they do.

8    Q.  And starting with prophylaxis, primary prophylaxis for

9    toxoplasma gondii, what are the guidelines recommendations?

10   A.  For primary prophylaxis of toxoplasmosis gondii, the

11   guidelines recommend a daily tablet of either single strength

12   or double strength TMP/SMX.

13          I also want to point out that the reason that this is

14   recommended is not only because there has been some data to

15   support that, but for convenience reasons, most patients are

16   already taking TMP/SMX to prevent pneumocystis pneumonia.

17          And so since those drugs were already being part of

18   the patient's medication regimen, an added benefit was to

19   prevent toxoplasmosis.  So the reasoning for using TMP/SMX is

20   most commonly a continuation in the rare case that the patient

21   was not at risk for pneumocystis.  Also, TMP/SMX would also

22   still be chosen because it has been shown to be effective.

23   Q.  What are the guidelines recommendations for the treatment

24   of active toxoplasmosis?

25   A.  For active toxoplasmosis, the guidelines give a

LCFKFTC3                          Hardy - Redirect

1   pyrimethamine-based regimen, the highest recommendation as A1.

2   Pyrimethamine does need to be combined with a second

3   antibiotic, either sulfadiazine, sulfonamide, or clindamycin.

4   Q.  What do the guidelines recommend for the secondary

5   prophylaxis for toxoplasmosis?

6   A.  For secondary prophylaxis, lower doses of pyrimethamine and

7   sulfadiazine or pyrimethamine and lower doses of clindamycin

8   are recommended.

9              THE COURT:  Say that again?  Slow down.  I'm sorry.

10             THE WITNESS:  Sorry.

11             For secondary prophylaxis, or what is also considered

12  to be maintenance therapy, the guidelines recommend lower doses

13  or less frequent dosing of both pyrimethamine plus

14  sulfadiazine, or, if the patient cannot tolerate a sulfa drug,

15  lower doses of pyrimethamine plus clindamycin.

16  BY MS. PEAY:

17  Q.  Dr. Hardy, do you have an understanding of why the

18  guidelines recommend different treatments for toxoplasmosis

19  depending on the treatment goal?

20  A.  Yes, I do.

21  Q.  What is that understanding?

22  A.  My understanding is that one would always like to prevent

23  an infection if possible.  It took us, as AIDS-treating

24  physicians and researchers, several years to figure out that we

25  could do that.  So we treated opportunistic infections for many

LCFKFTC3                    Hardy - Redirect

1    years until we realized that prevention, both before and after

2    acute treatment, was necessary.

3           So the goals are different in terms of the immediate

4    life-threatening effects of each disease state.  Prophylaxis is

5    used when there is a potential for active toxoplasmosis to

6    occur.  Active toxoplasmosis is the life-threatening disease

7    that we hope to prevent, or if we can't prevent it, then to

8    treat it successfully to put it back into a latent state.

9    Q.  Thank you.

10          Dr. Hardy, you've offered an opinion that FDA-approved

11   pyrimethamine in combination with sulfadiazine or clindamycin

12   is the gold standard for treating active toxoplasmosis,

13   correct?

14   A.  Correct.

15   Q.  Can you explain the basis for that opinion?

16   A.  The basis for that opinion really derives directly from the

17   grading system that the panel of the guidelines uses.  It's a

18   well-recognized academic system that is acronymed G-R-A-D-E.  I

19   don't remember exactly what the acronym stands for, but it is a

20   very highly analytic way of looking at data and being able to

21   place value and confidence in the data.  It results in a

22   number -- excuse me.  It results in a letter grade of A, B or

23   C — a being best, C being less — in terms of strength of data,

24   and a number — 1, 2, and 3 — relying on the quality of the

25   data.

LCFKFTC3                    Hardy - Redirect

1              So I think the way the guidelines really kind of boil

2       a huge amount of information down is by simply listing what

3       each treatment has been ranked.  Pyrimethamine-based regimens

4       with either sulfadiazine or clindamycin receive the highest

5       recommendation of A1, the strongest data with the highest

6       reliability, TMP/SMX receives a grade of B1, less strength of

7       the data, because of being tested less, of it being shown to

8       have much less potency when used in laboratory and in animal

9       models, compared to pyrimethamine, sulfadiazine, and,

10      therefore, this is really, I think, the best attempt at

11      providing guidance to practice evidence-based medicine really

12      going to the level of laboratory tests, animal models, and

13      human clinical experience, and human clinical trials to derive

14      something that will result in an easy-to-read and easy-to-use

15      grading system of recommendations.

16      Q.   Now, in your --

17              THE COURT:  Excuse me.  This testimony you've just

18      given about the A1 versus the B1 ratings, is that for the

19      treatment of the active disease?

20              THE WITNESS:  Yes, it is.

21              THE COURT:  Thank you.

22      BY MS. PEAY:

23      Q.   Dr. Hardy, sticking with the treatment of the active

24      disease, in your written direct testimony, you provided an

25      opinion regarding the use of TMP/SMX for the treatment of

LCFKFTC3                    Hardy - Redirect

1   active toxoplasmosis; is that correct?

2   A.   That is correct.

3   Q.   What is that opinion?

4   A.   My opinion of the use of TMP/SMX for the treatment of

5   active toxoplasmosis is really following what the guidelines

6   really recommend, and that is, if the first and most highly

7   recommended — the gold standard — regimen is not available, and

8   a decision to treat this disease has to be made quickly, then

9   one must use other alternative options.

10          I think it's important to put into context that when a

11  patient with active toxoplasmosis presents to a hospital or

12  medical center, there is very little time to try to procure

13  antibiotics.  This is a life-threatening disease immediately,

14  it is affecting the intimate tissues of the brain, and if

15  treatment is not initiated within hours, the patient could, in

16  fact, die or have significant neurologic deficits.  So waiting

17  for pharmacy orders, waiting for insurance approvals, waiting

18  for ways to try to obtain a difficult-to-procure antibiotic is

19  really not feasible.  Therapy has to be started within hours of

20  diagnosis.  And that's why, in the period of time where

21  pyrimethamine became difficult to obtain, TMP/SMX became used

22  much more commonly.

23  Q.   Dr. Hardy, counsel for defendants asked you some questions

24  about some emails that you had with some colleagues that you're

25  connected with through HIVMA.

LCFKFTC3                          Hardy - Redirect

1          Do you recall that?

2   A.  Yes, I do.

3   Q.  To the extent that these colleagues expressed a preference

4   for TMP/SMX, is that consistent or inconsistent with the

5   opinions you're offering in this case?

6   A.  One of the opinions — and I underscore the word opinion —

7   and own clinical experience is different than mine, of the

8   opinion I'm purporting here, because I use what I consider to

9   be the highest level of evidence-based medicine treatment

10  guidelines as the way that I make my treatment decisions.  I am

11  not perplexed, frustrated, or disappointed at some of my

12  colleagues that have different experiences.  I respect their

13  work; I respect their research.  They simply have different

14  experiences of treating, different styles of treating, than I

15  do.

16  Q.  And, Dr. Hardy, in your written direct testimony, you

17  offered the opinion that TMP/SMX is not interchangeable with a

18  pyrimethamine-based regimen for the treatment of active

19  toxoplasmosis.

20          Do you recall that?

21  A.  Yes, I do.

22  Q.  Can you explain the basis for that opinion, that TMP/SMX is

23  not reasonably interchangeable?

24  A.  The reason I feel like it's not readily interchangeable is

25  because this is not a situation in which both have been

LCFKFTC3                    Hardy - Redirect

1    recommended as equal options for treatments.  There is a clear

2    gradation that our guidelines give us, in terms of the ranking

3    system, of A1 for pyrimethamine-based regimens and B1 for

4    TMP/SMX regimens.

5            That's the basis of my opinion that they are not

6    readily interchangeable.

7    Q.  Are there populations of patients for whom TMP/SMX is not

8    an option?

9    A.  Yes, there are patients who cannot tolerate sulfonamide

10   because of the sulfamethoxazole that is part of the TMP/SMX.

11   Q.  Can patients who cannot tolerate sulfonamide, can they be

12   prescribed a pyrimethamine-based regimen?

13   A.  Yes, they can.  They can be prescribed a combination of

14   pyrimethamine plus clindamycin.

15   Q.  Do you have an understanding of how common sulfonamide

16   intolerances are among patients who are infected with active

17   toxoplasmosis generally?

18   A.  Yes.  There is good published evidence that sulfonamide

19   hypersensitivity or allergy is much more common in HIV positive

20   persons than HIV negative persons, being calculated somewhere

21   around 30 to 35 percent of all patients with HIV.

22   Q.  Can TMP/SMX be used in making an empirical diagnosis of

23   active toxoplasmosis?

24   A.  That's also another difficulty with using that drug.  To

25   elaborate just a bit, optimally, physicians would like to have

LCFKFTC3                    Hardy - Redirect

1    what's called a tissue diagnosis to be able to obtain tissue

2    from the patient in order to demonstrate clearly the infectious

3    organism.  In the case of toxoplasmosis in the brain, we're

4    talking about needing to do a brain biopsy, which carries with

5    it a high complication rate in a patient that's already

6    neurologically compromised.

7         One of the ways that we confirm the diagnosis of CNS

8    toxoplasmosis or toxoplasmic encephalitis is by a positive

9    response to therapy in order to avoid having to do a brain

10   biopsy.

11        The specificity that pyrimethamine sulfadiazine has

12   for treating toxoplasmosis is also one of its benefits.  On the

13   other hand, TMP/SMX was developed to treat primarily bacterial

14   infections.  Later on, after its use in the 1980s and '90s, it

15   was found that it could also treat other types of organisms,

16   such as pneumocystis pneumonia or toxoplasmosis.  The problem

17   here is that if there's a positive response to TMP/SMX, we do

18   not know for certain that the organism being treated is, in

19   fact, toxoplasmosis.  There have been cases of brain --

20   bacterial brain abscesses and even hemoptysis of the brain that

21   could, in fact, be treated successfully with TMP/SMX, at least

22   partially treated, for some period of time.

23        So the specificity of how well pyrimethamine-based

24   regimens treat toxoplasmosis are an important part of why we

25   use it.

LCFKFTC3                          Hardy – Recross

1            MS. PEAY:  Your Honor, at this time, I have no further

2     questions for the witness.

3            Thank you, Dr. Hardy.

4            THE WITNESS:  Thank you.

5            THE COURT:  Any recross?

6            MR. McCONNELL:  Sean McConnell, for defendant, Mark

7     Shkreli.  Yes, please, your Honor.

8     RECROSS EXAMINATION

9     BY MR. McCONNELL:

10    Q.   Hello again, Dr. Hardy.

11    A.   Hello.

12    Q.   Real quickly, you just provided testimony in response to

13    questions from plaintiffs' counsel regarding the gradation of

14    treatment for active toxoplasmosis with a pyrimethamine-based

15    treatment plan being A1 and the SMP/TMX being B2, correct?

16    A.   B1.

17    Q.   B1?

18    A.   Correct.

19    Q.   Sorry.

20           The reason for that gradation is solely as a result of

21    the guidelines you mentioned in your testimony, correct?

22    A.   The basis of those gradations are based upon the strength

23    of the evidence.  That is where the A and B differ in terms of

24    the strength of the data supporting each one of those choices.

25    Q.   Correct.

LCFKFTC3                     Hardy - Recross

1        And you, at the beginning of your redirect, explained

2   the hierarchy of the type of strength to go into that type of

3   evidence for the guidelines, correct?

4   A.  Correct.

5   Q.  So, number one, best evidence would be clinical review

6   trials, correct?

7   A.  Randomized controlled clinical trials are looked upon as

8   the highest level of testing medications, yes.

9   Q.  So, ideally, you would have those types of tests to test

10  the various treatment options for active toxoplasmosis,

11  correct?

12  A.  Correct.

13  Q.  And then you said the number two, if you don't have the

14  ability to do CRTs, the next best type of evidence would be

15  peer-reviewed studies, correct?

16  A.  Would be peer-reviewed cohort studies or what's called a

17  meta-analysis, a systemic review, of a collection of small

18  studies or even case reports.

19  Q.  And just to be clear, there are no available CRTs or

20  peer-reviewed studies establishing the benefits of a

21  pyrimethamine-based regimen versus SMP/TMX that have been

22  published since be 2000, correct?

23  A.  Since 2000?  I know that one was published in the 1990s,

24  the one from Italy.  There was a second one from Thailand that

25  was published — I don't have the exact date when that was

LCFKFTC3                    Hardy - Recross

1    published.  That may have been published after 2000.  I don't

2    remember exactly the date on that, but there are two, there are

3    two randomized controlled trials.  The one from Italy was

4    small — 77 patients.  The problem with that study was that, in

5    my opinion, it was a bit sloppy in the way the diagnosis of

6    toxoplasmosis was confirmed.  There was no antibody test that

7    is normally and preferentially done to show the patient is

8    harboring toxoplasmosis in their body.  They simply used a

9    brain-imaging study to make the diagnosis.

10          When those patients in whom there was serologic

11   confirmation of toxoplasmosis infection were taken out of that

12   study, it really loses its statistical power very quickly.

13          The other study, from Thailand, was never finished.

14   The rate of problems or why they couldn't enroll more patients

15   or other situations was not entirely clear, but it was never

16   finished.  So it never reached the point where any statistical

17   power was available.  So there has been attempts to do this.  I

18   don't remember when the Thai study was published, though.  It

19   may have been after 2000.

20   Q.  So just to be crystal clear, the two ideal forms of

21   evidence to support the guidelines are randomized clinical

22   trials or peer-reviewed studies, and you're only aware of two

23   such studies since 1990, correct?

24   A.  Correct.

25   Q.  And both of those results, despite the limitations that you

LCFKFTC3                    Hardy - Recross

1    just described, revealed no significant difference between

2    treatment of active toxoplasmosis between Bactrim and Daraprim,

3    correct?

4    A.   I think the best way -- that was the conclusion of the

5    authors, yes.  That was the conclusion of the authors.

6    Q.   And there have been no other clinical randomized trials or

7    peer-reviewed studies on this topic since 1990 despite those

8    two, correct?

9    A.   I don't believe so for active toxoplasmosis in the brain.

10            MR. McCONNELL:  Thank you.

11            No further questions, your Honor.

12            THE COURT:  There was a series of questions, Doctor,

13   about survival rates, and I'm not sure I understand the import

14   of those questions entirely.  I'm sure counsel will enlighten

15   me down the road.

16            But with respect to an HIV population, particularly

17   before the antiviral drugs were introduced in, I think you

18   said, 1996 --

19            THE WITNESS:  Correct.

20            THE COURT:  -- what can you say about survival rates

21   when a patient also has active toxoplasmosis?

22            THE WITNESS:  Active toxoplasmosis is a high mortality

23   disease.  The estimates of around 30 to maybe 40 percent death

24   either because of lack of treatment success or because of

25   recurrence after the initial treatment, and death due to that

LCFKFTC3                    Hardy - Recross

1    was very common during those days.

2            I can tell you that what we as physicians were simply

3    doing was postponing the inevitable in terms of trying to treat

4    several, oftentimes at one time, in one patient, opportunistic

5    infection.  And toxoplasmosis was always one of the worst

6    because it involves probably the most important organ in the

7    body — the brain.  And, therefore, survival really depended

8    upon promptness of diagnosis, promptness of institution of

9    treatment, completion of treatment, which went very easily six

10   to eight weeks, and then in order to ensure some degree of

11   latency of the organism, promptly putting the patient on the

12   secondary prophylactic or maintenance regimen.

13           What we were finding, of course, was an ever-declining

14   immune system and trying to use pharmacologic coverage as a way

15   to make up for that ever-declining immune system.

16           Sometimes that worked very well, sometimes it didn't.

17   I would just say in my experience, the average lifespan for a

18   person who was diagnosed with toxoplasmosis before 1996 was no

19   greater than 12 to 18 months.

20           THE COURT:  And, typically, for that patient

21   population, were they suffering solely from active

22   toxoplasmosis, or were there a variety of infections that had

23   to be addressed at the same time?

24           THE WITNESS:  At the immunological deficit level that

25   toxoplasmosis occurs, which means that they have -- and this

LCFKFTC3                    Hardy - Recross

1    has been very clearly worked out by many studies — at CB4

2    positive T cell count, an immune cell count of 100 or less,

3    when the normal range is between 500 to 1500, at a T cell count

4    less than 100, the person is susceptible to many opportunistic

5    infections — pneumocystis pneumonia, cryptococcal meningitis,

6    candidal infections throughout the esophagus and other parts of

7    the gastrointestinal tract, cryptosporidiosis causing horrible

8    diarrhea.

9         So what oftentimes we were dealing with was a series,

10   and sometimes even concurrencies of these infections, which

11   made treatment oftentimes difficult.

12        So this is something that I look back on in my memory

13   as being a very difficult time of watching persons die of

14   diseases that were kind of converging on them, and the ability

15   to treat or prevent all of them was a great difficult chore.

16        THE COURT:  Because of that, is it difficult to say

17   what a survival rate is due to one infection, when there are

18   multiple attacks on the system?

19        THE WITNESS:  Exactly.  I think you are perceiving

20   this very clearly, in the fact that mortality due to a single

21   opportunistic infection was very hard during that period of

22   time to really delineate.  We could only say a patient would

23   die with a disease, not necessarily of a disease.  It

24   oftentimes was the last opportunistic infection we diagnosed

25   that became the cause of the disease, or at least a

LCFKFTC3                    Hardy - Recross

1    contributing cause, but there were probably many infections,

2    some of which we didn't even diagnose.

3              THE COURT:  So let's take 1996 and the miracle with

4    which these patients and the physicians treating them were

5    given.

6              What can you say on the same topic of survival rates

7    with patients who have active toxoplasmosis after 1996?

8              THE WITNESS:  It was really almost like night and day.

9              Number one, one of the most important impacts of

10   successful anti-retroviral therapy was reconstitution of the

11   immune system and T cell counts that were always going down

12   reversed and starting going up.

13             We learned very quickly that if a patient had a T cell

14   count less than 100 and was at risk for toxoplasmosis, and

15   often had to be on prophylaxis primary prevention, as soon as

16   that T cell count got over 150, we could stop the prophylaxis,

17   and the cases of toxo really diminished very quickly because of

18   that, because of the healing power that the anti-retroviral

19   medications had of reconstituting the immune system that was

20   really the big problem, is why all of these opportunistic

21   infections were occurring.  So survival was remarkably

22   different, and the number of cases of toxoplasmosis also

23   decreased remarkably to those persons who were afforded the

24   availability of the anti-retroviral medication.

25             THE COURT:  Thank you.

LCFKFTC3                      Hardy - Recross

1          So, based on my questions of Dr. Hardy, do counsel

2     have any additional questions?

3          MS. PEAY:  No further questions for plaintiffs, your

4     Honor.

5          MR. McCONNELL:  Sean McConnell, your Honor, for

6     defendant, Shkreli.

7          No further questions.  Thank you.

8          THE COURT:  Thank you.

9          So, Doctor, I can't let you leave the stand without

10    thanking you for the care you've given to your patients and

11    those who love them, and so thank you.

12          (Witness excused)

13          THE COURT:  Next witness.

14          MR. MEIER:  Your Honor, Markus Meier, on behalf of the

15    FTC.

16          We'd call -- first of all, let me introduce the

17    attorney from the FTC who will be handling this.  It is

18    Attorney Black, and the witness is Christina Ghorban.

19          THE COURT:  Is it Ms. Ghorban?

20          THE WITNESS:  Yes.

21     CHRISTINA GHORBAN,

22         called as a witness by the Plaintiffs,

23         having been duly sworn, testified as follows.  Please be

24    seated you may remove your mask you may stated your full name.?

25          THE WITNESS:  Christina Ghorban.

LCFKFTC3                          Ghorban – Direct

1              THE COURT:  Can you spell your first and last name,

2     please?

3              THE WITNESS:  C-h-r-i-s-t-i-n-a G-h-o-r-b-a-n.

4              THE COURT:  Counsel.

5              MX. BLACK:  Thank you, your Honor, and good afternoon.

6              Armine Black, on behalf of plaintiffs, and good

7     afternoon, Ms. Ghorban.

8     DIRECT EXAMINATION

9     BY MX. BLACK:

10    Q.  Ms. Ghorban, let's begin with your professional background

11    and responsibilities when you worked at Vyera.

12             You worked at Vyera from April 2015 to October 2016,

13    correct?

14    A.  Yes.  It was Turing Pharmaceuticals then.

15    Q.  Understood.

16             And for the clarity of the record, I will refer to

17    Turing and Vyera interchangeably.

18             Will you understand me to refer to the same company?

19    A.  Yes, I will.

20    Q.  You were Vyera's head of marketing and business analytics

21    when you left the company, correct?

22    A.  Yes.

23    Q.  One of your responsibilities at Vyera was to support

24    commercial assessment of potential drug acquisition targets,

25    correct?

LCFKFTC3                        Ghorban - Direct

1   A.  Yes.

2   Q.  And one of the drugs you helped to evaluate for acquisition

3   was Daraprim, correct?

4   A.  Yes.

5   Q.  Vyera bought Daraprim in early August of 2015, correct?

6   A.  Yes.

7   Q.  And after Vyera acquired Daraprim, you managed the launch

8   of Daraprim?

9   A.  Yes, along with other people.

10  Q.  In fact, you led all aspects of Daraprim's launch after

11  acquisition, correct?

12  A.  I participated in a lot of the launch activities.  I was

13  not the chief commercial officer.

14  Q.  And the chief commercial officer was Nancy Retzlaff?

15  A.  Yes, it was.

16  Q.  And she was your boss?

17  A.  She was my boss, yes.

18  Q.  You reported directly to her?

19  A.  Yes.

20  Q.  And she reported directly to Martin Shkreli?

21  A.  Yes.

22  Q.  Ms. Ghorban, you helped to set up Vyera's Daraprim

23  distribution system, correct?

24  A.  Yes.

25  Q.  You helped to set up Vyera's Daraprim distribution

LCFKFTC3                     Ghorban - Direct

1    agreement?

2    A.   Yes.

3    Q.   You helped to manage the distribution agreements after they

4    were set up?

5    A.   Yes.

6    Q.   And you tracked where Daraprim's sales went?

7    A.   Yes.

8    Q.   And Ms. Ghorban, outside of Vyera, you have -- or including

9    Vyera, you have to about 20 years of experience in the

10   pharmaceutical industry, correct?

11   A.   Yes.

12   Q.   And you have worked at six different companies over the

13   course of your career?

14   A.   I believe so.

15   Q.   And these were pharmaceutical companies?

16   A.   Yes.   There was a brief stint where I was consulting, but,

17   otherwise, yes.

18   Q.   Now, let's talk a little bit about your interactions with

19   Martin Shkreli during your time at Vyera.

20        Martin Shkreli was Vyera's CEO when you joined the

21   company in April of 2015, correct?

22   A.   Yes.

23   Q.   Did Shkreli interview you for the job?

24   A.   I don't recall.

25   Q.   Martin Shkreli remained the CEO until December of 2015,

319

LCFKFTC3                    Ghorban - Direct

1   when he was arrested, correct?

2   A.  Yes.

3   Q.  So you overlapped with Mr. Shkreli for about nine months?

4   A.  Yes.

5   Q.  And during those nine months, you saw him on a regular

6   basis?

7   A.  Yes.

8   Q.  And how often is a regular basis?

9   A.  Every day, multiple times a day.

10  Q.  You had direct interactions with Martin Shkreli about

11  Daraprim acquisition?

12  A.  Yes.

13  Q.  And you had direct interactions with Martin Shkreli about

14  Daraprim price increase?

15  A.  Yes.

16  Q.  And you had direct interactions with Martin Shkreli about

17  Daraprim distribution?

18  A.  I don't recall if it was directly with Martin at that time

19  or if it was through his team of business development

20  colleagues.

21            (Continued on next page)

22

23

24

25

LCFMFTC4                    Ghorban - Direct

1   Q.  Martin Shkreli asked you about Daraprim distribution

2   channels, correct?

3   A.  After the acquisition or before?

4   Q.  Either.

5   A.  I know we had discussions of the distribution.  I would

6   think it would have been before and after.  There were a lot of

7   conversations that happened during that period.

8   Q.  Martin Shkreli definitely asked you about Daraprim sales

9   after acquisition?

10  A.  Yes.

11  Q.  And you gave Martin Shkreli updates on Daraprim business

12  and the source of the business after acquisition?

13  A.  Yes.

14  Q.  And you took direction from Martin Shkreli about Daraprim

15  business, correct?

16  A.  Yes.

17  Q.  Ms. Ghorban, you mentioned earlier Vyera's business

18  development team.  I would like to ask you some questions about

19  that.

20        The role of Vyera's business development team was to

21  find drug acquisition targets for the company, correct?

22  A.  That was one of their roles.  The other one was to ensure

23  the direction for those products that were acquired were

24  carried out by the rest of the organization.

25  Q.  And the directions came from Martin Shkreli?

LCFMFTC4                    Ghorban - Direct

1    A.  I think directly from him, but also they discussed them in

2    meetings pretty frequently, so overall strategy was decided by

3    that team quite often.

4    Q.  And evaluation of Daraprim acquisition was led by the

5    business development team?

6    A.  Yes.

7    Q.  And Martin Shkreli as well?

8    A.  Yes.

9    Q.  Martin Shkreli directed Vyera's business development team?

10   A.  Yes.

11   Q.  And he directed Vyera's business development team in

12   addition to serving as the CEO of the company?

13   A.  Yes.

14   Q.  Was Michael Smith a member of the business development

15   team?

16   A.  Yes, he was.

17   Q.  He came to Vyera from Retrophin?

18   A.  I believe so.

19   Q.  Patrick Crutcher was a member of the business development

20   team?

21   A.  Yes.

22   Q.  He also came to Vyera from Retrophin?

23   A.  I believe so.

24   Q.  And Edwin Urrutia of the business development team?

25   A.  Yes.

LCFMFTC4                    Ghorban - Direct

1    Q.  He as well came to Vyera from Retrophin?

2    A.  I don't know.  I don't recall where he came from.

3    Q.  And Ron Tilles was a member of the business development

4    team?

5    A.  I don't remember what his role was at that time that we

6    acquired Daraprim.

7    Q.  Did he become a member of the business development team

8    eventually?

9    A.  I don't recall him being a part of that team.  I'm not

10   exactly sure what role he played until after Martin left.

11   Q.  After Martin left, Martin Shkreli left, he became the CEO?

12   A.  Yes.

13   Q.  Mr. Tilles joined Vyera from Retrophin as well?

14   A.  I don't know.

15   Q.  Ms. Ghorban, let's briefly discuss Mr. Shkreli's

16   involvement in Vyera after he resigned as the CEO.

17   A.  OK.

18   Q.  You don't recall directly communicating to Martin Shkreli

19   after he resigned as the CEO, correct?

20   A.  No.  I had no phone calls or texts with him.

21   Q.  But it is your understanding that Shkreli continued talking

22   to Vyera's business development team after he left as CEO, is

23   that correct?

24   A.  That was my understanding.

25   Q.  And it was your understanding that there was a certain

LCFMFTC4                        Ghorban - Direct

1    number of people at Vyera who continued to have a relationship

2    with him after he left as CEO of the company?

3    A.  Yes.  I was told that.

4    Q.  Who told you that?

5    A.  I believe it was Michael Smith told me that.  I believe

6    Edwin told me that as well.

7              THE COURT:  Edwin --

8              THE WITNESS:  Edwin Urrutia.  I don't recall who else,

9    but I know that we were hearing -- I was getting requests from

10   people within the organization for information and data,

11   updates on the path of Martin.

12   Q.  You were getting requests about Daraprim business?

13             MR. CASEY:  Your Honor.  I am going to object.  These

14   questions are eliciting hearsay.

15             THE COURT:  Overruled.

16   Q.  I'll reask the question, Ms. Ghorban.

17             You said earlier that you were getting requests about

18   data?

19   A.  Yes.

20   Q.  Were those requests concerning Daraprim business?

21   A.  Yes.

22   Q.  And Vyera's business more generally?

23   A.  It was primarily focused on Daraprim because that was the

24   entire business at that time.

25             THE COURT:  Counsel, I think you might need to move

LCFMFTC4                    Ghorban - Direct

1   that mic.

2          THE WITNESS:  Is it me?

3          THE COURT:  I don't think it's the witness.  I think

4   it's counsel.

5          MS. BLACK:  Thank you, your Honor.  Let me know if

6   issues continue.

7   Q.  What was the nature of the request that you were getting

8   about Daraprim business?

9   A.  I don't recall offhand, but we were giving regular reports

10  about sales, regular reports about contracting.  There were

11  just sort of general business reports that you would report in

12  any company.

13  Q.  Those were the reports that you would present or were those

14  reports that were given to you?

15  A.  No.  They were reports that my team created.

16  Q.  Those reports were presented to Martin Shkreli?

17  A.  I gave them to whoever asked them, asked for them, so it

18  could have been Nancy, it could have been Michael Smith.  It

19  could have been any number of people on the business

20  development team.

21  Q.  And the members of the business development team continued

22  talking to Martin Shkreli after he left as CEO?

23  A.  That was my understanding, yes.

24  Q.  Now, let's focus on the Daraprim acquisition.  Vyera's

25  evaluation of Daraprim acquisition occurred in the spring,

LCFMFTC4                        Ghorban - Direct

1   summer of 2015?

2   A.   Yes, I believe so.

3   Q.   And you helped Martin Shkreli and the business development

4   team to evaluate drug Daraprim as a possible acquisition

5   target?

6   A.   I helped, but it was not in a primary role.

7   Q.   You participated in a lot of discussions about Daraprim

8   acquisition?

9   A.   Some, yes.

10  Q.   I believe you testified in your deposition that you

11  participated in a lot of discussions about Daraprim, correct?

12  A.   Yeah.  There were a lot of discussions and it was

13  definitely an important topic.

14  Q.   These discussions were led by the business development

15  team?

16  A.   Yes, they were.

17  Q.   And Martin Shkreli?

18  A.   Yes.

19  Q.   As part of the Daraprim acquisition you helped to evaluate

20  the opportunities and challenges with acquiring Daraprim?

21  A.   Yes, I did.

22  Q.   You conducted market research --

23  A.   Yes.

24  Q.   -- into Daraprim?

25  A.   Yes.

LCFMFTC4                          Ghorban - Direct

1    Q.  And you presented your findings to Mr. Shkreli?

2    A.  I don't recall if I presented them directly to him, but I

3    did do a report on it.  I think we included the findings and

4    some of the internal documents.

5    Q.  You presented your findings to Nancy Retzlaff?

6    A.  Yes.

7    Q.  And the business development team?

8    A.  I don't recall if we presented them directly to them, but

9    they had -- I know I sent them the report.

10   Q.  You sent your findings to the business development team?

11   A.  I believe so.

12   Q.  Now, let's focus on your discussions about Daraprim price

13   increase after acquisition.

14          Martin Shkreli was involved with the Daraprim price

15   increase, correct?

16   A.  He led the strategy behind it.

17   Q.  And you discussed the Daraprim price increase with Martin

18   Shkreli?

19   A.  Yes.

20   Q.  And the business development team?

21   A.  Yes.

22   Q.  And your boss, Nancy Retzlaff?

23   A.  Yes.

24   Q.  How many discussions did you have with Martin Shkreli about

25   the price increase?

LCFMFTC4                    Ghorban - Direct

1   A.  Multiple.  I don't recall how many.  It definitely came up

2   multiple times in multiple different meetings.

3   Q.  More than ten meetings?

4   A.  I don't think I was included in more than ten meetings, but

5   definitely every meeting that we had on Daraprim included a

6   conversation around the price increase.

7   Q.  Those meetings occurred in the spring and summer of 2015?

8   A.  Yes.  I was primarily involved towards the end of that

9   period.

10  Q.  And in these discussions you raised the issue that there

11  could be a pushback to the price increase from Daraprim

12  patients?

13  A.  Yes, I did.

14  Q.  Martin Shkreli did not believe you?

15  A.  He said I didn't know what I was talking about.

16  Q.  And he knew what he was talking about?

17  A.  I don't know what he thought.

18  Q.  Martin Shkreli told you that there will not be any

19  reactions to the price increase from Daraprim patients,

20  correct?

21  A.  He said there wouldn't be any reaction, right.

22  Q.  Shkreli ultimately made the decision to raise the price of

23  Daraprim?

24  A.  Yes.

25  Q.  And the price increase was about 4,000 percent?

**A-1395**

LCFMFTC4                    Ghorban - Direct

1   A.  Yes.

2   Q.  You haven't seen a price increase of this magnitude in your

3   20 years of experience in the pharmaceutical industry, correct?

4   A.  I have not.

5   Q.  It was unprecedented?

6   A.  I can't say that it was unprecedented.  I haven't seen a

7   price increase that high in my experience.

8            MS. BLACK:  Ms. Flint, could you please put Government

9   Exhibit 1228 on the screen.

10  Q.  Ms. Ghorban, I'll be sharing some documents with you today.

11  They will appear on your screen.  I'll ask some questions about

12  them.

13           Is the document on your screen right now?

14  A.  Yes.

15  Q.  Ms. Ghorban, have you seen the document marked as GX-1228

16  before?

17  A.  Yes.

18  Q.  And it is an April 2015 chat between you and Michael Smith,

19  correct?

20  A.  Yes.

21  Q.  And Michael Smith was a member of the business development

22  team?

23  A.  Yes.

24           MS. BLACK:  Your Honor, I move to admit GX-1228 in

25  evidence.

LCFMFTC4                        Ghorban - Direct

1          THE COURT:  Received.

2          (Government Exhibit 1228 received in evidence)

3    Q.  Ms. Ghorban, this is an April 2015 conversation between you

4    and Michael Smith, correct?

5    A.  Yes.

6    Q.  And this occurred about four months before Vyera bought

7    Daraprim?

8    A.  Yes.

9    Q.  I'd like to direct your attention to the line that starts

10   with Tina Ghorban, 9:14 a.m.

11   A.  Yes.

12   Q.  The second sentence says:  Martin also asked us to think

13   about possible commercial challenges to selling Daraprim

14   specifically since that's more near term, and I just wanted to

15   understand the pricing, both current and planned.

16          Do you see that?

17   A.  Yes, I see that.

18   Q.  Martin is Martin Shkreli?

19   A.  Yes.

20   Q.  Does us refer to you and Michael Smith here?

21   A.  I think this refers to us as the commercial team, so myself

22   and Nancy Retzlaff.

23   Q.  Commercial challenges refers to challenges due to the

24   planned price increase?

25   A.  I don't think it was specific to price increase.  I think

LCFMFTC4                    Ghorban - Direct

1   it was just any commercial challenges of selling the product.

2   Q.   Including distribution challenges?

3   A.   I don't think I understood anything about the distribution

4   process at that point, and I hadn't previously worked on

5   distribution, so I wouldn't have considered it.

6   Q.   I'd like to direct your attention now to the line that says

7   Tina Ghorban, 9:20 a.m.

8   A.   Um-hum.

9   Q.   You see where it says:  Just thinking that doctors tend to

10  be less price sensitive, but the HIV patient advocacy groups

11  are really well-organized and very sensitive to issues that

12  disproportionately affect their members.  There could be

13  backlash to such a significant price increase.

14          Do you see that?

15  A.   Yes, I do.

16  Q.   Are you referring to a significant price increase of

17  Daraprim?

18  A.   I can't recall if this was about -- I think we were looking

19  at sulphadiazine as well, but I think it was about Daraprim.

20  Q.   Backlash refers to backlash from patient advocacy groups?

21  A.   Yes.

22  Q.   Staying with the same message, but focusing on the last

23  line where it says:  Seems there are no alternatives, though.

24  So maybe it's a moot point.  Do you see that?

25  A.   Yes, I do.

LCFMFTC4                        Ghorban - Direct

1   Q.  You are saying that there are no alternatives to Daraprim

2   for the treatment of toxoplasmosis here?

3   A.  I think that's what I'm alluding to and this, again, was

4   very early on in the analysis.  So we hadn't quite fully

5   understood the commercial -- the competitive framework.

6   Q.  And you reached this conclusion about there being no

7   alternatives based on your market research in advance of

8   Daraprim acquisition?

9   A.  Again, I think it was very early on, so based on the quick

10  look at the market, I think that's what I came to, was this

11  was -- there were not a lot of alternatives.

12  Q.  Did this remain your conclusion about there being no

13  alternatives as you continued working with Daraprim after

14  acquisition?

15  A.  The conclusion that we came to was that Daraprim plus

16  sulphadiazine was the gold standard for the treatment of active

17  toxoplasmosis.  But there were alternatives, but less desirable

18  alternatives.

19          MS. BLACK:  We can take down this exhibit.  Thank you,

20  Phoebe.

21  Q.  Ms. Ghorban, now let's talk about Daraprim distribution.

22  A.  OK.

23  Q.  To set some definitions first, are you familiar with the

24  term open distribution?

25  A.  I am now.

332

LCFMFTC4                          Ghorban - Direct

1   Q.  Open distribution generally means that a drug is broadly

2   distributed through multiple full-line distributors and

3   available for purchase through retail pharmacies?

4   A.  Yes.

5   Q.  And closed distribution, in contrast, generally means that

6   a drug is distributed through a more limited number of

7   distributors and is not available at retail pharmacist?

8   A.  Yes.

9            THE COURT:  Sorry, counsel.  I lost track of time

10  here.  I'm very sorry.  We are going to take our luncheon

11  recess.  We will start back at 2:00.

12            Enjoy your lunch.  Thank you.

13            (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

LCFKFTC5                    Ghorban – Direct

1                    AFTERNOON SESSION

2                         2:00 P.M.

3          (Trial resumed; in open court)

4          THE COURT:  The witness may retake the stand.

5          Counsel.

6          MX. BLACK:  Yes, your Honor.

7    CHRISTINA GHORBAN, resumed.

8  DIRECT EXAMINATION CONTINUED

9  BY MX. BLACK:

10 Q.  All right.  Welcome back.

11 A.  Thank you.

12 Q.  Right before the recess, we started talking about open and

13 closed distribution.

14          Do you remember that?

15 A.  Yes.

16 Q.  And just to briefly recap, open distribution generally

17 means that a drug is broadly distributed through multiple

18 full-line distributors, correct?

19 A.  Yes.

20 Q.  And available through retail pharmacies?

21 A.  Yes.

22 Q.  And closed distribution generally means that a drug is

23 distributed through a more limited number of distributors,

24 correct?

25 A.  Yes.

LCFKFTC5                    Ghorban - Direct

1  Q.  And is not available at retail pharmacies?

2  A.  That's not a term that I would say is common in the

3  pharmaceutical industry.  I think we usually typically say a

4  product is in retail or it's in specialty.  Those are the terms

5  that I've seen more frequently.

6  Q.  For the first 60 years after Daraprim launched, it was an

7  open distribution, correct?

8          MR. CASEY:  Your Honor, I object.  I don't believe

9  that counsel has established the necessary adversity of this

10  witness to be asking leading questions.

11          THE COURT:  Overruled.

12          THE WITNESS:  Would you repeat the question?

13  BY MX. BLACK:

14  Q.  Yes.

15          For the first 60 years after Daraprim launched, it was

16  in open distribution, correct?

17  A.  I don't know.  I assume that -- I know it was in retail at

18  some point before Vyera acquired it.

19  Q.  During your time at Vyera, Daraprim was distributed through

20  a closed distribution system, correct?

21  A.  It was distributed through specialty pharmacies and

22  institutions.

23  Q.  And that kind of distribution is more closed than the open

24  distribution, which is defined?

25  A.  Closed, meaning -- what do you mean when you say "closed"?

LCFKFTC5                    Ghorban - Direct

1            THE COURT:  It's more closed than retail distribution?

2            THE WITNESS:  It's limited.  Yeah, there's more -- the

3    distribution is limited to a fewer number of outlets.

4    BY MX. BLACK:

5    Q.  And limited distribution is sometimes referred to as closed

6    distribution?

7    A.  Vyera was the only place I've ever heard it referred to it

8    as that way.  I had never heard that term, and continue to not

9    hear that term.  It's specialty versus retail mostly, in my

10   experience.

11   Q.  But at Vyera, you heard the term "closed distribution"

12   used?

13   A.  I did hear the term there.

14   Q.  And you heard the business development team using that

15   term?

16   A.  I did.

17   Q.  And Martin Shkreli using that term?

18   A.  I don't recall if I ever heard him say specifically closed

19   distribution, but I think it was on emails, and definitely he

20   was part of those chains.

21   Q.  So since Vyera, the company, referred to Daraprim

22   distribution as closed, I will refer to it as such for this

23   trial.

24   A.  Okay.

25   Q.  Is that okay?

LCFKFTC5                          Ghorban - Direct

1          So Daraprim wasn't available for purchase in retail

2     pharmacies after Vyera acquired the product, correct?

3     A.   Correct.

4     Q.   And it was only available through specialty pharmacies?

5     A.   It was available through specialty pharmacies and

6     institutions.

7     Q.   Such as hospitals?

8     A.   Hospitals.  I believe we opened it up to clinics related to

9     hospitals, ADAPs.  We had stock in Walgreens specialty pharmacy

10    stores that were located in institutions.

11          THE COURT:  What does the term "ADAP" mean?

12          THE WITNESS:  It's AIDS Drug Assistance Program.

13    BY MX. BLACK:

14    Q.   And there were no safety issues with Daraprim, as far as

15    you know, that required a change from open to closed

16    distribution system, correct?

17    A.   Not as far as I know.

18    Q.   Let's focus, Ms. Ghorban, on your conversations with Martin

19    Shkreli and the business development team about the use of

20    closed distribution system for Daraprim.

21          You have heard Martin Shkreli say that closed

22    distribution can make it harder for generics to obtain the

23    branded drug, correct?

24    A.   I don't recall him specifically saying it at any point,

25    but -- I just don't recall.  I know it was a conversation that

LCFKFTC5                    Ghorban - Direct

1   we had multiple times in many different situations before Vyera

2   acquired Daraprim and after.

3   Q.  You testified in your deposition that Martin Shkreli

4   mentioned using closed distribution to prevent generics to

5   obtain Daraprim?

6   A.  Again, I don't recall specifically.  We had a lot of

7   conversations, there were a lot of emails about it.  I think I

8   was forwarded an email.  So I just don't recall, to be honest,

9   a specific instance of him exactly saying that.  But it was a

10  conversation that we had many, many times in multiple meetings,

11  with all -- with him in those meetings, with the BD business

12  development team in those meetings.

13  Q.  In June of 2015, Martin Shkreli and the business

14  development team discussed with you the strategy of using a

15  closed distribution system to prevent generic entry, correct?

16  A.  I think we started getting emails about it, and we started

17  having discussions about it then.

18  Q.  So the answer is yes?

19  A.  Yes.

20  Q.  When you say we started getting questions about it, are you

21  referring to yourself and Nancy Retzlaff?

22  A.  Yes, and the broader commercial team at that time.

23  Q.  Who else was in the commercial team?

24  A.  I think we had a head of sales on that team by that point,

25  we had a small sales team, but it would have been the sales

LCFKFTC5                      Ghorban - Direct

1    leadership, myself, Nancy, perhaps some other marketing people

2    that may have been involved.

3    Q.  Could you name names?

4    A.  It was still a small group.  I can't remember exactly at

5    what point we hired certain people, but there were multiple

6    people involved.

7    Q.  And in those meetings you just mentioned, Martin Shkreli

8    and the business development team discussed using closed

9    distribution to make it harder for generics to acquire

10   Daraprim, correct?

11   A.  Yes.

12   Q.  And generic companies seeking to develop a competing

13   generic Daraprim required Daraprim samples, correct?

14   A.  I believe so.

15   Q.  And Daraprim samples are necessary to show to the FDA that

16   the generic is bioequivalent to Daraprim?

17   A.  Yes, they have to conduct studies that compare their

18   product to the listed product to be able to show equivalence.

19   Q.  And the business development team told you that they had an

20   interest in not making it easy for a generic company to acquire

21   Daraprim?

22   A.  Yes.

23   Q.  And they had this interest because a generic launching with

24   a competing product would have a dramatic impact on Vyera's

25   revenue, correct?

339

LCFKFTC5                          Ghorban - Direct

1   A.   Yes.

2   Q.   And a generic launch would, in fact, dramatically decrease

3   Vyera's revenue?

4   A.   Yes.

5   Q.   It would decimate it?

6   A.   Yes.

7   Q.   Daraprim was Vyera's primary source of revenue during your

8   time, correct?

9   A.   Yes.

10  Q.   So it was one of the objectives of the business development

11  team and Martin Shkreli to impede generic entry?

12  A.   Yes.

13  Q.   And you have heard discussions -- you have had discussions

14  with the business development team about using closed

15  distribution to make it harder for generics to get access to

16  Daraprim?

17  A.   Yes.

18  Q.   And, in fact, multiple people at Vyera discussed that

19  objective with you at multiple times?

20  A.   I would say primarily the business development team.

21  Q.   So the business development team discussed that objective

22  with you on multiple occasions?

23  A.   Yes.

24  Q.   And using a closed distribution to impede generics was very

25  much a topic of discussion at the time of the Daraprim

LCFKFTC5                    Ghorban - Direct

1    acquisition?

2    A.  Yes.

3    Q.  And given the importance of Daraprim to the company's

4    revenue, every single person from business development was

5    involved, at one point or another, in Daraprim distribution

6    contracts, correct?

7    A.  I don't know if every single person on the business

8    development team was involved in contracts.  I would say the

9    three we mentioned — Chris -- sorry, Mike Smith, Edwin Urrutia,

10   Patrick Crutcher — were the ones that I worked most closely

11   with.  I think there were a couple of other people on that team

12   that I didn't have as much contact with.

13   Q.  And Daraprim distribution contracts were incredibly

14   important documents, correct?

15   A.  Yes.

16   Q.  Because they enabled Vyera to sell product?

17   A.  Yes.

18   Q.  And generate sales?

19   A.  Generate revenue, yes.

20   Q.  And every person who was interested, which included Martin

21   Shkreli and his business development team, reviewed

22   distribution contracts?

23   A.  I don't know that every single person reviewed the

24   distribution contracts.  They're fairly lengthy, there's a lot

25   of legal terminology.  Legal definitely reviewed the

LCFKFTC5                    Ghorban - Direct

1    distribution contracts.  I recall sitting in with Mike Smith

2    and going pretty thoroughly through some of the contracts.  I

3    shared a lot of contracts, but I don't know that every single

4    person reviewed them.

5    Q.  Why don't we take a look at your deposition.

6          MX. BLACK:  Phoebe, could you bring up page 226.

7    Q.  Ms. Ghorban, do you have it on your screen?

8    A.  Yes.

9    Q.  Do you see, starting on line 4:

10   "Q.  Do you remember Mr. Shkreli being involved in these

11   distribution contracts in any way that wasn't hands-on like the

12   manner you described?"

13         And then starting on line 9:

14   "A.  I don't remember -- I don't remember specifics.  I know

15   that they were incredibly important documents because it

16   enabled us to sell the product and distribute the product and

17   would generate sales.  So I know that every person who was

18   interested, which was him and his team and obviously the

19   commercial leadership, would have reviewed it."

20         Do you see that?

21   A.  I see that.

22         MR. CASEY:  Your Honor, I object to the witness using

23   this for impeachment.  I don't think it's proper impeachment

24   when it hasn't been established as to whether the witness

25   testified contrary to the deposition.

LCFKFTC5                    Ghorban - Direct

 1          THE COURT:  Sustained.  Stricken.

 2          MX. BLACK:  Could I use it for refreshment?

 3          THE COURT:  Certainly, but you need to lay a

 4   foundation.

 5   BY MX. BLACK:

 6   Q.  Ms. Ghorban, you testified earlier that you did not

 7   remember every single person reviewing Daraprim distribution

 8   contracts, correct?

 9   A.  Correct.

10   Q.  Would looking at your deposition transcript refresh your

11   memory?

12          MR. CASEY:  Objection, your Honor.  She's trying to

13   impeach the witness --

14          THE COURT:  Sustained.  Sustained.

15          MX. BLACK:  Okay.  I'll move on.

16   BY MX. BLACK:

17   Q.  Ms. Ghorban, let's take a look at one other document.

18          MX. BLACK:  Phoebe, could you bring up GX 1207.

19   Q.  Do you see it on your screen?

20   A.  I see that.

21   Q.  And GX 1207 is an April 2015 email chain from Michael Smith

22   to you and Nancy Retzlaff?

23   A.  Yes, I see it.

24   Q.  And the subject line is sulfadiazine?

25   A.  Yes.

LCFKFTC5                    Ghorban - Direct

1           MX. BLACK:  Your Honor, I move Exhibit 1207 in

2    evidence.

3           THE COURT:  Received.

4           (Government's Exhibit 1207 received in evidence)

5    BY MX. BLACK:

6    Q.  Ms. Ghorban, let's look at the bottom email on this page

7    from Michael Smith.

8           And Michael Smith was on the business development

9    team?

10   A.  Yes.

11   Q.  The email says, "Another item to keep on your radar is

12   sulfadiazine.  It is a sole-source (U.S. only, generic ex U.S.)

13   infectious disease product from Sandoz indicated for

14   toxoplasmosis.  This would be the classic closed distribution

15   play.  We think it could do more than 250 million per annum.  I

16   have attached a short dec and the model for some quick

17   background."

18          Do you see that?

19   A.  I do.

20   Q.  I think you mentioned already earlier that sulfadiazine was

21   another product that Vyera was considering acquiring around

22   spring/summer of 2015?

23   A.  Yes.

24   Q.  And sulfadiazine was a sole-source product in the United

25   States?

LCFKFTC5                    Ghorban - Direct

1   A.   That's what he's telling me in this email.

2   Q.   And "sole source" means that there is only one company

3   producing that product with that API?

4   A.   I don't know about the API part, but it's the way that I

5   interpret it as, it's one company selling the product.

6   Q.   And it means that it doesn't have a generic competitor?

7   A.   I don't know if this is a brand, so I can't say that it has

8   a generic competitor or not.  If it's a generic, then it's a

9   generic, but it just tells me that this is -- there's only one

10  company selling this product at the moment.  It could be brand

11  or generic.

12  Q.   Got it.

13          So, in this case, it would mean it was the only

14  generic on the market?

15  A.   It was the only product -- the only product of that

16  molecule on the market.

17  Q.   And Michael Smith is using the term "classic closed

18  distribution play," correct?

19  A.   Yes, that's the term he's using.

20  Q.   And that term refers to the concept that you could use

21  closed distribution to make it more difficult for generics to

22  get reference-listed drugs for bioequivalence studies, correct?

23  A.   I know that now.  I didn't know that at the time.  I didn't

24  know what he meant by that.  I had never heard that term

25  before.

LCFKFTC5                    Ghorban - Direct

1   Q.  But you understand it to mean that now?

2   A.  Yes.

3   Q.  And using closed distribution -- strike that.

4        So Vyera was considering a closed distribution

5   strategy for sulfadiazine to impede generic -- another generic

6   competitor?

7   A.  Yeah, I think that's what he meant.

8   Q.  So let's look at the top email in the same document,

9   GX 1207.  And the second paragraph, the second full paragraph,

10  says -- it starts with, "We are also now in the process" -- so

11  it says, "We are also now in the process of bidding for

12  Daraprim (pyrimethamine) as a sole-source product from Impax

13  Labs.  Pyrimethamine plus sulfadiazine combo therapy is the

14  gold standard for toxoplasmosis.  I would build a similar dec

15  specific to Daraprim."

16       Do you see that?

17  A.  Yes, I do.

18  Q.  So this email was sent on April 29, 2015, correct?

19  A.  Yes.

20  Q.  And it was when around the time business development team

21  was evaluating Daraprim as a potential acquisition target?

22  A.  Yes.

23  Q.  And pyrimethamine refers to the active ingredient in

24  Daraprim?

25  A.  Yes.  It's the generic name for it.

LCFKFTC5                    Ghorban - Direct

1   Q.  And a sole-source product means that -- that refers to

2   Daraprim not having pyrimethamine competitors in the United

3   States?

4   A.  Correct.

5   Q.  And it mattered to the business development team that

6   Daraprim didn't have generic competitors, correct?

7   A.  Yes.

8   Q.  And why did it matter?

9   A.  There was an increased opportunity for revenue.

10       MX. BLACK:  Thanks, Phoebe.  You can take it down.

11   Q.  Let's look at another document.

12       MX. BLACK:  Phoebe, could you bring up GX 1303 --

13   sorry, sorry, 1302.

14   Q.  Ms. Ghorban, do you have GX 1302 on your screen?

15   A.  I do.

16       MX. BLACK:  Your Honor, GX 1302 is already in evidence

17   as one of the documents on plaintiffs' first list of exhibits

18   to be admitted in GX 9001.

19   Q.  So, Ms. Ghorban, GX 1302 is a June 2015 email chain from

20   Nancy Retzlaff, your boss and chief commercial officer at the

21   time, correct?

22   A.  Yes.

23   Q.  The subject line is Project DART.

24       Do you see that?

25   A.  Yes.

LCFKFTC5                    Ghorban - Direct

1   Q.  And Project DART is the code name for Vyera's plan to buy

2   Daraprim?

3   A.  Yes.

4   Q.  Now let's take a look at the bottom email on the first

5   page.  And it carries over to the next page, but we can start

6   on the first page.

7          It says, "Tina, Rick:  Martin shared an update today

8   re Project DART (Daraprim) at the leadership team today.  Based

9   on today's discussions, he anticipates roughly a two-week

10  timeline until the deal potentially closes.  As you're both

11  aware, the priority work stream is to ensure the product is

12  moved into closed distribution as swiftly as possible in order

13  to minimize exposure."

14          Do you see that?

15  A.  I do.

16  Q.  So this email is from June 9, 2015?

17  A.  Yes.

18  Q.  And that was two months before Vyera acquired Daraprim?

19  A.  Yes.

20  Q.  And "Martin" in this email refers to Martin Shkreli?

21  A.  Yes.

22  Q.  "Priority work stream' refers to the highest priority

23  tasks?

24  A.  Yes.

25  Q.  Which was said by Martin Shkreli?

LCFKFTC5                      Ghorban - Direct

1   A.  I'm assuming because he said it's an update and based on

2   other conversations.

3   Q.  Do you have any reason to doubt that it was said by Martin

4   Shkreli?

5   A.  No.

6   Q.  Where it says "to ensure the product is moved into closed

7   distribution," "the product" refers to Daraprim?

8   A.  Yes.

9   Q.  So the highest priority task said by Martin Shkreli was

10  moving Daraprim into a closed distribution system after

11  acquisition?

12  A.  That's what she's saying, yes.

13  Q.  And that was true?

14  A.  It was one of the -- it was one of the priorities, yes.  It

15  was a priority for the business development team.

16  Q.  And Martin Shkreli?

17  A.  Yes.

18  Q.  And it was necessary to do it as swiftly as possible to

19  minimize exposure to generic competitors being able to access

20  Daraprim?

21  A.  Yes.

22          MX. BLACK:  Thanks, Phoebe.  You can take it down.

23  Q.  Ms. Ghorban, let's talk now a little bit about IQVIA data.

24  A.  Okay.

25  Q.  IQVIA is a standard data source in the pharmaceutical

LCFKFTC5                    Ghorban - Direct

1   industry, correct?

2   A.  Yes, it is.

3   Q.  And it used to be called IMS, correct?

4   A.  Correct.

5   Q.  IQVIA collects and reports a variety of pharmaceutical

6   data?

7   A.  Yes.

8   Q.  It captures prescribing data?

9   A.  Yes.

10  Q.  Sales data?

11  A.  Yes.

12  Q.  Data around patients' age groups?

13  A.  Yes.

14  Q.  Prescribers' specialties?

15  A.  Yes.

16  Q.  And prescribers' age groups?

17  A.  Yes.  And a lot more stuff.  There's a lot more data in

18  there than just those.

19  Q.  It's a rich dataset?

20  A.  Yes.

21  Q.  And IQVIA data is a standard data source that companies and

22  analysts will look at to understand the dynamics of markets and

23  products?

24  A.  Yes.

25  Q.  In your experience, IQVIA data is always part of the

LCFKFTC5                        Ghorban - Direct

1    assessment in decisions to acquire a product, correct?

2    A.  It's always a starting point.

3    Q.  You always check IQVIA data to assess products for drug

4    acquisition?

5    A.  Yes.

6    Q.  And you always check IQVIA data to assess products for drug

7    development?

8    A.  Yes.  Or Symphony.  Symphony is another data source.

9    Q.  So Symphony is another pharmaceutical data aggregator?

10   A.  Yes.

11   Q.  And IQVIA data isn't free, correct?

12   A.  No.  As a pharmaceutical company, you have to pay for a

13   subscription.

14   Q.  And Vyera, in fact, had paid for a subscription to IQVIA

15   data when you were at the company?

16   A.  Yes.

17   Q.  And you looked at IQVIA data to assess Daraprim for

18   acquisition?

19   A.  I know I would have checked IQVIA.  I don't know if there

20   was -- it's a small product -- it was a small product, so when

21   you have smaller products, the data is not as consistent and is

22   not as reliable, but I would have started there.

23   Q.  So you looked at IQVIA data as a starting point?

24   A.  Yes.

25   Q.  And Vyera's business development team also looked at IQVIA

351

                LCFKFTC5                    Ghorban – Direct

1    data?

2    A.  I think they used an epidemiological model, which is

3    patient-based, but I'm sure they would have looked at IQVIA

4    data as well.

5    Q.  For Daraprim?

6    A.  Yeah.

7    Q.  Now, let's discuss the direction you received from the

8    business development team about blocking Daraprim data.

9         So after the Daraprim acquisition, the business

10   development team asked you to talk to Daraprim distributors

11   about not reporting Daraprim distribution data to IQVIA and

12   other data aggregators, correct?

13   A.  Yes.

14   Q.  And other data aggregators would have included Symphony?

15   A.  Yes.

16   Q.  And one of the reasons that the business development team

17   asked you to talk to Daraprim distributors about this issue was

18   so that data-reporting companies would show less in terms of

19   volume and sales for Daraprim?

20   A.  Yes.

21   Q.  And that mattered because if sales looked like they were

22   going down, there would be less interest from other companies

23   to develop generic Daraprim?

24   A.  That was their belief.

25   Q.  And data blocking was part of the business

LCFKFTC5                        Ghorban - Direct

1    development team's strategy to discourage generic entry?

2    A.   Yes.

3    Q.   And it was part of Martin Shkreli's strategy?

4    A.   Yes.

5    Q.   And this strategy was communicated to you on multiple

6    occasions?

7    A.   Yes.

8    Q.   You had multiple conversations with the business

9    development team about data blocking?

10   A.   Yes.

11   Q.   And Martin Shkreli was involved in those conversations?

12   A.   I think we started talking about data blocking after the

13   acquisition, so I was mostly dealing with the BD team directly

14   at that point about some of the details, but the BD team talked

15   to him on a regular basis, and I know we had bigger discussions

16   about it.

17   Q.   And you know, through the business development team, that

18   Shkreli requested that IQVIA data -- sorry, that IQVIA not have

19   their Daraprim data?

20   A.   Yes.  They actually asked me to track the data in IQVIA to

21   see if it was going down.

22   Q.   And Shkreli made that request, right, that IQVIA not have

23   Daraprim data?

24   A.   Yes.

25   Q.   Now, let's talk a little bit about your conversations with

LCFKFTC5                        Ghorban - Direct

1   Daraprim distributors about blocking Daraprim data.

2              MX. BLACK:  Phoebe, could you bring up GX 1556.

3   Q.  So GX 1556 is an August 2015 email chain from Michael

4   Smith, a member of the business development team, correct?

5   A.  Yes.

6   Q.  And it is to you and Nancy Retzlaff?

7   A.  Yes.

8   Q.  And the subject line is, "Tell Walgreens/ICS We Don't Want

9   Them Reporting To IMS Or Any Other Databases."

10             Do you see that?

11  A.  Yes.

12             MX. BLACK:  Your Honor, I move to admit

13  Exhibit GX 1556 in evidence.

14             THE COURT:  Received.

15             (Government's Exhibit 1556 received in evidence)

16  BY MX. BLACK:

17  Q.  Ms. Ghorban, let's take a look at the bottom email first.

18  It is dated August 10, 2015?

19  A.  Yes.

20  Q.  So it was three days after Vyera bought Daraprim?

21  A.  I don't recall the exact date, but it was early August that

22  the acquisition was complete.

23  Q.  So it was shortly after?

24  A.  I think so.

25  Q.  And the subject is, "Tell Walgreens/ICS We Don't Want Them

LCFKFTC5                    Ghorban - Direct

1    Reporting To IMS Or Any Other Databases."

2          Do you see that?

3    A.   Yes.

4    Q.   Walgreens and ICS were the only Daraprim distributors at

5    the time, correct?

6    A.   Yes.

7    Q.   And "we" in the subject line refers to the business

8    development team?

9    A.   I don't know who he's referring to at that point.  "We" --

10   I would think it would be business development, but I can't,

11   for sure, say.

12   Q.   And "reporting" refers to reporting Daraprim distribution

13   data?

14   A.   Daraprim prescription data and sales data.

15   Q.   And that's Daraprim prescription and sales data that

16   distributors own?

17   A.   I'm sorry, hold on.  It would be -- yeah, for Walgreens, it

18   would be the prescription data, and for ICS, it would be the

19   sales data.

20   Q.   And they owned the data?

21   A.   They collect the data because they distribute the product.

22   Q.   But it is their data to report or not to IQVIA?

23   A.   I don't know if it's their data.  It's kind of the

24   company's data because they report the data back to the

25   company, but, ultimately, it's their decision who they report

LCFKFTC5                     Ghorban - Direct

1   to, who they report the data to.

2   Q.  So they ultimately decide whether or not to report the

3   data?

4   A.  Yes.

5   Q.  Pending any agreement with the manufacturer?

6   A.  Yes.

7   Q.  And other databases in the subject line refers to data

8   aggregators such as Symphony?

9   A.  Yes.

10  Q.  So, shortly after the Daraprim acquisition, Michael Smith

11  asked you to tell Daraprim distributors that Vyera does not

12  want them reporting Daraprim sales and prescription data to

13  IQVIA and other data aggregators, correct?

14  A.  Yes.

15  Q.  Now, let's take a look at your response to the email.

16          So you reply:  "We are talking to both this morning,

17  so will mention it again."

18  A.  Yes.

19  Q.  And "we" refers to you and Nancy Retzlaff?

20  A.  I think it was myself and Nancy.  Mike could have been on

21  the phone.  I'm not exactly sure who it would have been.  There

22  were some other people that were working through the

23  agreements, I believe, and I didn't have any experience in

24  this, so I needed somebody else to help with the process.

25  Q.  And the "Mike" you mentioned, that's Michael Smith?

LCFKFTC5                         Ghorban - Direct

1   A.   Mike Smith, yeah.

2   Q.   So you planned to talk to Walgreens and ICS about data

3   blocking?

4   A.   We were talking to them about the process of reassigning, I

5   think, the contracts and how we set up a vendor relationship

6   with both of them.  So I think, in the context of this email, I

7   was saying we're already talking to them, so we'll mention it

8   again in that conversation.

9   Q.   So you're saying that you will mention data blocking of

10  Daraprim data again to ICS and Walgreens?

11  A.   Yes, in that meeting we already set up.

12  Q.   And you had discussions with Walgreens and ICS about data

13  blocking of Daraprim data before this email?

14  A.   I think we had -- I think we had mentioned it to them.  The

15  context was trying to reassign contracts, establish vendor

16  relationship, make sure that there was no disruption in supply.

17  So this was a component of those discussions.  It wasn't a

18  priority for the commercial team, nor was it an objective to

19  have a conversation; it was part of the larger discussions.

20  Q.   That you had at the direction of the business development

21  team?

22  A.   The conversation about the databases and the data blocking

23  was at the direction of the business development team.  The

24  other conversations were to ensure supply wasn't disrupted.

25          MX. BLACK:  Thanks, Phoebe.  You can take it down.

LCFKFTC5                    Ghorban - Direct

1   Q.  Let's take a look at another document.

2            MX. BLACK:  Phoebe, could you bring up GX 1289.

3   Q.  So GX 1289 is an August 2015 email from you to Nancy

4   Retzlaff, cc'ing Michael Smith?

5   A.  Yes.

6   Q.  And the subject line is:  "Update On Distribution Progress

7   and Additional Questions"?

8   A.  Yes.

9            MX. BLACK:  Your Honor, I move to admit GX 1289 in

10  evidence.

11           THE COURT:  Received.

12           (Government's Exhibit 1289 received in evidence)

13  BY MX. BLACK:

14  Q.  So, in this email, Ms. Ghorban, you followed up on Michael

15  Smith's data blocking request that we just saw and are now

16  updating Nancy Retzlaff and Michael Smith on outstanding items?

17  A.  Yeah.  This is just a general follow-up, and the data

18  blocking is part of that.

19  Q.  And I'd like to focus on the data blocking aspect.

20           Let's take a look under the heading "Walgreens

21  Progress."  And I'd like to focus on the fourth bullet.  It

22  says, "Confirmed that they do not disclose Daraprim sales/Rxs

23  to any data reporting company.  This was in the original

24  contract with Impax."

25  A.  Yes.

LCFKFTC5                          Ghorban - Direct

1   Q.  Do you see that?

2        And "RXs" refers to prescriptions?

3   A.  Yes.

4   Q.  So you talked to Walgreens again?

5   A.  Yes.

6   Q.  And you told them that Vyera didn't want Daraprim

7   distribution data to be reported to IQVIA and other data

8   aggregators?

9   A.  Yes.

10  Q.  And Walgreens confirmed that it does not disclose Daraprim

11  data to any data aggregator?

12  A.  Yes.  That was the agreement they had with Impax before we

13  acquired it.

14  Q.  And you requested that they continue not reporting Daraprim

15  data --

16  A.  Yes.

17  Q.  -- After Vyera took over?

18  A.  Yes.

19  Q.  And data blocking wasn't actually spelled out in Impax's

20  contract with Walgreens, correct?

21  A.  I don't recall.

22  Q.  You do not know why Impax had Walgreens not report data,

23  correct?

24  A.  No, I do not.

25  Q.  It could have also been done to make generic entry less

**A-1426**

LCFKFTC5                      Ghorban – Direct

1   attractive?

2   A.   Based on the theory from the business development team at

3   Vyera, potentially, but I don't know for sure why they did it

4   or when they did it.

5   Q.   Fair enough.

6           Now, let's take a look under the last section, titled

7   "Requests/Questions for ICS."

8           Focusing on the fifth item, it says, "We need them to

9   agree not to report into any sales databases, such as IMS,

10  Symphony, et cetera."

11          Do you see that?

12  A.   Yes.

13  Q.   Who does "we" refer to?

14  A.   "We" is the company.

15  Q.   And that includes Martin Shkreli?

16  A.   Yes.

17  Q.   And "them" refers to ICS?

18  A.   Yes.

19  Q.   So Vyera and Martin Shkreli wanted ICS to agree not to

20  report Daraprim data to IQVIA and other data aggregators?

21  A.   Yes.

22  Q.   And you got ICS to agree to this request?

23  A.   I don't remember if that was actually part of the

24  agreement.  I forget if that made it into the contract or not.

25  Q.   Was there an understanding outside a formal contract that

LCFKFTC5                           Ghorban - Direct

1    ICS would not report data?

2    A.   Not that I'm aware of.  I know I asked -- I requested it of

3    them, but I don't recall if we formalized that and they agreed

4    to it.  But based on my experience, they wouldn't just tell us

5    they weren't going to do it and not put it in a contract.  It

6    would have had to have made it into some contract, I believe.

7              MX. BLACK:  Phoebe, you can take this one down.

8              And I'll share yet another exhibit, and it's GX 1307.

9    Q.   Ms. Ghorban, do you see it on your screen?

10   A.   Yes.

11   Q.   So this is a May 2016 email chain between you and --

12             MX. BLACK:  Actually, could you zoom out, Phoebe.

13   Q.   The whole chain -- most of the chain, I guess, is between

14   you and Elizabeth Feldman from ASD?

15   A.   Yes.

16   Q.   And ASD was one of the Daraprim distributors at the time?

17   A.   Yes.  We added them.

18             MX. BLACK:  Your Honor, I move to admit GX 1307 in

19   evidence.

20             THE COURT:  Received.

21             (Government's Exhibit 1307 received in evidence)

22   BY MX. BLACK:

23   Q.   Now, let's turn to the second page of this email chain, and

24   the second sentence of -- sorry, one second.

25             Yeah, let's take a look at the March 12, 2016 email

LCFKFTC5                        Ghorban - Direct

1   from you to Elizabeth Feldman.  In the second sentence of this

2   email, you write, "Also, I'm not sure if I included language

3   regarding not sharing our sales data with third-party data

4   providers, such as IMS.  We would like that clause added."

5           Do you see that?

6   A.  Yes.

7   Q.  So you requested ASD to block Daraprim distribution data

8   from IQVIA, correct?

9   A.  Yes.

10  Q.  And other data aggregators?

11  A.  Yes.

12  Q.  Such as Symphony?

13  A.  Yes.

14  Q.  And that request came from the business development team?

15  A.  Yes.

16  Q.  And the business development team had an interest to block

17  Daraprim data?

18  A.  Yes.

19  Q.  Still looking at the second page of GX 1307, and focusing

20  on Ms. Feldman's response, it says, "Hi Tina.  I am meeting

21  with legal today to discuss the amendment.  I will also run the

22  data item below by the team.  Usually, as a policy from ABC, we

23  don't agree to block data, but will see what I can do."

24          Do you see that?

25  A.  Yes.

LCFKFTC5                     Ghorban - Direct

1    Q.  "ABC" here refers to AmerisourceBergen?

2    A.  Yes.

3    Q.  And it's ASD's parent company?

4    A.  Yes.

5    Q.  Now, going to page 1 of this exhibit, GX 1307, you follow

6    up at the bottom of the page.  It says, "Hi Liz.  Was there any

7    resolution as to whether you could block data to IMS?  I know

8    ICS was able to comply with us for that request."

9         Do you see that?

10   A.  Yes.

11   Q.  So ICS agreed to block Daraprim data per Vyera's request?

12   A.  I guess they did.

13   Q.  So still staying on the first page of GX 1307, Ms. Feldman

14   responds, "Hello Tina.  I was able to follow up with our data

15   team at the corporate headquarters.  Unfortunately, at this

16   time, we will be unable to block data to IMS.  Missing data

17   devalues our relationship with our third-party aggregator

18   partners and our policy to provide a complete picture of the

19   industry."

20        Do you see that?

21   A.  Yes, I do.

22   Q.  So in May of 2016, ASD did not agree to block its Daraprim

23   sales and prescription data from aggregators?

24   A.  Correct.

25   Q.  Do you know if they eventually agreed to do so?

LCFKFTC5                        Ghorban - Direct

1   A.  I don't -- not -- I don't believe so when I was there.

2   Q.  So not during your time?

3   A.  No.

4   Q.  So now, still staying with GX 1307, looking at the top

5   email on the page, so you forwarded ASD's response to a number

6   of individuals.

7          Do you see that?

8   A.  Yes.

9   Q.  And you forwarded it to Nancy Retzlaff?

10  A.  Yes.

11  Q.  Your boss?

12  A.  Yes.

13  Q.  And several members of the business development team?

14  A.  Correct.

15  Q.  One of them is Edwin Urrutia?

16  A.  Yes.

17  Q.  Another one is Patrick Crutcher?

18  A.  Yes.

19  Q.  And the third one is Michael Smith?

20  A.  Yes.

21  Q.  And you forwarded ASD's request to these individuals

22  because they were the ones who asked for this kind of activity

23  regarding data blocking of Daraprim to go on, correct?

24  A.  Correct.

25          MX. BLACK:  Thanks, Phoebe.  You can take it down.

LCFKFTC5                    Ghorban - Direct

1          I have one last document on data blocking.  Phoebe,

2     could you bring up GX 1405.

3     BY MX. BLACK:

4     Q.  Ms. Ghorban, do you see it on your screen?

5     A.  Yes.

6     Q.  It is a September 2016 email from you with a subject line,

7     "Cardinal Distribution Agreement"?

8     A.  Yes.

9          MX. BLACK:  Your Honor, I move to admit GX 1405 into

10    evidence.

11         THE COURT:  Received.

12         (Government's Exhibit 1405 received in evidence)

13    BY MX. BLACK:

14    Q.  So in this email, Ms. Ghorban, you email Crutcher, Patrick

15    Crutcher, and Michael Smith from the business development team?

16    A.  Yes.

17    Q.  And Nancy Retzlaff?

18    A.  Yes.

19    Q.  And you cc Ron Tilles?

20    A.  I cc Ron and Nancy.

21    Q.  Oh, sorry, yes.  Thanks for that correction.

22         And Ron Tilles was the CEO at the time?

23    A.  On September 14th?  I don't recall if he was the acting CEO

24    or -- he was playing a leadership role.  He may have been still

25    CEO at that time.

**A-1432**

LCFKFTC5                    Ghorban - Direct

1   Q.   So he was either CEO or interim CEO?

2   A.   Yeah, I think so.

3   Q.   Let's take a look at the second sentence, which starts

4   with, "We are expanding distribution to add in Cardinal for

5   inpatient and outpatient hospital pharmacy purchases."

6   A.   Yes.

7   Q.   "This accomplishes two objectives."

8            And focusing on the second objective there, it says,

9   "The BD group's objective of limiting data availability to IMS:

10  Cardinal Specialty is willing to not report their Daraprim

11  sales to IMS.  However, note that their fee for distribution

12  will be 3.05 percent, or 105 basis points, higher than ASD's

13  fee of 2 percent.  IMS is a revenue source for them, and the

14  premium is to compensate them for that lost revenue."

15           Do you see that?

16  A.   Yes, I do.

17  Q.   So the business development group had an objective of

18  limiting data availability to IMS?

19  A.   Yes.

20  Q.   And distributors, such as Cardinal, sell their data to IMS

21  and get paid for it?

22  A.   Yes.

23  Q.   It's a revenue source for them?

24  A.   Correct.

25  Q.   And Cardinal agreed to block Daraprim data, but requested a

366

LCFKFTC5                      Ghorban - Direct

1    data blocking fee in exchange to compensate them for the lost

2    revenue?

3    A.   Correct.

4    Q.   And they requested 3.05 percent of Daraprim's list price?

5    A.   I don't recall what that percentage was.  I want to say

6    it's a percentage of the price of the drug, but there may be

7    some other percentages in there.

8    Q.   And ASD agreed to data blocking in September 2016?

9    A.   I don't know.  I don't recall if they did.  Based on this

10   email -- I'm not sure if that 2 percent, if that's a data

11   blocking percentage or if it's a distribution percentage.  I

12   don't recall what that was for.

13   Q.   Okay.

14           So, now, looking at the last line of this email, it

15   says, "Also, based on your request, we have followed up with

16   all the specialty pharmacies in our network, and they are not

17   willing to withhold our data from IMS as a policy."

18           Do you see that?

19   A.   Yes.

20   Q.   And "your request," does that refer to the request from

21   Michael Smith and Patrick Crutcher?

22   A.   Yes.

23   Q.   And "all the specialty pharmacies in our network," how many

24   specialty pharmacies are you referring to?

25   A.   By September of 2016, we had expanded beyond just Walgreens

LCFKFTC5                    Ghorban - Direct

1    specialty pharmacy to enable patients to access the medication

2    more quickly and access our patient affordability programs, and

3    we were in the process of -- we had moved to a hub network,

4    which is basically a single-source intake, and then the hub

5    does all the insurance work, applies any affordability

6    programs, and then sends it to a specialty pharmacy for

7    dispensing to the patient.

8            I don't recall the exact number, but we were adding as

9    needed to ensure that patients had access.  So I don't -- it

10   was more than three, I think, but we were evaluating and

11   expanding as needed.

12   Q.  So three -- more than five?

13   A.  We were definitely adding a lot at that time, but I don't

14   remember exactly because there was a lot of discussion around

15   which ones would be -- would serve which purpose and where they

16   were located in the country, and which ones were covered by

17   payors.  There's a lot of other details.

18   Q.  So at least three pharmacies?

19   A.  I believe so.

20   Q.  So following the business development team's request, you

21   reached out to every entity who had Daraprim distribution data

22   and asked them not to report their data to IQVIA?

23   A.  I believe I reached out to our hub, who was the one that

24   was coordinating the specialty pharmacies, and asked them to

25   reach out to the specialty pharmacies because they had direct

LCFKFTC5                    Ghorban - Direct

1    contact with them, I didn't.  They managed that network.  And I

2    believe that they came back and said, just as a policy, you

3    know, a lot of specialty pharmacies don't do that because it's

4    a source of revenue.

5    Q.  And in addition to the hub, you reached out to ICS?

6    A.  I think ICS was like the year before.

7    Q.  But just like overall --

8    A.  Overall, yes.

9    Q.  -- you reached out to ICS?

10   A.  Yes.

11   Q.  You reached out to Walgreens?

12   A.  Yes.

13   Q.  You reached out to ASD?

14   A.  Yes.

15   Q.  You reached out to Cardinal?

16   A.  Yes.

17   Q.  And you asked them to not report Daraprim sales data to

18   IQVIA?

19   A.  Correct.

20   Q.  So now --

21          MX. BLACK:  We can take this one down.

22   Q.  Let's switch gears a little bit and talk about Daraprim

23   purchase limits during your time at Vyera.

24          Ms. Ghorban, you were involved in setting up purchase

25   limits on Daraprim orders, correct?

LCFKFTC5                          Ghorban - Direct

1   A.  I was involved in setting up the process of how hospitals

2   could order from ICS, and part of that was the request to limit

3   the number of bottles they could buy at any one time.

4   Q.  The request came from the business development team?

5   A.  Yes, it did.

6   Q.  Anyone in particular?

7   A.  I don't recall exactly who it was.

8          MX. BLACK:  Phoebe, could you bring up GX 1217.

9   Q.  So GX 1217 is an August 2015 email chain between you and

10  Georgios Tserotas of ICS?

11  A.  Yes.

12  Q.  And ICS was a Daraprim distributor at the time?

13  A.  Yes.

14         MX. BLACK:  Your Honor, I move to admit GX 1217 in

15  evidence.

16         THE COURT:  Received.

17         (Government's Exhibit 1217 received in evidence)

18  BY MX. BLACK:

19  Q.  Ms. Ghorban, let's take a look at the bottom email on the

20  first page of GX 1217.

21         Ms. Ghorban, this email was sent from you?

22  A.  Yes.

23  Q.  To Georgios Tserotas?

24  A.  Georgios, yeah.

25  Q.  Georgios, okay.

LCFKFTC5                         Ghorban - Direct

1              Cc'ing Michael Smith?

2    A.  And Nancy, yes.

3    Q.  And Nancy?

4              And Georgios Tserotas was an ICS representative,

5    right?

6    A.  Yes.  He was our customer service contact.

7    Q.  So staying on the first page, this bottom email, let's take

8    a look at the text of your email.  It says, "Hi Georgios.

9    Thanks for sending the sales report.  We should discuss

10   possibly limiting the maximum number of bottles that we send to

11   any one customer at one time.  Our concern is that a generic

12   company could access multiple bottles of our product, perhaps

13   attained through a hospital reselling it or distributing

14   product to surrounding retail pharmacies, and use it to create

15   a generic version."

16             Do you see that?

17   A.  Yes.

18             (Continued on next page)

19

20

21

22

23

24

25

LCFMFTC6                        Ghorban - Direct

1    Q.   When you say, we should discuss in the first highlighted

2    sentence, are you referring to you and Georgios Tserotas?

3    A.   Yes.

4    Q.   Maximum number of bottles, that refers to bottles of

5    Daraprim?

6    A.   Yes.

7    Q.   Customers refers to Daraprim buyers?

8    A.   Yes.

9    Q.   That includes hospitals buying Daraprim from ICS?

10   A.   Yes.

11   Q.   And specialty pharmacies?

12   A.   At that period of time, in August of 2015, there were no

13   other specialty pharmacies except for Walgreens.

14   Q.   It's referring to maximum number of bottles sold to

15   hospitals?

16   A.   Hospitals, institutions, yeah.

17   Q.   So here Vyera and ICS are discussing the possibility of

18   limiting the maximum number of bottles that ICS can send to

19   hospitals that want to buy Daraprim?

20   A.   Limiting per order.

21   Q.   Looking at the second sentence, our concern is that a

22   generic company could access multiple bottles of our product.

23   Generic companies need multiple bottles of Daraprim for FDA

24   required studies, correct?

25   A.   I don't know how many bottles they need.  I'm not familiar

LCFMFTC6                    Ghorban - Direct

1   with the process of creating a generic.

2   Q.  They need more than one?

3   A.  I would think, but I don't really have any idea.

4   Q.  When you say our concern, whose concern are you referring

5   to?

6   A.  When I wrote the e-mail, I think it was sort of the royal

7   we, the company concern.

8   Q.  Business development team's concern?

9   A.  It wasn't my concern, so it was coming from -- it was an

10  objective being directed by the business development team.

11  Q.  And Martin Shkreli's concern?

12  A.  Yes.

13  Q.  Business development team and Martin Shkreli were concerned

14  that a generic could buy multiple bottles of Daraprim and use

15  them to create a generic version?

16  A.  Yes.

17  Q.  And you talked to multiple people from the business

18  development team about setting purchase limits to impede

19  generics?

20  A.  Yes.

21  Q.  One of the people was Michael Smith?

22  A.  Yes, definitely Michael Smith.

23  Q.  And you made this purchase limit request at the request of

24  the business development team?

25  A.  Yes.  It was definitely part of it was the generic concern.

LCFMFTC6                    Ghorban - Direct

1    The other part of it was the redistribution of product to

2    retail pharmacies because at this point they were able to buy

3    the product for a penny a pill.  So if they diverted product

4    from say a 340B hospital into sort of the mainstream non-340B

5    patients, it would negatively impact our sales, essentially

6    cannibalize our sales.

7    Q.  Are you aware of any instances of 340B entities reselling

8    it to non-340B buyers?

9    A.  When we tracked hospital sales data, which is a common

10   practice for any pharmaceutical company, we saw that there were

11   aberrations in purchasing habits for more hospitals.  They were

12   buying more than they had in the past, in the history that we

13   could see, so we weren't sure if they were using it to treat

14   non-340B patients, which is not appropriate.  It's an

15   inappropriate use of the 340B system.  Again, it would

16   cannibalize our sales.

17   Q.  You don't actually know if they actually used Daraprim

18   improperly by reselling it --

19   A.  There is not a way to really track it unless you open an

20   investigation, and we weren't in the position to really accuse

21   anybody of anything at that time.

22   Q.  So you tracked Daraprim's sales, you noticed aberrations,

23   but you did not know one way or another if there were actually

24   any instances of abuse from 340B entities?

25   A.  No.

LCFMFTC6                    Ghorban - Direct

1   Q.  So one of the reasons for Daraprim purchase limits was the

2   objective of the business development team to make it more

3   difficult for generics to get access to Daraprim, correct?

4   A.  Yes.

5   Q.  And the purchase limits that ICS and Vyera agreed on were

6   not in response to any shortages of Daraprim, correct?

7   A.  No.

8   Q.  And purchase limits on multiple bottles of Daraprim make it

9   more difficult for generics to obtain multiple bottles of

10  Daraprim for bioequivalent studies, correct?

11  A.  I have no idea.  I don't know.

12  Q.  Let's briefly look at the date of the e-mail.  It is August

13  13, 2015.

14  A.  Yes.

15  Q.  So this was shortly after Vyera bought Daraprim, correct?

16  A.  Yes.

17  Q.  So shortly after Vyera bought Daraprim you reached out to

18  Vyera's Daraprim distributor to agree on purchase limits?

19  A.  Yes.

20  Q.  Now, still staying on the first page of GX-1217, let's take

21  a look at the reply from Georgios Tserotas to you.  It says:  I

22  agree with this.  Based on the sales report you received, what

23  do you think is a reasonable threshold?  Five vials?  Please

24  let me know and we can implement these limits in our system.

25          Do you see that?

LCFMFTC6                    Ghorban - Direct

1   A.   Yeah.

2   Q.   So your authorized distributor, ICS, agreed with Vyera to

3   implement purchase restrictions on Daraprim?

4   A.   Yes.

5   Q.   And ICS in fact established purchase limits on Daraprim as

6   requested, correct?

7   A.   Yes.  I don't remember what the limit was.  I don't think

8   it was five bottles, but I could be wrong.

9   Q.   But there was a limit implemented?

10   A.   Per purchase order.  A customer could order multiple times.

11   They would just split it up by whatever the limit was.

12   Q.   If a customer placed multiple orders one after another,

13   would you flag this series of transactions?

14   A.   I would definitely flag it just to look into it and maybe

15   try to understand, again, if they were -- if it was different

16   than what we had seen them order historically, what was that

17   pattern and, potentially, were they diverting it was my chief

18   concern.  Again, I don't know how generics obtained product for

19   creating a generic and doing the research on it.  But, yes, I

20   would have flagged it.

21   Q.   So you would flag multiple orders to the business

22   development team, correct?  Because they were interested in

23   making it less easy for generics to obtain Daraprim?

24   A.   I don't know that I would flag it to the business

25   development team.  I would probably would flag it just as

LCFMFTC6                        Ghorban – Direct

1    something to look into further and potentially talk to maybe

2    somebody on the sales team or look at the history and see if it

3    was consistent.  I don't know that I even would necessarily say

4    they couldn't sell multiple purchases, but it would be

5    something that would come to my attention, and I would probably

6    explore it further.

7    Q.  And it would come to your attention because one of your

8    roles was to track Daraprim sales, right?

9    A.  Yes.

10   Q.  So if a customer tried to purchase a number of Daraprim

11   bottles exceeding the purchase limit at a given time, then ICS

12   would reach out to Vyera for approval, correct?

13   A.  Yes.

14   Q.  Then Vyera would review the order exceeding the purchase

15   limit and decide whether to approve it or to deny it, correct?

16   A.  Yes.

17   Q.  And if Vyera approved the order, ICS would be able to sell

18   Daraprim in excess of the purchase limit?

19   A.  Yes.  I think that was the process we established.

20   Q.  If Vyera denied the order, ICS would not be able to sell

21   Daraprim in excess of the purchase limit?

22   A.  Correct.

23   Q.  And one of the things that Vyera would evaluate in making

24   the decision whether the order seemed -- one of the factors

25   that it would look into to decide whether or not to approve the

LCFMFTC6                          Ghorban - Direct

1    order is whether the order was a diversion from prior

2    historical patterns?

3    A.   Yes.  That institution's buying patterns before we had

4    acquired -- before Vyera had acquired Daraprim.

5    Q.   Analyzing this kind of diversion from historical appearance

6    was important because the business development team was worried

7    that generics were somehow getting Daraprim through hospitals,

8    correct?

9    A.   I think that was their interest in it and, again, it was

10   the diversion to non-340B patients that potentially would

11   impact revenue, which would affect the company as a whole.

12   Q.   And also diversion to generics?

13   A.   Correct.

14   Q.   And Martin Shkreli was also concerned that Daraprim was

15   being diverted to generics?

16   A.   Yes.

17   Q.   And he directed implementation of restrictions to make it

18   harder for generics to obtain Daraprim, correct?

19   A.   Yes.

20   Q.   Among those restrictions were customer restrictions?

21   A.   Customers -- when you say customers, do you mean certain

22   institutions or just -- having it in a specialty pharmacy and

23   selling directly to institutions, yes.

24   Q.   Another restriction that Martin Shkreli directed to make it

25   harder for generics to obtain Daraprim were purchase limits?

LCFMFTC6                    Ghorban - Cross

1   A.  I don't recall having a specific conversation with him

2   about purchase limits.  I think I mostly worked with Michael

3   Smith on that.

4   Q.  Michael Smith reported to Martin Shkreli?

5   A.  Yes.

6   Q.  The third kind of restriction that we discussed today to

7   impeach generic entry was data blocking, correct?

8   A.  Correct.

9   Q.  That was also implemented at the direction of Martin

10  Shkreli and the business development team?

11  A.  Yes.

12  Q.  To discourage generic entry?

13  A.  Yes.

14  Q.  Thank you, Ms. Ghorban.

15          MX. BLACK:  Your Honor, I pass the witness.

16          THE COURT:  Why don't we take our midafternoon recess.

17          Excuse me just one second here.

18          Thanks so much, counsel.  We will take a five-minute

19  recess.

20          (Recess)

21          THE COURT:  Put the witness back on the stand.

22          Excuse me just one second.

23          Counsel, you may begin.

24  CROSS-EXAMINATION

25  BY MR. CASEY:

LCFMFTC6                    Ghorban - Cross

1    Q.  Good afternoon, Ms. Ghorban.  My name is Christopher Casey,

2    and I'm here representing the defendant, Martin Shkreli.  I

3    have some questions for you this afternoon based upon your

4    testimony earlier.

5              First, I wanted to just go back to the distribution

6    discussion that you were having earlier regarding the

7    distribution of Daraprim.  Do you recall that general topic?

8    A.  Yes.

9    Q.  And counsel indicated that the word closed distribution was

10   used at Vyera and you agreed with that statement.  Do you

11   remember that testimony?

12   A.  Yes.

13   Q.  I think you also testified that you understood it as

14   specialty distribution.  Did I understand you correctly?

15   A.  What I said was that the more common term in terms of

16   distribution that I've heard is you can either have specialty

17   distribution, meaning it goes through specialty pharmacies, or

18   it goes through retail channels, which is more broad.  That's

19   typically the terms that I have heard before then and since

20   then.

21   Q.  I am going to use your term, if it's OK, and call it

22   specialty distribution.  You understand that I'm talking about

23   that kind of distribution if I use that term?

24   A.  Yes.

25   Q.  Are there products other than Daraprim that are distributed

LCFMFTC6                    Ghorban - Cross

1   through specialty distribution?

2   A.  Yeah.

3   Q.  Have you seen specialty distribution systems at other

4   pharmaceutical companies that you have worked at in your

5   career?

6   A.  Yes.

7   Q.  I'd like to just focus on the specialty distribution

8   systems at Vyera with regard to Daraprim.

9       Do the specialty distribution systems at Vyera benefit

10  patients who are prescribed Daraprim?

11  A.  They do.  You want me to expand on that?

12  Q.  Yes, please.

13  A.  They do because of the high price of the product.  After

14  Vyera increased the price, retail pharmacies would no longer

15  carry it.  Even if Vyera had allowed them to, they wouldn't

16  stock a product that is that expensive.

17      It's also a small patient population.  So a retail

18  store to have a product that pricey on its shelf, waiting for a

19  potential patient to come in, doesn't make good business sense

20  to them, as well as it is an orphan disease or an orphan

21  condition.  And many of those products, because they are higher

22  price, tend to be distributed through a specialty pharmacy

23  network.

24  Q.  Does the specialty pharmacy network have benefits to

25  patients?

Ghorban - Cross

1    A.   Sorry.   Yes.   The specialty pharmacy a lot of times will do

2    the intake on the patient.   So they look at the benefits, the

3    insurance benefits.   They contact the insurance company, work

4    with them if they need a prior authorization or other medical

5    information from the doctor.   They coordinate with the doctor.

6    They coordinate with the patient.   They apply any copay

7    benefits or if there is a Medicare -- I forgot what we called

8    it.   It's a Medicare charitable network that will contribute to

9    the price of the product.   They will apply that, potentially.

10   If it's an indigent patient or uninsured patient, they will

11   potentially give them benefits as well, and then they will

12   contact the patient, ship to the patient so they kind of become

13   the one-stop shop for the patient and the doctor and the

14   insurance.

15   Q.   Thank you.

16        Earlier I think you used the word in reference to

17   these programs, patient assistance programs.   Did I have that

18   correct?

19   A.   Yes.

20   Q.   What are patient assistance programs?

21   A.   There is a variety of then.   The most common is copay

22   cards, copay benefits.   If an insurance company will cover the

23   product for the patient but the patient has to pay $150 out of

24   pocket or some price, a lot of times the copay programs will

25   step in and support bringing that out of pocket to the patient,

LCFMFTC6                     Ghorban - Cross

1    bringing it down, making it more affordable to the patient, and

2    the manufacturer, the pharmaceutical company, pays for that, so

3    they pay for those benefits to the patient.

4            They also -- like I said, they do these -- they used

5    to, I don't know if it's allowed anymore, but there were these

6    Medicare charitable organizations that you can contribute to

7    that would, if you had a Medicare patient that had an

8    out-of-pocket price that was unaffordable, they would step in

9    and help to bring that cost to the patient down so that patient

10   could access the medicine.

11           Also, programs for indigent patients, if they made a

12   certain income per year, you do that based on the federal

13   poverty limit.

14           And then there are also patients, like cash programs

15   for patients who are uninsured.  And the pharmaceutical company

16   will typically, for patients who are truly uninsured, will sell

17   that product to the patient for a much reduced price so the

18   patient can have access to the medicine.

19   Q.  When Daraprim is distributed through specialty pharmacies

20   as you have described, does this system increase the adherence

21   of the patient to the medication regimen?

22   A.  It's technically supposed to.  Sometimes it doesn't because

23   of the mail order component of it.  Just receiving the call

24   from the specialty pharmacy, somebody has to be at home to get

25   it.  It slows down the process a bit.  But it is typically

LCFMFTC6                    Ghorban - Cross

1    looked at as helping the patient adhere to the medication in

2    the way that it is supposed to be taken.

3    Q.  Thank you.

4         Now, did Vyera fund a foundation to help patients if

5    there were affordability issues with affording Daraprim?

6    A.  Yes.  There are multiple -- Vyera had multiple patient

7    affordability programs.

8    Q.  Can you explain for the Court what those were.

9    A.  So there was -- I believe there was a copay card that would

10   help commercial patients, patients who had a commercial

11   insurance.  There was a Medicare foundation, charitable

12   foundation that would disseminate funds according to whether or

13   not that patient qualified.  And if they needed help and

14   couldn't access the medicine because the out-of-pocket was too

15   high, there was indigent patient support.  And when we created

16   that, we actually did a much higher limit for federal poverty

17   limit.  So we expanded the number that group of patients who

18   would qualify for that program.

19        I don't think that there was a cash program.  There

20   was also, I think -- early on, there was the move to decrease

21   the price, the price to hospitals, institutions.  I believe we

22   cut the price by half per institutions to make the product more

23   affordable for them to stock.  And I believe we also came out

24   with a 30-count bottle, again, because it's a very small

25   patient population.  So to have a 100-count bottle sitting on

LCFMFTC6                    Ghorban - Cross

1   the shelf taking up cash and eating into your inventory didn't

2   make sense.  So maybe giving them a smaller-count bottle would

3   make it more affordable, and they would be able to stock in

4   case a patient came in.

5   Q.  You mentioned earlier today the 340B program.  Can you

6   explain what that is.

7   A.  Yeah.  The 340B, and I wasn't aware of this program before

8   I worked for Vyera, the 340B program is a program, it's a

9   national program that covers -- it covers certain institutions.

10  The institutions have to have, I believe -- over 50 or 60

11  percent of the patients within their system have to be within a

12  certain level of the poverty limit.  Essentially, it's a

13  program for institutions to buy product at a cheaper price to

14  distribute to those patients.  The price that they get it at

15  for Daraprim, when we bought it, was a penny a pill, so they

16  were able to buy a 100-count bottle for a dollar.

17  Q.  Do you know as a percentage basis how many of the patients

18  who are on Daraprim received Daraprim for a penny a pill?

19  A.  The only thing I know, I didn't know the patient part of it

20  because there is not really a way to see that once it goes into

21  an institution.  But what I could track was, I think it was 50

22  to 60 percent of sales were going into a channel, a sales

23  channel that was for a penny a pill.  So it was at that greatly

24  reduced price.

25  Q.  Just to get back to the 340B issue as it came up earlier

LCFMFTC6                    Ghorban - Cross

1    about the diversion issue, could you explain that in more

2    detail, so I understand it, exactly what the concern was there.

3    A.   Sure.  I'm not an expert on this.  It's a fairly

4    complicated system.  But my understanding when we started

5    talking to institutions and trying to understand the process of

6    the 340B system is that when hospitals buy product at that 340B

7    price, that greatly reduced price, they are supposed to, when

8    they have it in the pharmacy, they are supposed to hold it

9    separately from product that is meant for commercial patients.

10        When a patient comes in, they are typically supposed

11   to determine if that patient has commercial insurance and,

12   potentially, the commercial insurance will pay for the product,

13   or part of the product, or if it's a patient who qualifies for

14   that 340B benefit, and they get the product at the very, very

15   low price.

16        What we have heard, and I think it's been kind of a

17   common discussion in the pharmaceutical industry, is that

18   hospitals will sometimes mix the product, and they will buy

19   340B product at a greatly reduced price and then use it for

20   commercial patients and get the payment from the commercial

21   insurance.

22        Again, I'm not an expert on this, so I may have some

23   of my facts wrong.  But when we had these discussions, those

24   were the points that were made, and I believe we talked to

25   consultants, and we also talked to people internally who knew a

LCFMFTC6                    Ghorban - Cross

1    lot more about it than I did.

2    Q.  That's helpful.

3         The concern -- I believe you testified that that was

4    one of the motivating reasons for the bottle limits that you

5    testified about, is that right?

6    A.  Correct.

7    Q.  Can you explain that part of it.  What is the connection

8    between those two things?

9    A.  Say if we are looking at the State of Georgia.  The

10   institutions there had -- typically, if I summed them all up,

11   the institutions there had been buying 50 bottles a year, and

12   we had historical data.

13        If they had been buying 50 bottles historically a year

14   of Daraprim, and even at the lower price, that kind of

15   indicates to me that that's the demand in that market.  You get

16   some spurts sometimes, you get some outbreaks, but, again, it's

17   a really, really small patient population.  Then we buy it, we

18   increase the price.  And, all of a sudden, we are seeing

19   institutions buying at one fell swoop 40 bottles, 50 bottles.

20   That's a clear deviation from what was happening before.

21        So the thought was, from the BD team, potentially it's

22   going to a generic, I don't know how that would happen

23   mechanistically, or maybe they are buying it at that low price,

24   and they are using it to give to commercial patients and they

25   are pocketing the difference, ultimately cannibalizing the

LCFMFTC6                    Ghorban - Cross

1   sales that we may have had from those commercial patients in a

2   more normal scenario.

3   Q.  Just so I'm clear, this is something the business

4   development team told you that they were concerned about?

5   A.  No.  Their primary concern, I believe, was the issue around

6   the generic accessibility.  I think we had a patient-access

7   person that was working with us, and I think from that person

8   we started thinking about this 340B diversion issue.  Again,

9   it's something that's been in the news.  You can Google it.  It

10  is clear that it wasn't just Vyera that was having those

11  concerns.  There were sort of persistent concerns in the

12  pharmaceutical industry.

13  Q.  Thank you for that.

14          I want to go back to an e-mail that you were shown

15  earlier.  It's GX-1302.

16          MR. CASEY:  Justin, if you could get that, please.

17  Q.  Do you have it up there on the screen, Ms. Ghorban?

18  A.  Yes.

19  Q.  Do you remember being asked questions about this document?

20  A.  Yes.

21  Q.  I'd like to direct your attention to the bottom of page

22  1302-001, that e-mail.  You were asked about this phrase:  The

23  priority work stream is to ensure the product is moved into

24  close distribution as swiftly as possible in order to minimize

25  exposure.  Do you see that?

LCFMFTC6                    Ghorban - Cross

1    A.   Yes.

2    Q.   You were asked about that.  Do you remember that?

3    A.   Yes.

4    Q.   I believe your testimony was that you believe that

5    minimized exposure meant minimized exposure to generic

6    competitors getting access to Daraprim?

7    A.   Yes.

8    Q.   Is that your testimony?

9    A.   Yes.

10   Q.   Do you recall, Ms. Ghorban, having your deposition taken in

11   this case on January 6 of 2021?

12   A.   Yeah.

13            MR. CASEY:  Can I have the deposition transcript,

14   please, at page 70, line 12.

15   Q.   Ms. Ghorban, everything you said in your deposition was

16   true and accurate, correct?

17   A.   Yes.

18   Q.   At page 70, starting at line 12, do you see it there you

19   were asked:

20            Do you understand what Ms. Retzlaff meant when she

21   said that the priority work stream was to move it into closed

22   distribution as swiftly as possible in order to minimize

23   exposure.  Do you know what she meant by minimize exposure?

24            Your answer was:  I -- I think when I read it, I

25   don't -- I don't remember exactly what she meant when she said

LCFMFTC6                    Ghorban - Cross

1    minimize exposure.  I'm assuming it's around generic

2    accessibility or accessibility of the product to generics.

3            Do you see that?

4    A.  Yes.

5    Q.  At the time of your deposition you were assuming that.  You

6    didn't actually know that for a fact, correct?

7    A.  Yeah.  I think the wording exposure, to me, it is like

8    risk.  That's the reason why I would say it's equivalent to

9    risk, having an open distribution system in the context of the

10   discussions we had.

11   Q.  Do you actually know what Ms. Retzlaff meant by that

12   phrase, minimized exposure?

13   A.  I can't speak for her.

14   Q.  So the answer is no?

15   A.  No.

16   Q.  Ms. Ghorban, you were asked at the beginning of examination

17   about your long experience in the pharmaceutical industry, 20

18   years of experience.  Based upon that experience, do you

19   believe it's possible to keep generic companies from accessing

20   drug products?

21   A.  I think it would be very hard to keep them from accessing

22   it.  But I don't know -- again, I haven't worked in the

23   generics business, so I don't know how they acquire product to

24   do their testing to show that it's equivalent.

25   Q.  Again, if I could go back to that deposition again.  I am

LCFMFTC6                    Ghorban - Cross

1    going to direct you to page 74 of your deposition, starting at

2    line 22.

3            You said:  I mean, I think the one comment I would

4    make is preventing generic entry was something that I don't

5    think was possible.  I still don't believe it's possible.

6            You see that?

7    A.  Yes.

8            MX. BLACK:  Your Honor, I object to foundation.

9            THE COURT:  Sustained.  Stricken.

10   Q.  You talked a little bit earlier about the expansion of the

11   distribution system.  I would like to direct your attention to

12   that testimony.

13           The specialty distribution system that Vyera used to

14   distribute Daraprim was inherited from the prior owner of

15   Daraprim, a company called Impax, correct?

16   A.  Yes.

17   Q.  Specifically, Vyera inherited a contract that Impax had

18   with ICS as a 3PL selling to hospitals, correct?

19   A.  Correct.

20   Q.  What is a 3PL?

21   A.  As I know it, a 3PL -- and, again, this was not my area of

22   expertise when I was at Vyera or before or since.  But the 3PL,

23   as I understand it, is a company that works with a

24   pharmaceutical manufacturer.  Part of what they do is hold

25   inventory, and then they are equipped to sell inventory to

LCFMFTC6                    Ghorban - Cross

1   wholesalers, to specialty pharmacies, to institutions, etc.

2   They are kind of your key partner in terms of knowing where the

3   product goes and keeping the product that you have, the

4   finished inventory saved.

5   Q.  Vyera also inherited a contract that Impax had with

6   Walgreens specialty pharmacy, correct?

7   A.  Correct.

8   Q.  You were asked about issues of access following the

9   acquisition of Daraprim.  Can you explain what the reasons were

10  for the access issues after the acquisition of Daraprim?

11         MX. BLACK:  Your Honor.  I object.  Beyond the scope

12  of my direct examination.

13         MR. CASEY:  I'll withdraw it, your Honor.

14  Q.  Ms. Ghorban, after the acquisition of Daraprim, did Vyera

15  realize that the distribution agreements it had inherited from

16  Impax were not adequate to meet the needs of Vyera's

17  prescribers and patients?

18  A.  Yes.

19  Q.  What, if anything, did Vyera do about that?

20  A.  We started trying to understand what the needs were for

21  physicians.  We didn't understand that the turnaround time to

22  getting product to patient was more urgent than a specialty

23  pharmacist could sometimes manage.

24         We started to look at ICS and how they were able to

25  sell to institutions.  It turned out they were not very well

LCFMFTC6                    Ghorban - Cross

1    equipped to sell to institutions because there was an account

2    set up that most institutions didn't have, so we added ASD to

3    distribute to institutions.

4         We added Cardinal because a lot of institutions, I

5    believe, had agreements already with Cardinal and had to buy

6    exclusively from Cardinal.

7         We added the hub to ensure that patients were able to

8    access the benefits, the copay benefits and the affordability

9    benefits that we were offering, and expanded the specialty

10   pharmacy network to ensure that no matter where the patient was

11   in terms of geography and also who the patient's commercial

12   insurance was, because commercial insurance is also partner

13   with specialty pharmacies, no matter where they were and what

14   they needed, they were able to get it.  It wasn't a hundred

15   percent, but we tried to meet the needs of the patients and the

16   prescribers.

17   Q.  You mentioned a hub program.  What is that?

18   A.  A hub program is -- it functions like a specialty pharmacy

19   except for it is sort of the hub of the specialty pharmacy

20   wheel.  If you think about the specialty pharmacies as the

21   spokes, the hub is the key intake for the patient and then we

22   will do all the work on the affordability, the insurance, and

23   then we will send that prescription, once it's ready to be

24   dispensed, it will send that to a specialty pharmacy.  The

25   specialty pharmacy will reach out to the patient and will send

**A-1466**

LCFMFTC6                    Ghorban - Cross

1    the product to the patient.

2    Q.  Once the hub model was instituted, was Walgreens replaced

3    as the exclusive specialty distributor of Daraprim?

4    A.  They weren't replaced.  They were no longer the exclusive

5    pharmacy, specialty pharmacy.  It was an add-on.

6    Q.  And you added specialty pharmacy in addition to Walgreens,

7    correct?

8    A.  Yes.

9    Q.  You also were asked about ADAP programs.  I think you said

10   they are an AIDS Drug Assistance Program?

11   A.  Yes.

12   Q.  Can you explain what they are.

13   A.  Again, it's really complicated, but I believe that it's

14   state run and it's essentially an assistance program that was

15   set up during the epidemic of AIDS and HIV to support patients

16   at a local level.

17          So what we found was that there were ADAPs in certain

18   states that couldn't access the product.  Either they couldn't

19   establish an account with ICS or -- again, the mechanism is

20   very confusing to me.  But, essentially, we had to do something

21   to make sure that they could buy product, and they could buy

22   product at the 340B price, so they were buying it at a penny a

23   pill.  But we had to expand to include them as customers to

24   ensure that they could buy the product and disseminate it to

25   their patient.

LCFMFTC6                        Ghorban - Cross

1   Q.  So Vyera expanded the distribution of Daraprim to include

2   ADAPs?

3   A.  Yes.

4   Q.  And all of these additional distribution outlets broadened

5   the accessibility of Daraprim, correct?

6   A.  That was the intent, yes.

7   Q.  In fact, that's what happened, correct?

8   A.  I believe so.

9   Q.  Did you consider these changes to the distribution system

10  of Daraprim to be improvements?

11  A.  Yes.

12  Q.  You testified earlier about the 30-pill Daraprim bottle for

13  hospitals.

14  A.  Yes.

15  Q.  Did Vyera also create sample packs for hospitals?

16  A.  Sample packs can't go through hospitals, but we created

17  sample packs for prescribing physicians in the typical clinic

18  setting.

19  Q.  What is a sample pack?

20  A.  A sample pack is just a small number of pills.  Usually,

21  doctors often have them in their offices, and they will give

22  them to patients to see if patients react well to the product,

23  if it helps, if they have a reaction.  They can also be used as

24  starters to start a patient on medication.

25          The way that we used it for Daraprim was sort of as a

LCFMFTC6                    Ghorban - Cross

1    bridge for while the patient was waiting for the product from

2    the specialty pharmacy, that they didn't have to wait, and

3    potentially it was readily available to them.  If the doctor --

4    I think we had a mailing system for the samples.  But it should

5    have been more readily available than sometimes waiting for

6    insurance to clear the approval on the product.

7    Q.   Thank you.

8         You were also asked some questions about Vyera buying

9    back bottles or the bottle limits, rather.  I'm sorry.

10        Withdraw that question.

11        I'd like to discuss the IQVIA data questions you were

12   asked.

13        Was the reporting of sales data to data-reporting

14   companies a deciding factor in any of Vyera's contracts?

15   A.   No.  It was a request.  It didn't decide whether or not we

16   were work with certain partners.

17   Q.   There are alternatives to IQVIA data, correct?

18   A.   There are alternatives.  There is also historical data that

19   doesn't go away if you decide not to share the data going

20   forward.  There is still historical data.

21   Q.   What are some of the alternatives?

22   A.   Symphony is a data source.  A lot of times you will look at

23   a company -- if you are looking to acquire a product from a

24   company, you will look at a company's financial reports, so

25   their 10-Ks and their 10-Qs.  A lot of times they will report

Ghorban - Cross

1   volume of sales there.  That's typically one of the steps --

2   when you do an assessment, that's one of the steps you take.

3         There are other sort of reporting companies that

4   aggregate information on certain therapeutic areas, certain

5   products, certain companies that sometimes you can find that

6   data in.  It depends on how public it is.

7   Q.  Thank you.

8         The reliability of IQVIA data depends on the drug,

9   correct?

10  A.  Correct.

11  Q.  Can you explain that?

12  A.  For products that treat -- that aren't as large, so for a

13  very large product, like a Lipitor, the data would be pretty

14  solid because there is a lot of volume there.  For products

15  that treat orphan indications, small patient populations

16  disseminated through hospitals or disseminated through clinics,

17  say the doctor buys it and distributes it directly to patients,

18  the data is not as robust for those different types of

19  medications.

20  Q.  So you have already testified that Daraprim was a small

21  patient population, correct?

22  A.  Correct.

23  Q.  If I understand you, the IQVIA data would not be as

24  reliable for Daraprim data, correct?

25  A.  Correct.  It might not capture just because it's not as

LCFMFTC6                    Ghorban - Redirect

1   large -- it's not as large of a product.

2   Q.  Because of these limitations on the data, it's not a

3   decision-making tool, correct?

4   A.  For certain products it's not a decision-making tool.

5   You'd have to go further to look at other data sources if you

6   are looking at a product to acquire.  For other products, where

7   it is reliable, you would use that data source pretty heavily.

8   Q.  But in terms of Daraprim, which is, as you have testified,

9   a small patient population where the data is not as reliable,

10  it would not be a decision making tool for assessing the

11  Daraprim market, right?

12  A.  I think we would -- we looked at the data, but -- and it

13  factors into the conversation and the analysis, but it wouldn't

14  be a single factor that would make a decision for us.

15  Q.  No one would decide to acquire a product based solely on

16  IQVIA data, correct?

17  A.  No.  That's not the process of acquisition.

18  Q.  No meaning --

19  A.  No.  You would never use just a data source to make a

20  decision on whether or not to buy a product.

21  Q.  Thank you, Ms. Ghorban.  I have no further questions.

22            THE COURT:  Any redirect?

23            MX. BLACK:  Yes, your Honor.

24  REDIRECT EXAMINATION

25  BY MX. BLACK:

**A-1465**

LCFMFTC6                          Ghorban - Redirect

1    Q.  Ms. Ghorban, you testified a moment ago about specialty

2    benefits of high-cost drugs.  Do you recall that?

3    A.  I'm sorry.  Specialty benefits?

4    Q.  Yeah.  To high-cost drugs.

5    A.  Benefits of being distributed in specialty pharmacies?

6    Q.  Yes.

7    A.  Yes.

8    Q.  Martin Shkreli made Daraprim a high-cost drug, correct?

9    A.  Yes.

10   Q.  It was not a high-cost drug for 60 years?

11   A.  When we -- when Vyera acquired it, it was not what I

12   considered to be a high-cost drug.

13   Q.  And you said that high-cost drugs with small patient

14   populations benefit from being distributed in specialty.  Do

15   you recall that?

16   A.  Yes.

17   Q.  Because it makes it harder to stock for pharmacies?

18   A.  It makes -- when you have a high-cost product for a

19   low-patient population, it's hard -- it's unaffordable for

20   retail pharmacies to stock it, and also you have issues with

21   insurance.  So specialty pharmacies or hub models help on both

22   those points in terms of stocking, as well as working with

23   insurance.

24   Q.  Daraprim has always been a small patient population drug,

25   correct?

LCFMFTC6                        Ghorban - Redirect

1   A.   Yes.

2   Q.   Before the price increase that Martin Shkreli implemented,

3   the small patient population did not present stocking issues,

4   correct?

5   A.   Not that I'm aware of.

6   Q.   Ms. Ghorban, you also testified in response to Mr. Casey's

7   question that specialty distribution technically is supposed to

8   improve patient compliance.  Do you recall that?

9   A.   Yes.

10  Q.   Do you know if patient compliance actually increased after

11  the transition to specialty distribution for Daraprim?

12  A.   I don't have a comparator for before Vyera acquired it to

13  say that it improved or decreased patient compliance.

14  Q.   So patient compliance might have actually decreased after

15  the transition to specialty?

16  A.   I don't know.  I don't have a comparator.

17  Q.   And you testified a moment ago about 340B programs.  Do you

18  recall that?

19  A.   Yes.

20  Q.   340B program, it's a federal program, correct?

21  A.   I believe so.

22  Q.   It's not a program that Vyera created?

23  A.   No.

24  Q.   You also testified a minute ago about using historical

25  IQVIA data for Daraprim.  Do you remember that?

LCFMFTC6                        Ghorban - Redirect

1   A.  Yes.

2   Q.  Would historical IQVIA data be reliable after Vyera's price

3   increase?

4   A.  Because it's a small patient population, I don't know that

5   it would have been accurate.  I've seen products that are high

6   priced more recently that the sales are inaccurate in IQVIA,

7   and I can't say whether or not it would have been accurate.

8   Q.  Daraprim volume declined after the price increase, correct?

9   A.  I believe it did.

10  Q.  It significantly declined, correct?

11  A.  I believe so.

12  Q.  And given the decline in volume, historical IQVIA data

13  after the price increase would not be representative of

14  Daraprim volume sales -- let me start it over.

15          Given the decline in volume in historical IQVIA data

16  before the price increase would not have been representative of

17  Daraprim volume sales after the price increase, correct?

18          MR. CASEY:  Objection, your Honor.  She is going

19  beyond the scope of the cross-examination.  I don't know where

20  this is going.

21          THE COURT:  Excuse me one second.

22          Overruled.

23          (Continued on next page)

24

25

LCFKFTC7                          Ghorban - Redirect

1    A.  I'm sorry, can you repeat that question?

2    Q.  Yes.

3         Given the decline in Daraprim volume after the price

4    increase, the historical IQVIA data, before the price increase,

5    would not have been representative of Daraprim volume sales

6    after the price increase, correct?

7    A.  I believe so, because the sales -- there's a couple of

8    sources of sales, but, yeah, the price is factored into the

9    sales as IQVIA reports it.

10   Q.  In other words, generic companies could not have just

11   looked at historical IQVIA data after the price increase to

12   figure out the Daraprim market opportunity, correct?

13   A.  They could -- usually, you look at it in two ways.  You

14   look at the volume of the prescriptions, and you look at the

15   sales.  And so they could potentially -- assuming the sales

16   were captured appropriately, given it's a small patient

17   population, they could look historically and see that the

18   volume was, you know, for example, 10,000 prescriptions a year.

19   They could see that.  And they knew the new price, so they

20   could do the calculation, but the sales would be different

21   because IQVIA considers the sale price when it reports

22   volume -- I'm sorry, when it reports the sales.

23   Q.  You mentioned that Daraprim was a small patient population

24   drug before, correct?

25   A.  Yes.

LCFKFTC7                          Ghorban - Redirect

1    Q.  And, yet, you used IQVIA data as a starting point in your

2    analysis for Daraprim acquisition, correct?

3    A.  Yes.

4    Q.  You also talked earlier about expanding the Daraprim

5    distribution system that Vyera inherited from previous owners.

6          Do you remember that?

7    A.  Yes.

8    Q.  But given the system that you've described with additional

9    customers, it had customer restrictions on authorized classes

10   of trade, correct, that Vyera could sell Daraprim to?

11   A.  Yes, it did.

12   Q.  You also added purchase limits, correct?

13   A.  Correct.

14   Q.  That previous owners did not have?

15   A.  I don't believe they had them, no.

16   Q.  Let me stop there.

17          MX. BLACK:  That's all I have.

18          THE COURT:  Any additional cross?

19          MR. CASEY:  No, your Honor.

20          THE COURT:  Thank you.

21          So what caused you to leave Vyera?

22          THE WITNESS:  It was a very distressing place to work.

23   It was stressful, it was not fulfilling, and it was just not a

24   good environment to be in.

25          THE COURT:  Does any counsel have any question for

LCFKFTC7                    Della Fera - Direct

1   this witness based on the question I just asked her?

2          MX. BLACK:  No, your Honor.

3          MR. CASEY:  No, your Honor.

4          THE COURT:  You may step down.

5          (Witness excused)

6          THE COURT:  Next witness.

7          MR. MEIER:  Yes, your Honor.  The government, at this

8   time, calls Frank Della Fera, and my colleague, Neal Perlman,

9   will be handling this witness.  This witness is with a

10  declaration.

11         THE COURT:  So, Mr. Della Fera, if you could come up

12  here, please, and take the witness stand and remain standing.

13   FRANK DELLA FERA,

14       called as a witness by the Plaintiffs,

15       having been duly sworn, testified as follows:

16         THE COURT:  You may take off your mask.

17         You're being handed a document, counsel.  What is the

18  exhibit number?

19         MR. PERLMAN:  8007, your Honor.

20         THE COURT:  Thank you.

21         And, Mr. Della Fera, if you would look at page 17, is

22  that your signature on this document?

23         Oh, Mr. Della Fera, I forgot to do something

24  important.  Could you please state your name for the record.

25         THE WITNESS:  Frank Della Fera.

LCFKFTC7                          Della Fera - Direct

1          THE COURT:  And could you spell your last name,

2     please?

3          THE WITNESS:  D-e-l-l-a F-e-r-a.

4          THE COURT:  And is that two words?

5          THE WITNESS:  Yes.

6          THE COURT:  So it's capital D and capital F?

7          THE WITNESS:  Correct.

8          THE COURT:  Thank you.

9          And if you could look now at Government Exhibit 8007,

10    which I believe is at the front of your binder.  And page 17,

11    is that your signature on that document?

12         THE WITNESS:  Yes.

13         THE COURT:  Before signing that document, did you read

14    it with care?

15         THE WITNESS:  Yes.

16         THE COURT:  Do you swear to the truth of its contents?

17         THE WITNESS:  Yes.

18         THE COURT:  Any objections to the receipt of

19    Government Exhibit 8007?

20         MR. POLLACK:  Yes.  Good afternoon, your Honor.  Jeff

21    Pollack, on behalf of the defendant.

22         Your Honor, first off, and I think the colloquy we

23    just did may have addressed this already, but I did want to

24    raise that your Honor's procedures require the submissions of

25    affidavits as sworn testimony, and Mr. Della Fera's statement

LCFKFTC7                    Della Fera - Direct

1    is not sworn or --

2              THE COURT:  You have to keep your mask on until you're

3    at the podium.  Thank you so much.

4              MR. POLLACK:  May I move to the podium where I don't

5    have to have my mask on?

6              THE COURT:  You may.

7              MR. POLLACK:  Thank you, your Honor.

8              So, your Honor, I was saying that perhaps the colloquy

9    we just went through addresses this, but your Honor's

10   procedures do require affidavits, and the written statement

11   that Mr. Della Fera submitted was not sworn.  I only raise it

12   as a point of procedure, and your Honor will guide us

13   appropriately on that.

14             THE COURT:  Oh.  Thank you.

15             Yes, of course, the testimony given in court must be

16   sworn, but I think the witness has just done that, and that's

17   sufficient.

18             MR. POLLACK:  Okay.  Very good.

19             Your Honor, we do have some objections.  Allow me to

20   grab -- paragraph 40 of Mr. Della Fera's affidavit, he recites

21   a conversation that he had with an individual, Mr. Valiveti,

22   about something that he was informed about from former Vyera

23   employee Kevin Mulleady.  Your Honor, we object to this

24   paragraph as hearsay.

25             THE COURT:  Give me just one second, please.

LCFKFTC7                    Della Fera – Direct

1          I'm on page 12, paragraph 40?

2          MR. POLLACK:  Correct.

3          THE COURT:  I think that's -- well, I'll hear from

4     plaintiffs' counsel, but I think that's just received not for

5     the truth, but for the fact that it was said by Mr. Valiveti to

6     the witness.

7          Am I right?

8          MR. PERLMAN:  Correct, your Honor.

9          THE COURT:  It's received in that vein.

10         (Government's Exhibit 8007 received in evidence)

11         MR. POLLACK:  Your Honor, then I turn us next to

12    paragraph 46, and specifically, I look down to beginning with,

13    I believe it's, the third to last sentence, three lines from

14    the bottom, where it begins "it is my view," where

15    Mr. Della Fera says, "It's my view that if we had used Fukuzyu

16    as our pyrimethamine API supplier, Vyera would have been able

17    to respond within the review period," referring to the review

18    period for their ANDA submission.  Your Honor, I submit that is

19    speculation and improper lay opinion.

20         Mr. Della Fera has, admittedly, a lengthy career in

21    the pharmaceutical industry, but except for one year in which

22    he was the president of Sandoz, he spent the remainder in sales

23    and marketing, and it does not appear that there's a foundation

24    laid for that statement in his affidavit.

25         THE COURT:  Overruled.  Obviously, he is testifying

LCFKFTC7                        Della Fera - Direct

1    here as someone knowledgeable about his company's business and

2    judgments made during the course of that business.  I'll

3    receive it as proper lay opinion under 701.

4            MR. POLLACK:  And, your Honor, before we proceed, I

5    believe that plaintiffs' counsel was going to move in some

6    evidence.  I'd like to know what's in evidence on the affidavit

7    before we begin.

8            THE COURT:  I'm happy to rule on any other objections

9    that you have.  This objection is overruled.

10           I'm sorry, what do you mean?  Which exhibits?

11           MR. POLLACK:  There was one document referenced in the

12   affidavit that we do have an evidentiary objection to.  There

13   was two that we've resolved with counsel.  The one that's an

14   objection is GX 3286.

15           Justin, if we could pull that up?

16           This is a summary document --

17           If we go to page 2, Justin.

18           -- a summary document of a series of events recorded

19   by Mr. Della Fera's employee, Scott, I believe his last name

20   is --

21           THE COURT:  Florentino.

22           MR. POLLACK:  Florentino, yes.  Thank you very much.

23           -- Scott Florentino at the top.

24           And, your Honor, this is a hearsay document.  It

25   cannot fall under the business records exception.  The record

LCFKFTC7                    Della Fera - Direct

1    must be made at or near the time of the events discussed.  This

2    was made in 2018, and the events go all the way back to '16.

3    When we talk about events involving Vyera, the earliest Vyera

4    meeting is in April of 2018 on this document.

5              Additionally, your Honor, it has to be created by

6    someone with knowledge.  When we look at this document --

7              And, Justin, if we could find the entry for May 14 of

8    2018.

9              -- we see here that there was a meeting with attendees

10   Kevin, meaning Mr. Mulleady, and Frank, meaning Mr. Della Fera.

11   Mr. Florentino was not even present here.  And if we look below

12   May 8, 2018, it does not even reference who the attendees were

13   in this meeting.

14             So in addition to not being a business record, this

15   document has several layers of hearsay within hearsay and

16   sometimes within hearsay, and, therefore, would be an

17   inadmissible record.

18             THE COURT:  Where is this referenced in the affidavit?

19   What paragraph?  So I can see the purpose for which it's being

20   offered.

21             MR. POLLACK:  Your Honor, this is referenced in

22   paragraph 51 of the affidavit.

23             THE COURT:  Thank you.

24             Let me ask plaintiffs' counsel if you want to address

25   the objection.  Are you offering 3286?

LCFKFTC7                          Della Fera - Direct

1      MR. PERLMAN:  Yes, your Honor, we are.  And we

2  actually, also, have one of the 9000 series documents with a

3  large bulk of the remaining exhibits in Mr. Della Fera's

4  affidavit, as well, to enter.

5      For GX 3286, we believe this is a contemporary

6  business record compiled by a Fera employee to memorialize a

7  series of meetings between Fera and Vyera.  As it says in

8  paragraph 51, Mr. Della Fera directed Mr. Florentino to

9  memorialize these events as listed.  And I can lay, on

10  redirect, additional foundation to support the fact that it's

11  Fera's practice to memorial discussions with outside parties

12  such as this one.

13      THE COURT:  So I'll receive it subject to connection,

14  and I will ask defense counsel if they feel, on redirect, a

15  sufficient basis hasn't been laid, or if the cross-examination

16  also suggests that I should not receive this, I will allow a

17  renewed objection.

18      Is that agreeable, counsel?

19      MR. POLLACK:  Thank you, your Honor.

20      THE COURT:  Good.

21      Anything else?

22      MR. POLLACK:  Nother further.  And we're ready to

23  proceed.

24      THE COURT:  Thank you so much.

25      Hold on one second, because I think there was going to

LCFKFTC7                    Della Fera - Direct

1   be an additional offer of evidence, and then we'll begin

2   cross-examination.

3          MR. POLLACK:  Your Honor, one point I would make is

4   that Mr. Della Fera is not the only employee of Fera who's

5   present today.  His coworker, Susan McDougal, is also present,

6   and I would ask to sequester the witness.

7          THE COURT:  Yes, unless the parties agree otherwise,

8   all witnesses are sequestered until their testimony is done

9   except for expert witnesses.  That's the general rule.

10         MR. POLLACK:  Thank you, your Honor.

11         MR. PERLMAN:  No objection, your Honor.

12         Your Honor, may I approach?

13         This is GX 9008.  It has 10 of the documents from

14  Mr. Della Fera and Ms. McDougal's affidavits.  There are three

15  remaining, for which we did not resolve the dispute until 1:45

16  today, so they're not on this list.

17         THE COURT:  Any objection to the receipt of GX 9008

18  and the documents listed therein?

19         MR. POLLACK:  None subject to your Honor's previous

20  rulings.  Thank you.

21         THE COURT:  Received.

22         (Government's Exhibit 9008 received in evidence)

23         THE COURT:  Cross-examination.

24         MR. POLLACK:  Thank you, your Honor.

25

LCFKFTC7                        Della Fera - Cross

1   CROSS-EXAMINATION

2   BY MR. POLLACK:

3   Q.  Good afternoon, Mr. Della Fera.  How are you?

4   A.  Good, thank you.

5   Q.  I don't know if you heard, but my name is Jeff Pollack.

6   I'm an attorney for Duane Morris, representing the defendant,

7   Martin Shkreli, in this case.  Thank you for being here and

8   answering my questions today.

9        Mr. Della Fera, your written statement was just

10  admitted into evidence.  There were other drafts of that

11  statement, correct?

12  A.  Of the affidavit?

13  Q.  Yes.

14  A.  Yes.

15          MR. POLLACK:  Justin, can we bring up DX 556, please.

16          Your Honor, may I approach?

17          THE COURT:  You don't need to ask permission, counsel.

18          MR. POLLACK:  Thank you, your Honor.

19          THE COURT:  Thank you.

20          MR. POLLACK:  Your Honor, what's the procedure?  Do I

21  hand it directly to the witness or to your staff?

22          THE COURT:  You may hand it directly to the witness.

23          MR. POLLACK:  Thank you.

24  BY MR. POLLACK:

25  Q.  Mr. Della Fera.

LCFKFTC7                     Della Fera - Cross

1    A.   Thank you.

2    Q.   Sure.

3         Mr. Della Fera, I've just handed to you what we've

4    marked as Exhibit DX 556.  This is a copy of the first draft of

5    your written testimony provided to us by the FTC's attorneys on

6    Friday afternoon.

7         THE COURT:  I'm sorry, you can't testify, counsel.

8         MR. POLLACK:  Okay.

9    Q.   Mr. Della Fera, have you seen this document before?

10   A.   I have to read the whole thing if you're asking me, but,

11   yes, it looks familiar to the affidavit, yes.

12   Q.   Does that appear to be your first draft of your affidavit?

13   A.   If you say so.

14   Q.   Is it your name on the last page of that document?

15   A.   No.

16   Q.   Which document -- what name is on the document?

17   A.   Witness name.

18   Q.   It just says "witness name"?

19   A.   Uh-huh.

20   Q.   Okay.

21        Turn to the front.

22        You're absolutely right.  My mistake.

23        That's your name on the front of the document,

24   correct?

25   A.   Yes.

LCFKFTC7                      Della Fera - Cross

1  Q.  Can you tell us, just explain, the process by which you

2  received a draft affidavit from the FTC?

3         I'm sorry, let me rephrase because I'm assuming facts.

4         Who sent you your first draft of your affidavit; do

5  you know?

6  A.  My counsel.

7  Q.  Do you know who he got it from?

8  A.  My counsel worked probably with the FTC, I believe.

9  Q.  When did you receive the first draft?

10 A.  I don't remember the date.

11 Q.  How long before -- well, first of all, your affidavit

12 itself is dated October 18, 2021.

13        How long before that did you receive the first draft

14 of your affidavit?

15 A.  I really don't recall, but a month or two.

16 Q.  When you received it, did you review it?

17 A.  Yes.

18 Q.  Did you make any changes?

19 A.  Yes.

20 Q.  How many changes did you make; do you recall?

21 A.  No.

22 Q.  From my review, it appears to be essentially the same

23 document.  Would you agree with that?

24 A.  I have not reviewed the two documents, but I do know which

25 one I signed.

LCFKFTC7                    Della Fera - Cross

1    Q.  And you don't recall how many changes you made?

2    A.  No.

3    Q.  And you don't recall if you signed, essentially, the same

4    document that your lawyer sent to you on day one?

5    A.  I don't know where you're going with that, counsel.  I

6    signed a document that was received from the counsel from FTC

7    just minutes ago — that's what I have in my hand — and then you

8    sent me a copy here.  I have not reviewed the copy.  I'm just

9    listening to your questions.

10   Q.  Mr. Della Fera, did you make any substantive changes to the

11   initial draft you received?

12   A.  I don't recall.

13   Q.  Let's talk about Fera Pharmaceuticals and its business.

14          Fera offers and sells generic and branded

15   pharmaceuticals, correct?

16   A.  Yes.

17   Q.  Your generic business model, as I understand it, is to

18   identify and develop products that have barriers to entry that

19   would otherwise deter your competitors; is that right?

20   A.  The word "deter" or less likely.

21   Q.  And Fera isn't interested, then, in investing in making a

22   generic drug for which there's already a lot of competition, is

23   it?

24   A.  No, we normally would not have an interest for that.

25   Q.  Is it correct -- I think you said before that in

LCFKFTC7                         Della Fera - Cross

1   determining which pharmaceuticals to pursue, Fera wants to

2   ensure that it, meaning the branded pharmaceutical product --

3   strike that.

4           Some of the barriers that Fera looks at,

5   Mr. Della Fera, are whether the drug was a complex formulation,

6   the type of its dosage form, and the unavailability of API?

7   Are those some of the barriers that you look for?

8   A.  Yes.

9   Q.  And as to API, as I understand it, figure out if that is

10  limited, your employees need to call around to every possible

11  manufacturer, correct?

12  A.  Yes, hopefully.

13  Q.  And what does it mean for API to be limited?

14  A.  Limited is usually one supplier to -- one supplier in the

15  market.

16  Q.  Why does your company, Fera, see that as a benefit to

17  pursuing a generic pharmaceutical?

18  A.  Less competition, potentially, going forward, but there is

19  no guarantee.

20  Q.  How does having limited API lead to less competition for

21  Fera Pharmaceuticals?

22  A.  Our hallmark is to have niche-type products, products that

23  are limited in availability, and to help the market have access

24  to a lower cost product.

25  Q.  So for your company, limited API is not a deterrent to

LCFKFTC7                    Della Fera - Cross

1   entry, but it's something that you see as a benefit?

2   A.  In some cases, yes.

3   Q.  Did you see it as a benefit when evaluating Daraprim?

4   A.  Yes.

5   Q.  Now, there are also data sources available that identify

6   which companies manufacture and offer for sale API, correct?

7   A.  Yes.

8   Q.  One of those data sources is the Newport database; am I

9   right?

10  A.  Correct.

11  Q.  Fera uses that Newport database to identify API

12  manufacturers; is that right?

13  A.  Yes.

14  Q.  Now, specifically to Daraprim, in September of 2015, your

15  company, Fera Pharmaceuticals, decided to develop a generic

16  Daraprim after seeing press coverage about Vyera's price

17  increase, right?

18  A.  When we decided to pursue the product, yes.

19  Q.  And the first thing you did to assess market opportunity

20  was that your company accessed, I believe — correct me if I'm

21  not pronouncing it right — IQVIA data from 2014?

22  A.  Yes.

23  Q.  And from that data, your company was able to ascertain that

24  the annual sales of Daraprim was approximately 1 million

25  tablets, correct?

LCFKFTC7                    Della Fera - Cross

1   A.  That is correct.

2   Q.  And from that, was Fera able to forecast the market

3   opportunity for generic Daraprim?

4   A.  Yes.

5   Q.  When you looked at that IQVIA data, your company was aware

6   that prescribers were also using other drugs, such as Bactrim,

7   instead of Daraprim because of Bactrim's lower price, correct?

8   A.  At that time, no, we were not looking at Bactrim data.

9   Bactrim is a very broad spectrum antibiotic.  I think there's

10  like 800 million tablets in the U.S. market.  So I would not be

11  looking at that, no.

12  Q.  Were you aware at some point that Bactrim was being used as

13  a substitute for Daraprim?

14  A.  Yes, when it hit the media, where healthcare professionals,

15  especially in hospitals, institutions, who were concerned with

16  the extraordinary costs of Daraprim, they were mentioning to

17  use Daraprim as a second line instead of a first line, and to

18  utilize Bactrim or Bactrim alternatives similar to generics as

19  the first line.

20  Q.  When you say "hit the press," when what hit the press?

21  A.  I'm trying to recall — late 2015 or '16, I don't remember

22  the dates or times — but in that general time there was a lot

23  of media attention drawn to the company Vyera.

24  Q.  Another thing that your company was aware of was that

25  prescribers were switching to compounded pyrimethamine as a

LCFKFTC7                    Della Fera - Cross

1    substitute for Daraprim, correct?

2    A.  I heard about that, but I wasn't -- I'm not familiar with

3    the compound, so -- it's still in those articles, they were

4    definitely out there.

5    Q.  And, in fact, after your company had manufactured its own

6    source of API, a compounder actually reached out to your

7    company to purchase API, correct?

8    A.  Yes.

9    Q.  And by API, I mean pyrimethamine API; are we on the same

10   page?

11   A.  Correct.  And we did not sell to the compounder.

12   Q.  But someone contacted you for it, correct?

13   A.  Yes.

14   Q.  Do you recall which compounder that was?

15   A.  No.

16   Q.  You shook your head, and I think you said no.  Which one

17   was it?

18   A.  It's no.

19   Q.  Okay.  Thank you.

20   A.  But if you want to refresh my memory, if there are any

21   documents I don't remember looking at...

22   Q.  Now, Mr. Della Fera, after your company looked at the IQVIA

23   data in 2015, did you estimate that sales would drop 50 percent

24   in the first year?

25   A.  You know, as time goes on — it's six years — we made a lot