# 22-728

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

FEDERAL TRADE COMMISSION, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF ILLINOIS, STATE OF NORTH CAROLINA, COMMONWEALTH OF VIRGINIA,

—against—

*Plaintiffs-Appellees,*

MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendant-Appellant,*

VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, KEVIN MULLEADY, individually, and as an owner and director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME VI OF VIII
### (Pages A-1486 to A-1782)

BRADLEY GROSSMAN
UNITED STATES FEDERAL
  TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-2424

*Attorneys for Plaintiff-Appellee*
  *Federal Trade Commission*

KIMO S. PELUSO
NOAM BIALE
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for Defendant-Appellant*
  *Martin Shkreli*

(*Counsel continued on inside cover*)

PHILIP LEVITZ
OFFICE OF THE NEW YORK STATE
 ATTORNEY GENERAL
28 Liberty Street, 15th Floor
New York, New York 10005
(212) 416-8000

*Attorneys for Plaintiffs-Appellees
 State of New York, State of
 California, Commonwealth of
 Pennsylvania, State of Illinois,
 Commonwealth of Virginia*

SHIRA HOFFMAN
ASSISTANT U.S. ATTORNEY
CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 269-6000

*Attorneys for Plaintiff-Appellee
 State of California*

DEREK MICHAEL WHIDDON
ASSISTANT ATTORNEY GENERAL
OHIO OFFICE OF THE
 ATTORNEY GENERAL
30 East Broad Street, 26th Floor
Columbus, Ohio 4321
(614) 466-2677

*Attorneys for Plaintiff-Appellee
 State of Ohio*

JOSEPH STEPHEN BETSKO, SR.
PENNSYLVANIA OFFICE OF
 THE ATTORNEY GENERAL
ANTITRUST SECTION
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-5393

*Attorneys for Plaintiff-Appellee
 Commonwealth of Pennsylvania*

SARAH A. HUNGER
DEPUTY SOLICITOR
ILLINOIS OFFICE OF THE
 ATTORNEY GENERAL
CIVIL APPEALS DIVISION
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5202

*Attorneys for Plaintiff-Appellee
 State of Illinois*

JESSICA VANCE SUTTON
NORTH CAROLINA DEPARTMENT
 OF JUSTICE
114 West Edenton Street
Raleigh, North Carolina 27603
(919) 716-0998

*Attorneys for Plaintiff-Appellee
 State of North Carolina*

SARAH OXENHAM ALLEN
LUCAS W.E. CROSLOW
MARTIN JORDAN MINOT
VIRGINIA OFFICE OF THE
 ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-6557

*Attorneys for Plaintiff-Appellee
 Commonwealth of Virginia*

# TABLE OF CONTENTS

PAGE

District Docket Court Entries ........................................... A-1

Amended Complaint, dated April 14, 2020 [Redacted] ................. A-136

Defendant Kevin Mulleady's Answer and Jury Demand,
  dated September 15, 2020 ......................................... A-222

Defendant Martin Shkreli's Answer with Jury Demand,
  dated September 15, 2020 ......................................... A-289

Defendant Vyera Pharmaceuticals' Answer with Jury Demand,
  dated September 15, 2020 ......................................... A-351

Joint Stipulation and Order to Amend the Relief Requested
  in the Pleadings, dated March 30, 2021 .......................... A-409

FTC's Motion for Leave to Withdraw the FTC's Prayer
  for Equitable Monetary Relief, dated May 26, 2021................ A-414

Order Dismissing the FTC's Claim for Disgorgement,
  dated June 2, 2021 .............................................. A-419

Defendant Martin Shkreli's Pretrial Memorandum of Law [Redacted]... A-422

Plaintiff States' Supplemental Pretrial Memorandum of Law,
  dated October 20, 2021 [Redacted] ............................... A-457

Joint Motion for Entry of Stipulated Order for Permanent Injunction,
  dated December 7, 2021........................................... A-492

Stipulated Order for Permanent Injunction and Equitable
  Monetary Relief, dated December 7, 2021.......................... A-541

ii

PAGE

Written Testimony of Nicholas Pelliccione, Ph. D.,
dated October 18, 2021 ......................................... A-581

Written Testimony of W. David Hardy, M.D., dated October 20, 2021 .. A-593

Written Testimony of Frank DellaFera, dated October 18, 2021
[Redacted] ..................................................... A-631

Written Testimony of James R. Bruno, dated October 20, 2021
[Redacted] ..................................................... A-649

Written Testimony of Edward V. Conroy, dated October 20, 2021 ...... A-687

Written Testimony of Susan McDougal, dated October 15, 2021
[Redacted] ..................................................... A-725

Written Testimony of Abhishek Mukhopadhyay,
dated October 19, 2021 [Redacted] .............................. A-739

Written Testimony of Nilesh Patel, dated October 15, 2021
[Redacted] ..................................................... A-751

Written Testimony of Manish S. Shah, dated October 20, 2021 ........ A-766

Written Testimony of Martin Shkreli, dated October 15, 2021
[Redacted] ..................................................... A-785

Written Testimony of Anne Kirby, dated October 20, 2021 [Redacted].. A-803

Written Testimony of Kevin Mulleady, dated October 20, 2021......... A-831

Written Testimony of Professor C. Scott Hemphill,
dated October 19, 2021 [Redacted] .............................. A-864

Written Testimony of Dr. Anupam B. Jena, dated October 20, 2021
[Redacted], with Attachments ................................... A-924

iii

PAGE

Written Testimony of John S. Russell, dated October 20, 2021
 [Redacted], with Attachments ................................. A-1011

Consolidated (Full) Trial Transcripts,
 dated December 14 to 20, 2021 ................................ A-1068

Defendant Martin Shkreli's Notice of Appeal, dated April 5, 2022 .... A-2298

LCFKFTC7                    Della Fera - Cross

1    of different estimates, and it's mostly on discussions.  That

2    would have been a good guess, Jeff, but I don't recall putting

3    that in writing or anything else, but it sounds like a good

4    guess.

5    Q.   Was that a yes?

6    A.   Yes.

7    Q.   And later, in 2018 --

8            THE COURT:  I'm sorry, a 50 percent drop of what?

9            MR. POLLACK:  You're absolutely right.

10           THE COURT:  Counsel, I don't know what that question

11   and answer referred to.

12           MR. POLLACK:  You're absolutely right.  Let me correct

13   the record.

14           Mr. Della Fera, when we're talking 50 percent your

15   firm projected a 50 percent drop in sales of Daraprim in the

16   first year after the price increase, correct?

17           THE WITNESS:  And I think Jeff means the unit tablets,

18   from a million tablets down to 500,000 tablets.

19   Q.   And even with the projection of 1 million tablets to

20   500,000 tablets, you and your company still viewed generic

21   Daraprim as an attractive opportunity to develop a product,

22   correct?

23   A.   Yes.

24   Q.   And I started off talking about -- fast-forward three years

25   down the road, in 2018, you have a meeting with Vyera's then

LCFKFTC7                    Della Fera - Cross

1    CEO, Mr. Mulleady, correct?

2    A.  Yes.

3    Q.  And from Mr. Mulleady, am I right that you learned that the

4    sales of Daraprim had actually decreased down to approximately

5    300,000, correct?

6    A.  That is correct.

7    Q.  It was about a 70 percent drop?

8    A.  Correct.  From Mr. Mulleady's share, the data from the

9    company that was accurate.

10   Q.  Did you believe the data to be accurate?

11   A.  I didn't see any reason for him not to be telling the

12   truth, but I still don't know if it's accurate.

13   Q.  Did your company perform projections based on that data?

14   A.  Yes.

15   Q.  And after you did your projections, did you still view

16   generic Daraprim as an attractive opportunity for your company?

17   A.  Yes.

18   Q.  Let's switch topics for a moment and talk about API

19   sourcing.

20         Mr. Della Fera, we'll be very careful not to use the

21   name of your API supplier.  We're going to refer to it as API

22   Company 1.

23   A.  Thank you.

24   Q.  If I say that, you'll understand who I'm referring to,

25   correct?

LCFKFTC7                    Della Fera - Cross

1   A.  Correct.

2   Q.  Before I get there, would you agree with me that

3   pyrimethamine is not a difficult molecule to manufacture?

4   A.  Agreed.

5   Q.  When you started out looking at Daraprim and you looked at

6   the Newport database -- first of all, was it you who looked at

7   the database, or someone else at your company?

8   A.  It was not me.

9   Q.  Who did that work?  Do you know?

10  A.  I would say Susan McDougal.

11  Q.  Okay, your colleague, Ms. McDougal?

12  A.  Yes.

13  Q.  She's your vice president?

14  A.  Yes.

15  Q.  Is she vice president of something specific or vice

16  president of the company overall?

17  A.  She's recently been promoted to executive vice president of

18  the company.

19  Q.  In 2018, what was her title?  Sorry, 2015; correct myself.

20  A.  I don't remember the title, but her responsibilities

21  increased over that time.  She was a vice president then, at

22  that time.

23  Q.  Well, I digress.  She'll be here to testify, and we can ask

24  her personally.

25  A.  Thank you.

LCFKFTC7                    Della Fera - Cross

1   Q.  With the Newport database, Fera identified two potential

2   API suppliers with the DMF, Fukuzyu and Ipca, correct?

3   A.  Correct.

4   Q.  And I say Fukuzyu.  I don't know if that's correct; I've

5   heard it's not.  That's what I'm used to, so if I use the word

6   "Fukuzyu," will you understand what I mean?

7   A.  Yes, Jeff.

8   Q.  Okay, thank you.  And feel free to do the same or however

9   you refer to it.

10          According to paragraph 19 of your written testimony,

11  your company reached out only to Fukuzyu, not to Ipca, correct?

12  A.  I want to share that I had diabetic retinopathy, I have

13  eyesight problems, so please bear with me.

14  Q.  Well, Mr. Della Fera, maybe you can answer without looking

15  at your direct testimony.

16          Is it correct your company reached only to Fukuzyu and

17  not to Ipca?

18  A.  I would believe we reached out Ipca in addition to -- I

19  don't have it memorialized but I believe we...

20  Q.  Paragraph 19 of your written statement says, "We reached

21  out to Fukuzyu which was DMF pyrimethamine API, but they did

22  not respond to our initial query," correct?

23          THE COURT:  I'm sorry, counsel, when you read, can you

24  read slowly --

25          MR. POLLACK:  Yes, of course.

LCFKFTC7                          Della Fera - Cross

1              THE COURT:  -- so we can catch every word.

2              So I think the statement you read was, "We first

3    reached out to Fukuzyu, which holds a DMF for pyrimethamine

4    API, but they did not respond to our initial inquiry."

5              Is that statement correct?

6              THE WITNESS:  Yes.

7    BY MR. POLLACK:

8    Q.   Your next paragraph of your affidavit says, "I then decided

9    to meet with two potential API suppliers at an industry

10   conference called Drug, Chemical & Associated Technologies

11   week, usually referred to as DCAT," correct?

12   A.   Correct.

13   Q.   If we look in the next sentence, we see that the companies

14   you reached out to were a company called API 1 and another

15   company called ChemCon, correct?

16   A.   Correct.

17   Q.   Nothing in your affidavit here about Ipca, correct?

18   A.   Correct.

19   Q.   When you went to the DCAT meeting and you met with ChemCon

20   and you met with API Company No. 1, you opted to go with API

21   Company No. 1, correct?

22   A.   I'm sorry, can you repeat that, Jeff?

23   Q.   Sure.  When you were at DCAT and you met with those two

24   companies, ChemCon and API No. 1, you opted to go with API

25   No. 1, correct?

LCFKFTC7                    Della Fera - Cross

1    A.  Yes.

2    Q.  And that's because API No. 1 was the more affordable option

3    between the two, correct?

4    A.  Affordable, and we had confidence in them executing.

5    Q.  And API No. 1 did not have a DMF on file, correct?

6    A.  Correct.

7    Q.  And DMF, when we say that, we're referring to drug master

8    file, correct?

9    A.  Yes.

10   Q.  That's a filing made with the FDA, correct?

11   A.  Yes.

12   Q.  And that's what an API manufacturer files that says that

13   they have been approved to make a certain API?

14   A.  Yes.

15           THE COURT:  I'm sorry to interrupt, but does it mean

16   that they have been approved, or if there's a DMF, they've

17   filed?

18           MR. CASEY:  Well, let me ask Mr. Della Fera because

19   he's the expert.

20           THE WITNESS:  It's not approved.  They filed.

21   Q.  They filed.  Thank you.

22   A.  And how they get approval, your Honor, is, after someone

23   submits an application utilizing their material and then the

24   FDA reviews the application along with reviewing the

25   manufacturer of the active ingredient, that's when they get

LCFKFTC7                          Della Fera - Cross

1   approved.

2   Q.   Thank you for that clarification.

3          As I understand it, your business practices, you

4   preferred to work with a company with a DMF, correct?

5   A.   Yes.

6   Q.   But, in this case, you did not?

7   A.   Yes.

8          THE COURT:  Well, you did not work with a company with

9   a DMF?

10          MR. POLLACK:  That was the question.

11          THE COURT:  Okay, but because he just said he reached

12   out to the one company that had the DMF.

13          MR. POLLACK:  And it did not respond.

14          THE COURT:  Right.

15   BY MR. POLLACK:

16   Q.   When you -- did you enter into a contract with API Company

17   No. 1?

18   A.   Yes.

19   Q.   Do you recall when you entered into a contract with API

20   Company No. 1?

21   A.   It was months after the DCAT meeting, so June --

22   approximately June of '16.

23   Q.   Before you contracted with API Company No. 1, did Fera

24   conduct any kind of a tour of the facility --

25   A.   No.

LCFKFTC7                    Della Fera - Cross

1    Q.  -- of their facilities?

2    A.  No.

3              MR. POLLACK:  Justin, can we pull up DX 113, please.

4    Q.  Mr. Della Fera, can you tell me if you have seen this

5    document before?

6    A.  Yes.

7    Q.  Is this your confidentiality and exclusivity agreement

8    entered into with company -- API Company 1 in June 13 of 2016?

9    A.  Yes.

10             MR. POLLACK:  Your Honor, this document is already in

11   evidence.

12             But could we turn to the second page, please.

13   Q.  If we look at paragraph 3, the document says, "Company

14   confirms" -- "company" meaning API Company No. 1, correct?

15   A.  I've got to read it to see the context.  I'm sorry.

16   Q.  It says, "Company confirms and agrees that during the

17   restricted period, company will not pursue development or

18   supply the API pyrimethamine for its account or on behalf of

19   any other person."

20   A.  Yes.

21   Q.  And it says, "The term 'restricted period' means five years

22   commencing on the effective date," correct?

23   A.  Yes.

24   Q.  So, in other words, this is an exclusive supply agreement

25   between your company, Fera, and API Company No. 1?

LCFKFTC7                        Della Fera - Cross

1    A.  That was the intention, yes.

2    Q.  And API Company No. 1, under this agreement, cannot supply

3    pyrimethamine API to any other company, correct?

4    A.  Yes, because we were paying for the development personally

5    for our company, yes.

6    Q.  So that's a yes?

7    A.  Yes.

8    Q.  If we go to the next page, please, if we look at paragraph

9    12, we see that the term of the exclusivity period runs for the

10   term of the agreement, five years, correct?

11   A.  Yes.

12          MR. POLLACK:  Can we turn to Exhibit A, please, page

13   115 of the document.  You're on 113.  Look for page FTC FERA

14   115.

15          There we go.  Blow up the commercial statistics

16   section, please.

17   Q.  If we look here, Mr. Della Fera, it appears that API

18   Company No. 1, if we add up the time, is predicting 34 to 40

19   weeks to develop pyrimethamine API, correct?

20   A.  Approximately, yes.

21   Q.  Ultimately, it took them longer than that to complete its

22   first batch of API, correct?

23   A.  Yes.

24   Q.  But you don't know what the source of those delays were at

25   API Company No. 1, do you?

LCFKFTC7                         Della Fera - Cross

1    A.  No specifics, no.

2    Q.  Whatever those delays were, was API Company No. 1

3    ultimately able to manufacture pyrimethamine API for Fera?

4    A.  Yes.

5    Q.  When was that?

6    A.  I don't recall the timelines.  There's a timeline sheet, if

7    I could -- I don't remember.

8    Q.  You know, Mr. Della Fera, we'll come back to that.

9          MR. POLLACK:  Can we bring up Exhibit DX 115, please.

10   Q.  Mr. Della Fera, what we've marked here -- can you tell me

11   if you recognize this document, from the first page?

12   A.  I recognize it.

13   Q.  Is this your supply agreement between your company and API

14   No. 1?

15   A.  Yes.

16   Q.  Agreed to on April 6, 2018?

17   A.  Yes.

18         MR. POLLACK:  Your Honor, I move to admit DX 115.

19         MR. PERLMAN:  No objection, your Honor.

20         THE COURT:  Received.

21         (Defendants' Exhibit 115 received in evidence)

22   BY MR. POLLACK:

23   Q.  If we turn to page 5 of this document, Section 2.5,

24   Mr. Della Fera, is this document, like the one we just looked

25   at, also subject to an exclusivity agreement?

LCFKFTC7                    Della Fera - Cross

1   A.  Can you repeat your question, please?

2   Q.  Sure.  Is this supply agreement, like your confidentiality

3   agreement with API to Company No. 1, also subject to an

4   exclusivity agreement?

5   A.  Yes.

6   Q.  Subject to this agreement, again, API Company No. 1 shall

7   only manufacture and supply API exclusively to Fera, correct?

8   A.  Yes.

9          MR. POLLACK:  Justin, can you blow this up a little

10  bit more, please, to get the whole provision and go down to

11  2.6.  Thank you.

12  Q.  Down here, it says, "During the term of the agreement, API

13  No. 1 shall not cause its affiliates not to purchase,

14  manufacture, supply or develop an alternate API, DMF and/or

15  finished dosage form using the API in the territory, or (b)

16  enter into any agreement with any third party to purchase,

17  manufacture, supply or develop an alternate API, DMF and/or

18  finished dosage form using the API for distribution in the

19  territory."

20         Do you see that?

21  A.  Yes.

22  Q.  If we look at the agreement, "territory" is defined on page

23  2, in the fourth whereas clause, as the United States and its

24  territories, correct?

25  A.  Yes.

LCFKFTC7                    Della Fera - Cross

1   Q.  In your written testimony, and just a few moments ago, you

2   alluded to this, you stated that Fera requested exclusivity

3   because of its investment in API 1's development process,

4   right?

5   A.  Yes.

6   Q.  But Fera didn't seek to bar API Company No. 1 from selling

7   pyrimethamine to third parties outside of the territory,

8   correct?

9   A.  Correct.

10  Q.  So those third parties outside of the territory, they can

11  benefit from the investment your company made in API Company

12  No. 1's pyrimethamine manufacturing abilities, correct?

13  A.  It would appear that way.

14          MR. POLLACK:  One moment, your Honor?

15          (Pause)

16          MR. CASEY:  Justin, will you please pull up GX 7015.

17  Q.  Mr. Della Fera, using this document, are you able to tell

18  me when API Company No. 1 was first able to manufacture

19  pyrimethamine?

20          THE COURT:  You can direct his attention to a specific

21  line if you think that would be helpful to you, counsel.

22          MR. POLLACK:  Thank you, your Honor.

23  Q.  Mr. Della Fera, the only thing I see on here about the API

24  is on May 28, 2019, Fera files pyrimethamine API DMF, on page 2

25  of the document.

LCFKFTC7                    Della Fera - Cross

1              Does that orient you to when API Company No. 1 first

2       manufactured pyrimethamine?

3              MR. PERLMAN:  Objection; this mischaracterizes the

4       document.

5              THE COURT:  Sustained.

6              MR. POLLACK:  Did I misread the document?

7       A.  Yes.

8       Q.  My mistake.

9              May 28, 2019, Fera files pyrimethamine API DMF.

10             Does that orient you to when API Company No. 1 first

11      manufactured pyrimethamine API?

12      A.  Yes.

13             MR. PERLMAN:  Same objection, your Honor.

14             THE COURT:  So you want to use the reference to this

15      filing to see if it refreshes his recollection as to when they

16      first manufactured a batch of API?

17             MR. POLLACK:  That's what I'm trying to do, your

18      Honor.

19             THE COURT:  Okay.

20             So, knowing the date of the filing, does that help you

21      remember when they first succeeded in manufacturing a batch?

22             THE WITNESS:  Yes, your Honor.  What refreshed was the

23      first page of this document.

24      Q.  Oh, my mistake.

25             And what does the first page of the document tell you,

LCFKFTC7                    Della Fera - Cross

1   sir?

2   A.  In October 2017 the initial batches were produced.

3   Q.  Thank you, sir.

4        Between the time of contracting with API Company No. 1

5   and getting this initial batch, did your company ever reach out

6   to another company with a European DMF called RL Fine?

7   A.  I don't recall.  I mean, we had a few people looking for

8   the API, so...

9   Q.  In fact, you did not, correct?

10  A.  I don't recall.

11       MR. POLLACK:  Justin, can we have his deposition at

12  page 173, line 18 to 23.

13  Q.  Mr. Della Fera, before I ask you about that, do you recall

14  having your deposition taken on January 19, 2021?

15  A.  I'm sorry, just --

16  Q.  He just took it -- he'll put it back up, but do you

17  remember having your deposition taken?

18  A.  When was it?  I'm sorry, Jeff.

19  Q.  January 19, 2021.

20  A.  Yes.

21  Q.  And you were under oath there, as you are here?

22  A.  Yes.

23       MR. POLLACK:  Justin, can you put that back up,

24  please.

25  Q.  You testified:  Okay, so you're not aware of any effort by

LCFKFTC7                    Della Fera - Cross

1    Fera to contact RL Fine about pyrimethamine API supply, and you

2    said, no, I don't, I don't know any efforts personally, no.

3    A.  I think my answer was the same.  I said I don't recall.

4    This is --

5    Q.  You're the president of the company; is that right?

6    A.  Yes.

7    Q.  Were you involved in your company's efforts to manufacture

8    Daraprim, generic Daraprim?

9    A.  Yes.

10   Q.  After API Company No. 1 manufactured its first batches of

11   pyrimethamine API, did it file for a DMF?

12   A.  I'm sorry, Jeff, can you repeat that?

13   Q.  Yes.  After API Company No. 1 manufactured its first

14   batches of API, it filed for a DMF, correct?

15   A.  No, we -- it takes months to prepare for a final for a DMF.

16   Q.  I understand.  But at some point after the manufacture,

17   there was a filing for a DMF, correct?

18   A.  It was in that other page that you referenced, in May of

19   2019.

20   Q.  Am I correct that your company held the DMF?

21   A.  No.  We created the DMF; we didn't hold the DMF.

22   Q.  Can you explain to us what that means, by creating the DMF?

23   A.  Making those three batches is not a DMF.  It's a huge

24   document, and all the data has to be put together, and testing,

25   and things of that nature.  I think we initiated the work in

LCFKFTC7                          Della Fera - Cross

1  January of '18, a couple of months after we got the raw

2  material, and it took over a year and three months to get it

3  all done.  That's why we prefer using material that's already

4  approved or filed with the FDA.

5  Q.  In 2020, did another generic --

6  A.  But I want to add to that because you asked a good

7  question.

8         I think when we got the material, on January 30, 2018,

9  the two bottles of Daraprim, is when we went full speed,

10 because it's an expensive process, building DMF and doing

11 everything else around the project.

12        So you just helped me recollect.  Thank you.

13 Q.  When you said your company filed for the DMF, does that

14 mean that you were the company of record for the DMF with the

15 FDA?

16 A.  Yes.

17 Q.  And, in fact, in late 2020, were you contacted by another

18 generic pharmaceutical company to purchase API?

19 A.  Yes.

20 Q.  Was that company Tanner Pharmaceuticals?

21 A.  No.

22 Q.  I'm sorry, was that company Teva Pharmaceuticals?

23 A.  Yes.

24 Q.  Thank you.

25        Do you know what price you quoted -- first of all, did

LCFKFTC7                    Della Fera - Cross

1    you quote a price to Teva?

2    A.   Yes.

3    Q.   Do you know what price you quoted?

4    A.   We gave them a price that they wouldn't buy it.

5    Q.   Why did you do that?

6    A.   Because I don't want to deal with them.

7    Q.   Are you aware that Teva's ANDA for generic Daraprim was

8    approved in August of 2021?

9    A.   Yes.

10   Q.   Do you know who supplied Teva's API?

11   A.   I can make a guess but I don't know a fact.

12           THE COURT:  Is this a good place to stop, counsel?

13           MR. POLLACK:  Yes, I'm about to change topics, your

14   Honor.

15           THE COURT:  Great.  We will recess for the day.  Just

16   give me one second.

17           You may step down, sir.  Thank you so much.

18           THE WITNESS:  Thank you, your Honor.

19           Your Honor, what do I do with these documents?

20           THE COURT:  You just leave them right there.  Counsel

21   are going to take care of them.

22           THE WITNESS:  Terrific.

23           (Witness temporarily excused)

24           THE COURT:  So, counsel, again, I'll check with my

25   team and see if this is accurate, but I think the plaintiffs

LCFKFTC7                    Della Fera - Cross

1    have used six hours and one minute, and the defense counsel

2    have used four hours and twenty-nine minutes, but I'll let you

3    know tomorrow morning if that's wrong.

4            Let me ask counsel — and thank you very much for this

5    notice of the next set of witnesses, beginning with Mr. Dorfman

6    — are we on track, as far as you're concerned?

7            MR. MEIER:  Your Honor, I think we are on track.  It's

8    going a little bit longer, but, as your Honor knows, there have

9    been a few witnesses that have dropped out, so we were always a

10   bit concerned of whether we were going to get a full Wednesday

11   anyway, so I think with Ms. McDougal and Mr. Della Fera

12   finishing, and Ms. McDougal, that we're going to be pretty much

13   on track tomorrow.

14           THE COURT:  Okay, good.

15           So you expect to get through these additional four

16   witnesses tomorrow?

17           MR. MEIER:  So I'm actually missing the email, I'm

18   missing the email that we sent --

19           THE COURT:  Dorfman, Mkhopadhyah, Hemphill and Conroy.

20           MR. MEIER:  I don't think we'll get through

21   Mr. Conroy, and we're hopeful we will get through Mr. Hemphill,

22   or Professor Hemphill.

23           THE COURT:  Okay.  Everyone, have a nice evening.  See

24   you tomorrow morning.

25           (Adjourned to December 16, 2021 at 9:30 a.m.)

1               INDEX OF EXAMINATION

2    Examination of:                              Page

3     JAMES BRUNO

4    Cross By Mr. Parks . . . . . . . . . . . . . 226

5    Redirect By Mr. Perlman  . . . . . . . . . . 235

6    WILLIAM DAVID HARDY

7    Cross By Mr. McConnell . . . . . . . . . . . 263

8    Redirect By Ms. Peay . . . . . . . . . . . . 295

9    Recross By Mr. McConnell . . . . . . . . . . 308

10    CHRISTINA GHORBAN

11   Direct By Mx. Black  . . . . . . . . . . . . 316

12   Cross By Mr. Casey . . . . . . . . . . . . . 378

13   Redirect By Mx. Black  . . . . . . . . . . . 397

14    FRANK DELLA FERA

15   Cross By Mr. Pollack . . . . . . . . . . . . 411

16               GOVERNMENT EXHIBITS

17   Exhibit No.                              Received

18    9053    . . . . . . . . . . . . . . . . . . 222

19    9054    . . . . . . . . . . . . . . . . . . 222

20    9055    . . . . . . . . . . . . . . . . . . 223

21    9056    . . . . . . . . . . . . . . . . . . 223

22    9057    . . . . . . . . . . . . . . . . . . 224

23    8003    . . . . . . . . . . . . . . . . . . 263

24    1228    . . . . . . . . . . . . . . . . . . 329

25    1207    . . . . . . . . . . . . . . . . . . 343

1    1556    . . . . . . . . . . . . . . . . . . 353

2    1289    . . . . . . . . . . . . . . . . . . 357

3    1307    . . . . . . . . . . . . . . . . . . 360

4    1405    . . . . . . . . . . . . . . . . . . 364

5    1217    . . . . . . . . . . . . . . . . . . 369

6    8007    . . . . . . . . . . . . . . . . . . 406

7    9008    . . . . . . . . . . . . . . . . . . 410

8                    DEFENDANT EXHIBITS

9    Exhibit No.                          Received

10    115    . . . . . . . . . . . . . . . . . . 428

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCGMFTC1

1    UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
    FEDERAL TRADE COMMISSION,
3    STATE OF NEW YORK, STATE OF
    CALIFORNIA, STATE OF OHIO,
4    COMMONWEALTH OF PENNSYLVANIA,
    STATE OF ILLINOIS, STATE OF
5    NORTH CAROLINA, and
    COMMONWEALTH OF VIRGINIA,
6
            Plaintiffs,
7         v.                20 CV 706 (DLC)

8    MARTIN SHKRELI, et al.,

9            Defendants.
    ------------------------------x
10                          New York, N.Y.
                          December 16, 2021
11                          9:30 a.m.
    Before:
12                  HON. DENISE COTE,
                          District Judge
13                   APPEARANCES

14    FEDERAL TRADE COMMISSION
    BY:  MARKUS H. MEIER
15        MARIN HANEBERG
        BRADLEY S. ALBERT
16        LAUREN PEAY
        NEAL PERLMAN
17        LEAH HUBINGER

18    NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
    BY:  ELINOR R. HOFFMANN
19        JEREMY R. KASHA
        AMY E. McFARLANE
20
    DUANE MORRIS LLP
21        Attorneys for Shkreli
    BY:  CHRISTOPHER H. CASEY
22        JEFFREY S. POLLACK
        ANDREW J. RUDOWITZ
23        SARAH FEHM STEWART
        SEAN McCONNELL
24        J. MANLY PARKS

25

LCGMFTC1

1          (Case called)

2          THE COURT:  Good morning, everyone.

3          The witness can retake the witness stand.

4          MR. MEIER:  Your Honor, if I may, we have a few

5   preliminary matters, if we can take those up.

6          THE COURT:  Sure.

7          MR. MEIER:  Thank you, your Honor.  The first thing

8   I'd like to do is simply introduce the paralegal who will be

9   comparably helping us today, Bryce Tuttle.  Now you have met

10  all three of our crack assistants that are making this work for

11  us today.  Thank you.

12          THE COURT:  Sir, you can come up and take the witness

13  stand.

14          MR. MEIER:  The first item, your Honor, is a

15  designation of the transcripts of a witness named Ramachandra

16  from RL Fine.  It's Government Exhibit 9058.  There are no

17  changes from the designations that had been admitted in

18  October, and it's my understanding that we have agreement from

19  defendants on the admission of this.

20          THE COURT:  Any objection to receipt of GX-9058?

21          MR. RUDOWITZ:  Your Honor, no objection.

22          THE COURT:  Received.

23          (Government Exhibit 9058 received in evidence)

24          MR. MEIER:  The next one, your Honor, is Government

25  Exhibit 9059.  9059, your Honor, is the designation of the

LCGMFTC1

1    transcript of a witness named Eric Sredzinski from a company

2    named Avella.  Again, there are no changes from the

3    designations that we submitted in October, and it's my

4    understanding that defendants do not object.

5              THE COURT:  Any objections?

6              MR. RUDOWITZ:  No objection.

7              THE COURT:  9059 is received.

8              (Government Exhibit 9059 received in evidence)

9              MR. MEIER:  The next one, your Honor, is Government

10   Exhibit 9060.  It's the deposition designations of a witness

11   named Christopher Lau from Vyera.  And there have been some

12   changes, as indicated on the first page.  So we have withdrawn

13   certain items as indicated.  Again, it's my understanding

14   defendants do not object, but I will let them speak for

15   themselves.

16             THE COURT:  Any objection?

17             MR. RUDOWITZ:  No objection, your Honor.

18             THE COURT:  Government Exhibit 9060 is received.

19             (Government Exhibit 9060 received in evidence)

20             MR. MEIER:  Your Honor, the next one is Government

21   Exhibit 9061.  These are the deposition designations of Lucas

22   Schulz from the University of Wisconsin Hospitals and Clinics.

23   There has one modification here, as indicated on the cover that

24   we submitted back in October.  It's my understanding that

25   defendants do not object.

LCGMFTC1

1          THE COURT:  Any objection?

2          MR. RUDOWITZ:  No objection, your Honor.

3          THE COURT:  Government Exhibit 9061 is received.

4          (Government Exhibit 9061 received in evidence)

5          MR. MEIER:  The next one, your Honor, is Government

6     Exhibit 9062.  It's the designations of a witness named Kevin

7     Wessel from CVS Capital.  Again, it's my understanding that

8     defendants do not object.

9          THE COURT:  Any objection to GX-9062?

10         MR. RUDOWITZ:  No objection, your Honor.

11         THE COURT:  Received.

12         (Government Exhibit 9062 received in evidence)

13         MR. MEIER:  Your Honor, this is Government Exhibit

14    5005.  There is a cover letter in the front.  I'll explain in a

15    moment.  It is the investigational hearing transcript of a

16    witness named Michael Smith from Vyera.

17         The issue here, your Honor, why we put a cover letter

18    on it is, we wanted to let your Honor know that in discussions

19    with the defendants, it is my understanding defendants wanted

20    us to put the entire transcript in without any highlighting on

21    it.  But in our October submission we highlighted the relevant

22    passages from this.  I'm not really sure the origin of why we

23    couldn't just submit the highlighted version.  Maybe

24    Mr. Rudowitz would like to speak to that.

25         THE COURT:  I have the highlighted version with the

LCGMFTC1

1    pretrial order.

2             MR. MEIER:  You do, your Honor.

3             MR. RUDOWITZ:  Your Honor, we object to the

4    highlighted designations of the investigational hearing

5    transcripts as they are not Rule 32 depositions.  But we do not

6    object to the admission of the investigational hearing

7    transcript as a whole, subject to your Honor's rulings.

8             THE COURT:  Thank you, counsel.

9             I obviously wrote on the evidentiary objection that

10   was made for the offer of testimony given during the

11   investigational hearings, so I'm not quite sure how to

12   understand your objection.  You're withdrawing those objections

13   so long as the entire transcript is offered?

14            MR. RUDOWITZ:  That is correct, your Honor.  We

15   understand your Court's ruling to allow in the investigational

16   hearing transcripts as an exception to hearsay.

17            THE COURT:  No.  As designated.  There were passages

18   designated with the pretrial order.  There was an objection

19   made.  I ruled on the objection, understanding it was in the

20   context of designated portions.  So now I am trying to

21   understand what the defendant's position is.

22            You no longer object at all to the receipt of the

23   testimony of Mr. Smith at the investigational hearing, so long

24   as all of the testimony comes in?

25            MR. POLLACK:  Your Honor, it appears that we were

444

LCGMFTC1

1    under a misapprehension of your Honor's order, which was that

2    we interpreted it to be that the investigational hearing

3    transcripts were not depositions under Rule 32(a), but your

4    Honor had ruled that they could be admissible under Rule 802(d)

5    as party statements by Vyera employees, in which case, under

6    that ruling, they would be admissible as a whole, but not as

7    designated testimony.

8           We are not withdrawing our objection.  We are simply

9    saying that we, subject to how we understood your Honor to have

10   ruled, that in that case they are indeed 802(d) statements that

11   your Honor has ruled that they would be admissible as any other

12   802(d) document, but not as a deposition.

13          Because an investigational hearing is not a

14   deposition.  Our client had no notice of it.  He was not there.

15   Would not have an opportunity to cross-examine at that hearing.

16          That is our position.

17          THE COURT:  Thank you.  Of course I ruled on the

18   general legal issue because I understood that was the dispute

19   between the parties.  The defendant at that time only had

20   notice that the plaintiffs wished to offer certain designated

21   material.  There could be multiple bases for objections to any

22   passage in testimony given at a hearing or in a deposition.

23          You are not withdrawing your objection as to the

24   single legal issue as to whether or not Mr. Smith's testimony

25   as an agent of the company is admissible.  But you have no

LCGMFTC1

1   other objection to any of the designated portions that the

2   plaintiffs wanted in and, indeed, you want in the entire

3   transcript.

4          MR. POLLACK:  Your Honor, just to clarify, not only

5   did plaintiffs seek to designate this testimony, they put it on

6   their exhibit list as an exhibit.  That was what was before

7   your Honor at the hearing.  We did not counterdesignate or

8   object to their designations because we viewed them as improper

9   when made, because the document was not a 32(a) deposition to

10  which designations could have been properly made.

11         Having received your Honor's ruling on 802(d), we

12  understood the entirety of the document to then constitute a

13  party admission.  We don't agree with that, but we accept the

14  Court's ruling, respectfully.  That's why our position was that

15  the document can come in as a whole, but we objected to the

16  highlighted portions because the highlighted portions would, in

17  effect, be a designation.

18         THE COURT:  I think the record is clear enough with

19  respect to the defendant's position.

20         MR. POLLACK:  Thank you, your Honor.

21         THE COURT:  I don't think I need to conduct further

22  colloquy to get that position stated on the record.

23         Do you agree, Mr. Meier?

24         MR. MEIER:  Yes, your Honor.

25         THE COURT:  Thank you.

446

LCGMFTC1

1          MR. MEIER:  I have another investigational hearing

2     transcript.  We have marked it as Government Exhibit 5013.

3          THE COURT:  I'm sorry.

4          GX-5005 is received.

5          (Government Exhibit 5005 received in evidence)

6          THE COURT:  Any objection to receipt of GX-5033?

7          MR. POLLACK:  Your Honor, it's the same issue, same

8     objection.  I don't believe the Court needs or wants me to

9     right the issue.

10          MR. MEIER:  It's Government Exhibit 5013.

11          THE COURT:  Thank you.   5013.

12          MR. MEIER:  It's the investigational hearing

13     transcript of Nancy Retzlaff from Vyera.

14          THE COURT:  The defendant wants to maintain its

15     original objection about the admissibility of any portion of

16     Ms. Retzlaff's hearing transcript.  But in the event any of it

17     comes in, it wishes all of it to come in.  Do I understand that

18     correctly?

19          MR. POLLACK:  Yes, you do, your Honor.

20          THE COURT:  Thank you.

21          GX-5013 is received.

22          (Government Exhibit 5013 received in evidence)

23          MR. MEIER:  Again, just for the record, as we have

24     pointed out in our cover letter, highlighted versions are

25     available to the Court from the October filing, to the extent

LCGMFTC1

 1    that that's useful to the Court.

 2              The last one I have, your Honor, is Government Exhibit

 3    9002.  9002 is a second list of exhibits to be admitted at

 4    trial.  My understanding is that we have agreement with the

 5    defendants on the admission of these exhibits, which do include

 6    a few defendant's exhibits and a number of government exhibits.

 7              THE COURT:  Any objection to the receipt of Government

 8    Exhibit 9002 and the exhibits listed within it?

 9              MS. STEWART:  No objection, your Honor.

10              THE COURT:  Thank you so much.  Government Exhibit

11    9002 and the exhibits listed within it are received.

12              (Government Exhibit 9002 received in evidence)

13              THE COURT:  Anything further, Mr. Meier?

14              MR. MEIER:  One last point, your Honor.  My colleague,

15    Mr. Perlman will be handling the examination of Mr. Della Fera

16    for the government, and we took his declaration off the stand,

17    so we need to give it back to him.

18              MR. PERLMAN:  This also has DX-556, which was the

19    exhibit that defendant showed Mr. Della Fera.

20              THE COURT:  Mr. Della Fera, I remind you you are still

21    under oath.

22              Cross-examination may resume.

23              MR. POLLACK:  Thank you, your Honor.

24    FRANK DELLA FERA, resumed.

25    CROSS-EXAMINATION (cont'd)

LCGMFTC1                    Della Fera - Cross

1    BY MR. POLLACK:

2    Q.  Mr. Della Fera, yesterday I erroneously starting off by

3    wishing you a good morning.  Today I can do that correctly.

4    Good morning, sir.

5    A.  Good morning.

6    Q.  How are you?

7    A.  Good.

8    Q.  Thank you for being back here today to continue the

9    examination.

10           I'd like to pick up where we left off yesterday.  I

11   have a couple of just clarifying questions for you on a couple

12   of points we touched upon before I move on to my next topic.

13           One of the things we discussed was the fact that your

14   company, Fera, had entered into two separate agreements with

15   API, company number 1.  A confidentiality and exclusivity

16   agreement in 2016, correct?

17   A.  Yes.

18   Q.  Followed then by a supply agreement two years later in

19   2018, correct?

20   A.  Yes.

21   Q.  Now, the supply agreement, if I'm correct, replaced and

22   superseded the confidentiality agreement, correct?

23   A.  I believe so.

24   Q.  Why did your company, Fera, enter into a supply agreement

25   in 2018 when the confidentiality exclusivity agreement had a

LCGMFTC1                    Della Fera - Cross

1   five-year term?

2   A.  I think it was just additional details that we needed to

3   put into our agreement between the two parties, and we both

4   agreed to do it.

5   Q.  It was just a more formalized agreement then?

6   A.  Pardon?

7   Q.  Just a more formalized agreement in that case?

8   A.  Yes.

9   Q.  Thank you.

10         I also want to just attach a date to an event we

11  discussed.  You had mentioned that early on in your evaluation

12  of whether to pursue a generic Daraprim product, Fera reached

13  out to an API supplier called Fukuzyu, correct?

14  A.  Yes.

15  Q.  Now, that contact came, I believe you have previously

16  testified, either late in 2016 or early 2017, is that right?

17  A.  I don't remember the dates.

18  Q.  You don't recall.  OK.  That's an important date for me.

19  If we showed you your deposition, would that perhaps refresh

20  your recollection on the point?

21  A.  Yes.

22         MR. POLLACK:  Justin could you pull up Mr. Della

23  Fera's deposition at page 42 and highlight lines 12 to 20,

24  please.  May need a bit more than that.  I'm sorry.  Let's take

25  it all the way down to -- that's where.  That was actually

LCGMFTC1                    Della Fera - Cross

1   perfect.

2   Q.  Mr. Della Fera, take a moment to read that and let me know

3   if that refreshes your recollection.

4        I had misspoken earlier.  Go ahead.

5   A.  I'm listening.

6   Q.  Does that refresh your recollection?

7   A.  Yes.

8   Q.  I said '16, '17.  In fact was it in fact late '15, early

9   '16 when someone from your company reached out to Fukuzyu?

10  A.  Correct.

11  Q.  In fact it was prior to March 2016, correct?

12  A.  Yes.

13  Q.  In any event, right?

14       There was some discussion about the fact that your

15  company then later reached out to Fukuzyu a second time,

16  correct?

17  A.  Yes.

18  Q.  Based upon your written testimony, I understand that to

19  have happened -- that one was late 2017, early 2018, correct?

20  A.  If you could get something that would refresh my memory, it

21  would be helpful.

22  Q.  Sure.

23       MR. POLLACK:  Justin, could we pull up Mr. Della

24  Fera's affidavit, please.  Can we direct him to page 8,

25  paragraph 28.

LCGMFTC1                    Della Fera - Cross

1   A.  Your question is?

2   Q.  Sure.  My question is, does that refresh your recollection

3   that the second time that Fera reached out to Fukuzyu was in

4   late 2017, early 2018?

5   A.  Yes.

6   Q.  So approximately one year after its first contact?

7   A.  Yes.

8   Q.  At that point in time API company number 1, from what you

9   told me, had already produced its initial batches of

10  pyrimethamine API in October of 2017, correct?

11  A.  Yes.

12  Q.  And the reason Fera reached out to Fukuzyu in late 2017,

13  early 2018 was to buy a sample of API pyrimethamine to use as a

14  reference test against API company number 1's pyrimethamine,

15  correct?

16  A.  Yes.

17  Q.  What is a reference test?

18  A.  A comparative.

19  Q.  When you say a comparative, what is a comparative?

20  A.  Comparing one manufacturer's product to the product that we

21  were producing.

22  Q.  Why would a company such as yours want to undertake that

23  comparison?

24  A.  We are always looking to ensure that we have the right

25  molecule before we proceed.

LCGMFTC1                    Della Fera - Cross

1    Q.  Finally, yesterday we discussed the request by another

2    pharmaceutical company named Teva.  Am I pronouncing it right?

3    Is it Teva or Teva?

4    A.  Either way works.

5    Q.  We discussed a request by Teva to purchase API from Fera.

6    He told me he basically gave them a price that they couldn't

7    accept because you didn't want to deal with them.

8            What did you mean by that, you didn't want to deal

9    with Teva?

10   A.  I had been in the business a long time and it's just

11   something that I'm not comfortable doing business with him.

12   They have always been my competitor.

13   Q.  So then you didn't want to sell pyrimethamine API to Teva

14   because it's your competitor?

15   A.  It's the largest generic drug company in the world, and,

16   yes, I don't want to deal with the largest player against my

17   product.

18   Q.  Was that a yes to my question, that you didn't want to sell

19   pyrimethamine API to Teva because they compete with you?

20   A.  I have a longstanding competition --

21   Q.  It's a yes or no, Mr. Della Fera.

22   A.  I said yes before.

23   Q.  Thank you.

24           Now I want to switch away from Fera's API activities

25   and talk about its efforts to purchase reference listed drugs,

LCGMFTC1                    Della Fera – Cross

1  which we also refer to in the industry as RLD, is that right?

2  A.   Yes.

3  Q.   If I use the word RLD, you will know what I'm referring to?

4  A.   Yes.

5  Q.   Very good.

6            If I understand your testimony correctly, Fera started

7  the process of sourcing RLD in 2016, is that correct?

8  A.   Correct.

9  Q.   Can you briefly explain to us who aren't intimately

10  involved in the pharmaceutical industry why a generic

11  manufacturer such as Fera requires RLD.

12  A.   Part of the requirement from the FDA is to show

13  equivalence, bioequivalence, to the referenced listed drug when

14  you produce a generic product.

15  Q.   Am I correct that the FDA has a five times requirement for

16  RLD?

17  A.   Yes.

18  Q.   Do you know how long that five times requirement has been

19  in place?

20  A.   No.

21  Q.   Was that five times requirement in place in 2015?  Do you

22  know?

23  A.   Yes.

24  Q.   Has it been in place since 2015 through the present?

25  A.   Yes.

LCGMFTC1                    Della Fera - Cross

1   Q.  Were you aware of that five times requirement in 2015?

2   A.  Yes.

3   Q.  Am I correct that in December of 2016, Fera was presented

4   with the opportunity to purchase Daraprim through a company

5   called Tanner Pharma Group?

6   A.  Discussions were with Tanner for a long period of time.

7   Q.  Did Tanner make an offer to Fera to sell it Daraprim in

8   December 2016, right?

9   A.  We were in discussions, yes.

10  Q.  Do you recall what Tanner offered Fera in December of 2016?

11  A.  What they offered is a requirement of a prepayment of over

12  a million dollars without proof or evidence that they had a

13  product.

14          THE COURT:  Mr. Della Fera, I am going to ask you to

15  move that mic down under your chin.  Thanks.

16  Q.  The Tanner offer was to sell Fera either a 100-count bottle

17  of Daraprim for $101,328.41 per bottle or a 30-count bottle for

18  $69,033.41 per bottle?

19  A.  I don't recall any of these details.

20  Q.  Is there a document that would refresh your recollection on

21  it, Mr. Della Fera?

22  A.  I'm not aware of a document, unless you have one.

23  Q.  Let me ask you this way.  Did your company respond to a

24  civil investigative demand by the FTC in this case?

25  A.  Yes.

LCGMFTC1                        Della Fera - Cross

1  Q.  If I understand correctly, I believe Ms. McDougal completed

2  these responses, correct?

3  A.  Yes.

4  Q.  You reviewed them before they went out?

5  A.  Yes.

6  Q.  Did you believe them to be accurate when they went out?

7  A.  Yes.

8          MR. POLLACK:  Justin, could we pull up DX-281, please.

9  Q.  Mr. Della Fera, I've put in front of you Exhibit DX-281.

10  Do you recognize this as Fera's response to the FTC's civil

11  investigative demand?

12  A.  Could I have it enlarged, whatever you want me to read.

13  Q.  I'm asking you first, do you recognize it as the response

14  to a civil investigative demand?  And then I'll direct you to

15  language in it.

16  A.  No.

17  Q.  You haven't seen this document before?

18  A.  No.  You asked me if I recognize it.  No.

19          MR. POLLACK:  Take it down, please.

20  Q.  In December of 2016, when Tanner came to Fera, did Fera

21  take it up on its offer to sell it RLD Daraprim?

22  A.  We were in discussions with Tanner, that I'm aware of.  I

23  wasn't dealing with it.  My colleagues were handling that.

24  Q.  Who was handling it for Fera?

25  A.  Susan McDougal was supervising the folks who, I think --

LCGMFTC1                    Della Fera - Cross

1   Genevieve was one of the folks that were working on it and

2   having a long standing discussions with Tanner.

3   Q.  Was Ms. McDougal involved in the day-to-day negotiations of

4   Tanner then?

5   A.  I would say she was a lot more involved than I am.

6   Q.  What involvement did you have in those negotiations, Mr.

7   Della Fera?

8   A.  I don't think I have ever dealt with the folks.  Just in

9   discussions in the office about the acquisition of the product.

10  Q.  Were you advised of the offers that Tanner was making to

11  Fera?

12  A.  I'm sure from time to time, yes.

13  Q.  Isn't it correct that after December of 2016, Tanner made a

14  second offer to Fera in January 11 of 2017?

15  A.  I don't recall.

16  Q.  Isn't it true that in January 11, 2017, Tanner offered to

17  sell Fera seven bottles of 100-count tablets of Daraprim for

18  $177,628 per bottle?

19  A.  Again, I don't recall.  If you have something to refresh my

20  memory, that would be helpful.

21  Q.  Did Fera purchase Daraprim from Tanner in January of 2017?

22  A.  No.  We never purchased product from Tanner.

23  Q.  Did Tanner come back after January 2017 and made a third

24  offer in September of 2017, Mr. Della Fera?

25  A.  Again, I don't know the dates of the discussions.  If you

LCGMFTC1                    Della Fera - Cross

1   have something to refresh my memory, I would --

2   Q.  You think Ms. McDougal would know better than you?

3   A.  Yes.

4   Q.  She will be here later today.  We can ask her.

5          You said that Tanner requested prepayment.  Isn't it

6   also the case that your company negotiated a 60/40 payment plan

7   with Tanner, 60 percent up front, 40 percent upon delivery of

8   product?  Is that something you are familiar with, Mr. Della

9   Fera?

10  A.  I know we negotiated a portion.  I don't remember the

11  percentages.  But, yes.

12  Q.  So you negotiated those percentages and did that induce

13  your company then to purchase the RLD that it needed for

14  bioequivalence tests?

15  A.  We discussed putting any dollars in escrow, and they had a

16  hard time with that, so we felt very uncomfortable.

17  Q.  That's an answer to a different question I have for you.

18  My question was, did the 60/40 split that you negotiated, or

19  whatever you think the split was, did that induce your company

20  to then purchase RLD from Tanner?

21  A.  I really don't understand your question by saying induced.

22  Q.  To cut to the chase, your company didn't buy RLD from

23  Tanner, no matter what the terms were, correct?

24  A.  They never showed any representation that they had the

25  product.

LCGMFTC1                    Della Fera – Cross

1   Q.   But you negotiated the 60/40 split, right?

2   A.   As I said, we spoke to them on and off for a long time.

3   They were very difficult to deal with.

4   Q.   And you mentioned an escrow agreement, correct?

5   A.   Correct.

6   Q.   Am I right the purpose of an escrow agreement is to protect

7   the purchaser in case the seller does not come through with the

8   product?

9   A.   Yes.

10  Q.   Mr. Della Fera, isn't it true that your employee Genevieve

11  Della Fera actually sent an escrow agreement to Tanner?

12  A.   I know Genevieve was managing the negotiations.

13  Q.   Did you know that she sent an escrow agreement to Tanner?

14  A.   I don't recall the nuances.  If there is anything you want

15  me to look at.

16  Q.   Isn't it true that Tanner signed and returned the escrow

17  agreement to your company?

18  A.   Again, I don't recall that.

19  Q.   That's something that we should take up with Ms. McDougal

20  later today?

21  A.   Yes.

22  Q.   Thank you.

23        Mr. Della Fera, am I correct that your company decided

24  not to do a deal with Tanner to purchase the RLD it needed for

25  bioequivalence tests because it was not comfortable paying the

LCGMFTC1                    Della Fera - Cross

1   sum of money that Tanner was charging for the RLD?

2   A.  We did negotiate price.  I do know that.  And I was

3   definitely uncomfortable with some of the numbers that they

4   were sharing without proof of product.

5           And, in essence, on that escrow agreement that I just

6   recalled is that they were putting demands on an escrow

7   agreement where we still didn't have any control, even if they

8   didn't deliver the product.  So that was really a big concern.

9   I didn't feel comfortable with this company.

10  Q.  So your testimony is that Tanner was putting conditions on

11  the escrow agreement that you could not agree on?

12  A.  Correct.

13          MR. POLLACK:  Justin, could we pull up Exhibit DX-291,

14  please.  Take us to page 4 of 7, please.

15  Q.  Mr. Della Fera, I am going to direct you to the bottom of

16  page 4 of 7 on this exhibit.  You'll see that it's an e-mail

17  from Genevieve Della Fera.  Is that your daughter and also your

18  employee?

19  A.  Yes.

20  Q.  She is writing to Richard Lambie.  His e-mail address is

21  rlambie@tannerpharma.com, copying your colleague, Susan

22  McDougal.  I see you're not on this e-mail.  You see here, that

23  Ms. Della Fera is writing to Richard Lambie saying:  Dear

24  Richard, please see the attached escrow agreement with Fera's

25  wiring instructions and the certification of our purchase order

LCGMFTC1                              Della Fera - Cross

1    at end of the document?

2              MR. PERLMAN:  Objection.  Foundation, your Honor.

3              THE COURT:  Is this in evidence?

4              MR. POLLACK:  This document is not yet in evidence,

5    your Honor.  I'm using it to impeach the witness.

6              THE COURT:  It's not proper impeachment.  You could

7    use it to see if it refreshes his recollection.

8              MR. POLLACK:  Your Honor, he said that Tanner was

9    placing conditions on the escrow agreement.

10             THE COURT:  This document does not indicate that their

11   witness was discussing the same document that's being discussed

12   in this e-mail.  Perhaps you can lay a foundation.

13   Q.  Mr. Della Fera, have you ever seen this e-mail before?

14   A.  No.

15   Q.  Are you aware of it?

16   A.  As I shared, the relationship with Tanner was over a period

17   of time and there was a lot of back and forth and agreements

18   could have been sent back and forth.  But I never agreed on the

19   final document.  That's why we never did any business with

20   them.

21   Q.  Ms. Della Fera, she authorized to send out a document that

22   your company has not approved to third parties?

23   A.  It could have happened.

24   Q.  Are you aware of that ever happening with Ms. Della Fera?

25   A.  It could have happened with this negotiation for sure.  She

LCGMFTC1                         Della Fera - Cross

1   was very emphatic working with these folks, and their

2   salespeople were pretty good.

3           MR. POLLACK:  Justin, you can take that down.

4   Q.  Mr. Della Fera, am I correct that while these negotiations

5   were ongoing with Tanner, Fera was able, in October of 2017, to

6   purchase Daraprim from a local pharmacy called Total Care

7   Pharmacy?

8   A.  Yes.

9   Q.  I believe you purchased two tablets from Total Care using a

10  physician prescription, correct?

11  A.  Yes.

12  Q.  Am I also correct that Fera purchased 70 more tablets from

13  another pharmacy, Walgreens Specialty, also using a

14  prescription written by a physician?

15  A.  Yes.

16  Q.  Both of those prescriptions were filled within just days of

17  requesting them, right?

18  A.  I'm not understanding the question about requesting.

19  Q.  The prescriptions were quickly filled, correct?

20  A.  Yes.

21  Q.  Coming forward now in time to January of 2018, this is

22  something, I believe, you will be familiar with.  Your company

23  purchased two 100-count bottles of Daraprim from a procurement

24  company called Reliant, correct?

25  A.  Yes.

LCGMFTC1                    Della Fera - Cross

1          MR. POLLACK:  Justin, could we pull up Exhibit DX-119,

2     please.

3     Q.  Mr. Della Fera, I've pulled up Exhibit DX-119.  It's an

4     e-mail from Satya.  Do you know who Satya is, Satya Valiveti?

5          THE COURT:  To the extent you can enlarge a passage

6     for the witness, it would be terrific.

7          MR. POLLACK:  Understood.  Thank you, your Honor.

8     A.  Yes.  I'm familiar with the gentleman named Satya.

9     Q.  Who is he?

10    A.  He is the representative of Reliant, where we purchased the

11    two bottles of Daraprim.

12    Q.  This e-mail is to Ms. McDougal, a gentleman named Peter.

13    Is that Mr. Florentino?

14    A.  No.

15    Q.  Who is the Peter on this?  Do you know?

16    A.  I don't know, but I could guess it's Peter Sketalis, the

17    broker.

18    Q.  You're copied on this e-mail, correct?

19    A.  Yes.

20    Q.  Do you recall getting this e-mail?

21    A.  I am going to look at it.  Yes, I recall.  It's when we

22    purchased the two bottles.

23         MR. POLLACK:  Your Honor, I move for the admission of

24    DX-119.

25         MR. PERLMAN:  No objection.

LCGMFTC1                        Della Fera - Cross

1              THE COURT:  Received.

2              (Defendant's Exhibit 119 received in evidence)

3              MR. POLLACK:  Justin, if we could pull up Exhibit

4     GX-3056, please.  I want to go to the bottom e-mail, please.

5     Next page.  Are we on the right document here?  You see where

6     it says -- go from the top all the way down to underneath

7     Ms. McDougal's signature line.  Thank you.

8     Q.  Mr. Della Fera, take a moment to review this e-mail and let

9     me know if you recognize it.

10    A.  Yes.  I mean, I would recognize it.

11    Q.  If we look down on the second e-mail in the chain, that's

12    an e-mail from your colleague, Ms. McDougal, acknowledging

13    receipt of the two bottles of Daraprim that she purchased on

14    January 22, correct?

15    A.  Correct.

16    Q.  They got them eight days later?

17    A.  Yes.

18             MR. POLLACK:  Your Honor, I move for the admission of

19    GX-3056.

20             MR. PERLMAN:  No objection, your Honor.

21             THE COURT:  Received.

22             (Government Exhibit 3056 received in evidence)

23    Q.  Mr. Della Fera, when you purchased the two bottles from

24    Reliant, you had the opportunity to buy up to five bottles,

25    correct?  I'm talking about in January of 2018.

464

LCGMFTC1                    Della Fera - Cross

1   A.  We were offered more bottles than two bottles, correct.

2   Q.  In fact, you had the opportunity to buy five, correct?

3   A.  You know, I am not sure about the quality.  It could have

4   been five or seven.  I am not sure yet of the number.  It was

5   more than two.  So I don't want to parse words.

6   Q.  If you testified to the quantity at your deposition, would

7   that refresh your recollection?

8   A.  Yes.

9            MR. POLLACK:  Justin, could you pull up Mr. Della

10  Fera's deposition testimony, please.  We are going to focus on

11  lines 238-24 to 239-5, please.

12  Q.  Mr. Della Fera, please take a moment to read that and let

13  me know if it refreshes your recollection as to the number of

14  bottles you had an opportunity to purchase.

15           THE COURT:  What page of the deposition or pages are

16  we looking at?

17           MR. POLLACK:  Yes.  We are looking at pages 238

18  starting at line 24 and we are running on to page 239,

19  concluding at line 5.

20           THE COURT:  Thank you.

21  A.  Yes, it does help for the recollection.  We were going to

22  buy five bottles, correct.  We bought two bottles because

23  Satya, the representative of Reliant, mentioned it --

24  Q.  Mr. Della Fera, with respect, I haven't asked another

25  question.

LCGMFTC1                    Della Fera - Cross

1    A.  I'm just answering your question.

2    Q.  My question was simply, you had the opportunity to buy up

3    to five bottles in January of 2018, correct?

4    A.  That is correct.

5           MR. POLLACK:  Justin, could we go back to Exhibit

6    DX-119, please.

7           I'm sorry.  That's not the one I wanted.  Let's go

8    back to 3056 is what I'm looking for.  I would like to enlarge

9    the top e-mail, please.

10   Q.  Mr. Della Fera, on February 12 of 2018, it appears that

11   Mr. Valiveti from Reliant wrote back to Ms. McDougal and said:

12   Dear, Susan, please let me know if you need any additional

13   quantity on Daraprim.  Correct?

14   A.  Yes.

15          MR. POLLACK:  If we could bring up Exhibit DX-121,

16   please.

17   Q.  Mr. Della Fera, take a moment to review this document and

18   let me know if you recognize this e-mail.

19   A.  Yes, I recognize it.

20          MR. POLLACK:  Your Honor, move to admit Exhibit

21   DX-121.

22          MR. PERLMAN:  No objection.

23          THE COURT:  Received.

24          (Defendant's Exhibit 121 received in evidence)

25          MR. POLLACK:  Thank you.

LCGMFTC1                    Della Fera - Cross

1   Q.  Mr. Della Fera, in this e-mail it's Ms. McDougal responding

2   to the last e-mail we just looked at from Mr. Valiveti saying,

3   thank you, Satya.  We are good for now.  Correct?

4   A.  Correct.

5   Q.  In other words, she is declining Mr. Valiveti's offer to

6   sell your company, Fera, additional bottles of Daraprim,

7   correct?

8   A.  Correct.

9   Q.  At this time I believe we have already established that you

10  know that you need at least five times the amount of Daraprim

11  that you use to manufacture your samples for bioequivalence

12  tests, right?

13  A.  Yes, sir.

14  Q.  That means that you need at least five bottles, correct?

15  A.  It doesn't have to be five bottles.  But if the number is

16  80 tablets, five times eight would be 40 bottles, yes.

17  Q.  In this case it's 100 tablets per bottle, correct?

18  A.  Correct.

19  Q.  So you need 500 tablets, correct, by your math?

20  A.  We need five times the quantity for the bioequivalence

21  study.

22  Q.  That's a yes, you needed five bottles?

23  A.  It's the number of tablets used in the bioequivalence

24  study, and I don't remember.  It could be 40 tablets, 60

25  tablets.  It's five times that quantity.

LCGMFTC1                    Della Fera - Cross

1    Q.  You knew you needed more than two bottles, correct?

2    A.  That is correct.

3    Q.  You had the opportunity to buy more than two bottles in

4    January, correct?

5    A.  Yes.

6    Q.  You had the opportunity to buy more bottles in February,

7    correct?

8    A.  Yes.

9    Q.  Both times you declined that opportunity, correct?

10   A.  Yes.

11   Q.  Without more than two bottles your company would need to

12   seek a waiver from the FDA to forego the five times -- I can't

13   remember -- withholding requirement, correct?

14          MR. PERLMAN:  Objection to form.

15          THE COURT:  Sustained.

16          MR. POLLACK:  Let me rephrase.

17   Q.  Just put it simply this way.  Without more than two

18   bottles, your company would have to seek a waiver from the FDA,

19   correct?

20   A.  At that time we were not looking to seek a waiver.  Again,

21   if you want me to give you a little color on your question, I

22   can.

23   Q.  Let me see if I can fill in the details here.

24          Before you even purchased this RLD, you had sent a

25   letter for a pre-ANDA meeting to the FDA in October of 2017,

LCGMFTC1                    Della Fera - Cross

1     correct?

2     A.  Yes.

3     Q.  Can you tell us, what is a pre-ANDA meeting?

4     A.  It's to have a formal meeting with the FDA representatives

5     in reference to the application of the pyrimethamine product.

6              MR. POLLACK:  Can we bring up Exhibit 3179, please.

7              THE COURT:  Is this a defendant's exhibit?

8              MR. POLLACK:  This is a plaintiff's exhibit that's, I

9     believe, already in evidence, your Honor.

10             THE COURT:  GX-3179.

11             MR. POLLACK:  G as in go.  They sound very similar.

12    I'll try to maybe say gamma X going forward.

13    Q.  Mr. Della Fera, is this the letter requesting that pre-ANDA

14    meeting?

15    A.  Yes.

16             MR. POLLACK:  Can we turn back to page 4.  I believe

17    we will see what you were just referencing.

18             Highlight question 1, please, Justin.

19    Q.  Question 1 that Fera poses:  Due to the unavailability of

20    Daraprim tablets -- I'd like to stop there for a moment.

21             You reference the unavailability of Daraprim tablets

22    in this letter, but you do not refer the FDA to the

23    opportunities Fera had to purchase RLD from Tanner, do you?

24    A.  I think the letter is quite specific to the FDA at the time

25    of Fera's situation, yes.  It was unavailable.

469

LCGMFTC1                    Della Fera – Cross

1   Q.  You don't refer them to the fact that earlier in time you

2   had the opportunity presented to you to purchase up to seven

3   bottles, correct?

4              MR. PERLMAN:  Objection to form.

5              THE COURT:  Sustained.

6   Q.  Due to the unavailability of Daraprim tablets, Fera

7   requests FDA waive the current draft pyrimethamine

8   product-specific guidance for generic drug development.  Fera

9   commits to fully characterize its finished drug product, to

10  include pharmacokinetic study to ascertain PK parameters for

11  the Fera product, enabling the agency to compare our findings

12  to the RLD as follows, and it goes on.

13             Mr. Della Fera, correct me if I'm wrong, if I

14  understand this correctly, a pharmacokinetic study wouldn't

15  require you to use any RLD, correct?

16             THE COURT:  Would not?

17             MR. POLLACK:  Would not.

18  Q.  Is that what you were describing to me?

19  A.  Just for the record, I didn't write this.  It came from our

20  head of regulatory, John D'Angelo.

21  Q.  Did you review it before it went out?

22  A.  Yes.

23  Q.  Back to my question, which is -- I believe it ties into

24  your written direct testimony.  What you're requesting here,

25  the pharmacokinetic study would not require you to use any RLD,

LCGMFTC1                    Della Fera - Cross

1   correct?

2   A.   Correct.

3   Q.   That's what you were requesting in October of 2017 before

4   you were approached by Reliant?

5   A.   Correct.  The unavailability was due to the close

6   distribution model --

7   Q.   Mr. Della Fera, there is no question pending, so I would

8   ask you, respectfully, to wait for a question.

9   A.   Just to correct -- you asked me about the unavailability of

10  Daraprim earlier.  I just didn't respond to you because I was

11  thinking of this letter.  You did ask that question.

12  Q.   My question to you was, you did not inform the FDA, when

13  you told them that Daraprim was unavailable, that Fera had been

14  approached earlier in 2017 by Tanner Pharmaceutical as late --

15  strike that.  Earlier in 2017 by Tanner Pharmaceutical,

16  correct?

17  A.   We approached many companies who supplied reference

18  product.  Tanner is just one that you are bringing up.  We

19  never came to an agreement.  They never showed proof that they

20  had the product.

21       MR. POLLACK:  Justin, could you just close this

22  document, please.

23  Q.   Am I correct, Mr. Della Fera, that in December of 2017, in

24  fact, it was December 1, the FDA denied this request without a

25  meeting?

LCGMFTC1                    Della Fera - Cross

1   A.  I don't recall the date, but they did deny it, yes.

2   Q.  Do you remember yesterday we looked at a timeline that you

3   prepared?

4   A.  Yes.

5          MR. POLLACK:  Justin, could we pull up Government

6   Exhibit GX-7015, please.  Could you bring it to --

7          MR. PERLMAN:  Your Honor, if I may just object to the

8   statement that Mr. Della Fera prepared this timeline.  I don't

9   know that that's in evidence.

10         THE COURT:  It is in evidence.  The exhibit is in

11  evidence, right.  The objection to the question is sustained.

12         MR. POLLACK:  It's a fair objection.  Let me ask

13  another question.

14  Q.  Mr. Della Fera, did you prepare this timeline?

15  A.  No.

16  Q.  Do you know who did?

17  A.  No.

18  Q.  Did someone at your company prepare it?

19  A.  Yes.

20  Q.  Did you review it?

21  A.  I've seen it.

22  Q.  When have you seen it?

23  A.  I don't recall.

24  Q.  Before coming here for your testimony today?

25  A.  Oh, yes.

LCGMFTC1                    Della Fera - Cross

1   Q.  Did you believe the information on this timeline to be

2   accurate?

3   A.  Yes.

4   Q.  If we can direct your attention to page GX-7015-2.  I just

5   want to put a flag pole on the date here.  The second entry

6   from the top, December 1, 2017.  FDA denies Fera's request for

7   a meeting.

8           Does that refresh your recollection that that's the

9   date that occurred on?

10  A.  Yes.

11  Q.  At the time Reliant approached Fera with the opportunity to

12  buy up to five bottles of Daraprim RLD in January of 2018, this

13  request to use zero bottles had already been denied by the FDA?

14  A.  Correct.

15  Q.  Then in that case you would agree with me that by January

16  2018, you would require a waiver if you were to proceed with

17  only two bottles of RLD, correct?

18  A.  I'm not understanding the question.

19  Q.  In January 2018, did you understand, based upon the FDA's

20  denial of your request to do pharmacokinetic testing that if

21  you were to proceed with less than five times RLD that you

22  would need to request a waiver from the FDA?

23  A.  That wasn't even into consideration, no.

24  Q.  But you were aware of the five times requirement, correct?

25  A.  Yes.

LCGMFTC1                      Della Fera - Cross

1              MR. POLLACK:  I want to bring up Exhibit GX-3177,

2    please, and I want to go to page 3.  Again, it's GX-3177.  This

3    document is already in evidence.

4    Q.  Mr. Della Fera, this document, dated August 24, 2018, do

5    you recognize this as Fera's first request from a waiver from

6    the FDA for the five-times-RLD requirement?

7    A.  Can you go to the second page.  I just want to make sure

8    it's the right document.

9              (Continued on next page)

LCGKFTC2                    Della Fera - Cross

1   BY MR. POLLACK:

2   Q.  Sure.

3        Are you looking for the language actually requesting

4   the waiver?

5   A.  Correct.

6        mmo:  Justin, why don't we take him to page 6 of the

7   document and highlight numeral 3.

8        THE WITNESS:  That is the document.

9   BY MR. POLLACK:

10  Q.  So your first request for a waiver was made on August 24th

11  of 2018, correct?

12  A.  That's correct.

13  Q.  That's eight months -- more than eight months after you

14  first purchased the two bottles of Daraprim from Reliant,

15  correct?

16  A.  Correct.

17  Q.  I'm sorry, seven months — let's be fair about it — seven

18  months, correct?

19  A.  That's correct.

20  Q.  Okay.  More than six months after Mr. Valiveti offered to

21  sell you additional bottles over the two that you already

22  purchased, correct?

23  A.  Yes.

24  Q.  At the top of what we've got highlighted here, Fera, again,

25  references the difficulty of obtaining adequate supplies of the

LCGKFTC2                    Della Fera - Cross

1    RLD, and it says, "Due to that, we request that a waiver be

2    granted for the minimum number of RLD samples required to be

3    retained from the conduct of the Fed and fasting BE studies."

4              That's what you requested?

5    A.   Yes.

6    Q.   Where Fera references the difficulty of obtaining adequate

7    supplies, it doesn't inform the FDA that it had the opportunity

8    to purchase five bottles from Reliant in January of 2018, does

9    it?

10   A.   Can I explain what you're --

11   Q.   It's a --

12   A.   Would you like --

13   Q.   Does it or does it not?

14   A.   Would you like me to explain it?

15   Q.   I would like you to answer my question, Mr. Della Fera.

16   A.   It doesn't say it.

17   Q.   Another thing it doesn't say, you'll agree with me, it

18   doesn't say that Reliant provided a second opportunity to buy

19   up the five bottles, correct?

20   A.   Oh, that's correct.

21   Q.   It makes no reference of Tanner and the opportunities that

22   Tanner presented to Fera earlier in time to sell Daraprim

23   bottles to Fera, correct?

24   A.   That's correct.

25   Q.   Am I correct that approximately five months later, in

LCGKFTC2                    Della Fera - Cross

1    January of 2019, this request for a waiver was -- sorry, yes,

2    January 2019, this request for a waiver was denied?

3    A.  Correct.

4            MR. POLLACK:  Justin, can we bring up GX 3176, please?

5    Q.  Mr. Della Fera, this is --

6            MR. POLLACK:  Your Honor, this is another document

7    preadmitted yesterday.

8    BY MR. POLLACK:

9    Q.  Mr. Della Fera, is this that letter denying the request for

10   a waiver?

11           Would it help you to see the language?

12           MR. POLLACK:  Justin, why don't we go to page 3 of 3,

13   please, and enlarge the portion at the end where it says "you

14   should."

15   Q.  Is this the denial of the waiver, this letter?

16   A.  Yes.

17   Q.  And the FDA, in its denial, informs Fera, "You should

18   obtain sufficient quantity of the RLD product, Daraprim

19   (pyrimethamine) tablets USP, 25 mg, to conduct in vivo fasting

20   and fed bioequivalence (BE) studies, and to reserve retention

21   samples for any potential poststudy assessment," correct?

22   A.  Correct.

23   Q.  And after receiving this letter, Fera did not go out and

24   obtain additional RLD, did it?

25   A.  No.

LCGKFTC2                    Della Fera - Cross

1   Q.  Now, Mr. Della Fera, another three months pass, and in

2   April of 2019, Fera makes a second request for a waiver to the

3   FDA, correct?

4   A.  Yes.

5              MR. POLLACK:  Justin, can we pull up Exhibit GX 3178,

6   please?

7              I'm sorry, your Honor, I made an error.  3176 was not

8   in evidence.  I would like to move for its admission.

9              MR. PERLMAN:  No objection, your Honor.

10             THE COURT:  Received.

11             MR. POLLACK:  Thank you.

12             (Government's Exhibit 3176 received in evidence)

13  BY MR. POLLACK:

14  Q.  Mr. Della Fera, GX 3178 is a letter from Fera dated

15  April 5, 2019.

16             MR. POLLACK:  I do believe this is in evidence.

17             Justin, if we can take Mr. Della Fera to the second

18  page and blow up the paragraph at the bottom.

19  Q.  Does this confirm for you, Mr. Della Fera, that this is the

20  letter representing the second request for a waiver by Fera on

21  April 5, 2019?

22  A.  Yes.

23             MR. POLLACK:  Justin, if we can turn to page 5,

24  please.  Actually, let's turn to page 6.

25  Q.  I see this letter is signed by Mr. John D'Angelo, Vice

LCGKFTC2                    Della Fera – Cross

1    President of Regulatory Affairs at Fera Pharmaceuticals.

2          I take it he's one of your employees?

3    A.   Yes.

4    Q.   And before this letter went out, did you review it?

5    A.   Yes.

6    Q.   Did you approve it?

7    A.   Yes.

8          MR. POLLACK:   Justin, let's go back to page 5 for a

9    moment.

10   Q.   Is that the same for all the letters that went to the FDA,

11   did you review and approve them all?

12   A.   Either review or discussed with the head of regulatory.

13         MR. POLLACK:   I'd like to highlight the paragraph

14   following the second bullet point on this page.

15   Q.   Mr. Della Fera, do you see here, it says, "Fera understands

16   that FDA's general policy is not to waive the 'five times

17   testing requirement' at 21 CFR Sections 320.38 and 320.63," and

18   it goes on with some additional citations?

19         What I want to ask you, sir, is:   Does that sentence

20   reflect Fera's understanding?

21   A.   It's written there, yes.

22   Q.   If I understand the timeline of things correctly, just

23   before Fera sent this second request for a waiver to the FDA,

24   in March of 2019 — March 4, to be specific — you and some of

25   your colleagues participated in a phone call with the FDA,

LCGKFTC2                        Della Fera - Cross

1    correct?

2    A.   Yes.

3    Q.   What was the purpose of that phone call?

4              Strike that.

5              MR. POLLACK:  Justin, can we bring up that exhibit,

6    GX 3198.  Thank you.

7    Q.   Is this the transcript -- or not a transcript.  Is this the

8    written statement that someone at your company read into the

9    phone call?

10   A.   Yes.

11   Q.   And I understand, from your written testimony, the portion

12   that says "Frank Della Fera," you did not actually read because

13   you had laryngitis that day, correct?

14   A.   That is correct.

15   Q.   Someone else read it for you?

16   A.   Yes.

17             MR. POLLACK:  Justin, can we go to the second page,

18   please?

19   Q.   Look down at Mr. D'Angelo's portion.

20             Did he speak on the call?

21   A.   Yes.

22   Q.   Mr. D'Angelo says:  Since we are limited to only 200

23   tablets of RLD — again, based on what he calls Vyera's

24   anticompetitive activity — on August 29, 2018, we submitted a

25   presubmission meeting package and request where we asked

LCGKFTC2                    Della Fera - Cross

1   FDA" --

2              THE COURT:  Slow down.

3              MR. POLLACK:  Yes.

4   BY MR. POLLACK:

5   Q.  -- to waive requirements for the amount of RLD retained for

6   the bioequivalence study, correct?

7   A.  Yes.

8   Q.  Again, in this statement to the FDA, Fera makes no

9   reference to its opportunity in January and February of 2018 to

10  purchase up to five bottles of RLD from Reliant, correct?

11  A.  Ask the question again?

12  Q.  Sure.

13             This statement does not reference the fact that Fera

14  had the opportunity in January and February of 2018 to purchase

15  up to five bottles of Daraprim RLD from Reliant, correct?

16  A.  We purchased two bottles.

17  Q.  Well, this letter doesn't even reference that.  My question

18  for you, Mr. Della Fera, is:  Mr. D'Angelo, when he talks about

19  being limited to only 200 tablets of RLD, he does not state

20  that your company had the opportunity in January, and then

21  again in February, of 2018, to purchase up to five bottles of

22  Daraprim RLD from Reliant, correct?

23  A.  We purchased two bottles from Reliant due to the short

24  dating the product had.

25  Q.  Mr. Della Fera --

LCGKFTC2                    Della Fera - Cross

1   A.  You want to know why I bought two.  I'm going to tell you.

2   Q.  It's a yes or no.

3   A.  Then ask again.

4   Q.  When Mr. D'Angelo says that your company was limited to

5   only 200 tablets of RLD, he omits from that statement that in

6   January 2018, and then again in February 2018, your company had

7   the opportunity to purchase up to five bottles of Daraprim RLD,

8   correct?

9   A.  He does not omit.

10  Q.  He doesn't state it, does he?

11  A.  You can't make me say things that are not true.

12  Q.  Mr. Della Fera, the document will speak for itself.

13          MR. POLLACK:  Let's take it down.

14  Q.  Mr. Della Fera, something else we didn't mention is:  In

15  addition to the five times requirement, the bottles have to

16  come from the same lot, correct?

17  A.  Yes.

18  Q.  Am I correct that after you had -- shortly after you had

19  this meeting with the FDA, you were then contacted by the

20  attorneys for the FTC, correct?

21  A.  Yes.

22  Q.  I believe, from your testimony, that was sometime weeks or

23  up to a month after your meeting with the FDA, correct?

24  A.  I don't know the timeline.

25          Is it on the timeline sheet?

LCGKFTC2                    Della Fera - Cross

1   Q.  Well, it would be in your deposition.  Why don't we bring

2   that up.  Let's see if I can find it for you.

3           MR. POLLACK:  Justin, let's go to page 141, line 25,

4   please.

5           I'm sorry, that's not going to be the right reference.

6   Just give me a moment.

7           Oh, yes, 141, line 21, through 142, line 16.

8   Q.  Take a moment to read that and tell me if it refreshes your

9   recollection as to when your first call with the FTC attorneys

10  occurred.

11  A.  It states here a couple of weeks or a month, yes.

12  Q.  Since that time, how many conversations have you had with

13  the FTC's attorneys about this matter?

14  A.  I can't recollect how many times.  We had a deposition

15  twice, I think, and a conversation prior to the first

16  deposition on the phone.

17  Q.  And at your deposition, you said prior to that, up to a

18  half dozen times, you spoke to the FTC, correct?

19  A.  That sounds correct.

20  Q.  And how many times since then?

21  A.  A handful of times.

22  Q.  Just coming back to your waiver request, getting the

23  timeline right, after you spoke to the FDA, after you met with

24  the FTC's attorneys, that would come forward to June 4, 2019 —

25  this is now two months after your second waiver request — your

LCGKFTC2                    Della Fera - Cross

1    waiver was finally approved, correct?

2    A.  Yes.

3    Q.  Following the grant of your waiver on June 4, 2019, Fera

4    was able to conduct its bioequivalence test using the RLD it

5    obtained from Reliant in January of 2018, correct?

6    A.  Yes.

7    Q.  You had made some reference to dating a couple of minutes

8    ago, and I'm not sure what exactly you were referring to, but

9    am I correct that the RLD you had purchased from Reliant had an

10   expiration date of July 2019?

11   A.  Correct.

12   Q.  And using that RLD following the waiver you got in June,

13   you were able to complete your bioequivalence studies, correct?

14   A.  Correct.  We didn't need the waiver to complete the bio

15   studies, but for the requirements for the submission of the

16   retains, the waiver helped there, yes.

17   Q.  When did you begin the bioequivalence studies?

18   A.  It happened in May of 2019.

19   Q.  And if Fera had purchased five bottles in January of 2019,

20   it could have started those bioequivalence tests even earlier,

21   correct?

22            MR. PERLMAN:  Objection to form.

23            THE COURT:  Sustained.

24            THE WITNESS:  We weren't prepared --

25            THE COURT:  I'm sorry, there's no question pending.

LCGKFTC2                    Della Fera – Cross

1          THE WITNESS:  Thank you.

2          MR. POLLACK:  That's correct.

3    BY MR. POLLACK:

4    Q.  Am I correct that Fera filed its ANDA on December 19, 2019?

5    A.  Yes.

6    Q.  And after you filed your ANDA, the FDA posed certain

7    questions about Fera's API manufacturing process, correct?

8    A.  Could you repeat that, please?

9    Q.  Sure.

10         After you filed your ANDA in December of 2019, you

11   received inquiries from the FDA regarding the manufacturing

12   process for the API that the API Company No. 1 had manufactured

13   for you, correct?

14   A.  Yes.

15   Q.  If I understand your written testimony correctly, you were

16   unable to timely respond to those inquiries because API Company

17   No. 1 was undergoing staff shortages due to the COVID-19

18   pandemic, correct?

19   A.  Yes.

20   Q.  And I believe, from your written testimony, you said that

21   those staffing issues at API Company No. 1 were a "decisive

22   factor preventing Fera from timely responding to the FDA,"

23   correct?

24   A.  Yes.

25   Q.  In your written testimony, you speculate that had Fera been

LCGKFTC2                    Della Fera - Cross

1   able to use Fukuzyu, it would have been able to respond within

2   the review period to the FDA's questions.

3              That's your testimony, right?

4              MR. PERLMAN:  Objection to form.

5              THE COURT:  Can you direct me to the paragraph to

6   which you're referring, counsel?

7              MR. POLLACK:  Certainly, your Honor.

8              THE COURT:  Is this page 14, paragraph 46?

9              MR. POLLACK:  I believe that's the one, and if the

10  Court would prefer, I can read in his testimony.  I'm trying to

11  be -- no, that's not the right one, your Honor.  I'm sorry, I

12  didn't write it down.  It was an omission by me.

13             THE COURT:  Sustained as to form.

14             MR. POLLACK:  I understand.

15             Found it.  It's paragraph 46, your Honor.

16  BY MR. POLLACK:

17  Q.  Mr. Della Fera, in your direct testimony, you state, "It is

18  my view that if we had used Fukuzyu as our pyrimethamine API

19  supplier, Fera would have been able to respond within the

20  review period," correct?

21  A.  Yes.

22  Q.  But when Fera reached out to Fukuzyu in late 2015/early

23  2016, Fukuzyu didn't respond, correct?

24  A.  Yes.

25  Q.  And then, when you reached out again in late 2017/early

LCGKFTC2                        Della Fera - Redirect

1    2018, you told me that was the purpose of buying a sample, for

2    a comparator test, correct?

3    A.  Yes.

4    Q.  Do you know if Fukuzyu was -- strike that.

5              And you don't know, and you can't tell us, can you,

6    whether Fukuzyu was having any staffing problems during the

7    COVID-19 pandemic?

8    A.  I wouldn't know.

9    Q.  And using the pyrimethamine that API Company No. 1

10   manufactured, Fera's ANDA was approved on July 27, 2021; is

11   that correct?

12   A.  Yes.

13             MR. POLLACK:  Mr. Della Fera, thank you.

14             Your Honor, I pass the witness.

15             THE COURT:  Thank you.

16   REDIRECT EXAMINATION

17   BY MR. PERLMAN:

18   Q.  Good morning, Mr. Della Fera.  This is Neal Perlman, for

19   the Federal Trade Commission.

20             Mr. Della Fera, I think I'll just start where

21   defendants left off.  Mr. Pollack asked you about your

22   2017-2018 interaction with Fukuzyu.

23             Do you recall that discussion?

24   A.  Yes.

25   Q.  And I believe you discussed with Mr. Pollack how Fera was

LCGKFTC2                    Della Fera - Redirect

1   hoping to use Fukuzyu's sample API for reference testing; is

2   that right?

3   A.   Yes.

4   Q.   Is there any other reason why you were reaching out to

5   Fukuzyu in 2017-2018?

6   A.   I don't recall.

7   Q.   Was Fera hoping to -- strike that.

8          Were you hoping to enter into a broader business

9   relationship with Fukuzyu if you had been able to obtain

10  pyrimethamine API from them?

11         MR. POLLACK:  Objection; leading.

12         THE COURT:  Sustained.

13         MR. PERLMAN:  I'll do it like this, your Honor:

14  BY MX. BLACK:

15  Q.   When Fera reached out to Fukuzyu in late 2017 and early

16  2018, did Fera reach out directly or via a broker?

17  A.   We used a broker.

18  Q.   And who arranged that broker?

19  A.   A consultant of ours, Gary Conte.

20  Q.   What were you planning to do with the pyrimethamine API

21  specifically that you were hoping to procure from Fukuzyu at

22  that point?

23  A.   Initially --

24         MR. POLLACK:  Objection; asked and answered.

25         THE COURT:  Overruled.

488

LCGKFTC2                    Della Fera - Redirect

1              You may answer.

2              THE WITNESS:  Initially, we wanted to do a comparator

3     to the API that was being produced by API No. 1.

4     BY MR. PERLMAN:

5     Q.  What do you mean by "initially"?

6     A.  That was the initial purpose of acquiring a sample.

7     Q.  Were there any other purposes?

8     A.  If we could build a relationship with Fukuzyu, we would

9     have loved to acquire their product.

10    Q.  Why is that?

11    A.  Because they already had an approved DMF, they had been a

12    supplier from day one in the U.S., and we could have started

13    all our activities immediately.  We still had a lot of work to

14    do with API 1.

15    Q.  So when you said "their product," did you mean their

16    pyrimethamine API?

17    A.  Yes.

18              MR. POLLACK:  Objection; leading.

19              THE COURT:  Overruled.

20    BY MR. PERLMAN:

21    Q.  Mr. Della Fera, I'd like to turn now to your discussions

22    with Mr. Pollack about your interactions with Tanner Pharma.

23              Are you with me?

24    A.  Yes.

25    Q.  Mr. Della Fera, did you have the ultimate authority at Fera

LCGKFTC2                    Della Fera - Redirect

1    Pharmaceuticals whether to purchase Daraprim RLD from Tanner

2    Pharma?

3    A.   Yes.

4    Q.   And why did you decide not to purchase Daraprim RLD from

5    Tanner Pharma?

6    A.   They never showed proof of product or lot number or

7    expiration date, they demanded prepayment of the material in

8    advance, and we were very uncomfortable -- I was very

9    uncomfortable with that.

10   Q.   What do you mean by "proof of product"?

11   A.   We requested on a regular basis, through the folks who were

12   dealing with them, to show us samples of the product that they

13   were going to sell to us, if they could truly acquire the

14   product.  They were asking for the dollars upfront, and we

15   weren't -- I wasn't ready to work with that.

16   Q.   Did the price that Tanner was quoting you change at all

17   through the course of the negotiations?

18            MR. POLLACK:  Objection.

19            THE COURT:  Overruled.

20            THE WITNESS:  It was a roller coaster in pricing, yes.

21   BY MR. PERLMAN:

22   Q.   What do you mean by "It was a roller coaster in pricing"?

23   A.   They went up, they went down, and I just cut to the chase,

24   show me the product and let us put the money in escrow with our

25   control, and we can do business.  They never agreed.

LCGKFTC2                    Della Fera - Redirect

1   Q.  Now, during the time you were interacting with --

2              THE COURT:  So I just have to interrupt.

3              It is the lot of a federal judge to preside over not

4   just civil cases, but criminal cases.  The testimony I have

5   just heard reminds me of so many Title 21 trials over which I

6   have presided where any good negotiation for the purchase of

7   illegal drugs requires a sample upfront.  I'm sorry, I just

8   can't restrain myself.

9              Okay.  Please proceed, counsel.

10             MR. PERLMAN:  Yes, your Honor.

11  BY MR. PERLMAN:

12  Q.  During the time that Fera was negotiating with -- I'm going

13  to strike that.

14             During the time that Fera was interacting with Tanner,

15  was Fera also in a business relationship with a company called

16  Xcelience?

17  A.  Yes.

18  Q.  Could you briefly describe what Xcelience is?

19  A.  Xcelience is a contract manufacturer and developer for

20  companies like us.  We were a virtual drug company, we don't

21  have facilities, and we give them projects to do, and they

22  develop the formulation, and then they manufacture it for us,

23  and they also acquire the RLD, if needed.

24  Q.  Did Xcelience represent to Fera that it would be able to

25  require Daraprim RLD?

LCGKFTC2                    Della Fera - Redirect

1    A.   Yes.

2              MR. POLLACK:   Objection; outside the cross of my

3    scope.

4              MR. PERLMAN:   Your Honor, I'll link up with my next

5    question.

6              THE COURT:   Okay.  I'll reserve on the objection.

7    BY MR. PERLMAN:

8    Q.   Did your experience with Xcelience inform your interaction

9    and your decision not to prepay Tanner Pharma?

10   A.   It was one of the contributing factors.

11   Q.   How so?

12   A.   Xcelience, when they -- we initially signed the contract,

13   they were very confident of acquiring the product, and they

14   said they had very strong sources.  As time evolved, I think we

15   signed a contract at the end of one year, and it lasted for

16   about eight months, and they were sourcing on a regular basis

17   for us and could not make an acquisition until they mentioned

18   that they had talked to the RLD manufacturer, Vyera, and they

19   were dealing with them directly.  I don't know how and what

20   kind of channels they were using.

21   Q.   How did that inform your interactions with Tanner

22   specifically?

23   A.   About prepaying, I'm not prepaying for product until I can

24   see the product.

25   Q.   All right.  So now I'd like to turn to your discussions

LCGKFTC2                    Della Fera - Redirect

1    with Mr. Pollack about another RLD procurement company,

2    Reliant.

3              Are you with me?

4    A.   Go ahead.

5    Q.   So how did you come to learn about Reliant?

6    A.   There's a business broker named Peter Sketalis who

7    introduced us to Reliant.

8    Q.   Was that in January of 2018?

9    A.   It sounds right.

10   Q.   Now, I believe you discussed with Mr. Pollack that Fera

11   purchased two bottles of Daraprim RLD from Reliant; is that

12   right?

13   A.   Yes.

14   Q.   Why did Fera purchase two bottles of Daraprim RLD from

15   Reliant and not more?

16   A.   The gentleman representing Reliant was very transparent and

17   shared that his expiration date was the summer of 2019 on the

18   product, that he had the inventory of five or seven bottles of

19   Daraprim.

20   Q.   And why did that expiration date matter for your purchase

21   amount?

22   A.   It's because we weren't sure if we would have our product

23   finally developed because -- finished product.  We had to

24   secure a manufacturer and make sure we made three batches, we

25   had to secure the DMF.  So timing was still nebulous at that

LCGKFTC2                    Della Fera - Redirect

1    time.

2    Q.  And why did that nebulous timing affect your purchase

3    decision?

4    A.  It's because the bottles were $115,000 a bottle.  If we

5    purchased this -- we purchased two to make sure we can get the

6    activities going, the comparatives, and Satya, the gentleman

7    from Reliant, kept stating that he can get Daraprim anytime for

8    us when we were in January of 2018 in our meeting, so I felt

9    very secure that we can always add on to acquire products when

10   needed.

11   Q.  Now, Mr. Della Fera, you just used the phrase "get our

12   process going."

13        What did you mean by that?

14   A.  To make sure we complete the DMF with our API manufacturer,

15   to negotiate a contractor to manufacture the product.

16   Q.  When you purchased the two bottles of Daraprim RLD from

17   Reliant, were you intending to use them for BE testing at that

18   point or something else?

19   A.  For development.

20   Q.  What do you mean by "development"?

21   A.  We also do a comparative at the manufacturing site, so we

22   needed samples of the product for it to be manufactured, and we

23   needed samples of the product for doing further testing of the

24   API.

25   Q.  Now, after that January 2018 purchase from Reliant, did you

LCGKFTC2                        Della Fera - Redirect

1    or any of your colleagues reach back out to Reliant to inquire

2    whether they'd be able to supply additional Daraprim?

3    A.  From the initial meeting, we -- Satya mentioned that he can

4    provide Daraprim at any time for us.

5    Q.  So my question is:  Later in that year, did Fera meet with

6    Mr. Valiveti about acquiring additional Daraprim RLD?

7    A.  We had a meeting in May of that year, and he shared with me

8    that he sold his inventory of Daraprim from that summer 2019

9    lot, and he also signed a contract with Vyera that he would not

10   be able to purchase and resell Daraprim.

11   Q.  Did Mr. Valiveti tell you -- strike that.

12           At that point, in May 2018, did you view Reliant as a

13   potential source of Daraprim RLD?

14   A.  As of that lunch that we spent time in May, he said he

15   cannot -- he was restricted of dealing with Daraprim.  The CEO

16   of Vyera purchased the product, the remaining inventory from

17   him, and then negotiated a deal where it would restrict Satya

18   from continuing sourcing the product for generic companies.

19   Q.  Did the CEO of Vyera -- let me rephrase that.

20           Was the CEO of Vyera that you were referencing Kevin

21   Mulleady?

22   A.  Yes.

23           MR. POLLACK:  Objection, your Honor; hearsay.

24           THE WITNESS:  It is Kevin Mulleady.

25           MR. POLLACK:  Withdrawn.

LCGKFTC2                    Della Fera - Redirect

1          THE COURT:  Thank you.

2    BY MR. PERLMAN:

3    Q.  And did you ever have any discussions with Mr. Mulleady

4    about this repurchase of Reliant RLD?

5    A.  Yes.  We just happened to have a meeting a week after, and

6    he mentioned what occurred -- hold on.  I don't know if it was

7    before or after, but in the month of May.  I don't have the

8    dates memorized.

9          But, yes, I did meet with him, and he actually shared

10   that information, that he purchased the remaining bottles.  He

11   actually said he did it personally with his own financing.  I

12   don't know.  And he mentioned those folks cannot sell Daraprim

13   going forward.

14          MR. POLLACK:  Your Honor, I object.  We're now well

15   outside of my cross, and Mr. Della Fera's testimony is hearsay,

16   and I move for it to be stricken.

17          MR. PERLMAN:  Your Honor, if I may --

18          THE COURT:  It's not hearsay, and it's not outside the

19   scope of cross.

20   BY MR. PERLMAN:

21   Q.  Do you recall anything else about that discussion with

22   Mr. Mulleady about the repurchase of Reliant RLD specifically?

23   A.  I can't recall anything else.  If you can refresh my memory

24   on some documents.

25   Q.  Well, let me ask you this, Mr. Della Fera:  How did you

LCGKFTC2                         Della Fera - Redirect

1    feel after you had that interaction with Mr. Mulleady in which

2    he informed you that he had repurchased Reliant's Daraprim RLD?

3    A.   I was taken back and very concerned about the prospect of

4    getting pyrimethamine ever on the market.

5    Q.   Why is that?

6    A.   We'd been discussing this morning about the requirements of

7    having five times the number of tablets for retains for the

8    ANDA submission.  Without being able to purchase the product

9    from Satya, we felt -- I felt, personally, that we would not be

10   able to get pyrimethamine completed.

11   Q.   I think with Mr. Pollack, you discussed how Fera acquired

12   some amount of Daraprim via prescription.

13        Do you recall that?

14   A.   Yes.

15   Q.   Can you use the Daraprim that Fera acquired via

16   prescription for bioequivalence testing or retains?

17   A.   No.

18   Q.   Why not?

19   A.   It's not in the RLD packaging, and without their -- with

20   their referencing of the lot number and expiration date, you

21   can't do it.

22   Q.   Okay.

23        So I'd like to turn to discussing your interactions

24   with the FDA, which I believe you recall discussing with

25   Mr. Pollack?

LCGKFTC2                    Della Fera - Redirect

1    A.  Yes.

2    Q.  So I think Mr. Pollack asked you a number of questions

3    about why you didn't discuss Reliant's offers in January and

4    February 2018 with the FDA.

5            Do you recall that back-and-forth?

6    A.  Yes.

7    Q.  Why didn't Fera include those discussions in its letters to

8    the FDA?

9    A.  It's not material.  The statement is plugging in something

10   that wasn't the case.  We were restricted from purchasing after

11   May from Satya, the Reliant company, and that's when we wrote

12   those letters.

13   Q.  I just want to make sure I understand.  So it's my

14   understanding that your first waiver request was in

15   August 2018; is that right?

16   A.  That's correct.

17   Q.  In August 2018, did you view Reliant as a source of

18   Daraprim RLD?

19   A.  Not as of August 2018, no.

20   Q.  Did you view Reliant as a source of Daraprim RLD in January

21   of 2019?

22   A.  No.

23   Q.  And in March of 2019, when you had the telephone conference

24   with the FDA, did you view Reliant as a source of Daraprim RLD?

25   A.  No.

LCGKFTC2                     Della Fera - Redirect

1   Q.  So, Mr. Della Fera, I'd like to, just quickly, turn to

2   asking you a couple of questions about Fera's recordkeeping

3   practices.

4           I apologize.

5           MR. POLLACK:  Objection, your Honor.  I don't believe

6   my cross addressed recordkeeping practices whatsoever.

7           THE COURT:  Let's see if this is tied up.

8           MR. PERLMAN:  Your Honor, this is related to

9   defendant's objection to GX 3286, which we discussed yesterday.

10          THE COURT:  Oh, okay.

11          MR. PERLMAN:  So I'm trying to lay the foundation for

12  that document.

13          THE COURT:  Right.

14          So, if there's no adequate foundation laid, then this

15  exhibit will be stricken.  The defense counsel used the

16  exhibit, I believe, in the cross.

17          Do you want the exhibit stricken or not?

18          MR. POLLACK:  I did not use the exhibit, your Honor.

19          THE COURT:  You used a different exhibit.

20          MR. POLLACK:  I used a timeline that's actually

21  referenced in Ms. McDougal's affidavit.  What Mr. Perlman is

22  referring to are the notes of Mr. Florentino, I believe it was,

23  that are the transcript notes of several meetings between Fera

24  and Vyera.

25          THE COURT:  Thank you very much for that explanation.

LCGKFTC2                    Della Fera - Redirect

1          So, as I understand it, the defendant still wants this

2    exhibit stricken?

3          MR. POLLACK:  It's many layers of hearsay, your Honor.

4          THE COURT:  Okay.  So there will be a foundation or

5    not, and I will hear argument from counsel, and you may have

6    recross on this issue of foundation and anything else you want

7    for recross.

8          MR. POLLACK:  Thank you, your Honor.

9    BY MR. PERLMAN:

10   Q.  So let me ask you this, Mr. Della Fera:

11         When Fera has telephone discussions with the FDA, is

12   it Fera's policy to memorialize those discussions?

13   A.  Yes.

14   Q.  Why is that?

15   A.  Because all contact with the FDA — either in

16   teleconference, physical meetings — is placed -- is a contact

17   report in the regulatory department.

18   Q.  Now, when Fera has telephone or other oral discussions with

19   its business partners, does Fera also have a policy to

20   memorialize those discussions?

21   A.  I wouldn't say it is their policy, but it is a common

22   practice.

23         MR. PERLMAN:  Bryce, could I ask you to put GX 3286 up

24   on the screen.  I'm actually going to ask you, Bryce, to go to

25   page -- well, I'll ask a couple of questions about this cover

LCGKFTC2                          Della Fera - Redirect

 1   email, so if you could zoom back in, Bryce.

 2   BY MR. PERLMAN:

 3   Q.   Mr. Della Fera, did you receive this cover email, GX 3286?

 4   A.   Yes.

 5   Q.   Are you familiar with this email?

 6   A.   Yes.

 7   Q.   And who is Scott Florentino?

 8   A.   He's the head of business development at Fera.

 9   Q.   This email was sent on June 27, 2018, right?

10   A.   Yes.

11        MR. PERLMAN:   Bryce, could I have you go to page 2 of

12   GX 3286.  If you could just zoom in on the very top through

13   "Compiled by Scott Florentino."  Perfect, thank you.

14   Q.   So did Mr. Florentino create this document?

15   A.   Yes.

16   Q.   Did you direct Mr. Florentino to create GX 3286?

17   A.   Yes.

18   Q.   And why did you direct Mr. Florentino to create GX 3286?

19   A.   I was very uncomfortable with the interaction with Vyera.

20   Q.   Did you --

21   A.   I just wanted to have it documented in detail to understand

22   and to make sure we had it memorialized.

23   Q.   Did you want Fera to have a record of its interactions with

24   Vyera?

25   A.   Yes.

LCGKFTC2                          Della Fera - Redirect

1            MR. POLLACK:  Objection; leading.

2            THE COURT:  Sustained, but I think -- sustained;

3    stricken.

4    BY MR. PERLMAN:

5    Q.   Do you recall when your discussions with Vyera concluded?

6    A.   The first day of June, early days of June.

7    Q.   When did you direct Mr. Florentino to compile GX 3286?

8    A.   Within that first week.

9    Q.   After Mr. Florentino sent you GX 3286, did you review it?

10   A.   Yes, I did review it.

11   Q.   And did Fera preserve GX 3286 on its servers?

12   A.   Yes.

13           MR. PERLMAN:  The government will move to admit

14   GX 3286 at this time as a business record.

15           THE COURT:  Is this the end of your redirect?

16           MR. PERLMAN:  I had a few more questions, but --

17           THE COURT:  So why don't you finish that.

18           MR. PERLMAN:  Okay.

19           THE COURT:  Then we're going to take our midmorning

20   recess.

21           MR. PERLMAN:  Okay.

22           THE COURT:  I'm not going to rule on this request to

23   admit the document.  We'll have our recess.  There may be some

24   recross, and any examination that you wish with respect to this

25   document, and then I'll hear counsel if there is a continued

LCGKFTC2                    Della Fera - Redirect

1    objection.

2              MR. POLLACK:  Your Honor, a point of clarification:

3    Has the document been admitted, or is there recross to the

4    admissibility of the document itself?

5              THE COURT:  It can be -- well, it certainly can be as

6    to the admissibility.  I have reserved decision on the

7    objection.

8              MR. POLLACK:  Because if it's admitted, there are

9    questions I would like to get into on the document.

10             THE COURT:  I will allow that, also, if I admit it,

11   but I want to give you a full chance to ask your questions and

12   argue against its admission.

13             MR. POLLACK:  Thank you, your Honor.

14             MR. PERLMAN:  Okay.  Thank you, your Honor, I.  Just

15   have a few more questions.

16   BY MR. PERLMAN:

17   Q.  Mr. Della Fera, are you familiar with the phrase "first to

18   market," as it's used in the pharmaceutical industry?

19   A.  Yes.

20   Q.  What does it mean?

21   A.  It means being the first generic player competing against

22   the reference-listed product.

23   Q.  Did you want Fera to be first to market for its generic

24   pyrimethamine product?

25   A.  Yes.

LCGKFTC2                    Della Fera – Redirect

1    Q.   Why?

2    A.   It's usually -- in the generic world is where most of the

3    positive opportunity happens.  The pricing is healthy, and you

4    can make tremendous profits.

5    Q.   What do you mean by "positive opportunity"?

6    A.   It's easy to get thorough distribution throughout the

7    pharmaceutical channels when you're first to market.

8    Q.   Mr. Della Fera, in your view, did Fera make efforts to be

9    first to market for its generic pyrimethamine?

10   A.   Yes.

11             MR. PERLMAN:  Thank you, your Honor.  I have no more

12   questions.

13             THE COURT:  Great.

14             So we'll take our midmorning recess and then resume

15   with recross.  Thank you.

16             (Recess)

17             THE COURT:  Counsel?

18             MR. POLLACK:  Yes, your Honor.

19             THE COURT:  Did you have questions for the witness?

20             MR. POLLACK:  Your Honor, not on the exhibit.  I don't

21   believe the foundation has been laid on it.

22             THE COURT:  That's fine.  Do you have any other

23   questions?

24             MR. POLLACK:  Only about the document, if it is

25   admitted.

LCGKFTC2                        Della Fera - Redirect

1              THE COURT:  Well, you wanted to be heard on that

2       issue.

3              MR. POLLACK:  Precisely, your Honor.

4              THE COURT:  Feel free.

5              MR. POLLACK:  Would you like me to proceed?

6              THE COURT:  Please.

7              MR. POLLACK:  Thank you, your Honor.  One moment, I

8       just dropped my glasses on the floor.

9              THE COURT:  No rush.

10             MR. POLLACK:  Your Honor, I don't know what basis on

11      which this document is being offered.  Presumably, it seems to

12      be being offered as a business record under Rule 80036.  The

13      issue with that is that 80036 requires the document to be made

14      by a person with knowledge at or near the time of the event or

15      occurrence.  When we look at this document, on page 1, it is

16      dated June 14, 2018.  As we go through the document, we see

17      that it goes to events that go back to '16 and early '18, and

18      in April and May, and finally culminating in June.  In fact, I

19      don't even know that it gets to June here.

20             THE COURT:  June 4th.

21             MR. POLLACK:  June 4th.  There's the last page, I

22      found it, your Honor.  Thank you.  And --

23             THE COURT:  So that's all but the first three entries

24      are from January 2018 to June 4th of 2018, and the document is

25      dated June 14th, 2018.

LCGKFTC2                    Della Fera - Redirect

1          MR. POLLACK:  Correct.  And the last entry is ten days

2     before this document was even created.  And as I pointed out

3     yesterday, the author of this document is not even listed as an

4     attendee at many of the events for which he purports to be

5     providing information.  And if we look at other entries, it

6     reflects hearsay within hearsay of what other individuals have

7     told them about what other individuals have said.  It's almost

8     three layers of hearsay within this document.  And it's

9     impossible to parse out any portion of that to determine what

10    is and is not admissible in this document.

11          Besides the fact it's not contemporaneous, so I don't

12    see how it's 80036, nor do I see how any of the hearsay

13    statements within this document fits with any exception.

14          THE COURT:  Thank you.

15          Anything further before I hear from plaintiffs'

16    counsel?

17          MR. POLLACK:  Not from me.  Thank you, your Honor.

18          THE COURT:  Thank you.

19          Counsel?

20          MR. PERLMAN:  Your Honor, I would acknowledge that --

21    first of all, defense counsel is correct that we are seeking to

22    admit this via 80036 as a business record.  It was compiled

23    contemporaneously with the events.  As your Honor noted, most

24    of the events were in January, right before this happened, and,

25    as Mr. Della Fera testified, he reviewed -- he directed that it

LCGKFTC2                         Della Fera - Redirect

1    be compiled and reviewed it to make sure it was accurate for

2    Fera's records.

3                As to the hearsay within hearsay argument:  We concede

4    that the statements made by third parties in this document are

5    hearsay, but I would contend that Fera's statements and Vyera's

6    statements — Vyera employees' statements, such as Kevin

7    Mulleady — as reflected in this document, are not because

8    Vyera's statements would come in as party admissions.

9                THE COURT:  So we can take this line by line with

10   respect to embedded hearsay.  And to the extent there isn't a

11   basis to admit the embedded hearsay for the truth, I will not

12   admit it, but to the extent that it is a description of

13   statements by someone associated with Vyera, I do find it is

14   admissible as an exception to hearsay.

15               If defense counsel wants me to look at any particular

16   line, I'm happy to.

17               I do find that the creation of the document and the

18   preservation of the document within the files of Fera is

19   sufficiently described as a document created in what is the

20   ordinary course of the business activity of Fera and would

21   ordinarily be kept by Fera.

22               I admit that the entries are a compilation.  I expect

23   that Mr. Florentino talked to people and looked at documents to

24   put together this timeline, but I don't have that evidence, I

25   think, before me, but that's what it appears to be.  As defense

LCGKFTC2                         Della Fera - Redirect

1      counsel points out, how could somebody not involved in these

2      events create a timeline of these events?

3             So I am going to receive it as a business record, and

4      I am happy to look at any description of a statement made by

5      someone who is not with the company, Fera, and not with Vyera

6      or its agent, I'm happy to look at that more closely, but I

7      expect, generally speaking, that's not the defendant's

8      principal concern here.

9             Certainly, the fact that the head of Fera directed the

10     creation of this document, as he describes, because of his

11     discomfort with the conversations had with Vyera in the first

12     half of 2018 is, by itself, a reason to admit the document,

13     that fact of creation.

14            So, counsel, do you want to examine, then, this

15     witness, the document having been received in evidence?

16            MR. POLLACK:  Briefly, your Honor.

17            THE COURT:  Thank you.

18            (Government's Exhibit 3286 received in evidence)

19            (Continued on next page)

20

21

22

23

24

25

LCGMFTC3                    Della Fera - Recross

1          MR. POLLACK:  Your Honor, if you will just indulge me

2     to get situated on this line of questioning, I would appreciate

3     it.

4          THE COURT:  No problem.

5          MR. POLLACK:  Thank you.

6     RECROSS EXAMINATION

7     BY MR. POLLACK:

8     Q.  Mr. Della Fera, if I understand your written testimony in

9     paragraph 48, you discuss at least one meeting leading to other

10    meetings between you and two Vyera employees, Mr. Mithani and

11    Mr. Mulleady, in which a joint venture was proposed in which

12    Vyera would provide the rights to Vecamyl, several other

13    projects, and support for a pyrimethamine ANDA to be based on

14    Vyera's ANDA file.  Is that correct?

15    A.  Yes.

16    Q.  Now, an ANDA based upon Vyera's NDA file, do I understand

17    that to refer to what's known in the industry as an authorized

18    generic?

19    A.  No.  That wasn't the intention.  We discussed that to have

20    included that.  What they were stating is to use the NDA

21    information of a manufacturing process and to submit it as a

22    new ANDA off the existing NDA data.  Actually, to file a new

23    ANDA utilizing all the information that the NDA has.  An

24    authorized generic, you don't need to file anything, just for

25    clarity.  Authorized generic, if the brand company wants you to

LCGMFTC3                    Della Fera - Recross

1   have a label, they can give you have a label and produce

2   product for it.

3   Q.  Was authorized generic one of the things that you discussed

4   with Mr. Mithani and Mr. Mulleady?

5   A.  Yes.  This was in discussions.

6   Q.  You and Vyera exchanged several term sheets if I understand

7   the contents of this exhibit, GX-3286, correct?

8   A.  I'm sorry.  I don't know what exhibit you're referencing.

9   Q.  Let me put it this way.  If I understand correctly, you and

10  Vyera exchanged several term sheets about this joint venture,

11  correct?

12  A.  Yes.

13  Q.  You had several meetings about it, correct?

14  A.  Yes.

15          MR. POLLACK:  Justin, can we bring up GX-3286, please.

16  I would like to take us to page 7.

17  Q.  Mr. Della Fera, I want to direct you to the entry close to

18  the top called May 29, 2018 teleconference.  We see the

19  attendees here were yourself, Mr. Florentino, Kevin Mulleady

20  and Akeel Mithani, at least reflected by this document,

21  correct?

22  A.  I'm sorry.  What is your question?  I was reading.

23  Q.  The attendees.  As reflected.

24  A.  The attendees are there, yes.

25  Q.  According to your testimony in paragraph 51, you reviewed

LCGMFTC3                    Della Fera - Recross

1    this document and agreed that it was accurate, correct?

2          MR. POLLACK:  Justin, you want to show Mr. Della Fera

3    paragraph 51 of his affidavit, please.  You don't need to show

4    them side by side.  It's on page 16, by the way.

5    Q.  You reviewed the document and you agree that it's accurate?

6    A.  Yes.

7          MR. POLLACK:  Justin, let's go back to GX-3286,

8    please.  Back to page 7, the text that we had highlighted.

9    Q.  One of the things that's highlighted here is that in the

10   course of your discussions about forming a joint venture with

11   Vyera, one of the things Mr. Mulleady proposed that he isn't

12   against is Fera continuing his ANDA development forward,

13   correct?

14   A.  In that teleconference that was discussed.

15         MR. POLLACK:  Justin, can we bring up the entry for

16   May 31 teleconference morning, please.

17   Q.  Mr. Della Fera, here we have a May 31, 2018 teleconference

18   listing attendees being you, Mr. Florentino, Ms. McDougal, and

19   Kevin Mulleady, correct?

20   A.  Yes.

21   Q.  By the way, are these Mr. Florentino's notes that we are

22   reviewing here?

23   A.  These are Mr. Florentino's notes.

24   Q.  Was the same true for May 30, 2018 as well or May 29, 2018?

25   A.  This entire document was created by Mr. Florentino from his

LCGMFTC3                    Della Fera - Recross

1    recollection.

2    Q.  But, obviously, not from his recollection for events that

3    he was never present at?

4    A.  Or information or hearsay from that, yes.

5    Q.  If we look at this next meeting --

6    A.  And the correction is there are no attorneys on the

7    attendees.  There was attorneys from both sides.

8    Q.  There were attorneys on the line too?

9    A.  Yes.

10   Q.  Who was your attorney on the line?

11   A.  Shon Glusky.

12   Q.  What firm is Mr. Glusky at?

13   A.  Shepard Mullin.

14   Q.  What is his specialty?  Do you know?

15   A.  No.

16   Q.  And Vyera had a lawyer on as well?

17   A.  Many.

18   Q.  Is this the first time lawyers were on the calls between

19   you and Vyera?

20   A.  All these teleconferences were attorneys with the red line.

21   Q.  When you say red line --

22   A.  With the discussion -- you just mentioned the term sheet.

23   Q.  The term sheet?

24   A.  Yeah.

25   Q.  Thank you.

LCGMFTC3                    Della Fera - Recross

1      Again, when we look at this meeting from May 31, 2018,

2   if we go down four, Fera can continue to move its ANDA

3   development forward.  Again proposed, correct?

4   A.  That's what's written.

5           MR. POLLACK:  Justin, you can pull that down.

6   Q.  Mr. Della Fera, isn't it a fact that -- excuse me.  I want

7   to phrase this correctly, sir.  Isn't it a fact, Mr. Della

8   Fera, that you did not have a genuine intention of entering

9   into a joint venture agreement with Vyera?

10  A.  I really can't answer that.

11  Q.  You can't answer that?

12  A.  No.

13  Q.  Perhaps your deposition will refresh your recollection.

14          MR. POLLACK:  Justin, can we bring up his deposition.

15  Let's go to the deposition at page 262, line 12 through page

16  263, line 6.

17  Q.  Mr. Della Fera, take a moment to read that.  Tell me if it

18  refreshes your recollection of whether you had a genuine

19  intention of ever entering -- genuine intention of entering

20  into a joint venture agreement with Vyera.

21  A.  Again, very mixed emotions, yes.  When we were dealing with

22  Vyera, Mr. Mulleady, you forgot that we just discussed --

23  Q.  Mr. Della Fera?

24  A.  Hold on.

25  Q.  I asked a question that required a yes or no.

LCGMFTC3                    Della Fera - Recross

1    A.  If you just want yes or no.  I said mixed emotions.  I did

2    not come to a finalization.  What I did finalize is, I was not

3    doing business with Vyera, absolutely.

4    Q.  Mr. Della Fera, the attorneys at your deposition asked you,

5    Mr. Cravens from the Morgan Lewis law firm:  Did you ever have

6    a genuine intention of entering a joint venture agreement with

7    Vyera?  Your answer was:  I think my statement would answer

8    that.  Your statement above was:  I needed to know as much as I

9    could learn to make sure I complete my project.

10         MR. POLLACK:  You got to go higher, Justin.  Sorry.

11   Q.  You said:  I personally took all the actions as CEO and one

12   of his directors in our negotiations could find out where we

13   were in our development.  I was very guarded.  But it's the old

14   adage, keep your friends close, but keep your enemies closer.

15   And he volunteered to come and wanted to be closer.  I needed

16   to know as much as I could learn to make sure I could complete

17   my project without interference.

18         Mr. Cravens asked you:  So were all of your efforts to

19   negotiate a joint venture agreement with Vyera in fact just an

20   effort to keep your enemies closer?  Your answer was:  I was

21   trying.  OK, yes.  That is one of the -- I was just using at a

22   metaphor, but just to find out as much as I could find out and

23   ensure that would be successful.

24         Was that the statement that you were referring to in

25   your answer as to whether you ever had a genuine intention of

LCGMFTC3                    Della Fera - Redirect

1   doing a deal with Vyera?

2   A.  Again, as I stated, I think that's clear.  What you just

3   read you can use as my statement.

4          MR. POLLACK:  No further questions, your Honor.

5          THE COURT:  Any additional questions?

6          MR. PERLMAN:  Your Honor, I just have one question for

7   the witness.

8   REDIRECT EXAMINATION

9   BY MR. PERLMAN:

10  Q.  Mr. Della Fera, what do you mean by mixed emotions in your

11  dealing with Mr. Mulleady and Vyera?

12  A.  When he initially contacted me, I was open to listening and

13  understanding what they wanted to do.  As soon as the actions

14  were taken when he purchased the remaining Daraprim from Satya

15  at Reliant, I knew I had trouble.  I had a problem.  And I had

16  to understand the problem, how to manage it.

17  Q.  Did Mr. Mulleady describe any other actions that led you to

18  believe you had a problem?

19  A.  The other action was when he shared with me in a lunch

20  meeting in the month of May or April, I am not sure of the date

21  exactly, what he did to two competitors of ours.  One is Mylan

22  and the other is Sandos.  Those are two big drug companies in

23  the generic market at that time.  He took out their API

24  manufacturer called RL out of India, RL Fine, I think it is

25  called, by going there, flying out there, meeting with the top

LCGMFTC3                    Della Fera - Redirect

1    executives.  I don't know who they are.  And he negotiated a

2    deal to have an exclusive supply arrangement with Vyera, and he

3    said he was paying them on a regular basis a royalty of sales

4    of Vyera.

5    Q.  How did that discussion make you feel, Mr. Della Fera?

6    A.  Very uncomfortable.

7    Q.  Why?

8    A.  It was unsettling to hear such behavior.

9    Q.  Why was it unsettling?

10        MR. POLLACK:  Your Honor, can I ask Mr. Perlman to

11   move a little closer to the microphone.

12        MR. PERLMAN:  Sorry.

13   Q.  Why was it unsettling?

14   A.  It's bad behavior.  I don't want to go any further.  I

15   didn't want to deal with a person like that, like a character.

16        MR. POLLACK:  Objection.  Leading.

17        THE COURT:  Overruled.

18   Q.  Did Mr. Mulleady mention anything else at the meeting

19   concerning API's supply?

20   A.  He shared in this document that a consultant firm produced

21   for him just weeks before we met, sharing that he knew who my

22   API supplier was.

23   Q.  How did that make you feel?

24   A.  Unsettled.

25   Q.  Could you elaborate, please.

LCGMFTC3                    Della Fera - Redirect

1   A.   That what he did to Sandos and Mylan with RL Fine by doing

2   an agreement to prevent the product from being produced, that

3   he can do the same to my API supplier.

4           MR. POLLACK:  Objection, your Honor.  I object to the

5   foundation of this witness' testimony about what Mr. Mulleady

6   did or did not do as to two other API suppliers, which there is

7   no evidence in the record on.

8           THE COURT:  I'm sorry.  I thought he was relating a

9   conversation with Mr. Mulleady.  I think your objection is

10  overruled.

11          MR. POLLACK:  If it's for the truth, it would be

12  objectionable.

13          THE COURT:  Overruled.

14          MR. POLLACK:  Thank you, your Honor.

15          MR. PERLMAN:  Your Honor, no further questions.

16          THE COURT:  Any further recross?

17          MR. POLLACK:  No, your Honor.  Thank you.

18          THE COURT:  Mr. Fera, help me put together a timeline.

19  In a world which may be a more normal world, which is not the

20  world you met.

21          When did you contact Fukuzyu for the second time

22  seeing if you could get some API from them?  Do you remember?

23          THE WITNESS:  From the documents it was in 2017.

24          THE COURT:  Sort of towards the end?

25          THE WITNESS:  Yes.

LCGMFTC3                        Della Fera - Redirect

1              THE COURT:  Is there anything I can look at to put a

2       date on that?

3              THE WITNESS:  There was -- there should be many

4       e-mails from Susan McDougal's files with our consultant, Gary

5       Conte, who was connecting us because we failed on our own.

6       They wouldn't even talk to us.

7              THE COURT:  Hypothetically, just for our discussion, I

8       am just going to look for those e-mails in the record, but if

9       they aren't in the record, so be it.

10             To start us off, I am going to pick a month, November

11      of 2017.  Let us say Fukuzyu answers your inquiries this time

12      and that those discussions go well.  They are willing to supply

13      you with API.

14             THE WITNESS:  Yes.

15             THE COURT:  In the best of all possible worlds,

16      wherein you had no interference in the market, what would you

17      have done at that point?

18             THE WITNESS:  We would have negotiated a supply

19      agreement with Fukuzyu immediately.

20             THE COURT:  Did you need a supply agreement?  Why

21      couldn't you just purchase the API?

22             THE WITNESS:  We would have purchased API to test it.

23      But the second thing, if we had the channels opened in our

24      relationship, we would have locked into an agreement.

25             THE COURT:  Why did you want a supply agreement?

1          THE WITNESS:  It's because the product has been

2     commercially available in the U.S.  It has an approved DMF.  It

3     wouldn't have the little wrinkles that we have with our API

4     number 1 with the impurity profile because when you're on the

5     market you have to keep up to the standard.  And if there is

6     any questions from the agency, it gets addressed while you're

7     in the market.

8          THE COURT:  So as opposed to just sending over a

9     purchase order to buy the API as you needed it, you would have

10    wanted a supply agreement with Fukuzyu as well?

11         THE WITNESS:  Yes.

12         THE COURT:  What advantage do you get from a supply

13    agreement?

14         THE WITNESS:  That we would have a consistent supply

15    going forward, not just one purchase.

16         THE COURT:  So you would want to negotiate terms that

17    gave you confidence in the supply going forward?

18         THE WITNESS:  Yes.

19         THE COURT:  How long do you think it would have taken

20    you in the normal course, based on your business experience?

21    With a willing manufacturer, willing to enter into an

22    agreement, a supply agreement with you, how long to negotiate

23    and sign that?

24         THE WITNESS:  Within three months.  We would have

25    probably worked faster if we had a cooperative partner, as

LCGMFTC3                    Della Fera - Redirect

1   Fukuzyu, as you're stating on the hypothetical.  We would have

2   immediately requested materials and start working just on the

3   premise of in good faith that we would enter into an agreement.

4              THE COURT:  On my hypothetical you would have gotten

5   an immediate supply of the API which you could use?

6              THE WITNESS:  Yes.

7              THE COURT:  And you would have used about perhaps two,

8   three months or so to negotiate a supply agreement?

9              THE WITNESS:  Correct.

10             THE COURT:  Then what other partners do you need in

11  order to create the pyrimethamine?

12             THE WITNESS:  A manufacturing partner that makes the

13  finished product.

14             THE COURT:  Would that be a manufacturing partner in

15  the United States?

16             THE WITNESS:  It doesn't have to be.  Our partner for

17  pyrimethamine is in Switzerland.

18             THE COURT:  As of November 2017, did you have a

19  relationship with that partner?

20             THE WITNESS:  I had a relationship with that partner,

21  yes, but we did not come to terms yet.

22             THE COURT:  Now that you know, in our hypothetical, in

23  November of 2017 that you have API in hand and you have a

24  willing partner to negotiate a supply agreement, how long to

25  finalize that agreement with your manufacturing partner?

LCGMFTC3                    Della Fera - Redirect

1              THE WITNESS:  Within 90 days.  And we would have many

2     choices.  This is the -- the formulation is a simple

3     formulation that could be produced almost anywhere that is

4     producing tablets.

5              THE COURT:  Under my hypothetical you also can go out

6     and just get as much Daraprim as you want.

7              THE WITNESS:  OK.

8              THE COURT:  Forgetting Daraprim, normally when you are

9     developing a generic product do you have trouble getting access

10    to the RLD?

11             THE WITNESS:  No.

12             THE COURT:  So under my hypothetical you have no

13    problem getting access to the RLD?

14             THE WITNESS:  OK.  That would be very helpful.

15             THE COURT:  What's the next step?

16             THE WITNESS:  You acquire -- it takes within a week,

17    two weeks to get the RLD from our supplier, our regular

18    supplier that we used.

19             THE COURT:  So now you have the RLD in hand.  You know

20    it took you until about February of 2018 to have a contract

21    executed with your Swiss manufacturing partner.  What's the

22    next step?

23             THE WITNESS:  For the partner to make the exhibit

24    batches, which is three batches.

25             THE COURT:  How long do you expect that would take?

LCGMFTC3                    Della Fera - Redirect

1              THE WITNESS:  That takes three to four months.  On

2      your hypothetical, we would have done this much early earlier.

3              THE COURT:  Because?

4              THE WITNESS:  I had no barriers.  When we decided to

5      make the product.

6              If I could just enjoy this hypothetical a little bit,

7      if we make the decision in the fall of 2015, I could have

8      started the project -- with the way the environment that you

9      are sharing with me, we could have started in early '16 and we

10     could have probably been filing our ANDA to the FDA by the

11     third quarter of '17, maybe the fourth quarter of '17, and get

12     the approval probably in 12 months, third quarter or fourth

13     quarter of '18.

14             THE COURT:  Stick with my hypothetical, though.

15             THE WITNESS:  I'm having a good time.

16             THE COURT:  The three batches are taking three to four

17     months to manufacture after you have your agreement with your

18     manufacturing partner in Switzerland.

19             THE WITNESS:  Yes.

20             THE COURT:  We are going to say June of 2018.

21             THE WITNESS:  OK.

22             THE COURT:  What happens next?

23             THE WITNESS:  You -- one of the components after

24     production, you have to wait six months of stability data of

25     the finished product that you produced at your contract

LCGMFTC3                    Della Fera - Redirect

1    manufacturer.  So let's say everything was produced probably in

2    April, May.  Add six months.  So we are looking at November.

3    Then we receive that six months data, which on the hypothetical

4    everything worked out.  The product is good.  Then we assemble

5    our ANDA file.

6              THE COURT:  You only assemble the file after the

7    six-month period, or are you working on that in the meantime?

8              THE WITNESS:  We are working on it.  You start working

9    on it much earlier.  You just keep adding the data set points

10   as it comes about.  The regulatory department would be working

11   on the ANDA.  It would be working on it even before those

12   batches were made.

13             THE COURT:  So once you have the six-month data in

14   hand, how long to file the ANDA?

15             THE WITNESS:  We try to turn it around in 30 days.

16             THE COURT:  So our dates in this hypothetical may be a

17   little off, but that means the ANDA is filed in January of 2019

18   in my hypothetical.

19             THE WITNESS:  It's a little late, but, yeah, I think

20   it would have been a little earlier.

21             THE COURT:  And then you had a problem when you filed

22   your ANDA this time with some questions that came back.  Would

23   you have expected, under our hypothetical, the same kind of

24   questions to come back from the FDA?

25             THE WITNESS:  No.

LCGMFTC3                    Della Fera - Redirect

1          THE COURT:  Why not?

2          THE WITNESS:  Because the API, if we were using

3    Fukuzyu, wouldn't have those problems -- those questions.  Our

4    product didn't have problems, but had those questions, probably

5    had already been answered, historical.

6          THE COURT:  So the questions related to the API

7    formulation that company A or the process for creating the API

8    that company A used?

9          THE WITNESS:  It was the impurity profile of the

10   product.  And there was -- those undetectable impurities that

11   usually you group up together and say as long as it's less than

12   a certain level, it doesn't matter.  This time the agency

13   asked, because it's a new API supplier, can you identify those.

14   Then it took us 10 months or eight months to do that.  That was

15   a long one, and very expensive.

16         THE COURT:  So you don't, under this hypothetical,

17   have those questions asked.  You filed an ANDA in January of

18   2019.  How long would you have expected to wait for ANDA

19   approval with no questions?

20         THE WITNESS:  Eight months.  Because we had a

21   target -- when we file it in December of '19 on our own ANDA,

22   not the hypothetical, because we were under the CGT status,

23   it's something that the agency developed kind of right after

24   Daraprim was launched to help generic companies come up and

25   genericize all types of pharmaceutical drugs, even if they are

LCGMFTC3                              Della Fera - Redirect

1    very low in sales.  So we would have alternatives in the

2    marketplace.

3            They came up with this new program which they would

4    kind of expedite the approval process and give you a target

5    date when you submit your ANDA.  When we submitted our ANDA in

6    December '19, we received from the agency a target date for

7    approval by August of '20.  You would add eight months to your

8    January hypothetical.  It would be September of '19, the

9    approval.

10           THE COURT:  How long to be in the market after your

11   approval date?

12           THE WITNESS:  How long it would take?

13           THE COURT:  Yes.

14           THE WITNESS:  We would already have the product being

15   produced at our contract manufacturer.  So within the 30 days

16   after the approval we would be on the market.

17           THE COURT:  The CGT status, when did the FDA institute

18   that, roughly?  Is that a longstanding program?

19           THE WITNESS:  No.  It's relatively new.  Commissioner

20   Scott Gottlieb.  That took place, I think, in 2016 I'm guessing

21   on the year, but I think it's '16 or '17, but it was '16.

22           THE COURT:  Thanks.

23           Give me one moment, counsel.

24           (Pause)

25           THE COURT:  Let me just check and see if I have other

1    questions.  Sorry.

2            At paragraph 46 of your direct testimony, which is on

3    page 14, at the last sentence you refer to a letter that you

4    responded to.  And to just focus your attention on this

5    passage, you're talking about a response to the FDA letter and

6    that you responded to the FDA letter in 2020.

7            Counsel, is the last sentence in that paragraph

8    redacted from public testimony?

9            MR. PERLMAN:  No, it is not, your Honor.

10           THE COURT:  In that last sentence you say:  In the

11   interim, we divested this product, which is approved on July

12   27, 2021.

13           What do you mean, divested?

14           THE WITNESS:  We licensed the product or sold the

15   product to another company.

16           THE COURT:  Thank you.

17           Counsel, do you have any questions for this witness

18   based on what I asked?

19           MR. PERLMAN:  One very short question.

20   REDIRECT EXAMINATION

21   BY MR. PERLMAN:

22   Q.  Mr. Della Fera, what does CGT stand for?

23   A.  Competitive generic therapy.

24           MR. POLLACK:  Your Honor, very briefly.

25           THE COURT:  Yes.

LCGMFTC3                    Della Fera - Recross

1          MR. POLLACK:  Justin, will you pull up Exhibit

2    GX-7015, please.

3    RECROSS EXAMINATION

4    BY MR. POLLACK:

5    Q.  Mr. Della Fera, this is the timeline that's been introduced

6    into evidence in the case.

7          MR. POLLACK:  I plan to get into some of this with

8    Ms. McDougal, your Honor, but I thought I would preview some of

9    it now, in light of your questions.  You may find it of

10   assistance.

11   Q.  Mr. Della Fera, when we look at page 1., you have already

12   testified to this, October 25, 2017, Fera completed its

13   manufacture of API, correct?

14   A.  Yes.

15   Q.  Prior to API company number 1 manufacturing that batch of

16   API, your company had been working with a CRO, a credit

17   research organization, called Xcelience, is that right?

18   A.  Yes.

19   Q.  And you terminated Xcelience in July of 2017 because of its

20   inability to source RLD, correct?

21   A.  Yes.

22   Q.  When we look at the timeline on page 2 at the top, we see

23   that from July until November you didn't have a CRO, correct,

24   for this product, the generic Daraprim?

25   A.  I'm sorry.  Can you reask the question.

LCGMFTC3                    Della Fera - Recross

1   Q.  Let me ask it a different way.  That was inartful.

2         Now, on November 1, 2017, after terminating Xcelience

3   in July, Fera contracts with another CRO, Latitude, for

4   development of a generic pyrimethamine prototype, correct?

5   A.  Yes.

6   Q.  Now, Xcelience was a company that was able to do both the

7   prototype and then the manufacturing you would need to do your

8   bioequivalence tests, correct?

9   A.  Yes.

10  Q.  Latitude could only do the prototyping, correct?

11  A.  Yes.

12  Q.  So you contract with Latitude in November of 2017.  We look

13  down the page.  October 25, 2018 is when Latitude completes the

14  prototype and transfers its manufacturing process to Fera's

15  contract manufacturer, Rivopharm, correct?

16  A.  Yes.

17  Q.  And Rivopharm completes its first manufacturing campaign of

18  Fera's generic Pyrimethamine in March 2019, correct?

19  A.  Yes.

20  Q.  Thank you, Mr. Della Fera.  No further questions.

21        THE COURT:  Counsel, I just want to make sure I

22  understand the significance of the questions you have just

23  placed.

24        Are you trying to say from this document that some of

25  the timeline that Mr. Della Fera has just given me is less than

LCGMFTC3                    Della Fera - Recross

1   reliable?

2              MR. POLLACK:  It's not grounded in reality because --

3              THE COURT:  I'm sorry.  I didn't capture that.  What

4   particular part of the timeline do you think is inconsistent

5   with what you pointed out on this chart?

6              MR. POLLACK:  Sure.  Your Honor, I did not catch all

7   of Mr. Della Fera's assumptions.  But the biggest one is that,

8   number 1, they had API --

9              THE COURT:  Just put the questions to the witness so

10  it's clearer to me what point you want me to draw from this, if

11  you could.

12  Q.  Mr. Della Fera --

13             THE COURT:  You told Judge Cote the following, that it

14  took X amount of months to accomplish this task, whatever you

15  want me to focus on.

16             MR. POLLACK:  Your Honor, my point is simply this.

17  Q.  Mr. Della Fera, you could not begin bioequivalence tests

18  until Rivopharm manufactured the Daraprim -- the generic

19  Daraprim product based upon Latitude's prototype manufacturing

20  process, correct?

21  A.  That is correct.

22  Q.  So the earliest that you could begin bioequivalence in the

23  real world, and you had another RLD to conduct it, would have

24  been March of 2019, correct, when Rivopharm completes its first

25  manufacturing campaign of Fera generic pyrimethamine?

LCGMFTC3                          Della Fera

1    A.   That's correct.

2              MR. POLLACK:  Thank you, your Honor.

3              THE COURT:  Thank you.

4              Any questions?

5              MR. PERLMAN:  No, your Honor.

6              THE COURT:  Mr. Della Fera, I did not understand that

7    last line of questions.

8              Explain to me, where in the timeline that you gave me,

9    the hypothetical world which you hope would be the world in

10   which you usually operate your company, where does

11   bioequivalence testing fit within that?  Is that the three to

12   four months in which the three batches are produced and tested?

13             THE WITNESS:  Correct.

14             THE COURT:  Where is the bioequivalency testing take

15   place.

16             THE WITNESS:  The bioequivalency takes place right

17   after you produce those three batches.

18             THE COURT:  How long does it take?

19             THE WITNESS:  It's either two to six weeks in total.

20   You have to schedule it.  It's not long.

21             THE COURT:  And you told us that the product has to

22   sit on a shelf for six months to do the stability testing.

23   Where does the bioequivalency testing fit within the framework

24   of the six months that you have to wait?

25             THE WITNESS:  Just to use pyrimethamine as the

LCGMFTC3                          Della Fera

1      example, we had the product produced in March of '19.  We did

2      the bioequivalency test in May of '19.  Parallel the six-month

3      testing is happening at that same time.

4              THE COURT:  So you do the bioequivalency testing

5      during the period where you're testing the shelf-life stability

6      of the product?

7              THE WITNESS:  Correct.

8              THE COURT:  Questions that counsel just put to you

9      were addressed -- perhaps you understood -- what part of this

10     chronology in the production and approval process were they

11     addressed to?

12             THE WITNESS:  I think he was using -- we have that

13     date, October 25, I forgot, from 2018 is when the API was

14     produced.  And he goes, you didn't start doing or finish your

15     tableting until March of '19.  That makes sense.  We had to get

16     the API.  We had to ship it from India to U.S. to our Swiss

17     friends.  Probably got there by the new year.  And they started

18     working on the preproduction batches probably late January,

19     February, completed probably early March.  That's what he was

20     referencing on the dates.

21             THE COURT:  Bringing your attention to those

22     real-world activities that you experienced in your development

23     of the generic pyrimethamine, does that change any of the

24     hypothetical that you and I discussed just a few minutes ago?

25             THE WITNESS:  I think it was very clear that three

LCGMFTC3

1    months, four months -- no.  I don't think it changed anything.

2    But he was identifying what we did.

3                    THE COURT:  Thank you.

4                    Counsel, any questions based on the questions I put to

5    this witness?

6                    MR. PERLMAN:  No, your Honor.

7                    MR. POLLACK:  No, your Honor.  Thank you.

8                    THE COURT:  Thank you.

9                    You may step down.

10                   (Witness excused)

11                   THE COURT:  Next witness.

12                   MR. MEIER:  Your Honor, the government calls as the

13   next witness Susan McDougal.  My colleague, Neal Perlman, will

14   also handle this witness.

15                   THE COURT:  Ms. McDougal, if you could come up here

16   and take the witness stand.

17                   If you could remain standing and face me, please.

18   Take the witness stand.  Remain standing.  Race your right

19   hand.

20   SUSAN McDOUGAL,

21        called as a witness by the Plaintiffs,

22        having been duly sworn, testified as follows:

23                   THE COURT:  Ms. McDougal, I think you are about to be

24   handed a document which bears a government exhibit number.

25                   THE WITNESS:  Excuse me, your Honor.  I left my

532

LCGMFTC3

1   glasses in my bag.  Can I get them?

2              THE COURT:  Certainly.

3              THE WITNESS:  I apologize.

4              THE COURT:  Someone is bringing your bag right over to

5    you.

6              THE WITNESS:  Thank you.

7              MR. PERLMAN:  Your Honor, it's GX-8008.

8              Your Honor, I would just note that Mr. Della Fera is

9    still in the courtroom.  I just want to make sure that that's

10   all right with you.

11             THE COURT:  I think his testimony is completed.

12             Is there any objection to Mr. Della Fera remaining in

13   the courtroom?

14             MR. POLLACK:  No.  I do not intend to recall Mr. Della

15   Fera.  Thank you, your Honor.

16             THE COURT:  Thank you, counsel.

17             Ms. McDougal, take your time.  Get your glasses.

18             THE WITNESS:  I have them.

19             THE COURT:  Ms. McDougal, you've been handed

20   Government Exhibit 8008, if you could turn to the 13th page.

21             THE WITNESS:  Yes.

22             THE COURT:  Is that your signature at the bottom?

23             THE WITNESS:  Yes.

24             THE COURT:  Did you read this document with care

25   before signing it?

LCGMFTC3

1           THE WITNESS:  I did.

2           THE COURT:  And you swear to the truth of its

3   contents?

4           THE WITNESS:  I do.

5           THE COURT:  Is there any objection to the receipt of

6   GX-8008?

7           MR. POLLACK:  Yes, your Honor.

8           We have some objections to the content of the

9   affidavit.  I am going to move the microphone closer so you can

10  hear me better.

11          THE COURT:  Sure.  Or you can walk over to the podium,

12  if you would like.

13          MR. POLLACK:  I'm perfectly appropriate at the podium.

14  Thank you, your Honor.

15          THE COURT:  Thank you.

16          MR. POLLACK:  Your Honor, unfortunately, when I take

17  off the mask, it pulls my hearing aids out with it.

18          THE COURT:  Take your time, counsel.

19          MR. POLLACK:  Thank you.

20          Your Honor, I was about to begin.  As colloquy, many

21  of these are going to be similar to objections that we raised

22  with Mr. Della Fera.  So I expect your rulings will be similar,

23  but I raise them to preserve the record.

24          To begin, your Honor, paragraph 12, when we look down

25  and we see Ms. McDougal testifying about -- there is a sentence

LCGMFTC3

1    here that starts:  Even better.

2            THE COURT:  Paragraph 12 has a sentence in the middle

3    that begins:  Even better.

4            MR. POLLACK:  Paragraph 12.  Even better is when a DMF

5    holder's API is used --

6            THE COURT:  Slow down.

7            MR. POLLACK:  -- used in an FDA-approved product

8    because that provides additional assurances that the API

9    supplier is reliable and likely to pass FDA muster.

10            Your Honor, based upon this witness' experience in

11    marketing of pharmaceuticals, I don't believe a foundation has

12    been laid for this testimony, which is speculative and improper

13    lay testimony.

14            THE COURT:  Objection overruled.  It comes out of her

15    work experience as described in her affidavit and is

16    appropriate lay opinion testimony under 701.

17            MR. POLLACK:  Your Honor, in paragraph 13 we raised

18    the same objection to the provision that begins -- second line

19    up from the bottom with the word which, but we should read the

20    entire sentence to understand it in context.  Developing it in

21    API from scratch takes a long time and involves a lot of trial

22    and error.  The portion we object to is improper speculation

23    and improper lay testimony which can lengthen the approval time

24    significantly, and the FDA often has questions about a new

25    manufacturing process.

LCGMFTC3

1           THE COURT:  Overruled.

2           MR. POLLACK:  Your Honor, in paragraph 37 there is a

3    sentence -- this paragraph discusses -- strike that one.  Your

4    Honor.

5           Paragraph 41, similar to Mr. Della Fera, Ms. McDougal

6    posits about five lines up, starting with the word if.  Your

7    Honor appears to be at the same spot as me now.  If we had used

8    Fukuzyu as our API supplier, I find it very unlikely that the

9    FDA would raise this issue, given that it was already familiar

10   with Fukuzyu's manufacturing process.  Again, your Honor, we

11   find that to be speculative and improper lay opinion.

12          THE COURT:  Overruled.

13          MR. POLLACK:  Finally, your Honor, my last objection,

14   I promise.  We object to the last sentence in paragraph 42,

15   which talks about what could have happened had Fera been able

16   to respond to FDA's inquiries and avoid the complete response

17   letter.  Again, we find this to be speculative and improper lay

18   testimony.

19          THE COURT:  Overruled.

20          Now I am not taking this testimony as evidence of what

21   the FDA would or wouldn't have done but to shed light on the

22   expectations within the industry and its understanding of the

23   process.

24          Anything else, counsel?

25          MR. POLLACK:  No, not from me.  Thank you, your Honor.

LCGMFTC3

1          THE COURT:  Thank you.

2          MR. POLLACK:  Your Honor, I meant to raise this in

3   colloquy before we got started, but there is an issue, and I

4   know your Honor's preference is that if we are to seal the

5   courtroom to do it at the beginning or end of testimony.  I do

6   want to get into a document that Fera has asked to seal.  I

7   suggest I'm ready to do it now.  It's DX-280.

8          THE COURT:  GX-8008 is received.

9          (Government Exhibit 8008 received in evidence)

10         THE COURT:  How long do you expect your examination to

11  take?

12         MR. POLLACK:  Not very long, your Honor.  You mean my

13  entire examination or the sealed portion?

14         THE COURT:  On this document.

15         MR. POLLACK:  Five, ten minutes.  Maybe not even.

16         THE COURT:  I'll ask anyone who is not counsel for the

17  plaintiffs, counsel for the defendant, or with Fera to leave

18  the courtroom.

19         We can't cut the feed to the overflow courtroom.  My

20  deputy is going to the overflow courtroom to make sure no one

21  is in it.

22         MR. MEIER:  Your Honor, I do not recognize who the

23  woman is in the back.

24         That's counsel for Vyera.  I am not sure if they are

25  permitted --

LCGMFTC3

1          THE COURT:  They are not.

2          Do you have a copy of the document for me, counsel, as

3   we wait?

4          Can you display it on the screen for me?

5          MR. POLLACK:  I can.  I only have my own copy, your

6   Honor, and it's highlighted for my convenience.  I would like

7   to keep it.  We are not going to use the redacted.

8          THE COURT:  The overflow courtroom is empty.  You can

9   proceed, counsel.

10          MR. POLLACK:  Thank you, your Honor.

11          (Pages 538-545 SEALED)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCGKFTC4                    McDougal - Cross

1                           AFTERNOON SESSION

2                              2:01 PM

3              (In open court)

4              THE COURT:  Ms. McDougal, you may retake the witness

5    stand.

6              Counsel.

7              MR. POLLACK:  Thank you, your Honor.

8     SUSAN McDOUGAL,

9    CROSS-EXAMINATION CONTINUED

10   BY MR. POLLACK:

11   Q.  Ms. McDougal, I'd like to talk to you about Fera's

12   activities surrounding -- by the way, you can take off your

13   mask.  I'm going to remove mine.

14   A.  All right.  Thanks.

15   Q.  That's better, right?

16   A.  Yes.

17   Q.  As I was starting to say, I'm going to turn your attention

18   to Fera's efforts and activities surrounding the acquisition of

19   Daraprim reference listed drug, or RLD, okay?

20   A.  Okay.

21   Q.  When did those efforts begin?

22   A.  I believe -- pretty much, I think, the first time we

23   reached out -- I have to reference because I don't have the

24   dates memorized, if that's okay?  I know it's in the testimony.

25           I don't remember the exact date, I'm sorry, but it was

LCGKFTC4                    McDougal - Cross

1    early in the process once we identified the opportunity.

2    Q.   And Fera, among other things, attempted to do this through

3    its contracting research organization, Xcelience, correct?

4    A.   I think that was a little bit later.

5    Q.   Okay.

6    A.   Because I know we started to work with Xcelience in the

7    December '16 time frame, and that was one of the reasons why we

8    worked with them, because they said they could procure RLD.

9    Q.   Now, if I'm correct, I believe your efforts, and

10   Mr. Della Fera said it, started in as early as 2015; is that

11   right?  I'm sorry, 2016?

12   A.   Yeah, yes.

13   Q.   When did you contract with Xcelience?

14   A.   In December of '16, I believe.

15   Q.   When we say CRO, contract research organization, that is an

16   entity that your company hires to do the manufacturing work,

17   correct?

18   A.   Yeah.  Actually, technically, the CMO is a contract

19   manufacturing organization, and, generally, they can do

20   development, manufacturing.  Some only do manufacturing.  CRO

21   is more research.

22   Q.   Your firm is what you would call a virtual pharmaceutical

23   company, correct?

24   A.   Yes.

25   Q.   You don't actually have your own manufacturing facilities,

LCGKFTC4                        McDougal – Cross

1    you outsource that to other companies like Xcelience, Latitude,

2    Rivopharm?

3    A.   Yes.

4    Q.   In addition to being a CMO, was Xcelience also working on

5    your behalf in an effort to obtain Daraprim RLD?

6    A.   Yes.

7              MR. POLLACK:  If we bring up GX 3469, please.

8              I was asking counsel if he had the list of exhibits we

9    handed up earlier, but it's okay, I'll proceed.

10   Q.   Ms. McDougal, we've put up on the screen an email from Ben

11   Sahacic to you dated June 27, 2017.  Take a moment to look at

12   this email.  Its subject is "Re Xcelience New Order PO

13   No. 4500061546 – Daraprim."

14             Let me know if you've seen this email before and

15   recognize it.

16   A.   You want to know if I've seen this before?  It was to me,

17   so I'm sure I read it, but do you want me to read it now?

18   Q.   Well, who's Ben Sahacic?

19             Am I saying it right?

20   A.   I think it's Sahacic.  I don't know.

21             So he's with Capsugel, which had acquired Xcelience at

22   some point in the time frame that we were working with them.

23   Q.   Did you and Mr. Sahacic correspond during this time period

24   about efforts to procure RLD?

25   A.   Yes.

LCGKFTC4                    McDougal - Cross

1   Q.  And if we look at the top of this email, he appears to be

2   writing you:  "Hi Susan.  Let us know how you would like to

3   proceed with RLD, please.  The attached came through from

4   Turing via our vendor.  You'll notice they changed the quantity

5   to 13 bottles."

6           Do you see that?

7   A.  I do.

8   Q.  Is this email describing an opportunity on June 27, 2017,

9   for your company, Fera, to purchase RLD from Vyera, then known

10  as Turing?

11  A.  Yes.

12  Q.  And if I read Mr. Sahacic's email correctly, Vyera — which

13  is how we're referring to Turing today, just so you know —

14  Vyera actually sent a purchase order back to Fera for review,

15  correct?

16          MR. PERLMAN:  Object to form.

17          THE COURT:  Sustained.

18          THE WITNESS:  It wasn't --

19          THE COURT:  There's no question pending.

20  BY MR. POLLACK:

21  Q.  That's correct.

22          Ms. McDougal, is it correct that Vyera sent a purchase

23  order back to Fera for review?

24  A.  That's not my understanding, no.

25  Q.  Did you get a purchase order through Mr. Sahacic?

LCGKFTC4                    McDougal – Cross

1    A.   No.

2    Q.   I'm sorry, a purchase agreement.  Did you get a purchase

3    agreement from Vyera?

4    A.   Yes.

5    Q.   So I misspoke, and I apologize for that.  It's my mistake.

6              And that purchase agreement, if we turn back three

7    pages, that's what's attached to this email?

8    A.   It appears, yes.

9    Q.   And, of course, this is in draft form, correct?

10   A.   I believe it was the first time it was being presented to

11   us, yes.

12   Q.   How many times was this purchase agreement traded back and

13   forth with Vyera?

14   A.   Between Fera and Vyera?

15   Q.   Yes.

16   A.   I know we reviewed it once, if I recall correctly, and we

17   sent back -- not directly, we were using -- Xcelience was the

18   in-between, and they had their third-party procurement, so I

19   believe we sent it back once to Xcelience.

20   Q.   So I understand what you're saying, you did not have direct

21   communications with Vyera?

22   A.   That's correct.

23   Q.   You communicated through them via an intermediary, in this

24   instance, Xcelience?

25   A.   Yes.

LCGKFTC4                        McDougal - Cross

1    Q.  And down in the first whereas clause, we see what

2    Mr. Sahacic was referring to in his email.  It says, "Whereas

3    company wishes to purchase 13 bottles of Daraprim, 25 mg, NDC,"

4    and it provides a number here, "through AdiraMedica, a third

5    party, for use in certain bioequivalence studies," correct?

6    A.  Correct.

7    Q.  Is that what Fera was inquiring into, for the purpose of

8    purchasing Daraprim RLD to do bioequivalence studies?

9    A.  That was -- yes, correct.

10   Q.  And who drafted this purchase agreement; do you know?

11   A.  I was told it was drafted by Turing and then Turing's

12   attorney.

13   Q.  So someone from Turing drafted this purchase agreement and

14   sent it to you via Xcelience?

15   A.  Correct.

16   Q.  This wasn't an agreement that Fera drafted and sent to

17   Turing for review?

18   A.  No.

19   Q.  Do you recall receiving this email and this attachment?

20   A.  Yes.

21       MR. POLLACK:  Your Honor, I would move to admit this

22   document, GX 3469, if it hasn't already been admitted.  I

23   believe it may have this morning.

24       THE COURT:  Received.

25       (Government's Exhibit 3469 received in evidence)

LCGKFTC4                     McDougal - Cross

1             MR. POLLACK:   Thank you.

2             Bring that back up, please.  Let's go to the next

3   page, please, Justin, page 4.  Let's highlight everything from

4   G to the bottom.

5   BY MR. POLLACK:

6   Q.  Ms. McDougal, in this document, we see here, under

7   paragraph 3, there's a provision related to indemnification,

8   correct?

9   A.  Yes.

10  Q.  Now, you and Mr. Della Fera had some objections to this

11  provision, correct?

12  A.  Yes.

13  Q.  Was this the only provision in the agreement that you found

14  objectionable?

15  A.  I don't recall any other.

16  Q.  Did you have any objections to the use provision above the

17  indemnification?

18  A.  No.

19  Q.  In fact, the use provision provides that it will be used

20  specifically for what Fera wants to use it for, bioequivalence

21  testing, correct?

22  A.  Yeah, as well as dissolution testing and assay and impurity

23  studies, yes.

24  Q.  Thank you for filling in the blanks.

25             And in the indemnification provision, if I understand

LCGKFTC4                    McDougal – Cross

1   your testimony correctly, what you found objectionable is the

2   provision in Section V, any product, liability, or other claim

3   arising out of any allegation of injury or death caused by any

4   person's use of Daraprim, correct?

5   A.   I think it was the next one as well.  Yeah, V and VI.

6   Q.   So you think it was number VI?

7   A.   It was both.

8   Q.   You're right in your direct testimony, it's number VI, and

9   I apologize.

10          MR. POLLACK:  Justin, can we have the highlighting,

11   and let's correct the record.

12   Q.   So, Ms. McDougal, just so the record is clear, what you

13   objected to in this indemnity provision was VI, "Any liability

14   or other claim, including, but without limitation, injury or

15   death arising from the use of Daraprim," correct?

16   A.   I believe it's V and VI is an issue.

17   Q.   So you had an issue with V as well?

18   A.   Yeah.

19   Q.   And did Fera -- strike that.

20          Fera didn't just strike out V and VI when it reviewed

21   this agreement, did it?

22   A.   No.  As I recall, we struck the entire section.

23   Q.   You just didn't like two provisions, and you struck out the

24   entire thing?

25   A.   Uh-huh.

LCGKFTC4                    McDougal - Cross

1    Q.  Is that a yes?

2    A.  Yes.

3    Q.  Okay, thanks.

4           For today --

5    A.  Yes.

6    Q.  -- like at your deposition, we've got to use full words.

7    A.  Got it.

8    Q.  Thanks.

9           So that includes everything in here, including things

10   like number III, any breach of this agreement or applicable law

11   by company or its affiliates, right?

12   A.  Well, yeah.  It didn't make any sense, really.  I mean, it

13   was a purchase agreement --

14   Q.  Well, you struck --

15   A.  How --

16   Q.  You struck that, too, correct?

17   A.  We struck the whole section because, you know, we didn't

18   think -- some of it just didn't make any sense, but what was

19   particularly egregious was V and VI.

20   Q.  Ms. McDougal, if you want to clarify, you'll have an

21   opportunity to do so when the FTC lawyers have their questions

22   for you, okay?

23   A.  Okay.

24   Q.  Thank you.

25           Now, before striking out this entire indemnity

LCGKFTC4                        McDougal - Cross

1   provision, Fera didn't send this draft of this agreement to any

2   lawyers for review, did it?

3   A.  No.

4   Q.  And after you sent this agreement back with that provision

5   struck in its entirety, that ended the negotiations with Vyera,

6   correct?

7   A.  My understanding was that, again, through the third party,

8   that there was no more communication.

9   Q.  Now, that wasn't Fera's only avenue for Daraprim, was it?

10          That wasn't the only avenue Fera pursued for Daraprim

11  RLD, correct?

12  A.  No.

13  Q.  I'm not correct, that is --

14  A.  Yes -- can you rephrase the question?

15  Q.  Sure.

16          Let me say it this way:  Fera pursued other avenues to

17  pursue Daraprim RLD other than this purchase agreement with

18  Vyera, correct?

19  A.  We did, yes.

20  Q.  And after you struck the indemnity provision, did you reach

21  out again?

22  A.  I don't recall.

23  Q.  Who was leading the negotiations on this purchase

24  agreement?

25  A.  I don't know what you mean by "leading."

LCGKFTC4                    McDougal - Cross

1  Q.  Were you involved in them?

2  A.  I reviewed this purchase agreement, yeah.

3  Q.  And it was your decision and Mr. Della Fera's decision to

4  strike the indemnity provision, correct?

5  A.  Correct.

6  Q.  And you don't recall if there were any other outreaches to

7  Vyera after you sent this back with that provision stricken?

8  A.  Correct.

9  Q.  On December of 2016, Fera was approached by another

10 company, Tanner Pharmaceuticals, with an offer to sell Fera

11 Daraprim RLD, correct?

12          MR. PERLMAN:  Object to form.

13          THE COURT:  That's a yes or a no.

14          THE WITNESS:  Yes.

15 Q.  And in December of 2016, Tanner offered to sell Daraprim to

16 Fera in 25-milligram tablets, in 100 count bottles, for

17 $101,433.09.

18          Do you recall that?

19 A.  Yes.

20 Q.  When you received that offer, am I correct that your direct

21 report, Genevieve Della Fera, voiced surprise at the cost?

22 A.  I don't know that we were surprised at the cost.  It was

23 definitely higher than what was published as the wholesale

24 acquisition cost.  So it was a significant markup that we

25 noted.

LCGKFTC4                        McDougal – Cross

1   Q.  And the wholesale acquisition cost is, presumably, what

2   Tanner paid for the drug product, correct?

3            MR. PERLMAN:  Objection; speculation.

4            THE COURT:  What was your understanding?

5            THE WITNESS:  I have no idea what -- I didn't think

6   about that.

7   BY MR. POLLACK:

8   Q.  Did Fera purchase the Daraprim RLD from Tanner -- strike

9   that.

10           Did Fera seek to purchase the Daraprim RLD from Tanner

11  at the price quoted in December 2016?

12  A.  Did we seek -- we had ongoing negotiations in trying to

13  secure product through them, yes.

14  Q.  You didn't place an order at that time, did you?

15  A.  We did not.

16  Q.  Was that because of price?

17  A.  That was part of it, yes.

18  Q.  At the time, December of 2016, you'd agree with me that

19  Fera had no reason to believe that if it placed an order with

20  Tanner for Daraprim RLD, that Tanner would not have been able

21  to deliver on the product, correct?

22  A.  No, I don't agree.

23  Q.  You don't agree?

24           Do you recall being asked that at your deposition in

25  this case?

LCGKFTC4                    McDougal – Cross

1   A.  No.

2          MR. POLLACK:  Justin, can we bring up Ms. McDougal's

3   deposition, please, at page 84, line 21, to 85, line 2.  A

4   little bit above that, so we can establish a time frame, so go

5   with 14.

6   BY MR. POLLACK:

7   Q.  Here, you're being asked about Tanner's ability to sell

8   Daraprim RLD in December of 2016.  The question the attorney

9   asked you:  Well, at this point, you hadn't had an experience

10  with Xcelience yet, so I'm asking you, at this point, in

11  December of 2016, did you have any basis to believe that you

12  could not -- what's that?

13          You answered:  I'm sorry, yeah, thank you for

14  orienting me with the time.

15          Sorry, the question goes on --

16          THE COURT:  Slow down.

17          MR. POLLACK:  You're right.

18  BY MR. POLLACK:

19  Q.  -- did you have any basis to believe they couldn't have

20  supplied it if you had ordered it at that time?

21          And your answer was:  No.

22  A.  Yeah, the same kind of issue, so, yes, I changed my answer.

23          At that time, we didn't think that, you know, they

24  couldn't supply it, necessarily, although we did have some

25  feedback from --

LCGKFTC4                         McDougal - Cross

1    Q.  So the answer was no?

2    A.  Yes.

3    Q.  You had no reason to believe that they couldn't deliver in

4    December of 2016?

5    A.  Correct.

6    Q.  But you didn't place an order at that time?

7    A.  No.

8    Q.  That is, no, you did not place an order?

9    A.  Correct.

10   Q.  Thank you.

11           Now, after that first parlay by Tanner, Tanner reached

12   out again, on January 11th, 2017, with a second offer to sell

13   Daraprim RLD to Fera; am I right?

14   A.  Yes.

15   Q.  And am I also right that at this time, in January of 2017,

16   Tanner disclosed to Fera that it had available Daraprim 25 mg

17   tab, 100, meaning 25-milligram, manufacturer — Turing,

18   package — 100 tablets, or 100 tabs, quantity — seven bottles,

19   price per bottle — $177,628?

20   A.  What was the time frame?

21   Q.  January 11, 2017.

22   A.  I don't really recall, but I'm sure you're reading some --

23   I don't recall.

24   Q.  Well, perhaps there's a document I can show you to refresh

25   your recollection.

LCGKFTC4                    McDougal - Cross

1              Ms. McDougal, did you complete written responses to a

2    civil investigative demand in this case?

3    A.   Yes.

4    Q.   That's a yes?

5    A.   Yes.

6    Q.   I'm hard of hearing.  If I don't hear you, it's not because

7    of you, it's probably because of me, okay?

8    A.   Okay.

9    Q.   I don't want you to feel bad about that.

10             Were you accurate in your responses to the civil

11   investigative demand?

12   A.   Yes.

13             MR. POLLACK:  Justin, can we pull up Exhibit DX 281,

14   please.

15   Q.  Ms. McDougal, take a moment to review just the top level of

16   this document and tell me if you recognize it as one of Fera's

17   responses to the FTC's civil investigative demand.

18             (Pause)

19   A.   Okay.

20   Q.   Is the "okay" meaning this is your response that you wrote

21   to a civil investigative demand?

22   A.   Yes.  It's part of it, yes.

23             MR. POLLACK:  Justin, if we could turn to page 3,

24   13651 at the bottom, and blow up everything from on January 11,

25   2017, to the bottom.

LCGKFTC4                    McDougal - Cross

1    Q.  Ms. McDougal, take a moment to read that and see if it

2    refreshes your recollection as to what Tanner had offered Fera

3    in January of 2017.

4    A.  Okay.

5         I'm finished reading it, and, yes, I recollect this.

6    Q.  Does the document accurately reflect what I just asked you,

7    that in January 11, 2017, Tanner had offered to Fera the

8    opportunity to purchase 25-milligram tabs of Daraprim in

9    100-count bottles, up to seven bottles, at a price per bottle

10   of $177,628 per bottle?

11   A.  Yes.

12   Q.  Or, alternatively, 30-count bottles of 25-milligram tabs,

13   up to six bottles, at the price of $67,641.70, correct?

14   A.  Correct.

15   Q.  Does the document also accurately reflect that Fera again

16   challenged the pricing of these Daraprim bottles with Tanner?

17   A.  Yes.

18   Q.  And did Fera seek to negotiate a discount on the price

19   offered by Tanner based upon the number of bottles to be

20   purchased?

21   A.  Yes.

22   Q.  And did Tanner actually offer Fera a discount?

23   A.  It says here they did, yes.

24   Q.  Okay.

25        Does this document also reflect your recollection that

LCGKFTC4                    McDougal - Cross

1   Tanner offered Fera a discount that if it was to purchase four

2   100-count bottles, that there would be a 2.8 percent discount?

3   A.  Yes.

4           THE COURT:  Is DX 281 in evidence, or are we using it

5   to refresh recollection?  What is its status?

6           MR. POLLACK:  It's not in evidence, your Honor.

7           THE COURT:  Okay.

8           MR. POLLACK:  Should we take it down?

9           THE COURT:  No.  I just -- for the record, then, a lot

10  of the information that's been read out of the document is not

11  part of the evidentiary record.  That's fine.  I just wanted to

12  make sure.

13  BY MR. POLLACK:

14  Q.  Well, Ms. McDougal, let me ask you, independent of this

15  document, is it true that Fera, after receiving the price

16  quote, negotiated a discount?

17  A.  Yes.

18  Q.  This document refreshed your recollection, correct, of the

19  bottle numbers -- the number of bottles and the price at which

20  Tanner had offered them to you, correct?

21  A.  Yes.

22  Q.  And the information that you gave to me is truthful and

23  accurate as to the offer that Tanner made on January 11, 2017,

24  correct?

25  A.  Correct.

LCGKFTC4                    McDougal - Cross

1    Q.  And the same would be true about the discount that Tanner

2    offered, correct?

3    A.  Correct.

4         MR. POLLACK:  We can take that down, Justin.  Thank

5    you.

6    Q.  And after Tanner offered Fera a discount of 2.8 percent,

7    did Fera then agree to purchase bottles of Daraprim from

8    Tanner?

9    A.  No.

10   Q.  Was the concern that the price was still too high?

11   A.  That was part of the concern, yes.

12   Q.  And because of that, Fera made the business decision not to

13   purchase Daraprim RLD when offered it by Tanner on January 11,

14   2017, correct?

15   A.  Correct.

16   Q.  And it also made the business decision not to purchase it,

17   when offered the opportunity to do so, in December of 2016,

18   correct?

19   A.  Correct.

20   Q.  After getting this proposal in January, did Fera also seek

21   to negotiate an arrangement whereby it would not have to prepay

22   the entire price of Daraprim RLD to Tanner?

23   A.  Yes.

24   Q.  Was the arrangement that Fera was able to negotiate with

25   Tanner a 60/40 split?

LCGKFTC4                        McDougal - Cross

1    A.  I don't recall.  I don't really understand the question.

2    Q.  Sure.  Maybe I have a document to help us with this.

3            MR. POLLACK:  Justin, can we pull up Exhibit 285,

4    please.

5            THE COURT:  Is that DX?

6            MR. POLLACK:  No, your Honor.  This one is not in

7    evidence, it's not on anyone's list.  I'm going to use it to

8    refresh recollection.

9            THE COURT:  So is this DX or GX?

10           MR. POLLACK:  It would be DX 285, but, again, it's not

11   on our exhibit list.  You won't find it in the records you

12   have.  I can hand up a copy --

13           THE COURT:  It's not necessary.  I just wanted, for

14   clarity of the record, whatever we're referring to.

15           MR. POLLACK:  All right.  Thank you, your Honor.

16           And, Justin, if you could turn us to page 304 of the

17   document, please, and highlight the bottom-most email.

18   BY MR. POLLACK:

19   Q.  Ms. McDougal, I'll ask you to read this to yourself and let

20   me know if it refreshes your recollection of the payment

21   arrangement that Fera negotiated with Tanner.

22           THE COURT:  So, refreshing recollection means that

23   you're just supposed to testify based on your current

24   recollection.  So you can read this to yourself, and it either

25   will bring back a memory or it won't.

LCGKFTC4                         McDougal - Cross

1          (Pause)

2          THE WITNESS:  I don't specifically remember this.

3    BY MR. POLLACK:

4    Q.  You don't remember this?

5    A.  Not specifically.

6          MR. POLLACK:  Take that down.  Thank you.

7    Q.  But you do recollect negotiating some form of split with

8    Tanner?

9    A.  No.  The thing I do remember is the -- sort of a request,

10   that last bullet, for the audited financials of the company,

11   because I know that was a concern.  But the split and --

12   Q.  But do you recollect a negotiation with Tanner over how

13   much Fera would be willing to prepay upfront?

14   A.  I don't remember the specifics.  I know we had a concern

15   about paying the fees in total because we were not familiar

16   with Tanner and just some of the troubles that we had prior.

17   Q.  Now, Tanner came back a third time, in September of 2017,

18   with a third offer to sell Daraprim RLD to Fera, correct?

19   A.  I don't really recall the time.

20         MR. POLLACK:  Let's bring up the CID again, please,

21   Exhibit 281.  And, Justin, if you could highlight the third

22   paragraph on page 4.

23   Q.  Ms. McDougal, I'll ask you to read your response to the FTC

24   on behalf of Fera, and tell me if this refreshes your

25   recollection as to the question I just asked you and whether

LCGKFTC4                    McDougal - Cross

1    Tanner offered Daraprim to Fera on September 28th, 2017.

2    A.   Okay, I see it.  I'm refreshed.

3    Q.   And does this?

4    A.   Yes.

5    Q.   So, correct, Tanner did offer again to sell Daraprim to

6    Fera in September of 2017?

7    A.   Yes.

8    Q.   Thank you.

9         MR. POLLACK:  You can take that down.

10   Q.   At this time, was one of the ongoing issues for Fera that

11   Tanner wanted payment upfront?

12   A.   Yes.

13   Q.   In your written direct, you state that Tanner eventually

14   agreed to an escrow agreement with Fera, correct?

15   A.   Yes.

16        MR. POLLACK:  Can we bring up Exhibit DX 291, please.

17   And can we go to page 4 of the document, please.  I would like

18   to highlight and bring up the bottom email, please.

19   Q.   Ms. McDougal, this is an email from Genevieve Della Fera.

20        Do I understand her to report directly to you at the

21   time?

22   A.   Yes.

23   Q.   And you're copied here, correct?

24   A.   Correct.

25   Q.   And the email is to Richard Lambie at Tanner Pharma,

LCGKFTC4                    McDougal - Cross

1    correct?

2    A.   Correct.

3    Q.   Do you recall this email?

4    A.   Not this specific email, no.

5    Q.   Do you recall sending emails to Tanner regarding Daraprim's

6    sourcing options?

7    A.   Yes.

8    Q.   In the email, Ms. Della Fera writes, "Dear Richard" --

9              THE COURT:  Excuse me.  Is this in evidence?

10             MR. POLLACK:  I was going to say one more thing to lay

11   a foundation for it and move it, but, your Honor, I would move

12   for the admission of this document, DX 291.

13             MR. PERLMAN:  No objection, your Honor.

14             THE COURT:  Received.

15             (Defendant's Exhibit 291 received in evidence)

16             MR. POLLACK:  Thank you, your Honor.

17   BY MR. POLLACK:

18   Q.   Ms. McDougal, we see here that Ms. Della Fera is sending

19   Mr. Lambie an escrow agreement with Fera's wiring instructions,

20   correct?

21   A.   Yes.

22   Q.   And that was on October 12, 2017, correct?

23   A.   Yes.

24   Q.   Now, do you recollect the occurrence of that, sending the

25   escrow agreement to Tanner Pharma?

LCGKFTC4                          McDougal - Cross

1   A.  Yes.

2   Q.  Was that an escrow agreement, since it's coming from

3   Ms. Della Fera, that someone at Fera drafted?

4   A.  No.

5   Q.  Did it contain Fera's requested edits and changes?

6   A.  I believe so, yes.

7   Q.  Did Ms. Della Fera have your authorization to send the

8   escrow agreement to Tanner?

9   A.  Yes.

10           MR. POLLACK:  Justin, let's go up to the next email in

11  the chain, just above this one.

12  Q.  And we see here, Ms. McDougal, Mr. Lambie writes back on

13  October 13, 2017, saying, "Hi Genevieve.  Please find the

14  completed form attached," correct?

15  A.  Yes.

16  Q.  So am I correct that Tanner signed and returned the escrow

17  agreement that Ms. Della Fera sent to them?

18  A.  I don't know that for sure.  I don't know what's attached

19  and what form he's referring.

20  Q.  You said, in your written direct, that Tanner eventually

21  agreed to an escrow agreement, correct?

22  A.  They did agree.

23  Q.  Was it to the form that you requested?

24  A.  I don't remember how far along the actual document

25  specifically got through, whether they signed or not, but I

LCGKFTC4                    McDougal – Cross

1   know that we spent time with them on it.

2   Q.  And perhaps you're right, it says here -- oh, no, never

3   mind.

4          If we go up to the next email, on page 3 of 7,

5   Ms. Della Fera responds to Mr. Lambie saying, "Hey, Richard.

6   We're good with just a scanned copy of the PDF.  We don't need

7   the DocuSign.  Would you please initiate execution of the

8   document."

9          Do you see that?

10  A.  I do.

11  Q.  She didn't raise any issue with the form of the document

12  that Mr. Lambie sent back, correct?

13  A.  Not at this time.

14          MR. POLLACK:  If we go up to page 1, please.  No, the

15  bottom, please.

16  Q.  We see here that Mr. Lambie writes back on October 17,

17  2017, "Dear Genevieve:  Please find attached our executed

18  document for counterexecution."

19          Does that indicate to you that Tanner signed the

20  agreement that Ms. Della Fera sent over?

21  A.  It seems to indicate that, yes.

22  Q.  But Fera never countersigned the escrow agreement sent to

23  Tanner; is that right?

24  A.  That's right.

25  Q.  And Fera never placed an order with Tanner Pharmaceuticals

LCGKFTC4                         McDougal - Cross

1    for the purchase of Daraprim RLD, correct?

2    A.   Correct.

3    Q.   Next, in January of 2018, approximately three months after

4    Tanner signed Fera's escrow agreement, Fera placed an order for

5    two bottles of Daraprim with another procurement firm, Reliant

6    Specialty LLC, correct?

7    A.   Correct.

8    Q.   Am I also correct that Fera structured that deal with

9    50 percent payment upfront, 50 percent upon delivery?

10   A.   Correct.

11   Q.   And Fera received the two bottles from Reliant, correct?

12   A.   Correct.

13            MR. POLLACK:  Can you bring up DX 121, please.  And

14   highlight the first two emails.  Thank you.

15   Q.   Ms. McDougal, I'll be brief on this, because I've covered

16   it with Mr. Della Fera, but on February 12, 2018, Mr. Valiveti

17   wrote to you and Mr. Della Fera saying, "Dear Susan:  Please

18   let me know if you need any additional quantity on Daraprim,"

19   correct?

20   A.   Yes.

21   Q.   And in the next email, on the same day, you responded,

22   "Thank you, Satya.  We are good for now"?

23   A.   Yes.

24            MR. POLLACK:  You can take that down, please.

25   Q.   When you declined to purchase additional Daraprim RLD from

571

LCGKFTC4                    McDougal - Cross

1   Mr. Valiveti and his company, Reliant, you knew that, like

2   anything else in life, there's never a guarantee that a product

3   that's available one day is going to be available the next,

4   right?

5              MR. PERLMAN:  Object to form of that question.

6              THE COURT:  Sustained.

7   BY MR. POLLACK:

8   Q.  Ms. McDougal, did you know, when you declined

9   Mr. Valiveti's invitation to purchase more Daraprim, whether or

10  not he would still have it in stock if you wanted to purchase

11  it at a later date?

12  A.  No, not definitively.

13  Q.  And the reason Fera didn't seek to purchase more Daraprim

14  RLD from Mr. Valiveti was, in your words, to derisk the

15  investment by purchasing only two bottles, correct?

16  A.  Correct.

17  Q.  And you and Mr. Della Fera, at the time, were hopeful that

18  you would be able to negotiate your way through a waiver with

19  the FDA, correct?

20  A.  So we're at, what, February of '18 now?  I don't know if

21  that was definitely our plan at that time.  I know that we knew

22  that that would be likely something we would have to pursue if

23  we couldn't get more product or, you know, just -- that's it.

24  Q.  Are you saying you don't remember, or are you disagreeing

25  with me?

LCGKFTC4                    McDougal - Cross

1              MR. PERLMAN:  Object to the form of that question.

2              THE COURT:  Sustained.

3              THE WITNESS:  Can you repeat the question?

4              MR. POLLACK:  I'll move on.

5         Your Honor, may I step away from the podium for one

6    moment to consult with my colleagues?

7              THE COURT:  Sure.

8         Just put your mask back on.  Thanks.

9              MR. POLLACK:  Thank you for that reminder.

10        (Pause)

11   BY MR. POLLACK:

12   Q.  Now, I want to turn to the issue of contract manufacturing.

13        So we determined already that Fera had contracted with

14   Xcelience, correct?

15   A.  Correct.

16   Q.  And that was in July of -- I'm sorry.  What was the time

17   frame for that contract; do you recall?

18   A.  December of '16.

19   Q.  And by July 2017, Fera terminated its contract with

20   Xcelience, correct?

21   A.  It may have been a little bit later than that, but that's

22   the general time frame.

23   Q.  And that was because Fera had lost faith in Xcelience

24   because it could not acquire Daraprim RLD; is that right?

25   A.  We just couldn't move forward with them without the RLD at

LCGKFTC4                    McDougal – Cross

1    that time.

2    Q.  And that was -- you didn't have to terminate Xcelience;

3    that was a business decision by Fera, correct?

4    A.  Correct.

5    Q.  To manufacture generic Daraprim, Fera then had the contract

6    with a new CRO or CMO?  I'm not sure of the correct term.

7    Maybe you can tell me.

8    A.  We had to find somebody else to work with to develop and

9    manufacture the product, yes.

10   Q.  And in November 2017, Fera contracted with a firm named

11   Latitude, correct?

12   A.  What was the time frame again?

13   Q.  November 2017.

14   A.  That sounds right, yes.

15   Q.  If I understand it right, Xcelience could both develop the

16   manufacturing process for generic Daraprim and then also create

17   the finished product for, among other things, bioequivalence

18   testing, correct?

19   A.  Yes.

20            MR. PERLMAN:  Object to form.

21            THE COURT:  Overruled.

22   BY MR. POLLACK:

23   Q.  But Latitude could only do one of those two things, it

24   could only develop the manufacturing process, right?

25   A.  Correct.

**A-1633**

LCGKFTC4                    McDougal - Cross

1   Q.  And Latitude, using API manufactured by your supplier,

2   which, for purposes of this case, we're calling API Company

3   No. 1, using that API, Latitude did not finish developing a

4   prototype for generic Daraprim until, approximately, August of

5   2018; is that right?

6   A.  Correct.

7   Q.  At that point, Fera needs to bring in another contracting

8   organization to actually produce the finished product, correct?

9   A.  Correct.

10  Q.  And am I right that in October of 2018, Fera brought in a

11  firm called Rivopharm?

12  A.  Correct.

13  Q.  So Fera is now using Latitude and Rivopharm to do the job

14  that Xcelience was able to do by itself?

15  A.  Xcelience wasn't able to do the job, so while they had

16  capability, they were not able to fulfill the task of

17  formulating and manufacturing a generic Daraprim.

18  Q.  Because they didn't have the RLD?

19  A.  Correct.

20  Q.  And you didn't have the RLD until -- you didn't have any

21  RLD until after you terminated Xcelience, correct?

22  A.  Correct.

23  Q.  And Rivopharm finished manufacturing generic Daraprim for

24  Fera in April of 2019, correct?

25  A.  It was around that time frame, yes.

LCGKFTC4                    McDougal - Cross

1    Q.  And at this point in time, am I also correct that Fera was

2    still working its way through waiver applications with the FDA?

3    A.  Yes.

4    Q.  Switching topics one more time, and I'm winding things up

5    here, you've never worked for the FDA, correct?

6    A.  No, I have not.

7    Q.  In your written direct, you say that it is unlikely --

8    excuse me, let me make sure I pull it up, so we're all on the

9    same page.

10         You say, "If we had used" -- and I'm at paragraph 41,

11   if you'd like to follow along.  It's on page 13.

12   A.  Okay.

13   Q.  You say, "If we had used Fukuzyu," and "we" meaning Fera,

14   correct?

15   A.  Correct.

16   Q.  -- "as our API supplier, I find it very unlikely that the

17   FDA would raise this issue, given that it was already familiar

18   with Fukuzyu's manufacturing process."

19         Did I read that correctly?

20   A.  Yes.

21   Q.  And the issue that we're talking about here is what?

22   A.  When we had submitted our ANDA, the FDA had questions about

23   our API supplier's process, essentially.

24   Q.  So I understand correctly, Fera reached out to Fukuzyu at

25   the beginning of its efforts to develop a generic Daraprim

LCGKFTC4                    McDougal - Cross

1    product, correct?

2    A.  Correct.

3    Q.  Am I correct that that occurred in early 2016, or late

4    2015?

5    A.  Correct.

6    Q.  I believe, again, it was your direct report, Genevieve

7    Della Fera, that reached out to Fukuzyu, correct?

8    A.  Correct.

9    Q.  And she used an email address she found online?

10   A.  Correct.

11   Q.  And she received no response back from Fukuzyu, correct?

12   A.  Correct.

13   Q.  When Fera received no response back from Fukuzyu, it made

14   the business decision to go with another company, API Company

15   No. 1, correct?

16   A.  Correct.

17   Q.  And I understand, from your written testimony, that later,

18   in September of 2017, through your consultant, Mr. Conte, Fera

19   again reached out to Fukuzyu; is that correct?

20   A.  Yes.

21   Q.  And, again, if I understand your testimony, the reason you

22   reached out to Fukuzyu was to purchase API to use as a

23   reference to test API Company No. 1's API against, correct?

24   A.  Correct.

25   Q.  And, at this point in time, by the way, in September of

LCGKFTC4                    McDougal - Cross

1    2017, we're basically just a month out from when API Company

2    No. 1 will finish its API batch, correct?

3    A.  Correct.

4    Q.  And we're now more than a year into your company's

5    relationship with API Company 1, correct?

6    A.  Yes.

7              MR. POLLACK:  Justin, can we pull up Exhibit 3106 --

8    GX 3106, please.

9              And, your Honor, I believe this is in evidence, but,

10   if not, I'll move it into evidence.

11             THE COURT:  Any objection?

12             MR. PERLMAN:  No, your Honor.

13             THE COURT:  Received.

14             (Government's Exhibit 3106 received in evidence)

15   BY MR. POLLACK:

16   Q.  Ms. McDougal, can you tell me if you've seen this document

17   before?

18   A.  Yes.

19   Q.  Does this document reflect the payments that Fera made to

20   API Company 1 to develop pyrimethamine API?

21   A.  Yes.

22   Q.  If we look here, prior to --

23   A.  Excuse me, I just want to interject.

24             There's also some payments to a consultant firm we use

25   sprinkled through this, but you can see where API 1 payments

LCGKFTC4                          McDougal – Cross

1   were made as well.

2   Q.  I see.

3          So which -- ah, so anything that's not API 1, the one

4   that's with the consult, that would be your consulting firm?

5   A.  Right, that helped us work through the technicalities of

6   the API.

7   Q.  If we look at this document, prior to September 2017, there

8   were five payments to API Company No. 1, correct?

9   A.  Correct.

10  Q.  And I know you don't have a calculator with you.  I've

11  added them up; I'll represent to you they total $233,500.

12         Any reason to disagree with me on that?

13  A.  That sounds right.

14  Q.  And that's if we look at the total research and development

15  expenses line down at the bottom of $518,025.50, that's roughly

16  half of what you would ultimately pay API Company No. 1 just

17  for R&D, correct?

18  A.  Correct.

19         MR. PERLMAN:  Object to form.

20         THE COURT:  Overruled.

21         MR. POLLACK:  Let's bring up Exhibit GX 3192, please.

22         3192.

23         Take that down, please.  It's not in evidence.

24         Ms. McDougal, I believe that is all the questions I

25  presently have for you.  I want to thank you again for your

LCGKFTC4                      McDougal - Cross

1    time and coming out to answer my questions today.

2              MR. PERLMAN:  Bryce, could I have you put GX 3106 back

3    up.  It's the document we were just looking at.

4              (Continued on next page)

LCGMFTC5                          McDougal - Redirect

1   REDIRECT EXAMINATION

2   BY MR. PERLMAN:

3   Q.  Ms. McDougal, do you recall discussing GX-3106 with

4   Mr. Pollack?

5   A.  I do.

6   Q.  I believe you testified something to the effect -- let me

7   rephrase that question.

8            Do you know the date of this document?

9   A.  It says May 30, 2019.

10  Q.  Did Fera spend more money on its API after May 30, 2019?

11  A.  Yes.

12  Q.  Do you know roughly how much more?

13  A.  Another ultimately I think another $500,000 in total.  So

14  for a total of a million.

15           MR. PERLMAN:  Thank you, your Honor.  I have no more

16  questions.

17           THE COURT:  Any recross?

18           MR. POLLACK:  No, your Honor.  Thank you.

19           THE COURT:  Give me just one minute, Ms. McDougal.

20           There were two requests from Fera for Fukuzyu

21  pyrimethamine, the API ingredient at issue here, and I believe

22  you've just testified that the second request that Fera made

23  was in September of 2017.  Did I catch that right?

24           THE WITNESS:  Yes.

25           THE COURT:  And did Fukuzyu agree to provide

LCGMFTC5                    McDougal - Redirect

1  pyrimethamine to Fera in September of 2017?

2          THE WITNESS:  No.

3          THE COURT:  And if Fukuzyu had agreed in September of

4  2017 to supply the API, what impact do you believe that would

5  have had on Fera's plans to develop this generic alternative to

6  Daraprim?

7          THE WITNESS:  I think that ultimately with regards to

8  the FDA's review, I think it would have -- we had a lot of

9  questions on our API process from the FDA.  One of the

10 questions -- a lot of the questions the FDA had for us when we

11 submitted the ANDA was with regard to the API, and those

12 questions came right basically at the time COVID hit, so that

13 delayed our approval significantly.  I don't think that if we

14 used Fukuzyu API those questions have arisen because that

15 material was already used in FDA-approved currently marketed

16 product.  I think that was number 1.

17         I think number 2, part of the reason why we went back

18 to Fukuzyu also was to be able to compare the innovator or

19 their API that was being used in Daraprim to ours to

20 understand, you know -- to characterize it as best we could

21 versus the innovator.  I think -- I think at the end of the day

22 we were a bioequivalent, so it was fine.  But we may have seen

23 some things that maybe would have sped our development along as

24 well.

25         I think we would have been able to get that API.  We

LCGMFTC5                    McDougal – Redirect

1   may have pivoted to the Fukuzyu and then that would have made a

2   more efficient approval process with FDA, and it may also have

3   improved at that point our timeline to ultimately submitting to

4   the FDA.

5            THE COURT:  In September of 2017, however, when you

6   made that request of Fukuzyu, you did not at that time have an

7   ANDA submitted to the FDA and, therefore, you did not yet have

8   the questions from the FDA.

9            So placing yourself back in September of 2017 and not

10  able to look into the future, do you believe you would have

11  pivoted if Fukuzyu had been willing to provide you with the API

12  then, knowing how much you had already invested in another

13  company, which we are calling company number 1, in their

14  process of developing the API for you?

15           THE WITNESS:  Yes, I believe we would have.

16           THE COURT:  And why?

17           THE WITNESS:  Again, it was -- even though we had

18  invested that amount of money, it was understood by us that,

19  again, this was an API that was currently approved on the U.S.

20  market and it would have derisked our whole program as far as

21  the API was concerned.

22           THE COURT:  Counsel, do you have any additional

23  questions for this witness, given the questions I have just put

24  to her?

25           MR. PERLMAN:  No, your Honor.

LCGMFTC5                     McDougal - Recross

1          MR. POLLACK:  Yes, your Honor.  Thank you.

2          I'm sorry, your Honor.  Forgive my delay.

3    RECROSS EXAMINATION

4    BY MR. POLLACK:

5    Q.  Ms. McDougal, API purchased for use as a reference

6    comparator, purchased for comparator testing, could that be

7    used to manufacture a batch of generic Daraprim?

8    A.  It depends how much is purchased and what a batch is

9    requiring.

10   Q.  Would you purchase a full batch just for purposes of

11   comparator testing?  You wouldn't, would you?

12   A.  I don't know.  I can't answer that.

13          MR. POLLACK:  At this time I would like to bring up

14   Exhibit 3192, please.

15          THE COURT:  Is that GX?

16          MR. POLLACK:  It is.  I'm sorry, your Honor.  GX-3192.

17   Q.  Ms. McDougal, if I understand your written testimony, your

18   communications with Fukuzyu were being conducted through a

19   consultancy called Charkit, correct?

20   A.  Yes.  They were a broker.

21   Q.  They were acting on your behalf?

22   A.  Correct.

23   Q.  Now, comparator testing, is that using API for human use?

24   A.  I don't know -- I don't understand your question.

25   Q.  When you're running a comparator test, that's testing API

LCGMFTC5                    McDougal - Recross

1    against API to determine equivalency, correct?

2    A.   You characterize API, how -- its security profile.

3    Q.   You are trying to determine --

4    A.   Compare it, yes.

5    Q.   You are trying to determine whether or not company number

6    1's API is chemically or molecularly equivalent to Fukuzyu's

7    API.  Is that what the comparator test is?  Am I understanding

8    things correctly?

9    A.   They are both molecularly pyrimethamine, and I'm not a

10   chemist.  But the idea is just to understand, again, like say

11   impurities and peeks of the impurities.  They retain at certain

12   rates and they can vary and that can have, I guess,

13   implications into ultimately how it can be used in a finished

14   product.

15   Q.   In other words, it's not being ingested by a human being

16   during that testing, correct?

17   A.   Correct.

18          MR. POLLACK:  Your Honor, I would at this point move

19   in GX-3192.

20          MR. PERLMAN:  I believe it's already in evidence, your

21   Honor.

22          MR. POLLACK:  Then it's in.

23          If we can go to page 2 of the document, please.  Can

24   we blow up the top-level e-mail, please.

25   Q.   Ms. McDougal, we see here there is an individual named

585

LCGMFTC5                         McDougal - Recross

1    Panos Yannopoulos writing an e-mail to Mitsuaki Abe.

2               Mr. Yannopoulos is he the representative from Charkit?

3    A.  Yes.

4    Q.  Did you communicate directly with him, Mr. Panos

5    Yannopoulos, about negotiations with Fukuzyu?

6               MR. PERLMAN:  Your Honor, this is getting beyond the

7    scope of your questions, I believe.

8               MR. POLLACK:  I am going to tie it together.  I'll

9    permit it.

10              It's not very much longer, your Honor.  I promise.

11   Q.  Who communicated with Mr. Yannopoulos?

12   A.  Our consultant, Gary Conte.

13   Q.  Did Mr. Conte pass Mr. Yannopoulos' messages along to you?

14   A.  Yes.

15   Q.  Did you have input into Mr. Yannopoulos' communications to

16   Fukuzyu?

17   A.  Only if there were questions being asked by Fukuzyu that

18   needed to be answered.

19   Q.  One of the things that Fukuzyu wanted to know was whether

20   the API would be for human use in the United States, correct?

21   A.  Yes.

22   Q.  Did you discuss that with Mr. Conte?

23   A.  Yes.

24   Q.  Did Mr. Conte pass along your concerns to Mr. Yannopoulos?

25              MR. PERLMAN:  Object to the form of that question.

LCGMFTC5                      McDougal - Recross

1          MR. POLLACK:  Withdrawn.

2          THE COURT:  Counsel, I think we are way beyond the

3    scope.  I was waiting for you to try to link it up, but I can't

4    see the linkage.

5          MR. POLLACK:  I'll do it in the next question, your

6    Honor.

7          Can we go to the last e-mail, please, on the bottom of

8    the page.

9    Q.  The one I'm focused in on is, Ms. McDougal, is 2017, 12/21,

10   at 11:40 from Panos Yannopoulos saying:  OK.  Abe-SAN.  I've

11   got all our ducks in a row and addressed every concern.  Now

12   all I need is a C of A and the sample in question, and we could

13   revert with a firm PO for 20 grams at U.S. dollars, $200 a gram

14   for shipment to customer, destination address in Argentina.  We

15   can also confirm our adherence to the statement required

16   regarding sales of the API will not be used to make

17   pyrimethamine drug product for human use.

18         THE COURT:  Counsel, how is this of assistance to you?

19   This is Fukuzyu refusing to provide API for human use in

20   America.

21         MR. POLLACK:  That is Mr. Yannopoulos confirming that

22   Fera is not looking to source API for manufacturers.  It's

23   looking for a comparator, not for human use.

24         THE COURT:  Forget the document.  Ask the witness

25   questions.

LCGMFTC5                        McDougal – Recross

1          MR. POLLACK:  Your Honor, I rest.

2          THE COURT:  No, counsel.  I'm letting you continue.

3    But just try to get her recollection.  If you start with that

4    before you go to the document.

5    Q.  Ms. McDougal, is it the case that your company was not

6    looking for API to manufacture Daraprim from Fukuzyu?  You were

7    looking for a reference sample as you told me earlier today,

8    correct?

9          MR. PERLMAN:  Object to the form of that question.

10          THE COURT:  Sustained to form.  But please place your

11    question, counsel.

12    Q.  Ms. McDougal, isn't it correct, as you told me earlier,

13    that your company was looking for a reference sample for API

14    from Fukuzyu, correct?

15    A.  I said that, but I also said we were trying to open up

16    communication with Fukuzyu to pursue a potential relationship

17    as a supplier.  So the feedbacks we were getting made it clear

18    that that wasn't going to be viable, but that was also part of

19    our intent.

20          MR. POLLACK:  Your Honor, no further questions.

21          THE COURT:  Thank you.

22          Any further redirect?

23          MR. PERLMAN:  No, your Honor.

24          THE COURT:  You may step down.

25          (Witness excused)

LCGMFTC5

1          THE COURT:  Next witness.

2          MR. PERLMAN:  Your Honor, if I may, I just have a

3    couple of exhibits that were in these affidavits that I believe

4    we reached resolution on with defendants.  Plaintiffs would

5    like to move these in not for the hearsay purpose but just for

6    the truth of the matter asserted in these exhibits.

7          THE COURT:  Not for the truth of the matters contained

8    therein, but simply for the fact that these communications were

9    made at around those times?

10          MR. PERLMAN:  Yes, your Honor.  In particular, the

11    first one is GX-3246.  It attaches a news article.  I believe

12    that was the focus of defendant's objection.

13          THE COURT:  Any objection to the receipt of GX-3246

14    received not for the truth of the matters stated therein?

15          Hearing no objection, it is received.

16          (Government Exhibit 3246 received in evidence)

17          MR. PERLMAN:  I'm sorry, your Honor.  Should I address

18    this question?

19          THE COURT:  Sure.  Why don't you consult, counsel.  No

20    need to rush.

21          MR. POLLACK:  I think what Mr. Perlman said was that

22    this document comes in not for its truth.  We agree.

23          MR. PERLMAN:  I believe the other document was

24    GX-3192, which was the e-mail chain that you just showed

25    Ms. McDougal, so I think that's already in evidence, but I just

LCGMFTC5

1  wanted to make sure.

2         THE COURT:  Received.  If not already formally on the

3  record, the parties understand it is received.  It is received

4  by me.

5         (Government Exhibit 3192 received in evidence)

6         MR. PERLMAN:  Thank you, your Honor.

7         THE COURT:  Did you have another witness to call?

8         MR. MEIER:  Thank you, your Honor.  Because these

9  examinations ran quite a bit longer than we had anticipated, we

10  had to do a little bit of reconfiguring of the schedule.  We

11  had told your Honor that we would call Howard Dorfman next, but

12  we had to move him to another day.

13         We would now call, and I am not sure how to pronounce

14  the name, but I will do my best, Abhishek Mukhopadhyay with Dr.

15  Reddy's, and my colleague, Leah Hubinger, will be responsible

16  for the government's examination of this witness, your Honor.

17         THE COURT:  Would the witness please approach.  If you

18  could take the witness stand and remain standing.

19  ABHISHEK MUKHOPADHYAY,

20      called as a witness by the Plaintiffs,

21      having been duly sworn, testified as follows:

22         THE COURT:  You're about to be shown a document by

23  counsel, which I believe is Government Exhibit 809.

24         MS. HUBINGER:  That's correct, your Honor.  May I

25  approach?

LCGMFTC5

1            THE COURT:  I would ask you to look at page 12, the

2    last page of that document, and ask if you authorized an

3    electronic signature, your electronic signature to be placed on

4    the last page?

5            THE WITNESS:  Yes.

6            THE COURT:  Before giving that authorization, did you

7    read this document with care?

8            THE WITNESS:  Yes.

9            THE COURT:  And do you swear to the truth of its

10   contents?

11           THE WITNESS:  Yes.

12           THE COURT:  Is there any objection to receipt of

13   GX-8009?

14           MR. CASEY:  Yes, your Honor.  We have just a few

15   objections to some of the paragraphs, your Honor.

16           We object to the admission of paragraphs 13 and 14 on

17   the basis of Rule 602 of the Federal Rules of Evidence.  Those

18   paragraphs discuss technical details regarding Bactrim in

19   paragraph 13 and compounded pyrimethamine in paragraph 14.

20           We don't believe there has been a foundation

21   established for the witness' knowledge about those two topics.

22           We also have objections to paragraphs 28.

23           THE COURT:  If it's a separate objection, can we take

24   them one at a time?

25           MR. CASEY:  Sure.

591

LCGMFTC5

1          THE COURT:  Thank you so much.

2          Paragraphs 13 and 14.  Give me a second.  Thank you.

3          The objection is overruled.  I am looking at the

4     description of the witness' job at Dr. Reddy's and, in

5     particular, paragraph 5.

6          Next.

7          MR. CASEY:  Your Honor, there are three objections,

8     all on hearsay grounds and those paragraphs are paragraphs 28,

9     32, and 33.  In each of those paragraphs there is reference to

10    statements by other people.  Some of them within Dr. Reddy's

11    and some of them outside of Dr. Reddy's.  All of those

12    statements are hearsay.  We object on hearsay grounds.

13         THE COURT:  I assume they are being offered for the

14    fact they were stated to this witness and to explain what he

15    did next or didn't do next.  Is that right?

16         MS. HUBINGER:  Yes.  That's correct.  He is relying on

17    those statements when he is making his own decisions and

18    suggestions about how Dr. Reddy's should source RLD.

19         THE COURT:  Your objection is well taken, but I will

20    receive these statements not for their truth but for the fact

21    that they were stated.

22         MR. CASEY:  Thank you, your Honor.

23         THE COURT:  With that, GX-8009 is received.

24         (Government Exhibit 8009 received in evidence)

25         THE COURT:  Cross-examination.

LCGMFTC5                    Mukhopadhyay – Cross

1  CROSS-EXAMINATION

2  BY MR. CASEY:

3  Q.  Good afternoon, Dr. Mukhopadhyay.

4  A.  Good afternoon.

5  Q.  Am I pronouncing your last name correctly?

6  A.  Yes.

7  Q.  My name is Christopher Casey and I'm representing

8  Mr. Shkreli in this trial.  I'll be questioning you today.

9       I want to ask you, first, some questions about the

10  affidavit that you just swore to and has been entered into

11  evidence.

12      First, Dr. Mukhopadhyay, if I could direct your

13  attention to paragraph 17 and 18.  They would be on page 6.

14  A.  Yes.

15  Q.  If you look at paragraph 17, the heading before the

16  paragraph says:  Cerovene search for new API supplier.  Do you

17  see that?

18  A.  Yes.

19  Q.  The paragraph reads:  The business development team's main

20  concern was Cerovene's search for an alternative API supplier.

21  A generic company needs to locate an API supplier with an

22  active U.S. DMF to make an FDA-approved drug product.

23  Alternatively, generic companies like Dr. Reddy's could develop

24  their own API in house, although the process of doing so can

25  take years.  That's paragraph 17.

LCGMFTC5                    Mukhopadhyay – Cross

1          Paragraph 18 says:  Cerovene had submitted its ANDA to

2     the FDA using API from Ipca.  Before I began discussions with

3     Cerovene, the FDA had placed Ipca on import alert, which meant

4     that Cerovene would not be able to use Ipca's API.  Cerovene

5     had received a complete response letter from the FDA that

6     indicated that's ANDA was ready for approval, except for the

7     compliance status of its API supplier.

8          That was your testimony, correct?

9     A.  Yes.

10    Q.  Dr. Mukhopadhyay, you don't have any personal involvement

11    in API sourcing at Dr. Reddy's, correct?

12    A.  No.

13    Q.  No, meaning you do our don't?

14    A.  I don't.

15    Q.  You do not.  Is that your answer?

16    A.  Yes.

17    Q.  Thank you.

18          Then moving down to paragraph 20, that paragraph

19    reads:  Through these interactions with Cerovene, I learned

20    that Cerovene first attempted to source API from Fukuzyu based

21    on my knowledge of generic drug product development.  Fukuzyu

22    would have been the best option after Ipca because it had an

23    active U.S. DMF.  After significant delays, though, Fukuzyu

24    eventually refused to supply Cerovene.

25          That was your testimony in paragraph 20, correct?

LCGMFTC5                    Mukhopadhyay – Cross

1    A.   Yes.

2    Q.   You have no independent knowledge of the negotiations

3    between Cerovene and Fukuzyu other than what Cerovene told you,

4    correct?

5    A.   Yes.

6    Q.   You have no independent knowledge of the negotiations

7    between Cerovene and RL Fine, correct?

8    A.   Yes.

9    Q.   In fact, you have never even seen the API supply contract

10   between Cerovene and RL Fine, correct?

11   A.   Yes.

12   Q.   If I could move to paragraph 25.  The heading there is:

13   Difficulties obtaining reference listed drug (RLD) required for

14   additional bioequivalence testing delayed the generic Daraprim

15   project.

16        Plaintiff 25 says:  In December 2017, the FDA notified

17   Cerovene that it needed to perform additional bioequivalence

18   studies using RL Fine's API.  To perform these studies, I

19   understood that Cerovene would be required to obtain brand-name

20   Daraprim, also referred to as the reference listed drug, RLD.

21   I expected that it would take only a few weeks to obtain

22   Daraprim RLD.  Based on my knowledge of generic drug

23   development, I anticipated that completing the bio studies

24   would take three to four months.

25        That was your testimony, correct?

LCGMFTC5                    Mukhopadhyay – Cross

1    A.  Yes.

2    Q.  But, in fact, you didn't know how long it would take to

3    obtain Daraprim RLD because sourcing RLD was Cerovene's

4    responsibility, not Dr. Reddy's, correct?

5    A.  Yes.

6    Q.  Now, just moving ahead to paragraphs 39 and 40, I am not

7    going to read the whole paragraph.  But the heading on this is

8    about Dr. Reddy's distribution of generic Daraprim.  I'll just

9    read from the sentence that begins:  Dr. Reddy's chose to sell

10   generic Daraprim in an open distribution model, which includes

11   using large drug wholesalers, such as Cardinal and McKesson, as

12   well as various specialty pharmacies.

13        The distribution strategy for generic Daraprim was

14   designed to encourage and enable broader access to the

15   patients, who could purchase the drug in various pharmacies

16   rather than one specific store.  Hospitals and group purchasing

17   organizations could also obtain generic Daraprim directly from

18   a wholesaler or the manufacturer.

19        That was your testimony in paragraph 39, correct?

20   A.  Yes.

21   Q.  In paragraph 40 you state:  I am not aware of any

22   discussions concerning restricting the distribution of

23   pyrimethamine.  I am not aware of discussions concerning

24   potential risks associated with product safety, product

25   liability, or product quality that would indicate that open

LCGMFTC5                    Mukhopadhyay - Cross

1    distribution would not be appropriate for generic Daraprim.

2            That was your testimony in paragraph 40, correct?

3    A.   Yes.

4    Q.   To be clear, you don't have any personal involvement with

5    distribution at Dr. Reddy's, correct?

6    A.   Yes.

7    Q.   You were not personally involved in the decisions about how

8    generic Daraprim would be distributed, correct?

9    A.   Yes.

10   Q.   So you don't know what the people who made the decisions

11   about generic Daraprim's distribution considered in making that

12   decision, correct?

13   A.   Yes.

14   Q.   Doctor, I'd like to move on then from your affidavit and

15   talk about the timeline of events that is in your affidavit.  I

16   am not going to specifically refer to the affidavit, but -- I

17   will, but what I want to do is just get some dates down, just

18   so I understand the timeline.  OK?

19   A.   Sure.

20   Q.   In March of 2016, Dr. Reddy's learned about Cerovene's

21   efforts to develop a generic Daraprim product, correct?

22   A.   Yes.

23   Q.   At that time Dr. Reddy's learned that Cerovene had already

24   filed an ANDA for a generic form of Daraprim, correct?

25   A.   Yeah.

LCGMFTC5                    Mukhopadhyay – Cross

1    Q.  Dr. Reddy's then learned that Cerovene's ANDA had used

2    pyrimethamine API from Ipca, correct?

3    A.  Yes.

4    Q.  Following the filing of Cerovene's ANDA, the FDA had placed

5    Ipca on an import alert, correct?

6    A.  Yeah.

7    Q.  On January 3, 2017, Dr. Reddy's development and supply

8    agreement with Cerovene was signed, correct?

9    A.  Yes.

10   Q.  Several months later, on April 2, 2017, Cerovene submitted

11   its major amendment with the FDA identifying RL Fine as its new

12   API supplier, correct?

13   A.  Yes.

14   Q.  Then in December 2017, the FDA issued Cerovene a complete

15   response letter, correct?

16   A.  Yes.

17   Q.  In that complete response letter the FDA said that Cerovene

18   needed to repeat the bioequivalence testing using fresh tablets

19   manufactured by RL Fine versus unexpired Daraprim tablets.  Is

20   that correct?

21   A.  Yes.

22   Q.  This meant that Cerovene had to get new supplies of

23   Daraprim RLD to conduct the bioequivalency testing, correct?

24   A.  Yes.

25   Q.  At the time that Cerovene filed its major amendment with

LCGMFTC5                    Mukhopadhyay - Cross

1    the FDA, which is in April of 2017, which identified RL Fine as

2    its new API supplier, there was a risk that the FDA would not

3    accept the bioequivalence testing results that Cerovene had

4    previously submitted and would require new bioequivalence

5    testing, correct?

6                THE COURT:  Excuse me just one second.  I want to make

7    sure I'm following your timeline.

8                Now we are back in April.

9                MR. CASEY:  Yes.  I'm sorry, your Honor.  I should

10   have flagged it.

11               THE COURT:  Fine.

12               MR. CASEY:  Talking about April of 2017.

13               THE COURT:  We are back at April.  It's the time the

14   amendment was filed.

15               MR. CASEY:  Correct.

16               THE COURT:  Great.

17   Q.  Do you want me to repeat the question, Doctor?

18   A.  Yes.

19               THE COURT:  No.

20   Q.  I'm happy to.

21   A.  Go ahead.

22   Q.  As of the time that Cerovene filed its major amendment with

23   the FDA, which was in April of 2017, identifying RL Fine as its

24   API supplier, there was a risk that the FDA would not accept

25   the bioequivalence testing results that Cerovene had previously

LCGMFTC5                    Mukhopadhyay - Cross

1    submitted and would require new bioequivalence testing,

2    correct?

3    A.  When you say risk, whose risk is it?  Is it risk as

4    identified by Dr. Reddy's or by Cerovene?

5    Q.  The question is, was there risk, risks to Dr. Reddy's?

6    A.  So I would say there is always risk.  In this case this was

7    an immediate release product.

8            THE COURT:  Excuse me.  I'm sorry.  I forgot to tell

9    you.  You may remove your mask.  We have tested the ventilation

10   system in this courtroom.  When you are speaking from that

11   location, you can be unmasked.  There is a full air exchange at

12   least every 10 minutes.  Also, counsel at the podium can remove

13   their mask.  Sorry for not telling you.

14   A.  We understood that this was an immediate-release product,

15   and for an immediate-release product the chances of FDA asking

16   for a repeat bioequivalence study was low.  So that's why we

17   considered the risks to be low for a repeat bioequivalence

18   study request from the FDA.

19           MR. CASEY:  Could you pull up document DX-160.

20   Q.  Doctor, on the screen there, if you can see in front of

21   you, there is Defendant's Exhibit DX-160.  Do you see that?

22   A.  Yes.

23   Q.  Are you familiar with this document?  Take a minute to read

24   it yes.

25   A.  It's an e-mail from Manish Shah.

LCGMFTC5                    Mukhopadhyay - Cross

1   Q.  You're familiar with this?

2   A.  Yes.

3   Q.  The e-mail about a third of the way down the page, you're

4   cc'd on that e-mail from Mr. Shah, is that correct?

5   A.  Yes.

6   Q.  You've seen this before?

7   A.  I'm sure I must have seen it before.

8         MR. CASEY:  Your Honor, the defendant would offer in

9   DX-160 in evidence.

10        THE COURT:  Received.

11        (Defendant's Exhibit 160 received in evidence)

12  Q.  Dr. Mukhopadhyay, I want to direct your attention -- first

13  there is a top e-mail from Srinivasa Rao, if I pronounce that

14  correctly?

15  A.  Yes.

16  Q.  Is that she?

17  A.  It's a he.

18  Q.  According to this document, he was the vice-president and

19  head of regulatory affairs, North America Generics for

20  Dr. Reddy's Laboratories, correct?

21  A.  Yes.

22  Q.  The e-mail below that is from Manish Shah, as you

23  mentioned.  Who is Manish Shah?

24  A.  He's the CEO of Cerovene.

25  Q.  It's sent to an Alok Sonig at Dr. Reddy's?

LCGMFTC5                    Mukhopadhyay - Cross

1    A.   Yes.

2    Q.   You are copied along with Mr. Rao and a Ray DiFalco at

3    Cerovene, correct?

4    A.   Yes.

5    Q.   The e-mail from Mr. Shah says:  Hi, Alok, Cerovene -- this

6    is dated January 6, 2018, correct?

7    A.   Yes.

8    Q.   It says:  Cerovene received a complete response letter for

9    pyrimethamine product on December 28, 2017, and the major point

10   in the letter is to repeat BE study using fresh tablets

11   manufactured from RL Fine chem versus unexpired Daraprim

12   tablets.  The original BE study involved Ipca's API.  FDA has

13   determined that new BE study is required due to the quality

14   issues at Ipca's facility.

15            Do you see that?

16   A.   Yes.

17   Q.   Then it goes on to say:  Cerovene is aggressively pursuing

18   multiple steps to achieve the successful approval and they, as

19   below -- the next page -- there are a number of steps.  I

20   direct your attention to step 3.  It says purchase five bottles

21   of Daraprim tablets this week, $130,000 per bottle.  Do you see

22   that?

23   A.   Yes.

24   Q.   I am going to direct your attention to the next page.  This

25   is an earlier e-mail, the December 1 e-mail where Mr. Rao

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCGMFTC5                    Mukhopadhyay - Cross

1    addresses this to Manish Shah at Cerovene.  He says:  Hi,

2    Manish.  As discussed with you this morning, it is important to

3    plan for a bio-study ASAP using the same CRO in our ANDA as a

4    backup.  He goes on to say:  With the drug product discipline

5    also not adequate, in my opinion, it is very likely the agency

6    would ask for a new bio study, as they may not accept the bio

7    study conducted using Ipca material.

8            Do you see that?

9    A.   Yes.

10   Q.   If you turn to the next page -- I'm sorry.  I moved too

11   fast.

12           I want to direct your attention to continue on that

13   e-mail to the sentence that begins:  I was under the

14   impression.  It's a little further down.

15           Do you see that where it says:  I was under the

16   impression that Cerovene had already received clearance from

17   the FDA RPM to refer the old bio.  Very disappointing to run a

18   bio now.  We could have done this as a backup.

19           Do you see that?

20   A.   Yes.

21   Q.   Do you remember being asked about this at your deposition?

22   A.   I don't specifically remember.

23           MR. CASEY:  Why don't we go to --

24           THE COURT:  Why don't you just ask the question that

25   you want answered.

603

LCGMFTC5                    Mukhopadhyay - Cross

1   Q.  This is an e-mail from Mr. Rao on December 1, 2017 where he

2   says he was under the impression that Cerovene had already

3   received clearance from the FDA.  What was your impression of

4   what Mr. Rao was saying in that e-mail?

5   A.  Specific to the sentence?

6   Q.  Yes.

7   A.  He seemed to think that Cerovene had received some kind of

8   clearance from FDA project manager to used the old bio study.

9   Q.  What was your impression of what he meant by saying we

10  could have done this as a backup?

11  A.  That we could run the bio study.

12  Q.  What was your impression of when, like the time frame of

13  when he was referring to?

14  A.  Like maybe post signing the deal at some point.

15  Q.  Signing which deal?

16  A.  The April -- or the January deal.

17  Q.  January deal with Cerovene?

18  A.  Yes.

19  Q.  The backup would have been backup bioequivalency testing in

20  the event that the FDA may have thrown out the old BE results?

21  A.  Yes.

22  Q.  There was some risk?

23  A.  Yes.

24  Q.  That risk was in April, perhaps, when you filed the

25  complete response?

LCGMFTC5                    Mukhopadhyay - Cross

1    A.   Yes.

2    Q.   And, perhaps, back into January when you did the agreement

3    with Cerovene?

4    A.   Yes.

5    Q.   But you didn't do a repeat bioequivalency testing at that

6    point, correct?

7    A.   Yes.

8    Q.   So you waited until the FDA notified you in late December

9    of 2017 that you had to do the new BE testing, correct?

10   A.   Yes.

11   Q.   If you had been aware of this risk back in January or

12   April, you would have advised Cerovene to do the new

13   bioequivalency testing as a backup, correct?

14   A.   Again, it depends on the extent of risk.  But if they are

15   reclassified as a high risk, high probability situation or a

16   low risk, it involved significant investment.  As you can see,

17   it's $130,000 a bottle.  So five bottles, it will be $650,000.

18   So it's a significant investment.  We were already paying

19   Cerovene significant milestones for the deal.  So on top of

20   that, spending another $650,000 for a bio study which may or

21   may not be requested by the FDA would have been difficult.

22             THE COURT:  Would have been --

23             THE WITNESS:  A difficult choice to make for us.

24             THE COURT:  Would have been --

25             THE WITNESS:  A difficult choice for us.

LCGMFTC5                    Mukhopadhyay - Cross

1           THE COURT:  Thank you.

2   Q.  Understood, Doctor.  But my question is, if Dr. Reddy's had

3   been aware of this risk in April of 2017, they would have

4   advised Cerovene to do new bioequivalency testing, correct?

5   A.  If FDA informed us in February or in April that a

6   bioequivalency study would be required, we would have done

7   that.

8   Q.  That's not my question, Doctor.  I am saying, the FDA did

9   not notify Dr. Reddy's until December, correct?

10  A.  Yes.

11  Q.  I believe you testified that there was some risk prior to

12  December that they might, correct?

13  A.  Yes.

14  Q.  And my question was, if Dr. Reddy's had been aware of this

15  risk, it would have advised Cerovene to do new BE testing as a

16  backup, correct?

17  A.  So Dr. Reddy's was always aware that there might be a low

18  risk of something like this happening because any submission

19  you make to the FDA, they may come back and ask for an

20  advisory.  It's not that Dr. Reddy's was not aware of any risk.

21  Q.  I'd like to go your deposition, Doctor.

22          MR. CASEY:  Could you pull it up, please.  At page

23  266, lines 12 to 16.

24  Q.  Doctor, do you remember having your deposition taken in

25  this case?

LCGMFTC5                    Mukhopadhyay - Cross

1    A.   Yes.

2    Q.   You swore an oath to tell the truth at that deposition?

3    A.   Yes.

4    Q.   The same one you took today, correct?

5    A.   Um-hum.

6    Q.   All of your answers at the deposition were true and

7    correct, correct?

8    A.   Yes.

9    Q.   That deposition was February 12, 2021, correct?

10   A.   Yes.

11   Q.   You were asked about this risk.  You were asked:   If

12   Dr. Reddy's had been aware of that risk, would it have advised

13   Cerovene to go ahead and do the bioequivalence study?  You

14   answered yes.  Do you see that?

15   A.   Yes.

16   Q.   And there was nothing preventing Cerovene from doing new

17   bioequivalence testing in April 2017 using RL Fine's API except

18   the cost of finding new RLD and doing the bioequivalence,

19   correct?

20   A.   Correct.

21   Q.   I want to move to another topic now.  I want to talk about

22   your efforts to assist Cerovene with sourcing RLD.  OK?

23   A.   Yes.

24   Q.   I am going to direct you now back to your direct testimony

25   back at paragraph 26.  You state:  As Cerovene's point of

LCGMFTC5                    Mukhopadhyay – Cross

1   contact at Dr. Reddy's, I was included on e-mails related to

2   RLD sourcing, and I connected Cerovene with members of

3   Dr. Reddy's' sourcing team who had relationships with RLD

4   suppliers that might have helped Cerovene.

5          That was your testimony, correct?

6   A.  Yes.

7   Q.  I want to focus on that phrase, might have helped Cerovene.

8   OK.

9          In fact, Dr. Reddy's suggested to Cerovene that

10  Cerovene allowed Dr. Reddy's to use its contacts to get RLD

11  more quickly, right?

12  A.  Yes.

13  Q.  In paragraph 27, you write or you testify:  Initially,

14  Cerovene had tried to obtain RLD from Espee.  I was copied on

15  e-mail communications concerning these sourcing efforts.

16  Cerovene had approved an order to purchase RLD from Espee on

17  December 30, 2017.

18         That was your testimony in paragraph 27, correct?

19  A.  Yes.

20  Q.  In February 2018, moving up to February 2018, you urged

21  Cerovene to cancel its contract with Espee and work with

22  ProSupplier to source RLD, correct?

23  A.  Yes.

24  Q.  In fact, it was February 12, 2018 when your team identified

25  ProSupplier as a source for Daraprim RLD and notified Cerovene

LCGMFTC5                        Mukhopadhyay – Cross

1    about ProSupplier, correct?

2    A.   Yes.

3    Q.   It was the prior Thursday, which is February 8, 2018, when

4    one of your team members left a voice mail message for Manish

5    Shah at Cerovene notifying him that ProSupplier was available

6    to source RLD, correct?

7    A.   I am not sure about the voice mail.

8    Q.   Does that time frame sound right to you?

9    A.   Yes.

10   Q.   February 8, 2018?

11   A.   Time frame -- I am not sure of the date, but yes.

12   Q.   As of February 8 of 2018, Dr. Reddy's had identified

13   ProSupplier as a potential source of RLD, correct?

14   A.   Yes.

15   Q.   You communicated that to Cerovene, correct?

16   A.   Not me personally, but yes.

17   Q.   And you suspected that the RLD suppliers were not taking

18   Cerovene's orders seriously because Cerovene was a smaller

19   company than Dr. Reddy's, correct?

20   A.   Yes.

21   Q.   And you believed that if Dr. Reddy's worked with Cerovene

22   to make the purchase orders that Dr. Reddy's could use its

23   relationships to help Cerovene obtain the RLD, correct?

24   A.   Yes.

25   Q.   In fact, you said at the time "we may have a better chance

LCGMFTC5                    Mukhopadhyay - Cross

1    of getting the RLD quickly if Dr. Reddy's orders on behalf of

2    Cerovene."  Do you remember saying that?

3    A.   Yes.

4    Q.   But at that time, February of 2018, Cerovene was attempting

5    to get RLD through a company called Reliant Specialty LLC,

6    correct?

7    A.   Yes.

8    Q.   And you wanted Cerovene to source RLD through ProSupplier

9    instead of Reliant, correct?

10   A.   Dr. Reddy's connected Cerovene with both Reliant and

11   ProSupplier.  I think -- I'm trying to remember.  Because both

12   Reliant and ProSupplier were through Dr. Reddy's' contact.  I

13   believe at one point we decided to go with Reliant versus

14   ProSupplier because Reliant was a U.S.-based company, and we

15   had previous relationships with Reliant, and I was familiar

16   with them.  I think they had said they would be able to source

17   the bottles sooner than what ProSupplier had said.  That's when

18   Cerovene started bottling it up, start talking to them for the

19   supply.

20   Q.   Doctor, I am just referring to February of 2018, at that

21   point.

22   A.   Let me check.

23   Q.   At that point you wanted ProSupplier to be the sourcing

24   company rather than Reliant, correct?

25   A.   Yes.  I believe initially I proposed working with

LCGMFTC5                    Mukhopadhyay – Cross

1    ProSupplier.

2    Q.  Do you remember saying in an e-mail to one of your

3    colleagues:  I believe we work with ProSupplier.  We cannot sit

4    and wait for Cerovene to get it.  They have tried and failed

5    and are getting delayed.

6            Do you remember saying that?

7    A.  Yes.

8    Q.  But Cerovene did not take your advice in February of 2018,

9    correct?

10   A.  Yes.

11   Q.  And it was ProSupplier that eventually ended up supplying

12   the RLD, but it wasn't until seven months later, right?

13   A.  Yes.

14   Q.  In fact, the order to ProSupplier was not even placed until

15   late September 2018, correct?

16   A.  Yes.

17   Q.  And you don't have any basis to believe that if Dr. Reddy's

18   from Cerovene had placed an order with ProSupplier for Daraprim

19   RLD in February 2018 that ProSupplier could not have provided

20   the RLD at that time, correct?

21   A.  Yes.

22   Q.  I'll move on.

23           I want to go back to paragraph 29 of your direct

24   testimony where you testified both ProSupplier and Reliant

25   required advance payment.  In my experience, this requirement

LCGMFTC5                        Mukhopadhyay - Cross

1   was unusual, as payments for RLD are usually made after the

2   product is delivered.  At the time I believed it would have

3   been an unreasonable risk to pay both suppliers at the same

4   time due to the amount of money involved and the uncertainty

5   that either company could actually source the RLD.

6           That is your testimony at paragraph 29, correct?

7   A.   Yes.

8   Q.   Now, on February 23 of 2018, Dr. Reddy's placed an order

9   with Reliant for five bottles of Daraprim, correct?

10  A.   Yes.

11  Q.   But Dr. Reddy's didn't release the funds to Reliant for the

12  order, which was $550,000, until more than five weeks later, on

13  March 28, 2021, correct?

14  A.   I am not sure of the date, but could be.

15  Q.   If you go to your written direct testimony, paragraph 30,

16  please.

17          Do you see the third sentence there:  On March 28,

18  2018, Dr. Reddy's released to Reliant a prepayment amount of

19  $550,000 for five bottles, the total amount of the order.

20          You see that?

21  A.   Yes.

22  Q.   So there was about five weeks between the placing of the

23  order and releasing the funds to Reliant, correct?

24  A.   Yes.

25  Q.   Although you testified that paying both suppliers was an

LCGMFTC5                    Mukhopadhyay - Cross

1   unreasonable risk, that is exactly what Dr. Reddy's did a few

2   months later in September 2018, correct?

3   A.   Yes.

4   Q.   At that time you had two deposits outstanding, one to

5   Reliant and one to ProSupplier, and your team decided to take

6   the very risk that you said you were concerned about in

7   February, correct?

8   A.   Yes.

9   Q.   And you have no basis to believe that if Dr. Reddy's and

10  Cerovene had placed an order with ProSupplier in February 2018

11  that ProSupplier would not have been able to supply the RLD,

12  correct?

13  A.   Yes.

14  Q.   So the order was placed with Reliant.  Five weeks later

15  there was a prepayment for the order.  And then several months

16  went by and Reliant was unable to deliver on its promise to

17  source the RLD, correct?

18  A.   Yes.

19  Q.   Finally, in July 2018, Reliant was able to provide one

20  bottle of Daraprim RLD, correct?

21  A.   Yes.

22  Q.   Despite the fact that Reliant was unable to deliver on its

23  promise and source Daraprim RLD for several months in the

24  spring and summer of 2018, you stuck with Reliant, correct?

25  A.   Yes.

LCGMFTC5                    Mukhopadhyay – Cross

1   Q.  As you stated in your direct testimony, instead of engaging

2   ProSupplier, my team and I decided to continue working with

3   Reliant at this time.

4         That's your testimony at paragraph 33, correct?

5   A.  Yes.

6   Q.  Now, at paragraph 35 of your testimony you state that by

7   August 23, 2018, I updated Dr. Reddy's' management on

8   continuing issues procuring Daraprim RLD from Reliant and a new

9   plan to order additional bottles of RLD from ProSupplier.  I

10  then monitored and participated in later e-mails relating to

11  efforts to source RLD through ProSupplier.

12        That is your testimony, correct?

13  A.  Yes.

14  Q.  In the next paragraph, under paragraph 36, you state that:

15  By September 28, 2018, Cerovene and Dr. Reddy's agreed to place

16  an order with ProSupplier for three bottles while also keeping

17  its existing order with Reliant open.  Due to the significant

18  delays in sourcing RLD, Dr. Reddy's executives, in conjunction

19  with Manish Shah at Cerovene, then concluded that we needed to

20  accept the risk of repaying in advance with two different RLD

21  suppliers.  Dr. Reddy's paid 50 percent of $375,000 in advance

22  for this order, with the remaining balance to be paid after

23  delivery.

24        That is your testimony, right?

25  A.  Yes.

LCGMFTC5                          Mukhopadhyay – Cross

1    Q.  Then in paragraph 37, last paragraph I am going to read.

2    37 says:  On November 19, 2018, I informed Dr. Reddy's'

3    executives and other personnel working on the generic Daraprim

4    project that Cerovene had obtained three bottles from

5    ProSupplier.  After receiving the three bottles from

6    ProSupplier, the Reliant order was cancelled.  Because the

7    ProSupplier bottles were from a different manufacturing lot

8    than the bottle previously sourced by Reliant, Cerovene could

9    not combine the ProSupplier bottles and the Reliant bottle for

10   bioequivalence testing.

11          That's your testimony, right?

12   A.  Yes.

13   Q.  Doctor, at this time, in 2018, you understood that the FDA

14   required a generic company to have five bottles of Daraprim RLD

15   in order to conduct bioequivalence testing, correct?

16   A.  When you say at this time, this is November 2018?

17   Q.  In 2018.

18   A.  Yes.  Earlier in 2018, we knew -- we understood we required

19   five bottles.

20   Q.  You understood throughout 2018 that that was a requirement,

21   correct?

22   A.  Yes.  I wouldn't say throughout.  At some point during

23   2018, when Cerovene received this communication from the FDA

24   with the waiver for three bottles.

25          (Continued on next page)

LCGKFTC6                    Mukhopadhyay - Cross

1   BY MR. CASEY:

2   Q.  I'm sorry, can you explain?

3   A.  So sometime during 2018, Cerovene had petitioned the FDA

4   for a waiver to use fewer bottles.  So I don't remember exactly

5   what date it was, but sometime during 2018, we knew that three

6   bottles would be sufficient.

7   Q.  You're saying sometime in 2018, you understood the FDA

8   granted the waiver?

9   A.  Yes.

10  Q.  I'd like to just go over in more detail the timeline of

11  these paragraphs — 35, 36, and 37.

12          MR. CASEY:  If you can just go back to 35, please, for

13  a second.

14  Q.  You talked about a new plan to order additional bottles of

15  RLD from ProSupplier.

16          You used the word "additional," there but just so

17  we're clear, as of August 23rd, 2018, you had not yet ordered

18  any bottles from ProSupplier, correct?

19  A.  Yes.

20  Q.  So the "additional" isn't additional bottles from

21  ProSupplier?

22  A.  It's not additional from ProSupplier, it's additional to

23  the one bottle that we had from Reliant.

24  Q.  From Reliant?

25  A.  Yes.

LCGKFTC6                    Mukhopadhyay – Cross

1   Q.  Okay.

2        So then what happened was another five weeks went by,

3   until September 28, 2018, when Cerovene and Dr. Reddy's finally

4   agreed to place an order with ProSupplier for three bottles of

5   Daraprim RLD rather than five, correct?

6   A.  Yes.

7   Q.  And it was Dr. Reddy's, not Cerovene, that placed that

8   order, correct?

9   A.  Yes.

10  Q.  And you don't remember what the date was that the FDA

11  granted the waiver for three bottles rather than five?

12  A.  I don't remember, but I would assume by this time, we knew

13  that three bottles would be sufficient.  That's why we ordered

14  three bottles.

15  Q.  Now, if the FDA had not granted the waiver at the time, you

16  would have ordered five bottles rather than three, correct?

17  A.  Yes.

18        MR. CASEY:  Would you pull up document DX 168, please.

19  Q.  Doctor, on the screen, you'll see Document DX 168.  It's an

20  email from Mallikarjun Reddy?

21  A.  Yes.

22  Q.  To a number of people, including you, correct?

23  A.  Yes.

24  Q.  You recognize that document?

25  A.  Yes.

LCGKFTC6                    Mukhopadhyay – Cross

1          MR. CASEY:  Your Honor, the defense would move in

2   DX 168.

3          MS. HUBINGER:  No objection.

4          THE COURT:  Received.

5          (Defendant's Exhibit 168 received in evidence)

6   BY MR. CASEY:

7   Q.  Doctor, is this the new plan that you talked about in your

8   affidavit, your written direct testimony, the number of items

9   that are listed?

10  A.  Yes.

11  Q.  So just so we're clear on what the plan was, it says, "We

12  will insist" –- and this, again, is from Mr. Reddy to a number

13  of people within Dr. Reddy's, correct?

14  A.  Yes.

15  Q.  And also Manish Shah, who was the CEO of Cerovene, correct?

16  A.  Yes.

17  Q.  The subject is "Daraprim RLD."  It says, "Dear all:  As per

18  our/my discussion with Manish on 17 September, we have agreed

19  to go ahead and place order for three bottles with new vendor

20  (ProSupplier) considering below."

21          Do you see that?

22  A.  Yes.

23  Q.  And Manish is Manish Shah?

24  A.  Yes.

25  Q.  It goes on to say, "We will insist ProSupplier to supply

LCGKFTC6                    Mukhopadhyay – Cross

1   two bottles from Lot No. AF6966G, as we already have one bottle

2   from this lot.  In case if they are not able to source this

3   lot, we will proceed to buy three bottles from new lot."

4          So what was your understanding of what was being

5   communicated there?

6   A.  So my understanding was we had one bottle from Reliant,

7   which was from this lot number that's here, and we needed three

8   bottles, in total.  So their first attempt would be to get two

9   bottles from the same lot, if they could, from ProSupplier; if

10  not, they would go ahead and buy three additional bottles from

11  the same lot or another lot.

12  Q.  That's because the FDA required that the five bottles all

13  come from the same lot, correct?

14  A.  FDA requires five bottles comes from the same lot, but, I

15  believe, as I said earlier, at this point, we knew that we

16  needed only three bottles.

17  Q.  The next line says, "DRL team," and that's Dr. Reddy's?

18  A.  Yes.

19  Q.  "DRL team will negotiate with ProSupplier to agree for a

20  50 percent advance payment against the order and balance

21  50 percent when the product is shipped.  PO to be placed

22  accordingly."

23         Is PO purchase order?

24  A.  Yes.

25  Q.  It goes on to say, "We will insist both the vendors, i.e.,

LCGKFTC6                    Mukhopadhyay - Cross

1   Reliant and ProSupplier, to promptly inform us ahead of time

2   when they get firm visibility to get the product shipped from

3   their primary source so that we don't end up having product

4   from both the suppliers. We will keep a track on this,"

5   correct?

6   A.   Yes.

7   Q.   What was your impression of what was being communicated in

8   that bullet?

9   A.   My impression is we had outstanding POs with both

10  suppliers, and we didn't want to be in a situation where we

11  ended up with bottles from both suppliers and ended up being

12  both suppliers for the bottles, like more bottles than we

13  needed.

14  Q.   The last bullet there says, "When one supplier is able to

15  deliver the product, we will take refund from the other. This

16  way, we increase chances of having product soon."

17       Do you see that?

18  A.   Yes.

19  Q.   What was your impression of what was being communicated in

20  that bullet?

21  A.   We had -- we were trying to derisk by having two suppliers,

22  try to source the bottles.

23  Q.   Did you say "derisk"?

24  A.   Yes.

25  Q.   What do you mean by that?

LCGKFTC6                    Mukhopadhyay - Cross

1   A.  Like, if one doesn't give us the bottle, the other one

2   could, potentially.

3   Q.  You wanted to get a refund from the company that --

4   A.  Does not give us.

5   Q.  The bottles that you don't need, you want to get a refund

6   for that, correct?

7   A.  We want a refund for the company that is unable to source

8   the bottles or whoever is not -- unable to source the bottles

9   earlier.

10  Q.  Now, just to go, again, on timing, this email is

11  September 19th of 2018, correct?

12  A.  Yes.

13  Q.  So from that time -- well, let me back up.

14       It was November 19 of 2018.  As you state in

15  paragraph 37, November 19 is when you informed the Dr. Reddy's

16  team that Cerovene had obtained the bottles, correct?

17  A.  Yes.

18  Q.  I just want to focus on that period of time, that

19  September 19, the date of this email, when the new plan was

20  explained from Mr. Reddy and the time that you actually got the

21  bottles.  Okay?

22  A.  Yes.

23  Q.  It was not until October 17, 2018, that Dr. Reddy's

24  released to ProSupplier the advance payment for the three

25  bottles it had ordered, correct?

LCGKFTC6                    Mukhopadhyay – Cross

1   A.  I don't have the date with me, but, you know, it could be

2   correct.

3   Q.  Maybe I can show you a document to refresh your

4   recollection.

5           MR. CASEY:  Can we pull up GX 3390, please.

6   Q.  Do you see GX 3390, Doctor?

7   A.  Yes.

8   Q.  Are you familiar with this?  It's a rather long email

9   chain.  Are you familiar with this?

10  A.  Yes.

11  Q.  In the top email, there is -- this is the email, it

12  appears, you were referencing Monday, November 19, 2018, from

13  Mr. Reddy to you and a number of others, and the email reads,

14  "Good to know the product is received.  Thank you."

15          Do you see that?

16  A.  Yes.

17  Q.  If we could just work backwards on this document and go to

18  the last page of the document, these emails were produced in

19  this form on page 16 and 17.  This is the earliest in time

20  email from -- at the bottom of 16 — that one there — from

21  Ramesh Rachapudi, September 21, 2018, and the next page, here's

22  the PO.

23          Do you see that?

24  A.  Yes.

25  Q.  Is that the purchase order for the --

LCGKFTC6                      Mukhopadhyay - Cross

1    A.  Yes.

2    Q.  -- bottles from ProSupplier?

3    A.  Yes.

4    Q.  So that was on September 19 -- well, September 21st,

5    rather, sorry.  September 21st, 2018, was the purchase order

6    date, correct?

7    A.  Yes.

8    Q.  The next email up, on that page 16, is an email from a

9    Mr. Koteswar Rao.  It says, "Dear Ramesh:  PO has been shared

10   with vendor."

11           Is the vendor ProSupplier?

12   A.  Yes.

13   Q.  "We have instructed vendor all the points which we have

14   discussed before PO, so kindly release the 50 percent advance

15   to vendor."

16           Do you see that?

17   A.  Yes.

18   Q.  And then moving forward again in time up the email chain,

19   there's a number of emails that I'm not going to ask you about,

20   but if we just go up in time --

21           MR. CASEY:  Up to page 9, please, 009.

22   Q.  -- that email there, from Surendra Chirra at Dr. Reddy's,

23   do you see that.

24   A.  Yes.

25   Q.  And, Doctor, are all these people that are on this email

LCGKFTC6                    Mukhopadhyay - Cross

1   chain, are they all Dr. Reddy's employees?

2   A.   Yes.

3   Q.   And this is now October 11, 2018.  He says, "Did we pay the

4   vendor?"

5        So as of October 11, 2018, he's asking whether the

6   vendor has been paid, correct?

7   A.   Yes.

8   Q.   And then if you move up again, to page 007, there's an

9   email from someone VV Parsuram, 29 October, 2018, and it says,

10  "Where are we on this?"

11       Do you see that?

12  A.   Yes.

13  Q.   Then there's a response on the next page up from Mr. Reddy.

14  It says, "Payment made to vendor on 17 October.  Update from

15  vendor on lot availability expected this week."

16       Do you see that?

17  A.   Yes.

18  Q.   So it was not until October 17 that Dr. Reddy's released

19  the advance payment to ProSupplier for the three bottles it had

20  ordered, correct?

21  A.   Yes.

22  Q.   And then moving further up again, to page 002 -- well, the

23  email I want to ask you about is -- I'm sorry, the one on, yes,

24  November 16, 2018.

25       Do you see that?

LCGKFTC6                    Mukhopadhyay - Cross

1   A.   Yes.

2   Q.   "Three bottles shipped and expected to reach Cerovene by

3   Monday.  Please inform them and ask for confirmation on

4   delivery."

5        Do you see that?

6   A.   Yes.

7   Q.   So ProSupplier actually delivered the bottles on

8   November 16, 2018, about a month from the initial payment,

9   correct?

10  A.   Yes.

11  Q.   And you have no basis to believe that if Cerovene or

12  Dr. Reddy's had ordered five bottles instead of three in

13  September 2018, that ProSupplier could not have provided the

14  five bottles, correct?

15  A.   Yes.

16  Q.   Doctor, I'm going to move to another topic now and talk

17  about Dr. Reddy's engagement of Navigant to assist Dr. Reddy's

18  in assessing the generic Daraprim market.

19       Dr. Reddy's did employ Navigant to consult and advise

20  Dr. Reddy's on that; is that right?

21  A.   Yes.

22  Q.   In your direct testimony, at paragraph --

23       MR. CASEY:  Can you put that up again, Justin?

24  Q.   -- at paragraphs 13 and 14, you state in paragraph 13,

25  "Third, in assessing the market opportunity, I did not consider

LCGKFTC6                    Mukhopadhyay – Cross

1   the availability of Bactrim on the market or its pricing.  I

2   did not consider Bactrim to be relevant to my assessment

3   because Bactrim is not AB rated to Daraprim, and thus cannot be

4   automatically substituted by a pharmacist for Daraprim.  I did

5   not consider the price of Bactrim in my analysis."

6           That's your testimony at paragraph 13, correct?

7   A.  Yes.

8   Q.  But in assessing the pyrimethamine market, Navigant

9   actually considered the availability of compounded

10  pyrimethamine, correct?

11          MS. HUBINGER:  Objection; lacks foundation.

12          THE COURT:  I didn't hear you.

13          MS. HUBINGER:  I'm sorry.  It lacks foundation.

14          MR. CASEY:  Your Honor, I'll withdraw the question.  I

15  need to go to the next paragraph.  The objection is

16  well-founded.

17          Just go to paragraph 14.

18  BY MR. CASEY:

19  Q.  You say, "Similarly, I did not consider the availability of

20  compounded pyrimethamine, or its price, on my pricing

21  projections for generic Daraprim.  Compounded pyrimethamine is

22  not automatically substitutable for Daraprim by a pharmacy.

23  Moreover, because compounded drug products are not FDA

24  approved, safety concerns could arise."

25          That's your testimony in paragraph 14, correct?

LCGKFTC6                          Mukhopadhyay – Cross

1    A.   Yes.

2    Q.   Now the question is:  In assessing the pyrimethamine

3    market, Navigant considered the availability of compounded

4    pyrimethamine, correct?

5           MS. HUBINGER:  Again, objection.  I don't know whether

6    Dr.Mukhopadhyay has seen this Navigant --

7           THE COURT:  If you don't know, just say I don't know.

8           THE WITNESS:  Yeah, I don't know.

9    BY MR. CASEY:

10   Q.   I direct your attention to your deposition.

11          MR. CASEY:  If you could pull the deposition up,

12   please, at page 230?

13   Q.   So at paragraph -- or page 230, paragraph 19, you were

14   asked:

15   "Q.  Based on this presentation, the availability of compounded

16   pyrimethamine is something that Navigant considered in making

17   its pricing recommendations?"

18          MS. HUBINGER:  Again, objection, your Honor.

19          THE COURT:  Sustained.

20   Q.   And Navigant identified compounded pyrimethamine as a

21   competing product that was being used to replace Daraprim,

22   correct?

23          MS. HUBINGER:  Again, objection.

24          THE COURT:  Sustained.

25          Just say objection.

LCGKFTC6                    Mukhopadhyay – Cross

1           Sustained.

2    BY MR. CASEY:

3    Q.  Now, in assessing the market opportunity for generic

4    Daraprim, you understood that Daraprim sales had fallen from

5    around 1 million tablets per year to about 150,000 after the

6    price increase in 2015, correct?

7    A.  Yes, based on the analysis that I did.

8    Q.  Some of those Daraprim patients switched to compounded

9    pyrimethamine, correct?

10   A.  Potentially, yes.

11   Q.  Did you say "potentially"?

12   A.  Yes.

13   Q.  Some of them -- some of the patients actually did switch to

14   compounded pyrimethamine, correct?

15           THE COURT:  You're asking for this witness' knowledge?

16           MR. CASEY:  Yes.

17           THE COURT:  Do you know whether patients switched to

18   compounded pyrimethamine?

19           THE WITNESS:  I don't have a personal knowledge, but I

20   would assume, yes.

21   BY MR. CASEY:

22   Q.  In fact, Dr. Reddy's hoped to be able to capture some of

23   the sales that went to compounded products, correct?

24   A.  Yes.

25   Q.  Doctor, I have no --

LCGKFTC6                      Mukhopadhyay - Redirect

1   A.   Sorry.  I would -- I don't think Dr. Reddy's expected to

2   convert some of the patients that went to compounded product,

3   and this goes back to the fact that the compounded product was

4   being sold very cheap.  I think we had one customer even tell

5   us that they would not be sourcing the Daraprim's generic

6   product from Dr. Reddy's.

7   Q.   I'm sorry, you had one customer tell you that they would

8   not be sourcing Daraprim's generic product from Dr. Reddy's.

9   Could you explain that?

10  A.   Yes.  Because they were using the compounded product.

11  Q.   And Dr. Reddy's hoped to be able to capture some of the

12  sales that went to compounded products, correct?

13  A.   Hoped, yes.

14           MR. CASEY:  Doctor, that's all I have.  Thank you very

15  much.

16           MS. HUBINGER:  Thank you, your Honor.  I have a few

17  questions for redirect.

18  REDIRECT EXAMINATION

19  BY MS. HUBINGER:

20  Q.   Good afternoon, Dr.Mukhopadhyay.  Can you hear me okay?

21  A.   Yes.

22           Good afternoon.

23           THE COURT:  You can remove your mask.

24           MS. HUBINGER:  I'm sorry.  I was just told that.

25  Thank you.

LCGKFTC6                    Mukhopadhyay - Redirect

1   BY MS. HUBINGER:

2   Q.  So I'd like to pick up right where the defendants left off.

3        You were talking about a customer that you said was

4   not interested in a generic Daraprim product because it was

5   using a compounded version; is that correct?

6   A.  Yes.

7   Q.  Besides that one customer, did you reach out to any other

8   customers to see whether they would be interested in generic

9   pyrimethamine product?

10  A.  Yes.

11  Q.  How many?

12  A.  I think we reached out to all the major wholesalers and

13  retailers.  I don't remember how many, but all the ones that we

14  thought could source Daraprim.

15  Q.  Do you have, like, a rough range of how many that might be?

16  A.  So there are three major wholesalers.  I believe we reached

17  out to all three of them.

18  Q.  Of the other ones, were any of the others uninterested in a

19  generic version of Daraprim because they used compounded?

20  A.  From what I remember, only one customer told us that.  I

21  think it was Econdisc that told us — Econdisc,

22  E-c-o-n-d-i-s-c — that they were not interested because they

23  were sourcing the compounded product.

24  Q.  But the other customers you spoke to, were they interested

25  in a generic pyrimethamine product?

LCGKFTC6                    Mukhopadhyay - Redirect

1   A.  So I'm trying to remember.  I think some of the customers

2   said they were selling the branded one because that was the

3   only one available.  Some of them said, after the price

4   increase, they were not sourcing the Daraprim anymore.

5   Q.  So, currently, Dr. Reddy's generic product is on the

6   market, right?

7   A.  Yes.

8   Q.  Do you currently sell your generic pyrimethamine product to

9   some of those customers you spoke with?

10  A.  Yes.

11  Q.  How many of them do you sell to?

12  A.  I think -- I don't know off the top of my head.  I believe

13  we sell to the major wholesalers, plus there are smaller

14  customers that we sell to.

15  Q.  Understood.

16          THE COURT:  So, Dr.Mukhopadhyay, I think I lost the

17  chain of questioning here.

18          Did I understand you to say that, at some point,

19  before you went on the market with your generic product --

20          THE WITNESS:  Yes.

21          THE COURT:  -- that competes with the brand

22  Daraprim --

23          THE WITNESS:  Yes.

24          THE COURT:  -- you called certain customers?

25          THE WITNESS:  Yes.

LCGKFTC6                          Mukhopadhyay - Redirect

1              THE COURT:  Did I understand that correctly?

2              THE WITNESS:  Yes.

3              THE COURT:  And you asked those customers, if we put a

4    generic version of Daraprim pyrimethamine on the market, would

5    you be interested?

6              THE WITNESS:  Yes.

7              THE COURT:  That's what you did?

8              THE WITNESS:  Yes.

9              THE COURT:  And what did you learn from those

10   conversations?

11             THE WITNESS:  So from those conversations, at least

12   one customer told us that they were using the compounded

13   version, so they were not interested -- or they were not that

14   excited about the ANDA product.

15             THE COURT:  And I think this attorney asked about the

16   other conversations.

17             THE WITNESS:  Yes.  The other conversations -- so

18   maybe I'll give a little bit of context of why we reached out.

19             So we had looked at Daraprim numbers or the usage

20   numbers from IQVIA, and the numbers had dropped -- after Vyera,

21   or Turing at this point, when they bought the product, the

22   numbers had dropped significantly, so we weren't sure what the

23   usage of the product was.

24             So we had reached out to all customers to see if they

25   were interested, were they using the brand Daraprim.  And

LCGKFTC6                    Mukhopadhyay – Redirect

1    that's how we got to know some of them said we were using the

2    compounded Daraprim, and that one customer had said we are

3    using compounded, so we assume they would not be that

4    interested in buying the ANDA product.  The other customers,

5    some of them said they stopped using Daraprim, some of them

6    said they were still using Daraprim.

7            So, yes, some of them are using, some of them are not

8    using.

9            THE COURT:  I thought you were asked did you inquire

10   of them, these customers, whether they would be interested in a

11   generic pyrimethamine.

12           Did you or didn't you ask?

13           THE WITNESS:  I think the question was more of what

14   were they using --

15           THE COURT:  Aha.

16           THE WITNESS:  -- at that point.

17           THE COURT:  So you wanted to know their current

18   practice?

19           THE WITNESS:  Yes.

20           THE COURT:  Not what they'd be interested in in the

21   future?

22           THE WITNESS:  Future.

23           THE COURT:  Thank you.  Thank you for clearing that up

24   for me.  Thank you.

25           Counsel.

LCGKFTC6                    Mukhopadhyay – Redirect

1          MS. HUBINGER:  Yes, thank you.

2    BY MS. HUBINGER:

3    Q.  Based on the response of those customers, you ultimately

4    decided to pursue a generic Daraprim project?

5    A.  Yes.

6    Q.  Currently, today, you sell to the major wholesalers?

7    A.  Yes.

8    Q.  Okay.  Thank you.

9          So I'd like to shift gears and talk about the RLD

10   sourcing that you spoke with defendants earlier about.

11         Do you recall that conversation, about serving in

12   Dr. Reddy's efforts to source Daraprim RLD?

13   A.  Yes.

14   Q.  Just to orient ourselves again in that timeline, I'd like

15   to start at the beginning of the relationship with Reliant.

16   And I believe we established that the first order was made in

17   February of 2018; is that right?

18   A.  Yes.

19   Q.  Before placing that order with Reliant, had Dr. Reddy's

20   been involved with sourcing Daraprim RLD?

21   A.  No.

22   Q.  Who had been --

23   A.  Cerovene.

24   Q.  And why did Dr. Reddy's decide to get involved helping

25   Cerovene source Daraprim RLD?

LCGKFTC6                    Mukhopadhyay - Redirect

1    A.  So I believe Cerovene had spent probably a month or more

2    trying to source it from this company named S.P., and they were

3    unable to source it.

4    Q.  Did a month seem like a long time to you for sourcing

5    Daraprim RLD?

6    A.  Yes.  Because not only they were unable to source, I don't

7    think they received an answer from S.P. that they will be able

8    to source.

9    Q.  Was it unusual for Dr. Reddy's to get involved in sourcing

10   RLD for one of their in-licensing partners, like Cerovene?

11   A.  Yes.

12   Q.  Why is that unusual?

13   A.  So the partnership was structured such that Cerovene would

14   take all responsibilities for development all the way to

15   getting the ANDA approved, and Dr. Reddy's would be more

16   responsible for the commercialization and marketing of the

17   product.  So, given that arrangement, it is unusual that we

18   would help them for development activities with the sourcing

19   RLD.

20   Q.  One way you helped Cerovene was introducing them to

21   Dr. Reddy's contacts, and you mentioned, I think, when you were

22   discussing it with Mr. Casey, that both Reliant and ProSupplier

23   were Dr. Reddy's contacts?

24   A.  Yes.

25   Q.  And in February 2018, were you choosing between ordering

LCGKFTC6                          Mukhopadhyay - Redirect

1    from ProSupplier and ordering from Reliant?

2    A.   Yes.

3    Q.   Was it your suggestion that Dr. Reddy's choose Reliant?

4    A.   Yes.

5    Q.   And why did you make that suggestion?

6    A.   I believe, at that point, ProSupplier had said -- I don't

7    remember the exact number of weeks; ProSupplier had probably

8    said, like, six weeks, Reliant said three weeks.  And I knew

9    Reliant because we had worked with them in the U.S. and they

10   were based in the U.S. and they set shorter timeline, so we

11   went with Reliant.

12   Q.   So it was your suggestion at Dr. Reddy's to pursue a

13   purchase order with Reliant?

14   A.   Yes.

15   Q.   And that is ultimately what you did in February 2018?

16   A.   Yes.

17   Q.   And in February 2018, how many bottles did you order from

18   Reliant?

19   A.   Five bottles, I believe.

20   Q.   And did you have to prepay for those?

21   A.   Yes.

22   Q.   Do you recall about how much you had to prepay?

23   A.   I think it must have been $375,000.

24   Q.   If you had chosen to source from ProSupplier in

25   February 2018 instead of Reliant, would you have had to prepay

LCGKFTC6                     Mukhopadhyay – Redirect

1    for those five bottles as well?

2    A.   Yes.

3    Q.   And, at that point — we're in February 2018 — the beginning

4    of Dr. Reddy's involvement, the search for Daraprim RLD, why

5    didn't you choose to source from both ProSupplier and Reliant

6    at the same time?

7    A.   It was a significant amount of money, and given Cerovene

8    already had issues trying to source from one company, we didn't

9    want to start paying two companies for RLD which we didn't know

10   whether they would be able to source.

11   Q.   When you initially ordered five bottles of Daraprim RLD

12   from Reliant in February 2018, how long did you expect it to

13   take to get those five bottles?

14   A.   I think they had said it was going to be three or four

15   weeks.  I don't remember the exact timeline, but they had said

16   in an email to Mallikarjun, or the Dr. Reddy's contact, that

17   they would be able to source within I believe it was three or

18   four weeks.  I don't remember the exact...

19   Q.   But I recall you talking with Mr. Casey that they were only

20   able to deliver one bottle in July of 2018; is that right?

21   A.   Yes.

22   Q.   At any point before they delivered that one bottle, did you

23   consider switching?

24   A.   Yes.

25   Q.   And who did you consider switching to?

LCGKFTC6                    Mukhopadhyay - Redirect

1   A.   ProSupplier.

2   Q.   Did you ultimately decide to continue sourcing from

3   Reliant?

4   A.   Yes.

5   Q.   Why?

6   A.   I believe Reliant communicated to -- and this was, again, I

7   heard it through Manish, that ProSupplier was trying to source

8   the bottles through Reliant, so we believed that they didn't

9   have an independent source.

10  Q.   After Reliant delivered that one bottle, in July of 2018,

11  you eventually decided, in September, to place a purchase order

12  with ProSupplier; is that right?

13  A.   Yes.

14  Q.   And that purchase order was for three bottles?

15  A.   Yes.

16  Q.   And at that time, you had both a purchase order with

17  ProSupplier and a purchase order with Reliant open?

18          MR. CASEY:  Your Honor, objection; she's leading the

19  witness.

20          THE COURT:  Sustained.

21          MS. HUBINGER:  Okay, sorry.  I'm just trying to

22  reorient ourselves here.

23  BY MS. HUBINGER:

24  Q.   In September of 2018, who did you have RLD purchase orders

25  open with?

1   A.  I believe we had it with both companies, Reliant and

2   ProSupplier.

3   Q.  Earlier, you testified that there was a financial risk to

4   having both orders.

5          Why, at that time, did you decide to take the

6   financial risk of placing a purchase order with both companies?

7   A.  So two reasons.

8          One, a significant time had passed, and we were still

9   not able to source the bottles.

10          And, second, at that point, we were looking for three

11  bottles versus five bottles, so it was a lower risk from a

12  financial perspective.

13  Q.  Leading up to the September 2018 order with ProSupplier,

14  were you personally communicating with anyone at ProSupplier?

15  A.  No.

16  Q.  Do you know who at Dr. Reddy's or Cerovene would have been

17  in contact with ProSupplier?

18  A.  I would think it was Mallikarjun Reddy or someone from his

19  team.

20  Q.  Would anyone at Cerovene have been involved, too?

21  A.  With ProSupplier?  I don't think so.

22  Q.  Okay.  Do you know whether or not ProSupplier was able to

23  supply more than three bottles of Daraprim RLD in

24  September 2018?

25  A.  We placed an order for three bottles.  We didn't place an

LCGKFTC6                          Mukhopadhyay – Redirect

1    order beyond that, so I don't know.  I cannot say one way or
2    the other.
3    Q.  I'd like to jump topics again to something that the
4    defendants covered earlier, and that was your portion of your
5    written direct testimony discussing Cerovene's API supply
6    source.  I want to talk a little bit about your due diligence
7    process, when you're evaluating an in-licensing partner.
8            Were you responsible, in your role at Dr. Reddy's, for
9    doing due diligence on Cerovene when you were considering a
10   project together?
11   A.  Yes.
12   Q.  Was part of that due diligence looking at API supply?
13   A.  So, in general, no, but in the specific case, since
14   Cerovene had a communication from the FDA that their ANDA was
15   not approved because of the API supply, so, yes, we did.
16   Q.  And why, in this particular case, is API important to you?
17   A.  Because the ANDA would not be approved by FDA without API.
18   Q.  As part of your diligence process, did you ask Cerovene
19   about its source for API?
20   A.  Yes.
21   Q.  At the time you signed the memo recommending Cerovene to
22   become a partner of Dr. Reddy's, who was Cerovene's API
23   supplier?
24   A.  So, originally, the API supplier was Ipca, and they had
25   also found RL Fine, which was their substitute supplier.

LCGKFTC6                    Mukhopadhyay – Redirect

1   Q.  So at the time you recommended entering a partnership with

2   Cerovene, had they identified an API supplier?

3   A.  Yes; RL Fine.

4   Q.  Was that an important part of your decision to --

5   A.  Yes.

6   Q.  -- recommend them?

7   A.  And that is why we took between March to January to sign

8   the agreement.

9   Q.  As part of your due diligence, did you consider whether

10  RL Fine was a reliable source of API?

11  A.  I wouldn't -- yeah, so we -- because Cerovene was

12  responsible for managing the API source, we did not get into

13  reliability, but we knew that RL Fine was an API supplier based

14  out of India and all the details.

15  Q.  How did you know that?

16  A.  Through Cerovene.  But then, of course, we found out

17  RL Fine exists in India, and we did some diligence on the side.

18  Q.  When you say some diligence on the side, what do you mean

19  by that?

20  A.  Like, we knew whether -- it was a lone supplier in India

21  and the API that they were supplying, like, to other countries,

22  so those things we found out.

23  Q.  Did those things impact your decision to recommend a

24  partnership with Cerovene?

25  A.  Yes.  We knew that they had -- they were manufacturing the

LCGKFTC6

1   API for other countries, so we thought they would be reliable.

2   Q.  And before RL Fine, had Cerovene considered any other API

3   suppliers?

4   A.  Yes.

5   Q.  Which one, or others?

6   A.  They had considered Fukuzyu.

7   Q.  If they hadn't been able to use Fukuzyu, would you have

8   considered them a reliable source of API?

9   A.  Yes.

10  Q.  Why?

11  A.  Because they were supplying to the brand.

12          MS. HUBINGER:  Just one moment more.

13          (Pause)

14          MS. HUBINGER:  I don't think I have any further

15  questions.  Thank you very much for your time,

16  Dr. Mukhopadhyay.

17          THE COURT:  Any recross?

18          MR. CASEY:  No recross, your Honor.  Thank you.

19          THE COURT:  Thank you.

20          Thank you very much.  You may stand down.

21          (Witness excused)

22          THE WITNESS:  Thank you.

23          THE COURT:  Next witness.

24          MR. MEIER:  Your Honor, the government calls as its

25  next witness Edward Conroy, who's an expert witness.  And for

LCGKFTC6

1    the government, Mr. Conroy will be handled by my colleague

2    attorney Armine Black.

3            THE COURT:  Mr. Conroy, come on up and take the

4    witness stand, if you would, and remain standing.

5    EDWARD VINCENT CONROY,

6        called as a witness by the Plaintiffs,

7        having been duly sworn, testified as follows:

8            THE COURT:  Please state your full name.

9            THE WITNESS:  Edward Vincent Conroy.

10           THE COURT:  How do you spell your last name?

11           THE WITNESS:  C-o-n-r-o-y.

12           THE COURT:  I think you're about to be shown your

13   affidavit, which is GX 8002.  I'm going to ask you, please, to

14   look at the last page of your affidavit, which I think is page

15   38, and I want to know if you authorized your electronic

16   signature to be put on the last page of the affidavit?

17           THE WITNESS:  Yes, your Honor.

18           THE COURT:  Before you did that, did you read this

19   document with care?

20           THE WITNESS:  Yes, your Honor.

21           THE COURT:  Do you swear to the truth of the

22   statements in it?

23           THE WITNESS:  Yes, your Honor.

24           THE COURT:  Any objection to receipt of 8002?

25           MR. PARKS:  Your Honor, Manly Parks on behalf of the

LCGKFTC6                    Conroy - Cross

1  Defendant Shkreli, and there is no objection.

2          THE COURT:  Thank you.

3          GX 8002 is received.

4          (Government's Exhibit 8002 received in evidence)

5          THE COURT:  Cross-examination?

6          MX. BLACK:  Your Honor, before we begin the

7  cross-examination, plaintiff would like to move in two exhibits

8  attached to the affidavit.  It's Exhibits GX 7002 and GX 7003.

9  Those are summary exhibits summarizing certain terms of

10 Daraprim distribution contracts.

11         THE COURT:  Any objection?

12         MR. PARKS:  Your Honor, no objection.

13         THE COURT:  They are received.

14         (Government's Exhibits 7002, 7003 received in

15 evidence)

16 CROSS-EXAMINATION

17 BY MR. PARKS:

18 Q.  Good afternoon.  My name is Manly Parks.  I'm part of the

19 team of attorneys representing Mr. Shkreli in this matter.

20         Sir, first, let me ask you:  Other than this case,

21 have you ever been retained as an expert witness on any topic

22 having to do with pharmaceutical distribution?

23 A.  No.

24 Q.  You have never --

25         THE COURT:  That is a thrilling statement.  That is so

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCGKFTC6                        Conroy - Cross

1    unusual, so thank you.

2    Q.  You have never published any articles or other publications

3    related to the distribution of pharmaceuticals, have you?

4    A.  No.

5    Q.  You have not, correct?

6    A.  Correct.

7    Q.  You have never conducted any sort of industry survey

8    related to the distribution of pharmaceuticals, have you?

9    A.  No.

10   Q.  You have not conducted any sort of formal market analysis

11   related to pharmaceutical distribution, have you?

12   A.  No.

13   Q.  Sir, you worked for more than 25 years for the company that

14   owned Daraprim historically, correct?

15   A.  Yes, I worked for Burroughs Wellcome.

16   Q.  And you refer to that company and its corporate successors

17   in your direct testimony, generally, as GSK, correct?

18   A.  Yes.  We were acquired by Glaxo.  Glaxo then became

19   GlaxoSmithKline.

20   Q.  Sir, when I use the term "GSK," I'm going to adopt the same

21   definition you used for that term in your direct testimony.

22           Is that okay with you?

23   A.  Yes.

24   Q.  And you will understand, when I'm referring to GSK, I'm

25   referring to that same group of corporate successors?

LCGKFTC6                    Conroy - Cross

1   A.   Yes.

2   Q.   In your direct testimony, you discuss your experience at

3   GSK with drug distribution.

4        During your time with GSK, you never made any

5   recommendations with respect to the distribution of Daraprim,

6   did you?

7   A.   No.

8   Q.   During your time with GSK, you were never tasked with

9   conducting a review of GSK's distribution practices

10  specifically regarding Daraprim, were you?

11  A.   Specifically tasked?  No.  But as part of drug development

12  and marketing committees, we would discuss the various products

13  at Burroughs Wellcome and Glaxo, whether I was distribution,

14  whether issues that needed to be solved -- so without issues,

15  no particular study was asked for.

16             THE COURT:  So, counsel, I'm going to ask you to move

17  that mic a little bit.  Great.  Thank you.

18             MR. PARKS:  Is that okay?

19             THE COURT:  Yes.  I think there's a little feedback

20  when you're leaning into it.

21             MR. PARKS:  I'm sorry.

22             THE COURT:  So move it where it's comfortable for you.

23             Good.  Thank you.

24             MR. PARKS:  Yes.

25  BY MR. PARKS:

LCGKFTC6                    Conroy - Cross

1   Q.  Sir, by the time you joined GSK, the distribution model for

2   Daraprim had already been established, correct?

3   A.  Pretty much since 1953, I believe.

4   Q.  So you don't have any personal knowledge concerning the

5   reasons that GSK selected that distribution model for Daraprim,

6   do you?

7   A.  When it first started, I was six years old, so, no, sir.

8   Q.  In your direct testimony, you referred to your experience

9   with market research and analysis while you were with GSK?

10  A.  Yes.

11  Q.  During the time you were employed by GSK, you never did any

12  market analysis specifically on Daraprim, did you?

13  A.  Not that I recall.

14           THE COURT:  Okay.  So maybe I misidentified the

15  feedback.

16           THE WITNESS:  I'm --

17           THE COURT:  Okay, good.  So let's adjust it so it's

18  good for everyone.  Thank you.

19  BY MR. PARKS:

20  Q.  Sir, during your time as an assistant to the marketing

21  services manager at GSK, your duties included being a product

22  planner for certain of GSK's products, correct?

23  A.  Yes.

24  Q.  During the time you were employed by GSK, you were never a

25  product planner for Daraprim, were you?

LCGKFTC6                    Conroy - Cross

1    A.   No.

2    Q.   From 1983 to 1988, your responsibilities at GSK related to

3    consumer products, correct?

4    A.   What years, again?

5    Q.   1983 to 1988.

6    A.   That's approximately right, yes.

7    Q.   During that period of time where your responsibilities at

8    GSK related to consumer products, you did not have any specific

9    responsibilities relating to Daraprim, did you?

10   A.   No.

11   Q.   From 1988 to 1995, or approximately those date ranges, you

12   were a national account trade development manager at GSK,

13   correct?

14   A.   Yes.

15   Q.   During that period, you did not have any specific

16   responsibilities related to Daraprim other than that it was

17   included on the price lists you used with those accounts,

18   correct?

19   A.   Yes.  It was in my purview to make a recommendation,

20   monitor, whatever, like any of the other drugs on that price

21   list.

22   Q.   But other than that, you didn't have any other specific

23   responsibilities related to Daraprim during that time, correct?

24   A.   No.

25   Q.   Well, it's incorrect or it's correct?

LCGKFTC6                      Conroy - Cross

1   A.   No -- yes, you're correct.

2   Q.   Thank you.

3           THE COURT:  So let's move that mic back.

4           Good.

5           THE WITNESS:  How's that?

6           THE COURT:  Let's try it there.

7   BY MR. PARKS:

8   Q.   Sir, during that same period of time, from 1988 to 1995,

9   you have no recollection of any specific conversations

10  regarding Daraprim; is that correct?

11  A.   No specific conversations.

12  Q.   From 1997 through 1998, you were a marketing director for

13  GSK's skincare division, correct?

14  A.   Yes.

15  Q.   During that period of time, you did not have any

16  responsibility for Daraprim, did you?

17  A.   No, but I did get involved in distribution of the skincare

18  products.

19  Q.   From 1998 to 2000, you were a senior district sales manager

20  for GSK, correct?

21  A.   Yes.

22  Q.   During that period, other than the fact that Daraprim was

23  included on price lists you used, you don't recall doing

24  anything specifically related to Daraprim, do you?

25  A.   No.

LCGKFTC6                    Conroy – Cross

1   Q.  Your last position with GSK, during the period 2000 to

2   2001, was as a senior manager of professional healthcare

3   communications, correct?

4   A.  Yes.

5   Q.  During that period, once again, you did not have any

6   specific responsibilities related to Daraprim, did you?

7   A.  No.  Daraprim was not what's considered a -- they were not

8   spending marketing dollars to promote the use of Daraprim, so

9   there was nothing -- you know, it was doing so well in the

10  distribution channels, there was no activity needed.

11  Q.  During your time, sir, at GSK, you did not have any

12  personal knowledge of reports of adverse events related to

13  Daraprim because those would have been reported to medical, not

14  to any of the positions you held, correct?

15  A.  Correct, in the fact that I was also on anti-infective --

16  we launched Retrovir, AZT, during that time period, so I was

17  part of distribution, marketing, medical, production,

18  committees; and if there were issues with any of those drugs,

19  they would have been discussed during those meetings.

20          And I do not recall any issues with Daraprim, even

21  though Daraprim is commonly used with HIV patients.

22  Q.  Sir, you would agree, wouldn't you, that during your time

23  at GSK, a medical question or concern could have been raised

24  about Daraprim but you simply did not become aware of it

25  because it was not reported to you; isn't that right?

LCGKFTC6                    Conroy - Cross

1   A.  Yes, sir.

2           MR. PARKS:  Your Honor, we're at about 5:00 o'clock.

3   I'm about to move beyond the background section.  This would be

4   an appropriate time if it's comfortable for your Honor; if not,

5   I can continue with some questions.

6           THE COURT:  No, I think we've all had a nice long day.

7           Again, this is subject to change.  If my consultations

8   lead to different numbers, I'll give you those in the morning.

9   The defendant has pulled ahead of the plaintiffs, and I have

10  seven hours and 17 minutes for the plaintiffs and eight hours

11  and 46 minutes for the defendant.

12          So we're a little ahead of our five hours a day, which

13  means we're on target.  I don't know if you're on target with

14  your witness lists; that's a separate issue.  And I wish you

15  all a good evening.

16          Give me just a moment here to take some materials with

17  me.

18          Thank you, everyone.

19          (Adjourned to December 17, 2021 at 9:30 a.m.)

20                             *  *  *

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                                Page

3    FRANK DELLA FERA

4    Cross By Mr. Pollack . . . . . . . . . . . . . 448

5    Redirect By Mr. Perlman  . . . . . . . . . . . 486

6    Recross By Mr. Pollack . . . . . . . . . . . . 508

7    Redirect By Mr. Perlman  . . . . . . . . . . . 514

8    Redirect By Mr. Perlman  . . . . . . . . . . . 525

9    Recross By Mr. Pollack . . . . . . . . . . . . 526

10   SUSAN McDOUGAL

11   Cross By Mr. Pollack . . . . . . . . . . . . . 546

12   Redirect By Mr. Perlman  . . . . . . . . . . . 580

13   Recross By Mr. Pollack . . . . . . . . . . . . 583

14   ABHISHEK MUKHOPADHYAY

15   Cross By Mr. Casey . . . . . . . . . . . . . . 592

16   Redirect By Ms. Hubinger . . . . . . . . . . . 628

17    EDWARD VINCENT CONROY

18   Cross By Mr. Parks . . . . . . . . . . . . . . 643

19                       GOVERNMENT EXHIBITS

20   Exhibit No.                                 Received

21    9058   . . . . . . . . . . . . . . . . . . . 440

22    9059   . . . . . . . . . . . . . . . . . . . 441

23    9060   . . . . . . . . . . . . . . . . . . . 441

24    9061   . . . . . . . . . . . . . . . . . . . 442

25    9062   . . . . . . . . . . . . . . . . . . . 442

1    5005   . . . . . . . . . . . . . . . . . . . 446

2    5013   . . . . . . . . . . . . . . . . . . . 446

3    9002   . . . . . . . . . . . . . . . . . . . 447

4    3056   . . . . . . . . . . . . . . . . . . . 463

5    3176   . . . . . . . . . . . . . . . . . . . 477

6    3286   . . . . . . . . . . . . . . . . . . . 507

7    8008   . . . . . . . . . . . . . . . . . . . 536

8    3469   . . . . . . . . . . . . . . . . . . . 551

9    3106   . . . . . . . . . . . . . . . . . . . 577

10   3246   . . . . . . . . . . . . . . . . . . . 588

11   3192   . . . . . . . . . . . . . . . . . . . 589

12   8009   . . . . . . . . . . . . . . . . . . . 591

13   8002   . . . . . . . . . . . . . . . . . . . 643

14   7002, 7003   . . . . . . . . . . . . . . . . 643

15                    DEFENDANT EXHIBITS

16   Exhibit No.                          Received

17   119   . . . . . . . . . . . . . . . . . . . 463

18   121   . . . . . . . . . . . . . . . . . . . 465

19   291   . . . . . . . . . . . . . . . . . . . 567

20   160   . . . . . . . . . . . . . . . . . . . 600

21   168   . . . . . . . . . . . . . . . . . . . 617

22

23

24

25

LCHKFTC1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    FEDERAL TRADE COMMISSION,
3   STATE OF NEW YORK, STATE OF
    CALIFORNIA, STATE OF OHIO,
4   COMMONWEALTH OF PENNSYLVANIA,
    STATE OF ILLINOIS, STATE OF
5   NORTH CAROLINA, and
    COMMONWEALTH OF VIRGINIA,
6
                Plaintiffs,
7        v.                          20 CV 706 (DLC)

8   MARTIN SHKRELI, et al.,

9               Defendants.
    ------------------------------x
10                                   New York, N.Y.
                                     December 17, 2021
11                                   9:30 a.m.
    Before:             HON. DENISE COTE,
12                                   District Judge
                            APPEARANCES
13
    FEDERAL TRADE COMMISSION
14  BY:  MARKUS H. MEIER
         MAREN HANEBERG
15       BRADLEY S. ALBERT
         LAUREN PEAY
16       NEAL PERLMAN
         MATT WEPRIN
17       ARMINE BLACK
         AMANDA TRIPLETT
18       LEAH HUBINGER
         JAMES WEINGARTEN
19
    NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
20  BY:  ELINOR R. HOFFMANN
         JEREMY R. KASHA
21       AMY E. McFARLANE

22  DUANE MORRIS LLP
         Attorneys for Shkreli
23  BY:  CHRISTOPHER H. CASEY
         JEFFREY S. POLLACK
24       ANDREW J. RUDOWITZ
         SARAH FEHM STEWART
25       SEAN McCONNELL
         J. MANLY PARKS
```

LCHKFTC1

1            (In open court)

2            THE COURT:  Good morning, everyone.

3            COUNSEL:  Good morning.

4            THE COURT:  The witness can take the stand.

5            THE WITNESS:  Good morning, your Honor.

6            THE COURT:  Good morning.  I remind you, you're still

7    under oath.

8            Mr. Meier.

9            MR. MEIER:  Good morning, your Honor.  Markus Meier,

10   on behalf of the FTC.

11           We would like to move some documents and exhibits in,

12   if that's possible?

13           THE COURT:  Sure.

14           MR. MEIER:  So the first one we'd like to move in is

15   actually a cleanup from yesterday.  It's the exhibits related

16   to the testimony of Mr. Mukhopadhyay that are cited in his

17   declaration.  You'll recall he testified yesterday, your Honor.

18           THE COURT:  You're going to have to keep your voice

19   up.

20           MR. MEIER:  I'm sorry.  Yes, your Honor, sorry.

21           THE COURT:  To make sure every word is heard.

22           MR. MEIER:  Yes, your Honor.

23           This is Government Exhibit 9010, and it's the exhibits

24   related to the declaration of Mr. Mukhopadhyay, who testified

25   yesterday.

LCHKFTC1

1          THE COURT:  Any objection to the receipt of GX 9010

2    with the exhibits listed therein?

3          MR. RUDOWITZ:  Good morning, your Honor.  AJ Rudowitz,

4    on behalf of Mark Shkreli.

5          No objection.

6          THE COURT:  Thank you.

7          They are received.

8          (Government's Exhibit 9010 with exhibits listed

9    therein received in evidence)

10         MR. MEIER:  The next one, your Honor, is Government

11   Exhibit 9003.

12         THE COURT:  Any objection to the receipt of GX 9003,

13   with the exhibits listed therein?

14         MR. POLLACK:  Your Honor, Jeff Pollack.

15         None subject to your prior rulings.  Thank you.

16         THE COURT:  Thank you.

17         GX 9003, with the exhibits listed therein, are

18   received.

19         (Government's Exhibit 9003 with the exhibits listed

20   therein received in evidence)

21         MR. MEIER:  The next one, your Honor, is Government

22   Exhibit 9005, which is our fifth listed exhibit to be admitted.

23         THE COURT:  Any objection to the receipt of GX 9005

24   and each of the exhibits listed therein?

25         MR. POLLACK:  Jeff Pollack, your Honor.

656

LCHKFTC1

1                None subject to your prior rulings.  Thank you.

2                THE COURT:  Thank you.

3                They are received.

4                (Government's Exhibits 9005 with the exhibits listed

5      therein received in evidence)

6                MR. MEIER:  Your Honor, the next is Government Exhibit

7      9009.

8                THE COURT:  Any objection to the receipt of GX 9009

9      and the exhibits listed therein?

10               MR. POLLACK:  None subject to your prior rulings, your

11     Honor.  Thank you.

12               THE COURT:  Thank you.

13               They are received.

14               (Government's Exhibit 9009 with the exhibits listed

15     therein received in evidence)

16               MR. MEIER:  The next, your Honor, is Government

17     Exhibit 9065.  It's the designations for the transcript of

18     Nancy Retzlaff, and -- let me hand it up.  I apologize.

19     Apparently, there are only two copies.  Sorry.

20               THE COURT:  Any objection to the receipt of GX 9065?

21               MR. POLLACK:  No, your Honor.

22               THE COURT:  Received.

23               (Government's Exhibit 9065 received in evidence)

24               MR. MEIER:  The next, your Honor, is Government

25     Exhibit 9064, and it's the designations -- revised transcript

LCHKFTC1

1    designations of Dennis Saadeh, S-a-a-d-e-h, from a company

2    called Harrow, H-a-r-r-o-w.

3                THE COURT:  Any objection to the receipt of GX 9064?

4                MR. POLLACK:  No, your Honor.

5                THE COURT:  And this one has some notations about

6    withdrawn passages.

7                MR. MEIER:  That is correct, your Honor.  It updates

8    what we submitted back in October.

9                THE COURT:  Received.

10               (Government's Exhibit 9064 received in evidence)

11               MR. MEIER:  The next is Government Exhibit 9063.

12               THE COURT:  Any objection to the receipt of GX 9063?

13               MR. POLLACK:  No, your Honor.

14               THE COURT:  Received.

15               (Government's Exhibit 9063 received in evidence)

16               MR. MEIER:  For the purposes of the court reporter,

17   this is the transcript of the deposition of Ann Kirby,

18   K-i-r-b-y, from Vyera.

19               This one, your Honor, is Government Exhibit 5009.

20   It's the transcript of the investigational hearing of Ann Kirby

21   from Vyera, and, similar to yesterday, we are submitting the

22   entire investigational hearing transcript, though we did submit

23   to the Court, back in October, a highlighted version, but for

24   the similar reasons we had the discussion yesterday, defendants

25   object to the admission of just the highlighted portions.  So

LCHKFTC1

1    we're admitting the entire investigational hearing transcript.

2    I'm not sure if defendants want to be heard on that issue again

3    today.

4              THE COURT:  Well, obviously, this is evidence being

5    offered by the plaintiffs, so the plaintiffs are consenting to

6    the offer of the entire transcript?

7              MR. MEIER:  That's right, your Honor, just for

8    administrative ease, but I also wanted to point out to the

9    Court that there is a highlighted version in the October

10   submissions.

11             THE COURT:  Yes.  Thank you.

12             Any objection to the receipt of GX 5009?

13             MR. POLLACK:  Nothing beyond what we discussed

14   yesterday, your Honor.

15             THE COURT:  Thank you.

16             It is received.

17             (Government's Exhibit 5009 received in evidence)

18             MR. MEIER:  And the very last one, your Honor, for

19   today, this is Government Exhibit 5011, and it's the transcript

20   of the investigational hearing of Akeel Mithani from Vyera.

21   And, again, this is an investigational hearing transcript.

22   We're submitting the entire transcript today, but we also

23   submitted to the Court, in October, highlighted versions.

24             THE COURT:  Any objection to receipt of GX 5011?

25             MR. POLLACK:  Nothing beyond what we've already

LCHKFTC1                    Conroy - Cross

1    discussed, your Honor, yesterday.

2            THE COURT:  It is received.

3            (Government's Exhibit 5011 received in evidence)

4            MR. MEIER:  Thank you, your Honor.  Plaintiffs are

5    prepared to proceed.

6            MR. PARKS:  Good morning, your Honor; good morning,

7    Mr. Conroy.

8            THE WITNESS:  Good morning.

9     EDWARD VINCENT CONROY,

10   CROSS-EXAMINATION CONTINUED

11   BY MR. PARKS:

12   Q.  Sir, I want to ask you some questions, first, this morning

13   on reference-listed drugs used in bioequivalence testing.

14           First, are you familiar with the term

15   "reference-listed drug," or RLD?

16   A.  Yes.

17   Q.  You are also generally familiar with the concept of the use

18   of an RLD in bioequivalence testing, correct?

19   A.  Yes.

20   Q.  You don't have any experience working with procurement

21   firms to obtain RLD for use in bioequivalence testing, do you?

22   A.  No.

23   Q.  You have never sought a waiver from the FDA regarding the

24   amount of RLD needed to perform bioequivalence testing, have

25   you?

LCHKFTC1                        Conroy – Cross

1   A.   No.  We had testimony to that effect.

2   Q.   You also have never worked with a client to seek a waiver

3   from the FDA regarding the amount of RLD needed to perform

4   bioequivalence testing, have you?

5   A.   Not that I recall.

6   Q.   Sir, are you a medical doctor?

7   A.   No.

8   Q.   Do you know the basis for the addition of toxoplasmosis as

9   an indication for Daraprim?

10  A.   Could you repeat that question, please?

11  Q.   Sure.

12          Do you know the basis for the addition of

13  toxoplasmosis as an indication for Daraprim?

14  A.   I'm not familiar with the original indications.  I was at

15  Burroughs Wellcome, and I do not think that occurred during my

16  time.  Yes, I do not know.

17  Q.   Okay.

18          Sir, you do not have any specific knowledge concerning

19  medical treatments for toxoplasmosis other than Daraprim, do

20  you?

21  A.   I'm trying to think about that.

22          At Burroughs Wellcome, the early GSK, and with the

23  launch of Retrovir, I was -- and as a medical center rep,

24  heavily trained by the Wellcome.  I had some familiarity, or

25  was trained in some of the familiarity, with uses of that drug

LCHKFTC1                    Conroy - Cross

1   and other drugs.  We had a drug called Septra.

2            THE COURT:  So, counsel, I just want to remind you

3   that, at your choice, you may, if you wish, remove your mask

4   while at the lectern.

5            MR. PARKS:  Thank you.  I forgot to do that.

6   BY MR. PARKS:

7   Q.  Sir, just to make sure we're clear on this, you were

8   deposed in this case on July 14, 2021, correct?

9   A.  Yes.

10  Q.  And do you recall you were asked a question about this

11  issue, what knowledge you had concerning medical treatments for

12  toxoplasmosis other than Daraprim?

13  A.  Yes.

14  Q.  Do you remember that your testimony, when you were asked,

15  "Is the answer to the question that you do not have any

16  knowledge concerning treatments for toxoplasmosis other than

17  Daraprim," was "Not specifically, no"?  Does that sound right

18  to you?

19  A.  Yes.

20  Q.  And that's your testimony here today?

21  A.  Yes.

22  Q.  Sir, you don't have any expertise in the use of Daraprim

23  for the treatment of toxoplasmosis, do you?

24  A.  I haven't studied the package insert.  I do know it's three

25  times a day dosage.

LCHKFTC1                    Conroy – Cross

1   Q.  But you don't have any expertise in the use of Daraprim for

2   the treatment of toxoplasmosis, do you?

3   A.  Not directly, no.

4   Q.  You are not familiar with Daraprim's side effects, are you?

5   A.  Not that I could recite to you.

6   Q.  Sir, you have no experience with the risk profile of

7   Daraprim, do you?

8   A.  I would say, actually, I have a reasonable amount of

9   familiarity in the sense of, since 1975, all my days at GSK,

10  nothing arose to my attention through these medical committees

11  I mentioned yesterday that I worked on, joint committees.

12  There was never any HIV drugs.  It never rose to a level that I

13  recall, and from that, I would assume there weren't any new or

14  significant issues with Daraprim, and there would have been

15  some FDA letters that I would think the plaintiffs might

16  have –- that may have come to light during this testimony,

17  because something new, then the FDA sends a letter out, and I

18  think you're familiar with that.

19  Q.  Sir, do you recall at your deposition, back in July, you

20  were asked, "Do you have any" experience -– I'm sorry,

21  "expertise in the risk profile of Daraprim?"

22          And your answer was, "Specifically, no"?

23  A.  Yes.

24  Q.  And that's your testimony here today?

25  A.  Yes.  It might have –- you know, you continue to read all

LCHKFTC1                    Conroy - Cross

1    this material, and little things, after all these years, you

2    know, slowly pop into your mind.  But, in general, that is

3    true.

4    Q.  Sir, you are not familiar with Daraprim's side effects, are

5    you?

6    A.  Not directly, no.

7    Q.  In preparing your report, you did not review adverse events

8    that had been reported to the FDA regarding Daraprim, did you?

9    A.  No.  I reviewed all the documents, and I don't -- as I

10   said, as a distribution expert, I'm able to read all that.  I

11   did not see anything that even suggested there was reports to

12   the FDA and there was actions being taken either by GSK or any

13   of the other -- that GSK had to deal with.

14   Q.  You didn't review all the documents in this case, did you,

15   sir?

16   A.  The ones that are listed in the -- that were shared with

17   me, yes.

18   Q.  And the FDA told you or sent you those documents, didn't

19   it?

20            THE COURT:  FDA or FTC?

21            MR. PARKS:  I'm sorry, the FTC.  Thank you.

22            THE WITNESS:  Yes, the source of the documents were

23   the FTC.

24   BY MR. PARKS:

25   Q.  Thank you.

LCHKFTC1                    Conroy - Cross

1          In preparing your report, you did not have any
2     information regarding the number of adverse events reported to
3     the FDA regarding Daraprim, did you?
4     A.   No.
5     Q.   Now, I want to talk a little bit about the scope of your
6     assignment here.
7          In this engagement, you were not asked to opine on
8     whether any specific generic manufacturer tried to purchase
9     Daraprim directly from Vyera, were you?
10    A.   No.
11    Q.   You also were not asked to offer an opinion on whether any
12    of Vyera's distribution practices, in fact, delayed market
13    entry by any specific generic manufacturer, were you?
14    A.   Please repeat the question?
15    Q.   Sure.
16         You were not asked to offer an opinion on whether any
17    of Vyera's distribution practices, in fact, delayed market
18    entry by any specific generic manufacturer, were you?
19    A.   I was not asked to opine, but in -- if you can find it --
20    Q.   Well, I can stop you right there.  That's my question.
21    A.   All right.
22    Q.   You were also not asked to opine on whether data blocking,
23    in fact, caused a delay in market entry by any specific generic
24    manufacturer, were you?
25    A.   Did you say "opine"?  No, I was not asked to opine.

LCHKFTC1                    Conroy - Cross

1   Q.  Sir, you were not asked to offer any opinion regarding

2   whether Vyera's distribution partners were motivated by any

3   anticompetitive intent, were you?

4   A.  No.

5   Q.  In fact, you don't consider yourself able to gauge anyone's

6   intent in this case, do you?

7   A.  No.

8   Q.  So you were not offering any opinion regarding Vyera's

9   intent, correct?

10  A.  No.

11  Q.  No, it's incorrect or, no, you are not offering such an

12  opinion?

13  A.  I was not asked to offer such an opinion.

14  Q.  And you are not offering one, correct?

15  A.  No.

16  Q.  No, that's not correct?

17  A.  I'm not offering an opinion.

18  Q.  Okay.

19          You are also not offering an opinion regarding the

20  intent of any shareholder of Vyera, are you?

21  A.  No.  I was asked -- you know what I was asked to do.  I was

22  asked to assess their distribution policies and practices.

23  Q.  Now, let's talk about what you were asked to offer an

24  opinion on.

25          You were asked to offer an opinion in this case with

LCHKFTC1                    Conroy - Cross

1    respect to whether Vyera's distribution system and practices

2    for Daraprim are consistent with pharmaceutical industry norms,

3    correct?

4    A.  Correct.

5    Q.  My question for you is this:  You told us yesterday that

6    you did not undertake any formal analysis of the pharmaceutical

7    industry in connection with your work on this project, right?

8    A.  For nearly 45 years, that's all I did, was -- or it was an

9    integral part of what I was doing with clients.  I was

10   assessing ways to distribute drugs in such a way that would

11   maximize patient benefits and sales.  And based upon all that

12   experience, I attended over 20, maybe -- various meetings with

13   the distributors, specialty distributors, specialty pharmacies,

14   NCPDP, which is a group that sets standards for National

15   Council of Prescription Drug Programs.

16           So because of my unique position of having all these

17   positions — from market research, to brand manager, to

18   distribution, to sales manager — all these things kind of give

19   me a very, I believe, unique position that I could assess their

20   practices based upon years and years of experience.

21   Q.  I understand that, sir, but my question --

22           THE COURT:  Excuse me, counsel.

23           So, Mr. Conroy, I appreciate this is your first time

24   as an expert on the stand.

25           THE WITNESS:  Thank you.

LCHKFTC1                    Conroy - Cross

1          THE COURT:  Is it the first time as a witness in a

2     trial?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.

5          So, as frustrating as it may be, these are the rules:

6     If you can answer a question fairly with a yes or a no, that's

7     what you do.  If you can't answer it fairly with a yes or a no,

8     then briefly explain, you know, I don't know, I don't remember,

9     yes with caveats, whatever it is to be truthful and accurate,

10    but keep it brief.

11         Then, when this cross-examination is done, counsel for

12    the plaintiffs have another chance to ask you questions, and,

13    at that point, if they think it's important to me to understand

14    more, they can ask you questions, so you can elaborate.

15         THE WITNESS:  Fine.

16         THE COURT:  Okay?

17         So frequently on cross-examination, they try to ask

18    just yes-or-no questions.  They don't succeed always, but

19    that's often their aim.  On redirect, there may be very broad

20    open-ended questions.  Okay?

21         THE WITNESS:  Okay.

22         THE COURT:  So listen with care to what you're asked.

23         THE WITNESS:  All right.

24         THE COURT:  Counsel.

25         MR. PARKS:  Thank you, your Honor.

LCHKFTC1                    Conroy – Cross

1   BY MR. PARKS:

2   Q.  Sir, my question, again, is:  You did not undertake any

3   formal analysis of the pharmaceutical industry in connection

4   with your work on this engagement, did you?

5   A.  No.

6   Q.  And we can agree, can't we, that because you didn't do any

7   formal analysis of the pharmaceutical industry, your opinions

8   in this case are not based on any formal analysis of the

9   pharmaceutical industry?

10  A.  That is true.

11          THE COURT:  Excellent, excellent.

12  Q.  You were also asked to offer an opinion in this case as to

13  whether Vyera's distribution partners financially benefit from

14  the Daraprim distribution system, correct?

15  A.  Repeat it again?

16  Q.  Sure.

17          You were asked to offer an opinion in this case as to

18  whether Vyera's distribution partners financially benefit from

19  the Daraprim distribution system, correct?

20  A.  Correct.

21  Q.  Sir, you did not conduct any formal study or analysis of

22  the pharmaceutical industry in connection with developing your

23  opinion on that question either, did you?

24  A.  No.

25  Q.  Your opinions in this case are based on your personal

LCHKFTC1                        Conroy - Cross

1    experience and observations in the pharmaceutical industry as

2    opposed to a formal analysis or study of the industry; isn't

3    that correct?

4    A.  That is correct.

5    Q.  Sir, I'd like to ask you some questions now about your

6    experience with pharmaceutical product distribution strategies.

7         During your time with GSK, it distributed about 20

8    specific brand-name drugs, correct?

9    A.  At least that many.

10   Q.  Over the course of your career, you have been involved in

11   the product launches of about 25 different products, correct?

12   A.  Yes.

13   Q.  The product launches were not all specialty

14   pharmaceuticals, were they?

15   A.  No.

16   Q.  They included some over-the-counter products, correct?

17   A.  Yes.

18   Q.  In fact, only five of the launches you have worked on

19   involved specialty needs, correct?

20   A.  Yes.

21   Q.  Sir, how many different pharmaceutical products,

22   approximately, are currently sold in the United States?

23   A.  I couldn't give you a number, but it's in the thousands.

24   Q.  I want to ask you some questions now, sir, about the

25   distribution timeline, as you understand it, in this case.

LCHKFTC1                    Conroy - Cross

1              In your expert report in this case, the first expert

2     opinion you offered is that, "Some aspects of Vyera's Daraprim

3     distribution system and practices are not consistent with

4     industry norms."

5              Correct?

6     A.   Correct.

7     Q.   And the very first reason you offered for that conclusion

8     is that Daraprim does not have the characteristics that warrant

9     specialty distribution, correct?

10    A.   Correct.  Two or more is the general standard.

11    Q.   Sir, my question for you is this:  You understand, don't

12    you, that Vyera was not the company that originally placed

13    Daraprim into specialty distribution?

14    A.   I understand that.

15    Q.   Do you understand that a previous owner of Daraprim, a

16    company called Amedra Pharmaceuticals, first moved Daraprim to

17    specialty distribution?

18    A.   That's the timeline I recall.

19    Q.   So you do understand that Amedra was the company that moved

20    Daraprim into specialty distribution?

21    A.   I'm trying to remember if Impax actually did it first.  Can

22    I check my materials or --

23    Q.   Well, let's see if we can refer to a paragraph in your

24    deposition that would perhaps be helpful.

25              MR. PARKS:  Justin, can we put up page 138 of

LCHKFTC1                    Conroy - Cross

1    Mr. Conroy's deposition, starting at line 25 on to page 139.

2    Actually, let's go back to -- well, that's great, 25 on the top

3    of 139.

4    BY MR. PARKS:

5    Q.  "Mr. Conroy, what is your understanding of who moved

6    Daraprim to specialty distribution?"

7          Your answer:  "It was not what I was asked an opinion

8    on, but it could be argued that Amedra, and I mentioned that in

9    my report somewhere."

10         "So is it your understanding that Amedra

11   Pharmaceuticals moved Daraprim from," and then you interrupted

12   with an answer, "They began the process."

13         Do you see that?

14   A.  They did a study, so at that point in time, that was my

15   statement.

16   Q.  That's your understanding here today, is it not?

17         Do you have a different understanding here today of

18   who started specialty distribution for Daraprim other than it

19   was Amedra?

20   A.  I believe -- from what I was rereading and rereading, I

21   believe Impax actually began the process.

22         I mean, did I say Amedra?  I meant -- did I say Impax?

23   Q.  Yes.  Just now, you said Impax.

24   A.  Impax.

25   Q.  You think Impax began specialty distribution of Daraprim?

LCHKFTC1                    Conroy - Cross

1    A.   Yeah, I think the facts will bear that out.

2    Q.   Sir, the materials you identified in your expert report as

3    materials on which you relied to form your opinions in this

4    case include a document entitled "Specialty Pharmacy Provider

5    Distribution Agreement Between Amedra Pharmaceuticals and

6    Walgreens Dated February 23rd, 2015"; isn't that right?

7    A.   Yes.

8    Q.   And if we take a look at page 42 of your expert report,

9    which is part of Appendix B, down there, about just below

10   halfway on the page, there is that title of that document,

11   "Specialty Pharmacy Provider Distribution Agreement Between

12   Amedra Pharmaceuticals LLC and Walgreen Company, February 23rd,

13   2015."

14            Do you see that?

15   A.   Yes.

16   Q.   And at the top, this is the appendix of materials you rely

17   on, if you look at Appendix B's title, right?

18   A.   Yes.

19   Q.   So this was one of the documents you relied on in

20   developing your opinion in this case, right?

21   A.   Yes.

22   Q.   And you understand, from having relied on this document,

23   that this agreement reflects the fact that Amedra

24   Pharmaceuticals moved Daraprim into specialty distribution in

25   2015, don't you?

LCHKFTC1                      Conroy – Cross

1   A.  From what you're showing me, they signed an agreement with

2   the previous –– ICS and with Walgreens.

3   Q.  Sir, in your expert report, you also list, as a document on

4   which you relied to develop your opinions, a marketing plan for

5   Daraprim prepared by Amedra Pharmaceuticals in 2015, and we

6   have the document on the screen.  If you look here ––

7             THE COURT:  What's the number, counsel?

8             MR. PARKS:  Oh, sure.  It's DX 323.

9             THE COURT:  Thank you.

10  BY MR. PARKS:

11  Q.  And right here, in the middle of the page, it says,

12  "Presentation:  2015 Sales & Marketing Plan – Daraprim."

13            Do you see that?

14  A.  Yes.

15  Q.  So that was a document you were familiar with from your

16  work on this case when you prepared your opinion, correct?

17  A.  Yes.

18  Q.  Now, let's take a look at that document.  This is DX 327.

19            You recognize this from your work on the case?

20  A.  Yes.

21  Q.  Let's take a look, sir, at the third page of that exhibit.

22            Now, on this page, Amedra explains in this

23  presentation ––

24            THE COURT:  Excuse me, counsel.  Is this document in

25  evidence?

LCHKFTC1                    Conroy - Cross

1      MR. PARKS:  I do not know if it's on the evidence

2  list.  But my view would be that it's cross-examination.  Am I

3  not entitled to use any document with the witness on cross?

4      THE COURT:  Well, I don't know about any, but you are

5  entitled to use documents on cross that weren't on the exhibit

6  list as evidence in chief; however, you can't read from it

7  unless it's in evidence.  So you can use it to refresh.  I'm

8  just trying to understand what's in the record and what isn't.

9      MR. PARKS:  Fair enough.  I will ask the question from

10  a refresh his recollection standpoint since he has identified

11  this as a document on which he relied to develop his opinion.

12  BY MR. PARKS:

13  Q.  Sir, does this page of this document refresh your

14  recollection that Amedra began considering moving Daraprim from

15  open distribution to specialty distribution in 2014?

16  A.  Yes.

17  Q.  You're aware, from reviewing this document in the course of

18  your work, that Amedra identified a number of benefits of

19  moving Daraprim from open distribution to specialty

20  distribution, correct?

21  A.  These were their recommendations on this slide.

22  Q.  And you were aware, from reviewing this document in

23  connection with the preparation of your report, that Amedra

24  identified a number of benefits associated with moving Daraprim

25  into specialty pharmacy distribution, correct?

LCHKFTC1                    Conroy - Cross

1    A.  That's what this document says, yes.

2    Q.  One of the benefits identified by Amedra of moving Daraprim

3    into specialty distribution was a reduction in distribution

4    fees, correct?

5    A.  Reported reduction, and until you negotiate distribution

6    fees, you don't know what they'll actually be.

7    Q.  But you understood, from reviewing this document, that

8    Amedra identified a reduction in distribution fees as a

9    potential benefit of this, correct?

10   A.  A potential reduction and, therefore, a potential benefit

11   in that single line.

12   Q.  Another potential benefit that Amedra identified from

13   moving --

14            MX. BLACK:  Objection, your Honor.  This is going

15   beyond refreshing recollection.

16            THE COURT:  Sustained.

17            MR. PARKS:  I will rephrase the question, your Honor.

18   BY MR. PARKS:

19   Q.  Do you recall that another benefit that Amedra identified

20   in moving Daraprim into specialty distribution was improved

21   price management?

22   A.  That was their conclusion on this slide.

23   Q.  Do you recall, from your review of this document, that

24   another benefit Amedra identified from moving -- or potential

25   benefit that Amedra identified from moving Daraprim into

LCHKFTC1                    Conroy - Cross

1   specialty distribution was greater visibility of inventory,

2   including returned goods management?

3   A.   Yes.

4   Q.   Do you recall, from your review of this document in the

5   course of preparing your report, that another potential benefit

6   that Amedra management identified, in moving Daraprim into

7   specialty distribution, was the ability to provide more

8   resources to patients, caregivers, and healthcare providers?

9   A.   Potentially, yes.

10  Q.   And do you remember that another benefit that Amedra

11  management identified from moving Daraprim into specialty

12  distribution was more transparency as to how the product is

13  being prescribed and what the concomitant therapies may be

14  prescribed with it?

15  A.   Potentially.

16  Q.   Now, you're aware, from reviewing this document, that

17  Amedra selected Walgreens specialty pharmacy as its preferred

18  distribution partner, correct?

19  A.   Correct.

20  Q.   And although you were aware of this document when you

21  developed your opinions in this case, you did not address this

22  document in your expert report in this case, did you?

23  A.   Not directly, but in a lot of the other arguments, I

24  clearly tried to elaborate on why these are -- the degree of

25  potential -- potentiality, if that's such a word.

LCHKFTC1                        Conroy - Cross

1   Q.  Your analysis, sir, does not attempt to examine whether any

2   of the benefits Amedra identified as potentially flowing from

3   specialty distribution of Daraprim were actually realized, does

4   it?

5   A.  Repeat the question again?

6   Q.  Sure.

7           Your analysis does not attempt to examine whether any

8   of the benefits Amedra identified as potentially flowing from

9   specialty distribution of Daraprim were actually realized, does

10  it?

11  A.  Only in regard to what I was -- if I chose one, such as --

12  how did they say it?

13          There was ample discussion, from my experience, that

14  these applied to the six things that later on -- that these

15  things could lead to the later on things that Vyera did,

16  frankly.

17  Q.  Sir, do you recall that you testified at your deposition

18  that the reason you did not address this document specifically

19  in your report was that you were asked to opine on Vyera, not

20  Amedra?

21  A.  Yes.

22  Q.  Did Amedra Pharmaceuticals sell Daraprim directly to Vyera?

23  A.  In my best recollection.

24  Q.  Sir, didn't Amedra Pharmaceuticals sell Daraprim to Impax

25  Laboratories in March of 2015?

LCHKFTC1                    Conroy - Cross

1    A.  My recollection is Impax -- Impax bought the product first

2    from GSK back in about 2012 — I can't bring up the exact date —

3    and then Amedra -- it was transferred to Amedra.  Check me if

4    I'm wrong on that.

5    Q.  Do you mean Daraprim was transferred -- I'm sorry, I don't

6    understand what you said there.  And then Amedra was

7    transferred?

8    A.  What I recall is that Impax acquired it from GSK, and then

9    it was transferred to Amedra, and then Amedra, in 2015, there

10   were discussions, I believe, in April and then maybe in August,

11   and actually the transfer or sale, whatever you referred to it

12   as, went to Vyera at that point.

13   Q.  Sir, just to refresh your recollection on this, can we take

14   a look at your expert report that's DX 323 at paragraph 41 on

15   page 13.

16        Does that refresh your recollection that at least, in

17   your own expert report, you had said that in March 2015, Impax

18   Laboratories acquired Daraprim as part of its $700 million

19   acquisition of Amedra's parent company?

20   A.  Can you put it in better context and include previous

21   paragraphs?

22   Q.  Sir, my question for you is:  Isn't --

23   A.  That is what I said, yes.

24   Q.  Okay.

25        And the proper sequence of events here is that GSK

LCHKFTC1                    Conroy - Cross

1    transferred this product to Amedra, and Amedra then transferred

2    it to Impax, correct?

3    A.   That's what it said here, yes.

4    Q.   That's what happened, isn't it?

5    A.   Yes.

6    Q.   Now, after acquiring Daraprim from Amedra in March of 2015,

7    Impax continued distributing Daraprim through specialty

8    distribution, didn't it?

9    A.   Yes.

10   Q.   So when Vyera acquired Daraprim from Impax, Vyera inherited

11   the specialty distribution model for Daraprim that was

12   developed by Amedra and continued by Impax, didn't it?

13   A.   For a short period of time, yes.

14   Q.   And, sir, because you were asked to opine on Vyera, not

15   Amedra or Impax, you did not spend a lot of time on the way

16   Amedra or Impax distributed Daraprim in developing your

17   opinions in this case; isn't that right?

18   A.   That is correct.

19   Q.   After --

20   A.   I'm familiar with it, but I didn't spend a lot of time on

21   it.

22   Q.   After Vyera acquired Daraprim, it actually added more

23   distributors than Amedra or Impax had for Daraprim, didn't it?

24   A.   Yes -- well, they dismissed ICS, who I have actually worked

25   with at one time, and they added ASD, which is Amerisource

LCHKFTC1                           Conroy - Cross

1    specialty distributor, and they added a few other people, but

2    then they added many restrictions on the products.

3    Q.  Sir, I'm asking you about the number of distributors, they

4    went up after Vyera acquired Daraprim, didn't they?

5    A.  Yes.

6    Q.  And you recognize, don't you, that Vyera added these

7    additional distributors to make it easier for customers to buy

8    Daraprim?

9    A.  They had contacted, I believe it was, Walgreens -- was it

10   Walgreens?  They had contacted --

11   Q.  Sir, my question was:  They added these distributors to

12   make it easier for customers to buy Daraprim, didn't they?

13   A.  That could be a possible outcome.  I can't -- okay.

14   Q.  So let's take a look at your deposition, page 178, line 20.

15   You were asked:  "So to cut to the chase, is it your opinion

16   that Vyera added these distributors to make it easier for

17   customers to buy the product?"

18           And your answer was, "Yep," and then you went on.

19           Correct?

20   A.  I said they needed government, which is the VA, et cetera,

21   they needed Walgreens, so -- and they needed Optime.  So, yes,

22   that's what I said.

23   Q.  You explained earlier that you're offering opinions here

24   about pharmaceutical industry norms, right?

25   A.  Yes.

LCHKFTC1                    Conroy - Cross

1   Q.  And your opinions are based on your personal experience,

2   right?

3   A.  Yes.

4   Q.  Your experience, your personal experience, does not include

5   anything to do specifically with the distribution of Daraprim,

6   right?

7   A.  No, but the norms definitely are, in my experience --

8          THE COURT:  If you can answer fairly with a yes or a

9   no.

10         THE WITNESS:  Okay.  Repeat the question, please.

11  BY MR. PARKS:

12  Q.  Sir, your experience does not include anything to do

13  specifically with the distribution of Daraprim, does it?

14  A.  Daraprim was in my purview, yes, so...

15  Q.  Sir, your experience with specialty distribution is limited

16  to five products, isn't it?

17  A.  That I recall, yes.

18  Q.  And you didn't find it relevant to your analysis of

19  industry norms that Vyera was not the first, not even the

20  second, but the third company to distribute Daraprim through

21  specialty distribution, did you?

22  A.  Repeat the first part of the question?

23  Q.  Sure.

24         You did not find it relevant to your analysis of

25  industry norms that Vyera was not the first, not the second,

LCHKFTC1                    Conroy - Redirect

1   but the third company to distribute Daraprim through specialty

2   distribution, did you?

3   A.  I did in the sense that when you inherit -- when you

4   purchase a product, you do not have to follow the previous

5   company's distribution strategy.  So it was part of the overall

6   thought process.

7   Q.  Do you remember being asked in your deposition whether

8   those facts were relevant, and you said, "Is it relevant?  Not

9   necessarily"?

10  A.  Yes, as you're quoting me.

11          MR. PARKS:  That's all the questions I have for this

12  witness at this time.  Thank you.

13          THE COURT:  Will there be redirect?  I'm not rushing

14  you, I just want to know.

15          MX. BLACK:  Perhaps, your Honor.

16          THE COURT:  Thanks.  Take your time.

17          (Pause)

18  REDIRECT EXAMINATION

19  BY MX. BLACK:

20  Q.  Good morning, Mr. Conroy.

21  A.  Good morning.

22  Q.  Do you recall earlier counsel asked you about your

23  experience with specialty drugs?

24  A.  Yes.

25  Q.  And do you recall counsel pointing out that you have

Conroy - Redirect

1    experience with only five drugs with specialty needs?

2    A.  That I recall, yes.

3    Q.  Could you describe for the Court your experience with

4    specialty drugs over the course of your 45 years of experience?

5    A.  You can -- the first one -- well, if you meant drugs that

6    actually go into distribution through specialty, we had drugs

7    that, like Retrovir, where specialty was -- Retrovir was for

8    HIV treatment.  As a matter of fact, it's the first one.  We

9    considered putting it in specialty, but it was a tablet, and

10   the AIDS -- AIDS was growing rapidly, so we put it in open

11   distribution, so any local pharmacy, where an AIDS patient

12   might need it, could get it.

13        I also worked on Flolan, which is a high -- very, very

14   high touch complicated cold chain.  It's for primary pulmonary

15   hypertension.  Once you went on Flolan, if you were a patient,

16   and -- and the tightest restrictions, okay, that you would die.

17   So we had to build a distribution system through a specialty

18   distributor and pharmacy — Accredo, I believe — so that

19   patients were absolutely assured that they would get their drug

20   in a timely fashion, and it could be very extremely adverse if

21   they did not get that.

22        And even though it was in specialty, we didn't put any

23   major restrictions other than that Accredo had it, and

24   Accredo -- these patients need it, it's very complex, needed a

25   lot of high touch, and those were the types of issues we were

LCHKFTC1                          Conroy - Redirect

1    addressing.

2          I also worked on Wellcovorin and -- which was a

3    specialty -- could have been a specialty — it actually is a

4    specialty today — but it's open distribution, almost

5    exclusively.

6          Lotronex, which was an IBS drug at GSK, and when we

7    launched it, it was open distribution.  It was a tablet.  And

8    what happens, we had a series of side effects that the FDA

9    called to our attention.  We immediately pulled the drug from

10   the market.  They developed a REMS.

11         Are you familiar with a REMS?  Okay.

12         It's a way to mitigate risk or lower risk.  So we had

13   a REMS on Lotronex.

14         And then I currently have a client with an asthma

15   drug -- not an asthma drug -- for agitation associated with

16   bipolar schizophrenia, and it's both an -- because of my

17   experience, it's a combo drug.  It's in a specialty wholesaler

18   McKesson Specialty, and it's also an open distribution with

19   always the goal of making it highly likely that a patient could

20   get their drug in an extremely timely fashion, and if need be,

21   in a local pharmacy where they have a relationship with a

22   pharmacist.

23   Q.  Is your knowledge of specialty distribution limited to the

24   five drugs you directly work with?

25   A.  No, because as I -- basically, I was a consultant for

LCHKFTC1                    Conroy - Redirect

1   roughly 2000 to current.  I may have met with other companies

2   that -- I remember I helped small -- basically small startup

3   pharmaceutical companies commercialize their drugs.  So in

4   every one of these instances, the distribution techniques,

5   rules, using industry norms, were always discussed to find the

6   optimal way to maximize profits, to deal with whether it was an

7   IV drug or a tablet or the other variables.

8          So you're constantly discussing the distribution

9   system, and that's where all my other experience kind of really

10  helps out.

11  Q.  Thank you, Mr. Conroy.

12         Do you recall now being asked some questions about

13  Amedra's slide deck in DX 327?

14  A.  The one we looked at earlier?

15  Q.  Yes.

16  A.  Yes.

17  Q.  Do you recall what Amedra predicted with respect to sales

18  volume after the transition to specialty?

19  A.  Yes.  It actually declined.  And, actually, the decline was

20  slightly more for specialty than it was for retail.

21  Q.  What does it tell you about benefits of specialty for

22  Daraprim?

23  A.  We were on the slide earlier.  I'm...

24  Q.  Let me rephrase.

25  A.  With that information, one would consider the fact that it

LCHKFTC1                    Conroy - Redirect

1   was specialty the best distribution system for Daraprim.  It

2   wasn't high touch.  It had been on the market since 1953.  It

3   wasn't cold chain, it wasn't REMS, it wasn't all the other

4   hallmark -- basically hallmark things, and it wasn't a new

5   entry, it was a very old drug, and all my background suggested

6   it was a reasonably safe drug, and prescribers were quite

7   familiar with the disease and how to treat it because, by and

8   large, the HIV treaters were the predominant group that used it

9   because toxoplasmosis is an opportunistic infection.

10  Q.  What does Amedra's predicted volume decline after

11  transition to specialty tell you about patient access to

12  Daraprim?

13  A.  Well, their conclusion was it might -- I don't have it in

14  front of me, but my recollection was it -- it potentially

15  might -- oh, access?

16        Because in specialty, you're going to have fewer

17  places to shop or -- shop for -- to get your prescription

18  filled.  It would probably deny access.  And it never addressed

19  what Vyera actually went on ahead and did.

20  Q.  Let's talk about that.

21        You recall being asked questions about Vyera adding

22  distributors after it acquired the product?

23  A.  Uh-huh.

24  Q.  How did addition of distributors affect distribution

25  restrictions?

LCHKFTC1                    Conroy - Redirect

1   A.  Repeat that question, so I can understand?

2   Q.  Earlier you started talking about restrictions and how a

3   transition to specialty did not address the restrictions.

4           Do you want to tell us more about the restrictions

5   that Vyera used?

6   A.  Okay.  They had customer restrictions, okay, which they

7   very limited -- Vyera had, correct?

8           Specifically, you're referring to Vyera?

9   Q.  Yes.

10          MR. PARKS:  Your Honor, I believe this is beyond the

11  scope of my cross-examination.

12          THE COURT:  It's not beyond the scope, but I think the

13  question could be more focused.

14          Can you place a question to the witness so he knows

15  what information you wish to elicit?

16          MX. BLACK:  Yes, your Honor.

17          THE COURT:  Counsel on cross-examination mentioned

18  that when Vyera acquired Daraprim, it increased the number of

19  distributors.

20          Do you remember that question?

21          THE WITNESS:  Yes.

22          THE COURT:  Did that increase in the number of

23  distributors, in your mind, increase access to the drug for the

24  patient population suffering from toxoplasmosis?

25          THE WITNESS:  That alone would have the potential of

LCHKFTC1                      Conroy - Redirect

1   doing that, your Honor, but the addition of restrictions --

2            THE COURT:  Did it in this case?

3            THE WITNESS:  -- counteract that.

4            THE COURT:  Did it in this case?  Did it increase in

5   the number of distributors in this case?  Did what Vyera did in

6   this case, when it increased the number of distributors,

7   increase the access to the drug?

8            THE WITNESS:  Based upon the sales results, I would

9   say no.

10           THE COURT:  Why not?

11           THE WITNESS:  A drug such as Daraprim with toxo -- you

12  need rapid access, and so even though they increased some

13  distributors, they closed down -- their restrictions affected

14  retail pharmacy.  AIDS patients often have a very good

15  relationship with a local pharmacy and who counsels them, knows

16  their disease, probably knows their doctor, as opposed to on

17  the phone, and you're dealing with a specialty pharmacy, which

18  is very -- you don't know who the person is, they don't know

19  who you are — maybe you've had that experience, I have — it can

20  be very -- it can be a conundrum trying to figure out, this guy

21  doesn't know what I'm talking about, as a patient getting my

22  drug.

23           So when you get doubts in taking a drug, oftentimes

24  you don't take it.  So these added distributor -- to answer

25  your question, just by adding, I think it was a very limited

LCHKFTC1                    Conroy - Redirect

1    addition, that it would not necessarily result in increased

2    access.

3               Does that help?

4    BY MX. BLACK:

5    Q.  Besides adding distributors, did Vyera do anything else to

6    restrict access to patients?

7    A.  They put a bottle --

8               MR. PARKS:  This is beyond the scope of my cross, your

9    Honor.

10              THE COURT:  I think, as I understand it, the point you

11   were making on cross was, Vyera added distributors to increase

12   access to the drug, so you opened the door for this witness to

13   explain whether or not Vyera took actions to increase access to

14   the drug.  And counsel will inquire, or not, at her choice.

15              Place a question, counsel, if you have one.

16   BY MX. BLACK:

17   Q.  So, Mr. Conroy, did Vyera do anything, after it acquired

18   Daraprim, to restrict access to Daraprim?

19   A.  Yes.  They put purchase limits on it.  They did intensive

20   monitoring and purchase limits of five bottles so that -- I can

21   expand on that, but that simply means somebody could run out of

22   stock.  It's more likely.  Today's modern open distribution

23   system, wholesalers' open distribution, wholesalers deliver

24   same day in big cities like New York and next day, the Amazon

25   mentality, if you will.  They put purchase -- so purchase

LCHKFTC1                    Conroy – Recross

1    limits, this doesn't really affect the patient, but they

2    excessively monitored all purchases, they reduced the number of

3    customers, they pulled out, I think, roughly 17,000 fewer

4    outsources -- not outsources, potential places to buy drug —

5    the local pharmacies, basically.

6          So none of those things help improve access.  It's

7    kind of like on the front side, you can have more distributors;

8    on the backside, you give the distributors less product, you

9    give the patients less access to pharmacies.  So, in my

10   experience, and that study by Amedra kind of shows, they're

11   going to have a decline in sales, when most of us in the

12   industry, if not all of us, work very hard to increase sales

13   rather than monitor sales and put restrictions such that you

14   could decrease sales.

15         MX. BLACK:  Thank you, Mr. Conroy.

16         Thanks, your Honor.  These are all the questions I

17   have.

18         THE COURT:  Any additional cross?

19         MR. PARKS:  Very, very briefly, your Honor.

20   RECROSS EXAMINATION

21   BY MR. PARKS:

22   Q.  Sir, you just talked about declining sales for Daraprim.

23         You haven't done any analysis of the reasons for those

24   decline in sales, such as decline in incidence of

25   toxoplasmosis, did you?

1   A.  Not medical reasons.

2              MR. PARKS:  Thank you.  Nothing further.

3              THE COURT:  So, Mr. Conroy -- I'm sorry, any redirect?

4              MX. BLACK:  No, your Honor.

5              THE COURT:  Mr. Conroy, you made a distinction in the

6   answer you gave recently between specialty distribution and

7   open distribution?

8              THE WITNESS:  Yes.

9              THE COURT:  You can have specialty distribution, but

10  you can also, at the same time, have open distribution?

11             THE WITNESS:  Yes.  It's a spectrum.

12             THE COURT:  So explain, please, how you're using those

13  terms and how you can have both at the same time.

14             THE WITNESS:  Okay.  The left-hand side, the extreme

15  open distribution, is you sell to all -- I call them

16  wholesalers -- the big ones — McKesson, Cardinal,

17  AmerisourceBergen, there are some other ones, but about

18  90 percent of them are in place.  They specialize in everyday

19  deliveries to drugstores.  They also have OTC items,

20  over-the-counter items, and then within that, you could put --

21  then you start stepping down.  You could design a restriction

22  as to an open distribution for some reason.  You may not have a

23  contract with the government, but I don't think you'd ever

24  restrict on that basis.

25             The other extreme side is something like I mentioned

LCHKFTC1                    Conroy – Recross

1    Flolan — that was for the -- I think it was only a thousand

2    patients, but that was tightly restricted simply because it was

3    cold chain, and if a patient didn't get their drug, and we wind

4    up with all the expertise of Accredo at that time, so that

5    patients were absolutely assured.  Having said that, using kind

6    of the middle example, Atticu, which I'm working on now,

7    because there are sites -- it's for psychiatric patients, okay.

8    So I use a mixture of distributors.  McKesson Plasma and

9    Biologics is a -- it's kind of like ASD, it would be the

10   equivalent of ASD in this conversation.  They have a lot of

11   relationships where it's very highly likely that Atticu would

12   be needed and needed in a timely fashion.

13          At the same rate, many of these patients -- and, also,

14   McKesson deals with the government, so that opened that up.

15   Their prime vendor, it's called.

16          But then there's plenty of these patients in small

17   towns, big cities, that just want to go to their local pharmacy

18   to get it.

19          Now, it was a REMS drug, so we had to put a

20   restriction on it, we had to be REMS certified through a set of

21   obligations.  So, there you have an open -- I certified the

22   wholesalers, but only after they became REMS certified.

23          Does that make sense to you?

24          (Continued on next page)

25

LCHMFTC2                    Conroy

1           THE WITNESS:  There are other mixtures of I think,

2     bio -- the one distributor they use, there is a specialty

3     distributor.  50 percent of their customers.  There were no

4     restrictions or suppliers.  There were no restrictions on their

5     drugs and then 50 percent had some specialty restrictions.

6           THE COURT:  Open distribution, as you are using that

7     term, means that any drug wholesaler with whom you have a

8     contract can purchase the product and distribute it to any kind

9     of pharmacy or medical institution.

10          THE WITNESS:  To a licensed pharmacy or a doctor with

11    what is called a medical education number, yes.

12          THE COURT:  Specialty distribution, as you are using

13    that term, in contrast, means what?

14          THE WITNESS:  It means that -- in the broadest

15    context, specialty distributors usually have a market segment,

16    like hospitals.  Like the VA, like a set of specialty

17    pharmacies, Walgreens Specialty pharmacy, so they -- because of

18    their focus on maybe a disease state or because of a focus on

19    hospitals, that they could be the optimal solution that's

20    related to the patients, but it would be the optimal solution

21    for getting drugs to that.  It could be a REMS drug.  They know

22    how to handle cold chain products.  They have to be

23    refrigerated.  They have to be carefully monitored.

24          Generally, one of the biggest reasons you use really

25    kind of a specialty would be really complex drugs.  There is a

LCHMFTC2                    Conroy

1    reference in my statement that 70 percent of the physical

2    volume is open distribution with a few restrictions, if any,

3    and 30 percent is specialty.

4          But on the dollar wise now it's about 50/50 because

5    the specialty drugs that go into specialty are usually ones we

6    referenced in my document, they were approved in 2018.  The

7    recently approved drugs, sometimes like the vaccines, they are

8    approved without really large studies, but the evidence was

9    such, so they will approve them.  By keeping it in restricted

10   distributions is a specialty and only certain types of

11   pharmacies that they can work with the doctors who don't

12   have -- like the experience they have with Daraprim is years

13   and years and years.  So doctors who use it are very, very

14   familiar with it.

15         The newer specialty drugs that are high touch, high

16   cost or have some of these characteristics, specialty --

17   interacting with other drugs, immunology, cancer drugs, MS

18   drugs, a lot of what you see on TV, by having to tie tightly

19   with a pharmacy system, a specialty pharmacy that has those

20   abilities to truly help manage that patient and the side

21   effects and the indications and all the complexities of the new

22   drugs you would consider -- in my opinion, definitely consider

23   them for specialty.

24         THE COURT:  Counsel, do you have any questions for

25   this witness based on the questions I have placed to him?

LCHMFTC2                    Conroy

1            MX. BLACK:  No, your Honor.

2            MR. PARKS:  No, your Honor.

3            THE COURT:  You may step down.

4            (Witness excused)

5            THE COURT:  Next witness.

6            MR. MEIER:  Your Honor, the government calls as its

7    next witness Manish Shah.  He's with Cerovene.  My colleague,

8    James Weingarten, will be handling that for the government,

9    your Honor.

10           THE COURT:  Mr. Shah, if you could come up here,

11   please.

12           Mr. Shah, if you could come up to the front of the

13   courtroom, please.  No need to rush.  Take your time.

14           If you could take the stand here and remain standing.

15   If you could come up here and take that stand.

16   MANISH SHAH,

17        called as a witness by the Plaintiffs,

18        having been duly sworn, testified as follows:

19           THE COURT:  You may be seated.  You go pull that chair

20   up.  That mic can be adjusted so it is under your chin and sort

21   of down.  There you go.  We will see if that works.

22           You are being handed your affidavit, which has been

23   marked as GX-8011.  I'd like you to turn to the last page,

24   which is, I believe, page 19.

25           THE WITNESS:  Yes.

LCHMFTC2                        Shah - Cross

1         THE COURT:  Did you authorize your electronic

2   signature to be added to that document?

3         THE WITNESS:  Yes.

4         THE COURT:  Before you gave that authorization, did

5   you read the entire document with care?

6         THE WITNESS:  Yes.

7         THE COURT:  Do you swear to the truth of the contents?

8         THE WITNESS:  Yes.

9         THE COURT:  Any objection to receipt of GX-8011?

10        MR. CASEY:  Your Honor, no objection.

11        THE COURT:  Thank you.  It is received.

12        (Government Exhibit 8011 received in evidence)

13        THE COURT:  Cross-examination.

14        MR. WEINGARTEN:  Mr. Shah, I believe you are allowed

15   to take off your mask during the questioning, if you'd like.

16        THE COURT:  Yes, Mr. Shah.  I should have explained

17   that.  Thank you, counsel.

18        Our courtroom has had ventilation testing and there is

19   a swift air exchange here.  You and counsel at the podium are

20   permitted to take off masks.  Thank you.

21   CROSS-EXAMINATION

22   BY MR. CASEY:

23   Q.  Good morning, Mr. Shah.

24   A.  Good morning.

25   Q.  My name is Chris Casey.  I represent Mr. Shkreli in this

LCHMFTC2                    Shah - Cross

1    proceeding.  I have questions for you this morning.

2          First, Mr. Shah, Cerovene was initially getting its

3    pyrimethamine API from a company called Ipca, correct?

4    A.  Yes.

5    Q.  And Ipca was subject to an import alert in 2015 forcing

6    Cerovene to find another source of API, correct?

7    A.  Yes.

8    Q.  Now, in your written direct testimony you discussed

9    Cerovene's attempts in 2015 and 2016 to obtain pyrimethamine

10   API from Fukuzyu, correct?

11   A.  Yes.

12   Q.  That's at paragraphs 21 through 28, correct?

13   A.  Yes.

14   Q.  Those efforts were unsuccessful, correct?

15   A.  Yes.

16   Q.  You were not able to enter an API supply agreement with

17   Fukuzyu, correct?

18   A.  Yes.

19   Q.  In 2016, Cerovene began negotiations with a company called

20   RL Fine to supply pyrimethamine API, correct?

21   A.  Yes.

22   Q.  Now, Cerovene did not speak with any API suppliers about

23   pyrimethamine API other than RL Fine and Fukuzyu in 2015 and

24   2016, correct?

25   A.  Yes.

LCHMFTC2                          Shah - Cross

1   Q.  And Cerovene made no attempt in 2015 and 2016 to identify

2   other manufacturers that were providing pyrimethamine powder in

3   markets outside the United States, correct?

4   A.  Can you repeat the question, please.

5   Q.  Sure.

6           Cerovene made no attempt in 2015 or 2016 to identify

7   other manufacturers that were providing pyrimethamine powder in

8   markets outside the United States, correct?

9   A.  Well, we made some other attempts by talking to the

10  colleagues and friends in the industry and see if anybody else

11  is producing pyrimethamine API, and we didn't find anybody who

12  could manufacture pyrimethamine API.

13  Q.  Do you recall being asked this question at your deposition,

14  Mr. Shah?  Your deposition was on December 17 of 2020.  Do you

15  recall that deposition?

16  A.  I don't recall.

17          MR. CASEY:  Can we have the deposition transcript up,

18  please.  At page 230, starting at line 21 there.

19  Q.  The question is asked:  Did you make any effort to identify

20  other manufacturers that were providing pyrimethamine powder in

21  markets outside the U.S.?  You answered no, correct?

22  A.  Yes.

23  Q.  That testimony was truthful, correct?

24  A.  Yes.

25  Q.  Cerovene made no attempt in 2015 and 2016 or 2016 to

LCHMFTC2                    Shah - Cross

1  identify other manufacturers that were supplying pyrimethamine

2  powder for the compounding industry in the United States,

3  correct?

4  A.  We didn't make any effort.

5  Q.  On November 16 of 2016, Cerovene and RL Fine entered into a

6  supply agreement, correct?

7  A.  Yes.

8  Q.  And the supply agreement provided that RL Fine would

9  exclusively supply Cerovene with pyrimethamine, correct?

10  A.  Correct.

11  Q.  Now, you said in your direct testimony at paragraph 32 that

12  exclusivity "made economic sense to keep other companies from

13  free writing on Cerovene's investment in getting RL Fine

14  qualified to supply pyrimethamine in the United States,"

15  correct?

16  A.  Yes.

17  Q.  But when were you asked in your deposition in this case

18  that the reasons why Cerovene wanted exclusivity in its

19  agreement with RL Fine, you didn't say anything about free

20  writing, did you?

21  A.  I don't recall.

22  Q.  Maybe we can pull out the deposition.  Maybe it will

23  refresh your recollection.  Let's go to the deposition at page

24  237:  You are asked there starting at line 18:  What about

25  exclusivity running in the other direction?  In other words,

LCHMFTC2                    Shah - Cross

1  why was it important to Cerovene that RL Fine would only supply

2  Cerovene with API for a period of years?  You answered at line

3  24:  Well, it's part of the overall picture of how you deal

4  with the specific project and -- product and company, right.

5  We wanted to be sure that RL Fine --

6            THE COURT:  Slow down.

7  Q.  We wanted to be sure that RL Fine is able to supply us with

8  the commercial quantities of the API that we needed.

9            Does that refresh your recollection, Mr. Shah?

10  A.  That's what I said at the time.

11            MR. WEINGARTEN:  Your Honor, I am not sure if it is

12  refreshing or impeaching.  If it's impeaching, I respectfully

13  suggest that the rest of the answer be read as well.

14            THE COURT:  Counsel, you may complete the quotation.

15            MR. CASEY:  I didn't hear the rest of the objection.

16            THE COURT:  Sorry, counsel.  It was that you had cut

17  off reading the complete answer.

18            MR. CASEY:  I'm happy to.

19  Q.  Your answer goes on in your deposition:  When I visited the

20  facility, they really don't have a very big facility to produce

21  the API, so we wanted to make sure that if you are going to

22  waste time and money and going to do all this work, we get a

23  commercial supplies.  You said that, correct?

24  A.  Yes.

25  Q.  Again, there is nothing in your answer at the deposition

LCHMFTC2                    Shah - Cross

1   that talked about other companies free writing on your

2   investment?

3   A.   No.

4   Q.   You signed the agreement with RL Fine on behalf of

5   Cerovene, correct?

6   A.   Yes.

7   Q.   And you also signed on behalf of Cerovene the major

8   amendment for Cerovene's Daraprim ANDA identifying RL Fine as

9   Cerovene's new API supplier, correct?

10  A.   Yes.

11  Q.   That was on April 2, 2017?

12  A.   Yes.

13  Q.   So it was approximately six months from the time that you

14  signed the API supply agreement to the time that you submitted

15  the major amendment identifying RL Fine as the new API

16  supplier, correct?

17  A.   Yes.

18  Q.   In 2016 and 2017, RL Fine delivered pyrimethamine API to

19  Cerovene, correct?

20  A.   Yes.

21  Q.   Those orders provided Cerovene with enough API to complete

22  bioequivalency testing and to support the commercial launch of

23  Cerovene's generic Daraprim product, correct?

24  A.   Yes.

25  Q.   After Cerovene's ANDA was approved, Cerovene also ordered

LCHMFTC2                    Shah – Cross

1   additional pyrimethamine from RL Fine that was delivered in

2   April 2020, correct?

3   A.   Yes.

4   Q.   And that pyrimethamine API was provided under the terms of

5   the November 16, 2016 supply agreement between Cerovene and RL

6   Fine, correct?

7   A.   Yes.

8   Q.   So every time that Cerovene has placed an order for

9   pyrimethamine API under the November 16, 2016 supply agreement,

10  RL Fine has provided it, correct?

11  A.   Yes.

12  Q.   Now, Mr. Shah, I am going to switch now to talk about some

13  of the filings and letters you sent to the FDA, OK?

14  A.   OK.

15  Q.   First, before we get to that, in December 2017, the FDA

16  required Cerovene to redo its bioequivalence testing using the

17  RL Fine API, correct?

18  A.   Yes.

19  Q.   On January 22, 2018, Cerovene asked the FDA to reconsider

20  that decision, correct?

21  A.   Yes.

22  Q.   And you signed the letter that went to the FDA on behalf of

23  Cerovene, correct?

24  A.   Yes.

25  Q.   Then two months after submitting that request for

LCHMFTC2                    Shah - Cross

1   reconsideration, Cerovene sent a follow-up letter to the FDA

2   demanding an answer one way or the other granting or denying

3   your request for reconsideration, correct?

4   A.  Yes.

5        MR. CASEY:  Can we have DX-376 up.  Thank you.

6   Q.  Mr. Shah, do you see what's on the screen now?

7   A.  Yes.

8   Q.  That's DX-376.  Do you recognize that document?

9   A.  Yes.

10  Q.  Is that the letter that you sent to the FDA?

11  A.  Yes.

12        MR. CASEY:  If we can go down to the last full

13  paragraph on the page.  Right there.

14  Q.  You see where it says:  If Cerovene were to simply

15  acquiesce and conduct the newly requested studies whose

16  necessity Cerovene is challenging, Cerovene would have to spend

17  over $600,000 in RLD acquisition costs alone to acquire the

18  requisite five bottles of Daraprim.  Do you see that?

19  A.  Yes.

20  Q.  Then you go on to say:  This $600,000 RLD acquisition cost

21  expenditure would be in addition to the many additional

22  hundreds of thousands of dollars that Cerovene would spend

23  conducting the newly requested bioequivalence studies.

24        That was you stating that to the FDA in your letter,

25  correct?

LCHMFTC2                          Shah - Cross

1   A.  Yes.

2           THE COURT:  Counsel, can I just ask, is DX-376 in

3   evidence?

4           MR. CASEY:  Your Honor, I should have offered it.  The

5   defendant offers DX-376 into evidence.

6           THE COURT:  Any objection?

7           MR. WEINGARTEN:  No objection, your Honor.

8           THE COURT:  Received.

9           (Defendant's Exhibit 376 received in evidence)

10          MR. CASEY:  Thank you.

11  Q.  Mr. Shah, Cerovene did not want to commit the $600,000 it

12  would have to spend acquiring RLD until the FDA acted on its

13  request for reconsideration, correct?

14  A.  You can read simply what we are saying here.  We are saying

15  that -- what I'm trying to say is that, in answering the

16  question that you have is what we are simply saying FDA, there

17  is going to be an additional cost of $600,000, approximately,

18  and then there is additional cost of bioequivalence study.  So

19  FDA must reconsider what they were restating in the company

20  response letter of 2017.  That's what we are saying to FDA.

21  Q.  To my question, Cerovene did not want to commit the

22  $600,000 it would have to spend acquiring RLD until the FDA

23  acted on its request for reconsideration.  Isn't that correct?

24  A.  Well --

25  Q.  Mr. Shah, could you just answer that.  That's a yes or no

LCHMFTC2                    Shah - Cross

1   question.  Is that correct, or not?

2   A.   Yes.

3   Q.   Now, in June 2018, about six months after you submitted the

4   request for reconsideration, the FDA rejected Cerovene's

5   request, correct?

6   A.   Yes.

7   Q.   Now, I am going to switch topics now and talk about

8   Cerovene's efforts to obtain RLD.  Do you know what I mean when

9   I say RLD?

10  A.   Yes.

11  Q.   That's reference listed drug, correct?

12  A.   Correct.

13  Q.   So you were seeking a Daraprim reference listed drug to do

14  your bioequivalence test after the FDA ordered you to, correct?

15  A.   Yes.

16  Q.   You led Cerovene's efforts to acquire new RLD samples after

17  the FDA required Cerovene to perform new bioequivalence

18  testing, did you?

19  A.   Yes.

20  Q.   Cerovene understood that it needed a minimum of five

21  100-count bottles of Daraprim RLD to do the testing and meet

22  the sample retention requirements, correct?

23  A.   Yes.

24  Q.   In February 2018, Cerovene and Dr. Reddy's engaged Reliant

25  Specialty to acquire five bottles of Daraprim, right?

LCHMFTC2                    Shah - Cross

1   A.  Yes.

2   Q.  And Reliant represented that it could acquire five bottles

3   and quoted a price of $110,000 per bottle, correct?

4   A.  Yes.

5   Q.  Cerovene placed an order with Reliant for $550,000 for five

6   bottles, correct?

7   A.  Yes.

8   Q.  Reliant was only able to procure one bottle, correct?

9   A.  Yes.

10  Q.  And the delivery of that one bottle was on June 4, 2018,

11  correct?

12  A.  Yes.

13  Q.  Now, in February 2018, before you placed the order with

14  Reliant, Dr. Reddy's identified ProSupplier, a Swiss

15  procurement company, as being able to supply Daraprim samples,

16  correct?

17  A.  Yes.

18  Q.  And ProSupplier is the firm that many months later, in

19  November 2018, ultimately supplied Cerovene with a Daraprim

20  samples that you used to do your bioequivalence testing,

21  correct?

22  A.  Yes.

23  Q.  In February 2018, Dr. Mukhopadhyay of Dr. Reddy's offered

24  to help Cerovene place orders for RLD samples, correct?

25  A.  Yes.

LCHMFTC2                    Shah - Cross

1    Q.  And Dr. Mukhopadhyay stated to you in an e-mail on February

2    20, 2018:  "Can we work with ProSupplier and order for

3    Cerovene?  Cerovene will pay us for the RLD.  I am suspecting

4    the suppliers are not taking the orders seriously as Cerovene

5    is a smaller company."

6             Do you remember that e-mail?

7    A.  I don't exactly recall the e-mail, but, yes.  There are

8    e-mails between me and him.

9             MR. CASEY:  Why don't we get GX-3395, please.

10   Q.  I am showing you on the screen there what's marked as

11   GX-3395.  It's an e-mail chain.

12            MR. CASEY:  If you could go down to page 2, please.

13   Q.  Do you see the e-mail from Dr. Mukhopadhyay, February 20,

14   2018 e-mail?

15   A.  Yes.

16   Q.  He says:  Hi, Manish.  This is an e-mail that was addressed

17   to you, correct?

18   A.  Yes.

19   Q.  Among others in Dr. Reddy's?

20   A.  Yes, um-hum.

21   Q.  It says:  Hi Manish.  As we still do not have the RLD from

22   Espee after more than a month, I think we should cancel the PO

23   and work with ProSupplier.  Then it goes on:  Ramesh Malli, can

24   we work with ProSupplier and order for Cerovene.  Cerovene will

25   pay us for the RLD.  I am suspecting the suppliers are not

LCHMFTC2                    Shah – Cross

1   taking the order seriously as Cerovene is a smaller company.

2   We may have better chance of getting the RLD quickly if DRL

3   orders on behalf of Cerovene.

4          Do you see that?

5   A.  Yes.

6   Q.  Does that refresh your recollection of seeing this e-mail

7   before?

8   A.  Yes.

9   Q.  In February 2018, Dr. Reddy's encouraged Cerovene to work

10  with ProSupplier to obtain the Daraprim samples needed to redo

11  the bioequivalence testing, correct?

12  A.  Yes.

13  Q.  And Cerovene had evaluated ProSupplier as a source of

14  Daraprim RLD but decided to remain with Reliant because of

15  Reliant's representations that it could get five bottles of

16  Daraprim RLD, correct?

17  A.  Yes.

18  Q.  Now, you don't have any reason to believe that ProSupplier

19  could not have supplied Daraprim RLD to Cerovene in February

20  2018 if Cerovene had placed an order with ProSupplier at that

21  time, correct?

22  A.  Correct.

23  Q.  It was not until September 2018, more than six months after

24  Dr. Reddy's had first suggested that Cerovene contact

25  ProSupplier, that Cerovene agreed to have Dr. Reddy's place a

709

LCHMFTC2                          Shah - Cross

1   purchase order with ProSupplier, correct?

2   A.   Yes.

3   Q.   That order was for three 100-count bottles of Daraprim

4   rather than five, correct?

5   A.   Yes.

6   Q.   And it was Dr. Reddy's, not Cerovene, that actually placed

7   that order with ProSupplier, correct?

8   A.   Yes.

9   Q.   Dr. Reddy's placed that order after Cerovene had submitted

10  a request to the FDA for a waiver to permit Cerovene to

11  complete the bioequivalence testing and satisfy the retention

12  requirements with just three bottles instead of five, correct?

13  A.   To the best of my recollection, yes.

14  Q.   So the order was placed after Cerovene made the waiver

15  request of the FDA, correct?

16  A.   I think so.

17  Q.   I can refresh your recollection on that.  You say you don't

18  recall exactly the date of the FDA request?

19  A.   I don't remember the exact dates because it's just that we

20  were trying to get the FDA an answer -- we were working with

21  the FDA to see if FDA can change their retention quantity

22  requirement.  At the same time we were working with different

23  suppliers, like Reliant Pharmacy, ProSupplier and any others

24  that Dr. Reddy's suggested.  They were happening at the same

25  time.  I am not sure they were connected in terms of making a

LCHMFTC2                        Shah - Cross

1   decision of which supplier to go.

2   Q.  My question, Mr. Shah, is very simple, when these events

3   happened.  If I could direct your attention to your written

4   direct testimony at paragraph 64.  Do you see that, paragraph

5   64?

6   A.  Yes.

7   Q.  That letter to the FDA was in July 2018, correct?

8   A.  Yes.

9   Q.  And the request or, rather, the order that Dr. Reddy's

10  placed for the RLD was in September 2018, correct?

11  A.  Yes.  Um-hum.

12  Q.  But the order was placed before the FDA had granted the

13  waiver, correct?

14  A.  Order to ProSupplier?

15  Q.  Yes.

16  A.  Yes.

17  Q.  That waiver wasn't granted until April 2019, correct?

18  A.  Correct.

19  Q.  So at the time that Dr. Reddy's placed the order with

20  ProSupplier for three bottles of Daraprim RLD rather than five,

21  Cerovene was still required, under the FDA rules, to conduct

22  the bioequivalence testing using five bottles, correct?

23  A.  Correct, yes.

24  Q.  Now, you say in paragraph 62 of your written direct that

25  you, quote, would have preferred to purchase more than three

LCHMFTC2                    Shah - Cross

1   bottles from ProSupplier, but it was your, quote, understanding

2   that ProSupplier could acquire only three bottles.

3          Do you see that?

4   A.  Yes.

5   Q.  My question to you, Mr. Shah, is, what is the basis for

6   that understanding?

7   A.  I can't exactly tell you what was the basis.  These

8   questions happened between Dr. Reddy's and us.  Looking at the

9   scenario where their brand RLDs is difficult to get, and all

10  the circumstances leading to that, it's just difficult to get

11  more bottles.  These are the discussions that happened between

12  different parties.  And it just seemed like five bottles is

13  difficult to get.

14  Q.  So did ProSupplier tell Dr. Reddy's or Cerovene that there

15  was a limit on how many bottles it could provide and that limit

16  was three?

17  A.  I don't recall exactly.  But I am sure there was some

18  discussions about that between ProSupplier and Dr. Reddy's.

19  Q.  Mr. Shah, I am trying to get an understanding -- the

20  question is, do you have an understanding that ProSupplier

21  could acquire only three bottles?  What was that based on?

22  A.  Like I said, it's based on the discussions that were

23  happening between the different parties at that time.

24  Primarily, I was talking to Dr. Reddy's, and Dr. Reddy's

25  contact was ProSupplier and that was the feeling I got, that

LCHMFTC2                        Shah - Cross

1   they can only get three bottles.

2   Q.  Did anyone from ProSupplier tell anyone at Dr. Reddy's or

3   Cerovene that it could only procure three bottles?

4   A.  Not that I'm aware of, no.

5   Q.  You really didn't have an understanding that ProSupplier

6   could acquire only three bottles.  That's not accurate,

7   correct?

8   A.  I can't tell you whether it is accurate or not.  But that

9   was my understanding, is that it's difficult to get the

10  bottles.

11  Q.  Mr. Shah, this is a sworn statement that you provided to

12  the Court, your written direct testimony.  You swore an oath to

13  tell the truth, right?

14  A.  Yeah.  It says here:  It was my understanding that

15  ProSupplier could acquire only three bottles, and that was my

16  understanding.

17  Q.  I thought you just told me that you can't tell whether it's

18  accurate or not.  Is that statement accurate, that that was in

19  fact your understanding, that ProSupplier could acquire only

20  three bottles?

21  A.  Yes.  I can tell you at that time my understanding was that

22  ProSupplier can only supply three bottles.

23  Q.  Did someone tell you that?

24  A.  Not that I recall, no.

25  Q.  Did someone tell anybody at Dr. Reddy's that?

LCHMFTC2                    Shah - Cross

1    A.  I think there was some discussions between me and

2    Dr. Reddy's about how many bottles can we order and how many

3    bottles can we purchase.  And it just -- my understanding is

4    that, you know, three bottles is something that we would be

5    able to purchase.

6    Q.  But nobody told you that?

7    A.  No.

8    Q.  No, meaning nobody told you that?

9    A.  I don't remember exactly if somebody said to me were the

10   three bottles the only thing that we can purchase, but my

11   understanding was that it was the right thing to only order

12   three bottles.

13            MR. CASEY:  Could we go to GX-3017, please.

14   Q.  Mr. Shah, you see on the screen GX-3017.  Do you see that?

15   A.  Yes.

16   Q.  Is this the letter that you signed on behalf of Cerovene to

17   the FDA?

18   A.  Yes.

19   Q.  On July 13, 2018.

20   A.  Yes.

21   Q.  This is the letter in which you are seeking the waiver,

22   correct?

23   A.  Yes.

24   Q.  The third paragraph, where it starts the test product, you

25   say:  Due to the inaccessibility of the RLD, the pharmacy with

714

LCHMFTC2                    Shah - Cross

1   which Cerovene is currently dealing is trying to procure

2   Daraprim tablets, is only able to purchase three bottles, 100

3   count, of the RLD to meet five times retention quantity

4   requirement.  We need five bottles, 100 count.  The pharmacy

5   has informed that it is not possible to purchase five bottles

6   but can try to procure three bottles and thus will not meet the

7   agency's sample retention requirement of five times the

8   quantity used in finished product testing.

9          Do you see that?

10  A.  Yes.

11  Q.  You represented to the FDA that the pharmacy that you were

12  dealing with told you it could only get up to three bottles.

13  Is that what you are telling the FDA here?

14  A.  Yes.

15  Q.  What's the pharmacy you are referring to here?

16  A.  Can I look at the date again, if you don't mind?

17  Q.  The date of what, sir?

18  A.  The date of the letter.

19  Q.  Yes.

20  A.  So, yes.  I think most likely we were referring to Reliant

21  Pharmacy here.

22  Q.  Did someone from Reliant Pharmacy tell you that it could

23  only acquire three bottles?

24  A.  Yes.  That, I think -- the basis of this letter was that,

25  yes, we could only get three bottles.

LCHMFTC2                          Shah - Cross

1   Q.  But your written direct testimony was referring to

2   ProSupplier being the one who led you to understand that they

3   could only acquire three bottles, not Reliant, correct?

4   A.  Yes.

5   Q.  So was it your understanding that both Reliant and

6   ProSupplier had a three-bottle limit?

7   A.  I think the question is very difficult to answer.  When we

8   write a letter to FDA, we write the letter based on the

9   information available at that time and to let FDA know what our

10  difficulties are.  At the same time, dealing with different

11  suppliers, trying to get the bottles, it's a real time thing.

12          The letter is written on July 13.  I believe that

13  Reliant was not able to provide the bottles, and there were

14  some talks that they can only get three bottles and that's what

15  I wrote here.

16  Q.  Is this statement accurate?  He has represented to the FDA

17  that the pharmacy has informed that it is not possible to

18  purchase five bottles.  Is that accurate?

19  A.  Yes.

20  Q.  Then you go on:  But can try to procure three bottles.  Is

21  that accurate too?

22  A.  Yes.

23  Q.  So that's what Reliant told you, correct?

24  A.  That's what I recall, yes.

25          MR. CASEY:  Could we pull up DX-168, please.

LCHMFTC2                        Shah - Cross

1    Q.   Mr. Shah, I'm showing you DX-168, which is an e-mail.  Do

2    you recognize that?  It's dated September 19 of 2018.

3    A.   Yes.

4    Q.   This is from a Mallikarjuna Reddy.  Is that an employee of

5    Dr. Reddy's?

6    A.   Yes.

7    Q.   The e-mail is to you and a number of other individuals.

8    Are they all Dr. Reddy's' employees?

9    A.   Yes.

10   Q.   The subject is Daraprim RLD.  It says:  Dear all.

11            THE COURT:  Excuse me.  Is this in evidence?

12            MR. MEIER:  I believe it is, your Honor.  If not, I'll

13   offer it.  The defense will offer it DX-168.

14            MR. WEINGARTEN:  No objection, your Honor.

15            THE COURT:  Received.

16            (Defendant's Exhibit 168 received in evidence)

17   Q.   Mr. Shah, it says:  As per our my discussion with Manish on

18   17-September, we have agreed to go ahead and place order for

19   three bottles with new vendor, ProSupplier, considering below.

20            Do you see that?

21   A.   Yes.

22   Q.   Manish is you, correct?

23   A.   Yes.

24   Q.   You had a discussion on September 17 with Mr. Reddy and you

25   decided to place an order for three bottles with ProSupplier

LCHMFTC2                    Shah - Cross

1   with the bullets below being part of that discussion, correct?

2   A.   Yes.

3   Q.   So the first one says:  We will insist ProSupplier to

4   supply two bottles from lot number AF6966G, as we already have

5   one bottle from this lot.  In case if they are not able to

6   source this lot, we will proceed to buy three bottles from new

7   lot.

8        What is your understanding of what that bullet is

9   referencing?

10  A.   That seems to be we had one bottle of the same lot.  If we

11  get additional two bottles, then we will have three bottles of

12  the same lot.  Because you need the same lot to do the

13  bioequivalence study.

14  Q.   At this point, Mr. Shah, September 19 of 2018, your waiver

15  request at the FDA had not yet been granted, correct?

16  A.   No.

17  Q.   No, meaning it had not been granted?

18  A.   The FDA did not grant the request.

19  Q.   That was April of 2019?

20  A.   Correct.

21  Q.   Now, the second bullet says:  DRL team will negotiate with

22  ProSupplier to agree for 50 percent advance payment against the

23  order and balance 50 percent when the product is shipped.  PO

24  to be placed accordingly.

25       You see that?

LCHMFTC2                    Shah - Cross

1   A.  Yes.

2   Q.  Does that mean that there is going to be half up front and

3   then half later payment for the RLD?

4   A.  Yeah.

5   Q.  Then it says:  We will insist both the vendors, i.e.,

6   Reliant and ProSupplier, to promptly inform us ahead of time

7   when they get firm visibility to get the product shipped from

8   their primary source so that we don't end up having product

9   from both the suppliers.  We will keep a track on this.

10          Do you see that?

11  A.  Yes.

12  Q.  What is your understanding of what that means?

13  A.  My understanding is exactly what it reads.  There are two

14  vendors and we will keep track of them.

15  Q.  Then it goes on to say:  When one supplier is able to

16  deliver the product, we will take refund from the other.  This

17  way, we increase chances of having product soon.  Correct?

18  A.  Yes.

19  Q.  Now, this plan that you and Mr. Reddy developed was to

20  order a limited number of bottles so that you could get your

21  money back.  Isn't that what happened?

22  A.  You can say that, yeah.

23  Q.  So you and Mr. Reddy decided that you weren't going to buy

24  any more than three bottles, correct?

25  A.  I don't exactly see that in this e-mail or I don't recall

LCHMFTC2                    Shah - Cross

1    having a discussion that we should not buy more than three

2    bottles.

3    Q.  That's not something you discussed with Mr. Reddy?

4    A.  No.  The discussion about -- with Mr. Reddy is exactly what

5    it says.  Let's try to get the brand bottles, as many as we

6    can, as fast as we can.

7    Q.  But the first line, sir, says:  We will insist ProSupplier

8    to supply two bottles, as we already have one bottle.  So

9    weren't you agreeing not to buy any more than three bottles?

10   A.  What that says here is that we have one bottle from that

11   lot.  And if you get two more bottles, then we will have three

12   bottles.  We wanted to use the bottle from that particular lot

13   that the line supplied us.

14   Q.  You wanted to make sure that you didn't end up having

15   product from both the suppliers, correct?

16   A.  Yeah.  Because one of the suppliers is asking for the

17   prepayment.

18   Q.  Now, the delivery of the three bottles was on or about

19   November 19 of 2018, correct?

20   A.  Correct.

21        MR. CASEY:  So if we could look at GX-3390, please.

22   Q.  3390, Mr. Shah, is another e-mail chain.  Again, it's from

23   Mr. Reddy at the top.  It's to a number of people.  You were on

24   this e-mail chain somewhere, correct?

25   A.  Yes.

LCHMFTC2                    Shah - Cross

1              THE COURT:  Excuse me, counsel.  Is this in evidence?

2              MR. CASEY:  It is not, your Honor.  Thank you.  The

3    defense offers GX-3390.

4              MR. WEINGARTEN:  Sorry, your Honor.  I don't mean to

5    interrupt, but the last question was:  You were on this e-mail

6    chain somewhere, correct?  And I am not sure I see where

7    Mr. Shah is on the e-mail chain.

8              MR. CASEY:  Can we go down to page 7, please.  I'm

9    sorry.  Go up.  Keep going up, please.  Further up.  Further.

10   You can go to page 2, please.  I'm sorry, your Honor.  I

11   thought Mr. Shah was on this.  I withdraw it.

12             THE COURT:  That's all right.

13   Q.  Do you recall that the delivery of the three bottles was on

14   or about November 16, 2018?

15   A.  Yes.

16   Q.  Do you recall that that was within about a month from the

17   initial payment from Dr. Reddy's?

18   A.  I don't recall the exact time frame, but, yes, it could be

19   around that time frame.

20   Q.  But Cerovene did not immediately start its bioequivalency

21   testing after getting the bottles, correct?

22   A.  No.

23   Q.  Sorry.  Is the answer, no, you did not start the

24   bioequivalency testing?

25   A.  You said immediately.  We didn't start like next day the

LCHMFTC2                    Shah - Cross

1  bioequivalency study.  It took us a while to start the

2  bioequivalency study because CRO is located outside the

3  country.

4  Q.  What is your CRO?

5  A.  Clinical research organization.

6  Q.  Didn't you wait, Mr. Shah, until the FDA had acted on your

7  waiver request to start the bioequivalence testing?

8  A.  I think you can say that because we were waiting for the

9  confirmation for the retention quality requirement.

10  Q.  The FDA approved your waiver request, correct?

11  A.  Yes.

12  Q.  That was in April of 2019, correct?

13  A.  Yes.

14  Q.  You didn't start the bioequivalency testing until May of

15  2019, correct?

16  A.  Yes.

17  Q.  Just to summarize, in terms of the timeline, the FDA

18  response allowing Cerovene to proceed with the bioequivalence

19  testing using 300 tablets came almost ten months after Cerovene

20  submitted its initial request for reduction in the retention

21  requirements in July 2018, correct?

22  A.  Yes.

23  Q.  And the response came six months after Cerovene had

24  obtained the 300 bottles it needed to conduct the new

25  bioequivalence testing, correct?

LCHMFTC2                    Shah - Cross

1   A.  Yes.

2           THE COURT:  The three bottles.  You said 300 bottles.

3   You meant 300 tablets.

4           MR. CASEY:  I misspoke.  Let me do that again.  I'll

5   try to that again.

6   Q.  The response came six months after Cerovene had obtained

7   the three bottles it needed to conduct the new bioequivalence

8   testing, correct?

9   A.  Yes.

10  Q.  At that point, in April 2019, 16 months had passed since

11  the FDA first notified Cerovene that new bioequivalence testing

12  would be required in December 2017, correct?

13  A.  Yes.

14  Q.  And it was not until May of 2019 that Cerovene actually

15  began its new testing, which was 17 months after the FDA had

16  required the new testing, correct?

17  A.  Yes.

18  Q.  I am going to shift topics, Mr. Shah.

19          You talked in your written direct testimony about a

20  data source called IQVIA.  Do you remember that testimony,

21  paragraph 71 of your direct testimony?

22  A.  Yes.

23          MR. CASEY:  Can we put up the written direct.

24  Q.  You see in paragraph 71 here it says:  Cerovene uses IQVIA

25  data in assessing market opportunities.  I understand that

LCHMFTC2                    Shah - Cross

1    IQVIA is the new name for a company formerly known as IMS which

2    provides data about brand-name drug sales.  I have used

3    IMS/IQVIA data in my work at Cerovene.  I use IMS/IQVIA sales

4    figures for a brand name product as part of deciding whether to

5    invest time and money in developing a generic version of that

6    product.

7              That's your testimony, correct?

8    A.  Yes.

9    Q.  Now, Cerovene does not subscribe to sales data provided by

10   IMS or IQVIA, correct?

11   A.  We do not subscribe.

12   Q.  So to the extent that you reviewed sales data for Daraprim

13   before beginning work on your ANDA in 2013, is it fair to say

14   that you relied on publicly available information rather than

15   data from a proprietary database?

16   A.  Yes.

17   Q.  After 2013, you made no attempt to obtain IQVIA or IMS

18   sales data for the brand Daraprim, correct?

19   A.  Correct.

20   Q.  Mr. Shah, thank you.  That's all the questions I have for

21   you?

22             THE COURT:  Let's take our mid morning recess,

23   everyone.

24             Give me just one second here.  Thanks so much.

25             (Recess)