# 22-728

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

FEDERAL TRADE COMMISSION, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF ILLINOIS, STATE OF NORTH CAROLINA, COMMONWEALTH OF VIRGINIA,

—against—

*Plaintiffs-Appellees,*

MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendant-Appellant,*

VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, KEVIN MULLEADY, individually, and as an owner and director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME VII OF VIII
**(Pages A-1783 to A-2079)**

BRADLEY GROSSMAN
UNITED STATES FEDERAL
  TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-2424

*Attorneys for Plaintiff-Appellee*
  *Federal Trade Commission*

KIMO S. PELUSO
NOAM BIALE
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for Defendant-Appellant*
  *Martin Shkreli*

(*Counsel continued on inside cover*)

PHILIP LEVITZ
OFFICE OF THE NEW YORK STATE
  ATTORNEY GENERAL
28 Liberty Street, 15th Floor
New York, New York 10005
(212) 416-8000

*Attorneys for Plaintiffs-Appellees
  State of New York, State of
  California, Commonwealth of
  Pennsylvania, State of Illinois,
  Commonwealth of Virginia*

SHIRA HOFFMAN
ASSISTANT U.S. ATTORNEY
CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 269-6000

*Attorneys for Plaintiff-Appellee
  State of California*

DEREK MICHAEL WHIDDON
ASSISTANT ATTORNEY GENERAL
OHIO OFFICE OF THE
  ATTORNEY GENERAL
30 East Broad Street, 26th Floor
Columbus, Ohio 4321
(614) 466-2677

*Attorneys for Plaintiff-Appellee
  State of Ohio*

JOSEPH STEPHEN BETSKO, SR.
PENNSYLVANIA OFFICE OF
  THE ATTORNEY GENERAL
ANTITRUST SECTION
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-5393

*Attorneys for Plaintiff-Appellee
  Commonwealth of Pennsylvania*

SARAH A. HUNGER
DEPUTY SOLICITOR
ILLINOIS OFFICE OF THE
  ATTORNEY GENERAL
CIVIL APPEALS DIVISION
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5202

*Attorneys for Plaintiff-Appellee
  State of Illinois*

JESSICA VANCE SUTTON
NORTH CAROLINA DEPARTMENT
  OF JUSTICE
114 West Edenton Street
Raleigh, North Carolina 27603
(919) 716-0998

*Attorneys for Plaintiff-Appellee
  State of North Carolina*

SARAH OXENHAM ALLEN
LUCAS W.E. CROSLOW
MARTIN JORDAN MINOT
VIRGINIA OFFICE OF THE
  ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-6557

*Attorneys for Plaintiff-Appellee
  Commonwealth of Virginia*

# TABLE OF CONTENTS

PAGE

District Docket Court Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Amended Complaint, dated April 14, 2020 [Redacted] . . . . . . . . . . . . . . . . A-136

Defendant Kevin Mulleady's Answer and Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-222

Defendant Martin Shkreli's Answer with Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-289

Defendant Vyera Pharmaceuticals' Answer with Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-351

Joint Stipulation and Order to Amend the Relief Requested
    in the Pleadings, dated March 30, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . A-409

FTC's Motion for Leave to Withdraw the FTC's Prayer
    for Equitable Monetary Relief, dated May 26, 2021 . . . . . . . . . . . . . . . A-414

Order Dismissing the FTC's Claim for Disgorgement,
    dated June 2, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-419

Defendant Martin Shkreli's Pretrial Memorandum of Law [Redacted] . . . A-422

Plaintiff States' Supplemental Pretrial Memorandum of Law,
    dated October 20, 2021 [Redacted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-457

Joint Motion for Entry of Stipulated Order for Permanent Injunction,
    dated December 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-492

Stipulated Order for Permanent Injunction and Equitable
    Monetary Relief, dated December 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . A-541

ii

PAGE

Written Testimony of Nicholas Pelliccione, Ph. D.,
        dated October 18, 2021 .......................................... A-581

Written Testimony of W. David Hardy, M.D., dated October 20, 2021 .. A-593

Written Testimony of Frank DellaFera, dated October 18, 2021
        [Redacted] ...................................................... A-631

Written Testimony of James R. Bruno, dated October 20, 2021
        [Redacted] ...................................................... A-649

Written Testimony of Edward V. Conroy, dated October 20, 2021 ...... A-687

Written Testimony of Susan McDougal, dated October 15, 2021
        [Redacted] ...................................................... A-725

Written Testimony of Abhishek Mukhopadhyay,
        dated October 19, 2021 [Redacted] .............................. A-739

Written Testimony of Nilesh Patel, dated October 15, 2021
        [Redacted] ...................................................... A-751

Written Testimony of Manish S. Shah, dated October 20, 2021 ........ A-766

Written Testimony of Martin Shkreli, dated October 15, 2021
        [Redacted] ...................................................... A-785

Written Testimony of Anne Kirby, dated October 20, 2021 [Redacted] .. A-803

Written Testimony of Kevin Mulleady, dated October 20, 2021 ........ A-831

Written Testimony of Professor C. Scott Hemphill,
        dated October 19, 2021 [Redacted] .............................. A-864

Written Testimony of Dr. Anupam B. Jena, dated October 20, 2021
        [Redacted], with Attachments ................................... A-924

iii

PAGE

Written Testimony of John S. Russell, dated October 20, 2021
    [Redacted], with Attachments ................................... A-1011

Consolidated (Full) Trial Transcripts,
    dated December 14 to 20, 2021 ................................. A-1068

Defendant Martin Shkreli's Notice of Appeal, dated April 5, 2022 .... A-2298

LCHKFTC3                        Shah - Redirect

1              MR. WEINGARTEN:  Thank you, your Honor.  James

2    Weingarten, with the Federal Trade Commission, on behalf of the

3    plaintiffs.

4    REDIRECT EXAMINATION

5    BY MR. WEINGARTEN:

6    Q.  Good morning, Mr. Shah.

7    A.  Good morning.

8    Q.  I'm going to ask you some questions about the topics that

9    Mr. Casey talked to you about earlier today.  Okay?

10   A.  Okay.

11   Q.  Mr. Casey asked you some questions about RL Fine.

12             Do you recall that?

13   A.  Yes.

14   Q.  He asked you some questions about the word "free riding."

15             Do you remember that?

16   A.  Yes.

17   Q.  As part of working with RL Fine, did Cerovene invest time

18   and money in helping RL Fine qualify its pyrimethamine API for

19   use in the United States?

20   A.  Yes.

21   Q.  Could you please explain?

22   A.  Well, typically, we refer DMF in our ANDA when we buy the

23   API substance from any company.  But, in this case, RL Fine did

24   not have and did not file the DMF with the U.S. FDA.  And

25   that's one of the requirement, to actually get the product

LCHKFTC3                    Shah - Redirect

1   approved with the FDA.

2           So --

3   Q.  Let me just stop you one second, sir.

4           DMF stands for drug master file?

5   A.  Drug master file.

6   Q.  Okay.  Thank you.

7           Please continue.

8   A.  Yes.

9           So -- and they said that, look, if you -- we have no

10  interest in selling this product in USA, for whatever reasons

11  that they had, so we had to then work with them and sort of

12  pay -- and do all of the work, spend money and time, and also

13  pay the FDA fees in order for us to use the API.  So all this

14  time and effort was put in by Cerovene and not RL Fine.  And we

15  just want to make sure that, you know, nobody will be able to

16  use that material because they have not really put any time.

17  It's us putting all the time and money, and that's what we did.

18  Q.  Mr. Casey asked you if RL Fine had always provided API

19  pyrimethamine API upon request.

20          Do you remember those questions?

21  A.  Yes.

22  Q.  Now, were you able to use all of the API that RL Fine

23  supplied in making finished sellable product of a generic

24  Daraprim?

25          Let me ask it this way:  Did some of the API that

726

LCHKFTC3                    Shah - Redirect

1   RL Fine supplied expire?

2   A.  Yes.

3   Q.  And are you allowed to use, under FDA regulations, expired

4   API in finished drug product for sale in the United States?

5         MR. CASEY:  Your Honor, I object.  He's leading the

6   witness.

7         THE COURT:  Sustained.

8   BY MR. WEINGARTEN:

9   Q.  Did there come a point whereby you were able to use the

10  RL Fine API to manufacture sellable product?

11  A.  I'm sorry, can you repeat the question?

12  Q.  Were you able to use all the RL Fine API to make sellable

13  Daraprim product?

14  A.  No.

15  Q.  Did there come a point in time, during your work with

16  RL Fine, where RL Fine declined to continue supporting

17  Cerovene's generic Daraprim product?

18  A.  Yes.

19  Q.  And was it your understanding, after that point in time,

20  that RL Fine would sell you more API or would not sell you more

21  API?

22  A.  I guess you have to rephrase the question.

23  Q.  Okay.  Did you travel to India to talk to RL Fine?

24  A.  Yes.

25  Q.  After you met with RL Fine in India, what was your

LCHKFTC3                    Shah - Redirect

1   understanding of whether RL Fine would supply you, or not

2   supply you, with pyrimethamine?

3   A.   So, just to clarify, I traveled to India, I believe, in

4   2017.  At that point, RL Fine said that we would not be able to

5   support anything for the U.S. market.  But then, again, I went

6   back in 2020, if I remember correctly, and they said, okay, no

7   problem, we can supply you the API now.

8   Q.   So between 2017, when you met with them, and 2020, what was

9   your understanding about whether RL Fine could supply API, or

10  would supply API, to Cerovene?

11  A.   Based on what they told me, they would not be able to

12  supply me.

13  Q.   Mr. Casey asked you some questions about the relationship

14  between bioequivalence testing requirements and the number of

15  bottles of Daraprim RLD you would need.

16          Do you remember that?

17  A.   Yes.

18  Q.   When did Cerovene engage Reliant to purchase -- first

19  engage Reliant to purchase Daraprim RLD?

20  A.   February 2018.

21  Q.   And how much RLD did you engage Reliant to procure?

22  A.   Five bottles.

23  Q.   If Reliant had delivered five bottles, would Cerovene have

24  accepted them?

25  A.   Yes.

728

LCHKFTC3                    Shah - Redirect

1   Q.  And would you have used them to make the tests to meet the

2   bioequivalence requirements of the FDA?

3   A.  Yes.

4   Q.  If ProSupplier had said it was able to deliver five

5   bottles, would you have accepted five bottles of Daraprim from

6   ProSupplier?

7   A.  Yes.

8   Q.  Now, Mr. Casey asked you a question about ProSupplier

9   versus Reliant, and he looked at a document with you,

10  Government Exhibit 3395.

11          MR. WEINGARTEN:  Could we please look at Government

12  Exhibit 3395, Ms. Guy.  Could you please turn to page 002.

13          THE COURT:  Is this in evidence, counsel?

14          MR. WEINGARTEN:  Your Honor, I'm not sure if Mr. Casey

15  moved it into evidence, but I will do so now, your Honor.

16          THE COURT:  Any objection?

17          MR. CASEY:  No objection, your Honor.

18          THE COURT:  Received.

19          MR. WEINGARTEN:  Thank you.

20          (Government's Exhibit 3395 received in evidence)

21  BY MR. WEINGARTEN:

22  Q.  Let's look at 002.

23          Mr. Casey asked you about the bottom email — it's from

24  Mr. Mukhopadhyay, and it's dated 20 February 2018.

25          Do you see that?

729

LCHKFTC3                    Shah – Redirect

1   A.  Yes.

2   Q.  I believe he pointed you to the sentences that say, "As we

3   still do not have the RLD from Espee after more than a month, I

4   think we should cancel the PO and work with ProSupplier."

5          Do you see that?

6   A.  Yes.

7   Q.  What is Espee?

8   A.  Espee is another specialty pharmacy like Reliant or

9   ProSupplier.

10  Q.  Did Cerovene try to get Daraprim RLD from Espee?

11  A.  Yes.

12  Q.  How much?

13  A.  Five bottles.

14  Q.  The next paragraph down, Mr. Mukhopadhyay wrote to you and

15  others, "Ramesh, Malli, can we work with ProSupplier and order

16  for Cerovene?"

17         Do you see that?

18  A.  Yes.

19  Q.  I want to take you to the top of this.

20         MR. WEINGARTEN:  Back to page 001, please.  Let's look

21  what happens at the rest of this email chain.  If you could

22  start with that email at the bottom, February 20, 2018, at

23  11:27 p.m.

24  Q.  This one is also from a Mr. Reddy, who works at

25  Dr. Reddy's, correct?

730

LCHKFTC3                    Shah - Redirect

1   A.   Yes.

2   Q.   And Mr. Reddy writes, in the first paragraph, "We checked

3   again with ProSupplier, and they have indicated four to six

4   weeks' lead time after providing PO and prepayment.  We have

5   also checked with other vendors, and Reliant is now ready to

6   supply the same within two weeks after receipt of PO and

7   prepayment."

8            Do you see that, sir?

9   A.   Yes.

10  Q.   What is the difference, from your perspective, in

11  developing the drug between four to six weeks' lead time and

12  two weeks' lead time?

13  A.   Well, it's a big difference, right, because we could start

14  the bioequivalence study that much earlier.

15  Q.   If we go to the top email, page 001, this is from

16  Mr. Mukhopadhyay, who had written the email earlier about

17  working with ProSupplier, and it's dated February 21st, and the

18  second paragraph of the email says, "Manish, seems all

19  pharmacies are requesting prepayment."  Let's stop there.

20           What does it mean, "requesting prepayment"?  Do you

21  understand that?

22  A.   Yes.  It means they need advance payment before they can

23  supply the bottle.

24  Q.   Could you please speak a little slower, sir?

25  A.   They need an advance payment before they can actually

LCHKFTC3                        Shah – Redirect

1    supply the bottle.

2    Q.   And Mr. Mukhopadhyay writes, "My suggestion would be for

3    Cerovene to wire transfer the funds to DRL, and we can place

4    the order with Reliant based on the PO below and prepayment."

5          Did Cerovene ultimately decide, at this point, to

6    continue moving forward with Reliant and not ProSupplier?

7          MR. CASEY:   Objection; leading.

8          THE COURT:   Overruled.

9          THE WITNESS:   Yes.

10   BY MR. WEINGARTEN:

11   Q.   Why?

12   A.   For the reasons that it is possible to get in two weeks

13   versus four to six weeks.

14   Q.   And Mr. Mukhopadhyay writes, at the end there, "We need to

15   move quickly, as we have already been delayed by two months

16   since the CR."

17          What is "CR," sir?

18   A.   It's a complete response.

19   Q.   And what is a complete response?

20   A.   It's basically FDA's consent, their complete response

21   letter in 2017, saying that we could not approve the Cerovene's

22   ANDA.

23   Q.   And at this time, did you agree with Mr. Mukhopadhyay about

24   the need to move quickly?

25   A.   Yes.

LCHKFTC3                    Shah – Redirect

1    Q.  Why did you want to move quickly?

2    A.  So we could finish the bioequivalency study and get

3    approval of the product.

4    Q.  Thank you.

5         MR. WEINGARTEN:  You can take that document down now,

6    Ms. Guy.

7    Q.  Now, Mr. Casey asked you several questions about three

8    bottles versus five bottles.

9         Do you remember that?

10   A.  Yes.

11   Q.  Now, I don't want you to say the name of the pharmacy, but

12   was there a pharmacy that in the past you had ordered Daraprim

13   bottles from that had delivered them?

14   A.  Yes.

15   Q.  Did you try to order bottles from that pharmacy again after

16   the FDA told you Cerovene would need to do new bioequivalence

17   testing?

18   A.  Yes.

19   Q.  And how soon after the FDA letter telling you that did you

20   contact that pharmacy?

21   A.  If I recall, probably the next day.

22   Q.  And based on your prior experience seeking Daraprim from

23   that pharmacy, how long did you think it would take to source

24   five bottles of Daraprim?

25   A.  Probably one or two days.

LCHKFTC3                        Shah - Redirect

1  Q.  And was that pharmacy able to supply Daraprim to you?

2  A.  No.

3  Q.  If you could have gotten five bottles from that local

4  pharmacy, would you have accepted them?

5  A.  Yes.

6  Q.  And would you have used them to meet the FDA bioequivalency

7  requirement?

8  A.  Yes.

9  Q.  At this point in time, if an RLD supplier had offered to

10  deliver five bottles of Daraprim RLD, would you have accepted

11  five bottles of Daraprim RLD?

12  A.  Yes.

13  Q.  Let's look, please, at Defense Exhibit 168.  This is also a

14  document that Mr. Casey showed you.

15        Do you remember Mr. Casey asking you some questions

16  about Defense Exhibit 168?

17  A.  Yes.

18  Q.  And this is an email from a Mr. Reddy, who works at

19  Dr. Reddy's, correct?

20  A.  Yes.

21  Q.  And it's dated September 19, 2018, correct?

22  A.  Yes.

23  Q.  And you are one of the recipients?

24  A.  Yes.

25        MR. WEINGARTEN:  And I'm not sure if it was moved into

LCHKFTC3                    Shah - Redirect

1   evidence, your Honor, but at this time --

2            THE COURT:  It is.

3            MR. WEINGARTEN:  It is?  Okay.  Thank you.

4   BY MR. WEINGARTEN:

5   Q.  And Mr. Casey went over some of these bullets with you,

6   correct?

7   A.  Yes.

8   Q.  I want to ask you to help clear up something about the

9   first bullet.

10           Now, in the first bullet, it says, "We will insist

11  ProSupplier to supply two bottles from a lot number" -- it

12  gives the number — "as we already have one bottle from this

13  lot."

14           Now, I think you got this briefly with Mr. Casey, but

15  I want to make sure it's understood:  Why does it matter if the

16  bottles are from the same lot or not?

17  A.  Because that's one of the requirement of FDA, to conduct

18  the biostudy from the same lot of RLD.

19  Q.  If you could have gotten bottles from the same lot from

20  only one supplier, would you have done that?

21  A.  Yes.

22  Q.  And if you had to use a combination of suppliers to get

23  enough bottles to meet FDA requirements, would you have tried

24  that?

25  A.  Yes.

735

LCHKFTC3                          Shah – Redirect

1   Q.  Now, Mr. Casey asked you a question about you receiving the

2   bottles from ProSupplier in November 2018.

3            Do you remember those questions?

4   A.  Yes.

5   Q.  In November 2018, you got three bottles -- sorry.  How many

6   bottles did ProSupplier deliver?

7   A.  Three bottles.

8   Q.  And Mr. Casey asked you some questions about waiting to

9   start bioequivalence testing.

10           Do you remember that?

11  A.  Yes.

12  Q.  In November 2018, when you got the three bottles from

13  ProSupplier, had FDA approved the use of only three bottles for

14  your bioequivalence testing?

15  A.  No.

16  Q.  When you started the bioequivalence testing, did you do so

17  after the FDA had approved the use of three bottles for

18  bioequivalence testing?

19  A.  Yes.

20  Q.  Throughout this development process, sir, what was your

21  goal in reaching the marketplace with a Daraprim generic

22  product?

23  A.  The goal was to get approval as fast as possible and

24  commercialize the product.

25           MR. WEINGARTEN:  Nothing further at this time, your

LCHKFTC3                         Shah - Redirect

1    Honor.

2              THE COURT:  Any recross?

3              MR. CASEY:  No, recross, your Honor.  Thank you.

4              THE COURT:  Thank you so much.

5              So, Mr. Shah, if I could direct your attention to

6    page 7 of your direct testimony.  It's my understanding, from

7    your discussion on page 7 of your interactions with Fukuzyu,

8    that it was your desire, your preference, to use Fukuzyu API.

9              Am I right?

10             THE WITNESS:  Yes.

11             THE COURT:  If Fukuzyu had agreed to supply you with

12   its API, would you have, instead, chosen to proceed with

13   RL Fine?

14             THE WITNESS:  No.

15             THE COURT:  So I want to have you discuss for me

16   something that did not occur.  Let us assume that Fukuzyu had

17   agreed to supply you with their API in the fall of 2016.

18             THE WITNESS:  Okay.

19             THE COURT:  I'd like you to also assume a second

20   thing — that when you went into the marketplace to get

21   Daraprim, the RLD, if you needed more Daraprim, you would have

22   had no difficulty getting it; for instance, you could go back

23   to that same pharmacy we are not naming and get as many bottles

24   as you wanted.  Okay?  That's the second assumption.

25             THE WITNESS:  Okay.

LCHKFTC3                          Shah - Redirect

1          THE COURT:  So could you walk me through the steps you

2    would have needed to take with those two assumptions and help

3    me create a timeline for how long it would have taken you then,

4    you expect, based on your experience, to actually enter the

5    marketplace, to get FDA approval and to enter the marketplace?

6          THE WITNESS:  Okay, okay.

7          So if we have gotten the Fukuzyu API and --

8          THE COURT:  When?  What date?

9          THE WITNESS:  Let's say October 2016.

10         And if there was no issue getting the RLD Daraprim,

11   then we would make one batch, which we call a registration

12   batch --

13         THE COURT:  Which you call a what special batch?

14         THE WITNESS:  A registration batch.

15         THE COURT:  A registration batch?

16         THE WITNESS:  Registration batch.

17         We would make one batch, and then we had to wait for

18   three months of stability data.  Within that three months, if I

19   had the RLD, then I could have done the study, also.  So from

20   my perspective, we would require four months to get the

21   stability data done, to produce one batch, and get the bio

22   study done, and then we could file the amendment.  If it's not,

23   file an amendment with FDA saying that we want to change the

24   API source from Ipca source to Fukuzyu source.

25         THE COURT:  So let me stop you there.

LCHKFTC3                        Shah - Redirect

1              So before you could amend your ANDA, you believed you

2    would need to take the following steps — you would need to make

3    a registration batch?

4              THE WITNESS:  Correct.

5              THE COURT:  You would need to wait three months to

6    obtain stability data?

7              THE WITNESS:  Correct.

8              THE COURT:  After you make the batch?

9              THE WITNESS:  Yes.

10             THE COURT:  So that's four months?

11             THE WITNESS:  Yes.

12             THE COURT:  And during that four-month period, you

13   would do, at the same time, the bioequivalency testing?

14             THE WITNESS:  Yes.

15             THE COURT:  So you would say it would take you four

16   months from the October 2016 to the filing of your amended

17   ANDA?

18             THE WITNESS:  Correct.

19             THE COURT:  So we're just going to say, roughly,

20   February of 2017?

21             THE WITNESS:  Yes.

22             THE COURT:  Next step?

23             THE WITNESS:  And once you file the amendment, then

24   it's really up to the FDA how quickly they would approve the

25   ANDA, right?  So that timeline is something really up to FDA,

739

LCHKFTC3                    Shah - Redirect

1   but FDA generally gives you a goal date.  Whenever you do the

2   file date, FDA generally give you goal date, and those goal

3   dates, depending upon what the amendment is — in this case, it

4   would be a major amendment — I would say about six to nine

5   months.  It could be three months, six months, but most likely

6   six months.

7          THE COURT:  Given the fact that you would have been

8   using, under this hypothetical, Fukuzyu's API, would you have

9   been optimistic that you would have been approved at the end of

10  that six-month period?

11         THE WITNESS:  Yes.  So, two reasons for yes:

12         One is we believe that Fukuzyu is the API that's been

13  used in the RLD Daraprim.  So I don't believe FDA would have a

14  major deficiency as it relates to the API.  And if our

15  bioequivalency studies successfully passed, then there's no

16  reason for FDA not to give the approval.

17         THE COURT:  So let us say that the FDA gives you

18  approval.  How long, then, to get the product into the market?

19         THE WITNESS:  I would say we could be in the market in

20  less than three months.

21         THE COURT:  And what is taking you three months to do?

22  What's happening in that interval?

23         THE WITNESS:  So as to the FDA's guidance, you have to

24  produce three batches, which we call process validating

25  batches, and we have to validate -- so produce three batches,

LCHKFTC3                    Shah - Redirect

1    then you have to do what we call process validation testings.
2    And once we finish up those testings, then we have to prepare a
3    complete report on those three batches, which is lot more
4    testing than you would normally do for a commercial batch.

5         So any batch you make after that three batches would
6    be a true commercial batch, and we would then require reduced
7    testing, so it doesn't take that much time to release that
8    batch.  But for the first three batches, we have to do lot more
9    testing.

10        So we -- I suppose we can move faster, we can try to
11   do it within, let's say, one and a half months, but it would
12   not take us more than three months to produce -- to
13   commercially launch the product.

14        THE COURT:  So after you create the three batches and
15   do that intense testing regimen and then create more batches
16   for the market, are you reporting to the FDA?  You said you use
17   these tests to create a report.

18        THE WITNESS:  So that particular report is not
19   submitted to FDA, but you are expected to provide that report
20   when FDA comes for a full inspection because the first thing
21   they would ask is, we need your process validation report.  And
22   if you don't have it, then it's sort of a violation of FDA.

23        THE COURT:  So let me just make sure I have this
24   timeline correct.  So you file your amendment in February, you
25   think it's likely the FDA would have taken six months to render

LCHKFTC3                    Shah - Redirect

1    its decision, you think it's very likely that would have been

2    an approval?

3                THE WITNESS:  Yes.

4                THE COURT:  It could have taken the FDA as long as

5    nine months, but you think six months is more likely?

6                THE WITNESS:  Yes.

7                THE COURT:  So that is August of 2017, and then you

8    need three more months after approval in order to validate your

9    process through testing of additional batches?

10               THE WITNESS:  Yes.

11               THE COURT:  So that's November of 2017 to enter the

12   market?

13               THE WITNESS:  Yes.

14               THE COURT:  Now, I suppose you could have done this

15   testing of the process, the creation of the three batches and

16   the testing and the validation, while you were waiting for the

17   FDA to react to your ANDA?

18               THE WITNESS:  Certainly, yes.

19               THE COURT:  And maybe other pharmaceutical companies

20   would choose to do that?

21               THE WITNESS:  Yes.

22               THE COURT:  I've heard reference to something called

23   CGT status.

24               Are you familiar with that term?

25               THE WITNESS:  Yes.

LCHKFTC3                    Shah - Redirect

1           THE COURT:  What is your understanding of that term?

2           THE WITNESS:  So it's an FDA -- with the new GDUFA

3      regulations, FDA's come up with an incentive situation for

4      generic drugs, where if you are the first generic that is

5      either getting approved or first generic being filed, then FDA

6      gives you some incentive with an expeditious review.

7           THE COURT:  And that's only for the first generic?

8           THE WITNESS:  Yes.

9           THE COURT:  Excuse me one minute, counsel.

10          (Pause)

11          THE COURT:  Counsel, do you have additional questions

12     for this witness, given the questions I have put to him?

13          MR. WEINGARTEN:  Just a few very, very briefly, if

14     it's okay, your Honor.

15     REDIRECT EXAMINATION

16     BY MR. WEINGARTEN:

17     Q.  Judge Cote asked you some questions about a hypothetical

18     world.  I just want to ask you, very briefly, about the real

19     world.

20          Do you remember, in the real world, the date the FDA

21     approved Cerovene's generic Daraprim product?

22     A.  Say that again?

23     Q.  Do you remember, in the real world that actually happened,

24     the date the FDA approved Cerovene's generic Daraprim product?

25     A.  Yes.  And that was February 28, 2020.

LCHKFTC3                    Shah - Redirect

1   Q.  Okay.  February 28, 2020.

2           And in the real world, do you remember what date the

3   product launched in the marketplace?

4   A.  We believe we launched directly in March 2020.

5   Q.  So in the real world, it only took one month from approval

6   to launch?

7   A.  Yes.

8   Q.  Okay.

9           MR. WEINGARTEN:  Nothing further, your Honor.  Thank

10  you.

11          THE COURT:  Any additional questions?

12          MR. CASEY:  No, your Honor.  Thank you.

13          MR. WEINGARTEN:  Briefly, your Honor, we have another

14  GX 9000 number that relates to this witness that I could move

15  into evidence.

16          THE COURT:  Sure.  Should he be on the stand for that

17  just in case?

18          MR. WEINGARTEN:  Sure, if there's any objection.  I

19  don't think there are.

20          If I may approach, your Honor.  This is GX 9011, and

21  the government moves to admit GX 9011 and the exhibits therein.

22          THE COURT:  Any objection?

23          MR. CASEY:  No objection.

24          THE COURT:  Received.

25          (Government's Exhibit 9011 with the exhibits within

744

LCHKFTC3                      Patel - Direct

1   received in evidence)

2           MR. WEINGARTEN:  Thank you.

3           THE COURT:  You may step down.

4           THE WITNESS:  Thank you.

5           (Witness excused)

6           THE COURT:  Next witness.

7           MR. MEIER:  Your Honor, the government calls, as its

8   next witness, Nilesh Patel, N-i-l-e-s-h and Patel is P-a-t-e-l,

9   and my colleague from the New York Attorney General's Office,

10  Elinor Hoffmann, will be the attorney for the government on

11  this one, your Honor.

12          THE COURT:  Sir, if you could come up, take the

13  witness stand, and remain standing.

14   NILESH PATEL,

15      called as a witness by the Plaintiffs,

16      having been duly sworn, testified as follows:

17          THE COURT:  You're about to be given a document which

18  is -- I'm sorry, please state your full name and spell your

19  first and last name for the record.

20          THE WITNESS:  Nilesh Patel, N-i-l-e-s-h P-a-t-e-l.

21          THE COURT:  Thank you.

22          And, Mr. Patel, if you could move your chair closer.

23          Thank you.

24          Our ventilation system in this room has been tested,

25  so if you wish, you may remove your mask, and you may move that

LCHKFTC3                          Patel - Direct

1    microphone in a way that keeps it low, a little under your

2    chin, but speak directly into it.

3              THE WITNESS:  Okay.

4              THE COURT:  Thank you.

5              I believe you're about to be handed a document which

6    is marked as GX 8010.  I'm going to ask you to look at page 14.

7              And I'm going to ask if that is your signature on

8    page 14 of that exhibit?

9              THE WITNESS:  Yes.

10             THE COURT:  Before signing that document, did you read

11   it with care?

12             THE WITNESS:  Yes.

13             THE COURT:  Do you swear to the truth of its contents?

14             THE WITNESS:  Yes.

15             THE COURT:  Any objections to receipt of GX 8010?

16             THE WITNESS:  No.

17             MS. STEWART:  Sarah Stewart, your Honor.

18             No objection.

19             THE COURT:  It is received.

20             (Government's Exhibit 8010 received in evidence)

21             THE COURT:  Cross-examination.

22             MS. HOFFMANN:  Your Honor, I have a few exhibits,

23   which I thought we might introduce at the beginning, or would

24   you --

25             THE COURT:  Certainly.  That's fine.

LCHKFTC3                    Patel - Cross

1           MS. HOFFMANN:  This is GX 9012, and these are
2    documents that were attached to the affidavit.  They're listed
3    on this exhibit.  I don't believe there are any objections.
4           THE COURT:  Any objections to the receipt of GX 9012
5    and the exhibits listed on it?
6           MS. STEWART:  Sarah Stewart, your Honor.
7           No objections.
8           THE COURT:  Received.
9           (Government's Exhibit 9012 and exhibits within
10   received in evidence)
11          THE COURT:  Cross-examination?
12   CROSS-EXAMINATION
13   BY MS. STEWART:
14   Q.  Good morning, Mr. Patel.  My name is Sarah Stewart, here
15   for Defendant, Martin Shkreli.  I have a few questions for you
16   this morning.
17          In 2014, InvaTech decided to begin developing a
18   generic version of Daraprim, correct?
19   A.  Yes.
20   Q.  And in 2014, InvaTech's efforts to develop a generic
21   Daraprim product began with reviewing IMS sales data for
22   Daraprim; is that correct?
23   A.  Yes.
24   Q.  InvaTech received the IMS sales data from one of its
25   marketing partners, a company called Trident Laboratories,

LCHKFTC3                    Patel - Cross

1    correct?

2    A.   Yes.

3    Q.   And since receiving the sales data in 2014, InvaTech hasn't

4    asked for any other sales data related to Daraprim, correct?

5    A.   Yes.

6    Q.   Now, part of InvaTech's efforts to develop a generic

7    Daraprim product, that included bioequivalence testing,

8    correct?

9    A.   Yes.

10   Q.   And to conduct bioequivalence testing, InvaTech needed to

11   obtain tablets of the branded drug, correct?

12   A.   Yes.

13   Q.   InvaTech needed three 100-tablet bottles of Daraprim,

14   correct?

15   A.   Yes.

16   Q.   InvaTech, in fact, obtained tablets of Daraprim, correct?

17   A.   Yes.

18   Q.   InvaTech obtained 600 tablets of Daraprim, correct?

19   A.   Yes.

20   Q.   And InvaTech obtained these 600 tablets in October of 2014,

21   correct?

22   A.   Yes.

23   Q.   So as of October 2014, InvaTech had the Daraprim samples

24   that it needed to conduct bioequivalence testing, correct?

25   A.   Yes.

LCHKFTC3                    Patel – Cross

1    Q.  InvaTech did not purchase any Daraprim after 2014, correct?

2    A.  Yes.

3    Q.  And InvaTech did not attempt to purchase any Daraprim after

4    2014, correct?

5    A.  Yes.

6    Q.  And InvaTech, in fact, used the Daraprim that it obtained

7    in 2014 to conduct bioequivalence testing, correct?

8    A.  Yes.

9    Q.  Let's change topics to InvaTech's pyrimethamine suppliers.

10            The first supplier with which InvaTech contracted was

11   Ipca Laboratories, correct?

12   A.  Yes.

13   Q.  And you identified Ipca by reviewing Ipca's website; is

14   that correct?

15   A.  Yes.

16   Q.  Did you also identify Ipca by reviewing the drug master

17   file, or DMF, list?

18   A.  DMF list.

19   Q.  I'm sorry, I did not hear that.

20   A.  DMF list.

21   Q.  Yes?

22   A.  Yes.

23   Q.  Thereafter, you contacted Ipca by phone, correct?

24   A.  Their local office in New Jersey.

25   Q.  You contacted them at a local office in New York City?

LCHKFTC3                    Patel - Cross

1    A.   New Jersey.

2    Q.   New Jersey by phone?

3    A.   Yes.

4    Q.   And other than speaking with Ipca by phone and reviewing

5    the website and the DMF list, InvaTech did not do any other

6    research in connection with selecting Ipca, correct?

7    A.   No.

8    Q.   Correct, no other research was done?

9    A.   That is correct.

10   Q.   Okay.  Thank you.

11            InvaTech did not do a site visit of Ipca's

12   manufacturing facilities, correct?

13   A.   No.

14   Q.   Correct, that they did not visit the manufacturing

15   facilities?

16   A.   I never visited Ipca's facility.

17   Q.   Thank you.

18            And InvaTech did not meet with anyone from Ipca in

19   person, correct?

20   A.   Local agent, yes.

21   Q.   You met with a local agent?

22   A.   Yes.

23   Q.   But no one at the manufacturing facility?

24   A.   No.

25   Q.   At the time InvaTech contracted with Ipca, it did not look

LCHKFTC3                    Patel - Cross

1    for or consider any other API suppliers, correct?

2    A.  Yes.

3    Q.  Ipca supplied pyrimethamine to InvaTech in 2014, correct?

4    A.  Yes.

5    Q.  Now, the FDA imposed an import ban on Ipca in 2015,

6    correct?

7    A.  Yes.

8    Q.  And that import ban on Ipca, it delayed InvaTech's

9    development of a generic Daraprim product, correct?

10   A.  Yes.

11   Q.  That's because InvaTech had to find a new supplier,

12   correct?

13   A.  Yes.

14   Q.  Now, in summer of 2015, you learned of RL Fine and that it

15   was a potential supplier of pyrimethamine, correct?

16   A.  Yes.

17   Q.  And you contacted RL Fine by phone; is that correct?

18   A.  Yes.

19   Q.  And then you met RL Fine at a pharmaceutical industry

20   conference, DCAT, in New York City; is that correct?

21   A.  Yes.

22   Q.  And at that conference, you discussed with RL Fine the

23   potential of supplying pyrimethamine to InvaTech, correct?

24   A.  Yes.

25   Q.  And InvaTech understood, from those discussions with

LCHKFTC3                        Patel - Cross

1    RL Fine, that RL Fine was supplying pyrimethamine outside the
2    United States, correct?
3    A.   Yes.
4    Q.   And InvaTech chose RL Fine as its new pyrimethamine
5    supplier because it was already supplying outside of the United
6    States, correct?
7    A.   Yes.
8    Q.   Before choosing RL Fine, InvaTech didn't conduct a
9    supplier's audit of RL Fine, did it?
10   A.   Can you repeat?
11   Q.   Before choosing RL Fine, InvaTech did not conduct a
12   supplier's audit of RL Fine, correct?
13   A.   No.
14   Q.   Correct as in no, no audit was conducted?
15   A.   No audit was conducted.
16   Q.   Okay.  Thank you.
17          And at this time, when InvaTech decided to work with
18   RL Fine, InvaTech did not research whether there were other
19   companies supplying pyrimethamine outside the United States,
20   correct?
21   A.   Yes.
22   Q.   Now, when you first contacted RL Fine, it did not have a
23   DMF for pyrimethamine, correct?
24   A.   Yes.
25   Q.   But InvaTech did not take any steps to have RL Fine file a

LCHKFTC3                    Patel - Cross

1   DMF for pyrimethamine in the summer of 2015, correct?

2   A.   Yes.

3   Q.   But, as far as you knew, RL Fine could have filed a DMF in

4   the summer of 2015, correct?

5   A.   They were not ready.

6   Q.   I'm sorry, could you say that --

7   A.   They were not ready at that time to file.

8   Q.   But, as far as you knew, nothing was preventing RL Fine

9   from filing the DMF?

10  A.   Yes.

11  Q.   And RL Fine first sent pyrimethamine to InvaTech in

12  September of 2015, correct?

13  A.   Yes.

14  Q.   Let's fast forward to November of 2016.  RL Fine still

15  hadn't filed the DMF, correct?

16  A.   Yes.

17  Q.   So RL Fine was delaying in filing the DMF, correct?

18  A.   Yes.

19  Q.   Now, InvaTech and RL Fine entered into a written agreement,

20  correct?

21  A.   Yes.

22  Q.   And the agreement required RL Fine to provide a

23  pyrimethamine DMF, correct?

24  A.   Yes.

25  Q.   The agreement also contemplated submission of an ANDA for

**A-1812**

LCHKFTC3                    Patel - Cross

1  InvaTech's pyrimethamine product in 2017 or 2018, correct?

2  A.   Yes.

3  Q.   And InvaTech was ready to submit its ANDA for generic

4  Daraprim in January of 2017, correct?

5  A.   Yes.

6  Q.   But RL Fine had not provided the DMF by that time, correct?

7  A.   Yes.

8  Q.   And let's fast forward again approximately six months, to

9  June of 2017, and RL Fine had still not provided the DMF,

10  correct?

11  A.   Yes.

12  Q.   InvaTech ultimately decided to submit its ANDA despite

13  RL Fine not having provided the DMF, correct?

14  A.   Can you repeat it?

15  Q.   InvaTech decided to submit the ANDA without RL Fine having

16  obtained the DMF, correct?

17  A.   Yes.

18  Q.   And to submit the ANDA, InvaTech actually took it upon

19  itself to include the DMF information within the ANDA, correct?

20  A.   Yes.

21  Q.   And InvaTech decided to do this, submit the DMF information

22  within the ANDA, even though it would have been easier and

23  faster for the FDA's review if there was a separate DMF on

24  file, correct?

25  A.   Yes.

LCHKFTC3                    Patel - Cross

1   Q.  And you did this because RL Fine was taking too long,

2   correct?

3   A.  Yes.

4   Q.  Now, there came a time when RL Fine decided it would no

5   longer support InvaTech's ANDA for generic Daraprim, correct?

6   A.  Can you repeat?

7   Q.  There came a time when RL Fine decided it would no longer

8   support InvaTech's ANDA for the generic Daraprim, correct?

9   A.  Yes.

10  Q.  And this was toward the end of September 2017, correct?

11  A.  Yes.

12  Q.  And in September 2017, you went to RL Fine's headquarters

13  in India, correct?

14  A.  Yes.

15  Q.  And you went there to discuss why RL Fine had decided to no

16  longer support InvaTech's pyrimethamine ANDA, correct?

17  A.  Yes.

18  Q.  And the reason you were given by RL Fine was that

19  pyrimethamine was a small-volume project, correct?

20  A.  Yes.

21  Q.  But InvaTech did not offer to purchase larger volumes of

22  pyrimethamine, correct?

23  A.  Yes.

24  Q.  Are you aware that it was not until three months after this

25  September 2017 meeting that RL Fine entered into a

LCHKFTC3                    Patel - Cross

1   collaboration and supply agreement with Vyera?

2   A.   No.

3   Q.   You're not aware of that fact?

4   A.   No.

5   Q.   Okay.  That's fine.

6            After RL Fine's decision to no longer support

7   InvaTech's ANDA, InvaTech had to find a new supplier, correct?

8   A.   Yes.

9   Q.   InvaTech started looking for a new supplier in late

10  2017/early '18?

11  A.   Can you repeat?

12  Q.   InvaTech started to look for a new supplier in late 2017 or

13  the early 2018 time frame, correct?

14  A.   Yes.

15  Q.   And InvaTech found a company that we're going to refer to

16  here as API 2, correct?

17  A.   Yes.

18  Q.   And when I refer to API 2, are you clear who I'm referring

19  to?

20  A.   Yes.

21  Q.   Now, you have a role with API 2, correct?

22  A.   Yes.

23  Q.   And what is that role?

24  A.   I was their U.S. agent for acting with FDA and biopharma

25  for filing their DMFs.

LCHKFTC3                    Patel - Cross

1  Q.  So you're familiar with API 2 as a result of that role?

2  A.  Yes.

3  Q.  And API 2 was the only company that InvaTech looked at and

4  considered after it stopped working with RL Fine, correct?

5  A.  Yes.

6  Q.  And in considering API 2, InvaTech did no due diligence on

7  API 2's ability to supply InvaTech with pyrimethamine, correct?

8  A.  Yes.

9  Q.  And at this time, API 2 did not have a DMF for

10 pyrimethamine, correct?

11 A.  Yes.

12 Q.  API 2 did not even manufacture pyrimethamine, correct?

13 A.  Yes.

14 Q.  And API 2 did not have a process to manufacture

15 pyrimethamine, correct?

16 A.  Yes.

17 Q.  So API 2 had to develop a process to manufacture

18 pyrimethamine, correct?

19       API 2 had to develop a process to manufacture

20 pyrimethamine, correct?

21 A.  We had given them the documents from our ANDA to produce

22 that.

23 Q.  You provided them documents or instructions to assist them

24 to create a process; is that --

25 A.  No.  From our filing, we have provided the section of DMF

LCHKFTC3                     Patel - Cross

1   to reproduce that API.

2   Q.  So you provided them information, so they could

3   reproduce --

4   A.  Yeah.

5   Q.  -- that process?  Okay.

6        And that took API 2 about six months --

7   A.  Yes.

8   Q.  Okay.  Thank you.

9        Now, in May of 2018, the FDA issued a complete

10  response letter to InvaTech's pyrimethamine ANDA, correct?

11  A.  Yes.

12  Q.  And the letter was a major deficiency response, correct?

13  A.  Yes.

14  Q.  And a major deficiency means there will be extensive

15  additional review, correct?

16  A.  Yes.

17  Q.  Lengthy additional review, correct?

18  A.  Yeah.

19  Q.  And some of the deficiencies had nothing to do with the

20  pyrimethamine API, correct?

21  A.  That is related to a drug product, a few.

22  Q.  But some had nothing to do with the API, correct?

23  A.  Yes.

24  Q.  And InvaTech responded to the major deficiency letter in

25  July of 2019, correct?

758

LCHKFTC3                    Patel - Cross

1   A.  Yes.

2   Q.  And after that, the FDA sent another reply to InvaTech's

3   letter in January 2017 -- sorry, January 2020, correct?

4   A.  Yes.

5   Q.  And this letter was a minor deficiency response, correct?

6   A.  Yes.

7   Q.  And a minor deficiency means there will be some additional

8   review, correct?

9   A.  Yes.

10  Q.  At least a few more months of review?

11  A.  Yeah.

12  Q.  And some of these deficiencies had nothing to do with the

13  pyrimethamine API, correct?

14  A.  A few, yes.

15  Q.  Just a few, but not all of them?

16  A.  Not all.

17  Q.  Okay.

18          InvaTech still hasn't responded to the FDA's

19  January 2020 letter, correct?

20  A.  We have responded.

21  Q.  You have responded?

22  A.  Yeah.

23  Q.  You had not responded as of the date you signed your

24  affidavit; is that accurate?

25  A.  Yes.

LCHKFTC3                    Patel - Cross

1    Q.   But you've recently responded?

2    A.   Yes.

3    Q.   And you were delayed in responding because of the COVID

4    pandemic; is that correct?

5    A.   Yes.

6    Q.   And you're still awaiting a response from the FDA, correct?

7    A.   Yes.

8               MS. STEWART:  I have no further questions.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCHMFTC4                    Patel - Redirect

1          MR. MEIER:  Your Honor, while Ms. Hoffmann is coming

2     up, I would like to inform the Court.  We have been working

3     very hard to make sure we have witnesses, but this afternoon it

4     does not look like we are going to be able to go until 5:00

5     this afternoon.  It looks like after this witness we only have

6     one more that we have been able to get to court, and I don't

7     think it's going to go for the two hours.  I just wanted to let

8     the Court know that before the lunch break.

9          THE COURT:  We will talk about the implications of

10    that because, as know, we have a schedule.  We have a day for

11    summations and a day on which evidentiary presentation will

12    conclude, but we can talk about that later.  Thank you for the

13    heads-up.

14         Counsel.

15         THE WITNESS:  Can I make one correction?

16         THE COURT:  Yes, you may.

17         THE WITNESS:  For the last question asked about filing

18    of that answer, that is still pending.  Answer to the last

19    query is still pending.

20    REDIRECT EXAMINATION

21    BY MS. HOFFMANN:

22    Q.  Good afternoon, Mr. Patel.  Thank you for being here today.

23         Mr. Patel, I am going to be asking you a few questions

24    following up on the questions that you just responded to.

25         First of all, do you recall Ms. Stewart asked you

LCHMFTC4                    Patel - Redirect

1   about the purchase of some Daraprim RLD back in 2014?

2   A.  Yes.

3   Q.  Do you recall that you told her you purchased or InvaTech

4   purchased six bottles?

5   A.  Yes.

6   Q.  Did you have any difficulty in acquiring those bottles in

7   2014?

8   A.  No.

9   Q.  Do you recall how much InvaTech paid for those bottles in

10  2014?

11  A.  Approximately around $1600 per bottle.

12  Q.  For all six bottles?

13  A.  No.  All six bottle would be around 8,000 or $9,000.

14  Q.  About $8,000 in 2016 -- in 2014?

15  A.  Yes.

16  Q.  Did you use those Daraprim pills in conducting

17  bioequivalency testing?

18  A.  Yes.

19  Q.  Do you recall when you conducted those bioequivalency

20  tests?

21  A.  Around 2016, '17.

22  Q.  If you had to do bioequivalency testing now, would you be

23  able to do that?

24          THE COURT:  With Daraprim that you purchased in 2014.

25  Is that your question, counsel?

LCHMFTC4                    Patel - Redirect

1        MS. HOFFMANN:  Yes.  Thank you.

2   A.  That might be expired.

3   Q.  Do you have any access to additional bottles of Daraprim?

4   A.  I haven't worked on that.

5   Q.  Do you recall, switching topics now, Ms. Stewart asked you

6   about your relationship with RL Fine?

7   A.  Um-hum.

8   Q.  At the time you chose RL Fine to be the API supplier, did

9   RL Fine have a DMF on file?

10  A.  No.

11  Q.  Why did you choose RL Fine?

12  A.  Because of their technical capabilities and they held some

13  APIs in the U.S. market, which was commercial.

14  Q.  Do you recall you told Ms. Stewart that they were supplying

15  pyrimethamine in other countries?

16  A.  Yes.

17  Q.  Now, when was the agreement with RL Fine executed?

18  A.  Around 2017.

19  Q.  Does February 2017 sound correct to you?

20  A.  Yes.

21  Q.  When did InvaTech file its ANDA for generic Daraprim?

22  A.  Around July, June July of 2017.

23  Q.  After InvaTech filed, did InvaTech get some initial

24  questions from the FDA?

25  A.  Yes.

LCHMFTC4                    Patel - Redirect

1   Q.  Did you request that RL Fine assist you with responding to

2   those initial questions?

3   A.  Yes.

4   Q.  How long after you got those initial questions did you

5   request RL Fine to respond?

6   A.  They requested multiple times.

7   Q.  I am not sure I understood your response.  How long did it

8   take you to ask RL Fine to help you respond to those initial

9   questions after you got the questions from the FDA?

10  A.  They never responded.

11  Q.  They never responded.  RL Fine never responded.

12  A.  Yes.

13  Q.  Did you ask RL Fine to help you respond right after you got

14  the questions from the FDA?

15  A.  Yes.

16  Q.  As you said, RL Fine never responded to you, is that

17  correct?

18  A.  Yes.

19  Q.  Did you tell RL Fine that those questions were time

20  sensitive?

21  A.  Yes.

22  Q.  And did you ask them to respond as soon as possible?

23  A.  Yes.

24  Q.  Now, I believe you told Ms. Stewart that at some point RL

25  Fine -- you understood that RL Fine was not going to support

LCHMFTC4                    Patel - Redirect

1   InvaTech with Daraprim API, is that correct?

2   A.  Yes.

3   Q.  You told Ms. Stewart that you were given a reason for RL

4   Fine not supporting InvaTech with API, is that correct?

5   A.  Yes.

6   Q.  What was that reason again?

7   A.  Small volume.

8   Q.  Did you find that credible?

9   A.  Not really.

10  Q.  Why not?

11  A.  Initially, we discussed my requirement, and I believe it

12  was spelled out correctly with them, the requirement to be 10

13  to 15 KG per year for InvaTech.

14  Q.  When you say initially had discussed that requirement, that

15  was at the time you signed the agreement with RL Fine back in

16  February of 2017?

17  A.  Yes.

18  Q.  You were given this reason about nine months later?

19  A.  Yes.

20  Q.  That was on your trip to India?

21  A.  Yes.

22  Q.  Do you recall discussing a complete response letter with

23  Ms. Stewart that InvaTech received from the FDA?

24  A.  Can you repeat it.

25  Q.  Do you recall discussing with Ms. Stewart a complete

LCHMFTC4                    Patel - Redirect

1   response letter that InvaTech received from the FDA?

2   A.  Yes.

3   Q.  Do you remember about when you received that complete

4   response letter?

5   A.  January, February of 2018.

6           MS. HOFFMANN:  Let's look at document 3173.

7   Q.  Do you recognize this document, Mr. Patel?

8   A.  Yes.

9           THE COURT:  Is this in evidence?

10          MS. HOFFMANN:  Yes, it is, your Honor.  It is part of

11  Exhibit 9012, I believe.

12  Q.  Mr. Patel, could you turn to the very last page of that

13  document.

14          MS. HOFFMANN:  Rather, Ms. Guy, could you put up the

15  very last page of this document where there is a digital

16  signature.

17  Q.  Mr. Patel, does this refresh your recollection of the date

18  of the complete response --

19  A.  Yes.  That is May 2018.

20  Q.  After you got that complete response letter, did you ask RL

21  Fine once again to help you respond to it?

22  A.  Yes.

23  Q.  Did RL Fine give any help to InvaTech in responding to that

24  letter?

25  A.  No.

LCHMFTC4                    Patel - Redirect

1   Q.  When did you ask RL Fine to help you respond to the FDA's

2   complete response letter?

3   A.  Immediately after getting this letter.

4   Q.  Did RL Fine ever give you any help in responding to the

5   complete response letter?

6   A.  No.

7   Q.  Switching topics a bit, after you understood that RL Fine

8   was no longer going to support InvaTech, did you look for

9   another API supplier?

10  A.  Yes.

11  Q.  That API supplier was the firm we are calling API 2.  Do

12  you remember telling Ms. Stewart that?

13  A.  Yes.

14  Q.  Did API 2 have a DMF for pyrimethamine?

15  A.  No.

16  Q.  Had API 2 ever made pyrimethamine before?

17  A.  No.

18  Q.  Did API 2 have a process or knowhow for making

19  pyrimethamine?

20  A.  No.

21  Q.  Was API 2 a firm that you considered back in 2015?

22  A.  No.

23  Q.  Why did you choose API 2?

24  A.  They helped set up for the small quantity manufacturing

25  and, at the same time, I was working with them as their U.S.

LCHKFTC5

1   agent in filing DMF on behalf of API 2.  So I know that

2   technical capability, their production capability.

3   Q.  I believe you told Ms. Stewart that it took API 2

4   approximately six months to develop a manufacturing process, is

5   that correct?

6   A.  Yes.

7        THE COURT:  Is this a good time to break for lunch,

8   counsel?

9        MS. HOFFMANN:  Yes.  I have about 10 more minutes of

10  questions.

11       THE COURT:  Good.  We will break for lunch.

12       Counsel I have a criminal proceeding during the

13  luncheon recess.  I'm afraid we are going to need to use those

14  tables, but we won't need to use all of it.  If you could just

15  clear out a section for counsel.

16       Thank you so much.  See you after lunch.

17       (Recess)

18       (Continued on next page)

19

20

21

22

23

24

25

768

LCHKFTC5

| | |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | 2:00 P.M. |
| 3 | (Trial resumed; in open court) |
| 4 | THE COURT:  Please be seated. |
| 5 | The witness may retake the stand. |
| 6 | Just one second, counsel.  Let me get set up here. |
| 7 | MS. HOFFMANN:  Sure. |
| 8 | THE COURT:  Good.  I'm ready.  Thank you. |
| 9 | MS. HOFFMANN:  Thank you. |
| 10 | BY MS. HOFFMANN: |
| 11 | Q.  Mr. Patel, if you would like, I think you can remove your |
| 12 | mask. |
| 13 | THE COURT:  Oh, you don't have to.  You don't have to. |
| 14 | BY MS. HOFFMANN: |
| 15 | Q.  Mr. Patel, good afternoon, and I want to just get us back |
| 16 | to where we were before the lunch break.  We were talking about |
| 17 | API 2, the supplier to which InvaTech turned after RL Fine |
| 18 | withdrew. |
| 19 | You chose API 2 in late 2017 or early '18; is that |
| 20 | correct? |
| 21 | A.  Yes. |
| 22 | Q.  And at the time you chose API 2, they did not have a |
| 23 | manufacturing process in place for making pyrimethamine, |
| 24 | correct? |
| 25 | A.  Yes. |

LCHKFTC5

1   Q.  And I think just before we left for lunch, you told me that

2   it would take about six months for API 2 to develop a

3   manufacturing process?

4   A.  Yes.

5   Q.  Did it take six months?

6   A.  Approximately, yes.

7   Q.  And after they developed a manufacturing process, were

8   there additional steps that API 2 had to take before they were

9   in a position to further your regulatory process with the FDA?

10  A.  Yes.

11  Q.  What were those steps?

12  A.  The steps — we had to manufacture additional batches,

13  comparative resolutions, and other testing to have established

14  similarity of the API and file it again.

15  Q.  Did API 2 have to prepare its own certificates of analysis?

16  A.  Yes.

17  Q.  When was API 2 able to give InvaTech the information that

18  InvaTech needed to respond to the FDA's May 2018 complete

19  response letter?

20  A.  Somewhere in 2019.

21  Q.  Does June 2019 sound correct?

22  A.  Yes.

23  Q.  It took about eight months, total, between the time you

24  chose API 2 until the time they were done with the work they

25  needed to do to help you respond?

LCHKFTC5

1   A.  Yes.

2   Q.  When did InvaTech actually respond to the 2018 FDA letter?

3   A.  After receiving all documents and everything, submitted

4   October 2018.

5   Q.  We can look at GX 3168 to refresh your recollection.

6           Mr. Patel, Ms. Guy has put up GX 3168.  Do you

7   recognize -- I realize this document is redacted --

8   A.  Yes.

9           MS. STEWART:  Objection.  I don't know that counsel

10  established the failure of recollection.

11          THE COURT:  Oh, I thought she did, but you may inquire

12  again.

13  BY MS. HOFFMANN:

14  Q.  Mr. Patel, do you recall the date when InvaTech responded

15  to the FDA's 2018 letter?

16  A.  Somewhere in October 2018.

17          MS. HOFFMANN:  And I wanted to put up the document to

18  refresh his recollection because I believe the document has a

19  different date.  In any event, this document is in evidence.

20          Your Honor, may I proceed?

21          THE COURT:  Yes.

22  BY MS. HOFFMANN:

23  Q.  So, Mr. Patel, do you recognize this document?

24  A.  Yes.

25  Q.  And what is it?

LCHKFTC5

1   A.  That is a response to FDA's correspondence.

2   Q.  And, Mr. Patel, can you turn to page 3 of this document.

3           Mr. Patel, does that refresh your recollection as to

4   the date of InvaTech's response to the FDA's 2018 letter?

5   A.  It's July 2019, after receiving the letter.

6   Q.  Would InvaTech have been able to respond to the FDA's

7   letter at an earlier date if RL Fine had continued to supply

8   InvaTech?

9   A.  Yes.

10          MS. STEWART:  Objection; leading.

11          THE COURT:  Overruled.

12  BY MS. HOFFMANN:

13  Q.  Mr. Patel, I just want to --

14          THE COURT:  Well, I'm sorry, I thought that was the

15  introduction to -- that was it for that line?

16          MS. HOFFMANN:  Yes.

17          THE COURT:  Sustained.

18  BY MS. HOFFMANN:

19  Q.  Mr. Patel, I just want to set some background here about

20  your experience.

21          Are you one of the cofounders of InvaTech?

22  A.  Yes.

23  Q.  What is InvaTech's business?

24  A.  We are a CDMO company, and we do manufacture products,

25  development of the products, and commercialization of ANDA

LCHKFTC5

1    products.

2    Q.   Does InvaTech submit abbreviated new drug applications,

3    ANDAs, as part of its business?

4    A.   Yes.

5    Q.   And has InvaTech developed around 50 products?

6    A.   Yes.

7    Q.   And what is your position at InvaTech?

8    A.   Compliance and regulatory officer.

9    Q.   Do you review and supervise InvaTech's correspondence with

10   the FDA?

11   A.   Yes.

12   Q.   And that is just one of your functions there; is that

13   correct?

14   A.   Yes.

15   Q.   How long have you been with InvaTech?

16   A.   Since 2013.

17   Q.   Did you have prior experience in the pharmaceutical

18   industry?

19   A.   Yes.  Prior, I was with Sandoz.

20   Q.   Based on your experience, did losing RL Fine as an API

21   supplier delay InvaTech's launch of generic Daraprim?

22             MS. STEWART:  Objection.

23             THE COURT:  Overruled.

24             THE WITNESS:  Yes.

25

LCHKFTC5

1   BY MS. HOFFMANN:

2   Q.  When do you think InvaTech would have received FDA approval

3   if RL Fine had continued as InvaTech's supplier?

4           MS. STEWART:  Objection, your Honor; speculation.

5           THE COURT:  Hold on just one second.

6           Overruled.

7   BY MS. HOFFMANN:

8   Q.  You may answer the question.

9   A.  Can you repeat it?

10  Q.  Sure.

11          When do you think InvaTech would have received FDA

12  approval if RL Fine had continued as InvaTech's supplier?

13  A.  Around Q4 of 2018 or 2019.

14  Q.  Was that 2019?

15  A.  Yes.

16  Q.  When do you think InvaTech would have launched generic

17  Daraprim if RL Fine had continued as API supplier?

18          MS. STEWART:  Objection; calls for speculation.

19          THE COURT:  Overruled.

20          THE WITNESS:  Within six months after approval.

21  BY MS. HOFFMANN:

22  Q.  So approximately when?

23  A.  Q4 2019.

24  Q.  Is that approval or launch?

25  A.  No, launch.

LCHKFTC5

1    Q.  Launch.

2         Sitting here today, when do you anticipate InvaTech

3    will launch a generic Daraprim product?

4    A.  Q4 2022.

5         MS. HOFFMANN:  Thank you.  I have no more questions,

6    Mr. Patel.

7         THE COURT:  Any recross?

8         MS. STEWART:  No, not at this time.  Thank you.

9         THE COURT:  Thanks so much.

10         I just want to make sure I understood correctly your

11   responses to that last chain of questions.

12         THE WITNESS:  Okay.

13         THE COURT:  Do you have your affidavit before you?

14         THE WITNESS:  Yes.

15         THE COURT:  If you could go to page 8, paragraph 43.

16         THE WITNESS:  Yes.

17         THE COURT:  It refers to a trip you made to India?

18         THE WITNESS:  Yes.

19         THE COURT:  And I think that was in 2017; am I right?

20         THE WITNESS:  Yes.

21         THE COURT:  Do you remember when, what month?

22         THE WITNESS:  Around September/October.

23         THE COURT:  I think that's it for my questions.

24         Counsel, do you have any additional questions based on

25   the questions I put to this witness?

LCHKFTC5                    Valiveti – Direct

1              MS. HOFFMANN:  No further questions, your Honor.

2              MS. STEWART:  No, your Honor.

3              THE COURT:  Thank you.

4              You may step down.  Thank you.

5              THE WITNESS:  Thank you.

6              (Witness excused)

7              THE COURT:  Next witness?

8              MR. MEIER:  Your Honor, the government calls, as its

9    next witness, Satya Valiveti.  That's S-a-t-y-a

10   V-a-l-i-v-e-t-i.  That will be my colleague, Mr. Weingarten,

11   for the government.

12             THE COURT:  Sir, if you could come up here and take

13   the witness stand.

14    SATYA VALIVETI,

15        called as a witness by the Plaintiffs,

16        having been duly sworn, testified as follows:

17             THE COURT:  Now, sir, the ventilation system has been

18   tested here, and, if you wish, you may remove your mask.

19             THE WITNESS:  Sure.  Thank you.

20             THE COURT:  Yes.

21             Please give us your full name.

22             THE WITNESS:  My name is Satya Rayana Valiveti.

23             THE COURT:  Could you spell your first name, please.

24             THE WITNESS:  S-a-t-y-a, Rayana R-a-y-a-n-a.

25             THE COURT:  Now, I have given you poor instructions.

LCHKFTC5                    Valiveti – Direct

1    Can you lower that mic even more?  Really push it down.  Yes,
2    good.  Much better.
3              How do you spell your last name?
4              THE WITNESS:  V-a-l-i-v-e-t-i.
5              THE COURT:  And you're about to be handed a document
6    which is -- no, no, no.
7              MR. WEINGARTEN:  If I may, your Honor, this witness
8    does not have a written direct.
9              THE COURT:  Yes, I have the deposition, not an
10   affidavit.  Thank you.
11             Counsel.
12   DIRECT EXAMINATION
13   BY MR. WEINGARTEN:
14   Q.  Good afternoon, Mr. Valiveti.
15   A.  Good afternoon.
16   Q.  My name, again for the record, is James Weingarten, with
17   the Federal Trade Commission, on behalf of the plaintiffs.  I'm
18   going to ask you several questions today.  Please speak up.
19   A.  Sure.
20   Q.  Please speak slowly.  Thank you.
21             I'd like to start by asking you a little bit about
22   your background.
23             Very briefly, sir, what do you do for a living?
24   A.  So I'm a CEO at Stira Pharmaceuticals.
25             THE COURT:  Excuse me one second.

1          We're going to try to adjust the volume issue, so

2    please be patient with us a little bit.

3          Thank you, Mr. Valiveti.  Continue.

4          MR. WEINGARTEN:  Sure.

5    BY MR. WEINGARTEN:

6    Q.  In addition to being CEO of Stira Pharmaceuticals, do you

7    own any other businesses?

8    A.  Yes.  I own Reliant Specialty LLC.  I'm a partner in the

9    company.

10   Q.  Who is the other partner?

11   A.  Sandhya, S-a-n-d-h-y-a, last name Kantamaneni,

12   K-a-n-t-a-m-a-n-e-n-i.

13   Q.  Do you have a familial relation with Ms. Kantamaneni?

14   A.  My wife.

15   Q.  Besides Reliant, do you own any other companies?

16   A.  Specialty PharmaSource LLC.

17   Q.  And are there any other co-owners of Specialty

18   PharmaSource?

19   A.  Yes.  My wife.

20   Q.  We'll get to those companies in a second.

21          How long have you worked in pharmaceuticals?

22   A.  Close to 20 years.

23   Q.  Do you have any advanced degrees related to

24   pharmaceuticals?

25   A.  Yes.  I have my Ph.D. in pharmaceutical sciences.

LCHKFTC5                      Valiveti - Direct

1   Q.  Briefly, sir, let's just talk about what each of those

2   companies that you mentioned does.

3              What does Stira Pharmaceuticals do?

4   A.  Stira is a product development and manufacturing company.

5   So we do injectable products in terms of research and

6   development and also provide analytical services to various

7   pharmaceutical industries.

8   Q.  And what does Reliant Specialty do?

9   A.  So Reliant Specialty is a wholesale distributor for the

10  clinical trial supplies.

11  Q.  What does that mean in layman's terms, if you could,

12  please, sir?  Could you please provide more description of what

13  it is that Reliant does?

14  A.  Reference listed drugs, short form RLD, and generic

15  products for the clinical trials of either bioequivalency

16  testing for -- to file FDA for product approvals.

17  Q.  Does Reliant source drugs for commercial sale or resale to

18  patients?

19  A.  No.

20  Q.  And could you please describe what Specialty PharmaSource

21  does?

22  A.  Similar to Reliant Specialty, other than geographical

23  location.

24  Q.  Are you the person at Reliant who is responsible for

25  sourcing RLD?

LCHKFTC5                    Valiveti - Direct

1    A.   That's right.

2    Q.   Are you also the person at Specialty Pharma --

3    A.   That's right.

4    Q.   -- wait, let me finish the question, please.  Sorry.

5             Are you also the person at Specialty Pharma who is

6    responsible for sourcing RLD?

7    A.   Right.  That's right.

8    Q.   Were you the person responsible for sourcing RLD at Reliant

9    between 2017 and 2019?

10   A.   Yes.

11   Q.   And the same for Specialty Pharma?

12   A.   Yes.

13   Q.   Does Reliant have a website?

14   A.   Yes.

15   Q.   When did Reliant first get a website?

16   A.   2013.

17            MR. WEINGARTEN:  Ms. Guy, could we please put

18   Government Exhibit 4064 on the screen.  I'd like to introduce

19   this.

20   Q.   Is Government Exhibit 4064 a printout or copy of Reliant's

21   website?

22   A.   Yes.

23            MR. WEINGARTEN:  Your Honor, at this time, I'd move to

24   admit Government Exhibit 4064.

25            THE COURT:  Received.

LCHKFTC5                        Valiveti - Direct

1              (Government's Exhibit 4064 received in evidence)

2              MR. WEINGARTEN:   Thank you.

3    BY MR. WEINGARTEN:

4    Q.  Let's take a look, sir, at the description of Reliant's

5    business that's on its website.

6              I'd like you to look at the very top box.  There's a

7    picture of a gentleman doing a chemical analysis.

8              What is the headline, sir, in bright big blue letters

9    at the top of your website?

10   A.  "We Supply Innovator Products/Reference Listed Drugs."

11   Q.  Underneath where it says, "Welcome to Reliant Specialty,"

12   it says, in part, "Our experience as pharmaceutical

13   distributors combined with our international network of

14   pharmaceutical drug wholesaler partners makes it possible for

15   Reliant Specialty to procure branded innovator

16   samples/reference listed drugs for bioequivalence and clinical

17   trials from almost anywhere in the world."

18             Do you see that?

19   A.  Yes.

20   Q.  Is that an accurate description of Reliant's business?

21   A.  Yes.

22   Q.  Was that description part of Reliant's website since its

23   creation in 2013?

24   A.  Yes.

25   Q.  Not to belabor the point, but under the left-hand, there's

LCHKFTC5                    Valiveti - Direct

1   a box that says "Our Services."

2          Do you see that?

3   A.  Yes.

4   Q.  And the first sentence under there, could you please read

5   that first sentence that starts "pharmaceutical innovator"?

6   A.  Yeah.  "Pharmaceutical innovators products/reference listed

7   drugs for the development of bio similar and abbreviated new

8   drug applications."

9   Q.  That's sometimes abbreviated ANDA?

10  A.  That's right.

11  Q.  And has that information been on this home page for Reliant

12  since 2013?

13  A.  Yes.

14  Q.  Is that an accurate description of Reliant's business?

15  A.  Yes.

16          MR. WEINGARTEN:  You can take that down, please,

17  Ms. Guy.

18  Q.  Who is Reliant's main client?

19  A.  We have several clients.

20          THE COURT:  What types of companies?

21          MR. WEINGARTEN:  Fair.

22  BY MR. WEINGARTEN:

23  Q.  What type of companies are your clients, sir?

24  A.  So pharmaceutical companies.  Majority of them are generic

25  companies.

LCHKFTC5                    Valiveti - Direct

1   Q.   Is Dr. Reddy's Laboratories one of Reliant's clients?

2   A.   That's right.

3   Q.   How would you describe Dr. Reddy's in terms of its -- and I

4   don't need an exact number -- but its importance or its share

5   of Reliant's business?

6   A.   Dr. Reddy's is one of the top client for us.

7   Q.   Not just for Dr. Reddy's, but generally, how many products,

8   RLD products, does Reliant source per year?

9   A.   For Dr. Reddy's?

10  Q.   Not just for Dr. Reddy's, sir; as a general matter in a

11  given year.

12  A.   So close to 50, 60 products.  Some of them are repeat

13  orders.

14  Q.   Some are what?

15  A.   Recurring orders.

16  Q.   I see.

17          And how many -- take away the recurring orders.  How

18  many different RLD products would you say in a given year

19  Reliant sources?

20  A.   Fifty to sixty products.

21  Q.   How many products, in Reliant's history, has Reliant

22  started the effort to source, but then been unable to source

23  the quantity the client requested?

24  A.   I don't have an exact number on top of my head, but close

25  to 20.

LCHKFTC5                    Valiveti - Direct

1   Q.  And that's over the lifetime of your experience at Reliant?

2   A.  Every year.

3   Q.  I'd like to talk to you about how Reliant sources its

4   products for its clients.

5           Now, are you familiar with the term "open

6   distribution" of pharmaceutical products?

7   A.  Yes.

8   Q.  What does "open distribution" mean with respect to

9   pharmaceuticals, as you understand it?

10  A.  So as per my understanding, open distribution means drugs

11  that are available to the pharmacies without any restrictions.

12  Q.  When you say pharmacies without restrictions, are there a

13  kind of pharmacies you're thinking of?

14  A.  Retail pharmacies.

15  Q.  Are you familiar with the term "closed distribution"?

16  A.  Yes.

17  Q.  Now, is there a difference, in your understanding, of the

18  kinds of pharmacies that can receive a drug in closed

19  distribution versus open distribution?

20  A.  Yes.

21  Q.  What kind of drugs, typically, in your experience -- strike

22  that.

23          What kind of pharmacies, in your experience,

24  distribute drugs that are in a closed distribution system?

25  A.  So even retail pharmacies could get the products that are

784

1   in the closed distribution.  Also, specialty pharmacies.

2   Q.  Are closed distribution drugs more or less likely to be

3   distributed through retail pharmacies than an open distribution

4   drug?

5   A.  That's right, they're less likely available to retail

6   pharmacies.

7   Q.  Would a drug distributed, in your experience, in closed

8   distribution be more or less likely to be distributed through a

9   specialty pharmacy?

10  A.  That's right.

11  Q.  So more likely or less likely through specialty?

12  A.  More likely through specialty pharmacies.

13  Q.  Okay.

14          How does a drug being in open or closed distribution

15  impact Reliant's ability to source the reference listed drug?

16  A.  It does a lot because sometimes the manufacturer denies the

17  supply of the products, citing a class of trade.

18  Q.  When you say "class of trade," what do you mean?

19  A.  Class of trade is a retail specialty or wholesale

20  distribution.

21  Q.  Can you elaborate?  What do you mean that restrictions on

22  class of trade impact how you source RLD?

23  A.  Some of the products are not available to source for us as

24  Reliant because they only distribute to the doctor offices or

25  specialty pharmacies.

LCHKFTC5                    Valiveti - Direct

1   Q.  Let's talk a little bit about the exact process that
2   Reliant uses to source RLD.
3          How, in general, does the process start when Reliant
4   is going to source RLD for a client?  How does that get going?
5   A.  First, client bring inquiry to us for the particular drug
6   sourcing.  Then --
7   Q.  Let me stop you there.
8          When they make an inquiry, the client or the potential
9   client, is it for a particular quantity of drug?
10  A.  Sometimes.
11  Q.  What do you do next after the client approaches and makes
12  an inquiry about a particular RLD?
13  A.  Then we approach manufacturer, the wholesale distributor,
14  which we have an account with, AmerisourceBergen, then we will
15  ask them whether this drug is available for us to source.
16  Q.  Sorry, go ahead.
17  A.  Then, you know, sometimes they'll send us some documents to
18  fill it, then they'll share with the manufacturer for
19  approvals.
20  Q.  Let me stop you and back up a second.
21         When Reliant contacts the wholesaler to inquire, what
22  information are you specifically inquiring about with the
23  wholesaler?
24  A.  So drug product name and NDC code.  It's a product code.
25  Q.  What information are you looking for from the wholesaler

LCHKFTC5                    Valiveti - Direct

1   when you give them the name and the NDC code?

2   A.  Whether that product is available for Reliant to source.

3   Q.  And do you ask for a price quote?

4   A.  Yes, price quote and availability.

5   Q.  Do you ask for lead time?

6   A.  Yes.

7   Q.  What does lead --

8   A.  That's availability.

9   Q.  After you receive -- let's assume for a second that the

10  wholesaler responds with price and availability and lead time.

11          What do you do next?

12  A.  So if the wholesaler comes back to us, okay, this product

13  is approved for Reliant to source, then we will send a

14  quotation to customer.

15  Q.  When you send the quotation to a customer, do you send them

16  a pro forma invoice?

17  A.  No.  We send an estimate.

18  Q.  I see.

19          What happens next, after the estimate, if the customer

20  wants to proceed, typically?

21  A.  They will issue a purchase order.

22  Q.  And what is a purchase order in this context?  Can you

23  describe one, please?

24  A.  So, basically, the customer would issue so-and-so product

25  and the quantity and the price.

LCHKFTC5                          Valiveti – Direct

1   Q.  And is purchase order sometimes abbreviated PO?

2   A.  Yes.

3   Q.  Now, when Reliant sends to a client an estimate based on

4   the information Reliant got from the wholesaler, is Reliant

5   sending a guarantee of delivery of that RLD?

6   A.  No.

7   Q.  And when Reliant sends an estimate to the client of lead

8   times or availabilities, is that a guarantee Reliant can meet

9   those times?

10  A.  Those are tentative timelines.  Those are like approximate

11  timelines.

12  Q.  When Reliant sends an estimate to a client, is that a

13  guarantee that Reliant has the RLD in its possession?

14  A.  No.

15  Q.  Now, if the customer decides to move ahead and issues the

16  purchase order, what happens next?

17  A.  Then we are going to send them a pro forma invoice for the

18  payment.

19  Q.  And you say "for the payment."  Is that a payment on

20  delivery or a prepayment?

21  A.  Prepayment.

22  Q.  What is the typical amount of prepayment that you ask from

23  a client?

24  A.  Majority of time, hundred percent.

25  Q.  I'm sorry, I can't hear you.

788

LCHKFTC5                    Valiveti – Direct

1    A.   Hundred percent prepayment.

2    Q.   Is prepayment a condition of Reliant beginning the work of

3    sourcing?

4    A.   Yes.

5    Q.   And when is the rest of the payment due?

6    A.   Prepayment is they are going to pay entire payment in

7    advance.

8    Q.   If there was a 50 percent prepayment, for example, when

9    would the payment balance be due?

10   A.   There wasn't a certain procedure.  It's depending on the

11   client to client.

12   Q.   Okay.

13   A.   Sometimes paid upon sourcing, sometimes paid upon shipping,

14   yeah.

15   Q.   Why do you require prepayment?

16   A.   Because these are specialty products, and sometimes when we

17   source the products from a wholesale distributor, those are

18   nonreturnable.

19   Q.   Now, let's assume that the client has made the prepayment

20   and asked Reliant, okay, please go ahead and source the RLD for

21   us.  What do you do first to try to source the RLD, typically?

22   A.   We approach wholesale distributor.

23   Q.   And you gave one example before of -- let me strike that.

24        Is AmerisourceBergen an example of a wholesale

25   distributor you might approach?

LCHKFTC5                    Valiveti - Direct

1    A.   Yes.

2    Q.   And what happens if the drug is available to Reliant from

3    the wholesale distributor, what do you do next?

4    A.   We'll issue a purchase order.  Then it takes a week to get

5    the product from them if it is approved.

6    Q.   So Reliant issues the purchase order to the wholesaler?

7    A.   Wholesaler, yes.

8    Q.   In your experience, did you say it typically takes a week

9    to get it back from the wholesaler?

10   A.   That's correct.

11   Q.   And what do you do with the drug once you get it back from

12   the wholesaler?

13   A.   So we'll share the lot and expiration to the customer, then

14   they'll arrange pickup.

15   Q.   That was the example of if the wholesaler agrees to supply

16   Reliant.

17            What would you try if you contact a wholesaler, and

18   the wholesaler says, no, we cannot supply Reliant with the RLD?

19   A.   Yes, often happens we do not have -- we may not have access

20   to certain products, then we approach other distributors.

21   Q.   Have you ever tried to talk to the manufacturer directly to

22   purchase RLD?

23   A.   Sometimes wholesale distributor will send us a note saying

24   that we need to contact the manufacturer.

25   Q.   And then I think before, we talked about manufacturer, you

LCHKFTC5                    Valiveti - Direct

1   said you will try to source it from another third party; is
2   that right?
3   A.   That's right.
4   Q.   So what is an example of another kind of company from whom
5   you would source?  What do you mean by that?
6   A.   So we source products from other similar distributors, like
7   Reliant, where they have access.
8   Q.   So if the wholesaler says it will not supply, one option is
9   to try to seek source from other companies like Reliant?
10  A.   Like Reliant.
11  Q.   Is that common, that RLD sourcing firms will contact each
12  other to try and source RLD?
13  A.   That's right.
14  Q.   Has a company called ProSupplier ever asked for Reliant's
15  help sourcing RLD?
16  A.   Yes.
17  Q.   Going back how long -- strike that.
18          When was the first time Reliant asked -- strike that.
19          When was the first time ProSupplier asked Reliant for
20  help sourcing RLD?
21  A.   I don't remember exact year, but I know them a long time.
22  Q.   Is it more than five years ago that ProSupplier may have
23  first contacted Reliant for help?
24  A.   Yes, yes.
25  Q.   Over the years, have they asked for help about various

LCHKFTC5                    Valiveti - Direct

1   products, one product?

2   A.   Lately, no inquiries; in the past, yes, they asked for

3   several products.

4   Q.   Has ProSupplier ever asked Reliant for help sourcing

5   Daraprim?

6   A.   Yes.

7   Q.   Did you agree to help ProSupplier source Daraprim?

8   A.   No.  The pricing did not work.

9   Q.   Can you elaborate more?  Why did Reliant not agree to help

10  provide or source Daraprim to ProSupplier?

11  A.   Because they're also suppliers like Reliant.  The pricing

12  which I quote, then they're going to add on some margin to the

13  customer, so they felt pricing is high.

14  Q.   So if -- when ProSupplier approached Reliant for help with

15  Daraprim, was it your understanding -- what was your

16  understanding that ProSupplier would then do with the price if

17  you had supplied it to ProSupplier?

18  A.   They go silent.  They don't really response.

19  Q.   I'm sorry, I didn't hear you.

20  A.   When they give a quotation, if they like you, they're going

21  to come back to us; if they don't, they went silent.

22  Q.   Would you expect ProSupplier to add its own markup on top

23  of what you would charge?

24  A.   Yes.

25          MS. STEWART:  Objection; foundation.

LCHKFTC5                    Valiveti - Direct

1          THE COURT:  Overruled.

2    Q.  When was the last time that ProSupplier -- strike that.

3          How often was ProSupplier asked for Reliant's help to

4    source Daraprim?

5    A.  I think one or two times.

6    Q.  Do you remember approximately when that was?

7    A.  I think sometime '17.

8    Q.  Now, in open distribution, how long does it typically take

9    Reliant to source RLD going through those steps, from the

10   moment the client says we're interested to delivery to client?

11   What's the typical time in open distribution?

12   A.  Less than a week.

13   Q.  Less than a week?  Okay.

14          I want to ask you a little bit, continuing on

15   discussion about how Reliant sources, I want to talk to you a

16   little bit about CentraState.

17          Now, we talked about companies that you own.  Does

18   your wife own a pharmacy?

19   A.  Yes.

20   Q.  And what is the name of that pharmacy?

21   A.  CentraState Specialty.

22   Q.  What kind of pharmacy is CentraState?

23   A.  It's a retail pharmacy.

24   Q.  Is it affiliated with a hospital, a CVS, a standalone?

25   A.  It's an outpatient pharmacy.

LCHKFTC5                    Valiveti - Direct

1   Q.  Is it located in a strip mall or a hospital or a medical

2   center?

3   A.  In the medical center.

4   Q.  What state, please?

5   A.  New Jersey.

6   Q.  How long has your wife owned CentraState?

7   A.  Since 2016, December.

8   Q.  If you cannot source a product from the wholesaler or the

9   manufacturer or other RLD sourcing firms, would you use

10  CentraState to help source?

11  A.  If the product is available, then only we can -- I can try.

12  Q.  Is it your understanding -- strike that.

13          Is CentraState allowed to buy pharmaceutical products

14  and resell them for nonretail use?

15  A.  Yes.

16  Q.  Does CentraState work with a distributor who supplies

17  specialty pharmacy products to CentraState?

18  A.  Yes.

19  Q.  What is the name of that distributor?

20  A.  ASD Healthcare.

21  Q.  Could you please walk us through the steps of how Reliant

22  might use CentraState to help source an otherwise unavailable

23  RLD?

24  A.  So we use very --

25  Q.  Just speak up and slowly, please, sir.

LCHKFTC5                    Valiveti - Direct

1   A.  We source products from CentraState very rarely.

2   Q.  What's the first step, sir?  Does Reliant make a request to

3   CentraState?

4   A.  Yes.

5   Q.  What happens then?

6   A.  So we'll ask them whether the particular product is

7   available.  Then, if it's available, then we'll procure the

8   product.

9   Q.  When you say if the product is available, do you mean

10  available from ASD?

11  A.  Yes.

12  Q.  And so you'll ask if it's available, CentraState will then

13  purchase the product from ASD?

14  A.  No.  We have to -- if it's available, then we'll ask them

15  to purchase, yes.

16  Q.  And after CentraState purchases the product, is it

17  CentraState that pays ASD?

18  A.  Yes.

19  Q.  And then does Reliant purchase the product, then, from

20  CentraState?

21  A.  Reliant will pay for CentraState.

22  Q.  And then Reliant gets delivery from CentraState, correct?

23  A.  Right.

24  Q.  And then does Reliant deliver the product to its client?

25  A.  That's correct.

795

LCHKFTC5                    Valiveti - Direct

1   Q.  And I know you said "rarely."  How often has Reliant used
2   CentraState to acquire RLD?
3   A.  The time period?
4   Q.  Oh, over the lifetime, let's say, of your relationship
5   between Reliant and CentraState.
6   A.  Yearly, I think around three, four times, we source.
7   Q.  I'm sorry, I didn't hear the first time.
8   A.  Three to four times.
9   Q.  Per year?
10  A.  Per year.
11  Q.  We'll get to more on this in a second, but did Reliant use
12  CentraState to help acquire some Daraprim in 2018?
13  A.  Yes.
14  Q.  Was that example, Daraprim, of Reliant using CentraState
15  the only time Reliant used CentraState in 2018, or were there
16  other times?
17  A.  For Daraprim?
18  Q.  No, I'm sorry, for any drug in 2018.
19  A.  I don't have -- I don't remember, but there were times.
20  Q.  Let's turn, then, specifically to Reliant's efforts to
21  source Daraprim.
22        Now, we talked about Dr. Reddy's, and Dr. Reddy's is
23  one of Reliant's main clients, right?
24  A.  Right.
25  Q.  Is Dr. Reddy's Laboratories also abbreviated DRL?

LCHKFTC5                    Valiveti - Direct

1   A.  Yes.

2   Q.  How long has Reliant been working with Dr. Reddy's?

3   A.  Since 2013.

4   Q.  In late 2017, did Dr. Reddy's ask Reliant to estimate a

5   cost to source Daraprim RLD?

6   A.  Yes.

7             MS. STEWART:  Objection; leading.

8             THE COURT:  I assume this is an introductory question

9   for a line.  Am I right?

10            MR. WEINGARTEN:  It is.

11            THE COURT:  Okay.

12            MR. WEINGARTEN:  Thank you, your Honor.

13  BY MR. WEINGARTEN:

14  Q.  How much Daraprim did DRL ask you to source?

15  A.  Five bottles.

16  Q.  Did you have any understanding why DRL wanted you to source

17  Daraprim RLD?

18  A.  Yes.

19  Q.  What did you think DRL needed it for?

20  A.  For the product development purpose.

21  Q.  Do you have any more specific understanding of product

22  development purpose there?

23  A.  I don't know.  I can say it's a generic product company.

24  They might be using for product development, and it would

25  ultimately be used for filing with the FDA.

LCHKFTC5                    Valiveti - Direct

1   Q.  After DRL asked you to look into sourcing Daraprim in late

2   2017, what did you do first?

3   A.  So I contacted AmerisourceBergen, ASD, to source this

4   product.  I sent an email stating that I need five bottles of

5   Daraprim, then asked them the pricing and lead time.

6           MR. WEINGARTEN:  Ms. Guy, could you please put GX 3126

7   on the screen.  And I'd like you to highlight the email

8   contents.  Both emails is fine.  Thank you.

9   BY MR. WEINGARTEN:

10  Q.  Now, is GX 3126 an email chain between Reliant and a

11  company called ICS-Connect?

12  A.  Yes.

13  Q.  What is ICS-Connect?

14  A.  So they have a -- ASD and AmerisourceBergen, they support

15  RLD sourcing through ICS-Connect.

16  Q.  So is ICS-Connect an affiliate of ASD?

17  A.  That's right.

18  Q.  Strike that -- yes, okay.  Thank you.

19          The email address at the bottom, the bottom email, it

20  says from Sandhya.  That's sandhya@reliantspecialtyrx.com.

21          Do you see that?

22  A.  Yes.

23  Q.  It's dated December 20, 2017.

24          Do you see that?

25  A.  Yes.

LCHKFTC5                    Valiveti – Direct

1    Q.  And Sandhya is your wife's name, right?

2    A.  That's right.

3    Q.  Is that your name at the bottom, Satya Valiveti?

4    A.  Yes.

5    Q.  So even those these emails are to and from Sandhya, did you

6    author and read these emails?

7    A.  Yes.

8    Q.  Do you sometimes use your wife's email address?

9    A.  Yes.

10        MR. WEINGARTEN:  Your Honor, I'd move to admit

11   GX 3126.

12        THE COURT:  Received.

13        (Government's Exhibit 3126 received in evidence)

14        MR. WEINGARTEN:  Thank you.

15   BY MR. WEINGARTEN:

16   Q.  So let's focus on the bottom email, please.  The message is

17   from sandhya@reliantspecialtyrx, and it's dated December 20,

18   2017.

19        Do you see that, sir?

20   A.  Yes.

21   Q.  And the message asks, "Please let me know the availability

22   and pricing on the following product."

23        What product are you asking about there, sir?

24   A.  Daraprim.

25   Q.  And what quantity of Daraprim?

LCHKFTC5                    Valiveti - Direct

1    A.   Five bottles.

2    Q.   Did you send this message as part of getting an estimate

3    for sourcing Daraprim for DRL?

4              MS. STEWART:  Objection; leading.

5              THE WITNESS:  Yes.

6              THE COURT:  I think that's just a summary, and I will

7    let both counsel do it, to just make sure the record is clear,

8    given communication issues.

9              MR. WEINGARTEN:  You can take down that one, Ms. Guy,

10   and we'll talk about the top email on the same document,

11   please.

12   BY MR. WEINGARTEN:

13   Q.   Did Mr. Benji Belleli, B-e-l-l-e-l-i, write you back?

14   A.   Yes.

15   Q.   And looking at GX 3126, what did he tell you?

16   A.   So they asked me to contact the manufacturer directly.

17   Q.   Did Mr. Belleli give you some contact info?

18   A.   Yes.

19   Q.   Whose contact information did he provide?

20   A.   Anne Kirby.

21   Q.   Had you ever talked to Anne Kirby before?

22   A.   No.

23   Q.   How often, in your experience, does a wholesaler tell you

24   to contact a manufacturer directly?

25   A.   I can remember a couple of times.

LCHKFTC5                    Valiveti - Direct

1   Q.  And that's a couple of times over your career?

2   A.  Yes.

3   Q.  Did you email --

4         MR. WEINGARTEN:  You can put that down, Ms. Guy.

5   Thank you very much.

6   Q.  Did you email Ms. Kirby at that email address about

7   Daraprim?

8   A.  Yes.

9         MR. WEINGARTEN:  Ms. Guy, could you please put GX 3127

10  on the screen.  If you can please zoom in, so we can see more.

11  Thank you.

12  Q.  Is GX 3127 an email you sent to Ms. Kirby?

13  A.  Yes.

14        MR. WEINGARTEN:  I'd like to move to admit GX 3127

15  into evidence, please, your Honor.

16        THE COURT:  Received.

17        (Government's Exhibit 3127 received in evidence)

18  BY MR. WEINGARTEN:

19  Q.  Let's take a look at the document, please, sir.  The

20  address is to akirby@vyera.com.

21        How did you get her email address?

22  A.  The AmerisourceBergen gave me the email.

23  Q.  That's the email we just looked at from ICS?

24  A.  Yes.

25  Q.  It says, "cc:  Sandhya" and "From:  Sandhya," and that's

LCHKFTC5                    Valiveti - Direct

1   your wife's email address, right?

2   A.  Yes.

3   Q.  Did you write this email?

4   A.  Yes.

5   Q.  The date of the email is January 3rd, 2018, correct?

6   A.  Yes.

7   Q.  What are you asking Ms. Kirby in this email?

8   A.  So I'm requesting for approval for five bottles of

9   Daraprim.

10  Q.  Was this also part of your work on behalf of Dr. Reddy's?

11  A.  Yes.

12  Q.  Did you specify the NDC code for Daraprim?

13  A.  Yes.

14  Q.  And you specified the kind of bottle that you needed,

15  right?

16  A.  Yes.

17  Q.  And what quantity, again, sir?  I'm not sure.

18  A.  Five bottles.

19  Q.  Did you offer to supply any additional information she

20  needed?

21  A.  No, I never heard from her.

22  Q.  Okay.  The question was, sir:  Did you ask at the bottom,

23  "Please let me know if you need additional information"?

24  A.  Yes.

25  Q.  And did she ever reach out to you?

LCHKFTC5                    Valiveti – Direct

1    A.  No.

2    Q.  Did you ever hear from Ms. Kirby?

3    A.  No.

4    Q.  I want to just focus on the top sentence there.  You said,

5    "This is Satya Valiveti from Reliant Specialty LLC.  Would like

6    to purchase the following product for chemical analysis for

7    research and development."

8            Do you see that, sir?

9    A.  Yes.

10   Q.  What did you mean when you wrote "chemical analysis for

11   research and development"?

12   A.  So for the product development.

13   Q.  Can you be more specific, sir?

14   A.  So it's basically used for the chemical analysis for the

15   generic product development.  So we call it research and

16   development.

17   Q.  I think we established, Ms. Kirby, did she ever respond to

18   your email?

19   A.  No.

20   Q.  Did anyone from Vyera respond to your email?

21   A.  No.

22   Q.  Did you also try calling Ms. Kirby?

23   A.  Yes, I did.

24   Q.  Did you leave voicemails for Ms. Kirby?

25   A.  Yes.

LCHKFTC5                    Valiveti - Direct

1    Q.  How many?

2    A.  One time.

3    Q.  Did Ms. Kirby respond to your voicemails?

4    A.  No.

5    Q.  In the voicemails, did you repeat the information that you

6    had put in this email --

7    A.  Yes.

8    Q.  -- that we're looking at, GX 3127?

9    A.  That's right.

10   Q.  Did anyone from Vyera call you back in response to your

11   voicemails?

12   A.  No.

13   Q.  And when, approximately, do you think you left those

14   voicemails for Ms. Kirby?

15   A.  I don't remember exact timelines.  It would be right after

16   a week I sent her this email.

17   Q.  So within a week of this email, you believe?

18   A.  Yes.

19   Q.  Okay.

20        MR. WEINGARTEN:  Ms. Guy, you can take that document

21   down.  Thank you very much.

22   Q.  So let's talk about what happens after the email and the

23   voicemails a little bit.

24        Strike that.  Let's talk about a company called Fera.

25        Now, we've been talking about DRL.  In January 2018,

LCHKFTC5                    Valiveti - Direct

1   right around the same time of the email we were just looking
2   at, while you were working on getting Daraprim for DRL, did a
3   company called Fera also ask Reliant to procure some Daraprim?
4   A.  Yes.
5   Q.  How much Daraprim did Fera ask you for?
6   A.  I don't remember exact quantity.  I think it's two bottles.
7   Q.  Would it help, sir, refresh your recollection if we looked
8   at some deposition testimony you gave on that topic?
9   A.  Sure.
10          MR. WEINGARTEN:  Ms. Guy, could we please look at the
11  deposition of Mr. Valiveti, page 93 of the deposition, and it's
12  lines 11 to 15.
13  Q.  Don't read it out loud, sir, just read that to yourself,
14  and let me know when you've had a chance to read it.
15          Does that refresh your recollection as to how many
16  bottles of Daraprim Reliant asked you to acquire?
17  A.  Yes.  Two bottles.
18  Q.  So did Reliant -- did Fera ask you to procure two bottles?
19  A.  Yes.
20          MR. WEINGARTEN:  Okay.  You can take that down.  Thank
21  you, Ms. Guy.
22  Q.  Did you have an understanding of why Fera wanted to source
23  Daraprim RLD?
24  A.  Product development.
25  Q.  And what product were they developing, in your

LCHKFTC5                    Valiveti - Direct

1   understanding?

2   A.  The generic product.

3   Q.  A generic of what, sir?

4   A.  Daraprim.

5   Q.  Did you contact ICS, the AmerisourceBergen division, again

6   in response to Fera's inquiry?

7   A.  I don't remember contacting them.

8   Q.  Why not?

9   A.  Since they already mentioned that I need to contact

10  manufacturer.

11  Q.  Did you contact Vyera again in response to Fera's request

12  for RLD?

13  A.  No.

14  Q.  And why not?

15  A.  Because I did not get a response from them.

16  Q.  Did you try to source the Daraprim for Fera from any other

17  RLD sourcing firms?

18  A.  Yes.

19  Q.  Were they able to supply you two bottles of Daraprim for

20  Fera?

21  A.  No.

22  Q.  Were you eventually able to acquire two bottles of Daraprim

23  for Fera?

24  A.  Yes.

25          MS. STEWART:  Objection; leading.  This whole line of

LCHKFTC5                    Valiveti - Direct

1    questioning is leading.

2            THE COURT:  Overruled.

3    BY MR. WEINGARTEN:

4    Q.  How did you acquire two bottles of Daraprim for Fera?

5    A.  From CentraState.

6    Q.  Can you walk us through from whom did CentraState acquire

7    the Daraprim?

8    A.  ASD Healthcare.

9    Q.  Why was CentraState able to buy it from ASD?

10   A.  Because they have access.

11   Q.  Why do they have access?

12   A.  I don't know.

13   Q.  Is CentraState a client of ASD?

14   A.  Yes.

15   Q.  Did you deliver the two bottles to Fera that CentraState

16   had acquired?

17   A.  Yes.

18   Q.  Do you recall when you delivered those two bottles?

19   A.  No, I don't remember the timelines.

20           MR. WEINGARTEN:  Ms. Guy, could you please put

21   Government Exhibit 3145 on the screen.

22           I believe, your Honor, this is already in evidence as

23   part of Government Exhibit 9002.

24           I don't know if it's possible, Ms. Guy, to rotate it?

25           MS. GUY:  I'm not sure.

LCHKFTC5                    Valiveti – Direct

1          MR. WEINGARTEN:  That's okay.  We can work with it.

2   Actually, instead of the barcode, Ms. Guy, can you please do

3   the shipping, the to and the from, on the upper part there.

4   Yes, and then above that.  Keep going up.  Thank you.

5   BY MR. WEINGARTEN:

6   Q.  Okay, sir, I want to show you this.

7          Do you recognize this document?

8   A.  Yes.

9   Q.  What is it?

10  A.  It's a shipping label.

11  Q.  From whom?

12  A.  From Reliant.

13  Q.  To whom?

14  A.  To Fera Pharma.

15  Q.  If you look in the upper right-hand corner, what's the ship

16  date, sir?

17  A.  January 30th.

18  Q.  I see January 29.

19  A.  January 29th, yes.  Sorry.

20  Q.  That's okay.

21         So does that help refresh your recollection, sir, as

22  to when you shipped Daraprim to Fera?

23  A.  Yes.

24  Q.  What was the date?

25  A.  January 29th.

LCHKFTC5                    Valiveti – Direct

 1              MR. WEINGARTEN:  And just to make sure this is, in

 2      fact, the Daraprim, can we turn to the next page of the

 3      document, please, Ms. Guy, Government Exhibit 3145-002.

 4      Q.  What is this, sir?

 5      A.  Daraprim.  It's a packing slip.

 6      Q.  Is this a Reliant packing slip?

 7      A.  Yes.

 8      Q.  What product does it say was packed?

 9      A.  Two bottles of Daraprim.

10      Q.  And how much did Reliant charge Fera for those two bottles

11      of Daraprim?  Strike that.

12              MR. WEINGARTEN:  Let's move to the next page, please,

13      Ms. Guy, 3145-003.

14      Q.  What is this document, sir?

15      A.  This is an invoice.

16      Q.  It's from whom?

17      A.  From Reliant to Fera Pharma.

18      Q.  And what product is this for?

19      A.  Daraprim.

20      Q.  Was this included in your package mailing the Daraprim to

21      Fera?

22      A.  I believe so.

23      Q.  How much did Reliant charge Fera for two bottles of

24      Daraprim?

25      A.  $230,500.

809

LCHKFTC5                    Valiveti - Direct

1    Q.  230,500, correct?

2    A.  Yes.

3    Q.  That's 115,250 per bottle?

4    A.  That's right.

5         MR. WEINGARTEN:  You can take that down, please,

6    Ms. Guy.

7    Q.  So we talked a little bit about Fera there.

8         So Fera requested, and you were able to supply, two

9    bottles; is that right, sir?

10   A.  That's right.

11   Q.  Using CentraState?

12   A.  That's right.

13   Q.  Let's turn back to DRL now.  That was January of 2018.

14   Let's turn back to DRL.

15        MR. WEINGARTEN:  Ms. Guy, could you please -- strike

16   that.

17   Q.  Did there come a time, sir, when DRL agreed to move forward

18   with your sourcing of Daraprim?

19   A.  Yes.

20        MR. WEINGARTEN:  Let's look at Government

21   Exhibit 3562, please.

22        This document, your Honor, is already in evidence.  I

23   believe it was admitted with Government Exhibit 9010.

24        Let's take a look -- Ms. Guy, sorry, can you zoom in

25   on the bottom email, please?  It's the one from Ramesh

LCHKFTC5                    Valiveti - Direct

1    Rachapudi.  Thank you.

2    Q.  The bottom email is from Mr. Rachapudi.

3            Where does he work?

4    A.  Dr. Reddy's.

5    Q.  What is date of the email, please?

6    A.  March 6, 2018.

7    Q.  Who is it to?

8    A.  To sandhya@reliant.

9    Q.  Even though it's to your wife's email, did you receive this

10   email?

11   A.  Yes.

12   Q.  Did you read it at the time?

13   A.  Yes.

14   Q.  What do you understand Mr. Ramesh to be communicating here?

15   A.  So they issued a purchase order for RLD samples of

16   Daraprim.

17            (Continued on next page)

18

19

20

21

22

23

24

25

LCHMFTC6                    Valiveti - Direct

1   Q.   That's on March 6, 2018?

2   A.   Yes, sir.

3        MR. WEINGARTEN:  Ms. Guy, let's look at the e-mail

4   above it, the top e-mail in the chain.

5   Q.   Is this your response, sir?

6   A.   Yes.

7   Q.   Even though it's from Sandhya's e-mail that's your name at

8   the bottom, right?

9   A.   Yes.

10  Q.   Did you write this response?

11  A.   Yes.

12  Q.   What's the date?

13  A.   March 6.

14  Q.   2018?

15  A.   2018.

16  Q.   What you explaining to Mr. Rachapudi of Dr. Reddy's?

17  A.   They sent pro forma invoice for advanced payment.

18  Q.   You wrote to Mr. Rachapudi, we will deliver the product

19  within a week from the payment receipt.  Do you see that?

20  A.   Yes.

21  Q.   Was to your intention at the time, to deliver the product

22  within a week?

23  A.   That's right.

24  Q.   What was the basis for your estimate that it might just

25  take a week to receive the product and deliver it to DRL?

812

LCHMFTC6                    Valiveti – Direct

1    A.  Based on the source, we thought we -- we thought we were

2    going to supply within a week.

3            MR. WEINGARTEN:  Ms. Guy, could you please turn to the

4    next page of this document, 3562-02.

5    Q.  What is this document, sir?

6    A.  A pro forma invoices.

7    Q.  Is this the attachment to that e-mail we were just looking

8    at?

9    A.  Yes.

10   Q.  It's from Reliant, right?

11   A.  Yes.

12   Q.  Who are you billing on this invoices?

13   A.  Dr. Reddy's.

14   Q.  To whom are you shipping the product, if you get it?

15   A.  Cerovene.

16   Q.  Under the word terms it says 100 percent advance.  Do you

17   see that?

18   A.  Yes.

19   Q.  What does that indicate?

20   A.  It's a prepayment.

21   Q.  Does it mean you're asking for full prepayment of the

22   entire cost of the drug?

23   A.  That's right.

24   Q.  In this case, sir, what is the drug that's being described

25   on this invoices?

813

LCHMFTC6                       Valiveti - Direct

 1   A.   Daraprim.

 2   Q.   How many bottles of Daraprim?

 3   A.   Five bottles.

 4   Q.   How much per bottle?

 5   A.   $110,000.

 6   Q.   How much would Dr. Reddy's have to prepay Reliant to begin

 7   the process of sourcing Daraprim five bottles?

 8   A.   $550,000.

 9        MR. WEINGARTEN:  You can take that down, Ms. Guy.

10   Thank you.

11   Q.   Did DRL actually make that prepayment?

12   A.   Yes.

13   Q.   How did they make the payment, by what mechanism?

14   A.   Wire transfer.

15   Q.   For the full amount of $550,000?

16   A.   Yes.

17   Q.   How soon after the pro forma invoice did you receive that

18   prepayment?

19   A.   I don't remember.

20   Q.   Was it a long time coming or do you remember anything,

21   approximately?

22   A.   I believe it may have taken like three weeks.

23   Q.   Was Reliant able to acquire five bottles of Daraprim RLD

24   after this discussion with Dr. Reddy's?

25   A.   Yes.

LCHMFTC6                    Valiveti - Direct

1   Q.  How?

2   A.  Reliant procured from CentraState.

3   Q.  Let me stop you right there.  How did CentraState acquire

4   the bottles?

5   A.  They purchased it from ASD.

6   Q.  Did they place an order for all five bottles with ASD?

7   A.  Yes.

8           MR. WEINGARTEN:  I'd like to introduce Government

9   Exhibit 3130, please, Ms. Guy.  Thank you.

10  Q.  Actually, what is this document, sir?

11  A.  It's an order confirmation.

12          MR. WEINGARTEN:  Ms. Guy, can you do the header of the

13  e-mail.  Thank you so much.

14  Q.  Who is this order confirmation from?

15  A.  ASD Health Care.

16  Q.  Who is it to?

17  A.  Sandhya Kantamaneni.

18  Q.  Is that your wife?

19  A.  Yes.

20  Q.  What's the date?

21  A.  March 4.

22  Q.  I'm sorry, sir.  Is it March 4 or April?

23  A.  April 4.

24  Q.  2018?

25  A.  That's correct.

LCHMFTC6                    Valiveti - Direct

1          MR. WEINGARTEN:  Ms. Guy, can you now go to the body

2     of the ASD confirmation.

3     Q.  It says there is an order date.  Do you see that, sir?

4     A.  Yes.

5     Q.  Strike that.  Let me do that first, actually.

6          MR. WEINGARTEN:  Your Honor, I'd like to admit into

7     evidence GX-3130, please.

8          THE COURT:  Received.

9          (Government Exhibit 3130 received in evidence)

10    Q.  Do you see the order date, sir?

11    A.  Yes.

12    Q.  Does that reference the date on which CentraState placed an

13    order with ASD?

14    A.  Yes.

15    Q.  What date is that?

16    A.  April 4.

17    Q.  Of 2018?

18    A.  2018.

19    Q.  2018?

20    A.  Yes.

21    Q.  What time?

22    A.  9:33 a.m.

23    Q.  What product was CentraState ordering, according to this

24    web order confirmation?

25    A.  Daraprim.

LCHMFTC6                    Valiveti - Direct

1  Q.  How much Daraprim?

2  A.  Five bottles.

3  Q.  How much per bottle?

4  A.  $75,000.

5  Q.  What's the total cost then that CentraState paid to ASD for

6  this five bottles of Daraprim?

7  A.  $375,000.

8          MR. WEINGARTEN:  Ms. Guy, you can take that one down.

9          THE COURT:  Sir, we are still getting a little

10  feedback.  I am going to ask you to just move the mic one way

11  or another, sort of a little away from you.  I don't want you

12  to move too far back.  If you could just move it down or move

13  it to the side.  It moves.  Let's see if that works.  Thank

14  you.

15  Q.  Did CentraState receive the five bottles of Daraprim that

16  it ordered from ASD?

17  A.  Yes.

18  Q.  When?  I'll ask you this.  How soon, sir, after the order

19  do you believe you received them?

20  A.  Usually, the next day.

21          MR. WEINGARTEN:  Ms. Guy, could we please look at

22  GX-3131.  Can you do the e-mail header and the title, please of

23  the document.

24  Q.  What is this document, sir?

25  A.  It's a shipment confirmation.

LCHMFTC6                    Valiveti - Direct

1   Q.  Is it from ASD?

2   A.  Yes.

3   Q.  Who is the shipment confirmation to?

4   A.  Sandhya Kantamaneni.

5   Q.  Did you receive the shipment confirmation?

6   A.  Yes.

7   Q.  What's the date of the shipment confirmation?

8   A.  April 4, 2018.

9   Q.  Is the order date, again, April 4, 2018?  Do you see that

10  it says order date?

11  A.  Order date, yes.

12  Q.  What's the date the e-mail was sent with the shipment

13  confirmation to Sandhya Kantamaneni?

14  A.  April 5, 2018.

15          MR. WEINGARTEN:  Ms. Guy, can you go to the contents

16  of the document, please.

17          Your Honor, I would move to admit GX-3131, please.

18          MS. STEWART:  Your Honor, objection.  It's not clear

19  to me from the record that the witness has seen this document.

20          THE COURT:  The objection is that counsel does not

21  know if the witness saw this document contemporaneously.

22          Counsel, may you inquire.

23          MR. WEINGARTEN:  Sure.

24  Q.  On or about the time that this e-mail is dated, did you see

25  it?

LCHMFTC6                    Valiveti - Direct

1    A.   Yes.

2    Q.   Is that a yes?

3    A.   Yes.

4    Q.   And, again, what is the product that ASD is confirming that

5    it shipped?

6    A.   Daraprim.

7    Q.   How much Daraprim?

8    A.   Five bottles.

9    Q.   To whom did ASD ship five bottles of Daraprim?

10   A.   CentraState.

11   Q.   Is that the same CentraState pharmacy that your wife owns?

12   A.   That's right.

13          MR. WEINGARTEN:  I am not sure if I got the admission.

14   I move to admit GX-3131, please.

15          THE COURT:  Received.

16          (Government Exhibit 3131 received in evidence)

17          MR. WEINGARTEN:  You can take that down, please,

18   Ms. Guy.

19   Q.   At the time, on April 5, when the bottles shipped, was it

20   your intention to deliver those five bottles to DRL?

21   A.   Yes.

22   Q.   Did CentraState actually receive the five bottles of

23   Daraprim from ASD?

24   A.   Yes.

25   Q.   Was it your intention to transfer the bottles from

LCHMFTC6                    Valiveti - Direct

1   CentraState to Reliant?

2   A.  Yes.

3   Q.  Did Reliant ultimately supply any of those five bottles of

4   Daraprim RLD to Dr. Reddy's?

5   A.  No.

6   Q.  Did Reliant ultimately supply any of those five bottles of

7   Daraprim RLD to any of its clients?

8   A.  No.

9   Q.  Let's talk about why not.

10          Now, after CentraState purchased five bottles of

11  Daraprim RLD from its wholesaler, ASD, did someone from Vyera

12  call CentraState?

13  A.  Yes.

14  Q.  Do you know who?

15  A.  I don't remember.

16  Q.  Do you know what the person wanted?

17  A.  I think it was a sales rep.

18  Q.  I'm sorry?

19  A.  It's a sales local rep.

20  Q.  What did this local sales rep for Vyera want?

21  A.  So what I heard from my wife is they inquiring about the

22  product -- why did CentraState purchase and the doctor name.

23  Q.  Let's break that down a little bit.  Is it your

24  understanding that a person from Vyera called asking about the

25  Daraprim that CentraState had purchased?

LCHMFTC6                    Valiveti - Direct

1   A.   That's right.

2   Q.   What questions did the person from Vyera ask?

3            THE COURT:  With whom did that person speak?

4            THE WITNESS:  The pharmacist at pharmacy.

5            THE COURT:  So they didn't speak to you?

6            THE WITNESS:  No, they didn't.

7            MR. WEINGARTEN:  I would like to introduce it, your

8   Honor, for the effect on the listener.

9            THE COURT:  How did you learn about that conversation?

10  Who told you about the conversation?

11           THE WITNESS:  My wife.

12           MR. WEINGARTEN:  Thank you, your Honor.

13  Q.   What did your wife tell you about the conversation?

14  A.   That the company rep called her inquiring about the

15  product, why the purchase happened, what was the purpose.

16  Q.   The person inquired about what the purpose of the purchase

17  of the Daraprim was?

18  A.   Yes.

19  Q.   What was your wife's reaction to this inquiry from Vyera?

20  A.   She felt nervous.

21  Q.   Why was she nervous?

22  A.   Because they are inquiring about the doctor name and

23  everything.

24  Q.   Why would inquiries about the doctor name, whether there

25  was a doctor who had ordered this Daraprim, why was that cause

LCHMFTC6                    Valiveti - Direct

1    for being nervous, in your mind?

2    A.  Once you read about the relationship between the supplier

3    of ASD and the pharmacy is going to be in trouble.

4    Q.  What did you think might happen that would cause

5    CentraState to get in trouble with ASD?

6    A.  I think she assumed that they were going to cancel the

7    account.

8    Q.  By they canceling the account, you mean ASD canceling its

9    account?

10   A.  Yes.

11   Q.  With CentraState?

12   A.  Yes.

13   Q.  Were you also nervous about this?

14   A.  Yes.

15   Q.  I don't want to put too fine a point on it, but I want to

16   get your personal knowledge.  Why was Vyera's inquiries making

17   you nervous about the relationship between ASD and CentraState?

18   What did you fear would happen?

19   A.  For me there was no reason, but my wife was nervous.  That

20   makes me worried.

21   Q.  I understand.  Your wife was nervous because there was a

22   concern about interference -- concern that ASD would be upset

23   with CentraState?

24   A.  Right.

25   Q.  Is that correct?

LCHMFTC6                    Valiveti - Direct

1   A.  That's right.

2   Q.  Why would that be a problem for CentraState if ASD ended

3   its contract with CentraState?

4   A.  She thought a rep was going to complain to ASD.

5   Q.  The rep being the Vyera rep?

6   A.  Yes.

7   Q.  If the Vyera rep complained and ASD stopped being

8   CentraState's supplier, why is that a problem for CentraState?

9   A.  Because that's the only specialty distributor that

10  CentraState purchased.

11  Q.  Could CentraState continue to do its business without ASD

12  as a supplier?

13          MS. STEWART:  Objection.  Calls for speculation.

14          THE COURT:  Overruled.

15  A.  There are other specialty distributors.

16  Q.  Would it be a disruption if ASD dropped CentraState?

17  A.  That I don't know.

18  Q.  Are there patients at CentraState who are on products that

19  ASD supplies?

20          THE COURT:  Counsel, I am going to sustain the

21  objection to leading.  I will let you inquire as to why it

22  would be a problem or why someone was worried, but it should

23  come from the witness.

24          MR. WEINGARTEN:  OK.

25  Q.  Was there anything specific, sir, about why it would be a

LCHMFTC6                    Valiveti - Direct

1    problem for CentraState if ASD terminated CentraState's

2    relationship?

3    A.  She thought she was going to lose access to particular

4    products.

5    Q.  Did you and your wife think about returning the bottles of

6    Daraprim to ASD?

7                MS. STEWART:  Objection.  Leading.

8                THE COURT:  Sustained.

9    Q.  What did you do next, sir, after you talked to your wife

10   about the Vyera sales rep's call?

11   A.  So we wanted to return the product to ASD.

12   Q.  Did you return the bottles to ASD?

13   A.  No.  We created a written authorization to return the

14   product to ASD.

15   Q.  And what happened at that point in time?  What happened

16   next with respect to the Daraprim bottles?

17   A.  I think after a couple of days we got a call from a person

18   I know that -- he was inquiring of me whether we bought

19   Daraprim and the quantity.

20   Q.  What is the name of the person who called?

21   A.  Peter.

22   Q.  Do you know Peter's last name?

23   A.  It's complicated.

24   Q.  Do you think it would refresh your recollection if we

25   looked at some testimony you gave about Peter?

LCHMFTC6                    Valiveti - Direct

1    A.  Yes.

2              MR. WEINGARTEN:  Ms. Guy, could we please look at the

3    deposition of Mr. Valiveti, page 117 of the deposition, line

4    22, to page 118, line 2:

5    Q.  Read to that to yourself, sir.

6    A.  Yes.

7    Q.  Does that refresh your recollection about the last name of

8    Peter?

9    A.  Yes.

10   Q.  What is Peter's last name?

11   A.  Skoutelas.

12   Q.  When Mr. Skoutelas called you, what happened?  What did he

13   say?

14   A.  So he was inquiring about the product we purchased.

15             MS. STEWART:  Objection.  Hearsay as to what --

16             THE COURT:  Overruled.

17   A.  Then he said an office friend at Vyera wanted to talk to

18   me.

19   Q.  Did you subsequently get on a conference call with a person

20   from Vyera and Mr. Skoutelas?

21   A.  Yes.

22   Q.  When?

23   A.  Around the same day.

24   Q.  Do you remember approximately when that day was or how long

25   after it was that you had received the Daraprim that you had

LCHMFTC6                    Valiveti - Direct

1   this call with Mr. Skoutelas and someone from Vyera?

2   A.  I think two or three days after.

3   Q.  Who were the participants on this conference call?

4   A.  Myself and Peter Skoutelas and Kevin Mulleady.

5   Q.  A gentleman named Kevin Mulleady?

6   A.  Yes.

7   Q.  Had you ever known Mr. Mulleady before this call?

8   A.  No.

9   Q.  Had you ever talked to Mr. Mulleady before that call?

10  A.  No.

11  Q.  What did Mr. Mulleady -- how did the call start?

12  A.  I don't remember the exact conversation.

13  Q.  What did Mr. Mulleady say on the call?

14  A.  So he was inquiring about the intent of the purchase.

15  Q.  Can you be more specific.

16  A.  He asked -- I don't remember the exact words.  He is trying

17  to get information on why we purchased the product.

18  Q.  Did you answer his questions about why you purchased five

19  bottles of Daraprim?

20  A.  I am -- I did not reveal my client.

21  Q.  Why not?

22  A.  Keep the confidentiality of the client.

23  Q.  Is it your understanding your clients request

24  confidentiality when you are doing purchases of RLD?

25  A.  In this case, no.  But the -- but Reliant wanted to keep

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCHMFTC6                    Valiveti – Direct

1   confidentiality.

2   Q.  Why did Reliant want to keep the confidentiality of its

3   client in this case?

4   A.  That's the nature of the business, because it's client

5   protection.

6   Q.  Did you tell Mr. Mulleady that you were thinking about

7   returning the bottles to ASD?

8   A.  Yes.

9          MS. STEWART:  Objection.  Leading.

10         THE COURT:  Sustained.  Stricken.

11  Q.  What did you tell Mr. Mulleady after he inquired about what

12  you were doing with the bottles?

13  A.  He offered me to -- Kevin wanted to take back the bottles.

14  Q.  Let's stop there for a second.  What specifically did

15  Mr. Mulleady offer?

16  A.  The price.

17  Q.  When Mr. Mulleady said he could take the bottles, what did

18  you say?

19  A.  We didn't -- we wanted to return to ASD.

20  Q.  What did Mr. Mulleady say after that?

21  A.  He said he wanted to get the bottles.

22  Q.  Get the bottles to whom?

23  A.  For himself.

24  Q.  Did you quote a price to Mr. Mulleady at which you would

25  sell the bottles back to Vyera?

LCHMFTC6                    Valiveti - Direct

1            MS. STEWART:  Objection.  Leading.

2            THE COURT:  Sustained.

3            Was there any discussion about price?

4            THE WITNESS:  Yes.

5            THE COURT:  Who said what with respect to price?

6            THE WITNESS:  Kevin offered me one price at the

7    purchase price, which was $75,000 per bottle.

8    Q.  What did you say?

9    A.  We said like we can give it to him at higher price.

10   Q.  What price did you say?

11   A.  I don't remember exact price.  It's 130,000 per bottle.

12   Q.  Did you and Mr. Mulleady -- what happened next after you

13   said 130,000 per bottle?

14   A.  I didn't say anything, and he agreed to pay.

15   Q.  Did Mr. Mulleady agreed to pay the price you quoted?

16   A.  Yes.

17   Q.  Did Reliant eventually receive the money, the price that

18   you were quoted on that call?

19   A.  Yes.

20   Q.  How much money did Reliant receive?

21   A.  I don't remember the exact number.

22   Q.  Was it in accord with what you had talked to with

23   Mr. Mulleady on the call?

24   A.  Can you repeat, please.

25   Q.  Sure.  Was it in accord with what you had discussed with

LCHMFTC6                    Valiveti - Direct

1   Mr. Mulleady on the call?

2   A.  I didn't get it.

3           THE COURT:  Did you receive the money?

4           THE WITNESS:  Yes, we received the money.

5           THE COURT:  Was it the full amount that you had agreed

6   upon with Mr. Mulleady?

7           THE WITNESS:  Not the full amount.  Some money taken

8   by the Peter.

9   Q.  What do you mean, some money was taken by Peter?

10  A.  Peter gets a commission.

11  Q.  Mr. Skoutelas got a commission?

12  A.  Yes.

13  Q.  And the rest went to Reliant?

14  A.  Reliant.

15  Q.  Did you return the five bottles of Daraprim to Vyera?

16  A.  Yes.

17  Q.  When did you do that?

18  A.  After getting paid.

19  Q.  Where did you return the five bottles of Daraprim that

20  Reliant had purchased for DRL?

21  A.  I met him at the parking lot of Starbucks in Parsippany.

22  Q.  When you say him, who did you mean, sir?

23  A.  Kevin Mulleady.

24  Q.  What happened at your meeting at the Starbucks parking lot

25  in New Jersey?

LCHMFTC6                    Valiveti - Direct

1   A.  Nothing.  It was a very short meeting.  I just gave him the

2   bottles.

3   Q.  Where were the bottles when you gave them to Mr. Mulleady?

4   A.  In an envelope.

5   Q.  Did you do it in the Starbucks, in the parking lot?

6   A.  In the parking lot.

7   Q.  Did you talk first?

8   A.  Yes.

9   Q.  What did you say?

10  A.  I just introduced myself.

11  Q.  Did Mr. Mulleady say anything?

12  A.  Just greetings.  He didn't speak a lot.

13  Q.  Did you physically hand the bottles to Mr. Mulleady?

14  A.  Yes.

15  Q.  And it was all five bottles?

16  A.  Yes.

17  Q.  Did Mr. Mulleady give you anything in return to the

18  Starbucks parking lot?

19  A.  Yes.

20          MS. STEWART:  Objection.  Leading.

21          THE COURT:  Overruled.

22  Q.  What did Mr. Mulleady give you?

23  A.  He give me an agreement to sign.

24  Q.  Did he say anything?

25  A.  No.

830

LCHMFTC6                    Valiveti – Direct

1   Q.  Did you say anything when he handed you the agreement?

2   A.  Yes.

3   Q.  What did you say?

4   A.  I am going to get ready to review it by an attorney and get

5   back to him.

6   Q.  How long did the entire meeting in the Starbucks parking

7   lot take?

8   A.  Less than five minutes.

9            THE COURT:  Are you about to move on?  Yes, counsel.

10           MR. WEINGARTEN:  I think I have one more question, if

11  it's a good breaking point.

12           THE COURT:  You're done with the parking lot?

13           MR. WEINGARTEN:  Yes, your Honor.

14           THE COURT:  How did you and Mr. Mulleady find each

15  other in the parking lot?

16           THE WITNESS:  He had exchanged a contact number.  I

17  have the telephone number of Kevin Mulleady, and we

18  coordinated.

19           THE COURT:  Thank you.

20           MR. WEINGARTEN:  I'd like to introduce GX-3129.  I

21  believe it's already admitted, but if you can please that on

22  the screen, Ms. Guy.

23  Q.  What is this document, sir?

24  A.  I believe this is an agreement, a draft given to me.

25  Q.  Is this the agreement that Mr. Mulleady handed you in the

**A-1890**

LCHMFTC6                    Valiveti – Direct

1    parking lot?

2    A.  Yes.

3    Q.  Did you ever sign this agreement?

4    A.  No.

5            MR. WEINGARTEN:  You can take that down, Ms. Guy.

6    Q.  Now, let's talk about what happened after you return the

7    bottles.

8            THE COURT:  Excuse me, counsel.  We are going to want

9    to take a break at some point here.  Is this a good time?

10           MR. WEINGARTEN:  Yes, your Honor.

11           THE COURT:  Thank you.  We will have a brief afternoon

12   recess.

13           (Recess)

14           THE COURT:  Let me just make sure that defense counsel

15   is ready.

16           MS. STEWART:  May I go get the counsel in the hall?

17           THE COURT:  Sure.

18           Counsel.

19   BY MR. WEINGARTEN:

20   Q.  Mr. Valiveti, I just want to take you back one second to

21   after the bottles were delivered to CentraState from ASD before

22   you got -- Vyera called CentraState.  OK.  After the bottles

23   were delivered to CentraState but before the call, what was

24   your intention to do with those bottles?

25           MS. STEWART:  Objection.

LCHMFTC6                    Valiveti - Direct

1          THE COURT:  Overruled.

2    A.  Supply to get the bottles to Reliant and supply it to the

3    client.

4    Q.  Which client, sir?

5    A.  Dr. Reddy's.

6    Q.  Let's talk about after the Starbucks parking lot meeting.

7    After you met Mr. Mulleady in the parking lot and returned the

8    five bottles, what did you do with DRL's prepayment?

9    A.  We refunded -- we returned the money to DRL.

10   Q.  All of it?

11   A.  All of it.

12   Q.  Did there come a time after that when DRL asked you to

13   again try to procure Daraprim?

14   A.  That's right.

15   Q.  Do you remember when?

16   A.  I think somewhere in 2018.

17          MR. WEINGARTEN:  Ms. Guy, could you please raise up

18   GX-3135, please.  It's page 006.  I just want to --

19   Q.  Is it possible, sir, that looking at an e-mail that you

20   sent about this topic would refresh your recollection?

21   A.  Yes.

22          MR. WEINGARTEN:  Let's turn to page 006 of Government

23   Exhibit 3135.  Could you go to the bottom couple of e-mails

24   there.  Thank you very much.

25   Q.  Look at those to yourself, sir.  You don't have to say

LCHMFTC6                        Valiveti – Direct

1    anything out loud.

2            Does that refresh your recollection as to the date

3    when DRL approached Reliant again about Daraprim?

4    A.   Yes.

5    Q.   When did DRL again approach Reliant about Daraprim?

6    A.   May 25, 2018.

7            MR. WEINGARTEN:   Thank you.  You can take that down,

8    Ms. Guy, please.

9    Q.   How many bottles did Dr. Reddy's ask Reliant to source at

10   that time?

11   A.   Two.

12   Q.   And did it remain as two or did they ask for more?

13   A.   I believe they asked for one more.

14   Q.   How many bottles total, starting in May 2018, did

15   Dr. Reddy's ask Reliant to source?

16   A.   Three bottles.

17   Q.   And did you tell Dr. Reddy's or Cerovene anything about

18   procuring Daraprim at that time?

19   A.   Yes.

20   Q.   What did you tell them?

21   A.   Reliant is going to try from different source.

22   Q.   Did you tell them anything more about why Reliant was going

23   to have to try different sources?

24   A.   I don't recollect.

25   Q.   How much Daraprim from that three-bottle order were you

LCHMFTC6                    Valiveti - Direct

1    ultimately able to deliver to DRL?

2    A.   One bottle.

3    Q.   How did you get that one bottle?

4    A.   We got it from a third-party distributor, Bilcare.

5    Q.   That's spelled B-i-l-c-a-r-e?

6    A.   That's right.

7    Q.   What is Bilcare?

8    A.   They are a clinical supplies company.  They have -- they

9    also have the same business model as Reliant.

10   Q.   How many bottles did you ask Bilcare to assist you with

11   sourcing?

12   A.   Three bottles.

13   Q.   How many bottles did Bilcare deliver?

14   A.   One bottle.

15   Q.   Did you deliver that bottle to DRL?

16   A.   Yes.

17   Q.   Do you remember when?

18   A.   I don't recollect that.

19   Q.   Did you think it would refresh your recollection if you

20   looked at an invoice that you sent DRL?

21   A.   Yes.

22           MR. WEINGARTEN:  Can you put GX-3039 on the screen.  I

23   believe this document is already admitted, your Honor.

24   Q.   What is this document, sir?

25   A.   This is a pro forma invoice.

A-1894

LCHMFTC6                    Valiveti – Direct

1   Q.  From whom?

2   A.  From Specialty Pharma Source.

3   Q.  Do you own Specialty Pharma Source?

4   A.  Yes.

5   Q.  Who is it to?

6   A.  To Dr. Reddy's.

7   Q.  Who is it to be shipped to?

8   A.  Cerovene.

9   Q.  What product?

10  A.  Daraprim.

11  Q.  How much?

12  A.  One bottle.

13  Q.  Does that refresh your recollection as to when you may have

14  delivered a bottle of Daraprim to DRL?

15  A.  No.  This is a pro forma invoice.

16  Q.  How much did you charge DRL for that one bottle of

17  Daraprim?

18  A.  110,000.

19       MR. WEINGARTEN:  You can take that down, please,

20  Ms. Guy.

21  Q.  Was that the only bottle you ever were able to procure for

22  Dr. Reddy's?

23  A.  That's right.

24  Q.  Let's turn back quickly to Fera.  After you had delivered

25  two bottles to Fera in January of 2018, did Fera ever ask you

LCHMFTC6                        Valiveti - Direct

1   to do more?

2   A.  There was an inquiry for additional bottles of Daraprim.

3   Q.  What did you say?

4   A.  I said we can try.

5   Q.  Were you able to procure any more Daraprim for Fera?

6   A.  No.  They haven't issued any purchase orders.

7   Q.  Have any other companies approached you after April 2018

8   about procuring Daraprim?

9   A.  I don't remember.

10  Q.  Is it possible you could refresh your recollection by

11  looking at your deposition, sir?

12          MR. WEINGARTEN:  Ms. Guy, could you please put page

13  150 of Mr. Valiveti's deposition on the screen, lines 7 through

14  11.

15  Q.  Read that to yourself, sir.  Let me know when you are

16  finished.

17  A.  Yes.

18          MR. WEINGARTEN:  You can take that down, Ms. Guy.

19  Q.  Did that refresh your recollection about whether other

20  companies have asked you to source Daraprim?

21  A.  I think so, but I don't remember that company name.

22  Q.  What was your response to inquiries from any other

23  companies about sourcing Daraprim?

24  A.  We can try.

25          MR. WEINGARTEN:  Ms. Guy, can you please put that back

LCHMFTC6                    Valiveti - Cross

1    up, page 150, line 7 to 11.

2    Q.  You testified, sir -- the question was:

3    "Q.  OK.  So other companies asked you to provide samples.

4    Sorry.  Provide Daraprim products.  And you did not respond

5    because of the difficulties you've had in the past acquiring

6    Daraprim.

7    "A.  Correct."

8              Was that your testimony at your deposition, sir?

9    A.  Yes.

10   Q.  Was that testimony truthful when you gave it?

11   A.  Yes.

12   Q.  So I am going to ask you, sir, why did you not respond to

13   other companies who asked you to help source Daraprim?

14   A.  Usually, like we pick and choose the companies whom we do

15   the business.  There may be inquiries and maybe did not

16   respond, if possible, because we had difficulty in sourcing the

17   product.

18   Q.  So did you not respond because you had difficulty sourcing

19   Daraprim?

20   A.  That's right.

21             MR. WEINGARTEN:  I have nothing further at this time.

22   CROSS-EXAMINATION

23   BY MS. STEWART:

24   Q.  Good afternoon, I have a few follow-up questions for you.

25             During the direct examination I believe you spoke

LCHMFTC6                          Valiveti - Cross

1  about how sometimes Reliant is unable to source a

2  pharmaceutical product from any source, correct?

3  A.  That's right.

4  Q.  And this is because pharmaceutical manufacturers sometimes

5  place restrictions on who a product can be supplied to,

6  correct?

7  A.  Correct.

8  Q.  For example, I think you testified earlier that

9  manufacturers can restrict the sale of a pharmaceutical product

10  to a class of trade, correct?

11  A.  Correct.

12  Q.  In your experience, pharmaceutical manufacturers have

13  increasingly restricted the sale of their products to specific

14  classes of trade, correct?

15  A.  Correct.

16  Q.  So the practice is becoming more commonplace?

17  A.  All I can say is I can see a trend.  I don't know --

18  Q.  You see a trend of more?

19  A.  Yes.

20  Q.  Not including Daraprim, manufacturers have placed

21  restrictions on products that Reliant has tried to source,

22  correct?

23  A.  Correct.

24  Q.  In fact, Reliant Specialty has been unable to source many

25  products due to manufacturer restrictions, correct?

LCHMFTC6                    Valiveti - Cross

1    A.   Correct.

2    Q.   I believe you testified earlier that it was close to 20 per

3    year.  Is that accurate?

4    A.   Yes.

5    Q.   How long has Reliant been in business?

6    A.   Since 2013.

7    Q.   Since 2013, is it fair to say that there has been 20

8    products or so each year that you have not been able -- that

9    Reliant has not been able to source?

10   A.   About 20 products each year they may have request same

11   products.  They keep on trying.  All I can say is 20 instance.

12   Q.   I'm sorry.  I couldn't quite hear you.

13   A.   Every year like I had 20 inquiries where we can try and get

14   feedback from the manufacturers where we get answer from

15   manufacturer that Reliant is not a class of trade for that

16   particular product.

17        THE COURT:  Counsel, I think, just so you know what I

18   think the witness said and what might be captured here, for

19   some products that you cannot source you get another request

20   for that same product or to source that same product year after

21   year.

22        THE WITNESS:  That's right.

23        THE COURT:  So it may be 20 products in all because

24   the same products get asked for year after year.

25        THE WITNESS:  It's a mixture of new and old product

LCHMFTC6                    Valiveti - Cross

1    requests that we keep on trying with manufacturer to see if
2    there are any change in classification by the manufacturer.
3            THE COURT:  If you have 20 such requests a year that
4    you can't fill, how many individual products, say, over last
5    five years have you been unable to fill?
6            THE WITNESS:  More than 20 products all those years.
7    Q.  Are you able to estimate for me how many products since
8    Reliant started business Reliant has been unable to source?
9    A.  I don't have an exact answer, but they are increasingly
10   difficult in sourcing the products.
11   Q.  So you don't remember today how many products Reliant has
12   been able to source?
13           THE COURT:  Has been unable to source.
14           MS. STEWART:  Has been unable.  Yes, your Honor.
15   A.  Most of the biologics we have not been able to source.
16   Q.  My question is, as you sit here today, you don't recall how
17   many products you've been unable to source?
18   A.  More than 20, I would say.
19   Q.  Would it help if I showed you your deposition testimony in
20   this case?
21   A.  Yes.
22           MS. STEWART:  Could you bring up the testimony at page
23   40, please.  41.  Apologies.
24   Q.  Do you see on the screen, this is a page from your
25   deposition testimony?

LCHMFTC6                    Valiveti - Cross

1   A.  Yes.

2   Q.  Do you see the question at the top of the page that begins,

3   I see?

4   A.  Yes.

5   Q.  Can you read this testimony to yourself and your answer and

6   tell me if that helps refresh your recollection?

7   A.  Yes.

8   Q.  Now that your recollection has been refreshed, how many

9   products has Reliant failed to source, approximately?

10  A.  Close to a hundred products.

11  Q.  A hundred products.  Thank you.

12          I believe you also testified earlier that Dr. Reddy's

13  is a large client of Reliant, is that correct?

14  A.  Yes.

15  Q.  And you've been unable to source products separate from

16  Daraprim, there are other products you have been unable to

17  source for Dr. Reddy's, correct?

18  A.  Correct.

19  Q.  You also testified earlier about obtaining Daraprim for a

20  company called Fera, correct?

21  A.  Yes.

22  Q.  And Reliant was able to source two bottles of Daraprim for

23  Fera, correct?

24  A.  Yes.

25  Q.  And it sourced those bottles in January of 2018, is that

842

LCHMFTC6                    Valiveti - Cross

1   correct?

2   A.   Right.

3   Q.   And those bottles were sourced from CentraState, correct?

4   A.   That's correct.

5   Q.   At this time you could have obtained more bottles from

6   CentraState, correct?

7   A.   We ordered five.

8   Q.   I'm talking specifically about the January 28 time frame.

9   A.   Can you repeat the question.

10  Q.   Yes.  In January of 2018, Reliant could have ordered more

11  bottles of Daraprim from CentraState, correct?

12  A.   We only have only two bottles ordered.

13  Q.   You only ordered two, but you could have ordered more at

14  that time, correct?

15  A.   We had only request from one client, two bottles.

16  Q.   But nothing was keeping you from ordering more bottles at

17  that time?

18  A.   I don't know.

19  Q.   Would it help if I showed you some of your testimony again.

20       MS. STEWART:  Could I see page 97, please.

21  Q.   Do you see your answer?  Does this help refresh your

22  recollection as to whether Reliant could have ordered more

23  Daraprim from CentraState?  Does this refresh your recollection

24  as to whether Reliant could have ordered more Daraprim from

25  CentraState?

LCHMFTC6                    Valiveti - Cross

1   A.  In January 2018.

2   Q.  The January 2018 time frame.

3   A.  Yes.

4   Q.  Thank you.

5          Now, on direct you were asked a question about whether

6   Fera asked you to order more Daraprim after the two bottles

7   that we were just talking about.  I'd like to show you a

8   document with regard to that.

9          MS. STEWART:  Could you bring up DX-121, please.

10  Q.  I am going to ask you to take a look at this document.  Is

11  that your e-mail address at the top of the page?

12  A.  Yes.

13  Q.  Do you recognize this document?

14  A.  Yes.

15  Q.  What is this?

16  A.  I sent an e-mail to Fera Pharma to see if they need any

17  additional quantity of Daraprim.

18  Q.  Did Fera respond to you?

19  A.  Yes.

20  Q.  How did they respond?

21  A.  They said they are good for now.

22  Q.  Reliant offered or asked if Fera needed any more Daraprim

23  and Fera declined your offer.  Is that fair to say?

24  A.  That's right.

25         MS. STEWART:  Your Honor, I would like to move DX-121

A-1903

LCHMFTC6                          Valiveti - Redirect

1    into evidence.

2              MR. WEINGARTEN:  No objection.

3              THE COURT:  Received.

4              (Defendant's Exhibit 121 received in evidence)

5    Q.  During your direct testimony you were asked about an e-mail

6    you sent to Ms. Kirby, correct?

7    A.  Yes.

8    Q.  That e-mail was sent in the beginning of January 2018,

9    correct?

10   A.  Yes.

11   Q.  But you were able to source Daraprim after you sent that

12   e-mail, correct?

13   A.  We don't source it from retail pharmacies in general.

14   Q.  Let me rephrase my question.  I apologize.

15             After the e-mail to Ms. Kirby, Reliant was able to

16   obtain most two bottles of Daraprim, correct?

17   A.  Yes.

18             MS. STEWART:  No further questions, your Honor.

19             MR. WEINGARTEN:  A very brief redirect, if I may, your

20   Honor.

21             THE COURT:  Yes.

22   REDIRECT EXAMINATION

23   BY MR. WEINGARTEN:

24   Q.  You were just asked on cross, sir, about restrictions and

25   trends in restrictions on pharmaceuticals.  Do you remember

LCHMFTC6                    Valiveti - Redirect

1   that?

2   A.   Yes.

3   Q.   Has any manufacturer ever bought back product in a

4   Starbucks parking lot from you other than Vyera?

5   A.   No.

6   Q.   You were asked about two bottles that were delivered to

7   Fera.  Do you recall that?

8   A.   Yes.

9   Q.   After you sourced the two bottles in January for Fera, did

10  anyone from Vyera call CentraState?

11  A.   No.

12  Q.   After you sourced five bottles for DRL, did someone from

13  Vyera call CentraState?

14  A.   Yes.

15  Q.   You were shown Defense Exhibit 121 and that was the e-mail

16  where you offered the source and someone from Fera said, we are

17  good for now.  Do you remember that?

18  A.   Yes.

19  Q.   Do you remember the date of that e-mail?

20        MR. WEINGARTEN:  Maybe we can put it on the screen,

21  Defense Exhibit 121, please.  The top two e-mails, please.

22  Q.   Your e-mail is dated February 12, 2018, right?

23  A.   That's right.

24  Q.   That's to people at Fera?

25  A.   Yes.

A-1905

846

LCHMFTC6                    Valiveti - Redirect

1   Q.  Is February 12, 2018 before or after the phone call from

2   Vyera to CentraState?

3   A.  This is before our call from Vyera.

4   Q.  Is February 12, 2018 before or after you met Mr. Mulleady

5   in the Starbucks parking lot?

6   A.  After.

7   Q.  Before or after?

8   A.  After February 12.

9   Q.  You met Mr. Mulleady in the Starbucks parking lot after

10  February 12?

11  A.  Yes.

12          MR. WEINGARTEN:  Nothing further.

13          THE COURT:  Any recross?

14          MS. STEWART:  No, your Honor.

15          THE COURT:  Sir, you may step down.

16          THE WITNESS:  Thank you.

17          (Witness excused)

18          THE COURT:  Next.

19          (Continued on next page)

20

21

22

23

24

25

LCHKFTC7

1          MR. MEIER:  Your Honor, as I mentioned before the
2     lunch break, we're out of witnesses for today, and I apologize
3     to the Court, but we did as much as we could, and this is the
4     best we could do.

5          THE COURT:  Great.  So give me just a second here.

6          I'll confirm, but I think the plaintiffs have used
7     nine hours and fifty-eight minutes and the defendant has used
8     ten hours and twenty-five minutes.  We have a little less than
9     one hour of the trial day remaining.

10          So let me see.  Somehow I'm subtracting the one hour
11     from the allocations but I'll let counsel reflect on how that
12     should be allocated.  And it may be irrelevant — you may not
13     need all your time, and that's just fine — I'm sure you'll have
14     additional time to prepare for your summations.

15          It would be fine with me if you started your
16     summations before Wednesday, but we had set aside Wednesday for
17     summations, not that they will take the whole day, but is that
18     still counsel's preferred schedule?

19          MR. MEIER:  Speaking on behalf of the government,
20     Markus Meier again, yes, your Honor, it would be our
21     preference, regardless of what time we finish on Tuesday, to
22     just start summation on 9:30 on Wednesday.

23          THE COURT:  Perfect.  That's the schedule that we will
24     follow.

25          I take it that's agreeable to the defendant, as well,

LCHKFTC7

1    and, indeed, your preference?

2              MR. CASEY:  Yes, it is, your Honor.

3              THE COURT:  Okay, good.

4              So it's fine with me if we end early on Tuesday and

5    that will give you even more time to make your final

6    preparations for summation.

7              I'll let you go.  I hope you have a good weekend,

8    everyone stays healthy, and I don't know if there are any issue

9    that you need to address with me.  I'm unaware of anything.

10             So good have a good weekend.

11             (Adjourned to December 20, 2021 at 9:30 a.m.)

12                              * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

849

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3     EDWARD VINCENT CONROY

4    Cross By Mr. Parks . . . . . . . . . . . . . . 659

5    Redirect By Mx. Black  . . . . . . . . . . . 682

6    Recross By Mr. Parks . . . . . . . . . . . . 690

7    MANISH SHAH

8    Cross By Mr. Casey . . . . . . . . . . . . . 696

9    Redirect By Mr. Weingarten . . . . . . . . . 724

10   Redirect By Mr. Weingarten . . . . . . . . . 742

11    NILESH PATEL

12   Cross By Ms. Stewart . . . . . . . . . . . . 746

13   Redirect By Ms. Hoffmann . . . . . . . . . . 760

14    SATYA VALIVETI

15   Direct By Mr. Weingarten . . . . . . . . . . 776

16   Cross By Ms. Stewart . . . . . . . . . . . . 837

17   Redirect By Mr. Weingarten . . . . . . . . . 844

18                    GOVERNMENT EXHIBITS

19   Exhibit No.                           Received

20    9010 with exhibits listed therein  . . . . . 655

21    9003 with the exhibits listed therein  . . . 655

22    9005 with the exhibits listed therein  . . . 656

23    9009 with the exhibits listed therein  . . . 656

24    9065    . . . . . . . . . . . . . . . . . . . 656

25    9064    . . . . . . . . . . . . . . . . . . . 657

850

```
1    9063   . . . . . . . . . . . . . . . . . . . 657
2    5009   . . . . . . . . . . . . . . . . . . . 658
3    5011   . . . . . . . . . . . . . . . . . . . 659
4    8011   . . . . . . . . . . . . . . . . . . . 696
5    3395   . . . . . . . . . . . . . . . . . . . 728
6    9011 with the exhibits within   . . . . . . . 743
7    8010   . . . . . . . . . . . . . . . . . . . 745
8    9012 and exhibits within   . . . . . . . . . 746
9    4064   . . . . . . . . . . . . . . . . . . . 780
10   3126   . . . . . . . . . . . . . . . . . . . 798
11   3127   . . . . . . . . . . . . . . . . . . . 800
12   3130   . . . . . . . . . . . . . . . . . . . 815
13   3131   . . . . . . . . . . . . . . . . . . . 818
14                    DEFENDANT EXHIBITS
15   Exhibit No.                          Received
16   376   . . . . . . . . . . . . . . . . . . . 704
17   168   . . . . . . . . . . . . . . . . . . . 716
18   121   . . . . . . . . . . . . . . . . . . . 844
19
20
21
22
23
24
25
```

LCKMFTC1                                                              851

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    FEDERAL TRADE COMMISSION,
3   STATE OF NEW YORK, STATE OF
    CALIFORNIA, STATE OF OHIO,
4   COMMONWEALTH OF PENNSYLVANIA,
    STATE OF ILLINOIS, STATE OF
5   NORTH CAROLINA, and
    COMMONWEALTH OF VIRGINIA,

6
                    Plaintiffs,
7            v.                         20 CV 706 (DLC)

8   MARTIN SHKRELI, et al.,

9                   Defendants.
    ------------------------------x
10                                      New York, N.Y.
                                        December 20, 2021
11                                      9:30 a.m.
    Before:                HON. DENISE COTE,
12                                      District Judge
                          APPEARANCES
13
    FEDERAL TRADE COMMISSION
14  BY:  MARKUS H. MEIER
         MAREN HANEBERG
15       BRADLEY S. ALBERT
         LAUREN PEAY
16       NEAL PERLMAN
         MATT WEPRIN
17       ARMINE BLACK
         AMANDA TRIPLETT
18       LEAH HUBINGER
         JAMES WEINGARTEN
19
    NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
20  BY:  ELINOR R. HOFFMANN
         JEREMY R. KASHA
21       AMY E. McFARLANE

22  DUANE MORRIS LLP
         Attorneys for Shkreli
23  BY:  CHRISTOPHER H. CASEY
         JEFFREY S. POLLACK
24       ANDREW J. RUDOWITZ
         SARAH FEHM STEWART
25       SEAN McCONNELL
         J. MANLY PARKS

1          (Trial resumed)

2          THE COURT:  Good morning, everyone.  I had the

3    opportunity this weekend to finish with the deposition binders,

4    and I want to thank the parties for all the hard work that the

5    staff for the parties put into preparing those and the synopses

6    and the color designations.  I know that was an enormous amount

7    of work to present that evidence to me.  But it really paid off

8    in terms of an efficient review.  I'm at the point where I

9    could, for my own purposes, figure out what seemed particularly

10   helpful to me in understanding these events.

11         I made an error, which we communicated on Friday to

12   counsel for both parties, in the calculation of the defendant's

13   time used to date.  It was 10 hours and 35 minutes.  So we

14   start today with nine hours and 58 minutes for the plaintiff

15   and 10 hours and 35 minutes for the defendant, which is at this

16   point roughly equal.

17         Let me ask you, Mr. Meier, what's the parties'

18   expectation for completing the evidentiary portion of this

19   trial at this point?

20         MR. MEIER:  Your Honor, from the government

21   perspective, we think we will be finishing sometime tomorrow.

22   Obviously, it is not a hundred percent.  But I wouldn't be

23   surprised if we are finished by about lunchtime tomorrow.

24   That's the entire case, not just the government's portion, but

25   I believe the defendant's also.

LCKMFTC1                                                               853

1          THE COURT:  Mr. Casey, is that your expectation too,
2   that the parties will be resting tomorrow midday?
3          MR. CASEY:  Your Honor, if the plaintiffs rest midday
4   tomorrow, we would expect to put on our case and rest by the
5   end of the day.  We don't have that much -- we have two
6   witnesses.  I would expect that that --
7          THE COURT:  Why don't counsel consult for a moment off
8   the record.
9          MR. MEIER:  To be clear, I don't know if Mr. Casey
10  heard me, but I said we would probably be finished tomorrow
11  with everything.
12         THE COURT:  Why don't you consult.
13         MR. MEIER:  We will be finished today.
14         THE COURT:  Why don't you talk.
15         MR. CASEY:  I apologize, your Honor.  I misunderstood
16  Mr. Meier.  I agree with him that we will likely be resting --
17  both parties would be resting sometime midday tomorrow.  I am
18  not sure we can guarantee it would be by lunch, but I think, if
19  anything, it would be shortly thereafter.
20         THE COURT:  Terrific.  That's helpful for me in my own
21  planning.  I appreciate that.
22         Let's resume the trial, plaintiffs.
23         MR. MEIER:  Your Honor, if we could take care of a few
24  administrative matters before we call the first witness.
25         THE COURT:  Sure.

1      MR. MEIER:  First of all, at the end of the Friday

2  there was the issue that we did not have a witness ready at

3  4:00.  Your Honor instructed us to work it out with the

4  defendants and figure out how we would divide up the lost hour.

5      THE COURT:  It's moot because you're ending hours

6  early on Tuesday.

7      MR. MEIER:  Fine.  We had come up with a split, but we

8  will scratch that one off our list.  Thank you very much, your

9  Honor.  Appreciate that.

10      The first thing I'd like to do is move in Government

11  Exhibit 9013.

12      THE COURT:  Any objection to the receipt of 9013 and

13  the exhibits listed therein?

14      MS. STEWART:  No objection, subject to your Honor's

15  rulings.

16      THE COURT:  9013 and the exhibits listed therein is

17  received.

18      (Government Exhibit 9013 and the exhibits listed

19  therein received in evidence)

20      MR. MEIER:  Your Honor, the next exhibit is one of

21  eight deposition transcript exhibits that we will be moving in

22  this morning.  This is Government Exhibit 9066.  It is the

23  transcript of the deposition of Averill Powers from Vyera.  As

24  you can see, your Honor, from the cover page, there have been

25  some withdrawn designations as a result of discussions between

1     the parties.  But it's my understanding that there are no

2     objections.  Again, we will let the defendants speak for

3     themselves on that.

4                THE COURT:  Any objections to 9066?

5                MR. RUDOWITZ:  No objection.

6                THE COURT:  Thank you.  Received.

7                (Government Exhibit 9066 received in evidence)

8                MR. MEIER:  The next one, your Honor, is Government

9     Exhibit 9067.  It is the transcript of a witness named Jonathan

10    Haas.  Again, it indicates some of the designations that have

11    been changed as a result of discussions between the parties.

12               THE COURT:  Any objection to the receipt of 9067?

13               MR. RUDOWITZ:  No objection subject to your Honor's

14    rules.

15               (Government Exhibit 9067 received in evidence)

16               MR. MEIER:  The next one, your Honor, is Government

17    Exhibit 9068.  It is the revised deposition designations for

18    the deposition of Donovan Quill from Optime.

19               THE COURT:  Any objection?

20               MR. RUDOWITZ:  No objection subject to your Honor's

21    rules.

22               THE COURT:  Received.

23               (Government Exhibit 9068 received in evidence)

24               MR. MEIER:  The next one, your Honor, is Government

25    Exhibit 9069.  It's the revised transcript designations of

LCKMFTC1                                                            856

1    Michael Hatch from Mylan, again reflecting some of the changes

2    from the versions we submitted back in October.

3              THE COURT:  Any objection?

4              MR. RUDOWITZ:  No objection subject to your Honor's

5    rules.

6              THE COURT:  Received.

7              (Government Exhibit 9069 received in evidence)

8              MR. MEIER:  The next one, your Honor, is Government

9    Exhibit 9070.  It's the revised designations of Hamilton Lenox

10   from LGM Pharma, again, reflecting changes that have been made

11   since the designations were submitted back in October.

12             THE COURT:  Any objection.

13             MR. RUDOWITZ:  No objection, subject to your Honor's

14   rules.

15             THE COURT:  Received.

16             (Government Exhibit 9070 received in evidence)

17             MR. MEIER:  The next one, your Honor, is Government

18   Exhibit 9071.  It's the revised designations of a witness named

19   Akeel Mithani with Vyera.  Again, it reflects some changes that

20   have been made since the October submission.

21             THE COURT:  Any objection?

22             MR. RUDOWITZ:  No objection, subject to your Honor's

23   rules.

24             THE COURT:  Received.

25             (Government Exhibit 9071 received in evidence)

LCKMFTC1                                                              857

1           MR. MEIER:  The next one, your Honor, is Government

2    Exhibit 9072.  It's the revised designations of a witness named

3    Eve Costopoulos formerly with Vyera.

4           THE COURT:  Any objections?

5           MR. RUDOWITZ:  No objection, subject to your Honor's

6    rules.

7           THE COURT:  Received.

8           (Government Exhibit 9072 received in evidence)

9           MR. MEIER:  Your Honor, the last one for today is

10   Government Exhibit 9073.  It is the revised designations of the

11   deposition of Martin Shkreli.

12          THE COURT:  Any objection?

13          MR. RUDOWITZ:  No objection, subject to your Honor's

14   rules.

15          THE COURT:  Received.

16          (Government Exhibit 9073 received in evidence)

17          MR. MEIER:  Two other brief housekeeping matters, your

18   Honor.

19          We are still in negotiations with defendants with

20   respect to one deposition designation and with respect to one

21   summary exhibit with additional documents.  It's our number

22   9007.  We do not expect that we will have those worked out this

23   morning before the government finishes its case.  My

24   understanding is, in negotiation with defendants, defendants do

25   not object to us moving those in tomorrow, if that's OK with

LCKMFTC1                                                              858

1    the Court.

2              THE COURT:  That's fine with me.  Thank you, counsel,

3    for working so well with each other.

4              MR. MEIER:  Your Honor, the government is ready to

5    call its next witness.  The government calls Howard Dorfman.

6    My colleague, Matt Weprin, will do the examination.  Mr.

7    Dorfman does not have a declaration.

8              THE COURT:  Mr. Dorfman, if you can come up here and

9    take the witness stand.  No need to rush.  If you could step up

10   on the witness stand and remaining standing.

11   HOWARD LEWIS DORFMAN,

12        called as a witness by the Plaintiffs,

13        having been duly sworn, testified as follows:

14             THE COURT:  Mr. Dorfman, we have had the ventilation

15   checked in this room, so very few people are allowed to remove

16   their masks.  You are one of them.  So is counsel when they are

17   standing at the podium.  Up to you whether to remove your mask.

18   If you would like to, though, you may.

19             Please state your full name and spell your last name.

20             THE WITNESS:  Howard Lewis Dorfman, D-o-r-f-m-a-n.

21             THE COURT:  Counsel, you are now going to examine Mr.

22   Dorfman.

23             MR. WEPRIN:  Thank you Honor.

24             Good morning, your Honor, and may it please the Court,

25   my name is Matthew Weprin on behalf of the government

LCKMFTC1                    Dorfman - Direct                    859

1    plaintiffs.

2    DIRECT EXAMINATION

3    BY MR. WEPRIN:

4    Q.   Good morning, Mr. Dorfman.

5    A.   Good morning.

6    Q.   You are appearing here pursuant to a subpoena, correct?

7    A.   Correct.

8    Q.   How are you today?

9    A.   I'm well.  Thank you.  And you?

10   Q.   I'm doing well.

11   A.   Good.

12   Q.   Mr. Dorfman, let's start by discussing your professional

13   experience.  You joined Turing Pharmaceuticals in December

14   2014?

15   A.   Yes.

16   Q.   At Turing your title was vice-president and general

17   counsel?

18   A.   Correct.

19   Q.   And you worked for Turing through August of 2015?

20   A.   Correct.

21   Q.   Since then, Turing has changed its name to Vyera.  Will you

22   understand if I use the term Vyera to apply to both Turing and

23   Vyera?

24   A.   Yes, I will.

25   Q.   Before your work at Vyera, you worked as an in-house lawyer

LCKMFTC1                    Dorfman - Direct                    860

1    or outside counsel for pharmaceutical companies for over 30

2    years?

3              MR. POLLACK:  Objection, your Honor.  I realize this

4    is interest introduction, but all of the questions are leading.

5              THE COURT:  Sustained.

6    Q.  How many years in the pharmaceutical industry did you work

7    prior to your work at Vyera?

8              MR. POLLACK:  Objection, foundation.

9              THE COURT:  Overruled.

10   A.  I started in 1978, so I think it's about 30 years or so.

11   Q.  Who hired you to work at Vyera?

12   A.  Mr. Shkreli.

13   Q.  In your role as vice-president and general counsel, did you

14   report to Mr. Shkreli?

15   A.  Yes, I did.

16   Q.  What was Mr. Shkreli's title at the time you were at the

17   company?

18   A.  I believe it was -- I think it was president.  I am not

19   sure.  I don't think he was CEO at that point.

20   Q.  In your role as vice-president and general counsel, did you

21   provide input to the company on business issues?

22   A.  Yes, I did.

23   Q.  Were you part of the management team at Vyera?

24   A.  Yes, I was.

25   Q.  Did the management team discuss issues confronting the

LCKMFTC1                    Dorfman - Direct                    861

1    company on a regular basis?

2    A.  Yes, your Honor.

3              MR. POLLACK:  Objection, your Honor.

4              THE COURT:  Sustained.  Stricken.

5    Q.  What was the role of the management team at Vyera?

6    A.  The management team provided advice to Mr. Shkreli and also

7    discussed issues pertaining to the company.

8    Q.  Do you recall anyone else who was on the management team at

9    Vyera while you were there?

10   A.  I am not really good at names, but I can designate by

11   position better.  The chief marketing officer, I forgot her

12   name at the moment; the general counsel, myself; the head of

13   the regulatory affairs group; the head of communications;

14   public relations.  These functions changed over time as the

15   company grew.

16   Q.  Who was the chair of the management team that you were

17   there?

18   A.  Mr. Shkreli.

19   Q.  Was Mr. Shkreli in charge of determining the business

20   strategy for Vyera at that time?

21             MR. POLLACK:  Objection.

22             THE COURT:  Sustained.

23   Q.  Who was in charge of determining business strategy for

24   Vyera at the time that you were there?

25   A.  There were a number of people who Mr. Shkreli would speak

1    to and consult with over time, but the ultimate decisions were

2    made by Mr. Shkreli.

3    Q.  How often did the management team meet?

4    A.  Approximately once a week.  Maybe if business demanded it,

5    there would be perhaps an ad hoc meeting, but generally once a

6    week.

7    Q.  What issues did the management team discuss?

8    A.  They discussed every issue that was pertaining to the

9    company at that point in time, such as business strategy,

10   hiring of new personnel, plans to raise additional funds on the

11   market, real estate, the identification of office space that

12   would accommodate a growing business.

13   Q.  Mr. Dorfman, I would like to turn now to Daraprim, the drug

14   at issue in this case.  Are you familiar with the drug

15   Daraprim?

16   A.  Yes, I am.

17   Q.  Approximately when did Vyera acquire Daraprim?

18   A.  The acquisition went through, it was finalized

19   approximately August of 2015.

20   Q.  Who identified Daraprim as an acquisition target?

21   A.  I don't know.

22   Q.  Would it refresh your recollection if I showed you your

23   deposition testimony in this case?

24   A.  Yes, it would.

25              MR. WEPRIN:  Ms. Flint, could you please pull up Mr.

LCKMFTC1                        Dorfman – Direct                        863

1    Dorfman's deposition on page 47, lines 18 to 25.

2    Q.  Can you please read that silently and let me know if it

3    refreshes your recollection.

4    A.  I believe that it is consistent with what I had testified

5    to.  The ultimate decision, of course, was Mr. Shkreli's, but

6    there were other people providing input to him that I probably

7    was not aware of who they were.

8    Q.  Who proposed raising the price of Daraprim after it was

9    acquired?

10   A.  I believe it was Mr. Shkreli.

11   Q.  Now, shifting gears, I want to talk about your

12   congressional testimony related to this case.  Did you testify

13   about Daraprim before the United States Senate Special

14   Committee on Aging?

15   A.  Yes, I did.

16           MR. POLLACK:  Objection.  His testimony before the

17   United States Senate is an out-of-court statement that would be

18   hearsay.

19           THE COURT:  Counsel, he just asked a fact question.

20   Overruled.

21           MR. POLLACK:  Withdrawn.

22   Q.  When did this testimony take place?

23   A.  Several years ago.  I don't recall the exact date.

24   Q.  Did it take place in 2016?

25   A.  That sounds right.

LCKMFTC1                    Dorfman - Direct                    864

1  Q.  What was the Senate aging committee investigating?

2  A.  They were investigating the issue of price increases by

3  pharmaceutical manufacturers.

4  Q.  Did you take an oath to tell the truth when you testified

5  at the Senate Special Committee on Aging?

6  A.  Yes, I did.

7  Q.  Was the written testimony you submitted to the Senate

8  Special Committee on Aging truth and accurate?

9  A.  Yes, it was.

10 Q.  I'd like to focus today on two issues that you addressed in

11 your Senate testimony:  Daraprim's closed distribution system

12 and its price increase.

13          Now, first, I want to discuss the closed distribution

14 system.  For Vyera the closed distribution system plays a role

15 in maximizing the return on Daraprim?

16          MR. POLLACK:  Objection, your Honor.

17          THE COURT:  Sustained.

18          MR. WEPRIN:  Your Honor, if I may be heard.

19          THE COURT:  You are going to start with nonleading

20 questions, and we will see if at some point you get to go to

21 leading.

22          MR. WEPRIN:  Thank you, your Honor.

23 Q.  For Vyera did the close distribution system play a role in

24 maximizing the terms on Daraprim?

25          MR. POLLACK:  Objection.

LCKMFTC1                    Dorfman - Direct                      865

1           THE COURT:  Sustained.

2           Did Vyera have a closed distribution system?

3           THE WITNESS:  I'm sorry?

4           THE COURT:  Did Vyera have a closed distribution

5   system?

6           THE WITNESS:  Yes, it did.

7           THE COURT:  What role did that play?

8           THE WITNESS:  The closed distribution system at Vyera

9   was designed to maximize control over the utilization of the

10  drug and provide information to the company with regard to

11  those patients who were taking the product, but also played a

12  role in the ability to control prices.

13  Q.  Mr. Dorfman, what effect did the closed distribution system

14  have on generic pharmaceutical companies seeking to obtain FDA

15  approval for Daraprim?

16          MR. POLLACK:  Objection.

17          THE COURT:  Overruled.

18  A.  Could you repeat the question.

19  Q.  Sure, Mr. Dorfman.  What effect did the closed distribution

20  system have on generic pharmaceutical companies seeking to

21  obtain FDA approval for Daraprim?

22  A.  I don't know what -- I don't know what they were going

23  through in the process.  I do know that a closed distribution

24  system generally can make it more difficult for a generic to

25  obtain the materials necessary to do the work to file for an

LCKMFTC1                    Dorfman - Direct                    866

1    ANDA and have a generic approved.

2    Q.  When it acquired Daraprim, did Vyera enter into any

3    exclusive distribution agreements with a specialty pharmacy

4    company?

5    A.  I believe it did, yes.

6    Q.  Was Daraprim in a specialty distribution system prior to

7    the acquisition?

8    A.  My recollection is that the pharmaceutical company from

9    which Daraprim was purchased by Vyera did in fact have such a

10   system in place at the time.

11   Q.  However, even though there was a specialty distribution

12   system in place, did Vyera take any steps to make the

13   exclusivity aspects of distribution more or less restrictive?

14            MR. POLLACK:  Objection.  Leading.

15            THE COURT:  Sustained.

16   Q.  Did Vyera take any steps to change the exclusivity aspects

17   of the distribution system?

18   A.  As I sit here, I don't recall the exact details of the

19   system that was in place prior to the acquisition.

20   Q.  Would it refresh your recollection to see your deposition

21   testimony on this topic?

22   A.  Certainly.

23            MR. POLLACK:  Objection.

24            THE COURT:  Overruled.

25            MR. WEPRIN:  Ms. Flint, could you please pull up Mr.

LCKMFTC1                    Dorfman – Direct                    867

1   Dorfman's deposition on page 76, lines 10 to 23.

2   Q.  Mr. Dorfman, can you please read these lines.

3              THE COURT:  To yourself.

4   Q.  To yourself, yes.  Let me know when you are finished

5   reading them.

6   A.  I finished.

7   Q.  My question was, did Vyera take any steps to change the

8   exclusivity aspects of the distribution system?

9   A.  Yes, they did.

10  Q.  What steps did they take?

11  A.  As I recall, the distribution system was generally made

12  even more restrictive, identifying with a desire to identify

13  with particularity every -- to the extent possible, every pill

14  that was being distributed by the company.

15  Q.  Did Vyera seek to tighten loopholes that may have existed

16  with the previous specialty pharmacy system?

17             MR. POLLACK:  Objection.

18             THE COURT:  Sustained.

19  Q.  Are there appropriate reasons for specialty pharmacies to

20  be utilized to provide benefits to patients?

21  A.  Yes, there are.

22  Q.  Was the business rationale for Vyera specialty pharmacy

23  system based on one of these appropriate reasons?

24             MR. POLLACK:  Objection.

25             THE COURT:  Overruled.

LCKMFTC1                    Dorfman - Direct                    868

1        MR. POLLACK:  Leading.
2   A.  Yes, they were.
3        MR. WEPRIN:  Ms. Flint, can you please pull up Mr.
4   Dorfman's deposition, page 85, line 22 to 86-3.
5        Ms. Flint, that's page 85 line 22 to 86, line 3.  I'm
6   sorry.  That was 85 line 18 to 86, line 3.
7        MR. POLLACK:  Your Honor, can we get a proffer as to
8   what is being done with this testimony that is being offered?
9        THE COURT:  Overruled.
10       MR. WEPRIN:  Thank you, your Honor.
11  Q.  "QUESTION:  Can you explain what you meant in this
12  statement?
13  "A.  What I was suggesting was that unlike the appropriate
14  utilization of a specialty pharmacy, in the case of Daraprim,
15  that was apparently not the commercial and business rationale
16  for the specialty pharmacy system."
17       That testimony was truthful and accurate?
18  A.  Yes, it was.
19  Q.  For Vyera what was the business rationale for implementing
20  a specialty distribution system?
21  A.  There were a number of reasons.  One of them was to provide
22  better control over patient care in terms of delivery of
23  product on a timely basis and the ability to promptly report --
24  obtain reports of any adverse events or other untoward
25  consequences of the utilization of the drug.  In this case

LCKMFTC1                    Dorfman – Direct                    869

1    another reason was the desire to maintain control over the

2    distribution and preclude any other companies from

3    identifying -- from obtaining products sufficient to file an

4    ANDA application.

5    Q.  Was the closed distribution system motivated by Vyera's

6    desire to block a generic entrant?

7            MR. POLLACK:  Objection.  Leading.

8            THE COURT:  I think he just testified to that, so I

9    think the question is trying to make sure that the questioner

10   understood the answer.

11           Please revise your question.

12   Q.  Do I understand that you are saying that the closed

13   distribution system was part of Vyera's desire to block generic

14   entry?

15   A.  Block or certainly to delay entry of any generic.

16   Q.  How long did Vyera hope to delay a generic entrant using a

17   closed distribution system?

18   A.  There was some discussion at the management committee

19   meeting that the objective was three years.

20   Q.  Now, I want to move on to discuss the price increase for

21   Daraprim.  Now, you testified earlier that Mr. Shkreli proposed

22   raising the price of Daraprim after it was acquired.  Do you

23   recall approximately how much the price per pill increased?

24   A.  For some reason, the number 700 times is something that

25   sticks in my mind, but I don't recall right now exactly what

LCKMFTC1                    Dorfman – Direct                    870

1    the ultimately price increase turned out to be.

2    Q.  In your experience, sometimes a company may justify a price

3    increase by pointing to a research and development of drug,

4    correct?

5    A.  Yes.

6              MR. POLLACK:  Objection.

7              THE COURT:  Counsel, I am going to ask you, if you

8    can, to use nonleading questions, if you are able to.

9              MR. WEPRIN:  Thank you, your Honor.

10   Q.  Did you object to Mr. Shkreli's proposed price increase?

11   A.  The reason I'm hesitating, I am trying to consider whether

12   my answer in any way would cause me to rely on attorney-client

13   privilege, given my position.

14             Would you read the question again, please.

15   Q.  Did you object to Mr. Shkreli's post price increase for any

16   business reasons?

17   A.  Yes, I did.

18   Q.  What were your business concerns about the price increase?

19   A.  Given the patient populations that were dependent on the

20   ability to acquire Daraprim for their condition, I felt that

21   certainly the timing of the price increase was -- would raise

22   serious public relations and other business concerns, such as

23   the ability of the company to raise funds in the open market.

24   There was also, in my opinion, the concern that the company had

25   not yet undertaken the type of expenditures, such as research

LCKMFTC1                    Dorfman - Direct                    871

1   and such, at that time to justify the price increase.

2   Q.  Did you consider the price increase to be justified?

3   A.  I did not see --

4          MR. POLLACK:  Objection.  Calls for an improper lay

5   opinion.

6          THE COURT:  Overruled.

7   A.  I did not see the circumstances that I had just raised in

8   my answer to be -- being taken into consideration at that time.

9   Q.  Did you consider the price increase to be ethical?

10         MR. POLLACK:  Objection.  Relevance.

11         THE COURT:  Overruled.

12  A.  Given the lack of research that was going to be or

13  purportedly going to be done, given the very severe

14  consequences that could arise to the patient populations that

15  were dependent upon the drug, I found it to be certainly a very

16  serious question of whether it was or was not ethical.

17  Q.  How did Mr. Shkreli respond to your objections?

18  A.  He was not happy.

19  Q.  Why wasn't he happy?

20         MR. POLLACK:  Objection.

21         THE COURT:  Sustained.

22         MR. POLLACK:  Calls for speculation.

23         THE COURT:  Did he tell you why he was not happy?

24  Q.  Did he tell you why he was not happy?

25  A.  Yes, he did.

LCKMFTC1                     Dorfman - Cross                        872

1   Q.  What did Mr. Shkreli say?

2   A.  He said that he was -- he said I did not know what I was

3   speaking about, that he was -- he considered himself an

4   authority in price increases as a business model and basically

5   did not appear to want to hear my business objections to his --

6   to the price increase.

7   Q.  Did Vyera implement Mr. Shkreli's proposed price increase?

8   A.  Eventually they did, yes.

9   Q.  Were you fired from Vyera after you objected to the price

10  increase?

11  A.  Yes, I was.

12          MR. WEPRIN:  Thank you, your Honor.  I have no further

13  questions.

14  CROSS-EXAMINATION

15  BY MR. POLLACK:

16  Q.  Good morning, Mr. Dorfman.

17  A.  Good morning.

18  Q.  My name is Jeff Pollack.  I'm an attorney for Martin

19  Shkreli.  I have some questions to follow up on Mr. Weprin's

20  questions to you this morning.

21          First of all, in terms of how Vyera identified

22  Daraprim for acquisition, you don't know how the company went

23  about that, do you?

24  A.  No.

25  Q.  You don't know how the company went about arriving at the

LCKMFTC1                    Dorfman - Cross                    873

1   decision to increase the price for Daraprim, do you?

2   A.  That's not exactly accurate.

3           MR. POLLACK:  Justin, could we bring up Mr. Dorfman's

4   deposition testimony at page 56, line 24 to 57-3.

5   Q.  Mr. Dorfman, at your deposition you were asked:  Do you

6   have an understanding of how Turing arrived at the decision to

7   increase the price of Daraprim?  Your answer was no.

8   A.  Correct.

9   Q.  That was truthful at the time?

10  A.  Absolutely.

11  Q.  You told Mr. Weprin that the sale of Daraprim closed in

12  August of 2015, correct?

13  A.  Yes.

14  Q.  And he didn't put a date on it, but is August 7 the correct

15  date for that closing?

16  A.  That sounds right.

17  Q.  And you left the company August 13, is that right?

18  A.  Correct.

19  Q.  After you left the company, you don't know what Vyera did

20  in terms of R&D, correct?

21  A.  Correct.

22  Q.  You don't know what the company did -- by company, I mean

23  Vyera -- in terms of drug development, correct?

24  A.  Correct.

25  Q.  You don't know how much money the company invested into R&D

LCKMFTC1                    Dorfman - Cross                    874

1   and drug development, do you?

2   A.  At the time --

3   Q.  After you left.

4   A.  Correct.

5   Q.  After you left the company, you don't know what Vyera did

6   in terms of educational programs related to Daraprim, do you?

7   A.  No, I don't.

8   Q.  You touched on the fact that when Daraprim was acquired by

9   Vyera it was already in specialty distribution, correct?

10  A.  Correct.

11  Q.  And that specialty distribution agreement was assigned from

12  the previous owner to Vyera, correct?

13  A.  I am not sure that they -- I am not sure --

14  Q.  I will ask a different question.  Do you know that that

15  agreement was assigned to Vyera?

16  A.  I don't think so.

17  Q.  Do you know anything about the terms of the agreement with

18  the previous owner and Walgreens Specialty?

19  A.  As I sit here now I can't recall, no.

20  Q.  Did you know that the prior owner's agreement with

21  Walgreens Specialty appointed Walgreens as the exclusive

22  specialty pharmacy dispensing for Daraprim in the United

23  States?

24          THE COURT:  Objection to form.  Counsel.

25  Q.  Mr. Dorfman, let me ask you this way.  You don't know, do

LCKMFTC1                    Dorfman – Cross                    875

1   you, after you left the company what Vyera did in terms of

2   expanding its distribution network, do you?

3   A.  I know that we were in the process of expanding it and

4   identifying additional resources prior to my leaving.

5   Q.  You don't know what other additional steps the company took

6   after you left to expand distribution, do you?

7   A.  To expand distribution?

8   Q.  Yes.

9   A.  No.

10  Q.  When a drug is in specialty distribution, there are a

11  number of ways that another company, a third party not Vyera,

12  can purchase referenced lists drug or RLD, correct?

13  A.  Correct.

14  Q.  For example, they can get a physician's prescription,

15  correct?

16  A.  A company cannot obtain a drug by a prescription to the

17  company.  It would have to be a prescription from a physician

18  to a patient, and I believe that there are restrictions on the

19  physician writing the prescription for a product that he or she

20  does not believe is medically necessary.

21  Q.  Mr. Dorfman, do you recall at your deposition being asked:

22  Do you have an understanding of how a pharmaceutical company

23  attempting to obtain FDA approval of a generic version of a

24  drug can obtain sufficient quantities of the drug it is copying

25  outside the closed distribution system?  You answered:  One

LCKMFTC1                    Dorfman - Cross                    876

1  can -- a company can attempt to purchase the product on the

2  open market from other, you know, pharmacy sources.  Sometimes

3  physicians are -- are able to provide at least a certain amount

4  to -- for valid for testing.

5  A.  Yes.  I remember that testimony, yes.

6  Q.  Was your testimony truthful when you gave it at your

7  deposition?

8  A.  Yes, it was.

9  Q.  Another way that a company can obtain RLD is through the

10 open market -- through other pharmacy sources, correct?

11 A.  Correct.

12 Q.  Mr. Dorfman, I have no further questions for you.  Thank

13 you today.

14          THE COURT:  Any redirect?

15          MR. WEPRIN:  No, your Honor.

16          THE COURT:  You may step down.

17          (Witness excused)

18          THE COURT:  Next witness.

19          MR. MEIER:  Your Honor, the government calls as its

20 next witness professor Scott Hemphill.  My colleague, Lauren

21 Peay, will handle that.

22          MS. PEAY:  Your Honor, may I approach the bench with

23 copies of the binders.

24          THE COURT:  Professor Hemphill, if you would take the

25 stand and remain standing.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCKMFTC1                    Dorfman - Cross                    877

1   SCOTT HEMPHILL,

2         called as a witness by the Plaintiffs,

3         having been duly sworn, testified as follows:

4         THE COURT:  Professor, you don't have to take off your

5   mask.  The courtroom's ventilation system has been tested.  You

6   may take off your mask, if you wish, when you are seated there,

7   as can counsel from the podium.

8         I believe you are being provided with a document which

9   bears an exhibit number GX-8004.  I am going to ask you,

10  please, to turn to the last page of that document, which I

11  think is page 58, and ask you if you authorized your electronic

12  signature to be added there.

13        THE WITNESS:  Yes, that's correct.

14        THE COURT:  Before doing that, giving that

15  authorization, did you read this document with care?

16        THE WITNESS:  Yes.

17        THE COURT:  Do you swear to the truth of its contents?

18        THE WITNESS:  Yes, I do.

19        THE COURT:  Any objection to the receipt of Government

20  Exhibit 8004?

21        MR. McDONNELL:  No objection, your Honor.

22        THE COURT:  Received.

23        (Government Exhibit 8004 received in evidence)

24        THE COURT:  Cross-examination.

25        MS. PEAY:  Your Honor, may I be heard?

1          THE COURT:  Sure.

2          MS. PEAY:  I would like at this time to move into

3  evidence GX-9014, which lists eight summary exhibits that

4  accompany Professor Hemphill's written direct.

5          THE COURT:  Great.

6          MS. PEAY:  May I hand up the papers?

7          THE COURT:  You don't need to ask permission.  You may

8  just approach.

9          Any objection to the receipt of Government Exhibit

10  9014 and the exhibits listed in it?

11          MR. McDONNELL:  Your Honor, no objection.

12          THE COURT:  Received.

13          (Government Exhibit 9014 received in evidence)

14          THE COURT:  Cross-examination.

15  CROSS-EXAMINATION

16  BY MR. McDONNELL:

17  Q.  Good morning, Professor Hemphill.

18  A.  Good morning.

19  Q.  My name is Sean McConnell.  I'm an attorney for the

20  defendant, Mr. Shkreli, in this case.

21          You have authored two written expert reports in this

22  case, correct, professor?

23  A.  That's correct.

24  Q.  The first is a corrected expert report, C. Scott Hemphill

25  Ph.D., JD.  Is it OK if I refer today to that as your opening

1    report, Professor?

2    A.  Yes, that's fine.

3    Q.  The second written report, Defendant's Exhibit 329, is a

4    corrected reply report of C. Scott Hemphill.  Is it OK if I

5    refer to that as your reply report today, Professor?

6    A.  Yes.  That makes sense.

7    Q.  At your deposition do you recall testifying that all of the

8    opinions that you intend to offer at trial in this case are

9    contained in either your opening report or your reply report,

10   correct?

11   A.  I don't know if I have a specific recollection, but that

12   sounds right.

13   Q.  Your direct testimony in this case has just been entered

14   into evidence as GX-8004, correct?

15   A.  I know it has just been entered into evidence.

16   Q.  I believe you have it in front of you, if you just want to

17   confirm.

18   A.  That it's GX-800 -- yes.  GX-8004.

19   Q.  Perfect.  Thank you, Professor.

20          Let's turn now to your opinion regarding the relevant

21   product market in this case.  OK?

22   A.  OK.

23   Q.  It is your opinion, Professor Hemphill, that the relevant

24   product market is no broader than FDA-approved pyrimethamine

25   products, correct?

LCKMFTC1                    Hemphill - Cross                    880

1   A.  That's correct.

2   Q.  So alternative treatments for toxoplasmosis are not

3   included in that relevant product market, correct?

4   A.  That's right.

5   Q.  For example, TMP-SMX is an alternative product that is not

6   in your proposed relevant product market, correct?

7   A.  Correct.  TMP-SMX is not part of the relevant product

8   market.

9   Q.  Atovaquone is also an alternative treatment for

10  toxoplasmosis that is not in your proposed relevant product

11  market, correct?

12  A.  That product is not part of the relevant product market.

13  Q.  Compounded pyrimethamine as an alternative treatment for

14  toxoplasmosis, that is also not in your relevant product

15  market, right?

16  A.  Compounded pyrimethamine is not part of the relevant

17  product market.

18  Q.  Professor, you are familiar with cross-price elasticity,

19  right?

20  A.  Yes.

21  Q.  Would you agree that cross-price elasticity refers to the

22  degree to which an increase or decrease in the price of a

23  product results in a change in the quantity demanded of another

24  product?

25  A.  Yes, I would agree with that.

LCKMFTC1                    Hemphill - Cross                    881

1   Q.  If two products have a high cross-price elasticity, then
2   they are closer substitutes to one another, correct?
3   A.  What I'd say is, the higher the cross-price elasticity, the
4   closer the degree of substitutability.
5   Q.  The higher the degree of cross-price elasticity between two
6   products, the more likely it would suggest that those two
7   products may need to be included in the same relevant product
8   market, correct?
9   A.  It's one piece of the puzzle.  It's not the central issue
10  in an economic analysis of relevant product market.  But
11  cross-price elasticity is relevant, yes.
12  Q.  You agree with my characterization of how cross-price
13  elasticity would impact what products fall into the relevant
14  product market?
15  A.  The higher the cross-price elasticity, the stronger the
16  case for inclusion.
17  Q.  Thank you.
18        In your reports and in your direct testimony you do
19  not say what threshold of cross-price elasticity there needs to
20  be in order for a product to be in or out of your relevant
21  product market, correct?
22  A.  That's correct.
23  Q.  In your reports you conclude that empirical research that
24  you did suggests that Dr. Reddy's generic Daraprim demonstrated
25  a degree -- a sufficient degree of cross-price elasticity of

LCKMFTC1                    Hemphill - Cross                    882

1   demand with branded Daraprim to meaningfully constrain the

2   exercise of market power, correct?

3   A.  Yes.  That's the result of a much larger analysis, as

4   opposed to the analysis itself.

5   Q.  And the data that you relied on for that empirical research

6   was provided to you from Vyera, right?

7   A.  From Vyera and also from Dr. Reddy's because the entry of

8   Dr. Reddy's had economic effects and the data from Dr. Reddy's

9   plays a role in calculating the overall price in the market of

10  FDA-approved pyrimethamine.

11  Q.  This data from Vyera provided you with quantity and prices

12  paid for Vyera's Daraprim, right?

13  A.  Yes, that's right.

14  Q.  Now, the data that you used for this empirical research

15  from Vyera and from Dr. Reddy's did not include quantity and

16  price information about TMP-SMX, correct?

17  A.  That's accurate, yes.

18  Q.  The data that you used from Vyera and from Dr. Reddy's as

19  part of this empirical research did not include any quantity

20  and price information about compounded pyrimethamine, correct?

21  A.  That's correct.  There was some information about

22  compounded and about TMP-SMX.  That data was not from Vyera or

23  DRL.  A limited amount of information.

24  Q.  But that information was not included in your empirical

25  research regarding cross-price elasticity in this case, right?

LCKMFTC1                  Hemphill - Cross                    883

1    A.  The limitations in the available data about TMP-SMX and

2    about compounded played a role in thinking about the

3    feasibility of a numerical calculation of cross-price

4    elasticity.  So I disagree to that extent.

5    Q.  Let me ask it this way, Professor.  You would need price

6    and quantity information to empirically test cross-price

7    elasticity between TMP-SMX and Daraprim, correct?

8    A.  You would need a lot of information in order to make a

9    numerical calculation of the kind that I think you have in

10   mind.  For a qualitative characterization of high or low

11   cross-price elasticity you don't need data of that kind.  I

12   would agree that you would need a lot of information, which you

13   said, and even more to do a proper cross-price elasticity

14   calculation.

15   Q.  Thanks, Professor.

16           Now, you testified on direct that it is not possible

17   to determine the precise quantity of Daraprim lost to those

18   alternative therapies that we talked about, correct?

19   A.  Yes, that's correct.

20   Q.  You did not do an empirical study regarding how many

21   patients of toxoplasmosis switched from Daraprim to any

22   alternative treatments for toxoplasmosis, correct?

23   A.  That's correct, yes.

24   Q.  I'd like to now turn and talk a little bit about market

25   power, Professor.  You conclude that Vyera exercised market

LCKMFTC1                     Hemphill - Cross                        884

1    power and monopoly power in the market for FDA-approved

2    pyrimethamine products, right?

3    A.  Yes, that's correct.

4    Q.  And one approach that you used to confirm this power you

5    called the direct approach, right?

6    A.  That's right.  That's one of several routes to establish

7    market power and monopoly power.

8    Q.  A showing that Vyera profitably charged a price

9    substantially above the competitive level, that is, the price

10   that would prevail under competitive conditions, suffices to

11   establish market power and monopoly power as an economic

12   matter, correct?

13   A.  Yes, that sounds like what I wrote.

14   Q.  You referred to this competitive level as the price that

15   would prevail under competitive conditions, correct?

16   A.  Yes, that's right.

17   Q.  Now, you do not offer an opinion in this case as to what

18   the precise competitive level for FDA-approved pyrimethamine

19   is, right?

20   A.  That's not quite right.  I offer an opinion about the upper

21   bound of the competitive level and offer two different ways of

22   understanding what that competitive level is.

23   Q.  So you propose a range of possibilities for the competitive

24   level, correct?

25   A.  No.  I wouldn't put it that way.  There are two

LCKMFTC1                    Hemphill - Cross                    885

1   calculations, one short run and one longer run.  I agree that

2   there is a range, that there is a difference between those two,

3   so inherently a range.  I don't think describing it as a range

4   is quite right either.

5   Q.  You do not identify a specific price point that you

6   consider to be the competitive level for the price that would

7   prevail under competitive conditions for your relevant product

8   market, correct?

9   A.  I don't think that's quite right.  I would say that -- I

10  understand we are not supposed to say the price.  The higher

11  price listed is my estimate of the conservative upper bound on

12  the competitive price level.

13  Q.  Using evidence of pricing conduct in your --

14          THE COURT:  Excuse me, counsel.  I am just going to

15  interrupt because I don't remember this limitation with respect

16  to this particular dollar figure, which is just fine.  We had

17  lots of rulings.

18          To understand your question, I am going to ask the

19  professor, please, to direct me to the paragraph that contains

20  the dollar figure to which he just alluded.

21          THE WITNESS:  Yes.  On page 17, figure 4, the number

22  above the red bar, which is the average price post DRL entry

23  for FDA-approved pyrimethamine.  That number is the measure of

24  the competitive level.  It's the higher of the two.  It's the

25  short-run measure of the competitive level.

1              THE COURT:  Thank you.

2    Q.  My question, Professor, you just said the higher of the

3    two.  What's the other number?

4    A.  The lower number, which I believe can be said, is $12,

5    which is the price of FDA-approved pyrimethamine during the

6    early period, call it 2013, when multiple generics were making

7    preparations to enter the market in competition with Daraprim.

8    Q.  And you conclude, Professor, that because Vyera was able to

9    profitably charge a price above that $160 that we have just

10   talked about, did you conclude that Vyera's pricing conduct

11   directly demonstrates market power?  Correct?

12   A.  That, in conjunction with other things, including the fact

13   that once Dr. Reddy's entered the market, the price fell to

14   this competitive level.  It's not just that the price was high,

15   but that it fell in response to Dr. Reddy's' competitive entry.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1   Q.  But the fact that for the five years preceding the entry,

2   you concluded that the price of Daraprim charged by Vyera was

3   higher than the upper bound, $160, is why you concluded that

4   Daraprim had market power in this case, correct?

5   A.  That is not the entirety of the basis, but that is, I would

6   agree, a part of the examination, a part of the analysis.

7   Q.  And you concede in your reply report that based on this

8   direct approach to determining market power, Dr. Reddy's might

9   have exercised market power in 2020, correct?

10  A.  Sorry, you're asking me about the reply report?

11  Q.  Yes, sir.

12  A.  Could you ask that one more time?

13  Q.  Sure.

14          You concede in your reply report that based on your

15  direct approach, Dr. Reddy's might have exercised market power

16  also in 2020, correct?

17          MS. PEAY:  Objection, your Honor, to the form of the

18  question.

19          THE COURT:  You understand the question?

20          THE WITNESS:  Yes.

21          I disagree that it's a concession.  It's an

22  implication --

23          THE COURT:  This is the answer?

24          THE WITNESS:  Yes.

25          It's an implication of the analysis -- it's an

LCKKFTC2                    Hemphill - Cross                    888

1    implication of economic analysis, period, that Dr. Reddy's

2    might well exercise the market power -- it would not be at all

3    surprising that Dr. Reddy's might well exercise some market

4    power as of the end of 2020.  Competition hasn't yet had a

5    chance to work its way through.  It's not at all surprising to

6    expect that after 2020, the prices would continue to fall.  In

7    fact, that's part of the analysis in thinking that a 12-dollar

8    estimate of the competitive level is supportable.

9    BY MR. McCONNELL:

10   Q.  You partly anticipated my next question, Professor.

11         The reason that Dr. Reddy's may have exercised market

12   power in 2020 is because there is uncertainty about the precise

13   competitive price level because we have not yet had the

14   opportunity to see the competitive process under generic

15   competition fully play out, correct?

16   A.  Right.  Prices may well fall further beyond 2020, as the

17   competitive process continues to play out.

18   Q.  In reaching your conclusions in this case, have you

19   considered whether it would be possible for, even after the

20   competitive process under generic competition fully plays out,

21   that Dr. Reddy's might still be able to exercise market power

22   by continuing to charge a price higher than the competitive

23   level determined in your direct approach?

24   A.  Well, it's certainly possible that post 2020, prices might

25   settle out at a level higher than, let's say, $12, and that,

LCKKFTC2                    Hemphill - Cross                    889

1    depending on a lot of factors, that Dr. Reddy's might continue

2    to exercise the market power beyond 2020.  That wouldn't be

3    surprising or inconsistent with my opinions.

4    Q.  You also used this direct approach regarding pricing

5    conduct to confirm the scope of your relevant product market,

6    correct?

7    A.  The direct approach does confirm that the relevant market

8    is FDA-approved pyrimethamine drugs, yes.

9    Q.  Now, given the results that we just talked about, about

10   this direct approach to market analysis, is there any testimony

11   that Dr. Hardy could have given in this case that would cause

12   you to reconsider that your relevant product market is limited

13   to FDA-approved pyrimethamine products?

14   A.  The focus of an economist's analysis of market definition

15   is economic factors rather than underlying medical testimony.

16   Given the powerful economic evidence of what actually happened

17   when the generic came into the market, I think of the medical

18   testimony as supportive and confirmatory, but not central.  So

19   I guess I struggle to think of what that would look like.

20   Q.  If Dr. Hardy provided testimony consistent with a relevant

21   product market that is broader than one consisting of only

22   FDA-approved pyrimethamine, would you reconsider your relevant

23   product market opinion in this case?

24   A.  Well, I would certainly take into consideration any

25   evidence, including evidence that seems at odds with what the

LCKKFTC2                        Hemphill - Cross                        890

1   data and the economics tell us, but speaking as an economist,

2   understanding what actually happens in response to entry, what

3   actually happens when Vyera raises its price, that's central,

4   and the medical testimony is secondary.

5   Q.  Turning to your assessment of competitive effects,

6   Professor Hemphill, as part of your assignment in this case,

7   plaintiffs asked you to assess what competitive effects, if

8   any, arose from the challenged conduct, correct?

9   A.  Yes, that's right.

10  Q.  And the challenged conduct that you looked at consisted of

11  Vyera's arrangements with its API suppliers and certain

12  distribution restrictions, correct?

13  A.  Yes, that's right.

14  Q.  The challenged conduct that you looked at are all vertical

15  restraints, right?

16  A.  Yes, that's correct.

17  Q.  You are not offering an opinion in this case about whether

18  so-called data-blocking agreements had any sort of competitive

19  effects, correct?

20  A.  That's right.

21  Q.  So when I refer to the challenged conduct today, can we

22  agree that this refers to, one, Vyera's agreements with its API

23  suppliers, and, two, distribution restrictions?  Is that okay?

24  A.  Yes.

25  Q.  To determine whether the challenged conduct had competitive

1    effects, you identified three conditions in your opening report

2    that you say must be met, correct?

3    A.  Yes, that's right.

4    Q.  So the first condition is that the drugmaker is able to

5    exercise market power and charge a supercompetitive price in

6    the absence of generic competition, correct?

7    A.  I don't know if that exact language is right, but the

8    ability to exercise market power, monopoly power is the first

9    condition.

10   Q.  The second condition is that the exclusion is sufficiently

11   effective as to make a real difference to competition, correct?

12   A.  Right, because, otherwise, harmless -- you could imagine a

13   contract that was just harmless and had no effect, and we want

14   to check that that's not the case.

15   Q.  And the third condition, Professor, is that the conduct

16   does not have demonstrated pro-competitive effects that would

17   offset any harm to purchasers, correct?

18   A.  That's right.

19   Q.  So in order for you to conclude that Vyera's challenged

20   conduct had anticompetitive effects, all three of those

21   conditions must be satisfied, correct?

22   A.  Yes, that's right.

23   Q.  So the single fact that Vyera raised the price of Daraprim,

24   regardless of how high, is insufficient conduct alone for you

25   to conclude that the challenged conduct had anticompetitive

1    effects, correct?

2    A.  Yes, I agree with that.

3    Q.  Now, let's focus on the second of those three conditions,

4    okay?

5         In paragraph 192 of your opening report, you write

6    that the second condition is that the exclusion is sufficiently

7    effective as to make a real difference to competition; is that

8    right?

9    A.  You're asking me if paragraph 192 of my opening -- yes, I

10   see that.  Yes, it says that.  It's the same as in the written

11   direct, I think, but, yes, I agree with that.

12   Q.  Now, Professor, you have not seen that specific formulation

13   that you use in your opening report sufficiently effective as

14   to make a real difference to competition used in any economic

15   literature, correct?

16   A.  I mean, I struggle to think of any specific formulation as

17   to how this basic economic idea is worded.  I agree -- this

18   exact language, I couldn't say one way or the other.

19   Q.  And you've also published a number of academic papers which

20   are listed in your curriculum vitae, correct?

21   A.  Yes, I agree with that.

22   Q.  And in all of your writings, you cannot identify any

23   publication that you have authored that uses that same

24   formulation, correct?

25   A.  I agree with that, right.

LCKKFTC2                    Hemphill – Cross                    893

1    Q.  Now, to you, the phrase "sufficiently effective" seeks only

2    to identify whether the challenged conduct causes more than no

3    foreclosure, right?

4    A.  Yeah, I think I'd agree with that.  I mean, the basic idea

5    is to check whether, you know, these contracts are actually not

6    foreclosing, for example, because, you know, a generic could

7    just as easily get API, or what have you, samples from another

8    outlet.  So you want to rule that out.  I think that's what the

9    economic literature tells us to do in order to figure out

10   whether there's an anticompetitive effect.

11   Q.  There isn't any magic to the phrase "sufficiently

12   effective," correct?

13   A.  I would agree with that, yes, there's no magic to the

14   particular language used here.

15   Q.  If this Court were to conclude that there was no

16   foreclosure caused by the challenged conduct, you'd agree that

17   your second condition would not be satisfied, correct?

18   A.  Yes, I think that's right.

19   Q.  Now, Professor, virtually all vertical agreements restrain

20   competition to some degree, correct?

21   A.  No, I don't agree with that.

22   Q.  You do not agree that vertical agreements restrain

23   competition to some degree?

24   A.  In general, vertical agreements do.  I don't agree that

25   virtually every single one does restrain competition.

LCKKFTC2                        Hemphill - Cross                        894

1   Q.  But it's fair to say, I guess, that all vertical agreements

2   restrain competition to some degree; is that correct?

3   A.  No, I think I still disagree with that.

4   Q.  Would it be fair to say some vertical agreements restrain

5   competition to some degree?

6   A.  Sure, yes.

7   Q.  In paragraph 192 of your opening report, you opine that the

8   challenged conduct must make a real difference to competition,

9   correct?

10  A.  This is the paragraph we looked at before?

11  Q.  Correct, Professor.

12  A.  I think if we're just quoting from the -- could you repeat

13  the question again?

14  Q.  Sure.

15       It's the first sentence there, Professor.  In

16  paragraph 192 of your opening report, you opine that the

17  challenged conduct must make a real difference to competition,

18  correct?

19  A.  Yes, that's what it says in my opening report.

20  Q.  And you also use the phrase "real difference" in your reply

21  report, correct?

22  A.  The exact language "real difference"?  I don't know.

23       MR. McCONNELL:  Justin, why don't you please bring up

24  the reply report at paragraph 95, I believe.

25  Q.  There, Professor, for part 2, it's the second condition,

1    Vyera's restrictive agreements were sufficiently effective as

2    to make a real difference to competition, correct?

3    A.  Yes.  And I'm probably citing my opening report for that,

4    yes.

5    Q.  In quantifying whether your second condition is satisfied,

6    you testified at your deposition that the challenged conduct

7    must impede generics in a non-zero fashion, correct?

8    A.  I remember us talking about this at deposition.  I think of

9    it as a characterization rather than a quantification, but,

10   yes, that's one way of putting the same basic economic point.

11   Q.  And the methodology that you were using for determining

12   whether an exclusion makes a real difference to competition was

13   trying to ascertain whether the restriction is present or

14   absent, correct?

15   A.  I don't understand that.  Sorry.

16   Q.  Sure.

17        MR. McCONNELL:  Justin, can you please bring up

18   Professor Hemphill's deposition testimony at page 155.

19   Q.  You were asked:  "Do you have a methodology for determining

20   whether an exclusion makes a real difference to competition?"

21        Do you see that?

22   A.  Yes.

23   Q.  And you testified:  "Again, the idea here is just, you

24   know, we're trying to ascertain -- (1), we analysts are trying

25   to ascertain whether the restriction is, you know, present or

LCKKFTC2                    Hemphill - Cross                    896

1    absent."

2           Correct, that was your testimony?

3    A.  Yeah, it might be helpful to look above and below, but,

4    yes, I think it looks like that's something that was said --

5    that I said at deposition.

6    Q.  Today, in your direct testimony, your second condition for

7    assessing competitive effects is now whether the exclusion is

8    sufficiently effective as to make a difference to competition,

9    correct?

10   A.  Is -- we could look.

11   Q.  Sure.

12   A.  Again, this is sort of very tightly parsing some language

13   that's making a pretty basic point, but I don't recall the

14   exact language.

15   Q.  If I can point you, Professor, to GX 8004, at page 043,

16   paragraph 29.

17   A.  At 043, paragraph 9?

18   Q.  Yes, Professor.

19   A.  You don't mean paragraph 29, I think.

20   Q.  Paragraph 129.  Sorry, I forgot the 1.

21          So, now, the second condition is that the exclusion is

22   sufficiently effective as to make a difference to competition,

23   right?

24   A.  Yes, that's what it says.  This is making the same point

25   three or four different ways, but, yes, the language is not

1    exactly the same.  I see what you're saying.

2    Q.  So you've taken out the word "real" from the second

3    condition, correct?

4    A.  Yes, I agree.

5    Q.  And even after dropping the word "real" from your second

6    condition, it is still the case, Professor, that you cannot

7    identify any economic publication that uses that same

8    formulation that you do, correct?

9    A.  I think the economic literature uses the same formulation,

10   the same idea, but it doesn't use the exact same language.

11   Q.  So when I say formulation, I mean the specific language,

12   correct?

13   A.  That's what I inferred you to mean, yes.

14   Q.  Are you aware, Professor Hemphill, that the Supreme Court

15   has found that under the rule-of-reason framework, that the

16   plaintiff has the initial burden to prove that the challenged

17   restraint has a substantial anticompetitive effect that harms

18   consumers in the relevant market?

19           MS. PEAY:  Objection.  This is outside the scope of

20   this witness' direct testimony.

21           THE COURT:  I'll allow it.

22           THE WITNESS:  Could you read the question?

23   BY MR. McCONNELL:

24   Q.  Sure.

25           Are you aware that the Supreme Court has found that,

1   under the rule-of-reason framework, that the plaintiff has the

2   initial burden to prove that the challenged restraint has a

3   substantial anticompetitive effect that harms consumers in the

4   relevant market?

5   A.  I'm aware that there is a statement that gets at some of

6   that.  I don't know if that's the exact language or not.  I

7   struggle with "found" a little bit.  It's a sentence in a

8   Supreme Court opinion that has some of what you said.

9   Q.  And did you consider that framework from the Supreme Court

10  in the context of rendering your opinion in this case,

11  Professor?

12  A.  No, no, the Supreme Court's dicta on this point is not part

13  of my economic analysis.

14  Q.  If you could please turn, Professor, to your direct

15  testimony on pages 41 and 42, and we'll discuss, a little bit

16  more, the second condition.

17          On those two pages, Professor, footnotes 63 and 64.

18  Let me know when you're there.

19  A.  Yes, I'm there.

20  Q.  None of the passages quoted in footnotes 63 or 64

21  articulate the standard using the same formulation that you do

22  in this case, meaning sufficiently effective to make a

23  difference to competition, correct?

24  A.  So far as I know, the economic literature, including the

25  articles cited, though lots more could be cited, do not use the

1   precise language that I use or that the Supreme Court

2   discusses, for that matter.  They're not getting at the exact

3   specifics of the language and trying to make this basic

4   economic point.

5   Q.  Now, in footnote 64, you cite the LaFontaine and Slade

6   article titled "Exclusive Contracts and Vertical Restraints:

7   Empirical Evidence and Public Policy."

8          Do you see that?

9   A.  Yes, I see that.

10  Q.  Are you aware, Professor, that the empirical findings in

11  that study led the authors to state that vertical restraints,

12  in the manufacturer setting, can be publicly desirable?

13  A.  In a handbook chapter about vertical contracts, it would be

14  extremely surprising for them not to say that sometimes

15  vertical contracts can be pro-competitive.  So I don't have a

16  specific recollection of that.  There's probably a fair amount

17  in that article on that point, but it's a basic point.

18  Q.  Are you aware, Professor, that the empirical results in

19  that study led the authors to conclude that the presumption

20  should not be that vertical restraints are detrimental to

21  consumers?  Correct?

22  A.  I'm not aware that they say that.

23  Q.  Turning back to your opening report, Professor, do you

24  recall that as part of your assignment in this case, plaintiffs

25  asked you to assess what competitive effects resulted from

LCKKFTC2                    Hemphill - Cross                    900

1   Vyera's agreements restricting the sale of Daraprim and its

2   exclusive agreements with API suppliers, correct?

3   A.  Yes.

4   Q.  And you concluded in your opening report that the

5   challenged contracts impeded competition from lower-priced

6   competing therapies, thereby preserving Vyera's market power,

7   correct?

8   A.  That's right.  To the extent that the contracts had this

9   impediment, an anticompetitive effect would follow it.

10          I understand that there is some confusion about this,

11  and we talked about it at deposition at some length, but that's

12  what that statement is getting at.

13  Q.  You also concluded that, as a result, purchasers were

14  forced to pay a higher price for FDA-approved pyrimethamine,

15  correct?

16  A.  Right.  A further consequence is that we would expect that

17  to happen.

18  Q.  Now, looking at paragraph 194 of your opening report, you

19  write that, "Vyera's agreements restricting access to samples

20  impeded generic companies that needed to obtain Daraprim for

21  FDA-mandated bioequivalent studies," correct?

22          Would you prefer to see your report, Professor?

23  A.  It might be easier.

24  Q.  Sure.

25          Why don't you take a look, and let me know when you've

LCKKFTC2                      Hemphill - Cross                        901

1    completed your review of paragraph 194.

2    A.  Yes, I see that.

3    Q.  Do you agree with my recitation of the first statement

4    there in 194?

5    A.  I agree with your recitation of the first sentence of

6    paragraph 194.

7    Q.  Now, to reach the conclusion that Vyera's agreements

8    restricting access to samples impeded generic companies, you

9    looked to real-world evidence as support for your conclusion

10   that this restriction was anticompetitive, correct?

11   A.  I think that's not quite right.  Just to be clear -- and I

12   understand that there was some confusion about this — I've

13   tried to make it clear in both the deposition and in the

14   written direct — I'm not offering an opinion, as a factual

15   matter, about whether this impediment occurred.  That's not my

16   role here.

17          The point that I am just trying to get out is that if

18   it's right that there was an impediment to the various

19   contracts, evidence that is being developed separate from me,

20   then it would follow that there is this anticompetitive effect

21   harm to the competitive process, a prediction about prices

22   rising as a consequence.

23   Q.  Thank you for the clarification, Professor.

24          I think you clarified, in paragraph 99 of your reply

25   report, that you are not offering an opinion on whether, as a

LCKKFTC2                    Hemphill - Cross                    902

1    factual matter, Vyera's restrictions made it more difficult for

2    generics to obtain necessary inputs, such as Daraprim samples

3    and API, correct?

4    A.  Right, yes, there's a statement to that effect in the reply

5    report.

6    Q.  At your deposition, you clarified that you are not offering

7    an opinion that any impairment, in fact, occurred as a result

8    of Vyera's challenged conduct, right?

9    A.  I'm not offering an opinion either way about that, yes.

10   That is a factual matter that I'm not opining on.

11   Q.  So you aren't offering an opinion that there was some

12   but-for cause and effect between Vyera's challenged conduct and

13   any anticompetitive effects in this case, correct?

14   A.  I think that's right.  What I would say is, I'm offering an

15   opinion about how if certain facts are established, there's a

16   prediction from economics about the consequences — harm to the

17   competitive process, higher prices.

18   Q.  As part of that, you have not done any sort of quantitative

19   analysis of how much any costs of any competitor in this case

20   went up, if at all, due to Vyera's challenged conduct, right?

21   A.  That's right.  There's not a quantitative analysis of the

22   degree to which costs were raised.  There was testimony that,

23   in fact, they were delayed by a year and change, let's say, but

24   no quantitative analysis of that kind.

25   Q.  In paragraph 14 of your direct testimony, you testified

1   that "Vyera's exclusive supply arrangements and distribution

2   restrictions, to the extent that they made it more difficult

3   for generic manufacturers to access the resources they need to

4   develop competing products, harmed the competitive process,"

5   correct?

6   A.  It sounds like you were reading from -- yes, that's right.

7   That's what I say in paragraph 14.

8   Q.  So when you state, "To the extent that they made it more

9   difficult for generic manufacturers to access the resources

10  they need to develop competing products," you are referring to

11  a factual conclusion that the factfinder must first reach

12  before you can conclude that there was harm to the competitive

13  process, correct?

14  A.  Yes, that's the work being done by "to the extent that."

15  Yes, I agree with that.

16  Q.  Now, offering any opinion that Vyera's challenged conduct

17  actually caused some sort of impairment is contrary to what you

18  stated in paragraph 99 of your reply report that you would not

19  be doing in this case, correct?

20  A.  Sorry.  Try me again on that.

21  Q.  Sure.

22          You are not offering any opinion, in this case, that

23  Vyera's conduct actually caused some sort of impairment,

24  correct?

25  A.  I'm not opining that, as a factual matter, these contracts

LCKKFTC2                    Hemphill - Cross                    904

1    impaired.

2    Q.  And one step further, you are not offering an opinion that,

3    as a matter of fact, Vyera's challenged conduct actually harmed

4    the competitive process, correct?

5    A.  My opinion about harm to the competitive process is

6    predicated on a factual finding about impairment.

7    Q.  You have not done any independent analysis or inquiry into

8    the factual details about the universe of potential API

9    suppliers in this case, correct?

10   A.  That's correct, no, I've not done an inquiry, separate

11   inquiry, no.  No, I'm relying on Mr. Bruno and others, yes.

12   Q.  If you could, please, Professor, flip to paragraph 133 of

13   your direct examination.

14   A.  Yes, I'm at 133.

15   Q.  So in paragraph 133 of your direct testimony, you refer to

16   Vyera's distribution restrictions, correct?

17   A.  Right, yes, that's the italicized language at the beginning

18   of the paragraph.

19   Q.  And you describe testimony and documents from generic

20   drugmakers Cerovene and Fera, correct?

21   A.  At least those two, yes.  I mean, I think there's also some

22   evidence about Mylan, for example, and perhaps InvaTech.

23   Q.  You conclude your testimony in that paragraph by stating

24   that evidence of "delayed and deterred entry supports the

25   conclusion that Vyera's conduct impaired the opportunities of

LCKKFTC2                    Hemphill - Cross                    905

1  its rivals to avert a degree that made a difference to

2  competition," correct?

3  A.  Yes, I see that sentence, yes.

4  Q.  So in paragraph 133, you are offering your view as to

5  whether Vyera's challenged conduct, in fact, harmed

6  competitors, correct?

7  A.  I'm offering the view that there was evidence supporting

8  this conclusion.  I'm not offering an opinion that, in fact,

9  these contracts, in fact, impaired.

10  Q.  If you could please turn, Professor, to paragraph 134 of

11  your direct examination.

12  A.  Yes.

13  Q.  In paragraph 134, you refer to Vyera's exclusive supply

14  agreements, correct?

15  A.  That's right, yes.  That's the italicized language at the

16  beginning.

17  Q.  And in that paragraph, you describe testimony and documents

18  from generic manufacturers Fukuzyu and RL Fine, correct?

19  A.  Yes, I see that.

20  Q.  And you also refer to the testimony of Dr. Bruno.  Do you

21  see that?

22  A.  Yes.

23  Q.  I believe that's a typo, right?  I believe it's Mr. Bruno,

24  he's not a doctor; is that right?

25  A.  Well, I see Mr. Bruno.  It may be a typo on your end.  It

1   says Mr. Bruno in the written direct.

2          Oh, I see what you're saying.  Yes, Dr. Bruno and then

3   corrected.  It's wrong in line 2, and it's correct in line 3.

4   Yes, Dr. Bruno should be Mr. Bruno.

5   Q.  Okay, thanks.

6          You stated in paragraph 134 that multiple generic

7   drugmakers have stated that they faced more than a year of

8   delay, increased costs, or both because of Vyera's agreements,

9   correct?

10  A.  Yes, I say that.  I believe it's a true statement.

11  Q.  You then conclude that paragraph by stating that, "This

12  amount of impairment would establish that the API exclusivity

13  agreements made a difference to competition," correct?

14  A.  Yes, that's what the sentence says.

15  Q.  So in paragraph 134, you are similarly offering your view

16  as to whether Vyera's challenged conduct, in fact, harmed

17  competitors, correct?

18  A.  No, I disagree in a parallel way to my disagreement a

19  moment ago.

20  Q.  You would agree, Professor Hemphill, that to the extent

21  that there are any factual conclusions in paragraphs 133 and

22  134 of your direct testimony, that those must be made by the

23  factfinder in this case, correct?

24  A.  Yes, yes.  It's certainly the factfinder's role, not mine,

25  to, in this context, answer whether, in fact, there was an

LCKKFTC2                          Hemphill - Cross                          907

1  impairment.

2  Q.  Okay.  Returning back to paragraph 133 of your direct

3  testimony, Professor Hemphill, where you refer to documents and

4  testimony from Cerovene and Fera, you testified that certain

5  evidence from generic drugmakers shows that these two companies

6  were "unable to obtain a sufficient quantity of Daraprim after

7  failing to secure adequate samples," correct?

8  A.  I think the sentence is as the evidence indicates.  I think

9  you said shows.  I don't know if it shows it or not.  There is

10  evidence in support of that point.  Whether that evidence is

11  credited by the factfinder or not is not up to me.  The

12  evidence indicates; there is evidence.

13  Q.  Thank you.

14       In making the statements in paragraph 133 of your

15  direct, were you aware that Dr. Reddy's Laboratories, which

16  launched Cerovene's generic pyrimethamine product, was able to

17  source Daraprim samples from two different suppliers as early

18  as February 2018?

19  A.  I don't have an understanding, one way or the other, on

20  that particular statement.

21  Q.  Were you aware, Professor, that Dr. Reddy's Laboratories

22  chose not to purchase those samples in February 2018, given the

23  high upfront costs?  Were you aware of that evidence when you

24  wrote paragraph 133 of your direct?

25  A.  I don't have a recollection, one way or the other, about

LCKKFTC2                    Hemphill - Cross                      908

1    that as I sit here.  I understand that there's discussion on

2    this point.

3    Q.  You are not making any assessment, in paragraph 133, that

4    Dr. Reddy's Laboratories' choice not to order the samples it

5    needed in February 2018 was a result of Vyera's challenged

6    conduct in this case, correct?

7    A.  I'm not offering an opinion that Dr. Reddy's and Cerovene

8    made a choice of the kind that you're describing, one way or

9    the other.

10   Q.  In making the statements in paragraph 133 of your direct

11   examination, were you aware, Professor, that Fera had the

12   ability to source Daraprim as early as December 2016?

13            MS. PEAY:  Objection, your Honor.  This line of

14   questioning lacks foundation.

15            THE COURT:  Sustained.

16            Counsel, I think I have got your fundamental point —

17   at least I hope I have — that it's for me to decide whether an

18   impairment occurred, and only then might the expert's analysis

19   of anticompetitive harm be useful to me.

20            MR. McCONNELL:  I will do my level best to avoid

21   similar questions like that, your Honor.

22            THE COURT:  Okay, good.

23   BY MR. McCONNELL:

24   Q.  Just to be clear — and I don't think I'm intrigued on that

25   instruction — Professor Hemphill, you are not making any

LCKKFTC2                    Hemphill - Cross                    909

1    assessment in paragraph 133 that Fera's business decision
2    regarding how many bottles of Daraprim it would purchase in
3    2018 was the result of Vyera's challenged conduct, correct?
4    A.  I think I agree with that, including whether there was such
5    a business decision at all of the kind that you're implying.
6    Q.  Turning to paragraph 134 of your direct examination,
7    Professor Hemphill, you refer to the exclusive supply
8    arrangements between Vyera with Fukuzyu and RL Fine, right?
9    A.  Yes, there is that reference.
10   Q.  You stated that the evidence indicates that the contracts
11   increased the expense of procuring API supply and entailed
12   additional investment to assemble the extensive data required
13   for FDA approval, right?
14   A.  Yes, that's what it says.
15   Q.  And the evidence that you referred to there is testimony
16   from generic drugmakers and the opinion of Mr. Bruno, correct?
17   A.  That's what comes to mind right now.
18   Q.  Apart from relying on Mr. Bruno's opinion, you are not
19   offering an independent opinion in this case that Fukuzyu and
20   RL Fine were in the "best position" to provide pyrimethamine
21   API, correct?
22   A.  It's true I'm not offering my own opinion about that
23   factual matter.
24   Q.  Just skipping over some questions following the guidance of
25   the Court:

LCKKFTC2                    Hemphill - Cross                    910

1          You are not, Professor Hemphill, making a factual

2     determination in paragraph 134 that any business decisions by

3     Cerovene related to how it sourced its API was actually caused

4     by Vyera's challenged conduct, correct?

5     A.  Correct, including whether they had a decision like that to

6     make.

7     Q.  In reaching your conclusions in paragraphs 133 and 134 of

8     your direct examination, you did not consider any record

9     evidence regarding the challenged conduct's impact on Teva's

10    entry into the relevant market, correct?

11         MS. PEAY:  Objection, your Honor.  This line of

12    questioning lacks foundation.

13         THE COURT:  Excuse me one second.

14         MS. PEAY:  Yes, your Honor.

15         Sustained.

16         MR. McCONNELL:  Your Honor, I'm just confirming that

17    Professor Hemphill did not consider that as part of his

18    opinion.

19         THE COURT:  You can place another question.  That

20    wasn't the question you asked.

21    BY MR. McCONNELL:

22    Q.  In reaching your conclusions in paragraphs 133 and 134,

23    Professor Hemphill, you did not consider any evidence regarding

24    the challenged conduct's impact on Teva, correct?

25    A.  These paragraphs are analysis of other generics, not of

LCKKFTC2                    Hemphill - Cross                    911

1    Teva.  There's not an analysis of Teva contained in those
2    paragraphs.
3    Q.  Thank you.
4         I'd like to turn now, Professor Hemphill, to your
5    calculation of excess profits.  Okay?
6    A.  Yes.
7    Q.  I believe that starts at paragraph 148 of your direct
8    examination.
9    A.  It could be.  Let me look.
10        Yes, that's right.
11   Q.  You attempted to contemplate excess profits as the
12   difference between Vyera's actual profits and its profits in
13   the but-for world in which competitive entry was not impeded by
14   Vyera's conduct, correct?
15   A.  That's the basic nature of the calculation that I made,
16   yes.
17   Q.  And you concede, Professor, that Vyera's conduct may not,
18   in fact, have impeded the entry of competing generics, right?
19   A.  I don't -- I don't have an opinion that I'm expressing
20   here, one way or the other, about that.
21   Q.  If it is determined that Vyera's conduct did, in fact,
22   impede the entry of competing generics, then delay of the date
23   of generic entry is a likely, but not certain, consequence,
24   correct?
25   A.  Yes, I would agree with that — likely, but not certain.

LCKKFTC2                    Hemphill - Cross                    912

1   Q.  And if it's determined that Vyera's conduct did, in fact,

2   impede the entry of competing generics, and that a consequence

3   of that was a delay of generic entry, you agree that there is

4   no way to know for certain exactly when generic pyrimethamine

5   would have launched absent Vyera's conduct, correct?

6   A.  Yes, that's always true and also true here.

7   Q.  So your excess profits calculation necessarily involves

8   making assumptions about what would have happened in a but-for

9   world, correct?

10  A.  Yes.  And the multiplicity of scenarios is of a piece with

11  not knowing for certain what would have happened in the but-for

12  world.

13  Q.  Now, one of the factors for your excess profits calculation

14  is determining the date of generic entry in the but-for world,

15  correct?

16  A.  Yes.  It depends on what we mean by determine, but, yes, it

17  is an important input into the calculation, what the but-for

18  entry date is.

19  Q.  And this is an important factor to your calculation,

20  correct?

21  A.  Yes.

22  Q.  The number of generic entrants is also a significant factor

23  to your excess profits calculation, correct?

24  A.  Yes, significant.  Much less important, but significant.

25  Q.  For your calculations, you model two alternative entry

1    dates for Cerovene, correct?

2    A.  Yes, that's right.

3    Q.  And for your calculations, you model a single alternative

4    entry date for Fera, correct?

5    A.  Yes.  You have the alternative of entry at that date or

6    entry not at all, so...

7    Q.  And you reached these -- or I guess you decided on these

8    alternate entry date inputs only after conversations with

9    counsel in this case, correct?

10   A.  Yes, coming up with a set of assumptions had a number of

11   inputs — reviewing documents, reviewing testimony,

12   conversations with counsel — trying to come to the best answer

13   we can.

14   Q.  And the ultimate product of that conversation was a set of

15   assumptions, correct?

16   A.  The ultimate result of that process, which included

17   conversations, was this set of assumptions.

18   Q.  And each of those assumptions in that set of assumptions

19   needs to bear out to be correct by the factfinder in this case

20   for your excess profits calculation to be accurate, correct?

21   A.  Well, you know, to the extent that the findings of the

22   factfinder differ from the assumptions in the excess profits

23   calculation, the excess profits calculation, I presume, would

24   be less helpful.

25   Q.  Your excess profits calculation does not model potential

LCKKFTC2                    Hemphill - Cross                    914

1   entry for any other generic, correct?

2   A.   Beyond Cerovene and Fera, I think you mean.

3        That's basically right.  I mean, these other would-be

4   entrants, to the extent that they were impaired, offer a

5   degree -- result in a degree of conservatism in my

6   calculations.

7   Q.   To make these assumptions about when Cerovene and Fera

8   would have launched, in the absence of Vyera's challenged

9   conduct, you looked at testimony and documents from certain

10  generic drugmakers, correct?

11  A.   I looked -- could you read that back?  I'm sorry.

12  Q.   Sure.

13       To make these assumptions about when Cerovene and Fera

14  would have launched, in the absence of Vyera's challenged

15  conduct, you looked at testimony and documents from certain

16  generic drugmakers, correct?

17  A.   Yes, and, also importantly, what happened in the real world

18  in terms of how long it took things to transpire during the FDA

19  approval process, bioequivalence testing and so forth.

20  Q.   And you are not offering an opinion as to what, in fact,

21  would have occurred in terms of early entry absent the alleged

22  conduct, correct?

23  A.   That's true, yes.

24  Q.   You are not offering an opinion as to whether any delay, in

25  fact, occurred at all as a result of Vyera's challenged

LCKKFTC2                     Hemphill - Cross                      915

1   conduct, right?

2   A.  Right.  Yes, that's correct.

3   Q.  In your direct testimony, you say that the alternative

4   entry dates are based on reasonable assumptions, correct?

5   A.  That sounds right.  I don't remember the exact language.

6   Q.  Would it be helpful if we took a look at the language, just

7   to be clear?

8   A.  Sure.

9   Q.  If you could look at paragraph 149 of your direct,

10  Professor.

11  A.  Yes.  The calculating of excess profits necessarily

12  involves making reasonable assumptions.  I think that's kind of

13  a global statement about this kind of calculation, but it

14  includes this particular one, yes.

15  Q.  So you are characterizing these assumptions as reasonable

16  based on your experience as an economist, correct?

17  A.  Yes.  My experience as an economist is a part of -- is a

18  part of that, yes, I would agree.

19  Q.  I want to be clear, because my understanding is that you

20  also have a law degree, that you are not offering a legal

21  opinion as to the reasonableness of that set of assumptions,

22  correct?

23  A.  I'm not offering a legal opinion, in any event, but I'm not

24  sure what it would mean, in this context, to offer a legal

25  opinion on that question.

LCKKFTC2                    Hemphill - Cross                    916

1   Q.  You have no expertise, Professor Hemphill, in the FDA's

2   regulatory process or how the FDA prioritizes its review of

3   ANDAs, correct?

4   A.  I'm not an expert on these questions.  I have some

5   understanding of the FDA approval process, not extending to the

6   prioritization question that you asked at the end of your

7   question.

8   Q.  You are not, Professor, an expert on API manufacturing or

9   the length of time that a manufacturer would need in order to

10  be able to manufacture pyrimethamine API, correct?

11  A.  Right.  I don't consider myself an expert on those

12  questions.

13  Q.  In creating these alternative entry date inputs for your

14  but-for world, you did not take into account alternative

15  sources of delay other than Vyera's challenged conduct,

16  correct?

17  A.  I think that's -- I think I agree with your statement, yes.

18  I mean, if there was some totally independent force that meant

19  that there was no delay, no difference, between the real world

20  and the but-for world, you know, a different set of

21  calculations would follow.

22  Q.  There is no paragraph in your opening report, your reply

23  report, or in your direct examination where you consider an

24  alternative reason for any delay experienced by Cerovene and

25  Fera from entering the relevant market, correct?

LCKKFTC2                    Hemphill - Cross                    917

1   A.  I think that's right.  I'm not sure that's right, but I

2   think that sounds right.

3   Q.  And, Professor Hemphill, that's because you did not

4   consider any other sources of delay in modeling these

5   alternative entry dates, right?

6   A.  I don't know that I didn't consider it, in the sense that,

7   in coming up with a set of assumptions, you know, I was just

8   doing the best I could to try to produce a set of scenarios

9   that would be helpful in understanding the excess profits

10  associated with the conduct.

11  Q.  So it would be fair to say that you did not consider

12  whether there was some other conduct, other than Vyera's

13  challenged conduct, that would have prevented Cerovene or Fera

14  from acting the way you predict in the but-for world, correct?

15  A.  So I'm not making a prediction — I don't think that's

16  right — nor do I think it's correct that I didn't consider it.

17          What I would agree is that there's no calculation that

18  reflects some independent force.  Totally apart from Vyera's

19  conduct, there's no calculation based on a scenario that looks

20  like that.

21  Q.  Are you able to point, Professor Hemphill, to any portion

22  of your opening report, your reply report, or your direct

23  examination where you describe that consideration?

24  A.  As I sit here, no, I don't recall a sentence saying exactly

25  that.

LCKKFTC2                    Hemphill - Cross                    918

1   Q.  Okay.

2           MR. McCONNELL:  Thank you, Professor Hemphill.

3           That's all for now, your Honor.

4           THE COURT:  We're going to take our midmorning recess.

5           (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCKMFTC3          Hemphill - Redirect          919

1              THE COURT:  Any redirect?

2              MS. PEAY:  Yes, your Honor.

3    REDIRECT EXAMINATION

4    BY MS. PEAY:

5    Q.  Good afternoon, Professor Hemphill.

6    A.  Hi.

7    Q.  I just have a few questions for you here.  Do you recall

8    defense counsel asking you earlier about your assessment of

9    cross-price elasticity?

10   A.  Yes, I do.

11   Q.  Did you calculate cross-price elasticity in this case?

12   A.  No.  I didn't make any numerical calculation.  It wasn't

13   necessary for the analysis that I was doing.

14   Q.  Why was it not necessary for the analysis you were doing?

15   A.  Well, I mean, in order to evaluate a market, the most

16   important thing is what happens in response to entry by a

17   competitor or exit.  What happens, in fact, in terms of

18   consumer response to a price change or to entry.  Answering

19   that question provides a basis for assessing the degree of

20   substitutability and cross-price elasticity is one way of

21   talking about that.  But it's not the main event for

22   understanding the ability of a firm or a set of firms to

23   exercise market power or monopoly power.

24   Q.  Do you recall defense counsel ask also asking you whether

25   there was a numerical threshold for cross-price elasticity

LCKMFTC3                    Hemphill – Redirect                    920

1    which you could use to assess whether the cross-price

2    elasticity was sufficiently high or low?

3    A.  Yes, I do recall that.

4    Q.  Is a numerical threshold of that type necessary for

5    performing the analysis you performed in this case?

6    A.  No, it's not necessary to make a numerical calculation and

7    neither is there some numerical threshold that is used in order

8    to make this kind of evaluation.

9    Q.  I'd like to turn now to some questions that defense counsel

10   asked you regarding your competitive effects opinion.

11   A.  OK.

12   Q.  Do you recall defense counsel asking you about the second

13   condition in your competitive effects analysis?

14   A.  Yes, I do.

15   Q.  What that second condition?

16   A.  The second condition is basically just trying to get at

17   whether there is any foreclosure such that we might anticipate

18   anticompetitive effects.  That is, it's a spot for us to rule

19   out situations in which the availability of alternative

20   contracting partners is so easy that there is no foreclosure,

21   that there is no impediment.

22   Q.  Do you recall defense counsel asking you about whether the

23   specific terminology you used in describing that second

24   condition is found in the economic literature?

25   A.  Yes, I do.

1   Q.  Is that specific terminology found in the economic

2   literature?

3   A.  No, it's not.  But economists are taught using magic

4   language that has some precise wording to it that matters to

5   economists.  There is a half dozen ways of expressing this same

6   very basic idea.

7   Q.  This very basic idea, is that found in the economic

8   literature?

9   A.  Yes.  I think in all the papers that we are talking about

10  there is attention to this basic question about whether there

11  is any actual foreclosure.  The models are discussing

12  situations where there is and there is not.

13  Q.  Do you recall that counsel also asked you about your

14  articulation of the second condition, whether you included real

15  difference to competition or difference to competition?  Do you

16  recall that?

17  A.  Yes.  From an economist standpoint, this is a distinction

18  without a difference.  There is no like meaningful difference

19  intended with and without that word.

20  Q.  Professor Hemphill, I'd like to turn now to your excess

21  profits calculations and opinion.

22  A.  Yeah.

23  Q.  Did you include Mylan in your excess profits model?

24  A.  I considered Mylan and it plays a role to the extent that

25  it offers an extra element of conservatism because I don't

LCKMFTC3                          Hemphill                          922

1    attribute any additional excess profits to Mylan's entry in a

2    but-for world, to the extent that Mylan might have entered the

3    true level of excess profits that is higher than what I've

4    calculated.

5    Q.  Why didn't you attribute any additional excess profits to

6    Mylan's entry in a but-for world?

7    A.  I did the best that I could with the materials that I had

8    at hand, that is, with the materials that are in the record

9    about what might have happened in the but-for world.  I felt

10   with respect to Mylan that there wasn't enough there on which

11   to hang your hat in terms of actually cranking out a

12   calculation.

13   Q.  I have a similar question regarding InvaTech.  Did you

14   include InvaTech in your excess profits calculation?

15   A.  Yes.  InvaTech comes in in my consideration in exactly the

16   same way as Mylan, more or less.  It adds an element of

17   conservatism.  We don't have, I feel, enough to go on in order

18   to actually render a calculation.

19   Q.  Thank you, Professor Hemphill.  That's all I have.  Thank

20   you.  No further questions.

21        THE COURT:  Any recross?

22        MR. McDONNELL:  Your Honor, may I just consult with my

23   colleagues for a second?

24        THE COURT:  Sure.

25        MR. McDONNELL:  Your Honor, no recross.  Thank you.

LCKMFTC3                          Hemphill                          923

1              THE COURT:  Thanks so much.

2              Professor, there is testimony here that would permit a

3    finding that Fera would have entered the marketplace in August

4    of 2019, and your calculations are based on an assumption of

5    entry in the last quarter of 2019.  Am I right?

6              THE WITNESS:  I want to doublecheck at that point in

7    '19 versus 2018.  Some of these later years run together for

8    me.  Just bear with me a second.  Yes.  That's right.  My

9    calculation is last quarter of 2019.  Is that what you said?

10             THE COURT:  Yes.

11             THE WITNESS:  Yes.

12             THE COURT:  At least that's what I intended to say.

13             Let's turn to Cerovene.  You do two different

14   calculations on the assumption of entry into the market in two

15   different dates.  Am I right, October and December of 2018?  Is

16   that right?

17             THE WITNESS:  Yes, that's correct, your Honor.

18             THE COURT:  So there is evidence in the record to

19   support an entry date of roughly a year earlier, September

20   2017.

21             THE WITNESS:  Yes, your Honor.

22             THE COURT:  Using your methodology, is it possible to

23   back into an excess profits calculation if the fact finding

24   uses such a different date?

25             THE WITNESS:  I think under those circumstances the

LCKMFTC3                    Hemphill - Redirect                    924

1    calculation that I made would be conservative.  It would be

2    less than the level with the earlier entry date.  The

3    difference could be substantial from the earlier entry date.

4    The set of scenarios that I set up doesn't deliver an answer

5    for that earlier date.  It's not a simple matter of just, you

6    know, pressing a button.  There is not an immediate way to get

7    to the higher calculation that would be consistent with the

8    higher -- with the earlier entry date.

9          THE COURT:  Do counsel have any additional questions

10   for the witness based on what the questions that I put to him?

11         MS. PEAY:  Yes, your Honor.  I have two questions.

12   REDIRECT EXAMINATION

13   BY MS. PEAY:

14   Q.  Professor Hemphill, if you were given a different entry

15   date, would you be able to take that entry date and calculate

16   the excess profits for that date?

17   A.  Oh, yes.  The method permits it, yes.

18         MS. PEAY:  Thank you, your Honor.  That is all.

19         THE COURT:  But the calculation into which, for

20   instance, someone else like me could put different numbers is

21   not available to me on this record?

22         THE WITNESS:  I think that's right.

23         THE COURT:  Thank you.

24         Counsel.

25         MR. McDONNELL:  No further questions, your Honor.

1          THE COURT:  Thank you.

2          You may step down, Professor.

3          (Witness excused)

4          THE COURT:  Next.

5          MR. MEIER:  Your Honor, the government calls as its

6   next witness Kevin Mulleady.

7          My colleague, James Weingarten, will be examining

8   Mr. Mulleady.

9          THE COURT:  Mr. Mulleady, if you could come up here

10  and take the witness stand.  If you would take the witness

11  stand and remain standing, please.

12  KEVIN PATRICK MULLEADY,

13      called as a witness by the Plaintiffs,

14      having been duly sworn, testified as follows:

15          THE COURT:  Mr. Mulleady, the ventilation systems in

16  this courtroom have been tested.  As a result, you may take off

17  your face mask, if you would like.  You are free to leave it

18  on.  Also, counsel, when they are at podium, may take off their

19  mask.  But only when they are at the podium.

20          Please state your full name.

21          THE WITNESS:  Kevin Patrick Mulleady.

22          THE COURT:  Please spell your last name.

23          THE WITNESS:  M-u-l-l-e-a-d-y.

24          MR. POLLACK:  There is an affidavit coming in, your

25  Honor.

LCKMFTC3                    Hemphill – Redirect                    926

1                    THE COURT:  Yes.

2                    I don't think I have the DX-number for that.

3                    MR. POLLACK:  This is DX-545.

4                    THE COURT:  You're being handed a document which is

5       the affidavit cons constituting your direct testimony, DX-545.

6       If you could turn to the last page, page 33.

7                    Mr. Mulleady, is that your signature there?

8                    THE WITNESS:  Yes, your Honor.

9                    THE COURT:  Before signing it, did you read this

10      document with care?

11                   THE WITNESS:  Yes, your Honor.

12                   THE COURT:  Do you swear to the truth of its contents?

13                   THE WITNESS:  Yes, your Honor.

14                   THE COURT:  Any objection by plaintiffs to the receipt

15      of DX-545?

16                   MR. WEINGARTEN:  No, your Honor.

17                   THE COURT:  DX-545 is received.

18                   (Defendant's Exhibit 545 received in evidence)

19                   MR. POLLACK:  Your Honor, for the record, I will point

20      out, there was one alteration to the written testimony before

21      it came in, which is we removed the name of one of the API

22      suppliers and replaced it with the name that we are using in

23      this litigation.

24                   THE COURT:  Thank you.

25                   Counsel.

1          MR. WEINGARTEN:  Thank you, your Honor.

2     DIRECT EXAMINATION

3     BY MR. WEINGARTEN:

4     Q.  Good morning, Mr. Mulleady.

5     A.  Good morning.

6     Q.  I would like to start by asking you a few questions about

7     your background and how it is you came to work at Vyera.

8          From 2005 to 2013, you worked in finance and real

9     estate, correct?

10    A.  Yes, that sounds correct.

11    Q.  Included in that is two years that you worked at

12    Mr. Shkreli's hedge fund MSMB Capital Management?

13    A.  Yes.

14    Q.  That was from 2011 to 2013 that you worked for Mr. Shkreli

15    at the hedge fund, right?

16    A.  Yes, sounds correct.

17    Q.  It was Mr. Shkreli himself who hired you for that job at

18    MSMB, correct?

19    A.  Yes.

20    Q.  At MSMB you reported directly to Mr. Shkreli?

21    A.  Yes.

22    Q.  Now, while you were at MSMB, Mr. Shkreli started a new

23    company called Retrophin, right?

24    A.  Yes.

25    Q.  I believe in your direct testimony you stated that you

1    performed some limited tasks at Retrophin, is that right?

2    A.  Yes.

3    Q.  Now, your job at Retrophin was predominantly focused on

4    raising money for Retrophin, right?

5    A.  Yes.  I think that's fair.

6    Q.  Again, you reported to Mr. Shkreli while you worked at

7    Retrophin, right?

8    A.  Yes.

9    Q.  You were a founder of Retrophin, correct?

10   A.  Yes, I was the cofounder.

11   Q.  Mr. Shkreli awarded you so-called founders shares in

12   Retrophin, correct?

13   A.  That is correct.

14   Q.  You left Mr. Shkreli's employ in 2013, right?

15   A.  That sounds accurate, yes.

16   Q.  And that was until 2014, when Mr. Shkreli asked you to join

17   Vyera, right?

18   A.  Yes.

19   Q.  And at the point in time it was called Turing and the name

20   changed to Vyera, right?

21   A.  That is correct.

22   Q.  If we refer today to the entities as Vyera, will you

23   understand what I mean?

24   A.  Yes.

25   Q.  If at any point you think it's important to clarify between

LCKMFTC3                    Mulleady - Direct                    929

1    Turing and Vyera, please do so.  OK?

2    A.  OK.

3    Q.  Now, you joined Vyera in 2014, correct?

4    A.  That sounds accurate.  I believe it was towards the tail

5    end of 2014.

6    Q.  Mr. Shkreli started what eventually became Vyera after he

7    had been terminated from Retrophin, correct?

8    A.  I believe there was a separation from Retrophin.  I am not

9    sure what stage the termination process was and if it was

10   formally entitled as a termination at that point.

11            THE COURT:  You can move that mic and you can move it

12   sort of down under your chin.

13   Q.  Now, at some point then, we can agree, sir, after

14   Mr. Shkreli ceased working at Retrophin, he founded a company

15   called Turing, right?

16   A.  Yes.

17   Q.  Turing eventually became Vyera Pharmaceuticals, right?

18   A.  Yes.  If I may, there is, obviously, Turing AG and Turing

19   Pharmaceuticals LLC.  Turing Pharmaceuticals LLC became Vyera

20   LLC and Turing AG became Phoenixus AG.

21   Q.  The relationship is, the AG is the parent company of the

22   pharmaceuticals company?

23   A.  Yes.  Based in Switzerland.

24   Q.  The AG is based in Switzerland?

25   A.  Yes.

LCKMFTC3                    Mulleady - Direct                    930

1  Q.  Since the founding of Turing AG or Pharmaceuticals, either

2  one, Mr. Shkreli has been the largest shareholder in that

3  entity, is that right?

4  A.  Yes.

5  Q.  Mr. Shkreli asked you to join Turing, right?

6  A.  Yes.

7  Q.  Initially your title there was managing director, correct?

8  A.  Yes, I believe that's accurate.

9  Q.  You were Vyera's chief of staff also for some period of

10 time?

11 A.  I believe that title was used, but I don't think it was

12 ever a formal title.

13 Q.  The title of chief of staff was used with respect to your

14 responsibilities at Turing, correct?

15 A.  Yes.  I would say that's correct.

16 Q.  Again, you reported to Mr. Shkreli from the period of 2014

17 to 2015, correct?

18 A.  Yes, that's correct.

19 Q.  And, again, your role involved helping to get investors to

20 invest in the company?

21 A.  I don't know if that would be fully accurate.  Amongst

22 other things.

23 Q.  Was one of your responsibilities between 2014 and 2015

24 helping to get investors for Turing?

25 A.  I would not agree with that statement as a formal role in

LCKMFTC3                     Mulleady - Direct                     931

1   my company.  I did not bring investors in.  If anything, I

2   helped with the process of onboarding interested parties.

3   Q.  Interested parties being investors?

4   A.  Yes.

5           MR. WEINGARTEN:  Ms. Flint, could we turn to the

6   investigational hearing transcript for Mr. Mulleady.  It's page

7   22, lines 12 to 20.  You can do 16 to 20.  That's fine:

8   "Q.  Sure.  Other than finding office space, what were your

9   responsibilities at Turing during that time?

10  "A.  I assisted with capital raise.

11  "Q.  So getting investors for the company?

12  "A.  That is correct."

13  Q.  That was your sworn testimony, sir?

14  A.  Yes, it seems like it.

15  Q.  It was truthful and accurate when you gave it?

16  A.  Yes.

17          MR. WEINGARTEN:  You can take that down, please,

18  Ms. Flint.

19  Q.  Now, you left Vyera in around June 2016, correct?

20  A.  Yes.

21  Q.  Even though you had left your role, you continued to be a

22  shareholder in Vyera?

23  A.  Yes.

24  Q.  In 2015, before you departed Vyera, you founded your own

25  drug company, right?

LCKMFTC3                    Mulleady – Direct                    932

1   A.   Yes.

2   Q.   That company was called Prospero?

3   A.   Prospero Pharmaceuticals LLC, yes.

4   Q.   It was Mr. Shkreli who suggested to you that you form

5   Prospero, correct?

6   A.   No.

7         MR. WEINGARTEN:   Could you please turn to the

8   investigational hearing transcript, page 30, lines 6 through 9:

9   "Q.   Did Mr. Shkreli ask you to form Prospero Pharmaceuticals?

10  "A.   He suggested it, but it was ultimately my decision."

11  Q.   That testimony was truthful and accurate when you gave it,

12  right, sir?

13  A.   Yes.

14  Q.   Mr. Shkreli suggested that you form Prospero

15  Pharmaceuticals?

16  A.   To me suggested assumes that it was -- the idea originated

17  from him.   That wasn't the case.

18  Q.   Your testimony was that he suggested forming Prospero,

19  correct?

20  A.   Could you say that again, please.

21  Q.   Your testimony under oath was that Mr. Shkreli suggested

22  forming Prospero Pharmaceuticals, correct?

23  A.   Yes.

24         MR. WEINGARTEN:   Ms. Flint, you can take that down.

25  Q.   Mr. Shkreli also invested in Prospero, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  A.  By means of a convertible debt piece, yes.

2  Q.  Now, you departed Vyera in or around June of 2016 and your

3  direct testimony is that you were rehired at Vyera on or about

4  June of 2017, correct?

5  A.  That sounds accurate, yes.

6  Q.  To be precise, on June 21 of 2017, you were elected to the

7  Phoenixus AG board of directors?

8  A.  That sounds accurate, yes.

9  Q.  And after you had left your role at Vyera in 2016, it was

10  Mr. Shkreli who approached you about joining the Phoenixus AG

11  board, correct?

12  A.  Yes.

13  Q.  And you don't know any reasons Mr. Shkreli gave you for why

14  he asked you to be on the Phoenixus board, correct?

15  A.  I do not recall.

16  Q.  You don't recall any reasons that he may have provided you

17  about why he asked you to join the Phoenixus board in 2016,

18  right?

19  A.  Not specifically, no.

20  Q.  But, nonetheless, you agreed to be a nominee for the

21  Phoenixus board as part of a slate of directors that

22  Mr. Shkreli was proposing, correct?

23  A.  Yes.

24  Q.  And Mr. Shkreli was supporting a slate of people to be

25  elected to the Phoenixus board to replace the existing board,

LCKMFTC3                    Mulleady – Direct                    934

1    correct?

2    A.  Yes, that's accurate.

3    Q.  And the vote on Mr. Shkreli's slate, of which you a part,

4    occurred in June 2017, right?

5    A.  That sounds accurate, yes.

6    Q.  And the entire Shkreli slate was elected to the board of

7    Phoenixus in June of 2017?

8    A.  Yes.

9    Q.  And everyone who previously comprised the board of

10   Phoenixus AG was defeated, correct?

11   A.  No.

12   Q.  Do you think it would refresh your recollection, sir, if we

13   looked at the minutes reflecting the election of the board of

14   directors in June of 2017?

15           MR. POLLACK:  Objection, your Honor.  He didn't say he

16   didn't remember.

17           MR. WEINGARTEN:  That's fine.  We will do it as an

18   impeachment, if I may, your Honor.

19           THE COURT:  Yes, you may.

20           MR. WEINGARTEN:  I would like Ms. Flint to put up

21   Government Exhibit 1344.  This was already admitted into

22   evidence as part of Government Exhibit 9005.

23   Q.  This cover e-mail, sir, is from a Lukas Dascher to several

24   individuals, including yourself, correct?

25   A.  Yes.  That's what the document states.

LCKMFTC3                    Mulleady – Direct                    935

1    Q.  It's dated June 28, 2017.  Do you see that?

2    A.  Yes.

3    Q.  Mr. Dascher writes:  Dear all, attached, please find a scan

4    copy of the signed minutes of the 21 June 2017 EGM of Turing

5    Pharmaceuticals AG.  Do you see that?

6    A.  Yes.

7    Q.  Is EGM, to your understanding, an acronym for extraordinary

8    general meeting?

9    A.  Yes.

10   Q.  Is that a reference to the meeting at which Mr. Skhreli's

11   slate of directors was elected to the board of Turing?

12   A.  Seems like it, yes.

13           MR. WEINGARTEN:  Ms. Flint, if you could please turn

14   to page 005 of that document.

15   Q.  Do you see number 2 heading there it says:  Election of

16   members of the board of directors, proposals by the board.  Do

17   you see that?

18   A.  Yes.

19   Q.  Number 1 says:  The board of directors proposed the

20   election of Eliseo O. Salinas to the board.  You see that?

21   A.  Yes.

22   Q.  Was Mr. Salinas approved to be on the board or were the

23   votes against him being on the board?

24   A.  He did not receive the necessary maturity to be voted on

25   the board, so he did not win.

1              MR. WEINGARTEN:  Ms. Flint, if you could go down to

2     number 2.

3     Q.  The board of directors proposed the election of Zsolt

4     Lavotha.  The board was proposing Mr. Lavotha to be on the

5     board of directors.  Do you remember that?

6     A.  I do not specifically remember Mr. Lavotha, but I have no

7     reason to believe this document is not accurate.

8     Q.  As stated in the minutes, the general meeting of the

9     shareholders rejected the proposal of the board to elect

10    Mr. Lavotha, correct?

11    A.  Yes.

12             MR. WEINGARTEN:  Ms. Flint, could you look at number 3

13    down below.

14    Q.  The board also proposed election of a Richard Berman to the

15    board of directors.  Do you see that, sir?

16    A.  Yes.

17    Q.  The general meeting of the shareholders also rejected that

18    proposed board member, correct?

19    A.  Yes.

20             MR. WEINGARTEN:  You can take that one down, please,

21    Ms. Flint.

22    Q.  As part of being elected to the board with Mr. Shkreli's

23    slate, the first order of business for your new slate was to

24    remove Mr. Salinas, who was then the CEO, correct?

25    A.  One of the initial decisions that was made was to put

1  Mr. Salinas under investigation -- on suspension pending the

2  outcome of an investigation.

3  Q.  That was one of the first things that the newly elected

4  board members did after the election, correct?

5  A.  It was in the early days of our tenure, yes.

6  Q.  Even though that was one of the first things that the newly

7  elected slate of Shkreli directors did, you don't ever remember

8  talking to Mr. Shkreli about removing Mr. Salinas?

9  A.  Could you ask that again, please.

10  Q.  You don't have any recollection of talking to Mr. Shkreli

11  about removing Mr. Salinas?

12  A.  I don't know if that's accurate.

13         MR. WEINGARTEN:  Ms. Flint, could you please pull up

14  page 86 of Mr. Mulleady's deposition.  It's page 86, line 20 to

15  lines 25:

16  "Q.  OK.  OK.  Did you talk to Mr. Shkreli about whether

17  Mr. Salinas should be removed from his position with the

18  company?

19  "A.  I do not recall."

20  Q.  That was your sworn testimony at your deposition, correct?

21  A.  That's what the document states, yes.

22  Q.  You gave truthful and accurate testimony at your

23  deposition, correct?

24  A.  Based on the facts and information I knew at the time, yes.

25  Q.  Now, at that same meeting where the newly constituted board

1    met and put Mr. Salinas on leave, the board named you and

2    Mr. Akeel Mithani as the two members of an executive committee,

3    correct?

4    A.  Mr. Mithani and myself were named to the executive

5    committee.  I do not recall the specific meeting.

6    Q.  The executive committee performed the executive functions

7    for Vyera, correct?

8    A.  Could you please expand on executive functions.

9    Q.  Well, the executive committee was empowered to take over

10   the tasks of senior management of Vyera, correct?

11   A.  I believe that is --

12           MR. POLLACK:  Objection to the form, your Honor.

13           THE COURT:  Is there an objection?

14           MR. POLLACK:  To form.

15           THE COURT:  Overruled.

16   A.  I believe there is a documentation saying that the

17   executive committee would involve the oversight for many

18   offices, but predominantly I would say it would be comparable

19   to CEO tasks.

20   Q.  So you and Mr. Mithani comprised a new executive committee

21   for Vyera, correct?

22   A.  Yes.

23   Q.  That was starting on June 22, 2017, correct?

24   A.  Again, I don't recall the specific meeting, but if it was

25   that same meeting, that sounds accurate.

LCKMFTC3                    Mulleady – Direct                    939

1   Q.  Would it refresh your recollection if we looked at the

2   meeting minutes at which this transpired?

3   A.  Sure.  If you would like me to look at them.

4           MR. WEINGARTEN:  Ms. Flint, could you please put

5   Government Exhibit 1151 on the screen.

6           Your Honor, this is also already admitted into

7   evidence as part of Government Exhibit 9005.

8           Let's just look at the heading, please, Mr. Flint.

9   Q.  Just to be clear, the minutes for what was Turing AG and

10  became Phoenixus AG are both in German and English, correct?

11  A.  It's bilingual.  I am not sure if it's German, Italian or a

12  blend.

13  Q.  We will be looking at the English part of the minutes, so

14  that's OK.

15  A.  Thank you.

16  Q.  Sir, GX-1151 is the meeting minutes for a Turing

17  Pharmaceuticals AG board meeting held on June 22, 2017?

18  A.  Yes.

19          MR. WEINGARTEN:  Ms. Flint, could you go down below

20  the line where it says present, and there is a list of people.

21  Q.  You attended, correct?

22  A.  Yes.

23          MR. WEINGARTEN:  And Ms. Flint, could you please turn

24  to page 005, the bottom paragraph right before the number 5

25  where it says an executive committee.

1   Q.  According to the meeting minutes -- let me strike that.

2        Does this refresh your recollection, sir, that the

3   date of the meeting we are discussing was June 22, 2017?

4   A.  I don't know if it refreshes recollection, but that's what

5   the document states, and I have no reason to disagree with it.

6   Q.  Let's see what the document says about the executive

7   committee.  According to the meeting minutes, an executive

8   committee consisting of the board members Mulleady and Mithani

9   is established.  Together with the chairman of the board, the

10  committee will perform executive functions and will take over

11  the tasks of the senior management -- CEO, CFO, CCO, and CLO --

12  on a temporary basis.  Do you see that, sir?

13  A.  Yes.

14  Q.  So the board empowered you and Mr. Mithani, together with

15  the chairman, to take over the tasks of the senior management

16  of Vyera, correct?

17  A.  Yes.

18        MR. WEINGARTEN:  Ms. Flint, you can take that document

19  down, please.

20  Q.  You noted in your direct testimony, sir, that around

21  November 2017, you then took on the role of CEO of Vyera on an

22  interim basis, correct?

23  A.  Could you please state the date again.

24  Q.  Sure.  Around November of 2017, you became the interim CEO

25  of Vyera, correct?

1    A.  That sounds accurate, yes.

2    Q.  And you moved for the board to appoint you as interim CEO,

3    correct?

4    A.  I'm not positive.  I am not sure if I could move to appoint

5    myself as CEO, but I have no reason to believe that I couldn't,

6    besides logistics.

7    Q.  Do you recall whether you did that, sir, or not?

8    A.  No.

9    Q.  You don't recall?

10   A.  No.  Not as I stand here today or sit here today.

11   Q.  Do you think it would refresh your recollection, sir, if we

12   looked at the meeting minutes at which you were made interim

13   CEO?

14   A.  Yes.

15           MR. WEINGARTEN:  Ms. Flint, could you please put up

16   Government Exhibit 1153.  If you could please turn to page 005.

17   This is not yet in evidence, so I am just going to ask you to

18   look at the very bottom paragraph, please.

19           If you could please blow that up, Ms. Flint.

20   Q.  Take a look, sir, please, at the last sentence starting

21   with he.  Do you see that?

22   A.  Yes.

23   Q.  Does that refresh your recollection, sir, that you moved

24   the board of directors to appoint you as interim CEO of Vyera

25   Pharmaceuticals?

1    A.  I have no reason to believe not to.  It says he, which I

2    don't know if the pronoun is Kevin or Akeel.  I have no reason

3    to believe it wouldn't be me, and I have no reason to debate

4    it.

5    Q.  It was either you or Mr. Mithani who moved to have you

6    appointed as interim CEO of Vyera?

7    A.  Yes.  My only apprehension is, I am not sure if I'm allowed

8    to motion myself into a position.

9    Q.  At that meeting, after the motion was made to have you

10   appointed as interim CEO, some of the board members expressed

11   concerns about that appointment, correct?

12   A.  I found that out at a later date, yes.

13   Q.  And some of the board members expressed concerns that your

14   appointment would represent an excessive exercise of influence

15   by Mr. Shkreli at the company?

16           MR. POLLACK:  Objection, your Honor.  Hearsay.

17           THE COURT:  Objection is overruled.

18   A.  Please repeat that, Mr. Weingarten.

19   Q.  Sure.  Some of the board members expressed a concern that

20   your appointment as interim CEO of Vyera would represent an

21   excessive exercise of influence by Martin Shkreli on the

22   company, correct?

23   A.  I was not present for those conversations.

24   Q.  Did you later learn about those conversations?

25   A.  Through the minutes.

LCKMFTC3                    Mulleady – Direct                    943

1   Q.  Those conversations are reflected in the minutes of the

2   company?

3   A.  That's my recollection, yes.

4          MR. WEINGARTEN:  Ms. Flint, let's go to GX-1153, the

5   first page, please:  Page 001.  Thank you.  If you could blow

6   up the top, the heading.

7   Q.  This is a copy of the minutes of the meeting of the Turing

8   board on September 27, 2017.  Is that right, sir?

9   A.  Yes.  That's what the document states.

10          MR. WEINGARTEN:  Your Honor, I move to admit

11   Government Exhibit 1153.

12          THE COURT:  It's received.

13          (Government Exhibit 1153 received in evidence)

14          MR. WEINGARTEN:  Thank you, your Honor.

15   Q.  Let's look, sir, at the minutes that you just referred.

16          MR. WEINGARTEN:  Page 006, please, Ms. Flint.  It's

17   the second paragraph that starts with Edward Painter.  Thank

18   you.

19   Q.  According to the minutes, Edward Painter and Ron Tilles

20   voiced concerns that the appointment of Kevin P. Mulleady as

21   Vyera Pharmaceuticals LLC's interim CEO may impose substantial

22   risks on the company.  That's reflected in the minutes, right,

23   sir?

24   A.  Yes.

25   Q.  The next sentence in the minutes is:  This would

LCKMFTC3                     Mulleady - Direct                     944

1   particularly be the case if insurers, authorities, banks and

2   other involved parties would regard said appointment as an

3   excessive exercise of influence by Martin Shkreli on the

4   company.

5          That's also reflected in the official minutes of the

6   company, right?

7   A.  Yes.

8          MR. WEINGARTEN:  You can take that down, Ms. Flint.

9   Q.  Despite the concerns that we just looked at in the minutes,

10  the board did eventually appoint you as CEO of Vyera, correct?

11  A.  Yes.

12  Q.  In November of 2017, the board elected you as chairman of

13  the board of directors, correct?

14  A.  Could you please state the date again.  Excuse me.

15  Q.  In November of 2017, the board elected you as chairman of

16  Vyera's board of directors?

17  A.  That sounds accurate.

18  Q.  In January of 2018, the board named you as permanent CEO of

19  Vyera?

20  A.  I am not sure.  I believe there was an interim period.

21  Q.  Right.  So you were appointed as interim CEO in 2017 and in

22  January 2018 you were named permanent CEO, correct?

23  A.  OK.  That sounds accurate.  Thank you for the clarity.

24  Q.  Your testimony on direct was that you served as Vyera's CEO

25  through February of 2019, correct?

**A-2004**

1  A.  Yes.  That sounds accurate.

2  Q.  Your testimony on direct was, at that point you left the

3  role of CEO, right?

4  A.  Yes.

5  Q.  And you testified that the board subsequently voted to

6  terminate you as CEO after you left your role, right?

7  A.  Yes.

8  Q.  But the board terminated your appointment as of February

9  2019, correct?

10 A.  I do not recall the specific date, but it was around that

11 time.

12 Q.  And the board terminated you for cause, correct?

13 A.  I believe that is a position they took, yes.

14 Q.  Part of that cause that the board cited related to disputes

15 between you and other board members about interactions with

16 Mr. Shkreli, correct?

17 A.  I believe that's accurate, yes.

18 Q.  Even though the board removed you as CEO in early 2019, you

19 stayed as chairman of the board until November 2020, correct?

20 A.  That sounds accurate, yes.

21 Q.  During that time period in 2019 and 2020, while you were

22 still chairman, you talked with other board members and

23 executives about Mr. Shkreli's influence on Vyera, correct?

24         MR. POLLACK:  Objection.  Hearsay.

25         THE COURT:  Overruled.

LCKMFTC3                    Mulleady - Direct                    946

1    Q.  You may answer, sir.

2    A.  Yes.  That would be accurate.

3    Q.  Let's look at an example.

4            MR. WEINGARTEN:  Ms. Flint, can you please put on the

5    screen GX-1256.  This is already admitted into evidence as part

6    of Government Exhibit 9005.

7            Let's start with the top e-mail, please, Ms. Flint.

8    Q.  This is an e-mail from Averill Powers, correct?

9    A.  Yes.

10   Q.  It's dated May 29, 2019, correct?

11   A.  Yes.

12   Q.  What was Mr. Powers' role at the company in May of 2019?

13   A.  May of 2019.  Excuse me as I go through the timeline in my

14   head.  I believe he was CEO at that point.

15   Q.  In May of 2019, you were still chairman of the board?

16   A.  Yes.

17   Q.  And the e-mail includes you, Mr. Jordan Walker, and

18   Mr. Mithani, correct?

19   A.  Yes.

20   Q.  Was Mr. Walker on the board of directors at that time?

21   A.  Yes.

22   Q.  Was Mr. Mithani on the board at that time?

23   A.  Yes.

24   Q.  Mr. Powers writes:  See my comments below.

25           The subject is about an annual general meeting of

1  Phoenixus AG, correct?

2  A.  Yes.

3          MR. WEINGARTEN:  Ms. Flint, could you please turn to

4  page 004 of this document.

5  Q.  You'll see the bottom e-mail it says on May 17, 2019,

6  Phoenixus AG investor relations wrote to the shareholders of

7  Phoenixus AG and there is a letter.  Do you see that, sir?

8  A.  Yes.

9  Q.  If you look at the third paragraph up from the bottom it

10 says:  In addition to these accomplishments, the new management

11 team has proposed to expand the size of the board from three

12 directors to five.  Do you see that, sir?

13 A.  Yes.

14 Q.  In 2019, management proposed expanding Phoenixus' board,

15 right?

16 A.  Yes.  It looks that way.

17         MR. WEINGARTEN:  Let's go up to the next e-mail from

18 Mr. Craig Rothenberg.  If you look up, it says external e-mail

19 right below that.  Excellent.

20 Q.  Mr. Craig Rothenberg responded to the investor relations

21 e-mail and said:  I believe you should disclose to shareholders

22 what, if any, prior relationships either of the two newly

23 proposed board members have had with Martin Shkreli.  Do you

24 see that?

25 A.  Yes.

LCKMFTC3                    Mulleady – Direct                   948

1    Q.  Do you recall what role Mr. Rothenberg had, if any, with

2    respect to Vyera?

3    A.  I believe his title was chief communications officer.

4    Q.  Was he also a shareholder?

5    A.  I believe a small one.

6    Q.  And in response to Mr. Rothenberg's note asking about the

7    relationship of new board members, proposed new board members

8    to Mr. Shkreli, you and Mr. Powers and Mr. Mithani and

9    Mr. Jordan had a discussion.  Do you remember that?

10   A.  Yes.  This is recalling my memory.

11           MR. WEINGARTEN:  Ms. Flint, could you go to page 001.

12   Q.  The e-mail that says from Kevin Mulleady.  Do you see that?

13   A.  Yes.

14   Q.  You contributed your thoughts to this discussion.  Do you

15   remember that, sir?

16           MR. WEINGARTEN:  You can take it, Ms. Flint, from the

17   heading all the way down to the first bullet point, please.

18   From Kevin Mulleady all the way through the first bullet.

19   Q.  You see that e-mail from you, sir?

20   A.  It seems as if from the different fonts that it's an edit

21   of a previous e-mail and comments put in, so I think it would

22   be a hybrid of multiple parties.

23   Q.  Exactly.  You wrote originally some bullets.  And then

24   Mr. Powers in the e-mail above said:  Please see my comments.

25   Do you remember that, sir?

**A-2008**

1          MR. WEINGARTEN:  Ms. Flint, we can go to the e-mail

2     above.  Very top even.

3     Q.  You see where Mr. Powers wrote:  See my comments?

4     A.  Yes.

5     Q.  It looks like he wrote his comments directly into the

6     bullets that you had circulated?

7     A.  Seems that way, yes.

8     Q.  Let's try it this way.

9          MR. WEINGARTEN:  Ms. Flint, I'm sorry to do this to

10    you, but could you try GX-1692, please.

11    Q.  Does this refresh your recollection, sir, that you drafted

12    the e-mail with bullets to Mr. Walker, Mr. Powers, and

13    Mr. Mithani?

14    A.  I do not recall this e-mail specifically, but I have no

15    reason to challenge its authenticity.

16         MR. WEINGARTEN:  Your Honor, move to admit Government

17    Exhibit 1692 into evidence, please.

18         THE COURT:  Received.

19         (Government Exhibit 1692 received in evidence)

20    Q.  I just want to focus on your first bullet, sir, and then we

21    will come back to Mr. Powers' comments.  Your first bullet is:

22    I almost would rather not bring attention to Martin.  He is a

23    shareholder, just like everyone else.

24         Do you see that you wrote that to these gentlemen?

25    A.  Yes.

1          MR. WEINGARTEN:  Ms. Flint, let's go back to 1526,

2    please.  Let's go to that first bullet, please.

3    Q.  The beginning there where it says:  I almost would rather

4    not bring attention to Martin.  Those are your words, right?

5    A.  Seems that way, yes.

6    Q.  Then Mr. Powers comments are:  I completely agree.  We do

7    not want to bring undue attention to Martin.  However, he is

8    the founder of the company and its largest shareholder and a

9    former CEO and chairman of the board.  As the WSJ and other

10   articles recently make clear, no one else is more publicly

11   associated with the company.

12          Do you see that next part.  It says:  He is a

13   shareholder, just like everyone else.  Those are your words,

14   right, sir?

15   A.  It seems that way from the difference of boldness, I

16   suppose, for lack of a better word.

17   Q.  From the e-mail we just looked at before, number 1692?

18   A.  Yes.

19   Q.  Mr. Powers writes in response to your comment that

20   Mr. Shkreli is a shareholder, just like everyone else,

21   Mr. Powers writes:  He is most certainly not just another

22   shareholder.  No other shareholder has helped create the

23   company as he has, and no other shareholders or group of

24   shareholders' reputation affect the company in the way he does.

25   No other shareholder has wrestled the board away from prior

LCKMFTC3                    Mulleady – Direct                    951

1  management successfully.

2        Mr. Powers' response to you, sir, was that no other

3  shareholder besides Mr. Shkreli had wrestled the board away

4  from management successfully, correct?

5  A.  That is correct.  That was Mr. Averill's response according

6  to this document.

7  Q.  Do you understand that wrestling the board away

8  successfully is a reference to the June 2017 election of

9  Mr. Shkreli's slate of directors?

10 A.  I can't speak for Mr. Averill's comments, Mr. Powers'

11 comments.

12 Q.  Are you aware of any other election at which a shareholder

13 defeated management's proposed slate of directors?  Withdrawn.

14       Let's talk about your interactions with Mr. Shkreli

15 while you were on the board with Phoenixus/Vyera.

16       Mr. Shkreli is currently incarcerated, correct?

17 A.  To my knowledge, yes.

18 Q.  You communicated with Mr. Shkreli during the period of his

19 incarceration, correct?

20 A.  Yes.

21 Q.  You've spoken on the phone with him on several occasions

22 while he has been in prison?

23 A.  Yes.

24 Q.  Is it correct, sir, that over the course of 2020, you

25 became more uncomfortable with the amount of time you were

LCKMFTC3                   Mulleady – Direct                    952

1  spending talking to Mr. Shkreli?

2  A.  I became more uncomfortable.  I don't know if I would

3  posture it as the catalyst being time spent.

4  Q.  Were you more uncomfortable talking to Mr. Shkreli because

5  he wanted to talk more and more about Vyera?

6  A.  I didn't take issue to talking about Vyera.  I took issue

7  to becoming more involved in the day-to-day management of

8  Vyera.

9          MR. WEINGARTEN:  Ms. Flint, could you please turn to

10  page 11 of Mr. Mulleady's deposition transcript.  It's lines 5

11  through 18 on page 11:

12  "Q.  And why did your conversations become more sporadic over

13  the course of 2020?

14  "A.  I feel like I was being less receptive.  I was

15  uncomfortable with the amount of times we were talking and the

16  topic of conversation.

17  "Q.  And what about the topic of conversation over the course

18  of 2020 with Mr. Shkreli made you uncomfortable?

19  "A.  He wanted to talk more and more about the company.

20  "Q.  And when you say the company, to what are you referring,

21  sir?

22  "A.  Excuse me.  Phoenixus."

23  Q.  Was that your testimony at your deposition, sir?

24  A.  It looks like it, yes.

25          (Continued on next page)

LCKKFTC4                    Mulleady – Direct                    953

1  BY MR. WEINGARTEN:

2  Q.  And that was truthful and accurate when you gave it?

3  A.  Yes.

4          MR. WEINGARTEN:  You can take that down, please,

5  Ms. Flint.

6  Q.  For example, in 2020, Mr. Shkreli asked you to send him

7  some resumes for some candidates to become Vyera's CEO,

8  correct?

9  A.  Yes, that is my recollection.

10 Q.  And Mr. Shkreli had actually been talking to you about

11 reviewing candidates to be CEO since 2019, right?

12 A.  I am not sure specifically when the conversations

13 originated.

14 Q.  Do you think it would refresh your recollection, sir, if we

15 looked at your deposition testimony on this topic?

16 A.  Yes.

17         MR. WEINGARTEN:  Let's take a look, please, Ms. Flint,

18 at page 13 of the deposition, line 18, through page 14, line 5.

19 13/18 to 14/5, please.

20 Q.  Read this to yourself, please, sir, and let me know when

21 you have had a chance to read it.

22 A.  In its entirety, 18 to 05?

23 Q.  Yes, please.

24 A.  Yes, I read it.

25         MR. WEINGARTEN:  You can take that down, Ms. Flint.

1    Q.  Does that refresh your recollection, sir, that your

2    conversations with Mr. Shkreli about new candidates to be CEO

3    started in 2019?

4    A.  I believe my statement was I wasn't sure of the exact date,

5    and I think that that deposition states that I wasn't sure of

6    the exact date.  I don't know if I have recollection of the

7    conversations, respectfully.

8    Q.  Let's take a look, sir, at the testimony again.

9            MR. WEINGARTEN:  Ms. Flint, 13/18 to 5.

10   Q.  Question:

11   "Q.  When were these conversations happening with Mr. Shkreli

12   about him wanting to review candidates to be the CEO of

13   Phoenixus?

14   "A.  Conversations with Mr. Shkreli regarding candidates, I

15   would think, would date back to almost the early stages of

16   Averill Powers' tenure.

17   "Q.  Can you put a year to that, or a month and a year?

18   "A.  I do not know the exact date, but I believe he became

19   permanent CEO in March/April 2019."

20           That testimony was truthful and accurate when you gave

21   it?

22   A.  Yes.

23           MR. WEINGARTEN:  You can take that down, please,

24   Ms. Flint.

25   Q.  So, Mr. Shkreli was talking to you, through 2019 and into

LCKKFTC4                    Mulleady – Direct                    955

1   2020, about candidates to replace Mr. Powers as CEO, correct?

2   A.  Yes, I think that's a fair statement, amongst other things.

3        MR. WEINGARTEN:  Let's take a look, please, at,

4   Ms. Flint, Government Exhibit 1374.  Let's look at some more

5   communications on this topic.  This is already admitted into

6   evidence as part of Government Exhibit 9001.  Let's just look

7   at the very top heading, please, for a second.

8   Q.  This is an email from Mr. Shkreli to you, correct?

9   A.  It looks that way, yes.

10  Q.  And it's dated February 22nd, 2020?

11  A.  Yes.

12        MR. WEINGARTEN:  You can zoom back out to the full

13  document.

14  Q.  This is an email chain between you and Mr. Shkreli while

15  he's incarcerated, correct?

16  A.  It seems that way, yes.

17        MR. WEINGARTEN:  At the very, very bottom, Ms. Flint,

18  there's one little heading there, it says, "Mulleady, Kevin."

19  The email continues on to the next page.  Yes.

20  Q.  Do you see, at the very bottom there, sir, it says,

21  "Mulleady, Kevin, on 2/21/2020, 1:06 a.m. wrote."

22        Do you see that?

23  A.  Yes.

24  Q.  And that indicates what follows is a message that you wrote

25  to Mr. Shkreli, right?

1  A.  May I read it?

2  Q.  Of course.

3       (Pause)

4  A.  The question was for me to indicate this?

5  Q.  I'm asking or confirming, yes, this is an email that you

6  wrote to Mr. Shkreli during his incarceration, correct?

7  A.  It seems that way, yes.

8  Q.  And the last two sentences of your email are, first, you

9  said to Mr. Shkreli, "My opinion would be to call an EGM to

10  replace AP with DM immediately."

11       Do you see that?

12  A.  I do see that, yes.

13  Q.  And an EGM, again, is a shareholder meeting, right?

14  A.  An extraordinary general shareholder meeting, yes.

15  Q.  And "AP" refers to Averill Powers?

16  A.  I think that would be a fair assumption.  I've used that

17  abbreviation before to reflect Mr. Powers.

18  Q.  So you're telling Mr. Shkreli, during his incarceration,

19  that it's your opinion that there should be an extraordinary

20  general meeting to replace Mr. Powers, right?

21  A.  It seems that way, but it's a bit confusing.  I don't

22  recall this exact message, and I don't know who "DM" is.

23       MR. WEINGARTEN:  You can take that down, please,

24  Ms. Flint.

25  Q.  Now, Mr. Shkreli had made it clear to you over time that

1   his ownership of the company meant he could fire anybody at

2   Vyera that he wanted to, right?

3   A.   I think that might be broadly overarching.

4           MR. WEINGARTEN:  Let's take a look, please, Ms. Flint

5   at Government Exhibit 3277.  This has already been admitted as

6   part of Government Exhibit 9001.

7   Q.   This is a transcript, sir, of a call made on March 12,

8   2020.

9           MR. WEINGARTEN:  Ms. Flint, could you go to the first

10  page, or page 002, please.  Let's just look at page 4.  If you

11  could blow up all of page 4 for Mr. Mulleady.

12  Q.   This is a transcript of a call between you and Mr. Shkreli

13  during his incarceration.  Okay?

14          Do you see where it says:

15          "Martin Shkreli:  Hello.

16          "Kevin Mulleady:  Hey"?

17  A.   Yes.

18          MR. WEINGARTEN:  Let's take a look, please, Ms. Flint,

19  at page 003 — that's pages 5 through 8 of the transcript — and

20  I want to look, in particular, at page 7 of the transcript.

21  Q.   I want to look at that first full paragraph, sir.  That's

22  Mr. Shkreli saying:  "The point is, you know, the company's not

23  prepared, and I'm ready to hold Averill accountable, Akeel

24  accountable, and you accountable if you don't get done -- if

25  something doesn't get done.  And, you know, I -- I think it's

LCKKFTC4                    Mulleady - Direct                    958

1   fair."

2           Do you remember Mr. Shkreli telling you he would hold

3   you, Mr. Powers, and Mr. Mithani accountable if something

4   didn't get done?

5   A.  I don't remember this specific instance, but he had alluded

6   to comments like that.

7   Q.  Mr. Shkreli continues:  "You know, I mean, ultimately, you

8   know, Averill's supposed to be there because he's some, you

9   know, respectable guy with a suit and tie that everyone can

10  trust, but, clearly, you know, he's not doing his job, you

11  know, getting the broker account open or finding some other

12  solution, creative solution, by investing in a fund or doing

13  something like that.  He hasn't done anything."

14          Do you remember Mr. Shkreli expressing frustration to

15  you about Mr. Powers not getting things done?

16  A.  Similar answer — not the specific conversation, but he

17  definitely had expressed that.

18  Q.  And Mr. Shkreli is saying that Mr. Powers is there because

19  he's a respectable guy with a suit and tie.  "There" refers to

20  being at Vyera?

21  A.  I can't comment on Mr. Shkreli's statement.

22          MR. WEINGARTEN:  Let's look at the bottom there,

23  Ms. Flint.  It's the Martin Shkreli, on page 7 of the

24  transcript, line 22, to page 8, line 4.  Thank you very much.

25  Perfect.

LCKKFTC4                    Mulleady - Direct                    959

1   Q.  Mr. Shkreli continues:  "So at the end of the day, he's

2   focused on trading his portfolio probably more than he is on

3   trading, you know, our portfolio.  So I'm ready.  You know, I

4   have EGM power."

5          Do you understand "EGM power" to mean the power to

6   call an extraordinary general meeting of the shareholders of

7   Vyera?

8   A.  I can't specifically say what Martin was trying to express

9   there, but I think that would be a fair assumption.

10  Q.  And then Mr. Shkreli writes -- or said, rather, "I mean, I

11  have no problem firing everybody, to be frank, if you guys

12  can't figure it out.  And, again, I'm -- take the context, I'm

13  not threatening anything, right?  Take the context correctly,

14  but you can use that context to light a fire --"

15         And, Ms. Flint, I'm sorry, can you please keep going

16  down the transcript there on page 8.?  That's good.  Thank you.

17  Q.  And you responded:  "I understand."

18         And Mr. Shkreli finished his thought:  "Light a fire

19  under people's asses, you know what I mean, by saying"--

20         And then you say:  "Mm-hmm."

21         -- "listen, Martin read me the riot act, and he's

22  ready to fire me, and I'm worried, right?"

23         Do you see that, sir?

24  A.  Yes.

25  Q.  So, on occasion, Mr. Shkreli would threaten to use his

LCKKFTC4                    Mulleady - Direct                     960

1    power to fire you or Mr. Mithani or Mr. Powers?

2    A.  Yes.

3    Q.  Let's take a look at a different conversation that you had

4    with Mr. Shkreli six months later.

5            MR. WEINGARTEN:  Ms. Flint, you can take that down,

6    please, and please put Government Exhibit 3284 on the screen.

7    Q.  Government Exhibit 3284 is already admitted into evidence

8    as part of Government Exhibit 9001.  This is, sir, a

9    September 17, 2020 call, and it's a transcript of that call.

10           MR. WEINGARTEN:  Let's look at page 002, please,

11   Ms. Flint.  And if you would just zoom in on page 4, please.

12   Q.  Do you see the call that starts, "Kevin Mulleady, hello"?

13   Do you see that?

14   A.  Yes.

15   Q.  And it tells you that you're getting a call from Martin

16   Shkreli, an inmate at a federal prison.  Do you see that?

17   A.  Yes.

18   Q.  It tells you the call is being recorded?

19   A.  Yes.

20           MR. WEINGARTEN:  Let's just take a look, please,

21   Ms. Flint, at page 005.  It's page 15 and 16 of the transcript.

22   Q.  Do you see where it says, "One, look," page -- line 21 of

23   page 15?

24           MR. WEINGARTEN:  That's goods right there.  Thank you.

25   Q.  That's Mr. Shkreli talking, and he says, "One, look, we

LCKKFTC4                    Mulleady - Direct                    961

1   have a cap.  Being on the board of Phoenixus means, you know,

2   you're on the Martin and Kevin board.  Between the two of us,

3   we control more than 50 percent, so that's the first thing you

4   need to know off the rip."

5          That's correct, sir, isn't it, that between you and

6   Mr. Shkreli, you control more than 50 percent of the voting

7   power of Vyera at that time?

8   A.  I don't know if we ever exceeded 50 percent.

9   Q.  That's what Mr. Shkreli is saying, though, correct?

10  A.  It seems that way from this documentation, yes.

11  Q.  And Mr. Shkreli continues, he says:  "The second thing you

12  need to" --

13         And you interrupt and say:  "Yeah.  And I told him

14  just to be" --

15         Mr. Shkreli says:  "You have to be okay with that."

16         And then you speak:  "Inaudible.  I'm not going to --

17  you know, I've worked with Martin -- listen, any partnership

18  has ups and downs.  I've worked with him for ten years and have

19  been -- I never screwed him, and I never intend to.  So I just

20  want to make sure that's not going to happen."

21         Do you see that, sir?

22  A.  Yes.

23  Q.  Those are your words to Mr. Shkreli?

24  A.  That's what the transcript states, yes.

25  Q.  And Mr. Shkreli responds:  "Yeah."

LCKKFTC4                    Mulleady – Direct                    962

1          MR. WEINGARTEN:  And then, Ms. Flint, can you zoom

2    out, please.

3          Can you go, please, to the next page of the document,

4    006.  And if you would go to page 17, lines 1 through 8, of the

5    transcript.

6    Q.  Mr. Shkreli says:  "And then, two -- but, you know, that's

7    just the first -- like the first thing is -- it's like

8    Facebook.  You can't go in there and tell Zuckerberg what to

9    do.  It's just" --

10         And then you say:  "Right."

11         Mr. Shkreli responds -- or continues, rather:  "You

12   know, can you give him advice?  Can you -- you know, it's just,

13   he just happens to own the thing, and that's the way it is."

14         So Mr. Shkreli is there, is he comparing -- strike

15   that.

16         He's talking about Mr. Zuckerberg just owning

17   Facebook, and that's the way it is?

18         MR. POLLACK:  Objection, your Honor.  That's gone on

19   for a number of questions.  I fail to see the relevance of this

20   line of questioning.  It has nothing to do with the challenged

21   conduct of the case.

22         THE COURT:  Actually, it has a great deal to do with

23   Mr. Shkreli's control during the period of time of the company.

24         Can you answer the question, sir?

25         THE WITNESS:  I can if Mr. Weingarten would be so kind

LCKKFTC4                                                            963

1    as to restate it, your Honor.

2              MR. WEINGARTEN:  Sure.  I'm happy to.

3    BY MR. WEINGARTEN:

4    Q.  Mr. Shkreli is comparing himself to Mark Zuckerberg in this

5    passage, correct?

6    A.  It seems that way, yes.

7    Q.  And he's saying about Mr. Zuckerberg, he just happens to

8    own the thing, and that's the way it is?

9    A.  Yes.

10   Q.  Just like Mr. Shkreli owns Vyera, and that's the way it is?

11   A.  As I've written here, or are you asking me to make that

12   comparison?

13   Q.  I'm asking you, sir, is that your understanding of

14   Mr. Shkreli's statement?

15   A.  I can't say specifically what Mr. Shkreli was alluding to,

16   but I would like to say this was when I was chairman, and this

17   was about a month before I brought to the board's attention

18   that I had some issues with this.

19   Q.  And let's talk about that, okay, your departure from --

20             THE COURT:  We're going to break for lunch.  I'll see

21   everyone at 2:00 o'clock.  Thanks.

22             (Luncheon recess)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCKKFTC4                    Mulleady - Direct                    964

1                         AFTERNOON SESSION

2                             2:00 P.M.

3          (Trial resumed; in open court)

4          THE COURT:  Mr. Mulleady should take the stand.  Thank

5   you.

6          Thanks so much.

7          Counsel.

8          MR. WEINGARTEN:  Thank you, your Honor.

9    KEVIN MULLEADY, resumed.

10  DIRECT EXAMINATION CONTINUED

11  BY MR. WEINGARTEN:

12  Q.  Mr. Mulleady, before the break, you noted that you brought

13  some of your concerns about Mr. Shkreli to the attention of the

14  Vyera board.

15          Do you remember that?

16  A.  Yes.

17  Q.  Let's talk a little bit more about what happened when you

18  raised those concerns.

19          Now, there was a board meeting scheduled for November

20  of 2020, correct?

21  A.  Yes, that sounds accurate.

22  Q.  And prior to that meeting, you circulated an agenda for the

23  meeting, right?

24  A.  Yes.

25  Q.  And you were, at that time, still the chair of the Vyera

LCKKFTC4                    Mulleady - Direct                    965

1    board, right?

2    A.  Yes.

3    Q.  One of the items that you put on the agenda was

4    Mr. Shkreli's continued involvement with Vyera, right?

5    A.  It sounds accurate, yes.

6    Q.  And specifically, you called the board meeting to discuss

7    Mr. Shkreli's ownership and involvement with Vyera, right?

8    A.  Yes, amongst other agenda items.

9    Q.  And you added that agenda item, about Mr. Shkreli, because

10   you had concerns about Mr. Shkreli's involvement with the

11   board?

12   A.  Yes.  And the company, I believe, as a whole.

13   Q.  And you asked the board to keep that agenda item

14   confidential from Mr. Shkreli; is that right?

15   A.  Yes.

16   Q.  And you did that because you were worried that if board

17   members informed Mr. Shkreli, he would see that item that you

18   were raising as a threat, and he would try to influence the

19   board to stop your meeting, right?

20   A.  Amongst other things.  I wanted to make sure that the board

21   members did not violate their duty of confidentiality.

22   Q.  But you were concerned that if the information got to

23   Mr. Shkreli, that you were raising this item, he might try to

24   influence the board to stop the meeting, right?

25   A.  I think that's fair, yes.

LCKKFTC4                    Mulleady - Direct                    966

1    Q.  So at the board meeting, you didn't get a chance to raise

2    any of the items on your agenda, correct?

3    A.  That is correct.

4    Q.  You didn't get a chance to raise the item that you had put

5    on there about Mr. Shkreli, correct?

6    A.  Yes.

7    Q.  And, in fact, before you could discuss any business at all,

8    another board member called for a vote to remove you as

9    chairman of the board, right?

10   A.  Correct.

11   Q.  And the board then immediately voted and did, in fact,

12   remove you as chairman, right?

13   A.  Yes.

14   Q.  And at that same meeting, you also learned that Mr. Shkreli

15   had called for another EGM, right?

16   A.  Yes.

17   Q.  And the purpose of that EGM was to vote on removing you and

18   another board member from the Vyera board entirely, correct?

19   A.  And reinstating another board member who resigned a week

20   prior.

21   Q.  Did the EGM to remove you from the board that Mr. Shkreli

22   had called take place?

23   A.  Yes.

24   Q.  And the result of that EGM was that you were removed from

25   the board, right?

1  A.  All of Mr. Shkreli's proposals were accepted and approved.

2  Q.  Including removing you from the board?

3  A.  Yes.

4  Q.  And including removing Mr. Thomas from the board?

5  A.  Yes.

6  Q.  And Mr. Thomas had supported you remaining as chair of

7  Vyera, correct?

8  A.  Yes.

9  Q.  And so when you raised concerns to the board about

10  Mr. Shkreli's involvement, Mr. Shkreli arranged for you to be

11  voted off the board, right?

12  A.  Could you please say that again, Mr. Weingarten?

13  Q.  Sure.

14        After you raised concerns about Mr. Shkreli's

15  involvement with the board and Vyera, Mr. Shkreli called a

16  meeting at which you were voted off the board, right?

17  A.  Yes, he called the extraordinary general meeting.

18  Q.  And you were voted off the board at that meeting?

19  A.  Yes.

20  Q.  Let's turn, sir, if we could, to a different topic.

21        Now, you understand that if a generic company cannot

22  acquire Daraprim referenced listed drug, they cannot develop

23  and got approval of a generic Daraprim product?

24  A.  There is some exclusions to that, but, to my understanding,

25  Daraprim does not -- has not been able to have those

LCKKFTC4                    Mulleady – Direct                    968

1   exclusions, so I believe they do need the bottles to run

2   bioequivalence.

3   Q.  So it's your understanding that a generic company needs

4   Daraprim referenced listed drug to do its bioequivalence

5   studies for Daraprim, right?

6   A.  Yes.

7   Q.  And without the required bioequivalence studies, a generic

8   product can't get FDA approval, right?

9   A.  To the best of my knowledge, yes.

10  Q.  And if we use the acronym RLD, would you understand that to

11  mean reference listed drug?

12  A.  Yes, sir.

13  Q.  And you also understand that if a generic company doesn't

14  have a source for the active pharmaceutical ingredient

15  pyrimethamine, then they wouldn't be able to come to market

16  with a generic pyrimethamine product, right?

17  A.  Yes, that would be a necessity for the development of the

18  drug.

19          MR. WEINGARTEN:  Ms. Flint, could you please put

20  Government Exhibit 1127 on the screen.

21          Your Honor, this is already admitted in evidence as

22  part of Government Exhibit 9005.

23          Can you show us the top heading, please, Ms. Flint?

24  Zoom in.  Thank you.

25  Q.  Now, Government Exhibit 1127 is an email from you to an

LCKKFTC4                    Mulleady - Direct                    969

1    email address called staff sales force.

2              Do you see that, sir?

3    A.  Yes.

4    Q.  And "To:  Staff Sales Force," that means it's going to the

5    Vyera sales force?

6    A.  Yes, I would say so, and maybe a few other individuals, but

7    that's the purpose.

8    Q.  And you sent this email on June 27, 2017, right?

9    A.  That's what the document states, correct.

10   Q.  Shortly after you had rejoined the board of Vyera, right?

11   A.  Yes.

12             MR. WEINGARTEN:  Ms. Flint, could you please zoom in

13   on the first paragraph after, "I hope you are well."

14   Q.  So you wrote to the sales force, "As you know, today the

15   FDA released a publication announcing that they could

16   immediately accept an ANDA (abbreviated new drug application)

17   for some drugs and specifically mentioned pyrimethamine

18   (Daraprim's active ingredient)."

19             Do you see that?

20   A.  Yes.

21   Q.  So the FDA communicating that they would immediately accept

22   an ANDA for pyrimethamine prompted you to write an email to the

23   sales force, right?

24   A.  The FDA -- the sales force's response to that FDA statement

25   prompted me to write a message to the sales force.

1  Q.  I see.

2        And the sales force had concerns about -- it was your

3  understanding that the sales force had concerns about that FDA

4  announcement?

5  A.  Yes, sir.

6        MR. WEINGARTEN:  Let's look at the third paragraph,

7  please, Ms. Flint, that starts, "in my opinion."

8  Q.  Did you write this email to assuage, or at least try to

9  assuage, the concerns of the sales force?

10 A.  I don't use "assuage" in my daily vocabulary.  Could you

11 use a different word or define --

12 Q.  Sure.

13       Did you write this email to try and reassure the sales

14 force?

15 A.  Yes.

16 Q.  And you wrote to the sales force, "In my opinion, this not

17 an immediate concern."

18       I assume you meant this is not an immediate concern?

19 A.  Yes.

20 Q.  Okay.

21       "Getting to the point of filing an ANDA is a

22 cumbersome process.  Personally, I can tell you the FDA

23 approval is generally not the main barrier to entry for

24 generics in our class.  Amongst other necessities, a company

25 would have to successfully create the active ingredient on

LCKKFTC4                    Mulleady - Direct                    971

1    scale using a well-controlled process and then formulate."

2           Is that a reference, "active ingredient," to active

3    pharmaceutical ingredient, sir?

4    A.  That would be a fair assumption, yes.

5    Q.  Then you continued:  "Next, they would have to obtain RLD

6    (registered listed drug), ten labeled and unexpired bottles

7    (informed estimation), of Daraprim to complete a study in

8    healthy volunteers to demonstrate bioequivalence."

9           Now, your estimation there, that you said is

10   informed -- do you see that?

11   A.  Yes.

12   Q.  And that was informed based on knowledge that you had

13   because Vyera also had a generics business, right?

14   A.  Amongst other information sources.

15   Q.  So you were writing to the sales force to reassure them

16   that it takes at least two necessities to be able to file an

17   ANDA, right?

18   A.  Yes.

19          MR. WEINGARTEN:  Ms. Flint, can you take that down and

20   zoom out, please?

21          Let's go back to the main document.  Can you go to the

22   next paragraph, please, that starts, "getting to the front of

23   the line."

24   Q.  You wrote, "Getting to the front of the line is helpful,

25   but getting to the line is not an easy task.  I can't imagine

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    ANDA submission preparation taking less than 18 months

2    (extremely conservative).  Since Turing actively collects

3    competitive intelligence concerning other potential developers,

4    we would most likely be aware of this process going on and have

5    plenty of time to prepare."

6             Do you see that?

7    A.  Yes.

8    Q.  And you're telling the sales force that Turing collects --

9    actively collects competitive intelligence about potential

10   developers of a generic Daraprim product, right?

11   A.  That is what the document states, yes.

12            MR. WEINGARTEN:  You can take that down, please,

13   Ms. Flint.

14   Q.  Now, in your direct exam, or your direct testimony, you

15   testified that while you were a Vyera employee at the time

16   Vyera acquired Daraprim, you were "not involved with or

17   responsible for" — now I'm going to paraphrase — the company's

18   decision to keep it in specialty distribution.

19            Do you remember that was your testimony?

20   A.  I don't remember that specific line, but that is an

21   accurate statement.

22   Q.  And Vyera acquired Daraprim in August of 2015; is that

23   right?

24   A.  That sounds accurate, yes.

25   Q.  And in June 2015, you were the project manager for Vyera's

LCKKFTC4                    Mulleady – Direct                    973

1   work getting its specialty distribution agreements in place,

2   correct?

3   A.  No.

4             MR. WEINGARTEN:  Ms. Flint, let's introduce, please,

5   Government Exhibit 1218.

6   Q.  And if you could please look, sir, at the top email.  I

7   know you're not on it, but we'll get there.

8             MR. WEINGARTEN:  If you could please do the top

9   heading, Ms. Flint.

10  Q.  This email is from Walter Worsham to a Richard DeYoung, and

11  it copies Nancy Retzlaff, Howard Dorfman, and another person.

12            Do you see that?

13  A.  Yes.

14  Q.  The subject is "Re:  Boilerplate contracts — Accredo and

15  CuraScript Specialty Distribution."

16            Do you see that?

17  A.  Yes.

18  Q.  I know you're not on that, but if you could turn to

19  pages 002 through 004, you're on several of the other emails in

20  the chain.

21            Do you see at the bottom there on 002, sir, that one

22  is blocked out, but you're on that one, right?

23  A.  I do see that, yes.

24            MR. WEINGARTEN:  Let's go to 003, Ms. Flint.

25  Q.  And you're on all of the -- strike that.

LCKKFTC4                    Mulleady - Direct                    974

1        You're at the very bottom one from Mr. Osborne

2   addressed to Kevin.  You're on that email, right?

3   A.  I see that, yes.

4        MR. WEINGARTEN:  Let's go to 004, please.

5   Q.  Lets look at the email that starts -- it says, "From Kevin

6   Mulleady."

7        You're definitely on this one, right?

8   A.  Yes.

9        MR. WEINGARTEN:  Your Honor, we move to admit

10  Government Exhibit 1218 into evidence.

11       THE COURT:  Received.

12       (Government's Exhibit 1218 received in evidence)

13       MR. WEINGARTEN:  Ms. Flint, could you go to page 005.

14  BY MR. WEINGARTEN:

15  Q.  The first email that starts the chain, it's from June 1,

16  2015, and it's from Mr. Rob Osborne of Express Scripts.

17       Do you see that?

18  A.  Yes.

19  Q.  He writes at the top, "This will get us started.  Please

20  redline as you see fit and keep in mind these are boilerplate,"

21  and he's attached a number of things or referenced a number of

22  things.

23       Do you see that list?

24  A.  I do, yes.

25  Q.  One of the items is CuraScript Specialty Distribution

LCKKFTC4                    Mulleady - Direct                    975

1    agreement?

2    A.  Yes.

3    Q.  And another item down there is the Accredo Specialty

4    Pharmacy agreement?

5    A.  Yes.

6    Q.  Let's see your response to Mr. Osborne.

7           MR. WEINGARTEN:  Ms. Flint, can you go back to

8    Page 004, please.  And you'll see at the bottom, it says on

9    June 1 -- exactly.

10   Q.  You respond to Mr. Osborne:  "Thank you, Rob.  I have

11   included our internal counsel."

12          "Howard, could you please take the contract lead and

13   turn this around as quick as humanly possible?  This is

14   currently the number one priority of Turing and exceptionally

15   time sensitive.  I will be the interim project manager."

16          Do you see that?

17   A.  Yes.

18   Q.  So you were addressing something to Howard.  Is that Howard

19   Dorfman you were talking about?

20   A.  I would assume so.  Howard Dorfman was the only Howard that

21   I recall that worked in the legal department.

22   Q.  So Mr. Dorfman was one of Vyera's in-house lawyers?

23   A.  Yes.  He was general counsel.

24   Q.  And you directed the general counsel to take the contract

25   lead and turn them around as quick as humanly possible?

LCKKFTC4                     Mulleady – Direct                      976

1   A.  That's what the document states, yes.

2   Q.  And you described yourself on the chain as the interim

3   project manager on this effort?

4   A.  That's what the document states, yes.

5   Q.  And then two sentences down, you say, "I have also cc'd

6   Martin so that he can efficiently stay in the loop."

7          Do you see that?

8   A.  Yes.

9   Q.  Okay.  That's a reference to Mr. Shkreli?

10  A.  I would assume so, yes.

11  Q.  So you took on the role of project manager with respect to

12  at least these two specialty agreements, right?

13  A.  That's what the document says, interim project manager,

14  but, to be clear, I did not really know much about it.  It was

15  new to the company and was trying to be a squeaky wheel.

16         MR. WEINGARTEN:  You can take that one down,

17  Ms. Flint.

18  Q.  I wanted to talk a little bit more about keeping

19  Mr. Shkreli in the loop for a second.

20  A.  Sure.

21         MR. WEINGARTEN:  Ms. Flint, could you put up

22  Government Exhibit 1349 on the screen, please.  It's produced

23  in native, but we have printed it, but can you go to page 002,

24  please, Ms. Flint.

25  Q.  Mr. Mulleady, is Government Exhibit 1349 a log of

LCKKFTC4                      Mulleady – Direct                    977

1   communications that you either prepared or had prepared?

2   A.  It seems like it.  Without looking at it in its entirety,

3   it's definitely the format of a document I put together.

4   Q.  Is this a record you kept of your email communications with

5   Mr. Shkreli?

6   A.  Yes.  I just paused because I didn't know if it included

7   phone calls, but it seems predominantly emails.

8   Q.  It might have phone calls, too, but we can agree it's a

9   record of at least some of the communications you had with

10  Mr. Shkreli?

11  A.  Yes.

12  Q.  The first item starts on December 26, 2019, right?

13  A.  It looks that way.

14          MR. WEINGARTEN:  And if you go down, Ms. Flint, to

15  page 042.

16          MR. POLLACK:  Your Honor, objection to the foundation

17  of this document.

18          THE COURT:  Overruled.

19  BY MR. WEINGARTEN:

20  Q.  The last item --

21          MR. WEINGARTEN:  If you can go to 042, please,

22  Ms. Flint.

23  Q.  The last item, sir, row 1551, is a log of an item from

24  July 14, 2020.

25          Do you see that?

LCKKFTC4                     Mulleady - Direct                     978

1   A.  Yes, I do.

2   Q.  So this document, Government Exhibit 1349, is a log that

3   you kept of some communications you had with Mr. Shkreli

4   between December 26, 2019, and July 14, 2020?

5   A.  It's inclusive of those dates, but I do see this goes to

6   page 50.  It might be a more expansive than that.

7   Q.  Okay.  So --

8            MR. POLLACK:  Your Honor, objection.  This document is

9   not in evidence.

10           MR. WEINGARTEN:  I'm about to move it in evidence,

11  your Honor.

12           I would like to move Government Exhibit 1349 into

13  evidence, please.

14           MR. POLLACK:  I object.  It's an improper summary

15  document.

16           THE COURT:  I think foundation has been laid, but you

17  may inquire.  Do you want a voir dire with respect to the

18  foundation?

19           MR. POLLACK:  I'm sorry, your Honor?

20           THE COURT:  Do you want to voir dire on the

21  foundation?  I think an adequate foundation has been laid, but

22  if you want to conduct a voir dire, you may.

23           MR. POLLACK:  No, thank you, your Honor.

24           THE COURT:  Received.

25           (Government's Exhibit 1349 received in evidence)

LCKKFTC4                    Mulleady - Direct                      979

1   BY MR. WEINGARTEN:

2   Q.  So we'll move quickly from this one, but if you would look,

3   sir -- we can stay on the same page -- column H, there's a

4   column called "Action."

5           Do you see that?

6   A.  Yes.

7   Q.  And that's where you would make a note of whether the items

8   you discussed with Mr. Shkreli required follow-up or not,

9   right?

10  A.  Me or someone at my direction.

11  Q.  And so this document, for the period we just discussed,

12  from December 26, 2019, to July 14, 2020, has some 1,550 rows,

13  at least, of communications with Mr. Shkreli?

14  A.  It seems that way from looking at this page, yes.

15          MR. WEINGARTEN:  You can take that down, Ms. Flint.

16  Q.  So you kept Mr. Shkreli in the loop fairly extensively

17  during the period -- well, strike that.

18          You kept Mr. Shkreli in the loop fairly extensively,

19  correct?

20  A.  Are you asking that based on this documentation or --

21  Q.  Yes, sir.

22  A.  I don't know if that would be a fair assumption based upon

23  that.  That's him reaching out to me, and it talked about

24  various different topics.

25  Q.  Let's talk about some time after you became a member of the

1    executive committee.

2          Now, soon after you became part of that executive

3    committee with Mr. Mithani, you made inquiries at the company

4    about where every bottle of Daraprim had gone.

5          Do you remember that?

6    A.  I do, as I sit here today, after preparing for this trial.

7          MR. WEINGARTEN:  Let's take a look, please, Ms. Flint,

8    at Government Exhibit 1358.  This is already in evidence as

9    part of Government Exhibit 9005.

10   Q.  We'll zoom in on a part in a second, but this is an email

11   chain, if you can read it, sir, between you and Mr. Chris Lau.

12         Do you see that?

13   A.  Yes, sir.

14   Q.  The top email is dated September 14, 2017?

15   A.  Yes.

16   Q.  And that's during the period that you and Mr. Mithani

17   comprised the executive committee?

18   A.  It sounds accurate, yes.

19   Q.  And Mr. Lau was Vyera's manager of business analytics and

20   intelligence?

21   A.  I'm not positive of his exact title, but I have no reason

22   to dispute that.

23         MR. WEINGARTEN:  If we could go to the very bottom

24   email, Ms. Flint, and zoom in on the email.  Thank you.

25   Q.  This is an email you sent to Mr. Lau on September 8, 2017;

1   "Subject:  Audit."

2          You wrote to Mr. Lau, "We want to do a full out audit

3   of Daraprim.  Where would be a good place to start if we wanted

4   to know where every bottle of Daraprim we sold went to,

5   et cetera?  I want access to all our data.  Thanks," and then

6   you signed it.

7          You sent that message to Mr. Lau on September 8?

8   A.  That's what the document states, yes.

9   Q.  You sent a similar message to Ms. Kirby, correct?  Do you

10  remember that?

11  A.  As I sit here today, yes, I've seen that document.

12  Q.  You also asked Ms. Kirby to know where every bottle Vyera

13  ever had wound up, correct?

14  A.  I couldn't say verbatim, unless you'd like to put the

15  document in front of me, but it was something along those

16  lines.

17         MR. WEINGARTEN:  Let's look at Government

18  Exhibit 1354, please.  Let's start at the very bottom, the

19  message from Mr. Mulleady.  Thank you.

20  Q.  The next day from the email we just looked at,

21  September 9th, you wrote to Ms. Kirby, "Subject:  Daraprim

22  Audit."  You said something complimentary to her, and then you

23  said, "I'd really like to start working with you on

24  understanding our distribution.  A good beginning point would

25  be just knowing where every bottle we have ever sent out went."

LCKKFTC4                    Mulleady - Direct                    982

1          Do you see that, sir?

2   A.  I do, yes.

3          MR. WEINGARTEN:  And then, Ms. Flint, can you go to

4   the very top of this document and give us that header, please.

5   That's good.

6   Q.  And Ms. Kirby responded, correct?

7   A.  It seems that way, yes.

8   Q.  And do you recall, sir, did she tell you that she wouldn't

9   help you or she said she would help you?

10  A.  Would you like me -- is it based upon this email?

11  Q.  Do you recall, sir, how she responded?

12  A.  No, but I highly doubt a response would be that I'm not

13  going to help you.

14  Q.  And then let's just see here.  She says, "Hi Kevin!  It

15  would be great to talk through our distribution and get your

16  thoughts."

17         Do you see that?

18  A.  Yes.

19  Q.  And then she gives you a lot of additional detail?

20         Do you see that?

21  A.  I see more information, yes.

22         MR. WEINGARTEN:  And then, Ms. Flint, can we go to the

23  very top header of this email chain.

24  Q.  You sent that exchange with Ms. Kirby to Mr. Shkreli,

25  correct?

1    A.  It seems that way off this document.

2    Q.  And you don't remember why -- let me strike that.

3            Mr. Shkreli wasn't employed at Vyera in September of

4    2017, correct?

5    A.  No, I don't believe so.

6    Q.  And Mr. Shkreli wasn't on the board of Vyera in

7    September 2017, correct?

8    A.  No.

9    Q.  And you don't remember why you forwarded this email to

10   Mr. Shkreli, correct?

11   A.  No.  I think I recall a bit of why I forwarded it to him.

12   Q.  You do recall now?

13   A.  Is there something counter to that?

14   Q.  Sir, I'm just asking you the question:  Do you or do you

15   not recall why you forwarded this to Mr. Shkreli?

16   A.  I do recall.

17   Q.  I see.

18           And at your deposition, sir --

19           MR. WEINGARTEN:  If you could please turn, Ms. Flint,

20   to page 240, line 24, to 241, line 11.

21   Q.  And the question was asked:

22   "Q.  Okay.  And my question is why did you forward -- do you

23   remember why you forwarded this email exchange between you and

24   Ms. Kirby to Mr. Shkreli?

25   "A.  I do not remember why, but I can say that my primary goal

1   was to learn the business as much as possible so that I could

2   do the job for our stakeholders as the best as possible, and

3   Martin knew the business quite well, and I wouldn't be

4   surprised if I was curious to see if he could work -- if his

5   input could help me get up the learning curve faster."

6            Do you see that?

7   A.  Yes.

8   Q.  That testimony was truthful when you gave it, right?

9   A.  Yes, but I don't see that contradicts my previous

10  statement.

11  Q.  Okay.  So you do recall why -- you don't remember why you

12  forwarded it, other than you were curious to get Mr. Shkreli's

13  input to help you get up the learning curve faster?

14  A.  That's what I can recall at this current moment.

15           MR. WEINGARTEN:  Let's take a look, Ms. Flint, please,

16  at Government Exhibit 1357.  And let's take a look at page 002,

17  please.

18           This is already in evidence as part of Government

19  Exhibit 9005.

20           Let's go back to the bottom of 001, just so we can get

21  the email header.  Thank you so much.

22  Q.  So on October 11th, you wrote again to Mr. Lau, and you

23  cc'd Mr. Mithani, right?

24  A.  That is what the document states, yes.

25  Q.  And you wrote to Mr. Lau, "Who are the wholesalers and what

LCKKFTC4                    Mulleady - Direct                    985

1    function do they have?  I worry that someone added more

2    complexity (and leakage) to the channel while we were gone.

3    Who can the wholesalers sell to?"

4            Do you see that?

5    A.  Yes, sir.

6    Q.  So you were inquiring of Mr. Lau now about your concerns

7    that there had been leakage in the channel.

8            Do you see that?

9    A.  Yes.

10   Q.  Does "the channel" refer to the mechanism through which

11   Vyera distributed Daraprim?

12   A.  I would assume so.  I'm not an expert in distribution, and

13   I probably was just repeating buzz words that I heard.

14   Q.  Do you think you heard the word "leakage" from Mr. Shkreli?

15   A.  I do not recall.

16          MR. WEINGARTEN:  You can take that one down, please,

17   Ms. Flint.

18   Q.  In October of 2017, around the same time as that email we

19   just looked at, you and Mr. Mithani directed Ms. Kirby to

20   establish a system for Vyera to be notified if anyone had

21   ordered five or more bottles of Daraprim, correct?

22   A.  If I heard you correctly, I thought that system was already

23   in place.  Would you mind repeating it, just so I'm answering

24   accurately?

25   Q.  Sure.

LCKKFTC4                    Mulleady - Direct                    986

1        In October of 2017, you and Mr. Mithani directed
2   Ms. Kirby to establish a system with one of the wholesalers to
3   notify Vyera of any orders of five or more bottles of Daraprim,
4   correct?
5   A.   I think that could be possible.  I believe there was
6   systems in place, but I think that they may have been expanded
7   with different distributors.
8   Q.   And Ms. Kirby sent you and Mr. Mithani periodically reports
9   about any orders for five or more bottles of Daraprim, correct?
10  A.   I don't recall too many reports about five or more bottles
11  because it was very rare, but we did receive reports
12  periodically.
13  Q.   Okay.  Ms. Kirby would send to you and Mr. Mithani
14  information when someone had ordered five or more bottles of
15  Daraprim, correct?
16  A.   I believe I received some of those emails, but I don't know
17  if I would receive all of them as a standard operating
18  practice.
19  Q.   And in April of 2018, Ms. Kirby told you that she was
20  working with Vyera's distributors, Cardinal and ASD, to go
21  further and find a way to block or approve particular orders
22  for Daraprim, correct?
23  A.   I wouldn't be able to confirm that without having
24  documentation to reference.
25  Q.   Okay.

**A-2046**

1          MR. WEINGARTEN:  Ms. Flint, please take a look and put

2    on the screen 1388, Government Exhibit 1388.  Thank you.

3    Q.  It's a little bit confusing — the format, sir — but do you

4    see at the top, it says, "Type:  Instant Message"?

5    A.  I do, yes.

6    Q.  And then --

7          MR. WEINGARTEN:  You can take that --

8    Q.  It says "From" and a phone number, "Anne Kirby."

9          Do you see that?

10   A.  Yes, sir.

11         MR. WEINGARTEN:  I'm sorry.  I'll just state for the

12   record, this is already in evidence as part of Government

13   Exhibit 9005.

14         You can take down that zoom.

15         And if you would look, Ms. Flint, where it says "body

16   and source and timestamp," can you get those three rows,

17   please?  Thank you.

18   Q.  The body of the message says:  "No worries!  Thanks for

19   update!  Talked to Cardinal Specialty and ASD and told them

20   they need to find a way we can approve or block orders.  Optime

21   Care WebEx scheduled Monday."

22         And the source application here is iMessage —

23   Kevin.Mulleady@gmail.com.

24         Do you see that?

25   A.  Yes.

A-2047

LCKKFTC4                        Mulleady – Direct                        988

1   Q.  This is an instant message from Ms. Kirby to you, correct?

2   A.  Yes, it seems that way.  I'm not very familiar with this

3   format, but it does look like the type was instant message, and

4   I have the source application as recipient.  It does seem that

5   it came to my iMessage, which is an email, which is odd, but it

6   was a communication.  I can confirm that based on this

7   document.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCKMFTC5                    Mulleady – Direct                    989

1    Q.  Ms. Kirby communicated to you that she had talked to

2    Cardinal Specialty and ASD about how to block or approve orders

3    for Daraprim, right?

4    A.  That's what the document states, yes.

5    Q.  And Cardinal Specialty and ASD were two of Vyera's

6    distributors for Daraprim?

7    A.  Yes, I believe that's accurate.

8    Q.  You had some other messages with Ms. Kirby on April 6 that

9    I want us to take a look at.

10              MR. WEINGARTEN:  Ms. Flint, could you back that back

11   down and pull up Government Exhibit 1633.  This is already in

12   evidence also as part of Government Exhibit 9005.  Ms. Flint,

13   could you go to page 002, please.

14   Q.  This is a little bit more familiar format for some text

15   messages, right, Mr. Mulleady?  Let's take a look starting from

16   the top.  You see the first message there from the 212 number.

17   It's dated April 6, same day as the message we were just

18   looking at.  Do you see that?

19   A.  Yes.

20   Q.  6:58 in the morning.  It says please call me ASAP.  That

21   number.  The 212 number, that's Ms. Kirby's number, right?

22   A.  No.

23              MR. WEINGARTEN:  Let's take a look, sir, Ms. Flint, if

24   we could, at Government Exhibit 10032-014.  Let's start with

25   Government Exhibit 0132-001.

1   Q.  You submitted to interrogatory responses in this case,

2   correct, sir?

3   A.  Yes.

4   Q.  I'm sorry, Mr. Mulleady.  The 212 number.  That's your

5   number, isn't it, sir?

6   A.  It is.

7   Q.  Let's go back then to 1633-002.  I apologize.

8           Let's start again.

9           The 212 number is your number, right, sir?

10  A.  Yes.

11  Q.  The 917 number in this list, that's Ms. Kirby's number,

12  right?

13  A.  Does it say that somewhere?  I don't have her number

14  memorized.

15  Q.  I guess we will have to do it again.  Let's go back to

16  Government Exhibit 0132-014.  Do you see five rows down Ms.

17  Kirby is listed there in the interrogatory response?

18  A.  Yes, sir.

19  Q.  You identified in your interrogatory response Ms. Kirby's

20  cell phone number?

21  A.  Yes.

22  Q.  Is that the phone number that's listed on Government

23  Exhibit 1633?

24  A.  Yes.

25  Q.  Let's go back to 1633.

LCKMFTC5                    Mulleady - Direct                    991

1    A.  Pardon me.  I wasn't trying to be complicated.

2    Q.  I understand.  I was not.  You wrote to Ms. Kirby, please

3    call me ASAP at 6:58 in the morning on April 6?

4    A.  That's what the document states, yes.

5    Q.  Then also at 6:58 you also emphasized please call me ASAP,

6    right?

7    A.  Yes.

8    Q.  At 7:30 you told her you were in the office and she had she

9    would be there shortly?

10   A.  I believe --

11   Q.  Ms. Kirby said I'm in the office.  You said:  I'll be there

12   shortly.  Then Ms. Kirby writes at 5 p.m. that day.  I hope you

13   enjoy Starbucks.  She follows up again at 8:41.  Please tell me

14   your coffee run was successful.  Then you finally get back to

15   her at 9:07 and you say:  Sorry for delay.  All good.  Meeting

16   in the morning at Starbucks.  She writes back:  No worries.

17   Thanks for the update.  Then comes her message that we looked

18   at before about approving her blocking orders, right?

19   A.  Yes.  That's what the document states.

20   Q.  So you and she are talking about a Starbucks run on April

21   6, 2018.  And then after you tell her it's all good, she brings

22   up the topic of blocking orders, right?

23   A.  That's what the document states, yes.

24   Q.  And the coffee run that you were discussing on April 6 with

25   Ms. Kirby was your trip to Starbucks to repurchase five bottles

**A-2051**

LCKMFTC5                    Mulleady - Direct                    992

1   of Daraprim from Mr. Satya Valiveti, correct?

2   A.  I can't say specifically.  I don't know the date off the

3   top of my head.  But I have no reason to dispute it.

4          MR. WEINGARTEN:  Let's take a look, please, Ms. Flint,

5   Government Exhibit 3004.

6   Q.  I want to refresh your recollection, sir.

7   A.  Thank you.

8          MR. WEINGARTEN:  Ms. Flint, you can highlight that.

9   Q.  Don't read it out loud, sir.  Look at it to yourself.  Look

10  at especially the date and who it is to.  Let me know when

11  you've had a chance to look at that.

12  A.  I've looked at it, Mr. Weingarten.

13  Q.  Does that refresh your recollection about the date on which

14  you were going to meet Mr. Valiveti?

15  A.  Yes, it does.  Thank you.

16  Q.  The date you were going to meet Mr. Valiveti about the five

17  bottles of Daraprim was April 6, 2018?

18  A.  On or around, I would assume.  I am not sure if we actually

19  met that day.

20          MR. WEINGARTEN:  You can take that down, please,

21  Ms. Flint.

22  Q.  Now, Ms. Kirby had alerted you that Mr. Valiveti of

23  Reliant -- strike that.

24          MR. WEINGARTEN:  Let's introduce Government Exhibit

25  1379.

A-2052

1   Q.  Do you see the first e-mail there?

2           MR. WEINGARTEN:  Highlight the whole thing, if you

3   don't mind.  Ms. Flint, can we do the bottom e-mail, please,

4   from Sandy.

5   Q.  That's an e-mail from Sandy to Ms. Kirby.  It's subject to

6   is request for approval to purchase.  Do you see that?

7   A.  Yes, I do.

8   Q.  It's signed by Mr. Satya Valiveti of Reliant Specialty.

9   You see that?

10  A.  I see his digital signature, yes.

11          MR. WEINGARTEN:  Now, Ms. Flint, can we go to the top

12  e-mail header.

13  Q.  Ms. Kirby forwarded that to you and Mr. Mithani?

14  A.  Looks that way, yes.

15          MR. WEINGARTEN:  Move to introduce Government Exhibit

16  1379, your Honor.

17          THE COURT:  Received.

18          (Government Exhibit 1379 received in evidence)

19  Q.  Let's take a look at what Mr. Valiveti wrote to Ms. Kirby,

20  that bottom e-mail.  Mr. Valiveti is asking for approval to buy

21  five bottles of Daraprim on January 3, 2018, correct?

22  A.  It seems that way, yes.

23  Q.  If we go to the top header and the top e-mail, Ms. Kirby

24  forwarded that to you and Mr. Mithani, correct?

25  A.  It seems that way, yes.

1  Q.  She says:  Please see forwarded request from Reliant

2  Specialty.  She gave you a website.  You see that?

3  A.  Yes.

4  Q.  You don't recall any response to this request from

5  Mr. Valiveti to purchase Daraprim RLD, correct?

6  A.  I'm sorry, Mr. Weingarten.  Could you ask that one more

7  time.

8  Q.  Sure.  You don't recall any response to this e-mail request

9  from Mr. Valiveti about purchasing some Daraprim RLD, right?

10  A.  As I sit here, no, I do not recall that.  But I don't know

11  if it means that didn't happen.

12  Q.  But you do recall clicking on that link that Ms. Kirby

13  forwarded to you.  Do you remember that?

14  A.  Do I recall the actual action of clicking on that link?

15  No.  But I do remember seeing an image about the Reliant

16  Specialty, I think -- that that had them based in a strip mall

17  or something along those lines.  I'm not sure exactly which

18  link that was or what I clicked.

19  Q.  Let me turn you, sir, if we could, in your deposition, to

20  page 256 of your deposition, lines 11 to 20.  See if this

21  refreshes your recollection.  It says:  No.

22        MR. WEINGARTEN:  Can we do lines 11 to 20, Ms. Flint.

23  Q.  Take a look at that, sir.  Let me ask you if that refreshes

24  your recollection that you clicked on the link.

25  A.  I don't know if I would use the terminology of refreshing

1    my recollection.  In all due respect, I recalled potentially

2    clicking it and seeing a picture of a mini mall.  This seems to

3    confirm my recollection.

4    Q.  Let's take a look at the website then.

5          MR. WEINGARTEN:  Can we please look at Government

6    Exhibit 4064.  This is already in evidence.

7    Q.  This is a screenshot of Reliant's website and it's the same

8    link that Ms. Kirby sent you.  If you look at the bottom of

9    page there, where it says HTTP, you see that?

10   A.  Yes, I do.

11   Q.  It says in big letters in blue, we supply innovator

12   products/reference listed drugs.  You see that?

13   A.  Yes.

14   Q.  If you look under our services, the box on the bottom left,

15   it says:  Pharmaceutical innovator products/reference listed

16   drugs for the development of bio similar and abbreviated new

17   drug applications.  Procurement of innovator products/reference

18   listed drugs in large quantities for bioequivalence and

19   clinical trials.  Do you see that?

20   A.  Yes.

21   Q.  According to Reliant's website, Reliant provides RLD to

22   companies doing bioequivalence studies, right?

23         MR. POLLACK:  Your Honor -- sorry, your Honor.  Never

24   mind.  No problem.

25   Q.  Ms. Kirby sent you that link on January 3, 2018.  Let's

1    fast forward to April.  You had concerns when you learned that

2    a company called CentraState had purchased five bottles of

3    Daraprim, right?

4    A.  I believe concerns were brought to my attention, if I

5    recall correctly.

6    Q.  And you testified in your direct examination that you

7    decided to further investigate the CentraState purchase?

8    A.  I have no reason to disagree with that.

9    Q.  And you learned that Satya Valiveti might be the purchaser?

10   A.  Sounds accurate, yes.

11   Q.  And you learned that Mr. Valiveti owned Reliant, which was

12   affiliated with CentraState, correct?

13   A.  I don't know if I ever learned of organizational structure

14   and ownership, but I learned of an affiliation.

15   Q.  So you learned that Reliant and CentraState had an

16   affiliation?

17   A.  An affiliation too.

18   Q.  Reliant and CentraState had an affiliation with each other,

19   correct?

20   A.  Being Satya.  Sandy is his name.  Agree.  I agree to that.

21   Q.  In your direct testimony that you submitted to the Court

22   earlier today, you omitted any mention of Reliant's services

23   procuring reference listed drug for use in bioequivalence

24   testing, correct?

25   A.  I am not sure.  I don't have the document in front of me

LCKMFTC5                    Mulleady – Direct                    997

1    and I haven't went over it thoroughly or have it memorized.

2    Q.  I'm sorry.  I didn't catch that last part, sir.

3    A.  I have it memorized.  I will try to get a little closer to

4    you.

5    Q.  I appreciate you said you didn't go over it thoroughly, but

6    you did read it accurately before you signed it.  You did read

7    it thoroughly before you signed it, correct?

8    A.  Maybe thoroughly wasn't an appropriate -- I don't have it

9    memorized.

10   Q.  But you stand by the testimony, is that right?

11   A.  Yes, sir.

12   Q.  Let's talk about some details of the repurchase that were

13   not in the direct testimony.  Now, you testified that Vyera

14   agreed to pay Mr. Valiveti twice for what he had paid for the

15   five bottles, right?

16   A.  I don't believe that's fully accurate.  I believe, if I

17   could expand on it.

18   Q.  Let's take a look, if we could, at your written direct.

19   It's page 28, paragraph 83.

20          Would you like a copy, sir, of your written direct

21   testimony?

22   A.  Sure.  I think I have it here.  I thought it was going to

23   be pulled up on the screen.

24   Q.  We are getting there.  Your written direct testimony, on

25   page 28 of your written direct.  It's 545.

LCKMFTC5                    Mulleady – Direct                    998

1   A.  Yes, I'm there.

2   Q.  You see in the second sentence:  Mr. Valiveti offered.  You

3   see that sentence, sir?

4   A.  Yes.

5   Q.  Your testimony on direct was, Mr. Valiveti offered to sell

6   the bottles to Vyera for twice the amount he paid, and we

7   agreed to that price.  Do you see that?

8   A.  Yes.

9   Q.  So that was truthful and accurate when you gave that

10  testimony, correct?

11  A.  Yes.  What had changed, which I was hoping to expand on, I

12  have seen since then that people have paid higher prices than

13  that, and I think this might be an assumption that Mr. Valiveti

14  paid the wholesale price of $75,000, but I don't know if that

15  was specifically confirmed to me.

16  Q.  In your direct testimony you say you don't have a specific

17  recollection of the details of the payment to Mr. Valiveti or

18  being involved in that payment.  Do you remember that?

19  A.  Yes.  That sounds accurate.

20  Q.  In your role as CEO of Vyera at the time you would have

21  approved a payment of that size, correct?

22  A.  I believe so, yes.

23  Q.  And you didn't negotiate the price with Mr. Valiveti,

24  correct?

25  A.  I don't believe there is much negotiation.

LCKMFTC5                    Mulleady – Direct                    999

1  Q.  He asked for $750,000 and you agreed, right?

2  A.  Yes.  I believe that's accurate.

3  Q.  After the payment was made, you met with Mr. Valiveti at a

4  Starbucks parking lot to reacquire the five bottles of

5  Daraprim, is that right?

6  A.  I met with Mr. Valiveti at a Starbucks.

7  Q.  You met him at his car in the Starbucks parking lot?

8  A.  After having coffee in the Starbucks.

9  Q.  Mr. Valiveti handed you the five bottles of Daraprim in a

10  Fed Ex envelope?

11  A.  Yes.

12  Q.  And you handed Mr. Valiveti a repurchase and collaboration

13  agreement, correct?

14  A.  I handed him an agreement.  I'm not exactly sure what type.

15       MR. WEINGARTEN:  Let's take a look at Government

16  Exhibit 1135, please.

17  Q.  This is a document entitled product purchase and

18  collaboration agreement by and among Vyera Pharmaceuticals AG,

19  CentraState, another entity and Reliant Pharmacy.  Do you see

20  that?

21  A.  Yes.

22  Q.  This is a copy of the repurchase contract that you handed

23  to Mr. Valiveti in the Starbucks parking lot, correct?

24  A.  I don't have a reason to dispute that.  I don't know if

25  there was variations.  It would be helpful to be able to

LCKMFTC5                    Mulleady - Direct                    1000

1    confirm the date.

2              MR. WEINGARTEN:  Your Honor, we move to admit

3    Government Exhibit 1135.

4              MR. POLLACK:  Your Honor, I don't think he has

5    identified it as authentic, that he didn't recognize it.

6              THE COURT:  Didn't this come in already?

7              MR. WEINGARTEN:  Another version of it came in with

8    Mr. Valiveti, your Honor.  I wanted the one from Vyera's files.

9              THE COURT:  You may inquire further.

10   Q.  Let's take a look, sir, if I can refresh your recollection.

11   Let's go to your deposition, page 265, line -- 265, line 23 to

12   266-4.

13             MR. WEINGARTEN:  I'm sorry to do this to you,

14   Ms. Flint.  265, line 11 to 266-4.  266-21.  Sorry.  265-21 to

15   266-4, please.  Thank you.

16   Q.  Take a look at line 21 through the bottom, sir, where it

17   starts with OK.  It says:

18   "Q.  OK.  So do you have 1135 open?

19   "A.  I do, yes.

20   "Q.  And is this the document that you were referring to when

21   you were talking about an agreement setting forth the terms of

22   the repurchase of the Daraprim from CentraState?

23   "A.  I do not have a reason to believe that it is not."

24             I move to admit the exhibit, your Honor.

25             MR. POLLACK:  Your Honor, that's not a definitive

LCKMFTC5                    Mulleady – Direct                    1001

1   identification of the document.

2          THE COURT:  If there is a basis to believe that this

3   is not the authentic document produced by Vyera, that will be

4   very important to know, but this would otherwise be sufficient

5   to admit the document.

6          It's admitted.  Overruled.

7          (Government Exhibit 1135received in evidence)

8   Q.  Let's go back to 1135 then briefly.  The title of the

9   document is product purchase and collaboration agreement,

10  right?

11  A.  Yes, sir.

12  Q.  And let's turn to page 002, please.  If you look at section

13  2, it says repurchase Daraprim inventory.  You see that?

14  A.  Yes.

15  Q.  There is a reference to repurchasing five bottles of

16  Daraprim held by CentraState Freehold and/or Reliant for

17  $750,000, right?

18  A.  That's what the documents states, yes.

19  Q.  It is also called a collaboration agreement because the

20  document proposed future collaboration with Reliant, right?

21  Let's take a look at section 4, please.

22  A.  Thank you.

23  Q.  Same page, future collaboration.  The document that you

24  handed Mr. Valiveti also proposed a future collaboration among

25  Vyera and Reliant and CentraState, right?

LCKMFTC5                    Mulleady - Direct                    1002

1    A.  That's what the document states, yes.

2            MR. WEINGARTEN:  You can take that down, please,

3    Ms. Flint.

4    Q.  In August of 2019, you had a conversation with Mr. Shkreli

5    while he was incarcerated in which he suggested tightening that

6    bottle limit from five even further to one bottle.  Is that

7    right, sir?

8    A.  Yes.  As I sit here today, after reviewing transcripts.

9    Q.  And that also occurred during a conversation when you were

10   talking about Mr. Frank Della Fera?

11   A.  I am not sure from memory.  I could look at a document, if

12   you would like, but I have no reason to dispute it.

13   Q.  Let's take a look at Government Exhibit 3088, please.  This

14   one is already in evidence as part of Government Exhibit 9001.

15   It's another transcript of a telephone call between you and

16   Mr. Shkreli, dated August 5, 2019.

17           MR. WEINGARTEN:  Ms. Flint, could you please turn to

18   002, which is transcript page 6.  Strike that.  003, transcript

19   page 6.  It's transcript page 6, lines 2 to 4.  Let's start at

20   the top.

21   Q.  Mr. Shkreli says to you:  But nothing big.  Nothing bad but

22   interesting.  You heard about this Frank Della Fera.  You

23   respond:  Yeah.  Mr. Shkreli says:  So what do you think?  Then

24   you tell him:  I am going to have -- the person who actually

25   introduced me to him in the past -- and he's one of these guys

A-2062

1    that's always networking and he keeps his ear to the ground.

2    Then you and Mr. Shkreli talk about who it might be.  At the

3    bottom you say:  I am going to have lunch.

4            MR. WEINGARTEN:  And let's carry on to the next page,

5    please, page 7 of the transcript.

6    Q.  You tell Mr. Shkreli:  I am going to have lunch with him

7    and just see kind of where his deal is because it's all -- the

8    timing is really kind of consistent from when he acquired or if

9    he ever did acquire RLD.  I am trying to get a better

10   understanding of when that's going to happen.  I think that --

11   well, with the timing and everything, he really would have had

12   to kind of -- while we were in conversations with him in the

13   past, if you remember, and it just didn't work out, he would

14   have really had to have acquired it pretty much a month or two

15   after that.

16           The it you're talking about, the acquired it, that's

17   RLD of Daraprim, sir?

18   A.  I do not recall, but it seems that's what the document is

19   alluding to.

20   Q.  Let's look at the next paragraph:  And I don't think he did

21   for it to be a threat, I think, in the next couple months, if

22   I'm doing the timing correctly.  So I want to do a little bit

23   of diligence on it.  But you know he's obviously invested in

24   it.  I mean, he's pursuing it.  Is the he there Mr. Della Fera?

25   A.  Same as before.  I don't recall specifically, but that's

LCKMFTC5                        Mulleady – Direct                        1004

1    what the document alludes to.

2    Q.  It looks like he is going to be coming to market.  It's

3    probably a matter of time, unless he can never acquire --

4    unless he has issues acquiring what he needs for the BE.  BE

5    there means bioequivalence?

6    A.  I don't recall specifically, but BE is used as an

7    abbreviation for bioequivalence.

8              MR. WEINGARTEN:  Let's turn to pages 9 and 10 of the

9    transcript, please, Ms. Flint.  I think it's page 4 on the GX

10   number.  Transcript page 9, line 20 to 10-6.

11   Q.  Mr. Shkreli is talking to you starting on line 13.  I want

12   to direct to you line 20.  Mr. Shkreli starts at the end of

13   that sentence saying:  So, you know, the company should, in my

14   opinion -- the company should, you know, just make sure it

15   really doesn't sell more than one bottle at a time, you know.

16   That would be -- you say mm-hmm.  Mr. Shkreli continues:  The

17   number one thing I would do and just really carefully screen

18   every doctor that you know.  Even if it drops sales a little

19   bit, it's a good -- you know, really make sure he's not getting

20   his hands on anything.  I think that's probably the best way to

21   do it.  And then, you know, you can even sort of lob in a call

22   to him and say, do you guys -- do you want to buy RLD, you

23   know.

24              Do you see that?

25   A.  Yes.

LCKMFTC5                    Mulleady - Direct                    1005

1   Q.  As part of your conversation with Mr. Shkreli about Mr.

2   Della Fera and acquiring Daraprim RLD, you're talking about

3   increasing the limits on bottles to one bottle per order,

4   right?

5   A.  Are you asking me if I was talking about that.

6   Q.  You and Mr. Shkreli are having a conversation about that,

7   right?

8   A.  I'm listening to him talk about it.

9               MR. WEINGARTEN:  You can take that down, please.

10  Q.  I want to talk to you a little bit about data blocking.

11  Mr. Mulleady, you directed Ms. Kirby to -- strike that.  You

12  agree that generics would be more interested in Daraprim if IMS

13  data showed more sales for Daraprim, right?

14  A.  Sorry.  One more time, Mr. Weingarten.

15  Q.  Sure.  You agree that generic companies would be more

16  interested in Daraprim if the IMS sales data showed larger

17  sales for Daraprim, right?

18  A.  Yes.

19  Q.  And you executed an agreement with Cardinal Health to

20  implement a data block on Daraprim's sales data, right?

21  A.  Who was the other party?

22  Q.  Cardinal.  I don't mean to cut you off, but let's take a

23  look at Government Exhibit 1178, please.  This is already in

24  evidence as part of Government Exhibit 9002.  Is that an

25  amendment to a specialty pharmaceutical distribution agreement,

LCKMFTC5                    Mulleady - Direct                    1006

1   sir?

2   A.  Yes, it looks that way.

3   Q.  If you look at the bottom right, is that your signature,

4   sir?

5   A.  Yes, sir.

6   Q.  On behalf of Turing Pharmaceuticals?

7   A.  Yes.

8   Q.  If you go to the page 002, Ms. Flint, number 4 is data

9   blocking fee, right?

10  A.  Um-hum.

11  Q.  So you executed an agreement with Cardinal Health with

12  respect to data blocking, right?

13  A.  Looks that way, yes.

14        MR. WEINGARTEN:  Let's take that down, please.

15  Q.  I want to talk to you briefly about API, sir.  You know API

16  stands for active pharmaceutical ingredient, right?

17  A.  Yes.

18  Q.  The generic that wants to submit an ANDA has to secure an

19  API source?

20  A.  Yes.  I believe that's accurate.

21  Q.  Your direct testimony -- strike that.  There was a company

22  that supplied API called Fukuzyu, right?

23  A.  Yes.

24  Q.  Your direct testimony is that you were not involved in the

25  negotiation, execution, or approval of the supply agreement

LCKMFTC5                    Mulleady - Direct                    1007

1   between Fukuzyu and Vyera, right?

2   A.  I could say that I do not recall that.  I do not have the

3   direct testimony memorized.  I could have a look at it, if you

4   would like that confirmation.

5           MR. WEINGARTEN:  Let's look at DX-545, please, page

6   12, paragraph 40.

7   Q.  You see the last sentence there:  As a result, I was not

8   involved in the negotiation, execution, or approval of the

9   supply agreement between Vyera and Fukuzyu.  You see that?

10  A.  Yes.

11  Q.  So that's your direct testimony to this court, right?

12  A.  Yes, sir.

13  Q.  Now, in August of 2018, however, you actually went to Japan

14  to personally establish a relationship with Fukuzyu, correct?

15  A.  Sounds accurate.  I did go to Japan.  I just don't know the

16  exact date off the top of my head.

17  Q.  You did go to Japan to establish a relationship personally

18  with Fukuzyu, right?

19  A.  To get to know them.  I don't know if it was to establish a

20  relationship, but we did go there to visit him.

21  Q.  You told senior management at Vyera that you were "taking

22  point on this part of the project" with Fukuzyu, right?

23  A.  I would need to know what part of the project that is to be

24  able to answer that.

25  Q.  You worked, sir, on making sure that Fukuzyu's supply

LCKMFTC5                    Mulleady – Direct                    1008

1    contracts with any other manufacturers precluded sales of API

2    for human use in the United States?

3    A.  Did I work to preclude that?

4    Q.  Did you work on making sure that Fukuzyu didn't sell API

5    for human use in the United States to anyone else?

6    A.  I believe those contracts were already in place.

7    Q.  Let's look at Government Exhibit 1674, please.  This is

8    already in evidence as part of Government Exhibit 9005.  These

9    are e-mails between you and Mikio Arisawa.  You see that?

10   A.  Yes.

11   Q.  Ms. Arisawa either worked for or represented Fukuzyu,

12   right?

13   A.  He was our translator.

14        MR. WEINGARTEN:  Let's go to page 002, please.

15   Q.  The first e-mail that starts this chain, Arisawa writes in

16   the second paragraph:  FKZ informed me about the development of

17   the business with Pegasus.  It received a letter from Pegasus

18   saying Pegasus Laboratories, Inc. confirmed the only use of

19   pyrimethamine by the company is in the animal health market.

20   Pegasus Laboratory, Inc. does not sell pyrimethamine or use

21   pyrimethamine in any finished products for human health use.

22   Mr. Arisawa says:  I think this agreement removes the

23   uncertainty of the use of pyrimethamine by Pegasus.

24        Do you see that?

25   A.  Yes.

LCKMFTC5                    Mulleady - Direct                    1009

1           MR. WEINGARTEN:  Let's go to the previous page, 001.

2    Q.  You say at the bottom e-mail in response:  Thank you for

3    sending over and please thank FKZ for promptly inquiring.  I

4    agree this letter removes the uncertainty of the use of

5    pyrimethamine by Pegasus.  Do you think it will be too much to

6    ask FKZ to ask Pegasus to sign an agreement stating they will

7    continue to operate in this manner in the future.  We would be

8    more than happy to draft an agreement for FKZ's review.

9           Do you see that?

10   A.  Yes.

11   Q.  Then Mr. Arisawa responded above:  Dear Kevin, FKZ agreed

12   to modify its contract with Pegasus to add the term to restrict

13   the use of FKZ's API.  You see that?

14   A.  Yes.

15   Q.  Let's go to the very final e-mail from you.  You write back

16   to Mr. Arisawa:  That is great.

17          You were in fact communicating with ensuring that

18   Fukuzyu had restrictions in place on sale of API in the United

19   States for human use, right?

20   A.  I was enforcing agreements that were already in place with

21   the organization and making sure they were documented

22   appropriately.

23   Q.  Those agreements were about restricting Fukuzyu's sales of

24   API pyrimethamine in the United States for human use, right?

25   A.  We had an exclusive agreement with Fukuzyu to provide us

A-2069

LCKMFTC5                    Mulleady - Direct                    1010

1  with API.

2  Q.  Let's talk about RL Fine.

3         MR. WEINGARTEN:  Ms. Flint, could you take that down,

4  please.

5  Q.  Now, in August of 2017, you received a report from a

6  company called Pennside Partners.  Do you remember that?

7  A.  I have received reports from Pennside Partners, yes.

8  Q.  Pennside is an intelligence -- competitive intelligence

9  consultant that Vyera has hired from time to time?

10  A.  I am not sure of their complete business model, but that is

11  one of the services they provide, to my understanding.

12  Q.  And Vyera retained Pennside to produce reports about the

13  competitive landscape for Daraprim?

14  A.  Yes.  Prior to -- I didn't have those in place, but they

15  were there.

16  Q.  And Pennside informed Vyera that it had contacted RL Fine

17  to determine if they had taken steps to file a U.S. DMF and

18  make pyrimethamine API available to a U.S. generic firm, right?

19  A.  As I sit here today, after recently reviewing one of those

20  Pennside reports, I believe that is accurate.

21  Q.  And you had conversations at Vyera about RL Fine maybe

22  filing a DMF in the United States for pyrimethamine, right?

23  A.  Sorry.  One more time, Mr. Weingarten.

24  Q.  Yup.  You had conversations at Vyera about RL Fine filing a

25  DMF in the United States for pyrimethamine, right?

LCKMFTC5                    Mulleady – Direct                    1011

1   A.  I don't recall specifically.

2   Q.  Maybe I'll refresh your recollection.  Do you think it

3   would refresh your recollection if you looked at deposition

4   testimony on that subject?

5   A.  I don't see why it wouldn't if it states that.

6   Q.  Let's take a look at deposition, page 176, line 25 to

7   177-12.  Read that to yourself, please.

8   A.  What were the lines again, please?

9   Q.  The whole thing that's on the screen, line 25, page 176 to

10  page 177-12.

11  A.  Thank you.

12  Q.  Does that refresh your recollection, sir, about having had

13  conversations about RL Fine's ability to file a DMF for

14  pyrimethamine in the U.S.?

15  A.  This document says that I do not recall specifically.

16  Q.  The last line, sir, read it to yourself.  Does that refresh

17  your recollection that you had those conversations?

18  A.  I don't recall specifically having those conversations, and

19  I think here I am stating that RL Fine was a company that was

20  on our radar screen prior to my being CEO and chairman and we

21  could be Vyera.  It's a little bit unclear from this document,

22  so I can't say with full confidence.

23  Q.  Is it your testimony, sir, that you did not have

24  conversations?

25  A.  No.  My testimony is, I'm uncertain.

LCKMFTC5                        Mulleady - Direct                    1012

1            MR. WEINGARTEN:  You can take that down.

2   Q.  You subsequently reached out to RL Fine about RL Fine

3   supplying pyrimethamine API to Vyera, correct?

4   A.  I did, along with many others and amongst other topics.

5   Q.  Mr. Mithani, in the summer of 2017, e-mailed RL Fine and

6   said Vyera was interested in pyrimethamine API, correct?

7   A.  That sounds accurate, yes.

8   Q.  Let's take a look at Government Exhibit 1104.  This is an

9   e-mail chain involving Mr. Mithani, you, a Mr. Ramachandra of

10  RL Fine, and Mr. Shkreli, right?

11  A.  It looks that way, yes.

12  Q.  The subject is antimalarial APIs?

13  A.  Yes.

14            MR. WEINGARTEN:  Your Honor, move to admit Government

15  Exhibit 1104.

16            THE COURT:  Received.

17            (Government Exhibit 1104 received in evidence)

18  Q.  Let's look at page 002.  You see that first e-mail from

19  Mr. Mithani.  He is writing to RL Fine and CCs you.  You see

20  that?

21  A.  Yes.

22  Q.  He says in part:  We are interested in sulfadoxine and

23  pyrimethamine APIs, among other ones.  You see that?

24  A.  Yes.

25  Q.  Let's go up to the next e-mail.  Mr. Mithani follows up.

Case 22-728, Document 100, 12/28/2022, 3442426, Page295 of 302

A-2072

1    He says:  Hello.  Just wanted to follow up.  We are excited to

2    explore working with RL Fine.  You see that?

3    A.   Yes.

4    Q.   Let's go to page 001.  See what RL Fine says.

5    Mr. Ramachandra of RL Fine writes back to you and Mithani says:

6    Thanks for the mail.  Let us know if the dosage is a

7    combination drug and the requirement so that we can comment

8    further.

9              Then let's see the e-mail about that.  Actually, you

10   see that little forward there, that whole thing there, you see

11   at the bottom there, sir, on Thursday, August 24.  That

12   indicated that you forwarded that e-mail from Mr. Ramachandra,

13   right?

14   A.   Would it be possible to zoom out?

15   Q.   Yes.  There you go.

16   A.   The question was, it seems that I forwarded it?

17   Q.   Yes?

18   A.   Yes, it looks that way.

19   Q.   Then Mr. Shkreli has the e-mail and he says -- he writes a

20   statement there:  We are looking to purchase 10 to 20KG

21   annually of pyrimethamine API with a U.S. DMF.  You see that?

22   A.   Yes.

23   Q.   He sends that to you.  You see that?

24   A.   Yes.

25             MR. WEINGARTEN:  And then let's go zoom out, please.

LCKMFTC5                      Mulleady - Direct                    1014

1    Q.  You send that to Mr. Mithani, right?

2    A.  Here it says who I forwarded it to.  But below it doesn't

3    say that I forwarded it to.

4    Q.  You did send Mr. Shkreli's note to Mr. Mithani, right?

5    A.  It seems that way, yes.

6    Q.  Actually, first, you wrote to Mr. Shkreli before you

7    forwarded it:  We will keep you more on the loop on

8    communications.  You see that?

9    A.  Yes.

10   Q.  Then you forwarded that whole thing, the e-mail Mr. Shkreli

11   wrote, your comment about the loop, all of that, to

12   Mr. Mithani, right?

13   A.  Seems that way, yes.

14   Q.  Let's look at Government Exhibit 1129, please:  This is

15   another set of e-mails between you, Mr. Mithani and RL Fine,

16   right?

17   A.  Looks that way, yes.

18            MR. WEINGARTEN:  Move to admit Government Exhibit

19   1129.

20            THE COURT:  Received.

21            (Government Exhibit 1129 received in evidence)

22   Q.  Look at the bottom e-mail there from Mr. Mithani.  He

23   writes to Mr. Ramachandra, and he copied and pasted and

24   actually what Mr. Shkreli had sent to you, isn't that right?

25   A.  Looks that way, yes.

LCKMFTC5                    Mulleady – Direct                    1015

1     MR. WEINGARTEN:  Let's go up in the chain a little

2  bit, please, Ms. Flint.

3  Q.  What is Mr. Ramachandra's response?  He says:  Noted and

4  wish to inform you that we have already working on

5  pyrimethamine and would not be able to offer to you.

6     As of August 24, 2017, RL Fine told you they would not

7  be able to sell pyrimethamine API to Vyera, correct?

8  A.  Seems that way, but I don't know if there is something lost

9  in translation.  I don't know why if they are working on it

10  they wouldn't be able to offer, but it does say we would not be

11  able to offer, yes.

12  Q.  That's August 24, 2017.

13     MR. WEINGARTEN:  You can take that down, Ms. Flint.

14  Q.  After that date, you started some conversations with RL

15  Fine about supplying pyrimethamine to Vyera, right?

16  A.  Started or continued?

17  Q.  You had conversations with RL Fine after August 24 about

18  supplying pyrimethamine to Vyera, right?

19  A.  Yes.

20  Q.  And you spoke to a Mr. Jacob Mathew of RL Fine about

21  forming a relationship between Vyera and RL Fine?

22  A.  Yes.

23  Q.  And you approached RL Fine about becoming an exclusive

24  partner to supply API to Vyera?

25  A.  Amongst other things, yes.

LCKMFTC5                  Mulleady - Direct                    1016

1    Q.  But you don't remember the specific conversations about any

2    of the terms that you discussed with Mr. Jacob, right?

3    A.  One more time, please, Mr. Weingarten.

4    Q.  You don't remember any specific conversations about the

5    terms that were discussed with RL Fine, right?

6    A.  Any terms?

7    Q.  You don't remember any of the specific conversations about

8    the terms that were discussed, correct, sir?

9    A.  I don't know if that would be fair.

10   Q.  Let's take a look at page 197 of your deposition, pages

11   lines 14 to 22.

12   "Q.  And who -- I'm sorry.  I guess my question is, I am not

13   asking you to recall necessarily the terms of the agreement.

14   I'm asking if you recall any of the conversations that led to

15   the agreements where the terms were discussed.

16   "A.  Not specifically.  I can speak in general --

17   generalities."

18           That was your testimony, sir?

19   A.  I have no reason to believe that it wasn't.

20   Q.  Truthful and accurate when you gave it?

21   A.  Yes.

22   Q.  Let's take a look at Government Exhibit 1338, further along

23   into 2017.

24           MR. WEINGARTEN:  If you could go to page 002, please,

25   Ms. Flint.  This is already in evidence as part of Government

LCKMFTC5                    Mulleady - Direct                    1017

1    Exhibit 9001 as a text message and it says:  It's Shkreli.

2    Trying to get in touch with you urgently.  Hearing pyri ANDA

3    approval in December 2017.  That's dated October 25, 2017,

4    correct?

5    A.  Yes.

6    Q.  Then there is that 212 number.  That's you, right?

7    A.  Yes.

8    Q.  You write:  Hey, I believe you spoke to Akeel.  Feel free

9    to call me if you need to.  Right?

10   A.  That's what the document states, yes.

11   Q.  You had conversations with Mr. Shkreli about pyrimethamine

12   ANDAs while he was incarcerated, right?

13   A.  Yes.  I think that would be a fair statement.

14   Q.  Let's see.  That was October 25.  Let's go forward to

15   November 2.

16           MR. WEINGARTEN:  Let's put up GX-1130, please.  Let's

17   go to the very -- let's turn the page, please.

18   Q.  This is a series of e-mails between you and a Mr. Deepak

19   Mohan, correct?

20   A.  Yes, seems that way.

21   Q.  Mr. Mohan worked at a company called Mape Group, right?

22   A.  Yes.

23   Q.  Mape Group was the majority owner of RL Fine?

24   A.  I believe so.

25           MR. WEINGARTEN:  Your Honor, I move to admit

LCKMFTC5                    Mulleady – Direct                    1018

1    Government Exhibit 1130.

2           THE COURT:  Received.

3           (Government Exhibit 1130 received in evidence)

4    Q.  This e-mail that Ms. Flint has highlighted, let's take a

5    look at that whole thing.

6           On November 2, you write to Mr. Mohan:  Nice to

7    virtually meet you.  As previously discussed, we would like to

8    formalize our exclusive agreement with RL Fine chem for the

9    distribution of any and all pyrimethamine-based products.  Do

10   you see that?

11   A.  Yes.

12   Q.  As of November 2, you had already discussed an exclusive

13   agreement with RL Fine, right?

14   A.  That's what it would seem like, yes.

15   Q.  Now you are trying to formalize that discussion, right?

16   A.  Yes.  It seems that way.

17   Q.  At this point you are telling Mr. Mohan the terms are for

18   $1.2 million a year to be paid monthly and $250,000 to be paid

19   immediately upon execution of a term sheet, right?

20   A.  That is what this states, yes.

21   Q.  Then you also offered him a guarantee of a minimum of $1

22   million for other products and/or investments to RL Fine,

23   right?

24   A.  Seems that way, yes.

25   Q.  You can take that down.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-2078**

LCKMFTC5                    Mulleady – Direct                    1019

1      In fact, you flew to India in November 2017 and

2 discussed this e-mail with RL Fine in person, right?

3 A.  I believe so, yes.

4 Q.  So somehow between the e-mail we saw where they said, RL

5 Fine said no about supplying pyrimethamine, you got them to get

6 to a yes, right?

7 A.  Again, I'm a little bit confused by that first message of

8 why they said they couldn't do it, and I would also add to that

9 I don't know if it was a sole endeavor.  But if we are going to

10 go off the basis that they had said, no, which I am not sure if

11 I can agree with, and now they are saying yes, it seems that

12 their mind was changed and I would agree with that statement.

13 Q.  RL Fine changed its mind after you introduced a, quote,

14 more robust relationship as a concept, right?

15 A.  I and others, yes.

16 Q.  A more robust relationship meant signing an additional

17 product development agreement, for example, right?

18 A.  I believe -- I could be mistaken.  I believe it was a

19 collaboration agreement.

20 Q.  That was part of having a more robust relationship with RL

21 Fine?

22 A.  Amongst other things, yes.

23 Q.  And a more robust relationship ultimately meant more money

24 for RL Fine, right?

25 A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCKMFTC5                    Mulleady - Direct                    1020

1       MR. WEINGARTEN:  Let's take a look at Government

2   Exhibit 1108, please.  This is already in evidence as

3   Government Exhibit 9005.  Let's take a look at 002, please,

4   Mr. Flint.

5   Q.  You see that title, product collaboration agreement?

6   A.  Yes.

7   Q.  Those were your initials at the bottom along with someone

8   else's, right?

9   A.  Yes, sir.

10  Q.  Let's go to page 010, please.  You signed this one on

11  behalf of Vyera Pharmaceuticals?

12  A.  Yes.  That's my signature.

13  Q.  Let's take a look at 012, please.  That's the distribution

14  and supply agreement for pyrimethamine API, right?

15  A.  Yes.

16  Q.  And you again initialed every page of this agreement,

17  right?

18  A.  I can't say every page, but I have no reason to believe

19  that I didn't.

20  Q.  Let's make sure about your signature at least.

21      MR. WEINGARTEN:  On page 016, if we could turn to

22  that, Ms. Flint.  Let's go to the very end of this one.  Keep

23  going.  Keep going.

24  Q.  Those are all your initials at the bottom, right?

25  A.  Yes.