# 22-728

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆

FEDERAL TRADE COMMISSION, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF ILLINOIS, STATE OF NORTH CAROLINA, COMMONWEALTH OF VIRGINIA,

—against—

*Plaintiffs-Appellees,*

MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendant-Appellant,*

VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, KEVIN MULLEADY, individually, and as an owner and director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## VOLUME VIII OF VIII
### (Pages A-2080 to A-2300)

BRADLEY GROSSMAN
UNITED STATES FEDERAL
  TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
(202) 326-2424

*Attorneys for Plaintiff-Appellee
  Federal Trade Commission*

KIMO S. PELUSO
NOAM BIALE
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for Defendant-Appellant
  Martin Shkreli*

(*Counsel continued on inside cover*)

PHILIP LEVITZ
OFFICE OF THE NEW YORK STATE
  ATTORNEY GENERAL
28 Liberty Street, 15th Floor
New York, New York 10005
(212) 416-8000

*Attorneys for Plaintiffs-Appellees
  State of New York, State of
  California, Commonwealth of
  Pennsylvania, State of Illinois,
  Commonwealth of Virginia*

SHIRA HOFFMAN
ASSISTANT U.S. ATTORNEY
CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
300 South Spring Street, Suite 1702
Los Angeles, California 90013
(213) 269-6000

*Attorneys for Plaintiff-Appellee
  State of California*

DEREK MICHAEL WHIDDON
ASSISTANT ATTORNEY GENERAL
OHIO OFFICE OF THE
  ATTORNEY GENERAL
30 East Broad Street, 26th Floor
Columbus, Ohio 4321
(614) 466-2677

*Attorneys for Plaintiff-Appellee
  State of Ohio*

JOSEPH STEPHEN BETSKO, SR.
PENNSYLVANIA OFFICE OF
  THE ATTORNEY GENERAL
ANTITRUST SECTION
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-5393

*Attorneys for Plaintiff-Appellee
  Commonwealth of Pennsylvania*

SARAH A. HUNGER
DEPUTY SOLICITOR
ILLINOIS OFFICE OF THE
  ATTORNEY GENERAL
CIVIL APPEALS DIVISION
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601
(312) 814-5202

*Attorneys for Plaintiff-Appellee
  State of Illinois*

JESSICA VANCE SUTTON
NORTH CAROLINA DEPARTMENT
  OF JUSTICE
114 West Edenton Street
Raleigh, North Carolina 27603
(919) 716-0998

*Attorneys for Plaintiff-Appellee
  State of North Carolina*

SARAH OXENHAM ALLEN
LUCAS W.E. CROSLOW
MARTIN JORDAN MINOT
VIRGINIA OFFICE OF THE
  ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
(804) 786-6557

*Attorneys for Plaintiff-Appellee
  Commonwealth of Virginia*

# TABLE OF CONTENTS

PAGE

District Docket Court Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Amended Complaint, dated April 14, 2020 [Redacted] . . . . . . . . . . . . . . . . A-136

Defendant Kevin Mulleady's Answer and Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-222

Defendant Martin Shkreli's Answer with Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-289

Defendant Vyera Pharmaceuticals' Answer with Jury Demand,
    dated September 15, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-351

Joint Stipulation and Order to Amend the Relief Requested
    in the Pleadings, dated March 30, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . A-409

FTC's Motion for Leave to Withdraw the FTC's Prayer
    for Equitable Monetary Relief, dated May 26, 2021 . . . . . . . . . . . . . . . A-414

Order Dismissing the FTC's Claim for Disgorgement,
    dated June 2, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-419

Defendant Martin Shkreli's Pretrial Memorandum of Law [Redacted] . . . A-422

Plaintiff States' Supplemental Pretrial Memorandum of Law,
    dated October 20, 2021 [Redacted] . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-457

Joint Motion for Entry of Stipulated Order for Permanent Injunction,
    dated December 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-492

Stipulated Order for Permanent Injunction and Equitable
    Monetary Relief, dated December 7, 2021 . . . . . . . . . . . . . . . . . . . . . . . A-541

ii

PAGE

Written Testimony of Nicholas Pelliccione, Ph. D.,
dated October 18, 2021 ........................................... A-581

Written Testimony of W. David Hardy, M.D., dated October 20, 2021 .. A-593

Written Testimony of Frank DellaFera, dated October 18, 2021
[Redacted] ..................................................... A-631

Written Testimony of James R. Bruno, dated October 20, 2021
[Redacted] ..................................................... A-649

Written Testimony of Edward V. Conroy, dated October 20, 2021 ...... A-687

Written Testimony of Susan McDougal, dated October 15, 2021
[Redacted] ..................................................... A-725

Written Testimony of Abhishek Mukhopadhyay,
dated October 19, 2021 [Redacted] ............................... A-739

Written Testimony of Nilesh Patel, dated October 15, 2021
[Redacted] ..................................................... A-751

Written Testimony of Manish S. Shah, dated October 20, 2021 ........ A-766

Written Testimony of Martin Shkreli, dated October 15, 2021
[Redacted] ..................................................... A-785

Written Testimony of Anne Kirby, dated October 20, 2021 [Redacted] .. A-803

Written Testimony of Kevin Mulleady, dated October 20, 2021 ........ A-831

Written Testimony of Professor C. Scott Hemphill,
dated October 19, 2021 [Redacted] ............................... A-864

Written Testimony of Dr. Anupam B. Jena, dated October 20, 2021
[Redacted], with Attachments .................................... A-924

iii

PAGE

Written Testimony of John S. Russell, dated October 20, 2021
[Redacted], with Attachments .................................. A-1011

Consolidated (Full) Trial Transcripts,
dated December 14 to 20, 2021 ................................ A-1068

Defendant Martin Shkreli's Notice of Appeal, dated April 5, 2022 .... A-2298

LCKMFTC5                    Mulleady – Direct              1021

1   Q.  That's your signature at the end of the document on behalf

2   of Vyera, right?

3   A.  Yes.

4   Q.  This document said that RL Fine would not sell API anywhere

5   in the world other than India, pyrimethamine API to anyone else

6   anywhere in the world other than India, right?

7   A.  Could you say that one more time, please.

8   Q.  This document had an exclusivity provision, right?

9   A.  I believe so, yes.

10  Q.  In fact, let's just take a quick look.

11       MR. WEINGARTEN:  016, Ms. Flint, please.

12  Q.  You see the little (b) there, exclusivity?  You see that?

13  A.  Yes.

14  Q.  Do you understand that provision to mean that RL Fine won't

15  accept, with Vyera's consent, sell any pyrimethamine API

16  anywhere other than India?

17  A.  So this is added with the consent, and I would have to see

18  the definition of territory.

19  Q.  We can get to the definition of territory.

20       MR. WEINGARTEN:  Can you page up, Ms. Flint, to page

21  002.  Actually, strike that.  Can you go to 015.

22  Q.  Do you see the word territory is defined there, sir?

23  A.  Yes.

24  Q.  Territory means the world other than India?

25  A.  Yes.

LCKMFTC5                    Mulleady – Direct                    1022

1    Q.  The exclusivity was, without Vyera's consent, RL Fine won't

2    sell API anywhere other than India, right?

3    A.  Yes.  Without Vyera's consent.

4    Q.  Let's look a little bit at the payments.

5             MR. WEINGARTEN:  Can we go to 002, please.

6    Q.  Here at the bottom it says purchase price.  Vyera would pay

7    fair market value for any pyrimethamine API RL Fine sold,

8    right?

9    A.  I'm sorry again.  One more time.

10   Q.  Under the terms of the agreement, Vyera would pay fair

11   market value for any pyrimethamine API it bought from RL Fine,

12   right?

13   A.  Yes.

14   Q.  Let's go to the next page, 023.  Vyera also paid -- if you

15   would look to section 5.01, it says:  Payment upon execution.

16   Upon execution and delivery by the parties of this agreement,

17   Vyera pays RL Fine $1 million.  Do you see that?

18   A.  Yes.  Towards expenses for filing the U.S. DMF.

19   Q.  Vyera paid that before RL Fine did any work on the DMF,

20   right?

21   A.  I am not sure.

22   Q.  And you included that provision about $1 million upon

23   execution of the agreement because you thought it was necessary

24   to beginning the relationship with RL Fine, right?

25   A.  I think that's a fair statement, yes.

LCKMFTC5                    Mulleady – Direct                    1023

1   Q.  Meaning there were lots of parties out there that may have

2   wanted to work with RL Fine and Vyera wanted to stand out,

3   correct?

4   A.  I think that's fair, yes.

5   Q.  Money talks in business, so you paid a premium, right?

6   A.  I think that's fair, yes.

7           MR. WEINGARTEN:  Let's just look at the product

8   collaboration agreement, 003, please, Ms. Flint.  Another

9   payment.

10  Q.  Do you see section 4, payment upon execution?

11  A.  Yes.

12  Q.  Here too, sir, upon execution and delivery by the parties

13  of this agreement, the company pays provider, that is, Vyera

14  pays RL Fine another million dollars as a nonrefundable

15  payment, right?

16  A.  Yes.

17          MR. WEINGARTEN:  You can take that down, Ms. Flint.

18  Thank you.

19  Q.  In your direct testimony you already stated that Vyera did

20  not conduct extensive due diligence on RL Fine, right?

21  A.  Would you mind if we looked at that?

22  Q.  Sure.  Paragraph 51, page 16 of your testimony.  We did not

23  conduct extensive due diligence on RL Fine during the

24  negotiations.  That was your testimony, right?

25  A.  Yes, Mr. Weingarten.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCKMFTC5                    Mulleady – Direct                    1024

1    Q.  That's truthful and accurate, right?

2    A.  Yes.

3    Q.  You actually personally conducted some due diligence on RL

4    Fine, you said, and toward their facilities?

5    A.  Yes.

6    Q.  But you don't have any formal training in reviewing API

7    facilities, correct?

8    A.  No.

9    Q.  You wouldn't know what to look for at RL Fine's facilities,

10   correct?

11   A.  I was looking at it more from a business and practical

12   standpoint.  I wanted to see that there was bricks and mortar.

13   I wanted to see that there was employees.  I wanted to see that

14   there was boots on the ground and operations and a buttoned-up

15   business.

16   Q.  Other than seeing that there was actually a structure and

17   maybe employees, you wouldn't know what to look for at an API

18   manufacturing facility, correct?

19   A.  I do not have formal training in conducting inspections of

20   API facilities.

21   Q.  You wouldn't know what to look for, right?

22        MR. POLLACK:  Objection.  Vague and argumentative.

23        THE COURT:  Overruled.

24   A.  I think that's a fair statement, yes.

25   Q.  One last thing, sir.

LCKMFTC5                     Mulleady – Direct                    1025

1          MR. WEINGARTEN:  Can we look at Government Exhibit

2    1490, please:

3    Q.  RL Fine, to your knowledge, never filed a DMF for

4    pyrimethamine, right?

5    A.  To my knowledge, no.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCKKFTC6                    Mulleady - Direct                    1026

1  BY MR. WEINGARTEN:

2  Q.  And you never ended up -- strike that.

3        Vyera never ended up introducing any products with

4  RL Fine, right?

5  A.  Disappointingly, no.

6  Q.  The answer was no?

7  A.  Yes, sir.

8        MR. WEINGARTEN:  Let's look at Government Exhibit

9  1490, please.  And this is another set of board minutes.  This

10 is already in evidence as part of GX 9005.

11 Q.  December 15, 2017 board minutes for Turing Pharmaceuticals;

12 do you see that?

13 A.  Yes.

14       MR. WEINGARTEN:  And, Ms. Flint, let's go to the

15 attendees.

16 Q.  Do you see where it says, "Present:  Kevin Mulleady,

17 Chairman"?

18 A.  Yes.

19       MR. WEINGARTEN:  Let's go to page 003, please,

20 Ms. Flint.

21 Q.  In the first paragraph, one of the attorneys is informing

22 members of the board about discussions about collaborating in a

23 business relationship with RL Fine, right?

24 A.  Yes, that's what the document states.

25 Q.  And the collaboration is going to be based on a product

LCKKFTC6                    Mulleady - Direct              1027

1    collaboration agreement, distribution and supply agreement, and

2    the bank payment guarantee, right?

3    A.  Yes, that's what the document states.

4    Q.  And do you remember that part of the deal with RL Fine was

5    they would get a worldwide royalty on pyrimethamine sales?

6    A.  They would get a worldwide royalty on pyrimethamine sales?

7    I was under the impression that they would get a royalty from

8    us for U.S. sales, and we would get a commission for API sales

9    ex-U.S.

10           MR. WEINGARTEN:  Let's quickly — I'm sorry to do

11   this -- 108 at 023.  Let's go back to the agreement.

12   Q.  Can you look where it says Section 5.02(a).

13           MR. WEINGARTEN:  Keep going down, please.  It's 023,

14   Ms. Flint, page 023.

15   Q.  The bottom part says:  "Royalty:  Company shall also pay to

16   supplier royalty payments in the amount of 7-1/2 percent of net

17   revenues of products sold by company."

18           Do you see that, sir?

19   A.  Yes, but that's not worldwide.  We were only allowed to

20   sell in the United States.

21   Q.  Well, let's look at the definition of products.

22           MR. WEINGARTEN:  Can we go back a few pages, to 001,

23   please.

24           Strike that.  Let's go to page 15.  We're going to

25   look for the definition of products.

1           Go back one page, to 14, please.

2   Q.  "Product:  'Product' means any product directly or

3   indirectly manufactured, sold, or marketed by company and any

4   of its affiliates that contain the API."

5           Do you see that?

6   A.  So the company could only sell in the United States, so it

7   would be a conflict to worldwide sales.

8   Q.  So any sales of product by the company where it was allowed

9   to sell product, a 7-1/2 percent royalty would go to RL Fine,

10  right?

11  A.  Yes, in the United States.

12  Q.  And that royalty was actually guaranteed by Vyera to be at

13  least $3 million?

14  A.  It sounds accurate.

15          MR. WEINGARTEN:  Let's go back to those board minutes,

16  GX 1490, at 003.

17  Q.  The board approved the deals, right?

18  A.  Yes.

19  Q.  Let's look at the second paragraph on this page, "the

20  rationale."  This is in the board minutes — "The rationale

21  behind the collaboration with RL Fine is the diversification of

22  the group's revenue stream and the potential market entry by

23  generic manufacturers and distributors, respectively."

24          Do you see that, sir?

25  A.  Yes.

LCKKFTC6                    Mulleady – Direct                    1029

1   Q.  And then --

2          MR. POLLACK:  Objection, your Honor.  This is hearsay

3   within hearsay of a statement by an unidentified person in the

4   board minutes.

5          THE COURT:  Overruled.

6   BY MR. WEINGARTEN:

7   Q.  According to information available to the board, according

8   to the minutes, one or two potential competitors are currently

9   in the process of preparing their market entry.

10          Do you see that?

11  A.  Yes.

12  Q.  So potential market entry by generics was discussed as part

13  of the rationale for entering into these agreements with

14  RL Fine, right?

15  A.  Yes.  We needed to diversify our revenue stream because we

16  were concerned that Daraprim would be cliffing off.

17  Q.  "Cliffing off" means a material loss of sales if a generic

18  entered?

19  A.  Yes.

20          MR. WEINGARTEN:  I don't have anything further at this

21  time, your Honor.

22          THE COURT:  Shall we take our midafternoon recess,

23  counsel?

24          (Recess)

25          THE COURT:  Mr. Mulleady, would you like to retake the

LCKKFTC6                    Mulleady - Cross                    1030

1    stand, please.

2              THE WITNESS:  Thank you, your Honor.

3              THE COURT:  Cross-examination?

4              MR. POLLACK:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MR. POLLACK:

7    Q.  Mr. Mulleady, good afternoon.

8    A.  Good afternoon.

9    Q.  My name is Jeff Pollack.  I'm an attorney for Mr. Shkreli.

10   I just have a few questions for you following up on

11   Mr. Weingarten's examination.

12             During your examination, you talked about

13   communications you had had with Mr. Shkreli while you were the

14   CEO and chairman of Vyera and its parent corporation,

15   Phoenixus, correct?

16   A.  Yes.

17   Q.  One of the communications you discussed was

18   Exhibit GX 1104.  It was a communication between you and

19   Mr. Shkreli concerning a potential transaction with RL Fine.

20             Do you remember the document during your examination?

21   A.  No.

22             Is there any chance we can pull it up?

23             MR. POLLACK:  Justin, can we bring that up, please?

24             THE WITNESS:  I have it here.

25             MR. POLLACK:  Can we enlarge everything from the top

1  down to August 24th?  Right there, that's good.

2  BY MR. POLLACK:

3  Q.  Do you remember discussing this document with

4  Mr. Weingarten?

5  A.  Yes, Mr. Pollack.

6  Q.  I just want to draw your attention to your email at the top

7  of the page to Mr. Shkreli, where you say, "We will keep you

8  more in the loop on communications."

9           Mr. Mulleady, why did you offer to keep Mr. Shkreli

10  more in the loop on these kinds of communications?

11  A.  Part of the role of chairman, per the mandate, is to

12  communicate with the shareholders, and Martin, being one of the

13  largest shareholders, he wanted to be more involved in the

14  company and the state of affairs, and I wanted to give him that

15  peace of mind.

16  Q.  Mr. Mulleady, at this point in time, how long had you been

17  with the company as its chairman and CEO?

18  A.  Excuse me.  This would be in the early stages of coming

19  back to the company.  I don't know if I was CEO yet.  I believe

20  I was chairman.

21  Q.  Were there any other reasons why you would reach out to

22  Mr. Shkreli on something like this?

23  A.  As mentioned prior, Mr. Shkreli has a very thorough

24  knowledge base in the industry, and I was trying to come up to

25  the learning curve as quick as possible, and I was trying to

LCKKFTC6                    Mulleady – Cross                    1032

1    use whatever resources were at my disposal in order to come up

2    to that learning curve.

3    Q.  Can you tell us whether or not you were seeking his advice

4    on this matter?

5    A.  I do not recall.

6    Q.  Would your deposition testimony refresh your recollection

7    on this?

8    A.  If it discusses it, yes.

9            MR. POLLACK:  Justin, can we bring up Mr. Mulleady's

10   deposition testimony at page 206, lines 3 through 10, please.

11           You can take that down.  Take that down, please.  I

12   believe it must be his IH testimony.  Give me one moment.

13           Bring up the IH testimony, the same page, please.

14   Q.  Mr. Mulleady, take a moment to read that and tell me if

15   that refreshes your recollection as to why you were reaching

16   out to Mr. Shkreli about this matter on 1104.

17   A.  The previous document was 1104?

18   Q.  The one we were just looking at.

19   A.  Thank you.

20   Q.  Also referenced in the question posed by the questioning

21   attorney here.

22   A.  I see.  Thank you.

23           That is what I state, that I was seeking his advice,

24   and I gave that testimony truthfully and honestly.

25   Q.  And is that why you were offering to keep him in the loop?

LCKKFTC6                    Mulleady - Cross                    1033

1   A.  I think that's fair to say.

2   Q.  Now, Mr. Mulleady, when you talked to Mr. Shkreli during

3   your time as CEO, did Mr. Shkreli make suggestions to you about

4   the business?

5   A.  Yes.

6   Q.  And I believe we saw a spreadsheet at GX 1349 listing a

7   number of communications you had with Mr. Shkreli during your

8   tenure either as CEO or chairman of the company, correct?

9   A.  Yes.  I don't recall the exact exhibit, but if you're

10  referring to the Excel file of email communications, I recall.

11  Q.  When Mr. Shkreli would make suggestions to you about

12  running the business, would you always follow his suggestions?

13  A.  No.  Rarely.

14  Q.  Mr. Mulleady, that's all the questions I have for you.

15  Thank you.

16  A.  Thank you, Mr. Pollack.

17          THE COURT:  Any redirect?

18          MR. WEINGARTEN:  Nothing further, your Honor.  Thank

19  you.

20          THE COURT:  You may step down.

21          THE WITNESS:  Thank you, your Honor.

22          (Witness excused)

23          MR. POLLACK:  I forgot my binder, Judge.

24          THE COURT:  That's fine.

25          Next witness.

1          MR. MEIER:  Your Honor, the government has completed

2     calling all of its witnesses.  Just as a reminder, we talked

3     about a couple of administrative matters this morning.  Subject

4     to moving a couple of more exhibits in tomorrow, we are

5     complete with our presentation of evidence.

6          THE COURT:  So with those two caveats, the government

7     rests?

8          MR. MEIER:  Yes, your Honor.

9          THE COURT:  Defense case.

10         MR. POLLACK:  Thank you, your Honor.

11         We're prepared to call some witnesses.  We'd like to

12    move in some evidence --

13         THE COURT:  Sure.

14         MR. POLLACK:  -- first, if it pleases the Court.

15         Your Honor, the first piece of evidence we would like

16    to move in is Exhibit DX 538.  This is the written testimony of

17    Anne Kirby.  It is being offered by agreement of the parties.

18    We have stricken, I believe, four paragraphs, which is noted in

19    the cover page, also by agreement.

20         THE COURT:  Any objection?

21         MR. MEIER:  No objection, your Honor.

22         THE COURT:  Received.

23         (Defendant's Exhibit 538 received in evidence)

24         MR. POLLACK:  Your Honor, the second piece of evidence

25    we'd like to move in, and it should have been my first, but it

LCKKFTC6                                                           1035

1   was not in the right order, but it's the written testimony of

2   Mr. Shkreli.

3              THE COURT:  DX?

4              MR. POLLACK:  Yes, you're right.  DX 546.

5              We are also moving in with this Trial Exhibits DX 497

6   and DX 126.

7              THE COURT:  Any objection?

8              MR. MEIER:  Your Honor, if I might?

9              MR. POLLACK:  Oh, I've made a mistake.  Let me correct

10  the record.

11             So my colleague just told me that the errata says that

12  we have made a correction to the affidavit, which is that there

13  was a reference to DX 497 -- a reference to DX 126, which

14  should be 497.  And I do understand that the plaintiffs have

15  two objections to this document.

16             THE COURT:  Okay.  So I have just been handed DX 546,

17  which is the Shkreli direct testimony, and on the first page,

18  it explains that the reference to DX 126 should be to DX 497.

19  So the offer is for receipt of 546 and 497?  Is that what I

20  should understand?

21             MR. POLLACK:  So what you should understand is that

22  where Trial Exhibit 126 is referenced in paragraph 67, it

23  should be a reference to 497.

24             THE COURT:  So you're not offering 497?

25             MR. POLLACK:  We will offer it.  We haven't yet

LCKKFTC6                                                              1036

1   conferred with our adversary about that, those two exhibits

2   yet.  We plan to offer them tomorrow.

3             THE COURT:  Okay.  So all you're offering right now --

4             MR. POLLACK:  Is the affidavit.

5             THE COURT:  -- is DX 546, with one change?

6             MR. POLLACK:  Absolutely.  And I'm sorry that I was so

7   unclear about that.

8             THE COURT:  That's no problem.

9             Any objection?

10            MR. MEIER:  Yes, your Honor.

11            The government has objections that we had indicated

12  over the weekend to defendants, with a statement in

13  paragraph 44 of Mr. Shkreli's testimony, and paragraph 45.

14  Specifically, your Honor, paragraph 44 starts with, "while

15  exclusivity clauses between API suppliers and pharmaceutical

16  companies are common," and then it goes on from there.

17  Frankly, your Honor, there's no basis for this testimony from

18  Mr. Shkreli, there's no foundation.  I don't think it's

19  appropriate lay opinion testimony; I think it's appropriate for

20  expert testimony.  And I would strike that clause.

21            THE COURT:  And the same analysis for 45?

22            MR. MEIER:  Correct, your Honor.

23            THE COURT:  I'll hear defense counsel.

24            MR. POLLACK:  Your Honor, Mr. Shkreli is experienced

25  in the pharmaceutical industry dating back to 2012.  These are

LCKKFTC6                                                          1037

1    statements made based upon his experience, his perceptions, and

2    his understandings of the industry.  This is analogous to the

3    same testimony we moved to strike as to other witnesses

4    offering opinions as to the FDA.  We believe it is proper lay

5    testimony on these issues based upon Mr. Shkreli's experience

6    and knowledge.

7            THE COURT:  Well, if you want to direct me to any

8    ruling in particular that I've made which you think this would

9    relate to, I'm happy to consider that, but, off the top of my

10   head, all I remember are statements from pharmaceutical

11   executives, with decades of experience in the industry, talking

12   about their background and understanding that they used in

13   running their companies.  So paragraphs 44 and 45 are stricken.

14           Any other objection?

15           MR. MEIER:  No further objection, your Honor, subject

16   to these exhibits that they also want to move in, which I

17   understand they're going to try to move in tomorrow separately

18   from the declaration itself.

19           THE COURT:  So DX 546, with that amendment, is

20   received.

21           (Defendant's Exhibit 546 received in evidence)

22           THE COURT:  Next?

23           MR. POLLACK:  Your Honor, Mr. Rudowitz will handle the

24   next two exhibits we're moving in.  Thank you.

25           MR. RUDOWITZ:  Your Honor, AJ Rudowitz, on behalf of

1   Martin Shkreli.

2           We seek to admit, first, a list of trial exhibits to

3   be admitted into evidence.  The first one is DX 901, and I

4   believe that we have reached an agreement with plaintiffs for

5   the admission of the documents on this list.

6           THE COURT:  Any objection to the receipt of 901,

7   DX 901, and the exhibits listed on it?

8           MR. MEIER:  Your Honor, we do not have any objections

9   to the admission of DX 901.

10          THE COURT:  And its exhibits?

11          MR. MEIER:  And its exhibits, yes, your Honor.

12          THE COURT:  Received.

13          (Defendant's Exhibit 901 and exhibits listed therein

14  received in evidence)

15          MR. RUDOWITZ:  Your Honor, next, we seek to admit into

16  evidence a second list of exhibits that is Bates numbered

17  DX 902, as well as the exhibits listed therein, and, similarly,

18  I believe that we have reached agreement on these exhibits, as

19  well, with plaintiffs.

20          THE COURT:  Any objection to the receipt of DX 902 and

21  its exhibits?

22          MR. MEIER:  Your Honor, the government does not object

23  to the admission of DX 902 and its exhibits.

24          THE COURT:  Received.

25          (Defendant's Exhibit 902 and exhibits listed therein

LCKKFTC6                                                              1039

1    received in evidence)

2            MR. PARKS:  Your Honor, with that taken care of,

3    Defendant Martin Shkreli calls John Russell.

4            THE COURT:  Thank you.

5            Mr. Russell, if you could take the witness stand here,

6    please — no need to rush — and remain standing.

7     JOHN S. RUSSELL,

8        called as a witness by the Defendant,

9        having been duly sworn, testified as follows: is

10           THE COURT:  Now, ventilation in this room has been

11   tested, and you are permitted to take off your mask while

12   seated in that chair, if you would like.

13           THE WITNESS:  Thank you.

14           THE COURT:  Please state your full name.

15           THE WITNESS:  John S. Russell.

16           THE COURT:  Spell your first name.

17           THE WITNESS:  J-o-h-n.

18           THE COURT:  And then it's middle initial S?

19           THE WITNESS:  S, yes.

20           THE COURT:  And how do you spell your last name?

21           THE WITNESS:  R-u-s-s-e-l-l.

22           THE COURT:  And that mic moves, so adjust it so it's a

23   little bit under your chin.

24           THE WITNESS:  Okay.

25           THE COURT:  Speak towards it, but not directly into

LCKKFTC6                                                              1040

1   it.

2              You're about to be handed an exhibit --

3              And, counsel, what's the DX number?

4              MR. PARKS:  Your Honor, it's DX 542.

5              THE COURT:  -- DX 542, which is your affidavit

6   constituting your direct testimony in this case.

7              If you turn to page 34, I believe you authorized the

8   addition of your electronic signature to that page; am I right?

9              THE WITNESS:  Yes, ma'am.

10             THE COURT:  And before you did that, did you read this

11  document carefully?

12             THE WITNESS:  I did.

13             THE COURT:  And do you swear to the truth of its

14  contents?

15             THE WITNESS:  I do.

16             THE COURT:  Okay.

17             Now, many passages here, counsel, I am aware, have

18  been stricken, based on prior rulings I've made.  Is there any

19  further objection to receipt of DX 902?

20             MR. PARKS:  542, your Honor.

21             THE COURT:  I'm sorry, DX 542?  Thank you.

22             MR. WEINGARTEN:  No, your Honor.

23             THE COURT:  Now, this DX 542, is it a redacted

24  document?

25             MR. PARKS:  Your Honor, there is a version that is for

LCKKFTC6                                                            1041

1    under-seal use, and there is a public version, so I believe the

2    answer to your question, if you mean redactions with respect to

3    sealed issues, yes.  And I have a copy of the public version.

4    I also have a copy of the under-seal version, and I'm happy to

5    distribute whichever the Court would prefer to have, or both.

6              THE COURT:  Well, I have reviewed, in preparation for

7    this testimony, my markup based on what I thought the rulings

8    were that were communicated to counsel.

9              I would just like to make sure that I read everything

10   that counsel think I'm reading, so I would like copies of those

11   two documents that would reflect the redactions based on my

12   rulings.

13             MR. PARKS:  Yes, your Honor.

14             And my understanding, although I was not personally

15   involved in these discussions, is that there were discussions

16   with counsel for the FTC, and there has been agreement reached

17   as to these redactions.

18             THE COURT:  Okay.

19             MR. PARKS:  Or as to the redactions based on the

20   exclusions based on your Honor's ruling.

21             THE COURT:  Great.

22             I need to see those documents.  Thanks so much.

23             MR. PARKS:  This is the under-seal version.

24             This would be the public version.

25             THE COURT:  Thank you.

1          Cross-examination?

2    CROSS-EXAMINATION

3    BY MR. WEINGARTEN:

4    Q.  Good afternoon, Mr. Russell.

5    A.  Good afternoon.

6    Q.  My name is James Weingarten.  I'm an attorney with the

7    Federal Trade Commission, and I am representing the plaintiffs

8    in this case.

9          You and I met previously at your deposition, I

10   believe?

11   A.  That's correct.  I recall.

12   Q.  I'm going to be asking you some questions today about the

13   written testimony that was just submitted to the Court and the

14   opinions that you're offering in this case.  Okay?

15   A.  Fair enough.

16   Q.  I'd like to start by talking to you about the opinions

17   you've offered about Vyera's distribution system.  Okay?

18   A.  Sure.

19   Q.  Daraprim was in open distribution starting in 1953, right?

20   A.  Yes, I believe that's correct.

21   Q.  And you're not offering any opinion in your testimony today

22   about any examples of drugs that were in open distribution for

23   ten or more years and then moved into specialty, correct?

24   A.  That's correct.

25   Q.  In your direct testimony, you state that Vyera identified

LCKKFTC6                    Russell – Cross                    1043

1   some compelling reasons, in your opinion, to market Daraprim

2   through specialty distribution, right?

3   A.  Yes.

4   Q.  And one of the reasons was the cost of Daraprim, right?

5   A.  Yes.

6   Q.  Another that you identified is a small patient population

7   with compliance issues, right?

8   A.  Correct.

9   Q.  And another reason you identified was helping patients with

10  insurance claims and assuring coverage for their treatment,

11  right?

12  A.  Yes, I believe that's correct.

13  Q.  Did I miss any of the compelling reasons you identified?

14  A.  I'd have to look at my report, but I think you've covered

15  most of them.

16  Q.  Let's talk about cost.

17          Now, it was Vyera that, in August of 2015, increased

18  the price of Daraprim from almost $17.50 per tablet to $750 per

19  tablet, right?

20  A.  That's my understanding, yes.

21  Q.  Turning to patient compliance:  You're not opining that

22  Vyera's distribution system actually helped with patient

23  compliance, correct?

24  A.  I believe that based on my experience, normally, a drug in

25  specialty distribution does enhance compliance for patients.

1    Q.  Right.

2           I understand your general point, but you're not

3    offering an opinion about actual effects on patient compliance

4    from the Vyera system, right?

5    A.  No, I'm not.

6    Q.  And you're not opining that Vyera's distribution system

7    resulted in better patient compliance than the previous system,

8    right?

9    A.  No, I'm not doing that.

10   Q.  And you didn't identify any realized patient benefits from

11   specialty distribution of Daraprim, correct?

12   A.  Did you mean quantify specific benefits?

13   Q.  Correct.

14   A.  I did not quantify specific benefits, no.

15   Q.  You didn't offer any opinion in this case that there was an

16   unmet patient need with respect to Daraprim at any time, right?

17   A.  Well, I think I mentioned in my report that there were

18   complicated regimens with these antiretrovirals, and having a

19   specialty distribution system would aid and support that kind

20   of thing.

21   Q.  But you're not offering a particular opinion -- strike

22   that.

23          You're not offering a specific opinion that there was

24   an unmet patient need for Daraprim at any particular point in

25   time, right?

1   A.  I did not offer any opinion about enhanced or increased

2   medical need.

3   Q.  And you are not offering an opinion for the Court's

4   consideration that Vyera's distribution system for Daraprim

5   actually helped patients pay for Daraprim, right?

6   A.  I'm sorry, helped patient to what?  Excuse me?

7   Q.  Pay for Daraprim.

8   A.  Oh.  No, I did not.

9   Q.  And you're not opining that Vyera's distribution system

10  actually helped with inventory management of Daraprim, correct?

11  A.  Well, I alluded to it's one of the potential benefits of

12  having a specialty system, yes, in place, correct.

13  Q.  It's a potential benefit, but you're not opining that that

14  potential benefit was actually realized, correct?

15  A.  I did not do that, no.

16  Q.  And let's look at some potential benefits.

17          In your direct testimony, you discuss some potential

18  benefits for distribution of Daraprim in specialty that a

19  company called Amedra identified, right?

20  A.  Yes.

21  Q.  And Amedra identified some potential benefits from

22  specialty distribution, right?

23  A.  They did.

24  Q.  But you didn't evaluate whether anyone ever realized any of

25  the potential benefits Amedra identified, right?

LCKKFTC6                    Russell - Cross                    1046

1    A.  Well, I think what I said in my deposition was that

2    normally a company that initiates that kind of specialty

3    distribution system and another company acquires the drug, they

4    would rely on the improvement based on the drug they have, in

5    compliance or any other factors that you were measuring.

6    Q.  Well, let's take a look at your deposition, sir.  It's page

7    213 of your deposition, lines 8 to 14.

8    "Q.  My question is:  Whether it was Amedra that realized the

9    benefits or not, did you ever do any analysis of whether

10   anyone — Vyera or Impax — realized the potential benefits that

11   you talk about in paragraph 86?

12   "A.  I don't believe I did a specific analysis for Daraprim,

13   no."

14            And that testimony was truthful when you gave it,

15   right, sir?

16   A.  I don't see paragraph 86, but I'll take your word for it.

17   Q.  So you didn't do an analysis of whether the potential

18   benefits Amedra identified were actually realized by anyone,

19   correct?

20   A.  That's correct, yes.

21   Q.  Now, you talk about some industry trends in your direct

22   testimony, right?

23   A.  Correct.

24   Q.  Industry trends with respect to specialty distribution

25   generally, right?

LCKKFTC6                    Russell - Cross                    1047

1  A.  That's correct, yes.

2  Q.  And you didn't do any -- strike that.

3       You're not offering any opinions or analysis today

4  about industry trends with respect to companies conducting

5  bottle audits, right?

6  A.  I didn't offer an opinion on that.

7  Q.  And you didn't do -- you're not offering an opinion on

8  industry trends with respect to quantity limits on purchases of

9  a prescription drug, right?

10  A.  I don't believe I did, no.

11  Q.  And you don't in an analysis of -- strike that.

12       You're not offering an opinion about industry trends

13  with respect to removing accounts that are eligible to receive

14  a pharmaceutical product, right?

15  A.  No, I'm talking more generally about the benefits of

16  specialty distribution.

17  Q.  Okay.

18       Let's just talk a little bit about data blocking.

19  Now, I believe your opinion that you offer refers to data

20  sharing; is that right?

21       Yes, here we go.

22       Your opinion is that agreements limiting distributor

23  data sharing did not prevent manufacturers from estimating the

24  size of the market opportunity.

25       That is your opinion, right?

1    A.   Yes.

2    Q.   Another word for agreements limiting distributor data

3    sharing is "data blocking agreements," right?

4    A.   They could be construed that way, yes.

5    Q.   That's, in fact, what some of the agreements that are at

6    issue here are called; they're called data blocking agreements,

7    correct?

8    A.   Yes, that's one way to describe them.

9    Q.   Let's talk about your opinions about Vyera's data blocking

10   agreements.

11           In the course of your work on this case, you never

12   reviewed any IQVIA data for Daraprim, right?

13   A.   I did not, no.

14   Q.   You do note there are other sources of data for estimating

15   a pharmaceutical market besides IQVIA, right?

16   A.   Correct.

17   Q.   But you didn't analyze the accuracy of any of those other

18   sources, right?

19   A.   I didn't look at other sources, no.

20   Q.   And you didn't try on your own to undertake an estimate of

21   the size of the market for Daraprim at any point, right?

22   A.   No.  I didn't feel it was necessary.

23   Q.   And you're not offering any opinions about why Vyera

24   entered into data blocking agreements, right?

25   A.   No, I'm not, no.

LCKKFTC6                    Russell - Cross                    1049

1   Q.  Let's talk about API.  Let's start first with Fukuzyu.

2        I believe your opinion that you're offering to the

3   Court for its consideration is that Vyera's supply agreements

4   with Fukuzyu were consistent with industry practice; is that

5   right?

6   A.  Yes.

7   Q.  You didn't analyze the terms of Fukuzyu's deal with Vyera,

8   right?

9   A.  I didn't look at the specific terms, no.

10  Q.  And you didn't analyze how the terms of the agreement

11  between Vyera and Fukuzyu mitigated Vyera's supply risk, right?

12  A.  My sense, based on my experience, it would mitigate supply

13  risk because Vyera was a small firm and only had one product in

14  the market, so they were mitigating risk, in my view.

15  Q.  Right.

16       But you're not offering any opinion, sir, as to how

17  the terms, the specific terms, of Vyera's agreement with

18  Fukuzyu mitigated API supply risk, right?

19  A.  Not specifically, no.

20  Q.  And, in fact, Vyera's deal, its supply deal, with Fukuzyu

21  doesn't actually require Fukuzyu to make any deliveries of

22  pyrimethamine API to Vyera, right?

23  A.  As I recall, that's correct.  But I've seen deals of a

24  different nature, which I discussed with you in my deposition,

25  that would seem abnormal perhaps but which are in the

1   marketplace.

2   Q.  Would you characterize Vyera's deal with Fukuzyu as also

3   being one of those abnormal deals?

4   A.  Not really, no.

5   Q.  But it doesn't actually require Fukuzyu to supply any

6   pyrimethamine to Vyera, right?

7   A.  As I recall, it does not.

8   Q.  When Vyera acquired Daraprim, the product, it also acquired

9   a stock or inventory of some pyrimethamine API, right?

10  A.  That's correct.

11  Q.  And you, in discussing Fukuzyu, in your written testimony,

12  you opine that the deposition testimony suggests Vyera

13  employees were concerned that Vyera was going to run out of API

14  to manufacture Daraprim, right?

15  A.  Yes.

16  Q.  And you don't cite any Vyera documents substantiating that

17  concern, right?

18  A.  I don't recall.

19  Q.  Well, let's look at the information at the time.

20          In your opinion, or in your direct testimony to this

21  Court, Vyera had a, quote, substantial amount of pyrimethamine

22  API on hand after it had bought Daraprim, right?

23  A.  Yes.

24  Q.  And in January of 2016, to be precise, Vyera had

25  75 kilograms of pyrimethamine API on hand, right?

1  A.  Sounds right, yes.

2  Q.  And Vyera needed only 55 kilograms per year to make

3  Daraprim, right?

4  A.  Yes, I believe that's right.

5  Q.  Also in your direct testimony, you explained to the Court

6  that 75 kilograms — that's what Vyera had as of January 2016 —

7  75 kilograms of pyrimethamine is enough to make 2.6 million

8  tablets of Daraprim; is that right?

9  A.  Yes, it's in my testimony.

10  Q.  Do you know how many tablets of Daraprim Vyera was selling

11  annually between 2016 and 2019?

12  A.  I don't recall.

13  Q.  Can I refresh your recollection by showing you some of the

14  testimony by some of the executives who might recall?

15  A.  Sure.

16          MR. WEINGARTEN:  Can we put DX 538 up, please.  This

17  is the written testimony of Ms. Kirby — I think it was just

18  entered into evidence — and let's go to page 26, please,

19  paragraph 119.

20          Next page, please.  There you go.

21  Q.  Now, Ms. Kirby's testimony, the defendants just sponsored,

22  was that after the initial sharp drop, annual tablet sales then

23  remained relatively flat, at approximately 250,000 tablets per

24  year from 2016 through 2019.

25          Do you see that?

LCKKFTC6                    Russell - Cross                    1052

1  A.  I do.

2  Q.  So does that refresh your recollection, sir, that from 2016

3  to 2019, sales of Daraprim were roughly 250,000 tablets per

4  year?

5  A.  Yes, that's what it says, yes.

6  Q.  So, based on your calculation, then, that in January 2016

7  Vyera had enough pyrimethamine in stock to make 2.6 million

8  tablets, that's ten years of Daraprim, right?

9  A.  Well, based on the tablet numbers cited here, that would be

10 correct, yes.

11 Q.  But your opinion is there was a concern about running out

12 of pyrimethamine API at Vyera?

13 A.  Well, you never know what can happen to inventories, you

14 never know what issues there might occur, again, they were

15 mitigating risk, in my view.

16 Q.  And it was your view also -- strike that.

17       Your opinion that you're presenting to this Court is

18 that Fukuzyu was a large and dependable supplier, right?

19 A.  Yes, they had a good track record.

20 Q.  So even if the ten years of tablets had somehow something

21 happen to them, Fukuzyu was still a large and dependable

22 supplier, right?

23 A.  Correct.  And I remind, this deal was done at arm's-length.

24 I mean, they had an option to consider other alternatives.

25 Q.  You you're not offering any opinions, though, about the

LCKKFTC6                    Russell – Cross                    1053

1    negotiation of this deal, are you?

2    A.  Not specific terms, no.

3    Q.  You're not offering any opinions about negotiating

4    strategies of either Fukuzyu or Vyera, right?

5    A.  No, more broadly, I'm saying the type of deal, I feel, was

6    supportive of someone having an exclusive agreement.

7    Q.  Let's talk about another basis for the Fukuzyu deal.

8    Sometimes you say firms might enter into exclusive agreements

9    with an API supplier because they want a long-term relationship

10   with that supplier, right?

11   A.  Yes.

12   Q.  On this point, you say, deposition testimony suggests Vyera

13   was interested in developing a long-term partnership for future

14   toxoplasmosis products, right?

15   A.  Yes.

16   Q.  And you cite Mr. Salinas' deposition testimony for that,

17   right?

18   A.  I do.

19   Q.  You say the company was — and you mean Vyera here, I

20   suppose — was contemplating ways it could develop improved

21   versions of Daraprim?

22   A.  Yes.

23   Q.  And you're not offering an opinion that any of those

24   programs that you mention or that Dr. Salinas testified about

25   ever came to fruition, right?

1  A.  I'm not offering an opinion on that, no.

2  Q.  So the exclusivity provision, as you understand it, between

3  Vyera and Fukuzyu precluded Fukuzyu from selling pyrimethamine

4  API to anybody else for human use in the United States, right?

5  A.  For human use, yes.

6  Q.  And Vyera's contract with Fukuzyu didn't require Fukuzyu to

7  supply any minimum amount of API to Vyera, right?

8  A.  That's right.

9  Q.  So, again, under this deal with Vyera and Fukuzyu, Fukuzyu

10  could supply zero kilograms of pyrimethamine API to Vyera,

11  right?

12  A.  That would be a potential option.

13  Q.  Okay.  Let's talk about RL Fine.

14      In your written direct testimony, you say that you

15  opine that Vyera's API supply agreement with RL Fine was

16  consistent with industry practice, right?

17  A.  Yes.

18  Q.  That's not the same opinion that you offered in your expert

19  report in this case, though, is it?

20  A.  Say that again, please.

21  Q.  That's not the same opinion that you offered in your expert

22  report, right?

23  A.  I'd have to look at the particular passages to compare

24  them.

25      MR. WEINGARTEN:  Let's take a look at Mr. Russell's

1   expert report, please, Ms. Flint, at page 10.

2   Q.  In the first heading there, to paragraph 33, you say,

3   "Vyera's API supply agreement with RL Fine was not inconsistent

4   with industry practice."

5           That's what you said in your report, right?

6   A.  Right.

7   Q.  That's not the same thing as saying something is

8   consistent, is it?

9   A.  I'd have to think about that more carefully.

10          So I think, in terms of how are the languages listed

11  here, I think really what I'm saying is, as a backup supplier,

12  that would be reasonable to do, to have a backup supplier.

13  Q.  Right, but I just want to be clear, sir.  Let's go to page

14  284 of your deposition, lines 4 through 10.  Your opinion in

15  your expert report was not the same as the opinion that you're

16  offering here today; isn't that correct?

17  A.  You would have to show them side by side, if you could.

18  Q.  Yes.  Here we are.  Your opinion today, sir -- you have

19  your written testimony in front of you?  We'll keep it easy for

20  Ms. Flint, if we can.  Do you have your written testimony?

21  A.  I do not, no.

22          MR. WEINGARTEN:  Your Honor, may I approach?

23          THE COURT:  Yes.  You don't need to ask permission.

24  Just identify for the record what you're showing the witness.

25          MR. WEINGARTEN:  I'm handing the witness the

1   under-seal copy of DX 542.

2              THE COURT:  Thank you.

3              THE WITNESS:  Thank you.

4   BY MR. WEINGARTEN:

5   Q.  If you could please go to page 27 of DX -- well, of your

6   written testimony today.

7              Do you see page 27 there, sir?

8   A.  I'm working on it.

9   Q.  Yes.  Take your time.

10  A.  Yes, I have it.

11  Q.  And the big heading at the top, in your testimony to the

12  Court, is, "Vyera's API Supply Agreement with RL Fine Was

13  Consistent With Industry Practice."

14             Do you see that?

15  A.  I do.

16             MR. WEINGARTEN:  And then I want Ms. Flint to please

17  put up page 284 of your deposition, lines 4 through 10.

18             MS. FLINT:  Mr. Weingarten, I am having issues with

19  our monitor right now.

20             MR. WEINGARTEN:  That's okay.

21             Let's try it this way.  Do we have a copy of the

22  deposition for Mr. Russell?

23             MS. FLINT:  I also do not have that.

24             MR. WEINGARTEN:  Your Honor, I know I don't need ask

25  to approach but it's a bit unusual:  I'm handing the witness a

1    copy of his deposition.  I've indicated lines 4 through 10 of

2    page 284.

3    Q.  Sir, can you please read that out loud, with the question

4    and the answer?

5    A.  "Okay.  You don't have an opinion in your report, sir, that

6    the terms of the RL Fine agreement with Vyera are consistent

7    with industry practice, correct?"

8            Then my answer was:  "No, I don't think I opined on

9    that, that's correct."

10   Q.  Thank you, sir.  I'll take that back.

11           So at your deposition you testified that you were not

12   offering the opinion that is in that heading in your written

13   direct testimony, right?

14   A.  Yes, that's correct.

15   Q.  Now, you opine that Vyera would need a reliable backup

16   supplier after their existing inventory of pyrimethamine API

17   was used, right?

18   A.  Yes.

19   Q.  Even though we just talked about the existing inventory

20   being 2.6 million tablets, right?

21   A.  Yes.

22   Q.  And as evidence for the need for a backup supplier on

23   Vyera's part, you cite deposition testimony from two Vyera

24   employees, right?

25   A.  I don't recall exactly, but that's probably right.

LCKKFTC6                    Russell - Cross                    1058

1    Q.  Let's take a look at — you have it now, I think I handed it

2    to you — DX 542 from your trial testimony, page 27, paragraph

3    115.

4    A.  Yes, I have it.

5    Q.  So, in support of your proposition about the importance of

6    having a backup supplier for Vyera, you cite the deposition of

7    Mr. Pelliccione and the deposition of Mr. Salinas, right?

8    A.  Yes, that's correct.

9    Q.  Were you here in court, sir, when Mr. Pelliccione and

10   Mr. Salinas testified?

11   A.  I was not.

12   Q.  Did you read any of their trial testimony?

13   A.  I don't recall doing that, no.

14   Q.  So you never heard Mr. Pelliccione testify that no one had

15   ever discussed with him about having a backup supplier for API?

16   A.  No, I wasn't aware of that.

17   Q.  You didn't hear Mr. Salinas testify that he didn't consider

18   it necessary to have a backup supplier after Vyera signed a

19   supply agreement with Fukuzyu?

20   A.  I didn't know that.

21   Q.  Now, we talked about this a little bit.  Fukuzyu was

22   Vyera's primary supplier?

23   A.  Yes.

24   Q.  And, again, you've characterized Fukuzyu as large and

25   dependable as an API supplier?

LCKKFTC6                    Russell – Cross                    1059

1    A.   Yes, I think I called them a major, yes.

2    Q.   And for RL Fine to supply pyrimethamine to Vyera, it would

3    need either to have a DMF on file or it would have to amend its

4    ANDA, Vyera would have to amend its ANDA, to include all the

5    details about RL Fine's manufacturing process, right?

6    A.   That would be correct, yes.

7    Q.   And Vyera and RL Fine signed their exclusive supply deal on

8    December 27, 2017?

9    A.   Sounds about right, yes.

10   Q.   And did RL Fine have a DMF on file on December 27, 2017?

11   A.   Not at that time, no.

12   Q.   Has RLF ever filed a DMF for pyrimethamine with the FDA?

13   A.   I don't recall.  But I do know that Cerovene struck a

14   three-year deal with them, RL Fine, an exclusive agreement.

15   Q.   My question, sir, is simply, to your knowledge, has RL Fine

16   ever filed a pyrimethamine DMF with FDA?

17   A.   I don't think so, but I don't know for sure.

18              (Continued on next page)

19

20

21

22

23

24

25

LCKMFTC7                    Russell - Cross                    1060

1  Q.  Would it refresh your recollection, sir, if we looked at

2  your deposition transcript?

3  A.  Sure.

4  Q.  Sir, I'm handing your deposition transcript.  You can read

5  it to yourself, sir, please, page 283, lines 20 through 284-3.

6  Just read that to yourself, there to there.  Let me know when

7  you've had a chance to read that.

8          THE COURT:  It just displayed on my screen, so thank

9  you.

10 Q.  Have you had a chance to look at that, sir?

11 A.  Yes.

12 Q.  Does that refresh your recollection as to whether RL Fine,

13 to your knowledge, has ever filed a DMF for pyrimethamine?

14 A.  It appears they have not.

15 Q.  To your knowledge, sir, RL Fine has never taken -- to your

16 knowledge, sir, RL Fine has never taken any steps to qualify as

17 a supplier of pyrimethamine API, correct?

18 A.  For whom?  Would you repeat the question, please.

19 Q.  Sure.  To your knowledge, RL Fine has never taken any steps

20 to qualify as an API supplier of pyrimethamine for Daraprim,

21 right?

22 A.  That's correct, yes.

23 Q.  Let's just take the terms -- strike that.

24          You also know that Vyera has never taken any steps to

25 qualify RL Fine as a supplier of pyrimethamine for Vyera,

1   right?

2   A.  That's correct, yes.

3   Q.  Let's take the RL Fine agreement on its own terms.  You

4   never analyzed the terms of Vyera's deals with RL Fine, right?

5   A.  No, I did not.

6   Q.  You didn't compare the terms of the deal between Vyera and

7   RL Fine to the goal of establishing a backup supply of

8   pyrimethamine, right?

9   A.  I didn't do that analysis, no.

10  Q.  You didn't analyze Vyera's payments to RL Fine, correct?

11  A.  Did you say payments?

12  Q.  Payments.

13  A.  No, I did not.

14  Q.  The RL Fine deal with Vyera has a global royalty payment in

15  it, right?

16  A.  Yes.  I believe it did.

17  Q.  You've never seen a global royalty provision in your

18  career, have you?

19  A.  You mean in an API agreement?

20  Q.  Correct.

21  A.  I don't believe I have.

22  Q.  This is the only API agreement you've seen in your career

23  that has a global royalty provision, right?

24  A.  Yes.  I believe in my career, from what I've seen, I think

25  that's correct.

LCKMFTC7                    Russell - Cross                    1062

1   Q.  You've never seen in your career a backup supply deal that

2   required an upfront payment to the backup supplier, right?

3   A.  I am not sure about that one.  That's possible I've seen an

4   agreement or two that a payment was involved.

5   Q.  I am going to show you your deposition again, sir.  It's

6   deposition, page 35, line 21 to 36-4.  It starts here at page

7   35, line 21 and runs to line 4.  Can you read that question,

8   and answer, sir.

9   A.  OK --

10  Q.  Please go slow for the court reporter's sake.

11  A.  OK.  Have you seen -- so I take it, sir, then you have

12  never seen an agreement where the pharmaceutical company paid

13  money up front in a backup API supplier, is that right?  I

14  said:  I don't recall seeing any agreement like that.

15  Q.  That was your testimony at the time, right?

16  A.  Yes.

17  Q.  That was truthful and accurate, right?

18  A.  Yes.  Yes, it was.

19  Q.  You couldn't recall seeing any agreement for backup supply

20  that had an upfront payment to the backup supplier, correct?

21  A.  Correct.

22  Q.  The Vyera RL Fine deal is a backup supply agreement with an

23  upfront payment to the backup supplier, right?

24  A.  It was, yes.

25          THE COURT:  Counsel, the equipment seems to be up and

LCKMFTC7                    Russell - Cross                    1063

1    running again.

2           MR. WEINGARTEN:  Thank you, your Honor.

3    Q.  Now, Vyera's contract with RL Fine didn't require RL Fine

4    to provide any minimum amounts of pyrimethamine to Vyera,

5    right?

6    A.  I believe that's correct, yes.

7    Q.  So just like with Fukuzyu, even if RL Fine had somehow been

8    qualified or filed a DMF, RL Fine, under its deal with Vyera,

9    could supply zero kilograms of API to Vyera, right?

10   A.  Potentially correct, yes.

11   Q.  Were you aware, sir, that the time that RL Fine entered

12   into its agreement for executive supply of pyrimethamine with

13   Vyera, it already had another exclusive supply agreement with a

14   different manufacturer?

15   A.  You're saying RL Fine did?

16   Q.  Yes, sir.

17   A.  Yes.  I was aware of that.

18   Q.  And you agree, sir, that it's unusual that RL Fine entered

19   into multiple exclusive agreements at the same time?

20   A.  Yes, that would be unusual.

21   Q.  So that's yet another unusual feature of Vyera's deal with

22   RL Fine, right?

23   A.  It appears to be.

24   Q.  Would you agree, sir, that Vyera's deal with RL Fine is

25   unusual in your experience?

LCKMFTC7                    Russell - Redirect                    1064

1    A.  Well, there were certain parameters in it which made me

2    think perhaps it would not be a good deal financially for

3    Vyera.

4    Q.  It is your view, sir, that taken on its terms, Vyera's deal

5    with RL Fine was not a good deal for Vyera, right?

6    A.  Well, at a larger view, and I didn't do a detailed analysis

7    of it, there were just certain things that, to me, I thought

8    perhaps it may not be a good deal for Vyera long term.

9            MR. WEINGARTEN:  Nothing further, your Honor.

10   REDIRECT EXAMINATION

11   BY MR. PARKS:

12   Q.  Mr. Russell, I'd like to direct your recollection back to

13   the series of questions you were asked about the quantity of

14   API on hand at Vyera in January of 2016 and how much time into

15   the future that quantity of API would be able to produce

16   product.

17   A.  OK.

18   Q.  My question for you, sir, is, can API -- my first question

19   to you is, can API expire?

20   A.  Yes, it can.  Yes.

21   Q.  Was the inventory, these 2 million and some pills that you

22   were asked about, was that about to expire later in 2016?

23   A.  You know, I am not sure, but that's possible.

24   Q.  If that API was about to expire in 2016, you wouldn't be

25   able to make 10 years with the medicine with it, would you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  No, of course not.

2           MR. PARKS:  That's all I have, your Honor.

3           THE COURT:  Any further questions?

4           MR. WEINGARTEN:  No.  Thank you, your Honor.

5           THE COURT:  Do you know one way or the other whether

6   the API that was purchased by Vyera when it acquired Daraprim

7   was about to expire?

8           THE WITNESS:  I don't have direct knowledge of that,

9   no.

10          THE COURT:  Thank you.

11          You may step down.

12          (Witness excused)

13          THE COURT:  Next.

14          MR. CASEY:  Your Honor, the defendant, Mr. Shkreli,

15  calls Dr. Anupam Jena.  My colleague, Sean McDonnell, will be

16  conducting that examination.

17          THE COURT:  Dr. Jena, if you would take the stand and

18  remaining standing.

19  ANUPAM B. JENA,

20      called as a witness by the Defendant,

21      having been duly sworn, testified as follows:

22          THE COURT:  Dr. Jena, we have had the ventilation

23  tested in this room and you are allowed, you are not required

24  to, but you may remove your mask, if you would like to.  Also,

25  counsel, when they are at that podium, may remove their mask.

LCKMFTC7                    Russell - Redirect                    1066

1          Please state your full name for the record.

2          THE WITNESS:  My full name is Anupam, A-n-u-p-a-m;

3    Jena, J-e-n-a; middle initial B.

4          THE COURT:  You're about to be handed a document and

5    counsel, no doubt, will tell me what its exhibit number is.

6          MR. McDONNELL:  Your Honor, I am moving to admit the

7    trial testimony of Dr. Jena, DX-541, which I believe has been

8    agreed to between the parties.

9          THE COURT:  If you could give the witness the exhibit,

10   please.

11         Doctor, if counsel could approach you and give you a

12   copy of your testimony.

13         If you could turn, please, to page 36.  Is that your

14   authorized signature on page 36, Dr. Jena?

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  Before authorizing your signature to be

17   placed on page 36, did you read this document with care?

18         THE WITNESS:  Yes, your Honor.

19         THE COURT:  And do you swear to the truth of the

20   contents of this document?

21         THE WITNESS:  I do, your Honor.

22         THE COURT:  Thank you.

23         Any objections to the receipt of DX-541 as offered

24   with redactions to reflect, I believe, what was anticipated as

25   being consistent with my rulings?

1      MR. MEIER:  Your Honor, I have a general objection,

2    which is this is the first time I have -- we have been given a

3    copy with the redactions.  I haven't had a chance to review it.

4      Up to now, both parties have these things ahead of

5    time.  We have had a chance to look at it before we come to

6    court.  I've just been handed this by Mr. McConnell.

7      I will take their representation that they have

8    properly redacted it, but I don't know that for myself.  I have

9    not personally verified that, your Honor.  I have not had the

10   chance to do so, nor am I prepared to do that right this

11   minute.

12     MR. McDONNELL:  Your Honor, if I may just reply,

13   please.

14     We did send a copy of our proposed redactions to

15   Exhibit DX-541, and we received a request from plaintiffs'

16   counsel to make additional redactions, which we agreed to make.

17   So, yes, we did not send the final copy incorporating the

18   additional redactions requested by plaintiffs, but they did

19   receive our initial proposed redactions, and we did accept

20   their request for more modifications.

21     MR. MEIER:  Your Honor, I'll accept that

22   representation by counsel, but I did just want to make sure

23   that the Court understood that.

24     THE COURT:  I've just looked at the trial testimony,

25   the version that I have read that struck from it the paragraphs

LCKMFTC7              Jena – Cross                    1068

1   that I required to be stricken, and those paragraphs are

2   stricken from the exhibit, DX-541, that I've been handed.  So I

3   understand that there may be additional passages that the

4   parties agreed should be stricken and that plaintiff's counsel

5   will have overnight to look at that and discuss the issue with

6   defense counsel.

7          With that understanding, I receive DX-541.

8          (Defendant's Exhibit 541 received in evidence)

9   CROSS-EXAMINATION

10  BY MR. MEIER:

11  Q.  Good afternoon, Dr. Jena.

12  A.  Good afternoon.  Nice to see you again.

13  Q.  As you know, I'm Markus Meier, and I'm an attorney at the

14  Federal Trade Commission, and we met via deposition in this

15  case back on June 30 of this year.

16         Is there anything that might affect your ability to

17  give truthful, complete testimony here today, Dr. Jena?

18  A.  No, sir.

19  Q.  What I'd like to do is start today with your medical

20  opinions in this case.  Do you understand that?

21  A.  Yes.

22  Q.  Because you are giving medical opinions in this case and

23  you are giving economic opinions, is that correct?

24  A.  That's correct.

25  Q.  Starting with the medical opinions, according to your

LCKMFTC7                    Jena - Cross                    1069

1   written direct, you have been involved in the care of patients

2   with toxoplasmosis, correct?

3   A.  Correct.

4   Q.  But you are not a board certified doctor in infectious

5   diseases, correct?

6   A.  No, I'm not an ID doctor.  I'm a general internist.  I

7   focus on hospitalized patients, some of whom have HIV, minority

8   of whom have had toxoplasmosis, but I mostly focus on

9   hospitalized inpatients and, in this past year and a half,

10  COVID patients.

11          THE COURT:  If you could move back a little bit from

12  that mic.  That mic moves.  So you can put it under your chin.

13  Don't speak directly into it.  Thank you.

14  Q.  My question, Dr. Jena, you are not board certified in

15  infectious disease, correct?

16  A.  Correct.

17  Q.  That is, however, a board certification that doctors can

18  get?

19  A.  Yes.

20  Q.  You are board certified as an internist?

21  A.  Internal medicine.

22  Q.  Internal medicine.  Thank you.

23          And your best estimate --

24          THE COURT:  I am not sure that's what he said.

25          THE WITNESS:  Internal medicine.

1           THE COURT:  You did.

2           THE WITNESS:  I-n-t-e-r-n-a-l medicine.

3    Q.  Your best estimate of the number of patients you've seen

4    with toxoplasmosis is less than five or perhaps one to five?

5    A.  I'd say in my career, practicing as an independent doctor,

6    probably five or so toxoplasmosis patients.  Probably, 50 or

7    so, 50 to a hundred HIV patients, but a small number of

8    toxoplasmosis patients.

9    Q.  Five or so patients with toxoplasmosis?

10   A.  Yes, sir.

11   Q.  That's over a 15-year period?

12   A.  I would say since 2012, so roughly a 10-year period.

13   Q.  Would that include the time you were in medical school?

14   A.  That is after medical school.

15   Q.  Including the time you were in medical school, when you did

16   a residency, and to today, you've been seeing patients for

17   about 15 years?

18   A.  Correct.

19   Q.  In that time you've seen maybe about five toxoplasmosis

20   patients?

21   A.  I think that's about right.

22   Q.  Is it correct that you haven't seen any toxoplasmosis

23   patients in the last one or two years?

24   A.  I think that would be accurate.

25   Q.  That's something you can say for certain, correct?

LCKMFTC7                    Jena - Cross                    1071

1    A.  Yes.

2    Q.  Is it correct that you still practice medicine from time to

3    time?

4    A.  Yeah.  I practice about four to six weeks at Mass. General

5    Hospital as an internist.  Last year and a half, as I

6    mentioned, has been mostly in the COVID-19 medical service.

7    Q.  That's four to six weeks a year?

8    A.  Correct.

9    Q.  And the rest of the time you're a professor of what?

10   A.  The rest of the time I'm a professor of health care policy

11   and medicine at Harvard Medical School.  I'm happy to expand on

12   that, if you'd like.

13   Q.  Do you recall even one instance where you prescribed

14   Daraprim?

15   A.  Not specifically.  I have specific recollections of

16   toxoplasmosis patients, but I don't recall the specific

17   medication that was used.

18   Q.  So you don't recall ever having actually prescribed

19   Daraprim, correct?

20   A.  No specific recollection.

21   Q.  Do you have any specific recollection of ever prescribing

22   Bactrim or its generic TMP-SMX for a patient with active

23   toxoplasmosis?

24   A.  No.  I couldn't tell you which medication I had used in

25   those handful of circumstances that I treated toxoplasmosis

1    patients.

2    Q.  Have you ever actually prescribed atovaquone or its generic

3    for a patient with active toxoplasmosis?

4    A.  Not that I specifically recall.  I've used that drug in

5    other patients, but not that I specifically recall with

6    patients for toxoplasmosis.

7    Q.  You've never actually prescribed atovaquone or its generic

8    for a patient who has active toxoplasmosis?

9    A.  I don't believe that is what I testified to.

10   Q.  I'm asking you that now.

11   A.  I couldn't tell you whether I used atovaquone, compounded

12   pyrimethamine, Daraprim, or Bactrim.  I can tell you that I've

13   treated about five patients with this disease over the last 10

14   to 15 years I've been in practice.  But I couldn't tell you

15   specifically which medications.

16   Q.  Were all of these five or so instances at Mass. General

17   Hospital?

18   A.  I believe most of them were.  The other place they would be

19   is where I trained, which is University of Chicago, which is in

20   Chicago.

21   Q.  The Massachusetts General Hospital is a teaching hospital?

22   A.  Yes, sir.

23   Q.  So each patient who is admitted at Massachusetts General is

24   a teaching case?

25   A.  Not entirely.  There are two different medical services at

LCKMFTC7                    Jena - Cross                    1073

1   mast general.  I'm happy to describe them all.

2   Q.  When a patient presents with toxoplasmosis with active

3   toxoplasmosis encephalitis, they typically come through the

4   emergency room, is that correct?

5   A.  They could come from the emergency room or they could be a

6   direct admission from an infectious disease or other specialty

7   clinic in the hospital.

8   Q.  When they come through the emergency room, they would be

9   admitted by an emergency room physician?

10  A.  Correct.

11  Q.  It would be the emergency room that would first diagnose

12  the toxoplasmosis, is that correct?

13  A.  It could be, or if the patient was referred to the

14  emergency room by an outpatient physician, that physician may

15  have been responsible for the initial diagnosis.

16  Q.  Typically, as a hospitalist working on the medical ward at

17  Mass. General, you wouldn't actually make the initial diagnosis

18  of toxoplasmosis, is that correct?

19  A.  Not necessarily.  It depends on what diagnostic information

20  was available at the time of transfer from the emergency

21  department to the general medical floor.

22  Q.  In the five or so cases of toxoplasmosis patients you have

23  seen over the course of the last 15 years, how many times have

24  you been the physician who made the diagnosis of toxoplasmosis?

25  A.  If I was the physician involved in the team that made the

LCKMFTC7                    Jena - Cross                      1074

1   diagnosis, I would say it's probably one or two times, and my

2   instinct would be that most of the time the diagnosis is made

3   in the emergency department or earlier, before they arrive to

4   the care of the team that I might supervise.

5   Q.  I am not sure really you addressed my question.  Your

6   answer was, if I was the physician involved in the team.  I am

7   not asking you about an if or a hypothetical.  I'm asking you,

8   how many times do you know that you personally made the

9   diagnosis of toxoplasmosis in the five or so patients you've

10  seen in the last 15 years?

11  A.  I would say maybe once, but, again, these are infrequent

12  cases.  I don't have specific recollection, but they would be,

13  at most, one or two.

14  Q.  Do you remember when that was?

15  A.  I remember a specific case, which was about five or six

16  years ago, which I'm happy to describe more details.

17  Q.  No.  That's OK.  You had indicated that you would typically

18  see these patients as part of a team, correct?

19  A.  Correct.

20  Q.  That team would include an infectious disease specialist as

21  part of that team, correct?

22  A.  An infectious disease specialist would often be part of the

23  broader medical team.  But when I used the word team, that

24  wasn't what I was referring to.

25  Q.  In a case of toxoplasmosis at Massachusetts General

LCKMFTC7                    Jena - Cross                    1075

1   Hospital, it would typically involve the input from an

2   infectious disease specialist, correct?

3   A.  Correct.

4   Q.  Someone like Dr. Hardy?

5   A.  I don't know Dr. Hardy in particular, but an infectious

6   disease doctor for sure.

7   Q.  An infectious disease doctor like Dr. Hardy.

8   A.  It could be.

9   Q.  According to your trial testimony, only pyrimethamine is

10  FDA approved to treat toxoplasmosis, correct?

11  A.  For the treatment, yes.  For the prophylaxis it's Bactrim.

12  But for primary -- secondary prevention and treatment, it would

13  be toxoplasmosis.  It would be pyrimethamine.

14  Q.  Only pyrimethamine is FDA approved to treat toxoplasmosis,

15  correct?

16  A.  Correct.

17  Q.  And compounded drugs are not FDA approved, correct?

18  A.  They are not FDA approved, but there is FDA guidance around

19  them, but they are not FDA approved.

20  Q.  As part of your work in this case you reviewed the

21  guidelines for the prevention and treatment of opportunistic

22  infections, correct?

23  A.  I did.

24  Q.  And you consulted them as part of the work you did in this

25  case?

1    A.  I did.

2    Q.  And prior to your work in this case, do you recall whether

3    you've actually ever read those guidelines?

4    A.  I'm certain I have, and I'm happy to expand more as to why.

5              MR. MEIER:  If the technology is working again, I'd

6    like to call up the guidelines for the prevention and treatment

7    of opportunistic infections as Government Exhibit 4088.

8              THE COURT:  Counsel, we are at like one minute to 5.

9    Is this a good time?

10             MR. MEIER:  This would be a perfect time, your Honor.

11   Because this segment will take a little while.

12             THE COURT:  It sounded like it.  Good.

13             I'll see everybody tomorrow morning at 9:30.  Have a

14   good night.

15             (Adjourned to December 21, 2021, at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1                                INDEX OF EXAMINATION

2    Examination of:                              Page

3    HOWARD LEWIS DORFMAN

4    Direct By Mr. Weprin . . . . . . . . . . . . 859

5    Cross By Mr. Pollack . . . . . . . . . . . . 872

6    SCOTT HEMPHILL

7    Cross By Mr. McDonnell . . . . . . . . . . . 878

8    Redirect By Ms. Peay . . . . . . . . . . . . 919

9    Redirect By Ms. Peay . . . . . . . . . . . . 924

10   KEVIN PATRICK MULLEADY

11   Direct By Mr. Weingarten . . . . . . . . . . 927

12   Cross By Mr. Pollack . . . . . . . . . . . .1030

13    JOHN S. RUSSELL

14   Cross By Mr. Weingarten . . . . . . . . . .1042

15   Redirect By Mr. Parks . . . . . . . . . . .1064

16   ANUPAM B. JENA

17   Cross By Mr. Meier . . . . . . . . . . . . .1068

18                          GOVERNMENT EXHIBITS

19   Exhibit No.                           Received

20    9013 and the exhibits listed therein   . . . 854

21    9066   . . . . . . . . . . . . . . . . . . . 855

22    9067   . . . . . . . . . . . . . . . . . . . 855

23    9068   . . . . . . . . . . . . . . . . . . . 855

24    9069   . . . . . . . . . . . . . . . . . . . 856

25    9070   . . . . . . . . . . . . . . . . . . . 856

1078

| | | |
|---|---|---|
| 1 | 9071 . . . . . . . . . . . . . . . . | 856 |
| 2 | 9072 . . . . . . . . . . . . . . . . | 857 |
| 3 | 9073 . . . . . . . . . . . . . . . . | 857 |
| 4 | 8004 . . . . . . . . . . . . . . . . | 877 |
| 5 | 9014 . . . . . . . . . . . . . . . . | 878 |
| 6 | 1153 . . . . . . . . . . . . . . . . | 943 |
| 7 | 1692 . . . . . . . . . . . . . . . . | 949 |
| 8 | 1218 . . . . . . . . . . . . . . . . | 974 |
| 9 | 1349 . . . . . . . . . . . . . . . . | 978 |
| 10 | 1379 . . . . . . . . . . . . . . . . | 993 |
| 11 | 1135 . . . . . . . . . . . . . . . . | 1001 |
| 12 | 1104 . . . . . . . . . . . . . . . . | 1012 |
| 13 | 1129 . . . . . . . . . . . . . . . . | 1014 |
| 14 | 1130 . . . . . . . . . . . . . . . . | 1018 |

15                      DEFENDANT EXHIBITS

16    Exhibit No.                              Received

| | | |
|---|---|---|
| 17 | 545 . . . . . . . . . . . . . . . . | 926 |
| 18 | 538 . . . . . . . . . . . . . . . . | 1034 |
| 19 | 546 . . . . . . . . . . . . . . . . | 1037 |
| 20 | 901 and exhibits listed therein . . . . . | 1038 |
| 21 | 902 and exhibits listed therein . . . . . | 1038 |
| 22 | 541 . . . . . . . . . . . . . . . . | 1068 |

23

24

25

LCLKFTC1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     FEDERAL TRADE COMMISSION,
3    STATE OF NEW YORK, STATE OF
     CALIFORNIA, STATE OF OHIO,
4    COMMONWEALTH OF PENNSYLVANIA,
     STATE OF ILLINOIS, STATE OF
5    NORTH CAROLINA, and
     COMMONWEALTH OF VIRGINIA,

6
                   Plaintiffs,
7            v.                          20 CV 706 (DLC)

8    MARTIN SHKRELI, et al.,

9                  Defendants.
     ------------------------------x
10                                       New York, N.Y.
                                         December 21, 2021
11                                       9:30 a.m.
     Before:
12                       HON. DENISE COTE,
                                         District Judge
13                          APPEARANCES

14   FEDERAL TRADE COMMISSION
     BY:  MARKUS H. MEIER
15        MARIN HANEBERG
          BRADLEY S. ALBERT
16        LAUREN PEAY
          NEAL PERLMAN
17        LEAH HUBINGER

18   NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
     BY:  ELINOR R. HOFFMANN
19        JEREMY R. KASHA
          AMY E. McFARLANE
20
     DUANE MORRIS LLP
21        Attorneys for Shkreli
     BY:  CHRISTOPHER H. CASEY
22        JEFFREY S. POLLACK
          ANDREW J. RUDOWITZ
23        SARAH FEHM STEWART
          SEAN McCONNELL
24        J. MANLY PARKS

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

LCLKFTC1

1       (In open court; trial resumed)

2              THE COURT:  So, counsel, I forgot to put on the record

3       yesterday your use of time, but we communicated that to counsel

4       after court ended.  The plaintiffs have used 14 hours and two

5       minutes, and the defendant has used 12 hours and 18 minutes.

6              Let's talk a little bit about where we stand.  I

7       understand that Dr. Jena is the last witness.  Is that true?

8              MR. CASEY:  Yes, your Honor, that's correct.

9              THE COURT:  Yesterday, Ms. Kirby's affidavit was

10      received that constitutes her direct testimony, but I take it,

11      then, the plaintiffs are waiving their right to cross-examine

12      Ms. Kirby?

13             MR. MEIER:  Your Honor, I think we have an

14      understanding -- Markus Meier, for the FTC, sorry — that we

15      will put in, and I think we've put in, her deposition

16      testimony.  So one of the things we moved in was deposition

17      testimony, and Ms. Kirby will not be appearing live, and,

18      through agreement with the defendants, we used the deposition

19      testimony instead.

20             THE COURT:  Let me make sure.

21             (Pause)

22             THE COURT:  So, counsel, this last weekend, I

23      reviewed, I thought, all the deposition designations that were

24      being offered by the parties.  I did not understand at that

25      time that Ms. Kirby's dep designations were being offered by

LCLKFTC1

1  the parties because I thought she was going to be a witness.

2  So I will now read the deposition designations for Ms. Kirby.

3          Is there anyone else who might fall in that category,

4  where -- I've read Mr. Shkreli's designations.  Anyone else?

5          MR. MEIER:  Yes, your Honor.  Markus Meier, for the

6  FTC.

7          Also, Eve Costopoulos.

8          THE COURT:  I read hers.

9          MR. MEIER:  That would be it, as far as I understand.

10          MR. RUDOWITZ:  Your Honor, this is AJ Rudowitz, on

11  behalf of Mark Shkreli.

12          I believe that we will be offering today Danny Bailey

13  and Amanda Lopez's deposition designations.  I don't think that

14  those fall into the same category as someone who is expected to

15  testify, but now is not, but I just wanted to let your Honor

16  know that we do intend to offer those today.

17          THE COURT:  Bailey, I have read.

18          And which other one?

19          MR. RUDOWITZ:  Amanda Lopez, your Honor.

20          THE COURT:  Yes, I read that.

21          MR. MEIER:  Your Honor --

22          THE COURT:  Excuse me one second.

23          (Pause)

24          MR. MEIER:  I wanted to add that plaintiffs will be

25  admitting this morning, or seeking to admit, the deposition

LCLKFTC1

1    testimony of Ron Tilles.  The difference between Costopoulos

2    and Kirby is they put in written directs, and we've

3    counterdesignated depositions.  Mr. Tilles is not a written

4    direct, he's just another witness with a --

5            THE COURT:  Yes, and I read his designations, also,

6    this weekend.

7            MR. MEIER:  Thank you.

8            THE COURT:  So, what is my roadmap for my assignments

9    is the document that defense counsel gave me at the beginning

10   of the trial.  So, thank you very much.  It's been very useful

11   to me.

12           Okay, good.

13           Let's get Dr. Jena back on the stand, and then I want

14   to talk with counsel about how we organize ourselves for

15   tomorrow with summations and other cleanup issues.

16           Dr. Jena, thank you for your patience.  Please retake

17   the stand.

18           THE WITNESS:  Thank you.  Good morning.

19           THE COURT:  Good morning.  I remind you, you are still

20   under oath.

21           Cross-examination?

22           MR. MEIER:  Your Honor, there are a couple of

23   administrative matters, if we may, first?

24           THE COURT:  Sure.

25           MR. MEIER:  We have two things that the plaintiffs

LCLKFTC1

1   would like to move in, and then defendants have two that they
2   would like to move in.
3           This is all by agreement, as I understand it.  The
4   first is:  Government Exhibit 9007.
5           THE COURT:  Any objection to the receipt of GX 9007
6   and the exhibits listed therein?
7           MS. STEWART:  Sarah Stewart, your Honor.
8           No objection, subject to your Honor's rulings.  Thank
9   you.
10          THE COURT:  Received.
11          (Government's Exhibit 9007 and exhibits listed therein
12  received in evidence)
13          MR. MEIER:  The last one for the plaintiffs, your
14  Honor, is Government Exhibit 9074.  It is the deposition
15  transcript excerpts of Ronald Tilles, T-i-l-l-e-s, from Vyera.
16          THE COURT:  Any objection to receipt of GX 9074?
17          MR. RUDOWITZ:  RJ Rudowitz, your Honor.
18          No objection.
19          THE COURT:  It's received.
20          (Government's Exhibit 9074 received in evidence)
21          THE COURT:  I notice that there are some passages that
22  are being withdrawn.  I'm going to try to be hypervigilant
23  about that as I finalize my opinion.
24          Thank you.
25          Anything from defense counsel?

LCLKFTC1

1          MR. CASEY:  Yes, your Honor.  We have several exhibits

2      to move in evidence at this point.

3          THE COURT:  And you want to do that now, or do you

4      wish to wait until your expert is off the stand?

5          MR. CASEY:  Whatever the Court prefers.

6          THE COURT:  Your call, counsel.

7          MR. CASEY:  We'll do it now, your Honor.

8          THE COURT:  Great.

9          MR. RUDOWITZ:  First, your Honor, is Defendant's

10     Exhibit DX 801.  This is the deposition designation to the

11     transcript of the deposition of Danny Bailey.

12         THE COURT:  Any objection to the receipt of DX 801?

13         MR. MEIER:  No objection, your Honor.

14         THE COURT:  Received.

15         (Defendant's Exhibit 801 received in evidence)

16         MR. RUDOWITZ:  Your Honor, next will be Defendant's

17     Exhibit DX 802.  These are the deposition designations to the

18     transcript of the deposition of Amanda Lopez.

19         THE COURT:  Any objection?

20         MR. MEIER:  No objection, your Honor.

21         THE COURT:  Received.

22         (Defendant's Exhibit 802 received in evidence)

23         MS. STEWART:  Your Honor, Sarah Stewart.

24         The next exhibit that we have to offer is DX 903.  It

25     lists various other exhibits that the parties have agreed may

LCLKFTC1

1    be admitted into evidence.

2           THE COURT:  Any objection to the receipt of DX 903 and

3    the exhibits listed therein?

4           MR. MEIER:  No objection, your Honor.

5           THE COURT:  Received.

6           (Defendant's Exhibit 903 and exhibits listed therein

7    received in evidence)

8           MS. STEWART:  The last one, your Honor, is DX 904.  It

9    is another list of exhibits that the parties have conferred on

10   and agreed may come into evidence.

11          THE COURT:  Any objection to the receipt of DX 904 and

12   the exhibits listed therein?

13          MR. MEIER:  No objection, your Honor.

14          THE COURT:  Received.

15          (Defendant's Exhibit 904 and exhibits listed therein

16   received in evidence)

17          MR. CASEY:  Your Honor, just one point of

18   clarification.  With respect to the Ron Tilles' deposition

19   designations, just so the record is clear, we have no

20   objections, subject to this Court's prior rulings.

21          THE COURT:  Sure.

22          Counsel.

23          MR. MEIER:  Thank you, your Honor.  May it please the

24   Court, Markus Meier, on behalf of the FTC.

25          Your Honor, it would be my intention to try to save

1086

LCLKFTC1                    Jena – Cross

1   about eight minutes of the 58 minutes for possible redirect,

2   and you may see some assistant come up and give me a note

3   telling me that I'm running out of time.

4   ANUPAM JENA,

5   CROSS-EXAMINATION CONTINUED

6   BY MR. MEIER:

7   Q.  Dr. Jena, I'd like to start where we left off yesterday

8   afternoon — discussing your medical opinions in this case.

9           As we were just about to get started before the

10  recess, I wanted to show you Government Exhibit 4088.

11          MR. MEIER:  So if we could pull that up, please,

12  Mr. Tuttle.

13  Q.  While Mr. Tuttle is pulling that up, as part of your work

14  in this case, you looked at the guidelines for the prevention

15  and treatment of opportunistic infections, correct?

16  A.  Yes, sir.

17  Q.  And we discussed it during your deposition?

18  A.  Yes, sir.

19  Q.  And you do not cite the guidelines for the prevention and

20  treatment of opportunistic infections by name in your trial

21  testimony, but you do appear to discuss these guidelines,

22  correct?

23  A.  I believe that's correct.

24  Q.  Let's start by looking at the cover page.

25          The cover page, do you see right under the headline,

LCLKFTC1                    Jena - Cross

1   there is a symbol of the Health and Human Services, and then it

2   says, "Recommendations from The Centers for Disease Control and

3   Prevention, The National Institutes of Health, and The HIV

4   Medicine Association of The Infectious Diseases Society of

5   America."

6           Do you see that?

7   A.   Yes, sir.

8   Q.   And the current director of the CDC is Dr. Rochelle

9   Walensky?

10  A.   Yes, sir.

11  Q.   And Dr. Walensky was the chief of the Division of

12  Infectious Diseases at Mass General Hospital, your hospital,

13  correct?

14  A.   Yes.

15  Q.   And the current director of the NIH, National Institute of

16  Allergy and Infectious Diseases, is Dr. Anthony Fauci?

17  A.   Correct.

18  Q.   Unfortunately, because of COVID, Drs. Walensky and Fauci

19  have become household names for many of us, correct?

20  A.   Agreed.

21          MR. MEIER:  Let's turn to page A2, please, Bryce.

22  Q.   So I'd like to bring your attention, in the middle of the

23  first paragraph at the top, there's a sentence that begins with

24  "the NIH and CDC."

25          Do you see that?

LCLKFTC1                    Jena - Cross

1    A.  Yes, sir.

2    Q.  It says, "The NIH and the CDC and the HIV Medicine

3    Association of The Infectious Diseases Society of America now

4    jointly cosponsor these guidelines, which have been published

5    in peer-reviewed journals and/or the MMWR in 1997, 1999, and

6    2002.  Since 2009, the guidelines have been managed as a living

7    document on the Web with each chapter reviewed quarterly by the

8    guidelines committee.  Updates are published as often and as

9    promptly as deemed appropriate by the guidelines committee."

10            Now, you're not a member of the guidelines committee,

11   are you?

12   A.  No, sir.

13   Q.  Do you happen to know what the acronym MMWR stands for?

14   A.  It's the Monthly Morbidity Weekly Review, I believe.  It's

15   published by the CDC and frequently would appear in the medical

16   journal JAMA.  That's the Journal of The American Medical

17   Association.

18   Q.  Is it correct that these guidelines are intended for

19   clinicians and other healthcare providers, patients with HIV,

20   and policymakers in the United States?

21   A.  Yes, I think primarily healthcare professionals.  I don't

22   know the extent to which policymakers review these guidelines,

23   but, certainly, healthcare providers.

24   Q.  So just so you know, I was actually reading.  I probably

25   should have called your attention to it.

LCLKFTC1                    Jena – Cross

1       MR. MEIER:  Let's go to the fourth paragraph down from

2  the top, Mr. Tuttle.

3  Q.  It says, "These guidelines are intended for clinicians,

4  other healthcare providers, patients with HIV, and policymakers

5  in the United States."

6       Do you see that?

7  A.  Yes, sir.

8  Q.  And as you said, the guidelines are intended for physicians

9  like you, correct?

10  A.  Correct.

11  Q.  And they're designed for use by clinicians who may

12  encounter certain infectious diseases only rarely?

13  A.  Correct.

14       MR. MEIER:  Still looking at page 2, moving down to

15  that big paragraph there -- and I want to find the right

16  sentence -- sort of in the middle, there's -- Mr. Tuttle,

17  there's a place where it starts with "the working group's," and

18  if you could just highlight that down to the word "indicate."

19  The next couple lines, also, Mr. Tuttle, including the next

20  sentence.  Thank you, Mr. Tuttle.

21  Q.  It says, "The working group's review in realtime the

22  relevant literature published since the last review of the

23  guidelines and, if indicated, propose revised recommendations,

24  which are then presented to the coeditors and other working

25  group leaders.  The coeditors and working group leaders have a

LCLKFTC1                    Jena - Cross

1   teleconference quarterly to determine changes in each section

2   that are indicated."

3          Do you see that?

4   A.  Yes, sir.

5   Q.  And you're not a coeditor, correct?

6   A.  No, sir.

7   Q.  And you're not a working group leader, correct?

8   A.  No, sir.

9   Q.  And the guidelines, as this would indicate, are constantly

10  being updated to reflect the latest medical findings from the

11  research; is that correct?

12  A.  That's correct.

13  Q.  And the guidelines have been updated throughout the time

14  you've been a physician?

15  A.  That's correct.

16         MR. MEIER:  So if we could go to page 4 now, which

17  is -- I'm sorry, page A4.  That's 0035 of the document.  I'm

18  sorry, 005, excuse me.

19  Q.  Do you see where there's a headline up near the top on how

20  to use the information in these guidelines?

21  A.  Yes, sir.

22         MR. MEIER:  And then there's ten points, and then

23  there's a paragraph that starts with "recommendations," so if

24  we could just pull that up.

25  Q.  And it says, "Recommendations are rated according to the

LCLKFTC1                    Jena - Cross

1   criteria in the table below and accompanied, as needed, by

2   explanatory text that reviews the evidence and the working

3   group's assessment.  In this system, the letters A, B, or C

4   signify the strength of the recommendation for or against a

5   preventative or therapeutic measure, and the Roman numerals I,

6   II, or III indicate the quality of the evidence supporting the

7   recommendation."

8           Do you see that?

9   A.  Yes, sir.

10  Q.  So let's take a look at the table directly below that.

11  This is essentially an explanation of the rating system used

12  throughout the guidelines, correct?

13  A.  Correct.

14  Q.  And it consists of two elements, a strength of

15  recommendation and the quality of evidence for the

16  recommendation.

17          Do you see that?

18  A.  Yes.

19  Q.  So if I understand this correctly, AI would be the highest

20  rated prevention and treatment recommendation and CIII would be

21  the lowest?

22  A.  Correct.

23  Q.  So you'd agree that this rating system is fairly easy to

24  understand and to use, correct?

25  A.  I think so.

LCLKFTC1                    Jena - Cross

1   Q.  So even people like us lawyers, who didn't go to medical

2   school, could understand this, correct?

3   A.  I think so.

4   Q.  Okay.  Thank you.

5       MR. MEIER:  So let's turn to the section about

6   Toxoplasma gondii encephalitis.  And that would be AA-1.

7   Q.  Looking at the very top, do you see, it says, "Last Updated

8   July 25, 2017; Last Reviewed June 26, 2019"?

9   A.  Yes.

10  Q.  And then under the heading "Treating Disease," which is on

11  page AA-3 -- I just want to focus on treating the disease -- it

12  says, "The initial therapy of choice for TE" -- that would be

13  Toxoplasma encephalitis, correct?

14  A.  Correct.

15  Q.  That is Toxoplasma in the brain?

16  A.  That's correct.

17  Q.  So it says, "The initial therapy of choice for TE consists

18  of the combination of pyrimethamine plus sulfadiazine plus

19  leucovorin," and then it says "AI," right?

20  A.  Yes.

21  Q.  And that's the highest rating that the guidelines give?

22  A.  Correct.

23      MR. MEIER:  And if we could go to page AA-9 under the

24  heading "Recommendations for Preventing and Treating Toxoplasma

25  Gondii."  Sorry, Mr. Tuttle, I'm moving a little fast.

LCLKFTC1                    Jena - Cross

1    Q.  Here's a chart that's part of a guidelines that then

2    marches through the different ways to treat different

3    manifestations of Toxoplasma, correct?

4    A.  Correct.

5    Q.  It says, "The preferred regimen, AI, is pyrimethamine

6    200 milligrams."

7            You see that?

8    A.  Yes.

9    Q.  And then there's a note.

10            You see where the note is?

11   A.  Yes.

12   Q.  It says, "If pyrimethamine is unavailable or there is a

13   delay in obtaining it, TMP-SMX should be used in place of

14   pyrimethamine sulfadiazine," and that gets a BI, correct?

15   A.  That's correct.  And I think it refers to the part of A3,

16   which is the very bottom of A3, which refers to the comparative

17   effectiveness evidence.

18   Q.  So what the joint committees and organizations that have

19   put together the guidelines and brought to bear the most recent

20   understanding of the medical literature and updating it as

21   necessary, they determined that pyrimethamine is an AI and

22   TMP-SMX is a BI, correct?

23   A.  That's correct, yes, sir.

24   Q.  And the last one, it talks about atovaquone, and it says,

25   "Atovaquone should be administered until therapeutic doses of

LCLKFTC1                          Jena - Cross

1    TMP-SMX are achieved," and that gets a CIII, correct?

2    A.  Correct.

3    Q.  So that's the least strong medical evidence and the least

4    strong recommendation, correct?

5    A.  Yes, sir.

6              MR. MEIER:  Thank you, Mr. Tuttle.  You can take this

7    exhibit down now.

8    Q.  Let's move to your opinions as an economic expert in this

9    case.  Okay?

10   A.  Sure.

11   Q.  Are you with me?

12   A.  Yes, sir.

13   Q.  Please turn to page 6 of your trial testimony.

14              Do you have it up there with you?

15   A.  I do.

16   Q.  I'm going to focus on Exhibit D.1.

17              Do you see that?

18   A.  Yes, sir.

19   Q.  And D.1 has a title "Quantity and Price of Daraprim Q1 2006

20   Through Q2 2015," correct?

21   A.  Yes, sir.

22   Q.  And Q1 would stand for the first quarter of 2006, i.e.,

23   January to March, correct?

24   A.  Yes, sir.

25   Q.  And Q2 would be the second quarter of 2015, which would be

LCLKFTC1                    Jena - Cross

1   April to June?

2   A.  Yes, sir.

3   Q.  All right.

4           So in paragraph 26 of your trial testimony -- that's

5   right before the charts -- you write, "Daraprim received FDA

6   approval in January of 1953 and was marketed worldwide by

7   GlaxoSmithKline (hereinafter GSK) and its affiliated

8   predecessors until 2010.  As seen in Exhibit D.1, data reported

9   by IQVIA, based on sales to wholesalers and other distributors,

10  show that by 2010, the price charged per Daraprim tablet was

11  approximately one dollar," correct?

12  A.  Yes, sir.

13  Q.  And going back to the chart on page 6, we can see that

14  graphically by the blue line that's very flat running from 2006

15  to about the fourth -- roughly, the fourth quarter of 2010.

16          Do you see that?

17  A.  Yes, sir.

18  Q.  That's the price line, correct?

19  A.  That's correct.

20  Q.  That blue line?

21          And then the orange line, that's the line for tablets?

22  A.  Correct.

23  Q.  Measured in increments of 100,000, correct?

24  A.  Yes, sir.

25  Q.  So if we're reading this correctly, where you start the

LCLKFTC1                    Jena - Cross

1    chart in the first quarter of 2006, GSK was selling about

2    450,000 tablets a year -- I'm sorry, a quarter at the time at a

3    price of a dollar a pill?

4    A.  Correct.

5    Q.  And that orangish line shows a steady decline, correct?

6    A.  That's correct.

7    Q.  And that steady decline indicates that the sales of

8    Daraprim tablets was declining at a fairly constant rate over

9    the period of your Exhibit D.1, correct?

10   A.  Correct.

11   Q.  And your Exhibit D.1 ends at the second quarter of 2015,

12   correct?

13   A.  Correct.

14   Q.  And that's just before Vyera acquired the U.S. rights to

15   Daraprim, correct?

16   A.  Yes, sir.

17              THE COURT:  Counsel, is it true that the correct way

18   to read this chart is – could you inquire — 450,000 tablets per

19   quarter?

20              MR. MEIER:  I think you're right, your Honor.  I think

21   it's probably per year at that moment.

22   BY MR. MEIER:

23   Q.  But, actually, Dr. Jena, how is the correct way to read

24   that?

25   A.  This would be by quarter.  So if you look at the table of

LCLKFTC1                    Jena – Cross

1    notes it's priced at, it's quarterly gross sales by quarterly

2    units, so I believe this would be per quarter.  I'm not

3    entirely sure.  I'd have to look at the underlying data.

4    BY MR. MEIER:

5    Q.  But what it's showing is it fluctuates -- there's

6    fluctuation from quarter to quarter, but over time, the trend

7    line is markedly going down, correct?

8    A.  That's correct.

9    Q.  So that by the second quarter of 2015, it looks like about

10   200,000 tablets, right, before Vyera acquires Daraprim?

11   A.  That's correct.

12          And, just to clarify, I believe these are quarterly

13   units.

14   Q.  Okay.  Can you just explain that real quickly, so we all

15   understand what you mean by that?

16   A.  Yes, sir.  Units sold per quarter, so tablets sold per

17   quarter.

18   Q.  Okay.  Thank you.

19          Now, the graph doesn't tell us anything about

20   physician or patient switching away from Daraprim and using

21   other drugs to treat toxoplasmosis, correct?

22   A.  No, it does not.

23   Q.  Instead, the downward trend in Daraprim sales reflect the

24   increasing success that the medical community has had in

25   diagnosing, preventing, and treating HIV, correct?

1098

LCLKFTC1                    Jena - Cross

1   A.  That's certainly part of it, but, from this graph, I

2   couldn't conclude whether that's the only component or whether

3   there's also changes over time in use of other drugs versus

4   pyrimethamine, but I would expect that the primary component is

5   what you just described.

6   Q.  And nothing in your chart -- nothing in this graph tells us

7   anything about switching to other drugs that might be used to

8   treat toxoplasmosis, correct?

9   A.  Correct.

10  Q.  So your graph shows that even during the time GSK was

11  charging a dollar a pill for Daraprim, the quantity of Daraprim

12  sold declined from about 450,000 tablets to about 350,000

13  tablets per quarter, correct?

14  A.  Yes, sir.

15  Q.  That's about a 22 percent decline in quantity sold?

16  A.  I think that's correct.

17  Q.  And then it shows, your graph shows, that Daraprim price

18  started going up from about a dollar a pill around the third

19  quarter of 2010?

20  A.  Yes, sir.

21  Q.  And at some point, it goes all the way up to about $12,

22  slightly under $12, a pill, correct?

23  A.  Yes, sir.

24  Q.  That's over about a five-year period, maybe

25  four-and-a-half, five years?

LCLKFTC1                    Jena - Cross

1    A.  Correct.

2    Q.  And that's about an 1100 percent price increase?

3    A.  I'll take your representation for that price increase, but

4    the absolute increase is correct, from about $6 to about $12.

5    Q.  So during the same time that Daraprim experienced a

6    1100 percent price increase, there was only about a 22 percent

7    decline in quantity sold, correct?

8    A.  Correct.

9    Q.  And in Exhibit D.1 of your trial testimony, you use

10   Daraprim pricing data from IQVIA, correct?

11   A.  Correct.

12   Q.  And this data, in this particular chart from IQVIA, doesn't

13   include all rebates to payers and other types of discounts that

14   Vyera might have offered or GSK might have offered or any other

15   company that owned Daraprim might have offered?

16   A.  Correct.

17   Q.  You, nonetheless, found the IQVIA data sufficiently

18   reliable to use as part of your trial testimony, correct?

19   A.  Yes.  Just to describe the overall trends in quantities

20   sold and prices not inclusive of rebates.

21   Q.  Thank you.

22            So let's turn to page 7, paragraph 29, of your trial

23   testimony.

24            Are you with me?

25   A.  Yes, sir.

LCLKFTC1                    Jena - Cross

1   Q.  And this paragraph says, "On August 7, 2015, Impax sold its

2   U.S. rights to market and distribute Daraprim to Vyera (known

3   as Turing at the time).  On August 11, 2015, Vyera increased

4   the list price of Daraprim from approximately $17.60 per tablet

5   to $750 per tablet."

6           Do you see that?

7   A.  Yes, sir.

8   Q.  So when Vyera raised its price of Daraprim to 750 in 2015,

9   after that — I'm going to ask you about the next few years —

10  Vyera's Daraprim sales were profitable in 2016, correct?

11  A.  Correct.

12  Q.  And they were profitable in 2017, correct?

13  A.  Correct.

14  Q.  And they were profitable in 2018, correct?

15  A.  Correct.

16  Q.  And they were profitable in 2019, correct?

17  A.  Yes, sir.

18  Q.  And Vyera's Daraprim sales were profitable in 2020?

19  A.  Correct.

20  Q.  In fact, Vyera's Daraprim sales have been profitable ever

21  since the acquisition, correct?

22  A.  Yes, sir.

23  Q.  So Vyera didn't lose so many Daraprim sales so as to make

24  the price increase to $750 per tablet unprofitable, correct?

25  A.  That is correct.  It lost, I think, something like

LCLKFTC1                    Jena - Cross

1   67 percent of its units sold, the quantity, but with that price

2   increase, it remained profitable, as you just described.

3   Q.  So Vyera didn't lose so many Daraprim sales so as to make

4   the price increase to $750 per tablet unprofitable, correct?

5   A.  Correct.

6   Q.  Let's turn to page 29 of your trial testimony and look at

7   Exhibit D.5.  Page 29, Exhibit D.5.

8           Are you with me?

9   A.  Yes, sir.

10  Q.  Exhibit D.5 has a heading "Quantity of Daraprim Tablets

11  Sold Q1 2006 To Q4 2020."

12          Do you see that?

13  A.  Yes, sir.

14  Q.  And, again, it shows some of the same trend line as DX 1,

15  but it adds additional time periods after the second quarter of

16  2015, correct?

17  A.  Yes, sir.

18  Q.  What it shows, as I look at it — at least as I interpret

19  it, but you can correct me — from the time Vyera acquired

20  Daraprim in the third quarter of 2015 to the time of generic

21  Daraprim entry in Q1 2020, Daraprim's sales remained relatively

22  flat despite the 4,000 percent price increase, correct?

23  A.  I think that's correct, but maybe I can just qualify it, if

24  you're open to it, but I defer to you.

25  Q.  We'll let your attorneys get up and qualify something if it

LCLKFTC1                    Jena - Cross

1    needs to be qualified.

2    A.  Sure.

3    Q.  This can be seen graphically by the yellow highlighter that

4    Mr. Tuttle put on there, the sales are relatively flat from the

5    period after Vyera has increased the price by 4,000 percent,

6    correct?

7    A.  Correct, the sales are relatively flat after the price

8    increase, but, of course, prior to that, there's a large

9    reduction in quantity, but after that, they remain relatively

10   flat.

11   Q.  Yes, thank you.  So you got the explanation in after all.

12        Looking at Exhibit D.5, your Daraprim sales line

13   changes from a dotted orangish line to a solid orangish line in

14   the third quarter of 2015.

15        Do you see that?

16   A.  Yes, sir.

17   Q.  And according to the note and sources below, where you

18   explain where the information came from, you switched from

19   using IQVIA sales data for Daraprim to using Vyera sales data,

20   correct?

21   A.  Yes, sir.

22   Q.  That's because you no longer found the IQVIA sales data for

23   Daraprim sufficiently reliable after Vyera acquired Daraprim?

24   A.  Yes, sir.

25   Q.  In fact, also, you can see, between the second and third

LCLKFTC1                    Jena - Cross

1    quarter of 2015, you actually see an increase in the sales

2    quantity for Vyera.

3              Do you see that?

4              MR. MEIER:  Bryce, can you circle that area there, or

5    highlight it.  Thank you.

6    Q.  Do you see that?

7    A.  I do see that.  I don't know that I'd call that an

8    increase, given the fluctuation that we observed, but,

9    visually, I do see that uptick.

10   Q.  Yes, that's what it shows.  It shows, visually, that

11   there's a discernible increase in Daraprim sales when you first

12   start using Vyera sales data instead of the IQVIA data,

13   correct?

14   A.  Again, visually, there's an uptick, but I wouldn't draw

15   anything from that besides to say that, visually, I observe

16   that.

17   Q.  Yes, so that's all we've got to work with here, Dr. Jena.

18   You didn't include any other things in your report that would

19   explain this, so we're sort of stuck with what we see visually.

20             In fact, isn't this an indication that the IQVIA data

21   was underreporting Daraprim sales?

22   A.  I don't know if it's correct.  I don't have a particular

23   opinion on that.

24   Q.  Well, you started using Vyera's data, didn't you, because

25   the IQVIA data was no longer reliable because of Vyera's

LCLKFTC1                    Jena - Cross

1    data-blocking policy?

2    A.  That is true.

3    Q.  Now, generic drugs --

4          MR. MEIER:  You can take that down, Mr. Tuttle.

5    Q.  Generic drugs are medications that are created to be the

6    same as an existing approved brand drug in dosage form, in

7    safety, in strength, in route of administration, in quality,

8    and in performance characteristics, correct?

9    A.  Yes, sir.

10   Q.  And that's actually a direct quote out of your written

11   testimony.

12         You would agree that generic Daraprim is branded

13   Daraprim's closest therapeutic substitute?

14   A.  Yes, sir.

15   Q.  Would you also agree that Daraprim is branded -- I'm sorry,

16   generic Daraprim is branded Daraprim's closest economic

17   substitute?

18   A.  I would agree.

19   Q.  That's basically because they're the same drug?

20   A.  Yes, sir.

21   Q.  Just different price?

22   A.  Correct.

23         MR. MEIER:  Mr. Tuttle, would you please put

24   Government Exhibit 1093 on the screen.

25         And while Mr. Tuttle is doing that, your Honor, I'll

LCLKFTC1                    Jena - Cross

1   just point out for the record that Government Exhibit 1093 was

2   admitted as part of a broader Government Exhibit 9013.

3   BY MR. MEIER:

4   Q.  I'd like to show you what's been marked as Government

5   Exhibit 1093, and just ask you to take a quick look at the

6   email at the bottom from an Andrea Weddle to a number of people

7   at turing.com.

8           I showed you this letter -- I'm sorry, this email at

9   your deposition.

10          Do you have a recollection of that?

11  A.  I do, and thanks for the correction.

12  Q.  In the email from Ms. Weddle to the executives at Turing,

13  it says, "I am sending the attached letter on behalf of the

14  president of the Infectious Diseases Society of America,

15  Stephen Calderwood, M.D., and the chair of the HIV Medicine

16  Association, Adora Adimora, M.D., MPH to urge Turing

17  Pharmaceuticals to immediately develop a rational and fair drug

18  pricing strategy for the recently acquired drug pyrimethamine."

19          Do you see that?

20  A.  Yes, sir.

21  Q.  The next sentence says, "The price increase that took

22  effect in the middle of August is negatively impacting patient

23  care and challenging hospital systems across the country."

24          Do you see that?

25  A.  Yes, sir.

1106

LCLKFTC1                    Jena – Cross

1   Q.   Now, you do not offer any opinion in your trial testimony

2   on whether Vyera's Daraprim price increase in 2015 negatively

3   impacted patient care and challenged hospital systems across

4   the country, correct?

5   A.   That's correct.

6   Q.   Let's turn to page 2 of Government Exhibit 1083, which is

7   the actual letter from the IDSA and HIVMA from September the

8   8th, 2015.

9        Do you see that?

10  A.   Yes, sir.

11       MR. MEIER:   If we could go down to the third paragraph

12  of the letter, Mr. Tuttle.

13  Q.   It says, "In mid-August, after Turing purchased

14  pyrimethamine, the price of the medication increased by

15  5,000 percent in hospital pharmacies around the country with no

16  justification for an increase of this magnitude for a

17  medication approved by the U.S. Food and Drug Administration in

18  1953."

19       Do you see that?

20  A.   Yes, sir.

21  Q.   It says, "In addition, hospitals, including those with 340B

22  pharmacies, also reported being unable to obtain the

23  medication."

24       Do you see that?

25  A.   Yes, sir.

LCLKFTC1                          Jena - Cross

1   Q.  Now, you do not offer an opinion in your trial testimony

2   that Vyera's Daraprim price increase was justified, correct?

3   A.  That's correct.

4   Q.  And you do not offer any opinion in your trial testimony

5   contradicting the statement that after Vyera's Daraprim price

6   increase, hospitals reported being unable to obtain Daraprim,

7   correct?

8   A.  That's correct.  I don't assess that, one way or the other.

9   Q.  Right.

10          MR. MEIER:  We can take that letter down, Mr. Tuttle.

11  Thank you.

12  Q.  Turning to page 8 of your trial testimony, we're going to

13  look at Table 1 on page 8.  Table 1 on page 8 of your trial

14  testimony has the heading "Summary of Generic Manufacturers'

15  ANDAs."

16          Do you see that?

17  A.  Yes, sir.

18  Q.  And this is a chart, or a table, I should say, you put

19  together in order to sort of give the dates when various

20  generic manufacturers started working on ANDAs and the status,

21  at least as of the time of your testimony, correct?

22  A.  Yes, sir.

23  Q.  If I'm reading this correctly, two of the companies, the

24  first two companies, shows that they were starting to develop a

25  generic version of Daraprim before Vyera even acquired Daraprim

LCLKFTC1                    Jena - Cross

1    and raised the prices 4,000 percent, correct?

2    A.  Correct.

3    Q.  This would have been in the period when the price was going

4    up from about a dollar a pill to somewhere around 12 or 13

5    dollars a pill?

6    A.  That's correct.

7    Q.  So would it be fair to say that your Table 1 shows that at

8    least two generics started working on generic Daraprim before

9    Vyera acquired the rights?

10   A.  I would say that's correct.

11   Q.  And your table shows that at least two generic companies

12   expected generic Daraprim entry would be profitable at a price

13   somewhere around $12 a pill?

14   A.  I don't have a particular opinion on that.  I didn't

15   analyze that specific question.

16   Q.  Right.

17        But it would be irrational for them to have entered,

18   sought to enter, when the price was $12 a pill, if they didn't

19   think it was going to be profitable, correct?

20   A.  I'd assume that's correct, but I don't have any insight

21   into their business decisions.

22   Q.  No, I understand you don't have insight into that.

23        But you do assume, as an industrial organization

24   economist, that companies are profit-maximizing, correct?

25   A.  I would agree with that.

LCLKFTC1                    Jena - Cross

1  Q.  And that they don't purposely try to lose money, correct?

2  A.  I would agree with that, but I don't know what they were

3  forecasting for the price and quantity sold.

4  Q.  Got it.  Understood.

5          Have you ever had --

6          MR. MEIER:  We can take that down, Mr. Tuttle.

7  Q.  Have you ever had any communications of any kind with

8  Martin Shkreli?

9  A.  No, sir.

10 Q.  You don't rely on anything from Martin Shkreli's deposition

11 in forming any of your opinions in this case, correct?

12 A.  Correct.

13 Q.  You haven't even read Mr. Shkreli's deposition, correct?

14 A.  Correct.

15 Q.  You don't rely on anything from Mr. Shkreli's trial

16 testimony in forming any of your opinions in this case,

17 correct?

18 A.  Correct, sir.

19 Q.  You haven't even read Mr. Shkreli's written direct

20 testimony in this case, correct?

21 A.  No, sir, I've not.

22 Q.  And you do not offer any opinions in your trial testimony

23 on the role of Mr. Shkreli in this case, correct?

24 A.  Correct.

25 Q.  And you were not asked to define a relevant antitrust

LCLKFTC1                    Jena – Cross

1   product market in this case, correct?

2   A.  Correct.

3   Q.  And you were not asked to define a relevant antitrust

4   geographic market, correct?

5   A.  Correct.

6   Q.  So you were not asked to offer any opinions challenging

7   Professor Hemphill's opinion that the relevant geographic

8   market in this case is the United States, correct?

9   A.  Correct.

10  Q.  And you don't define the relevant market for Daraprim in

11  your trial testimony, correct?

12  A.  That is correct.

13  Q.  You don't calculate Daraprim's market share in your trial

14  testimony, correct?

15  A.  That is correct.

16  Q.  You don't give an estimate of Daraprim's market share in

17  your trial testimony, correct?

18  A.  That's correct.

19  Q.  And you were not asked to perform an excess profit

20  calculation in this case, correct?

21  A.  No, I was not.  I was only asked to respond to

22  Dr. Hemphill's calculations in his written testimony.

23  Q.  And you don't offer any opinions in your trial testimony

24  about barriers to entry into the market in which Daraprim

25  competes, correct?

1111

LCLKFTC1                    Jena - Cross

1   A.  No, I do not.

2   Q.  And you did not conduct an analysis of cross-price

3   elasticity in this case, correct?

4   A.  That's correct.

5   Q.  So I'd like to ask you a hypothetical.  Let's look, again,

6   at page 8, Table 1, of your testimony.  That's the one with the

7   Summary of Generic Manufacturers' ANDAs.

8           Do you see that?

9   A.  Yes, sir.

10  Q.  So let's assume a world in which Vyera owns branded

11  Daraprim and acquires each of the generic ANDAs in Table 1.

12          Are you with me?

13  A.  Yes.

14  Q.  Under these circumstances, would you expect Vyera to be

15  able to profitably increase the price of Daraprim and its

16  generics 5 to 10 percent?

17  A.  I don't have a specific opinion on that.  I couldn't tell

18  you one way or the other.

19  Q.  Well, let me ask you this:  Assume a world in which Vyera

20  owns branded Daraprim and pays Cerovene and Fera to exit the

21  market for Daraprim.

22          Are you with me?

23  A.  Yes.

24  Q.  Do you have any opinion on whether Vyera would be able to

25  profitably increase the price of Daraprim by 5 to 10 percent?

LCLKFTC1                    Jena - Cross

1  A.  No, I do not.

2  Q.  Let's turn to tab 3 of your trial testimony.  Tab 3, it's

3  in the back.

4         It's a little bit tricky to find, but it's the one

5  with the big blue page that says, "Pharmaceutical Industry

6  Antitrust Handbook, Second Edition."

7         Do you see that?

8         We've also got up it on the screen, if that helps.

9  A.  Yes, now I see it.  Thank you.  I appreciate it.

10  Q.  Is it fair to say given that you felt this was sufficiently

11  important to attach to your trial testimony, that you relied on

12  the ABA's Pharmaceutical Industry Antitrust Handbook in

13  preparing your testimony?

14  A.  Yes, sir.

15  Q.  Indeed, you found the ABA's Pharmaceutical Industry

16  Antitrust Handbook so important, that you actually included

17  this excerpt as a tab to your trial testimony, correct?

18  A.  Correct.

19  Q.  If you look at the actual excerpt, if we go to page 236,

20  where it has a heading "Competition from Generic Products," do

21  you see that?

22  A.  Yes, sir.

23  Q.  And that's the excerpt that you chose to include as part of

24  your report?

25  A.  Yes, sir.

LCLKFTC1                    Jena - Cross

1   Q.  And looking at the second sentence of the excerpt that

2   starts with, "the entry of an AB rated generic," do you see

3   that?

4   A.  Yes, sir.

5   Q.  It says, "The entry of an AB-rated generic equivalent to

6   the branded drug typically has a powerful effect on the market

7   price for the drug molecule."

8           Do you see that?

9   A.  Yes, sir.

10  Q.  Do you agree with that statement?

11  A.  I would agree with that.

12  Q.  It actually goes on to cite an FTC study, but we don't have

13  time to go into that.

14          Let me go down to the part of the paragraph that

15  starts with "the magnitude of this effect."

16          Do you see that?

17  A.  Yes, sir.

18  Q.  And it says, "The magnitude of this effect varies depending

19  on how many generic manufacturers enter the market."

20          Do you see that?

21  A.  I see that.

22  Q.  Do you agree with that statement?

23  A.  I would agree with that as a general point.

24  Q.  So, generally speaking, the more generics that come in that

25  are AB-rated to the brand, the lower the price goes for the

LCLKFTC1                    Jena - Cross

1    molecule?

2    A.  That's correct.  That's what the academic literature would

3    suggest.

4    Q.  And generic Daraprim is AB-rated to branded Daraprim,

5    correct?

6    A.  Yes, sir.

7    Q.  So looking at the excerpt you chose to include, there is a

8    heading that starts at the bottom that says, "Direct Evidence

9    of Market Power."

10           Do you see that?

11   A.  Yes, sir.

12   Q.  But you didn't continue the excerpt at that point, did you?

13   A.  No, sir.

14   Q.  So you left off the section that discusses so-called direct

15   evidence of market power, correct?

16   A.  Well, I cite to the document.  I don't have that explicitly

17   in here, but I certainly cite to the document, but it is

18   correct to say that the excerpt ends at page 236.

19   Q.  Turning real quickly to your -- keep that page, if you can,

20   hold onto the page --

21   A.  Sure.

22   Q.  -- but also turn back to paragraph 83 on page 18.  It's a

23   little bit of a juggling act.  I'm going to ask you to keep

24   your place.

25   A.  Okay, I'm there.

LCLKFTC1                    Jena - Cross

1    Q.  I'm sorry, I took you to the wrong place.  I wanted to go

2    to paragraph 133, excuse me, which is on page 34.

3              So, maintaining that juggling act, paragraph 133,

4    page 34.

5    A.  All right, I'm there.  Thank you.

6    Q.  And, here, you have some criticisms of Professor Hemphill,

7    and you say, "Direct evidence of market power is typically

8    unavailable, particularly in the pharmaceutical industry."

9              Do you see that?

10   A.  Yes, sir.

11   Q.  Now, you don't cite anything for that proposition, do you?

12   You just state that essentially as an ipse dixit, correct?

13   A.  I don't know what "ipse dixit" means, but I don't cite

14   anything specific there to that statement.

15   Q.  Okay.  So it's just a statement you've made.

16             Now, let's turn back to the handbook, which you felt

17   was sufficiently authoritative, that you included it in your

18   report.

19             Do you know what the handbook has to say about direct

20   evidence of market power?

21   A.  My understanding is that it describes direct and indirect

22   evidence, but it describes the role of direct evidence and

23   market power.

24   Q.  Do you know whether the handbook says anything similar to

25   your statement that it is particularly in the pharmaceutical

LCLKFTC1                    Jena - Cross

1    industry that this type of data is unavailable?

2    A.  Not specifically, but I'm happy to review something, if you

3    would like to show it to me.

4         MR. MEIER:  Your Honor, at this time, I would like to

5    read into the record the section from the Pharmaceutical

6    Antitrust Handbook that talks about direct evidence as a

7    learned treatise.

8         "Although courts predominantly rely upon the relevant

9    market analysis to determine market shares and the presence of

10   market power, some courts evaluate market power by examining

11   direct forms of proof, such as evidence of supercompetitive

12   prices, barriers to entry, abnormally large profit margins,

13   output restrictions, or subcompetitive quality or service."

14        Next paragraph:  "The direct evidence approach has

15   been advocated most strongly in cases alleging unlawful

16   exclusion of generic competition."

17        Thank you, your Honor.

18   BY MR. MEIER:

19   Q.  Let's turn to paragraph 22 on page 5.

20   A.  I'm there.

21   Q.  In paragraph 22, you talk about the experience at Mass

22   General Hospital, correct?

23   A.  Yes.

24   Q.  You say, "As of January 2016, all inpatient pyrimethamine

25   usage at my own hospital, Massachusetts General Hospital (MGH),

LCLKFTC1                    Jena – Cross

1  was the compounded suspension produced by our own compounding

2  pharmacy," and then you cite Defense Exhibit 468, correct?

3  A.  Yes, sir.

4        MR. MEIER:  Mr. Tuttle, would you please put Defense

5  Exhibit 468 on the screen.

6        And while he's doing that, I'll say that it has been

7  admitted in evidence as part of Defense Exhibit 902.

8  Q.  And you've seen this before, correct?

9  A.  I believe so.

10  Q.  So I don't have the time anymore to read all the

11  paragraphs, but Mass General Hospital pharmacists compound

12  pyrimethamine in advance of a specific patient's needs,

13  correct?

14  A.  That is my understanding.

15  Q.  And although Daraprim comes in a tablet form, compounded

16  pyrimethamine at MGH is an oral suspension, correct?

17  A.  Yes, sir.

18  Q.  And MGH-compounded Daraprim is only dispensed by the

19  pharmacy with approval from an infectious disease specialist at

20  MGH, correct?

21  A.  That's correct.

22  Q.  So noninfectious disease specialists, like you, can't

23  approve the use of compounded pyrimethamine at MGH without

24  approval, correct?

25  A.  That's correct.

LCLKFTC1                          Jena - Cross

1    Q.  And even at MGH, outpatients who need pyrimethamine are

2    given Daraprim, correct?

3    A.  That is my understanding.

4             MR. MEIER:  You can take that down.

5             The last thing I'd like to show you, Mr. Tuttle,

6    assuming I still have a minute left — I think I do — would you

7    please put Defense Exhibit 456 on the screen.

8    Q.  Do you know a Dr. Rajesh Gandhi at Mass General Hospital?

9    A.  Yes.  He's an infectious disease doctor at Mass General.

10   Q.  Have you seen this email before?

11   A.  I may have, but I don't specifically recall, but I may

12   have.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

LCLMFTC2                    Jena - Redirect

1  Q.  Dr. Gandhi is writing to Dr. Hardy, among others, in April

2  of 2019 and he says:  The situation at MGH is as follows:  We

3  have been unable to access pyrimethamine through a

4  noncommercial source, but that will no longer be the case as of

5  September 2019.  As a result, our patients will either need to

6  use the commercial product, 400 to $900 per 25-milligram

7  tablet, or we will be forced to switch to

8  trimethoprim/sulfamethoxazole instead.  Do you see that?

9  A.  I think you may have misread.  You said:  We have been

10 unable.  It says we have been able to access pyrimethamine.

11 Otherwise, I agree with that.

12 Q.  I'm sorry.  It does say that.  In other words, it can get

13 it through a noncommercial source, but if it tries to get it

14 through commercial sources it has to pay a lot more?

15 A.  That's correct.

16           MR. MEIER:  Thank you, your Honor.  I think I have a

17 few minutes left for recross, if necessary.

18 REDIRECT EXAMINATION

19 BY MR. McDONNELL:

20 Q.  Good morning, Dr. Jena.

21 A.  Good morning.

22 Q.  You were asked yesterday and today by counsel for

23 plaintiffs about Dr. Hardy.  Do you remember that?

24 A.  Yes, sir.

25 Q.  Have you reviewed Dr. Hardy's trial testimony in this case?

LCLMFTC2                    Jena - Redirect

1    A.  I have.

2    Q.  Has that review of Dr. Hardy's trial testimony impacted

3    your opinions in this case at all?

4    A.  No, sir, it hasn't.

5    Q.  You were asked a little bit about the direct versus

6    indirect approach to market definition.  Can you just please

7    describe for the Court the differences between the indirect

8    approach to understanding a relevant product market versus the

9    direct approach.

10   A.  Sure.  If anything is unclear, let me know.  A direct

11   approach looks at evidence of the market price as it compares

12   to a competitive price and that can be difficult to assess.

13   The indirect approach starts with defining the relevant

14   antitrust product market and then computing market shares in

15   that product market.

16        So the handbook to which Mr. Meier referred, it starts

17   with the assessment that although it is possible-- although

18   courts primarily rely on an indirect approach, a

19   direct-evidence approach can be useful, and I would absolutely

20   agree with it.  I think both sets of metrics are important to

21   understand.

22   Q.  In your experience as an economist which approach is more

23   reliable to defining a relevant product market?

24   A.  I think both are required because they can tell you

25   different things perhaps.  Certainly I think that an indirect

LCLMFTC2                    Jena – Redirect

1   approach is useful.  But I would want to consider both.

2          MR. MEIER:  Your Honor, I object to this line of

3   testimony.  I would ask if I could voir dire the witness to see

4   whether he has actually ever defined a market in any case.

5          THE COURT:  You may voir dire.

6          MR. MEIER:  I will just do it from here.

7   VOIR DIRE EXAMINATION

8   BY MR. MEIER:

9   Q.  Dr. Jena, have you actually ever defined an antitrust

10  product market in any of your academic work, in your consulting

11  work, or in your work as a testifying expert in a case?

12  A.  Yes, sir.

13  Q.  What case was that?

14  A.  Do I have a copy of my testimony list here?

15  Q.  You didn't include it.

16  A.  I don't know what I can speak about, but in the cholesterol

17  market I defined the antitrust market for lipid-lowering drugs.

18  I have defined the relevant antitrust market in setting up

19  antiseizure or antiepileptic medications.  I have defined the

20  antitrust market for anticoagulants.

21         MR. MEIER:  Your Honor, I withdraw my objection.

22         THE COURT:  Thank you.

23  Q.  Thank you, Dr. Jena.  No further questions.

24         THE COURT:  Any recross?

25         MR. MEIER:  No, your Honor.

LCLMFTC2

1        THE COURT:  You may step down.

2        THE WITNESS:  Thank you.  I appreciate it.

3        (Witness excused)

4        MR. CASEY:  Your Honor, the defendants have no more

5   evidence, so we would rest.

6        THE COURT:  Thank you.

7        I have commented before on how helpful the physical

8   assembly of evidence has been to me to assist my review, both

9   deposition binders and, where I had them, the witness affidavit

10  binders with exhibits.

11       So I know that attorneys are present in the courtroom,

12  but there are teams behind them.  Not everybody gets to travel

13  to New York.  Not everybody gets to travel to the courthouse,

14  particularly at a time of COVID.  So please extend my gratitude

15  to the teams.

16       Both sides here have had excellent assistance from

17  those trying to display the evidence so that I could look at it

18  with ease during the examination of the witnesses.  Sadly, we

19  had some equipment problems due to the courthouse equipment,

20  not to counsel's equipment.  But you soldiered on and overcame

21  that and it really helped me understand the relevant evidence

22  as counsel discussed it, so I want to give my thanks to those

23  members of your teams as well.

24       I am going to single out the FTC for giving so many of

25  its younger members of its team -- I think they were all FTC

LCLMFTC2

1    lawyers.  But maybe I'm wrong.  Maybe some came from the New

2    York AG's office.

3              Counsel, can you help me?  Did some come from the AG's

4    office.

5              MS. HOFFMANN:  Your Honor, so far, all of the lawyers

6    examining witnesses have been FTC lawyers, except me.  There

7    will be someone speaking tomorrow from the New York AG's

8    office.

9              THE COURT:  Thank you.  I think it's noteworthy that

10   so many opportunities were given to young lawyers to appear in

11   court.  I think that's a very important practice for counsel.

12   The mentoring and training of young lawyers is critical to our

13   profession.

14             Lastly, and I may think of more things to commend.

15   But counsel have really cooperated so well with each other.

16   You identified evidentiary and legal disputes for me.  I gave

17   you rulings and then you took those and applied those across

18   the board and I think saved all of us an enormous amount of

19   time and energy so we could focus on the core evidence.  I want

20   to thank counsel for cooperating so effectively with each

21   other.  I expect there were a few bumps in the road on that

22   process, but somehow you soldiered on and managed to bring this

23   evidentiary portion of the trial to a close.

24             There was a trial scheduled here with many more

25   defendants, but there was a settlement on the eve of trial for

LCLMFTC2

1    everyone except Mr. Shkreli.

2         Mr. Shkreli's trial team had to wear many hats that it

3    probably had no idea it would have to wear.  I want to

4    acknowledge the effort during the holiday period that went into

5    that.

6         Let's talk about summations.  I think what would be

7    most effective for me -- and I don't know what counsel's

8    desires are, but I'll be happy to hear from you if you have a

9    different idea -- is to start with the plaintiffs' summation,

10   since they bear the burden, then move in to defense summations,

11   and then have a rebuttal from the plaintiffs.

12        The plaintiffs, however, should anticipate everything

13   that they can in their opening summation.  The defendant has a

14   fair opportunity to respond to it in their summation.  There

15   may be some points of emphasis or some surprise that occurs in

16   the defense summation.  So I do want to give the plaintiffs a

17   chance for a rebuttal.

18        Mr. Meier, do you have an anticipation of how long

19   plaintiffs' opening summation will be, roughly?

20        MR. MEIER:  Your Honor, we have been trying to work

21   through that.  I think we are shooting very hard to try to make

22   that an hour.  But I am just concerned that once you get going,

23   it might be a little bit longer.  I think with the summation,

24   both the initial and rebuttal, I think we will get that done in

25   an hour and a half.

LCLMFTC2

 1            THE COURT:  There are no time limits.  I am just

 2    trying to do this for planning purposes.

 3            MR. MEIER:  Understood.  I think that's our best

 4    estimate.

 5            We anticipate having three people speak.  They are

 6    some of the people you have met over the course of the trial,

 7    but it won't be me.

 8            THE COURT:  Thank you.

 9            For defense counsel, do you have an estimate of your

10    summation right now?

11            MR. CASEY:  Your Honor, at this point I would estimate

12    roughly around 90 minutes, perhaps a little bit longer than

13    that.  But that's my best estimate at this point, your Honor.

14            THE COURT:  I don't know if you are going to use

15    demonstratives during your summations.  If you are, and are

16    able to, I would love a set of them printed out.

17            I know as soon as I'm off the bench I'll think of

18    other things that I should have mentioned, but that's it for

19    now.

20            Mr. Meier, anything else?

21            MR. MEIER:  No, your Honor.  But we will absolutely

22    bring copies for the Court and for the clerks, and we do intend

23    to use demonstratives.

24            THE COURT:  Mr. Casey.

25            MR. CASEY:  Your Honor, just one point of

1126

LCLMFTC2

1    clarification.

2          I believe Mr. Meier said that they intended to have

3    three lawyers speak.  Ms. Hoffmann indicated there would be

4    someone from the state speaking.  I don't if they could clarify

5    how they are going to divide that up or who is going to speak.

6          THE COURT:  I'm happy for you to talk to them.  I

7    assume, because the states are the ones making a request for

8    monetary relief, that the state should be speaking.  And there

9    is a request for injunctive relief and I have to make a

10   decision on liability.

11         MR. CASEY:  I'll speak to them.

12         THE COURT:  Good.

13         MR. CASEY:  Nothing further.

14         THE COURT:  That's it, Mr. Casey?  I wanted to make

15   sure you had an opportunity for any question or comment.

16   Nothing more?

17         MR. CASEY:  Thank you, your Honor.

18         THE COURT:  Good.  Enjoy today and I'll see you

19   tomorrow at 9:30.

20         (Adjourned to December 22, 2021 at 9:30 a.m.)

21

22

23

24

25

1    INDEX OF EXAMINATION

2    Examination of:                              Page

3    ANUPAM JENA

4    Cross By Mr. Meier . . . . . . . . . . . . . 858

5    Redirect By Mr. McDonnell  . . . . . . . . . 891

6             GOVERNMENT EXHIBITS

7    Exhibit No.                         Received

8     9007 and exhibits listed therein   . . . . . 855

9     9074   . . . . . . . . . . . . . . . . . . 855

10            DEFENDANT EXHIBITS

11   Exhibit No.                         Received

12    801   . . . . . . . . . . . . . . . . . . 856

13    802   . . . . . . . . . . . . . . . . . . 856

14    903 and exhibits listed therein   . . . . . . 857

15    904 and exhibits listed therein   . . . . . . 857

16

17

18

19

20

21

22

23

24

25

LCMMFTC1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    FEDERAL TRADE COMMISSION,
3   STATE OF NEW YORK, STATE OF
    CALIFORNIA, STATE OF OHIO,
4   COMMONWEALTH OF PENNSYLVANIA,
    STATE OF ILLINOIS, STATE OF
5   NORTH CAROLINA, and
    COMMONWEALTH OF VIRGINIA,
6
                Plaintiffs,
7        v.                          20 CV 706 (DLC)

8   MARTIN SHKRELI, et al.,

9               Defendants.
    ------------------------------x
10                                  New York, N.Y.
                                    December 22, 2021
11                                  10:00 a.m.
    Before:              HON. DENISE COTE,
12                                  District Judge
                         APPEARANCES
13
    FEDERAL TRADE COMMISSION
14  BY:  MARKUS H. MEIER
         MAREN HANEBERG
15       BRADLEY S. ALBERT
         LAUREN PEAY
16       NEAL PERLMAN
         MATT WEPRIN
17       ARMINE BLACK
         AMANDA TRIPLETT
18       LEAH HUBINGER
         JAMES WEINGARTEN
19       AMY McFARLANE
    NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
20  BY:  ELINOR R. HOFFMANN
         JEREMY R. KASHA
21       AMY E. McFARLANE

22  DUANE MORRIS LLP
         Attorneys for Shkreli
23  BY:  CHRISTOPHER H. CASEY
         JEFFREY S. POLLACK
24       ANDREW J. RUDOWITZ
         SARAH FEHM STEWART
25       SEAN McCONNELL
         J. MANLY PARKS

LCMMFTC1                    Summation - Ms. Peay

1    THE COURT:  Counsel, I'm so sorry for the late start

2  today.  We will do whatever makes sense to counsel in terms of

3  the schedule for lunch.  When we get close to that time you

4  will consult with each other and tell me what your preferences

5  are.  Thank you.

6        You may begin.

7        MR. MEIER:  Good morning, your Honor.  We will be

8  dividing up the argument this morning.  Real briefly, Lauren

9  Peay will do part of the argument for the government.  Maren

10  Haneberg will also do part of the argument for the government.

11  And then my colleague from the New York AG's office, Amy

12  McFarlane.  Yesterday your Honor asked a question about people

13  appearing from New York or the states with witnesses.  As it so

14  happened, Ms. McFarlane and a number of other state attorneys

15  who were going to be doing witnesses, those witnesses happened

16  to be the ones, coincidentally, that fell out.  But you will

17  also be hearing from Ms. McFarlane.  Ms. Peay will explain how

18  we are going to divide that up.  We are ready to go.

19        THE COURT:  Perfect.

20        MS. PEAY:  Good morning, your Honor.  Lauren Peay from

21  the Federal Trade Commission on behalf of plaintiffs.

22        Your Honor, the witnesses have testified, the evidence

23  is in and had record is closed.  The following facts are not

24  seriously in dispute.  Vyera's distribution restrictions

25  prevented its distributors from selling Daraprim to generics.

LCMMFTC1                    Summation - Ms. Peay

1    Vyera's exclusive supply agreements with Fukuzyu and RL Fine

2    prevented the two most viable suppliers from selling

3    pyrimethamine API to generics.  And, three, Vyera's data

4    blocking agreements with two major distributors prevented them

5    from reporting Daraprim sales data to IQVIA, obscuring the

6    market opportunity for would be generic competitors.

7            What defendant, Mr. Shkreli, appears to be disputing

8    is that despite his intentions, his plans, and his company's

9    actions to thwart generic competition to Vyera's most important

10   product, Daraprim, by any means possible and for as long as

11   possible, he argues that none of it made any difference.  And,

12   even if he did, he wasn't responsible.  The evidence

13   overwhelmingly contradicts these defenses.

14           I will be joined today, as Mr. Meier said, by my

15   colleagues, Maren Haneberg of the FTC and Amy McFarlane of the

16   New York Attorney General's office.  I will begin with an

17   overview of the evidence plaintiffs have proffered that

18   established the challenged anticompetitive conduct.  I will

19   then address one of the two overarching themes in Mr. Shkreli's

20   defense, the no harm, no foul defense.  This defense posits

21   that even if the conduct occurred, it did not result in harm,

22   or even if the conducted occurred and it did impede the

23   generics, any harm is attributable to outside forces, like the

24   FDA.

25           I will then turn it over to Ms. Haneberg, who will

LCMMFTC1                    Summation - Ms. Peay

1    address the second theme that has emerged in Mr. Shkreli's

2    defense, the it wasn't me defense.  And this defense posits

3    that even if the conduct occurred and even if the generics were

4    impeded, that was all Vyera.  Mr. Shkreli was not involved.

5         Ms. McFarlane will then address the plaintiffs'

6    request for injunctive and equitable monetary relief.

7         Martin Shkreli pioneered the anticompetitive business

8    model at issue in this case, acquiring a small but essential

9    drug with no patent protection, no competitors, but

10   substantially increasing the price of the drug and then

11   restricting distribution to prevent potential competitors from

12   accessing that drug.  You will hear much more about Mr. Shkreli

13   from my colleague later, but Mr. Shkreli first implemented this

14   model as CEO Retrophin, the first pharmaceutical company that

15   he founded.

16        After being outed from Retrophin in September 2014,

17   Mr. Shkreli founded Vyera to be able to continue profiting from

18   his anticompetitive business model.  As the founder, CEO, and

19   largest shareholder of Vyera, in 2015, Mr. Shkreli selected

20   Daraprim as the perfect drug to repeat his monopolization

21   model.

22        With Mr. Shkreli at the helm, Mr. Vyera acquired

23   Daraprim in August of 2015 and promptly raised the list price

24   from $13.50 per tablet to a Shkreli-approved $750 per tablet, a

25   hike of 4,000 percent.

LCMMFTC1                     Summation - Ms. Peay

1     I would like to turn now to plaintiffs' claim against

2     the defendant.   The FTC in seven states -- New York,

3     California, Illinois, Ohio, Pennsylvania, North Carolina, and

4     Virginia -- are challenging the actions that Vyera, with the

5     participation of and control by Mr. Shkreli, took to prevent

6     competition.   Specifically, we are challenging this scheme

7     which includes distribution restrictions, exclusive API

8     agreements, and data-blocking agreements to prevent generic

9     competition as monopoly maintenance under Sherman Act Section 2

10    theories, and we are challenging the distribution restrictions

11    and API exclusivity agreements as unreasonable restraints of

12    trade under Sherman Act Section 1 theories.

13         Now, a monopolization claim has two elements:   The

14    possession of monopoly power in a relevant market and the

15    willful acquisition or maintenance of that power as

16    distinguished from growth or development as a consequence of a

17    superior product business acumen or historic accident.

18    Plaintiffs have offered overwhelming evidence that defendant

19    engaged in anticompetitive conduct and there is monopoly power

20    over Daraprim.

21         Let's walk through the evidence of the anticompetitive

22    conduct starting with the distribution restrictions.   As

23    Vyera's Tina Ghorban and Frank Della Fera testified here in

24    court, the FDA requires any generic applicant to conduct

25    bioequivalence testing comparing its product to samples of the

LCMMFTC1                    Summation – Ms. Peay

1    branded drug.  To conduct this FDA mandated testing, the

2    applicant is required to procure sufficient quantities of the

3    branded product.  The evidence has shown that Vyera carried out

4    Mr. Shkreli's vision and that Vyera's distributors cannot sell

5    Daraprim to generics because the distributors have agreed to

6    sell only to specifically authorized customers or customer

7    types.  It is undisputed that generics are unable to purchase a

8    RLD, or reference listed drug, from Vyera's distributors.

9    These restrictions are spelled out in Vyera's agreements with

10   its distribution partners as set forth in Government Exhibit

11   7003 in the demonstrative.

12        As Vyera's executive vice-president of commercial and

13   operations, Anne Kirby testified by affidavit every single one

14   of Vyera's written agreements with its distributors has

15   restrictions on authorized customer types that can purchase

16   Daraprim without Vyera's approval.  Generics and their agents

17   are not authorized customers, so no Vyera distributors can sell

18   Daraprim to them without Vyera's express approval.

19        That express approval never comes.  Generics requests

20   to buy Daraprim follow typically a set pattern.  Vyera's

21   distributor receives a request and forwards it to Vyera's

22   executives seeking approval, as shown here on the slide

23   depicting GX-1139.  The distributor seeks approval to sell

24   Daraprim to the generic or its agent.  Vyera's executives then

25   tell the distributor, do not fulfill the request, and they

LCMMFTC1                    Summation – Ms. Peay

1    instructed the distributor to tell the generics or its agent to

2    reach out to Vyera directly.  There is no evidence that Vyera

3    has approved a single request from generics or their

4    intermediaries to purchase Daraprim for bioequivalence testing.

5         As we showed in Government Exhibit 7002, summary

6    exhibit, the distributors benefited from the restrictions.

7    Most Daraprim distributors get a certain percentage of

8    Daraprim's list price, which Mr. Shkreli raised to $75,000 per

9    bottle.  One distributor gets a fee based on the volume sold.

10   Regardless of the fee structure, lack of generic competition is

11   a good thing for these distributors because it means that they

12   can continue selling greater volumes of Daraprim at a higher

13   price.

14        THE COURT:  But even if the distributors didn't

15   benefit financially, that doesn't interfere with your theory of

16   the case.  Am I right?

17        MS. PEAY:  Yes, your Honor.  That is correct.

18        As Ms. Ghorban, Vyera's former head of marketing and

19   business analytics, testified, Mr. Shkreli and his business

20   development team also were concerned that even with these class

21   of trade restrictions, generics could acquire multiple bottles

22   of Daraprim needed for FDA mandated studies.  To mitigate this

23   risk they implemented purchase limits on the number of bottles

24   a customer could buy at a given time.  Any customer seeking to

25   buy a quantity exceeding the limit had to get Vyera's override.

LCMMFTC1                    Summation - Ms. Peay

1   Vyera has also aggressively monitored sales to ensure

2   compliance with these agreements and has acted quickly to

3   rectify any breaches.  In fact, in September 2017, Mr. Kevin

4   Mulleady ordered a full-out audit of Daraprim to know where

5   every bottle of Daraprim we sold went to.

6        You have heard from defendant's counsel, and they have

7   suggested that there is nothing unusual about class or trade

8   restrictions, and that specialty distribution system can

9   provide patient benefits.

10       There are two important responses to this.  First, I'd

11  like to make clear that plaintiffs have not offered evidence

12  that specialty distribution in and of itself is

13  anticompetitive.  Rather, the anticompetitive conduct is the

14  restrictions that prevent sales to generics.  As Vyera's former

15  chief commercial officer, Nancy Retzlaff, acknowledged,

16  preventing generics from purchasing Daraprim for use in

17  bioequivalence studies is not at all necessary for specialty

18  distribution to function or for specialty pharmacies to provide

19  services to patients.  One has nothing to do with the other.

20       The second response is that the purpose of Vyera's

21  distribution system is clear.  We have heard it directly from

22  Vyera's executives.  Vyera's first general counsel, Howard

23  Dorfman, testified the closed distribution system was part of

24  Vyera's desire to block or certainly to delay entry of any

25  generic.  Former Vyera executive Tina Ghorban testified that

LCMMFTC1                    Summation – Ms. Peay

1    Martin Shkreli and the business development team discussed

2    using closed distribution to make it harder for generics to

3    acquire Daraprim.  This system was designed, implemented, and

4    executed to make it harder, much harder for generics to obtain

5    samples of Daraprim needed for FDA approval.

6           Turning now to the exclusive API supply agreements.

7    The evidence has also shown that exclusivity agreements

8    sideline the two most viable producers of pyrimethamine API:

9    Fukuzyu, and RL Fine.  Pyrimethamine API is the key ingredient

10   in Daraprim.  Any pharmaceutical company seeking to make

11   Daraprim or a generic version needs a source of pyrimethamine

12   API.

13          Developing a pyrimethamine API manufacturing process

14   can take many months.  Mr. Bruno, plaintiffs' manufacturing

15   expert, estimated at least 15 months and Vyera's

16   Dr. Pelliccione estimated 12 to 18 months on the low end.  For

17   this reason drug companies prefer to use an API supplier that

18   already has a manufacturing process, preferably one that has a

19   DMF that is used in the market.  Vyera's Dr. Pelliccione

20   testified that it would help to work with a supplier who

21   already knew how to make the API and who had a U.S. DMF.

22          Now, until the generic companies went out and

23   developed pyrimethamine API manufacturing processes in

24   partnership with their CMOs, the only two API suppliers with a

25   manufacturing process were Fukuzyu and RL Fine.  RL Fine itself

LCMMFTC1                    Summation - Ms. Peay

1   could not identify any other API suppliers, and an RL Fine

2   sales executive testified that he has not come across anyone

3   offering pyrimethamine API.  And Mylan, one of the largest

4   generic companies in the world, conducted a 15-month search to

5   find a pyrimethamine API supplier but could only identify RL

6   Fine.

7        THE COURT:  Why do you think that's so?  Why couldn't

8   they identify Fukuzyu?  Isn't that public record information?

9        MS. PEAY:  Yes, your Honor.  It is public record

10  information.  But by the time that they were searching, Fukuzyu

11  had an exclusive agreement and was not entertaining offers to

12  supply pyrimethamine API to other parties.

13        THE COURT:  So it's not that they are the only two

14  suppliers identified with the manufacturing process; it is the

15  only supplier that reportedly was willing to sell.

16        MS. PEAY:  Your Honor, they were the only two

17  pyrimethamine API suppliers with a viable manufacturing process

18  ready.  Fukuzyu and RL Fine were the only ones.  At the time

19  when Mylan was searching for a supplier, they understood that

20  Fukuzyu would not supply them.

21        THE COURT:  Mylan identified Fukuzyu too.

22        MS. PEAY:  They were aware of Fukuzyu too.

23        Let's turn first to Fukuzyu.  The evidence has shown

24  that Fukuzyu agreed to prevent generic companies from obtaining

25  pyrimethamine API in exchange for the promise of additional

LCMMFTC1                    Summation - Ms. Peay

1    business.  When Vyera acquired Daraprim, Fukuzyu was the

2    pyrimethamine API supplier for the product on a nonexclusive

3    basis.  Obtaining an exclusive contract with Fukuzyu had long

4    been Mr. Shkreli's goal.  Even before purchasing Daraprim,

5    Vyera contacted Fukuzyu to ask, can you sign up exclusivity

6    with us?

7              After Mr. Shkreli was arrested, Vyera continued to

8    pursue an exclusive supply agreement with Fukuzyu.  On October

9    5, 2016, senior scientific executives from Vyera met with

10   Fukuzyu in Japan.  And on November 22, 2016, Vyera and Fukuzyu

11   entered a supply agreement.  Dr. Pelliccione told his

12   subordinate, we got good news from Mikio in Japan overnight.

13   Fukuzyu has accepted our agreement to provide pyrimethamine

14   exclusively for us for human drugs and will not sell to

15   generics manufacturers.  That is a big sigh of relief for us.

16             THE COURT:  There is this sort of gap in the record

17   perhaps.  Perhaps you can point me to what happened from, let's

18   say, late 2015 to the fall of 2016 to get that exclusive supply

19   agreement with Fukuzyu.  I understand that there is record

20   evidence that Mr. Shkreli had this goal to have an exclusive

21   supply agreement with Fukuzyu from early on.  But is there

22   record evidence about what happened in that roughly nine-month

23   gap to achieve that goal?

24             MS. PEAY:  During that gap, when Vyera originally

25   reached out to Fukuzyu, they didn't express interest in an

LCMMFTC1                    Summation - Ms. Peay

1   exclusive agreement at that time.

2          THE COURT:  Yes.  But, as I understand it, then in the

3   fall of 2016, Vyera came back with an offer of a broad-based

4   relationship that would involve not just pyrimethamine but

5   other projects in the future potentially.  So they came up with

6   a strategy to make a play for Fukuzyu that might be more

7   attractive, if I understand the record evidence.

8          My question is, do we have anything about that roughly

9   nine-month gap?  Why did it take nine months for Vyera to

10  figure out a strategy to deal with Fukuzyu's initial response?

11  Can you point me to anything, or not?

12         MS. PEAY:  I don't have anything I can point you to

13  specifically.

14         THE COURT:  Thank you.

15         MS. PEAY:  After Fukuzyu and Vyera entered a supply

16  agreement on November 22, 2016 --

17         THE COURT:  I think the agreement was January, wasn't

18  it?

19         MS. PEAY:  Ms. Guy, can you go back a slide.

20         In November 22, 2016, they accepted the agreement.

21         THE COURT:  Yes.  Sorry.

22         MS. PEAY:  Sorry about that.  It was the wrong

23  wording.

24         Moving to the next slide, Ms. Guy, Vyera promised

25  Fukuzyu additional business in order to compensate them for

1140

LCMMFTC1                    Summation - Ms. Peay

1    that exclusive supply agreement.  Dr. Salinas confirmed that

2    the offer of additional business was intended to get them to

3    sign the exclusive supply agreement.  The evidence also shows

4    that the Fukuzyu agreement does not actually guarantee supply.

5    An exclusivity provision ensures that others will not purchase

6    the API, but it does not ensure that you will receive the API.

7         As Mr. Bruno explained, if there was a surge in demand

8    outside the United States, there is nothing in the Fukuzyu

9    contract that would ensure that Vyera would receive

10   pyrimethamine API from Fukuzyu.  And also, to the extent that

11   exclusivity provisions are used in the industry, they are

12   designed to protect an investment, not guarantee supply.  As

13   Mr. Della Fera explained, Fera sought an exclusive contract

14   with API 1 because we were paying for the development

15   personally for our company.  So the exclusive was to protect

16   Fera's investment.

17        Turning now to the RL Fine supply agreement.  With

18   Fukuzyu locked up and eliminated as an API supply option for

19   would be competitors, Mr. Shkreli and Vyera next turned their

20   attention to another potential source of supply for the

21   generics.  Vyera began pursuing RL Fine in August 2017, when it

22   received word that generics may be using RL Fine pyrimethamine

23   API.  And then on December 27, 2017, on behalf of Vyera,

24   Mr. Mulleady executed two contracts with RL Fine.

25        THE COURT:  Now, think there is some evidentiary

LCMMFTC1                    Summation – Ms. Peay

1   record that Vyera had two independent tipoffs of generic

2   interest in RL Fine.  I think there was a Frankfurt trade show

3   and there was another conversation independent of that.  Can

4   you point me to anything else?

5           MS. PEAY:  You are correct.  There are two sources of

6   information that tipped Vyera off that RL Fine may be supplying

7   to generics.  One was a presentation by Pennside Partners, and

8   that identified that two generics were using RL Fine as supply.

9   You are correct, there was a meeting in Frankfurt where RL Fine

10  executives indeed confirmed that they were working with

11  generics and that some of those generics may be ready to file

12  an ANDA as soon as the end of that year.

13          I will walk through that in some more detail in a bit,

14  but, yes, you are correct.

15          Under the agreement with RL Fine, Vyera is appointed

16  the exclusive distributor.  Vyera pays $1 million for a DMF

17  that ultimately was never filed, and Vyera pays RL Fine 7.5

18  percent of Daraprim net revenues, regardless of whether RL Fine

19  provides any API.

20          There is no evidence in the record that Vyera needed a

21  backup supplier or that the RL Fine agreement ensured that

22  Vyera would have a backup supplier.  Vyera's scientific

23  executives, like Dr. Pelliccione, did not even know that this

24  contract existed and never considered getting a backup

25  supplier, and there is no evidence in the record that Vyera

LCMMFTC1                    Summation – Ms. Peay

1    took any steps to add RL Fine to its NDA, which would allow it

2    to be a backup supplier, or that it asked RL Fine to take the

3    steps to be ready or to file a DMF.

4            THE COURT:  I'm sorry.  What is your point about

5    Mr. Pelliccione?

6            MS. PEAY:  Dr. Pelliccione, who has responsibility for

7    scientific matters at Vyera, so, thus, would be knowledgeable

8    about things like API supply, when he was deposed in this case,

9    and this came out in his trial testimony as well, he had not

10   been aware years later that there was this RL Fine contract,

11   and he himself testified that he hadn't considered getting a

12   backup supplier as one of the individuals at Vyera who would

13   typically have responsibility for those.

14           THE COURT:  There was some discussion about expiration

15   dates of the API that Vyera had purchased, sort of the

16   inventory API when it had purchased Daraprim.  There was a

17   question about, well, perhaps the fact you had all that API

18   didn't mean it was readily available for you to use because

19   even API has expiration dates.  Is there any record evidence

20   about the expiration dates of the API or what expiration dates

21   there are for API, as opposed to the Daraprim once it's

22   manufactured?

23           MS. PEAY:  Your Honor, I can't point you to that

24   record evidence right now, but I can note that to the extent

25   that Vyera was seeking additional pyrimethamine API, if there

LCMMFTC1                        Summation - Ms. Peay

1    was a concern that their existing pyrimethamine API would

2    expire, that would have been in the context of seeking the

3    Fukuzyu -- supply from Fukuzyu, who actually did supply them

4    with API.  The RL Fine contract, which came later, never

5    resulted in Vyera or RL Fine taking the steps to even allow RL

6    Fine to even being able to supply the API.

7          Now, the amount that Vyera paid RL Fine, even though

8    RL Fine supplied nothing to Vyera, is staggering.  Each monthly

9    royalty payment amounted to between 300,000 and 450,000.

10   Ultimately, the evidence shows that Vyera terminated the

11   agreement in October 2019, after paying RL Fine almost $9.5

12   million.

13         To put that figure in perspective, Vyera has paid

14   Fukuzyu about $500,000 on all purchases of pyrimethamine API

15   through March 2019.  That means Vyera paid to RL Fine almost 19

16   times the amount for supplying nothing that it paid Fukuzyu for

17   supplying all of its API needs.

18         The only possible conclusion from this evidence is

19   that Vyera was paying RL Fine not to supply its competitors,

20   which is in fact what Vyera's board minutes reflect.  In the

21   December 2017 board minutes, Government Exhibit 1490,

22   Mr. Mulleady and Mr. Mithani brought the RL Fine agreement to

23   the board.  They explained that the rationale behind the

24   collaboration with RL Fine is the diversification of the

25   group's revenues stream from the potential market entry by

LCMMFTC1                    Summation - Ms. Peay

1    generics manufacturers and distributors.  They do not mention

2    backup supply or supply at all.

3           Mr. Mulleady and Mr. Mithani explained that addressing

4    potential generic competitors are in the Vyera group's

5    interests.

6           Turning now to the data blocking agreements, as former

7    Vyera executive Tina Ghorban testified, IQVIA, formerly known

8    as IMS, is a standard data source that companies and analysts

9    use to understand the dynamics of markets.

10          Reaching back to his days at Retrophin, Mr. Shkreli

11   knew that drug companies relied on IQVIA and other channel

12   audits to forecast their potential revenue for launching drugs.

13   We heard Ms. Ghorban's testimony that Mr. Shkreli knew that if

14   sales appeared to go down, generic companies would have less

15   interest in generic pyrimethamine development.  So he used data

16   blocking as part of his toolbox to discourage generic entry.

17   Just three days after acquiring Daraprim, Vyera employees

18   reached out to ICS and Walgreens, the only Daraprim

19   distributors at the time, to inquire into blocking Daraprim

20   data from IQVIA and other aggregators.

21          Ms. Guy, can you advance the slide.

22          Vyera immediately acted within three days of acquiring

23   Daraprim to reach out to ICS and Walgreens to confirm that they

24   weren't reporting.

25          Then, if you can move to the next slide, in September

LCMMFTC1                    Summation - Ms. Peay

1    2017, Vyera formalized its data blocking agreements with two of

2    its main distributors, ASD and Cardinal, under which Vyera paid

3    each a fee in exchange for the distributors agreement to not

4    report its Daraprim sales data.

5        I'd like to turn now to monopoly power.  The monopoly

6    power question is whether Vyera can profitably sustain a small

7    but significant price increase.  As Professor Hemphill

8    demonstrated, the shocking price increase here was very

9    profitable for Vyera.  Defendant's economic expert also agreed

10   that Vyera's Daraprim price increase was profitable in every

11   year since its acquisition of the product.  It was not until

12   generic entry that the profits began to drop.

13       It is undisputed that Vyera had a 100 percent share of

14   FDA-approved pyrimethamine products from 2015 until generic

15   entry in 2020.  The Court has also heard about the significant

16   barriers to entry into this market due to the FDA approval

17   process for generics and Vyera's restrictions at issue.

18       Defendant's response to this has been to argue that

19   TMP-SMX, or compounded pyrimethamine, can be used to treat

20   toxoplasmosis in at least some circumstances.  That is not the

21   standard.  Market definition looks at whether products restrain

22   price.  It is not enough that they can be used for the same

23   purpose.

24       The evidence here shows that so many purchasers stuck

25   with Daraprim, that its annual profits increased by tens of

1146

LCMMFTC1                    Summation – Ms. Peay

1  millions of dollars.  If these other products were close

2  economic substitutes, no one would have paid a price increase

3  like Vyera's.  Nearly everyone would have switched.

4        But not only is defendant's argument about these other

5  therapies legally misplaced, it is also contradicted by the

6  evidence.  Vyera's Dr. Salinas, a medical doctor, acknowledged

7  that TMP-SMX is medically inferior to Daraprim, and Vyera's

8  Dr. Pelliccione acknowledges that compounding in the large

9  scale was not safe or appropriate.  We also heard from

10  plaintiffs' expert, Dr. Hardy, who explained that Daraprim has

11  the strongest recommendation from the relevant clinical

12  guidelines for treating active toxoplasmosis and that other

13  therapies, like TMP-SMX, are not as good of substitutes.  This

14  is why people kept using Daraprim, even when the cost

15  increased, by hundreds of dollars per tablet, despite the fact

16  that TMP-SMX, or compounded pyrimethamine, cost only a small

17  fraction of that.

18        I'd like to turn now to the first theme of defendant's

19  defense here:  No harm, no foul.  Rather than fully engage with

20  the overwhelming evidence of this conduct, Mr. Shkreli has

21  focused on pointing the blame elsewhere.

22        The first way he has tried to shift the blame is by

23  trying to argue that his vast scheme to prevent generic

24  pyrimethamine competition actually had no effect.  He would

25  like the Court to believe that the FDA is to blame for the

LCMMFTC1                    Summation – Ms. Peay

1    delay in generic entry.

2         Your Honor may remember, when Mr. Shkreli's lawyer

3    argued if only the FDA hadn't banned Ipca from importing API

4    into the United States, Cerovene would have had its API supply

5    source and Vyera's exclusive deals wouldn't have made any

6    difference.

7         In addition to blaming the FDA, Mr. Shkreli blames the

8    generics themselves.  He argues that the generics didn't try

9    hard enough to get Daraprim samples.  They made bad –- he

10   argues they made bad business decisions, and he argues that

11   they tried to cut corners by seeking to purchase only three

12   rather than five bottles of Daraprim RLD.  But this defense

13   does not fit with the evidence.

14        As we have heard from the generic companies

15   themselves, they were all actively trying to develop, obtain

16   approval, and launch generic versions of Daraprim.  Mr. Shah

17   testified that Cerovene's approach was, let's try to get the

18   brand bottles, as many as we can as fast as we can.  And Mr.

19   Della Fera likewise testified that Fera wanted to be first to

20   market for its generic pyrimethamine product.

21        But at every turn the generics were stimied by

22   Mr. Shkreli's scheme.  The classic closed distribution play

23   prevented them from getting samples.  The exclusive supply

24   contracts prevented them from getting API.  And for generics

25   that were still in the initial stages of looking at making a

LCMMFTC1                    Summation - Ms. Peay

1    Daraprim product, after 2015, the data blocking made the market

2    opportunity unclear.

3            THE COURT:  So you may not be the lawyer to address

4    this, so I apologize.  It may be the last counsel for the

5    plaintiffs.  But I have tried to understand the defense

6    argument about the generics not trying hard enough.

7            It seems to me that I'm not aware of a legal test that

8    requires a competitor to use extraordinary efforts beyond

9    anything normally seen in the business community or overcome

10   every hurdle placed in their way.  I have tried to understand

11   the relevance, and I know defense counsel will address this,

12   but just so plaintiffs' counsel can anticipate what I've been

13   thinking about, I have tried to think of it instead as an

14   argument about the calculation of damages perhaps.

15           Anyway, I am going to hear the relevance.  You may not

16   be the right lawyer to address this, that it's more an argument

17   about they could have entered some months earlier if they had

18   taken these additional steps, as opposed to really addressing

19   the liability issue.

20           MS. PEAY:  Your Honor, I agree with you that we are

21   not aware of a standard that would require the generics to take

22   every effort possible to get on the market.  You are correct,

23   Ms. McFarlane will be addressing the plaintiffs' case for

24   disgorgement, for equitable monetary relief.

25           Let's move to the next slide, Ms. Guy.

LCMMFTC1                    Summation - Ms. Peay

1       I'd like to walk through the first roadblock then that
2  Mr. Shkreli put up for the generics to overcome.  This is the
3  distribution restrictions.  The evidence is clear that
4  Mr. Shkreli's plan to prevent generics from accessing Daraprim
5  impeded their entry and sent them scrambling for many months to
6  try to obtain enough Daraprim to conduct the necessary testing.
7       Cerovene was hit particularly hard by these
8  restrictions.  In 2013, Cerovene had been able to purchase
9  Daraprim samples from a local pharmacy.  Back then, the
10 pharmacy had been able to supply more than enough samples in
11 about a day.
12      Fast forward to late December 2017, when Cerovene
13 learns from the FDA that it needs to repeat its bioequivalence
14 testing and now needs more bottles of Daraprim RLD.  Cerovene
15 had to go out and buy five bottles, all from the same
16 manufacturing lot.  This time around that local pharmacy could
17 not supply any Daraprim RLD at all.
18      So what did Cerovene do?  They reached out to various
19 entities to try to source Daraprim RLD.  This included
20 hospitals, independent pharmacies, and sample procurement
21 companies.  Government Exhibit 3397 is a list of Cerovene's
22 efforts.  None were able to procure five bottles of Daraprim
23 RLD.
24      Cerovene enlisted its marketing partner, Dr. Reddy's
25 to help.  Dr. Reddy's suggested prepaying $550,000 to Reliant

LCMMFTC1                    Summation - Ms. Peay

1    to acquire five bottles.  But Vyera's aggressive monitoring

2    allowed it to spring into action and promptly buy back Daraprim

3    from Reliant that otherwise Reliant intended to sell to

4    Dr. Reddy's.

5         On April 4, 2018, CentraState, a pharmacy affiliated

6    with Reliant, ordered five bottles of Daraprim from ASD,

7    Vyera's distributor.  That same day Anne Kirby of Vyera noticed

8    CentraState's five-bottle order of Daraprim where they had only

9    previously purchased two bottles.  She found this deviation

10   suspicious and immediately contacted ASD to inquire about the

11   order and was advised that ASD had already shipped the bottles.

12   Ms. Kirby promptly flagged this transaction to Mr. Mulleady and

13   Mr. Mithani.  Mr. Mulleady then decided to buy back the five

14   bottles from CentraState to avoid the risk of diversion to a

15   generic.

16        Without much negotiation, Mr. Mulleady accepted

17   CentraState's offer to sell the five bottles of Daraprim back

18   to Vyera at $750,000, almost twice the original purchase price.

19        On April 6, 2018, Mr. Mulleady personally met with

20   Satya Valiveti, the owner of CentraState, in a Starbucks

21   parking lot to repurchase the five bottles of Daraprim.

22   Following this buyback, Vyera instructed ASD to block

23   CentraState's and its sister company, Reliant's, access to

24   Daraprim.  ASD implemented Vyera's request immediately.

25        As we have heard from Mr. Valiveti, because of Vyera's

LCMMFTC1                    Summation - Ms. Peay

1    buyback, Reliant and CentraState were unable to sell these five

2    bottles of Daraprim to Dr. Reddy's or any other potential

3    generic competitor.  So but for that buyback, Cerovene would

4    have had Daraprim RLD to conduct BE testing no later than April

5    2018.

6              Finally, after Cerovene spends 12 months, basically

7    the entirety of 2018, to obtain Daraprim, Cerovene is able to

8    cobble together three bottles from one source, but never the

9    five they were seeking.

10             Defendant tries to shift blame away from its practices

11   here and claim that Cerovene could have obtained the five

12   bottles it needed back in early 2018 if only it had chosen to

13   work with ProSupplier instead of Reliant.  But there is no

14   evidence in the record, none, that ProSupplier had five bottles

15   of Daraprim RLD in early 2018 or at any other time.

16             In fact, there is no evidence in the record from

17   ProSupplier at all.  There are no documents from ProSupplier,

18   which is based in Switzerland, and no one from ProSupplier was

19   deposed.  Defendants, instead, withdrew their Hague request for

20   discovery from ProSupplier.

21             But we did hear from Cerovene and we did hear from

22   Dr. Reddy's, both of whom testified live.  And Mr. Shah and Mr.

23   Mukhopadhyay testified that there were good reasons why they

24   chose to work with Reliant.  Mr. Shah indicated that because

25   Reliant said they could get the RLD in two weeks versus

LCMMFTC1                    Summation - Ms. Peay

1   ProSupplier's estimate of four to six weeks, they went with

2   Reliant.  Time was of the essence.  And Mr. Mukhopadhyay

3   testified to the previous relationship with Reliant and how

4   they were familiar with Reliant and also pointed to Reliant's

5   promise that they could source the bottles sooner than

6   ProSupplier.

7          We also heard from Mr. Valiveti of Reliant, who

8   explained that actually, in 2018, ProSupplier had tried to

9   source Daraprim from him, from Reliant.  Of course we know that

10  Cerovene and Dr. Reddy's were right to focus on Reliant because

11  Reliant did successfully procure five bottles of Daraprim and

12  was on the verge of selling those bottles to Cerovene until

13  Vyera intervened.

14         THE COURT:  Of course it was only successful because

15  of a family relationship.  It was sort of serendipitous.  Maybe

16  that's not the right word.  But unusual.

17         MS. PEAY:  Your Honor, are you referring to the family

18  relationship between CentraState and Reliant?

19         THE COURT:  Yes.

20         MS. PEAY:  Yes, your Honor, that's correct.  But, your

21  Honor, Reliant was in the business of supplying RLD to various

22  pharmaceutical companies.  That was their regular business.

23         Like Cerovene, Fera also expended a great deal of

24  effort trying acquire RLD but could not find any.  Fera tried

25  to get Daraprim from November 2016 through May of 2018.  They

LCMMFTC1                          Summation - Ms. Peay

1    tried their normal supplier, a hospital, and they even went to

2    Vyera itself through their CMO.  Fera was able to get two

3    bottles initially from Reliant, but was unable to get more from

4    them, who by that time had been cut off by Vyera from access to

5    Daraprim.

6            Without the required five bottles, Fera was forced to

7    seek a waiver from the FDA, which was not granted until April

8    2019.  The exclusive agreement with Fukuzyu also stimied the

9    generics and wreaked havoc on their efforts to obtain approval

10   and enter the market.

11           In 2015, when Cerovene had to find a new API supplier

12   after its previous supplier Ipca had been banned from

13   importing, it began negotiations with Fukuzyu.  Cerovene

14   recognized that Fukuzyu was its best option and even agreed to

15   purchase much more API than it needed because Cerovene very

16   much wanted to partner with Fukuzyu.

17           On October 4, 2016, while Vyera executives were in

18   route to visit Fukuzyu's headquarters, Fukuzyu's CEO informed

19   Cerovene that it would no longer be interested in dealing with

20   Cerovene.  Like Cerovene, Fera was stimied by Vyera's exclusive

21   contract with Fukuzyu.

22           Fera contacted Fukuzyu in late 2017 seeking a supply

23   relationship.  Fukuzyu informed Fera, via a broker, it would

24   not be able to supply pyrimethamine because they could not sell

25   to a U.S. company for commercial use in humans.  Fukuzyu's

1154

LCMMFTC1                    Summation – Ms. Peay

1    message to Fera was verbatim.  The language provided to them by

2    Vyera's Dr. Pelliccione.

3             Instead, turned down by Fukuzyu, Fera was forced to

4    work with an API supplier that had to develop a new

5    pyrimethamine API manufacturing process.  This further delayed

6    Fera's entry onto the market.

7             Turning to RL Fine, the exclusive agreement with RL

8    Fine also had significant consequences for generics.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCMKFTC2                    Summation – Ms. Stewart

1     MS. PEAY:  (Continuing)  As Mr. Shah of Cerovene

2  testified by affidavit, after Cerovene learned it could no

3  longer use Fukuzyu, they turned to RL Fine.

4     Now, as I referred to earlier, your Honor, in

5  August 10th of 2017, this is when Vyera receives a report from

6  their competitive intelligence consultant, Pennside Partners.

7  This report was the one that they identified two generics,

8  Mylan and Sandoz, as purchasers of RL Fine pyrimethamine API.

9  At this time, Mr. Mulleady, Mr. Mithani were running Vyera.

10  Mr. Mulleady immediately forwarded the presentation to

11  Mr. Shkreli.

12     Spurred on by Mr. Shkreli, Mr. Mithani and

13  Mr. Mulleady reach out to RL Fine in August 2017 inquiring

14  about pyrimethamine API.

15     Mr. Tilles, the then chairman of the Phoenixus board,

16  meets with RL Fine executives at the end of August 2017 in

17  Frankfurt.  It was at this October 2017 meeting that RL Fine

18  executives, as we discussed earlier, confirmed that the company

19  was supporting several generic companies that would soon file

20  pyrimethamine ANDAs.  This information gets back to

21  Mr. Shkreli, who then texted Mr. Mulleady from his contraband

22  phone:  "It's Shkreli.  Trying to get in touch with you

23  urgently.  Hearing pyri ANDA approval in December 2017."

24     The evidence then shows that Mr. Mulleady and

25  Mr. Mithani pushed forward with negotiations with RL Fine in

LCMKFTC2                    Summation - Ms. Stewart

1    November, ultimately leading to the signing of the exclusive

2    agreement that I referenced earlier on December 27, 2017.

3            Now, on the first day of trial, Mr. Shkreli's lawyer

4    tried to imply that Vyera's RL Fine deal could not possibly

5    have affected RL Fine's decision not to work with the generic

6    companies because the agreement wasn't signed until

7    December 27, 2017, which was nearly a month after RL Fine

8    informed Cerovene that it would no longer supply it with

9    pyrimethamine API.

10           But the full-time line paints a very different

11   picture.  On November 2nd, 2017, Mr. Mulleady reaches out to

12   RL Fine and offers 1.25 million per year to finalize their,

13   quote, exclusive agreement.

14           On November 25, 2017, Mr. Mulleady and RL Fine then

15   reach an informal agreement.  This is just five days before

16   RL Fine cuts off Cerovene on November 30, 2017.  Then, moving

17   forward, two years later, when Vyera ends the RL Fine contract,

18   RL Fine was back supplying Cerovene within a couple of months

19   of the termination of that contract.

20           It is clear from the evidence that the restrictions

21   Mr. Shkreli and Vyera imposed, they resulted in incredible

22   roadblocks that stymied the generics in so many ways.  It's

23   also clear that despite these roadblocks, the generics worked

24   tirelessly for years to try to get on the market.  It's clear

25   that to suggest that outside forces may have played a role in

LCMKFTC2                    Summation - Ms. Stewart

1   the generic difficulties getting to market is to ignore the

2   plain evidence that the root cause of the generics'

3   difficulties were the defendant's actions.  When you consider

4   all this evidence, it is amazing that these companies persisted

5   and that generic entry has occurred at all so far.

6           Now, your Honor, my colleague, Ms. Haneberg, is

7   prepared to address Mr. Shkreli's second overarching defense.

8           THE COURT:  Thank you.

9           MS. HANEBERG:  Thank you, your Honor.

10          Good morning, your Honor.  May it please the Court,

11  Maren Haneberg, from the FTC and on behalf of all plaintiffs.

12          I will now address the second overarching defense we

13  have heard from Mr. Shkreli, and that is, even if there were

14  antitrust violations, it wasn't his conduct that was the root

15  of those violations.  This is despite the fact that he

16  masterminded the scheme at issue.

17          Mr. Shkreli meets the individual liability standard

18  for an antitrust violation.  He had direct participation in

19  those violations and the authority to control Vyera.

20          Mr. Shkreli need not always be an employee of Vyera to

21  be held individually liable.  Mr. Shkreli had, and has, the

22  authority to control the corporation because he is the

23  controlling shareholder; in other words, he owns Vyera.  And

24  even if Shkreli had ceased involvement after setting the scheme

25  in motion, he is still liable for the continuance of that

LCMKFTC2                    Summation – Ms. Stewart

1    conduct because it did not materially change after his formal

2    tenure at Vyera ended.

3         According to Mr. Shkreli's own written testimony,

4    having only worked at hedge funds since graduating college in

5    2004, and with zero actual pharmaceutical industry experience,

6    Mr. Shkreli formed the drug company that would become Retrophin

7    in late 2010.  There, as Ms. Peay earlier explained, he

8    pioneered the anticompetitive business strategy that he would

9    later apply to Daraprim.  That is acquiring a small, but

10   essential drug with no patent protection and no competitors,

11   substantially increasing the price of the drug, and then

12   restricting the distribution to prevent potential competitors

13   from accessing the drug for FDA-mandated bioequivalence

14   studies.

15        Mr. Shkreli acknowledges that while he was CEO,

16   Retrophin acquired or licensed to such drugs, Chenodal and

17   Thiola, and raised their prices to, quote, generate revenue.

18        Ms. Guy, the slide is up?  Oh, thank you.

19        Mr. Shkreli's plan to protect these price hikes

20   through closed distribution to prevent generic access was not a

21   secret.  In public Retrophin investor calls, Mr. Shkreli

22   proudly boasted of his distribution plan.  In a February 2014

23   investor transcript, he explained:  "Chenodal will continue to

24   be distributed through Centra, a special pharmacy.  This unique

25   distribution system does not allow for generics to access

1  product and to conduct bioequivalence studies as required

2  against the reference listed drug, and the filings are almost

3  impossible unless a generic company illegally penetrates the

4  specialty pharmacy distribution."

5          He goes on to explain, "I think we have a really good

6  handle on making sure that generics won't enter or gain access

7  to our product, and that's a key feature.  To our knowledge, as

8  I mentioned, this model has protected virtually every single

9  company that has it from generic competition."

10          In another investor call in May of 2014, he bluntly

11  stated:  "Our distribution strategy for rare diseases is closed

12  distribution.  The closed distribution system allows for us to

13  control the release of our product.  We do not sell Retrophin

14  products to generic companies.  The specialty pharmacy

15  distribution model takes the AB substitutable rating that

16  generics rely on and neuters it."

17          Again, these are Mr. Shkreli's public statements

18  regarding his reasons for utilizing closed distribution.

19          While at Retrophin, Mr. Shkreli also tried to acquire

20  and apply the strategy to Cuprime and Syprine, other drugs used

21  to treat another life-threatening disease.  Though ultimately

22  unsuccessful in acquiring the drugs, Mr. Shkreli had planned to

23  increase the price of those lifesaving drugs for which there

24  was no alternative therapy by 10 to 30 times and closing the

25  drugs' distribution, so, quote, "Generics become unable to

LCMKFTC2                    Summation - Ms. Stewart

1    source the product for their bioequivalence study."

2          As Ms. Peay explained, upon Mr. Shkreli's ouster from

3    Retrophin for alleged misconduct, Mr. Shkreli founded Vyera

4    with the intent of replicating the same anticompetitive

5    business strategy that he had successfully implemented at

6    Retrophin.  As bluntly put to early potential investors,

7    exclusivity, meaning closed distribution, creates a barrier and

8    pricing power.

9          And as Mr. Shkreli himself testified, Vyera's business

10   development group focused on identifying lifesaving drugs in

11   which Vyera should invest.  That would be to add shareholder

12   value through licensing or acquiring these drugs and then,

13   quote, "improving distribution networks."

14         Vyera's first target under Mr. Shkreli's direction was

15   Biltricide, another old gold standard treatment for a parasitic

16   infection that had no patent protection.  Mr. Shkreli aimed to

17   increase the price of treatment, which was comprised of a total

18   of six pills, from under $100 to over $100,000, again, using

19   closed distribution to curb generic risk.  Mr. Shkreli actually

20   tried to recruit Fera Pharmaceuticals' CEO, Frank Della Fera,

21   into investing into his Biltricide scheme.  Mr. Della Fera was

22   perplexed as to how he planned to turn this old low revenue

23   drug into a blockbuster. As Mr. Della Fera testified, "I

24   assumed that he knew of some new indication for Biltricide, but

25   Mr. Shkreli never indicated that was his plan.  Instead, he

LCMKFTC2                    Summation - Ms. Stewart

1    simply mentioned that he planned to raise the price and put the

2    drug into a closed distribution system to deter generic entry."

3         When Mr. Shkreli and Vyera failed to close the deal on

4    Biltricide, they set their sites on Daraprim.  As Mr. Shkreli

5    explained to one investor prior to closing the acquisition,

6    "Despite Daraprim having no orphan or patent exclusivity left,

7    I feel very good that there are no incoming generics, and now

8    that it is closed distribution, there will not be any going

9    forward.  Of course, even if we get three years, it is a great

10   payout."  And it was Mr. Shkreli himself who executed the

11   Daraprim asset purchase agreement on behalf of Vyera.

12        Through the live and designated deposition or

13   investigational hearing testimony of five of Mr. Shkreli's

14   former employees, we have heard repeatedly that the plan to

15   utilize closed distribution was intended to block generic entry

16   and that the plan was originated and driven by Mr. Shkreli.

17        Michael Smith, who worked both in business development

18   with Mr. Shkreli at both Retrophin and Vyera, testified via

19   designation that it was Mr. Shkreli who came up with that

20   thesis.

21        As Ms. Peay cited earlier, Mr. Dorfman, Vyera's prior

22   general counsel, he understood the closed distribution system

23   was part of Vyera's desire to block or certainly to delay entry

24   of any generic.

25        Another former general counsel of Vyera, Eve

1   Costopoulos, testified that it was her personal understanding

2   that there was a strategy to control the drug so that -- and to

3   protect the drug from generics for as long as possible, meaning

4   protect a generic or potential generic manufacturer from

5   obtaining the drug so that they could then develop a generic

6   form of the drug.

7           And as Ms. Peay also pointed out earlier, Ms. Ghorban,

8   Vyera's then head of marketing and business analytics, it was

9   also her understanding that the strategy of using closed

10  distribution was to prevent generic entry.

11          She also testified that a generic launch would

12  decimate Vyera's revenue -- Daraprim revenues on which it was

13  dependent.

14          Finally, Nancy Retzlaff, Vyera's chief commercial

15  officer, also testified via deposition that being a small

16  company, Mr. Shkreli was intimately involved with ultimate

17  responsibility for setting the strategy.

18          And it was Mr. Shkreli's belief that to the extent

19  that a generic company was challenged to get samples of the

20  product, that would impede their ability to conduct a

21  bioequivalence -- to get the product sufficient to conduct a

22  bioequivalence study.  That was the purpose of closed

23  distribution.

24          As the founder and CEO of Vyera, Mr. Shkreli made all

25  of the decisions.  He made the decision to acquire Daraprim at

LCMKFTC2                          Summation – Ms. Stewart

1  a premium price of $55 million, despite having only $4 million

2  in annual sales, and no patent or regulatory protection,

3  knowing that he would profit from his anticompetitive strategy.

4          As Mr. Shkreli explained, "It was clear to me that

5  Daraprim was significantly undervalued and that if Vyera could

6  acquire the drug at the right price, the acquisition made

7  sense."

8          And Mr. Shkreli made the decision to restrict the

9  distribution of Daraprim to prevent generics from accessing the

10  RLD they would need for FDA-mandated bioequivalence testing.

11          And it was Mr. Shkreli who made the decision to raise

12  the price of Daraprim from $17.50 per tablet to $750 per

13  tablet.  Even after the public backlash to such an outrageous

14  price increase to an essential lifesaving drug, Mr. Shkreli

15  publicly stated that his only regret was not raising the price

16  even higher.

17          Asked by an audience member at a healthcare summit

18  hosted by Forbes what he would do differently if he could go

19  back in time, he replied, "I probably would have raised prices

20  higher as that is probably what I should have done.  I could

21  have raised it higher and made more profits for our

22  shareholders, which is my primary duty."

23          It should be noted that Mr. Shkreli is, and always has

24  been, Phoenixus' largest shareholder.

25          To this day, Mr. Shkreli defends his conducted:  "I

LCMKFTC2                    Summation - Ms. Stewart

1   accept full responsibility for the price increase, which I

2   still believe was the right decision for the company and the

3   patient community."

4          In sum, it was Mr. Shkreli who made all of the

5   decisions.  As Mr. Tilles, who took over as interim CEO when

6   Mr. Shkreli stepped down, testified, it was not the senior

7   leadership team making all the important management decisions,

8   it was Martin Shkreli.

9          And in Martin Shkreli's own words:  "I was the boss of

10  the entire company."

11         Once Vyera had acquired the Daraprim rights,

12  Mr. Shkreli's marching orders were to ensure Daraprim was moved

13  into closed distribution as swiftly as possible in order to

14  minimize exposure, meaning minimize exposure to generic

15  competitors being able to access Daraprim.

16         Under Mr. Shkreli's leadership, Vyera worked to

17  further restrict the distribution of Daraprim.  As Mr. Dorfman

18  testified at trial, the distribution system was generally made

19  even more restrictive, identifying with a desire to identify

20  with particularity every -- to the extent possible, every pill

21  that was being distributed by the company.

22         Vyera also immediately focused on purchase limits,

23  keeping Shkreli apprised of any developments, and Mr. Shkreli

24  also closely monitored the Daraprim sales data.  Even after

25  leaving -- having formally left the company — I'm sorry — he

LCMKFTC2                    Summation - Ms. Stewart

1  was still a board member.  He carefully tracked the commercial

2  sales of Daraprim in order to make sure that our, quote,

3  "distribution wasn't penetrated by a generic."

4         As my colleague, Ms. Peay, discussed earlier, with

5  Vyera dependent on sales to generate revenue, Mr. Shkreli and

6  Vyera were not content to solely rely on closed distribution to

7  prevent generic entry.  Mr. Shkreli also set the course to do

8  everything possible to keep generics from accessing the most

9  viable sources of API.

10         As Mr. Smith testified, it was Mr. Shkreli's desire to

11 enter an exclusivity agreement with Fukuzyu.  That idea

12 originated with Mr. Shkreli.

13         Mr. Shkreli first had Mr. Smith -- asked Mr. Smith to

14 contact Fukuzyu in May of 2015, just as negotiations with Impax

15 to acquire the rights were beginning.

16         And in June -- early June 2015, a Fukuzyu sales

17 representative responded to Vyera's inquiry, and this is a

18 follow-up to an email Ms. Peay showed earlier — this is

19 GX 1200 -- 1209.  The sales representative responded to Vyera's

20 inquiry as follows:

21         "Do you have any exclusive agreements to supply

22 pyrimethamine in the United States?

23         "Yes, we do.

24         "Can you sell us pyrimethamine?

25         "Sorry, we can't.

LCMKFTC2                          Summation - Ms. Stewart

1          "Can you sign up exclusivity with us?

2          "Sorry, we can't."

3          When Mr. Smith forwarded this exchange to Mr. Shkreli,

4     Mr. Shkreli replied:  "Hopefully, it is Impax, because then it

5     would be unlikely a generic is out there.  Only one other DMF,

6     which was Ipca, and they can't do it.  I think DMFs are highly

7     preferred by FDA and arguably even required."

8          As Mr. Tilles explained, even if Mr. Shkreli wasn't

9     physically present in Japan for the execution of the agreement,

10    exclusivity with Fukuzyu was Mr. Shkreli's idea and intention,

11    it was something he wanted, and it happened.

12         Data blocking was also key to Mr. Shkreli's plan to

13    prevent generic competition to Daraprim.  Again, even prior to

14    the acquisition, Mr. Shkreli sought to prevent sales data from

15    being reported to IMS, now known as IQVIA, and other

16    third-party data aggregators in order to mask the true size of

17    the Daraprim market opportunity.  As Ms. Retzlaff, the former

18    chief operating officer, explained, Mr. Shkreli believed that

19    by limiting data to generic manufacturers, that would limit or

20    impede their ability to assess the size of the market

21    opportunity.

22         Vyera's efforts to get ICS and Walgreens not to report

23    sales to IQVIA, again when Mr. Shkreli was still CEO, and in

24    May 2016, even after having formally departed from Vyera,

25    Mr. Shkreli wrote Mr. Tilles, Mr. Crutcher, and Ms. Retzlaff

LCMKFTC2                    Summation - Ms. Stewart

1   demanding to know how are there still so many Daraprim bottles

2   getting through to IMS.

3           It is clear that Mr. Shkreli's official exit from the

4   company in February 2016 did not stop his involvement in the

5   anticompetitive scheme.  Mr. Shkreli has regularly used his

6   shareholder voting power, or the threat thereof, to control the

7   management of Vyera.

8           Mr. Tilles who, again, took over as interim CEO upon

9   Mr. Shkreli's departure, understood Mr. Shkreli to be exerting,

10  quote, shadow control over the company.

11          When Mr. Shkreli grew unhappy with those he had left

12  in charge, he called an extraordinary general meeting, known as

13  an EGM, something only he has the sufficient shareholder power

14  to do, and installed a new board comprised of his thoroughly

15  unqualified cronies.

16          As Mr. Shkreli himself testified via affidavit, "In

17  2016, I was not satisfied that Vyera was moving in the right

18  direction and became concerned about the future of the company,

19  which at the time was my largest investment.  I was

20  particularly frustrated by the way that Ron Tilles, who had

21  been named interim CEO, was managing Vyera.  As a result, I

22  organized a proxy fight to remove members of the board of

23  directors of Phoenixus that I didn't think were doing a good

24  job, including Mr. Tilles.  The proxy fight was successful, and

25  my slate of directors, which included Kevin Mulleady and Akeel

LCMKFTC2                    Summation - Ms. Stewart

1    Mithani, was elected."

2            THE COURT:  So does the record reflect anything that

3    would indicate that Mr. Tilles or those in charge before their

4    ouster were doing anything to unwind the anticompetitive

5    conduct you've identified?

6            MS. HANEBERG:  Your Honor, no.  Quite to the contrary,

7    they were pursuing Mr. Shkreli's scheme throughout that time

8    period.

9            THE COURT:  So we have this statement from Mr. Shkreli

10   as to his unhappiness, but do the plaintiffs have a view as to

11   what the record might show as to the source of that

12   unhappiness?

13           MS. HANEBERG:  I believe that -- your Honor, I believe

14   it is a variety of issues, and some of it included personal

15   issues between Mr. Tilles and Mr. Shkreli, and that ultimately

16   resulted in a dissolution of the relationship.

17           Mr. Tilles was actually fired as CEO before the formal

18   EGM took place to remove him, but I don't believe that there

19   was any disagreement over whether he was actually pursuing the

20   anticompetitive business strategy that Mr. Shkreli had set in

21   motion.

22           Prior to the EGM, the then board of directors implored

23   shareholders not to elect Mr. Shkreli's proposed slate for

24   three key reasons --

25           THE COURT:  I'm sorry?

LCMKFTC2                        Summation - Ms. Stewart

1        MS. HANEBERG:  I'm sorry.

2        Prior to the EGM, the then board of directors implored

3    shareholders not to elect Mr. Shkreli's proposed slate for

4    three key reasons:

5        The first was an utter lack of transparency.

6    Mr. Shkreli provided no rationale behind his proposals.  He

7    initiated litigation against the company, and his

8    communications with Turing's group staff and other shareholders

9    was vitriolic and accusatory.

10       They were also extremely concerned by undue

11   involvement of Mr. Shkreli.  As they explained to shareholders,

12   over the past year, Turing has faced substantial inquiries and

13   mistrust from consultants, auditors, banks, insurers,

14   regulatory authorities, and even potential customers due to

15   Martin Shkreli's actual and perceived involvement in the

16   company, first as the CEO and now as a shareholder.

17       The then board found Mr. Shkreli's proposed slate to

18   be, quote, "woefully inadequate."  The board, quote, "believes

19   that in case of their election, many third parties, including

20   regulatory authorities, will likely deem the newly elected

21   board members to be serving merely as strawmen acting on

22   Mr. Shkreli's behalf."

23       Finally, the board found that there was an utter lack

24   of qualifications, and conflicts of interest were rife.  Board

25   of directors did not believe that the candidates proposed by

LCMKFTC2                    Summation - Ms. Stewart

1    Mr. Shkreli had the independence, nor the finance, biotech, or

2    pharma or leadership experience required for membership on a

3    pharmaceutical board.

4         Despite these serious concerns, Mr. Shkreli used his

5    shareholder power to elect his chosen slate in June 2017.

6    After the vote, it became clear, in the testimony of

7    Mr. Tilles, that Shkreli just wanted absolute control of the

8    votes by installing all his cronies.

9         Within 24 hours of their election, Shkreli's newly

10   elected board fired Dr. Salinas as CEO and Eve Costopoulos as

11   general counsel.  As Dr. Salinas testified at trial,

12   Mr. Shkreli was successful in getting his slate of directors

13   involved despite their lack of qualifications.  In the end,

14   Dr. Salinas was out and Mr. Shkreli's people were in.

15        Key among the five newly elected board members were

16   Kevin Mulleady and Akeel Mithani, who quickly became the sole

17   members of a newly formed executive committee, which was to

18   perform the executive functions and take over the tasks of

19   senior management, meaning chief executive officer, chief

20   financial officer, chief commercial officer, and chief legal

21   officer.

22        Mr. Mulleady had worked for Shkreli at his hedge

23   funds, Retrophin, other Shkreli startups, and Vyera at its

24   founding.  After Mr. Shkreli's formal departure, Mr. Tilles had

25   fired Mr. Mulleady for his lack of abilities.

LCMKFTC2                    Summation - Ms. Stewart

1    Mr. Mithani was a recent college graduate and another

2    close Shkreli associate, who admitted at his deposition that he

3    did not think he had the qualifications to join the board at

4    that time.

5    Mr. Mulleady would go on to assume the role of CEO and

6    chairman of the board.  Mr. Mithani became senior vice

7    president of business development.

8    Mr. Shkreli himself has referred to this board as the,

9    quote, "Martin and Kevin board."  As Mr. Shkreli said in a

10   prison phone call to Mr. Mulleady, "Being on the board of

11   Phoenixus means, you know, you're on the Martin and Kevin

12   board.  Between the two of us, we control more than 50 percent,

13   so that's the first thing you know off the rip."

14   Mr. Shkreli went on to explain, "Like the first thing,

15   it's like Facebook, you can't go in there and tell Zuckerberg

16   what to do.  You know, you can give him advice, you know, it's

17   just he happens to own the thing, and that's the way it is."

18   As Mr. Mulleady testified at trial, Mr. Shkreli in

19   this passage was likening himself to Mark Zuckerberg of

20   Facebook.

21   Central to Mr. Shkreli's continued control of Vyera is

22   his EGM power, that is, his ability as the largest shareholder

23   to call an extraordinary general meeting to remove and/or

24   install his chosen directors.  He has repeatedly flexed this

25   power.

LCMKFTC2                         Summation – Ms. Stewart

1    In another call from prison, he explained: "I'm ready

2    to hold Averill — as in Averill Powers, the CEO — accountable,

3    Akeel Mithani accountable, and you, Kevin Mulleady, accountable

4    if something doesn't get done." He continued that: "I have

5    EGM power. I mean, I have no problem firing everybody, to be

6    frank, if you guys can't figure it out."

7        Mr. Shkreli has fought tooth and nail to ensure that

8    his anticompetitive strategy not only remained in place, but

9    actually expanded in scope even after his imprisonment in

10   September of 2017.

11       In terms of distribution, Mr. Shkreli urged the

12   tightening, further tightening, of the supply chain. In a

13   phone call to Mr. Mithani, Mr. Shkreli instructed Mithani that

14   Vyera should be, quote, "doing everything possible to prevent a

15   generic company from obtaining a sample of Daraprim, as this

16   would mean making Daraprim a $600 million asset in perpetuity."

17       Mr. Shkreli instructed Mulleady on how to deal with

18   Mr. Della Fera when they suspected that Fera might be

19   approaching generic entry. Mr. Shkreli explained: "The number

20   one thing I would do is just really carefully screen every

21   doctor that you know, even if it drops sales a little bit.

22   It's a good -- you know, really make sure he's not getting his

23   hands on anything."

24       And in terms of API, it was Mr. Shkreli who crafted

25   some of the original outreach to RL Fine. If you compare

LCMKFTC2                    Summation - Ms. Stewart

1   GX 1104 to GX 1129, it is clear that Mr. Shkreli crafted one of

2   the original emails to reach out to RL Fine, which Mr. Mithani

3   simply copied and pasted and sent on to RL Fine.

4          Mr. Shkreli was integrally involved in Vyera's RL Fine

5   exclusivity effort.

6          Ultimately, Mr. Shkreli grew dissatisfied with

7   Mr. Mulleady and called yet another EGM to remove Mr. Mulleady

8   from the board, and Mr. Mulleady was, in fact, voted off the

9   board at an EGM in December of 2020.

10         But Mr. Shkreli's reasons for dropping Mr. Mulleady

11  from the board indicate that Mr. Mulleady never should have

12  been elected to the board in the first place, as he, quote,

13  "lacked pharmaceutical knowledge base."

14         As Mr. Shkreli testified at his deposition:  "One of

15  the things I have implored Mulleady to do over at least the

16  last several years, but certainly in the last 12 months, over

17  and over again, is to really try to focus and learn as much as

18  he can about the pharmaceutical industry, where I think there

19  are topics — not all topics, but some topics — he is fairly

20  deficient in that I think he owes it to himself and to those

21  around him in his career to work on."

22         He continued:  "I wanted him to sort of increase his

23  knowledge base in pharmaceuticals.  This was not --

24  pharmaceuticals is not an easy business to understand, and

25  there would be many moments in time where I felt Kevin

LCMKFTC2                    Summation - Ms. Stewart

1    demonstrated his lack of understanding and lack of knowledge

2    and fact-specific knowledge, especially in pharmaceuticals."

3            Having no pharmaceutical knowledge base, one can only

4    infer that Mr. Shkreli elected Mr. Mulleady to run Vyera simply

5    because of his close ties to Mr. Shkreli.

6            Shkreli believes, and regularly demonstrates, that the

7    power to hire and fire falls to him --

8            THE COURT:  Let's just pause there.

9            MS. HANEBERG:  Yes.

10           THE COURT:  With this removal of Mr. Mulleady, again,

11   I'm not aware of any record evidence that before his removal,

12   Mr. Mulleady, or those he was working with within Vyera, were

13   doing anything to unwind the anticompetitive practices to which

14   the plaintiffs are pointing, that the removal had to do with

15   other reasons.

16           Is that your understanding of what the record evidence

17   is as well?

18           MS. HANEBERG:  Your Honor, I agree, the record

19   evidence shows that the removal of Mr. Mulleady was not due to

20   any dampening of anticompetitive efforts; in fact, Mr. Mulleady

21   spearheaded numerous efforts to further restrict the ability of

22   generics to get on the market.  I will just note two points,

23   which is that, after significant questioning by the FTC, Vyera

24   did pay RL Fine to terminate its exclusivity agreement, and

25   there were board minutes reflecting a very different reason for

LCMKFTC2                    Summation - Ms. Stewart

1    the RL Fine agreement than what had happened when they actually

2    entered into it.

3           Second, I will note that after we filed the complaint

4    in this action, I believe Vyera terminated its data blocking

5    provisions with its distributors.  I believe both of those

6    were -- I think the record would indicate that both of those

7    were in response to investigation or action by the FTC and the

8    state attorneys general, but I did want to be fully candid that

9    those two things did happen under Mr. Mulleady's tenure.

10          THE COURT:  Thank you.

11          MS. HANEBERG:  Mr. Shkreli believes and demonstrates

12   that the power to hire and fire falls to him, as the largest

13   shareholder.

14          He explained in his deposition:  "As the largest

15   shareholder, at least in my experience, a lot of those sorts of

16   decisions" — referring to removing Mr. Powers -- from

17   potentially removing Mr. Powers from the company — "they ended

18   up going to the largest shareholder."

19          The evidence shows, your Honor, that Mr. Shkreli meets

20   the standard for individual antitrust liability.  He

21   masterminded the scheme.  He set the scheme in motion.  He had,

22   and continues to have, control over the corporation through his

23   ability to hire and fire.

24          And even if any of Mr. Shkreli's involvement had

25   ceased, he would still be liable for the continuance because

LCMKFTC2                     Summation - Ms. Stewart

1    his scheme did not materially change after his formal tenure at

2    Vyera ended.

3            Your Honor, I will now turn over to my colleague, Amy

4    McFarlane, from The New York Attorney General's Office, to

5    discuss remedy.

6            THE COURT:  Before we do that, just one second here,

7    does anyone need a break?

8            Not seeing any desire for that, great, go ahead.

9            MS. McFARLANE:  Good morning, your Honor.  And may it

10   please the Court, I'm Amy McFarland, from the New York State

11   Attorney General's Office.  I'm also speaking today on behalf

12   of the government plaintiffs.

13           I'd like to briefly address our authority to seek

14   injunctive relief and the state's authority to seek equitable

15   monetary relief in this case.

16           Your Honor, ever since New York initiated the Daraprim

17   investigation in 2015, we and the other plaintiff states have

18   worked closely with our sister enforcers at the Federal Trade

19   Commission to address the conduct that allowed defendant, in

20   2015, to implement a 4,000 percent increase in the price of

21   Daraprim, a lifesaving drug, and to unlawfully maintain that

22   4,000 percent increase by engaging in anticompetitive

23   practices.

24           The evidence clearly shows that Martin Shkreli,

25   through the company that he controlled, directed and

LCMKFTC2                    Summation - Ms. Stewart

1    participated in a comprehensive scheme to prevent generic

2    competition for Daraprim to protect his massive price hike.

3    This scheme, designed to maintain a monopoly on Daraprim,

4    violated the antitrust laws.

5            As your Honor knows from our papers, the FTC and the

6    states, particularly New York, have strong independent federal

7    and state law bases for the equitable relief sought in this

8    case.  Here, I'll be touching on those legal bases and on the

9    appropriateness of three aspects of that relief:

10           First, permanently banning Mr. Shkreli from working in

11   the pharmaceutical industry, consulting in the pharmaceutical

12   industry, or having any meaningful ownership interest in a

13   pharmaceutical company.

14           Second, the disgorgement of unjust gains.

15           And, third, the application of joint and several

16   liability in relation to the disgorgement of unjust gains.

17           So, first, with respect to an injunction:  The FTC

18   act, the Clayton Act, and state law authorize the plaintiffs to

19   seek strong injunctive relief, including industry bans against

20   individuals when equity demands it.

21           The New York Attorney General has the ability to seek

22   broad equitable relief under Section 63.12 of the New York

23   executive law, which is a remedial statute, not a penal

24   statute.

25           Through Section 63.12, the Attorney General has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCMKFTC2                    Summation – Ms. Stewart

1   secured lifetime bans against individuals who repeatedly or

2   persistently violate the law.  In litigated cases, our state

3   courts have exercised their equitable discretion to issue

4   industry bans against lawbreakers in a variety of industries.

5        As noted in our papers, the Attorney General has

6   secured injunctions banning individuals from everything from

7   the business of equipment leasing, to the business of mortgage

8   foreclosure consultation, to the business of selling, breeding,

9   or training of dogs.

10       These industry bans were not time limited, and they

11  did not provide carve-outs for certain activities.  They were

12  permanent, plenary injunctions.

13       Here, federal law and New York law should be used to

14  ban Martin Shkreli from the pharmaceutical industry for life.

15       To be sure, banning an individual from working in an

16  industry is a serious remedy, but where egregious conduct

17  demands it, it is the proper remedy.  And, here, the

18  defendant's conduct warrants a permanent industry ban.  He has

19  repeatedly undertaken to profit by grossly distorting

20  competition in pharmaceutical markets and will do it again

21  unless he is banned from the industry.

22       Mr. Shkreli's chose not to attend this trial and offer

23  his testimony live, but we know from the --

24            THE COURT:  You have to slow down --

25            MS. McFARLANE:  Okay.

LCMKFTC2                    Summation - Ms. Stewart

1    THE COURT:  -- so that the reporter can catch every

2  word you say and so I can catch every word you say.

3    MS. McFARLANE:  Thank you very much, your Honor, and I

4  apologize.

5    THE COURT:  Thank you.

6    MS. McFARLANE:  Mr. Shkreli chose not to attend this

7  trial and offer his testimony live, but we know, from the many

8  facts in evidence at this trial, that Mr. Shkreli participated

9  in, and directed, the illegal scheme at issue in this case.

10    While at his prior pharmaceutical company, Retrophin,

11  Mr. Shkreli pioneered his strategy of restricting distribution

12  to foreclose generic -- to foreclose potential generic

13  competitors from getting the drug samples necessary to conduct

14  FDA testing for generic approval.

15    At Retrophin, he bragged to investors that putting

16  drugs into closed distribution has protected virtually every

17  single company that has it from generic competition.  He used

18  this strategy at Retrophin to protect price increases after he

19  raised the price of Chenodal from $100,000 to $515,000 a year,

20  and raised the price of Thiola from $4,000 to $80,000 per year.

21    Then Mr. Shkreli started Vyera.  His business

22  development team that had implemented his strategies at

23  Retrophin followed him to Vyera.  Vyera, under Mr. Shkreli's

24  control, acquired Daraprim from Impax.  As we've heard from

25  Dr. Hardy, Daraprim is used to treat central nervous system

LCMKFTC2                    Summation – Ms. Stewart

1   toxoplasmosis, a disease that most frequently afflicts

2   immunocompromised individuals, such as those with uncontrolled

3   HIV.

4           Under the control of Shkreli, Vyera acquired Daraprim

5   and immediately increased the price 4,000 percent, a price that

6   we've heard former Vyera executive, Dr. Salinas, call

7   excessive, crazy, irresponsible, and the poster child of

8   everything that is considered wrong about the pharmaceutical

9   industry.

10          Dr. Salinas testified that this kind of massive price

11  hike was Mr. Shkreli's business model.  To be able to protect

12  and maintain this grossly excessive price, Vyera imposed

13  restrictions on API suppliers, distributorships, and

14  information flows.  Mr. Shkreli, the largest shareholder of

15  Vyera's parent corporation, directed and participated in the

16  scheme continuously from 2015 to the present, even from prison.

17  Because of that conduct, generic entry was impeded, and Vyera

18  was able to force patients to pay its exorbitant price for

19  Daraprim.

20          As Dr. Hardy testified, and as we've seen in emails

21  from Massachusetts General Hospital, Shkreli's scheme to

22  inflate the price of Daraprim forced physicians and vulnerable

23  patients in life-threatening situations to turn to second-best

24  treatments.  Mr. Shkreli has testified that he contemplates

25  some sort of return to the pharmaceutical industry when he is

LCMKFTC2                    Summation - Ms. Stewart

1    released from prison.  This must not happen.

2            Equity demands that Mr. Shkreli be permanently banned

3    from the pharmaceutical industry.  A conduct-specific

4    injunction that would allow Mr. Shkreli's continued

5    participation in the pharmaceutical industry would be more

6    difficult to monitor and enforce and would not be sufficient to

7    protect consumers.

8            We ask the Court to use the federal and New York State

9    law to issue the strong injunctive relief to ensure that

10   Mr. Shkreli cannot repeat this or any other kind of

11   reprehensible conduct in the pharmaceutical industry when he is

12   released from prison.

13           Banning Mr. Shkreli from the pharmaceutical industry

14   would also send a powerful signal to corporate executives in

15   the pharmaceutical industry that they cannot engage in illegal

16   schemes to reap monopoly profits at the expense of vulnerable

17   patients.

18           Turning now to the equitable monetary relief, sought

19   by the state plaintiffs in this case.  As your Honor knows,

20   following the Supreme Court's decision in the AMG case,

21   monetary relief here is the unique province of the states.

22           Your Honor has already found in this case that the

23   plaintiff states have parens patriae standing to bring this

24   action for equitable relief.  Your Honor determined, in your

25   partial summary judgment ruling, that the New York Attorney

LCMKFTC2                    Summation – Ms. Stewart

1   General has the authority to seek disgorgement of defendant's

2   net profits.  Your Honor also ruled that New York has authority

3   to seek disgorgement of unjust gains from the defendant based

4   on the entirety of U.S. sales of Daraprim because the locus of

5   the wrongful activity was in New York State.

6            Case law counsels that the district court has broad

7   discretion in calculating the amount to be disgorged.  In the

8   Second Circuit, *FTC v. Bronson* provides the guiding principles

9   for calculation of disgorgement.  *Bronson* tells us that the

10  plaintiffs bear the burden of showing that the disgorgement

11  calculation reasonably approximated the amount of defendants'

12  unjust gain.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

LCMMFTC3                    Summation – Ms. McFarlane

1      MS. McFARLANE:  *Bronson* specifies that this should be

2 the calculation of the profits resulting from the unlawful

3 conduct less any direct costs incurred by the defendant.  If

4 plaintiffs make this showing, the burden then shifts to the

5 defendants to show that the figures were inaccurate.

6      *SEC v. First Jersey Securities* counsels that any risk

7 of uncertainty in calculating disgorgement should fall on the

8 wrongdoer whose illegal conduct created the uncertainty.

9      Here, Professor Hemphill has calculated the amount of

10 unjust gain resulting from the illegal activity.  He has

11 reasonably approximated that unjust gain to be $64.6 million.

12 As we heard from Professor Hemphill, he was assigned to

13 construct a model that calculates the amount of excess profits

14 under a variety of counterfeit factual scenarios that reflect

15 the likely timing and extent of entry, absent Vyera's unlawful

16 conduct.  In order to make this calculation, Professor Hemphill

17 undertook four steps, each of which I will briefly address.

18      First, Professor Hemphill calculated Vyera's net

19 Daraprim revenue in the actual world over the relevant period,

20 October 2018, when Professor Hemphill assumed the first generic

21 would have entered, through December 2020.  This is a

22 relatively straightforward calculation.

23      Revenues for the relevant period, less discounts,

24 rebates, and chargebacks paid to distributors, purchasers and

25 payors, Professor Hemphill calculates this figure to be $130.6

LCMMFTC3                    Summation - Ms. McFarlane

1    million.  This is actually a conservative estimate, since he

2    only considered data through the end of 2020, even though

3    Shkreli's scheme continued to yield unjust gains after that

4    date.

5            Second, he calculated Vyera's revenue in the

6    counterfactual but-for world associated with a number of

7    different scenarios for generic and authorized generic entry.

8            Now, one issue that is always central to the

9    construction of the counterfactual is whether the assumptions

10   that were made to construct the counterfactual were reasonable.

11           Here, Professor Hemphill has said that he relied on

12   the testimony and documents from the generic drug makers,

13   Cerovene and Fera.  We have heard from the generic

14   manufacturers, Cerovene and Fera, that they were delayed from

15   entering the market because of restraints on their ability to

16   source API and obtain samples for FDA testing.  This is despite

17   the fact that they doggedly pursued every avenue to overcome

18   the roadblocks erected by Mr. Shkreli and Vyera.

19           We heard from Manish Shah, the president of Cerovene.

20   Mr. Shah testified that in a world where Fukuzyu agreed to

21   supply Cerovene with API in October 2016, and in a world where

22   Cerovene had no trouble sourcing Daraprim RLD, Cerovene could

23   have filed its amended ANDA in February 2017.  Mr. Shah told us

24   that if Cerovene were using Fukuzyu API, the FDA likely would

25   have approved the ANDA in six months, in August of 2017.

LCMMFTC3                    Summation - Ms. McFarlane

1    Cerovene then would have completed validation batches and would

2    have entered in November 2017.  This is actually earlier than

3    Professor Hemphill had anticipated in the very conservative

4    but-for world that he constructed.

5         We also heard from Frank Della Fera, the CEO of Fera.

6    Mr. Della Fera said that in a normal world, without the

7    restraints imposed by the defendant, he would have expected to

8    source API from Fukuzyu in November 2017.  In a normal world,

9    he would have been able to easily acquire RLD and test it

10   against sample batches in June 2018.  In a normal world, he

11   would have filed his ANDA in January of 2019 with approval in

12   September, and he would have launched within 30 days, that is

13   to say, in October 2019.

14        This is consistent with Professor Hemphill's scenarios

15   that assume Fera entry in the fourth quarter of 2019.  As we

16   have heard in the testimony, there is a strong evidentiary

17   basis for Professor Hemphill's scenario that assumes Cerovene

18   entry on or before October 2018 and Fera entry in October 2019.

19        I should note that, as Professor Hemphill testified,

20   this is a very conservative model.  First, it's conservative in

21   that it does not model potential entry from two other firms

22   that sought to enter the market, InvaTech and Mylan, because at

23   the time we constructed the models there was not sufficient

24   information to reasonably determine when these companies might

25   have entered.  It's always conservative in that we project

LCMMFTC3                    Summation - Ms. McFarlane

1    Cerovene entry in October 2018, although we now have testimony

2    from Manish Shah at Cerovene saying that without the illegal

3    conduct, Cerovene might have been able to enter as early as

4    2017.

5          Professor Hemphill considered just Cerovene and Fera

6    and assumed Cerovene entry in October 2018 and Fera entry in

7    October 2019 to calculate Vyera's Daraprim revenues, absent the

8    illegal conduct.

9          The third step of Professor Hemphill's model is a

10   simple mathematical calculation.  In this step, he assesses the

11   difference between Vyera's real-world revenues and the revenues

12   that they would have made in the counterfactual world, where

13   there was no illegality.  By doing this, he determines the

14   incremental revenue attributable to Vyera's conduct.  Professor

15   Hemphill calculates this access revenue, revenue but for the

16   illegal conduct, to be $67.6 million.

17         Which brings us to the fourth and final step of

18   Professor Hemphill's excess profits calculation.  In the

19   counterfactual world, where generics entered earlier, Vyera

20   would have sold less Daraprim.  Vyera's incremental costs,

21   costs associated with the manufacturing of tablets and sales

22   force costs, therefore, would have been lower in the but-for

23   world.

24         So as a final adjustment, Professor Hemphill deducts

25   the cost that Vyera would have avoided if Vyera were making and

LCMMFTC3                    Summation - Ms. McFarlane

1    selling less Daraprim.  After deducting those costs, Professor

2    Hemphill recently approximates that 64.6 million in excess

3    profits were attributable to the illegal conduct.

4         Professor Hemphill's model incorporated assumptions

5    that are well rooted in fact, so he has reasonably approximated

6    the amount of unjust gain.  Plaintiffs have met their burden

7    under *Bronson*.  As I mentioned, under *Bronson*, the burden then

8    shifts to the defendants to show that our approximation of

9    unjust gains is inaccurate.

10        Defendant's expert, Professor Jena, has done nothing

11   to establish that Professor Hemphill's approximation is

12   unreasonable.  He raises no issue with Professor Hemphill's

13   methodology.  Instead, he notes generally, without any

14   specifics, that Professor Hemphill has not provided a sound

15   basis for determining the date of generic entry in the but-for

16   world.

17        He also quibbles with Professor Hemphill's volume

18   assumption, even though Professor Hemphill based those

19   assumptions on the real-world data and on Vyera's own forecast.

20   His thin and uncompelling criticisms do nothing but cast doubt

21   on the accuracy of Professor Hemphill's analysis.  Defendant's

22   have, therefore, failed to meet their burden under *Bronson*.

23        Professor Hemphill has presented a reasonable

24   approximation of ill-gotten gains, and we ask the Court to

25   award at least $64.6 million of disgorgement to the plaintiffs.

LCMMFTC3                          Summation - Ms. McFarlane

1    As a last issue, should the Court award disgorgement

2    in this case, Martin Shkreli should be held jointly and

3    severally liable for the award.  It is well established that

4    the Court can exercise its discretion to impose joint and

5    several liability in disgorgement cases.  This discretion is

6    properly exercised when defendants in a case have collaborated

7    on the illegal scheme.

8        For example, in *SEC v. Pentagon Capital Management*,

9    the Second Circuit found that joint and several liability was

10   appropriate because defendants collaborated on a common scheme.

11       This principle also holds under state law.  In *212*

12   *Investors Corporation v. Kaplan*, a New York state court

13   observed that there is a significant body of authority holding

14   that when apportioning liability for disgorgement, courts have

15   the discretion to find joint and several liability when two or

16   more individuals collaborate in the illegal conduct.  Where

17   joint and several liability applies in the disgorgement

18   context, as it should here, there is no requirement to show

19   that the ill-gotten profits personally accrued to the

20   defendant.

21       As the Second Circuit noted in *SEC v. Contorinis*,

22   where there is joint and several liability for disgorgement,

23   the amount a court may order a wrongdoer to disgorge may not

24   exceed the total amount of gain from the illegal action, but

25   that does not entail that the gain must personally accrue to

LCMMFTC3                    Summation - Ms. McFarlane

1    the wrongdoer.

2         Whether an award of several and joint liability is

3    appropriate is a fact-specific inquiry.  The facts here clearly

4    establish that the defendant should be held jointly and

5    severally liable for the total amount of disgorgement.

6         Since Martin Shkreli hatched this monopolistic scheme,

7    he has been a primary shareholder of Vyera's parent company and

8    has significant voting rights.  Any increased revenues that

9    have benefited shareholders have benefited Mr. Shkreli first

10   and foremost.

11        As we have heard from Ms. Haneberg, Mr. Shkreli also

12   continuously exercised functional control over the company,

13   even after he was in prison.  Shkreli stayed in regular contact

14   with Kevin Mulleady while Shkreli was in prison, collaborating

15   with him regarding the operation and management of Vyera.

16        As your Honor knows, Shkreli's foliation of messages

17   sent from Shkreli's illegal prison phone have prejudiced our

18   ability to fully understand the scope of those discussions.

19   But we do know, according to Kevin Mulleady's log, that

20   Mulleady had over 1500 communications with Shkreli just in the

21   seven-month period from December 2019 until July 2020, some of

22   which pertained to the operation of Vyera.

23        And we know, from reported prison conversations, that

24   Shkreli thought, as recently as 2020, that being on the board

25   of Phoenixus means you're on the Martin and Kevin board.  He

LCMMFTC3                    Summation – Ms. McFarlane

1  understood himself to be and in fact was controlling the

2  company from prison.  He was personally integrally involved in

3  decision making at Vyera and was collaborating with Vyera

4  executives to continue implementation of the illegal scheme

5  that he had designed.  If defendants have collaborated in an

6  illegal scheme, imposition of joint and several liability is

7  consistent with equitable principles.  The Supreme Court

8  recognized this in *SEC v. Liu* and remanded to the trial court

9  there to determine whether the facts were such that Liu and his

10  wife could be held jointly and severally liable.  On remand,

11  the trial court found that Liu's wife of was an active partner

12  and accomplice in the scheme and imposed joint and several

13  liability.

14        Here, Shkreli designed and maintained an illegal

15  scheme that harmed not only competition but also consumers, the

16  patients who are unable to obtain or afford Daraprim and those

17  who were forced to pay its inflated price.

18        For his role in this scheme Martin Shkreli should be

19  permanently banned from the pharmaceutical industry and should

20  be held jointly and severally liable for a disgorgement award

21  of at least $64.6 million.

22        Thank you, your Honor, for your time and

23  consideration.

24        THE COURT:  There has been a settlement publicly

25  disclosed with respect to the codefendants in this action.  So

LCMMFTC3                          Summation – Ms. McFarlane

1    how does that settlement agreement affect, if at all, the award

2    that you seek here of disgorgement?

3          MS. McFARLANE:  Sure, your Honor.  Should your Honor

4    find $64.6 million of disgorgement appropriate in this case and

5    declare Mr. Shkreli jointly and severally liable, we do believe

6    that equitable principles may require some setoff in the amount

7    of what the settling defendants actually pay in the settlement.

8          THE COURT:  Thank you.

9          MS. McFARLANE:  Thank you, your Honor.

10         THE COURT:  Mr. Casey, what is your preference?  Would

11   you like to take a brief recess before beginning?

12         MR. CASEY:  Yes, your Honor, we would like to.

13         Your Honor, if I can mention one issue.

14         THE COURT:  Sure.

15         MR. CASEY:  It seems that our real time is not

16   working.  I noticed that plaintiffs appears to be.  There may

17   be something technical with this.

18         THE COURT:  We will help you in the interim, but I am

19   sure plaintiffs' counsel technical team will help you too.

20         The real, time the transcript.

21         MR. CASEY:  It's coming up unintelligible.

22         THE COURT:  While I am thrilled we have court

23   reporters and we will rely on the transcript, I have actually

24   not been looking at it during summations.  I see my screen is

25   working.  One of my law clerks and court reporter will try to

LCMMFTC3                    Summation - Mr. Casey

1    assist you during that.

2              MR. CASEY:  How much time, your Honor?

3              THE COURT:  How much time do you want?

4              MR. CASEY:  Fifteen minutes.

5              THE COURT:  Sure.

6              (Recess)

7              MR. CASEY:  Your Honor.

8              THE COURT:  Mr. Casey.

9              MR. CASEY:  Thank you, your Honor.

10             Before I begin, the defense has some timelines that we

11   intend to use or allow the Court to look at during the

12   presentation.  I have copies here and these have been provided

13   to plaintiffs' counsel this morning.

14             THE COURT:  Thank you so much.

15             MR. CASEY:  Your Honor, we will also have those

16   available electronically when we get to those portions.  They

17   are just for the Court's assistance and the assistance of the

18   plaintiffs.

19             Your Honor, on behalf of Martin Shkreli I want to

20   thank the Court for your time and attention during this trial.

21             The first thing I wanted to do, your Honor, before I

22   got into the substance of the argument, is to address just two

23   points that came up during the plaintiffs' summation.

24             The first is, the Court asked about whether

25   Mr. Shkreli's unhappiness with Mr. Tilles and the other

LCMMFTC3                    Summation - Mr. Casey

1    executives at Vyera that precipitated the proxy fight had to do

2    with anything involving the anticompetitive scheme as alleged.

3    Your Honor, the answer to that is no.

4          I would direct the Court to Mr. Shkreli's written

5    direct testimony where he addresses this.  It's at page 12.

6    This is DX-546 at page 12 where he addresses the proxy fight.

7    I believe the first part was presented by the plaintiffs,

8    paragraph 61.

9          What was not presented was the next paragraph, 62.

10   That says:  The proxy fight was totally unrelated to Vyera's

11   sale and distribution of Daraprim.  Then paragraph 63 says:

12   Despite the fact that my share ownership in Vyera allowed me to

13   make changes to the board of Phoenixus, I never used that power

14   to affect in any way Vyera's distribution of Daraprim, its

15   acquisition of pyrimethamine API for Daraprim, or its policies

16   and practices related to reporting of data.

17         That's unrebutted testimony from Mr. Shkreli.  It

18   clearly shows that there is not a connection between his

19   exercising his authority or his ownership, his rights as a

20   shareholder, and the company's sale of Daraprim.  There is no

21   record evidence to suggest that he was directing Vyera's

22   conduct relating to Daraprim or the distribution of Daraprim

23   during the period after he left the company.  That's the first

24   item I wanted to discuss.

25         Secondly, your Honor --

LCMMFTC3                    Summation - Mr. Casey

1      THE COURT:  When you say that, no evidence that he

2  directed Vyera's conduct relating to Daraprim or the

3  distribution of Daraprim after he left the company, what date

4  are you using for after he left the company?

5      MR. CASEY:  He left as CEO in December of 2015, your

6  Honor.

7      THE COURT:  Yes.  But for that last statement is that

8  the date you are using?

9      MR. CASEY:  Well, for that I would use the date that

10  he actually left the board, which was February 2016.

11      THE COURT:  Your contention is following February of

12  2016, he did nothing to affect the company policy with respect

13  to Daraprim?

14      MR. CASEY:  Yes, your Honor.  I think what I would say

15  is, there is record evidence that he made suggestions as a

16  shareholder about the direction of the company and those

17  suggestions included in some cases Daraprim.  But there were

18  merely suggestions and there is also record evidence that the

19  executives did not -- in many cases did not act on those

20  suggestions, so he wasn't directing the policy.  In other

21  words, he may have made suggestions, but it wasn't -- there is

22  no record evidence that I'm aware of that he actually directed

23  the distribution of Daraprim and that the executives

24  furthered -- carried out those directives.

25      THE COURT:  That's a little tough, I think,

LCMMFTC3                    Summation - Mr. Casey

1   proposition, given this record and given the transcripts of his

2   calls for the period after February of 2016.

3          MR. CASEY:  Your Honor, there are transcripts of phone

4   calls for certain, and we don't dispute that.  What I'm saying

5   is, those transcripts reflect discussions he had with the

6   executives, including Mr. Mulleady, suggestions about company

7   business.  But in most cases those suggestions were not acted

8   upon.  So he was not controlling company decisions during that

9   period of time.  There is evidence from the executives,

10  including Ms. Costopoulos, Mr. Salinas, others that confirmed

11  that, that he wasn't controlling the company while he was out

12  of the company.

13         THE COURT:  Let's take one example during the period

14  you're focusing on, the period after February 2016, of the

15  discussions about RL Fine.  If you're planning to address those

16  later --

17         MR. CASEY:  I was not, your Honor.

18         THE COURT:  What about his suggestions or directions

19  with respect to how to engage with RL Fine after they learned

20  that generics were looking to RL Fine for supply of the API?

21         MR. CASEY:  Your Honor, what I'm aware of is one

22  e-mail in the record in which Mr. Shkreli suggested what the

23  company should order from RL Fine.  That e-mail did not direct

24  them to form an exclusive contract with RL Fine and there is

25  testimony from Mr. Mulleady that the reason that he was -- I

LCMMFTC3                    Summation - Mr. Casey

1   think there was a follow-on e-mail saying I'll keep you in the

2   loop on these communications going forward.  Mr. Mulleady

3   testified just the other day that he was relying on

4   Mr. Shkreli's expertise in the pharmaceutical industry in terms

5   of what should be in that e-mail.  But there is no record

6   evidence of a direction from Mr. Shkreli to the company to form

7   an exclusive deal with RL Fine.  It just doesn't exist.

8            THE COURT:  Thank you, counsel.

9            MR. CASEY:  Thank you, your Honor.

10           One other thing I wanted to address, your Honor.  The

11   plaintiffs said that Mr. Shkreli is blaming others, blaming the

12   generic companies, blaming the FDA.

13           Your Honor, that's not what is happening here.

14   Mr. Shkreli is not blaming anybody.  In fact, he has taken

15   responsibility in his affidavit for some conduct, including the

16   price increase, which he takes responsibility for, and for some

17   of the fallout after that.

18           But what our argument is is simply holding the

19   plaintiffs to their burden of proof.  They have a burden to

20   establish causation.  They have a burden to establish that

21   there was a substantial anticompetitive effect in the market.

22   Our argument is they have not met that burden.

23           That's what I plan to go into with the Court today, is

24   to discuss some of those pieces of record evidence that

25   suggest, we think strongly -- I wouldn't say suggest -- that

LCMMFTC3                    Summation - Mr. Casey

1    show that plaintiffs haven't met their burden.

2         It's not debatable that under the rule of reason

3    plaintiffs bear the initial burden -- and I'm quoting from *Ohio*

4    *v. American Express*, Supreme Court decision, 2018 -- the

5    initial burden to prove that the challenged restraint has a

6    substantial anticompetitive effect that harms consumers in the

7    relevant market.

8         That's plaintiffs' burden. They have to show that

9    these restrictions and this scheme, as they put it, actually

10   delayed the generics in entering the market. The record

11   evidence does not show that, your Honor.

12        The reason it doesn't is because there were lots of

13   things going on. There were filings at the FDA. There were

14   business decisions that these generic companies were making.

15   There is also a lack of evidence of a connection between the

16   agreements and the refusals to deal that are alleged in the

17   complaint. That's what I would like to go through this

18   morning, this afternoon.

19        THE COURT: You are conceding that the goal,

20   Mr. Shkreli's goal, was to impede generic entry through the

21   measures he took or directed, but you are arguing that, despite

22   that goal, he failed to achieve his purpose.

23        MR. CASEY: Your Honor, on that I would say there is

24   record evidence from which the Court could conclude that there

25   was an intent to impede generics. That was not only

LCMMFTC3                          Summation – Mr. Casey

1   Mr. Shkreli, but it was other executives at the company.  We

2   have heard testimony that it was -- that topic, that discussion

3   was held at the company.  But, as the Court knows,

4   anticompetitive intent is not sufficient.  They have to prove

5   that there was an actual substantial anticompetitive effect.

6   They have not shown that.

7           As I said, the record shows that each of the generic

8   companies made multiple business decisions and FDA filings that

9   impacted the timing of approval of their ANDAs.

10          The record does not support a finding that the

11  challenged agreements caused actual delay in the generic's ANDA

12  approvals.  As this Court said in the *Lavoho LLC v. Apple, Inc.*

13  case, this is 232 F.Supp. 3d 513 (S.D.N.Y. 2016), at page 525

14  this Court said:  "Lack of causation in fact is fatal to the

15  merits of any antitrust claim."

16          Further, the plaintiffs have failed to meet their

17  burden to prove a relevant product market of FDA-approved

18  pyrimethamine products.

19          Finally, even if the Court determines that plaintiffs

20  have met their burden, the relief that they seek is not

21  warranted.  There are now three companies selling generic

22  Daraprim, so there was no need for an injunction to preserve

23  competition in the market.

24          Plaintiffs' requests for a pharmaceutical industry ban

25  amounts to a penalty provision that is inappropriate for a

LCMMFTC3                    Summation - Mr. Casey

1    court of equity.  Plaintiffs' request for equitable monetary

2    relief against Mr. Shkreli which relies upon a joint and

3    several liability theory is legally and factually unsupported.

4         Now, with that introduction, your Honor, I would like

5    to just go through, if I may, starting with Cerovene, the

6    timeline that you have, the first timeline is Cerovene that

7    deals with their API sourcing.

8         So the first broad point, your Honor, is Cerovene was

9    able to source API.  That's clearly in the record.  Starting in

10   2013 and 2014, Cerovene obtained API from Ipca to support its

11   ANDA.  Cerovene filed its ANDA on May 8, 2014.  That's not in

12   the timeline, your Honor.  The portions that are I will get to.

13        In January 2015, the FDA issued an import alert

14   preventing importation of Ipca's API into the U.S.  Forced to

15   find a new source of API, Cerovene looked to just two

16   companies, Fukuzyu and RL Fine, to get API.  Cerovene made no

17   effort to identify API suppliers other than those two.

18   Mr. Shah testified to that.

19        With respect to Fukuzyu, in 2015, Cerovene began

20   negotiating with Fukuzyu for API suppliers to supply.

21        (Continued on next page)

22

23

24

25

LCMKFTC4                    Summation – Mr. Casey

1          MR. CASEY:  (Continuing)  In September of 2015,

2     Fukuzyu provided Cerovene with a small amount of pyrimethamine

3     API for testing.  And then in October 2015, Cerovene wrote to

4     the FDA — and this is, again, a common theme here, as if

5     there's many, many FDA filings — Cerovene wrote to the FDA

6     seeking an exemption from the Ipca import ban.

7          Now, we fast forward to March of 2016.  Cerovene and

8     Ipca jointly asked the FDA for an exemption.  And in July 2016,

9     Cerovene contacted Fukuzyu again, after the FDA had denied the

10    exemption.

11         On September 9 of 2016, Cerovene told its broker that

12    it wished to place an order with Fukuzyu for 50 kilograms of

13    pyrimethamine API.

14         And then in October 4th –- on October 4th of 2016 —

15    and this is in your timeline, your Honor, in green there —

16    Fukuzyu told Cerovene that it would not supply the API, citing

17    low demand for pyrimethamine and high risk with the business.

18         Now, this denial by Fukuzyu occurred several months

19    before the Fukuzyu-Vyera master services agreement, which, as

20    the Court knows, happened on January 25th of 2017, and there is

21    no evidence that the later-in-time agreement between Fukuzyu

22    and Vyera had any effect on Fukuzyu's refusal to sell API to

23    Cerovene.

24         Let's talk about RL Fine.

25         In 2016, Manish Shah of Cerovene learned of RL Fine as

LCMKFTC4                    Summation - Mr. Casey

1    a potential API supplier.  On November 16th of 2016 — again,

2    this is on your timeline, your Honor, in green — Cerovene and

3    RL Fine entered into an exclusive supply agreement for four

4    years.

5         Now, Cerovene believed that exclusivity was important

6    to ensuring a viable commercial supply of API.  We heard that

7    from Mr. Shah at trial.

8         Cerovene purchased enough API from RL Fine under the

9    November 16, 2016 agreement for its bioequivalency testing for

10   the launch of its generic Daraprim product.

11        On November 30 of 2017, RL Fine stopped supplying

12   pyrimethamine API to Cerovene.  And, again, in terms of the

13   timing, this agreement was more than a year before the RL Fine

14   agreement with Vyera, which was December 27th of 2017.  There

15   is no evidence that the later-in-time agreement between Vyera

16   and RL Fine had any effect on RL Fine's decision to stop

17   supplying API to Cerovene.

18        In April of 2020, RL Fine delivered more API under

19   that November 16, 2016 agreement.  And on February 19, 2019,

20   Cerovene executed a supply agreement for a company we're

21   referring to as API-3 to supply pyrimethamine API if Cerovene

22   received FDA approval to use API-3 as its API supplier.

23        THE COURT:  I just want to backtrack a moment to make

24   sure I've captured your point.

25        MR. CASEY:  Okay.

LCMKFTC4                          Summation - Mr. Casey

1      THE COURT:  Your point with respect to Cerovene and

2  API supply is, one, they only identified Fukuzyu and RL Fine as

3  realistic suppliers of API?

4      MR. CASEY:  I don't know if I would say that, your

5  Honor.  I think the record evidence is that they're the only

6  two that they reached out to.

7      THE COURT:  Okay.  The only two that they reached out

8  to.  And your argument, with respect to that, is that they

9  should have reached out to more than those two?

10      MR. CASEY:  Well, there are lots of other companies,

11  and there were at that time, yes.

12      THE COURT:  Who else, in the record, was a

13  manufacturer of pyrimethamine?

14      MR. CASEY:  At that time?

15      THE COURT:  Yes.

16      MR. CASEY:  I don't have that available at this point,

17  your Honor, but there were others.

18      THE COURT:  Okay.

19      And then with respect to Fukuzyu, just to make sure I

20  understand your point, you think there is no record evidence

21  that Fukuzyu declining to supply Cerovene with API, that

22  there's no record evidence that that refusal by Fukuzyu can be

23  linked to Vyera's conduct?

24      MR. CASEY:  There's no record evidence that that

25  refusal can be linked to the challenged agreement in the

LCMKFTC4                    Summation - Mr. Casey

1   complaint, which is the January 25th, 2017 agreement.

2           THE COURT:  So you're not saying there's no evidence

3   that it can be linked to Vyera's efforts to negotiate that

4   agreement; your argument is sort of a legal one, that any

5   activity by Vyera before the agreement was actually executed is

6   irrelevant?

7           MR. CASEY:  I don't know if I would say that, your

8   Honor, but this came up in the examination of the plaintiffs'

9   expert, Mr. Bruno.  Mr. Bruno testified -- and he was asked

10  about this, and whether the negotiations could have affected --

11  if negotiations were going on at the time of the refusal,

12  whether they could have affected the refusal.  I mean

13  negotiations between Vyera and Fukuzyu.

14          And he said that he didn't see any evidence that Vyera

15  insisted that Fukuzyu decline to supply Cerovene on October 4,

16  2016.  He was asked the same thing with respect to the RL Fine

17  refusal, and he said the same thing, he said he did not see any

18  evidence that Vyera's agreement with RL Fine on December 27,

19  2017, prevented RL Fine from supplying Cerovene with API in

20  November 2017.

21          THE COURT:  Okay.  I think with respect to RL Fine, I

22  heard you say a moment ago — and I may have misheard — that

23  RL Fine's refusal was a year before RL Fine signed the

24  agreement with Vyera.  But you're saying it was a month before?

25          MR. CASEY:  If I did say that, I misspoke, your Honor.

LCMKFTC4                        Summation – Mr. Casey

1    THE COURT:  Okay, good.  Thanks.  I just want to make

2    sure I capture your argument.

3    MR. CASEY:  Okay.

4    Now, if we can move on, then, your Honor, to the next

5    timeline, which is I'm going to focus on Cerovene's accessing

6    RLD.  That's the timeline that's where the boxes are orange.

7    Again, first, the main point is that Cerovene was able

8    to obtain RLD for bioequivalence testing.  On April 3rd, 2017 —

9    and this is going before the timeline that you have in front of

10   you — Cerovene filed a major amendment to its ANDA to notify

11   the FDA that it was substituting RL Fine for Ipca as its API

12   supplier.

13   On December 26th of 2017, the FDA issued a complete

14   response letter to Cerovene which directed Cerovene to conduct

15   new bioequivalence testing using the new API supplier, RL Fine.

16   And even though there was some risk that the FDA would

17   require new bioequivalence testing, during the period April 3rd

18   and December 26, 2017, Cerovene made no attempt to obtain new

19   RLD; instead, it simply waited for the FDA to respond to its

20   major amendment.

21   On January 22nd, 2018, Cerovene asked the FDA to

22   reconsider its decision requiring new bioequivalence testing.

23   Cerovene did not want to commit the $600,000 it would have to

24   spend acquiring RLD until the FDA acted on its request.  We

25   heard that from Mr. Shah at trial.

LCMKFTC4                    Summation - Mr. Casey

1    On March 12 of 2018, Cerovene sent FDA a follow-up

2  letter demanding an answer to its request for reconsideration.

3  And on April 6, 2018, the FDA denied the request for

4  reconsideration.

5    Now let's talk about the RLD purchase orders that

6  Cerovene made.

7    On December 30, 2017, Cerovene placed a purchase order

8  with a procurement company called Espee.

9    On February 20, 2018, Cerovene canceled the Espee

10  order.  And in February 2018, Dr. Reddy's, Cerovene's marketing

11  partner, identified ProSupplier as a possible procurement

12  partner and urged Cerovene to partner with ProSupplier.

13  Cerovene, instead, went with Reliant, and in February 2018,

14  placed an order for five 100-count bottles with Reliant.

15    Cerovene's decision to go with Reliant as opposed to

16  ProSupplier was based on assurances that Cerovene received from

17  Reliant, that Reliant could obtain the samples quickly, and

18  that didn't happen.  Reliant did not make good on these

19  assurances and repeatedly asked Cerovene for additional time.

20    Cerovene had no reason to believe that ProSupplier

21  could not have supplied Daraprim RLD to Cerovene in

22  February 2018 if Cerovene had placed an order with ProSupplier

23  at that time.  Again, Mr. Shah testified to that.

24    In June of 2018, Reliant delivered one of the five

25  bottles that Cerovene had ordered.

LCMKFTC4                    Summation - Mr. Casey

1          And then on July 13, 2018, Cerovene wrote to the FDA

2     asking for a waiver from the five-bottle requirement.

3          Following that request, Cerovene continued to wait for

4     Reliant to deliver the additional four bottles rather than

5     switch to ProSupplier, as its more established pharmaceutical

6     partner, Dr. Reddy's, was urging Cerovene to do.  Dr. Reddy's

7     believed that ProSupplier could deliver the requested bottles

8     within two to three weeks.

9          And in September 2018, Cerovene finally relented and

10    agreed to place a purchase order with ProSupplier for three

11    100-count bottles rather than five.

12         Justin, if we could get up, please, DX 168.

13         Your Honor, I just wanted to show you a document

14    that's been admitted and was used in the Cerovene examination.

15    This is an email which shows Dr. Reddy's business plan to put

16    two orders out to both Reliant and ProSupplier, but not to

17    order five bottles, but to, rather, order a maximum of three.

18    I'm not going to read the whole thing, but the Court's familiar

19    with it from the trial testimony.

20         It's clear, from this email and from the other

21    testimony, that Cerovene and Dr. Reddy's were making a business

22    decision to limit the number of bottles they were going to

23    order at a time when they still had the FDA requirement of five

24    bottles, and, instead, they ordered three to control the risk,

25    and so that if one supplier was able to deliver just a couple

LCMKFTC4                    Summation – Mr. Casey

1    of bottles, they would get a refund from the other.  Again,

2    this is the kinds of business decisions that were being made by

3    the generic companies.

4         Now, the order with ProSupplier, which was in

5    September, was placed after Cerovene had sought the FDA waiver,

6    as I mentioned, but before it was granted.  The waiver was not

7    granted until April of 2019.  So they knew they were required

8    to get five bottles, but they got three, and asked for a waiver

9    from the FDA in the meantime.  And they took the risk that the

10   FDA would deny the waiver request, but they didn't want to

11   spend the extra money to obtain the five bottles.

12        Dr. Mukhopadhyay, of Dr. Reddy's, testified that if

13   Dr. Reddy's had known that the FDA had not granted the request

14   for the waiver, Dr. Reddy's would have advised Cerovene to

15   order five bottles instead of three.

16        And then on October 17 of 2018, Cerovene made its

17   initial payment to ProSupplier for the RLD, and about a month

18   later, November 19, 2018, ProSupplier obtained three bottles,

19   and ProSupplier was, of course, the company that Cerovene chose

20   not to go with back in February.

21        And Dr. Mukhopadhyay, of Dr. Reddy's, testified that

22   there's no reason Cerovene could not have ordered the required

23   five bottles from ProSupplier — five bottles rather than

24   three — and no reason it could not have obtained five bottles

25   instead of three.

LCMKFTC4                    Summation – Mr. Casey

1    Now, following the order with ProSupplier and the

2    obtaining of the RLD, Cerovene waited. They waited until the

3    FDA approved its use of the three bottles, and, again, that

4    happened on April 19, 2019, to conduct the bioequivalence

5    testing. And in May and June of 2019, following the waiver

6    grant — the grant of the waiver — Cerovene conducted the

7    bioequivalence testing using the three bottles that ProSupplier

8    had obtained.

9    Moving forward, September 4 of 2019, Cerovene reported

10   the results of its bioequivalence testing to the FDA.

11   February 28, 2020, the FDA approved Cerovene's ANDA.

12   And then less than a month later, March 19 of 2020,

13   Cerovene and Dr. Reddy's jointly announced the commercial

14   launch of the generic Daraprim product.

15   So, in summary, your Honor, in terms of the timeline

16   for the RLD purchases, any delay in receiving the required

17   amount for the bioequivalence testing is attributable to the

18   following factors:

19   First, Cerovene's decision to not look for RLD during

20   the period April 2017 to December 2017, while the FDA

21   considered Cerovene's major amendment, stating that it was

22   switching to RL Fine as its API supplier.

23   Two, the Ipca import ban, which required Cerovene to

24   start from scratch, beginning on December 26, 2017, to find new

25   RLD.

LCMKFTC4                    Summation - Mr. Casey

1          Third, Cerovene's decision not to follow the

2    recommendation of its more established partner, Dr. Reddy's,

3    and, instead, to choose Reliant over ProSupplier to obtain RLD

4    as Reliant could not live up to its representations that it

5    could access the RLD quickly.

6          Fourth, Cerovene's decision that upon receiving only

7    one bottle from Reliant in June 2018, to ask the FDA for a

8    waiver of the five-bottle requirement and purchase three

9    bottles rather than five, once it finally agreed to use

10   ProSupplier in September 2018.

11         And then, fifth, Cerovene's decision to not

12   immediately conduct bioequivalence testing once it received the

13   three bottles from ProSupplier on November 29, 2018, but,

14   rather, to wait for FDA approval of its request on April 19,

15   2019.

16         I was going to move on to Fera now, your Honor.

17         So there is a Fera timeline, your Honor.  On that

18   timeline, there is both the API portion, the boxes that are in

19   green, and the blue boxes are the RLD portions of the

20   discussion.

21         First, just focusing on API, the global point, again,

22   is that Fera was able to access API.

23         With respect to Fukuzyu:  Fera made two attempts to

24   contact Fukuzyu to inquire about its ability to supply

25   pyrimethamine API.  In late 2015/early 2016, the first attempt

LCMKFTC4                    Summation – Mr. Casey

1    was an email from Genevieve Della Fera, and there was no

2    response from Fukuzyu.  There is no record evidence that Fera

3    followed up.

4         The second outreach took place after Fera made the

5    business decision to form a contract with another API supplier,

6    referring to that supplier as API-1, and around eight months

7    after Fukuzyu entered the exclusive contract with Vyera in

8    January 2017.  At no point prior to this second outreach did

9    Fera make another attempt to reach out to Fukuzyu.

10        With respect to API-1, in March of 2016, Fera

11   approached two possible API suppliers, including API-1, at

12   DCAT, the conference that you heard testimony about.  API-1 did

13   not at the time, and does not now, have a DMF.  Fera did no due

14   diligence on API-1 other than confirming it was a reputable

15   company.

16        On June 13, 2016, API-1 and Fera entered a

17   confidentiality and exclusivity agreement.  Fera selected API-1

18   approximately seven months before Vyera entered into the MSA

19   with Fukuzyu and approximately 18 months before Vyera's

20   agreement with RL Fine.  Therefore, Vyera's supply agreements

21   with Fukuzyu and RL Fine could not have affected Fera's

22   decision to go with API-1.

23        Now, API-1 estimated 34 to 40 weeks to develop

24   pyrimethamine.  Ultimately, API-1 completed its first batch of

25   pyrimethamine in October of 2017.  Fera is unaware of the

LCMKFTC4                    Summation - Mr. Casey

1    reasons why it took API-1 approximately six months longer than

2    its estimate.

3          On April 6, 2018, Fera and API entered into a second

4    agreement, a ten-year mutually exclusive supply agreement, for

5    pyrimethamine.

6          So now I'm moving to the discussion of RLD.

7          Fera was able to access RLD.

8          In June of 2017, Fera received a purchase agreement

9    from Vyera for the sale of 13 30-count bottles of Daraprim from

10   Vyera.

11         The purchase agreement permitted Fera to use the

12   Daraprim tablets to conduct bioequivalence testing.  Rather

13   than sign the agreement and obtain the Daraprim RLD directly

14   from Vyera, Fera, without consulting an attorney, struck out

15   the entirety of an indemnity clause and returned the edited

16   document to Vyera.  Negotiations ended after the wholesale

17   deletion of this provision.

18         In October 2017, Fera got small quantities for initial

19   testing by having a doctor write two prescriptions, which a

20   local pharmacy filled within a couple of days.

21         Now, moving on to negotiations with a company called

22   Tanner:  In December 2016, Fera received an offer from Tanner

23   Pharma to sell Fera 100-count bottles of Daraprim.  At that

24   time, Fera had no reason to believe that Tanner could not have

25   supplied it with Daraprim, but Fera did not place a purchase

LCMKFTC4                    Summation – Mr. Casey

1    order.

2          In January 2017, Tanner offered to sell Fera up to

3    seven 100-count bottles of Daraprim.  Again, Fera did not make

4    a purchase order.

5          Moving forward to September of 2017, Tanner made a

6    third offer to supply Daraprim to Fera, and, again, no offer.

7          Throughout its dealings with Tanner, Fera was

8    concerned over price.  To address this, Tanner sent Fera a

9    signed escrow agreement that Fera had edited and emailed to

10   Tanner for execution.  Fera never countersigned the agreement

11   and never placed an order.

12         And so, to sum up, Fera had three opportunities to

13   place a purchase order for RLD with Tanner but never placed an

14   order.

15         Now, moving to another topic with respect to Fera's

16   access to RLD:  On October 25, 2017, Fera sought a pre-ANDA

17   meeting with the FDA to conduct a pharmacokinetic study for its

18   bioequivalence testing, which would not require Fera to use any

19   RLD.

20         On December the 1st, 2017, the FDA denied Fera's

21   request without a meeting.

22         Now, moving on to Fera's purchases from Reliant:

23         Having had its request denied, Fera finally determined

24   to place an order for RLD and did so through Reliant.

25         On January 22nd, 2018, Fera placed an order for two

LCMKFTC4                    Summation – Mr. Casey

1    bottles with Reliant.  Fera received the two bottles eight days

2    later.

3              Fera knew about the FDA's five-bottle requirement and

4    had the opportunity to purchase five bottles in January 2018,

5    and could have through Reliant but it opted not to.

6              On February 12, 2018, Reliant offered to procure more

7    bottles but Fera declined, saying, "we are good for now." Fera

8    opted not to purchase additional bottles because it made the

9    decision to quote-unquote derisk the purchase.  We heard that

10   from Ms. McDougal.

11             Fera opted to seek a waiver of the FDA's five-bottle

12   requirement even though it later acknowledged that, quote, the

13   FDA's general policy is not to waive the five-times testing

14   requirement.

15             On August 24, 2018, seven months after buying two

16   bottles of RLD from Reliant, Fera sent FDA a letter seeking a

17   waiver of the five-bottle requirement.  The FDA denied this

18   request in January 2019.

19             Three months later, Fera tried again, in April 2019,

20   sending a letter to the FDA, but not disclosing to the FDA that

21   it had opportunities to buy five bottles but declined.

22             On June 4, 2019, the FDA granted the waiver.

23             Now, there was another series of events happening with

24   Fera around this time relating to its CMO, contract

25   manufacturing organization.  Fera encountered delays with its

LCMKFTC4                    Summation - Mr. Casey

1   CMOs that had nothing to do with Vyera's distribution

2   agreements.  Fera terminated its first CMO with Xcelience in

3   July of 2017 and hired a new CMO, Latitude, in November of

4   2017.  Latitude completed developing the prototype for generic

5   Daraprim in August 2018, and Fera then hired a company called

6   Rivopharm as its CMO to manufacture Daraprim tablets for use in

7   stability and bioequivalence studies.

8        The tech transfer from Latitude to Rivopharm was not

9   implemented until October of 2018, and Rivopharm did not

10  manufacture the first batches of Daraprim until March 2019.

11       So, prior to March 2019, Fera could not have done

12  stability and bioequivalence testing because its product wasn't

13  finished.

14       And then Fera submitted its ANDA on December 19, 2019,

15  and got approval on June 27, 2021.

16       So, in summary, any delay in Fera submitting its ANDA

17  was caused by its own business decisions and FDA filings,

18  including the following:

19       Fera's business decision to proceed with API-1 after

20  Fukuzyu did not respond to Fera's initial outreach, and API-1's

21  failure to meet its projected timeline for production of API.

22       Two, Fera's business decision to buy only two bottles

23  of RLD instead of five.

24       Three, Fera's waiting seven months, from January to

25  August 2018, after buying the two bottles, to seek an FDA

LCMKFTC4                    Summation – Mr. Casey

1    waiver.

2         Fourth, Fera's strategic decision to pursue a

3    time-consuming and uncertain waiver from the FDA.

4         Five, Fera's waiting three months, from January to

5    April 2019, to submit a second request to the FDA after the

6    first one was denied.

7         And then, finally, Fera's business decision to switch

8    CMOs.

9         So that's the Fera discussion, your Honor.

10        Now, moving to InvaTech — and that's the last of the

11   timelines, your Honor — again, InvaTech obtained RLD.  And I'll

12   do these in reverse order now, your Honor, for InvaTech because

13   the RLD discussions are pretty brief.

14        InvaTech decided on Daraprim generic in 2014.

15        In October 2014, InvaTech bought six 100-count bottles

16   from a pharmacy in New Jersey.

17        InvaTech completed its bioequivalence testing in 2016,

18   using those samples and pyrimethamine API from RL Fine.

19        InvaTech has had no need for additional samples of

20   Daraprim to conduct bioequivalence testing since it completed

21   that testing in 2016.

22        Now, moving on to API:

23        InvaTech obtained API.  Like Cerovene, InvaTech

24   originally was supplied by Ipca, but after the import ban, it

25   was forced to find a new API supplier.

LCMKFTC4                    Summation - Mr. Casey

1        On February 17, 2017, InvaTech and RL Fine entered a

2   preliminary collaboration agreement whereby RL Fine would

3   supply InvaTech with three APIs, including pyrimethamine.  This

4   collaboration agreement was ten months before the Vyera-RL Fine

5   agreement.

6        The collaboration agreement required RL Fine to submit

7   a DMF for pyrimethamine but RL Fine did not do so.

8        By January 2017, InvaTech was ready to file its ANDA,

9   but RL Fine had not yet submitted its DMF.

10       Therefore, in July 2017, InvaTech submitted DMF

11   materials for RL Fine in the CMC-section of the ANDA.

12       InvaTech filed its generic Daraprim ANDA on July 28,

13   2017.

14       Now I will discuss RL Fine's decision to stop

15   supplying API to InvaTech.  In December of 2017, InvaTech

16   contacted RL Fine for help responding to the FDA's questions

17   regarding its generic Daraprim ANDA.  RL Fine informed InvaTech

18   by phone that it would no longer support InvaTech's ANDA.

19   Mr. Patel of InvaTech flew to India and was told that Daraprim

20   was too small a product for RL Fine to continue supporting

21   InvaTech's ANDA.

22       RL Fine's decision to not support InvaTech's ANDA came

23   approximately ten months after the Cerovene-RL Fine agreement,

24   which, by its terms, prevented RL Fine from supplying

25   pyrimethamine API to InvaTech.  More importantly, it came

LCMKFTC4                    Summation – Mr. Casey

1  approximately three months before Vyera's agreement with

2  RL Fine.  There is no evidence that the later-in-time agreement

3  between Vyera and RL Fine had any effect on RL Fine's decision

4  to stop supplying API to InvaTech.

5        Thus, Vyera's agreement with RL Fine could not have

6  affected RL Fine's decision to not support InvaTech's ANDA.

7        Now, InvaTech -- we'll discuss and InvaTech and API

8  No. 2.  There's an API manufacturer we're referring to as

9  API-2.  InvaTech then needed a new source of API, and it found

10 one in API-2.  API-2 did not have a DMF on file, and it never

11 manufactured pyrimethamine API before.  API-2 was the only

12 company that InvaTech looked at, considered, as an API supplier

13 after it stopped working with RL Fine, and InvaTech did not do

14 any due diligence on API-2.

15       It took API-2 approximately six months to develop a

16 process for developing pyrimethamine API.

17       Now I'm going to discuss FDA responses to InvaTech.

18       Going to the next timeline, the next page:

19       On May 22nd, 2018, InvaTech received a complete

20 response letter from FDA identifying over 50 deficiencies

21 regarding InvaTech's ANDA.

22       InvaTech worked with API-2 to gather information to

23 respond to the FDA, and did so 14 months later, on July 31st,

24 2019.

25       On January 24, 2020, the FDA sent another letter

LCMKFTC4                    Summation - Mr. Casey

1  identifying an additional 20 issues to be addressed by

2  InvaTech.  InvaTech experienced delays relating to COVID-19,

3  and only recently responded to the complete response letter in

4  the fourth quarter of 2021.

5          So, in sum, with respect to InvaTech, any delay in

6  InvaTech's pursuit of its ANDA was caused by the following,

7  none of which is attributable to Vyera:

8          One, the Ipca import ban, which required InvaTech to

9  find a new source of pyrimethamine API.

10         Two, RL Fine's delays in filing a DMF for

11 pyrimethamine between 2015 and 2017.

12         Three, RL Fine's decision to stop supporting

13 InvaTech's ANDA in September 2017 before the RL Fine supply

14 agreement but after the RL Fine-Cerovene exclusive agreement.

15         And then, finally, recent delays caused by COVID-19.

16         Now, your Honor, I know that was a lot, and I

17 appreciate you listening through that, but I'm done with that

18 section.

19         Excuse me one second.

20         (Pause)

21         MR. CASEY:  Your Honor, at this point, I'd like to

22 talk about the data-blocking agreements.

23         The data-blocking agreements had no effect on the

24 market.  These agreements were entered after all the generic

25 companies in this case had already assessed the generic

LCMKFTC4                    Summation - Mr. Casey

1    Daraprim market opportunity.  There were two data-blocking

2    agreements.

3         First was an ASD agreement — Vyera and ASD agreed —

4    and that agreement was dated September 12 of 2017.  And then

5    Cardinal Health and Vyera reached a data-blocking agreement,

6    and that was dated September 20, 2017.

7         So Cerovene, Fera and InvaTech also assessed the

8    market opportunity prior to those agreements.  Cerovene

9    assessed the market for Daraprim in 2013, four years before the

10   data-blocking agreements were entered.  Cerovene decided to

11   enter and relied upon publicly available data rather than IQVIA

12   data to make its assessment.

13        Fera had a thorough opportunity to assess the market

14   for generic Daraprim in late 2015 and early 2016.  Public data

15   and IQVIA data from 2014 showed the market opportunity at

16   1 million tablets, so Fera clearly overestimated the market

17   opportunity.

18        InvaTech assessed the market opportunity for Daraprim

19   in 2014 based on publicly available IQVIA sales data.

20        The plaintiffs' economic expert, Professor Hemphill,

21   provided no opinion on the data-blocking theory, and so in

22   conclusion, the plaintiffs' data-blocking theory has absolutely

23   no support in the record.

24        I'd like to talk about Vyera's distribution system

25   now, your Honor.  The Vyera distribution system expanded access

LCMKFTC4                    Summation - Mr. Casey

1    to Daraprim, and there's lots of record evidence of this.

2            Vyera inherited the specialty distribution system from

3    Amedra and Impax, the previous owners of the rights to

4    Daraprim.  Amedra's specialty distribution agreements only

5    licensed two specialty distribution pharmacies to distribute

6    Daraprim — Walgreens, which had the exclusive right to

7    distribute Daraprim directly to patients, and ICS, that had the

8    exclusive right to distribute to hospitals and government

9    entities.  Vyera added four additional specialty distributors —

10   ASD Healthcare, Biorich Pharma, Cardinal Specialty, and Optime.

11           Vyera amended its distribution agreement with

12   Walgreens that it inherited from Amedra to remove its

13   exclusivity provisions.

14           Vyera then significantly increased the number of

15   specialty pharmacies that could sell Daraprim to patients.

16           Vyera, likewise, added significant patient support

17   services to the Daraprim distribution system through contracts

18   with Asembia LLC and Optime.

19           Vyera instituted a hub as a, quote, key intake for the

20   patient, quote, to ensure that patients were able to access the

21   benefits, the copay benefits and the affordability benefits,

22   that Vyera was offering.  That's from the trial testimony at

23   Christina Ghorban.

24           And Vyera expanded the distribution to state ADAP

25   programs, the AIDS Drug Assistance Programs.  And, again,

LCMKFTC4                    Summation - Mr. Casey

1   that's from the testimony of Christina Ghorban.

2           In terms of supply agreements:  Exclusive supply

3   agreements are common in the industry.  As the Second Circuit

4   has said, exclusive supply agreements often, "have

5   pro-competitive purposes and effects, such as ensuring steady

6   supply for the protection against price fluctuations, reducing

7   selling expenses, and promoting stable long-term business

8   relationships."  The case is *Geneva Pharm. Tech. Corp.*, 386

9   F.3d 485 at page 508 (2d Cir. 2004).

10          THE COURT:  Which of those do you think was most

11  relevant to the analysis of the Fukuzyu and RL Fine supply

12  agreements?

13          MR. CASEY:  Which of what, your Honor?

14          THE COURT:  Those pro-competitive effects.

15          MR. CASEY:  Well, I think, certainly, it assured a

16  steady supply.  We had testimony on that from, I believe it was

17  Dr. Salinas.

18          THE COURT:  Of the actual agreements, I'm talking

19  about, not generally, but in this case --

20          MR. CASEY:  Right.

21          THE COURT:  -- of the agreements at issue, what are

22  the pro-competitive effects?

23          MR. CASEY:  I think that the agreements -- well, the

24  Fukuzyu agreement assured a steady supply.  Afforded protection

25  against price fluctuations, I'm not sure about that, I don't

LCMKFTC4                    Summation - Mr. Casey

1    know if there's record of evidence of that, but, certainly, I

2    think it promoted a stable relationship with Fukuzyu.

3            THE COURT:  Thank you.

4            MR. CASEY:  And so exclusive supply agreements are,

5    thus, presumptively legal.  That's from the case *CDC*

6    *Techs, Inc. v. IDEXX Labs, Inc.*, 186 F.3d 74, at page 80

7    (2d Cir. 1999).

8            We had several witnesses testify to the benefits of

9    the exclusive supply agreements in this case.  Manish Shah, the

10   president of Cerovene — and this gets, I guess, to your

11   question, your Honor — Manish Shah testified that Cerovene

12   wanted an exclusive supply agreement with RL Fine so that

13   Cerovene could ensure that RL Fine is able to supply Cerovene

14   with a commercial quantities of the API that Cerovene needed.

15   Dr. Salinas testified that exclusive supply agreements are very

16   common, and, according to John S. Russell, the defense expert,

17   exclusive API agreements are common in the pharmaceutical

18   industry and are used to maintain high quality, avoid drug

19   shortages and protect revenues.  That's the John Russell

20   written direct at paragraph 104.

21           Now, your Honor, I wanted to get back to something

22   that you mentioned in the plaintiffs' presentation, that came

23   up during the trial, and that is the issue of whether Vyera's

24   API was set to expire.  You asked if there was record evidence

25   of that.  There is, your Honor.

LCMKFTC4                    Summation - Mr. Casey

1      I'd like to show you DX 511.  This is a document that

2  Mr. Russell cited in his written direct testimony.  If you'll

3  see that first bullet point, this is a Turing meeting notes.

4      There it is.  It says, the second bullet there,

5  current API inventory of, roughly, 76 kilograms to expire in

6  August 2016.  So this memo is, as you go up to the top, the

7  date of the memo, so as of January 12, your Honor, the

8  projection was that the API inventory would have expired in

9  August of 2016.

10     THE COURT:  So the inventory acquired in 2015, the

11 entirety of the inventory, was to expire in August of 2016?

12     MR. CASEY:  Yes.

13     THE COURT:  And so when did Vyera need additional

14 inventory, then, from Fukuzyu?

15     MR. CASEY:  Well, your Honor, I know that, of course,

16 the agreement was about a year later, January of 2017, but I

17 believe there's record evidence that there were discussions

18 prior to that time about the need to get a supply agreement

19 during that period of time.

20     THE COURT:  Yes.  But when did it next order

21 pyrimethamine from Fukuzyu because its entire inventory of API

22 expired in August of 2016?

23     MR. CASEY:  I don't know the answer to that, your

24 Honor.  I could get you that evidence, but I'm not aware of it

25 at this point.

LCMKFTC4                        Summation – Mr. Casey

1       THE COURT:  Thank you.

2       MR. CASEY:  It does say that its projection is, it

3   will expire, not that it has expired.  Its projection in

4   January was that it would expire in August.

5       THE COURT:  Thank you.

6       MR. CASEY:  Certainly.

7       And then, finally, on exclusive supply agreements:

8   Both Cerovene and Fera entered into exclusive supply

9   agreements, as the Court is aware, with RL Fine and API-1

10  respectively.

11      Now, I'd like to move on now to the product market

12  discussion.  Of course, the threshold element plaintiffs must

13  establish, under either Section 1 or Section 2 of the Sherman

14  Act, is harm to competition in the relevant market.

15      And in the case *U.S. Airways, Inc. v. Sabre Holdings*

16  *Corp.*, 938 F.3d 43, at page 64 (2d Cir. 2019), the Second

17  Circuit said, "The relevant market must be a market for

18  particular products or services, the outer boundaries of which

19  are determined by the reasonable interchangeability of use or

20  the cross-elasticity of demand between the product itself and

21  substitutes for it."  And that passage quoted the Brown Shoe

22  case, *Brown Shoe Company v. United States*.

23      So now, neither the reasonable interchangeability of

24  use nor the cross-elasticity of demand support plaintiffs'

25  proposed relevant product market of FDA-approved pyrimethamine.

LCMKFTC4                        Summation – Mr. Casey

1     So just focusing on interchangeability:  That standard

2  looks to the use or function of the given product as compared

3  to other products.  That case is *Bayer Schering Pharma AG v.*

4  *Sandoz, Inc.*, 813 F.Supp.2d 569, 575 (S.D.N.Y. 2011).

5     Now, the evidence in this case is uncontroverted that

6  TMP-SMX, atovaquone, and compounded pyrimethamine are medical

7  alternatives for treating patients with active toxoplasmosis

8  and for prophylaxis.

9     (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LCMMFTC5                    Summation - Mr. Casey

1    MR. CASEY:  Dr. Hardy testified to that, the

2    plaintiffs' expert.

3    The evidence showing decision making of actual

4    physicians supports the conclusion that all of these

5    alternative therapies are within the proper standard of care,

6    as explained by plaintiffs' own expert, Dr. Hardy.  The fact

7    that FDA approved pyrimethamine is the gold standard for active

8    toxoplasmosis and that TMP-SMX is the gold standard for

9    toxoplasmosis prophylaxis only shows that these alternative

10   treatments are better options for certain patients, not that

11   they are each their own relevant product market.

12   Now, turning from the interchangeability to the cross

13   elasticity of demand, the cross elasticity is related to

14   interchangeability.  It requires a consideration of the extent

15   to which a change in the price of one product will alter the

16   demand for another product.

17   Professor Hemphill admitted that he did not have

18   quantity and price data for TMP-SMX, atovaquone, or compounded

19   pyrimethamine to use cross elasticity of demand to establish a

20   relevant product market.

21   In summary, in terms of the relevant product market,

22   which is plaintiffs' burden, the real-world evidence of

23   substitution, the choices that consumers are actually making

24   when treating toxoplasmosis establishes that there are several

25   alternative therapies for toxoplasmosis, depending on the

LCMMFTC5                    Summation - Mr. Casey

1   patient, the type of toxoplasmosis, and the price of the

2   alternative treatments.  Plaintiffs have failed to prove -- to

3   meet their burden of proof that FDA-approved pyrimethamine is a

4   proper relevant product market.

5          Your Honor, I want to move -- I am nearing the end of

6   my presentation, your Honor.  I wanted to talk a little bit

7   about Mr. Shkreli's -- the plaintiffs' claim that he should be

8   held individually liable.  Again, this gets back to a

9   discussion we had earlier.

10         We heard a lot of evidence of Mr. Shkreli exercising

11  influence as a large shareholder of Phoenixus.  But there has

12  been no evidence presented of his direction of or participation

13  in the challenged agreements.  There is no evidence to show

14  that he negotiated or signed --

15         THE COURT:  Let me make sure I have that formulation.

16  No evidence of his direction or what?

17         MR. CASEY:  Participation in the challenged

18  agreements.

19         THE COURT:  Thank you.

20         MR. CASEY:  You're welcome.

21         There has been no evidence that he negotiated or

22  signed the Fukuzyu or RL Fine agreements which were entered

23  after he left the company, nor has there been any evidence to

24  show that he negotiated or signed any of the challenged

25  distribution agreements, nor that he is familiar with any of

LCMMFTC5                    Summation - Mr. Casey

1   the terms of those agreements.

2          At this point, your Honor, I would like to move on to

3   the relief issues, injunctive relief and equitable monetary

4   relief.  Plaintiffs have asked for an industry ban.  This

5   morning it appeared that they were asking for a lifetime ban.

6   It's not clear to me whether that's in fact what they are

7   seeking.  In their pretrial memo they asked for at least a

8   20-year ban.  But, in any event, they are asking for a

9   significant industry ban from the Court.

10          Here, your Honor, this obviously is an issue for your

11  discretion.  This is an equity court.  In our view, any

12  injunctive relief, if the Court disagreed with us and believed

13  that Mr. Shkreli should be held liable, the question is, what

14  is the consequence of that?  Any injunctive relief should be

15  narrowly tailored to the specific violations and avoid

16  unnecessary burden on lawful commercial activity.  That's a

17  quote from a case called *Syntel Sterling Best Shores Mauritius*

18  *Ltd. v. Trizetto Group, Inc.*, 2021 WL 1553926 at page 14

19  (S.D.N.Y. April 20, 2021)

20          Your Honor, the plaintiffs concede in their pretrial

21  brief that an industry ban is "uncommon and reserved for the

22  most egregious cases."  That's a direct quote from their

23  pretrial memorandum at page 49.

24          But this is not the type of case in which the FTC or

25  the states have pursued industry bans.  For this Court to issue

1229

LCMMFTC5                    Summation - Mr. Casey

1    an industry ban, we submit would simply constitute punishment,

2    which is not the purpose of an equity court.

3          For that, your Honor, I can refer you to the Liu case,

4    which was cited earlier by plaintiffs in the Supreme Court.

5    *Liu v. SEC*, 140 S. Ct. 1936 at page 1945 (2020).  The

6    plaintiffs have cited a number of cases in their pretrial

7    memorandum, some of those we saw this morning, maybe all of

8    them, in which courts have issued industry bans.  In every

9    single one of those cases there was fraudulent conduct by the

10   defendant.  And there has been no fraud alleged here.

11         This is a civil rule-of-reason antitrust case.  It's

12   not about, we would humbly submit, whether the price increase

13   was a wise decision and whether we agree or if the Court agrees

14   with that decision.  This is about antitrust.  They have not

15   shown why in this particular case, on these facts, with these

16   allegations, the defendant should be banned from an industry

17   for the remainder of his life.  The cases where they have done

18   that have been fraud cases akin to criminal cases.  Whatever

19   else Mr. Shkreli has done, which I would submit is not relevant

20   to what he did in this case, there is no justification for an

21   industry ban in this particular case.

22         I don't want to discuss those cases that they have

23   cited in any detail, but I would mention one that is worth

24   mentioning.  It's a case called *FTC v. Ross*, 897 F.Supp.2d 369.

25   It's from the District of Maryland in 2012.  The Court in *Ross*

LCMMFTC5                    Summation - Mr. Casey

1   specifically declined to issue an industry ban.  Instead, the

2   defendant was permitted to continue working in the industry

3   with conduct restrictions.  This was so despite that the

4   defendant's fraudulent marketing scheme generated large sums of

5   money and resulted in the filing of over 3,000 consumer

6   complaints with the FTC.

7           Plaintiffs point to no case where the government has

8   sought or the Court has imposed an industry ban in an antitrust

9   case without any allegations of fraud.  The Court should not

10  take the apparently unprecedented step of imposing an industry

11  ban in an antitrust case when conduct restrictions would be

12  sufficient to restrain and prevent the challenged conduct from

13  recurring.

14          THE COURT:  What conduct restrictions do you

15  recommend?

16          MR. CASEY:  Your Honor, I don't think you should

17  impose any.  Our position is you should not.  We don't think

18  you should find liability.  But if the Court were to find

19  liability, restrictions that are tailored to the allegations in

20  the complaint:  Exclusive supply agreements, restricted

21  distribution agreements, data blocking agreements.  Those are

22  the allegations in the complaint.  And what they are doing now

23  is going well beyond those.

24          I know the Court has lots of criminal cases.  It's as

25  if the defendant was ready to plead to every count of the

LCMMFTC5                    Summation - Mr. Casey

1    indictment but yet that's not enough.  There has got to be some

2    extra sanction imposed on the defendant.

3           In this case the FTC and the states are enforcing the

4    antitrust laws and they do a very good job of it.  I used to be

5    at the FTC many years ago.  I respect what they do.  But what

6    they do is, they are there to protect the market and to make

7    sure that this kind of conduct -- again, I don't agree with

8    their theory of the case, but I respect their right to bring

9    the case.  They bring the case.  They get relief and the

10   market -- they fix the market harm.  In my view, that's what

11   they should be doing instead of expelling an individual from an

12   industry for the rest of his life.  I don't think that's

13   appropriate here, particularly in an equity court.  I don't

14   think there has been anything presented by them other than --

15   obviously, there has been a lot of negative publicity

16   associated with Mr. Shkreli.  He has acknowledged that.  He

17   takes responsibility for that.  He did in his affidavit.

18          THE COURT:  He didn't take responsibility for

19   violating the antitrust laws.

20          MR. CASEY:  Correct.

21          THE COURT:  He has not admitted liability here.

22          MR. CASEY:  He has not, your Honor.  We are defending

23   the case.

24          THE COURT:  When you say he took responsibility, he

25   admitted that he's the one who set the price for the drug, for

LCMMFTC5                    Summation - Mr. Casey

1   Daraprim.  He admitted he set it at 750.  He is not denying he

2   said he should have set it higher.  I'm not quite sure what you

3   are saying, he admitted.

4            MR. CASEY:  I didn't mean to suggest that he's

5   admitting the conduct.

6            THE COURT:  OK.

7            MR. CASEY:  What I'm saying is, from the tenor, I will

8   say, of the discussion about what their relief should be, it

9   seems like it's a little bit beyond what they have charged in

10  the complaint and what they should be seeking.  That is my

11  view.  I would submit to the Court that whatever the Court

12  does -- and I respect that this is the Court's decision.  You

13  have discretion to do it.  But my only point is, this is an

14  equity court and the Court should find an equitable resolution,

15  if the Court finds liability, that advances the legitimate law

16  enforcement purposes of the plaintiffs.  I don't know that they

17  have made a case, at least I haven't heard it made, for why

18  they would need to ban Mr. Shkreli from this industry for the

19  rest of his life.

20           THE COURT:  Is it or is it not relevant, from your

21  point of view, for me to consider that he was the author of the

22  strategy?

23           MR. CASEY:  Your Honor, I don't know that I would

24  necessarily agree -- it depends on what you mean by author, but

25  certainly there is record evidence to support the fact --

LCMMFTC5                          Summation - Mr. Casey

1       THE COURT:  No.  I'm sorry.  Let me put my question

2  more directly.  If I find he is liable for a violation of the

3  antitrust laws and am now considering what kind of injunctive

4  relief is appropriate, which is what I think you're addressing

5  now.

6       MR. CASEY:  Yes.

7       THE COURT:  On the assumption that I have found him

8  liable and have turned to the issue of formulating injunctive

9  relief, is it -- in your view, should I find it to be true that

10 I consider, in shaping the injunctive relief, that I have found

11 he is the author of the anticompetitive strategy?

12      MR. CASEY:  I think that's a valid consideration for

13 the Court to make.

14      THE COURT:  Would it be relevant, from your point of

15 view, as a legal matter, for me to consider that it was a

16 strategy, again, directed to the pharmaceutical industry and

17 the role that the pharmaceutical industry plays in providing

18 life-saving remedies to the public?

19      MR. CASEY:  Certainly.  That's certainly a

20 consideration that's appropriate.

21      THE COURT:  Would it be relevant for me to consider in

22 this decision making that the specific drug that's at the heart

23 of this is in fact a life-saving drug for which the decision

24 about its administration must be made generally within 24 hours

25 of symptoms?

1      MR. CASEY:  Well, certainly, your Honor, that's

2  something you could consider.

3      My point only, your Honor, is that you have to fashion

4  and mold the relief to stop this from occurring again.  I think

5  that's an appropriate role for the Court.  But a narrowly

6  tailored injunction for a reasonable period of time would be an

7  appropriate resolution rather than a ban.  I don't know why

8  they need a ban in this case.  They have said there is an

9  enforcement problem with something less than a ban.  I am not

10  sure I understand that.  But I just ask the Court to consider

11  that, what is appropriate and necessary, again, given that the

12  issue here is whether there has been a violation of the

13  antitrust laws and whether the Court needs to put in place an

14  injunction to prevent that from happening again.  That's I

15  think the role of the Court.  I respect the Court's discretion

16  to come up with an appropriate injunction, if the Court decides

17  to do that.

18      In terms of equitable monetary relief, your Honor, the

19  *Liu* case from the Supreme Court says that disgorgement should

20  not be a joint and several remedy.  In *Liu*, the Supreme Court

21  said the rule against joint and several liability for profits

22  that have accrued to another appears throughout equity cases

23  awarding profits.  That's in the *Liu* case, 140 S. Ct. at page

24  1945.  In other words, allowing joint and several liability

25  "runs against the rule to not impose joint liability in favor

LCMMFTC5                          Summation - Mr. Casey

1   of holding defendants liable to account for such profits only

2   as have accrued to themselves."

3            *Liu* also held that the amount of disgorgement must be

4   limited to profits the defendant took from the alleged scheme.

5   Here, the plaintiffs have failed to meet their burden to prove

6   that Mr. Shkreli profited at all from Vyera sales of Daraprim.

7   Mr. Shkreli testified in his written direct testimony that he

8   invested approximately $18 million into Vyera, and plaintiffs

9   have not rebutted this testimony.

10           The only asset Mr. Shkreli has from Vyera is his Vyera

11   stock.  He took no salary from the company.  The plaintiffs

12   have not proven the value of that stock.  Professor Hemphill's

13   calculation is flawed because even if the Court is inclined to

14   hold Mr. Shkreli jointly and severally liable for Vyera's

15   profits from Daraprim, the plaintiff has failed to show that

16   those profits should be in the range of 53 to $64.6 million, as

17   Professor Hemphill claims.

18           Professor Hemphill admitted on cross-examination that

19   in performing his calculation he did not take into account the

20   numerous business decisions that the generic companies made

21   that I have talked about here today that contributed to their

22   delay in entering the market.  Therefore, the assumptions on

23   which his excess profits model is based are flawed.

24           Your Honor, I just wanted to mention a few things

25   about Mr. Shkreli and his future plans.  I know it was

LCMMFTC5

1    referenced in plaintiffs' presentation, and he addresses it in

2    his affidavit.

3           Again, the Court has the discretion to decide, if the

4    Court finds him liable, what the appropriate relief is.  I will

5    just say this.  He does hope to change the public's perception

6    of him following his release from prison and his return to

7    civilian life.  He said in his written direct testimony at page

8    83 that he hopes to "continue playing a role in the discovery

9    of cures and treatments for rare and life-threatening

10   diseases."

11          In conclusion, your Honor, we would ask that the Court

12   find that Mr. Shkreli is not liable for any of the counts in

13   the amended complaint.  In the alternative, should the Court

14   disagree, we ask the Court to impose relief that is narrowly

15   tailored to the allegations of the amended complaint, such as

16   an injunction to not engage in the alleged conduct for a

17   reasonable period of time and to deny any monetary relief.

18   Thank you very much, your Honor.

19          THE COURT:  Thank you.

20          Counsel, I leave it to you as to whether we take a

21   break, a short break, a luncheon recess, or no break at all.

22   Whatever is your choice.

23          MR. MEIER:  Your Honor, we think we would benefit from

24   taking a break, either a short break and come back, or a lunch

25   break.  They are telling me short break on our side.

LCMMFTC5

1    THE COURT:  Why don't counsel consult, since it

2   affects all of you, just off the record here with each other.

3    MR. MEIER:  Your Honor, I think the parties agree to a

4   15-minute break and then we come back and wrap it up.

5    THE COURT:  Great.  Thanks.

6    (Recess)

7    MS. McFARLANE:  Your Honor, may I briefly be heard on

8   remedy?

9    THE COURT:  Certainly.

10    MS. McFARLANE:  Thank you.

11    Your Honor, I'll be very brief.  New York Executive

12   Law 6312 is a remedial statute, not a penal statute.  There is

13   no distinction in the statute between remedies for fraudulent

14   conduct and otherwise illegal conduct.  The anticompetitive

15   conduct in this case is at least as egregious as the fraudulent

16   conduct at issue in our cited cases.

17    (Continued on next page)

18

19

20

21

22

23

24

25

1238

LCMKFTC6

1     MS. McFARLANE:  (Continuing)  Whether a ban is

2  appropriate in equity and whether joint and several liability

3  is appropriate in equity is based on your Honor's fact-finding

4  about Mr. Shkreli's conduct and culpability.

5     Mr. Casey was right — enforcers aim to protect the

6  markets.  And the only way to protect the market here is to

7  keep Mr. Shkreli out of the market.

8     Thank you, your Honor.

9     THE COURT:  So, counsel, that's it for the reply?

10     MS. McFARLANE:  That's it.

11     THE COURT:  That's fine, that's fine.

12     Okay.  I think we're done.  I will spend some time

13  taking my pen to my draft and taking into account all the hard

14  work counsel have expended during this trial to educate me.  I

15  thank you, and I wish everyone a happy holiday season.

16     Thank you.

17     (Adjourned)

18

19

20

21

22

23

24

25

**A-2298**

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

<table>
<tr>
<td>

FEDERAL TRADE COMMISSION; STATE OF
NEW YORK; STATE OF CALIFORNIA;
STATE OF ILLINOIS; STATE OF NORTH
CAROLINA; STATE OF OHIO;
COMMONWEALTH OF PENNSYLVANIA;
and COMMONWEALTH OF VIRGINIA,

<i>Plaintiffs,</i>

v.

VYERA PHARMACEUTICALS, LLC;
PHOENIXUS AG; MARTIN SHKRELI,
individually, as an owner and former director of
Phoenixus AG and a former executive of Vyera
Pharmaceuticals, LLC; and KEVIN
MULLEADY, individually, as an owner and
director of Phoenixus AG and a former executive
of Vyera Pharmaceuticals, LLC,

<i>Defendants.</i>

</td>
<td>

Case No. 20-cv-00706 (DLC)

ECF Case

</td>
</tr>
</table>

### DEFENDANT MARTIN SHKRELI'S NOTICE OF APPEAL

Defendant Martin Shkreli appeals to the United States Court of Appeals for the Second

Circuit from the Order for Permanent Injunction and Equitable Monetary Relief entered in this

action on February 4, 2022, at docket number 876 (the "Order"), which (1) entered a permanent

injunction against Mr. Shkreli that banned and enjoined him for life from directly or indirectly

participating in any manner in the pharmaceutical industry, (2) entered a monetary judgment

against Mr. Shkreli in the amount of $64.6 million, (3) imposed compliance reporting requirements

on Mr. Shkreli, and (4) required Mr. Shkreli to submit to an interview and provide information for

purposes of determining or securing compliance with the Order. The Order is the judgment and

final order in this action. In appealing from the Order, Mr. Shkreli also appeals from all previously

1

non-final orders that were made appealable by the Order's entry and that merged into the Order as

the judgment and final order.

On April 1, 2022, Mr. Shkreli, through his power of attorney, Leonora Izerne, filed a *pro se* notice of appeal from the Order. On April 5, 2022, the clerk rejected that notice and deleted it from the docket. (The *pro se* notice of appeal is attached hereto as Exhibit A). The undersigned counsel has not been engaged to represent Mr. Shkreli on appeal and intends to move to withdraw as counsel for Mr. Shkreli in this Court and in the Court of Appeals for the Second Circuit. The undersigned counsel files this notice of appeal without prejudice to its forthcoming motions to withdraw as counsel.

Respectfully submitted,

By: */s/ Christopher H. Casey*
Christopher H. Casey, Esq. (admitted *pro hac vice)*
Jeffrey S. Pollack, Esq. (admitted *pro hac vice*)
A.J. Rudowitz, Esq. (admitted *pro hac vice*)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA  19103-4196
Telephone: (215) 979-1155/1299/1974

*Counsel for Defendant Martin Shkreli*

April 5, 2022

2

**CERTIFICATE OF SERVICE**

I hereby certify that on April 5, 2022, I served a true and correct copy of the foregoing on

all counsel of record in this action via ECF.

*/s/ Andrew J. Rudowitz*____
Andrew J. Rudowitz