# 22-728

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

FEDERAL TRADE COMMISSION, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF ILLINOIS, STATE OF NORTH CAROLINA, COMMONWEALTH OF VIRGINIA,

—against—

*Plaintiffs-Appellees,*

MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendant-Appellant,*

VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, KEVIN MULLEADY, individually, and as an owner and director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendants.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

KIMO S. PELUSO
NOAM BIALE
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600

*Attorneys for Defendant-Appellant
Martin Shkreli*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iv

PRELIMINARY STATEMENT ...........................................................1

JURISDICTIONAL STATEMENT .......................................................2

ISSUES PRESENTED.........................................................................3

STATEMENT OF THE CASE..............................................................3

I.   Statement of Facts.....................................................................4

    A.   Sectors of the Pharmaceutical Industry...................................4

    B.   Abbreviated New Drug Application Process ............................5

    C.   History of Branded Pyrimethamine .........................................6

    D.   Corporate History of Vyera and Phoenixus ............................7

    E.   Vyera's Challenged Agreements .............................................8

II.  Procedural History ....................................................................9

SUMMARY OF ARGUMENT ...........................................................14

STANDARD OF REVIEW .................................................................18

ARGUMENT .....................................................................................19

I.   THE DISTRICT COURT ERRED BY HOLDING SHKRELI
     JOINTLY AND SEVERALLY LIABLE FOR DISGORGEMENT
     OF VYERA'S PROFITS.............................................................19

    A.   The District Court Erred by Relying on the Federal Law of
          Remedies Even Though the Monetary Claims Were Based on
          New York Statutes................................................................19

        1.   A Federal District Court Cannot Order Relief for State
               Law Claims Beyond the Observed Limits of State Law ..........19

2. The State Plaintiffs Expressly Limited Their Requests for Equitable Monetary Relief to Disgorgement Under New York Law ................................................24

B. New York Law Precluded a Disgorgement Award Against Shkreli for a Co-Defendant's Profits ..............................27

1. Under New York Law, a Defendant Disgorges Only the Ill-Gotten Gains That He Received ............................27

2. New York's Highest Court Recently Confirmed That Federal SEC Cases on "Disgorgement" Are Inconsistent With State Law ...........................................28

3. There Was No Evidence of Any Benefits Directly Received by Shkreli. ................................................29

4. Having Abandoned Other Monetary Remedies for Tactical Reasons, the State Plaintiffs Were Not Entitled to a Money Judgment Against Shkreli ...................30

C. Even Under Federal Notions of Disgorgement, the Award Against Shkreli Was Error ............................................32

II. THE DISTRICT COURT ERRED BY IMPOSING A VAGUE, OVERBROAD INJUNCTION ................................................34

A. Governing Law ................................................35

B. The District Court Abused Its Discretion by Banning Shkreli From an Entire Industry ............................................37

1. An Industry-Wide Ban Was Excessive on Its Face Given the Conduct at Issue ................................................38

2. The District Court Failed to Account for Sectors of the Pharmaceutical Industry Not Conceivably Affected by the Alleged Violation Here ........................................44

C. The "Risk of Recurrence" Cited by the District Court Could Not Justify a Permanent Ban Unrelated to Shkreli's Unlawful Conduct ................................................48

ii

D.    The District Court Erred by Imposing Unjustified Restraints on Expressive Activities ........................................................50

E.    The District Court Erred by Imposing an Injunction for Shkreli's Lifetime ...................................................................54

F.    The Vagueness of the Injunction's Terms Compounds the Potential Unfairness to Shkreli ............................................56

G.    The Injunction Should Be Vacated and Modified .............................60

CONCLUSION ........................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aladdin Cap. Holdings, LLC v. Donoyan*,
No. 11-cv-655, 2011 WL 2293236 (D. Conn. June 8, 2011) ..............................21

*Alexander v. United States*,
509 U.S. 544 (1993) ........................................................................................51

*AMG Cap. Mgmt., LLC v. FTC*,
141 S. Ct. 1341 (2021) .......................................................... 10, 24, 26

*Beacon Theatres, Inc. v. Westover*,
359 U.S. 500 (1959) ........................................................................31

*Belknap v. Schild*,
161 U.S. 10 (1896) ........................................................................33

*Cendant Corp. v. Forbes*,
70 F. Supp. 2d 339 (S.D.N.Y. 1999) ..................................................22

*City of Johnstown v. Bankers Std. Ins. Co.*,
877 F.2d 1146 (2d Cir. 1989)..........................................................22

*City of New York v. Mickalis Pawn Shop, LLC*,
645 F.3d 114 (2d Cir. 2011).................................................... 36, 39, 44

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
187 F.3d 229 (2d Cir. 1999).............................................................18

*Columbia Nastri & Carta Carbone S/p/A v. Columbia Ribbon & Carbon Mfg. Co.*,
367 F.2d 308 (2d Cir. 1966).............................................................22

*Combs v. Int'l Ins. Co.*,
354 F.3d 568 (6th Cir. 2004) ...........................................................23

*Corning Inc. v. PicVue Elecs., Ltd.*,
365 F.3d 156 (2d Cir. 2004)............................................................35

*Crosby v. Bradstreet Co.*,
 312 F.2d 483 (2d Cir. 1963)................................................................52

*Dayton v. Peck, Stow & Wilcox Co. (Pexto)*,
 739 F.2d 690 (1st Cir. 1984)............................................................23

*Deerbrook Ins. Co. v. Mirvis*,
 No. 20-1385, 2021 WL 4256845 (2d Cir. Sept. 20, 2021)..................20

*E.E.O.C. v. AutoZone, Inc.*,
 707 F.3d 824 (7th Cir. 2013) ............................................................55

*E.W. Bliss & Co. v. Struthers-Dunn, Inc.*,
 408 F.2d 1108 (8th Cir. 1969) ..........................................................60

*Erie R. Co. v. Tompkins*,
 304 U.S. 64 (1938).............................................................................14

*ES Dev., Inc. v. RWM Enters., Inc.*,
 939 F.2d 547 (8th Cir. 1991) ..................................................... 39, 55

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
 314 U.S. 95 (1941).............................................................................57

*Forschner Grp., Inc. v. Arrow Trading Co.*,
 124 F.3d 402 (2d Cir. 1997)..............................................................36

*Franke v. Wiltschek*,
 209 F.2d 493 (2d Cir. 1953)..............................................................20

*FTC v. Digital Altitude, LLC*,
 No. LA CV18-00729 (JAK)(MRWx), 2018 WL 4944419 (C.D. Cal. July 26,
 2018) .................................................................................................42

*FTC v. Grant Connect, LLC*,
 763 F.3d 1094 (9th Cir. 2014) ..........................................................42

*FTC v. Grant Connect, LLC*,
 827 F. Supp. 2d 1199 (D. Nev. 2011).................................................42

*FTC v. John Beck Amazing Profits LLC*,
   888 F. Supp. 2d 1006 (C.D. Cal. 2012) ............................................................42

*FTC v. QYK Brands, LLC*,
   No. SACV20-1431 PSG (KESx), 2022 WL 2784416 (C.D. Cal. June 21, 2022)
   ......................................................................................................................42

*FTC v. Shkreli*,
   581 F. Supp. 3d 579 (S.D.N.Y. 2022) ..................................................................4

*FTC v. Vyera Pharms., LLC*,
   No. 20cv00706 (DLC), 2022 WL 1081563 (S.D.N.Y. Feb. 4, 2022) ...... 4, 5, 6, 9

*Garcia v. Yonkers Sch. Dist.*,
   561 F.3d 97 (2d Cir 2009)....................................................................................19

*Genovese Drug Stores, Inc. v. Bercrose Assocs.*,
   563 F. Supp. 1299 (D. Conn. 1983) .....................................................................21

*Genovese Drug Stores, Inc. v. Conn. Packing Co., Inc.*,
   732 F.2d 286 (2d Cir. 1984)........................................................................... 21, 22

*In re Generic Pharms. Pricing Antitrust Litig.*,
   --- F. Supp. 3d ---, 2022 WL 2047964 (E.D. Pa. June 7, 2022) .........................26

*In re MF Glob. Holdings Ltd. Inv. Litig. (DeAngelis v. Corzine)*,
   611 F. App'x 34 (2d Cir. 2015) ...........................................................................21

*J.P. Morgan Secs. Inc. v. Vigilant Ins. Co.*,
   183 N.E.3d 443 (N.Y. 2021)................................................................... 27, 28, 29

*John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*,
   588 F.2d 24 (2d Cir. 1978)...................................................................................36

*Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi
   Negara*,
   500 F.3d 111 (2d Cir. 2007).................................................................................18

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976).................................................................................20

*Liu v. SEC,*
   140 S. Ct. 1936 (2020) .......................................................... 27, 32, 33

*Mack v. Latta,*
   16 Bedell 525 (N.Y. 1904) ........................................................ 30, 31

*Madsen v. Women's Health Ctr.,*
   512 U.S. 753 (1994) ...................................................................51

*Mallet & Co. Inc. v. Lacayo,*
   16 F.4th 364 (3d Cir. 2021) ..................................................... 39, 43, 60

*Meador v. Apple, Inc.,*
   911 F.3d 260 (5th Cir. 2018) ........................................................23

*Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union,*
   239 F.3d 172 (2d Cir. 2001) ..................................................... 51, 52

*N.Y. ex rel. Spitzer v. Operation Rescue Nat'l,*
   273 F.3d 184 (2d Cir. 2001) ..........................................................51

*N.Y. State Nat'l Org. for Women v. Terry,*
   886 F.2d 1339 (2d Cir. 1989) ........................................................35

*Nat'l Soc'y of Eng'rs v. United States,*
   435 U.S. 679 (1978) ............................................................. 53, 54

*Nat'l Union Fire Ins. Co. v. Stroh Cos., Inc.,*
   265 F.3d 97 (2d Cir. 2001) ..........................................................22

*O'Donnell v. Erie Cnty.,*
   146 N.E.3d 1171 (N.Y. 2020) .........................................................32

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,*
   317 F.3d 209 (2d Cir. 2003) .........................................................36

*People ex rel. Schneiderman v. Greenberg,*
   54 N.E.3d 74 (N.Y. 2016) ............................................................27

*People v. Ernst & Young, LLP*,
   114 A.D.3d 569 (N.Y. App. Div. 2014) ...................................................... 25, 27

*People v. Imported Quality Guard Dogs, Inc.*,
   930 N.Y.S.2d 906 (N.Y. App. Div. 2011) ...........................................................43

*Peregrine Myanmar Ltd. v. Segal*,
   89 F.3d 41 (2d Cir. 1996)........................................................................... 36, 53

*Perfect Fit Industries, Inc. v. Acme Quilting Co.*,
   646 F.2d 800 (2d Cir. 1981)...............................................................................21

*Petrello v. White*,
   533 F.3d 110 (2d Cir. 2008)...............................................................................35

*Pisciotta v. Old Nat'l Bancorp*,
   499 F.3d 629 (7th Cir. 2007) .............................................................................23

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
   241 F.3d 232 (2d Cir. 2001)...............................................................................35

*SEC v. Contorinis*,
   743 F.3d 296 (2d Cir. 2014)...............................................................................33

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996)...................................................................... 29, 32

*SEC v. Pentagon Cap. Mgmt. PLC*,
   725 F.3d 279 (2d Cir. 2013)...............................................................................29

*Saad v. SEC*,
   980 F.3d 103 (D.C. Cir. 2020) ...........................................................................40

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)............................................................................................35

*Stern v. S. Chester Tube Co.*,
   390 U.S. 606 (1968)............................................................................................21

*Travelers Ins. Co. v. 633 Third Assocs.*,
14 F.3d 114 (2d Cir. 1994)................................................................ 22, 29

*Travelers Ins. Co. v. 633 Third Assocs.*,
973 F.2d 82 (2d Cir. 1992)...............................................................20

*United States v. Bell*,
414 F.3d 474 (3d Cir. 2005)............................................................51

*United States v. Carson*,
52 F.3d 1173 (2d Cir. 1995)............................................................41

*United States v. Curcio*,
712 F.2d 1532 (2d Cir. 1983)..........................................................59

*United States v. Holtzman*,
762 F.2d 720 (9th Cir. 1985) ..........................................................36

*United States v. Huber*,
603 F.2d 387 (2d Cir. 1979)............................................................57

*United States v. Line Material Co.*,
333 U.S. 287 (1948)........................................................................46

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
44 F.3d 1082 (2d Cir. 1995)............................................................41

*United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*,
793 F. Supp. 1114 (E.D.N.Y. 1992) .................................................41

*United States v. Zaken Corp.*,
57 F. Supp. 3d 1233 (C.D. Cal. 2014) .............................................42

*W. Allis Mem'l Hosp., Inc. v. Bowen*,
852 F.2d 251 (7th Cir. 1988) ..........................................................22

*Wendt v. Fischer*,
154 N.E. 303 (N.Y. 1926)........................................................... 27, 28

*Zervos v. Verizon N.Y., Inc.*,
   252 F.3d 163 (2d Cir. 2001) ................................................................. 19

**Statutes**

15 U.S.C. § 15c ........................................................................................ 26

15 U.S.C. § 26 ......................................................................................... 25

18 U.S.C. § 1964 ..................................................................................... 41

18 U.S.C. § 1961 ................................................................................ 40, 41

21 U.S.C. § 335a ..................................................................................... 40

21 U.S.C. § 355 ................................................................................. 46, 48

28 U.S.C. § 1652 ..................................................................................... 20

N.Y. Educ. L. § 6511 .............................................................................. 40

N.Y. Educ. L. § 6520 .............................................................................. 40

N.Y. Exec. L. § 63(12) ........................................................... 12, 13, 31, 43

**Rules**

Fed. R. App. P. 4 ....................................................................................... 3

Fed. R. Civ. P. 52 ................................................................................... 18

Fed. R. Civ. P. 65 ........................................................................ 16, 35, 60

**Other Authorities**

Dep't of Justice, *Martin Shkreli Sentenced to Seven Years' Imprisonment for
   Multi-Million Dollar Fraud Scheme*, Mar. 9, 2018,
   https://www.justice.gov/usao-edny/pr/martin-shkreli-sentenced-seven-years-
   imprisonment-multi-million-dollar-fraud-scheme ................................... 7

Julie Creswell et al., *Drug C.E.O. Martin Shkreli Arrested on Fraud Charges*, N.Y. Times, Dec. 17, 2015, https://www.nytimes.com/2015/12/18/business/shkreli-fraud-charges.html ................................................................................7

Lori R. Jacobs, *Prescription to Over-the-Counter Drug Reclassification*, Am. Family Physician. 1998;57(9)………………………………………………72

M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1986)……………51

Restatement (Third) of Restitution and Unjust Enrichment § 51 (2010) ...............27

U.S. Food & Drug Admin., *Office of Generic Drugs 2021 Annual Report*, https://www.fda.gov/drugs/generic-drugs/office-generic-drugs-2021-annual-report ................................................................................................47

Wright & Miller, 19 Fed. Prac. & Proc. Juris. § 4513 (3d ed.) ...............................19

## PRELIMINARY STATEMENT

Defendant-Appellant Martin Shkreli appeals the judgment of the United States District Court for the Southern District of New York (Hon. Denise L. Cote, *Judge*). Plaintiffs brought this action under federal and state antitrust laws to challenge the conduct of Shkreli and his co-Defendants with respect to Daraprim, a branded drug used to treat a parasitic condition called toxoplasmosis. When Shkreli's corporate co-Defendant Vyera Pharmaceuticals acquired the rights to Daraprim, it raised the price forty-fold. Plaintiffs alleged—and the district court found—that Shkreli originated and helped implement a plan to ensure that generic drug competitors could not enter the market, thus protecting this price increase. On January 14, 2022, following a week-long bench trial, the district court held Shkreli liable for these antitrust violations. Alongside liability, the district court imposed two remedies on Shkreli that far exceed the limits of the Constitution, the Federal Rules, and the equitable powers of federal courts.

First, the district court ordered joint and several disgorgement against Shkreli—for profits obtained solely by Vyera. Because Plaintiffs limited their basis for monetary relief to disgorgement under New York statutes, the court was bound by the *Erie* doctrine to respect state law limits on disgorgement awards. In New York, a defendant cannot be ordered to disgorge profits received solely by his co-defendants or other third parties. Because the court's disgorgement order

1

plainly contradicts New York law, and because the court made no finding that Shkreli personally profited at all from the anticompetitive scheme, the order should be reversed.

Second, the district court entered an injunction permanently barring Shkreli from participating in virtually the entire pharmaceutical industry. The injunction order is overbroad, vague, and it violates the First Amendment. The district court found Shkreli carried out a specific model of anticompetitive activity, repeating the same conduct again and again. There was no basis to expel Shkreli from an entire industry, including lawful activities and business sectors for which his past scheme would be irrelevant. There was certainly no basis to ban him from publicly commenting on the industry. The district court's permanent injunction was an abuse of discretion.

This Court should reverse the district court's disgorgement order and vacate and modify its injunction to comply with constitutional and equitable principles.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a), and 1345. The district court entered a final judgment disposing of all parties' claims on February 4, 2022. SPA-152-70.[1] Shkreli noticed this appeal on

---

[1] The Appendix is cited herein as "A-_." The Special Appendix is cited as "SPA-_."

April 5, 2022.  A-2298; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether the district court erred by relying on federal law to impose joint and several disgorgement on Shkreli, even though Plaintiffs pursued disgorgement solely under New York law.

2.      Whether the district court's injunction against Shkreli is vague, overbroad, and impermissibly limits Shkreli's speech.

## STATEMENT OF THE CASE

On January 27, 2020, Plaintiffs[2] filed suit against Shkreli and his co-Defendants in the United States District Court for the Southern District of New York, alleging violations of federal and state antitrust law for conduct involving the distribution of Daraprim, a brand-name drug.  Though Shkreli's co-Defendants settled prior to trial, Plaintiffs' claims against Shkreli were tried before the Honorable Denise L. Cote, sitting without a jury, beginning on December 14, 2021.  On January 14, 2022, the district court found Shkreli liable on each claim. *FTC v. Shkreli*, 581 F. Supp. 3d 579, 643 (S.D.N.Y. 2022).  On February 4, 2022, the court issued an order against Shkreli imposing $64.6 million in disgorgement

---

[2] Plaintiffs include the FTC as well as the States of California, Illinois, New York, North Carolina, Ohio, Pennsylvania, and Virginia (the "State Plaintiffs").

and a permanent injunction. *FTC v. Vyera Pharms., LLC*, No. 20cv00706 (DLC), 2022 WL 1081563, at *3-5 (S.D.N.Y. Feb. 4, 2022). After the court denied Shkreli's request for a stay, Shkreli appealed.

## I.     Statement of Facts

This case concerns antitrust violations in the pharmaceutical industry specifically regarding the development of generic drugs to compete with post-patent branded pharmaceuticals.[3]

### A.     *Sectors of the Pharmaceutical Industry*

Some United States pharmaceutical companies exclusively or predominantly manufacture or distribute new pharmaceutical products, known as "brand-name drugs" or "branded drugs." A-150. These companies may develop their drug products from scratch, and these products typically enjoy patent protection for several years after they are developed. *See* A-752, 768. Pharmaceutical companies may research and develop branded drug products without marketing the products they develop. *See* A-751.

Other companies exclusively or predominantly manufacture or distribute generic versions of branded drugs ("generics"). A-150. Generics are "essentially

---

[3]     The following facts are drawn from the trial record and the district court's findings of fact, which Shkreli does not appeal, though he disputed them at trial. References in this brief to unlawful conduct or anticompetitive conduct by Shkreli are based on the findings of the district court.

identical" to branded drugs, but distributors can afford to market them at a much lower price. A-873. Generic companies typically develop generics once a brand-name drug loses its patent protection and can no longer sue to prevent entry of identical competitors. *See* A-752, 768.

Drug marketers use different business models to distribute their products. SPA-38. Marketers may use an "open distribution" model, whereby they partner with a major distributor to deliver a product to licensed dispensaries without limitation. *Id.* Marketers may also use a "closed distribution" or "specialty distribution" model, imposing restrictions on which entities may acquire a product or how the product is sold. *See* SPA-39.

### B. *Abbreviated New Drug Application Process*

In the United States, to market the generic equivalent of an FDA-approved branded drug, a manufacturer can obtain expedited approval from the FDA by filing an Abbreviated New Drug Application ("ANDA"). SPA-32. The ANDA application process requires the generic manufacturer to obtain the branded drug's active pharmaceutical ingredient ("API")—the ingredient that provides the drug's therapeutic effect, *id.*—and samples of the branded drug, SPA-35. If the FDA finds major deficiencies in an ANDA, that may substantially delay the approval process. *See* SPA-37.

## C.    *History of Branded Pyrimethamine*

Pyrimethamine—the API at issue in this case—is used to treat
toxoplasmosis, a parasitic infection that causes symptoms in immunocompromised
individuals.  SPA-45-46.  The branded version of pyrimethamine is Daraprim,
which has been on the market since 1953.

In October 2014, Shkreli founded Turing Pharmaceuticals AG, now known
as Phoenixus AG ("Phoenixus"), as well as a subsidiary called Turing
Pharmaceuticals LLC, now known as Vyera Pharmaceuticals LLC ("Vyera").
SPA-42.  Phoenixus purchased the rights to market Daraprim in August 2015 and
designated Vyera as Daraprim's exclusive U.S. distributor.  SPA-48.  A month
later, Vyera raised Daraprim's price from $17.60 per pill to $750 per pill.  *Id.*; A-
427.  Between roughly 2016 and 2019, the average net price of Daraprim
decreased, ranging between $228 and $305 per pill.  SPA-48.  Shkreli did not take
a salary or receive any compensation from Vyera or Phoenixus.  A-428.  Instead,
Vyera invested most of its revenues into research and development for more
effective toxoplasmosis treatments.  A-427-28.

Alongside the Daraprim price increase, Vyera implemented a closed
distribution system, imposing a variety of trade restrictions and maintaining
relationships with specialty pharmacies.  *See* SPA-50-52.  Vyera's trade

restrictions included a restriction on the number of Daraprim bottles that distributors could sell to one purchaser.  SPA-55-56.

### D.    *Corporate History of Vyera and Phoenixus*

Shkreli served as CEO of Vyera until December 2015, when he was arrested for conduct involving his prior company, Retrophin.  In August 2017, Shkreli was convicted and subsequently sentenced to seven years in prison and a $75,000 fine.[4] The charges were unrelated to his tenure at Vyera.  SPA-43.  While in prison, Shkreli maintained some communication with longtime friend and eventual Vyera CEO Kevin Mulleady, and sometimes gave Mulleady suggestions about Vyera's management, which Mulleady regularly ignored.  A-434-35.

In the meantime, although he remained as chairman of Phoenixus until January 2016, Shkreli resigned as chairman and from the board altogether soon thereafter.  SPA-43.  Shkreli remained Vyera's largest shareholder and thus retained power to call extraordinary general meetings of Vyera shareholders.  SPA-97-98.

---

[4] Julie Creswell *et al*., *Drug C.E.O. Martin Shkreli Arrested on Fraud Charges*, N.Y. Times, Dec. 17, 2015, https://www.nytimes.com/2015/12/18/business/shkreli-fraud-charges.html; U.S. Dep't of Justice, *Martin Shkreli Sentenced to Seven Years' Imprisonment for Multi-Million Dollar Fraud Scheme*, Mar. 9, 2018, https://www.justice.gov/usao-edny/pr/martin-shkreli-sentenced-seven-years-imprisonment-multi-million-dollar-fraud-scheme.

According to the district court, while incarcerated, Shkreli was able to cause changes in the membership of Vyera's board, which in turn appointed Vyera's CEO.  The district court found that in 2017, and again in 2020, Shkreli called a shareholder vote upon which a new slate of directors was elected to Vyera's board.  SPA-99, 101-02.  Although Shkreli was Vyera's largest shareholder throughout the relevant period, he did not hold a controlling interest in either Vyera or Phoenixus after December 2015, and thus could not unilaterally control the results of the votes he called in 2017 and 2020.  *See* SPA-97.

### E. *Vyera's Challenged Agreements*

In November 2016, Vyera signed a pyrimethamine API supply agreement with Fukuzyu, a Japanese chemical manufacturer.  SPA-62.  Vyera's contract with Fukuzyu included an exclusivity provision: under the terms of the agreement, Fukuzyu was not allowed to sell pyrimethamine API for commercial use in the United States to any entity other than Vyera.  SPA-62-64.  In November 2017, Vyera signed a backup pyrimethamine API supply agreement with RL Fine, an Indian chemical manufacturer.  SPA-65, 67.  Vyera's contract with RL Fine also included a similar exclusivity provision.  SPA-67.  Between 2015 and 2020, Vyera also established agreements with its distributors that required Vyera's approval to sell Daraprim to customers except those that Vyera pre-approved.  SPA-52-54.

In order to prevent resale of Daraprim to non-approved customers, Vyera also sought agreements that required Vyera's consent for any resale apart from resales directly to patients and certain specialty pharmacies. SPA-54-55. In conjunction, Vyera imposed limits on the number of bottles of Daraprim that could be sold at one time to the same customer. SPA-55-56.

## II. Procedural History

On January 27, 2020, Plaintiffs filed a complaint (subsequently amended) against Vyera, Phoenixus, Shkreli, and Mulleady, alleging violations of Sections 1 and 2 of the Sherman Act and Section 5(a) of the FTC Act, violations of the antitrust laws of the states of New York, California, Illinois, North Carolina, Ohio, Virginia, violations of the consumer protection laws of New York, California, North Carolina, and Pennsylvania, as well as Pennsylvania's common law doctrine against restraints of trade. A-136-221 (the "Amended Complaint"). Plaintiffs alleged a three-part "scheme" intended to thwart the ability of generic manufacturers to obtain FDA approval to sell a generic form of Daraprim. *See generally id.*

The Amended Complaint sought multiple forms of relief under federal and state law, including declaratory relief, A-211; injunctive relief, *id.*; equitable monetary relief, A-212; attorneys' fees and costs for the State Plaintiffs only, *id.*; and civil penalties/forfeitures for the State Plaintiffs only, *id*. In September and

9

October 2020, Defendants responded to the Amended Complaint with answers containing jury demands. A-222-88, 289-350, 351-408. Subsequently, the district court approved an agreement among the parties whereby the State Plaintiffs agreed to forgo any claim for civil penalties/forfeitures in exchange for Defendants' agreement to withdraw their jury demands. A-409-13.

Following the Supreme Court's April 22, 2021 decision in *AMG Capital Management, LLC v. Federal Trade Commission*, 141 S. Ct. 1341, 1352 (2021) ("*AMG*"), holding that § 13(b) of the FTC Act does not authorize the FTC to seek equitable monetary relief, the FTC moved for leave to withdraw its prayer for equitable monetary relief, A-414-16, which the district court granted on June 2, 2021, A-419-21.

On September 24, 2021, the district court denied Defendants' motion for partial summary judgment that any monetary relief in favor of the State Plaintiffs should be limited to Daraprim sales revenue in each state. SPA-4. In briefing for that motion, the State Plaintiffs narrowed their requests for equitable monetary relief by "argu[ing] solely for disgorgement," SPA-8, and the district court treated their prayer for equitable monetary relief "as a claim for disgorgement and not any other form of equitable monetary relief," *id.* The court found that the State Plaintiffs could seek disgorgement for nationwide sales based on two New York statutes: the Donnelly Act and Executive Law § 63(12). SPA-11-14. The district

10

court ruled that the State Plaintiffs could not seek disgorgement under the Sherman Act, and expressly declined to rule whether other State Attorneys General (besides New York) were so authorized. SPA-10-11.

Prior to trial, Defendants Vyera, Phoenixus, and Mulleady, without admitting the allegations and claims against them, entered into a stipulated order pursuant to which they are enjoined for ten years from engaging in conduct similar to that described in the Amended Complaint, A-136-221, and agreeing to disgorgement, A-492-580. Plaintiffs' claims against Shkreli were tried before the district court, sitting without a jury, beginning on December 14, 2021.

On January 14, 2022, the district court issued a decision finding Shkreli liable on each of the claims presented based on its conclusion that Shkreli "conceived of, implemented, maintained, and controlled" Vyera's anticompetitive conduct. SPA-136-37. The district court also ordered $64.6 million in disgorgement, solely for the benefit of the State Plaintiffs, with no monetary relief awarded to the FTC. SPA-144-45. This amount was calculated entirely based on profits received by Vyera—Shkreli never received a distribution of profits, salary, or any form of compensation from either Vyera or Phoenixus. A-789. Even so, the court held Shkreli jointly and severally liable for the disgorgement, emphasizing Shkreli's stake in Vyera, Shkreli's testimony that generic entry would have had a "significant effect" on his investment, and its conclusion that Shkreli

11

must have derived some amount of "excess profit" because he was Vyera's largest shareholder. SPA-149. When Shkreli argued that joint and several disgorgement was improper because he did not make any personal profit from the alleged conduct, the court responded that its order was "consistent with equitable principles." SPA-150.

On February 4, 2022, the district court entered a permanent injunction against Shkreli, pursuant to §13(b) of the FTC Act, § 342 of New York's General Business Law, and § 63(12) of New York's Executive Law (the "Permanent Injunction"). SPA-138-39, 162-70. In relevant part, the Permanent Injunction prohibits Shkreli from "directly or indirectly participating in any manner" in the pharmaceutical industry, "including," among other things, doing the following:

- "Participating in or directing the research, Development, manufacture, commercialization, distribution, marketing, importation, or sale" of any drug product or API;

- "Participating in the formulation, determination, or direction of any business decisions" of any pharmaceutical company;

- "Acquiring or holding an Ownership Interest" in a pharmaceutical company; and

- "Taking any action to directly or indirectly influence or control the management or business" of a pharmaceutical company.

12

SPA-166.  With respect to the final provision, the court emphasized that Shkreli's public statements about a pharmaceutical company would be deemed "an action taken to influence or control the management or business" of the pharmaceutical company if Shkreli "intended the statement to have that effect or if a reasonable person would conclude that the statement has that effect."  *Id.*

To support imposing this lifetime ban[5] on Shkreli's participation in the pharmaceutical industry, the court held that, under New York Executive Law § 63(12), "a court may exercise its discretion to issue a permanent and plenary ban in a particular industry."  SPA-139-40.  The court justified exercising that purported discretion based on findings that Shkreli's conduct—undertaken "in the face of public opprobrium"—was "flagrant," "reckless," "particularly heartless and coercive," and "ultimately dangerous" to "a particularly vulnerable population." SPA-140-43.  The court rejected Shkreli's arguments that the injunction was overly broad and could be more narrowly tailored because the conduct at issue was "egregious" and because Shkreli "demonstrated that he can and will adapt to restrictions."  SPA-142-43.

---

[5] The lifetime duration went beyond one version of Plaintiffs' request: in their pretrial memorandum, Plaintiffs requested that Shkreli be banned from the pharmaceutical industry for twenty years.  SPA-140.  Plaintiffs later requested that the ban be for life.

On March 28, 2022, the district court denied Shkreli's request for a stay pending appeal.  SPA-171-76.  On April 5, 2022, Shkreli filed a timely notice of appeal.  A-2298-300.

## SUMMARY OF ARGUMENT

Shkreli appeals from a district court order that imposed two improper remedies after finding that Shkreli violated the antitrust laws.  First, the district court awarded disgorgement of $64.6 million from Shkreli, even though there were no findings or evidence that Shkreli received any profits or other ill-gotten gains.  Second, the district court enjoined Shkreli from participating in an entire industry for the rest of his life, without any measures to tailor the injunction to Shkreli's specific conduct.

The district court erred by ordering disgorgement against Shkreli.  The disgorgement remedy was premised on $64.6 million in profits made by his co-defendant Vyera.  Although this award was for the benefit of the State Plaintiffs for their claims under New York law, the district court relied entirely on a joint-and-several version of disgorgement developed in federal court jurisprudence from SEC enforcement actions.  This was error.

It is a long-settled principle under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 79-80 (1938), that federal courts must apply state law to pendent state claims.  The *Erie* doctrine generally requires federal courts to follow state law limits on

14

remedies, including equitable remedies. As a remedy for New York law claims, the State Plaintiffs cannot obtain millions in disgorgement from a federal court if a state court would have granted them nothing.

This result follows from Plaintiffs' knowing decision to limit their monetary claims to disgorgement, and to disgorgement alone. The FTC withdrew all claims for monetary relief based on recent Supreme Court authority. The State Plaintiffs disavowed seeking any monetary remedies other than disgorgement for strategic reasons. They agreed to drop any claim for forfeiture, civil penalties or ordinary legal damages, in exchange for Defendants withdrawing their jury trial demands. By further confining their equitable monetary claims to disgorgement (and not, for example, restitution), the State Plaintiffs substantially avoided any burden under New York law to prove state-specific losses, or any loss at all. Consequently, Plaintiffs were limited to whatever recovery was available to them under New York law of disgorgement.

In New York, courts may disgorge profits from a defendant only to the point of putting him in the same position as if no violation had occurred. An individual cannot be ordered to disgorge ill-gotten gains received only by his co-defendants or third parties. Indeed, the state's highest court, the New York Court of Appeals recently contrasted state disgorgement law from the federal court remedies developed in SEC cases. Under New York law, regardless of what liability a

corporation's executives or shareholders may have by way of ordinary damages, they cannot be personally ordered to disgorge profits received only by the corporation.  Thus, it was error for the district court to impose disgorgement in the form of joint and several liability, directly contravening state law.  Indeed, the disgorgement order here stretches beyond even the federal disgorgement precedents cited by the district court.  The disgorgement judgment against Shkreli should be reversed.

Separately, the district court erred by imposing a permanent injunction against Shkreli that sweepingly bars lawful conduct, indiscriminately bans him from a vast and varied industry, and explicitly restrains his freedom of speech. Federal Rule of Civil Procedure 65(d) requires that an injunction be specific, clearly defined, and narrowly tailored to redress a defendant's unlawful conduct. These principles apply with particular force when the injunction implicates the defendant's First Amendment rights.

The district court abused its discretion by imposing an injunction that violates these principles.  The industry-wide scope of the injunction was entirely unwarranted, defying any conceivable notion of what a "narrowly tailored" remedy should be.  Shkreli was found to have developed a specific anticompetitive practice, particular to branded drugs whose patents had expired, but for which there were not yet any competing generics.  The district court found that Shkreli

16

repeated the same particular anticompetitive strategy persistently. The resulting injunction, however, betrays no hint of the specific conduct on which it is based. The injunction instead excludes Shkreli from virtually any role in virtually any part of the entire pharmaceutical industry, which itself is a sprawling collection of varied businesses. For much of that industry, a scheme to thwart the development of generic drugs (the anticompetitive conduct Shkreli was actually found to have committed) would be nonsensical or impossible. Although injunctions in other cases have prohibited defendants from engaging in certain business practices or from particular sectors dubbed an "industry," none of them support a defendant being fenced off from such a wide swath of lawful activity to prevent him from repeating a history of specific unlawful conduct.

The district court also erred by prohibiting public speech and innocuous conduct like passive stock ownership. To justify these provisions, the district court emphasized that Shkreli was persistent and unrepentant in his conduct. Although such findings may have been relevant to *whether* an injunction should issue, they do not logically inform the injunction's scope. Such findings cannot justify banning Shkreli from lawful conduct, from prospective property ownership, or from First Amendment protected activities that are unrelated to his actual past misconduct.

The injunction's legal flaws are aggravated by its vagueness and permanence.  With a defendant thirty-eight years old at the time of judgment, the injunction could be the subject of interpretation or enforcement *decades* into the future.  By comparison, the settlements against Shkreli's co-Defendants included injunctive provisions limited to ten years.  Particularly with the broad scope and loose terminology of the injunction against Shkreli, it is hard to imagine future judges, state attorneys general, or FTC officials consistently interpreting and enforcing its terms for the next forty or fifty years.  For all of these reasons, the injunction should be vacated and modified.

## STANDARD OF REVIEW

The district court's conclusions of law and its application of law to the facts are reviewed *de novo*.  *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 238 (2d Cir 1999).  Findings of fact are reviewed for clear error.  Fed. R. Civ. P. 52(a)(6).

The standard of review for the grant of a permanent injunction is abuse of discretion.  *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 118-19 (2d Cir. 2007).  A district court abuses its discretion where (1) its decision rests on "an error of law" or "a clearly erroneous factual finding" or (2) "its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of

permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir.

2001).  However, whether an injunction complies with Federal Rule of Civil

Procedure 65(d) is reviewed *de novo*.  *See Garcia v. Yonkers Sch. Dist.*, 561 F.3d

97, 103 (2d Cir 2009).

## ARGUMENT

**I.  THE DISTRICT COURT ERRED BY HOLDING SHKRELI JOINTLY AND SEVERALLY LIABLE FOR DISGORGEMENT OF VYERA'S PROFITS**

    **A.  The District Court Erred by Relying on the Federal Law of Remedies Even Though the Monetary Claims Were Based on New York Statutes**

        **1.  A Federal District Court Cannot Order Relief for State Law Claims Beyond the Observed Limits of State Law**

In general, "when forum state law defines the underlying substantive right,

state law also governs the availability of such equitable remedies as a permanent

injunction, specific performance, rescission, an accounting, or equitable defenses

and related equitable principles and defenses."  Wright & Miller, 19 Fed. Prac. &

Proc. Juris. § 4513 (3d ed.).  As one treatise has summarized,

> Unless a Federal Rule, congressional statute, federal common law, or constitutional restraint clearly is applicable, the Rules of Decision Act as interpreted in *Erie* and its progeny constrains whatever inherent equitable and remedial powers federal courts possess. *Most of these decisions dictate that remedies for state-created rights be granted according to state law. Rights and remedies are closely interrelated concepts; to deviate from the state's definition of the latter often also would change the former.*

> In addition, an independent federal law of remedies would
> be contrary to the twin aims of *Erie* . . . .

*Id.* (emphasis added) (citing *Franke v. Wiltschek*, 209 F.2d 493 (2d Cir. 1953)).[6]

Consistent with that understanding, this Court has repeatedly looked to state law alone to assess the final remedies available for state-law claims, including equitable remedies, or to assess other issues purely equitable in character. *See Deerbrook Ins. Co. v. Mirvis*, No. 20-1385, 2021 WL 4256845, at *1 (2d Cir. Sept. 20, 2021) (summary order) (issue of proper remedy under New York's Debtor and Creditor Law turned on "how the state's highest court would interpret the statute") (alterations and internal quotations omitted); *Travelers Ins. Co. v. 633 Third Assocs.*, 973 F.2d 82, 85 (2d Cir. 1992) (standing of party to assert state-law claims held to depend on "whatever rights it may have under New York law to sue, in equity" for the specific remedy of compelling certain payments to preserve partnership property); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976) (in breach of contract action, holding, "we thus turn to New York law for the standards which govern the remedy of rescission"); *Franke*, 209 F.2d at 497-98 ("issuance of an injunction" governed by New York law, "for a local rule

---

[6] *See also* 28 U.S.C. § 1652 ("The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.").

which itself holds a legal principle to be procedural may for us be binding as substantive"); *see also In re MF Glob. Holdings Ltd. Inv. Litig. (DeAngelis v. Corzine)*, 611 F. App'x 34, 37 (2d Cir. 2015) (summary order) (holding equitable defense of in *pari delicto* was "governed exclusively by state law," and declining to apply federal common law).[7]

To be sure, at least one district court has observed that the Supreme Court and this Court have avoided expressly stating whether state law exclusively controls the equitable remedies available for state law claims. *See Aladdin Cap. Holdings, LLC v. Donoyan*, No. 11-cv-655, 2011 WL 2293236, at *2-3 (D. Conn. June 8, 2011) (citing *Stern v. S. Chester Tube Co.,* 390 U.S. 606, 609 (1968), and

---

[7] The only potentially contrary indication is language that comes from this Court's decision, *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 646 F.2d 800 (2d Cir. 1981), which dealt with one provision of a larger permanent injunction order, and where there was no dispute that injunctive relief was generally available. There the Court found no state-law authority precluding the single injunctive provision in question, an order that defendant send a recall letter to retrieve goods found to infringe the plaintiff's trade dress. The Court also opined in dicta that such a provision could have been ordered even if hypothetically there had been a state-court rule forbidding recall orders. *See id.* at 806.

Notably, just two years later, a district court cited *Perfect Fit Industries* for the proposition that *state law* governed equitable remedies, not federal law. *See Genovese Drug Stores, Inc. v. Bercrose Assocs.*, 563 F. Supp. 1299, 1304 (D. Conn. 1983). On appeal, this Court referenced, but did not disagree with, the district court's reading, expressly leaving open "[w]hatever rule is to be derived from *Perfect Fit* and *Franke*." *Genovese Drug Stores, Inc. v. Conn. Packing Co., Inc.,* 732 F.2d 286, 288 n.1 (2d Cir. 1984).

*Genovese Drug Stores, Inc. v. Conn. Packing Co.,* 732 F.2d 286, 288 n. 1 (2d Cir. 1984)).[8]  Other Circuits, however, as well as district courts within this Circuit, have expressly recognized that a federal court presiding over state-law claims in diversity or supplemental jurisdiction cases "has the same equitable powers as the state court." *W. Allis Mem'l Hosp., Inc. v. Bowen*, 852 F.2d 251, 257 (7th Cir. 1988); *accord Cendant Corp. v. Forbes*, 70 F. Supp. 2d 339, 344-45 (S.D.N.Y. 1999).

More broadly, under modern understandings of *Erie*, it is all but unthinkable for district courts to import federal law doctrines to resolve state-law disputes. Rather, "[w]here the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994).  Accordingly, federal courts may not advance state-law jurisprudence beyond its observed limits.  "'Our role as a federal court sitting in diversity is . . . not to adopt innovative theories that may distort established state law.'"  *Nat'l Union Fire Ins. Co. v. Stroh Cos., Inc.*, 265 F.3d 97, 106 (2d Cir. 2001) (quoting *City of Johnstown v. Bankers Std. Ins. Co.*,

---

[8] *See also Columbia Nastri & Carta Carbone S/p/A v. Columbia Ribbon & Carbon Mfg. Co.*, 367 F.2d 308, 313 n.5 (2d Cir. 1966) ("Since we hold that the injunction was proper under New York law, we do not reach the issue whether a federal court may grant a[n] injunction in a diversity case where a state court would not.").

877 F.2d 1146, 1153 (2d Cir. 1989)); *see also Dayton v. Peck, Stow & Wilcox Co. (Pexto)*, 739 F.2d 690, 694 (1st Cir. 1984) (observing federal courts in diversity are in "a particularly poor position . . . to endorse [a] fundamental policy innovation," especially "[a]bsent some authoritative signal from the legislature or the [state] courts").

And it is not surprising that other Circuits have frequently warned litigants, who chose to pursue state-law claims in federal court, against attempting to advance new state-law theories of recovery. As the Seventh Circuit has stated,

> [P]laintiffs must come forward with *some* authority to support their view that they have a right to the relief they seek because, as we have stated, we have limited discretion with respect to untested legal theories brought under the rubric of state law.

*Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007) (internal quotations and alterations omitted) (finding no state authority to extend concepts of "compensable injury" under Indiana negligence law); *see also Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018) ("[I]t is not for us to adopt innovative theories of recovery under state law.") (internal quotations omitted); *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) ("This Court's proper reluctance to speculate on any trends of state law applies with special force to a plaintiff . . . who has chosen to litigate his state law claim in federal court.").

2. **The State Plaintiffs Expressly Limited Their Requests for Equitable Monetary Relief to Disgorgement Under New York Law**

In this case, the only monetary relief available was disgorgement under New York law. None of the Plaintiffs sought damages, A-410, and all requests for equitable monetary relief other than New York's request for disgorgement were either dismissed, withdrawn, or abandoned. Thus, under *Erie*, the district court could not order disgorgement beyond New York law's limits.

The FTC did not ultimately seek any monetary relief whatsoever. The FTC had not sued for damages, and it later successfully moved to withdraw its prayer for equitable monetary relief. A-414-421. This occurred after the Supreme Court held that the FTC Act, Section 13(b), did not authorize the FTC to seek equitable monetary remedies. *See AMG Cap. Mgmt.*, 141 S. Ct. at 1352. A-420. Hence, the final judgment awarded disgorgement only to the State Plaintiffs, not the FTC. SPA-167.

The State Plaintiffs, similarly, limited their requested monetary remedies. They never sought damages, and they withdrew requests for civil penalties and forfeitures by stipulation, in exchange for Defendants' withdrawal of their jury demands. A-410. The State Plaintiffs later narrowed their requests for equitable monetary relief further by "argu[ing] solely for disgorgement." SPA-8. In their motion for summary judgment, Defendants had argued that disgorgement for any

State Plaintiff be limited to Daraprim sales in its State. The district court held that New York could seek disgorgement based on nationwide sales, premised entirely on New York statutory claims, not federal antitrust claims: "the New York Attorney General, should it succeed in proving a violation of the Donnelly Act and Executive Law stemming from Vyera's New York-based operations, may obtain disgorgement of Vyera's net profits attributable to the entirety of its U.S. sales." SPA-11-14. The district court expressly declined to rule whether any of the other states, besides New York, were so authorized. SPA-10-11.

Thus, Plaintiffs decided to forgo remedies other than disgorgement under New York law, entirely for tactical reasons. The disgorgement claim would not trigger Defendants' Seventh Amendment right to a jury trial, and pursuing disgorgement under New York statute would simplify the State Plaintiffs' burden in establishing damages.[9]

In contrast, federal claims for Sherman Act violations were not, and could not have been, the basis for disgorgement here. The Clayton Act authorizes civil actions for Sherman Act violations whereby plaintiffs can seek "injunctive relief," 15 U.S.C. § 26, but such statutory language cannot support disgorgement in light

---

[9] In cases like this one, where the New York Attorney General alleges injury to the public at large, disgorgement can be easier to prove because it "does not require a showing or allegation of direct losses to consumers or the public." *People v. Ernst & Young, LLP*, 114 A.D.3d 569, 569-570 (N.Y. App. Div. 2014).

of the *AMG* decision.[10]  *See* SPA-10 ("[t]he reasoning in *AMG* appears to preclude all of the plaintiffs from seeking disgorgement" pursuant to the Clayton Act); *see also In re Generic Pharms. Pricing Antitrust Litig.*, --- F. Supp. 3d ---, 2022 WL 2047964, at *2-3 (E.D. Pa. June 7, 2022).  By the end of the case here, disgorgement was not framed as a remedy for the Sherman Act claims, either in the State Plaintiffs' pretrial briefs, A-466, 477, or in the district court's decision, SPA-102.  Rather, based on *AMG*, the district court had already held, ruling on summary judgment motions, that disgorgement was not an available Sherman Act remedy. SPA-10.

Consequently, in service of Plaintiffs' case strategy, and because of limits on federal antitrust claims, Plaintiffs' only monetary claims were for disgorgement under New York law.  Thus, under *Erie*, the district court could not order equitable monetary relief beyond the observed limits of New York disgorgement law.  As discussed below, such a remedy could not be ordered against Shkreli because there were no findings or evidence that Shkreli received any ill-gotten gains.

---

[10] The Clayton Act also authorizes state attorneys general to bring *parens patriae* actions to enforce Sherman Act violations.  15 U.S.C. § 15c(a)(1).  But such actions are for a specific treble damages remedy, and must be based on the actual losses of "natural persons residing in such State."  *Id.* §§ 15c(a)(1), (a)(2).  Nothing in this provision suggests an action for equitable relief or disgorgement.

### B.    New York Law Precluded a Disgorgement Award Against Shkreli for a Co-Defendant's Profits

#### 1.    Under New York Law, a Defendant Disgorges Only the Ill-Gotten Gains That He Received

In New York, typically the term "disgorgement" refers "only to 'the return of wrongfully obtained profits.'"  *J.P. Morgan Secs. Inc. v. Vigilant Ins. Co.*, 183 N.E.3d 443, 451 (N.Y. 2021) (quoting *People ex rel. Schneiderman v. Greenberg*, 54 N.E.3d 74, 77 (N.Y. 2016)).  Under approximately a century of established law, such disgorgement is limited to the proceeds a defendant actually received.  *See Wendt v. Fischer*, 154 N.E. 303, 305 (N.Y. 1926) (Cardozo, J.) (rejecting a request for accounting[11] against defendants who "had no share in the profits realized" from the misconduct at issue).  Disgorgement cannot be used to impose a "penalty" and solely puts the defendant in "the position he would have occupied had there been no misconduct."  *People v. Ernst & Young, LLP*, 114 A.D.3d 569, 570 (N.Y. App. Div. 2014) (quoting Restatement (Third) of Restitution & Unjust Enrichment § 51, Comment *k* (2010)).

These limits on disgorgement under New York law apply even when the defendant owns the company that received the proceeds.  In *Wendt v. Fischer*, the

---

[11] Disgorgement may also be known as an "accounting" or an "accounting for profits."  *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51, Comment *a* (2010)).

plaintiff sued three real estate brokers and a real estate corporation for

disgorgement of profits made on a resale of property that the defendants had

fraudulently induced the plaintiff to sell. 154 N.E. at 304. The corporation was the

entity that retained profits from resale of the property, but one of the brokers had

complete ownership and control over the corporation. *Id.* Even so, the New York

Court of Appeals concluded that the judgment went "too far" in "declaring the

brokers to be accountable for profits" from the property because they "had no

share" of those profits. *Id.* at 305. That ruling extended to the broker who had

complete control over the corporation that retained the profits. *See id.*

> **2.** **New York's Highest Court Recently Confirmed That Federal SEC Cases on "Disgorgement" Are Inconsistent With State Law**

The Court of Appeals recently confirmed that New York's disgorgement

remedy does *not* extend as far as the joint-and-several liability that the SEC has

obtained in federal court. In *J.P. Morgan Securities Inc. v. Vigilant Insurance*

*Company*, the Court of Appeals interpreted certain liability insurance policies. The

issue was whether a policy that excluded "fines or penalties" could cover money

paid pursuant to an SEC disgorgement order. 183 N.E.3d at 448. As part of its

analysis, the Court of Appeals observed that federal jurisprudence had extended

SEC recovery to profits wrongfully obtained by third parties, *in contrast to New*

*York law*:

> While, in New York, the term "disgorgement" typically refers only to "the return of wrongfully obtained profits", when the parties entered these insurance contracts, the SEC believed it had the power—as an equitable remedy—to require an entity that facilitated wrongdoing to "disgorge" profits wrongfully obtained by third parties and courts authorized that remedy.

*Id.* at 451-52 (citations omitted).

Particularly considering this recent statement from the state's highest court, New York disgorgement law cannot be construed to embrace the federal remedies developed in SEC cases. *See Travelers*, 14 F.3d at 119 ("we must afford the fullest weight to the pronouncements of the New York Court of Appeals"). Yet federal SEC precedents were the exclusive basis for the district court's order imposing a $64.6 million award against Shkreli. SPA-148-49 (citing *SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996)). The district court's disgorgement order contravenes New York disgorgement law and should be reversed.

### 3. There Was No Evidence of Any Benefits Directly Received by Shkreli

The district court made no finding about Shkreli's individual profits resulting from the misconduct—indeed, because there was no such evidence. Shkreli earned no salary, gains from stock sales, or dividends from Vyera. A-789.

Even so, the district court ordered that Shkreli be jointly and severally liable for the entire $64.6 million that *Vyera* earned in excess profits.

The district court made no findings, and received no evidence, of Shkreli receiving any ill-gotten gains. Instead, it stated, "As Vyera's founder and its largest shareholder, any excess profit gained from Shkreli's scheme directly benefited him." SPA-149. This is far from a finding of personal ill-gotten gains. A company's shareholder, even its largest, does not "benefit directly" from the company's receipts. He certainly does not, by mere fact of stock ownership, benefit from the company's receipts *dollar-for-dollar*. The court's order purports to disgorge from Shkreli the ill-gotten gains of someone else, in defiance of New York law.

> **4.  Having Abandoned Other Monetary Remedies for Tactical Reasons, the State Plaintiffs Were Not Entitled to a Money Judgment Against Shkreli**

The district court did not cite any exception to the rule under New York law that disgorgement must be based on individual profits. A finding about Vyera's profits might have supported monetary relief against Shkreli through some *other* remedy, but the State Plaintiffs voluntarily dropped any claim for those remedies.

New York courts have long held that awards beyond a defendant's personal ill-gotten gains must be based on a remedy other than disgorgement. In *Mack v. Latta*, 16 Bedell 525 (N.Y. 1904), the plaintiff sued a corporation and two of its

directors for fraud, seeking the disgorgement of $100,000 that the plaintiff had already paid under their contract. *Id.* at 527. The Court of Appeals affirmed collective liability over the corporation and individual defendants, expressly *not* as a matter of disgorgement, but as a matter of *legal* remedies. That is, the court found the defendants would have been liable to the same extent for damages (separate and apart from disgorgement) in a subsequent action at law. *Id.* at 529-530. Thus, this type of joint remedy was appropriate only where the plaintiff could pursue both disgorgement and damages. *See id.*[12]

Here, in contrast, the State Plaintiffs deliberately foreclosed alternative remedies. By "argu[ing] solely for [nationwide] disgorgement" in the district court, SPA-8, Plaintiffs elected their evidentiary hurdle. They were relieved of any burden to prove each State's losses, but accepted a burden to prove each Defendant's ill-gotten gains. Having failed to meet that burden, Plaintiffs were not entitled to a monetary award against Shkreli.

Neither the Donnelly Act nor New York Executive Law § 63(12)—the statutes cited by the district court in support of its joint and several disgorgement order—abrogate New York common law regarding disgorgement. Neither

---

[12] Of course, in such a case, a *federal* court could not rely on separate remedies at law without triggering a defendant's Seventh Amendment jury trial rights. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959).

statute's language explicitly permits joint and several liability for disgorgement, and reading an implicit permission into either statute would violate "the canon disfavoring interpreting statutes so as to overrule the common law" in the absence of express statutory language. *O'Donnell v. Erie Cnty.*, 146 N.E.3d 1171, 1175 (N.Y. 2020).

## C.  Even Under Federal Notions of Disgorgement, the Award Against Shkreli Was Error

Even if federal standards for the imposition of disgorgement in SEC cases were to apply, they counsel against the district court's imposition of joint and several disgorgement against Shkreli.  While this Circuit has held that disgorgement may be available on a joint and several basis for violations of the securities laws pursuant to statute, *see, e.g.*, *First Jersey Sec.*, 101 F.3d at 1475 (joint and several liability allowed under 15 U.S.C. § 78t), the Supreme Court's recent decision in *Liu v. Securities and Exchange Commission*, 140 S. Ct. 1936 (2020), makes clear that joint and several liability is only available—if at all— under limited circumstances not present here.

In *Liu*, the defendants in an SEC action were a husband and wife.  *Id.* at 1941.  The district court found for the SEC and ordered disgorgement in the total revenue the defendants had raised from investors.  *Id.* at 1942.  The Supreme Court held that disgorgement was available as a remedy only to the extent of a

defendant's net profits rather than revenue. *Id.* at 1949-50. The Court observed that eighteenth and nineteenth century equity courts "generally awarded profits-based remedies against individuals or partners engaged in concerted wrongdoing, *not* against multiple wrongdoers under a joint-and-several liability theory." *Id.* at 1945 (emphasis added); *see also id.* ("The rule against joint-and-several liability for profits that have accrued to another appears throughout equity cases awarding profits."). The Court noted that the SEC sought to impose disgorgement with joint and several liability "in a manner sometimes seemingly at odds with the common-law rule" whereby defendants were held liable "to account for such profits only as have accrued to themselves." And the Court warned that such a "practice could transform any equitable profits-focused remedy into a penalty." *Id.* (quoting *Belknap v. Schild*, 161 U.S. 10, 25-26 (1896)). In so doing, the Court cited disapprovingly this Court's decision in *SEC v. Contorinis*, 743 F.3d 296 (2d Cir. 2014).

Nevertheless, the Supreme Court ultimately did not decide whether joint and several liability could be applied in *Liu*, leaving that question for the Ninth Circuit to determine on remand. 140 S. Ct. at 1949. The Court noted that the defendants were married, one was the president of an entity to which the other directed misappropriated funds, and there was no evidence that the profits were not commingled "or that one spouse did not enjoy the fruits of the scheme." *Id.*

33

Here, by contrast, Shkreli was a mere shareholder of Vyera rather than an officer or director of the company, and there was no evidence that any of the company's profits went to him. *Liu* thus makes clear that, to the extent joint and several liability is ever available under federal law, it cannot be imposed here.

Accordingly, the order or disgorgement should be reversed.

## II. THE DISTRICT COURT ERRED BY IMPOSING A VAGUE, OVERBROAD INJUNCTION

The district court abused its discretion by entering a Permanent Injunction that is a sweeping prohibition on Shkreli participating in any way, directly or indirectly, in the pharmaceutical industry. Such a restraint was untethered from the district court's findings that the Defendants consistently employed the same specific scheme to prevent the development of generic drugs. There was no basis to enjoin Shkreli from an entire industry, without regard to anti-competitive conduct, and without regard to what role or part of the industry he might occupy. Even construing the Permanent Injunction's "specific" enumerated prohibitions as limiting the ban on "participating in the pharmaceutical industry" in the preamble, those prohibitions are themselves overbroad and inconsistent with the Constitution, the Federal Rules, and precedent. The Permanent Injunction should be vacated.

34

## A.    Governing Law

Rule 65(d) provides that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  This Court has construed Rule 65(d) to require that "an injunction . . . be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 240-41 (2d Cir. 2001) (quoting *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989)); *see also Schmidt v. Lessard,* 414 U.S. 473, 476 (1974).  "Rule 65(d) is satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden or required."  *Petrello v. White,* 533 F.3d 110, 114 (2d Cir. 2008) (internal quotation marks omitted).

Rule 65(d) is said to serve two general purposes: "to prevent uncertainty and confusion on the part of those to whom the injunction is directed," and to ensure "that the appellate court knows precisely what it is reviewing."  *S.C. Johnson & Son,* 241 F.3d at 241 (internal quotation marks omitted); *see also Schmidt,* 414 U.S. at 476-77.  Injunctions that fail to satisfy the requirements of Rule 65(d) "will not withstand appellate scrutiny."  *Corning Inc. v. PicVue Elecs., Ltd.,* 365 F.3d 156, 158 (2d Cir. 2004) (per curiam) (internal quotation marks omitted).

In addition to complying with Rule 65(d)'s specificity requirements, district courts must ensure that injunctive relief is not overbroad. Although a district court has "a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct," it is nonetheless "the essence of equity jurisdiction" that a court is empowered only "to grant relief no broader than necessary to cure the effects of the harm caused by the violation." *Forschner Grp., Inc. v. Arrow Trading Co.,* 124 F.3d 402, 406 (2d Cir. 1997) (internal quotation omitted). This Court has instructed that injunctive relief should be "narrowly tailored to fit specific legal violations," *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 50 (2d Cir. 1996) (internal quotation marks omitted), and that the court must "mould each decree to the necessities of the particular case," *Forschner Grp.,* 124 F.3d at 406 (internal quotation marks omitted); *see also Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 220 (2d Cir. 2003). "An injunction may not 'enjoin all possible breaches of the law.'" *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 143-44 (2d Cir. 2011) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.,* 588 F.2d 24, 30 (2d Cir. 1978)). Especially where an injunction proscribes otherwise lawful conduct, "a necessary and appropriate injunction . . . must be carefully limited in time and scope to avoid an unreasonably punitive or nonremedial effect." *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985).

**B.  The District Court Abused Its Discretion by Banning Shkreli From an Entire Industry**

The district court departed from well-established limitations on injunctions and ordered that Shkreli be banned broadly from the pharmaceutical industry, without restriction to particular kinds of conduct or particular kinds of businesses. This was an error because (1) it was not narrowly tailored to the conduct at issue in this case and (2) it cut Shkreli off from broad swaths of the industry where Shkreli's conduct could have no conceivable effect on the market.

Plaintiffs did not principally argue that their proposed injunction was narrowly tailored, but that a narrowly tailored injunction was insufficient. Plaintiffs advocated for general deterrence, arguing, "Banning Shkreli from the pharmaceutical industry would also send a powerful signal to corporate executives in the pharmaceutical industry that they cannot engage in illegal schemes to reap monopoly profits at the expense of vulnerable patients."  A-2240.  The district court likewise cited Shkreli or his conduct as "heartless" and "cynical[ ]," noted that "in the face of public opprobrium, [he] doubled down," and found that he was "unrepentant."  SPA-141, SPA-143.  None of these findings could justify a permanent injunction devoid of the normal boundaries under Rule 65, and the order should be vacated.

37

### 1. An Industry-Wide Ban Was Excessive on Its Face Given the Conduct at Issue

The wrongdoing ascribed to Shkreli, although persisting for several years, was distinctly repetitive, and could have been addressed by a narrowly drawn injunction. The district court several times noted that Shkreli's conduct consistently fit into "the same anticompetitive business model." SPA-141. The district court referred to this as Shkreli's "road-tested" scheme, his "pattern" or his "model," one he had had "pioneered" at his prior company, Retrophin, from 2012 to 2014. SPA-40-41, 71, 136, 141. The "pattern," the district court found, was that Shkreli would acquire unpatented but exclusive drugs, increase their prices, and impose limits on distribution and supply channels to prevent generic competition. SPA-40-41.

Any hint at this specific pattern of conduct is utterly absent from Permanent Injunction. Instead, the Injunction is framed in broad concepts like the "pharmaceutical industry," a "Pharmaceutical Company," and sweeping conduct like "Development," "manufacture," "marketing" or "sale," of drug products. SPA-166. It precludes Shkreli from any relationship with a Pharmaceutical Company, or having any influence on one, whether as an employee, consultant, investor, or public commentator. There are otherwise no boundaries, and certainly not the clear prohibitions one might expect from the district court's extensive

38

findings of Shkreli repeating the "same anticompetitive conduct" again and again. The district court abused its discretion by taking literally no measures to tailor the Permanent Injunction to its own findings, narrowly or otherwise.

Although the precise boundaries would be subject to district court discretion, it was clear error for the district court to dispense with drawing any meaningful boundaries at all. Courts have vacated injunctions where they bar a party "from the marketplace altogether," *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 390 (3d Cir. 2021), go beyond the conduct found to be illegal to enjoin lawful conduct, *Mickalis Pawn Shop*, 645 F.3d at 144-45, or fail to observe reasonable time limitations tied to the actual risk of recurrence, *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 558 (8th Cir. 1991).

The Permanent Injunction here does all three. It does not even purport to confine itself to illegal conduct, to anticompetitive conduct, nor to carve out constitutionally protected conduct. A narrowly tailored permanent injunction could have certainly prevented Shkreli from similar violations without such an expansive ban. It could have barred him using distribution and supply agreements to interfere with generic drug development. Such restrictions could have further been tailored to the kinds of drugs over which Shkreli's antitrust violations were found—branded drugs beyond their patent terms, but without generic competitors.

Plaintiffs and the district court described an industry ban as though it were a routine remedy for antitrust violations. It is not. Banning an individual from an entire industry based on civil law violations is not something the law takes lightly. Such matters are normally the province of licensing boards, with rules drawn by state legislatures, typically for a narrow class of professionals.[13]

By comparison, when Congress devised debarment provisions for the federal Food, Drug, and Cosmetic Act (FDCA) (the regulatory space actually relevant here), it required at least one *criminal conviction* to bar an individual from future involvement in drug applications. 21 U.S.C. § 335a(a)-(b). The statute sets forth specific crimes of conviction for which debarment is mandatory. *Id.* For others, the statute gives the Department of Health and Human Services discretion to impose debarment, but only if some kind of criminal conviction has occurred.

In cases under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), likewise, this Court has affirmed injunctions

---

[13] Some industries have both self-regulating apparatuses and simultaneously operate under the supervision of a government agency. *See, e.g.*, *Saad v. SEC*, 980 F.3d 103, 109 (D.C. Cir. 2020) (affirming SEC decision to uphold FINRA-imposed lifetime ban on registered broker-dealer). Neither New York State nor the federal government has seen fit to require a professional license for pharmaceutical executives. Education Law Title VIII provides the list of professions requiring professional licenses and provides specific penalties for professional misconduct by members of those professions. N.Y. Educ. L. § 6511. No license is required for general participation in the pharmaceutical industry. *See generally* N.Y. Educ. L. §§ 6520, *et seq.*

barring defendants from particular industries, albeit ones more narrowly

circumscribed, such as solid waste management, *see United States v. Private*

*Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995),

or from certain activities such as "[the] participation in the affairs of any labor

organization," *United States v. Carson*, 52 F.3d 1173, 1185 (2d Cir. 1995). The

RICO statute provides specific authority to courts to issue "appropriate

orders . . . imposing reasonable restrictions on the future activities or investments

of any person, including, but not limited to, *prohibiting any person from engaging*

*in the same type of endeavor as the enterprise engaged in*." 18 U.S.C. § 1964

(emphasis added). In the RICO context, such an injunction must be premised on a

finding of *repeated criminality*. *See id.* § 1961(1), (5).[14]

    Here, the district court imposed an overpowered remedy that the law

normally reserves for far more extreme conduct and after safeguards such as the

---

[14] *See also Carson*, 52 F.3d at 1184 (injunction warranted where defendant "deprive[d] the union's members of $546,000 in wages, . . . had illegally accepted free meals from employers [and] . . . had used his ties to the Genovese Crime Family to maintain a climate of fear in the union and to exploit that fear to maintain control of the union" (internal quotation marks and alteration omitted)); *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 793 F. Supp. 1114, 1121 (E.D.N.Y. 1992) (describing conduct of the enterprise, which was controlled by the Lucchese and Gambino Organized Crime Families of La Cosa Nostra, as including "the use of threats and violence" and "bribery and the corruption of local government officials and employees" (internal quotation marks and alteration omitted)).

41

right to a jury trial have been observed. By comparison, the industry bans that the

FTC cites from consumer deception cases are generally not in the same league.

The FTC has obtained permanent injunctions bans against defendants who

repeatedly deceived consumers, but there the term "industry ban" is often a

misnomer. These orders usually enjoin *conduct*, *i.e.*, sales methods or practices,

like direct marketing or telemarketing. *See FTC v. Digital Altitude, LLC*, No. LA

CV18-00729 (JAK)(MRWx), 2018 WL 4944419, at *5 (C.D. Cal. July 26, 2018)

("Injunctions in FTC enforcement actions also regularly include broad restrictions

on *conduct* similar to those set forth in the proposed judgment." (emphasis added))

(citing cases). The defendants in these cases are not necessarily excluded from an

entire category of goods, much less one as substantial and varied as all

pharmaceuticals.[15]

---

[15] *See, e.g.*, *FTC v. QYK Brands, LLC*, No. SACV20-1431 PSG (KESx), 2022 WL 2784416, at *2 (C.D. Cal. June 21, 2022) (injunction barring defendants from "continuing to advertise or sell 'protective goods and services' intended to prevent, mitigate, or cure COVID–19 or other diseases"); *United States v. Zaken Corp.*, 57 F. Supp. 3d 1233, 1242 (C.D. Cal. 2014) (lifetime ban on marketing work-at-home business opportunities); *FTC v. John Beck Amazing Profits LLC*, 888 F. Supp. 2d 1006, 1010 (C.D. Cal. 2012) (permanent ban on "engaging or participating in the production or dissemination of any infomercial" and telemarketing); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1232 (D. Nev. 2011) (permanent ban on "(1) engaging in negative option marketing, continuity programs, preauthorized electronic fund transfers, or the use of testimonials, and (2) marketing and selling products related to grants, credit, business opportunities, and diet supplements or nutraceuticals"), *vacated in part on other grounds*, 763 F.3d 1094 (9th Cir. 2014).

Any lessons to be drawn from these consumer deception cases, moreover, would be of limited value in the antitrust context. Neither Plaintiffs nor the district court cited a case in which a defendant has been barred from an entire industry based solely on anticompetitive activity. This is hardly surprising because competition and antitrust policy generally do not favor *excluding* participants from the market. *See Mallet & Co.*, 16 F.4th at 390 ("It would take a truly extraordinary showing—one not made here—to justify an order ejecting a competitor from the marketplace altogether.").

The district court stated that industry bans are common under the New York Executive Law and cited one case only as supporting its authority to bar Shkreli from the pharmaceutical industry, *People v. Imported Quality Guard Dogs, Inc.*, 930 N.Y.S.2d 906 (N.Y. App. Div. 2011). But the state court there too enjoined the defendant from specific *conduct*, namely, "selling, breeding, or training dogs, or advertising or soliciting the sale, breeding, or training of dogs." *Id.* at 907. It did not enjoin the defendant from the entire pet industry. Further, the opinion from the Second Department does not disclose whether the defendant in *Imported Quality Guard Dogs* engaged in any anticompetitive behavior; it merely affirms the trial court's finding of a violation of the Executive Law, which broadly proscribes "repeated fraudulent or illegal acts." N.Y. Exec. L. § 63(12). *Imported Quality Guard Dogs* thus does not support the district court's industry ban.

43

**2.      The District Court Failed to Account for Sectors of the Pharmaceutical Industry Not Conceivably Affected by the Alleged Violation Here**

If the Permanent Injunction went beyond the conduct that was the subject of litigation to bar all unlawful activity in the pharmaceutical sector, that would itself be impermissibly overbroad. *See Mickalis Pawn Shop*, 645 F.3d at 143-44 ("An injunction may not enjoin all possible breaches of the law." (internal quotation marks omitted)). But it goes much further. The Injunction is not limited to illegal conduct or even to actions likely to be adjacent to illegal conduct. Nor is it limited to a particular company or product, or even a type of company or type of product where the violations here could reoccur. Rather, the Injunction's particular numbered prohibitions, to say nothing of its preamble, bar Shkreli for life from the entire industry.

The conduct found by the district court could have successfully achieved anticompetitive effects only because of a confluence of factors. The Plaintiffs alleged, and the district court found, that Shkreli engaged in anti-competitive conduct by causing Vyera to enter into exclusive API supply and distribution agreements for Daraprim, thereby stifling the development of generic alternatives, while charging higher prices. By its nature, such a scheme could take advantage of the market only as to a drug that (i) is commercially available, (ii) for which patent protection has expired (or otherwise does not exist), but (iii) somehow enjoys

44

exclusivity in the market, including the absence of generic competitors. Indeed, the district court explicitly found that Shkreli caused Vyera to acquire Daraprim precisely because it had these particular market characteristics. SPA-96 ("He directed his team to identify a small, essential drug out of patent protection and without generic competition that could be priced exorbitantly.").

Plaintiffs presented no evidence, and the district court made no findings, to suggest that these circumstances are found throughout the "pharmaceutical industry." Of course, they are not. The pharmaceutical industry includes entire industry sectors defined by pre-commercial drugs, or drugs with live patents, or post-patent drugs with established competitors.

_Pre-Commercial Drugs – Research & Development_. With no apparent connection to the adjudicated antitrust scheme, the Permanent Injunction explicitly precludes Shkreli from being involved with drugs that are pre-market, including research and development. The district court enjoined him from participating in "the _research_, _Development_, manufacture, [or] _commercialization_ . . . of a Drug Product or API." SPA-166 (emphasis added). The court defined "Pharmaceutical Company" to include any company engaged in the "research, Development, manufacture, [or] commercialization," of such products. SPA-165. And the court defined "Development" as broadly as possible, capturing all "preclinical and clinical research and development activities" related to drugs, drug chemistry, drug

manufacturing, and regulatory submissions. SPA-164. The district court did not purport to explain how antitrust violations involving a drug with market exclusivity decades before Defendants' involvement could only be remedied by banning Shkreli from researching new drugs.

*Patent Protected Drug Businesses*. The district court also did not explain the need to ban Shkreli from working on pharmaceutical products that remain under patent protection. The legal *purpose* of such protection is exclusivity. *See United States v. Line Material Co.*, 333 U.S. 287, 308 (1948) ("[A] valid patent excludes all except its owner from the use of the protected process or product."). Such patent protection is built into the laws and regulations governing the development of generics. Prospective drugmakers generally cannot submit an ANDA for generic drugs that would infringe a valid, unexpired patent. *See* 21 U.S.C. § 355(j)(2)(A)(vii), (viii) (ANDA application for generic drug must address any patent claimed by listed drug, including, among other responses, certify that such patent has expired, is invalid, or will not be infringed by new generic drug). Shkreli's anticompetitive conduct has no apparent relevance in this setting, where a drug's market exclusivity is already protected by law. Particularly, as to listed drugs with years before their patents expire, the district court made no findings to suggest that Shkreli's scheme would or could be repeated.

_OTC, Generic and Post-Patent Drugs_.  The district court also made no findings suggesting a need to preclude Shkreli from working for drug businesses who already have established competitors.  The majority of drugs sold are over-the-counter medications.  _See_ Lori R. Jacobs, _Prescription to Over-the-Counter Drug Reclassification_, Am. Family Physician. 1998;57(9):2209-2214 ("Nonprescription medications now account for about 60 percent of all medications used in the United States and may be used to treat or cure about 400 ailments.").  Even among prescription drugs, 90% of all prescriptions dispensed in the United States are for generics.  U.S. Food & Drug Admin., _Office of Generic Drugs 2021 Annual Report_, _available at_ https://www.fda.gov/drugs/generic-drugs/office-generic-drugs-2021-annual-report.  Shkreli's antitrust violations, as found by the district court, were to prevent the development of competing products.  That scheme does not translate to a market sector where competitors are already established.

As to any of these broad swaths of the industry, the Permanent Injunction is plainly not "narrowly tailored."  The district court made no findings to suggest that it adhered to Rule 65's standards when it banned Shkreli from the entire pharmaceutical industry.  Nor could it have done so: the anticompetitive conduct adjudicated here would be irrelevant, impossible, or nonsensical in much of that industry.

47

**C.** **The "Risk of Recurrence" Cited by the District Court Could Not Justify a Permanent Ban Unrelated to Shkreli's Unlawful Conduct**

The district court justified its industry-wide ban based on findings that have nothing to do with the scope of the injunction. The district court never found, and had no basis to find, that Shkreli was likely to engage in anticompetitive conduct other than the same identical scheme he had repeated in the past.

The relevant question should not have been Shkreli's bare likelihood of recidivism, the focus of the district court's analysis. The district court observed that "[t]he risk of recurrence here is real" as "Shkreli has not expressed remorse or any awareness that his actions violated the law." *Id.* The court concluded "there is a real danger that Shkreli will engage in anticompetitive conduct within the pharmaceutical industry again." SPA-141. The court further found that Shkreli had "demonstrated that he can and will adapt to restrictions," pointing to his use of a cellphone in prison to "control his company." SPA-143.

In defining the injunction's scope, the question instead should have been whether Shkreli had a demonstrated likelihood to hatch varied anticompetitive schemes from any role, and in any sector, he might occupy in the pharmaceutical industry. There was no evidence, nor any findings, of any such likelihood. The evidence of Shkreli's likelihood to "adapt" his conduct (using a phone from prison

to control the company) was in pursuit of the same anticompetitive conduct he had engaged in all along.

To be sure, the district court's findings supported the need for *some* injunctive relief in the first instance. None of these findings, however, suggest the need for a *broader* injunction. Excluding Shkreli from more expansive activities could not make it easier to enforce the injunction. A higher fence is harder to jump; a wider fence is not. The district court did not attempt to limit the injunction to keep Shkreli away from powers and responsibilities that might create an *opportunity* to repeat his conduct.

Instead, Shrkeli is now banned even from activities where his repeated scheme would be impossible or nonsensical. The district court indiscriminately excluded Shkreli from having any role in the industry whatsoever. The definition of "Pharmaceutical Company," for example, is "any Entity engaged in the research, Development, manufacture, commercialization, or marketing of any Drug Product or API" – broad enough to include a generic drug company that develops and manufactures drugs, generally good for competition.

As another example, Paragraph II.C of the Permanent Injunction prohibits Shkreli from "[a]cquiring or owning an Ownership Interest in a Pharmaceutical Company (other than indirectly through a mutual fund [or similar indirect investment vehicle)." SPA-166. The order defines "Ownership Interest" to mean

"any voting *or non-voting* stock, share capital, or equity." SPA-165 (emphasis added). In other words, even if Shkreli invests in a pharmaceutical company, and that company makes no exclusive drugs, and that investment confers on him no influence over corporate matters at the company, Plaintiffs could nevertheless argue he is in violation of the Injunction.[16]

### D. The District Court Erred by Imposing Unjustified Restraints on Expressive Activities

The Permanent Injunction's overbreadth is all the more troubling because of its curtailment of Shkreli's First Amendment rights. The Permanent Injunction explicitly proscribes Shkreli's speech: Paragraph II(D) prohibits Shkreli from making "public statements about a Pharmaceutical Company" when he "intend[s] the statement" to "influence or control the management or business of any Pharmaceutical Company" or when "a reasonable person would conclude that the statement has that effect." SPA-166. In response to Shkreli's objection that this provision burdened his First Amendment rights, the district court stated that Shkreli's antitrust violations had "lost for him the right to speak publicly about the

---

[16] This provision is especially overbroad because it is completely unnecessary: Paragraph II.F bars Shkreli from "[o]btaining, holding, or exercising any voting or other shareholder rights." SPA-166. Thus, the only purpose Paragraph II.C serves that is not co-terminus with II.F is to bar Shkreli from being a purely passive investor in a pharmaceutical company—a result that can hardly be justified by the record here.

pharmaceutical industry when such speech is uttered to influence the management or business of a Pharmaceutical Company."  SPA-159.

Injunctions proscribing speech must "burden no more speech than necessary to serve a significant government interest."  *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994); *accord N.Y. ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 202 (2d Cir. 2001); *United States v. Bell*, 414 F.3d 474, 481 (3d Cir. 2005) (injunctions proscribing speech "must be narrowly drawn to separate protected speech from unprotected speech").  Appellate courts have "an obligation" to examine the record to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression."  *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001).

Moreover, because the Permanent Injunction "*forbid[s]* certain communications . . . issued in advance of the time that such communications are to occur," it constitutes a prior restraint.  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1986)).  "A prior restraint on expression comes with a heavy presumption against its constitutional validity," and "[w]hen a prior restraint takes the form of a court-issued injunction," the risk of impinging on First Amendment rights increases because "[a]n injunction must be obeyed until modified or dissolved, and its

unconstitutionality is no defense to disobedience." *Metro. Opera Ass'n*, 239 F.3d at 176 (internal quotation marks and citations omitted).

In *Metropolitan Opera Association*, the district court issued a preliminary injunction prohibiting the defendant from "threatening or harassing" the plaintiff and "engaging in fraudulent or defamatory representations" regarding the plaintiff. *Id.* at 174. After the defendant distributed leaflets and chanted in close proximity to the plaintiff, the district court held the defendant in civil contempt. *Id.* This Court vacated the injunction, noting that it "present[ed] serious questions under the First Amendment." *Id.* at 175-176. Although the Court ultimately found it unnecessary to determine whether the injunction violated the First Amendment because it was impermissibly vague, the Court was especially troubled that the risk of contempt inherent in the injunction served to "freeze" the defendant's speech— an even greater intrusion on First Amendment rights than mere "chill[ing]." *Id.* at 176 (quoting *Crosby v. Bradstreet Co.*, 312 F.2d 483, 485 (2d Cir. 1963)).

The Permanent Injunction here presents the same problems. It proscribes Shkreli from speaking on any topic that could influence the business of a pharmaceutical company, even if that speech would cause no violation of the antitrust laws. Such "influence" could, as in *Metropolitan Opera Association*, include "legitimate social pressure," *id.*, such as publishing an op-ed about best industry practices or for tweeting disapproval of a distributor's marketing strategy.

52

The decisions cited by the district court to the contrary are inapposite. In *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41 (2d Cir. 1996), this Court affirmed an injunction barring the defendant from communicating with the officers, directors, employees, and agents of the joint venture the defendant had used to effectuate her unlawful conduct. *Id.* at 51-52. The Court reasoned that the provision was narrowly tailored to proscribe only illegal conduct because "any communications" of this nature were "likely to constitute her forbidden involvement or engagement in [the company]'s management or operations." *Id.* at 52. In contrast, the Permanent Injunction here is not limited to preventing Shkreli from entering into exclusive contracts. It proscribes speech not likely to constitute an antitrust violation: as the district court acknowledged, the Permanent Injunction would prohibit Shkreli "from using a blog to discuss the pharmaceutical industry" if written "to influence the management or business or a Pharmaceutical Company." SPA-159.

In *National Society of Professional Engineers v. United States*, 435 U.S. 679 (1978), the Supreme Court affirmed a finding that a professional association had violated the Sherman Act by issuing a canon of ethics prohibiting competitive bidding by its members. *Id.* at 681. Simultaneously, the Court affirmed an injunction prohibiting the association from "adopting any official opinion, policy statement, or guideline stating or implying that competitive bidding is unethical."

*Id.* at 697. There, too, the injunction proscribed only illegal conduct: though the association "apparently fear[ed]" that the injunction would "block legitimate paths of expression on all ethical matters relating to bidding," *id.* at 698, the Supreme Court noted that the terms of the injunction "contain[ed] no such prohibition," *id.* at 698 n.27. Conversely, here the risk to Shkreli of violating the Permanent Injunction by engaging in otherwise legitimate, protected speech is not merely hypothetical: the Permanent Injunction proscribes protected speech on its face. *See* SPA-159. Moreover, the injunction in *National Society of Professional Engineers* was limited to ethical matters related to bidding—speech closely tied to the violation at issue. Here, the Permanent Injunction proscribes speech that is wholly unrelated to pricing, distribution, or other conduct underlying the district court's finding of liability. The Permanent Injunction accordingly burdens Shkreli's First Amendment right to free expression.

## E. The District Court Erred by Imposing an Injunction for Shkreli's Lifetime

The Permanent Injunction's overbroad prohibitions are made even more punitive by its lack of any time limit. Besides Shkreli's purported lack of remorse and ability to continue to perpetuate the specific conduct at issue in the case while he was incarcerated, the district court cited no basis in the record to conclude that the risk for recurrence would continue *indefinitely*. Instead, it stated, "If a court

sitting in equity is powerless to impose a lifetime industry ban to protect the public against a repetition of the conduct proven at this trial, then the public could rightfully ask whether its wellbeing had been adequately weighed." SPA-143. But that statement assumed the conclusion that a lifetime ban was necessary and elided that the Permanent Injunction went far beyond the conduct proven at trial.

While the district court is certainly empowered to impose limitations on activity that are "necessary to prevent [Shkreli] from both reaping and perpetuating the benefits" of that conduct, "the continuing effects" of the conduct here "are certain to recede with time." *ES Dev., Inc.*, 939 F.2d at 558 (vacating injunction without a time limitation as an impermissible "open-ended restriction upon appellants' individual exercise of their constitutionally protected rights of commercial speech").

Even injunctions that simply require obedience to the law are problematic if applied indefinitely, as they allow litigation of a potential violation of the law "to be raised via contempt motion no matter how remote in time or different from the violation proven in [the specific] case." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 844 (7th Cir. 2013). Here, Shkreli is thirty-nine years old. The district court's lifetime ban would thus "deny [Shkreli] the protections of the normal administrative and adjudicative processes" for *decades*, *id.*; indeed, the Permanent Injunction will be enforced a generation from now, potentially by judges who are

55

not yet in law school.  The court's lifetime ban on Shkreli's participation in the pharmaceutical industry is accordingly overbroad.

**F.    The Vagueness of the Injunction's Terms Compounds the Potential Unfairness to Shkreli**

The overbreadth of the Permanent Injunction is compounded by the vagueness of its terms.  Although the Permanent Injunction contains definitions, it lacks definitions for two of its key terms: the "pharmaceutical industry" and "participating."

The Permanent Injunction does not attempt to define the metes and bounds of the "pharmaceutical industry."  As noted, the industry is far broader than could be affected by the misconduct found here.  Shkreli is therefore left to speculate, on penalty of a contempt finding, what activities fall within or outside the pharmaceutical industry.  Indeed, the Permanent Injunction itself suggests there is ambiguity to the term "pharmaceutical industry," as it permits Shkreli to obtain "qualified employment," which the Injunction defines to *include* employment "with a Pharmaceutical Company that is not primarily involved in the research, Development, manufacture, commercialization, or marketing of Drug Products or APIs and whose gross revenues from this activity accounts for less than 10% of the total gross revenues of the Pharmaceutical Company."  SPA-165-66.  Such a

56

company would presumably still be part of the pharmaceutical industry—or at least that point might be debatable, underscoring the lack of clarity in the Injunction.

The Permanent Injunction also does not define was it means to "participat[e]" in the pharmaceutical industry. Shkreli raised, for example, the concern that the Injunction might prohibit him from discussing pharmaceuticals with a friend in the industry. SPA-159. The district court dismissed this objection, pointing to the moderately more specific prohibition on "participating in the formulation, determination, or direction of any business decisions of any Pharmaceutical Company" as resolving the ambiguity of the term "participating" in the preamble. SPA-159. This would suggest that the word "including," as used after the preamble limits the Injunction's prohibitions to those specifically set forth in it (though typically the word "including" connotes merely illustrative examples, rather than a limiting and exhaustive list of the conduct proscribed, *see Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."); *United States v. Huber*, 603 F.2d 387, 394 (2d Cir. 1979) ("[A] list beginning with the word 'includes' . . . is not exhaustive but merely illustrative.")). The district court's statement that the term "participating" was not vague "in context," SPA-158, could be construed as further supporting such a limitation. But the fact that there are two possible interpretations

of the word "including" in the Permanent Injunction underscores its vagueness and the district court's departure from Rule 65(d)'s requirement that the person enjoined be able to determine from the four corners of the injunction what is permitted and what is forbidden.

Moreover, to the extent the Permanent Injunction is limited to its enumerated prohibitions, many of those similarly suffer from vagueness. Paragraph II.A prohibits Shkreli from "[p]articipating in or directing the research, Development, manufacture, commercialization, distribution, marketing, importation, or sale of a Drug Product or API." SPA-166. It is unclear what "participating" means even in this more narrowly defined context. "Participating" in "research" could be broad enough to prohibiting Shkreli from being a subject in a clinical trial. "Participating" in "marketing" could bar Shkreli from working for an advertising company whose clients include pharmaceutical companies. "Participating" in the "sale" of a Drug Product—which is defined to include "any product that is subject to an FDA Authorization, or any product that is regulated through an over-the-counter drug monograph"—could (and if read literally would) prohibit Shkreli from taking a job as a cashier at Walgreens. At a minimum, it is not clear from the four corners of the Injunction whether these activities fall within or outside its prohibitions.

In addition to the First Amendment concerns related to Paragraph II.D, which prohibits Shkreli from "[t]aking any action," including making any public statement, that would "indirectly influence . . . the business" of a pharmaceutical company, the provision is vague. SPA-166. It is unclear what "indirectly influence . . . the business" encompasses. In theory, it could include lobbying for or against any federal or state policy that could affect the bottom line of a pharmaceutical company. In the criminal context, such a vague prohibition might be saved by the inclusion of a scienter requirement. *See, e.g.*, *United States v. Curcio*, 712 F.2d 1532, 1543 (2d Cir. 1983). Here, by contrast, Shkreli may violate this provision if he intends to influence the business of a pharmaceutical company *or* "if a reasonable person would conclude that the statement has that effect." SPA-166. This provision forces Shkreli to guess at what others might construe his comments to mean, even if he has no intent to influence or control a pharmaceutical company.

Certain other provisions exacerbate the vagueness of these provisions. The Permanent Injunction contains a Compliance Reporting Requirement that mandates Shkreli to provide a verified statement to the FTC that he is not and has not violated Paragraphs II.A and II.C of the Injunction. This provision compounds the unfairness of Paragraph II.A's vagueness—if Shkreli incorrectly interprets its limits, he may be held in contempt not only for violating that provision but for

providing a "false" verified statement that he is in compliance. The Permanent Injunction further requires that Shkreli provide the plaintiffs with "Access to Information," including making himself available for an "interview"—with no parameters spelled out as to duration, frequency, or topics to be covered—and to provide access to private books and records "that relate to compliance with this Order." SPA-169. "Such vagueness 'places an unduly harsh burden on" Shkreli "and is not in accord with the mandate of Rule 65 that a preliminary injunction shall be in specific terms.'" *Mallet & Co*, 16 F.4th at 389 (quoting *E.W. Bliss & Co. v. Struthers-Dunn, Inc.*, 408 F.2d 1108, 1114 (8th Cir. 1969)).[17]

## G. The Injunction Should Be Vacated and Modified

Based on the foregoing, this Court should vacate the Permanent Injunction and remand to the district court with instructions to modify it. Modifications should (a) remove the ban on participation in the pharmaceutical industry; (b) limit the Injunction to prohibiting Shkreli from attempting to impair the development of generic alternatives to commercially available non-patented drugs, including by the use of restrictive distribution or supply agreements; (c) impose a temporal limit on

---

[17] The Permanent Injunction's lack of specificity is not cured by its reference to the district court's Opinion and Order of January 14, 2022, and its Opinion and Order of February 4, 2022. *See* Fed. R. Civ. P. 65(d) (requiring that an injunction shall describe in reasonable detail--and *not by referring to the complaint or other document*--the act or acts [sought to be] restrained" (emphasis added)).

the Injunction of five years, provided that Plaintiffs may apply to lengthen the Injunction; (d) not impose any restrictions on Shkreli's purely public expressive activity, except to the extent carried out to violate the other terms of the modified injunction; and (e) not impose any restrictions on Shkreli having an ownership stake or investing in a pharmaceutical company, other than a restriction against employing such ownership, including through voting rights, to violate the other terms of the modified injunction.

## CONCLUSION

For the foregoing reasons, the Court should reverse the order of

disgorgement and vacate the Permanent Injunction with instructions to limit the

Injunction as set forth above.

Dated:  New York, New York
         December 22, 2022

SHER TREMONTE LLP

By:   */s/ Kimo S. Peluso*
        Kimo S. Peluso
        Noam Biale
90 Broad Street, 23rd Floor
New York, NY 11201
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
Email: kpeluso@shertremonte.com

*Attorneys for Defendant-Appellant*
*Martin Shkreli*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Defendant-Appellant Martin Shkreli certifies pursuant to Federal Rule of Appellate Procedure 32(g)(1) that the foregoing brief contains 13,833 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature on Microsoft Word; and that the brief has been prepared in 14-point Times New Roman font.

Dated: New York, New York
            December 22, 2022

_/s/ Kimo S. Peluso_
Kimo S. Peluso
SHER TREMONTE LLP

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Dkt. No. 482 - Opinion and Order Regarding Disgorgement,
dated September 24, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-2

Dkt. No. 865 - Opinion and Order Regarding Judgment,
dated January 14, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SPA-18

Dkt. No. 875 - Opinion and Order Regarding Martin Shkreli's
Objections to Injunction, dated February 4, 2022 . . . . . . . . . . . . . . SPA-153

Dkt No. 876 - Order for Permanent Injunction and Equitable
Monetary Relief, dated February 4, 2022 . . . . . . . . . . . . . . . . . . . . . . SPA-163

Dkt. No. 895 - Memorandum Opinion and Order Regarding
Martin Shkreli's Motion to Stay, dated March 17, 2022 . . . . . . . . . SPA-172

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
FEDERAL TRADE COMMISSION, STATE OF     :
NEW YORK, STATE OF CALIFORNIA, STATE   :
OF OHIO, COMMONWEALTH OF               :        20cv00706 (DLC)
PENNSYLVANIA, STATE OF ILLINOIS,       :
STATE OF NORTH CAROLINA, and           :        OPINION AND ORDER
COMMONWEALTH OF VIRGINIA,              :
                                       :
                        Plaintiffs,    :
                                       :
            -v-                        :
                                       :
VYERA PHARMACEUTICALS, LLC, AND        :
PHOENIXUS AG, MARTIN SHKRELI,          :
individually, as an owner and former   :
director of Phoenixus AG and a former  :
executive of Vyera Pharmaceuticals,    :
LLC, and KEVIN MULLEADY,               :
individually, as an owner and former   :
director of Phoenixus AG and a former  :
executive of Vyera Pharmaceuticals,    :
LLC,                                   :
                                       :
                        Defendants.    :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiff Federal Trade Commission:
James H. Weingarten
Markus H. Meier
Amanda Triplett
Armine Black
Bradley S. Albert
Daniel W. Butrymowicz
J. Maren Schmidt
Lauren Peay
Leah Hubinger
Matthew B. Weprin
Neal J. Perlman
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
```

For plaintiff State of New York:
Amy E. McFarlane
Jeremy R. Kasha
Elinor R. Hoffman
Saami Zain
Office of the New York Attorney General
Antitrust Bureau
28 Liberty Street, 20th Floor
New York, NY 10005

For plaintiff State of California:
Michael D. Battaglia
Office of the Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

For plaintiff State of Ohio:
Beth Ann Finnerty
Elizebeth M. Maag
Office of the Ohio Attorney General
150 E. Gay Street, 26th Floor
Columbus, OH 43215

For plaintiff Commonwealth of Pennsylvania:
Joseph Betsko
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120

For plaintiff State of Illinois:
Richard S. Schultz
Office of the Attorney General of Illinois
100 W. Randolph Street, 11th Floor
Chicago, IL 60601

For plaintiff State of North Carolina:
Jessica V. Sutton
Kip D. Sturgis
North Carolina Dept. of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603

For plaintiff Commonwealth of Virginia:
Sarah Oxenham Allen

Tyler Henry
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219

For defendants Vyera Pharmaceuticals, LLC and Phoenixus AG:
Stacey Anne Mahoney
Sarah E. Hsu Wilbur
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178
(212) 309-6000

Scott A. Stempel
William S. D. Cravens
Melina R. Dimattio
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004

Steven A. Reed
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Noah J. Kaufman
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02210
(617) 341-7700

Michael M. Elliott
Rachel J. Rodriguez
Phillips Nizer LLP
485 Lexington Avenue
New York, NY 10017

Michael L. Weiner
Dechert LLP (NYC)
1095 Avenue of the Americas
New York, NY 10036-6797

For defendant Martin Shkreli:
Christopher H. Casey
Andrew J. Rudowitz

Jeffrey S. Pollack
Sarah O'Laughlin Kulik
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103

For defendant Kevin Mulleady:
Kenneth R. David
Albert Shemtov Mishaan
Nicholas Anthony Rendino
Kasowitz, Benson, Torres LLP (NYC)
1633 Broadway
New York, NY 10019

DENISE COTE, District Judge:

Defendants Vyera Pharmaceuticals, LLC and its parent
company Phoenixus, AG (together, "Vyera"), Martin Shkreli, and
Kevin Mulleady have moved for partial summary judgment on the
scope of the plaintiffs' claim for disgorgement. They contend
that the seven State plaintiffs may only pursue such relief
where the defendants' net profits are tied to sales that have
victimized citizens of their States. The State plaintiffs have
cross-moved for summary judgment and a preclusion order. For
the following reasons, the defendants' motion is denied. The
States' cross-motion is granted.

4

## Background

Seven States[1] claim that the defendants in this antitrust litigation have abused the market for the pharmaceutical Daraprim.  The events underlying this action are described in an Opinion of August 18, 2020, which is incorporated by reference.  See Fed. Trade Comm'n v. Vyera Pharms., LLC, 479 F. Supp. 3d 31 (S.D.N.Y. 2020).

In brief, in August 2015, Vyera acquired the U.S. rights to the branded drug Daraprim, which is used to treat toxoplasmosis, a potentially fatal infection.  The day after acquiring the rights, Vyera raised the price of Daraprim from $17.50 per tablet to $750 per tablet.  The plaintiffs allege that Vyera and the individual defendants designed and implemented a comprehensive scheme to block lower-cost generic drug competition to Daraprim with the purpose of maintaining the drug's inflated price.  The alleged scheme involved Vyera entering into restrictive agreements with distributors and suppliers, as well as actions by Shkreli and Mulleady to originate and further this scheme.

The locus of the defendants' alleged wrongful activity was New York State.  The headquarters of Vyera Pharmaceuticals, LLC

---

[1]  The seven State plaintiffs are the States of New York, California, Ohio, Illinois, and North Carolina, and the Commonwealths of Pennsylvania and Virginia.

were and are located in New York State.  The distribution

agreements at issue were executed on defendants' behalf in New

York, as were the exclusive supply agreements that the

plaintiffs allege were integral to the scheme.

The seven States have sued in their parens patriae

capacity.  Parens patriae means literally "parent of the

country."  Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel.

Barez, 458 U.S. 592, 600 (1982) ("Snapp").  To have parens

patriae standing a State "must assert an injury to what has been

characterized as a quasi-sovereign interest."  Id. at 601.  A

State has a quasi-sovereign interest "in the health and well-

being -- both physical and economic -- of its residents in

general."  Id. at 607.  Parens patriae standing permits "a state

(in its capacity as a sovereign) to bring suit on behalf of its

citizens when it allege[s] injury to a sufficiently substantial

segment of its population, articulate[s] an interest apart from

the interests of particular private parties, and express[es] a

quasi-sovereign interest."  Lacewell v. Off. of Comptroller of

Currency, 999 F.3d 130, 142 n.13 (2d Cir. 2021) (citation

omitted); see also Purdue Pharma L.P. v. Kentucky, 704 F.3d 208,

215 (2d Cir. 2013).  In assessing whether such standing exists,

a relevant question is "whether the injury is one that the

State, if it could, would likely attempt to address through its
sovereign lawmaking powers."  Snapp, 458 U.S. at 607.

In their Amended Complaint of April 14, 2020, all seven
States explain in identical terms that they bring suit in their
quasi-sovereign capacity.  New York proclaims, for example, that
it "brings this action on behalf of the people of the State of
New York to protect the state, its general economy, and its
residents from Defendants' anticompetitive business practices."
New York continues: "The Attorney General has authority under
federal and state law to pursue an injunction and other
equitable relief to prevent and remedy the harms caused by
anticompetitive conduct."  All seven States also pray for "such
equitable relief, including equitable monetary relief, as the
Court finds necessary to redress and prevent recurrence of
Defendants' violations of" federal and state antitrust laws.

In 2020, the seven States joined the Federal Trade
Commission ("FTC") in bringing claims against Vyera and two of
the companies' owners and executives, Shkreli and Mulleady.  The
FTC brought claims under § 5(a) of the FTC Act, 15 U.S.C. §
45(a), seeking a permanent injunction pursuant to § 13(b) of the
same Act, 15 U.S.C. § 53(b), and under §§ 1 and 2 of the Sherman
Act, 15 U.S.C. §§ 1, 2, seeking a permanent injunction pursuant
to § 16 of the Clayton Act, 15 U.S.C. § 26.  The States have

also brought identical claims under the Sherman Act and § 16 of

the Clayton Act as well as pursuant to their own state laws

barring unfair competition and restraint of trade.[2]  For example,

New York has sued under the New York Donnelly Act, N.Y. Gen.

Bus. Law § 340 et seq., and New York Executive Law, N.Y. Exec.

Law § 63(12).[3]

On March 30, 2021, the plaintiffs waived their right to

money damages and therefore their right to a jury trial.  What

remains is their claim for equitable relief, in particular a

claim for injunctive relief and disgorgement.[4]  Disgorgement is

frequently defined as "[r]estitution measured by the defendant's

wrongful gain."  Liu v. SEC, 140 S. Ct. 1936, 1943 (2020)

---

[2] All seven States sue under state antitrust statutes with the
exception of Pennsylvania, which sues under its common law
doctrine against restraints of trade.  On August 18, 2020, this
Court dismissed Pennsylvania's statutory claim under the
Pennsylvania Unfair Trade Practices and Consumer Protection Law,
73 P.S. §§ 201-1 et seq.

[3] The other five States pursuing statutory claims sue under the
California Cartwright Act, Cal. Bus. & Prof. Code § 16700, and
California Unfair Competition Law, Cal. Bus. & Prof. Code §
17200; Illinois Antitrust Act, Ill. Comp. Stat. 10/3(3); North
Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. §
75-1 et seq.; Ohio Valentine Act, Ohio Rev. Code Ann. § 1331;
and Virginia Antitrust Act, Va. Code Ann. § 59.1 et seq.

[4] In the amended complaint, the State plaintiffs pray for
equitable monetary relief generally.  In their brief in
opposition to Vyera's motion, the States argue solely for
nationwide disgorgement.  Accordingly, the Court treats the
States' prayer for equitable monetary relief as a claim for
disgorgement and not any other form of equitable monetary
relief.

("Liu") (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt. a (Am. L. Inst. 2011)).  As the Court observed in Liu, disgorgement is "a remedy tethered to a wrongdoer's net unlawful profits" and "has been a mainstay of equity courts."  Id.

On April 22, 2021, the Supreme Court held that § 13(b) of the FTC Act does not authorize the FTC to seek equitable monetary relief such as disgorgement.  AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n, 141 S. Ct. 1341, 1352 (2021) ("AMG").  Section 13(b) authorizes the FTC to obtain a "permanent injunction" directly in federal court.  Id. at 1346.  The Court in AMG held that this provision does not also authorize the FTC to "obtain court-ordered monetary relief" in equity because the language and structure of the FTC Act restrict the words "permanent injunction" in § 13(b) to "relief that is prospective, not retrospective."  Id. at 1347-48.  It observed as well that an injunction "is not the same as an award of equitable monetary relief."  Id. at 1347.  This Court consequently granted on June 2, 2021, the FTC's motion for leave to withdraw its prayer for equitable monetary relief.[5]

_____

[5] The FTC has indicated that it may seek to reinstate its prayer for equitable monetary relief in the event Congress passes authorizing legislation.

The State plaintiffs apparently seek to maintain their claims for disgorgement under both the federal and state laws at issue here, that is, pursuant to §§ 1 and 2 of the Sherman Act, as authorized by § 16 of the Clayton Act, and pursuant to their respective state laws.[6]  Pursuant to those claims, they seek recovery of Vyera's net profits derived from the entirety of its U.S. Daraprim sales.

A bench trial is scheduled for December 14, 2021.  The pretrial order is due October 20.  The parties' cross-motions testing the geographic limits of the States' claim for disgorgement became fully submitted on September 3.

## Discussion

Vyera argues that the State plaintiffs lack parens patriae standing to obtain equitable monetary relief, including disgorgement, on behalf of those who are not citizens of their States.[7]  The States oppose the motion, cross-move for summary judgment on the same issue, and seek an order precluding Vyera

---

[6] Section 16 of the Clayton Act authorizes any person "to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26. The reasoning in AMG appears to preclude all of the plaintiffs from seeking disgorgement pursuant to § 16.

[7] The defendants also argue that Virginia's state antitrust statute precludes it from seeking disgorgement of profits from Daraprim sales on behalf of even Virginia citizens.  The decision in this Opinion allowing the plaintiff States to obtain nationwide relief makes it unnecessary to reach this issue.

from again contesting the scope of nationwide equitable monetary relief in either pretrial or trial proceedings by declaring that the location of Daraprim purchases is irrelevant to this case and by prohibiting Vyera from introducing evidence with respect to the location of such purchases at trial.  There are no factual disputes material to these cross-motions for summary judgment.

It is unnecessary to decide whether each of the seven States' Attorneys General has authority to seek disgorgement of Vyera's net profits when those profits are not tethered to the purchase of Daraprim or the reimbursement of Daraprim purchased by that State's citizens.  It is clear that the New York Attorney General has such authority.  To the extent the defendants violated either the federal or state statutes at issue here, they did so from decisions made and contracts executed in New York.

The New York Attorney General seeks through this action to enforce the Donnelly Act.  The New York Donnelly Act declares void as against public policy any "contract, agreement, arrangement or combination" creating a "monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, [that] is or may be established or maintained," or which restrains "[c]ompetition or the free

11

exercise of any activity in the conduct of any business, trade or commerce . . . in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 340(1) (McKinney 2012).

New York law permits the Attorney General to bring an action in equity to enforce the Donnelly Act. Section 63(12) of the New York Executive Law generally empowers the New York State Attorney General to enforce violations of "persistent fraud or illegality in the carrying on, conducting or transaction of business," "in the name of the people of the state of New York" by applying

> to the supreme court of the state of New York . . . for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages . . . and the court may award the relief applied for or so much thereof as it may deem proper.

N.Y. Exec. Law § 63(12) (McKinney 2018). It is well established that this grant of power to the Attorney General includes a grant of authority to enforce the Donnelly Act. See, e.g., Am. Dental Co-op., Inc. v. Att'y Gen. of State of N.Y., 514 N.Y.S.2d 228, 232 (1st Dep't 1987).

Among the remedies that the Attorney General may obtain through a § 63(12) proceeding is disgorgement. People ex rel. Schneiderman v. Greenberg, 27 N.Y.3d 490, 497 (2016) (construing the Executive Law in the context of an action for violation of the New York Martin Act, N.Y. Gen. Bus. Law §§ 352, 353). In an

action under the Executive Law, "[d]isgorgement is distinct from
the remedy of restitution because it focuses on the gain to the
wrongdoer as opposed to the loss to the victim." People v.
Ernst & Young, LLP, 980 N.Y.S.2d 456, 456 (1st Dep't 2014).
"Accordingly, the remedy of disgorgement does not require a
showing or allegation of direct losses to consumers or the
public; the source of the ill-gotten gains is immaterial." Id.

When a defendant engages in conduct within the State
prohibited by Executive Law § 63(12), the Attorney General is
authorized to seek relief on behalf of out-of-state residents
injured by the wrongdoing. People ex rel. Cuomo v. H & R Block,
Inc., 870 N.Y.S.2d 315, 316 (1st Dep't 2009). The Attorney
General has such broad authority in recognition of "New York's
vital interest in securing an honest marketplace," which is
threatened when a defendant uses "a New York business" to engage
in its scheme. Id.; see also New York v. Feldman, 210 F. Supp.
2d 294, 303 (S.D.N.Y. 2002) (enforcing the Donnelly Act and the
New York Deceptive Practices Act, N.Y. Gen. Bus. Law § 349); In
re DeFelice, 77 B.R. 376, 380 (Bankr. D. Conn. 1987) (enforcing
New York consumer fraud laws in a challenge to the
dischargeability of New York's restitution claim); Spitzer v.
Coventry First LLC, No. 0404620/2006, 2007 WL 2905486 (N.Y. Sup.
Ct. Sep. 25, 2007), aff'd, 861 N.Y.S.2d 9, 10 (1st Dep't 2008)

(enforcing the Donnelly Act and the Martin Act); People ex rel.
Spitzer v. Telehublink Corp., 756 N.Y.S.2d 285, 285 (3d Dep't
2003) (enforcing the federal Telemarketing Act, 15 U.S.C. §
6103(a), and the New York Deceptive Practices Act); State by
Abrams v. Camera Warehouse, Inc., 496 N.Y.S.2d 659, 660 (N.Y.
Sup. Ct. 1985) (enforcing N.Y. Gen. Bus. Law § 518); People by
Vacco v. Lipsitz, 663 N.Y.S.2d 468, 474 (N.Y. Sup. Ct. 1997)
(enforcing the New York Deceptive Practices and False
Advertising Acts, N.Y. Gen. Bus. Law §§ 349, 350).

Accordingly, the New York Attorney General, should it
succeed to proving a violation of the Donnelly Act and Executive
Law stemming from Vyera's New York-based operations, may obtain
disgorgement of Vyera's net profits attributable to the entirety
of its U.S. sales.  As indicated above, a State's quasi-
sovereign interest includes the control of economic activity
within the State and the power to seek redress for illegality
occurring within its borders.  See Snapp, 458 U.S. at 607.

Vyera makes several arguments in support of its motion.
None of them calls into question the analysis set forth above.

Vyera relies on Goshen v. Mut. Life Ins. Co. of New York,
98 N.Y.2d 314, 324-25 (2002), for the proposition that the New
York Consumer Protection Act, N.Y. Gen. Bus. Law § 349(a), and
by analogy the Donnelly Act, cannot be enforced

extraterritorially.  Goshen is inapposite.  The claims in Goshen
were brought not by the New York Attorney General acting
pursuant to the Executive Law, but by consumers pursuant to §
349.  Id. at 321-22.

Vyera also contends that the disgorgement of its net
profits when untethered to the victims within the seven States
would constitute a penalty and violate the principle that
equitable monetary relief must be connected to the harm
experienced by victims.  See Liu, 140 S. Ct. at 1942.  This
objection is easily addressed.  The States represent that,
should they prevail, they will undertake to distribute the
disgorged net profits to all victims wherever they reside.

Vyera next contends that nationwide disgorgement will
expose the defendants to the "possibility of overlapping
awards."  Any disgorgement ordered here or elsewhere would be
awarded by a court sitting in equity.  The defendants would have
an opportunity to be heard and to alert a court to the problem
of duplicative recoveries.  Therefore, Vyera's concern is not an
impediment to the plaintiff States pursuing through the December
trial their request for nationwide relief.

Finally, Vyera points to the statement in New York v.
Facebook, Inc., No. CV 20-3589 (JEB), 2021 WL 2643724 (D.D.C.
June 28, 2021), that parens patriae standing reflects a state's

15

interest "in the well-being of its own populace." Id. at *8.
In Facebook, the court inter alia granted the defendant's motion
to dismiss an antitrust action brought by several States,
including New York, on the ground of laches. Id. at *1. The
court's unremarkable statement of the doctrine of parens
patriae, on which Vyera relies, was not applied to limit the
scope of relief sought by the plaintiffs but to find, over
Facebook's objection, that the plaintiff States had standing.
Id. at *9. Therefore, Facebook provides no basis for limiting
the scope of the disgorgement remedy sought by the plaintiff
States in this action.

## Conclusion

The defendants' motion for partial summary judgment on the
issue of the States' authority to seek nationwide equitable
monetary relief is denied. The State plaintiffs' cross-motion
for partial summary judgment is granted. A separate Order
grants the States' request regarding pretrial and trial
proceedings.

Dated:   New York, New York
         September 24, 2021

                                    _____
                                    DENISE COTE
                                    United States District Judge

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
                                       :
FEDERAL TRADE COMMISSION, STATE OF NEW :    20cv00706 (DLC)
YORK, STATE OF CALIFORNIA, STATE OF    :
OHIO, COMMONWEALTH OF PENNSYLVANIA,    :    OPINION AND ORDER
STATE OF ILLINOIS, STATE OF NORTH      :
CAROLINA, and COMMONWEALTH OF          :
VIRGINIA,                              :
                                       :
                  Plaintiffs,          :
         -v-                           :
                                       :
MARTIN SHKRELI,                        :
                                       :
                  Defendant.           :
                                       :
-------------------------------------- X
```

<u>APPEARANCES:</u>

For plaintiff Federal Trade Commission:
Markus H. Meier
Bradley S. Albert
Armine Black
Daniel W. Butrymowicz
J. Maren Haneberg
Leah Hubinger
Lauren Peay
Neal J. Perlman
James H. Weingarten
Amanda Triplett
Matthew B. Weprin
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

For plaintiff State of New York:
Elinor R. Hoffmann
Bryan Bloom
Jeremy R. Kasha
Amy E. McFarlane
Saami Zain
Office of the New York Attorney General
Antitrust Bureau
28 Liberty Street, 20th Floor

New York, NY 10005

For plaintiff State of California:
Michael D. Battaglia
Office of the Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

For plaintiff State of Illinois:
Richard S. Schultz
Office of the Attorney General of Illinois
100 W. Randolph Street, 11th Floor
Chicago, IL 60601

For plaintiff State of North Carolina:
Jessica V. Sutton
North Carolina Dept. of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603

For plaintiff State of Ohio:
Beth A. Finnerty
Office of the Ohio Attorney General
150 E. Gay Street, 22nd Floor
Columbus, OH 43215

For plaintiff Commonwealth of Pennsylvania:
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120

For plaintiff Commonwealth of Virginia:
Tyler T. Henry
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219

For defendant Martin Shkreli:
Christopher H. Casey
Jeffrey S. Pollack
Andrew J. Rudowitz
Sarah Fehm Stewart
Sean P. McConnell
J. Manly Parks
Duane Morris LLP

```
30 South 17th Street
Philadelphia, PA 19103
```

Procedural History.................................................7

Background......................................................16

I.    FDA Drug Approval Process for Generic Drugs ............ 16

II.   Retrophin ............................................. 24

III.  Vyera is Founded....................................... 26

      A.   Vyera Acquires Daraprim............................ 28

      B.   Daraprim's 2015 Price Hike and Vyera's Revenues ....... 32

IV.   Vyera's Implementation of a Closed Distribution System
      for Daraprim .......................................... 34

      A.   Class of Trade Restrictions ........................... 36

      B.   Bottle Limits ...................................... 39

      C.   Surveillance ...................................... 41

      D.   Benefits to Distributors ............................. 43

V.    Vyera's Restriction of Access to the API Pyrimethamine . 43

      A.   Fukuzyu .......................................... 44

      B.   RL Fine .......................................... 48

VI.   Delay of Generic Entry ................................ 53

      A.   Barriers to Entry ................................... 54

      B.   Cerovene and Dr. Reddy's Laboratories ................. 56

      C.   Fera ............................................. 66

      D.   InvaTech ......................................... 74

      E.   Mylan ........................................... 76

VII.  Impact of Competition on Prices of Daraprim........... 77

VIII.   The Role of Martin Shkreli at Vyera ................. 80

Discussion......................................................86

I.    Legal Standard ....................................... 87

      A.   Section 5 of the FTC Act ........................... 87

      B.   Section 1 of the Sherman Act ........................ 87

      C.   Section 2 of the Sherman Act ........................ 90

           a.   Monopoly Power ................................ 90

           b.   Anticompetitive Conduct ........................ 93

II.   Plaintiff States' Laws ............................... 94

      A.   New York ......................................... 94

      B.   California ........................................ 96

      C.   Illinois ......................................... 96

D.   North Carolina ........................................ 97
E.   Ohio .................................................. 97
F.   Pennsylvania .......................................... 98
G.   Virginia .............................................. 98
III.   Liability ........................................... 99
B.   The Relevant Market ................................. 100
C.   Monopoly Power ...................................... 108
D.   Anticompetitive Conduct ............................. 109
a.   Distribution Contracts ............................ 109
b.   Exclusive Supply Agreements ....................... 111
c.   Degree of Burden on Generic Competitors ........... 117
E.   Shkreli is Individually Liable ...................... 120
IV.   Remedies ............................................ 121
A.   Injunctive Relief ................................... 122
B.   Disgorgement ........................................ 128
a.   Cerovene and Dr. Reddy's Hypothetical Entry Date ... 130
b.   Fera's Hypothetical Entry Date .................... 130
c.   Vyera's Excess Profits ............................ 131
C.   Shkreli's Liability for Vyera's Excess Profits ....... 132
Conclusion...............................................134

DENISE COTE, District Judge:

In 2015, Martin Shkreli raised the price of the life-saving pharmaceutical Daraprim by 4,000% and initiated a scheme to block the entry of generic drug competition so that he could reap the profits from Daraprim sales for as long as possible. Through his tight control of the distribution of Daraprim, Shkreli prevented generic drug companies from getting access to the quantity of Daraprim they needed to conduct testing demanded by the Food and Drug Administration ("FDA").  Through exclusive supply agreements, Shkreli also blocked off access to the two most important manufacturers of the active pharmaceutical ingredient ("API") for Daraprim.  Through these strategies, Shkreli delayed the entry of generic competition for at least eighteen months.  Shkreli and his companies profited over $64 million from this scheme.

The Federal Trade Commission ("FTC") and seven States[1] (the "States"; collectively, "Plaintiffs") filed this action in 2020. At a bench trial held over seven days between December 14 and 22, 2021, the Plaintiffs carried their burden to establish that Shkreli violated federal and state laws that ban anticompetitive conduct.  Based on the trial evidence, Shkreli will be barred

---

[1] The seven state plaintiffs are the States of New York, California, Ohio, Illinois, and North Carolina, and the Commonwealths of Pennsylvania and Virginia.

for life from participating in the pharmaceutical industry and is ordered to disgorge $64.6 million in net profits from his wrongdoing.  This Opinion contains the Findings of Fact and Conclusions of Law from the trial.

## Procedural History

The Plaintiffs filed this action on January 27, 2020 and brought claims for violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, § 5(a) of the FTC Act, 15 U.S.C. § 45(a), and various state statutes.[2]  They brought these claims against Shkreli, Vyera Pharmaceuticals, LLC and its parent company Phoenixus AG ("Phoenixus"; together, "Vyera"), and Kevin Mulleady ("Mulleady"), former Vyera CEO and member of the Phoenixus Board of Directors (collectively, "Defendants").  The Defendants' motion to dismiss was largely denied through an

---

[2] The States pursuing statutory claims sue under the Sherman Act and under the California Cartwright Act, Cal. Bus. & Prof. Code § 16700, and California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; Illinois Antitrust Act, Ill. Comp. Stat. 10/3(3); the New York Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq., and New York Executive Law, N.Y. Exec. Law § 63(12); North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. § 75-1 et seq.; Ohio Valentine Act, Ohio Rev. Code Ann. § 1331; and Virginia Antitrust Act, Va. Code Ann. § 59.1 et seq. Pennsylvania sues under the Sherman Act and its common law doctrine against restraint of trade.

Opinion of August 18, 2020.[3]  See Fed. Trade Comm'n v. Vyera

Pharms., LLC, 479 F. Supp. 3d 31 (S.D.N.Y. 2020).

Two decisions in 2021 addressed the Plaintiffs' requests

for equitable monetary relief.[4]  A June 2, 2021 Order granted the

FTC's motion for leave to withdraw its prayer for equitable

monetary relief pursuant to the Supreme Court's decision in AMG

Cap. Mgmt., LLC v. Fed. Trade Comm'n, 141 S. Ct. 1341, 1352

(2021).  An Opinion of September 24 denied the Defendants'

motion for partial summary judgment on the nationwide scope of

the States' prayer for equitable monetary relief, and granted

the Plaintiffs' cross-motion for summary judgment on the same

issue.  See Fed. Trade Comm'n v. Vyera Pharms., LLC, No.

20CV00706 (DLC), 2021 WL 4392481, at *5 (S.D.N.Y. Sept. 24,

2021).

Only Shkreli proceeded to trial; on the eve of trial Vyera

and Mulleady settled with both the FTC and the States.  Before

those settlements were reached, the parties' submitted their

Joint Pretrial Order, proposed findings of fact and conclusions

of law, motions in limine, and pretrial memoranda on October 20.

_____

[3] Pennsylvania's statutory claim under the Pennsylvania Unfair
Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 et
seq., was dismissed.

[4] On March 30, 2021, the Plaintiffs waived their right to money
damages and therefore their right to a jury trial.

Following rulings on redactions, these submissions were filed on November 29.

As is customary for this Court's non-jury proceedings, and with consent of the parties, the direct testimony of those witnesses under a party's control were submitted with the Joint Pretrial Order.[5]  The parties also served copies of all exhibits and deposition testimony that they intended to offer as evidence in chief at trial.[6]

Prior to trial, the motions in limine were decided.  On November 5, Shkreli's motion in limine to preclude evidence relating to Retrophin, Inc. ("Retrophin"), a pharmaceutical company that Shkreli and Mulleady founded in 2011, was denied. Id., 2021 WL 5154119 (S.D.N.Y. Nov. 5, 2021).  On November 10, motions by Shkreli and Mulleady to exclude the testimony of current and former employees of Vyera were addressed in an Opinion that set forth the standards that would govern the

---

[5] These affidavits were ordered to be filed on the day on which the witness testified or was deemed to have testified at trial.

[6] The Court's procedures for non-jury trials were discussed in detail at a conference of December 10, 2021.  As the parties were informed, the Court prepared a draft opinion in advance of the bench trial based on the witness affidavits and other documents submitted with the Pretrial Order and the arguments of counsel in their trial memoranda.  At trial, the affiants swore to the truth of the contents of their affidavits and were tendered for cross and redirect examination, and the other trial evidence was formally received.

admissibility of such testimony.  Id., 2021 WL 5236333 (S.D.N.Y.

Nov. 10, 2021).  An Opinion of November 12 denied the

Defendants' motion to exclude certain testimony of Plaintiffs'

expert Professor C. Scott Hemphill ("Hemphill"), an economist

and Professor of Law at New York University, and granted the

Plaintiffs' motion to exclude certain opinions offered by Dr.

Anupam B. Jena ("Dr. Jena"), a physician, economist, Professor

of Health Care Policy and Medicine at Harvard Medical School,

and Internal Medicine Specialist in the Department of Medicine

at Massachusetts General Hospital.  Id., 2021 WL 5279465

(S.D.N.Y. Nov. 12, 2021).  Opinions of November 15 granted the

Plaintiffs' motion to exclude designated deposition testimony of

Rule 30(b)(6), Fed. R. Civ. P., deponents that were not based on

personal knowledge, id., 2021 WL 5300019 (S.D.N.Y. Nov. 15,

2021), and excluded testimony from Defendants' expert Justin

McLean, id., 2021 WL 5300031 (S.D.N.Y. Nov. 15, 2021).  An

Opinion of November 16 struck most of the testimony offered by

Defendants' expert Sheldon Bradshaw.  Id., 2021 WL 5336949

(S.D.N.Y. Nov. 16, 2021).[7]  On November 18, the Plaintiffs'

motion to exclude portions of testimony by Defendants' expert

John S. Russell ("Russell"), Managing Partner for ASDO

---

[7] Thereafter, Shkreli withdrew the testimony of Bradshaw and the
Plaintiffs withdrew the testimony of their rebuttal expert,
Mansoor A. Khan.

Consulting Group, a pharmaceutical consulting company, was largely granted.  Id., 2021 WL 5403749 (S.D.N.Y. Nov. 18, 2021).

At trial, eleven fact witnesses and four expert witnesses called by the Plaintiffs testified.  The Plaintiffs' fact witnesses included one current Vyera executive -- Nicholas Pelliccione ("Pelliccione"), Vyera's Senior Vice President of Research and Development ("R&D") -- and four former executives and employees:  Howard Dorfman, Vyera's General Counsel between December 2014 and August 2015; Christina Ghorban, Vyera's Head of Marketing and Business Analytics between April 2015 and October 2016; Dr. Eliseo Salinas ("Dr. Salinas"), Vyera's President of R&D between June 2015 and April 2017 and interim CEO between April and July 2017; and Mulleady, who worked at Vyera from October 2014 to June 2016, was appointed to Vyera's Board in June 2017, served as Executive Director and then CEO between October 2017 and February 2019, and was chairman of the Phoenixus Board of Directors until December 2020.  The Plaintiffs called six additional fact witnesses:  Frank DellaFera ("DellaFera"), CEO and founder of Fera Pharmaceuticals, Inc. ("Fera"); Susan McDougal ("McDougal"), Fera's Vice President; Abhishek Mukhopadhyay ("Mukhopadhyay"), Head of Business Development at Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Nilesh Patel ("Patel"), co-founder and Compliance and Regulatory Officer of InvaTech Pharmaceuticals

LLC ("InvaTech"); Manish Shah ("Shah"), co-founder and President
of Cerovene Health, Inc. ("Cerovene"); and Satya Valiveti
("Valiveti"), co-founder and co-owner of Reliant Specialty LLC
("Reliant").

The Plaintiffs' expert witnesses were James R. Bruno,
managing director of Chemical and Pharmaceuticals Solutions,
Inc., a pharmaceutical consulting company; Edward V. Conroy,
President and Chief Operating Officer of Ed Conroy & Associates,
a pharmaceutical consulting firm; Dr. W. David Hardy, a
physician and Adjunct Clinical Professor of Medicine in the
Division of Infectious Diseases at the Keck School of Medicine
at the University of Southern California and former Chair of the
Board of Directors of the HIV Medicine Association ("HIVMA") of
the Infectious Diseases Society of America ("IDSA"); and
Hemphill.[8]

The Plaintiffs also intended to call at trial three
additional fact witnesses to testify:  Shkreli; Eve Costopoulos
("Costopoulos"), Vyera's former General Counsel from November
2015 to July 2017; and Anne Kirby ("Kirby"), a member of Vyera's
sales team from June 2015 to late 2018, CEO from late 2018 to

---

[8] The Plaintiffs filed affidavits constituting the direct
testimony of five of their fact witnesses and all of their
experts.  The five fact witnesses were DellaFera, McDougal,
Mukhopadhyay, Patel, and Shah.

early 2019, and current Executive Vice President of Commercial
and Operations.  Shkreli is incarcerated in federal prison,
serving a sentence on an unrelated federal conviction.[9]  He opted
not to attend the trial.  The parties agreed that the affidavit
that he had prepared to present as his direct testimony would be
received at the trial and that his cross-examination and
redirect examination would be conducted through the designation
of his pretrial deposition testimony.

Neither Kirby nor Costopoulos appeared at trial.  The
parties agreed that Kirby's affidavit would be received as her
direct testimony and that cross-examination and redirect would
be conducted by deposition designation.  The parties also agreed
to designate portions of Costopoulos' deposition to serve as her
trial testimony.

At the time the Pretrial Order was submitted, Shkreli
intended to call eleven of the Plaintiffs' witnesses in his own
case in addition to testifying on his own behalf:  Mulleady,
Pelliccione, Kirby, Costopoulos, Dr. Salinas, DellaFera,

---

[9] Shkreli was arrested in December 17, 2015 on federal criminal
charges.  A jury convicted him on August 4, 2017.  He was
sentenced on March 8, 2018, principally to a term of
imprisonment of eighty-four months (seven years).  Shkreli was
remanded to federal custody on September 13, 2017.  He is
currently scheduled to be released on October 11, 2023, or one
year earlier pending successful completion of an early release
program.

McDougal, Mukhopadhyay, Patel, Shah, and Valiveti.[10]  Affidavits constituting the direct testimony of defense witnesses Shkreli, Mulleady, Pelliccione, and Kirby were received into evidence. Shkreli also called two expert witnesses:  Russell and Dr. Jena.

The parties offered excerpts from the depositions of the following additional witnesses associated with Vyera: Jonathan Haas, Vyera's Former Director of Patient Access; Christopher Lau ("Lau"), Vyera's Director of Analytics and Business Intelligence; Akeel Mithani ("Mithani"), Senior Vice President of Business Development of Vyera and former member of the Phoenixus Board of Directors; Averill Powers, CEO and former Chairman of the Phoenixus Board, and Vyera's General Counsel; Marco Polizzi, CEO of Vyera subsidiary Oakrum Pharma, LLC; Nancy Retzlaff ("Retzlaff"), Vyera's former Chief Commercial Officer; Michael Smith ("Smith"), co-founder of Vyera and former member of the Business Development team; and Ron Tilles ("Tilles"), Vyera's former CEO and Chairman of the Phoenixus Board.  They also offered excerpts from the depositions of seventeen additional fact witnesses: Nilaben Desai, former manager at ASD Healthcare ("ASD"); Michael Hatch, Head of Global Project

---

[10] The parties had agreed that each witness would take the stand a single time at trial.  To the extent Shkreli had also intended to call the witness on his own case, his "cross-examination" of the witness was not restricted by the scope of the direct testimony.

Management for R&D for Mylan N.V. ("Mylan") affiliate Viatris
Inc.; Courtney Johnson, former Director of Global Sourcing &
Business Development for Cardinal Specialty ("Cardinal");
Hamilton Lenox, Senior Vice President of Business Development at
LGM Pharma; Amanda Lopez, Clinical Trial Supervisor for Durbin
USA; Jacob Mathew, Chairman of RL Fine Chem. Pvt. Ltd. ("RL
Fine"); Ravi Patel, part-owner of Espee Biopharma & Fine Chem;
Donovan Quill, founder and CEO of Optime Care, Inc. ("Optime");
Paula Raese, Senior Director of API Sourcing for Mylan; A.R.
Ramachandra, General Manager of Marketing and Sales at RL Fine;
Dennis Saadeh, Chief of Formulation Strategy for Harrow Health,
parent company of Imprimis; Dr. Lucas Schulz, Clinical
Coordinator for Infectious Diseases in the Department of
Pharmacy at the University of Wisconsin Health; Devang Shah,
Director of Aadivignesh Chem.; Dr. Eric Sredzinski, formerly the
head of clinical affairs and quality assurance for Avella; Dr.
John Vande Waa, Division Director of the Division of Infectious
Diseases for the University of South Alabama Health; and Kevin
Wessels, Senior Director of Trade Relations at Zinc Health
Services, a subsidiary of CVS Health ("CVS").[11]

---

[11] Excerpts of the deposition of a witness from an API
manufacturer, the name of which has been sealed, were also
received into evidence.

As noted, the bench trial was held from December 14 to December 22, 2021, and this Opinion presents the Court's findings of fact and conclusions of law.  The findings of fact appear principally in the Background section, but also appear in the remaining sections of the Opinion.

## Background

I.   FDA Drug Approval Process for Generic Drugs

Shkreli's scheme unfolded against the backdrop of the U.S. regulatory process for the approval and sale of pharmaceutical drugs.  The FDA is the federal agency that approves the sale of branded and generic drugs in the United States.  The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585, commonly known as the Hatch-Waxman Act, allows a generic manufacturer of an already approved brand-name drug to obtain expedited approval from the FDA to market the generic equivalent by filing an Abbreviated New Drug Application, or ANDA.  See FTC v. Actavis, Inc., 570 U.S. 136, 142 (2013) ("Actavis").  The ANDA process is designed to help expedite market introduction of low-cost generic drugs in order to further competition.  Id.

Any pharmaceutical company applying for FDA approval of a generic competitor to a branded drug must obtain the API used in the branded drug -- that is, the drug's critical ingredient that provides its therapeutic effect -- from an approved supplier.

16

The API to be used in the generic drug is evaluated for
impurities and stability.  21 C.F.R. §§ 211.165, 211.170.

An API supplier's manufacturing process must also comply
with FDA standards known as current Good Manufacturing Practices
("cGMPs").  FDA regulations set minimum standards for the
methods, facilities, controls, and documentation for
manufacturing, processing, and packing of the pharmaceutical,
including its API.

A pharmaceutical company may demonstrate that the
manufacturing process of the API used in its drug product
complies with cGMPs either by supplying that information to the
FDA in the ANDA itself or, more commonly, by referencing
information filed by an API supplier with the FDA in a
standalone drug master file ("DMF").  The FDA categorizes DMFs
for APIs as Type II DMFs.  To file a Type II DMF, an API
supplier must pay a fee and submit enough materials, including
confidential documents about the manufacturer's facilities,
processing, packaging, and storing of human drug products, to
permit the FDA to conduct a full scientific review for any ANDAs
that reference the DMF.  The FDA conducts a completeness
assessment of an API supplier's newly-filed DMF at the time it
is submitted, but does not fully review a DMF's documented
manufacturing process for cGMPs compliance until the DMF is

referenced in a new drug application ("NDA") or ANDA.  21 CFR §
314.420(a).

In order to obtain the API for a particular drug product a
pharmaceutical company may invest in developing an API
supplier's manufacturing processes, or it may shorten the
process significantly by partnering with an API supplier that
has already filed a DMF for the API.  Because developing and
documenting a cGMPs-compliant API manufacturing process from
scratch is time-consuming and expensive -- it can take twelve to
eighteen months or more and may cost over $1 million -- generic
pharmaceutical companies prefer to use a supplier that already
has an FDA-approved DMF for the API.

Therefore, any generic company that seeks to launch a
product as fast as possible generally attempts to partner with a
DMF-holding supplier whose API is already in use in another FDA-
approved product.  A less desirable option is partnering with an
API manufacturer that currently produces the API but does not
have a DMF filed in the U.S.  The least attractive option is to
develop a cGMPs-compliant manufacturing process from scratch,
which is costly and can take years.

Proof of therapeutic equivalency is also central to the
ANDA process.  A generic manufacturer applying for approval of
its drug must demonstrate that the generic drug "has the same
active ingredients as, and is biologically equivalent to, the

already-approved brand-name drug." <u>Actavis</u>, 570 U.S. at 142

(citation omitted); see also 21 C.F.R. §§ 314.92(a)(1),

314.3(b).

Bioequivalence ("BE") testing compares the generic product

to samples of the branded drug, commonly referred to as the

reference listed drug ("RLD").  BE studies are used to evaluate

whether there is any significant difference in the rate and

extent to which the product's active ingredient becomes

available in the body.[12]  21 C.F.R. § 320.33.  BE testing

demonstrates to the FDA that the proposed generic drug product

is safe, effective, and comparable to the RLD.

In a BE study, human subjects are given dosages of the

generic drug and the RLD.  These studies, which take two to six

weeks to complete, are typically run by a third-party clinical

organization concurrently with the FDA-required shelf stability

testing for the first batch of the finished generic product.

The stability testing can take three to six months.

In order to conduct BE testing, a generic drug applicant

must procure sufficient quantities of the brand-name drug or RLD

---

[12] FDA regulations define bioequivalence as "the absence of a
significant difference in the rate and extent to which the
active ingredient or active moiety in pharmaceutical equivalents
or pharmaceutical alternatives becomes available at the site of
drug action when administered at the same molar dose under
similar conditions in an appropriately designed study."  21 CFR
§§ 320.1, 314.3(b).

and retain those quantities before and after approval of an
ANDA.  FDA regulations require applicants to retain at least
five times the amount of the RLD needed to perform BE testing.
21 C.F.R. § 320.38(c).

The RLD used in the testing must come from the same
manufacturing lot and be unexpired.  Obtaining sufficient
quantities of RLD usually takes only a few days or, at most, a
month.

Consistent with its policy of encouraging price competition
for prescription pharmaceuticals, the FDA expresses the view
that "a path to securing samples of brand drugs for the purpose
of generic drug development should always be available."[13]  By
utilizing an RLD license permitting them to buy prescription
drugs without a prescription, pharmaceutical companies often
procure the RLD samples needed to develop generic drug products
through drug wholesalers or specialty pharmacies.

If the FDA determines that a proposed generic drug is
therapeutically equivalent to the brand-name drug listed in the

---

[13] Statement from FDA Commissioner Scott Gottlieb, M.D., on New
Agency Efforts to Shine Light on Situations Where Drug Makers
May Be Pursuing Gaming Tactics to Delay Generic Competition, FDA
(May 17, 2018), https://www.fda.gov/news-events/press-
announcements/statement-fda-commissioner-scott-gottlieb-md-new-
agencyefforts-shine-light-situations-where-drug.

FDA's "Orange Book,"[14] the agency assigns an "AB" rating to that drug. But if the FDA finds major deficiencies in an ANDA and the applicant does not address its inquiries during the review period, the FDA sends the applicant a complete response letter detailing the identified deficiencies.

To foster price competition among pharmaceuticals, the law provides various incentives to pharmaceutical companies. See Generic Drug User Fee Act, 21 U.S.C. § 356h. These include the FDA's prioritization of its review of the first generic entrant to file an ANDA. The first generic drug product to enter a market in competition against the brand name drug is known in the pharmaceutical industry as the "first-to-market" generic.

As generic drugs typically enter a market at a discount, the entry of the first generic competitor generally results in price erosion of approximately 30% to 40% from the prevailing price of the brand-name drug. The brand name drug's sales volume also experiences a significant decline of approximately 60% to 70% when the first generic enters the market. Six months after generic entry, the brand name drug's sales will typically

---

[14] The FDA publication Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the Orange Book, "identifies drug products approved on the basis of safety and effectiveness by the [FDA] under the Federal Food, Drug, and Cosmetic Act." Orange Book Preface, FDA (January 21, 2021), https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface.

have fallen by 80%.  The branded drug's sales volume and price
usually continue to decline as additional generic products enter
the market.  The full decline in the price of the drug usually
occurs after three or four generic drugs have entered the
market.

II.  Distribution of Prescription Drugs in the U.S.

When introducing a branded drug or its generic equivalent
into the U.S. market, the manufacturer can choose to distribute
it with fewer or more restrictions.  The poles of this spectrum
are referred to in the pharmaceutical industry as open
distribution, representing the least restrictive means, and
specialty distribution, which can range from minor limitations
to severe restrictions on how freely a drug is sold.
Restrictions are set by the manufacturer in agreements with its
distribution partners.

Seventy percent of prescription drugs sold in the U.S. is
in open distribution.  In an open system, the manufacturer
typically partners with a major distributor to deliver the
product to licensed dispensaries such as retail pharmacies,
hospitals, clinics, and nursing homes.  Open distribution
maximizes patient access to a given drug and is generally
appropriate for pharmaceutical products that do not require
special handling, do not present safety concerns, and are self-

administered by the patient or are clinically simple to administer.

By contrast, approximately 30% of the volume of U.S. prescription drugs is sold through some degree of specialty distribution.  Also known as closed distribution, a drug that is circulated in a specialty distribution system is referred to in the pharmaceutical industry as being "in specialty" or as having a "class of trade" restriction.  Drugs in specialty distribution tend to be novel drugs, have special shipping, handling, and storage requirements (such as cold-chain storage), or require ongoing clinical monitoring or skilled patient administration (such as injections).  Highly closed distribution systems usually lower patient access and reduce sales.

Safety concerns may also mark a particular drug as a prime candidate for specialty distribution.  Specialty distribution is more frequent, for instance, when the FDA requires a "black box" warning on the label of drugs that present safety risks or when it has put the drug in a Risk Evaluation and Mitigation Strategies ("REMS") program.  REMS is a drug safety program that the FDA may require for certain medications that present serious safety risks.

The percentage of prescription drugs on the U.S. market that are sold in specialty distribution has risen in recent years.  This trend, however, is largely driven by the advent of

new, complex therapies for illnesses such as cystic fibrosis and
cancer.  Drug manufacturers do not commonly put oral tablets
that do not require complex patient administration in specialty
distribution, as closed distribution reduces sales.

II.  Retrophin

Shkreli road-tested the scheme at issue here at another
company that he founded, Retrophin.  Shkreli is thirty-eight
years old.  He graduated from Baruch College in 2004 with a
degree in Business Administration.  After graduation, he worked
as a healthcare and technology analyst for a hedge fund until he
left in 2006 to found his own investment firm.  In 2009, Shkreli
founded the hedge fund MSMB Capital Management ("MSMB").

While still working at MSMB, in 2011 Shkreli co-founded
Retrophin, a publicly-traded biopharmaceutical company, with
Mulleady.  Mulleady is now thirty-nine years old.  He graduated
from Rutgers University in 2005, having majored in mechanical
and aerospace engineering.  He worked in real estate and finance
following graduation.  While working at Morgan Stanley Smith
Barney (now Morgan Stanley Wealth), he met Shkreli in 2011.
Shkreli hired Mulleady as Chief Operating Officer at MSMB, where
Mulleady worked from 2011 to 2013.

Shkreli served as Retrophin's CEO from December 2012 to
September 2014, and designed its business model.  Retrophin
acquired brand-name drugs approved to treat so-called orphan

diseases[15] that were the sole source in the U.S. for that treatment, closed the drugs' distribution to prevent generic drug manufacturers from acquiring the RLD, and substantially increased the drugs' prices.  This was a pattern that Shkreli would repeat at Vyera.

At Retrophin, Shkreli closed the distribution systems of two branded drugs, Chenodal and Thiola, to cut off access to the RLD needed for BE testing and impede generic drug competition.  Shkreli described his strategy and its purpose frankly in calls with Retrophin investors.  On one such call, he explained that "we do not sell Retrophin products to generic companies" and "[t]he whole model that generics rely upon is turned upside down with specialty pharmacy distribution."  He explained in another call that a closed distribution system did not allow generic drug companies to access the branded product "to conduct bioequivalence studies."  Shkreli boasted in an email to a potential investor that the specialty distribution method Retrophin had adopted "reliably eliminated" generic competition "by refusing to supply the product to generic companies for [BE] studies required for ANDAs."

---

[15] An orphan disease is a rare condition (defined in the United States as affecting fewer than 200,000 people) or a common condition in undeveloped countries that is rare in developed countries.

As noted, Shkreli put his strategy into practice with two drugs.  Retrophin acquired Chenodal, a drug approved for the treatment of cerebrotendinous xanthomatosis ("CTX"), and restricted distribution through distributor agreements.[16] Retrophin then raised Chenodal's price from $100,000 to $515,000 per patient per year.  Retrophin also licensed Thiola, a drug approved for the prevention of cystine stone formation in patients with cystinuria,[17] restricted its distribution, and raised its price from $4,000 to $80,000 per patient per year.

III. Vyera is Founded.

Only one month after departing Retrophin, in October 2014 Shkreli founded Turing Pharmaceuticals LLC ("Turing"), a privately-held pharmaceutical company with its principal place of business in New York.  Shkreli also founded Turing Pharmaceuticals AG ("Turing AG"), Turing's parent company, based in Switzerland.  Turing's name was later changed to Vyera, and Turing AG became Phoenixus.

From day one, Shkreli focused his new venture on acquiring sole-source drugs that were the gold standard treatment option for life-threatening diseases with a small patient population

---

[16] CTX is a life-threatening cholate excretion disorder.  The patient population for CTX is very small, with roughly 2,000 patients in the United States.

[17] Cystinuria is a rare kidney stone disorder, also with a very small patient population.

and inferior alternative treatments, with the intent to raise their prices, block generic competition, and reap extraordinary profits.  Shkreli highlighted to early Turing investors his "track record of successful transactions" at Retrophin and explained that "[e]xclusivity (closed distribution) creates a barrier and pricing power."

Shkreli remained CEO of Turing until his arrest on December 18, 2015 for securities fraud related to his prior business ventures, including at Retrophin.  He served as chairman of the Board of Turing AG until January 20, 2016, resigning from the Board entirely on February 10, 2016.  After Shkreli departed, Turing was renamed Vyera and Turing AG was renamed Phoenixus in order to distance the companies from Shkreli in the public mind. Shkreli remained the largest shareholder, however, and continued to control them and direct their strategy.  At no time after Shkreli left the Board did Vyera deviate from the strategy Shkreli had designed and initiated.

Shkreli brought with him to Vyera several Retrophin executives, including Mulleady, Tilles, Smith, Lau, Edwin Urrutia (a Vyera co-founder and Chief Financial Officer between October 2014 and June 2016), and Patrick Crutcher (a Vyera co-founder and Senior Vice President and Head of Business Development between October 2014 and May 2017).  Mulleady in particular was one of Shkreli's closest allies at Vyera before

earning Shkreli's ire in 2020.  Mulleady held the title of
Phoenixus' Managing Director from October 27, 2014 until Vyera
terminated his employment on June 3, 2016.  Mulleady returned to
Vyera a year later when, on June 21, 2017, he was elected to
Phoenixus' Board of Directors in a Shkreli power play.

A.   Vyera Acquires Daraprim.

At Shkreli's direction, Vyera's sales and business
development teams evaluated market opportunities for Vyera to
acquire sole-source drugs.  By the Spring of 2015, Vyera focused
on Daraprim as a prime candidate.  Smith, Vyera's Senior
Director of Business Development, instructed the sales team in
April 2015 to investigate acquiring both Daraprim and another
sole-source drug, sulfadiazine (often used in combination with
Daraprim), because it would be "the classic closed distribution
play."  Smith testified that Daraprim provided an opportunity to
build a foothold "where no one is paying attention to it."
Daraprim was first approved by the FDA in 1953, and approved by
the FDA in 1958 for the treatment of toxoplasmosis specifically.

Toxoplasmosis is a parasitic infection that can cause
severe disease and death.  The parasite is present in
approximately 10% of the population, but is usually dormant.  An
opportunistic infection, toxoplasmosis principally impacts
immunosuppressed and immunocompromised individuals such as
patients who are HIV positive or recipients of organ

transplants.  Toxoplasmosis can cause disease in many parts of the body, but the most common manifestations are infections of the brain (toxoplasma encephalitis), eye (ocular toxoplasmosis), and in utero.

Toxoplasma encephalitis is the most common and acute presentation of the disease among immunosuppressed patients. Toxoplasmosis fatalities have dropped significantly since the launch of antiretroviral therapies in 1996, which significantly limited opportunities for a toxoplasmosis infection to become acute in HIV-positive patients.  If an infection becomes active and advanced, a patient presenting with toxoplasma encephalitis could die within twelve to twenty-four hours unless treated. There is also a risk of severe brain damage in those who survive.  As a result, physicians must have an effective treatment on hand to halt the progress of an active infection as quickly as possible.

The Opportunistic Infections Guidelines (the "Guidelines"), an authoritative publication on which physicians depend,[18] gives

---

[18] The Guidelines are published by the Centers for Disease Control and Prevention, the National Institutes of Health, and HIVMA.  The Guidelines reflect the medical consensus for the benefit of "clinicians, health care providers, patients with HIV, and policymakers in the United States."  They are updated and reviewed regularly.  The section addressed to the treatment of toxoplasmosis was last updated on July 25, 2017, and last reviewed on June 26, 2019.

its highest recommendation to a pyrimethamine-based regimen for the treatment of acute toxoplasmosis.  Pyrimethamine is the API of Daraprim.

The Guidelines rank recommended treatment options for certain diseases with a letter and a numeral.  The letter grade signifies the strength of the recommendation and the Roman numerals indicate the quality of the evidence supporting the recommendation.  Accordingly, an A-I grade is a recommendation based on the strongest, highest-quality evidence derived from randomized control clinical trials, or, if randomized control trials have not been conducted, methodologically sound cohort studies or meta-analyses.  Lower grades are given to treatment options that have been shown to be effective but are not preferred, or are based on less methodologically reliable studies.

Under the Guidelines, pyrimethamine plus sulfadiazine and leucovorin[19] is given the strongest possible recommendation for treating active toxoplasma encephalitis:  A-I.  The recommended dosage of Daraprim, available only as a 25 milligram tablet, is an initial dose of 200 milligrams (eight pills) followed by 50 to 75 milligrams (two to three pills) daily for at least six

---

[19] Leucovorin is administered to mitigate pyrimethamine's suppression of the bone marrow, which would decrease white and red blood cells if left untreated.

weeks.  For patients who cannot tolerate a sulfa drug, the recommended treatment is pyrimethamine plus clindamycin.

The pyrimethamine-based regimen is preferred to alternative treatments because of its efficacy and safety, long history of successful clinical use, superior potency in comparison to other treatments, and diagnostic utility when a biopsy is not feasible.  A significant decrease in the size, inflation, or number of lesions in the brain following a week or more of treatment confirms the diagnosis.  Because a biopsy of the brain carries extreme risks, pyrimethamine's diagnostic utility is particularly important.  Pyrimethamine remains the only drug approved by the FDA for the treatment of toxoplasmosis.  And, until the entry of FDA-approved generic pyrimethamine in 2020, Daraprim was the only FDA-approved pyrimethamine product on the market.

Before Vyera acquired Daraprim, it commissioned a physician survey to determine whether doctors "would continue to prescribe Daraprim" following a price hike.  In response to the survey, doctors indicated that they considered the drug to be the "backbone of therapy" for toxoplasmosis and were "at a loss to think of an appropriate alternative."  Shkreli and others at Vyera recognized Daraprim as "the gold standard" therapy for toxoplasmosis, rendering Daraprim "essentially unsubstitutable."

In April 2015, Vyera made Impax Laboratories, Inc. ("Impax"), then the owner of the U.S. licensing rights to Daraprim, an unsolicited offer of $60 million. This offer represented a considerable premium over Daraprim's market value. Annual net sales of Daraprim constituted roughly $4 million at the time, and Impax assessed its net present value as $19 million. In a transaction that closed on August 7, 2015, Vyera paid Impax $55 million, more than eleven times Daraprim's 2014 net revenues.

B.   Daraprim's 2015 Price Hike and Vyera's Revenues

Until 2010, Daraprim had been owned by GlaxoSmithKline ("GSK"), a global pharmaceutical company based in the United Kingdom. Between 2011 and 2015, the new owners of Daraprim had raised the list price -- also called the wholesale acquisition cost ("WAC") -- of a tablet from $6.74 to $17.60. These price increases ranged from 15% to 30% at a time. Within days of Vyera's purchase of Daraprim and at Shkreli's direction, Vyera raised the WAC from $17.60 to $750 per tablet effective August 11, 2015. From roughly 2016 to 2019, the average net price of Daraprim (the price per tablet after subtracting discounts, chargebacks, and rebates off the WAC) ranged between $228 and $305 per tablet. Dr. Salinas testified that the price hike was the "poster child of everything that is considered wrong about the pharmaceutical industry."

Comparing the nine-month period preceding and following Vyera's price hike, Daraprim's sales volume dropped by 66%.  In September 2015, sales data from IQVIA (formerly IMS Health), a commercial data aggregator commonly used for market research in the pharmaceutical industry, indicated that the market size for Daraprim was around one million tablets annually.  After that steep decline, the sales volume stabilized at roughly 200,000 to 250,000 tablets per year between 2016 and 2019.  These sales remained steady until the first generic pyrimethamine product entered the market in March 2020.

From 2016 through 2019, Vyera made between $55 and $74 million in annual gross profits from its sales of Daraprim. Daraprim revenues in the years between 2010 to 2014 had amounted at most to $10 million a year.  Vyera's estimated gross profit margin from Daraprim, calculated by subtracting Vyera's reported production costs, ranged between 89% and 98% in 2016 through 2019.  The Figure below illustrates net revenue and gross profit for Daraprim sales between 2010 and 2020.



**GX7012
Daraprim Net Revenue and Gross Profit
2010–2020**

Source:  GX3555 (IQVIA National Sales Perspectives), GX1618 (Vyera_01560868), GX1619 (Vyera_01560869)
Note:  [1] Available sales data for 2010 through Q2 2015 takes account of chargebacks but not rebates; thus, for 2010 through 2015, reported net revenue is an upper bound. [2] Gross Profit = Net Revenue - Cost of Goods Sold.

GX7012-001

From August 2015 to the end of 2019, Daraprim sales amounted to over 96% of Vyera's total revenues.[20]

IV.  Vyera's Implementation of a Closed Distribution System for Daraprim

Even before finalizing its acquisition of the rights to the drug, Shkreli made it a priority to close the Daraprim distribution channels.  In June 2015, Shkreli directed Retzlaff, who ran Vyera's sales team, to move Daraprim from retail distribution into a closed distribution system "as swiftly as possible."  As the interim project manager in charge of the

---

[20] In that period, Vyera earned revenue only from sales of one other drug, Vecamyl.

initiative, Mulleady ensured that Shkreli's wishes for
Daraprim's closed distribution system were implemented.

Shkreli recognized that generic entry into the
pyrimethamine market was inevitable, but Shkreli hoped to delay
that entry for at least three years.  In July 2015, Shkreli
remarked to an investor that he felt "very good that there are
no incoming generics and now that it is closed distribution
there will not be any going forward . . . even if we get 3
years, it is a great payout."

Daraprim had been in open distribution from its
introduction into the market in the 1950s until 2015.  After he
had initiated his own plans to move Daraprim into specialty
distribution, Shkreli learned that a prior owner of Daraprim had
already begun to do so.  By the time Vyera acquired Daraprim,
Daraprim was distributed through two wholesale distributors and
specialty pharmacies, AmerisourceBergen Corporation ("ABC") and
Walgreens Specialty Pharmacy ("Walgreens").[21]  Vyera continued
the terms of the assigned contract with Walgreens and slowly
expanded the number of distribution partners for Daraprim to
five distributors and specialty pharmacies.  They were ASD (a

---

[21] Impax had just transitioned Daraprim from retail distribution
to Walgreens specialty distribution.  Orders to Walgreens were
to be fulfilled by another distribution partner that Vyera
inherited when it acquired Daraprim, ICS, an affiliate of ABC
and ASD.

subsidiary of ABC), BioRidge Pharma LLC ("BioRidge"), Cardinal, Optime, and Walgreens (together, the "Distributors").  Despite expanding the number of distribution partners, however, Vyera imposed class of trade restrictions in its distribution contracts, limiting the types of customers who could buy Daraprim.  The end result was that no Distributor could sell Daraprim to a retail pharmacy or a generic drug company without Vyera's approval.

Vyera's distribution restrictions on Daraprim were not justified by a need to protect either patient health or Vyera from lawsuits asserting that a patient had experienced an adverse drug reaction.  As noted above, Daraprim had been sold through open distribution for decades.  It was considered a safe drug; the FDA never put Daraprim in a REMS program or required a black box warning on the label.  Daraprim is an oral tablet that does not require special shipping, handling, storage, or administration.  When the first generic pyrimethamine product was launched in March 2020, it was sold through an open distribution system.

A.   Class of Trade Restrictions

Between 2015 and 2020, Vyera's Distributors were restricted to selling only to authorized customers that included government customers, hospitals, specialty pharmacies, and other specialized entities.  The authorized customers or types of

customers approved to buy Daraprim did not include generic drug companies or their agents.  No Distributor was permitted to sell Daraprim to a generic drug manufacturer or their agent without Vyera's express approval.  There is no evidence that Vyera ever gave such approval.

Vyera's contract with ASD, executed on September 2015, provides an example of the class of trade restrictions.  It simply stated that the "Distributor may only sell Daraprim to Government Customers and hospitals."[22]  In 2016, Vyera expanded ASD's authorized customer list to include "certain state AIDS Drug Assistance Programs (ADAPs), subject to the Company's prior written approval."  An amendment in 2018 revised the authorized customer clause as follows:

> Distributor may only sell Daraprim to licensed wholesalers and specialty pharmacies that support certain state [ADAPs], subject to the Company's prior written approval, Government Customers, hospitals, and 'covered entities', as defined by Section 340B of the Public Health Services Act ("340B Customers"). [Vyera] will approve any new authorized customers via email and will maintain and update a monthly authorized customer file.[23]

---

[22] Government Customers were defined in the contract as the Department of Veterans Affairs or Department of Defense sites.

[23] Entities covered by § 340B of the Public Health Services Act, a federal discount pricing program for entities that serve indigent populations, may purchase prescription drugs at steep discounts.  42 U.S.C. § 256b.  A § 340B entity was permitted to buy Daraprim for $1 per 100-pill bottle.

Effective February 25, 2020 -- just as the first generic competitor to Daraprim was about to receive FDA approval -- the authorized customer list was expanded to permit sales to "340B contract pharmacies, any customers on the approval list provided by Company, and any new customers approved by Company in writing (with email being sufficient)."

Equivalent restrictions were in place for each Vyera Distributor.  For example, as of December 2015, BioRidge was only authorized to distribute Daraprim to Walgreens Specialty Pharmacies.  In 2017, Vyera entered a contract with Cardinal that limited distribution to hospitals, ADAPs, and § 340B entities.  A 2018 contract with Optime permitted distribution to hospitals, ADAPs, government customers, health departments ("with a valid 340b ID"), hospital distributors ("defined as a distributor that supplies a single hospital system"), and correctional facilities.

Vyera also had contracts with roughly a hundred hospitals to supply them with Daraprim directly at a discounted price so long as they agreed to limit their use of it to their "own use" and not to resell Daraprim.  For example, Vyera's agreement with one distinguished medical system provided that "[p]rices available under this Term Sheet shall only apply with respect to product purchased by Hospital for its 'own use' as that term is described in Abbott Laboratories Inc. v. Portland Retail

Druggists, 425 U.S. 1 (1976), [without regard to whether Company

is a non-profit entity described in section 501 of the Internal

Revenue Code].”

     B.   Bottle Limits

    Vyera also controlled the distribution of Daraprim by

imposing limits on the number of Daraprim bottles that a single

customer could purchase at a time.  For example, in December

2015, ASD agreed to cap orders from § 340B program participants

to five bottles “per week per order,” with any exceptions for

larger orders requiring approval from Vyera.  Vyera’s Director

of Patient Access openly admitted that the quantity limits

imposed in 2015 were introduced to make it harder for generic

drug companies to acquire “large quantities” of Daraprim “in

order to copy the drug and compete with it.”  He was quoted in a

news article published on October 5, 2015, stating that if a

generic drug maker tried to order Daraprim,

> Most likely I would block that purchase. . . .  We
> spent a lot of money for this drug.  We would like
> to do our best to avoid generic competition.  It's
> inevitable.  They seem to figure out a way [to make
> generics], no matter what.  But I'm certainly not
> going to make it easier for them.

    Vyera added similar restrictions to its contracts with

other Distributors.  For example, under its 2018 contract with

Optime, “[a]ll orders greater than 3 bottles require[d] Vyera

approval.”

As the entry of generic competition became more imminent, Shkreli urged that the limits on the sale of Daraprim bottles be further tightened.  On August 8, 2019, while incarcerated following his conviction for securities fraud, Shkreli was recorded asking Mithani about the likelihood that a doctor could order more than one bottle of Daraprim at a time.  When Mithani responded that it is "very likely", Shkreli responded that "that's what I've been stressing to you guys for the last three years, to look at that very carefully, you know, meet those doctors."  Shkreli went on to say "there has to be some way to tighten the supply chain a bit . . . I just want to make sure you guys are doing everything you can."  When Mithani told Shkreli that Vyera "can't say no" to hospitals, Shkreli responded, "Okay.  Well, that's a shame."

Just days before, upon learning of the efforts made by the generic pharmaceutical company Fera to purchase Daraprim RLD, Shkreli had urged Vyera to limit all sales of Daraprim to one bottle at a time.  Shkreli told Mulleady that

> the company should, you know, just make sure it really
> doesn't sell more than one bottle at a time, you know.
> That would be -- the number one thing I would do and
> just really screen every doctor that, you know -- even
> if it drops sales a little bit, it's a good -- you
> know, really make sure he's [referring to Fera's
> owner] not getting his hands on anything.

C.    Surveillance

Vyera monitored its Distributors' daily and weekly sales reports to prevent the diversion of Daraprim to generic drug companies for BE testing.  It promptly followed up on any sales it considered unusual to stop any leakage.

The monitoring began as soon as Vyera acquired Daraprim. For example, on August 13, 2015 -- just two days after the Daraprim price hike -- Vyera saw a sales report from ICS reflecting a sale of 40 bottles to a customer.  Vyera asked ICS to cap the maximum number of bottles sold to any one customer, explaining Vyera's

> concern that a generic company could access multiple
> bottles of our product, perhaps attained through a
> hospital reselling it or distributing product to
> surrounding retail pharmacies, and use it to create a
> generic version.

In response, ICS agreed to limit sales to five bottles at a time.  Shkreli was informed of the "[n]eed to investigate the 40 unit buy."

Vyera repeatedly instructed its Distributors to refrain from selling Daraprim to potential competitors for clinical trials.  For example, in February 2017, a company that obtains RLD for generic pharmaceutical companies ordered a 30-count bottle of Daraprim from ASD.  ASD advised Vyera that it had denied the request due to "the conversation around generics."

Later in 2017, Vyera directed ASD to rebuff another company that reached out to ASD to buy Daraprim for use in a clinical trial.

The speed and effectiveness of Vyera's surveillance system is dramatically illustrated by its interception of five bottles of Daraprim intended for a generic drug distributor -- Dr. Reddy's -- in April 2018.  On April 5, ASD delivered the five bottles to a pharmacy pursuant to an order placed on April 4.  Vyera's surveillance system flagged the purchase on April 5, investigated the purchaser, learned the bottles were destined for a company that supplies RLD for bioequivalence and clinical trials, and by April 6, Mulleady met with the company's owner in a parking lot to repurchase the bottles for $750,000.  This was twice the price the pharmacy had paid for the bottles.

Vyera's frantic interception of this purchase prompted it to lock down Daraprim distribution even more strictly.  Vyera instructed ASD to block that pharmacy's access to any Daraprim.  It then dramatically shrank the number of customers to which ASD and Cardinal were permitted to sell Daraprim without specific prior authorization from Vyera.  For ASD, this resulted in a reduction of approved customers from approximately 13,000 to roughly 555.  Vyera similarly cut Cardinal's list of approved accounts from about 14,700 to fewer than 1,500.  Vyera also reduced the number of bottles that ASD could sell to any one of

the pre-approved customers, reducing the number to four bottles unless the customer was a § 340B customer.

D.   Benefits to Distributors

The Distributors benefitted financially from their contracts with Vyera despite the restrictions on their sales of Daraprim.  This was true for as long as Daraprim was sold at a high price.  Vyera compensated the Distributors with either a fixed fee (Optime) or a percentage of WAC based on volume sold (ASD, Cardinal, BioRidge, and Walgreens).  ASD, for example, received $2,062.50 for each 100-count bottle of Daraprim it sold.  By contrast, when Dr. Reddy's launched its generic pyrimethamine product in March 2020, it offered ASD's parent company a price of only $877.50 per bottle.

V.   Vyera's Restriction of Access to the API Pyrimethamine

Besides blocking access to the Daraprim that generic drug manufacturers needed to conduct BE testing, Shkreli also worked to block their access to pyrimethamine, the API in Daraprim.  He was well aware that the sooner a generic company could find an established API manufacturer the sooner it could launch a generic version of Daraprim.  Vyera locked up the supply of pyrimethamine to U.S.-based generic drug companies through exclusive supply agreements with the two most attractive pyrimethamine suppliers: Japan's Fukuzyu Pharmaceutical Company ("Fukuzyu") and India's RL Fine.

A.   Fukuzyu

Fukuzyu, an established and prominent Japanese chemical manufacturer, was the long-term supplier of pyrimethamine for Daraprim.  Fukuzyu had been producing pyrimethamine since 1966, had held a DMF for pyrimethamine since 1992, and is the manufacturer referenced in Daraprim's NDA.  The only other manufacturer to have filed a pyrimethamine DMF, Ipca, had lost its right to sell pyrimethamine in the United States in 2015.[24]

Fukuzyu typically requires a customer to provide an estimate of how much API it will require for a given period. Such clauses mitigate a purchaser's supply risk and help Fukuzyu manage its production schedule.

Fukuzyu's contract with GSK, for example, requires GSK to produce forecasts of how much API it will need for a defined period and requires Fukuzyu to deliver that amount.  GSK holds the worldwide rights to Daraprim outside of North America.  The contract states that GSK "[s]hall provide [Fukuzyu's] Agent with a rolling forecast schedule of demand showing their estimated requirements for PYRIMETHAMINE for the following twelve (12) months ('Forecast Schedule')," and "[t]he Product detailed in the first 3 months ('Firm Order Period') of each Forecast Schedule will represent firm orders for PYRIMETHAMINE" to which

---

[24] The FDA imposed an import ban on Ipca in 2015.

Fukuzyu must respond within five days.  "[E]ach Firm Order will be regarded by the Parties as a binding irrevocable commitment" to purchase pyrimethamine from Fukuzyu, which in turn obligates Fukuzyu to manufacture enough API to meet the order.  The GSK contract also requires Fukuzyu to ensure that it has "at all times sufficient manufacturing capacity to meet [GSK]'s . . . requirements for PYRIMETHAMINE as shown in the Forecast Schedule."  GSK's contract with Fukuzyu does not include an exclusivity clause.

Impax, the company from which Vyera purchased Daraprim, had purchased pyrimethamine from Fukuzyu through a broker without even entering into a supply contract.  Shkreli was immediately interested in reversing that practice.  He wanted an exclusive supply agreement with Fukuzyu.  With the help of a consultant, Vyera eventually succeeded by representing that it had several ambitious projects and hoped to use Fukuzyu as a long-term API supplier for each of those projects.  In October 2016, three Vyera executives traveled to Japan to visit Fukuzyu.  They were Pelliccione, then Vyera's Senior Vice President for Regulatory Affairs, Dr. Salinas, and Vyera's Head of Chemistry, Manufacturing, and Controls.

Vyera bluntly explained to Fukuzyu that it needed an exclusive supply contract to prevent generic Daraprim from entering the United States market.  In November 2016, Dr.

Salinas directed Vyera's consultant to inform Fukuzyu that "[i]f
generic products are put on the U.S. market" Vyera will face a
"serious problem, and may eventually terminate the marketing of
Daraprim as well as the R&D in toxoplasmosis"; that generic
pyrimethamine "will hamper" Vyera's plans to develop new
pharmaceutical products and "may leave toxoplasmosis as a
forgotten disease with insufficient therapeutic effects"; and
that Vyera's plans are "ONLY POSSIBLE" if Vyera has exclusive
access to Fukuzyu's API.  The consultant was also to stress that
Fukuzyu would "not benefit" if generic companies sold
pyrimethamine in the U.S. market since generic companies would
sell pyrimethamine at a "significantly lower" price.

By November 22, 2016, Fukuzyu had agreed not to sell
pyrimethamine "to generic companies."  According to Vyera's
consultant, Fukuzyu's CEO was particularly pleased that Vyera
planned to "develop four more new compounds and would like
[Fukuzyu] to work together" with it on those compounds.[25]

On January 25, 2017, Phoenixus entered into a three-year
exclusive supply agreement with Fukuzyu.  The exclusivity term
states that

> [Fukuzyu] shall provide the API Bulk Drug Substance,
> pyrimethamine exclusively to [Phoenixus] for the use,

---

[25] As of 2021, Vyera has filed investigative new drug
applications ("INDs") for new potential drugs but has not
launched any new product.

>          sale, and/or distribution in the Territory.  To be
>          clear, the use, sale, and/or distribution of
>          pyrimethamine described in this section refers to the
>          use, sale, and/or distribution of the API Bulk Drug
>          Substance for humans only.[26]

The Territory was defined as the United States.

The Fukuzyu contract also provided that the minimum purchase quantity of pyrimethamine was 50 kilograms.  Vyera, which contracts for the manufacture of pyrimethamine, needs 35 kilograms for a batch of Daraprim to be manufactured.  Since executing the exclusive supply agreement, Vyera has twice purchased pyrimethamine from Fukuzyu.

The agreement with Fukuzyu does not ensure that Vyera will have a supply of pyrimethamine or require Fukuzyu to prioritize Vyera's orders over those from its other customers.  It does not, for instance, require Vyera to forecast its API requirements or obligate Fukuzyu to reserve any quantity of pyrimethamine or manufacturing capacity to produce pyrimethamine.  It does not even require Fukuzyu to fill a Vyera order.

Under the agreement, Vyera must submit a purchase order to Fukuzyu.  If Fukuzyu does not acknowledge the order in writing

---

[26] Since Fukuzyu sells pyrimethamine to a veterinary drug company that uses it to produce drugs for horses in the United States, there was a carveout permitting Fukuzyu to continue selling the API to other U.S. drug companies for use in animals.

within ten days, it has no obligation to fill the order.  The
agreement states that:

> [Daraprim] is historically a low volume product for
> [Vyera].  Due to the infrequent need to manufacture
> [Daraprim], [Vyera] will provide [Fukuzyu] a Firm
> Order for API, in the form of a Purchase Order.
> Receipt of the Purchase Order denotes [Vyera]'s
> binding request to purchase API within 180 days of
> date of Purchase Order.  [Fukuzyu] will accept Firm
> Orders by sending an acknowledgement to [Vyera]
> within 10 business days of its receipt of the Firm
> Order.

What Vyera obtained through its agreement with Fukuzyu was
the right to bar other buyers, and Vyera strictly enforced that
right.  For example, in November 2017, Fukuzyu inquired whether
it could sell pyrimethamine to a company that intended to resell
it to a U.S.-based pharmaceutical company for a drug to be sold
in South America.  Vyera asked Fukuzyu to include in the sales
agreement that the API sold to the US company "will not be used
to make pyrimethamine drug product, for human use, that will
find its way back to the US for commercial purposes," and "that
the API will ONLY be used for drug products sold and used in
South America."  Fukuzyu agreed.

B.   RL Fine

As of 2015, most generic drug companies would have sought
to purchase pyrimethamine from Fukuzyu.  Vyera closed off that
avenue of supply with its exclusive supply agreement with
Fukuzyu.  After Fukuzyu, RL Fine was the second most attractive

source of supply.  In 2017, after Shkreli learned that generic companies were going to obtain pyrimethamine from RL Fine, he moved quickly to cut off that source of supply as well.

RL Fine is based in Bangalore, India and had been manufacturing pyrimethamine since at least 2004.  RL Fine sells pyrimethamine directly to customers; it does not use distributors.  As of 2016, RL Fine had a European pyrimethamine DMF but had not filed a U.S. DMF.

In 2017, in defending against an investigation that preceded the filing of this lawsuit, Vyera emphasized the importance of RL Fine to generic drug manufacturers.  It downplayed the significance of its exclusive supply agreement with Fukuzyu in a letter to the Office of the New York Attorney General dated May 5, 2017, by asserting that "generics manufacturers can obtain pyrimethamine API from a variety of sources, even without the option to purchase it from Fukuzyu".  It cited RL Fine as one of those alternatives.  Vyera explained that

> the cost for a potential competitor to qualify API
> from the European DMF holder RL Fine Chemicals would
> be less than $100,000, as the company has already
> validated its production process and has a DMF ready
> to file in the United States.  Such a cost can
> hardly be deemed a barrier to entry, especially when
> viewed as part of the overall process of drug
> development.

Yet when Vyera learned from its consultant on August 7, 2017, that two generic drug companies, Mylan and Sandoz, were planning to buy pyrimethamine from RL Fine, Shkreli acted quickly to block their access.  On August 24, Shkreli drafted an email from prison for Mithani to send to RL Fine.  The email represented that Vyera was "looking to purchase 10-20kg/annually of pyrimethamine API with a US DMF" for a "combination product with leucovorin."  Mithani sent Shkreli's drafted email to RL Fine verbatim.  RL Fine replied that it was "already working on pyrimethamine and would not be able to offer [it] to you." Vyera was undeterred and continued to negotiate with RL Fine.

In October 2017, Vyera received independent confirmation from executives attending a trade conference in Frankfurt that RL Fine was supporting generic drug companies that would soon file ANDAs.  On October 25, Shkreli texted Mulleady from prison using a contraband phone:[27]  "its shkreli -- trying to get in touch with you urgently -- hearing pyri ANDA approval in december 2017."

Within eight days of that email, on November 2 Mulleady offered RL Fine $1,250,000 per year and other financial

---

[27] For a period of time, Shkreli had a contraband phone in prison that he used to communicate with, among others, Mulleady and Mithani.  <u>Fed. Trade Comm'n v. Vyera Pharms., LLC</u>, No. 20CV00706 (DLC), 2021 WL 2201382 (S.D.N.Y. June 1, 2021).

enticements "to formalize our exclusive agreement" for pyrimethamine API.  In late November, Mulleady and Mithani flew to India to meet with RL Fine.  By November 25, Vyera and RL Fine had agreed on the terms of an exclusive supply agreement.

Vyera made no bones about its motive for entering this exclusive supply agreement.  It needed to block the access of generic manufacturers to RL Fine pyrimethamine.  The minutes of the December 15, 2017 Phoenixus board meeting present the rationale for Vyera's costly agreement with RL Fine as "the potential market entry by generics manufacturers and distributors."  According to the minutes, "one or two potential competitors are currently in the process of preparing their market entry."  The minutes report that Mulleady and Mithani, by then Board members of Phoenixus and in control of the company's management functions, believed "addressing potential generic competitors are in the Vyera Group's interest" and justified the extraordinary price Vyera agreed to pay RL Fine.

On December 17, Vyera executed two contracts with RL Fine: A Distribution and Supply Agreement ("Supply Agreement") and a Product Collaboration Agreement ("Collaboration Agreement").  The twenty-five-page Supply Agreement gave Vyera "the exclusive right to sell, distribute, and market" RL Fine's pyrimethamine for five years and limited RL Fine to selling pyrimethamine for use outside India only "with the consent" of Vyera.

In return, Vyera paid RL Fine $1 million "towards expenses for filing the US" DMF for pyrimethamine. Vyera also agreed to pay RL Fine royalty payments in the amount of 7.5% of net revenues on its sales of Daraprim, with a guaranteed minimum payment of $3 million. Under the Supply Agreement, Vyera's obligation to make royalty payments other than the guaranteed amount of $3 million would terminate if and when a generic pyrimethamine product entered the U.S. market.

Under the Collaboration Agreement, which had a one-year term, Vyera paid a non-refundable $1 million towards R&D expenses and preparation of a DMF. The Collaboration Agreement acknowledged the parties' Supply Agreement.

Having signed the Supply Agreement, RL Fine stopped supplying pyrimethamine to the generic drug manufacturers Cerovene and InvaTech. Vyera has paid RL Fine approximately $300,000 to $450,000 a month in royalty payments. By October 2019, Vyera had paid RL Fine almost $7 million in monthly royalty payments alone, and almost $9.5 million in total. Vyera's payments to Fukuzyu pale in comparison. Over this time period, Vyera has paid Fukuzyu approximately $500,000.

Neither the Supply Agreement nor the Collaboration Agreement required RL Fine to file a DMF with the FDA or conditioned any payment on RL Fine completing any of the steps necessary to file a U.S. DMF. RL Fine never paid even the

$57,795 DMF filing fee to the FDA, despite receiving $1 million
from Vyera to do so, or took any other steps toward filing a DMF
for pyrimethamine.  Similarly, Vyera never sought FDA approval
to use RL Fine's API in Daraprim, or took any other steps to be
able to use RL Fine as a backup supplier of pyrimethamine.
Pelliccione, Vyera's executive in charge of regulatory matters,
didn't even know of the RL Fine contract until he was preparing
for this trial.  It had never even crossed his mind that Vyera
needed a second source for pyrimethamine.  In sum, Vyera
received nothing in return for the millions of dollars it paid
to RL Fine except the foreclosure of generic competitors' access
to RL Fine's pyrimethamine.

Facing regulatory pressure, on October 20, 2019, Vyera paid
RL Fine $750,000 to terminate the Supply Agreement.  RL Fine
threatened to speak to the FTC if it did not get a termination
fee.

VI.  Delay of Generic Entry

Shkreli's efforts to delay the entry of generic competition
to Daraprim succeeded.  The following chart sets out the dates
on which the four generic manufacturers filed their ANDAs, and
the dates on which three of those ANDAs were approved.

| Generic | ANDA Filed | Approved | Time to Approval |
|---|---|---|---|
| Cerovene/Dr. Reddy's | 5/8/2014 | 2/28/2020 | 70 months |
| InvaTech | 7/28/2017 | Pending as of January 2022 | 53+ months |
| Fera | 12/19/2019 | 7/27/2021 | 31 months |
| Teva Pharmaceuticals | 1/27/2021 | 8/13/2021 | 7 months |

Vyera's multifaceted campaign to delay the entry of generic pyrimethamine succeeded in substantially delaying the entry of at least Cerovene and Fera.  Vyera made it exceedingly difficult for each of them to obtain the pyrimethamine API and a sufficient quantity of Daraprim RLD for BE testing.

A.   Barriers to Entry

As of 2015 only two API suppliers held a pyrimethamine DMF in the United States:  Fukuzyu and Ipca.  Fukuzyu was the long-term supplier of the API for Daraprim.  Because Ipca's supply of pyrimethamine became subject to an FDA-imposed import ban, Fukuzyu was the only option for any pharmaceutical company in the United States seeking a pyrimethamine API supplier that held an active DMF.

RL Fine was the next-best option for a supply of pyrimethamine for generic drug companies seeking to compete with Daraprim because it was familiar with the FDA's requirements; it had DMFs on file with the FDA for other APIs.  In addition, it marketed its drug products globally, already manufactured

significant quantities of pyrimethamine, and held a European
pyrimethamine DMF.  Possession of a European DMF typically
indicates that one can also meet U.S. DMF standards.

With its exclusive supply agreements, Vyera blocked access
to these two sources of API.  Shkreli began efforts to obtain an
exclusive supply agreement with Fukuzyu in 2015.  Vyera and
Fukuzyu came to terms in November of 2016 and executed their
contract in January of 2017.  In 2017, at Shkreli's urging,
Vyera also entered into an exclusive supply agreement with
RL Fine.  It paid RL Fine millions of dollars to do so.

Shkreli also cut off access to the RLD that generic drug
companies needed to do the BE testing required for FDA approval
of an ANDA.  Understanding the importance of access to the RLD,
Shkreli adopted a closed distribution system for the sale of
Daraprim.  This was the model he had adopted at Retrophin to
block generic competition to Retrophin's pharmaceuticals.

Against this backdrop, several generic drug companies
worked for years to obtain an API supplier and quantities of the
RLD, a process that in the ordinary course should have taken
weeks.  Cerovene was the first to get its ANDA approved and its
efforts to obtain an API supplier and the requisite RLD will be
described first.  Fera's path to entering the market will be
described next.  Finally, there will be brief descriptions of
the experiences of InvaTech and Mylan.

B.   Cerovene and Dr. Reddy's Laboratories

Cerovene, a pharmaceutical research and development firm founded in 2006, is focused on the development of generic drugs. Cerovene does not manufacture API, but manufactures the finished drug product, creates the documents necessary to submit the ANDA to the FDA, works with the FDA to gain approval, and produces a finished product for distribution after approval.

Dr. Reddy's is Cerovene's generic pyrimethamine marketing partner.  Dr. Reddy's is a large multinational pharmaceutical company that sells about 150 drug products, primarily generic versions of innovator drugs (that is, the first FDA-approved drug created containing a specific API).  As it did with Cerovene, Dr. Reddy's often licenses a third party's developed drug or partners with a third party to develop a drug for Dr. Reddy's to bring to market.  After a seven-year effort, Cerovene received FDA approval of its ANDA for generic pyrimethamine on February 28, 2020, and Dr. Reddy's launched the generic product on March 20, 2020.

Cerovene began developing generic Daraprim in 2013 and submitted its ANDA to the FDA on May 8, 2014.  It expected that a generic version of Daraprim would be profitable based on the price of Daraprim at the time, which was approximately $12 per tablet.  In late 2015, Dr. Reddy's explored developing a generic version after Vyera dramatically hiked up Daraprim's price.  It

learned in March 2016 that Cerovene had already filed an ANDA, and on January 3, 2017, Dr. Reddy's and Cerovene entered into a licensing agreement.

In evaluating the market opportunity of generic Daraprim, Dr. Reddy's conservatively expected that Cerovene's ANDA would be approved by August 2017, with the product launch occurring by early 2018.  Dr. Reddy's also projected that Cerovene's generic would launch at a 55-70% discount off Daraprim's list price (depending on how many other generic competitors entered the market) and expected to take a significant fraction of the branded drug's sales.

Cerovene's experience in acquiring RLD to support its 2014 ANDA was typical of the process generic drug companies generally encounter.  Cerovene had done the BE testing that it included in its May 2014 ANDA with nine 100-tablet bottles of Daraprim that it had purchased in 2013 from an independent pharmacy for a total price of just over $10,000.  Shah, Cerovene's co-founder and President, recalled that it had taken approximately one day for the pharmacy to acquire the nine Daraprim bottles on Cerovene's behalf.

Cerovene then encountered a setback.  It had planned to obtain pyrimethamine from Ipca and had referenced Ipca's DMF in its ANDA, but the 2015 FDA import ban on Ipca's products required it to find a new supplier.  In October 2015 and March

2016, Cerovene and Ipca wrote letters to the FDA seeking an exemption to the import ban for Ipca-manufactured pyrimethamine. The FDA denied the requests on April 15, 2016.

Meanwhile, Cerovene attempted to purchase 50 kilograms of pyrimethamine from Fukuzyu. Cerovene first contacted Fukuzyu in 2015, and Fukuzyu supplied a sample of pyrimethamine for Cerovene to assess for suitability. By September 2016, Shah believed that Fukuzyu had agreed to supply Cerovene with pyrimethamine to develop its generic product. But in October -- the same month that Vyera executives visited Japan -- Fukuzyu refused to supply the API. In a letter to Cerovene dated October 4, 2016, Fukuzyu explained that it would not supply pyrimethamine "to anyone because of low business potential and high risk associated with the business." Yet, as described above, Fukuzyu executed an exclusive supply agreement with Vyera in January 2017.

Cerovene promptly turned its sights on RL Fine as the next-best option. Although RL Fine did not have an FDA-approved DMF for pyrimethamine, Cerovene considered it a promising alternative supplier due to its experience manufacturing pyrimethamine for use outside the U.S. and because it held DMFs for other products.

On November 16, 2016, Cerovene and RL Fine executed a five-year supply agreement. The agreement obligated RL Fine to

provide a pyrimethamine DMF that would be referenced in an amendment to Cerovene's ANDA.  In return, Cerovene paid RL Fine $100,000, with another $100,000 due upon approval of its ANDA.

Cerovene's agreement with RL Fine had an exclusivity provision.  That provision was intended to protect Cerovene's investment in getting RL Fine qualified as an API supplier in the United States and forestall free riding by other generic drug companies on Cerovene's investment.  RL Fine confirmed that it would support Cerovene's pyrimethamine ANDA in early 2017 and supplied 33.5 kilograms of API, which was enough for Cerovene to test and launch its product.

On April 2, 2017, Cerovene submitted a major amendment to its ANDA changing its API supplier from Ipca to RL Fine.  In the amendment, Cerovene informed the FDA that RL Fine had been manufacturing pyrimethamine on a commercial basis in European and Asian markets and noted that the FDA had inspected RL Fine as recently as June 2015.  Cerovene included RL Fine's manufacturing information as an amendment to its ANDA instead of relying on RL Fine to handle the DMF process separately.  This appeared to Cerovene to be the fastest way to get FDA approval.

Because of the switch in supplier from Ipca to RL Fine, the FDA issued a complete response letter to Cerovene's amended ANDA dated December 26, 2017, requiring Cerovene to conduct new BE testing using RL Fine's API and an unexpired lot of RLD.  New BE

testing was the only substantial correction required by the FDA, but the Daraprim that Cerovene had purchased in 2013 had expired, so Cerovene immediately tried to buy five more bottles.

Cerovene made an extensive search for the RLD that proved futile.  It tried and failed to acquire RLD from five different suppliers, on occasion making simultaneous prepayments.  It made multiple applications to the FDA requesting partial waivers of the BE retesting requirement.  After roughly twelve months of effort, Cerovene had purchased only three bottles of Daraprim. It did so in November 2018 at a total cost of $375,000.

Cerovene first sought RLD on December 29, 2017, from the pharmacy that had supplied it with Daraprim bottles in 2013, but the pharmacy was no longer able to supply it with Daraprim.  The next day, Cerovene ordered five bottles at a cost of $112,000 each from another pharmacy but cancelled the order in February 2018 when the pharmacy proved unable to fill the order.

On January 22, 2018, Cerovene asked the FDA to reconsider its new BE testing requirement due to its difficulty acquiring Daraprim RLD.  Cerovene explained that "the RLD is inaccessible and unavailable in the US for BE or other testing because it is the subject of a restricted distribution program."  On June 29, 2018, the FDA denied Cerovene's requests to conduct new BE testing by using its expired lots of Daraprim or to conduct alternative studies.  The FDA noted that it "did not have

additional recommendations that can address the issue of RLD

inaccessibility" and that "Daraprim is not subject to a REMS,

and the restrictions on supply of Daraprim described in your

letter are not required by the [FDA]."  The agency added,

> If you have been unable to obtain supplies of the
> drug from the manufacturer or other distributers,
> and you believe this refusal constitutes
> anticompetitive behavior, we encourage you to raise
> the matter with the Federal Trade Commission, which
> is responsible for addressing anticompetitive
> practices.

Throughout 2018, Cerovene struggled to find a distributor

that could deliver sufficient RLD.  Dr. Reddy's did not

typically help its partners procure RLD but by the end of

January, it had stepped in to aid Cerovene.  As a far larger

company, Dr. Reddy's believed that its connections might work.

Dr. Reddy's efforts included prepaying $550,000 in March

2018 to Reliant for five bottles of Daraprim.  Reliant is a New

Jersey-based pharmaceutical wholesale company that "procure[s]

branded Innovator Samples/Reference Listed Drugs for

bioequivalence and clinical trials."  Reliant, however, was

unable to purchase any Daraprim from its normal sources.

When Reliant tried to buy Daraprim bottles from ASD, ASD

directed Reliant to place its order directly with Vyera.  Vyera

never responded to Reliant's request for five bottles.

Relying on a family connection, Reliant turned to a small

New Jersey pharmacy and arranged for the pharmacy to order five

bottles of Daraprim from ASD.  As described above, Vyera
immediately flagged that transaction and hurried to repurchase
the five bottles for twice their purchase price during a meeting
in a Starbucks parking lot in New Jersey.

The pharmacy had placed its order with ASD on April 4, 2018
for five bottles, which were delivered the next day.  Vyera's
Kirby emailed ASD on April 5 to verify that the pharmacy was an
"approved account type[]" and requested that ASD put a hold on
the pharmacy's account for "placing further orders until we can
determine if there is alignment with our distribution model."
ASD answered that it had approved the sale in error and
confirmed that the purchase could not be stopped as the bottles
had already shipped.  A Vyera employee then called the pharmacy
and spoke to the owner.

Vyera repurchased the five bottles for $750,000 on April 6,
2018.  Vyera's CEO Mulleady drove to Parsippany, New Jersey to
meet Reliant's owner in a Starbucks parking lot and repurchased
the bottles.  Mulleady also handed the owner of Reliant a draft
contract titled "Product Purchase and Collaboration Agreement."
The document proposed that Reliant and its affiliates "agree not
to purchase, directly or indirectly, or their own account or on
account of others, or to cause or direct any third party to
purchase, directly or indirectly, any Daraprim, except directly
through normal commercial channels."  Reliant never signed the

document.  Despite its continuing efforts, Reliant only
delivered one bottle of Daraprim in June of 2018.

Cerovene and Dr. Reddy's also used a Swiss distributor,
ProSupplier GmbH ("ProSupplier"), which also required an advance
payment to begin locating Daraprim RLD.  Cerovene and Dr.
Reddy's initially resisted prepaying both Reliant and
ProSupplier for RLD that may never materialize; they had also
heard that ProSupplier was in fact attempting to obtain Daraprim
through Reliant.  As more time passed, however, Dr. Reddy's and
Cerovene decided to accept the risk of holding open two orders
at the same time and prepaid $375,000 to ProSupplier in
September for three bottles of Daraprim, with another $375,000
to be paid after delivery.

ProSupplier delivered three bottles of Daraprim in November
2018, but as they came from a different manufacturing lot than
the one bottle obtained by Reliant, the four bottles could not
be combined to meet the FDA's BE testing and the RLD retention
requirements.  With the three bottles in hand, Dr. Reddy's
cancelled its outstanding order with Reliant.

Cerovene had written the FDA again in July 2018 to stress
that Daraprim appeared to be subject to a restricted
distribution program and was inaccessible in the United States.
It requested a reduction in the amount of RLD needed for BE
testing and retention.  In April 2019, the FDA permitted

Cerovene to conduct BE testing with just the three bottles of Daraprim that it had been able to acquire from ProSupplier.

Meanwhile, due to Vyera's interference, Cerovene was forced to search for yet another API supplier.  During a November 30, 2017 meeting in India, RL Fine informed Cerovene's Shah that, notwithstanding their five-year contract, it would no longer supply Cerovene with any more pyrimethamine.

Cerovene returned to Ipca, which had acquired another company with manufacturing facilities.  Cerovene executed a supply agreement on February 19, 2019, that was conditioned on FDA approval of Ipca's affiliate as Cerovene's API supplier. Cerovene invested in developing the company's pyrimethamine manufacturing capacity from scratch, but even with Ipca transferring its manufacturing process, it took until late 2019 for the company to provide Cerovene with the materials necessary to supplement its ANDA.

From May to June 2019, Cerovene proceeded to conduct BE testing using the RL Fine API that it had received in 2017 and the three bottles of Daraprim obtained from ProSupplier in November 2018.  It submitted its results to the FDA in September 2019.  Then, on February 25, 2020 -- after Vyera terminated its exclusive agreement with RL Fine in October 2019 -- RL Fine agreed once more to supply Cerovene with pyrimethamine pursuant to their 2016 agreement.  Three days later, Cerovene's generic

pyrimethamine product received FDA approval and an AB rating to
Daraprim.  Dr. Reddy's launched the generic on March 20, 2020.
Cerovene began manufacturing commercial batches of generic
pyrimethamine using RL Fine's API in 2021.

Vyera delayed Cerovene's entry into the market by roughly
thirty months, that is, from September 2017 to its actual entry
date of March 2020.  This timeline is premised on Cerovene
having been able to obtain API from Fukuzyu in October 2016 and
being able to obtain Daraprim without any delay.  Cerovene, as
explained at trial by its principal, would have needed
approximately eleven months to obtain approval for an amended
ANDA in these circumstances.[28]  Shah testified that it would have
taken one month to manufacture a registration batch of the
generic drug product.  He would have redone the BE testing
during the three-month period needed for stability testing.  He
predicted that he would have filed an amended ANDA changing
Cerovene's API supplier to Fukuzyu in or around February 2017.
Assuming that the FDA would have taken six months to review of
Cerovene's amendment, it would have approved Cerovene's ANDA by
August 2017.  Dr. Reddy's would have launched Cerovene's FDA-
approved generic pyrimethamine one month later, by September
2017.

---

[28] Shkreli did not challenge this testimony at trial.

As was true when Dr. Reddy's actually launched Cerovene's generic competitor to Daraprim in 2020, the effect of the entry of FDA-approved generic pyrimethamine on the price of Daraprim would have been immediate.  Upon the entry of the Dr. Reddy's generic product, Vyera began to compete on price by offering steep rebates and brand-for-generic deals to various pharmacies and pharmaceutical benefit managers.[29]

C.   Fera

The second pharmaceutical company to bring FDA-approved generic pyrimethamine to the market is Fera.  Fera is based in Locust Valley, New York, and develops generic and branded drugs.  DellaFera founded Fera in 2009 to develop niche products that face barriers to entry and are often overlooked by the pharmaceutical industry.

Fera is a virtual drug company, which means that it does not have its own manufacturing capacity; it contracts with other manufacturers to produce its products.  When developing a new drug, Fera usually partners with reputable API suppliers that have experience complying with the FDA's cGMPs regulations.

---

[29] A brand-for-generic rebate is a rebate offered on the price of a brand name drug by a pharmaceutical company in exchange for a pharmacy agreeing to dispense the brand name drug in lieu of the generic version when filling prescriptions.  The end payer pays the generic cost of the copay despite receiving the brand name drug.

**SPA-83**

In September 2015, Fera decided to develop generic pyrimethamine after learning about Vyera's Daraprim price hike in the media.  After confirming that about one million tablets of Daraprim were being sold per year at the time, Fera began to search for API suppliers holding a U.S. DMF for pyrimethamine.

In February 2016, Fera inquired of Fukuzyu about purchasing pyrimethamine.  Fukuzyu did not respond.

On June 13, 2016, Fera entered into an agreement with another manufacturer to develop a pyrimethamine API manufacturing process exclusively for Fera's use.  That manufacturer had never made pyrimethamine.  Fera invested about $2 million for the development of a pyrimethamine manufacturing process.  The company completed its work in October 2017.[30]

Meanwhile, Fera continued its efforts to acquire the API from an already established source.  Despite its investment in an API development process, Fera understood that its ANDA would be approved more quickly if it relied on a supplier that already had an FDA-approved pyrimethamine DMF.

In September 2017, Fera reached out to Fukuzyu a second time.  Fera sought a sample of pyrimethamine API to test against the API being produced by its manufacturing partner, and also

---

[30] Due to the difficulty obtaining RLD, Fera did not begin working on a DMF until late 2018.  It filed the DMF on May 28, 2019.

hoped that Fukuzyu would agree to become its pyrimethamine
supplier for generic Daraprim.  That proved to be impossible.
At Vyera's direction, Fukuzyu's agent told Fera that it had to
guarantee that Fukuzyu's pyrimethamine would not be used in a
drug for human use in the United States "either via normal
prescription drug distribution" or via compounding.[31]

In the Fall of 2016, Fera also sought to purchase Daraprim
RLD for BE testing and to use as a comparator with the product
being produced by its manufacturing partner.  Its efforts were
largely fruitless.

On November 7, 2016, Fera's McDougal reached out to
Pharmaceutical Buyers, Inc. ("PBI"), a distributor, to acquire
samples of Daraprim.  PBI responded that Daraprim was "only
available to hospitals and government facilities at this time."
McDougal next inquired of a hospital pharmacist at a major
university, who responded that "according to our hospital policy
and distributor contract, I can only procure from what is
defined as own use for hospital business."  Fera was finally
able to acquire small amounts of Daraprim by using a physician's
prescription at a pharmacy.  That Daraprim would not meet FDA

---

[31] Drug compounding is a practice whereby a pharmacist combines,
mixes, or alters pharmaceutical ingredients to create a
medication in a non-FDA-approved facility.  Compounded drugs are
not reviewed by the FDA for safety or efficacy.

requirements for BE testing, however, because the sample contained too few tablets, was provided in an unsealed vial, and had no manufacturing lot number.

Fera also attempted to procure Daraprim through its contract research organization ("CRO"), Xcelience.  Fera had entered into an agreement with Xcelience on December 22, 2016, to develop a generic prototype and manufacture the end product. Xcelience quickly ran into the same roadblocks Fera had met in its own efforts to acquire RLD.  On January 4, 2017, Xcelience relayed to Fera that "the manufacturer is now limiting distribution of Daraprim only to hospitals and government agencies directly."  When Xcelience reached out to Vyera, Vyera explained that Fera would have to enter into an agreement accepting full liability from any use of Daraprim.  This is the first time a purchase of RLD had been conditioned on Fera executing an indemnification clause.  Fera replied by striking the proposed indemnity clause, which ended negotiations.

McDougal continued to inquire of PBI in February and again in May of 2017, to no avail.  In July 2017, Fera ended its relationship with Xcelience at least in part because it had failed to procure the RLD.

Fera signed a development contract with another CRO in November 2017.  Fera also negotiated a partnership with a contract manufacturing organization ("CMO").  That CMO completed

its first manufacture of Fera's generic pyrimethamine product in March 2019.

Meanwhile, in January 2018, Fera succeeded in purchasing two 100-count bottles of Daraprim from Reliant at a cost of $115,000 per bottle. Fera declined to purchase more bottles at that time, partly because the bottles came from a manufacturing lot that expired in Summer 2019, that is, before Fera was sure that it could conduct BE testing. Fera intended to purchase additional bottles from Reliant as its development timeline became clearer. In April 2018, Reliant informed Fera that Vyera's Mulleady had repurchased its inventory of Daraprim and that it could not acquire more.

Using an industry broker, Vyera's Mulleady asked to meet with Fera in April of 2018. DellaFera met with Mulleady in April and May of 2018. Following instructions from Shkreli, Mulleady quizzed DellaFera about his plans, dangling the possibility of a joint venture as he did. Mulleady told DellaFera that he had repurchased Reliant's entire stock of Daraprim. He also related that he had flown to India to lock RL Fine into an exclusive contract in order to prevent it from supplying two major pharmaceutical companies, Mylan and Sandoz, with pyrimethamine. He explained that Vyera was paying RL Fine a royalty on Daraprim sales. When Mulleady added that he knew the identity of Fera's API supplier, DellaFera understood this

as a threat that Vyera was willing to interfere with Fera's source of API as well.  At this point, DellaFera became concerned that Fera might never get pyrimethamine into the market.  DellaFera had no interest in a joint venture with Vyera and the discussions came to a close.

Like Cerovene, Fera had already asked the FDA for a waiver of its BE testing requirements due to difficulty acquiring RLD. In October 2017, Fera proposed performing a pharmacokinetic study, which would not require Daraprim RLD, in lieu of BE testing.  Fera explained that

> the unavailability due to the restricted access program created by the RLD has made the development of a generic version of the product largely impossible. Additionally, the cost of the RLD is exorbitant, forcing even patients to forego this medically necessary treatment.

The FDA denied Fera's request.

On June 1, 2018, Fera requested a competitive generic therapy designation from the FDA that would allow for expedited review of Fera's application.  It also asked for a meeting with the relevant FDA officials to ensure that its ANDA was on track. In August 2018, Fera sought a waiver "for the minimum number of RLD samples required to be retained from the conduct of the Fed and Fasting BE studies."  Fera pointed out that

> [t]he RLD sponsor for this drug product, Vyera, utilizes a closed pharmacy distribution model.  This has resulted in extreme difficulty in obtaining

> sufficient samples of drug product normally needed to
> meet all ANDA test analysis and BE study requirements.

In January 2019, the FDA again denied Fera's request.

On March 4, 2019, Fera's team participated in a call with the FDA's Office of Generic Drugs.  DellaFera stressed how difficult it was to locate RLD and that it had taken over a year to buy just two bottles.  He described his conversations with Mulleady, including Mulleady's admission that Vyera had entered an exclusive API supply agreement with RL Fine to eliminate competition from Mylan and Sandoz.  In April, Fera formally requested another waiver to conduct BE testing with only two bottles of Daraprim, which the FDA granted in June.

Fera immediately conducted BE testing of its generic pyrimethamine product, undertook six months of stability testing, and filed its ANDA in December 2019.  The FDA responded by requiring Fera to conduct additional tests on its API, and in August 2020, the FDA sent Fera a complete response letter citing deficiencies in the impurity profile of Fera's API.  Due to the COVID-19 pandemic, it took Fera until December 2020 to complete the resubmission.  On July 27, 2021, the FDA approved Fera's generic pyrimethamine ANDA.

Vyera delayed Fera's entry into the generic pyrimethamine market by roughly twenty-four months.  This timeline assumes that Fukuzyu would have agreed to supply Fera with pyrimethamine

after Fera reached out to it for a second time in September 2017
and that Fera had unimpeded access to Daraprim RLD.  DellaFera
estimates that, operating on those assumptions, Fera's generic
Daraprim would have entered the market twenty-three months
later, or in August 2019 instead of shortly after Fera's ANDA
was approved in July of 2021.

   As DellaFera explained at trial, Fera would have acted
promptly to finalize an agreement with a CMO partner to
manufacture the drug.  The CMO would have taken between three or
four months -- or up to April 2018 at the latest -- to
manufacture the necessary batches of generic pyrimethamine for
six months of stability testing, bringing the timeline to
October 2018.  During this six-month period, Fera would have
conducted BE testing, assembled its ANDA, and been prepared to
file its ANDA by November 2018.  Presuming eight months for
review, the FDA would have approved Fera's ANDA in July 2019,
avoiding any delays caused by the COVID-19 pandemic.  As Fera's
CMO would have been producing batches of generic pyrimethamine
for commercial sales while awaiting FDA approval, Fera would
have been ready to launch its product within a month, or by
August 2019.[32]

---

[32] At trial, Shkreli did not take issue with this timeline.

D.   InvaTech

InvaTech has also filed an ANDA for generic pyrimethamine.
Identifying RL Fine as its supplier of API, InvaTech filed an
ANDA on July 28, 2017.  Due to its exclusive supply agreement
with Vyera, however, RL Fine stopped cooperating with InvaTech
and InvaTech was forced to find a new supplier of API.  Although
Vyera's actions have delayed InvaTech's entry into the market,
there are too many unknowns to attribute any particular period
of delay to Vyera.  InvaTech has still not received FDA approval
for its ANDA.

InvaTech, founded in 2009, is a New Jersey pharmaceutical
company that develops and markets around twenty products.  In
2014, it began its effort to develop generic pyrimethamine.  In
October of 2014, InvaTech bought six 100-tablet bottles of
Daraprim for a total of just over $8,000.

Like Cerovene, InvaTech initially chose Ipca as its API
supplier, but was forced to look elsewhere following the FDA's
2015 Ipca import ban.  In the summer of 2015, RL Fine agreed to
supply pyrimethamine to InvaTech.  In February 2017, InvaTech
and RL Fine executed a Preliminary Collaboration Agreement
covering pyrimethamine and two other products for which RL Fine
would supply the API.  RL Fine agreed to file a DMF for
pyrimethamine.  While the Agreement left RL Fine free to supply
pyrimethamine to other companies, InvaTech was given

74

preferential pricing.  The Agreement specified that InvaTech would file its pyrimethamine ANDA in either 2017 or 2018.

InvaTech used RL Fine's API to conduct BE testing.  Because RL Fine had not yet filed a DMF, InvaTech requested in June 2017 that RL Fine provide it with the documentation regarding its pyrimethamine manufacturing process for InvaTech to include in its ANDA.  With that information, on July 28, 2017, InvaTech filed its pyrimethamine ANDA.

On September 11, 2017, the FDA sent a response that included questions about RL Fine's API, setting an answer deadline of September 18.  InvaTech sought assistance from RL Fine, but RL Fine ignored each of its requests.  By that time, Vyera and RL Fine were in the midst of negotiating their exclusive supply agreement.

Given the urgency of the situation, Patel flew to India in September for a two-hour meeting with RL Fine.  In that meeting and through other communications, Patel learned that RL Fine would no longer support InvaTech's pyrimethamine ANDA even though it continued to support InvaTech's work on the other two products.

On May 22, 2018, the FDA issued a complete response letter to InvaTech's ANDA.  The FDA cited major deficiencies, including deficiencies with the API information.  RL Fine again ignored InvaTech's requests for help.

Having lost first Ipca and then RL Fine as its API
supplier, InvaTech turned to a third company.  On July 31, 2019,
InvaTech amended its ANDA to reflect the transfer of its API
source to that third company.  To this day, InvaTech continues
to work toward approval of a generic Daraprim product.

 E. Mylan

Vyera was successful in preventing one of the largest
manufacturers of generic drugs in the United States from
entering the market.  Prompted by the dramatic increase in
Daraprim's price, Mylan explored developing generic
pyrimethamine.  In February 2016, Mylan began to search for
potential pyrimethamine API suppliers.  By December 2016 Mylan
concluded that RL Fine was the only supplier that could provide
pyrimethamine "off the shelf and not require a development
agreement."  By that time, however, RL Fine had entered the
exclusive supply agreement with Cerovene.

Like Cerovene and Fera, Mylan was also unable to acquire
Daraprim RLD through its regular distributors and approved
vendors.  It could not get "even a single bottle."  Mylan's Head
of Global Project Management can only recall two or three other
times out of hundreds of projects in which Mylan had such
trouble.  In those instances, the difficulties were easily
explained by the fact that the RLD was part of a REMS program.

Unable to find a source of the API or to obtain Daraprim, Mylan abandoned its nascent plans to develop generic pyrimethamine.

VII. Impact of Competition on Prices of Daraprim

In early 2020, Vyera braced for the imminent approval of Cerovene's ANDA and subsequent launch of Dr. Reddy's FDA-approved generic pyrimethamine product.  In an internal forecast prepared in March 2020, Vyera projected that the net price for a Daraprim tablet would immediately drop from $278 to $126 after generic entry, based on the assumption that Dr. Reddy's generic would launch at a 61% discount on April 1, 2020.  Assuming that another generic competitor would enter the market on September 1, Vyera projected that the business lost by the end of the year due to generic competition would increase to $2.1 million per month and amount to close to $13 million for the year 2020.

Dr. Reddy's FDA-approved generic pyrimethamine launched with a WAC of $292.50.  Daraprim immediately faced stiff price competition, and the net price of FDA-approved pyrimethamine products dropped substantially.  During its first nine months on the market, the average net price of Dr. Reddy's generic pyrimethamine was $197 per tablet, a significant discount from $228, which was the average net price of Daraprim in the prior year.  By the end of 2020, Dr. Reddy's generic pyrimethamine had captured 41% of the sales volume for all FDA-approved pyrimethamine.  At the same time as the price of FDA-approved

pyrimethamine dropped, the total volume of FDA-approved pyrimethamine sales increased.  The sales volume expanded by 9% when 2020 sales are compared to 2019 sales.  This expansion recovered some of the sales lost when Vyera hiked Daraprim's price by 4,000% in 2015.

In March 2020, Vyera launched its own generic pyrimethamine tablet (the "Vyera AG").[33]  The Vyera AG had captured only 16% of the FDA-approved pyrimethamine market by the end of 2020.

The chart below illustrates the relative market share of Daraprim, the Vyera AG (identified as "Authorized Generic"), and



GX7013
**Quantity of FDA-Approved Pyrimethamine by Product**
**2019–2020**

Source:  GX1618 (Vyera_01560868), GX1619 (Vyera_01560869), GX3386 (DRL0000146b)

GX7013-001

---

[33] A generic of a brand name drug may be launched under the brand's preexisting FDA approval.  It is known as an authorized generic.

Dr. Reddy's generic pyrimethamine (identified as "DRL") between the first quarter of 2019 and the last quarter of 2020.

The next chart illustrates the change in the average net price of all FDA-approved pyrimethamine, which dropped from $228 in 2019 to $166 in 2020 -- a decrease of 27%.  This rate of decrease exceeded any year-over-year net price drop that had occurred since 2016.



In response to the entry of Dr. Reddy's generic pyrimethamine, Vyera cut the net price of Daraprim through steep rebates and brand-for-generic offers to pharmacies and pharmacy benefit managers.  Despite these offers from Vyera, the availability of generic alternatives to Daraprim allowed pharmacy benefit managers to cover the cheaper generic

competitors at the lowest tiers of their formularies and to
exclude Daraprim from their formularies.  For example, in
January 2021 CVS Caremark moved Daraprim to "excluded status" on
its standard control formulary.  It explained its decision as
follows:  CVS Caremark, like most payors, promotes a "generic-
first strategy."  Where the branded drug is expensive and two
generics became available, it is "a very cost-effective
strategy" to exclude the brand from the formulary.  With the
entry of more generic competitors in the FDA-approved
pyrimethamine market, the price of FDA-approved pyrimethamine
can be expected to fall further.

    VIII. The Role of Martin Shkreli at Vyera

    Shkreli founded Vyera.  He did so with the intention to use
Vyera to acquire a pharmaceutical that was the sole source of
treatment for a life-threatening ailment, raise the drug's price
sky-high, and keep it sky-high for as long as possible by
blocking generic competition.

    Shkreli was Vyera's first CEO, a position he held from
October 10, 2014 to December 18, 2015.  It was Shkreli who made
the decision to acquire Daraprim and to implement his scheme
with Daraprim.  He directed his team to identify a small,
essential drug out of patent protection and without generic
competition that could be priced exorbitantly.  That drug was

Daraprim.  Shkreli signed off on Vyera's unsolicited bid to acquire it at a price far above its present value.

Shkreli raised the price of Daraprim to $750 per tablet. When Vyera's General Counsel objected to the price hike, Shkreli fired him.

To block generic competition, Shkreli devised a highly restrictive, closed distribution system for Daraprim and told Vyera that it was a top priority to put it in place by the time of the price hike.  Shkreli also instructed his staff to buy back Daraprim inventory from wholesalers and distributors.

Having checked the FDA's pyrimethamine DMF list, Shkreli decided to pursue an exclusive supply contract with Fukuzyu.  As Tilles, Shkreli's immediate successor as CEO, explained, the 2017 Fukuzyu contract was "something [Shkreli] wanted and it happened."  As the arrival of a generic competitor grew more likely, in 2017 Shkreli decided to pursue an exclusive supply contract with pyrimethamine manufacturer RL Fine as well.

Shkreli remained in functional control of Vyera's management and its business strategy even after his arrest in December 2015 and in spite of management's occasional resistance.  He was Vyera's largest shareholder and at any one time controlled between 43.07% and 49.44% of its voting shares. Even during his incarceration, Shkreli worked to ensure that his grand strategy not only remained in place but actually worked.

Critically, none of the resistance put up by Shkreli's successors included unwinding Vyera's anticompetitive strategy. To the contrary, all of Vyera's CEOs pursued Shkreli's original vision.

Shkreli recruited employees and agents to carry out his vision at Vyera and picked the men who ran Vyera after he stepped down as its CEO. That those agents' names appear on documents executed after Shkreli's formal departure in lieu of his own does not shield him as the scheme's prime mover from individual liability. Shkreli initiated every anticompetitive decision that Vyera pursued to its conclusion. He maintained "shadow control" of the company, staying in close contact with Vyera's directors and officers, providing guidance on how to maintain control of the market, and threatening to use his authority as the largest shareholder to call an extraordinary general meeting ("EGM") that would install more pliant officers and directors. He did exactly that in 2017 and again in 2020, each time installing loyalists.

As Tilles has testified, he couldn't do anything "major" as CEO of Vyera without Shkreli's approval. When Shkreli became frustrated with Tilles, he replaced him with Dr. Salinas. Shkreli quickly became dissatisfied with Dr. Salinas too, proclaiming in one email that Dr. Salinas was a "cockroach that needed to be stomped or crushed."

Utilizing his controlling voting shares, Shkreli replaced Dr. Salinas with Mulleady.  In June of 2017, Shkreli called an EGM of the shareholders to vote on a new slate of Directors. The Phoenixus Board and Shkreli put up competing slates.

In its Invitation to shareholders, the Board strongly opposed Shkreli's slate as unqualified and conflicted.  The Board advised that

> many third parties -- including regulatory authorities -- will likely deem the newly elected Board members to be serving merely as straw men acting on Mr. Shkreli's behalf, and could further deem Mr. Shkreli to be in a position to influence, direct or control the Board and thus, the Company as well.

At the EGM held on June 21, 2017, Shkreli's slate was elected.

The new Board members notably lacked experience in the pharmaceutical industry.  Those new members included Mulleady and Mithani.  Tilles had fired Mulleady after Shkreli's arrest because Mulleady lacked "any skills" to offer the company. Mithani had graduated from college just three years earlier. His only prior employment was at a distressed debt brokerage firm, which he had quit to manage his own investment portfolio. Mithani has admitted that he was not qualified to join the board of a pharmaceutical company and that he was placed on the Board because Shkreli wanted "people he can trust."

The next day, the Board placed Dr. Salinas, then interim CEO, on leave and established an Executive Committee to "perform

executive functions and take over the task of the Senior
Management (CEO, CFO, CCO and CLO)."  The Executive Committee
had only two members:  Mulleady and Mithani.

Mulleady promptly sent a reassuring email to Vyera's sales
force, which was confronting an FDA announcement that it would
expedite review of pyrimethamine ANDAs.  He explained,

> In my opinion, this not an immediate concern.  Getting
> to the point of filing an ANDA is a cumbersome
> process.  Personally, I can tell you the FDA approval
> is generally not the main barrier to entry for
> generics in our class.  Amongst other necessities, a
> company would have to successfully create the active
> ingredient on scale using a well-controlled process
> and then formulate.  Next they would have to obtain
> RLD (registered listed drug), 10 labelled and
> unexpired bottles (informed estimation), of Daraprim
> to complete a study in healthy volunteers to
> demonstrate bioequivalence.
>
> Getting to the front of the line is helpful, but
> getting to the line is not an easy task.  I can't
> imagine ANDA submission preparation taking less than
> 18 months (extremely conservative).  Since [Vyera]
> actively collects competitive intelligence concerning
> other potential developers, we would most likely be
> aware of this process going on and have plenty of time
> to prepare.

Mulleady also ordered a "full out audit" of Daraprim to
know where "every bottle" of Daraprim went.  He made sure that
Shkreli got the audit results.

If anything, Shkreli tightened his control over Vyera as
his criminal problems progressed.  Concern was expressed at an
August 30, 2017 Board meeting that the company was buying back
shares at a price below par value "to increase Martin Shkreli's

holding in the Company and to facilitate his control over it."
At Mulleady and Mithani's urging, the Board nonetheless approved
the buyback.  The Board then appointed Mulleady CEO in October
2017.[34]

Shkreli kept in regular contact with both Mulleady and
Mithani to discuss when a generic Daraprim drug might enter the
market and what should be done to slow that entry.  As shown in
an Excel spreadsheet maintained by Mulleady, between December
26, 2019 and July 14, 2020 alone, at a time when Shkreli was in
prison, Mulleady and Shkreli communicated over 1,500 times.

In the few recordings of Shkreli's conversations from
prison with Vyera management that are part of the trial record,
Shkreli openly discussed his control over Vyera.  He observed
that he had "EGM power."  Shkreli said "I have no problem firing
everybody to be frank, if you guys can't figure it out."  In
September 2020, Shkreli told Mulleady that any dissenters
amongst the Directors needed to understand that "being on the
board of Phoenixus means, you know, you're on the Martin and
Kevin board."  Shkreli compared himself to Mark Zuckerberg and

---

[34] Mulleady served as the interim Executive Director of Vyera and
Phoenixus from October to December 2017, then became Vyera's CEO
from January 1, 2018 until February 19, 2019.  Mulleady was
removed as the Chairman of the Board of Phoenixus on November
17, 2020 and removed from the Board on December 11 at another
EGM called by Shkreli.

Vyera to Facebook, noting that Zuckerberg "just happens to own the thing and that's the way it is," and "[y]ou can't go in there and tell Zuckerberg what to do."

In February 2020, Shkreli used his EGM power to change Vyera's management team once again.  This time, he removed Mulleady.  Mulleady had added a "confidential" item to the agenda of an upcoming Board meeting.  It was intended to address Shkreli's meddlesome involvement with Vyera.  But before it could be discussed, Shkreli called for an EGM, Mulleady was removed from the Board, and Shkreli's new directors were installed.

### **Discussion**

The FTC has brought claims against Shkreli for violations of §§ 1 and 2 of the Sherman Act.  The States have brought claims against Shkreli based on violations of various state statutes and Pennsylvania common law, all of which follow federal precedent.  After finding that the Plaintiffs have carried their burden of proving by a preponderance of the evidence that Shkreli violated §§ 1 and 2 of the Sherman Act and the state laws at issue here, the Plaintiffs' requests for relief will be addressed.

I.    Legal Standard

   A.    Section 5 of the FTC Act

   The FTC brings this action pursuant to authority given to
it in the FTC Act.  The FTC Act declares "[u]nfair methods of
competition" to be unlawful, 15 U.S.C. § 45, and directs the FTC
to prevent violations of the FTC Act.  "Unfair methods of
competition" under the FTC Act encompass violations of the
Sherman Act.  FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 454-
55, 465-66 (1986).

   B.    Section 1 of the Sherman Act

   Section 1 of the Sherman Act outlaws "[e]very contract,
combination . . . , or conspiracy, in restraint of trade or
commerce among the several States."  15 U.S.C. § 1.  The
"primary purpose of the antitrust laws is to protect interbrand
competition.  Low prices . . . benefit consumers."  State Oil
Co. v. Khan, 522 U.S. 3, 15 (1997).

   To prove a § 1 violation, a plaintiff must show that there
was "a combination or some form of concerted action between at
least two legally distinct economic entities that constituted an
unreasonable restraint of trade."  United States v. Apple, Inc.,
791 F.3d 290, 313 (2d Cir. 2015) (citation omitted).
"[O]fficers or employees of the same firm do not provide the
plurality of actors imperative for a § 1 conspiracy" because "an
internal agreement to implement a single, unitary firm's

policies does not raise the antitrust dangers that § 1 was designed to police." Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 769 (1984).

"The first crucial question in a Section 1 case is . . . whether the challenged conduct stems from independent decision or from an agreement, tacit or express." Apple, 791 F.3d at 314-15 (citation omitted).  Courts presumptively apply a rule of reason analysis to challenged agreements to determine whether they restrain trade.  1-800 Contacts, Inc. v. Fed. Trade Comm'n, 1 F.4th 102, 114 (2d Cir. 2021) (citing Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006)).  Therefore, "antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." Texaco, 547 U.S. at 5.  Anticompetitive effects may be shown through direct evidence of increased prices in the relevant market. 1-800 Contacts, 1 F.4th at 118.

Under the rule of reason,

[a] plaintiff bears the initial burden of showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market. After a prima facie case of anticompetitive conduct has been established, the burden shifts to the defendant to proffer procompetitive justifications for the agreement.  Assuming defendants can provide such proof, the burden shifts back to the plaintiffs to prove that any legitimate competitive benefits offered by defendants could have been achieved through less restrictive means.

Id. at 114 (citation omitted).

The rule of reason analysis requires a court to weigh "the
relevant circumstances of a case to decide whether a restrictive
practice constitutes an unreasonable restraint on competition."
Anderson News, L.L.C. v. Am, Media, Inc., 680 F.3d 162, 183 (2d
Cir. 2012) (quoting Monsanto Co. v. Spray-Rite Service Corp.,
465 U.S. 752, 761 (1984)).  Such factors may include "specific
information about the relevant business, its condition before
and after the restraint was imposed, and the restraint's
history, nature, and effect."  State Oil Co., 522 U.S. at 10.

Exclusive dealing arrangements "implicate § 1 because they
have the potential unreasonably to exclude competitors or new
entrants from a needed supply, or to allow one supplier to
deprive other suppliers of a market for their goods."  Geneva
Pharms. Tech. Corp. v. Barr Lab'ys Inc., 386 F.3d 485, 508 (2d
Cir. 2004).  Exclusive dealing is a § 1 violation "only when the
agreement freezes out a significant fraction of buyers or
sellers from the market."  Id.

Exclusive dealing agreements may "have pro-competitive
purposes and effects, such as assuring steady supply, affording
protection against price fluctuations, reducing selling
expenses, and promoting stable, long-term business
relationships."  Id.  In analyzing the procompetitive effects of
these agreements, "courts must take care to consider the
competitive characteristics of the relevant market."  Id.

C.   Section 2 of the Sherman Act

Under § 2 of the Sherman Act, it is unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States."  15 U.S.C. § 2.  A claim brought under § 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co. Ltd., 11 F.4th 118, 137 (2d Cir. 2021) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)).  "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct."  In re Adderall XR Antitrust Litig., 754 F.3d 128, 133 (2d Cir. 2014) (quoting Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004)).

a.   Monopoly Power

Monopoly power is "the power to control prices or exclude competition."  Geneva Pharms., 386 F.3d at 500 (quoting United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 334 (1961)).  Defendants with monopoly power have "the ability (1)

to price substantially above the competitive level and (2) to
persist in doing so for a significant period without erosion by
new entry or expansion." AD/SAT, Div. of Skylight, Inc. v.
Associated Press, 181 F.3d 216, 227 (2d Cir. 1999).  A plaintiff
can establish a defendant's monopoly power either "directly
through evidence of control over prices or the exclusion of
competition, or it may be inferred from a firm's large
percentage share of the relevant market."  Geneva Pharms., 386
F.3d at 500.

      "While market share is not the functional equivalent of
monopoly power, it nevertheless is highly relevant to the
determination of monopoly power."  Tops Markets, Inc. v. Quality
Markets, Inc., 142 F.3d 90, 98 (2d Cir. 1998).  As such,
"defining a relevant market is generally a necessary component
of analyzing a monopolization claim."  PepsiCo, Inc. v. Coca-
Cola Co., 315 F.3d 101, 108 (2d Cir. 2002).  "Once a relevant
market is determined, the defendant's share in that market can
be used as a proxy for market power."  Id.

      "The relevant market must be a market for particular
products or services, the outer boundaries of which are
determined by the reasonable interchangeability of use or the
cross-elasticity of demand between the product itself and
substitutes for it."  US Airways, Inc. v. Sabre Holdings Corp.,
938 F.3d 43, 64 (2d Cir. 2019) (quoting Brown Shoe Co. v. United

States, 370 U.S. 294, 325 (1962)). "[A] single brand of a product or service may be a relevant market under the Sherman Act if no substitute exists for that brand's products or services." US Airways, 938 F.3d at 66 (citation omitted). On the other hand, products "need not be identical" to exist in the same market. AD/SAT, 181 F.3d at 227. Pharmaceutical drugs that are "therapeutically equivalent" can nevertheless exist in separate markets. Geneva Pharms., 386 F.3d at 496. To define the boundaries of the relevant market, courts can look toward

> such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

US Airways, 938 F.3d at 64 (quoting Brown Shoe, 370 U.S. at 325).

Courts will find sufficient cross-elasticity of demand if "consumers would respond to a slight increase in the price of one product by switching to another product." Geneva Pharms., 386 F.3d at 496. One of the tests that courts employ to discern the relevant market is the hypothetical monopolist test ("HMT"). Under that test, courts ask "[w]hether a hypothetical monopolist acting within the proposed market would be substantially constrained from increasing prices by the ability of customers

to switch to other products." United States v. Am. Express Co.,
838 F.3d 179, 198-199 (2d Cir. 2016) (citation omitted).

> The Court implements the HMT by imagining that a
> hypothetical monopolist has imposed a small but
> significant non-transitory increase in price ("SSNIP")
> within the proposed market.  If the hypothetical
> monopolist can impose this SSNIP without losing so
> many sales to other products as to render the SSNIP
> unprofitable, then the proposed market is the relevant
> market.  By contrast, if consumers are able and
> inclined to switch away from the products in the
> proposed market in sufficiently high numbers to render
> the SSNIP unprofitable, then the proposed market
> definition is likely too narrow and should be
> expanded.

Id. at 199.

The Department of Justice and the FTC most often use a
SSNIP of five percent.  U.S. Dep't of Justice & Fed. Trade
Comm'n, Horizontal Merger Guidelines § 4.1.2 (2010).  Once the
relevant market is established, courts have found that "a market
share of over 70 percent is usually strong evidence of monopoly
power."  Tops Markets, 142 F.3d at 99.

   b.  Anticompetitive Conduct

The second element of the monopolization claim "requires a
plaintiff to establish that the defendant has engaged in
improper conduct that has or is likely to have the effect of
controlling prices or excluding competition."  Takeda, 11 F.4th
at 137 (citation omitted).  "For there to be an antitrust
violation, generics need not be barred from all means of
distribution if they are barred from the cost-efficient ones."

New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 656

(2d Cir. 2015) ("Actavis PLC") (citation omitted).

> "[O]nce a plaintiff establishes that a monopolist's conduct
> is anticompetitive or exclusionary, the monopolist may proffer
> nonpretextual procompetitive justifications for its conduct.
> The plaintiff may then either rebut those justifications or
> demonstrate that the anticompetitive harm outweighs the
> procompetitive benefit." Actavis PLC, 787 F.3d at 652 (citation
> omitted).

II.   Plaintiff States' Laws

Seven States have joined in this action.  They are the

States of New York, California, Ohio, Illinois, and North

Carolina, and the Commonwealths of Pennsylvania and Virginia.

A.   New York

The New York Donnelly Act, New York's antitrust statute,

declares illegal

> Every contract, agreement, arrangement or combination
> whereby . . . [c]ompetition or the free exercise of
> any activity in the conduct of any business, trade or
> commerce or in the furnishing of any service in this
> state is or may be restrained or whereby . . . for the
> purpose of establishing or maintaining any such
> monopoly or unlawfully interfering with the free
> exercise of any activity in the conduct of any
> business, trade or commerce or in the furnishing of
> any service in this state any business, trade or
> commerce or the furnishing of any service is or may be
> restrained.

N.Y. Gen. Bus. Law § 340(1).  The New York Donnelly Act is

"modeled after the Sherman Act and should generally be construed

in light of Federal precedent." Biocad JSC v. F. Hoffmann-La
Roche, 942 F.3d 88, 101 (2d Cir. 2019) (citation omitted).

Section 63(12) of the New York Executive Law authorizes the
New York Attorney General to seek equitable relief.  In relevant
part, § 63 provides:

> Whenever any person shall engage in repeated
> fraudulent or illegal acts or otherwise demonstrate
> persistent fraud or illegality in the carrying on,
> conducting or transaction of business, the attorney
> general may apply . . . for an order enjoining the
> continuance of such business activity or of any
> fraudulent or illegal acts, [and] directing
> restitution and damages . . . .  The term "persistent
> fraud" or "illegality" as used herein shall include
> continuance or carrying on of any fraudulent or
> illegal act or conduct.  The term "repeated" as used
> herein shall include repetition of any separate and
> distinct fraudulent or illegal act, or conduct which
> affects more than one person.

N.Y. Exec. Law § 63(12).

"Any conduct which violates state or federal law or
regulation is actionable" under Executive Law § 63(12).  People
ex rel. Vacco v. World Interactive Gaming Corp., 714 N.Y.S.2d
844, 848 (N.Y. Sup. Ct. 1999).  When a defendant engages in
conduct within New York prohibited by Executive Law § 63(12),
the Attorney General is authorized to seek relief on behalf of
out-of-state residents injured by the wrongdoing.  People ex
rel. Cuomo v. H & R Block, Inc., 870 N.Y.S.2d 315, 316 (1st
Dep't 2009); see also Vyera, 2021 WL 4392481, at *4.

B.   California

The California Cartwright Act, Cal. Bus. & Prof. Code §
16700 et seq., prohibits "conspiracies or agreements in
restraint or monopolization of trade."  Exxon Corp. v. Superior
Ct., 60 Cal. Rptr. 2d 195, 200 (1997), as modified on denial of
reh'g (Feb. 13, 1997).  The analysis of claims brought under
California's Cartwright Act "mirrors the analysis under federal
law because the Cartwright Act . . . was modeled after the
Sherman Act."  Cnty. of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d
1148, 1160 (9th Cir. 2001) (citation omitted).

The California Unfair Competition Law prohibits "any
unlawful, unfair or fraudulent business act or practice."  Cal.
Bus. & Prof. Code § 17200.  In actions brought by the Attorney
General, courts may "grant such mandatory injunctions as may be
reasonably necessary to restore and preserve fair competition in
the trade or commerce affected by the violation."  Cal. Bus. &
Prof. Code § 16754.5.

C.   Illinois

The Illinois Antitrust Act ("IAA") instructs that "[w]hen
the wording of this Act is identical or similar to that of a
federal antitrust law, the courts of this State shall use the
construction of the federal law by the federal courts as a guide
in construing this Act."  740 Ill. Comp. Stat. 10/11.  "Illinois
courts interpret the state antitrust law in harmony with federal

case law construing analogous provisions of federal legislation." McGarry & McGarry, LLC v. Bankr. Mgmt. Sols., Inc., 937 F.3d 1056, 1062 (7th Cir. 2019) (citation omitted). Section 10/7(1) of the IAA authorizes the Illinois Attorney General to bring actions to prevent and restrain violations of § 3 of the IAA, and courts are directed to enter such judgment as they consider necessary to remove the effects of any such violations.  740 Ill. Comp. Stat. 10/7(1).

D.   North Carolina

Under the North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. § 75-1, "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal."  N.C. Gen. Stat. § 75-1.  The Attorney General is authorized to investigate "all corporations or persons doing business in this State . . . with the purpose of acquiring such information as may be necessary to enable him to prosecute any such corporation, its agents, officers and employees for crime, or prosecute civil actions against them if he discovers they are liable and should be prosecuted."  N.C. Gen. Stat. § 75-9.

E.   Ohio

The Ohio Valentine Act, Ohio Rev. Code Ann. § 133, is "patterned after the Sherman Antitrust Act, and as a consequence

[Ohio's highest] court has interpreted the statutory language in light of federal judicial construction of the Sherman Act." C. K. & J. K, Inc. v. Fairview Shopping Ctr. Corp., 407 N.E.2d 507, 509 (Ohio 1980). "Ohio has long followed federal law in interpreting the Valentine Act." Johnson v. Microsoft Corp., 834 N.E.2d 791, 794-95 (Ohio 2005). The Ohio Attorney General has a duty to "do all things necessary" to enforce the antitrust laws, by bringing suits for "equitable relief." O.R.C. § 109.81.

F.   Pennsylvania

To establish a claim under Pennsylvania's common law doctrine against unreasonable restraint of trade, the plaintiff may show that "the illegal bargain tends to create or has for its purpose to create a monopoly in prices or products," or that "competition has in fact been restricted by the monopolistic agreement." Collins v. Main Line Board of Realtors, 304 A.2d 493, 496-97 (Pa. 1973). The Pennsylvania Supreme Court has applied federal courts' interpretation of the Sherman Act to state common law antitrust claims. See id.

G.   Virginia

Virginia Code § 59.1-9.5 parallels § 1 of the Sherman Act and provides that "[e]very contract, combination or conspiracy in restraint of trade or commerce of this Commonwealth is unlawful." Section § 59.1-9.6 parallels § 2 of the Sherman Act

and provides that "[e]very conspiracy, combination, or attempt
to monopolize, or monopolization of, trade or commerce of this
Commonwealth is unlawful."  The Virginia Antitrust Act, Va. Code
Ann. § 59.1 et seq, requires that the statute "shall be applied
and construed to effectuate its general purposes in harmony with
judicial interpretation of comparable federal statutory
provisions."  Va. Code Ann. § 59.1-9.17.  The Virginia Attorney
General may seek "injunctive relief" for violations of the Act.
Virginia Code § 59.1-9.15(a).

III.    Liability

    The Plaintiffs have shown that Shkreli is liable for
Vyera's unreasonable restraint of trade and monopolization of
the FDA-approved pyrimethamine market in violation of §§ 1 and 2
of the Sherman Act.  His conduct also violated the competition
laws of each of the Plaintiff States.

    Shkreli's anticompetitive scheme was made up of two simple
but effective sets of vertical restraints.[35]  Shkreli does not

---

[35] The Plaintiffs proved at trial that separate provisions in
Vyera's contracts with Distributors were intended to impede the
entry of generic drug companies into the FDA-approved
pyrimethamine market by depriving those companies of accurate
information about Daraprim sales.  Through these data-blocking
provisions, Distributors agreed not to provide Daraprim sales
data to data aggregators such as IQVIA, Symphony Health, and
Wolters Kluwer.  Because the absence of this normally available
market data did not impede the entry of either Cerovene or Fera,
the data-blocking scheme need not be further described.  The
Cerovene and Fera experiences are central to the calculation of
the disgorgement the State Plaintiffs seek.

dispute that it was his intention to impede generic pharmaceutical companies from launching competitive products that would threaten the price of Daraprim.  The Plaintiffs have shown that the restraints Vyera implemented succeeded in doing just that.

The two restraints -- restrictive distribution contracts for Daraprim and exclusive supply agreements for pyrimethamine -- exploited features of the FDA approval process for generic drug products by unreasonably and unlawfully restricting the markets for RLD and API.  These agreements violated § 1 of the Sherman Act.  Through these agreements, Shkreli and Vyera unlawfully and willfully maintained a monopoly in FDA-approved pyrimethamine, which is the relevant market in which Shkreli and Vyera operated their anticompetitive scheme.  Vyera maintained that monopoly through anticompetitive conduct and not "from growth or development as a consequence of a superior product, business acumen, or historic accident."  Takeda, 11 F.4th at 137 (citation omitted).

B.   The Relevant Market

The analysis under §§ 1 and 2 of the Sherman Act relies, as a threshold matter, on the definition of the relevant market. The Plaintiffs have proven that, by any established method, FDA-approved pyrimethamine is the relevant product market and the United States is the relevant geographic market.  Shkreli does

not dispute that the United States is the relevant geographic
market.

Apart from a generic equivalent to Daraprim that receives
FDA approval, no reasonably interchangeable substitute for
Daraprim exists for the treatment of toxoplasmosis.  This is
true in terms of both the use of Daraprim to treat
toxoplasmosis, particularly active toxoplasma encephalitis, as
well as the cross-elasticity of demand for FDA-approved
pyrimethamine for treatment of that disease.

In terms of its use, Daraprim is the only pharmaceutical to
receive an A-I rating in the Guidelines for the treatment of
active toxoplasma encephalitis.  It has many unique features.
Among other qualities, FDA-approved pyrimethamine targets
toxoplasmosis specifically, has been successfully used in its
treatment for decades, and permits a diagnosis of toxoplasma
encephalitis without resort to a biopsy of the brain, which
would present significant risks to patients if performed.
Because death and/or significant brain damage can occur within
hours, its endorsement in the Guidelines assists physicians
throughout the United States to treat a highly dangerous
infection with confidence, quickly, and successfully.

An analysis of the cross-elasticity of demand for FDA-
approved pyrimethamine confirms this definition of the relevant
market.  Even in response to Vyera's drastic price hike in

August 2015, appreciable numbers of physicians and their patients continued to use Daraprim.  Vyera was profitably able to keep Daraprim's list price at $750 per tablet and maintain a high average net price for the drug for the four years and seven months that it marketed Daraprim without generic competition. The average net price was very substantially above the competitive price level, whether that level is measured by Daraprim's price in the years before Vyera acquired it, or in the period after its first generic competitor entered the market.  As more generic competitors enter the market, of course, the average net price will fall even further.

The high degree of cross-elasticity in demand between Daraprim and FDA-approved generic pyrimethamine is demonstrated as well by the market reaction to Dr. Reddy's March 2020 launch of its first-to-market generic.  In the period following that launch, both the price and sales of Daraprim (as well as Vyera's revenue and profits) promptly declined as Dr. Reddy's generic tablet was substituted for Daraprim.  Daraprim sales dropped 49% in the nine-month period after March 2020 compared to the same period prior to entry, and Vyera's revenue and gross profits from Daraprim sales declined 59% between 2019 and 2020.

Finally, practical indicia of the relevant market support a finding that it is FDA-approved pyrimethamine.  Shkreli and Vyera considered that to be the relevant market, as did Vyera's

**SPA-119**

consultants and those the consultants interviewed.  Generic drug companies also assessed the relevant market to be FDA-approved pyrimethamine.  There is no evidence that the price hike for Daraprim affected the prices of any other pharmaceutical. Lastly, FDA-approved pyrimethamine is the only FDA-approved drug that specifically targets toxoplasmosis.

In response to this cascade of evidence that FDA-approved pyrimethamine is the relevant product market, Shkreli argues that drug therapies trimethoprim-sulfamethoxazole ("TMP-SMX") and compounded pyrimethamine are sufficient economic and medical substitutes for Daraprim and that they must be included in the relevant antitrust market.  These therapies are not part of the relevant market.

TMP-SMX is a broad-spectrum antibiotic medication approved by the FDA in 1973 and sold under the brand names Bactrim and Septra.  TMP-SMX is FDA-approved to treat certain infections, including pneumocystis jirovecii pneumonia ("PCP").  It is also available as a generic.  Although TMP-SMX is not FDA-approved to treat toxoplasmosis, a fact that Vyera itself emphasized to the market, it is prescribed in certain circumstances.

TMP-SMX is an effective prophylactic treatment because it has been effective at preventing multiple opportunistic infections that tend to occur together.  For example, TMP-SMX is the recommended medication as primary prophylaxis for PCP, and

patients at risk for toxoplasma encephalitis but who are not
suffering from an acute infection of the brain are also at risk
for PCP.  These patients are often prescribed TMP-SMX
medications to prevent both infections and reduce the "pill
burden" for patients.  For this reason, TMP-SMX is also
effective at the secondary prophylaxis stage, in which the goal
is to prevent a relapse in a patient that has recovered from an
active infection.  TMP-SMX, which may be administered
intravenously, is a recommended alternative treatment when a
patient is incapable of swallowing pills; pyrimethamine may only
be taken orally.

     The most difficult stage in treating toxoplasmosis,
however, is an active infection.  At that point the treatment
goal is to medicate the patient within hours of presenting
symptoms.  A pyrimethamine treatment regimen is the gold
standard treatment in the case of an acute infection of
toxoplasmosis.  Even Vyera's Dr. Salinas viewed TMP-SMX as
"medically inferior" because not enough of the drug reaches the
brain or the retina (in the case of ocular toxoplasmosis) to
treat an infection properly.  Studies have shown that TMP-SMX is
25- to 50-times less potent than pyrimethamine.  In the
Guidelines, TMP-SMX is graded B-I for the treatment of
toxoplasma encephalitis and recommended only "if pyrimethamine
is unavailable or there is a delay in obtaining it."  As a

broad-spectrum antibiotic, TMP-SMX also cannot be reliably used
to confirm the diagnoses of toxoplasma encephalitis, while
pyrimethamine aids in diagnosis because it is targeted to treat
toxoplasmosis.  Finally, TMP-SMX cannot be taken by patients
with a sulfa hypersensitivity or allergy, which constitutes
roughly 30-35% of all HIV-positive patients.[36]

The other therapy suggested by Shkreli as a potential
substitute for Daraprim is compounded pyrimethamine, which two
specialty pharmacies began selling in 2015.  Compounding
contains no assurance that the end product will deliver the
correct amount of the API, and compounded products are not FDA-
approved.

Vyera itself objected to the mass production of compounded
drugs as dangerous.  On November 30, 2015, Vyera warned the FDA
that Imprimis, a compounding pharmacy, intended to mass produce
compounded pyrimethamine.  Vyera objected that

[c]ompounded drugs can pose serious health risks to
patients.  Compounded drugs are not FDA-approved.

---

[36] Although Shkreli made no developed argument regarding this
third alternative treatment, Shkreli suggests that atovaquone
was another therapeutic alternative to Daraprim for the
treatment of toxoplasmosis.  Atovaquone is an FDA-approved
antimicrobial drug for treatment of PCP and is prescribed for
patients who cannot tolerate TMP-SMX.  The Guidelines give
atovaquone a C-III grade for primary prophylaxis of
toxoplasmosis and a B-II grade as an alternative treatment for
active toxoplasma encephalitis.  Shkreli has not shown that
atovaquone was either therapeutically or economically
substitutable with Daraprim.

There is no FDA premarket review.  No data and
information are required to demonstrate a compounded
drug is safe and effective for its intended purposes .
. . . Compounding large volumes of drugs without
obtaining FDA approval, which Imprimis apparently
intends to do, circumvents important public health
requirements.  As a result, it is not appropriate to
use a compounded product in lieu of an FDA approved,
commercially available product unless the compounded
drug provides a medically necessary and unavailable
drug for a specific patient.

Vyera's alarm that compounded pyrimethamine sales might eat
into Daraprim sales was unfounded.  Despite compounded
pyrimethamine capsules being priced at $1 to $5, there were
never significant sales of the compounded drug produced by
Imprimis.  The only way a patient could get Imprimis' compounded
pyrimethamine product was with a specific prescription for that
product, which did not permit en masse market substitution.
Imprimis sold fewer than 22,000 compounded pyrimethamine
capsules in 2016, and its sales declined thereafter.  Avella,
another compounding pharmacy, sold a total of 1,280 compounded
pyrimethamine capsules, with no sales after 2018 due to a lack
of customers.

Shkreli has pointed out that demand for Daraprim,
represented by sales volume, dropped precipitously immediately
after the 2015 price hike.  The defendant suggests that
consumers must have substituted alternative therapies for
Daraprim.  None of the parties have offered comparative data
regarding TMP-SMX to support or contradict that hypothesis.  It

would be difficult to draw any conclusions from TMP-SMX data in any event because it is a broad-spectrum antibiotic prescribed for multiple infectious diseases.  Sales of mass-production compounded pyrimethamine during the period of Vyera's sale of Daraprim were minimal at best.  What can be said with certainty is that the market for FDA-approved pyrimethamine was sufficiently bound that Vyera was able to raise Daraprim's price to never before seen heights and earn record revenues and profits after doing so.

The practical indicia enumerated in Brown Shoe and the other evidence described above strongly support the conclusion that doctors and pharmaceutical buyers did not react to the astronomical rise in Daraprim's price by freely switching to other, cheaper drugs to treat toxoplasmosis.  The demand for FDA-approved pyrimethamine remained relatively stable at approximately 250,000 tablets per year between 2016 and 2019 after the initial drop in sales in 2015.  If there had been any material cross-price elasticity between Daraprim and other products at the time of the 4,000% price hike in 2015, purchasers would have abandoned Daraprim in favor of cheaper products on the market.  And if alternative toxoplasmosis treatments had been constraining the price of Daraprim before March 2020, generic entry would not have resulted in the

significant drop in the price for FDA-approved pyrimethamine
that occurred.

In sum, as a result of its distinctive attributes, FDA-
approved pyrimethamine constitutes the relevant market.  It
treats a distinct patient population; in economic terms, it has
a distinct kind of customer.

C.   Monopoly Power

Having defined the relevant market, the conclusion that
Vyera had a monopoly in that market follows easily.  Vyera
controlled 100% of the market for FDA-approved pyrimethamine
market between August 2015 and March 2020.  Shkreli controlled
the price of Daraprim, which he acquired precisely because it
was a sole-source drug in a market of its own.  Vyera profitably
charged a per-tablet average net price for Daraprim ranging
between $228 and $305 during the full years of 2016, 2017, 2018,
and 2019.  These prices were also substantially above any
competitive price level, which was at most $160.[37]

---

[37] To arrive at a figure of $160, the Plaintiffs' economic expert
Hemphill observed the average net price of Daraprim, Dr. Reddy's
generic pyrimethamine, and the Vyera AG tablet for a sustained
period after Dr. Reddy's generic pyrimethamine entered the
market.  The real-world evidence of Daraprim's price, volume,
and market share after Dr. Reddy's entry in March 2020 starkly
demonstrates not only that Vyera had a monopoly over Daraprim,
but also that the high price maintained in that monopoly
depended entirely on the absence of competition.

D.   Anticompetitive Conduct

The Plaintiffs have met their burden under § 1 of the
Sherman Act of showing that the contracts at issue here were an
unreasonable restraint on trade and had an adverse effect on
competition.  In response, Shkreli has not shown that the
contracts had procompetitive benefits.

Shkreli does not dispute that he intended to block generic
competition to Daraprim and strove to do so for as long as
possible.  Each of the API supply agreements and the restrictive
distribution agreements was entered in service of that strategy.
Similarly, Vyera's continued monopolistic control of the FDA-
approved pyrimethamine market did not occur by accident and
self-evidently harmed competition.  Shkreli raised the price of
Daraprim by 4,000%.  Over more than four years, the average net
price of a single Daraprim tablet remained hundreds of dollars.
Its price did not meaningfully decline until Dr. Reddy's generic
pyrimethamine penetrated the market barriers Vyera had erected.

a.   Distribution Contracts

Vyera's restrictions in its distribution contracts
substantially delayed generic pharmaceutical companies from
acquiring sufficient RLD to conduct BE testing and receive FDA
approval of their ANDAs.  Those restrictions included class of
trade restrictions and caps on the number of bottles that could
be sold to a customer.  Vyera drastically reduced the number of

customers to which its distributors were authorized to sell.
Vyera monitored distributors' sales closely to ensure there was
no leakage.  It repurchased inventory and conducted audits to
learn where every bottle of Daraprim was heading.  Vyera's
Mulleady even went to a parking lot in New Jersey to buy back
five bottles of Daraprim, paying twice the purchase price, to
prevent those bottles from going to a generic pharmaceutical
company.

This extraordinarily tight control of the supply of
Daraprim had its intended effect.  It actually delayed the entry
of generic pharmaceutical companies.

Vyera paid a sizeable premium to its downstream partners to
keep Daraprim RLD out of the hands of its competitors.
Those partners agreed to and enforced the resale restrictions,
and in doing so benefitted significantly.  They profited
handsomely with each sale so long as Daraprim's price remained
inflated.

All of Shkreli's purportedly procompetitive justifications
for these distribution agreements are pretextual.  He has argued
that putting Daraprim in specialty distribution benefitted
patients by giving them access to services that specialty
pharmacies can provide.  These purported benefits include advice
on defraying the high cost of the drug, assistance in getting

insurance coverage, and help reducing and monitoring adverse
effects.

Shkreli offered no evidence, however, that patients were
assisted in any of these ways.  Patients didn't need help
figuring out how to pay for Daraprim, of course, until Shkreli
raised its price to a scandalous level and put his
anticompetitive scheme in place to protect that price.  And
there is no evidence that FDA-approved pyrimethamine has any
serious side effects, much less side effects that could be or
were addressed by any specialty pharmacy.  Specialty pharmacies
and closed distribution are tailor-made for the administration
and monitoring of drugs that have an altogether different
profile from that of Daraprim.  For decades Daraprim was
administered safely and without problems through open
distribution, and both Dr. Reddy's and Vyera's own generic
entrant, the Vyera AG, returned to the open distribution model.
In sum, Shkreli has failed to justify his choice of a closed
distribution system.  It was designed and used solely to
restrict competition.

b.   Exclusive Supply Agreements

Vyera's agreements with Fukuzyu and RL Fine closed off
access to the two most viable suppliers of pyrimethamine for
years.  Vyera's exclusive supply agreements achieved their

intended effect and delayed the entry of generic pyrimethamine
into the market.

While the pyrimethamine manufacturing process is relatively
simple, it still takes time and money to design the process, set
it up, and test it.  Shut out of access to Fukuzyu's and then
RL Fine's API, Fera, Cerovene, and InvaTech were required to
undertake a time-consuming and costly journey to develop
alternative API manufacturers.  Other than a desire to block
competition, there was no reason to tie either Fukuzyu or
RL Fine to exclusive supply agreements.

Fukuzyu had provided pyrimethamine for Daraprim in the
United States without any exclusive supply agreement, and at
times without any supply agreement at all, to Vyera's
predecessors.  Shkreli decided to change that.  After months of
courting, Vyera and Fukuzyu entered into an exclusive supply
agreement in January 2017.  In October 2016, the same month that
Vyera's science executives visited Fukuzyu in Japan, Fukuzyu
upset Cerovene's plans and refused to supply it with
pyrimethamine.  In September of 2017, Fukuzyu refused to supply
Fera with pyrimethamine in a message that repeated, word-for-
word, the restrictions against human use in the United States
that Vyera's Pelliccione relayed to Fukuzyu.

Vyera's agreement with RL Fine had a similarly
anticompetitive purpose and effect.  Vyera had no need for any

agreement at all with RL Fine.  Learning that generic
competitors were working with RL Fine to obtain pyrimethamine,
however, Vyera entered into an exclusive supply agreement with
RL Fine on December 17, 2017.  Vyera's pursuit of this agreement
had the immediate effect of disrupting and delaying Cerovene's
and InvaTech's ANDA approval process.  Vyera paid millions of
dollars to RL Fine for the sole purpose of blocking its rivals
from access to RL Fine's pyrimethamine.  The Phoenixus Board
Minutes of December 2017 justified the expense in these very
terms.  Witness after witness from Vyera has confirmed as much.

The impact on competitors was immediate.  In November 2016,
Cerovene had entered a five-year exclusive supply agreement with
RL Fine.  In the months that followed, Cerovene invested heavily
first to support RL Fine filing a DMF and then, switching its
plans, to support Cerovene itself incorporating the RL Fine
manufacturing information and data within its own ANDA.
Cerovene amended its ANDA in April 2017 to list RL Fine as its
API supplier.  But, on November 30, 2017 -- five days after
Vyera and RL Fine reached an agreement in principle –- RL Fine
reneged on its contract with Cerovene and refused to supply
pyrimethamine or cooperate further on a Cerovene pyrimethamine
ANDA.  RL Fine stopped cooperating as well with InvaTech in the
Fall of 2017, preventing InvaTech from responding to the FDA's

questions about RL Fine's API and requiring InvaTech to begin
from scratch and develop a new supplier.

Shkreli's attempt to justify the exclusivity provisions in
these two agreements fail.  He relies on the following
procompetitive justifications:  that the agreements ensured a
steady supply of pyrimethamine and, in the case of Fukuzyu,
promoted a long-term business relationship.  Shkreli contends
that the exclusivity clauses thus mitigated Vyera's supply risk.
Neither contract did so.

Shkreli has offered no evidence that any manufacturer of
Daraprim had ever been unable to obtain pyrimethamine from
Fukuzyu.  Moreover, Vyera's contract with Fukuzyu contained no
provision that protected it against the risk that Fukuzyu might
be unable to supply Vyera with FDA-approved pyrimethamine.  For
example, it contained no provision requiring Fukuzyu to maintain
cGMPs-compliant facilities, to ensure the purity of its API, or
to keep an active DMF.  It did not even require Fukuzyu to fill
Vyera's orders for pyrimethamine.  There is nothing in the
agreement that prevented Fukuzyu from selling its entire
inventory of pyrimethamine to others for use outside the United
States or for the treatment of animals in the United States.

There are standard provisions that protect against the risk
of a loss of supply.  Those provisions were absent in the Vyera
contracts, but tellingly, were present in the GSK contract with

Fukuzyu.  Those provisions include clauses addressed to the forecasting of requirements, customer priority, reserve capacity, and firm order dates.

Moreover, while it may be common for companies to enter into exclusive supply agreements with API manufacturers when a company has invested time and money with that manufacturer to develop a new API manufacturing process, there was no such justification here.  Fukuzyu already had a DMF on file and had been supplying pyrimethamine for Daraprim for decades.

Shkreli suggests that its contract with Fukuzyu was motivated by a desire to build a long-term relationship for future toxoplasmosis products.  Dr. Salinas testified that Vyera has even filed INDs for some of these nascent projects.  While Vyera may have used its promise of future projects to entice Fukuzyu during the contract negotiations, Shkreli has failed to explain the relevance of those projects to his desire to include a pyrimethamine exclusivity clause in the contract.  The exclusivity clause had only one purpose, to eliminate competition with Daraprim.

Shkreli's justification for the RL Fine contract fails entirely.  Shkreli asserts that it is common in the pharmaceutical industry to have a backup supplier.  But, Vyera has failed to offer any evidence that either Vyera or any of its predecessors ever needed a backup supplier of pyrimethamine.

**SPA-132**

Vyera didn't even pursue a contract with RL Fine until it learned that RL Fine was going to supply generic drug companies with pyrimethamine.

Moreover, Vyera's contract with RL Fine did not ensure that RL Fine could operate as a backup supplier if Vyera ever needed it to do so.  The contract did not require RL Fine to file a DMF and RL Fine never did.  Nor did the contract require RL Fine to do anything to support Vyera if Vyera amended Daraprim's NDA to include RL Fine's manufacturing process.  Instead, during the life of the contract, Vyera paid RL Fine almost $9.5 million to do nothing except stop cooperating with Vyera's competitors.  To put this outlay in perspective, through March 2019, Vyera spent only $500,000 buying pyrimethamine from Fukuzyu.

Finally, Shkreli highlights the fact that the exclusive supply agreements were not executed until a date after each supplier refused to supply each generic company.  Sophisticated contracts are not executed on the same day they are negotiated. The evidence is overwhelming that Fukuzyu and RL Fine stopped cooperating with generic drug companies who wanted to enter the U.S. market because they were negotiating exclusive supply contracts with Vyera that they considered to be more attractive. The incentives that Vyera offered to RL Fine were so enticing that it even stopped performing on its five-year contract with Cerovene.

116

c.   Degree of Burden on Generic Competitors

Finally, Shkreli argues that the plaintiffs failed to
establish that the contracts had a substantial anticompetitive
effect in the relevant market.  Relying on Ohio v. American
Express Co., 138 S. Ct. 2274, 2284 (2018) ("American Express"),
he emphasizes that it is the Plaintiffs' burden to show a
"substantial" anticompetitive effect from his activities and
that they have failed to do so.  Shkreli contends that, whatever
his intent may have been, the generic manufacturers made a
series of bad business decisions and were unwilling to spend the
money necessary to enter the market faster.  Shkreli principally
points to occasions on which Fera or Cerovene did not accept an
offer by an RLD supplier to find more bottles of Daraprim for
them.

Shkreli did not actually prove at trial that RLD suppliers
were able to acquire more bottles of Daraprim for generic
pharmaceutical companies after Vyera set up its closed
distribution system.  To the contrary, RLD suppliers struggled
to fill orders for Daraprim.  And, when Reliant used its
personal connection to a pharmacy to circumvent Vyera's closed
distribution system and succeeded in obtaining five bottles of
Daraprim, Mulleady rushed to buy those bottles back and paid
twice their purchase price to do so.

Shkreli similarly argues that Vyera's competitors foolishly
pursued doomed requests to the FDA to modify BE testing
requirements, and in doing so lost precious time waiting for
waivers that never came.  He argues that it was their flawed
tactics and not his restrictive agreements that were responsible
for the delays that occurred here.  He is wrong.

The Plaintiffs proved that Shkreli's actions had a very
substantial impact on competition.  Under § 1, the Plaintiffs
may show the existence of anticompetitive effects from
restraints on trade through direct evidence of increased prices
in the relevant market, which they have done.  See 1-800
Contacts, 1 F.4th at 118.  Under the rule of reason test, the
Plaintiffs have the burden of showing an "actual adverse effect
on competition as a whole in the relevant market."  Id. at 114.
Under § 2, the Plaintiffs must show that Shkreli's improper
conduct "has or is likely to have the effect of controlling
prices or excluding competition."  Takeda, 11 F.4th at 137
(citation omitted).  The Plaintiffs have more than carried each
of these burdens.

Shkreli's reliance on American Express is misplaced.  The
holding in that case turned on whether the plaintiffs' direct
evidence of price increases on just one side of the two-sided
credit card transaction market demonstrated any anticompetitive
effect at all.  American Express, 138 S. Ct. at 2287.

More importantly, American Express' unremarkable statement
of the law did not revise the longstanding rule of reason test
in antitrust cases.  As the Supreme Court has explained, the
rule of reason steps

> do not represent a rote checklist, nor may they be
> employed as an inflexible substitute for careful
> analysis. . . . [W]hat is required to assess whether a
> challenged restraint harms competition can vary
> depending on the circumstances.  The whole point of
> the rule of reason is to furnish an enquiry meet for
> the case, looking to the circumstances, details, and
> logic of a restraint to ensure that it unduly harms
> competition before a court declares it unlawful.

Nat'l Collegiate Athletic Ass'n v. Alston, 141 S. Ct. 2141, 2160
(2021) (citation omitted).  Even under Shkreli's rigid view of
the law, Shkreli's Daraprim scheme substantially impacted
competition in the market for FDA-approved pyrimethamine.

Generic drug companies need not undertake herculean efforts
to overcome significant anticompetitive barriers specifically
erected to prevent their entry into a market.  It bears
repeating that "generics need not be barred from all means of
distribution if they are barred from the cost-efficient ones."
Actavis PLC, 787 F.3d at 656 (citation omitted).  "The test is
not total foreclosure, but rather whether the challenged
practices bar a substantial number of rivals or severely
restrict the market's ambit."  Id.  While exclusive supply and
restrictive distribution agreements are not inherently unlawful,
here their sole purpose and effect was to foreclose generic

pharmaceutical companies from acquiring the API and RLD that would have otherwise been readily available to them in the ordinary course and that were critical to their efforts to compete with Vyera.

E.   Shkreli is Individually Liable

An individual may be held liable under the Sherman Act to the extent that the individual has "participated in violations of" the antitrust laws, such as by "negotiating, voting for[,] or executing agreements which constituted steps in the progress of the conspiracy." Hartford-Empire Co. v. United States, 323 U.S. 386, 407 (1945); see also Lorain Journal Co. v. United States, 342 U.S. 143, 145 n.2 (1951) (officers and directors "participated in the conduct alleged to constitute the attempt to monopolize").

Shkreli is liable for the violations of §§ 1 and 2 of the Sherman Act and the parallel violations of state law.  Shkreli conceived of, implemented, maintained, and controlled Vyera's anticompetitive and monopolistic scheme.  His control continued after he stepped down as Vyera's CEO and even after he entered federal prison.  As the company's largest shareholder, he freely changed its management and directed its policy.

Shkreli pioneered Vyera's business model at Retrophin and brought many of Retrophin's employees with him to replicate the "classic closed distribution play" at Vyera.  Shkreli frankly

and repeatedly acknowledged that his goal was to delay entry of a generic competitor with Daraprim for at least three years.  He then planned, managed, and controlled the execution of his scheme.  He erected and policed barriers around the FDA-approved pyrimethamine market in order to maintain a monopoly price for Daraprim.

Shkreli emphasizes that he did not sign any of the contracts at issue.  The absence of his signature from a document does not immunize him from antitrust liability.

Shkreli argues that after December 2015 he was no longer a Vyera executive and that his ability to influence Vyera's operations was severely restricted after he was imprisoned in September 2017.  The Plaintiffs have shown that Vyera remained under Shkreli's control throughout the years it maintained its monopoly on FDA-approved Daraprim.  Even when incarcerated, Shkreli managed to direct its policies and choose Vyera's executives.  Whether he used a smuggled phone or the prison's authorized phones, he stayed in touch with Vyera's management and exercised his power over Vyera as its largest shareholder.

IV.    Remedies

The Plaintiffs seek injunctive relief and the State Plaintiffs seek disgorgement.  They have shown that Shkreli should be banned for life from the pharmaceutical industry and required to pay $64.6 million in disgorgement.

    A.    Injunctive Relief

    Section 13(b) of the FTC Act authorizes the FTC to pursue

permanent injunctive relief in federal court only "in proper

cases . . . and after proper proof."  15 U.S.C. § 53(b).

Plaintiffs must prove an ongoing or likely future violation of

the antitrust laws and that injunctive relief will not only

remedy that violation but also "be in the interest of the

public."  Id. § 53(b)(1)-(2).

    A permanent injunction is appropriate where a plaintiff

shows that

> there exists some cognizable danger of recurrent
> violation, something more than the mere possibility
> which serves to keep the case alive. . . .  To be
> considered are the bona fides of the expressed intent
> to comply, the effectiveness of the discontinuance
> and, in some cases, the character of the past
> violations.

United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)

(Clayton Act).

> To assess the likelihood of recurrence, courts consider

> the fact that defendant has been found liable for
> illegal conduct; the degree of scienter involved;
> whether the infraction is an "isolated occurrence;"
> whether defendant continues to maintain that his past
> conduct was blameless; and whether, because of his
> professional occupation, the defendant might be in a
> position where future violations could be anticipated.

Sec. & Exch. Comm'n v. Commonwealth Chem. Sec., Inc., 574 F.2d

90, 100 (2d Cir. 1978).

In assessing whether to issue injunctive relief, a court balances the equities and considers the public interest. E.E.O.C. v. KarenKim, Inc., 698 F.3d 92, 100 (2d Cir. 2012). "A Government plaintiff, unlike a private plaintiff, must seek to obtain relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm." Apple, 791 F.3d at 339 (quoting F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 170 (2004)). "The district court has large discretion to model its judgments to fit the exigencies of the particular case and all doubts about the remedy are to be resolved in the Government's favor." Id. (quoting E. I. du Pont de Nemours & Co., 366 U.S. at 334).

In New York, pursuant to the Donnelly Act, the Attorney General may seek and obtain an order on behalf of the State "to restrain and prevent the doing in this state of any act herein declared to be illegal, or any act in, toward or for the making or consummation of any contract, agreement, arrangement or combination herein prohibited." N.Y. Gen. Bus. Law § 342. Pursuant to § 63(12) of the Executive Law, New York may seek "an order enjoining the continuance of [illegal or fraudulent] business activity or of any fraudulent or illegal acts." N.Y. Exec. Law § 63(12). Upon finding a violation under Executive Law § 63(12), a court may exercise its discretion to issue a permanent and plenary ban in a particular industry. See, e.g.,

<u>People v. Imported Quality Guard Dogs, Inc.</u>, 930 N.Y.S.2d 906,
907 (2nd Dep't 2011) (permanently enjoining the appellant "from
selling, breeding, or training dogs, or advertising or
soliciting the sale, breeding, or training of dogs").

The Plaintiffs seek a lifetime ban against Shkreli
participating in the pharmaceutical industry.[38]  Banning an
individual from an entire industry and limiting his future
capacity to make a living in that field is a serious remedy and
must be done with care and only if equity demands.  Shkreli's
egregious, deliberate, repetitive, long-running, and ultimately
dangerous illegal conduct warrants imposition of an injunction
of this scope.

The Plaintiffs presented a wealth of evidence that Shkreli
conducted a comprehensive scheme that violated the antitrust
laws of the United States and the competition laws of the seven
States.  The FTC and the States are empowered by federal and
State law to seek comprehensive equitable relief.  The
Plaintiffs have demonstrated that a lifetime ban against
Shkreli's future participation in the pharmaceutical industry
will protect the public from suffering a repetition of the
unlawful schemes proven in this case.

---

[38] In their memorandum, filed with the Pretrial Order, the
Plaintiffs requested that Shkreli be banned for twenty years
from the pharmaceutical industry.

Without a lifetime ban, there is a real danger that Shkreli
will engage in anticompetitive conduct within the pharmaceutical
industry again.  Shkreli established two companies, Retrophin
and Vyera, with the same anticompetitive business model:
Acquiring sole-source drugs for rare diseases so that he could
profit from a monopolist scheme on the backs of a dependent
population of pharmaceutical distributors, healthcare providers,
and the patients who needed the drugs.  The Daraprim scheme was
particularly heartless and coercive.  Daraprim must be
administered within hours to those suffering from active
toxoplasma encephalitis.

Moreover, in the face of public opprobrium, Shkreli doubled
down.  He refused to change course and proclaimed that he should
have raised Daraprim's price higher.

The context in which Shkreli conducted his schemes cannot
be ignored.  He cynically took advantage of the requirements of
a federal regulatory scheme designed to protect the health of a
nation by ensuring that its population has access to drugs that
are not only effective but also safe.  He recklessly disregarded
the health of a particularly vulnerable population, those with
compromised immune systems.  His scheme burdened those patients,
their loved ones, and their healthcare providers.

A lifetime ban would not deprive Shkreli of the opportunity
to practice a profession or to exercise a lawful skill for which

he trained.  In his trial testimony Shkreli does not even express a clear desire to return to the pharmaceutical industry. He reports that he is considering pursuing opportunities "within and outside" the pharmaceutical industry upon his release from prison.

The risk of a recurrence here is real.  Shkreli has not expressed remorse or any awareness that his actions violated the law.  While he takes full responsibility in his direct testimony for the increase of Daraprim's price from $17.50 to $750 per pill, he denies responsibility for virtually anything else.  He argues in his testimony that he is not responsible for Vyera's anticompetitive contracts because he did not negotiate or sign the exclusive supply agreements or the restrictive distribution agreements.  He has also denied that what happened here was egregious, arguing that the Plaintiffs have not proven that any patient died due to the price he set for Daraprim.  He chose to not even attend the trial.

Shkreli presents several legal arguments against a lifetime industry ban.  He contends that it amounts to a penalty beyond the proper scope of a court's power in equity.  He argues that an industry ban is uncommon and reserved only for the most egregious cases and for cases of fraud.  He argues that a ban of this scope is not narrowly tailored to match the challenged conduct.  For the reasons laid out above, these arguments are

unavailing.  This is an egregious case; death is not the only
relevant metric.  If a court sitting in equity is powerless to
impose a lifetime industry ban to protect the public against a
repetition of the conduct proven at this trial, then the public
could rightfully ask whether its wellbeing has been adequately
weighed.

Shkreli appears to suggest that any injunction could be
limited to banning him from acquiring commercial assets or
engaging in the "day-to-day affairs of commercializing
medicine."  There is no reason to believe that a narrowly
crafted injunction will succeed in providing adequate protection
against a repetition of illegal conduct.  Shkreli has
demonstrated that he can and will adapt to restrictions.  With
help at times from a contraband phone, Shkreli managed to
control his company even from federal prison.

Shkreli's anticompetitive conduct at the expense of the
public health was flagrant and reckless.  He is unrepentant.
Barring him from the opportunity to repeat that conduct is
nothing if not in the interest of justice.  "If not now, when?"
Mishnah, Pirkei Avot 1:14.

B.   Disgorgement

The State Plaintiffs seek disgorgement in the amount of $64.6 million to return to victims nationwide.[39]  Disgorgement is "a remedy tethered to a wrongdoer's net unlawful profits" and "has been a mainstay of equity courts." Liu v. Sec. & Exch. Comm'n, 140 S. Ct. 1936, 1943 (2020).  "The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-75 (2d Cir. 1996) (federal securities laws violations). "The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation. . . .  So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." S.E.C. v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013), as amended (Nov. 26, 2013).

The Second Circuit has "adopted a two-step burden-shifting framework for calculating equitable monetary relief.  That framework requires a court to look first to the [plaintiff] to show that its calculations reasonably approximated the amount of

_____

[39] The FTC is precluded from seeking disgorgement. Vyera, 2021 WL 4392481, at *2.

the defendants' unjust gains and then shift the burden to the
defendants to show that those figures were inaccurate." Fed.
Trade Comm'n v. Moses, 913 F.3d 297, 310 (2d Cir. 2019)
(citation omitted).

New York Executive Law § 63(12) empowers the New York
Attorney General to disgorge unlawfully gained profits wherever
they were derived. Vyera, 2021 WL 4392481, at *4. Contrary to
Shkreli's contention, there is no legal distinction between
equitable monetary remedies available for fraudulent conduct and
other illegal conduct occurring in the State of New York. The
Plaintiffs have shown that the anticompetitive conduct in this
case is at least as egregious in terms of its willfulness and
harm to victims as the frauds typically subject to this
equitable remedy under § 63(12).

The excess profits that Vyera gained from its sales of
Daraprim amount, conservatively, to $64.6 million and must be
disgorged to the States, subject to a set-off of any amount paid
by the settling defendants. Shkreli is liable for this relief.

In arriving at this amount, a threshold determination is
the hypothetical date or dates on which generic drug companies
would have entered the market but-for Vyera's anticompetitive
conduct. Here, the evidence is sufficiently robust to select
those dates for two competitors, Cerovene and Fera. The record

is insufficiently developed regarding the three other
competitors who have entered or tried to enter the market.

a.   Cerovene and Dr. Reddy's Hypothetical Entry Date

Cerovene's president Shah estimates that his company's FDA-
approved generic pyrimethamine tablet, which entered the market
in March of 2020, would have entered the market in September of
2017 if Cerovene had had unfettered access to Fukuzyu's API and
the RLD.  This is a thirty-month delay.  This estimate was
unchallenged at trial.

Plaintiff's economic expert Hemphill calculated Vyera's
excess profits using two alternative hypothetical entry dates
for Cerovene:  October 2018 and December 2018.  The October 2018
entry date is an extremely conservative date on which to base
the calculations, and is adopted for the calculation of excess
profits.  The difference between October 2018 and March 2020
represents an eighteen-month delay.

b.   Fera's Hypothetical Entry Date

Fera's DellaFera estimates that his FDA-approved
pyrimethamine tablet, which entered the market soon after it
received FDA approval in July of 2021, would have entered the
market in August of 2019 if Fera had unfettered access to
Fukuzyu's API and to the RLD.  This is a delay of roughly
twenty-four months.  His estimate was unchallenged at trial.

Hemphill calculated Vyera's excess profits on the assumption that Fera's generic drug would have entered the market in October 2019, representing a twenty-three month delay. The October 2019 date is a conservative estimate and is adopted for the calculation of excess profits.

c.   Vyera's Excess Profits

Hemphill's model for calculating these counterfactual profits involves four steps.  First, he calculated Daraprim's actual revenue from October 2018 to December 2020. Conservatively, it was $130.6 million.

Next, he calculated Vyera's revenue in the but-for world during that same period under a number of conditions, including different generic entry dates, the numbers of generic competitors, and the effect from Vyera launching its own authorized generic earlier.  Those calculations based on the October 2018 entry date for Cerovene's drug and the October 2019 entry date for Fera's drug are the relevant calculations here.

Third, using simple arithmetic, Hemphill calculated the difference between Vyera's actual profit and its profits in the but-for world in which competitive entry was not impeded by Vyera's conduct.  Hemphill determined that, but-for Vyera's illegal conduct, it would have earned $67.6 million less in Daraprim revenue during that period.

Finally, taking into account that in the counterfactual world Vyera's incremental costs would have been lower because it would be selling less Daraprim, Hemphill deducted an estimated $3 million in costs that Vyera would have avoided.  This four-step process yields a conservative estimate of $64.6 million in excess profits.

Shkreli has offered no different calculation of excess profits, including any opposing calculation based on later generic entry dates or competing assumptions.  Accordingly, the Plaintiff States' calculation of $64.6 million in excess profits from the sale of Daraprim is adopted.

C.   Shkreli's Liability for Vyera's Excess Profits

Disgorgement may be imposed against multiple defendants so long as the order is consistent with equitable principles.  See Liu, 140 S. Ct. at 1949 (remanding to the Ninth Circuit to determine whether "circumstances would render a joint-and-several disgorgement order unjust").  Joint and several liability for disgorgement is properly imposed when multiple defendants have collaborated in an illegal scheme.  S.E.C. v. Pentagon Cap. Mgmt. PLC, 725 F.3d 279, 288 (2d Cir. 2013).  In First Jersey, an individual defendant was required to disgorge net profits accruing to his company where he was "primarily liable" for the fraud that created these profits, was "intimately involved" in the perpetration of the fraud, and was

a "controlling person" of the company.  101 F.3d at 1475
(citation omitted).

Shkreli was the prime mover in this anticompetitive
scheme.  It was his brainchild and he drove it each step of
the way.  As Vyera's founder and its largest shareholder,
any excess profit gained from Shkreli's scheme directly
benefited him.  Shkreli explains in his direct testimony
that he took the actions he did at Vyera based on his
belief that the "entry of a generic alternative to Daraprim
. . . would have a significant effect on my investment in
the company."  Liability for the sum of equitable monetary
relief determined in this Opinion is, therefore, properly
imposed against him.

The sum owed by Shkreli will be reduced by any monies paid
by the settling defendants.  A settlement payment may properly
"be taken into account by the court in calculating the amount to
be disgorged."  Id.

Shkreli argues that, following the Supreme Court's decision
in Liu, he may no longer be held jointly and severally
responsible for Vyera's excess profits.  Shkreli relies on Liu's
statement that allowing joint and several liability alongside
the remedy of disgorgement "runs against the rule to not impose
joint liability in favor of holding defendants liable to account
for such profits only as have accrued to themselves."  Liu, 140

S. Ct. at 1945 (citation omitted).  According to Shkreli, the
amount of disgorgement he may be ordered to pay is limited to
any profits he actually took from the scheme, and the Plaintiffs
have failed to show that Shkreli personally profited at all.

Liu did not categorically reject a disgorgement order
imposed against multiple parties.  Liu in fact held that joint
and several liability for disgorgement orders is permissible as
long as they are consistent with equitable principles.  Id. at
1949.  The Supreme Court specifically noted that, since the
common law permitted "liability for partners engaged in
concerted wrongdoing . . . [t]he historic profits remedy thus
allows some flexibility to impose collective liability."  Id.

In this case, imposition of a disgorgement order against
Shkreli serves the interests of justice, for all the reasons
explained above.  Shkreli was no side player in, or a "remote,
unrelated" beneficiary of, Vyera's scheme.  See id.  He was the
mastermind of its illegal conduct and the person principally
responsible for it throughout the years.

<u>**Conclusion**</u>

Shkreli is liable on each on the claims presented in this
action.  An injunction shall issue banning him for life from
participating in the pharmaceutical industry in any capacity.

134

He is ordered to pay the Plaintiff States $64.6 million in
disgorgement.

Dated:     New York, New York
           January 14, 2022

                              _____
                                    DENISE COTE
                          United States District Judge

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
FEDERAL TRADE COMMISSION, STATE OF NEW  :      20cv00706 (DLC)
YORK, STATE OF CALIFORNIA, STATE OF     :
OHIO, COMMONWEALTH OF PENNSYLVANIA,     :      OPINION AND ORDER
STATE OF ILLINOIS, STATE OF NORTH       :
CAROLINA, and COMMONWEALTH OF           :
VIRGINIA,                               :
                                        :
                     Plaintiffs,        :
            -v-                         :
                                        :
MARTIN SHKRELI,                         :
                                        :
                     Defendant.         :
                                        :
--------------------------------------- X
```

<u>APPEARANCES:</u>

For plaintiff Federal Trade Commission:
Markus H. Meier
Bradley S. Albert
Armine Black
Daniel W. Butrymowicz
J. Maren Haneberg
Leah Hubinger
Lauren Peay
Neal J. Perlman
James H. Weingarten
Amanda Triplett
Matthew B. Weprin
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

For plaintiff State of New York:
Elinor R. Hoffmann
Bryan Bloom
Jeremy R. Kasha
Amy E. McFarlane
Saami Zain
Office of the New York Attorney General
Antitrust Bureau
28 Liberty Street, 20th Floor

New York, NY 10005

For plaintiff State of California:
Michael D. Battaglia
Office of the Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

For plaintiff State of Illinois:
Richard S. Schultz
Office of the Attorney General of Illinois
100 W. Randolph Street, 11th Floor
Chicago, IL 60601

For plaintiff State of North Carolina:
Jessica V. Sutton
North Carolina Dept. of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603

For plaintiff State of Ohio:
Beth A. Finnerty
Office of the Ohio Attorney General
150 E. Gay Street, 22nd Floor
Columbus, OH 43215

For plaintiff Commonwealth of Pennsylvania:
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120

For plaintiff Commonwealth of Virginia:
Tyler T. Henry
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219

For defendant Martin Shkreli:
Christopher H. Casey
Jeffrey S. Pollack
Andrew J. Rudowitz
Sarah Fehm Stewart
Sean P. McConnell
J. Manly Parks
Duane Morris LLP

30 South 17th Street
Philadelphia, PA 19103

DENISE COTE, District Judge:

Following trial, on January 14, 2022, this Court ordered
that Martin Shkreli ("Shkreli") be banned for life from
participating in the pharmaceutical industry in any capacity and
pay $64.6 million in disgorgement.  Fed. Trade Comm'n v.
Shkreli, No. 20CV00706 (DLC), 2022 WL 135026 (S.D.N.Y. Jan. 14,
2022).  Having considered the injunction proposed by the
plaintiffs and Shkreli's objections, an injunction and final
judgment has been issued today.

This Opinion addresses Shkreli's objections to the
injunction.  "[I]njunctive relief should be narrowly tailored to
fit specific legal violations, [and] the court must mould each
decree to the necessities of the particular case."  City of New
York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 144 (2d Cir.
2011) ("Mickalis") (citation omitted).  Rule 65(d) of the
Federal Rules of Civil Procedure further provides that "[e]very
order granting an injunction . . . must: (A) state the reasons
why it issued; (B) state its terms specifically; and (C)
describe in reasonable detail -- and not by referring to the
complaint or other document -- the act or acts restrained or
required."  Fed. R. Civ. P. 65(d).  "Rule 65(d) reflects
Congress' concern with the dangers inherent in the threat of a

contempt citation for violation of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds." Sanders v. Air Line Pilots Ass'n, Int'l, 473 F.2d 244, 247 (2d Cir. 1972) (citing International Longshoremen's Assoc., Local 1291 v. Philadelphia Marine Trade Assoc., 389 U.S. 64, 76 (1967)); see also Corning Inc. v. PicVue Elecs., Ltd., 365 F.3d 156, 157-58 (2d Cir. 2004) ("Corning").

Rule 65(d) is satisfied only if the party enjoined can "ascertain from the four corners of the order precisely what acts are forbidden." All. for Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev., 911 F.3d 104, 112 (2d Cir. 2018), rev'd on other grounds sub nom., Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 140 S. Ct. 2082 (2020) (citation omitted). An injunction may be overbroad "when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation." Mickalis, 645 F.3d at 145. An order entering an injunction that refers to extrinsic documents or is not tailored to the specific facts of the case does not meet the standard of Rule 65(d). See, e.g., Corning, 365 F.3d at 157-58; Howard Opera House Assocs. v. Urb. Outfitters, Inc., 322 F.3d 125, 130 (2d Cir. 2003). The specificity requirement is satisfied, however, when the terms of an injunction cannot be drawn more narrowly without "unduly complicating its enforcement and

4

impairing its effectiveness."  Peregrine Myanmar Ltd. v. Segal,
89 F.3d 41, 51 (2d Cir. 1996).

     Shkreli first objects to components of three of the
injunction's definitions.  The definitions are of the terms
Development, FDA Authorization, and Pharmaceutical Company.  The
plaintiffs have agreed to remove the term Marketing
Authorization Applications, which refers to procedures in the
European Union and the United Kingdom, from the definition of
FDA Authorization but otherwise oppose the Shkreli objections.
Shkreli's remaining objections are overruled.

     In addition to the reasons given by the plaintiffs for
retaining the definitions, Shkreli's objections are denied to
the extent that they depend on a restrictive description of the
trial record.  Shkreli is wrong to suggest that pharmaceutical
research and development activities and that conduct outside the
United States were not among the conduct at issue in this case.
Shkreli and Vyera used the promise that Vyera would engage in
research and development activities to recruit Vyera executives
and to induce one of the restrictive supply agreements at issue
here.  At trial, Shkreli sought to justify his anticompetitive
conduct by his need for supracompetitive profits to fund such
research and development work.  Vyera and its generic drug
competitors depended on a global network of API suppliers and
drug manufacturers to provide pyrimethamine to American

distributors, medical providers, and patients.  Thus, while
Shkreli's violation of our nation's antitrust laws arose from
his conduct and its anticompetitive impact within our borders,
it denies reality to suggest that that anticompetitive activity
could have succeeded without a coordinated effort that reached
into the global pharmaceutical market.

Similarly, Shkreli's objection to the definition of
Pharmaceutical Company fails.  He contends that the definition
is vague and could prevent him from working, for example, at a
university that is engaged in pharmaceutical research or at an
advertising agency that assists in the marketing of drugs.  The
injunction defines Pharmaceutical Company as "any Entity engaged
in the research, Development, manufacture, commercialization, or
marketing of any Drug Product or API."[1]

In response to this and a related objection, the plaintiffs
have added a mechanism for Shkreli to undertake employment at a
Pharmaceutical Company whose total gross revenues are not
primarily derived from work in the pharmaceutical industry.  It
provides that such Qualified Employment means employment or a
consulting engagement with a Pharmaceutical Company "that is not
primarily involved in the research, Development, manufacture,

---

[1] Entity is defined as "means any partnership, joint venture,
firm, corporation, association, trust, unincorporated
organization, or other business or government entity, and any
subsidiaries, divisions, groups, or affiliates thereof."

commercialization, or marketing of Drug Products or APIs and whose gross revenues from this activity accounts for less than 10% of the total gross revenues of the Pharmaceutical Company." The injunction requires Shkreli to provide a notice of intent to accept a written offer of such work and provides the plaintiffs with 30 working days to object. In response to Shkreli's objection, the injunction requires the plaintiffs to object within 20 working days. The Court retains jurisdiction over the injunction, and Shkreli of course may apply for relief should the plaintiffs unreasonably object to his employment.

Shkreli next objects that the Preamble to Section II of the injunction is vague and overbroad. It enjoins him from "directly or indirectly participating in any manner in the pharmaceutical industry, including by" engaging in six activities. Shkreli objects that the words participating and indirectly, and the term including by are vague. Read in context, they are not. Removing these words would undercut the effectiveness of the injunction, which is necessary to protect the public.

Shkreli objects as well to the breadth of the descriptions of the activities from which he is barred. The plaintiffs have sufficiently explained the reasons for these bars and only the following observations will be added.

Shkreli asks whether he is barred from engaging in
conversations about business decisions in a pharmaceutical
company with a friend who works in the company.  The injunction
bars him from "[p]articipating in the formulation,
determination, or direction of any business decisions of any
Pharmaceutical Company."  This language is sufficiently clear to
give Shkreli the notice he requires of the terms of the
injunction and is also necessary to control the very real risk
that he will continue to participate in the industry by working
through others employed in the industry, as he has done while
incarcerated.

Objecting that one of the prohibitions in the injunction is
vague and violates his First Amendment rights, Shkreli questions
whether he would be prohibited from using a blog to discuss the
pharmaceutical industry by the bar against him taking any action
to influence the management of a Pharmaceutical Company.  This
provision is not vague.  It bars him from taking actions to
influence the management of a Pharmaceutical Company even
through publicly issued statements.  While First Amendment
rights deserve of great protection, Shkreli's violations of the
antitrust laws have lost for him the right to speak publicly
about the pharmaceutical industry when such speech is uttered to
influence the management or business of a Pharmaceutical
Company.  See Peregrine, 89 F.3d at 51 (finding that an

8

injunction restraining the defendant from communicating with the management of a joint venture from which she was also enjoined from being involved was not overbroad).

To further respond to Shkreli's objection, the following clause will be added to provision II.D.: Shkreli's public statements about a Pharmaceutical Company will be deemed an action taken to influence or control the management or business of any Pharmaceutical Company if Shkreli intended the statement to have that effect or if a reasonable person would conclude that the statement has that effect.

Shkreli next objects to certain provisions that require him to pay the judgment and that allow for a set-off.  The plaintiffs have made some revisions to the proposed judgment and no further revisions are necessary to respond to Shkreli's objections.  Among his objections, Shkreli asserts that he should not be required to sell his shares in Phoenixus so long as he is prohibited from voting his shares, and should certainly not be required to do so within 180 days in the event any shares are returned to him by the receiver appointed in Koestler v. Shkreli, 16 Civ. 7175 (S.D.N.Y.).  Shkreli objects that these requirements are vague, burdensome, and in violation of his Fifth Amendment rights.  The requirements are neither vague nor unduly burdensome.  Nor do they violate his constitutional rights.  Shkreli used his position as the largest Phoenixus

shareholder to exert control over it and Vyera's operations even after he had given up all formal role in the companies' operations.  Through that control, he orchestrated their violation of the antitrust laws.  The divestiture of his ownership interest in Phoenixus arises directly from the violations of law found at trial.

Finally, Shkreli objects to aspects of the reporting requirements in the injunction and the duty to provide access to certain information to insure that he pays the monetary judgment.  These objections are overruled.  To the extent that Shkreli is concerned that the inspection of financial records will occur at his home, the injunction recognizes that any inspection will occur in the presence of Shkreli's counsel and during business hours.  It does not dictate the location.  His production of his books and records could occur at any appropriate location of his choosing, including his counsel's office.

Dated:      New York, New York
            February 4, 2022

                                    _____
                                          DENISE COTE
                                    United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF NORTH CAROLINA; STATE OF OHIO; COMMONWEALTH OF PENNSYLVANIA; and COMMONWEALTH OF VIRGINIA<br><br>                          Plaintiffs,<br><br>      v.<br><br>VYERA PHARMACEUTICALS, LLC; PHOENIXUS AG; MARTIN SHKRELI, individually, as an owner and former officer of Vyera Pharmaceuticals, LLC and Phoenixus AG (formerly known as Turing Pharmaceuticals, LLC and Turing Pharmaceuticals, AG); and KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and a former executive of Vyera Pharmaceuticals, LLC,<br><br>                          Defendants. | 20cv00706 (DLC) |

**ORDER FOR PERMANENT INJUNCTION
AND EQUITABLE MONETARY RELIEF**

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"), by its designated

attorneys, and the states or commonwealths of New York, California, Illinois, North Carolina,

Ohio, Pennsylvania, and Virginia (collectively "Plaintiff States"), by and through their

Attorneys General, pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C.

§ 53(b), Section 16 of the Clayton Act, 15 U.S.C § 26, Section 342 of the New York General

1

Business Law, Section 63(12) of the New York Executive Law, Sections 16700 *et seq.* and 17200 *et seq.* of the California Business and Professions Code, Section 7 of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. §75-1 *et seq.*, Chapter 1331and Section 109.81 of the Ohio Revised Code, Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.* and Common Law Doctrine against Restraints of Trade proceeding under 71 P.S. §732-204 (c) and the Virginia Antitrust Act, Virginia Code §59.1-9.1 *et seq.*, filed their Amended Complaint for Permanent Injunctive and Other Equitable Relief against Defendants Vyera Pharmaceuticals, LLC ("Vyera"), Phoenixus AG ("Phoenixus"), Martin Shkreli, and Kevin Mulleady to remedy and prevent their anticompetitive conduct and unfair methods of competition in or affecting commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and state law.  This Order is entered against Defendant Martin Shkreli pursuant to the Opinion and Order issued by this Court on January 14, 2022, and today's Order and Opinion.

## I. DEFINITIONS

**IT IS ORDERED** that, as used in this Order, the following definitions shall apply:

A.    "Defendant Shkreli" means Defendant Martin Shkreli, an individual defendant. Defendant Shkreli is the founder of Phoenixus AG and Vyera Pharmaceuticals, LLC.

B.    "Commission" means the United States Federal Trade Commission.

C.    "Plaintiff States" mean the states or commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia.

D.    "Corporate Defendants" mean Defendants Vyera Pharmaceuticals LLC and Phoenixus AG.

2

E.   "Designated State Representatives" mean the following named individuals or another representative identified by each respective Plaintiff State:

1.   Elinor R. Hoffmann, Chief, Antitrust Bureau, Office of the New York State Attorney General, 28 Liberty Street, New York, NY 10005, elinor.hoffmann@ag.ny.gov;

2.   Michael D. Battaglia, Deputy Attorney General, California Department of Justice, 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102, michael.battaglia@doj.ca.gov;

3.   Richard S. Schultz, Assistant Attorney General, Antitrust Bureau, Office of the Illinois Attorney General, 100 West Randolph Street, Chicago, IL 60601, richard.schultz@ilag.gov;

4.   Jessica V. Sutton, Special Deputy Attorney General, Consumer Protection Division, North Carolina Department of Justice, 114 West Edenton Street, Raleigh, NC 27603, jsutton2@ncdoj.gov;

5.   Beth A. Finnerty, Assistant Chief, Antitrust Section, Office of the Ohio Attorney General, 30 East Broad Street, 26th Floor, Columbus, OH 43215, Beth.Finnerty@ohioAGO.gov;

6.   Joseph S. Betsko, Senior Deputy Attorney General, Pennsylvania Office of Attorney General, Strawberry Square, Harrisburg, PA 17120, jbetsko@attorneygeneral.gov; and

7.   Tyler T. Henry, Assistant Attorney General, Office of the Attorney General of Virginia, 202 North Ninth Street, Richmond, VA 23219, thenry@oag.state.va.us.

F.   "API" means any active pharmaceutical ingredient that is used in the manufacture of a Drug Product.

G.   "Development" means all preclinical and clinical research and development activities related to a Drug Product, including discovery or identification of a new chemical entity, test method development, all studies for the safety and efficacy of a Drug Product, toxicology studies, bioequivalence and bioavailability studies, pharmaceutical formulation, process development, manufacturing scale-up, development-stage manufacturing, quality assurance/quality control development, stability testing, statistical analysis and report writing, for the purpose of obtaining any and all FDA Authorizations, licenses, approvals, or registrations necessary for the manufacture, use, storage, import, export, transport, promotion, marketing, and sale of a Drug Product, and regulatory affairs related to the foregoing.

H.   "Drug Product" means any product that is subject to an FDA Authorization, or any product that is regulated through an over-the-counter drug monograph.

3

I.      "Entity" means any partnership, joint venture, firm, corporation, association, trust, unincorporated organization, or other business or government entity, and any subsidiaries, divisions, groups, or affiliates thereof.

J.      "FDA" means the United States Food and Drug Administration.

K.      "FDA Authorization" means any of the following applications:

1.      An application filed or to be filed with the FDA pursuant to 21 C.F.R. Part 314 et seq., including "New Drug Application" ("NDA"), "Abbreviated New Drug Application" ("ANDA"), or "Supplemental New Drug Application" ("SNDA"), and all supplements, amendments, and revisions thereto, any preparatory work, registration dossier, drafts and data necessary for the preparation thereof, and all correspondence between the holder and the FDA related thereto;

2.      An "Investigational New Drug Application" ("IND") filed or to be filed with the FDA pursuant to 21 C.F.R. Part 312, and all supplements, amendments, and revisions thereto, any preparatory work, registration dossier, drafts and data necessary for the preparation thereof, and all correspondence between the holder and the FDA related thereto; or

3.      A Biologic License Application ("BLA") filed or to be filed with the FDA pursuant to 21 C.F.R. 601.2, et seq., and Section 351 of the Public Health Service Act, and any NDA deemed to be a BLA by the FDA, and all supplements, amendments, revisions thereto, any preparatory work, drafts and data necessary for the preparation thereof, and all correspondence between the holder and the FDA related thereto.

L.      "Ownership Interest" means any voting or non-voting stock, share capital, or equity in an Entity.  Ownership Interest shall not include any unexercised options or other unexercised instruments that are convertible into any voting or non-voting stock.

M.      "Pharmaceutical Company" means any Entity engaged in the research, Development, manufacture, commercialization, or marketing of any Drug Product or API.

N.      "Qualified Employment" means an employment or a consulting engagement that:

1.      is with a Pharmaceutical Company that is not primarily involved in the research, Development, manufacture, commercialization, or marketing of Drug Products or APIs and whose gross revenues from this activity accounts for less than 10% of the total gross revenues of the Pharmaceutical Company, and

2.      does not violate Paragraph II.A of this Order.

## II.  PERMANENT INJUNCTION

**IT IS FURTHER ORDERED** that Defendant Shkreli is hereby banned and enjoined for life from directly or indirectly participating in any manner in the pharmaceutical industry, including by:

A.  Participating in or directing the research, Development, manufacture, commercialization, distribution, marketing, importation, or sale of a Drug Product or API, whether through compensated or uncompensated employment, consulting, advising, board membership, or otherwise;

B.  Participating in the formulation, determination, or direction of any business decisions of any Pharmaceutical Company;

C.  Acquiring or holding an Ownership Interest in a Pharmaceutical Company (other than indirectly through a mutual fund, exchange-traded fund, or other diversified, investment vehicle that is not specifically focused on Pharmaceutical Companies),

*Provided, however*, Defendant Shkreli may retain an Ownership Interest in securities that are under the control of the receiver appointed in *Koestler v. Shkreli*, 1:16cv7175 (S.D.N.Y.) until the earlier of (a) the sale of the securities by the receiver or (b) 180 days after the receiver returns the securities to Defendant Shkreli so long as Defendant Shkreli does not exercise any rights as owner of the securities, including voting rights, while the securities are under the control of the receiver or under the control of Defendant Shkreli;

D.  Taking any action to directly or indirectly influence or control the management or business of any Pharmaceutical Company; Shkreli's public statements about a Pharmaceutical Company will be deemed an action taken to influence or control the management or business of any Pharmaceutical Company if Shkreli intended the statement to have that effect or if a reasonable person would conclude that the statement has that effect;

E.  Serving on, nominating, or otherwise seeking or obtaining representation on the board of directors of a Pharmaceutical Company; or

F.  Obtaining, holding, or exercising any voting or other shareholder rights in a Pharmaceutical Company, including rights assigned to Defendant Shkreli by an Entity or individual, including rights assigned in connection with Shkreli's transfer of Ownership Interest in a Pharmaceutical Company to the Entity or individual.

G.  Defendant Shkreli may submit a notice of his intent to accept Qualified Employment ("Notice") to the Commission and each of the Designated State Representatives by submitting the Notice electronically to the Secretary of the Commission at ElectronicFilings@ftc.gov, the Compliance Division of the Commission at

bccompliance@ftc.gov, and the Designated State Representatives at the email addresses provided in Paragraph I.E of the Order.  The Notice must include a written offer of Qualified Employment, and a verified statement describing the scope and nature of the Qualified Employment and the date on which Defendant Shkreli seeks to accept such Qualified Employment.  Any Plaintiff that receives a Notice complying with the requirements of this Paragraph II.G and does not, within 20 working days after receiving the Notice, inform Defendant Shkreli in writing that it objects to Defendant Shkreli accepting the Qualified Employment because such Qualified Employment involves participation in the pharmaceutical industry, is barred from filing an action for contempt against Defendant Shkreli on the basis that the Qualified Employment violates Paragraph II.B or Paragraph II.D of this Order.

### III. MONETARY JUDGMENT

**IT IS FURTHER ORDERED** that:

A.   Judgment in the amount of $64.6 million is entered in favor of Plaintiff States against Defendant Shkreli, provided that up to $40 million of the judgment is subject to a setoff equal to the equitable monetary relief paid by the Corporate Defendants to the Plaintiff States on or before December 6, 2031 pursuant to the Stipulated Order for Permanent Injunction and Equitable Monetary Relief entered in this matter on December 7, 2021.

B.   Defendant Shkreli is ordered to pay to the Plaintiff States $64.6 million within 30 days of entry of this Order by electronic fund transfer in accordance with the instructions provided by the Plaintiff States, provided that this payment shall be reduced by an amount equal to the equitable monetary relief already paid by Corporate Defendants to the Plaintiff States.

C.   Except as required by Paragraph III.D below, Plaintiff States shall deposit the monetary judgment paid by Defendant Shkreli into a fund administered by Plaintiff New York or its designee ("Equitable Relief Fund").  The Equitable Relief Fund shall be used for equitable relief, including consumer redress and other equitable relief Plaintiff States determine to be reasonably related to Defendant Shkreli's violative practices and injury, any attendant expenses for the administration and distribution of such funds by the Plaintiff States, and repayment of out-of-pocket expenses incurred by the Plaintiff States in this litigation.  Any money remaining in the Equitable Relief Fund after such distributions shall be deposited by the Plaintiff States as disgorgement to be used consistently with their respective state laws, including the funding of future antitrust enforcement.  Any interest earned on amounts deposited into the Equitable Relief Fund will remain in, and become a part of, that fund.

D.   All payments received from Defendant Shkreli that exceed $24.6 million shall be held in a separate escrow account administered by Plaintiff New York.  Plaintiff New York shall refund to Defendant Shkreli monies from the escrow account sufficient to offset the

6

amount of equitable monetary relief paid by the Corporate Defendants in this matter.  On December 6, 2022 and annually thereafter until December 5, 2031, Plaintiff New York shall refund to Defendant Shkreli monies from the escrow account equal to the amount of equitable monetary relief paid by the Corporate Defendants to the Plaintiff States during the preceding year, less any attendant expenses for the administration and distribution of such funds and repayment of out-of-pocket expenses.  All monies remaining in the escrow account on December 7, 2031 shall be deposited into the Equitable Relief Fund.

E.    Defendant Shkreli relinquishes dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets except as explicitly permitted in Paragraph III.D of this Order.  For avoidance of doubt, nothing in this Order shall interfere with any right to appeal from or to move to stay the Court's Order that may otherwise exist.

F.    Defendant Shkreli has no right to challenge any actions that Plaintiff States, or their representatives, may take pursuant to this Equitable Monetary Relief Section of the Order.

## IV. COMPLIANCE REPORTING REQUIREMENTS

**IT IS FURTHER ORDERED** that:

A.    Defendant Shkreli shall submit to the Commission and to each of the Designated State Representatives verified written reports ("Compliance Reports") setting forth in detail the manner and form in which he intends to comply, has complied, and is complying with this Order, in accordance with the following:

1.    Within 60 days of the entry of this Order;

2.    One year after the entry of this Order, and annually thereafter until the later of 10 years or payment of the monetary judgment ordered herein; and

3.    At such other times as the Commission or a Plaintiff State may require.

B.    Each Compliance Report shall contain:

1.    A verified statement by Defendant Shkreli that he is not directly or indirectly participating in any manner in the pharmaceutical industry, except as permitted by Paragraph II.G of this Order;

2.    Each Qualified Employment engagement that Defendant Shkreli has accepted and the following information about the Qualified Employment:

a)    the Entity or individual for whom Defendant Shkreli performed or is performing the Qualified Employment and the name, position, phone number and email address for Defendant Shkreli's primary contact with the Entity or individual,

7

       b)      the starting and ending date of the Qualified Employment,

       c)      a description of the Qualified Employment, and

       d)      a verified statement that Defendant Shkreli is not and has not violated Paragraphs II.A and II.C in performing the Qualified Employment; and

3.    If Defendant Shkreli has not fully satisfied the monetary judgment ordered by this Court, a copy of Defendant Shkreli's most recent tax return, a full and complete accounting of all Defendant Shkreli's assets, and a full and complete accounting of all assets that Shkreli has transferred, sold or otherwise disposed of during the 12 month period preceding the submission of the Compliance Report.

C.    Defendant Shkreli shall submit each Compliance Report to the Commission and each of the Designated State Representatives by submitting the report electronically to the Secretary of the Commission at ElectronicFilings@ftc.gov, the Compliance Division of the Commission at bccompliance@ftc.gov, and the Designated State Representatives at the email addresses provided in Paragraph I.E of the Order.

## V.  ACCESS TO INFORMATION

**IT IS FURTHER ORDERED** that, for purposes of determining or securing compliance with this Order, including payment of the monetary judgment, upon 5 days' notice, Defendant Shkreli shall:

A.    Make himself available for interview, in the presence of counsel, by a duly authorized representative of the Commission or a Designated State Representative; and

B.    Provide to any duly authorized representative of the Commission or a Designated State Representative, during business hours and in the presence of counsel, access to inspect and copy all books, ledgers, accounts, correspondence, memoranda, tax returns, financial statements and all other records and documents in Defendant Shkreli's possession or control that relate to compliance with this Order.

## VI. ATTORNEYS' FEES AND COSTS

**IT IS FURTHER ORDERED** that Plaintiff States may seek attorneys' fees, costs, and related nontaxable expenses in this matter.  Any application for attorneys' fees, costs, and related nontaxable expenses must be filed by motion within 30 days of the entry of this Order.

## VII.   RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for the purposes of construction, modification, and enforcement of this Order.

SO ORDERED THIS ____*4th*____ day of ____*February*____, *2022*.

_____

The Honorable Denise Cote

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
FEDERAL TRADE COMMISSION, STATE OF NEW  :       20cv706 (DLC)
YORK, STATE OF CALIFORNIA, STATE OF     :
OHIO, COMMONWEALTH OF PENNSYLVANIA,     :       MEMORANDUM OPINION
STATE OF ILLINOIS, STATE OF NORTH       :          AND ORDER
CAROLINA, and COMMONWEALTH OF           :
VIRGINIA,                               :
                                        :
                       Plaintiffs,      :
            -v-                         :
                                        :
MARTIN SHKRELI,                         :
                                        :
                       Defendant.       :
                                        :
--------------------------------------- X
```

APPEARANCES:

For plaintiff Federal Trade Commission:
Markus H. Meier
Bradley S. Albert
Armine Black
Daniel W. Butrymowicz
J. Maren Haneberg
Leah Hubinger
Lauren Peay
Neal J. Perlman
James H. Weingarten
Amanda Triplett
Matthew B. Weprin
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580

For plaintiff State of New York:
Elinor R. Hoffmann
Bryan Bloom
Jeremy R. Kasha
Amy E. McFarlane
Saami Zain
Office of the New York Attorney General
Antitrust Bureau
28 Liberty Street, 20th Floor

New York, NY 10005

For plaintiff State of California:
Michael D. Battaglia
Office of the Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

For plaintiff State of Illinois:
Richard S. Schultz
Office of the Attorney General of Illinois
100 W. Randolph Street, 11th Floor
Chicago, IL 60601

For plaintiff State of North Carolina:
Jessica V. Sutton
North Carolina Dept. of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603

For plaintiff State of Ohio:
Beth A. Finnerty
Office of the Ohio Attorney General
150 E. Gay Street, 22nd Floor
Columbus, OH 43215

For plaintiff Commonwealth of Pennsylvania:
Joseph S. Betsko
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120

For plaintiff Commonwealth of Virginia:
Tyler T. Henry
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA 23219

For defendant Martin Shkreli:
Christopher H. Casey
Jeffrey S. Pollack
Andrew J. Rudowitz
Sarah Fehm Stewart
Sean P. McConnell
J. Manly Parks
Duane Morris LLP

30 South 17th Street
Philadelphia, PA 19103

DENISE COTE, District Judge:

On February 4, 2022, following a bench trial, a judgment in
the amount of $64.6 million in equitable monetary relief,
subject to a setoff of up to $40 million, was entered against
defendant Martin Shkreli ("Shkreli") in favor of the seven
plaintiff States.[1] FTC v. Shkreli, No. 20CV00706 (DLC), 2022 WL
336973 (S.D.N.Y. Feb. 4, 2022). Pursuant to Rule 62(a) of the
Federal Rules of Civil Procedure, execution on that monetary
judgment was stayed for 30 days. On the 30th day, which fell on
March 7, Shkreli filed a motion to further stay execution on the
judgment pending the outcome of any appeal he may file and the
posting of purported "other security" in lieu of filing of a
supersedeas bond. The motion became fully submitted on March
16. For the following reasons, Shkreli's motion is denied.[2]

_____

[1] The seven state plaintiffs are the States of New York,
California, Ohio, Illinois, and North Carolina, and the
Commonwealths of Pennsylvania and Virginia.

[2] In his reply, Shkreli requests that any denial of his motion be
without prejudice so that, in the event he recovers any shares
in Phoenixus AG in the future, he may renew his application for
a stay of enforcement proceedings. Any party may make any
motion allowed by the Federal Rules of Civil Procedure, which is
brought in good faith, at any time without prior approval of a
court.

Rule 62(b) provides that "[a]t any time after judgment is entered, a party may obtain a stay by providing a bond or other security."  Fed. R. Civ. P. 62(b).[3]  The Second Circuit has explained that the

> purpose of the rule is to <u>ensure that the prevailing party will recover in full</u>, if the decision should be affirmed, while protecting the other side against the risk that payment cannot be recouped if the decision should be reversed.  A district court therefore may, in its discretion, waive the bond requirement if the appellant provides an acceptable alternative means of securing the judgment.

<u>In re Nassau County Strip Search Cases</u>, 783 F.3d 414, 417 (2d Cir. 2015) (per curiam) (citation omitted) (emphasis added).  A court may consider the following non-exclusive factors in determining whether to waive the <u>supersedeas</u> bond requirement under Rule 62:

> (1) the complexity of the collection process; (2) the amount of time required to obtain a judgment after it is affirmed on appeal; (3) the degree of confidence that the district court has in the availability of funds to pay the judgment; (4) whether the defendant's ability to pay the judgment is so plain that the cost of a bond would be a waste of money; and (5) whether the defendant is in such a precarious financial situation that the requirement to post a bond would place other creditors of the defendant in an insecure position.

<u>Id.</u> at 417–18 (citation omitted).

---

[3] In 2018, the Advisory Committee amended and revised the subdivisions of former Rule 62.  The Committee moved the <u>supersedeas</u> bond provisions of former Rule 62(d) to Rule 62(b), making "explicit the opportunity to post security in a form other than a bond."  Fed. R. Civ. P. 62, 2018 Amendments.

Shkreli moves to stay enforcement of the monetary judgment pending appeal, offering only his remainder interest in shares of Phoenixus AG as substitute for a bond. These shares are currently held by a receiver appointed in Koestler v. Shkreli, 16CV07175, to satisfy the judgment against Shkreli in that unrelated civil case. In Koestler, the plaintiff seeks to collect on a judgment in the amount of $2,614,930 that the plaintiff obtained against Shkreli in 2017. Shkreli argues that shares of a company's stock can constitute "other security" within the meaning of Rule 62(b), and that he should therefore be allowed to post as substitute for a bond any shares left over after the Koestler judgment is satisfied.

Shkreli's proposed bond is insufficient to "ensure that the prevailing party will recover in full." In re Naussau County Strip Search Cases, 783 F.3d at 417. Phoenixus AG is a private company, and it is not clear what the market value of its shares is or even when that value will be determined. It is even unclear whether the sale of the shares will be sufficient to satisfy the judgment obtained by the plaintiff in Koestler. Even if a private company's stock may, under some circumstances, provide an appropriate substitute for a bond under Rule 62(b), Shkreli's future interest in any shares that may remain after the Koestler judgment is satisfied is entirely speculative and

provides no assurance that the plaintiffs here will be able to collect on their judgment after success on appeal.

Shkreli also argues that he should be allowed to post his Phoenixus AG shares as a substitute for a bond because he has no other significant assets that could be used to post a bond or satisfy the judgment against him. This argument, however, cuts against his request, as it effectively concedes the second, third, and fourth <u>Nassau County</u> factors. Courts in this district have often held that such financial difficulties weigh heavily against issuance of a stay without bond. <u>See, e.g.,</u> <u>Frye v. Lagerstrom</u>, No. 15CV05348 (NRB), 2018 WL 4935805, at *4 (S.D.N.Y. Oct. 10, 2018).

### **Conclusion**

The defendant's March 7, 2022 motion to stay the execution of the monetary judgment pending appeal is denied.


Dated:    New York, New York
          March 17, 2022



_____
DENISE COTE
United States District Judge