# 22-728

## United States Court of Appeals
### for the Second Circuit

FEDERAL TRADE COMMISSION, STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF OHIO, COMMONWEALTH OF PENNSYLVANIA, STATE OF ILLINOIS, STATE OF NORTH CAROLINA, COMMONWEALTH OF VIRGINIA,

*Plaintiffs-Appellees,*

v.

MARTIN SHKRELI, individually, as an owner and former director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendant-Appellant,*

VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, KEVIN MULLEADY, individually, as an owner and director of Phoenixus AG and as a former executive of Vyera Pharmaceuticals, LLC,

*Defendants.*

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR APPELLEES STATES OF NEW YORK, CALIFORNIA, ILLINOIS, NORTH CAROLINA, OHIO, PENNSYLVANIA, AND VIRGINIA**

BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
PHILIP J. LEVITZ
 *Assistant Solicitor General*
 *of Counsel*

*(Counsel listing continues on signature pages.)*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for State Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6325

Dated: March 23, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

PRELIMINARY STATEMENT ................................................................ 1

ISSUES PRESENTED ........................................................................... 3

STATEMENT OF THE CASE ................................................................. 3

    A.   Factual Background ................................................................ 3

        1.   Shkreli's anticompetitive scheme ..................................... 4

        2.   Shkreli's control and principal ownership of Vyera .......... 8

    B.   Procedural Background ........................................................... 9

        1.   The FTC and the States' case against Shkreli.................. 9

        2.   The district court's comprehensive post-trial opinion and disgorgement and injunction orders ........................ 11

        3.   Shkreli's contempt of the injunction while this appeal was pending ......................................................... 14

STANDARD OF REVIEW....................................................................... 15

SUMMARY OF ARGUMENT ................................................................. 16

ARGUMENT ....................................................................................... 20

POINT I

THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION
IN REQUIRING SHKRELI TO DISGORGE THE ILL-GOTTEN GAINS
FROM HIS SCHEME................................................................................ 20

**Page**

A.  Shkreli Forfeited His Argument That Federal Equity Jurisprudence Does Not Apply and Fails to Dispute Any of the Factual Findings Supporting Disgorgement. ....... 22

B.  In Any Event, Shkreli's Challenge to the Disgorgement Order Is Meritless. .................................................... 30

   1.  Federal equity jurisprudence properly informs the equitable relief available in this federal proceeding ....... 31

   2.  New York equity jurisprudence permits joint-and-several disgorgement. ....................................... 34

   3.  Equity jurisprudence in the other plaintiff States also permits joint-and-several disgorgement. ................. 41

POINT II

THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN ISSUING ITS PERMANENT INJUNCTION ................................... 44

A.  The Scope of the Injunction Is Appropriately Tailored to Shkreli's Egregious, Repeated, and Unrepentant Misconduct. ............................................................... 44

B.  The Injunction Does Not Impose Unjustified Restraints on Expressive Conduct............................................. 52

C.  The Injunction Appropriately Follows the Default Rule of Having Permanent Effect. ................................. 55

D.  The Injunction Sets Clear Standards and Is Not Vague. ....... 57

CONCLUSION ......................................................... 61

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*212 Inv. Corp. v. Kaplan*,
   2007 N.Y. Slip Op. 51577(U) (Sup. Ct. N.Y. County 2007)...........36-37

*Alaska Right to Life Comm. v. Miles*,
   441 F.3d 773 (9th Cir. 2006).................................................................59

*AMG Cap. Mgmt., LLC v. FTC*,
   141 S. Ct. 1341 (2021)................................................................... 10, 30

*Asphalt Constr. Co. v. Bouker*,
   150 A.D. 691 (1st Dep't 1912)...........................................................36

*Bosworth v. Allen*,
   168 N.Y. 157 (1901) ......................................................................35-36

*California Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972)..............................................................................53

*City of New York v. Lead Indus. Ass'n*,
   190 A.D.2d 173 (1st Dep't 1993) .......................................................37

*Clayworth v. Pfizer, Inc.*,
   49 Cal. 4th 758 (2010)..........................................................................41

*Davilla v. Enable Midstream Partners L.P.*,
   913 F.3d 959 (10th Cir. 2019)............................................................32

*Deerbrook Ins. Co. v. Mirvis*,
   No. 20-1385, 2021 WL 4256845 (2d Cir. Sept. 20, 2021) ..................33

*Doe v. Trump Corp.*,
   6 F.4th 400 (2d Cir. 2021)...................................................................23

*EEOC v. AutoZone, Inc.*,
   707 F.3d 824 (7th Cir. 2013)...............................................................56

*Erie Railroad Co. v. Tompkins*,
   304 U.S. 64 (1938)................................................................................32

**Cases**                                                               **Page(s)**

*ES Dev., Inc. v. RWM Enters., Inc.,*
   939 F.2d 547 (8th Cir. 1991)............................................................ 56

*Fielding v. Allen,*
   181 F.2d 163 (2d Cir. 1950) ............................................................ 31

*Ford Motor Co. v. United States,*
   405 U.S. 562 (1972)........................................................................ 47

*FTC v. Digital Altitude, LLC,*
   No. 18-cv-729, 2018 WL 4944419 (C.D. Cal. July 26, 2018) ............. 47

*FTC v. Gill,*
   265 F.3d 944 (9th Cir. 2001)............................................................ 48

*FTC v. Moses,*
   913 F.3d 297 (2d Cir. 2019) ............................................................ 24

*FTC v. Ruberoid Co.,*
   343 U.S. 470 (1952)........................................................................ 49

*Genovese Drug Stores, Inc. v. Connecticut Packing Co.,*
   732 F.2d 286 (2d Cir. 1984) ............................................................ 31

*In re MF Glob. Holdings Ltd. Inv. Litig. (Deangelis v. Corzine),*
   611 F. App'x 34 (2d Cir. 2015) ........................................................ 33

*J.P. Morgan Securities Inc. v. Vigilant Insurance Co.,*
   37 N.Y.3d 552 (2021) ...................................................................39-40

*Liu v. SEC,*
   140 S. Ct. 1936 (2020).................................................................22, 25

*Mack v. Latta,*
   178 N.Y. 525 (1904) ........................................................................ 38

*Matter of People v. Imported Quality Guard Dogs, Inc.,*
   88 A.D.3d 800 (2d Dep't 2011)........................................................ 47

## Cases                                                               Page(s)

*Matter of People v. Orbital Publ'g Grp., Inc.,*
  193 A.D.3d 661 (1st Dep't 2021) ........................................ 37

*National Ass'n of Mfrs. v. Taylor,*
  582 F.3d 1 (D.C. Cir. 2009) ............................................... 58

*National Soc'y of Pro. Eng'rs. v. United States,*
  435 U.S. 679 (1978) ..................................................... 53, 55

*Omega SA v. 375 Canal, LLC,*
  984 F.3d 244 (2d Cir. 2021) ............................................. 15

*People v. 21st Century Leisure Spa Int'l,*
  153 Misc. 2d 938 (Sup. Ct. N.Y. County 1991) .................... 37

*People v. Ernst & Young LLP,*
  114 A.D.3d 569 (1st Dep't 2014) .................................... 35, 38

*People v. Greenberg,*
  27 N.Y.3d 490 (2016) .................................................... 35

*People v. Northern Leasing Sys., Inc.,*
  70 Misc. 3d 256 (Sup. Ct. N.Y. County 2020) .................... 48

*People v. Rattenni,*
  81 N.Y.2d 166 (1993) .................................................... 33

*Peregrine Myanmar Ltd. v. Segal,*
  89 F.3d 41 (2d Cir. 1996) ........................................... 50, 54-55

*Perfect Fit Indus., Inc. v. Acme Quilting Co.,*
  646 F.2d 800 (2d Cir. 1981) ......................................... 17, 31

*Piercing Pagoda, Inc. v. Hoffner,*
  465 Pa. 500 (1976) ....................................................... 42

*Pollitz v. Wabash Ry.,*
  167 A.D. 669 (1st Dep't 1915) ........................................ 36

| Cases | Page(s) |
|---|---|

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
241 F.3d 232 (2d Cir. 2001) ................................................................ 57

*SEC v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996) ........................................... 15-16, 24, 26

*SEC v. Johnson*,
43 F.4th 382 (4th Cir. 2022) .............................................................. 25

*SEC v. Pentagon Cap. Mgmt. plc*,
725 F.3d 279 (2d Cir. 2013) ............................................................... 24

*SEC v. Posner*,
16 F.3d 520 (2d Cir. 1994) ..................................................... 18, 44, 47

*SEC v. Svoboda*,
409 F. Supp. 2d 331 (S.D.N.Y. 2006)................................................. 29

*Solomon v. Cedar Acres E., Inc.*,
455 Pa. 496 (1974)............................................................................. 43

*SRS Arlington Offs. 1, LLC v. Arlington Condo. Owners Ass'n*,
234 N.C. App. 541 (N.C. Ct. App. 2014) ........................................... 42

*State v. Fashion Place Assocs.*,
224 A.D.2d 280 (1st Dep't 1996) ....................................................... 48

*State v. Midland Equities of N.Y.*,
117 Misc. 2d 203 (Sup. Ct. N.Y. County 1982)................................. 48

*Troyk v. Farmers Grp., Inc.*,
171 Cal. App. 4th 1305 (Cal. Ct. App. 2009) .................................... 42

*U.S. Bank, N.A. v. Cordero*,
191 A.D.3d 490 (1st Dep't 2021) ....................................................... 35

*U.S. SEC v. Liu*,
No. 21-56090, 2022 WL 3645063 (9th Cir. Aug. 24, 2022) .............. 25

**Cases**                                                      **Page(s)**

*United States Civ. Serv. Comm'n v. National Ass'n of Letter Carriers*,
  413 U.S. 548 (1973) .................................................................. 58

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ................................... 19, 44, 49

*Wendt v. Fischer*,
  243 N.Y. 439 (1926) ............................................................. 39

## Laws & Rules

*Federal*

CREATES Act, Pub. L. No. 116-94, 133 Stat. 2534 (2019) .................... 46

15 U.S.C.
  § 1 ................................................................................ 10
  § 2 ................................................................................ 10
  § 45 .............................................................................. 10
  § 53 .............................................................................. 55

21 U.S.C. § 335a ................................................................ 51

*States (alphabetical)*

740 Ill. Comp. Stat. Ann. 10/7 ................................................ 42

N.Y. Executive Law § 63 ...................................................... 10

N.Y. General Business Law § 340 et seq. ................................. 10

Ohio Rev. Code Ann. § 109.81 ............................................... 42

*Rules*

Fed. R. Civ. P. 65 ............................................................... 57

**Miscellaneous Authorities**                                    **Page(s)**

Beth Mole, *Out of Prison, Shkreli Plans "Web3 Drug Discovery"*
  *Platform Backed by Crypto*, Ars Technica (July 26, 2022),
  https://arstechnica.com/science/2022/07/out-of-prison-shkreli-
  plans-web3-drug-discovery-platform-backed-by-crypto/...................14

Charles Alan Wright et al., *Federal Practice and Procedure*
  § 4513 (3d ed. Aug. 19, 2022 update) (Westlaw)...........................32-33

*Restatement (Third) of Restitution and Unjust Enrichment* § 23
  (Mar. 2023 update) (Westlaw)...........................................29

## PRELIMINARY STATEMENT

Defendant Martin Shkreli engaged in an unlawful and anticompetitive scheme to raise the price of a life-saving drug by 4,000% and then eliminate any potential generic drug competition that would reduce the drug's price—thus endangering the lives of vulnerable patients who depended on the drug. The Federal Trade Commission (FTC) and the plaintiff States[1] proved during a seven-day bench trial in the U.S. District Court for the Southern District of New York (Cote, J.) that Shkreli's scheme violated federal and state antitrust laws. On appeal, Shkreli does not dispute any of the district court's liability determinations, or the extensive factual findings underlying them. He contests only the appropriate scope of equitable relief ordered by the district court. This Court should affirm.

*First*, the district court properly exercised its broad equitable discretion to order Shkreli to disgorge on a joint-and-several basis the ill-gotten profits that he and his codefendant companies, Vyera Pharmaceuticals,

---

[1] The plaintiff States are New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia. This brief is filed solely on their behalf.

LLC and its parent Phoenixus AG (together "Vyera"), obtained through Shkreli's unlawful scheme. Shkreli argues for the first time on appeal that New York, rather than federal, equity jurisprudence applies, and that joint-and-several disgorgement is unavailable in New York. But Shkreli forfeited this new argument when he failed to raise it to the district court and instead urged the district court to apply federal equity jurisprudence. In any event, joint-and-several disgorgement is available under federal *and* New York equity jurisprudence, as well as the equity jurisprudence of other plaintiff States, where, as here, codefendants engage in concerted wrongful conduct. Indeed, Shkreli not only participated in the unlawful scheme but devised and implemented it to enrich himself as Vyera's largest shareholder.

*Second*, the district court properly exercised its broad discretion to permanently enjoin Shkreli from participating in the pharmaceutical industry. The district court rightly found that an injunction of this scope is warranted given Shkreli's egregious and deliberate anticompetitive conduct that harmed vulnerable patients; his repetition of similar misconduct at multiple drug companies despite public outcry; his purposeful evasion of restrictions and continued orchestration of his anticompetitive

scheme even while incarcerated for other misconduct; and his continued failure to acknowledge responsibility or express remorse for his misconduct. Contrary to Shkreli's suggestion, courts regularly order similar industry-wide, permanent injunctions.

## ISSUES PRESENTED

1.   Whether the district court reasonably exercised its discretion in holding Shkreli jointly and severally liable for disgorgement of the excess profits from the unlawful scheme he devised and implemented.

2.   Whether the district court reasonably exercised its discretion in issuing a permanent injunction prohibiting Shkreli from participating in the pharmaceutical industry.

## STATEMENT OF THE CASE

## A.   Factual Background

The full background of this case is set forth in detail in the district court's findings of fact and the FTC's brief. The plaintiff States provide the abbreviated background below for reference, based on the district court's undisputed factual findings. *See* Br. for Def.-Appellant (Br.) at 4 n.3.

3

### 1. Shkreli's anticompetitive scheme

This case involves Shkreli's anticompetitive scheme to unlawfully reap monopoly profits at patients' expense by acquiring a life-saving, brand-name drug called Daraprim that did not yet have generic drug competition, and then dramatically increasing the drug's price and creating a web of exclusionary contracts to deny generics the samples they needed to obtain Food and Drug Administration (FDA) approval.

Shkreli previously engaged in similar misconduct beginning in 2011, when he co-founded a pharmaceutical company called Retrophin. To prevent competition from emerging, Shkreli closed distribution of certain brand-name drugs that Retrophin acquired so that potential generic competitors could not access the samples of the drug they needed to conduct the bioequivalence testing that the FDA requires to approve a generic version of the drug. (Special Appendix (S.A.) 40-42; *see also* S.A. 32-38.) Shkreli raised the price of one of the brand-name drugs he acquired while at Retrophin by a factor of 20, from $4,000 to $80,000. (S.A. 42.)

In 2014, Shkreli left Retrophin to found a new pharmaceutical company called Vyera. (Vyera was originally called Turing Pharmaceu-

ticals, before later changing its name in an effort to avoid being associated with Shkreli.) Shkreli's new company was aimed at acquiring brand-name drugs that were especially well suited to his scheme of raising prices while preventing competition. Shkreli sought out drugs that provided the only effective treatment for life-threatening diseases and that had small patient populations, which made it easier for him to carefully control access to the drugs and thus block competitors from developing generic versions of the drugs. (S.A. 42-43.)

By 2015, at Shkreli's direction, Vyera identified Daraprim as a prime drug candidate for acquisition. (S.A. 44.) Daraprim is the unique "gold standard" treatment for toxoplasmosis, a parasitic infection that can cause severe disease and death. (S.A. 44, 47.) Patients who suffer from toxoplasmosis may need to take Daraprim very quickly, within twelve to twenty-four hours, to prevent serious illness or death. These patients are often immunocompromised and thus particularly vulnerable to infection and severe consequences from infection. (S.A. 44-45.) Daraprim had no generic competition at the time of Vyera's acquisition. Vyera purchased the rights to Daraprim for $55 million, more than eleven times the then-most recent annual revenues for the drug. (S.A. 47-48.)

Within days of purchasing Daraprim, Shkreli and Vyera raised the price of the drug from $17.60 to $750 per tablet—an increase of more than 4,000% from the base price. One of Vyera's own top executives testified at trial that the price hike was the "poster child of everything that is considered wrong about the pharmaceutical industry." (S.A. 48.) Following the price hike, Daraprim's sales dropped to between a fifth and a quarter of prior levels. But Vyera nevertheless reaped enormous profits of $55 million to $74 million per year—at least a five-to-seven-fold increase from before the price hike. (*See* S.A. 49.)

At the same time, Shkreli and Vyera made herculean efforts to prevent competitors from entering the market with generic versions of Daraprim—which would bring down Daraprim's price. Shkreli prevented generic drug manufacturers from accessing sufficient quantities of Daraprim to complete the required bioequivalence testing for FDA approval. (S.A. 50-59.) Shkreli and Vyera did so by building a closed distribution system that strictly limited sales to authorized customers and strictly limited the number of pills sold at a given time. (S.A. 52-56.) And Vyera closely monitored sales and took prompt action to prevent any generic manufacturers from getting access to Daraprim. (S.A. 57-59.) For instance,

6

when Vyera's surveillance system flagged a Daraprim sale to a company that has supplied drugs for bioequivalence testing, a Vyera executive met the company's owner in a parking lot the next day to repurchase the Daraprim for $750,000—twice the amount the company had paid for the drug. (S.A. 58.)

Vyera also made similarly aggressive efforts to prevent generic manufacturers from accessing Daraprim's active ingredient, pyrimethamine, by entering exclusive supply agreements with FDA-approved pyrimethamine suppliers. The district court found that there was no purpose to these exclusivity agreements except to block generic manufacturers from competing with Vyera. (S.A. 59-69.) Through these combined efforts, Shkreli's scheme successfully delayed the entry of generic competition to the Daraprim market for at least eighteen months, earning Vyera at least $64.6 million in excess profits—which the district court found was a "conservative" estimate. (S.A. 70-93, 145-148.)

In the face of public outrage against Shkreli's scheme, Shkreli expressed no remorse—and instead proclaimed that he should have raised Daraprim's price higher. (S.A. 141.)

### 2. Shkreli's control and principal ownership of Vyera

Shkreli founded Vyera and served as its first CEO until late 2015, when he was arrested for securities fraud related to his prior business ventures, including at Retrophin. (S.A. 43, 96.) Shkreli also was Vyera's largest shareholder, owning nearly half of its voting shares. (S.A. 97.)

Shkreli made the decision to acquire Daraprim and to implement his scheme with Daraprim, including the massive price hike and the extreme efforts to prevent competition that could bring down the price. When Shkreli's general counsel objected to the price increase, Shkreli fired him. (S.A. 96-97.)

Even after Shkreli's arrest and subsequent conviction and sentencing to seven years in prison, Shkreli continued to control Vyera and his anticompetitive scheme. (S.A. 29 n.9, 97-98.) When he faced any resistance, he threatened to use—and in 2017 and again in 2020 did use—his authority as Vyera's largest shareholder to install loyalist directors and officers who lacked relevant business experience. For example, he installed Kevin Mulleady, Shkreli's partner dating back to his Retrophin days, as a board member and CEO of Vyera. Shkreli also made another individual a board and executive committee member, even though that individual

8

was just three years out of college and had no pharmaceutical experience. (S.A. 98-101; *see also* S.A. 43.) As Shkreli explained from prison, "being on the board . . . means, you know, you're on the Martin and Kevin board," and, if directors and officers do not listen to him, "I have no problem firing everybody to be frank." (S.A. 101.) Shkreli compared himself to Mark Zuckerberg and Vyera to Facebook, explaining that Zuckerberg "just happens to own the thing and that's the way it is," and "[y]ou can't go in there and tell Zuckerberg what to do." (S.A. 101-102.)

Shkreli also stayed in close contact with his directors and officers even from prison, including by using a contraband phone, as he oversaw the continuation of his anticompetitive scheme. (S.A. 66 & n.27.) A log Mulleady maintained while he was a director and CEO showed that he communicated with Shkreli over 1,500 times in a roughly six-month period while Shkreli was incarcerated. (S.A. 101.)

## B.   Procedural Background

### 1.   The FTC and the States' case against Shkreli

The FTC and the plaintiff States filed this action against Shkreli, Mulleady, and Vyera in the U.S. District Court for the Southern District of New York, bringing claims for violations of §§ 1 and 2 of the Sherman

Act, 15 U.S.C. §§ 1-2; § 5(a) of the FTC Act, 15 U.S.C. § 45(a); and state laws of each of the plaintiff States. (Appendix (A.) 136-138, 200-209.) The plaintiffs sought equitable and declaratory relief, including equitable monetary relief such as disgorgement and a permanent injunction to remedy and prevent recurrence of the defendants' anticompetitive conduct. (A. 209-213.) The FTC later withdrew its claim for equitable monetary relief following the Supreme Court's determination that the FTC Act does not permit the FTC to seek such relief. *See AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1352 (2021). The plaintiff States continued to press their claims for equitable monetary relief, including pursuant to their state laws.

On summary judgment, the district court (Cote, J.) ruled that the plaintiff States could pursue their claims against the defendants for disgorgement of the profits they unlawfully obtained. (S.A. 1-16.) The court found it "clear" under New York's antitrust statute, the Donnelly Act, General Business Law § 340 et seq., and Executive Law § 63(12), that New York has authority to pursue disgorgement of the profits that the New York–based defendants obtained nationwide. (S.A. 11-14.) Accordingly, the court found it "unnecessary to decide" whether each of

the other plaintiff States have similar authority under their own state laws. (S.A. 11.)

Shortly before the case was scheduled for trial, defendants Mulleady and Vyera settled the claims against them. Shkreli proceeded to trial. (A. 492-580.)

### 2. The district court's comprehensive post-trial opinion and disgorgement and injunction orders

Following a seven-day bench trial with testimony from dozens of fact and expert witnesses, the district court issued a comprehensive 135-page opinion finding Shkreli liable on all claims. (S.A. 17-151.) As the district court found, Shkreli devised and implemented an anticompetitive scheme through which he acquired Daraprim, raised its price by 4,000%, and then orchestrated elaborate steps to prevent generic drug manufacturers from competing with Daraprim. For example, Shkreli closed off Daraprim distribution channels and blocked generic drug companies from obtaining the active ingredient in Daraprim. (S.A. 42-102.)

The court ordered that Shkreli pay the plaintiff States $64.6 million in disgorgement of the excess profits obtained from his unlawful scheme, "subject to a set-off of any amount paid by the settling defendants."

11

(S.A. 145.) The court explained that joint-and-several liability for Shkreli is appropriate because Shkreli was "the mastermind" and "prime mover" in the anticompetitive scheme. (S.A. 149-150.) Shkreli founded Vyera with the specific intent to raise prices on a life-saving drug "sky-high" and then eliminate competition to reap supra-competitive profits for as long as possible. (S.A. 96.) And that is exactly what he did in the Daraprim scheme, which he drove "each step of the way" (S.A. 149) and continued micromanaging even from federal prison (S.A. 96-102). Moreover, the district court explained that "[a]s Vyera's founder and its largest share-holder, any excess profit gained from Shkreli's scheme directly benefited him." (S.A. 149.)

The court further held that Shkreli should be permanently enjoined from participation in the pharmaceutical industry. (S.A. 140-143.) The court concluded that an injunction of this scope was warranted given the "wealth of evidence" of Shkreli's "egregious, deliberate, repetitive, long-running, and ultimately dangerous illegal conduct"—which was "partic-ularly heartless and coercive" given that immunocompromised patients often need to take Daraprim quickly to avoid serious brain injury or death. (S.A. 140-141.) "Without a lifetime ban," the court found that Shkreli

12

would likely repeat unlawful conduct in the pharmaceutical industry, especially given his demonstrated tendency to "double[] down" on misconduct even "in the face of public opprobrium." (S.A. 141.) The court emphasized that Shkreli "cynically took advantage of the requirements of a federal regulatory scheme designed to protect the health of a nation"; "recklessly disregarded the health of a particularly vulnerable [patient] population"; and "has not expressed remorse or any awareness that his actions violated the law." (S.A. 141-142.) The court specifically found that a narrower injunction would not provide adequate protection against Shkreli's "flagrant and reckless" illegal conduct. (S.A. 143.) As the court observed, "Shkreli has demonstrated that he can and will adapt to restrictions," such as when he used a contraband phone to continue his unlawful scheme from prison. (S.A. 143.)

The district court sought the parties' input on specific language for the injunction. The court then issued the injunction, accompanied by an opinion explaining language used to address certain of Shkreli's concerns, and explaining why other arguments Shkreli had raised were meritless. (S.A. 152-170.)

Shkreli sought stays of the district court's disgorgement order and injunction pending appeal, which the district court denied. (Appellees' Supplemental Appendix (Supp.) 214-229; S.A. 171-176.) The district court again emphasized the "serious risk that, absent the Injunction, Shkreli will reengage in anticompetitive conduct within the pharmaceutical industry," potentially injuring "patients, their families, health care professionals, generic drug manufacturers, and others in the pharmaceutical industry." (Supp. 227.)

### 3. Shkreli's contempt of the injunction while this appeal was pending

While this appeal was pending, press reports indicated that Shkreli, immediately upon his release from prison, was forming a new company called "Druglike," involved in "early-stage drug discovery."[2] Given plaintiffs' concerns that Shkreli's involvement in Druglike appeared to violate the terms of the injunction, plaintiffs invoked the injunction order provisions requiring Shkreli to provide them with a compliance report, relevant

---

[2] *See, e.g.*, Beth Mole, *Out of Prison, Shkreli Plans "Web3 Drug Discovery" Platform Backed by Crypto*, Ars Technica (July 26, 2022), https://arstechnica.com/science/2022/07/out-of-prison-shkreli-plans-web3-drug-discovery-platform-backed-by-crypto/. (*See also* Supp. 231-233.)

documents, and an interview to demonstrate his compliance. Despite plaintiffs' repeated requests, Shkreli failed to provide the full compliance report, documents, and interview plaintiffs requested. As a result of Shkreli's refusal to explain his apparent violation of the injunction, and his continued failure to pay any portion of the disgorgement order against him, plaintiffs filed a motion for an order to show cause why Shkreli should not be found in contempt. (Dist. Ct. ECF Nos. 921-922.) Only after that motion was filed did Shkreli agree to provide the required information and interview, which plaintiffs are currently evaluating. (Dist. Ct. ECF No. 932.)

## STANDARD OF REVIEW

A district court has "broad discretion" to determine whether to order disgorgement and to determine the appropriate disgorgement amount. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996). Accordingly, disgorgement orders are reviewed for abuse of discretion. *Id.* Likewise, a district court has "broad discretion" in issuing and shaping the form of injunctive relief, and issuance of a permanent injunction, and the scope of the injunction, is therefore reviewed for abuse of discretion. *See, e.g.*, *Omega SA v. 375 Canal, LLC*, 984 F.3d 244, 259-60 (2d Cir. 2021).

15

## SUMMARY OF ARGUMENT

I. The district court appropriately exercised its broad discretion in ordering Shkreli to disgorge the excess profits generated from his unlawful scheme on a joint-and-several basis.

I.A. Although Shkreli contends that federal equity jurisprudence regarding disgorgement is inapplicable here and only New York equity jurisprudence governs, he relied exclusively on federal equity jurisprudence below, and so forfeited his new reliance on New York equity jurisprudence. The district court was correct to conclude, pursuant to the federal jurisprudence on which Shkreli himself relied, that joint-and-several disgorgement is appropriate against concerted wrongdoers in order to ensure the return of the full fruits of the wrongdoing, regardless of whether a given defendant personally received the full benefit of the wrongdoing. *See, e.g.*, *First Jersey*, 101 F.3d at 1475. Here, it is undisputed not only that Shkreli is a concerted wrongdoer, but that the whole anticompetitive scheme at issue was Shkreli's "brainchild and he drove it each step of the way." (*See* S.A. 149-150.) There is also no dispute that Shkreli was Vyera's largest shareholder; thus, he necessarily benefited from Vyera's wrongfully obtained profits. (*See* S.A. 149.)

16

I.B. Even if the Court considers Shkreli's forfeited argument that only New York equity jurisprudence should govern the disgorgement order here, that argument fails for multiple independent reasons. First, federal equity jurisprudence properly informs the scope of equitable relief available in federal court, including where, as here, the equitable relief is to remedy state-law violations. *See Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 806 (2d Cir. 1981). Consideration of federal jurisprudence is especially appropriate for remediating state claims like those here, brought pursuant to New York's Donnelly Act, because the New York Court of Appeals has repeatedly held that the Donnelly Act generally should be construed in light of federal precedent.

Second, and in any event, New York courts and the courts in the other plaintiff States exercise broad equitable discretion to order disgorgement, including where codefendants engage in concerted wrongdoing. Indeed, New York courts indisputably have equitable discretion to order disgorgement for the type of claims brought here, i.e., claims brought by the Attorney General under Executive Law § 63(12) for repeated or persistent antitrust violations. And Shkreli fails to present any plausible basis to conclude that New York equity jurisprudence governing such

17

disgorgement is fundamentally different from federal equity jurispru-
dence. To the contrary, multiple New York precedents hold codefendants
who engaged in concerted wrongdoing jointly and severally liable for the
ill-gotten profits obtained.

II. The district court also appropriately exercised its broad discre-
tion to enjoin Shkreli from future participation in the pharmaceutical
industry.

II.A. The injunction is properly tailored to Shkreli's extreme miscon-
duct. That misconduct satisfies the criteria that this Court has held
support a broad injunction. *See, e.g.*, *SEC v. Posner*, 16 F.3d 520, 521-22
(2d Cir. 1994). For example, Shkreli acted with a high degree of scienter
here, at the expense of vulnerable patients whose lives were at risk. He
also has a history of repeated past misconduct and circumventing prior
restrictions designed to prevent such misconduct. And Shkreli has
displayed a continued refusal to acknowledge his misconduct or provide
any assurances against its recurrence.

Contrary to Shkreli's suggestion, similar industry-wide injunctions
have been ordered in many other cases brought under federal and state
law. That is because injunctions need not be limited to the narrow

18

misconduct a defendant has engaged in before, but rather should close all paths to future unlawful conduct. *See, e.g.*, *United States v. Apple, Inc.*, 791 F.3d 290, 339 (2d Cir. 2015).

II.B. The injunction does not improperly burden Shkreli's First Amendment free-speech rights. Shkreli points to the language including "public statements" in the injunction's prohibition against "action" to influence pharmaceutical companies. (*See* S.A. 166.) But the First Amendment is not implicated merely because prohibited actions sometimes involve speech. In any event, to the extent this prohibition implicates the First Amendment at all, it burdens no more speech than necessary to serve the critical government interest in preventing Shkreli from again harming patients by influencing pharmaceutical companies to engage in unlawful conduct.

II.C. The district court also appropriately exercised its discretion in making the injunction against participating in the pharmaceutical industry permanent, particularly given the court's undisputed factual findings as to the egregiousness, repetitiveness, and unrepentant nature of Shkreli's violations. Indeed, permanent injunctions are the default injunctive remedy for violations akin to Shkreli's and are ordered routinely.

II.D. There is nothing vague about the detailed and carefully defined provisions of the injunction. The Supreme Court and other courts have rejected vagueness challenges to the same commonly understood terms at issue here. This Court should do the same.

## ARGUMENT

### POINT I

#### THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN REQUIRING SHKRELI TO DISGORGE THE ILL-GOTTEN GAINS FROM HIS SCHEME

Shkreli does not contest the district court's determinations that he violated both federal and state antitrust laws through an extensive scheme that blocked the entry of generic drug competition for Daraprim—a life-saving medication for vulnerable patients in urgent need—for the purpose of reaping extraordinary monopoly profits from his massive price hike on Daraprim for as long as possible. (*See* S.A 22-23.) Nor does he dispute that, for his state-law violations, the district court had equitable discretion to award the plaintiff States disgorgement of the excess profits earned from his anticompetitive scheme. And Shkreli also does not challenge *any* of the district court's extensive factual findings supporting both its conclusions on liability and the scope of its disgorgement order.

20

Instead, Shkreli contends (Br. at 19-23)—for the first time on appeal—that the district court should have applied solely New York equity jurisprudence, and not federal equity jurisprudence, in fashioning the equitable disgorgement remedy, and that New York equity jurisprudence purportedly does not permit Shkreli to be jointly and severally liable with his codefendants for the full amount of the excess profits garnered from his own unlawful scheme. But Shkreli forfeited this argument by failing to raise it to the district court and instead urging the court to apply the very same federal precedents that he now contends are inapplicable. That forfeiture is dispositive here.

In any event, Shkreli is wrong. The district court correctly looked to federal equity jurisprudence in exercising its equitable disgorgement powers. And New York jurisprudence is not meaningfully different because it too provides courts with broad equitable discretion to craft a disgorgement remedy—including holding Shkreli jointly and severally liable for disgorgement of the excess profits garnered from the anticompetitive scheme that he not only perpetrated with his codefendants, but also orchestrated and controlled.

21

**A.  Shkreli Forfeited His Argument That Federal Equity Jurisprudence Does Not Apply and Fails to Dispute Any of the Factual Findings Supporting Disgorgement.**

Shkreli forfeited his argument that the district court was prohibited from applying federal equity jurisprudence, and was instead required to apply only New York equity jurisprudence, in crafting the disgorgement order. Shkreli never raised any such argument to the district court, before or after the trial. To the contrary, throughout this litigation—including on a motion to dismiss (Mem. at 20-21, Dist. Ct. ECF No. 129), on summary judgment (Mem. at 4-6, Dist. Ct. ECF No. 462), and in pretrial briefing (A. 449-451)—Shkreli relied exclusively on *federal* equity jurisprudence in contending that he should not be ordered to pay the disgorgement that the plaintiff States sought. Indeed, in his pretrial brief (A. 449-450), Shkreli affirmatively urged the district court to rely on federal precedents, including *Liu v. SEC*, 140 S. Ct. 1936 (2020), to determine whether he should be jointly and severally liable for disgorgement of the ill-gotten profits from his scheme.

Shkreli is thus precluded from now arguing that the district court erred in applying the very same federal precedents, including *Liu*, in concluding that Shkreli should be jointly and severally liable for the full

disgorgement amount. (*See* S.A. 148-150 (district court post-trial order applying *Liu* and other federal cases).) It is well established that this Court may not consider arguments that, like Shkreli's, are asserted "for the first time on appeal." *See Doe v. Trump Corp.*, 6 F.4th 400, 410 (2d Cir. 2021) (quotation marks omitted). And considering Shkreli's new argument would be particularly inappropriate here, where Shkreli urged the district court to apply federal equitable jurisprudence and the court then did so in conducting a seven-day bench trial, issuing extensive factual findings, and crafting equitable relief based on those findings.

Shkreli's forfeiture of his new argument is dispositive. The federal equity jurisprudence that the district court applied, and that all of the parties agreed the court should apply, is clear that defendants may be jointly and severally liable for disgorgement where they together engaged in the concerted wrongdoing at issue. And Shkreli does not contest the district court's factual findings that he not only collaborated with his codefendants in unlawfully blocking generic drug competition for Daraprim, but "was the mastermind" of this illegal scheme (S.A. 150), who devised, directed, and controlled the scheme's implementation at every step (*see* S.A. 96-102, 149).

23

As the district court correctly explained (S.A. 148-149), federal courts have discretion to hold defendants jointly and severally liable for disgorgement when they are together deeply involved in forming and implementing the unlawful scheme that generates their ill-gotten excess profits. In *SEC v. First Jersey Securities, Inc.*, for instance, this Court affirmed an order requiring an individual defendant to disgorge profits that accrued to his codefendant company where he was "primarily liable" for the misconduct at issue and was "intimately involved in [its] perpetration." 101 F.3d at 1475 (quotation marks omitted). Indeed, this Court in *First Jersey* rejected the same argument that Shkreli makes here, i.e., that an individual defendant may be required to disgorge solely the profits he "personally received." *See id.*; *see also FTC v. Moses*, 913 F.3d 297, 304, 307 (2d Cir. 2019) (joint-and-several disgorgement against corporate defendants and 50% owner with authority to control corporate defendants' unlawful actions); *SEC v. Pentagon Cap. Mgmt. plc*, 725 F.3d 279, 288 (2d Cir. 2013) (joint-and-several disgorgement against collaborating codefendants).

Contrary to Shkreli's contention (Br. at 32-34), the Supreme Court's decision in *Liu* confirms the availability of disgorgement on a joint-and-

24

several basis where, as here, "partners engaged in concerted wrongdoing" to obtain ill-gotten profits, 140 S. Ct. at 1949. The Court noted that "more remote" relationships between participants and beneficiaries of unlawful schemes might not give rise to joint-and-several disgorgement—such as the relationship between a defendant who directly perpetrated an unlawful scheme and a third-party beneficiary who was less involved. *See id.* But whatever the outer limits of joint-and-several disgorgement liability may be, the Court emphasized that courts have flexibility to impose it when they find, consistent with equitable principles, that codefendants are "partners in wrongdoing." *Id.* Following the Supreme Court's opinion in *Liu*, federal courts have continued to exercise their equitable discretion in determining that joint-and-several disgorgement is appropriate where codefendants engaged in "concerted wrongdoing." *See U.S. SEC v. Liu*, No. 21-56090, 2022 WL 3645063, at *3 (9th Cir. Aug. 24, 2022) (opinion on remand from Supreme Court), *cert. docketed*, No. 22-751 (U.S. Feb. 9, 2023); *see also SEC v. Johnson*, 43 F.4th 382, 390 (4th Cir. 2022) (joint-and-several disgorgement order based on "concerted wrongdoing").

The rule permitting joint-and-several disgorgement orders for partners in wrongdoing makes sense because it is often the case that individ-

ual wrongdoers' relative contributions to, and excess profits from, concerted misconduct in a single scheme cannot be reasonably disentangled. And "any risk of uncertainty in calculating disgorgement should fall on the wrongdoer[s] whose illegal conduct created that uncertainty." *First Jersey*, 101 F.3d at 1475 (quotation and alteration marks omitted). Requiring plaintiffs to trace and prove each wrongdoer's precise contribution to, and excess profits from, their concerted misconduct, and limiting each wrongdoer's disgorgement liability to that amount, would be impractical and likely would lead to under-collection of amounts wrongfully obtained.

The district court plainly acted within its broad discretion in applying these equitable principles here because Shkreli does not dispute the extensive factual findings that he was *far more* than an active partner in concerted wrongdoing with his codefendants. Indeed, the district court found, and Shkreli does not contest on appeal, that he was "the mastermind of [his codefendant company's] illegal conduct and the person principally responsible for it throughout the years." (*See* S.A. 150.)

For example, Shkreli founded Vyera for the purpose of using it "to acquire a pharmaceutical that was the sole source of treatment for a life-threatening ailment, raise the drug's price sky-high, and keep it sky-high

26

for as long as possible by blocking generic competition." (S.A. 96.) Shkreli "then planned, managed, and controlled the execution" of his unlawful scheme.[3] (S.A. 137.) He raised the price of Daraprim from $17.60 to $750 per tablet. (S.A. 48, 97.) He devised the "highly restrictive, closed distribution system for Daraprim" that blocked generic competitors from completing the bioequivalence testing needed to get their product approved. (S.A. 97.) He decided to pursue the exclusive supply contracts that further prevented generic competitors from entering the market. (S.A. 97.) And Shkreli "remained in functional control of Vyera's management and its business strategy even after his arrest" (S.A. 97), using a contraband phone to direct Vyera's operations from prison (S.A. 66, 101, 143).

These undisputed findings amply support the joint-and-several disgorgement order, and the district court further correctly found that "any excess profit gained from Shkreli's scheme directly benefited him."

---

[3] Shkreli's unsupported statement in passing in his brief (at 34) that he was "a mere shareholder rather than an officer or director" at Vyera is simply wrong. As Shkreli acknowledges elsewhere in his brief (at 6-7), he was not only Vyera's founder and largest shareholder, but also both its CEO and chairman of its parent company's board of directors until he was arrested for securities fraud (S.A. 43, 96-97).

(*See* S.A. 149.) Shkreli contends that he "never received a salary" or compensation from Vyera (A. 789), but he was indisputably Vyera's founder and largest shareholder (S.A. 149). And he undertook the anticompetitive scheme for the purpose of extracting enormous profits that would benefit himself. For example, he stated that he took the actions he did at Vyera because "entry of a generic alternative to Daraprim . . . would have significant effect on my investment in the company." (S.A. 149 (quotation marks omitted).) When faced with public criticism for the anticompetitive scheme, he stated that he should have "raised prices higher . . . and made more profits for [Vyera's] shareholders" (Supp. 90; *see also* S.A. 141)—including himself. As the mastermind and driver of an unlawful scheme designed to enrich himself, Shkreli is properly liable for the full disgorgement amount.

Ordering Shkreli jointly-and-severally liable for the disgorgement amount was especially appropriate here because Shkreli did not satisfy his burden to demonstrate that he is liable only for a lesser disgorgement amount than the full excess profits wrongfully obtained from his scheme. Once an enforcer "has demonstrated that the disgorgement amount is a reasonable approximation" of the amount wrongfully obtained—which is

not disputed on appeal here—"the burden shifts to the defendant to demonstrat[e] that he received less than the full amount allegedly misappropriated and sought to be disgorged." *See SEC v. Svoboda*, 409 F. Supp. 2d 331, 344 (S.D.N.Y. 2006) (quotation marks omitted). Shkreli has not offered any evidence to satisfy his burden, and errs in attempting to shift his burden to the plaintiffs.

Moreover, as in other situations of joint-and-several liability, if one codefendant believes that a joint-and-several disgorgement order forces him to disgorge more than he personally owes, he may seek contribution or indemnification from others. *See, e.g.*, *Restatement (Third) of Restitution and Unjust Enrichment* § 23 cmt. a (Mar. 2023 update) (Westlaw) ("An entitlement to indemnity or contribution can potentially arise in any setting in which two parties are jointly and severally liable to a third."). Indeed, the district court here ordered that the settlement payments made by his codefendants will be deducted from the disgorgement amount that Shkreli owes. (S.A. 149.)

29

**B.    In Any Event, Shkreli's Challenge to the Disgorgement Order Is Meritless.**

Even if the Court considers Shkreli's forfeited argument that only New York equity jurisprudence should govern the disgorgement order here, that argument does not assist him, for multiple independent reasons. First, federal equity jurisprudence properly informs the scope of equitable relief available in federal court, including where, as here, the equitable relief is to remedy state-law violations.[4] Second, and in any event, equity jurisprudence in New York and in the other plaintiff States allows joint-and-several liability for disgorgement where, as here, defendants engage in concerted wrongdoing.

---

[4] Federal jurisprudence also governs the scope of equitable relief available in federal court for Shkreli's liability on the States' federal-law claims under the Sherman Act. However, the plaintiff States sought relief for the Sherman Act claims pursuant to Clayton Act § 16, and the district court concluded that the Supreme Court's reasoning in *AMG*, 141 S. Ct. 1341, "appear[ed] to preclude" the States from seeking disgorgement for violations of federal law pursuant to Clayton Act § 16. (S.A. 10 n.6.) The States do not concede that *AMG*, which addressed only the FTC Act, governs the relief available pursuant to Clayton Act § 16, a distinct statute with its own language and history. But this Court need not reach that issue here because the district court properly ordered disgorgement as a remedy for the States' state-law claims. See *supra* at 22-29 & *infra* at 31-43.

30

### 1. Federal equity jurisprudence properly informs the equitable relief available in this federal proceeding.

Shkreli is incorrect in arguing that solely state equity jurisprudence governs a federal court's exercise of its equitable discretion in fashioning a remedy for violations of state laws. As this Court has held, "[s]tate law does not govern the scope of the equity powers of the federal court; and this is so even when state law supplies the rule of decision." *Perfect Fit*, 646 F.2d at 806. Thus, "a federal court may afford an equitable remedy for a substantive right recognized by a State," even if that State's courts could not give it. *Id.* (quotation marks omitted).[5] That is because the equity jurisdiction of the federal courts "is subject to neither limitation or restraint by State legislation, and is uniform throughout the different States of the Union." *Fielding v. Allen*, 181 F.2d 163, 167 (2d Cir. 1950) (quotation marks omitted).

---

[5] Shkreli misplaces his reliance (Br. at 21 n.7) on the fact that a district court once erroneously cited *Perfect Fit* for the proposition that state equity jurisprudence, rather than federal equity jurisprudence, governs equitable remedies in federal court. Indeed, this Court, in vacating that district court's decision, recognized that federal authority governed the requirements for the equitable preliminary-injunction remedy at issue there. *See Genovese Drug Stores, Inc. v. Connecticut Packing Co.*, 732 F.2d 286, 289 n.1 (2d Cir. 1984).

31

The sources on which Shkreli relies (Br. at 19-23) do not alter the result. For example, the treatise section on which Shkreli principally relies recognizes that some federal courts have looked to state authority when determining the type or scope of equitable relief to provide for a state-law violation, apparently in deference to the doctrine of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). *See* Charles Alan Wright et al., *Federal Practice and Procedure* § 4513 (3d ed. Aug. 19, 2022 update) (Westlaw). But the same treatise section also recognizes that other federal courts, including this Court, have concluded that, notwithstanding any duty federal courts might have under *Erie* to apply state law to interpret substantive state legal rights, state law does not limit the scope of federal courts' equitable remedial powers, "'even when state law supplies the [substantive] rule of decision.'" *Id.* (quoting *Perfect Fit*, 646 F.2d at 806); *see also Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 973 (10th Cir. 2019) ("[T]he practice of borrowing state rules of decision does not apply with equal force to determining appropriate remedies, especially equitable remedies, as it does to defining actionable rights."). Indeed, the treatise section emphasizes that the *Erie* doctrine should not be construed to disable federal courts from using their flexible equity powers to provide

remedies that "effect justice expeditiously or creatively," consistent with the substance of state-created rights. Wright et al., *supra*, § 4513.

The cases Shkreli relies upon (Br. at 20-21) are inapposite. First, none of those cases held that federal courts addressing state-law claims are categorically barred from considering federal equity jurisprudence in exercising their equitable remedial powers; these cases simply recognized that state authority could be considered too.[6] Second, none of those cases involved a claim under New York's Donnelly Act, which must "generally be construed in light of Federal precedent'" because that statute was modeled on federal antitrust law. *See People v. Rattenni*, 81 N.Y.2d 166, 171 (1993) (quoting *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335 (1988)). In other words, the Donnelly Act under which New York sued here was intended to provide remedies consistent with those provided by federal jurisprudence. It thus makes sense for a federal court adjudicat-

---

[6] One of the cases Shkreli cites did not involve equitable *remedies* at all. It held only that a substantive *defense* to a state claim was governed by state law. *See In re MF Glob. Holdings Ltd. Inv. Litig. (Deangelis v. Corzine)*, 611 F. App'x 34, 37 (2d Cir. 2015) (summary order). In another case Shkreli cites, the "parties agree[d]" that a state statute governed the available remedies. *See Deerbrook Ins. Co. v. Mirvis*, No. 20-1385, 2021 WL 4256845, at *1-2 (2d Cir. Sept. 20, 2021) (summary order).

ing a Donnelly Act claim to consider equitable remedies available under federal jurisprudence.

Shkreli also misses the mark in arguing (Br. at 22-23) that federal courts should be reluctant to expand state law beyond its existing limits. The district court's disgorgement order does not expand state law; it merely applies the federal court's equitable powers to issue relief consistent with federal equitable principles—which in any case accord with relevant state law (see *infra* at 34-43).

### 2. New York equity jurisprudence permits joint-and-several disgorgement.

In any event, even if New York equity jurisprudence governed the fashioning of disgorgement relief here, New York equity jurisprudence is consistent with federal equity jurisprudence permitting joint-and-several disgorgement, regardless of whether the defendant personally received the full profits to be disgorged. Shkreli's arguments to the contrary (Br. at 27-32) are meritless.

It is undisputed that New York courts have equitable discretion to order disgorgement where the Attorney General proves claims of persistent illegality under Executive Law § 63(12), including where, as here,

the illegality is antitrust violations under the Donnelly Act. *See People v. Greenberg*, 27 N.Y.3d 490, 497 (2016); *People v. Ernst & Young LLP*, 114 A.D.3d 569, 569-70 (1st Dep't 2014). Like their federal counterparts, New York courts exercise broad discretion in fashioning equitable relief. *See generally U.S. Bank, N.A. v. Cordero*, 191 A.D.3d 490 (1st Dep't 2021). And, as under federal equity jurisprudence, the purpose of equitable disgorgement in New York is to require defendants found liable for unlawful conduct to disgorge their ill-gotten profits. *See Greenberg*, 27 N.Y.3d at 497; *Ernst & Young*, 114 A.D.3d at 569-70.

Moreover, New York courts have long granted equitable monetary relief on a joint-and-several basis for concerted wrongdoing—as federal courts have likewise done. In early cases involving equitable accounting—a precursor to modern disgorgement—New York courts consistently recognized that "a court of equity has power to discover and fix the value" of an amount owed in equity, "caused by the wrongful acts of the defendants, and to compel them jointly and severally to pay the aggregate amount over to the plaintiff." *Bosworth v. Allen*, 168 N.Y. 157, 167 (1901). In such cases, individual defendants were liable to account "not only for the money or property in their hands," but also for other amounts "result-

35

ing from their official misconduct." *Id.* at 166. In other words, individual defendants who "participated in [a] wrong" resulting in unlawfully obtained profits owed "the entire amount of those profits" on a joint-and-several basis, "irrespective of the share which each received." *Asphalt Constr. Co. v. Bouker*, 150 A.D. 691, 692, 694 (1st Dep't 1912), *aff'd*, 210 N.Y. 643 (1914); *see also Pollitz v. Wabash Ry.*, 167 A.D. 669, 686 (1st Dep't 1915) (individual defendants who "actively participated" in wrong-doing were jointly and severally liable to account for damages "sustained by reason of their illegal acts").

New York courts today continue to recognize the "significant body of authority" permitting equitable monetary relief to be ordered on a joint-and-several basis "when two or more individuals collaborate in the illegal conduct"—and New York courts approve joint-and-several disgorgement in such circumstances. *E.g., 212 Inv. Corp. v. Kaplan,* 2007 N.Y. Slip Op. 51577(U), at 10 (Sup. Ct. N.Y. County 2007) (quotation marks omitted). Indeed, a New York court has specifically rejected the same argument against joint-and-several disgorgement that Shkreli makes here—that "a disgorgement remedy is personal" and can be imposed only on the actual recipient of the full illicit benefit to be disgorged. *See id.*

(quotation marks omitted). As that court explained, joint-and-several disgorgement is appropriate where, as here, codefendants engaged in concerted wrongdoing, and particularly where, as here, the codefendants each obtained "any benefit that in equity and good conscience [they] should not have obtained," even if not necessarily the full benefit of the scheme. *See id.* (quotation marks omitted); *see also Matter of People v. Orbital Publ'g Grp., Inc.*, 193 A.D.3d 661, 662-63 (1st Dep't 2021) (affirming joint-and-several restitution order for defendant engaged in concerted wrongdoing); *City of New York v. Lead Indus. Ass'n*, 190 A.D.2d 173, 177-78 (1st Dep't 1993) (same); *People v. 21st Century Leisure Spa Int'l*, 153 Misc. 2d 938, 941, 945 (Sup. Ct. N.Y. County 1991) (ordering individual defendant to pay full restitution, rejecting argument "that he cannot be held personally liable because he did not benefit personally").

The New York cases on which Shkreli relies (Br. at 27-29, 30-32) do not come close to showing that the broad equitable discretion of New York courts is any narrower than federal courts' when the courts order disgorgement against multiple defendants that engaged in concerted wrongdoing. Nor would such a narrower scope of discretion make sense when New York's Donnelly Act was modeled on federal antitrust law and intended

37

to provide remedies consistent with those provided by federal juris-prudence. See *supra* at 33.

For example, *Mack v. Latta*, on which Shkreli relies, *approved* of a "court of equity" holding liable "officers and agents of the corporation" who were responsible for misconduct resulting in a corporate codefendant's wrongfully obtained gains. *See* 178 N.Y. 525, 535 (1904). And *Mack* relied on a treatise explaining that a plaintiff in such a case may be awarded relief against individual defendants "*jointly and separately* for the repayment to [plaintiff] of all the moneys" wrongfully obtained by the corporation. *Id.* at 531-32 (quotation marks omitted) (emphasis added). That is precisely the equitable relief appropriately ordered here.[7] And *Ernst & Young* likewise *approved* a disgorgement remedy and emphasized "that maintaining disgorgement as a remedy within the court's equitable powers is crucial." 114 A.D.3d at 570.

---

[7] Shkreli misreads *Mack* in suggesting that the court there affirmed the relief ordered against the individual defendants only "as a matter of legal remedies." *See* Br. at 31. The plaintiff in *Mack* sued exclusively "on the equity side of the court," and the court merely observed in its analysis that relief against the individual defendants would *also* have been available as a matter of legal damages. *See* 178 N.Y. at 527, 529.

*Wendt v. Fischer* does not aid Shkreli because that case declined to order equitable joint-and-several liability against defendants who did not engage in the concerted action that generated the ill-gotten profits. *See* 243 N.Y. 439 (1926). As the court in *Wendt* stated, those defendants "took no part in effecting the resale" of the property that generated the wrongful profits and "had no share in the profits realized" from that resale. *Id.* at 444. Here, by contrast, Shkreli not only participated in the anticompetitive scheme, but took the leading role in effectuating it—as the district court's extensive undisputed findings make crystal clear. (*See* S.A. 96-102, 149-150.)

Shkreli also misconstrues dicta from *J.P. Morgan Securities Inc. v. Vigilant Insurance Co.*, 37 N.Y.3d 552 (2021), *rearg. denied*, 37 N.Y.3d 1228 (2022). That case is irrelevant here because it interpreted the terms of a private insurance contract. And the case did not remotely suggest, much less hold, that joint-and-several disgorgement is unavailable against codefendants engaged in concerted wrongdoing under New York equity jurisprudence. The court in *J.P. Morgan* suggested that certain federal cases that have "require[d] an entity that facilitated wrongdoing to 'disgorge' profits wrongfully obtained *by third parties*" might not be

consistent with New York precedent. *See id.* at 567 (emphasis added). And the court referenced federal cases that had required defendants to disgorge profits obtained entirely by "innocent third parties," not named as defendants, on the ground that the defendants' wrongdoing had ultimately contributed to the third parties' profits. *Id.* (citing *SEC v. Contorinis*, 743 F.3d 296, 304 (2d Cir. 2014); *SEC v. Warde*, 151 F.3d 42, 49 (2d Cir. 1998); *SEC v. Clark*, 915 F.2d 439, 454 (9th Cir. 1990)). But liability for profits earned by innocent third parties has no bearing on the core equitable power to hold codefendants who together engaged in concerted wrongdoing jointly and severally liable for their ill-gotten gains.[8] Both federal and New York courts have long exercised that core power. The district court's joint-and-several disgorgement order was therefore appropriate under New York law, as under federal law.

---

[8] Contrary to Shkreli's suggestion (Br. at 29), the district court here did not rely on any of the federal cases cited in *J.P. Morgan*.

40

### 3. Equity jurisprudence in the other plaintiff States also permits joint-and-several disgorgement.

Moreover, joint-and-several disgorgement is permissible under the equity jurisprudence of other plaintiff States, which brought their own claims against Shkreli and his codefendants pursuant to their own States' laws. The Court may affirm the disgorgement order on that alternative ground, or remand to the district court for consideration of disgorgement under the other plaintiff States' laws.[9]

For instance, as the California Supreme Court has explained, the text of California's antitrust statute, the Cartwright Act, under which California sued here, "shows the Legislature shared Congress's preference for maximizing deterrence and ensuring full disgorgement of profits generated by antitrust violations." *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 777-78 n.16 (2010). And California courts, like federal and New York courts, have approved monetary equitable relief against codefendants

---

[9] Even if the Court concludes that no applicable body of law permits the district court's joint-and-several disgorgement order, the proper course would be to remand for a determination of the disgorgement amount Shkreli owes for his own personal unlawfully obtained gains, because there is no dispute that disgorgement is appropriate at least for such gains.

41

engaged in concerted wrongdoing, without a need to show that a defendant personally received the full profits from the defendants' unlawful conduct. *See, e.g.*, *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1340-43 (Cal. Ct. App. 2009).

Likewise, a North Carolina court has affirmed a joint-and-several disgorgement order against a defendant entity and a codefendant collaborating individual—even though the wrongly obtained profits to be disgorged were "payments received *by* [*the entity*]," not the individual. *See SRS Arlington Offs. 1, LLC v. Arlington Condo. Owners Ass'n*, 234 N.C. App. 541, 543 n.1, 548-49 (N.C. Ct. App. 2014) (emphasis added). This joint-and-several disgorgement order is functionally indistinguishable from the district court's order here.[10]

---

[10] Although there is limited relevant published precedent under the other plaintiff States' laws, those States' laws all emphasize the need for flexible equitable remedies to address violations of their antitrust laws. *See, e.g.*, 740 Ill. Comp. Stat. Ann. 10/7(1) (court "shall enter such judgment as it considers necessary to remove the effects of any violation which it finds" and "may exercise all powers necessary for this purpose"); Ohio Rev. Code Ann. § 109.81(A) ("The attorney general shall do all things necessary under the laws of any state or the federal government to properly conduct any antitrust case in which he acts as attorney at law, including the bringing of an action for equitable relief or for the recovery of damages."); *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 513 (1976)

*(continued on the next page)*

42

Shkreli is incorrect to assert that the plaintiff States "decided to forgo" a disgorgement remedy under state jurisprudence other than New York's. *See* Br. at 25. On the contrary, the States sought equitable monetary relief, including disgorgement, under *each* of their own state laws and federal law throughout the litigation, including in their complaint and subsequent district-court briefing. (*See, e.g.*, A. 212 (Am. Compl.) (seeking any equitable monetary relief necessary to redress and prevent recurrence of defendants' violations of each plaintiff State's law and federal law); Mem. at 6-10, Dist. Ct. ECF No. 466 (summary judgment brief).) The district court simply concluded on summary judgment that, because "[i]t is clear" that New York jurisprudence permits the disgorgement of nationwide profits here, it was "unnecessary to decide" whether any other State permits the same disgorgement. (*See* S.A. 11.)

---

("Where equity assumes jurisdiction for one or more purposes, it will retain jurisdiction for all purposes to give complete relief and to do complete justice between the parties."); *see also Solomon v. Cedar Acres E., Inc.*, 455 Pa. 496, 501 (1974) (equity provides complete relief against all responsible defendants, inclusive of a monetary award).

## POINT II

### THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION IN ISSUING ITS PERMANENT INJUNCTION

The district court also properly exercised its broad discretion in permanently enjoining Shkreli from participating in the pharmaceutical industry. Particularly in cases like this one, which address complex anticompetitive conduct, "[t]he district court has large discretion to model its judgments to fit the exigencies of the particular case and all doubts about the remedy are to be resolved in the Government's favor." *Apple*, 791 F.3d at 339 (quotation and alteration marks, and citation omitted).

### A. The Scope of the Injunction Is Appropriately Tailored to Shkreli's Egregious, Repeated, and Unrepentant Misconduct.

The district court's exhaustive and undisputed factual findings regarding Shkreli's misconduct amply support the court's exercise of its broad discretion to permanently enjoin Shkreli from participation in the pharmaceutical industry. Indeed, the district court's findings fulfill all the criteria that this Court typically looks to in supporting broad injunctive relief, including "a high degree of scienter"; a history of past violations; and a lack of assurances against future violations. *See, e.g.*, *Posner*, 16 F.3d at 521-22 (quotation marks omitted).

44

For example, the district court found that Shkreli's misconduct was "egregious," "heartless," and "deliberate." (S.A. 140-141.) As the court explained, Shkreli "cynically took advantage of the requirements of a federal regulatory scheme designed to protect the health of a nation," in reckless disregard of the highly vulnerable individuals that depended on Daraprim. (S.A. 141.) And Shkreli did so by suddenly making Daraprim 4,000% more expensive than it was before he acquired it—and then devising and implementing an anticompetitive scheme to keep it that way. (S.A. 42-102.)

The court also found that Shkreli's dangerous misconduct was "repetitive" and "long-running" at two different pharmaceutical companies that he founded. (S.A. 140-141.) Moreover, the court found that Shkreli remains "unrepentant," has taken no responsibility for his egregious misconduct, and has only "doubled down" on his misconduct "in the face of public opprobrium." (S.A. 141-143.) And the district court found that Shkreli demonstrated "that he can and will adapt to restrictions," as he

did, for instance, by continuing to orchestrate his unlawful scheme from federal prison, with the help of a contraband phone. (S.A. 143.)[11]

The district properly exercised its discretion in concluding (S.A. 143) that such evidence demonstrated that a narrower, more easily circumventable injunction would not suffice. Indeed, the district court's concerns about Shkreli attempting to evade the injunction have already been validated. Almost immediately after his release from prison, Shkreli tested the limits of the pharmaceutical-industry ban by starting a pharmaceutical-related company, Druglike.

Shkreli is wrong to contend (Br. at 37-50) that the district court abused its discretion by issuing an industry-wide ban. Enjoining defendants from participating in the industry in which they engaged in unlaw-

---

[11] Amicus, the Pensmore Foundation, contends (Br. at 19-26) that uncertainty as to antitrust liability would counsel against a broad injunction. But that would be so only if the defendant—unlike Shkreli—expressed an intent not to repeat the past conduct. In any event, Shkreli does not argue that his liability was uncertain, and his decision not to challenge liability on appeal underscores that his liability is consistent with settled law. In addition, Pensmore's observation that Congress enacted the CREATES Act, Pub. L. No. 116-94, § 610, 133 Stat. 2534, 3130-37 (2019), largely in response to Shkreli's misconduct highlights the egregiousness of his actions and the extraordinary public outrage it inspired—further underscoring the need for a broad injunction against his participation in the pharmaceutical industry here.

46

ful conduct is a common remedy in both federal and state enforcement actions. A case Shkreli cites lists numerous examples of such injunctions in federal cases, including injunctions against participation in industries such as telemarketing, credit repair, and foreclosure and loan modification services. *See FTC v. Digital Altitude, LLC*, No. 18-cv-729, 2018 WL 4944419, at *5 (C.D. Cal. July 26, 2018). Contrary to Shkreli's suggestion (Br. at 43), federal courts have approved industry-wide injunctions in antitrust cases too, *see, e.g.*, *Ford Motor Co. v. United States*, 405 U.S. 562, 575 (1972) (spark-plug manufacturing industry). In fact, this Court has found that an injunction against defendants acting as officers or directors of any public company in *any* industry—rather than one particular industry—is within the courts' broad discretion to craft appropriate equitable relief. *See Posner*, 16 F.3d at 521-22.

New York courts also have approved industry-wide injunctions in enforcement actions like this one, brought pursuant to Executive Law § 63(12). For example, under Executive Law § 63(12), New York courts have permanently enjoined defendants "from selling, breeding, or training dogs, or advertising or soliciting the sale, breeding, or training of dogs," *Matter of People v. Imported Quality Guard Dogs, Inc.*, 88 A.D.3d 800,

47

801-02 (2d Dep't 2011), and from "engaging in any and all acts directly or indirectly involving the offer of sale of real estate securities," *State v. Fashion Place Assocs.*, 224 A.D.2d 280, 280 (1st Dep't 1996). In other cases, New York courts have permanently enjoined wrongdoers from participating in the "business of equipment finance leasing," *People v. Northern Leasing Sys., Inc.*, 70 Misc. 3d 256, 279-280 (Sup. Ct. N.Y. County 2020), *aff'd*, 193 A.D.3d 67 (1st Dep't), *lv. dismissed*, 37 N.Y.3d 1088 (2021), or the "business of mortgage foreclosure consultation," *State v. Midland Equities of N.Y.*, 117 Misc. 2d 203, 208 (Sup. Ct. N.Y. County 1982).

There is also no merit to Shkreli's suggestion (Br. at 42-43) that injunctions must be limited solely to the same specific conduct for which the defendant has been held liable. To the contrary, courts have regularly framed injunctions as broad prohibitions on "participating in any aspect" of a given business. *See, e.g.*, *FTC v. Gill*, 265 F.3d 944, 954 (9th Cir. 2001); *see also Midland Equities*, 117 Misc. 2d at 208 (prohibiting "engaging in the [given] business"). Shkreli contends (Br. at 38-39, 44-50) that the repetitive nature of his past anticompetitive conduct—in which he dramatically raised drug prices and then prevented generic competition—

48

demands a narrower injunction focused exclusively on that precise misconduct. But this is wrong for at least three reasons.

*First*, as explained (see *supra* at 44-46), the fact that Shkreli kept violating the law repeatedly—circumventing restrictions imposed after earlier misconduct—demands a *broader* injunction to ensure that Shkreli cannot engage in further misconduct, not a narrower one.

*Second*, the law is clear that injunctions need not—and often should not—be limited to the narrow path defendants followed in their past misconduct. When a defendant has sought an anticompetitive end in the past, a court need not leave open "'all untraveled roads to that end,'" closing "'only the worn one.'" *Apple*, 791 F.3d at 339 (quoting *International Salt Co. v. United States*, 332 U.S. 392, 400 (1947)). Rather, the court "must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity." *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952). That is precisely what the district court properly did here, crafting an industry-specific ban that is broad enough to close off new avenues for Shkreli to unlawfully eliminate drug competition and profit at the expense of vulnerable patients in the future. By contrast, limiting the district court's discretion to issuing a narrow injunction

49

against Shkreli's precise past misconduct, as in Shkreli's proposed injunction (*see* Br. at 60), would have at least two fatal flaws. As an initial matter, it would unduly complicate enforcement by avoiding the simplicity of a straightforward industry ban. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 52 (2d Cir. 1996). In addition, it would facilitate Shkreli's ability to get around the injunction, just as he has gotten around other restrictions in the past. Shkreli's analogy that a wider fence is not harder to jump (Br. at 49) is misplaced: a wider fence may not be harder to jump, but it is harder to get around.

*Third*, Shkreli's past misconduct in the pharmaceutical industry has not been nearly as cabined as he suggests. His misconduct has not been limited to anticompetitive conduct; he also served substantial prison time for securities fraud, including at one of the same pharmaceutical companies where he engaged in anticompetitive conduct. (*See* S.A. 43, 56.) Moreover, contrary to Shkreli's suggestion (Br. at 44-50), his anticompetitive conduct was not limited to a narrow sector of the pharmaceutical industry, such that participation in other parts of the industry, such as research and development, should have been excluded from the injunction. On the contrary, Shkreli exploited the broad scope of Vyera's

pharmaceutical business to advance his anticompetitive scheme. For instance, as the district court found, Shkreli "used the promise that Vyera would engage in research and development activities to recruit Vyera executives and to induce one of the restrictive supply agreements at issue." (S.A. 156.)

Shkreli's further observation (Br. at 40-41) that certain statutory schemes establish specific debarment procedures has no bearing on the appropriateness of the injunctive relief here—which was issued pursuant to the district court's broad equitable discretion. In any event, Shkreli's conviction for securities fraud appears to qualify him for debarment from submitting new drug applications under the Food, Drug, and Cosmetic Act provision he cites. *See* 21 U.S.C. § 335a(b)(2)(B)(ii) (permissive debarment for individuals convicted of felonies involving fraud). And insofar as Shkreli observes (Br. at 40 & n.13) that there is no debarment procedure for the pharmaceutical industry at large—as there is for other industries—that fact only underscores that the district court could not rely on some other debarment procedure to fully protect patients from Shkreli's

future unlawful practices in the pharmaceutical industry, making its injunction all the more appropriate.[12]

## B. The Injunction Does Not Impose Unjustified Restraints on Expressive Conduct.

There is also no merit to Shkreli's contention (Br. at 50-54) that the injunction imposes unjustified restraints on his First Amendment expression rights. The injunction prohibits "*action* to directly or indirectly influence or control the management or business of any Pharmaceutical Company"—not expression standing alone. (S.A. 166 (emphasis added).) The injunction merely recognizes that "public statements" may "be deemed an action taken to influence or control the management or business of any Pharmaceutical Company if Shkreli intended the statement to have that effect or if a reasonable person would conclude that the statement has that effect." (S.A. 166.) In other words, the injunction recognizes that

---

[12] Shkreli also argues in passing that the injunction's definition of a prohibited "Ownership Interest" in the pharmaceutical industry is overbroad in including "non-voting stock." Br. at 49-50. But Shkreli waived any objection to that definition by not raising it below. (*See* Objs. at 3-5, Dist. Ct. ECF No. 867-2 (challenging certain definitions from the proposed injunction order, but not the "Ownership Interest" definition).) Regardless, it was not an abuse of discretion for the district court to recognize that Shkreli could exercise dangerous influence over a pharmaceutical company with sufficient non-voting stock.

Shkreli may engage in a range of actions, including public statements, to exercise harmful influence or control over pharmaceutical companies—as he has in the past—and so prohibits all such actions.

As the Supreme Court has explained, enjoining actions does not infringe free speech merely because such actions may be "in part initiated, evidenced, or carried out by means of language." *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972) (quotation marks omitted). Indeed, "[s]uch an expansive interpretation of the constitutional guaranties of speech . . . would make it practically impossible ever to enforce laws against agreements in restraint of trade." *Id.*; *see also National Soc'y of Pro. Eng'rs. v. United States*, 435 U.S. 679, 697-98 (1978) (First Amendment protections "do not prevent [district court] from remedying the antitrust violations").

In any event, even if the injunction's explanation that public statements are not to be excluded from covered actions could be construed to restrain Shkreli's speech, the provision would easily pass constitutional muster. Shkreli acknowledges that an injunction is permissible under the First Amendment so long as it "'burden[s] no more speech than necessary to serve a significant government interest.'" Br. at 53 (quoting

*Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994)). Here, the challenged injunction language is narrowly tailored to prohibit only (1) public statements (2) intended to influence or control a pharmaceutical business—as necessary to serve the government's critical interest in preventing Shkreli from again causing harm to patients and others by influencing pharmaceutical company leadership to engage in unlawful conduct, as he managed to do even from federal prison. (*See* S.A. 159.) Thus, the injunction does not violate the First Amendment.

This Court has previously rejected a defendant's First Amendment objections to an injunction provision similar to the one at issue here, which prohibited the defendant from "communicating" in an attempt to "involv[e] or engag[e] herself" in certain "management or operations." *See Peregrine Myanmar*, 89 F.3d at 51-52 (quotation marks omitted). As the Court recognized in *Peregrine Myanmar*, *see id.*, such an injunction is appropriate where, as here (S.A. 143), the injunction could not be drawn more narrowly without compromising its effectiveness.

There is no merit to Shkreli's attempt to distinguish *Peregrine Myanmar* on the basis that the injunction there was purportedly intended "to proscribe only illegal conduct." *See* Br. at 53. In fact, the language of

the injunction there broadly proscribes communications involving the defendant in management or operations, regardless of whether the communications are by themselves illegal, because the district court found that there was a substantial risk that such communications could advance illegality. *See* 89 F.3d at 51-52. Similarly, the injunction in this case proscribes public statements to influence or control a pharmaceutical business, whether illegal or not, because the district court found a substantial risk that such statements could advance illegality too.[13]

## C. The Injunction Appropriately Follows the Default Rule of Having Permanent Effect.

The district court also properly exercised its discretion in making its injunction permanent. The FTC Act expressly permits "the Commission [to] seek, and after proper proof, the court [to] issue, a *permanent* injunction" as the default injunctive remedy for violations. 15 U.S.C. § 53(b) (emphasis added). Accordingly, courts regularly order permanent injunc-

---

[13] Shkreli's reliance on (Br. at 53-54) *National Society of Professional Engineers* is misplaced because that case did not hold that a court may enjoin only particular speech or conduct that the court found illegal. On the contrary, the Supreme Court expressly emphasized in that case that an injunction that "goes beyond a simple proscription against the precise conduct previously pursued" "is entirely appropriate." *See* 435 U.S. at 698.

tions to prevent repetition of unlawful conduct. See *supra* at 46-48 (citing federal and New York cases imposing permanent industry bans).

Here, the district court reasonably concluded that, given the egregiousness, repetition, and remorselessness of Shkreli's misconduct, "[w]ithout a lifetime ban, there is a real danger that Shkreli will engage in anticompetitive conduct within the pharmaceutical industry again." (*See* S.A. 141.) That conclusion was well within the court's discretion.

The two out-of-circuit cases on which Shkreli relies (Br. at 55) are inapposite. In one of the cases, the court found a time limit appropriate for a broad injunction ordered against a large corporate defendant, when the injunction was based on a liability finding regarding a single incident involving a single employee. *See EEOC v. AutoZone, Inc.*, 707 F.3d 824, 829, 844 (7th Cir. 2013). No such circumstances are present here, where Shkreli personally showed himself to be sufficiently incorrigible to necessitate a permanent injunction. *Cf. ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 558-59 (8th Cir. 1991) (injunction of communication related to particular time-limited mall development project should be time-limited). At bottom, these cases show only that different facts may support differ-

ent injunctions; the district court appropriately exercised its discretion here in crafting the injunction based on the facts proved at trial.

## D.  The Injunction Sets Clear Standards and Is Not Vague.

Finally, Shkreli is wrong in contending (Br. at 56-60) that the injunction is too vague to satisfy Federal Rule of Civil Procedure 65(d). That rule provides that an order granting an injunction must "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained." To comply with this rule, an injunction need only "be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240-41 (2d Cir. 2001) (quotation marks omitted). The highly detailed injunction order here easily satisfies that standard. (*See* S.A. 162-170.)

Shkreli argues (Br. at 56) that the injunction does not define the term "pharmaceutical industry." But the injunction does define the term "pharmaceutical company" (S.A. 165), and the plain meaning of the term "pharmaceutical industry" is the industry comprised of pharmaceutical companies.

There also is no merit to Shkreli's contention (Br. at 57-58) that the injunction's prohibition on "participating" in the pharmaceutical industry is improperly vague. As the Supreme Court and the D.C. Circuit have explained in interpreting a regulation and a statute, "there are limitations in the English language with respect to being both specific and manageably brief," and a prohibition on "participating" is "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with." *United States Civ. Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 578-79 (1973) (quotation marks omitted); *accord National Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 24-25 (D.C. Cir. 2009). That is especially so where, as here, the injunction "specifies in separate paragraphs . . . various activities deemed to be prohibited" participation, *United States Civ. Serv. Comm'n*, 413 U.S. at 577, and carves out particular conduct—such as qualified employment here—"as specifically permissible," *National Ass'n of Mfrs.*, 582 F.3d at 25 n.18. (S.A. 166-167.)

Shkreli again misses the mark in complaining (Br. at 56-57) that the injunction is vague in *allowing* him to participate in qualified employment in the pharmaceutical industry. The qualified-employment provision

was added to benefit Shkreli, in response to his own earlier complaints about the injunction. (S.A. 157-158.) And the language leaves no room for ambiguity, with an express definition of "qualified employment" (S.A. 165), and a specified process for ensuring that the parties agree that a given employment opportunity is "qualified employment" (S.A. 166-167).

Contrary to Shkreli's assertion (Br. at 59), there is also nothing improperly vague about the injunction provision prohibiting him from taking action, either directly or indirectly, to influence the management of a pharmaceutical company. As a sister court of appeals elaborated in rejecting another vagueness challenge to a statute using a "directly or indirectly" qualifier (without a scienter restriction), "'[i]ndirectly' is an easily understood word in common English usage." *See Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 783 (9th Cir. 2006). And "the words 'direct and indirect' together" are entirely clear in "describ[ing] the complete universe of possible methods" of doing something, like acting to influence pharmaceutical company management. *See id.*

Finally, Shkreli is incorrect to assert (Br. at 59-60) that the injunction's compliance reporting requirements make the injunction vague. Those provisions are spelled out in great detail, and the provision for an

interview—which Shkreli never challenged on vagueness grounds below (Objs. at 12, Dist. Ct. ECF No. 867-2)—is expressly limited to the "purposes of determining or securing compliance with th[e injunction] Order" (S.A. 168-169). The injunction appropriately leaves out any more specific "topics to be covered" or "duration" and "frequency" for the interviews (Br. at 60), because these will be dependent on the particular compliance concerns that are raised. If anything, the compliance provisions undermine Shkreli's vagueness concerns about other provisions of the injunction because the compliance provisions give Shkreli express opportunities to explain "the manner and form in which he intends to comply, has complied, and is complying" with the injunction before plaintiffs need involve the court. (*See* S.A. 168.)

## CONCLUSION

For all these reasons, this Court should affirm the decision below.

Dated:  New York, New York
        March 23, 2023

                                 Respectfully submitted,

                                 LETITIA JAMES
                                   *Attorney General*
                                   *State of New York*
                                 Attorney for State Appellees


                          By:  */s/ Philip J. Levitz*
                                 PHILIP J. LEVITZ
                                 Assistant Solicitor General

BARBARA D. UNDERWOOD              28 Liberty Street
  *Solicitor General*            New York, NY 10005
JUDITH N. VALE                   (212) 416-6325
  *Deputy Solicitor General*
PHILIP J. LEVITZ
  *Assistant Solicitor General*
    *of Counsel*

*(Counsel listing continues on the following page.)*

61

ROB BONTA
  *Attorney General*
  *State of California*
455 Golden Gate Avenue,
  Suite 11000
San Francisco, CA 94102-7004

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 West Randolph Street,
  12th Floor
Chicago, IL 60601

JOSHUA H. STEIN
  *Attorney General*
  *State of North Carolina*
P.O. Box 629
Raleigh, NC 27602

DAVE YOST
  *Attorney General*
  *State of Ohio*
30 East Broad Street, 26th Floor
Columbus, OH 43215

MICHELLE HENRY
  *Attorney General*
  *Commonwealth of Pennsylvania*
14th Floor Strawberry Square
Harrisburg, PA 17120

JASON S. MIYARES
  *Attorney General*
  *Commonwealth of Virginia*
202 North 9th Street
Richmond, VA 23219

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 11,708 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

 /s/ Kelly Cheung